# Exhibit 4

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| Rodrigo Ribadeneira and | ) | |
| Superdeporte Plus Peru S.A.C., | ) | |
| | ) | |
| Petitioners, | ) | |
| | ) | |
| v. | ) | Civ. No. _____ |
| | ) | |
| New Balance Athletics, Inc., | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

## PETITION TO VACATE ARBITRATION AWARD

Pursuant to Sections 10 and 12 of the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 10, 12 Petitioners Rodrigo Ribadeneira and Superdeporte Plus Peru S.A.C. ("Superdeporte") (collectively "Petitioners") file this Petition to vacate the Partial Final Arbitration Award (the "Award"), dated August 20, 2020, as clarified by the Order on Respondents' Request for Correction and Interpretation of the Partial Final Award, dated November 4, 2020 ("Order"), that was made in this District by a single Arbitrator appointed by the International Centre for Dispute Resolution ("ICDR") in the matter of *New Balance Athletics, Inc. v. PSG et al.* (ICDR Case No. 01-18-0003-1183), as to Petitioners Ribadeneira and Superdeporte.

Petitioners never signed an arbitration agreement with New Balance Athletics, Inc. ("New Balance"), and therefore did not agree with New Balance to arbitrate any claims. The Award should be vacated under the Federal Arbitration Act because "the arbitrator[] exceeded [his] powers, or so imperfectly executed them that a mutual, final, and indefinite award upon the subject matter submitted was not made." 9 U.S.C. § 10(a)(4). The Arbitrator here exceeded his authority

1

by determining in the first instance the gateway arbitrability question of whether Ribadeneira and Superdeporte were bound by the arbitration agreement. The Arbitrator also exceeded his authority by resolving that question in the affirmative, in conflict with well-established law providing six exceptions to the rule that nonsignatories to an arbitration agreement may not be bound thereto. None of those exceptions applies here based on the law and the undisputed facts.[1]

## PARTIES

1.      Petitioner Rodrigo Ribadeneira is an Ecuadorian entrepreneur who wholly or partially owns corporate entities, including an indirect ownership of Superdeporte through other holding companies, that have made investments in Peru, as well as in other countries in Latin America. Mr. Ribadeneira's address is at Hidalgo de Pinto, Quito, Ecuador.

2.      Petitioner Superdeporte is a limited liability company registered under the laws of Peru, with its registered office located at Av. Larco Nro. 1301 Int. 301, Miraflores, Peru. Superdeporte is in the business of distributing athletic footwear, apparel, and accessories.

3.      Respondent New Balance is a company registered under the laws of Massachusetts, with its registered office located at Boston Landing, 100 Guest Street, Boston, Massachusetts 02135. New Balance is in the business of designing, manufacturing, marketing, and distributing athletic footwear, apparel, and accessories.

## JURISDICTION AND VENUE

---

[1]   While Petitioners are not challenging certain of the other factual and legal findings or conclusions reached by the Arbitrator, they by no means accept them as correct interpretations of the underlying facts or law, and they do not challenge them here given the very limited circumstances under which a party may challenge an arbitral award pursuant to the requirements of the Federal Arbitration Act.

4. Pursuant to 28 U.S.C. § 1332(a), this Court has jurisdiction over this matter because there is diversity of citizenship, and the amount "in controversy exceeds the sum or value of $75,000, exclusive of interest and costs[.]"

5. Venue is proper under 9 U.S.C. § 10 because the Award, the Order, and the related findings and rulings, that are the subject of this Petition were all made in this District by an ICDR-designated Arbitrator sitting in Boston, Massachusetts.

## FACTS

6. Mr. Ribadeneira initiated a relationship with New Balance in 1992, whereby one of the entities he owned began distributing sportswear for New Balance in Ecuador. In 2000, after the relationship between the parties had developed well in Ecuador, the parties extended their relationship to cover Peru. The relationship progressed well in Peru for the following 10 years.

7. At the end of 2009, Peruvian Sporting Goods S.A.C. ("PSG") was created, with Ribadeneira as PSG's ultimate majority shareholder through various intervening corporate entities.

8. At the beginning of 2010, PSG and New Balance entered into a distribution agreement for the distribution of New Balance's products in Peru.

9. On January 1, 2013, New Balance and PSG entered into a further Distribution Agreement (the "Distribution Agreement"), which is at issue in this proceeding. The Distribution Agreement governed the sale and distribution of New Balance's products in Peru. Article 21 of the Distribution Agreement states, in relevant part: "The parties agree that any and all disputes (whether in contract or any other theories of recovery) related to or arising out of this Agreement or the relationship, its application and/or termination (including post-termination obligations) shall be settled by final and binding arbitration in accordance with the UNCITRAL Arbitration Rules"

(the "Arbitration Clause").  A true and accurate copy of the Distribution Agreement is attached hereto as Exhibit 1.

10.     Neither Ribadeneira nor Superdeporte are signatories to the Distribution Agreement between New Balance and PSG, or the Arbitration Clause contained therein.

11.     The Distribution Agreement was valid under its original terms until December 31, 2015.  However, if neither party expressed an intention to let the Distribution Agreement expire, then (by its terms) the Distribution Agreement would automatically renew for an additional year, i.e., until December 31, 2016.  By the end of the Distribution Agreement's original term, neither party expressed an intention to let the Distribution Agreement expire, and thus it automatically renewed until December 31, 2016.

12.     Starting in late 2014 and culminating in 2015, New Balance made an offer to PSG to enter into a new and reformed distribution agreement for its business in Peru.  Per New Balance's requirements for the new distribution agreement, PSG would enter into the agreement through a different corporate entity, which had distinct capabilities from PSG, which ultimately, after the formation of Superdeporte in early 2016, became Superdeporte.

13.     In mid-2015, PSG and New Balance began negotiating the new agreement.  PSG believed that, by late 2015 and with minor amendments in January 2016, an agreement had been reached between PSG and New Balance, with Superdeporte ultimately to replace PSG in the new agreement.  However, on May 30, 2016, New Balance informed PSG and Superdeporte that it believed no distribution agreement existed between New Balance and Superdeporte and that it was "reverting back" to the original 2013 distribution agreement that New Balance had in place with PSG.

4

14.     Shortly thereafter, on June 23, 2016, New Balance notified PSG and Superdeporte in writing that it was formally terminating the Distribution Agreement with PSG effective December 31, 2016.  On July 8, 2016, New Balance informed PSG and Superdeporte that New Balance had decided to work with another distributor in Peru beginning in 2017.

15.     On November 25, 2016, PSG and Superdeporte executed two similar assignments of rights contracts with Ribadeneira, assigning to him all of their rights to the claims initiated against New Balance with respect to the new, unsigned agreement that New Balance claimed to be ineffective.

16.     Subsequently, in January 2017, Ribadeneira initiated civil legal proceedings against New Balance before Peruvian civil courts.  Ribadeneira claimed that New Balance failed to honor its obligations under the new agreement and alleged extracontractual claims arising from New Balance's failure to conduct itself in good faith under Peruvian law with respect to the negotiation and execution of the new agreement (the "Peru Claims").

17.     On February 1, 2017, Ribadeneira filed a request with the Peruvian civil courts for interim relief.  Ribadeneira asked the court to order New Balance to abstain from the distribution of its products in Peru with any distributor other than PSG, claiming that the new agreement was in effect and that, as such, New Balance should not be distributing products through the new distributor.

18.     In December 2017, the Peruvian civil court ordered a halt on the distribution of New Balance products in Peru during the pendency of the proceeding.

19.     On July 31, 2018, the Peruvian court lifted its interim order, formally permitting the distribution of New Balance products in Peru.

20.     On May 2, 2019, PSG, Superdeporte, and Ribadeneira executed two similar assignment of rights contracts in which Ribadeneira transferred all the right to proceed with the claims he possessed against New Balance back to PSG and Superdeporte.

21.     New Balance initiated an arbitration proceeding against PSG and Ribadeneira on July 31, 2018.  New Balance argued that PSG and Ribadeneira had breached the Distribution Agreement for failure to pay money due thereunder.  A true and accurate copy of the Notice of Arbitration is attached hereto as Exhibit 2.

22.     PSG and Ribadeneira responded on September 4, 2018, arguing (*inter alia*) that the Arbitrator did not have jurisdiction over Ribadeneira because he was not a party to the Distribution Agreement.  A true and accurate copy of the Response is attached hereto as Exhibit 3.

23.     PSG and Ribadeneira amended their response on October 29, 2018, and, while reiterating their jurisdictional objection as to Ribadeneira, asserted a counterclaim against New Balance for breaching the Distribution Agreement.  A true and accurate copy of the Amended Response to the Notice of Arbitration and Counterclaim is attached hereto as Exhibit 4.

24.     On January 25, 2019, New Balance moved to compel PSG and Ribadeneira to arbitrate the claims then pending against New Balance in Peru.  A true and accurate copy of the Motion to Compel Arbitration is attached hereto as Exhibit 5.

25.     In their response of February 4, 2019, PSG and Ribadeneira reiterated their objection that the Arbitrator did not have jurisdiction over Ribadeneira, as he was never a party to the Distribution Agreement.  A true and accurate copy of the Response to Claimant's Jurisdictional Objections is attached hereto as Exhibit 6.

26.     On March 18, 2019, the Arbitrator granted New Balance's motion to compel arbitration, holding, in relevant part, that "[it] is the claims that are subject to arbitration."  A true

and accurate copy of the Memorandum and Order on Claimant's Motion to Compel Arbitration is attached hereto as Exhibit 7.

27.     On May 3, 2019, New Balance amended its notice of arbitration to add Superdeporte as a respondent and to add a claim against PSG, Superdeporte, and Ribadeneira for tortious interference with New Balance's new distribution arrangement with its new distributor in Peru as a result of the Peru Claims.  A true and accurate copy of the Motion to Amend is attached hereto as Exhibit 8.

28.     PSG, Ribadeneira, and Superdeporte moved for summary disposition on May 31, 2019, asserting, in relevant part, that the Arbitrator did not have jurisdiction over Ribadeneira, explaining the general rule under Massachusetts law that a nonsignatory could not be bound to an arbitration agreement, and that none of the six exceptions applied.  A true and accurate copy of the Motion for Summary Disposition is attached hereto as Exhibit 9.

29.     On August 20, 2019, the Arbitrator denied the motion for summary disposition. The Arbitrator noted his prior holding that he had jurisdiction over the Peru Claims filed by Ribadeneira, and further held that because New Balance's tortious interference claim arose from the Peru Claims, he had jurisdiction over Ribadeneira with regard to the tortious interference claim as well.  The Arbitrator deferred ruling until the close of discovery on the question whether he had jurisdiction over Ribadeneira with respect to New Balance's original claim for breach of the Distribution Agreement based upon a theory of piercing the corporate veil.  A true and accurate copy of the Memorandum and Order on Respondents' Motion for Summary Disposition is attached hereto as Exhibit 10.

30.     Following discovery, PSG, Superdeporte, and Ribadeneira renewed their motion for summary disposition on February 12, 2020, and again asserted that the Arbitrator did not have

7

jurisdiction over Ribadeneira or Superdeporte with respect to any of New Balance's claims. A true and accurate copy of the Renewed Motion for Summary Disposition is attached hereto as Exhibit 11.

31.   The parties held a hearing in the case on March 9-11 and May 30, 2020 and PSG, Superdeporte and Ribadeneira again argued that the Arbitrator had no jurisdiction over Ribadeneira and Superdeporte under New Balance's claim for breach of the Distribution Agreement. A true and accurate copy of excerpted portions of the Hearing Transcript is attached hereto as Exhibit 12.

32.   PSG, Superdeporte and Ribadeneira reiterated this argument in their June 30, 2020 post-hearing brief. A true and accurate copy of the Post-Hearing Brief is attached hereto as Exhibit 13.

33.   On August 20, 2020, the Arbitrator issued the Award. A true and accurate copy of the Memorandum of Decision and Partial Final Award is attached hereto as Exhibit 14.

34.   As relevant here, the Arbitrator determined that PSG was liable for breaching the Distribution Agreement and that Superdeporte was also liable for the breach as PSG's "business successor." As to the tortious interference claim, the Arbitrator stated:

> . . . I find that the respondents employed improper means in order to obtain their desired result, an outcome that restrained sales by New Balance for approximately seven months, and caused the claimant lost earnings for at least four of those months. This finding applies to the three respondents. While the material misrepresentations were submitted to the [Peruvian] court on behalf of Ribadeneira, I find that the assignments from PSG and Superdeporte created principal-agent relationships rendering the principals as well as the agent responsible for the losses caused.

Ex. 14 at 22.

35.   On September 17, 2020, PSG, Superdeporte, and Ribadeneira requested correction of the Award, interpretation of the Award, and/or the issuance of an additional award. A true and

accurate copy of the Request for Correction and Interpretation of the Partial Final Award and/or for the Issuance of an Additional Award is attached hereto as Exhibit 15.

36.     As relevant here, they again objected to the Arbitrator's exercise of jurisdiction over Ribadeneira and Superdeporte, noting:  "Since the start of this Arbitration, Respondents Ribadeneira and Superdeporte consistently have maintained that this Tribunal does not have jurisdiction to arbitrate any claims with respect to these Respondents, because neither has ever consented to arbitrate any claims with New Balance, and because there is no legal doctrine or set of facts that can require them to arbitrate claims against New Balance over their objection." Ex. 15 at 7.

37.     They also explained that arbitral jurisdiction over a claim does not, standing alone, confer arbitral jurisdiction over a person who has the right to advance that claim.  Respondents pointed out that in the Award, "the Tribunal did not explain the reasons as to why it was asserting jurisdiction over Respondents Ribadeneira and Superdeporte, nor what evidence, if any, it relied upon to deny Respondents' jurisdiction objections and to assert jurisdiction over them" and that "[i]t also did not explain what legal doctrine or doctrines it is relying upon to deny Respondents' jurisdictional objections and to assert jurisdiction over Respondents Mr. Ribadeneira and Superdeporte or its legal reasoning for doing so." *Id*. at 9.

38.     The Arbitrator denied that request in the Order issued on November 4, 2020.  He stated that he had "exercised jurisdiction with respect to Superdeporte by imposing joint liability on that company (together with PSG) for amounts owed under the 2013 distribution agreement based on [his] finding that it is the business successor to PSG."  He further stated that he had "exercised jurisdiction over Ribadeneira and Superdeporte, and ha[d] concluded that each is liable (together with PSG) with respect to New Balance's tortious interference claim, because the Peru

claims, so-called, from which that interference arose were pursued by Ribadeneira pursuant to assignments of those claims by PSG and Superdeporte." A true and accurate copy of the Memorandum and Order on Respondents' Request for Correction and Interpretation of the Partial Final Award and/or for the Issuance of an Additional Award is attached hereto as <u>Exhibit 16</u>.

## **COUNT I**

39.     Petitioners incorporate all previous paragraphs as if fully set forth here.

40.     Pursuant to Section 10(4) of the FAA, 9 U.S.C. § 10(a)(4), "the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration – (4)where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made."

41.     The Arbitrator here exceeded his authority by determining in the first instance the gateway arbitrability question of whether Ribadeneira and Superdeporte were bound by the Arbitration Clause.

42.     Accordingly, the arbitration award as to Petitioners Ribadeneira and Superdeporte should be vacated.

## **COUNT II**

43.     Petitioners incorporate all previous paragraphs as if fully set forth here.

44.     The Arbitrator exceeded his authority by resolving the arbitrability question of whether Ribadeneira and Superdeporte were bound by the Arbitration Clause in the affirmative, in conflict with well-established law providing six exceptions to the rule that nonsignatories to an arbitration agreement may not be bound thereto.

45.     Accordingly, the arbitration award as to Petitioners Ribadeneira and Superdeporte should be vacated.

## **PRAYER FOR RELIEF**

Wherefore, Petitioners pray that this Honorable Court enter an Order that:

A.     Vacates the arbitration award as to Petitioner Ribadeneira;

B.     Vacates the arbitration award as to Petitioner Superdeporte; and

C.     Provides further relief as this Honorable Court deems just and equitable.

Date: February 1, 2021

Respectfully submitted,

Rodrigo Ribadeneira and
Superdeporte Plus Peru S.A.C.

By their attorneys,

*/s/ Gregg Badichek*
Gregg Badichek (BBO #706270)
greggbadichek@quinnemanuel.com
111 Huntington Ave, Suite 520
Boston, MA 02199
Tel: 617-712-7100
Fax: 617-712-7200

David M. Orta, *pro hac vice application
forthcoming*
davidorta@quinnemanuel.com
Julianne Jaquith, *pro hac vice application
forthcoming*
juliannejaquith@quinnemanuel.com
1300 I Street NW, Suite 900
Washington, D.C. 20005
Tel: +1 202 538 8000
Fax: +1 202 538 8100

David Cooper, *pro hac vice application
forthcoming*
davidcooper@quinnemanuel.com
51 Madison Ave, 22nd floor
New York, NY 10010
Tel: +1 212 849 7000
Fax: +1 212 849 7100

*Attorneys for Petitioners*

## CERTIFICATE OF SERVICE

I hereby certify that on February 1, 2021, I caused a true and correct copy of the foregoing Petition and related Exhibits to be served on the following counsel by email:

Mark E. Tully
Kate MacLeman
Dylan Schweers
Goodwin Procter LLP
100 Northern Avenue
Boston, MA 02210
MTully@goodwinlaw.com
KMacLeman@goodwinlaw.com
DSchweers@goodwinlaw.com

*/s/ Julianne Jaquith*
Julianne Jaquith

# EXHIBIT 1

# DISTRIBUTION AGREEMENT

## BY AND BETWEEN

### NEW BALANCE ATHLETIC SHOE, INC

### AND

### PERUVIAN SPORTING GOODS S.A.C.

LIBC/4349355.3

Arbitration
Exhibit

1

PSG00005497

# TABLE OF CONTENTS

| | | |
|---|---|---|
| 1. | BASIC TERMS AND DEFINITIONS | 1 |
| 2. | ADDITIONAL DEFINITIONS | 2 |
| 3. | APPOINTMENT OF DISTRIBUTOR | 3 |
| 4. | TERRITORY | 4 |
| 5. | TERM | 4 |
| 6. | TERMS AND CONDITIONS OF SALE TO DISTRIBUTOR | 5 |
| 7. | CERTAIN COVENANTS OF DISTRIBUTOR | 8 |
| 8. | MINIMUM SALES REQUIREMENTS | 12 |
| 9. | DISTRIBUTION OF OTHER PRODUCTS | 13 |
| 10. | RETURN AND PURCHASE OF INVENTORY | 13 |
| 11. | TRADEMARKS AND AUTHORIZED DOMAIN NAME | 14 |
| 12. | AUTHORITY OF DISTRIBUTOR; REPRESENTATION | 16 |
| 13. | RETURNED PRODUCTS | 17 |
| 14. | DISTRIBUTION FEE | 17 |
| 15. | CONFIDENTIALITY | 19 |
| 16. | TERMINATION | 20 |
| 17. | OBLIGATION ON TERMINATION | 21 |
| 18. | FORCE MAJEURE | 22 |
| 19. | INSPECTION | 23 |
| 20. | GOVERNING LAW | 23 |
| 21. | ARBITRATION | 23 |
| 22. | NOTICES | 24 |
| 23. | FAILURE TO ENFORCE | 24 |
| 24. | ENTIRE AGREEMENT - MODIFICATIONS | 24 |
| 25. | ASSIGNABILITY | 25 |
| 26. | INVALID PROVISIONS | 25 |

i

PSG00005498

## DISTRIBUTION AGREEMENT

THIS AGREEMENT, made and entered into as of the Effective Date by and between:

NEW BALANCE ATHLETIC SHOE, INC., having its principal offices at Brighton Landing, 20 Guest Street, Boston, Massachusetts, USA (hereinafter "**COMPANY**"),

ON THE ONE HAND,

AND

PERUVIAN SPORTING GOODS S.A.C., having its principal office at Carretera Panamericana KM, 1303 mz, B lote 4 Zofratacna, Tacna, Peru (hereinafter "**Distributor**"),

ON THE OTHER HAND.

WHEREAS Distributor desires to obtain from COMPANY and COMPANY desires to grant to Distributor, on the terms and conditions set forth below, the right to import, sell and distribute the Products (as hereinafter defined) in the Territory (as hereinafter defined); and

WHEREAS COMPANY is entering into this Agreement based on assurances that Distributor will devote its best efforts to market and sell said Products in the Territory and otherwise adhere to all the terms and conditions of this Agreement.

NOW THEREFORE, in consideration of the mutual covenants herein set forth, the parties hereby agree as follows:

1.   BASIC TERMS AND DEFINITIONS

    (a)   "**Approved Channels**" shall have the meaning set forth in Exhibit A.

    (b)   "**Authorized Domain Name**" shall mean www.newbalance.com.ec



    (c)   "**COMPANY Bank Account**" shall mean:

> New Balance Athletic Shoe, Inc.
> Account Number: 0501232733
> Bank Name: Bank of America
> New York, New York
> ABA #: 026009593

    (d)   "**Distributor's Notice Address**" shall mean:

> Carretera Panamericana KM
> 1303 mz. B lote 4 Zofratacna
> Tacna, Peru
> TELEFAX: (5932) 484-195

LIBC/4049355.3

(e)     "**Ecuador Distribution Agreement**" means the Distribution Agreement between COMPANY and Distribuidora Deportiva DIDE SA. dated January 1, 2013.

(f)     "**Effective Date**" shall mean January 1, 2013.

(g)     "**Fee**" shall have the meaning set forth in Exhibit B.

(h)     "**Initial Term**" shall commence on the Effective Date and end on the day prior to the third anniversary of the Effective Date.

(i)     "**Minimum Advertising Expenditure**" shall have the meaning set forth in Exhibit C.

(j)     "**Minimum Fee**" shall have the meaning set forth in Exhibit D.

(k)     "**Minimum Sales Requirement**" shall have the meaning set forth in Exhibit E.

(l)     "**Territory**" shall mean Peru.

(m)     "**Trademark**" shall mean collectively: "New Balance", "NB" and "N".

2.     ADDITIONAL DEFINITIONS

For purposes of this Agreement, the following definitions shall apply:

(a)     "**Accessory**" or "**Accessories**" shall mean hats, socks and bags.

(b)     "**Affiliate**" shall mean any legal entity controlled directly or indirectly to the extent of a holding of at least fifty (50%) percent of the share capital of such entity by either of the parties or so controlled by or under such common control with one of them.

(c)     "**Annual Period**" shall mean the twelve (12) month period commencing on the Effective Date or an anniversary of the Effective Date.



(d)     "**Authorized Suppliers**" shall mean entities which COMPANY advises Distributor in writing from time to time that it has authorized to manufacture Products for sale to distributors and other third parties.

(e)     "**Competing Products**" shall mean any products similar to the Products or which can be put to identical or similar uses or which might compete with or hinder the sale of the Products.

(f)     "**Domain Names**" shall have the meaning set forth in Section 11(d).

(g)     "**Exchange Rate**" shall mean the exchange rate converting the local currency(ies) in the Territory to U.S. dollars as published in *The Wall Street Journal* two business days prior to the date a payment or report, as the case may be, is due.

2

LIBC/4349355.3

PSG00005500

(h)    "**Internet**" shall mean the world wide web or any similar public computer network or electronic media.

(i)    "**Net Selling Price**" shall mean the gross selling price as invoiced by Distributor or Distributor's Affiliate, as the case may be, (after deduction of bona fide trade discounts to the extent customary in the trade, freight charges, and value added type taxes included in the gross selling price) less only accepted returns from purchasers of the Products and defective Products for which credit is given to Distributor's customers. No deduction is allowed for costs incurred in the sale, distribution or advertising of Products (including co-op and promotional allowances) nor shall any deduction be allowed for uncollectable accounts or cash discounts. If Distributor sells Products to an Affiliate or other party controlled by or related to Distributor, or to a series of Affiliates or controlled or related parties, Net Selling Price shall be calculated on the basis of the Net Selling Price for such Product charged by such Affiliate(s) or controlled or related party(ies) on resale of such Product to a third party which is not an Affiliate or other controlled or related party.

(j)    "**Products**" shall mean COMPANY's footwear, apparel and Accessory products bearing one or more of the Trademarks as set forth in COMPANY'S current approved country assortment plan, as modified from time to time, a copy of the original version of which has been delivered to Distributor prior to the Effective Date. Products expressly exclude any products using any other trademarks, tradenames, or logos which COMPANY or its Affiliates may own or have the right to use, other than the Trademarks.

(k)    "**Promotional Products**" shall have the meaning set forth in Section 11(e).

### 3.    APPOINTMENT OF DISTRIBUTOR



(a)    COMPANY hereby appoints Distributor, which accepts, for the term of this Agreement and subject to the terms and conditions hereof, its exclusive distributor to distribute at the wholesale level of trade and sell the Products to retail dealers and others selling in Approved Channels and who sell to ultimate users in the Territory; provided, however, that Distributor may not distribute and sell Products to retail dealers, and others, whose primary business is the sale to ultimate users over the Internet. COMPANY, in its sole discretion, may waive the foregoing provision in writing upon written request by Distributor. To the extent such designation is exclusive means that COMPANY shall not appoint any third party located within the Territory for the sale or distribution of the Products in the Territory to retail dealers and others selling in Approved Channels and who sell to ultimate users. It is further understood that Distributor shall not appoint any assistant or subsidiary distributors for the purpose of selling and distributing the Products without the prior written consent of COMPANY; provided that this shall not (nor shall anything else in this Agreement) be construed as to restrict the ability of the Distributor to supply the Approved Channels. Distributor hereby undertakes at all times during the term of this Agreement to use its best efforts to vigorously and continuously promote and sell the Products throughout the entire Territory and to all Approved Channels. Distributor may use, display, transmit, market or otherwise reproduce the Trademarks to promote the Products over the Internet on a COMPANY approved web site. The appointment of Distributor by COMPANY is on an "*intuitu personae*" basis. Notwithstanding the foregoing, Distributor shall be entitled to sell Products to Distribuidora Deportiva DIDE SA for resale by it pursuant to the

3

LIBC/4349355.3

PSG00005501

Ecuador Distribution Agreement. Any such sales shall not be taken into account in determining sales for purposes of Distributor's complying with Minimum Sales Requirement, complying with the Minimum Advertising Expenditure or payment of the Fee.

(b)     Notwithstanding the appointment of Distributor as exclusive distributor for Products as provided above, it is expressly understood and agreed that COMPANY shall be entitled to (i) grant exclusive and/or non-exclusive manufacture, distribution and/or trademark licenses covering the Products outside of the Territory, (ii) grant manufacture licenses or agreements within the Territory, (iii) grant retailers the right to sell Products in the Territory, (iv) grant exclusive or non-exclusive rights to sell Products in the Territory to retail dealers and others selling in channels of distribution other than Approved Channels, including without limitation military and civil service channels, (v) operate or authorize third parties to operate New Balance only retail stores, (vi) grant exclusive and/or non-exclusive distribution or license rights to distribute and sell products which are not Products in the Territory, (vii) grant exclusive and/or non-exclusive rights to distribute and sell Products over the Internet, and (viii) advertise and otherwise offer Products for sale in the Territory (and authorize third parties to do so) at any time within six (6) months prior to the termination of this Agreement under Section 5(a) or Section 5(b). COMPANY shall have no liability for breach of this Agreement for acts in connection with such appointments. COMPANY expressly disclaims any representation, covenant or warranty that Products shall not be sold in the Territory by any such licensee, distributor or other third party.

(c)     It is expressly agreed that Distributor shall have no right under this Agreement to sell Products to ultimate users (i) through a Distributor owned and/or operated New Balance only retail store, (ii) over the Internet or (iii) by any other means other than as specified in Section 3).

4.     TERRITORY

Distributor is appointed distributor only for Approved Channels in the Territory and shall not distribute or sell, or assist in the distribution or sale of, any Products to any parties located outside the Territory or in any channel of distribution other than the Approved Channels. Distributor shall not distribute or sell Products to any person or entity which Distributor knows or should know will distribute or sell Products outside the Territory or other than in the Approved Channels.

5.     TERM

(a)     The original term of this Agreement shall be the Initial Term at the end of which, if either party notifies the other in writing at least sixty (60) days before the end of such Initial Term of its intention to let the Agreement expire, it shall so automatically expire.

(b)     If neither party sends notice of its intention to let the Agreement expire, then the Agreement shall be automatically renewed at the end of the Initial Term for one one-year period, provided, however, that in the event of such renewal either party can, in its sole discretion, with or without cause, and without payment of any termination indemnities or similar payments, terminate this Agreement upon sixty (60) days' prior written notice at any time during any such one year renewal period and this Agreement will terminate at the end of said sixty (60) days.

4

PSG00005502

## 6. TERMS AND CONDITIONS OF SALE TO DISTRIBUTOR

Distributor undertakes and agrees to purchase the Products from COMPANY and its Affiliates or its Authorized Suppliers under the following terms and conditions:

(a)  Price:

The prices to be paid by Distributor to COMPANY, its Affiliates or Authorized Suppliers, as the case may be, for the Products shall be the prices set forth in COMPANY's, its Affiliates' or Authorized Suppliers' then current published price list specified for the Territory, the current version of which has been delivered to Distributor prior to the Effective Date. Such price list may be changed from time to time by the selling entity in its sole discretion. Such prices are exclusive of handling, shipping and insurance charges, inspection fees, consular fees, import or export duties, taxes, and levies (including without limitation value added, property, sales, use or government entity charges, fees, duties, taxes or levies), all of which shall be the sole responsibility of Distributor. If COMPANY, its Affiliate or Authorized Supplier is required to collect or pay any such charges, fees, duties, taxes or levies, the amounts so paid or collected shall be invoiced to Distributor.

(b)  Payment:

Payment of all amounts due for Products and all payment documentation for the purchase of the Products shall be effected by Distributor through irrevocable letter of credit at sight or cash in advance due upon placement of any order, unless otherwise agreed to by COMPANY, its Affiliate or its Authorized Supplier, as the case may be. All payments shall be made in the currency used in the price list referred to in Section 6(a) above, which will be US dollars unless otherwise specified. If COMPANY, its Affiliate or Authorized Supplier allows Distributor to deliver the letter of credit or cash after the placement of the order and Distributor fails to deliver the same, or if Distributor otherwise delays or cancels the shipment of Products, in addition to the other rights hereunder of COMPANY, its Affiliate or its Authorized Supplier, as the case may be, and without in any manner excusing such violation, COMPANY, its Affiliate or Authorized Supplier shall be entitled (i) to charge Distributor interest at the rate of two percent (2%) per month (or, if the applicable usury rate does not permit two (2%) percent per month, then at the maximum interest rate permitted by law) for any amounts not received when due, (ii) to withhold, or cause its Authorized Supplier to withhold, all shipments of Products and to sell such withheld Products to third parties in which case Distributor shall be responsible *inter alia* for COMPANY's, its Affiliate's or its Authorized Supplier's loss incurred on such sales and/or (iii) to terminate this Agreement as provided in Section 16(a). Distributor shall pay all customs duties, value added taxes and other taxes and charges arising in connection with the transportation, importation, sales and use of the Products it purchases notwithstanding that title to such Products remains with COMPANY or its Affiliate or Authorized Supplier until fully paid.

5

PSG00005503

(c)     Acceptance of Orders:

All purchase orders for the Products shall be sent in writing, by telefax, by electronic mail or by electronic data interchange, as directed by COMPANY. All orders placed via electronic mail (including but not limited to orders placed on COMPANY's NBCustomers.com web site), shall be placed directly with COMPANY or its Affiliate, as directed by COMPANY, or through a third party service provider and shall be identified as Distributor's order by the use of an electronic signature which shall consist of symbols or codes and shall be affixed to or contained in each order. Such signature shall be sufficient to verify the identity of Distributor. Acceptance of any such order may be made electronically and shall contain COMPANY'S or its Affiliate's, as the case may be, identifying signature. All orders and/or modifications placed by Distributor under this Agreement shall be subject to acceptance by COMPANY or its Affiliate or Authorized Supplier, as the case may be, and no such order shall be binding until accepted by COMPANY or its Affiliate or Authorized Supplier, as the case may be. Orders which are not accepted within forty-five (45) days shall be deemed canceled. Distributor may not cancel an accepted order without COMPANY's or the Affiliate's or Authorized Supplier's (as the case may be) written consent. COMPANY and each Affiliate and each Authorized Supplier shall be entitled (without incurring any liability toward Distributor or any customer) to cancel accepted orders prior to delivery to Distributor in the event that, prior to delivery, notice of termination of this Agreement has been given or in the event that this Agreement shall have been otherwise terminated for any reason. All order forms used for the placing by Distributor of orders for the Products shall be subject to the prior approval of COMPANY or the Affiliate or Authorized Supplier, as the case may be, to which the order is sent and, in any event, the terms of this Agreement shall supersede any terms and conditions on such order forms used by Distributor.

(d)     Title and Delivery Schedules:

(i)     It is expressly understood and agreed between the parties that Products delivered to Distributor shall remain the property of COMPANY or its Affiliate or Authorized Supplier, as the case may be, until the entire value of the invoices issued in relation thereto has been collected. Therefore, partial or conditional payment shall not be considered as valid payment for the transfer of title to the property to Distributor. Distributor shall use its best efforts in assisting COMPANY or its Affiliate or Authorized Supplier, as the case may be, and in taking all measures required or useful in order to protect such right and title to the property consisting of the Products until full payment therefor has been received by COMPANY or its Affiliate or Authorized Supplier, as the case may be. Notwithstanding the retention of title in the Products, risk of loss therefor shall pass to Distributor at the factory loading point and COMPANY or its Affiliate or Authorized Supplier shall have no responsibility for any damages or losses attributable to the carrier. Distributor shall procure insurance from a reliable insurance company covering the Products and the interest of COMPANY or its Affiliate or Authorized Supplier therein.

It is further expressly understood and agreed that all free samples, advertising material, technical, sales, marketing and other documents or material delivered to Distributor on a complimentary basis shall remain the property of COMPANY or its Affiliate and shall be immediately returned upon request and in all cases upon termination of this Agreement.

6

LIBC/4349355.3

PSG00005504

(ii)     Delivery schedules stated to Distributor upon acceptance of an order or otherwise are given as an indication only and shall not be binding. However, a specific delivery schedule may be required by Distributor for a particular order and, once explicitly accepted as such by COMPANY or its Affiliate or Authorized Supplier, as the case may be, it shall be binding as so accepted and if it fails to comply therewith, Distributor shall as its exclusive remedy have the right to cancel the order in question if said scheduled date is more than thirty (30) days overdue.

(e)     Product Availability:

COMPANY and its Affiliates will endeavor to make the Products ordered from inventory available in the quantities and at the times specified by Distributor in its purchase orders, but in case of a shortage in the Products, COMPANY and its Affiliates reserve the right to allocate available supplies to its various distributors and customers in such a way as it may reasonably determine.

(f)     Product Identification:

Distributor shall not remove or otherwise modify COMPANY's or its Affiliates' tradenames or trademarks as they appear on the Products sold to Distributor. Distributor shall not, without COMPANY's written consent, place any other tradenames or trademarks on such Products.

(g)     Product Changes:

COMPANY and its Affiliates reserve the right without thereby incurring any liability to Distributor or to Distributor's customers, from time to time, to terminate, limit or significantly modify or change the basic specifications of any Product and to effect any other changes and/or improvements in any Product without prior notice to Distributor.

(h)     Government Authorization:

Distributor, at its own expense, shall obtain all necessary permits and licenses for the importation of the Products into the Territory and shall secure all necessary regulatory approval for, and shall be responsible for compliance with local law with respect to, the distribution, sale or use of the Products within the Territory. COMPANY and its Affiliates shall cooperate with Distributor in obtaining such approvals.

(i)     Sourcing:

Distributor shall not purchase or otherwise procure Products bearing the Trademarks from any source other than COMPANY and its Affiliates and Authorized Suppliers.

(j)     Required Insurance Coverage:

Distributor will carry continuously during the term insurance of the types specified by COMPANY from time to time (including workers' compensation and liability coverage). Initial insurance coverage requirements are:

7

LIBC/4349155.3

Commercial General Liability or equivalent
US $1,000,000 each occurrence
US $2,000,000 general aggregate
US $1,000,000 products/completed operations

Automobile Liability
US $1,000,000 combined single limit

Umbrella                    (Coverage over general liability and
US $1,000,000               automobile liability policies)

Each policy must (i) be obtained from an insurance carrier that has and maintains a Best's Insurance Reports rating of A-, Class VIII, or better and (ii) provide for not less than thirty (30) days' prior notice to COMPANY of cancellation or non-renewal of the policy. New Balance Athletic Shoe, Inc. and its Affiliates shall be named additional insureds in all policies. Distributor shall provide COMPANY with a current certificate of insurance at all times during the term.

7.      CERTAIN COVENANTS OF DISTRIBUTOR

(a)     Sales Structure:

Distributor shall at its sole expense set up and maintain at all times during the term of this Agreement adequate facilities for stocking the Products, showrooms to display the Products and a sales organization adequate to cover the potential market for the Products in the Territory. Such sales organization shall be subject to COMPANY's approval. Distributor shall, under its sole responsibility and at its own expense, employ a trained and qualified staff to promote and sell the Products throughout the entire Territory and in accordance with Distributor's undertaking herein to at all times vigorously and continuously use its best efforts to promote and sell the Products to Approved Channels throughout the entire Territory and to achieve agreed upon sales goals.

(b)     Assistance to Customers:

Distributor shall furnish all appropriate information regarding the Products to existing and potential customers in the Territory. Distributor shall reply promptly to all requests for information as well as to all correspondence or purchase orders from said customers. COMPANY and its Affiliates may send their own representatives to visit and advise customers in the Territory.

(c)     Inventory:

Distributor agrees that during the term of this Agreement it will have in inventory such quantity of Products as shall be sufficient to promptly and efficiently permit Distributor to supply customers in the Territory.

8

PSG00005506

    (d)    Safety Health and Other Regulations:

Distributor shall keep COMPANY and its Affiliates informed in writing of all administrative and/or technical regulations applicable to the Products in the Territory; however, COMPANY and its Affiliates shall be the sole judge of whether they will modify or cause to be modified any of the Products in order to conform to any such regulations and COMPANY and its Affiliates shall be under no obligation to so modify or cause to be modified any of the Products.

    (e)    Resale Prices:

Distributor is free to set its resale prices. Such resale prices shall at all times be set forth in a current price list for the Products maintained by Distributor.

    (f)    Reports of Operation/Accurate Records:

    (i)    Distributor shall promptly make available to COMPANY or its Affiliate, if directed by COMPANY, during the term of this Agreement, at least quarterly, and shall cooperate in and cause third parties to cooperate in making available to COMPANY or such Affiliate, such information as COMPANY shall reasonably request from time to time and the information set forth below as the same may be modified from time to time:



> (A)    Actual and forecast sales of each of the Products in the Territory as well as Distributor's marketing plan for each Product for the upcoming twelve (12) months on a rolling basis;
>
> (B)    Distributor's marketing plan, advertising and promotion campaigns (including actual copy and any photographs, audio, video or point of sale materials and displays used in such advertising) and actual expenditures referred to in Section 7(g) in such quarter (such plan shall include, without limitation, on a Product by Product basis, marketing timetable, methods of distribution, nature, timing and amounts of advertising and actual and targeted customers). Such expenditures shall be stated in the local currency of the Territory and the totals shall be converted to U.S. dollars using the Exchange Rate;
>
> (C)    The potential and existing market, the outlook and trends for the sale of the Products in the Territory, as well as all publically available information on competition (including prices, terms of sales, etc.), on marketing techniques and on significant changes in laws, regulations and practices in the Territory with regard to the importing and sales of the Products;
>
> (D)    Product line-ups; and
>
> (E)    List of all Distributor's then current customers of any Product.

9

PSG00005507

(ii)     Within ninety (90) days after the close of each fiscal year of the Distributor, Distributor shall forward to COMPANY original signed financial statements relating to Distributor including a balance sheet as of the close of such year and statements of income and retained earnings and cash flows for the year then ended, accompanied by a report thereon, prepared and audited in conformity with generally accepted accounting principles in the Territory by a firm of independent certified public accountants acceptable to COMPANY.

(iii)    It is understood and agreed that the prompt rendering of the aforesaid reports and statements are material obligations of Distributor without which COMPANY would not have been prepared to sign this Agreement. All information and reports provided to COMPANY or its Affiliate pursuant to Section 7(f)(i) shall be treated as confidential material.

(iv)    During the term of this Agreement and for three (3) years thereafter, COMPANY or its Affiliate and Distributor each agree to maintain accurate and complete books, records and accounts of transactions under this Agreement.

(v)     All reports and written materials submitted under this Section or elsewhere pursuant to this Agreement shall be in English with accurate translations.

(g)     Product Advertising and Marketing Expenditures:

Distributor shall:

(i)     at its own cost be responsible for adequate advertising of the Products in the Territory (which shall at all times be properly and exclusively, unless COMPANY otherwise agrees in writing, identified with Trademarks) and the active promotion of sales of the Products throughout the entire Territory.



Distributor further undertakes to expend to unrelated third parties on promotional activities during each Annual Period for advertising and co-op advertising, printed and point-of-sale promotional material, fixtures supplied to third party customers (to the extent not reimbursed), sales promotion and similar marketing activities, consistent with Distributor's marketing plan, as submitted to COMPANY or its Affiliate pursuant to Section 7(f) hereof, the Minimum Advertising Expenditure. At least fifteen (15%) percent of the Minimum Advertising Expenditure shall be expended in each calendar quarter. This amount shall not include any co-op or other allowances made by COMPANY or its Affiliate to Distributor for promotional activities nor shall it include funds spent on samples, tradeshows, trade discounts, sales incentives, attendance at meetings referred to in subsection (iii) below and travel expenses.

(ii)    if requested by COMPANY, Distributor shall pay up to fifteen (15%) percent of its Minimum Advertising Expenditure in any Annual Period to COMPANY or its Affiliate to be utilized in connection with a global or regional marketing fund for purposes of advertising Products or otherwise enhancing brand image. Amounts so paid by Distributor shall be taken into account in determining Distributor's compliance with its Minimum Advertising Expenditure obligations.

10

PSG00005508

(iii)    participate at its own cost in all appropriate expositions within the Territory for the showing of the Products and attend at least two COMPANY annual worldwide and regional sales meetings.

(iv)    express and identify properly in its communications with each customer the "Authorized Distributor" relationship with COMPANY and its Affiliates for the Products.

(v)    not engage in, publish, cause to be published, encourage or approve any advertisement or practice which might mislead or deceive the public, which might be detrimental to the good name, trademarks, tradenames, goodwill or reputation of COMPANY and its Affiliates or the Products, or which infringes upon another's copyright, trade dress, slogan advertising idea, publication rights, privacy rights or other intellectual property rights.

All advertising and promotional materials must be approved by COMPANY or its Affiliate prior to use by Distributor, including without limitation printed advertising, catalogs, brochures, billboards, electronic material, Internet sites, television or radio ads, press releases and wireless networks and any and all other mediums now known or hereafter devised. Distributor further agrees, upon request, to promptly discontinue any advertising or practice reasonably deemed by COMPANY or its Affiliate to have a detrimental effect as aforesaid. In any such case, Distributor agrees that it will ensure that any such discontinuance is complied with by all retail sellers or others to which Distributor has distributed the Products. Distributor shall not advertise the Products outside the Territory, provided, however, that Distributor may use, display, transmit, market or otherwise reproduce the Trademarks to promote the Products over the Internet on a COMPANY approved web site, as set forth in Section 3(a). Except for the use of the Trademarks as approved by COMPANY or its Affiliate, Distributor shall indemnify and hold COMPANY and its Affiliates harmless from and against all losses, costs, liabilities and expenses arising out of any claim such advertising or promotional materials violate or infringe any copyright, trademark, service mark, patent or other intellectual property right.



(h)    Commercial Practices

Distributor shall at all times respect normal commercial practices and the rules of fair competition in each country of the Territory. It shall engage in no practices which could be detrimental or embarrassing to COMPANY or its Affiliates.

(i)    Appointment of Brand and Sales Managers

Distributor shall within thirty (30) days of the Effective Date appoint a brand manager and a sales manager to act as liaisons between COMPANY and its Affiliates and Distributor and to have overall responsibility with regard to the Products, sales performance, marketing and sales planning. Such brand manager and sales manager shall be exclusively dedicated to the Products. If COMPANY is not satisfied with the performance of either manager, such manager shall be assigned to other duties.

11

LIBC/4349255.3

(j)    Samples

During each relevant period, Distributor shall purchase and take delivery of one or more sample bands of Products as specified in COMPANY's or its Affiliate's merchandise plan for the particular selling season.

(k)    Standards of Business Conduct

Distributor acknowledges that COMPANY has, and is determined to maintain, a high reputation for ethical conduct in the world-wide business community and acknowledges further that Distributor's conduct as a distributor shall reflect on COMPANY's and its Affiliates' reputation. Distributor further acknowledges that COMPANY and its Affiliates have obligations under laws of various countries, including, but not limited to the laws of the United States, and that its public image in the business community is critical to it. Distributor shall not do any act or omission which may harm COMPANY's and its Affiliates' reputation or good name or which may trigger the application against COMPANY or its Affiliates of any such laws.

Distributor agrees and undertakes to conform its activities under this Agreement to the highest standards of business ethics and in furtherance thereof assumes full responsibility for compliance with all laws and regulations (whether local or any other applicable laws or rules) and common ethical standards of the Territory; and, even though local laws or business practice may not prohibit such action or omission, Distributor shall not be involved in any unethical activity. Without limitation to the generality of the foregoing, Distributor shall abide strictly by all environmental laws and regulations and individual and labor laws in force in the Territory and shall not, even though local laws or business practices may not prohibit such action, seek unethically to influence any government official.

In conducting all aspects of its operations under this Agreement, Distributor shall abide by any codes of ethics or codes of conduct adopted by the COMPANY from time to time and provided to Distributor. Company shall be entitled to monitor compliance with such codes of ethics and/or codes of conduct at COMPANY's own cost. It is understood and agreed that any such verification or monitoring by COMPANY shall be without liability to COMPANY and shall not relieve Distributor from strictly complying with the codes of ethics and/or codes of conduct.

8.    MINIMUM SALES REQUIREMENTS

(a)    During the Initial Term, Distributor undertakes to sell during each Annual Period such minimum amount in U.S. dollars of Products in Approved Channels in the Territory equal to and as specified in the Minimum Sales Requirement. Such Minimum Sales Requirement shall be based on the Net Selling Price of the Products and initially be calculated in the local currency(ies) of the Territory and converted to U.S. dollars using the Exchange Rate when the monthly reports pursuant to Section 8(c) are delivered by Distributor.

(b)    If this Agreement is extended as provided in Section 5 above, the Minimum Sales Requirements for the one year renewal period will automatically be twenty percent (20%) greater than the Minimum Sales Requirement for the immediately preceding Annual Period with respect to each category.

12

PSG00005510

(c)     Within fifteen (15) days after the end of each calendar month, Distributor shall deliver to COMPANY or its Affiliate, if directed by COMPANY, an authenticated written statement in English certified by Distributor's chief financial officer showing the aggregate of the Net Selling Prices and number of units of the Products sold by Distributor or its Affiliates during the prior calendar month broken down by style of each Product, the Approved Channel it was sold in and the geographic area within the Territory where it was sold, all as specified by COMPANY. In addition, such report will include a statement of the inventory as of the end of the month of each style of Products. Such statements shall be stated in the local currency of the Territory and the totals shall be converted into U.S. dollars using the Exchange Rate.

(d)     It is understood and agreed that Distributor's undertaking to fulfill such Minimum Sales Requirement is a material obligation of Distributor without which COMPANY would not have been prepared to enter into this Agreement and failure to satisfy such Minimum Sales Requirement with respect to any Product category in any Annual Period shall entitle COMPANY to (i) terminate this Agreement or (ii) to designate Distributor's appointment for such Product category as non-exclusive for the remainder of the term, by written notice to Distributor at any time after COMPANY shall learn that such Minimum Sales Requirement has not been satisfied.

## 9.     DISTRIBUTION OF OTHER PRODUCTS

(a)     Distributor agrees during the term of this Agreement that Distributor and its Affiliates will not manufacture, sell, distribute or otherwise handle in the Territory any Competing Products unless otherwise agreed to in writing by COMPANY.

(b)     Distributor expressly agrees for itself and its Affiliates during the term of this Agreement not to directly or indirectly facilitate the distribution and/or sale of any Competing Products or to hold or acquire, directly or indirectly, any participation in any organization or entity selling, distributing or otherwise handling Competing Products. Non-compliance by Distributor or its Affiliates with the provisions of this paragraph during the term hereof shall be cause for COMPANY to terminate this Agreement pursuant to Section 16 below.



(c)     In the event that this Section 9 or any portion thereof shall be held by a court or arbitration panel, administrative body or governmental agency of competent jurisdiction to be invalid, illegal or unenforceable for any reason whatsoever, it is expressly understood and agreed that as to such jurisdiction the foregoing restrictions set forth in Section 9 shall be automatically considered modified to embrace the greatest possible time and area of restriction then permitted under applicable law, and such invalidity, illegality or unenforceability of this Section 9 or any portion thereof shall not impair the enforceability of these restrictions as so modified nor in any manner otherwise affect the remaining provisions of this Agreement.

## 10.     RETURN AND PURCHASE OF INVENTORY

(a)     In the event of termination, expiration or non-renewal of this Agreement for any reason whatsoever, COMPANY and its Affiliate shall from and after the date of notice of such termination having been given by either party be entitled to cease accepting orders for any Products and shall be entitled to direct Authorized Suppliers to cease accepting orders. On the effective date of termination, all Products and other materials and documents which are in the

13

PSG00005511

possession or under the control of Distributor which remain the property of COMPANY or any Affiliate shall be immediately returned to COMPANY or the Affiliate by Distributor. Within thirty (30) days of the effective date of such termination, expiration or non-renewal of this Agreement, Distributor shall submit to COMPANY an inventory list of all unsold Products and Promotional Products and all unfinished Promotional Products which are the property of Distributor as of the date of the said termination, expiration or non-renewal. COMPANY may in its sole discretion in all cases (but shall in no case have any obligation to) purchase or cause any Affiliate to purchase all or any part of such inventory by notifying Distributor in writing. Under no circumstances regardless of the cause of termination of this Agreement (including COMPANY's default) shall COMPANY be required to purchase such inventory. The price for any such inventory so purchased shall be COMPANY's, the Affiliate's or the Authorized Supplier's, as the case may be, actual selling price therefor to Distributor or Distributor's manufacturing cost in the case of Promotional Products (excluding shipping, insurance and customs costs). The transportation and packing costs for the Products owned by COMPANY or any Affiliate or repurchased as provided above shall be paid by Distributor. Distributor shall in any event return to COMPANY and its Affiliates free of charge all Products, materials and equipment which they may have made available to Distributor free of charge.

(b)    In the event that COMPANY and its Affiliates should not purchase or should purchase only part of the inventory mentioned in the preceding paragraph, Distributor shall have the right, under the terms and conditions of this Agreement, to sell the said inventory or that part of the inventory not purchased for a period of ninety (90) days after the effective date of the termination to customers in Approved Channels in the Territory, it being understood and agreed by Distributor that all such sales shall be made pursuant to normal conditions and terms of sale (including prices) theretofore practiced by Distributor. Distributor shall pay to COMPANY the Fee required under Section 14 hereof with respect to such sales. After such date, all sales by Distributor of any Products held in inventory on the date of termination shall end. Distributor shall thereafter destroy all remaining inventory upon prior written notice to COMPANY of the proposed place and time of such destruction. COMPANY may, at its sole discretion (i) elect to have a representative present at the time and place of such destruction or (ii) request a certificate of the president or other officer of Distributor and the brand manager certifying as to the destruction of the inventory and accompanied by verifying photographs or video.



## 11.    TRADEMARKS AND AUTHORIZED DOMAIN NAME

(a)    During the term of this Agreement and solely in connection with the distribution and sale of Products in accordance with the terms and conditions of this Agreement, COMPANY grants Distributor the non-exclusive, non-assignable right to use the Trademarks and Authorized Domain Name.

(b)    Distributor shall not (i) acquire any right or interest whatsoever, as a result of this Agreement, in any patents, trademarks including the Trademarks, domain name including the Authorized Domain Name or other intellectual property rights of COMPANY or its Affiliates, (ii) represent in any way that it has any right to or interest in any of the patents, trademarks including the Trademarks, domain name including the Authorized Domain Name or other intellectual property rights of COMPANY or its Affiliates or (iii) use the Trademarks in any manner except as explicitly authorized by COMPANY. Distributor acknowledges and agrees

14

LIBC/4349355.3

that any use of Trademarks shall inure to the sole benefit of COMPANY and its Affiliates. If Distributor acquires any rights to the Trademarks or Authorized Domain Name by operation of law or otherwise, it will immediately at no expense to COMPANY, assign such rights to COMPANY along with any associated goodwill, applications and/or registrations.

(c)    If any case of unfair competition or infringement by third parties of the Trademarks or other intellectual property rights of COMPANY or its Affiliates comes to the knowledge of Distributor, the latter will inform COMPANY immediately.  COMPANY will, at its own discretion, decide whether it will prosecute any such case of which it is so notified and in what manner it will prosecute.  At the request of COMPANY, Distributor will assist COMPANY to the best of its ability.  Without limiting the foregoing, it is expressly understood that Distributor shall not be entitled to take or institute any action thereon, either by way of informal protest or legal, equitable or criminal proceedings, without express written approval of COMPANY, nor shall Distributor be entitled to call upon COMPANY to take action thereon, all such matters shall be entirely within the discretion of COMPANY.

(d)    Distributor agrees that it will not, in any country, at any time, (i) challenge COMPANY's or its Affiliate's ownership or use of the Trademarks or Authorized Domain Name, (ii) apply for or seek registration of any words, trademarks, tradenames, domain names, or logos which are the same as or confusingly similar to any of the Trademarks or Authorized Domain Name or which may in any manner be used in unfair competition therewith or (iii) infringe any Trademarks, nor will Distributor incorporate any Trademarks or Authorized Domain Name into Distributor's trademarks, service marks, company name, Internet address, domain names, or any other similar designations.  Distributor further undertakes and agrees that it will not at any time do, or so far as it is able, allow to be done, any act or thing which may in any way diminish, dilute or adversely affect the reputation of any of the Trademarks.  Further, Distributor acknowledges and agrees that, as between COMPANY and its Affiliates, on the one hand, and Distributor, COMPANY and its Affiliates own all right, title and interest in and to any Internet domain names (and any registrations thereof) containing any of the Trademarks (collectively, the "Domain Names"), including without limitation the Authorized Domain Name and to the extent Distributor retains or obtains any right, title or interest in or to any Domain Name for any reason, Distributor hereby transfers, conveys and assigns, and will transfer, convey and assign, to COMPANY and its successors and assigns any such right, title and interest in and to such Domain Name and any other rights appurtenant thereto.  Distributor shall execute any documents requested by COMPANY relating to the Domain Names in order to effectuate COMPANY's rights to the Domain Names hereunder.

(e)    COMPANY may from time to time, pursuant to written approval, and subject to such further terms and conditions as may be provided in such written approval, grant to Distributor a non-exclusive license to use the Trademarks in the Territory to manufacture and package or to arrange for the manufacture and packaging of products to be used solely for promotional purposes and not for re-sale ("Promotional Products").  If such Promotional Products are to be manufactured by a third party manufacturer, such manufacturer shall be subject to COMPANY's written approval at least sixty (60) days prior to the commencement of any manufacturing of such Promotional Products.  Distributor or such approved manufacturer shall manufacture and package the Promotional Products from such materials and using such production methods, techniques and standards as COMPANY may specify.   COMPANY

15

LIBC/4349355.3

PSG00005513

reserves the right to inspect all machinery, facilities, equipment, raw materials, ingredients, packaging, work in progress and finished Promotional Products. Prior to distribution of any Promotional Product, Distributor shall submit to COMPANY or its Affiliate, if directed by COMPANY, production samples of finished units of the Promotional Product, including packaging. Distributor shall not commence distribution of any such Promotional Product until it has received written approval of the Promotional Product. Distributor shall withdraw from the course of manufacture and from the market any Promotional Product which does not conform with the methods, techniques and standards of COMPANY or which has not otherwise been approved by COMPANY or its Affiliate. Distributor shall indemnify and hold COMPANY and its Affiliates harmless from and against all losses, costs, liabilities and expenses arising out of or related to the Promotional Products or any approved manufacturer whether related to intellectual property infringement, product liability or any other claim or cause of action.

(f)     With respect to the Authorized Domain Name, Distributor shall (i) identify itself to Network Solutions, LLC, or any other applicable registrar for the Authorized Domain Name (the "Registrar") as the new "Account Contact", (ii) submit any information required by the Registrar to change the Authorized Domain Name server information necessary for Distributor's exercise of the rights granted hereunder, and (iii) submit documentation required by the Registrar to effect such changes. Distributor shall assume all duties and responsibilities required by the Registrar as the "Account Contact".

(g)     Distributor shall assist COMPANY and its Affiliates, at COMPANY's request, in the procurement and maintenance of COMPANY's intellectual property rights, including the Trademark and Authorized Domain Name. In connection therewith, Distributor shall, without limitation, execute and deliver to COMPANY in such form as it may reasonably request, all instruments necessary to (i) effectuate copyright and trademark protection, (ii) record Distributor as a registered user of any Trademarks or (iii) cancel any such registration. With respect to any registrations or applications for registration of Trademarks in the Territory, Distributor agrees to take all proper actions requested by COMPANY to facilitate and expedite the registrations.

(h)     COMPANY and Distributor agree that upon termination or expiration of this Agreement, COMPANY or any of its Affiliates (as directed by COMPANY) shall have all right, title and interest in the website content related to the Authorized Domain Name, including copyright rights. COMPANY or its Affiliates shall exclusively own the website content and all economic and other exploitation rights therein and related thereto, including all textual, audio and/or visual rights, digital layers, software engines and digital files. Distributor shall obtain the necessary assignments from the respective authors of any copyrighted works.

12.     AUTHORITY OF DISTRIBUTOR; REPRESENTATION

(a)     The relationship between COMPANY and Distributor is and will remain that of seller and buyer and independent contractor. Distributor, its agents and employees are in no way the sales representatives or agents of COMPANY and its Affiliates for any purpose whatsoever and have no right or authority to represent themselves or act as such or in any way to bind COMPANY and its Affiliates to any obligation to a third party, and they shall not assume or create in writing or otherwise any obligation of any kind, express or implied, in the name of or on behalf of COMPANY and its Affiliates, unless specifically authorized to do so in writing by

LIBC/4349355.3

16

PSG00005514

COMPANY or its Affiliate and in accordance with the conditions specified by COMPANY or its Affiliate.

(b)    Distributor warrants and agrees that it shall be at all times an independent contractor and that it shall do business at its own risk and for its own profit and not as an agent or employee of COMPANY or of any of its Affiliates.

(c)    Distributor represents to COMPANY that prior to its negotiation of this Agreement it possessed all of the facilities, equipment, personnel, expertise and experience necessary to perform its obligations under this Agreement and such facilities, equipment, personnel, expertise and experience fully exists on the Effective Date. Distributor acknowledges it has not incurred additional capital or labor costs at the request of COMPANY or its Affiliates or in connection with this Agreement. Distributor further acknowledges that to the extent it incurs additional capital or labor costs during the term of this Agreement, it incurs such cost at its own risk and for its own profit.

13.    RETURNED PRODUCTS

(a)    COMPANY and its Affiliates and Authorized Suppliers will accept no returns for credit either from Distributor or from any customer unless the company which sold the Product to Distributor gives written permission, in each case, in advance. In no case will such company consider accepting the return of any Products which are not (i) in good merchantable condition comparable to such company's prevailing standards, (ii) in its standard product line and (iii) in active demand. In cases where such company gives its written permission for a specific return for credit, the credit given will be based upon the originally invoiced price of the returned Product.



(b)    In the event COMPANY determines it is necessary or appropriate to undertake a product recall, Distributor, at its own expense, shall assist COMPANY, its Affiliates and Authorized Suppliers in such manner and to such extent as COMPANY may reasonably request.

14.    DISTRIBUTION FEE

(a)    In consideration of the rights granted under this Agreement, Distributor agrees to pay COMPANY the Fee in U.S. dollars based on the sale of all Products by Distributor or its Affiliates, as the case may be. The Fee payable under this Section 14 shall be calculated and paid in accordance with the provisions hereinafter contained and shall be payable within fifteen (15) days after the end of each calendar month with respect to the immediately prior calendar month.

(b)    During the Initial Term, Distributor shall pay COMPANY the Minimum Fee. If this Agreement is extended as provided in Section 5, the Minimum Fee for the one year renewal period will automatically be twenty percent (20%) greater than the greater of (i) the Minimum Fee for the immediately preceding Annual Period and (ii) the aggregate Fees payable with respect to the immediately proceeding Annual Period. If the Minimum Fee is not paid in full during any required period of this Agreement, then the balance shall be paid by Distributor to COMPANY in accordance with the provisions hereinafter contained within fifteen (15) days after the end of such period.

17

LIBC/4349355.3

PSG00005515

(c)     Within fifteen (15) days after the end of each calendar month, Distributor shall deliver to COMPANY the statement required under Section 8(c) and the amount of the Fee and, if applicable, the Minimum Fee due to COMPANY in respect thereof.

(d)     For the purpose of this Section 14, the Products shall be deemed to have been sold upon the earlier of the dispatch of the invoice to the purchaser or the delivery of the Products to the purchaser.

(e)     Distributor shall during the continuance of this Agreement keep at its usual place of business true and particular accounts and records of the Products sold by Distributor or its Affiliates and of the amount of all Fees paid or payable hereunder.

(f)     The duly authorized representatives of COMPANY shall have the right at any reasonable time during business hours to inspect and audit the accounts and records of Distributor or its Affiliates relating to the sale and/or disposal of the Products and of the invoice price and all other matters directly or indirectly relevant to the calculation of the amount of Fee due and such representatives shall be entitled to take copies of or extracts from any such records.



(g)     Fee payments made hereunder shall be made in U.S. dollars at the Exchange Rate by wire transfer to the COMPANY Bank Account or to such other account or in such other manner as COMPANY may direct in writing to Distributor, provided that, if payment is overdue and if the Exchange Rate on the date when payment is actually made to COMPANY exceeds the rate prevailing on the date when such payment is due, then such payment shall be made at such higher rate. In the event of Distributor's being unable to effect any payment due hereunder in accordance with this Agreement by reason of any refusal of any government to permit such payment applicable exchange control regulations or by reason of any other government order or control, Distributor shall not be relieved of its obligation to make such payment but COMPANY shall not be entitled to exercise any right of termination hereunder by reason of delay or failure to make the payment provided that:

(i)     Distributor uses every reasonable endeavor to obtain permission to make said payment, and

(ii)     Distributor shall effect payment in any permitted manner required by COMPANY.

Distributor shall make all such declarations and provide all such information and assistance as COMPANY may reasonably require to enable COMPANY to obtain all applicable double taxation convention relief or exemptions from relevant withholding obligation and/or to enable COMPANY to reclaim or claim a credit for such taxes as may have been withheld in accordance with this Section.

(h)     The parties recognize that if any government imposes a withholding tax on the Fee and Minimum Fee, Distributor shall be entitled to deduct therefrom the applicable withholding tax provided that (i) such tax is in fact remitted to such government and (ii) Distributor submits to COMPANY a certificate of such payment.

18

PSG00005516

(i)     In addition, Distributor shall promptly pay for all materials, samples and merchandise which COMPANY, its Affiliates or Authorized Suppliers sells to Distributor pursuant to this Agreement or in connection with the distribution relationship created hereby.

(j)     All late payments shall bear interest at a rate of two (2%) percent per month or, if such rate should exceed any applicable permissible legal interest rate, then at the highest legally permissible rate. The operation of this Section 14 is without prejudice to any other right or remedy COMPANY may have under law or pursuant to the terms of this Agreement, including the right to terminate this Agreement pursuant to Section 16.

## 15.     CONFIDENTIALITY

(a)     Distributor acknowledges that all technical and commercial information and know-how furnished by COMPANY and its Affiliates to Distributor during the term of this Agreement is proprietary and is of a highly confidential and secret nature.

(b)     All of such technical and commercial information and know-how is given and received in strict confidence and is to be used by Distributor solely for the purpose of carrying out this Agreement. Distributor shall keep in strict confidence the aforesaid technical and commercial information and know-how and shall not, for any reason whatsoever, reveal, disclose, sell or transfer any part of such technical or commercial information or know-how, directly or indirectly, to its own employees or agents or to any third party except as permitted by the terms of this Agreement.



(c)     In the performance of its obligations under this Section 15, Distributor shall at its own cost take all precautions and steps which may be reasonably requested in order to protect such know-how and confidential information (including the bringing of legal action in order to ensure that others respect this undertaking of confidentiality). Nothing herein shall be interpreted as prohibiting COMPANY or its Affiliate at its own expense from bringing such legal actions within or outside the Territory as it shall deem to be in its best interest.

(d)     Distributor shall have the right to disclose such technical information and know-how received only to those of Distributor's employees who need to know such information and Distributor agrees to exercise a high degree of care in the selection of its employees and assistant and subsidiary distributors to whom such technical information and know-how, or any part thereof, will be disclosed.

(e)     Distributor's obligations set forth in this Section 15 shall survive and remain in effect even after the expiration or the termination of this Agreement.

(f)     It is expressly agreed that the obligations of Distributor to keep confidential information under this Section 15 shall not apply to any such information which:

(i)     was in the public domain at the time of disclosure to Distributor; or

(ii)    was in the possession of Distributor without binder of secrecy prior to disclosure to it; or

19

PSG00005517

(iii)    though confidential at the time of disclosure, subsequently becomes part of the public domain through no fault of Distributor.

(g)    Distributor shall inform COMPANY without delay of any and all violations which come to Distributor's attention of COMPANY's and its Affiliates' rights in the technical and commercial information and know-how covered by this Agreement. If COMPANY or its Affiliate, after consultation with Distributor but in its entire discretion, should decide to institute a legal action in its own name, it may do so at its own expense, provided however, that Distributor may, at its option, participate in such legal action, in which case each party shall pay its own expenses in connection with such an action, including fees of legal counsel. COMPANY or its Affiliate, as the case may be, shall have the final decision with regard to the conduct of all such legal actions and shall retain all settlements, recoveries and judgments arising therefrom, after reimbursement to Distributor for out of pocket expenses, if any, incurred by Distributor in connection with such legal action at COMPANY's or its Affiliate's specific request. If Distributor decides not to participate in such legal action, it shall at Distributor's expense cooperate with COMPANY or its Affiliate, as the case may be, and assign to it without compensation any claims it may have.

## 16.    TERMINATION

(a)    Notwithstanding any other provisions of this Agreement, this Agreement may be terminated before the expiration of its term, without payment by COMPANY of any indemnity or other sums on account of such termination, under the following circumstances:



(i)    by COMPANY if any amounts due under this Agreement are not paid within five (5) days of the date such amounts are due;

(ii)    except with respect to obligations and terms otherwise provided for in this Section 16, by either party if within fifteen (15) days after notification to the other party, advising said other party of a failure to fulfill any of its obligations under this Agreement or of a violation of or a default under the terms of this Agreement, said other party has not cured such failure, violation or default;

(iii)    by COMPANY (A) if a change occurs in the ownership of Distributor as defined in Section 25 (whether such change is in direct or indirect ownership), or (B) if a change or disruption occurs in Distributor's management, commercial or financial situation which change has or might, in COMPANY's reasonable judgment, substantially adversely affect the performance by Distributor of its obligations under this Agreement or (C) if Distributor (v) files a voluntary petition in bankruptcy or is adjudicated a bankrupt or insolvent, (w) files (or there is filed and not dismissed within thirty (30) days) a petition (or an answer to a petition) seeking any reorganization, arrangement, composition, liquidation, dissolution or similar proceeding under any present or future statute, law, or regulation, inside or outside the Territory, relating to bankruptcy, insolvency or other relief for debtors, (x) seeks or consents to or acquiesces in the appointment of any trustee, receiver, or liquidator of all or any substantial part of its properties, (y) makes any general assignment for the benefit of creditors, or (z) admits in writing its inability to pay its debts generally as they become due;

20

LIBC/4349355.3

(iv)   upon termination of any other agreement of any nature between COMPANY or its Affiliates, and Distributor, including the Ecuador Distribution Agreement, for any reason whatsoever;

(v)   by mutual consent of the parties hereto;

(vi)   by COMPANY at any time after COMPANY shall learn that the Minimum Sales Requirement has not been satisfied; or

(vii)   by COMPANY upon written notice to Distributor if Distributor violates the terms of Sections 4, 6(f), 6(i) or 15 hereof.

(b)   Termination of this Agreement as provided in paragraphs (i), (ii), (iii)(A), (iii)(B), (vi) and (vii) of Section 16(a) shall be by written notice and shall be effective upon delivery. In the case of paragraphs (iii)(C), (iv) and (v) of Section 16(a), termination is automatic (without notice) upon the occurrence of the event. The time of delivery of any such notice shall be determined as set forth in Section 22 hereof.

(c)   Without limiting COMPANY's right to terminate this Agreement in the event of a breach by Distributor, Distributor agrees that it would be difficult for COMPANY to determine actual damages in the event Distributor breaches any of the below-mentioned obligations. Distributor also agrees that any such action by Distributor would irreparably harm COMPANY's business. Therefore, in good faith estimate of actual damages and not as a penalty, in such circumstances Distributor agrees to pay to COMPANY U.S. $100,000 as liquidated damages in each instance for any of the below-mentioned obligations within seven (7) days after receiving written notice from COMPANY. The breach conditions set forth below shall not be construed to limit COMPANY's other rights and remedies with respect to any such breach of this Agreement. Breach obligations for which Distributor will be liable for liquidated damages are: (i) in the event that Distributor distributes or sells the Products at wholesale outside the Approved Channels or the Territory.



## 17.   OBLIGATION ON TERMINATION

(a)   COMPANY AND ITS AFFILIATES SHALL HAVE NO LIABILITY TO DISTRIBUTOR OR DISTRIBUTOR'S CUSTOMERS OR OTHER THIRD PARTIES, FOR CLAIMS OR DAMAGES OF ANY KIND, INCLUDING INCIDENTAL OR CONSEQUENTIAL DAMAGES, ARISING OR RESULTING SOLELY FROM TERMINATION OF THIS AGREEMENT IN ACCORDANCE WITH ITS TERMS. Notwithstanding any laws or regulations in the Territory to the contrary, COMPANY and its Affiliates shall not be liable to Distributor on account of the termination or expiration of this Agreement for reimbursement or damages for loss of goodwill, prospective profits or anticipated orders, or on account of any expenditures, investments, leases or commitments made by Distributor or for any other reason whatsoever based upon or growing out of such termination or expiration. Distributor waives any right it may have to receive any compensation or reparations on termination or expiration of this Agreement. Notwithstanding any laws or regulations in the Territory to the contrary, Distributor acknowledges and agrees that (a) Distributor has no expectation and has received no assurances that its business relationship with COMPANY will

21

PSG00005519

continue beyond the stated term of this Agreement or its earlier termination in accordance with Section 16 hereof, or that any investment by Distributor in the promotion of Products will be recovered or recouped by virtue of this Agreement; and (b) Distributor shall not have or acquire by virtue of this Agreement or otherwise any vested, proprietary or other right in the promotion of Products or in any goodwill created by its efforts hereunder. The parties acknowledge that this Section 17(a) has been included as a material inducement for COMPANY to enter into this Agreement and that COMPANY would not have entered into this Agreement but for the limitations of liability as set forth herein.

(b)     The termination, expiration or non-renewal of this Agreement shall not relieve Distributor of any liability for any monies due to COMPANY or any Affiliate at the time of such termination, expiration or non-renewal nor shall it relieve Distributor of the post-termination obligations imposed by this Agreement. At no time during the term of this Agreement or at or after its termination shall Distributor have the right for any reason whatsoever to withhold any payments due hereunder to COMPANY or to set off against any such payments any amounts which Distributor claims are owed to it by COMPANY or any Affiliate.

(c)     Upon such termination, expiration or non-renewal, Distributor shall immediately remove from its premise, website and elsewhere all signs and advertising relating to COMPANY and the Products and shall thereafter cease all use of the Trademarks and Authorized Domain Name and all other trademarks and tradenames identified with the Products and Distributor shall ensure that all such use by any assistant and subsidiary distributors or others claiming rights from Distributor shall also immediately cease. Upon such termination, expiration or non-renewal, Distributor agrees promptly to return to COMPANY all technical, sales, marketing and other confidential documents which COMPANY or any Affiliate may have supplied to it, as well as, to the best of Distributor's ability, all copies thereof.



(d)     Upon termination, expiration or non-renewal, Distributor shall permit representatives of COMPANY to inspect the Products and the premises of Distributor to insure compliance with this Section 17.

(e)     Notwithstanding the expiration or non-renewal or earlier termination of this Agreement Sections 1, 2, 6(a), 6(b), 7(f), 10, 11, 12, 14, 15 and 17 through 26 shall remain in full force and effect.

## 18.    FORCE MAJEURE

COMPANY and its Affiliates shall not under any circumstances be liable for any claim whatsoever or however arising of Distributor or any of its customers or any other third party due to COMPANY's, its Affiliates' or Authorized Suppliers' failure of or any delay in performance of any of its obligations arising in connection with this Agreement if the performance of such obligation is prevented, restricted or materially interfered with as a result of any acts, causes or circumstances beyond the reasonable control of COMPANY, its Affiliates and Authorized Suppliers including without limitation acts of God, acts or omissions of any other entity or person (including suppliers of the Products or parts or components thereof), fire, flood, strike or labor dispute of any kind, embargo, war, riot, insurrection or civil or military authority.

22

LIBC/4349355.3

PSG00005520

### 19. INSPECTION

Upon request, COMPANY and its representatives shall have reasonable access, during normal working hours, to Distributor's place(s) of business and inventory stock to ascertain Distributor's compliance with this Agreement.

### 20. GOVERNING LAW

This Agreement shall be deemed to have been entered into in the Commonwealth of Massachusetts, U.S.A. and shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts, U.S.A. without giving effect to principles of conflicts of law and excluding the United Nations Convention on Contracts For the International Sale of Goods. This Agreement has been executed in the English language and any interpretation or construction of this Agreement shall be based solely on the English language official text, notwithstanding the fact the parties for convenience or for local requirements may have also executed a version of this Agreement in a non-English language.

### 21. ARBITRATION

The parties agree that any and all disputes (whether in contract or any other theories of recovery) related to or arising out of this Agreement or the relationship, its application and/or termination (including post-termination obligations) shall be settled by final and binding arbitration in accordance with the UNCITRAL Arbitration Rules.

 COMPANY may designate the appointing authority, which may be either the International Chamber of Commerce or the American Arbitration Association. The arbitration may be administered by the designated appointing authority, in accordance with its procedures for cases under the UNCITRAL Arbitration Rules.

The arbitration shall be heard and determined by a single arbitrator. The place of arbitration shall be Boston, Massachusetts, USA. The language of the arbitration shall be English and the arbitrator shall speak English fluently. All documents which are not in English shall be submitted with an English translation thereof. The decision of the arbitrator shall be final and binding and any court with proper jurisdiction shall be entitled to issue a decree enforcing the arbitral award.

The arbitrator shall determine the matters in dispute in accordance with the laws of the Commonwealth of Massachusetts, USA. The award shall be made and shall be payable in U.S. dollars.

Notwithstanding the requirement herein that the parties arbitrate disputes arising from or related to this Agreement, either party shall have the right to seek interim equitable relief in the form of a temporary restraining order or preliminary injunction from a court of competent jurisdiction pending the resolution of any such arbitration proceedings. In the event that either party seeks such relief, the other party agrees that the U.S. District Court District of Massachusetts shall have jurisdiction over such matters and the parties hereby agree to submit to such jurisdiction and that any such equitable relief may be enforced against it without any

23

LIBC/4349355.3

defense anywhere in the world.  Service of process for purposes of the foregoing will be valid if made by hand, in person or via telefax.

22.    NOTICES

All notices, requests, demands and other communications shall be validly given if sent by registered or certified mail, recognized overnight courier such as Federal Express or by telefax to the recipient party's address or telefax number appearing hereinbelow, unless such party has notified the other party of a substitute address or telefax number in writing, and shall be deemed validly delivered upon the date of sending.

To COMPANY at:    Brighton Landing
                  20 Guest Street
                  Boston, Massachusetts 02135-2088 USA
                  Attn:  Vice President - International
                  TELEFAX:  (617) 787-9355

With a copy to:    Brighton Landing
                   20 Guest Street
                   Boston, Massachusetts 02135-2088 USA
                   Attn:  President
                   TELEFAX:  (617) 787-9355

To Distributor at:    Distributor's Notice Address



23.    FAILURE TO ENFORCE

The failure of COMPANY to enforce at any time or for any period of time the provisions hereof in accordance with their terms will not be construed to be a waiver of such provisions or of the right of COMPANY thereafter to enforce each and every such provision.

24.    ENTIRE AGREEMENT - MODIFICATIONS

This Agreement supersedes all prior agreements, oral or written, between the parties hereto with respect to the subject matter hereof, including the Distribution Agreement dated January 1, 2010, as amended, and contains the entire and only agreement between the parties respecting the sale and the purchase, the distribution and servicing by Distributor of any Products, and any representation, terms or conditions relating thereto or in connection therewith, oral or in writing, not incorporated herein will not be binding upon either party.  No modification, termination, notice of termination or discharge of this Agreement or any of the provisions hereof nor any representation, promise or condition relating to this Agreement will be binding unless made in writing.

24

LIBC/4349355.3

PSG00005522

25.    **ASSIGNABILITY**

This Agreement is binding upon the parties hereto and their respective successors in interest, but with respect to Distributor, this Agreement and the rights granted hereunder is nondivisible, nontransferable and nonassignable, and without the right to grant subdistribution agreements or subcontracts. Without limiting the foregoing, any direct or indirect change in ownership of Distributor shall be deemed a prohibited assignment (for purposes hereof, "change in ownership" shall occur in the event the holders of the stock, membership interests or other voting equity of Distributor own less than sixty seven percent (67%) of such stock, membership interests or other voting equity immediately after one or a series of related transactions). COMPANY shall have the right by written notice to Distributor to assign its rights and/or obligations hereunder to an Affiliate, to a purchaser of its business, or to any entity which succeeds to the interest of COMPANY in the Territory and shall have the right to nominate any other person or entity to receive payments or to undertake the obligations of COMPANY under the terms of this Agreement whether or not this Agreement is so assigned.

26.    **INVALID PROVISIONS**

Except as otherwise provided elsewhere in this Agreement, should any provision of this Agreement now or later conflict with any applicable law or administrative regulation with the force of law, whether national or supranational, said provision(s) shall be considered as not written and of no effect and all other provisions of this Agreement shall remain in full force and effect.

IN WITNESS WHEREOF the parties have accepted, agreed and executed this Agreement in one or more counterparts, each of which will be deemed an original, as of the Effective Date.

NEW BALANCE ATHLETIC SHOE, INC.

By: _____

Name: _____ Alan R. Hel _____

Title: _____ EVP International _____

PERUVIAN SPORTING GOODS S.A.C.

By: _____

Name: _____ Lorena Blanco Z _____

Title: _____ General Manager _____

25

PSG00005523

## Exhibit A

### Approved Channels

- Sporting Goods/Outdoor Stores
- New Balance Only Stores
- Family Shoe Stores
- Specialty Running Stores
- Department Stores



LIBC/4249355.3

PSG00005524

Exhibit B

Fee

(A)   For Products which are footwear, thirteen percent (13%) of the Net Selling Price.

(B)   For Products which are apparel and Accessories:

    (i)   Eleven percent (11%) of the Net Selling Price of such Products which are sold in 2013.

    (ii)   Twelve percent (12%) of the Net Selling Price of such Products which are sold in 2014.

    (iii)   Thirteen percent (13%) of the Net Selling Price of such Products which are sold in 2015 and thereafter.

LIBC/4349355.3

PSG00005525

Exhibit C

Minimum Advertising Expenditure

Six (6%) percent of the greater of (i) the aggregate Net Selling Price from the sale of Products by Distributor during the Annual Period or (ii) the aggregate monetary Minimum Sales Requirement for the Annual Period.

LIBC/4349355.3

PSG00005526

Exhibit D

Minimum Fee

| Annual Period | Amount in US $ | | |
|---|---|---|---|
| | Footwear | Apparel | Accessories |
| January 1, 2013 – December 31, 2013 | $479,570 | $35,536 | $6,600 |
| January 1, 2014 – December 31, 2014 | $624,000 | $64,800 | $10,080 |
| January 1, 2015 – December 31, 2015 | $790,400 | $108,225 | $17,745 |

LIBC/4349355.3

PSG00005527

## Exhibit E

### Minimum Sales Requirement

| Annual Period | Amount in US $ | | |
|---|---|---|---|
| | Footwear | Apparel | Accessories |
| January 1, 2013 – December 31, 2013 | $3,689,000 | $323,060 | $60,000 |
| January 1, 2014 – December 31, 2014 | $4,800,000 | $540,000 | $84,000 |
| January 1, 2015 – December 31, 2015 | $6,080,000 | $832,500 | $136,500 |



LJBC/4349355.3

PSG00005528

## Exhibit E

### Minimum Sales Requirement

| Annual Period | Amount in US $ | | |
|---|---|---|---|
| | Footwear | Apparel | Accessories |
| January 1, 2013 – December 31, 2013 | $3,689,000 | $323,060 | $60,000 |
| January 1, 2014 – December 31, 2014 | $4,800,000 | $540,000 | $84,000 |
| January 1, 2015 – December 31, 2015 | $6,080,000 | $832,500 | $136,500 |

LI3C/43493553

# EXHIBIT 2

NOTICE OF ARBITRATION UNDER THE ARBITRATION RULES OF THE UNITED NATIONS
COMMISSION ON INTERNATIONAL TRADE LAW

BETWEEN:

NEW BALANCE ATHLETICS, INC.

(CLAIMANT)

-AND-

PERUVIAN SPORTING GOODS S.A.C. AND RODRIGO RIBADENEIRA

(RESPONDENT)

# NOTICE OF ARBITRATION

**GOODWIN PROCTER LLP**

Goodwin Procter LLP
100 Northern Ave
Boston, MA 02210
Tel: (617) 570-1000
Fax: (617) 523-1231
Legal representative for Claimant                                        July 31, 2018

## I. INTRODUCTION

1. This Notice of Arbitration, together with its Exhibits numbered 1 to 5, is submitted on behalf of New Balance Athletics, Inc. ("New Balance") pursuant to Article 3 of the Arbitration Rules of the United Nations Commission on International Trade Law in force as from August 15, 2010 (the "UNCITRAL Arbitration Rules") against Peruvian Sporting Goods S.A.C. ("PSG") and Rodrigo Ribadeneira ("Ribadeneira") (collectively "Respondents").

2. This Notice of Arbitration contains information concerning the following:

   i.     The name, description and address of each of the Parties **(II)**;

   ii.    The Parties' contractual relationship and the nature and circumstances of the Parties' dispute giving rise to Claimant's claims **(III)**;

   iii.   The dispute resolution clause, the proposed governing law, the seat and language of the arbitration **(IV)**;

   iv.    Claimant's position as regard to the composition of the arbitral tribunal **(V)**;

   v.     Claimant's damages **(V)**;

   vi.    A statement of the relief sought **(VI)**;

3. This dispute principally concerns Respondent's failure to render payment under the Parties' agreement covering Respondent's distribution of New Balance products (the "Distribution Agreement").

## II. THE PARTIES

### A. Claimant

4. Claimant is New Balance, a company registered under the laws of Massachusetts, with its registered office located at Boston Landing, 100 Guest Street, Boston, Massachusetts 02135. New Balance is in the business of designing, manufacturing, marketing, and

ACTIVE/95834196.5

distributing athletic footwear, apparel and accessories.  Its footwear, apparel and accessories are distributed all over the world.

5.      Claimant's address is:

> New Balance Athletics, Inc.
> Boston Landing
> 100 Guest Street
> Boston, MA 02135
> Attention: Paul Gauron, EVP and General Counsel
> Tel.:   (617) 746-2554
> Fax:    (617) 787-9355
> paul.gauron@newbalance.com

6.      Claimant's representative, to whom all correspondence should be sent in this arbitration, are:

> Goodwin Procter LLP
> Mark Tully (BBO # 550403)
> 100 Northern Avenue
> Boston, MA 02210
> Tel.:   (617) 570-1000
> Fax:    (617) 523-1231
> MTully@goodwinlaw.com

## B.      Respondents

7.      Respondents are Peruvian Sporting Goods S.A.C., a company registered under the laws of Peru, with its registered office located at Carretera Panamericana KM, 1303 mz. B lote 4 Zofratacna, Tacna, Peru, and Rodrigo Ribadeneira, an individual, who during the relevant time period was the majority shareholder in PSG.

8.      Respondents' contact information is:

> Peruvian Sporting Goods S.A.C.
> Carretera Panamericana KM
> 1303 mz. B lote 4 Zofratacna
> Tacna, Peru
> Attention: Rodrigo Ribadeneira
> TELEFAX: (5932) 484-195
>
> Rodrigo Ribadeneira

3

Hidalgo de Pinto
City of Quito, Ecuador

## III.   THE PARTIES' CONTRACT AND THE NATURE AND CIRCUMSTANCES OF THE PARTIES' DISPUTE GIVING RISE TO THE CLAIMS

9.      On January 1, 2013, New Balance and PSG entered into a three-year distribution agreement for the sale and distribution of New Balance's products in Peru (the "Agreement"). Ex. 1 (Agreement). The three-year term of the Agreement was subject to a one-year extension if the Agreement was not terminated by either party sixty days in advance of its scheduled termination on December 31, 2015.  Ex. 1, ¶ 5(b).  By all accounts, the relationship between New Balance and PSG was successful for two and a half years.  But in mid-2015, the relationship took a turn for the worse when PSG fell behind on its contractual obligations and became less and less responsive to New Balance's inquiries.

10.     By July 2015, New Balance had notified PSG of its past due payments and that unless it made substantial progress toward bringing them up-to-date, PSG would be unable to order more product under the Agreement.  Ex. 3, p. 57.  Over two months later, PSG had still not become current on its past due payments, promising instead to make its payments to New Balance over time.  Ex. 2, p. 23; Ex. 3, pp. 60, 66.  To the contrary, however, PSG continuously failed to adhere to each and every payment schedule it proposed.  Ex. 3, pp. 64, 74, 110–11.

11.     Between July 2015 and January 1, 2016, New Balance and PSG tried to negotiate a new distribution agreement, while New Balance also tried to recover PSG's past-due balances. The Parties could not come to terms on a new distribution agreement, in large part due to PSG's eleventh hour demand for changes to the new agreement's terms.  Ex. 3, pp. 80– 81.  As New Balance pointed out to PSG at the time, many of its demands were "huge change[s] in the conditions that ha[d] been negotiated extensively over the [previous] year."  Ex. 3, pp. 82–83.

12.     On January 1, 2016, the Agreement's one-year extension went into effect and the parties remained subject to the terms of that Agreement.  Ex. 3, pp. 88–102; Ex. 1, ¶ 5(b).

4

13. At about that same time, New Balance notified PSG that continued delinquency of amounts owed under the Agreement would jeopardize the parties' relationship. Ex. 3, pp. 110–11. On May 4, 2016, New Balance wrote to PSG: "We need to have an honest conversation about what the future holds for our relationship. We have been partners for many years but the last 12 months ha[ve] tested [New Balance's] patience and, if there is no future with PSG/Super Deportes, we will need to look at other ways to keep the brand relevant in Peru and Ecuador." Ex. 3, p. 119. Later that month, New Balance informed PSG that New Balance would discontinue shipping its product to PSG until past due amounts that it owed under the Agreement had been paid. Ex. 2, p. 13.

14. On June 23, 2016, New Balance notified PSG that it would not agree to PSG's demanded changes to the Agreement and that the parties' relationship would end on December 31, 2016, at the termination of the one-year extension under the original Agreement. Ex. 4.

15. As a result of PSG's failure to pay money due and owing under the Agreement, as of June 30, 2018, PSG owed New Balance over $2.9 million for product sold, contractual interest, and past-due distribution fees. Interest on these amounts continues to accrue according to the terms of the Agreement. The precise amounts that PSG owes New Balance are set forth in the below table:

| Description | Amount | Interest | Combined |
|---|---|---|---|
| Distribution Fees | $1,692,080.00 | $727,377.41 | $2,419,457.41 |
| Sample Expense | $43,801.00 | $39,955.05 | $83,756.05 |
| Withholding Tax Debits | $207,823.72 | $191,438.70 | $399,262.42 |
| **TOTAL** | **$1,943,704.70** | **$958,771.16** | **$2,902,475.86** |

16. On November 25, 2016, through an Assignment of Rights, PSG purports to have transferred "all of the rights entitled to [it]" in relation to the dispute between it and New Balance to Ribadeneira. Ex. 5. Thus, to the extent of any such purported assignment, Ribadeneira has "take[n] [PSG's] place" under the Agreement, and is subject to the Agreement's arbitration clause. *Id.*

## IV. DISPUTE RESOLUTION CLAUSE, GOVERNING LAW, SEAT AND LANGUAGE OF THE ARBITRATION

### (a) The Arbitration Clause

17.   This arbitration is initiated pursuant to the arbitration clause found at paragraph 21 of the Agreement, which provides as follows:

> The parties agree that any and all disputes (whether in contract or any other theories of recovery) related to or arising out of this Agreement or the relationship, its application and/or termination (including post-termination obligations) shall be settled by final and binding arbitration in accordance with the UNCITRAL Arbitration Rules. . . .  The arbitration shall be heard and determined by a single arbitrator.  The place of arbitration shall be Boston, Massachusetts, USA.

### (b) The Place of Arbitration

18.   Pursuant to paragraph 21 set out above, the place of the arbitration is Boston, Massachusetts, USA.

### (c) Governing Law

19.   The Agreement is governed by the substantive laws of the Commonwealth of Massachusetts pursuant to paragraph 20, which provides as follows:

> This Agreement shall be deemed to have been entered into in the Commonwealth of Massachusetts, U.S.A and shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts, U.S.A without giving effect to principles of conflicts of law and excluding the United Nations Convention on Contracts For the International Sale of Goods.

### (d) The Language of Arbitration

20.   Pursuant to paragraph 21 of the Agreement, the language of the arbitration shall be English.

## V. THE ARBITRAL TRIBUNAL

21.   Paragraph 21 of the Agreement provides for a single arbitrator. Pursuant to paragraph 21, the appointing authority shall be the American Arbitration Association.

## VI. CLAIMANT'S DAMAGES

ACTIVE/95834196.5

22. New Balance's damages consist of monies owed for product sold, contractual interest, and past-due distribution fees and are currently estimated at $2,902,475.86, plus interest that continues to accrue under the Agreement.

## VII.   RELIEF SOUGHT

23. As a result, New Balance respectfully requests the arbitral tribunal to issue an award:

    i.    declaring that the arbitral tribunal has jurisdiction to consider the dispute described herein between the Parties;

    ii.    declaring that Respondents violated their obligations by failing to render payment to New Balance according to the terms of the Agreement;

    iii.    ordering Respondents to compensate New Balance for the damages and losses suffered as a result of PSG's breaches of the Agreement, currently estimated to be in the amount of $2,902,475.86, plus interest that continues to accrue under the Agreement;

    iv.    ordering Respondents to pay all arbitration costs, including Claimant's representative's costs and expenses; and

24. For the avoidance of doubt, Claimant reserves its right to:

    i.    raise any and all further claims arising out of or in connection with the disputed matters described in this Notice of Arbitration or otherwise arising between the Parties; and

    ii.    amend and/or supplement the relief sought herein;

    iii.    produce such factual or legal arguments or evidence (including witness testimony, expert testimony and documents) as may be necessary to present its case or rebut any case which may be put forward by Respondent; and

    iv.    seek interim and provisional measures before this arbitral tribunal or any competent national court.

7

Respectfully submitted,

/s/ Mark Tully

Mark Tully
Goodwin Procter LLP
Legal representative for Claimant
100 Northern Avenue
Boston, MA 02210
Tel.: (617) 570-1000
Fax: (617) 523-1231
MTully@goodwinlaw.com
July 31, 2018

8

**EXHIBIT 3**

IN THE MATTER OF AN ARBITRATION UNDER THE ARBITRATION RULES OF THE
UNITED NATIONS COMMISSION ON INTERNATIONAL TRADE LAW

BETWEEN:

NEW BALANCE ATHLETICS, INC.

(CLAIMANT)

-AND-

PERUVIAN SPORTING GOODS S.A.C. and RODRIGO RIBADENEIRA

(RESPONDENTS)

# RESPONSE TO THE NOTICE OF ARBITRATION

## QUINN EMANUEL URQUHART & SULLIVAN LLP

Quinn Emanuel Urquhart & Sullivan
1300 I Street NW, Suite 900
Washington, DC 20005
Tel: (202)538-8000
Fax: (202)538-8100
Legal representative for Respondents                    September 4, 2018

## I.   INTRODUCTION

1.   Peruvian Sporting Goods S.A.C. ("PSG") and Rodrigo Ribadeneira ("Mr. Ribadeneira") (collectively, "Respondents") submit this response to Claimant's Notice of Arbitration (hereinafter the "Response"), together with its Exhibits numbered R-1 to R-6 pursuant to Article 4 of the Arbitration Rules of The United Nations Commission on International Trade Law as adopted in 2013 (the "UNCITRAL Arbitration Rules").

2.   Respondents reserve their right to submit a Statement of Defense/Counter-Memorial/Counterclaim pursuant to Articles 21 and 22 of the UNCITRAL Arbitration Rules, including objecting to the jurisdiction of the Arbitral Tribunal, in accordance with the schedule and due process determined by the parties and/or the Tribunal.

3.   Unless expressly admitted, each paragraph of the Notice is denied by Respondents.

4.   Pursuant to Article 4 of the UNCITRAL Arbitration Rules, this Response contains information concerning the following:

   i.   The name, description and address of each of the Parties (**II**);

   ii.   Respondents' comments as to the arbitral tribunal's jurisdiction (**III**);

   iii.   Respondents' position as regards the nature and circumstances of the dispute (**IV**);

   iv.   Respondents' comments concerning the composition of the arbitral tribunal (**V**);

   v.   Respondents' comments as to the place of arbitration, the applicable rules of law and the language of the arbitration (**VI**);

   vi.   Relief sought (**VII**)

## II.   THE PARTIES

### A.   Respondents

5.     Respondent Peruvian Sporting Goods S.A.C. is a sportswear distribution company registered under the laws of Peru, with its registered office located at Carretera Panamericana KM, 1303 Mz. B lote 4 Zofratacna, Tacna, Peru.

6.     Respondent Rodrigo Ribadeneira is a successful Ecuadorian entrepreneur who wholly or partially owns corporate entities, including PSG, that have made investments in Peru, as well as in other countries in Latin America.

7.     Respondents' addresses are:

> Peruvian Sporting Goods S.A.C
> Carretera Panamericana KM
> 1303 mz. B lote 4 Zofratacna
> Tacna, Peru
> Tel: (5932)484-195
>
> Rodrigo Ribadeneira
> Hidalgo de Pinto
> Quito, Ecuador

8.     Respondents' representatives, to whom all correspondence should be sent in this arbitration, are:

> Quinn Emanuel Urquhart & Sullivan LLP
> David M. Orta
> Julianne Jaquith
> Manuel Valderrama
> 1300 I Street NW, Suite 900
> Washington, DC 20005
> Tel:(202)538-8000
> Fax: (202)538-8100
> davidorta@quinnemanuel.com
> juliannejaquith@quinnemanuel.com
> manuelvalderrama@quinnemanuel.com

**B.      Claimant**

9.      Claimant is New Balance, a company registered under the laws of Massachusetts, with its
registered office located at Boston Landing, 100 Guest Street, Boston, Massachusetts
02135.  New Balance is in the business of designing, manufacturing, marketing, and
distributing athletic footwear, apparel, and accessories.

## III.   RESPONDENTS' COMMENTS AS TO THE ARBITRAL TRIBUNAL'S JURISDICTION

10.     This Tribunal does not have jurisdiction over Mr. Rodrigo Ribadeneira.  Mr. Ribadeneira
was not and never has been a party to the 2013 Distribution Agreement between PSG and
New Balance (the "Distribution Agreement").  PSG also never assigned the Distribution
Agreement to Mr. Ribadeneira, nor has he in any way assumed the obligations to New
Balance under that agreement.  It is a fundamental principle of arbitration that it is based
upon the consent of the parties to the arbitration agreement.  Without its consent, a party
may not be compelled to arbitrate a dispute.

11.     Pursuant to Clause 21 of the Distribution Agreement, the parties to the Distribution
Agreement agree to arbitrate "all disputes arising out of the Distribution Agreement."  *See*
Claimant's Exhibit 1.  Only the parties to the Distribution Agreement, namely PSG and
New Balance, can be bound by the Distribution Agreement's arbitration clause.  The
Distribution Agreement itself, with respect to the Distributor is, by its own terms,
"nondivisible, nontransferable, and nonassignable".  *See* Claimant's Exhibit 1.  As noted,
PSG never assigned or transferred this agreement to Mr. Ribadeneira.  Accordingly, Mr.
Ribadeneira, as a non-party to the Distribution Agreement and its arbitration agreement,
cannot be bound by its arbitration clause.

12.     Claimant wrongly contends that through an Assignment of Rights PSG has transferred its rights in relation to the dispute between it and New Balance to Mr. Ribadeneira. *See* Notice of Arbitration, ¶ 16; *see also* Claimant's Exhibit 5. PSG executed the Assignment of Rights in connection with very different proceedings initiated against New Balance in Peru. The Peruvian proceedings, as will be described in more detail below, relate to New Balance's failure to move forward with a New Distribution Agreement in Peru with Superdeporte S.A.C., an entity that Respondents had created for purposes of distributing New Balance's products in Peru. It does not relate to PSG's rights and obligations under the Distribution Agreement that is the subject of this proceeding.

13.     Furthermore, the Assignment of Rights contemplates only that PSG will assign its rights to Mr. Ribadeneira "with respect to legal actions to be initiated against New Balance Athletic Shoe Inc. in Peru and anywhere else in the world." *See* Claimant's Exhibit 5. This arbitration proceeding is not a proceeding initiated against New Balance, as New Balance is the Claimant in this arbitration. Moreover, and importantly, the Assignment of Rights does not assign and does not effectuate any assignment of PSG's obligation to pay invoices billed by New Balance under the Distribution Agreement. That obligation, should it exist, remains with PSG. As such, Mr. Ribadeneira has not "take[n] PSG's place" under the Agreement as New Balance contends. *Id.* The Assignment of Rights is not only inapplicable to this proceeding, an assignment of the type that Claimants says occurred— which it did not—is forbidden by the Distribution Agreement which, as noted, precludes any assignment of PSG's rights and obligations under the agreement.

14.     As a result, an arbitral tribunal lacks jurisdiction to hear any dispute between Claimant and Mr. Ribadeneira or any claims which Claimant purports to have in relation to Mr.

Ribadeneira.  It must decline to exercise jurisdiction over any dispute relating to Mr.

Ribadeneira, who does not consent to arbitrate these disputes with New Balance.

## IV.  THE NATURE AND CIRCUMSTANCES OF THE DISPUTE

### (a)  Factual Background

15.  On January 1, 2013, New Balance and PSG entered into a Distribution Agreement, as they

had done a number of times previously, which governed the sale and distribution of New

Balance's products in Peru.  The Distribution Agreement was valid for a term of three

years.  If neither party expressed an intention to let the Distribution Agreement expire,

then, by its terms, the Distribution Agreement would automatically be renewed for an

additional year, until December 31, 2016.  At the end of 2015, neither party expressed an

intention to let the Distribution Agreement expire.   As such, the parties allowed the

Distribution Agreement to automatically renew until December 31, 2016.

16.  The Distribution Agreement between PSG and New Balance was successful.  PSG invested

significant sums of money in marketing New Balance's products in Peru, and those efforts

significantly increased New Balance's brand visibility and sales in Peru.

17.  During 2015, New Balance proposed that PSG, through a new corporate entity to be

created, and New Balance enter into a new Distribution Agreement (the "New Distribution

Agreement") for Peru that would take effect after the December 31, 2016 expiration of the

Distribution Agreement with PSG and presumably would contain more favorable terms for

both parties. The new structure proposed by New Balance required that the corporate entity

with whom it contracted for distribution in Peru be at the "retail" level so that New Balance

would receive dual margins and better product placement where its products were being

sold.   New Balance maintained that this was essential for any future distribution

relationship with New Balance. New Balance stated that it required the new structure under the New Distribution Agreement so as to gain an "unfair advantage" over its competitors in the Peruvian market. Claimant's Exhibit 3, p. 59.

18. The parties exchanged an initial draft of the New Distribution Agreement in September 2015 and negotiated the terms of the New Distribution Agreement over the coming months. As a part of the New Distribution Agreement, New Balance requested that PSG alter their distribution structure for New Balance products in Peru, in part by utilizing a new Peruvian entity that PSG or its owners would create—the entity created for this purpose ultimately was called Superdeporte S.A.C. ("Superdeporte")—to serve as New Balance's exclusive distributor under the New Distribution Agreement. By the end of January 2016, all of the terms of the New Distribution Agreement were finalized and agreed to between New Balance and PSG, as Superdeporte had not yet been created. New Balance and PSG agreed that the New Distribution Agreement would be finalized as between New Balance and PSG, and that once Superdeporte was established, Superdeporte would be substituted for PSG in the New Distribution Agreement. Claimant's Exhibit 3, p. 80, 91-92. This approach would allow the parties to finalize the New Distribution Agreement as soon as possible.

19. In early May of 2016, PSG and Superdeporte informed New Balance that despite some delays, Superdeporte was ready to distribute New Balance products in Peru. With Superdeporte up and running, New Balance was supposed to promptly modify the New Distribution Agreement in order to add Superdeporte as their Peruvian distributor. As such, in order to finalize agreements with retailers, one of PSG's employees asked New Balance

for a letter confirming that Superdeporte was New Balance's distributor in Peru. Claimant's Exhibit 2, pp. 17-19, 27.

20. On May 30, 2016, much to PSG and Superdeporte's surprise, New Balance informed PSG and Superdeporte that no distribution agreement existed between New Balance and Superdeporte. Claimant's Exhibit 2, pp. 12-13. Shortly thereafter, on June 23, 2016, New Balance notified PSG and Superdeporte in writing that it was formally terminating the Distribution Agreement with PSG effective December 31, 2016. *See* Claimant's Exhibit 4. On July 8, 2016, ignoring that it had already concluded the New Distribution Agreement between New Balance and Superdeporte that would take effect on January 1, 2017, New Balance informed PSG and Superdeporte, without any explanation, that New Balance had decided to work with another distributor in Peru beginning in 2017. New Balance then concluded its contractual relationship with PSG on December 31, 2017 and has done business in Peru through another distributor, Deportes Sparta, effective January 1, 2017.

21. At or around that time, Superdeporte S.A., New Balance's partner in Ecuador, was also negotiating licensing agreements with New Balance in Ecuador. After the termination of the relationship in Peru, negotiations for the Ecuador agreements also stalled and ultimately failed.

22. In January 2017, Mr. Ribadeneira initiated civil legal proceedings against New Balance in the Peruvian civil courts with respect to New Balance's failure to honor its obligations under the New Distribution Agreement and alleging extra-contractual claims that arose from New Balance's failure to conduct itself in good faith under Peruvian law with respect to the negotiation and execution of the New Distribution Agreement ("the Peruvian Demand"). *See* Respondents' Exhibit 1. In the Peruvian Demand, Mr. Ribadeneira argues

8

first that the terms of the New Distribution Agreement were agreed to, the New Distribution Agreement is a valid contract, and that the parties' respective rights had been validly perfected. *Id.* at 18 (English version) and at 21 (Spanish version). If the court were to find that there was not a valid contract, Mr. Ribadeneira also argues that New Balance had a pre-contractual obligation under Peruvian law to negotiate with PSG and Superdeporte in good faith, particularly after requiring that the owners of the Peruvian distribution business create a new entity at the "retail" level for purposes of effectuating the New Distribution Agreement, and that it breached its pre-contractual obligation to Mr. Ribadeneira, PSG, and Superdeporte. *Id.* at 9 (English version) and at 10 (Spanish version).

23. On February 1, 2017, Mr. Ribadeneira filed a request with the Peruvian Court for interim measures, asking that the court order New Balance to abstain from the distribution of its products in Peru with any distributor other than PSG. *See* Respondents' Exhibit 2. In December 2017, the Peruvian court overseeing the Peruvian Demand granted the request for interim measures. *See* Respondents' Exhibit 3. The court ordered a halt on the distribution of New Balance products in Peru during the pendency of the proceeding. On July 31, 2018, the Peruvian Court dissolved its interim measures order, formally permitting the distribution of New Balance products in Peru. *See* Respondents' Exhibit 4.

24. On May 29, 2018, Respondents and Superdeporte filed a petition for discovery in aid of the Peruvian proceeding pursuant to 28 U.S.C. §1782 in the District of Massachusetts against Claimant, as well as a number of current and former employees who were involved in the decision not to move forward with the New Distribution Agreement. Claimant, as well as John, Cullen, a current New Balance employee, and William Tung, a former New Balance employee, have moved to quash the subpoenas and Respondents and Superdeporte

have opposed the motions to quash.  On August 17, 2018, Respondents and Superdeporte filed a separate petition for discovery in aid of the Peruvian proceeding pursuant to 28 U.S.C. §1782 in the District of Oregon from a former New Balance employee, Alan Hed, who signed the Distribution Agreement on behalf of Claimant, and who was also involved in New Balance's decision not to move forward with the new Distribution Agreement and to work with another distributor in Peru.  On August 22, 2018, the Oregon Court granted the 1782 petition.  These proceedings remain ongoing.

**(b)     Responses to Claimant's Claims**

25.    Respondents deny Claimant's entitlement to the damages it seeks.  Claimant estimates its damages to be over $2.9 million, but it provides no documentary support for the alleged damages sought.  Claimant has failed to submit invoices, statements of account, or other contemporaneous documentation to support its claim for damages.  Pursuant to Section 14 of the Distribution Agreement, the right of Claimant to obtain the Distribution Fee as well as the calculation of the Distribution Fee, is based upon the sale of products by the distributor or its affiliates.  *See* Claimant's Exhibit 1.  Claimant provides no proof that products were in fact sold within the meaning of Section 14 of the Distribution Agreement.  To the extent that products were not sold, no Distribution Fees would be owed under the Distribution Agreement.  Respondents reserve the right to rebut any and all of Claimant's damages claims once Claimant has submitted any support for their damages claim.

26.    While Respondents did fall behind on their payments of Distribution Fees to Claimant in late 2015, given the parties' longstanding relationship, which dates back to 1992, both parties sought and expected to work through the payment delays.  Such payment delays are common in the sportswear distribution industry, and parties expect continuity in their

contracts.  The situation here was no different.  Claimant had been flexible in the past with payment delays, and Respondent PSG expected the same treatment here, which has become a customary part of the parties' relationship.  Respondent PSG explained its temporary cash flow issues to Claimant who expressed a desire to continue to work together notwithstanding this temporary delay in payment.  Respondent PSG continued to make payments to Claimant in good faith throughout 2015 and 2016.  *See* Claimant's Exhibit 3, p. 118.  Respondent PSG thanked Claimant for its patience on its payment defaults and reinforced its superior ability as a distributor.

27.    Furthermore, in addition to failing to cite to a shred of evidentiary support, Claimant's damages claim is larger than the amounts that Claimant's own collections agency sought to collect from Respondent PSG in 2017.  *See* Respondents' Exhibit 5.  In 2017, Claimant hired a collections agency, Atradius Collections, who attempted to collect supposed amounts owed under the Distribution Agreement.  Claimant's own collections agency's statement of account states that Respondent PSG's outstanding amount owed to Claimant, excluding interest, was $918,207.51, and including interest, was $1,025,657.04.  *Id*.  Contemporaneous statements of account which Claimant provided to Respondent PSG also reflect similar totals.  *See* Respondents' Exhibit 6.

28.    For all of these reasons, and others to be elaborated during this proceeding, Respondents contest Claimant's unsubstantiated damages claim.

## V.    THE ARBITRAL TRIBUNAL

29.    Paragraph 21 of the Distribution Agreement provides for a single arbitrator.  In its Notice of Arbitration and in accordance with paragraph 21 of the Distribution Agreement, Claimant designated the American Arbitration Association as the appointing authority.

30.     To date, neither Claimant nor Respondents have submitted a proposal for the appointment

        of an arbitrator.  In accordance with Article 8 of the UNCITRAL Rules, if within 30 days

        after receipt by all other parties of a proposal for the appointment of a sole arbitrator the

        parties have not reached agreement thereon, a sole arbitrator shall, at the request of a party,

        be appointed by the appointing authority.

## VI.     RESPONDENTS' COMMENTS AS TO THE PLACE OF ARBITRATION, THE APPLICABLE RULES OF LAW AND THE LANGUAGE OF THE ARBITRATION

### (a)     The Place of Arbitration

31.     Respondents confirm Boston, Massachusetts as the place of arbitration.

### (b)     Governing Law

32.     Respondents confirm that in accordance with paragraph 20 of the Distribution Agreement,

        the Agreement is covered by the substantive laws of the Commonwealth of Massachusetts

        but note further that the applicable conflict of laws provisions of the Commonwealth of

        Massachusetts also will apply.

### (c)     The Language of Arbitration

33.     Respondents confirm that in accordance with paragraph 21 of the Distribution Agreement,

        the language of the arbitration is English.

## VII.    RELIEF SOUGHT

34.     Respondents reject Claimant's claims as set out in its Notice and reject the relief sought.

35.     Respondents respectfully request the arbitral tribunal to:

        i.      Dismiss all Claimant's claims with respect to Mr. Ribadeneira on the ground that

                the arbitral tribunal lacks jurisdiction with respect to a dispute between Claimant

                and Mr. Ribadeneira.

  ii.  Dismiss Claimant's claim in their entirety;

  iii. Order Claimant to pay all arbitration costs, including Respondents' representative's costs and expenses; and

  iv. Order any further and/or additional relief as the Tribunal may deem appropriate.

36. Respondents reserve their right to:

  i.  Amend or supplement the above arguments as well as to present any counterclaims it may have or that come to light as the proceedings evolve, if any;

  ii.  Amend or supplement the relief sought herein;

  iii. Present factual or legal arguments as may be necessary to present its case or rebut any case put forward by Claimant; and,

  iv. Seek interim and or provisional measures before this tribunal or any competent national court.

Respectfully submitted,

David M. Orta
Legal representative for Respondents
1300 I Street NW, Suite 900
Washington, DC 20005
Tel: (202)538-8000
Fax: (202)538-8100
September 4, 2018

# EXHIBIT 4

IN THE MATTER OF AN ARBITRATION UNDER THE ARBITRATION RULES OF THE
UNITED NATIONS COMMISSION ON INTERNATIONAL TRADE LAW

BETWEEN:

NEW BALANCE ATHLETICS, INC.

(CLAIMANT)

-AND-

PERUVIAN SPORTING GOODS S.A.C. and RODRIGO RIBADENEIRA

(RESPONDENTS)

# AMENDED RESPONSE TO THE NOTICE OF ARBITRATION AND COUNTERCLAIM

**QUINN EMANUEL URQUHART & SULLIVAN LLP**

Quinn Emanuel Urquhart & Sullivan
1300 I Street NW, Suite 900
Washington, DC 20005
Tel: (202)538-8000
Fax: (202)538-8100
Legal representative for Respondents
October 29, 2018

## I.     INTRODUCTION

1.     Peruvian Sporting Goods S.A.C. ("PSG") and Rodrigo Ribadeneira ("Mr. Ribadeneira") (collectively, "Respondents") submit this amended response to Claimant's Notice of Arbitration (hereinafter the "Amended Response and Counterclaim"), together with its Exhibits numbered R-1 to R-6 pursuant to Article 4 of the Arbitration Rules of The United Nations Commission on International Trade Law as adopted in 2013 (the "UNCITRAL Arbitration Rules").

2.     Respondents reserve their right to submit a Statement of Defense/Counter-Memorial/Counterclaim pursuant to Articles 21 and 22 of the UNCITRAL Arbitration Rules, including objecting to the jurisdiction of the Arbitral Tribunal, in accordance with the schedule and due process determined by the parties and/or the Tribunal.

3.     Unless expressly admitted, each paragraph of the Notice is denied by Respondents.

4.     Pursuant to Article 4 of the UNCITRAL Arbitration Rules, this Response contains information concerning the following:

    i.     The name, description and address of each of the Parties (**II**);

    ii.     Respondents' comments as to the arbitral tribunal's jurisdiction (**III**);

    iii.     Respondents' position as regards the nature and circumstances of the dispute (**IV**);

    iv.     Respondents' comments concerning the composition of the arbitral tribunal (**V**);

    v.     Respondents' comments as to the place of arbitration, the applicable rules of law and the language of the arbitration (**VI**);

    vi.     Respondents' counterclaim (**VII**);

    vii.     Relief sought (**VIII**)

## II.  THE PARTIES

## A.  Respondents

5.  Respondent Peruvian Sporting Goods S.A.C. is a sportswear distribution company registered under the laws of Peru, with its registered office located at Carretera Panamericana KM, 1303 Mz. B lote 4 Zofratacna, Tacna, Peru.

6.  Respondent Rodrigo Ribadeneira is a successful Ecuadorian entrepreneur who wholly or partially owns, or owned, corporate entities that have made investments in Peru, as well as in other countries in Latin America.

7.  Respondents' addresses are:

> Peruvian Sporting Goods S.A.C
> Carretera Panamericana KM
> 1303 mz. B lote 4 Zofratacna
> Tacna, Peru
> Tel: (5932)484-195
>
> Rodrigo Ribadeneira
> Hidalgo de Pinto
> Quito, Ecuador

8.  Respondents' representatives, to whom all correspondence should be sent in this arbitration, are:

> Quinn Emanuel Urquhart & Sullivan LLP
> David M. Orta
> Julianne Jaquith
> Manuel Valderrama
> 1300 I Street NW, Suite 900
> Washington, DC 20005
> Tel:(202)538-8000
> Fax: (202)538-8100
> davidorta@quinnemanuel.com
> juliannejaquith@quinnemanuel.com
> manuelvalderrama@quinnemanuel.com

**B. Claimant**

9.    Claimant is New Balance, a company registered under the laws of Massachusetts, with its registered office located at Boston Landing, 100 Guest Street, Boston, Massachusetts 02135.  New Balance is in the business of designing, manufacturing, marketing, and distributing athletic footwear, apparel, and accessories.

## III.  RESPONDENTS' COMMENTS AS TO THE ARBITRAL TRIBUNAL'S JURISDICTION

10.   This Tribunal does not have jurisdiction over Mr. Rodrigo Ribadeneira.  Mr. Ribadeneira was not and never has been a party to the 2013 Distribution Agreement between PSG and New Balance (the "Distribution Agreement").  PSG also never assigned the Distribution Agreement to Mr. Ribadeneira, nor has he in any way assumed the obligations to New Balance under that agreement.  It is a fundamental principle of arbitration that it is based upon the consent of the parties to the arbitration agreement.  Without its consent, a party may not be compelled to arbitrate a dispute.

11.   Pursuant to Clause 21 of the Distribution Agreement, the parties to the Distribution Agreement agree to arbitrate "all disputes arising out of the Distribution Agreement."  *See* Claimant's Exhibit 1.  Only the parties to the Distribution Agreement, namely PSG and New Balance, can be bound by the Distribution Agreement's arbitration clause.  The Distribution Agreement itself, with respect to the Distributor is, by its own terms, "nondivisible, nontransferable, and nonassignable".  *See* Claimant's Exhibit 1.  As noted, PSG never assigned or transferred this agreement to Mr. Ribadeneira.  Accordingly, Mr. Ribadeneira, as a non-party to the Distribution Agreement and its arbitration agreement, cannot be bound by its arbitration clause.

4

12.     Claimant wrongly contends that through an Assignment of Rights PSG has transferred its rights in relation to the dispute between it and New Balance to Mr. Ribadeneira.  *See* Notice of Arbitration, ¶ 16; *see also* Claimant's Exhibit 5.  PSG executed the Assignment of Rights in connection with very different proceedings initiated against New Balance in Peru.  The Peruvian proceedings, as will be described in more detail below, relate to New Balance's failure to move forward with a New Distribution Agreement in Peru with Superdeporte S.A.C., an entity that Respondents reconstituted and repurposed for purposes of distributing New Balance's products in Peru.  It does not relate to PSG's rights and obligations under the Distribution Agreement that is the subject of this proceeding.

13.     Furthermore, the Assignment of Rights contemplates only that PSG will assign its rights related to the Peruvian Demand (defined and discussed in more detail below) to Mr. Ribadeneira "with respect to legal actions to be initiated against New Balance Athletic Shoe Inc. in Peru and anywhere else in the world."  *See* Claimant's Exhibit 5.  This arbitration proceeding is distinct from the Peruvian Demand and it is not a proceeding initiated against New Balance, as New Balance is the Claimant in this arbitration.  Moreover, and importantly, the Assignment of Rights does not assign and does not effectuate any assignment of PSG's obligation to pay invoices billed by New Balance under the Distribution Agreement.  That obligation, should it exist, remains with PSG.  Nor has PSG assigned its rights and obligations under the arbitration agreement contained in the Distribution Agreement to Mr. Ribadeneira.  As such, Mr. Ribadeneira has not "take[n] PSG's place" under the Agreement as New Balance contends.  *Id.*  The Assignment of Rights is not only inapplicable to this proceeding, an assignment of the type that Claimant

5

says occurred—which it did not—is forbidden by the Distribution Agreement which, as noted, precludes any assignment of PSG's rights and obligations under the agreement.

14. As a result, an arbitral tribunal lacks jurisdiction to hear any dispute between Claimant and Mr. Ribadeneira or any claims which Claimant purports to have in relation to Mr. Ribadeneira. It must decline to exercise jurisdiction over any dispute relating to Mr. Ribadeneira, who does not consent to arbitrate these disputes with New Balance.

## IV.   THE NATURE AND CIRCUMSTANCES OF THE DISPUTE

### (a)   Factual Background

15. On January 1, 2013, New Balance and PSG entered into a Distribution Agreement, as they had done a number of times previously, which governed the sale and distribution of New Balance's products in Peru. The Distribution Agreement was valid for a term of three years. If neither party expressed an intention to let the Distribution Agreement expire, then, by its terms, the Distribution Agreement would automatically be renewed for an additional year, until December 31, 2016. At the end of 2015, neither party expressed an intention to let the Distribution Agreement expire. As such, the parties allowed the Distribution Agreement to automatically renew until December 31, 2016.

16. The Distribution Agreement between PSG and New Balance was successful. PSG invested significant sums of money in marketing New Balance's products in Peru, and those efforts significantly increased New Balance's brand visibility and sales in Peru.

17. During 2015, New Balance proposed that PSG, through a new corporate entity, and New Balance enter into a new Distribution Agreement (the "New Distribution Agreement") for Peru that would take effect after the December 31, 2016 expiration of the Distribution Agreement with PSG and that presumably would contain more favorable terms for both

parties.  The new structure proposed by New Balance required that the corporate entity with whom it contracted for distribution in Peru be at the "retail" level so that New Balance would receive dual margins and better product placement where its products were being sold.  New Balance maintained that this was essential for any future distribution relationship with New Balance.  New Balance stated that it required the new structure under the New Distribution Agreement so as to gain an "unfair advantage" over its competitors in the Peruvian market.  Claimant's Exhibit 3, p. 59.

18.  PSG and New Balance exchanged an initial draft of the New Distribution Agreement in September 2015 and negotiated the terms of the New Distribution Agreement over the coming months.  As a part of the New Distribution Agreement, New Balance requested that PSG alter their distribution structure for New Balance products in Peru, in part by utilizing a new Peruvian entity—the entity reconstituted and repurposed  for this objective ultimately was called Superdeporte S.A.C. ("Superdeporte")—to serve as New Balance's exclusive distributor under the New Distribution Agreement.  By the end of January 2016, all of the terms of the New Distribution Agreement were finalized and agreed to between New Balance and PSG, as Superdeporte had not yet been created.  New Balance and PSG agreed that the New Distribution Agreement would be finalized as between New Balance and PSG, and that once Superdeporte was ready, Superdeporte would be substituted for PSG in the New Distribution Agreement.  Claimant's Exhibit 3, p. 80, 91-92.  This approach would allow the parties to finalize the New Distribution Agreement as soon as possible.

19.  In early May of 2016, PSG and Superdeporte informed New Balance that despite some delays, Superdeporte was ready to distribute New Balance products in Peru.  With

Superdeporte up and running, New Balance was supposed to promptly modify the New Distribution Agreement in order to add Superdeporte as their Peruvian distributor. As such, in order to finalize agreements with retailers, one of PSG's employees asked New Balance for a letter confirming that Superdeporte was New Balance's distributor in Peru. Claimant's Exhibit 2, pp. 17-19, 27.

20. On May 30, 2016, much to PSG and Superdeporte's surprise, New Balance informed PSG and Superdeporte that no distribution agreement existed between New Balance and Superdeporte. Claimant's Exhibit 2, pp. 12-13. Shortly thereafter, on June 23, 2016, New Balance notified PSG and Superdeporte in writing that it was formally terminating the Distribution Agreement with PSG effective December 31, 2016. *See* Claimant's Exhibit 4. On July 8, 2016, ignoring that it had already concluded the New Distribution Agreement between New Balance and Superdeporte that would take effect on January 1, 2017, New Balance informed PSG and Superdeporte, without any explanation, that New Balance had decided to work with another distributor in Peru beginning in 2017. New Balance then concluded its contractual relationship with PSG on December 31, 2016 and has done business in Peru through another distributor, Deportes Sparta, effective January 1, 2017.

21. At or around that time, Superdeporte S.A., New Balance's partner in Ecuador, was also negotiating licensing agreements with New Balance in Ecuador. After the termination of the relationship in Peru, negotiations for the Ecuador agreements also stalled and ultimately failed.

22. In January 2017, Mr. Ribadeneira initiated civil legal proceedings against New Balance in the Peruvian civil courts with respect to New Balance's failure to honor its obligations under the New Distribution Agreement with PSG, and then to be substituted with

Superdeporte, and alleging extra-contractual claims that arose from New Balance's failure to conduct itself in good faith under Peruvian law with respect to the negotiation and execution of the New Distribution Agreement ("the Peruvian Demand"). *See* Respondents' Exhibit 1. In the Peruvian Demand, Mr. Ribadeneira argues first that the terms of the New Distribution Agreement were agreed to, the New Distribution Agreement is a valid contract, and that the parties' respective rights had been validly perfected. *Id.* at 18 (English version) and at 21 (Spanish version). If the court were to find that there was not a valid contract, Mr. Ribadeneira also argues that New Balance had a pre-contractual obligation under Peruvian law to negotiate with PSG and Superdeporte in good faith, particularly after requiring that the owners of the Peruvian distribution business create a new entity at the "retail" level for purposes of effectuating the New Distribution Agreement, and that it breached its pre-contractual obligation to PSG and Superdeporte. *Id.* at 9 (English version) and at 10 (Spanish version).

23.  On February 1, 2017, Mr. Ribadeneira filed a request with the Peruvian Court for interim measures, asking that the court order New Balance to abstain from the distribution of its products in Peru with any distributor other than PSG. *See* Respondents' Exhibit 2. In December 2017, the Peruvian court overseeing the Peruvian Demand granted the request for interim measures. *See* Respondents' Exhibit 3. The court ordered a halt on the distribution of New Balance products in Peru during the pendency of the proceeding. On July 31, 2018, the Peruvian Court dissolved its interim measures order, formally permitting the distribution of New Balance products in Peru. *See* Respondents' Exhibit 4.

24.  On May 29, 2018, Respondents and Superdeporte filed a petition for discovery in aid of the Peruvian proceeding pursuant to 28 U.S.C. §1782 in the District of Massachusetts

against Claimant, as well as a number of current and former employees who were involved in the decision not to move forward with the New Distribution Agreement. Claimant, as well as John, Cullen, a current New Balance employee, and William Tung, a former New Balance employee, have moved to quash the subpoenas and Respondents and Superdeporte have opposed the motions to quash. On August 17, 2018, Respondents and Superdeporte filed a separate petition for discovery in aid of the Peruvian proceeding pursuant to 28 U.S.C. §1782 in the District of Oregon from a former New Balance employee, Alan Hed, who signed the Distribution Agreement on behalf of Claimant, and who was also involved in New Balance's decision not to move forward with the New Distribution Agreement and to work with another distributor in Peru. On August 22, 2018, the Oregon Court granted the 1782 petition. These proceedings remain ongoing.

**(b)     Responses to Claimant's Claims**

25.     Respondents deny Claimant's entitlement to the damages it seeks and further deny that Claimant can seek any damages against Mr. Ribadeneira, a non-party to the Distribution Agreement. Claimant estimates its damages to be over $2.9 million, but it provides no documentary support for the alleged damages sought. Claimant has failed to submit invoices, statements of account, or other contemporaneous documentation to support its claim for damages. Pursuant to Section 14 of the Distribution Agreement, the right of Claimant to obtain the Distribution Fee as well as the calculation of the Distribution Fee, is based upon the sale of products by the distributor or its affiliates. *See* Claimant's Exhibit 1. Claimant provides no proof that products were in fact sold within the meaning of Section 14 of the Distribution Agreement. To the extent that products were not sold, no Distribution Fees would be owed under the Distribution Agreement. Respondents reserve

the right to rebut any and all of Claimant's damages claims once Claimant has submitted any support for their damages claim.

26. While Respondent PSG did fall behind on its payments of Distribution Fees to Claimant in late 2015, given the parties' longstanding relationship, which dates back to 1992, both parties sought and expected to work through the payment delays. Such payment delays are common in the sportswear distribution industry, and parties expect continuity in their contracts. The situation here was no different. Claimant had been flexible in the past with payment delays, and Respondent PSG expected the same treatment here, which has become a customary part of the parties' relationship. Respondent PSG explained its temporary cash flow issues to Claimant who expressed a desire to continue to work together notwithstanding this temporary delay in payment. Respondent PSG continued to make payments to Claimant in good faith throughout 2015 and 2016. *See* Claimant's Exhibit 3, p. 118. Respondent PSG thanked Claimant for its patience on its payment defaults and reinforced its superior ability as a distributor.

27. Furthermore, in addition to failing to cite to a shred of evidentiary support, Claimant's damages claim is larger than the amounts that Claimant's own collections agency sought to collect from Respondent PSG in 2017. *See* Respondents' Exhibit 5. In 2017, Claimant hired a collections agency, Atradius Collections, who attempted to collect supposed amounts owed under the Distribution Agreement. Claimant's own collections agency's statement of account states that Respondent PSG's outstanding amount owed to Claimant, excluding interest, was $918,207.51, and including interest, was $1,025,657.04. *Id*. Contemporaneous statements of account which Claimant provided to Respondent PSG also reflect similar totals. *See* Respondents' Exhibit 6.

28. For all of these reasons, and others to be elaborated during this proceeding, Respondents contest Claimant's unsubstantiated damages claim.

## V. THE ARBITRAL TRIBUNAL

29. Paragraph 21 of the Distribution Agreement provides for a single arbitrator. In its Notice of Arbitration and in accordance with paragraph 21 of the Distribution Agreement, Claimant designated the American Arbitration Association as the appointing authority.

30. The parties have agreed to the appointment of William Cowin as the arbitrator for this matter.

## VI. RESPONDENTS' COMMENTS AS TO THE PLACE OF ARBITRATION, THE APPLICABLE RULES OF LAW AND THE LANGUAGE OF THE ARBITRATION

### (a) The Place of Arbitration

31. Respondents confirm Boston, Massachusetts as the place of arbitration.

### (b) Governing Law

32. Respondents confirm that in accordance with paragraph 20 of the Distribution Agreement, the Agreement is covered by the substantive laws of the Commonwealth of Massachusetts but note further that the applicable conflict of laws provisions of the Commonwealth of Massachusetts also will apply.

### (c) The Language of Arbitration

33. Respondents confirm that in accordance with paragraph 21 of the Distribution Agreement, the language of the arbitration is English.

## VII. RESPONDENTS' COUNTERCLAIM

### (a) Factual Background to the Counterclaim

34. New Balance accepted orders from its distributors, like Respondent PSG, on a quarterly basis. As such, Respondent PSG was able to place orders from New Balance four times a

12

year. Respondent PSG would place an order for products about six months in advance of the shipments of the goods, and generally PSG had to pre-pay for its orders.

35. In 2014, there was a significant market contraction in Peru and Ecuador that caused Respondent PSG to suffer cash flow issues. The cash flow issues made it difficult for Respondent PSG to timely pay its Distribution Fees and to pre-pay for its orders with New Balance.

36. Respondent PSG discussed these cash flow issues with New Balance. Although New Balance was initially receptive to granting Respondent PSG more time to make its payments to New Balance, in mid-2015, New Balance refused to accept any additional orders from Respondent PSG until Respondent PSG paid outstanding amounts owed to New Balance. In fact, in mid-2015, New Balance closed Respondent PSG's access to New Balance's online ordering system, preventing PSG from placing any additional orders under the Distribution Agreement.

37. Under this scenario, Respondent PSG asked New Balance to pay for its future orders through letters of credit, as provided for in the Distribution Agreement. The only way Respondent PSG could pay the amounts owed to New Balance was through amounts Respondent PSG would earn from the sale of New Balance inventory, and New Balance knew this. Although the Distribution Agreement permits payment by letter of credit, New Balance refused—in breach of its obligations under the Distribution Agreement—to accept PSG's payment by letter of credit.

38. As a result, Respondent PSG was unable to place any orders from mid 2015 through the end of 2016, when the Distribution Agreement terminated and lost the right it had to

purchase products from New Balance, make sales in the Peruvian market and earn the corresponding revenues and profits from those sales.

**(b)     Claimant's Violations of Its Legal Obligations**

39.   Pursuant to Clause 6(b) of the Distribution Agreement, Respondent PSG may make payment for products through irrevocable letter of credit or cash.[1]  Beginning in mid-2015, Petitioner PSG sought to place orders for New Balance products (footwear, apparel, and accessories) through a letter of credit.  New Balance refused to accept any orders from Respondent PSG by letter of credit, in violation of Clause 6(b) of the Distribution Agreement.   As a result of New Balance's breach of the Distribution Agreement, Respondent PSG has been damaged in the amount of approximately $1.8 million. Although Claimant may argue that these damages suffered by PSG should be precluded based upon the language in Clause 17 of the Distribution Agreement, this reading of the Distribution Agreement would be erroneous.  This counterclaim does not  arise or result from termination of the Distribution Agreement.  Instead, this counterclaim relates to Claimant's violation of its legal obligations during the pendency of the Distribution Agreement.  Thus, Respondent PSG's counterclaim is permissible under the language in Clause 17 of the Distribution Agreement.

---

[1]  Clause 6(b) states: "Payment of all amounts due for Products and all payment documentation for the purchase of the Products shall be effected by Distributor through irrevocable letter of credit at sight or cash in advance due upon placement of any order, unless otherwise agreed to by Company, its Affiliate, or it Authorized Supplier, as the case may be."  "Products" are defined in Clause 2(j) as follows: "Company's footwear, apparel and Accessory products bearing one of more of the trademarks as set forth in Company's current approved country assortment plan, as modified from time to time, a copy of the original version of which has been delivered to Distributor prior to the Effective Date."

(c)     **Respondents Have Suffered Losses of $1.8 Million for Which Claimant Is Liable**

40.     Respondent PSG's damages consist of the lost profits from the merchandise that PSG was unable to purchase from New Balance between mid 2015 and the end of 2016, currently estimated at $1.8 million.

## VIII.  RELIEF SOUGHT

41.     Respondents reject Claimant's claims as set out in its Notice and reject the relief sought therein.

42.     Respondents respectfully request the arbitral tribunal to:

i.      Dismiss all Claimant's claims with respect to Mr. Ribadeneira on the ground that the arbitral tribunal lacks jurisdiction with respect to a dispute between Claimant and Mr. Ribadeneira;

ii.     Dismiss Claimant's claims in their entirety;

iii.    Declare that Claimant has violated its obligations under the Distribution Agreement;

iv.     Order Claimant to compensate Respondents for the damages and losses suffered as a result of Claimant's conduct, currently estimated to be in the amount of $1.8 million;

v.      Order Claimant to pay all arbitration costs, including Respondents' representative's costs and expenses; and

vi.     Order any further and/or additional relief as the Tribunal may deem appropriate.

43.     Respondents reserve their right to:

i.      Amend or supplement the above arguments as well as to present any other counterclaims it may have or that come to light as the proceedings evolve, if any;

 ii. Amend or supplement the relief sought herein;

 iii. Present factual or legal arguments as may be necessary to present its case or rebut any case put forward by Claimant; and,

 iv. Seek interim and or provisional measures before this tribunal or any competent national court.

Respectfully submitted,

David M. Orta

Legal representative for Respondents

1300 I Street NW, Suite 900

Washington, DC 20005

Tel: (202)538-8000

Fax: (202)538-8100

October 29, 2018

# EXHIBIT 5

## INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION

IN THE MATTER OF ARBITRATION
BETWEEN:

NEW BALANCE ATHLETICS, INC.

vs.

PERUVIAN SPORTING GOODS S.A.C. et al.

Civil No. 01-18-0003-1183

**Hearing Requested**

### PETITIONER NEW BALANCE ATHLETICS, INC.'S MOTION TO COMPEL ARBITRATION AND MEMORANDUM IN SUPPORT THEREOF

Petitioner New Balance Athletics, Inc. ("New Balance") moves to compel Peruvian Sporting Goods ("PSG") and its business manager and majority shareholder Rodrigo Ribadeneira (together, "Respondents") to arbitrate the claims pending against New Balance in Peru. In short, Respondents breached the mandatory arbitration provision in PSG's distribution contract with New Balance (the "Distribution Agreement") that requires "any and all disputes . . . related to or arising out of [the Distribution Agreement] or the relationship, its application and/or termination (including post-termination obligations)" be "settled by final and binding arbitration." Instead, Respondents filed suit against New Balance in Peru claiming that New Balance either breached a binding distribution contract with PSG or, in the alternative, acted in bad faith in terminating its distribution relationship with PSG (the "Peru Claims"). As described more fully below, the Peru Claims directly relate to the parties' renegotiation of the original Distribution Agreement and, as result, they clearly fall under the parties' broad arbitration agreement.

Respondents argue that they are not bound by New Balance and PSG's arbitration agreement because (1) the Peru Claims pertain to a "new" agreement and not the Distribution

Agreement where the arbitration agreement is found, and (2) the Peru Claims have been assigned to Ribadeneira who is a non-signatory to the Distribution Agreement.  It cannot be clearer, however, that the Peru Claims arise out of New Balance's original distribution relationship with PSG, and the termination thereof, and fall under the parties' broad agreement to arbitrate "any and all disputes" "related to or arising out of" not only the Distribution Agreement, but its application or termination, and the parties' relationship generally.  Moreover, the parties' arbitration agreement encompasses the parties' entire relationship and not just the express terms of the Distribution Agreement, and therefore, is equally applicable to the negotiations of the alleged "new" agreement with PSG—which itself contains an identical arbitration provision.

Finally, Respondents cannot use a purported assignment to obviate their contractual arbitration obligations.  Ribadeneira, although technically a non-signatory to the Distribution Agreement, is bound by the arbitration provisions for a number of reasons, including that 1) as an assignee he must stand in the shoes of the assignor, 2) he assumed the agreement in bringing the Peru Claims, and 3) the Peru Claims are so "inextricably intertwined with and relate directly to" the Distribution Agreement containing the arbitration provision that he is equitably estopped from denying its application.  *See Machado v. System4 LLC*, 471 Mass. 204, 211-13 (2015).  In short, Respondents' arguments are meritless, and they cannot meet their burden of proof that the Peru Claims are not arbitrable.

As a result, and for the reasons more fully set forth below, New Balance requests that this tribunal compel arbitration of the Peru Claims.

## I.    BACKGROUND FACTS

### A.    <u>The Parties' Distribution Contract</u>

On January 1, 2013, New Balance PSG entered into the Distribution Agreement, a three-year agreement for the sale and distribution of New Balance's products in Peru.  Ex. 1.[1]  The three-year term of the Distribution Agreement was subject to a one-year extension if it was not terminated by either party sixty days in advance of its scheduled termination on December 31, 2015.  Ex. 1, ¶¶ 1(h), 5(b).  At all relevant times, Ribadeneira was the business manager and majority shareholder of PSG, as well as New Balance's primary contact at PSG.

The Distribution Agreement was entered into, in part, based on the parties' agreement to arbitrate any and all disputes arising out of the Distribution Agreement, or the parties' relationship generally, in accordance with the UNCITRAL Arbitration Rules and the laws of the Commonwealth of Massachusetts.  More specifically, the Distribution Agreement reads:

> The parties agree that any and all disputes (whether in contract or any other theories of recovery) related to or arising out of this [Distribution Agreement] or the relationship, its application and/or termination (including post-termination obligations) shall be settled by final and binding arbitration in accordance with the UNCITRAL Arbitration Rules. . . . The arbitration shall be heard and determined by a single arbitrator.  The place of arbitration shall be Boston, Massachusetts, USA . . . .  The arbitrator shall determine the matters in dispute in accordance with the law of the Commonwealth of Massachusetts, USA.
>
> Ex. 1, ¶ 21.[2]

As the end of three-year term of the Distribution Agreement neared, in mid-2015, PSG stopped paying New Balance money due and owing on products distributed in Peru and repeatedly breached the Distribution Agreement.  Ex. 3, at 57, 74.  On July 17, 2015, New Balance notified PSG of its past due payments and made clear that unless PSG made substantial

---

[1] True and correct copies of Exhibits 1-6 are submitted herewith.

progress toward bringing them up-to-date, PSG would be unable to order more product under the Distribution Agreement. Ex. 3, at 57. At this same time, New Balance put PSG on "credit hold" foreclosing it from placing new orders on New Balance products. Ex. 3, at 57. Over two months later, PSG still had not paid New Balance, and instead promised to pay New Balance over time. Ex. 2, at 23; Ex. 3, at 60, 66. However, PSG failed to adhere to each and every payment schedule it proposed. Ex. 3, at 64, 74, 110-11.

While maintaining efforts to collect PSG's outstanding debts, New Balance and PSG attempted to negotiate an amended and restated distribution agreement (the "Amended and Restated Agreement") at PSG's request. *See* Ex. 6. That agreement, if entered into, would have run until December 31, 2016. *See* Ex. 6, ¶ 1(h). New Balance reached out to PSG on multiple occasions to sign the Amended and Restated Agreement—including through emails on September 18, 2015, October 3, 2015, October 4, 2015, November 4, 2015, November 10, 2015, November 17, 2015, December 2, 2015, and April 11, 2016—but PSG failed to do so at each and every opportunity. Ex. 3, at 58, 60, 62, 72, 74, 82, 116. Instead, PSG made ever-changing demands, including attempting to remove the minimum fee provision. Ex. 3, at 71.

As a result, on January 1, 2016, the Distribution Agreement's one-year extension went into effect and the parties remained subject to the terms of that Distribution Agreement, which expired by its terms at the end of December 2016. Ex. 3, at 88–102; Ex. 1, ¶ 5(b). Respondents appear to claim that the Amended and Restated Agreement was in effect between New Balance and PSG beginning on January 25, 2016, and that the Amended and Restated Agreement should be enforced as written. Respondents' Ex. 1, at 54. If so, the Amended and Restated Agreement

---

[2] The arbitration provision in the Distribution Agreement survives the Distribution Agreement's termination. *See* Ex. 1, ¶ 17(e) ("Notwithstanding the expiration or non-renewal or earlier termination of this [Distribution Agreement] Sections . . . 17 through 26 shall remain in full force and effect."); *Id.* ¶ 21 (arbitration clause).

contains the same arbitration provision as the 2013 Distribution Agreement. Ex. 6, ¶ 21. The

Amended and Restated Agreement was by and between New Balance and PSG, and New

Balance was notified that PSG would be "changed to Super Deporte[s] Peru later." Ex. 3, at 71,

85. New Balance understood this change in the Amended and Restated Agreement to be in name

only. *See, e.g.*, Ex. 3, at 91 ("Do you have the address and proof of existence of Super Deportes

yet? Regardless, I suggest we sign the agreement now as PSG and do an amendment once that

info is ready."); *see also* Ex. 2, at 13 (New Balance writing to PSG noting, "PSG . . . soon to be

Super Deportes . . ."). New Balance's contacts, operations, and relationship with PSG (or "Super

Deportes") were otherwise not to change.

### B.    PSG's Claims Against New Balance

On January 22, 2017, ignoring the arbitration agreement, Respondent Ribadeneira filed

suit against New Balance in Peru claiming both breach of contract of the Amended and Restated

Agreement—which he calls the "new agreement"—and, alternatively, "pre-contractual liability."

Respondents' Ex. 1, at 44, 53. Respondents have represented that Ribadeneira has brought the

Peru Claims based on two virtually identical documents titled "Cesion de Derechos" (translated,

Assignment of Rights), dated November 25, 2016, whereby PSG and Super Deportes

purportedly, without any agreement or notice to New Balance, transferred their rights to

Ribadeneira. Ex. 5. The Assignment of Rights, as translated, states that PSG:

> [H]eld negotiations with [New Balance] in order to celebrate a Distribution
> Contract to import, sell and distribute sports products in the territory of Peru.
> However, once the contractual  terms were agreed and the contract ready to be
> executed, [New Balance] informed [PSG] that it will work with another partner in
> Peru, arising a dispute between the parties. . . .  By this contract [PSG] . . .
> transfers without valuable considerations to [Ribadeneira] all its rights in attention
> to the dispute.

Ex. 5.

In short, the Peru Claims contend that New Balance either entered into the Amended and Restated Agreement and breached it, or alternatively, committed a tort by failing to negotiate the Amended and Restated Agreement in good faith, allegedly causing Ridadeneira to suffer approximately $3,000,000 in damages.  Respondents' Ex. 1, at 44, 53.[3]

### C.    New Balance's Claims Against PSG

On July 31, 2018, New Balance initiated arbitration proceedings against PSG and Mr. Ribadeneira, the purported assignee of PSG's rights, to recoup the more than $2.5 million owed to New Balance as a result of the parties' Distribution Agreement.  On September 4, 2018, Respondents filed a response to New Balance's Notice of Arbitration, which was subsequently amended on October 29, 2018, to add a counterclaim.  PSG concedes liability on New Balance's claim, stating that it "fell behind on its payments of Distribution Fees."  Amended Response to the Notice of Arbitration and Counterclaim, at 11, ¶ 26.  However, Respondents object to this tribunal's jurisdiction over Ribadeneira, arguing that as a non-party to the Distribution Agreement, he may not be compelled into arbitration.  *Id*. at 4-6.

During the parties' initial status conference, New Balance informed the tribunal of the Peru Claims and its intention to move to compel the Peru Claims into arbitration.  At that time, Respondents' counsel stated that the Peru Claims are not subject to arbitration because Ribadeneira is not a signatory to the Distribution Agreement.  Similarly, in the Amended Response and Counterclaim, Respondents state that the "assignment of rights" from PSG did not assign the Distribution Agreement or any rights thereunder, but rather only assigned to Ribadeneira claims to litigate "legal actions to be initiated *against* New Balance" related to New

---

[3]  On December 18, 2017, the Peruvian court granted Respondents' request for interim measure of relief, but on July 30, 2018, reversed its decision and denied the request for interim relief.  New Balance has since filed a motion to dismiss the Peruvian proceedings based on the court's lack of jurisdiction.  That motion is pending before the Peruvian court.

Balance's "failure to move forward with" a distribution agreement. *Id.* at 5-6, ¶ 13 (emphasis added).

New Balance files this motion seeking the tribunal to issue an order that Respondents' claims currently pending in Peru are subject to the arbitration provision in the Distribution Agreement and must be submitted to arbitration.

## II.   LEGAL STANDARD

"[A]ny and all disputes (whether in contract or any other theories of recovery) related to or arising out of this [Distribution Agreement] or the relationship, its application and/or termination (including post-termination obligations) shall be settled by final and binding arbitration in accordance with UNCITRAL Arbitration Rules" and the laws of Massachusetts. Ex. 1, ¶ 21.[4]  Under Massachusetts law, there is a "strong public policy" in favor of arbitrating commercial disputes. *See Plymouth-Carver Regional Sch. Dist. v. J. Farmer & Co., Inc.*, 407 Mass. 1006, 1007 (1990).[5]  More specifically, "where a contract contains an arbitration clause, there is a presumption of arbitrability," and arbitration should not be denied unless it can be said with "positive assurance" that the particular clause cannot be construed to cover the dispute in issue. *Drywall Sys., Inc. v. ZVI Constr. Co.*, 435 Mass. 664, 666-67 (2002).

"[W]hen considering a broadly worded arbitration clause, there is a presumption that a contract dispute is encompassed by the clause unless it is clear that the dispute is excluded." *Commonwealth v. Philip Morris Inc.*, 448 Mass. 836, 843 (2007).  The party opposing arbitration

---

[4]  Under the UNCITRAL Arbitration Rules, the arbitral tribunal has "the power to rule on its own jurisdiction, including any objections with respect to the existence or validity of the arbitration agreement."  UNCITRAL Arbitration Rules § 3, art. 23; *see also Apollo Computer, Inc. v. Berg*, 886 F.2d 469, 473-74 (1st Cir. 1989) (concluding that parties agreed to submit issue of validity to the arbitrator where contract dictated arbitration would be decided in accordance with particular arbitration rules, and those rules allowed arbitrator to determine jurisdiction).
[5]  Peruvian courts routinely enforce arbitration agreements.  *See* Legislative Decree N° 1071 (Peruvian Arbitration Law); *see also* Cecilia O'Neill de la Fuente & José Luis Repetto Deville, *Main Features of Arbitration in Peru*, 23 ILSA J. Int'l & Comp. L. 425, 426 (2017) (recognizing Peruvian courts' respect for arbitration law).

bears the burden of proving that the claim at issue is not referable to arbitration. *Grand Wireless, Inc. v. Verizon Wireless, Inc.*, 748 F.3d 1, 7 (1st Cir. 2014) (noting "presumption in favor of arbitration applies unless the party opposing arbitration rebuts it").[6] Only "the most forceful evidence" of a desire to exclude a claim from arbitration can exclude it. *Id.* at 8.

## III.    ARGUMENT

### A.    The Peru Claims Are Subject To The Arbitration Provision Contained In The Distribution Agreement

The Peru Claims, which clearly arise from the parties' failed renegotiation of the Distribution Agreement, plainly fall under the broad language of the Distribution Agreement's arbitration clause. *See Carpenter v. Pomerantz*, 36 Mass. App. Ct. 627, 630 (1994) (noting broad arbitration clauses given "strong presumption of arbitrability"). The arbitration provision in the Distribution Agreement is broad, covering "any and all disputes" "related to or arising out of" not only the Distribution Agreement, but its application or termination, and the parties' relationship generally. The Peru Claims directly relate to the Distribution Agreement, its termination, and the discontinuation of the parties' relationship generally. As a result, the dispute must be arbitrated because it is "susceptible of an interpretation that covers the asserted dispute." *See Drywall Sys. Inc.*, 435 Mass. at 666. Indeed any interpretation of the arbitration provision encompasses the Peru claims, as any alternative interpretation flies in the face of fact and logic. *See, e.g.*, *Grand Wireless, Inc.*, 748 F.3d at 7–8 (compelling arbitration of extra-contractual claims, in part, because the arbitration provision in the contract compelled arbitration of claims arising out of the parties' relationship).

---

[6] Because the Massachusetts Arbitration Act is the Massachusetts enactment of the Uniform Arbitration Act, Massachusetts courts give the decisions of other jurisdictions and federal courts "strong weight." *O'Brien v. Hanover Ins. Co.*, 427 Mass 194, 201 (1998).

The Peru Claims are grounded in the fact that New Balance terminated its Distribution Agreement with PSG to distribute products in Peru. The assignment of rights itself, moreover, states that the Peru Claims arose out of the Distribution Agreement and its termination. *See* Ex. 5 (stating as translated: "During 2015 and 2016, [PSG] held negotiations with the [New Balance] in order to celebrate a Distribution Contract to import, sell and distribute sports products in the territory of Peru. However, once the contractual terms were agreed and the contract ready to be executed, [New Balance] informed [PSG] that it will work with another partner in Peru, arising a dispute between the parties").

Respondents try to sidestep the arbitration provision by claiming that the Peru Claims pertain to a new and different agreement—namely the Amended and Restated Agreement that contains yet another agreement to arbitrate—but that argument fails. *First*, if Respondents are correct that a new distribution agreement was entered into on January 25, 2016, then that "new" distribution agreement has the same arbitration and choice of law provisions, requiring the parties to arbitrate the Peru Claims in Boston under Massachusetts law. Ex. 6, ¶ 21. *Second*, the arbitration provision in the Distribution Agreement applies not only to the implementation of the Distribution Agreement itself, but also to its termination and the parties' relationship generally, such that it applies here. *See, e.g.*, *Grand Wireless, Inc.*, 748 F.3d at 7–8 (holding claims were covered by broad arbitration agreement where the allegations related to the parties' relationship that arose out of an agreement with an arbitration clause); *Acevedo Maldonado v. PPG Indus., Inc.*, 514 F.2d 614, 616 (1st Cir. 1975) (recognizing broad arbitration clauses cover "contract-generated or contract-related disputes between the parties however labeled"); *see also Next Step Med. Co. v. Johnson & Johnson Int'l*, 619 F.3d 67, 69 (1st Cir. 2010) (upholding magistrate's ruling requiring parties to arbitrate dispute based upon arbitration clause in previously terminated

agreement).[7]  And, in any event, the "new" distribution agreement is merely a draft extension of

the prior Distribution Agreement.  Indeed, the "Effective Date" of the "new" agreement is

defined as: "January 1, 2013 with this Amended and Restated Agreement effective August 1,

2015," such that the "new" agreement incorporates the Distribution Agreement by explicit

reference.  *See* Ex. 6, at ¶ 1(f).  There is no doubt that the Peru Claims—whether they pertain to

the Distribution Agreement or the "new" agreement—fall under the ambit of the parties' broad

arbitration agreement.

**B.      Respondents Cannot Avoid Arbitration Of The Peru Claims By Arguing That Ribadeneira Is Not A Signatory To The Distribution Agreement**

Respondents further argue that they cannot be compelled to arbitrate Ribadeneira's Peru

Claims because he is not a signatory to the Distribution Agreement or the Amended and Restated

Agreement, but that argument also fails.  Respondents cannot avoid their arbitration obligations

by assignment.  Whether a non-signatory can be compelled to arbitrate is determined by

traditional principles of Massachusetts contract law.  *See Arthur Andersen LLP v. Carlisle*, 556

U.S. 624, 630-31, 632 (2009).  Traditional principles of Massachusetts contract law require the

assignee to take the place of the assignor and litigate his claims as if he were the assignor.  *See,*

*e.g.*, *Yung v. Reymonde*, 1999 Mass. App. Div. 194 (Dist. Ct. 1999) ("When a claim is assigned,

the assignee stands in the shoes of the assignor and is in the same position as the assignor

without the assignment."); *Graves Equip., Inc. v. M. DeMatteo Const. Co.*, 397 Mass. 110, 112

(1986) (recognizing the "common law rule that an assignee of contract rights stands in the shoes

of the assignor and has no greater rights against the debtor than the assignor had"); *Quincy Tr.*

*Co. v. Town of Pembroke*, 346 Mass. 730, 732 (1964) ("[T]he assignee stands in no better

position than the assignor, and any defence which the defendant could raise against the latter

---

[7]  *See* Ex.1, ¶ 17(e) ("Notwithstanding the expiration or non-renewal or earlier termination of this [Distribution

may also be raised against the former.").  In other words, PSG cannot assign away the arbitration

agreement that it entered into.  *Id.*  Indeed, the Distribution Agreement itself specifically states

that it is "binding upon the parties hereto and their respective successors in interest" (Ex.1, ¶ 25)

and, as a result, is binding on Ribadeneira.  It would be unsound to allow parties to avoid

arbitration simply by assigning rights to third parties who then sue the other contracting party.

*Cf. Grand Wireless, Inc.*, 748 F. 3d at 11 (stating: "Any other rule . . . would permit the party

bringing the complaint to avoid the practical consequences of having signed an agreement to

arbitrate; naming the other party's officers, directors or employees as defendants along with the

corporation would absolve the party of all obligations to arbitrate").[8]  Especially where, as in this

instance, the third party is closely related to the signing party.  Notably, if PSG were to assert the

Peru Claims itself, then it would be subject to the arbitration clause in the Distribution

Agreement, as  claims arising out of the parties' relationship.  Basic contract principles dictate

that PSG should not be able to avoid this result by assigning its rights to its largest shareholder

and business manager.

Moreover, Ribadeneira should be compelled to arbitrate his Peru Claims for the many

other reasons courts bind non-signatories to arbitration agreements, including that Ribadeneira:

assumed the arbitration agreement upon assignment, is an agent of the signatory that derived

benefits from the arbitration agreement, and brings claims that are so "directly intertwined" with

the arbitration agreement that compelling arbitration is appropriate.  *See, e.g.*, *Machado*, 471

Mass. at 209-10; *see also Ambeliotis v. Brown*, No. CV1400855BLS1, 2015 WL 9591312, at *5

(Mass. Super. Sept. 30, 2015) (concluding non-signatory-plaintiff required to submit dispute to

---

Agreement] Sections . . . 17 through 26 shall remain in full force and effect); *Id.* ¶ 21 (arbitration clause).
[8]  Of course, this principle also applies here because Ribadeneira is an agent of PSG.

arbitration because plaintiff's trustee signed agreement and because plaintiff "derived the benefits of" the agreement).

Moreover, Ribadeneira, as majority shareholder of PSG, acted pursuant to the Distribution Agreement and received direct benefits therefrom. For that reason alone, he should be bound by the arbitration agreement. *See Deloitte Noraudit A/S v. Deloitte Haskins & Sells, U.S.*, 9 F.3d 1060, 1064 (2d Cir. 1993) (determining that a non-signatory party that knowingly benefited from an agreement containing an arbitration clause by continuing to use the company name provided for in that agreement could be compelled to arbitrate). "If arbitration defenses could be foreclosed simply by adding as a defendant a person not a party to an arbitration agreement, the utility of such agreements would be seriously compromised." *Hilti, Inc. v. Oldach*, 392 F. 2d 368, 369, n.2 (1st Cir. 1968). In addition, Ribadeneira's claims "are so intimately founded in and closely related to an agreement which also mandates arbitration" that he, as "the party opposing arbitration, is equitably estopped from denying the arbitrability of [his] claims." *Machado*, 471 Mass. at 211.

## IV. CONCLUSION

For the foregoing reasons, this Court should grant New Balance's motion and compel the Peru Claims into arbitration.

Dated: January 25, 2019

Respectfully submitted,


/s/ Mark E. Tully
Mark E. Tully
Kate E. MacLeman
100 Northern Avenue
Boston, MA 02210
mtully@goodwinlaw.com
kmacleman@goodwinlaw.com
p: 617-570-1000
f: 617-801-8955


*Attorneys for Respondents*

# EXHIBIT 6

IN THE MATTER OF AN ARBITRATION UNDER THE ARBITRATION RULES OF THE
UNITED NATIONS COMMISSION ON INTERNATIONAL TRADE LAW

BETWEEN:

NEW BALANCE ATHLETICS, INC.

(CLAIMANT)

-AND-

PERUVIAN SPORTING GOODS S.A.C. and RODRIGO RIBADENEIRA

(RESPONDENTS)

# RESPONSE TO CLAIMANT'S JURISDICTIONAL OBJECTIONS

**QUINN EMANUEL URQUHART & SULLIVAN LLP**

Quinn Emanuel Urquhart & Sullivan
1300 I Street NW, Suite 900
Washington, DC 20005
Tel: (202)538-8000
Fax: (202)538-8100
Legal representative for Respondents

February 4, 2019

## I.      INTRODUCTION

1.      In accordance with Procedural Order No. 1, Respondents Peruvian Sporting Goods
("PSG") and Rodrigo Ribadeneira ("Mr. Ribadeneira") (together, "Respondents") assert
that this Tribunal does not have jurisdiction over Mr. Ribadeneira and further object to
Claimant's attempt to join the pending claims in the Peru action (the "Peru Action") with
this arbitration.  Mr. Ribadeneira was not a party to the 2013 Distribution Agreement (the
"Distribution Agreement"), nor was he a party to a new distribution agreement (the "New
Distribution Agreement"), negotiated at New Balance's request in 2015.  The New
Distribution Agreement also is distinct from the earlier distribution agreement on which
New Balance bases its claims in this arbitration proceeding.  It involves different parties
and a very different distribution structure than was at issue in the Distribution Agreement.
Furthermore, the claims in the Peru Action are entirely distinct from this arbitration,
because they involve New Balance's failure to move forward with the New Distribution
Agreement, which as noted had a different distributor party and a different distribution
structure.  Moreover, the claims in the Peru Action were filed by Mr. Rodrigo Ribadeneira
in his individual capacity, and he was not a party to either of the distribution agreements
with New Balance.  Finally, the determination as to the jurisdiction of the Peru claims is
pending before the Peruvian court and it is solely within the jurisdiction of the Peruvian
court to determine its own jurisdiction.  As such, Respondents respectfully request that this
Tribunal decline to exercise jurisdiction over Mr. Ribadeneira and that this Tribunal deny
Claimant's request to join the Peru claims with this arbitration.

## II.      FACTUAL BACKGROUND

2.      On January 1, 2013, New Balance and PSG entered into a Distribution Agreement which
governed the sale and distribution of New Balance's products in Peru.  New Balance and

PSG had worked together for a number of years in Peru and through this relationship, had negotiated distribution agreements in the past. This Distribution Agreement was valid for a term of three years. If neither party expressed an intention to let the Distribution Agreement expire, then, by its terms, the Distribution Agreement would automatically be renewed for an additional year, until December 31, 2016. At the end of 2015, neither party expressed an intention to let the Distribution Agreement expire. As such, the parties allowed the Distribution Agreement to automatically renew until December 31, 2016.

3.      The Distribution Agreement between PSG and New Balance was successful. PSG invested significant sums of money in marketing New Balance's products in Peru, and those efforts significantly increased New Balance's brand visibility and sales in Peru. Through the Distribution Agreement, PSG would distribute New Balance's products to third party retailers and to Marathon Sports Stores in Peru. Marathon Sports is an Ecuador-based athletic company with sportswear stores across Latin America. Mr. Ribadeneira is the CEO of Marathon Sports.

4.      During 2015, New Balance proposed that a new corporate entity, Superdeporte S.A.C. ("Superdeporte"), and New Balance enter into a new and different type of distribution agreement for Peru – the New Distribution Agreement – that would contain a new structure and more favorable terms for these parties. The new structure proposed by New Balance required that the corporate entity with whom it contracted for distribution in Peru be at the "retail" level – it had to be an entity other than PSG as PSG did not sell at the retail level – so that New Balance would receive dual margins (at the distribution and the retail levels) and better product placement where its products were being sold. For example, under the New Distribution Agreement, New Balance required that its new Peru distributor "expend

US $150,000 in each of 2015 and 2016 for furniture, fixtures, point of purchase materials and other improvements to create shop in shop displays for Products in Marathon Sports stores located in the Territory." Claimant's Exhibit 6, p. 11. Through the shop in shop locations, Superdeporte would provide New Balance an exclusive space within Marathon Sports stores dedicated to the sale of New Balance products. New Balance maintained that this new structure was essential for any future distribution relationship with New Balance in Peru. Additionally, the New Distribution Agreement significantly increased the distribution fees that the distributor was required to pay to New Balance, as well as the minimum purchase requirement that the distributor needed to make to New Balance. *See* Claimant's Exhibit 6, at Exhibits D and E. New Balance stated that it required the new structure under the New Distribution Agreement so as to gain an "unfair advantage" over its competitors in the Peruvian market. Claimant's Exhibit 3, p. 59.

5.  The principals and management of Superdeporte and New Balance exchanged an initial draft of the New Distribution Agreement in September 2015 and negotiated the terms of the New Distribution Agreement over the coming months. *See* Claimant's Exhibit 6 at p. 1. By the end of January 2016, all of the terms of the New Distribution Agreement were finalized and agreed to between New Balance and Superdeporte. The only outstanding item was for Superdeporte's principals and management to take the necessary steps for Superdeporte to serve as the distributor for New Balance in Peru. In December 2015, the parties agreed, that in the interest of finalizing the New Distribution Agreement as soon as possible, the New Distribution Agreement would be executed between New Balance and PSG as a temporary fix to get the agreement finalized and executed, and that once Superdeporte was established, Superdeporte would be substituted for PSG as the

counterparty to New Balance, and the new distributor for New Balance products in Peru pursuant to the New Distribution Agreement. Claimant's Exhibit 3, p. 80, 91–92. This approach would allow the parties to finalize the New Distribution Agreement as soon as possible.

6. In early May of 2016, Mr. Ribadeneira, one of the principals of Superderporte, informed New Balance that despite some delays, Superdeporte was ready to distribute New Balance products in Peru. With Superdeporte up and running, New Balance was supposed to promptly modify the New Distribution Agreement in order to substitute in Superdeporte as their Peruvian distributor. As such, in order to finalize agreements with retailers, one of Mr. Ribadeneira's employees asked New Balance for a letter confirming that Superdeporte was New Balance's distributor in Peru. Claimant's Exhibit 2, pp. 17–19, 27.

7. On May 30, 2016, New Balance informed Mr. Ribadeneira and his employees that no distribution agreement existed between New Balance and Superdeporte and that New Balance would not be proceeding with the New Distribution Agreement with that entity. Claimant's Exhibit 2, pp. 12–13. Shortly thereafter, on June 23, 2016, New Balance formally terminated the Distribution Agreement with PSG through a termination letter. *See* Claimant's Exhibit 4. On July 8, 2016, ignoring that it had already concluded negotiations for the New Distribution Agreement between New Balance and Superdeporte, New Balance informed PSG and Superdeporte, without any explanation, that New Balance had decided to work with another distributor in Peru beginning in 2017. After concluding its contractual relationship with PSG, New Balance has done business in Peru through another distributor, Deportes Sparta, effective January 1, 2017.

8.      In January 2017, Mr. Ribadeneira (who is a principal for Superdeporte), in his individual capacity, initiated civil legal proceedings against New Balance in the Peruvian civil courts with respect to New Balance's failure to honor its obligations to proceed with the New Distribution Agreement between New Balance and Superdeporte, and alleging extra-contractual claims that arose from New Balance's failure to conduct itself in good faith under Peruvian law with respect to the negotiation and execution of the New Distribution Agreement.  *See* Respondents' Exhibit 1.  In the Peru Action, Mr. Ribadeneira argues first that Superdeporte, PSG, and New Balance agreed to the terms of the New Distribution Agreement, and that the parties' respective rights had been validly perfected.  *Id.* at 18 (English version) and at 21 (Spanish version).  If the court were to find that the contract had not been concluded, Mr. Ribadeneira also argues that New Balance had a pre-contractual obligation under Peruvian law to negotiate with PSG and Superdeporte in good faith, particularly after requiring that the owners of the Peruvian distribution business spend months creating a new entity at the "retail" level for purposes of effectuating the New Distribution Agreement, and that it breached its pre-contractual obligation to PSG and Superdeporte.  *Id.* at 9 (English version) and at 10 (Spanish version).

9.      On February 1, 2017, Mr. Ribadeneira filed a request with the Peruvian Court for interim measures, asking that the court order New Balance to abstain from the distribution of its products in Peru with any distributor other than PSG.  *See* Respondents' Exhibit 2.  In December 2017, the Peruvian court overseeing the Peru Action granted the request for interim measures.  *See* Respondents' Exhibit 3.  The court ordered a halt on the distribution of New Balance products in Peru during the pendency of the proceeding.  On July 31, 2018,

the Peruvian Court dissolved its interim measures order, formally permitting the distribution of New Balance products in Peru.

10. The Peru Action remains ongoing. On April 19, 2018, New Balance moved for dismissal of the Peru Action because it argued the case should instead be heard before the Peruvian commercial court. On May 14, 2018, the Peruvian civil courts rejected New Balance's request to transfer the action, and New Balance appealed. On June 11, 2018, New Balance then argued, for the first time, that the Peru Action is subject to mandatory arbitration under the 2013 Distribution Agreement.

11. On May 29, 2018, Respondents and Superdeporte filed a petition for discovery in aid of the Peru Action pursuant to 28 U.S.C. §1782 in the District of Massachusetts against Claimant, as well as a number of current and former employees who were involved in the decision not to move forward with the New Distribution Agreement. Claimant, as well as John, Cullen, a current New Balance employee, and William Tung, a former New Balance employee, moved to quash the subpoenas. On December 7, 2018, the Magistrate Judge issued a Report and Recommendation recommending that that the Court issue an order granting the subpoenas. New Balance submitted its opposition to the Report and Recommendation on January 18, 2019, and Mr. Ribadeneira, PSG, and Superdeporte submitted their Response to New Balance's Opposition on February 1, 2019. On August 17, 2018, Respondents and Superdeporte filed a separate petition for discovery in aid of the Peruvian proceeding pursuant to 28 U.S.C. §1782 in the District of Oregon from a former New Balance employee, Alan Hed, who signed the Distribution Agreement on behalf of Claimant, and who was also involved in New Balance's decision not to move forward with the New Distribution Agreement and to work with another distributor in Peru.

On August 22, 2018, the Oregon Court granted the 1782 petition.  These proceedings

remain ongoing.

## III.   THIS TRIBUNAL DOES NOT HAVE JURISDICTION OVER MR. RIBADENEIRA

12.     Simply put, this Tribunal does not have jurisdiction over Mr. Ribadeneira.  Mr. Ribadeneira

was not and never has been a party to the Distribution Agreement between PSG and New

Balance.  He also has never been a party to the New Distribution Agreement.  PSG also

never assigned the Distribution Agreement to Mr. Ribadeneira, nor has he in any way

assumed the obligations under the Distribution Agreement.  Arbitration is fundamentally

based upon the consent of the parties to the arbitration agreement.  Without its consent, a

party may not be compelled to arbitrate a dispute.

### A.   Mr. Ribadeneira Was Not a Party to the Distribution Agreement Or its Arbitration Clause

13.     Pursuant to Clause 21 of the Distribution Agreement, the *parties* to the Distribution

Agreement agree to arbitrate any and all disputes arising out of the Distribution Agreement.

*See* Claimant's Exhibit 1.  As such, only the *parties* to the Distribution Agreement, namely

PSG and New Balance, can be bound by the Distribution Agreement's arbitration clause.

Accordingly, Mr. Ribadeneira, as a non-party to the Distribution Agreement as well as its

arbitration agreement, cannot be bound by its arbitration clause.

### B.   PSG Has Not Assigned Its Rights Under the Agreement to Mr. Ribadeneira

14.     Furthermore, PSG has not transferred or assigned its rights in relation to the dispute

between it and New Balance to Mr. Ribadeneira.  *See* Notice of Arbitration, ¶ 16; *see also*

Claimant's Exhibit 5.  The Distribution Agreement itself, with respect to the Distributor is,

by its own terms, "nondivisible, nontransferable, and nonassignable".  *See* Claimant's

Exhibit 1. As such, PSG never assigned or transferred this agreement to Mr. Ribadeneira and Claimant's discussion of assignment is plainly irrelevant.

15. PSG and Superdeporte executed Assignments of Rights in connection with the Peru Action. The Peru Action relates to New Balance's failure to move forward with a New Distribution Agreement in Peru with Superdeporte, an entity that Respondents reconstituted and repurposed for purposes of distributing New Balance's products in Peru. It does not relate to PSG's rights and obligations under the Distribution Agreement that are the subject of this proceeding.

16. What is more, the Assignment of Rights contemplates only that PSG will assign its rights related to the Peruvian Demand to Mr. Ribadeneira "with respect to legal actions to be *initiated against* New Balance Athletic Shoe Inc. in Peru and anywhere else in the world." *See* Claimant's Exhibit 5 (emphasis added). This arbitration proceeding is distinct from the Peruvian Demand and it is not a proceeding *initiated against* New Balance, as New Balance is the Claimant in this arbitration.

17. PSG did not assign its rights and obligations under the arbitration agreement contained in the Distribution Agreement to Mr. Ribadeneira. The Assignment of Rights is not only inapplicable to this proceeding, but also, an assignment of the type that Claimant says occurred—which it did not—is forbidden by the Distribution Agreement and the New Distribution Agreement.

18. As a result, this tribunal lacks jurisdiction to hear any dispute between Claimant and Mr. Ribadeneira or any claims which Claimant purports to have in relation to Mr. Ribadeneira. It must decline to exercise jurisdiction over any dispute relating to Mr. Ribadeneira, who does not consent to arbitrate these disputes with New Balance. It also lacks jurisdiction to

hear the separate and distinct claims that Mr. Ribadeneira has filed against New Balance in the Peru Action.

## IV. THIS TRIBUNAL SHOULD NOT JOIN THE CLAIMS IN THE PERU ACTION WITH THIS ARBITRATION

19. There is a strong public policy in favor of enforcing arbitration agreements both in Massachusetts and in Peru. This is generally true unless, as is true here, the party opposing arbitration rebuts the presumption in favor or arbitration. *Grand Wireless, Inc. v. Verizon Wireless, Inc.*, 748 F.3d 1, 7 (1st Cir. 2014). Rebutting the presumption begins with highlighting an ambiguity. Under Massachusetts law, an ambiguity arises only if "a reasonable person could read the provision more than one way." *Shen v. CMFG Life Ins. Co.*, No. CV 15-11593-MLW, 2016 WL 1129308, at *8 (D. Mass. Mar. 4, 2016), *report and recommendation adopted*, No. CV 15-11593-MLW, 2016 WL 1189125 (D. Mass. Mar. 22, 2016). Rebutting an ambiguity in order to limit arbitration requires a showing of an intent to exclude the type of dispute at issue from the scope of the arbitration clause. *See Grand*, 748 F.3d at 8–9. By this standard, the arbitration clause contained in the Distribution Agreement does not apply to the claims in the Peru Action. The parties did not intend to arbitrate the claims that Mr. Ribadeneira filed against New Balance in Peru in relation to New Balance's failure to move forward with the New Distribution Agreement.

### A. The Peru Action Does Not Relate to or Arise From the Distribution Agreement At Issue in This Arbitration, it Relates to New Balance's Failure to Move Forward With the New Distribution Agreement

20. The Distribution Agreement's arbitration clause provides: "The parties agree that any and all disputes (whether in contract or any other theories of recovery) related to or arising out of this Agreement or the relationship, its application and/or termination (including post-

termination obligations) shall be settled by final and binding arbitration in accordance with the UNCITRAL Arbitration Rules."  *See* Claimant's Exhibit 1.

21.   The parties to the arbitration clause of the Distribution Agreement are *only* PSG and New Balance.  The "relationship" at issue in the arbitration clause is the distribution arrangement between PSG and New Balance as set forth in the Distribution Agreement.  It does not involve any other relationship including the new and different structure and relationship that the parties were negotiating under the New Distribution Agreement.  PSG and New Balance have, in accordance with this arbitration agreement, agreed to arbitrate their contractual claims arising under the Distribution Agreement in this forum.

22.   The claims pending in the Peru Action do not arise out of or relate to the Distribution Agreement.  Instead, they arise out of and relate to the New Distribution Agreement and New Balance's bad faith in failing to move forward with the New Distribution Agreement. The claims in the Peru Action also do not pertain to post-termination obligations under this Distribution Agreement.  Instead, they pertain to the negotiation of a New Distribution Agreement, which ultimately did not come to fruition because New Balance acted in bad faith in negotiating the New Distribution Agreement.  As such, the Peru Claims do not fall within the scope of the Distribution Agreement should not be joined with this arbitration.

23.   Furthermore, the claims at issue in the Peru Action are not, as Claimant contends, inextricably intertwined with the arbitration claims.  The New Distribution Agreement, at New Balance's request, had a different structure and different parties than the Distribution Agreement.  Under the New Distribution Agreement, Superdeporte was going to serve as New Balance's exclusive distributor in Peru.  New Balance has not made any claims in this

arbitration related to the New Distribution Agreement between New Balance and Superdeporte.

**B.    The New Distribution Agreement Was Not Simply a Contract Renewal, it Was a Complete Restructure of the Distribution Relationship**

24.    Claimant also inaccurately refers to the New Distribution Agreement as merely a renewal of the Distribution Agreement.  This characterization is plainly incorrect.  The facts reflect that the New Distribution Agreement, while it may not have involved significant changes on New Balance's part, involved a *complete* reorganization of the distribution relationship from the perspective of the distributor.  First, as explained above, the New Distribution Agreement, at New Balance's request, was to have a different distributor party, Superdeporte.  Under the New Distribution Agreement, Superdeporte was going to serve as New Balance's exclusive distributor in Peru.  It took Mr. Ribadeneira months to properly reconstitute Superdeporte so that it was prepared to serve as New Balance's exclusive distributor in Peru.

25.    The New Distribution Agreement also had a distinct structure as compared to the Distribution Agreement.  Under the New Distribution Agreement, the parties planned to significantly increase the distribution of New Balance products in Peru.  In addition to expanding the distribution of New Balance products in Peru, the structure of the relationship changed, at New Balance's request.  The change in structure was designed to increase New Balance's margins and improve product placement where its products were sold.  New Balance sought to increase its margins through the "shop in shop" locations at Marathon Sports Stores, giving New Balance increased floor space as well as an "unfair advantage" over its competitors.

26.     New Balance's attempts to characterize the New Distribution Agreement as merely a
renewal are also contrary to New Balance's contemporaneous representations to
Respondents.  For example, when New Balance shared the terms of the New Distribution
Agreement with PSG's representatives, New Balance itself refers to the draft New
Distribution Agreement as a "contract restructure."  Claimant's Exhibit 6, p. 1.  To
restructure something is to change its makeup or organization, which is exactly what the
parties contemplated through the New Distribution Agreement.

**C.     Superdeporte Has Not Consented to Arbitration with Claimant**

27.     While the terms of the New Distribution Agreement had been agreed to between the parties
and the New Distribution Agreement was set for execution, the parties never formally
executed the New Distribution Agreement.  New Balance acted in bad faith in negotiating
and finalizing the New Distribution Agreement, and misled Respondents and Superdeporte
into thinking that they had concluded negotiations and ultimately decided not to move
forward with the New Distribution Agreement.  While the New Distribution Agreement
also contained an identical arbitration clause, New Balance, Superdeporte, and PSG never
signed the New Distribution Agreement.  Superdeporte's name does not even appear in the
draft of the New Distribution Agreement.  As such, Superdeporte was never a party to the
New Distribution Agreement, nor was it a party to its arbitration clause.

**D.     It is Exclusively Up to the Peruvian Court, Not This Tribunal, to Determine its
Jurisdiction to Hear the Claims in the Peru Action**

28.     The Peruvian Court is currently considering its jurisdiction over the claims in the Peru
Action.  First, New Balance's jurisdictional objections to the Peru Action are unlikely to
be granted.  When the Peruvian civil courts rejected New Balance's request to transfer the
action to the Peruvian commercial court in May 2018, the Peruvian civil court in fact

confirmed its own competence over the Peru Action. *See* declaration of Javier Lozada, ¶¶ 4, 10. In fact, the Peruvian court affirmed its jurisdiction to hear the matter when it admitted the Demand, considered the request for interim measures, and when it denied New Balance's request to transfer the Peru Action to the Peruvian commercial court. *Id.* at ¶ 10. New Balance's jurisdictional objections, arguing first that the matter should be heard by the commercial court and then that the matter is subject to arbitration, are inconsistent, unsupported by the evidence on the record, and are unlikely to be granted. *Id.* at ¶ 11.

29. To date, New Balance has made arguments regarding the Peruvian court's jurisdiction both in the Peru Action as well as in this arbitration. New Balance's strategy is faulty because it risks inconsistent outcomes. Furthermore, under the doctrine of *lis pendens*, this tribunal should defer to the Peruvian court regarding the determination of the Peruvian court's own jurisdiction. New Balance first raised the issue of the Peruvian court's jurisdiction to hear this matter before the Peruvian court. The Peruvian court will, in turn, rule on its jurisdiction. This tribunal should thus refrain from ruling on the question while it remains pending before the Peruvian court.

30. Finally, it is exclusively within the prevue of the Peruvian court to determine its own jurisdiction to hear this dispute. The Peru Action will continue until a judgement is issued in Peru that resolves the merits of the controversy. *See* Informe Legal, CASAHIERRO Abogados, p. 3 (English version). Under Peruvian law, arbitration consolidation may only take place between arbitration proceedings, not between an arbitration proceeding and an ongoing litigation. *Id.* at pp. 4–5. Furthermore, consolidation may only be made effective by express agreement between the parties. *Id*. Here, there has been no express agreement

between the parties. Furthermore, the constitution of Peru states that "no authority may appeal to pending cases before the jurisdictional body or interfere in the exercise of its functions." *Id.* at pp. 5. For the tribunal to intervene in this case would be an interference with the exercise of the court's functions, and would also subject the judge in the Peru Action to criminal prosecution for the crime of undue avoidance under Peruvian law. *Id.* at p. 6.

31.     Therefore, even if this tribunal were to find that the Peru Claims should be joined with this arbitration, under Peruvian law, the judge in the Peru Action would not be compelled to follow, and almost certainly would not follow, this tribunal's determination regarding the claims at issue in the Peru Action. *Id.*

## V.      RELIEF SOUGHT

32.     Respondents reject Claimant's claims as set out in its Motion and reject the relief sought therein.

33.     Respondents respectfully request the arbitral tribunal to:

      i.      Dismiss all Claimant's claims with respect to Mr. Ribadeneira on the ground that the arbitral tribunal lacks jurisdiction with respect to a dispute between Claimant and Mr. Ribadeneira;

      ii.     Reject Claimant's Motion to compel arbitration of the claims pending in the Peru Action;

      iii.    Order Claimant to pay all arbitration costs associated with this jurisdictional briefing, including Respondents' representative's costs and expenses; and

      iv.     Order any further and/or additional relief as the Tribunal may deem appropriate.

34.     Respondents reserve their right to:

i.      Amend or supplement the above arguments as well as the relief sought herein;

ii.     Present additional factual or legal arguments as may be necessary to present its case or rebut any case put forward by Claimant; and,

iii.    Seek interim and or provisional measures before this tribunal or any competent national court.

Respectfully submitted,

David M. Orta
Legal representative for Respondents
1300 I Street NW, Suite 900
Washington, DC 20005
Tel: (202)538-8000
Fax: (202)538-8100
February 4, 2019

# EXHIBIT 7

INTERNATIONAL INSTITUTE FOR CONFLICT PREVENTION & RESOLUTION

IN THE MATTER OF ARBITRATION
BETWEEN:

NEW BALANCE ATHLETICS, INC.,
     Claimant                      CASE NO. 01-18-0003-1183

v.

PERUVIAN SPORTING GOODS S.A.C., et
al.
     Respondents

## MEMORANDUM AND ORDER ON CLAIMANT'S MOTION
## TO COMPEL ARBITRATION

The claimant, New Balance Athletics, Inc. ("New Balance"), seeks an award against the

respondents, Peruvian Sporting Goods S.A.C. ("PSG") and Rodrigo Ribadeneira, PSG's majority

stockholder and general manager ("Ribadeneira"), for amounts allegedly owed under a

distribution agreement dated January 1, 2013, pursuant to which PSG purchased New Balance

products for distribution in Peru ("the distribution agreement"). PSG has submitted an

amended response, including a counterclaim alleging breach of the distribution agreement by

New Balance. Ribadeneira has objected to the jurisdiction of the tribunal. New Balance has

moved for an order declaring that Ribadeneira is subject to the tribunal's jurisdiction with

respect to certain claims asserted by Ribadeneira in the courts of Peru, and that such claims

must be adjudicated in this arbitration. I am empowered to make the jurisdictional

determination pursuant to Article 23 of the UNCITRAL Arbitration Rules. I conducted a hearing

on the subject by telephone on February 26, 2019.

1. **Findings of Fact.** Based on the relevant evidence submitted to me to date, I make the following findings with respect to the jurisdictional defense asserted by Ribadeneira and the motion to compel arbitration of the Peru claims. These findings relate to the motion to compel arbitration only and are made without prejudice to the right of the parties to present evidence on the merits of the arbitration claims.

PSG has distributed New Balance products in Peru since 2000. New Balance and PSG entered into the distribution agreement effective January 1, 2013, to December 31, 2015. In the event that neither party gave timely notice otherwise, which they did not, the agreement self-extended to December 31, 2016. Ribadeneira was not a party to the distribution agreement. That agreement contained in section 21 an arbitration clause as follows: "The parties agree that any and all disputes (whether in contract or any other theories of recovery) related to or arising out of this Agreement or the relationship, its application and/or termination (including post-termination obligations) shall be settled by final and binding arbitration in accordance with the UNCITRAL Arbitration Rules." Under section 25, the distribution agreement is "nondivisible, nontransferable, and nonassignable." Under section 17(e), the obligation to arbitrate survives termination of the agreement.

In mid-2015, alleging that PSG was in significant arrears with respect to amounts owed, New Balance placed PSG on "credit hold," and refused to fill new orders, even when backed by a letter of credit. At the same time, the parties embarked on a negotiation to bring about a new distribution agreement that would make certain changes in wholesale/retail arrangements.

2

On September 15, 2015, New Balance forwarded to PSG a draft of an Amended and Restated Agreement between the parties. The draft contained the same arbitration clause that appears in the distribution agreement; recites an effective date of January 1, 2013 (the effective date of the distribution agreement); adds an effective date of August 15, 2015, with respect to the amendment; and appears to be an extension of the then extant distribution agreement with certain changes. Further negotiation by the parties of various terms continued from there. It was anticipated that a yet-to-be created entity, Superdeporte S.A.C. ("Superdeporte"), of which Ribadeneira would also be a principal, would be substituted for PSG as distributor once Superdeporte was established and capable of performing the distributor's functions. Throughout this period, New Balance regularly demanded that PSG make significant payments with respect to its arrearages, but no mutually satisfactory arrangements were implemented and the debt remained outstanding. There was also discussion at this time of proceeding with PSG as signatory, with Superdeporte to be substituted for PSG at a later time. In the end, no version of an amended agreement was signed by any party.

On or about May 16, 2016, with no new agreement signed and a substantial arrearage continuing to exist, PSG notified New Balance that Superdeporte had been established and was prepared to assume responsibilities as distributor. PSG requested a letter confirming Superdeporte as its new distributor in Peru. After agreeing initially to provide the requested letter, New Balance subsequently refused to do so, citing the absence of a contract with Superdeporte and the size of the debt owed by PSG.

3

On or about May 30, 2016, New Balance notified PSG that it would not proceed with a new arrangement until a satisfactory payment was made and a new agreement with Superdeporte was executed. On or about June 23, 2016, New Balance forwarded to PSG a subsequent notice that it would not renew the distribution agreement, and on or about July 8, 2016, notified PSG that it would work with a different distributor in Peru.

On or about November 25, 2016, PSG and Superdeporte executed similar written assignments of claims to Ribadeneira. The assignments recite allegations regarding the earlier negotiations between PSG and New Balance. Each assignor then assigns to Ribadeneira, without consideration, "... all its rights in attention to the dispute mentioned before against NEW BALANCE ATHLETIC SHOE INC. before judicial and administrative authorities, which enables THE ASSIGNEE to hold its position and execute all THE ASSIGNOR'S rights in respect with the legal actions to be initiated against NEW BALANCE ATHLETIC SHOE INC. in Peru and anywhere else in the world."

In January, 2017, Ribadeneira commenced legal proceedings in the Peru civil courts on two alternative claims ("the Peru claims"). First, Ribadeneira alleged that New Balance, PSG and Superdeporte had in fact agreed on a new distribution arrangement; that such agreement was fully perfected as of January 25, 2016; and that the new agreement had been breached by New Balance causing damages to the other contracting parties. Alternatively, Ribadeneira alleged

4

that New Balance had failed to fulfill its obligation under Peruvian law to conduct the negotiation regarding a new distribution agreement in good faith, likewise causing damages.

The proceeding in Peru remains pending. In December, 2017, the Peruvian court temporarily enjoined New Balance from distributing products in Peru through any distributor other than PSG. In July, 2018, the court dissolved the injunction, based apparently on its finding that no distribution contract between New Balance and PSG remained in effect. New Balance has moved to dismiss the Peru claims in the Peru courts. Meanwhile, discovery with respect to those claims has been authorized by the United States District Court in Oregon, and a similar request is pending in the United States District Court in Massachusetts.

2. **Discussion.** With certain exceptions, "a party cannot be required to arbitrate any dispute that it has not by contract submitted to arbitration." *Commonwealth v. Philip Morris Incorporated*, 448 Mass. 836, 843 (2007). Ribadeneira was not a party to the distribution agreement effective January 1, 2013, and in ordinary circumstances would not be bound personally by its provisions, including its arbitration clause. Likewise, if -- as Ribadeneira contends -- the Amended and Restated Agreement or other extension of the distribution relationship became effective, such new agreement, and any arbitration clause contained therein, would ordinarily bind PSG and/or Superdeporte, but not Ribadeneira in his individual capacity. The question is whether Ribadeneira, while not a party to either agreement, may have become subject to the arbitration clause with respect to the Peru claims by virtue of the PSG and/or Superdeporte assignments or for other reasons.

5

The related question, the answer to which will in my view be dispositive, is what disputes the arbitration clause is intended to encompass, and specifically whether it applies to the Peru claims at all. The answer appears clear with respect to the first of such claims. If Ribadeneira is correct that a new distribution agreement between New Balance and either PSG or Superdeporte became effective (notwithstanding the absence of formal execution by any affected party), the arbitration clause contained therein would bind either PSG or Superdeporte with respect to the assertion of claims thereunder. Those claimants cannot evade the arbitration clause by means of assignments of the claims to a nonparty. To the extent that Ribadeneira has acquired those claims, he has acquired as well the accompanying obligation to have them adjudicated in this arbitration.

In this regard, Ribadeneira's assertion of at least the first of the Peru claims turns on the validity of the respective assignments, given that it is the claims of PSG and/or Superdeporte that he is pursuing. I assume the validity of those assignments notwithstanding the nonassignment provision set forth in section 25 of the distribution agreement as well as in the purported new agreement. *Apollo Computer, Inc. v. Berg*, 886 F.2d 469, 472 (1st Cir. 1989) ("... under Massachusetts law, a general nonassignment clause will be construed as barring only the delegation of duties, not the assignment of rights"). The assignments do not convey to Ribadeneira any of the obligations incurred by PSG or Superdeporte, nor do they transfer to Ribadeneira personally any on-going right to act as distributor. They assign only claims, if any,

6

already possessed by the assignors for breach of the purported agreement and, as set forth above, do so subject to the requirement that such claims be arbitrated.

Whether the second Peru claim is embraced by the arbitration clause of the original distribution agreement is a closer question. That claim is an alternative claim that assumes that New Balance on the one hand, and PSG and/or Superdeporte on the other, did not conclude a new distribution agreement. In that event, Ribadeneira, as assignee of PSG and Superdeporte, asserts under Peru law that New Balance bargained in bad faith; induced the principals of PSG and Superdeporte to incur considerable expense in reliance on New Balance's representations; and ultimately damaged those companies by terminating the negotiation and engaging with a new distributor. Given that the claim turns on the allegation that no new agreement exists, a duty to arbitrate can be located, if at all, only in the arbitration clause of the original agreement.

The arbitration clause of the distribution agreement provides in relevant part "that any and all disputes ... related to or arising out of the Agreement or the relationship, its application and/or termination (including post-termination obligations) shall be settled by final and binding arbitration." This is a so-called "broad clause" that creates "a presumption that a contract dispute is encompassed by the clause unless it is clear that the dispute is excluded." _Commonwealth v. Philip Morris Incorporated,_ 448 Mass. at 843-844; _Carpenter v. Pomerantz,_ 36 Mass. App. Ct. 627, 630 (1994) (where broad arbitration clause, "there is a strong presumption of arbitrability"). In construing a broad clause similar to the clause in the distribution

7

agreement, the Court of Appeals observed that "(b) road language of this nature covers

contract-generated or contract-related disputes between the parties however labeled: it is

immaterial whether claims are in contract or in tort." *Maldonado v. PPG Industries, Inc.*, 514 F.

2d 614, 616 (1st Cir. 1975) (emphasis supplied). "The arbitration clause is not limited to

disputes over the terms of the contract or to disputes arising during the performance of the

contract." Id at 616 n. 6.


The terms of a contract, including presumably its arbitration clause, may be enforced by

or against nonparties through "assumption, piercing the corporate veil, alter ego, incorporation

by reference, third-party beneficiary theories, waiver and estoppel." *Arthur Andersen LLP v.*

*Carlisle,* 129 S. Ct. 1896, 1902 (2009), quoting 21 R. Lord, Williston on Contracts s. 57:19, p. 183

(4th ed. 2001). Where a broad arbitration clause is in place, arbitration is avoided only where

there is "positive assurance that the arbitration clause is not susceptible to an interpretation

that covers the asserted dispute. Doubts should be resolved in favor of coverage." *Grand*

*Wireless, Inc. v. Verizon Wireless, Inc.*, 748 F.3d 1, 8 (1st Cir. 2014), quoting *United Steelworkers*

*of Am. v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 582-583 (1960).


With these principles in mind, I turn to the language of the arbitration clause and the

Peru claim at issue. The provision that "all disputes related to or arising out of this Agreement"

speaks for itself. Thus, the parties do not dispute, nor could they, that New Balance's claim for

amounts due under the agreement and PSG's counterclaim for breach of that agreement are

governed by the clause. The reference in the clause to those disputes that relate to or arise out

8

of the agreement is followed by the phrase "or the relationship." I am not persuaded by the

proposition that the reference to "the relationship" reflects only the rights and obligations

created by the agreement. Such an interpretation renders the phrase superfluous. Abiding by

normal criteria for the interpretation of language of this nature, the phrase presumably means t

something, and that "something" must expand the scope of the arbitration clause beyond those

disputes that are captured by the preceding language.

I conclude, therefore, that the phrase "or the relationship" was intended to apply to all

aspects of the interaction between New Balance and PSG on the subject of the distribution of

New Balance products in Peru, whether such interaction reflected existing contractual rights or

otherwise. The arbitration clause refers as well to "this Agreement or the relationship, its

application and/or termination," suggesting that the clause embraces disputes arising from the

cessation of business dealings between the parties apart from disputes arising specifically from

the distribution agreement itself.

The Peru claim at issue, i.e., that New Balance negotiated in bad faith before ending the

distribution relationship, arises from the parties' efforts while the original agreement was in

effect to extend the relationship into the future past the date (December 31, 2016) on which

the existing agreement would expire by its own terms. Those efforts generated a draft of a

document entitled "Amended and Restated Agreement" that recites an effective date of

January 1, 2013, the effective date of the earlier agreement, with a subsequent reference to

August 15, 2015, as the date on which amendments would become effective. The inference is

9

clear that what was contemplated by the parties was the continuation of a relationship between manufacturer and distributor which had by then existed for more than fifteen years, but which would otherwise expire if not extended by agreement. That the extended agreement contained somewhat different terms does not alter its purpose. This is true as well with the intention to substitute as distributor Superdeporte, a company in which Ribadeneira would also be a principal, and which apparently could undertake distribution activities that PSG could not perform. It is still the ending of the relationship between New Balance and PSG that invokes the arbitration clause, and I am not persuaded that PSG and Superdeporte are sufficiently independent of each other that any incidental effect on Superdeporte is unfair or unlawful.

I am satisfied that the claim of PSG and/or Superdeporte that PSG acted unlawfully with respect to negotiation of an extended agreement, which claim has been assigned to Ribadeneira, implicates directly the "relationship" between manufacturer and distributor that then existed; accordingly, that claim is governed by the arbitration clause. In this regard, the outcome is similar to that arrived at in _Next Step Medical Co., Inc. v. Johnson & Johnson International,_ 619 F.3d 67, 72 (1st Cir. 2010), wherein an arbitration clause governed any dispute "arising out of or relating in any way to the business relationship between (the parties)." Id. at 69. Construing the intended scope of the clause, the court concluded that it "is not limited to contract disputes ... (A) claim arising out of and relating to the breakdown of business relationships ... is covered by this broadly worded arbitration clause." Id. at 72.

10

My conclusion that the arbitration clause applies to the Peru claims disposes as well of Ribadeneira's contention that he cannot be compelled to arbitrate because he is not a party to the agreement that contains the arbitration requirement. It is the claims that are subject to arbitration. Those claims belonged to PSG and/or Superdeporte, but were subsequently transferred to Ribadeneira by assignment. They remain governed by the arbitration clause irrespective of who prosecutes them. I make no attempt to determine whether Ribadeneira has other rights as an individual under Peru law that may be independent of the claims of PSG and/or Superdeporte; it is the claims of those entities that are covered.

By so ruling, it is not my intention to attempt to impose a result on the courts of Peru, nor do I seek to interfere with whatever jurisdiction those courts choose to assert. I decide only what has been presented to me in this arbitration. Resolution of any possible conflicts that could result from on-going litigation in a separate forum is for another time.

**3. Conclusion.** The motion of New Balance to compel arbitration is allowed. The case administrator shall contact the parties to arrange a convenient time for a scheduling conference to be conducted by telephone.

/s/ William I. Cowin
Hon. William I. Cowin (Ret.)
Arbitrator

DATED: March 18, 2019

11

**PROOF OF SERVICE BY EMAIL & U.S. MAIL**

Re: New Balance Athletics, Inc. / Peruvian Sporting Goods S.A.C. (ICDR)
Reference No. 1400017459

I, Kristen Flaherty, not a party to the within action, hereby declare that on  March 18, 2019, I served

the attached Memorandum and Order on Claimaint's Motion to Compel Arbitration on the parties in the within

action by Email and by depositing true copies thereof enclosed in sealed envelopes with postage thereon fully

prepaid, in the United States Mail, at Boston, MASSACHUSETTS, addressed as follows:

Kate E. MacLeman Esq
Mark E. Tully Esq.
Goodwin Procter LLP
100 Northern Ave
Boston, MA   02210
Phone: 617-570-1000
kmacleman@goodwinlaw.com
mtully@goodwinprocter.com
　Parties Represented:
　New Balance Athletics, Inc.

Mr. Michael Pickett
Joseph P. McGurrin Esq.
Goodwin Procter LLP
100 Northern Avenue
Boston, MA   02210
Phone: 617-570-1389
mpickett@goodwinlaw.com
jmcgurrin@goodwinlaw.com
　Parties Represented:
　New Balance Athletics, Inc.

Julianne Jaquith Esq.
David M. Orta Esq.
Quinn Emanuel Urquhart & Sullivan LLP
1300 I Street NW
Suite 900
Washington, DC   20005
Phone: 202-538-8000
juliannejaquith@quinnemanuel.com
davidorta@quinnemanuel.com
　Parties Represented:
　Peruvian Sporting Goods S.A.C.

I declare under penalty of perjury the foregoing to be true and correct. Executed at Boston,

MASSACHUSETTS on March 18, 2019.

Kristen Flaherty
KFlaherty@jamsadr.com

# SERVICE LIST

| | |
|---|---|
| **Case Name:** | New Balance Athletics, Inc. vs. Peruvian Sporting Goods S.A.C. (IC) |
| **Reference #:** | 1400017459 |
| **Panelist:** | Cowin, William I., |

| | |
|---|---|
| **Hear Type:** | Arbitration |
| **Case Type:** | Business/Commercial |

---

### Julianne Jaquith

Quinn Emanuel Urquhart & Sullivan LLP

Julianne Jaquith
1300 I Street NW
Suite 900
Washington, DC 20005
juliannejaquith@quinnemanuel.com

Respondent
Phone: 202-538-8000
Fax: 202-538-8100

**Party Represented:**
  Peruvian Sporting Goods S.A.C.

### Kate E. MacLeman

Goodwin Procter LLP

Kate E. MacLeman
100 Northern Ave
Boston, MA 02210
kmacleman@goodwinlaw.com

Claimant
Phone: 617-570-1000
Fax: 617-523-1231

**Party Represented:**
  New Balance Athletics, Inc.

### Joseph P. McGurrin

Goodwin Procter LLP

Joseph P. McGurrin
100 Northern Avenue
Boston, MA 02210
jmcgurrin@goodwinlaw.com

Claimant
Phone: 617-570-1389
Fax: 617-321-4702

**Party Represented:**
  New Balance Athletics, Inc.

### David M. Orta

Quinn Emanuel Urquhart & Sullivan LLP

David M. Orta
1300 I Street NW
Suite 900
Washington, DC 20005
davidorta@quinnemanuel.com

Respondent
Phone: 202-538-8000
Fax: 202-538-8100

**Party Represented:**
  Peruvian Sporting Goods S.A.C.

### Michael Pickett

Goodwin Procter LLP

Michael Pickett
100 Northern Avenue
Boston, MA 02210
mpickett@goodwinlaw.com

Claimant
Phone: 617-570-1389
Fax: 617-321-4702

**Party Represented:**
  New Balance Athletics, Inc.

### Mark E. Tully

Goodwin Procter LLP

Mark E. Tully
100 Northern Ave
Boston, MA 02210
mtully@goodwinprocter.com

Claimant
Phone: 617-570-1000
Fax: 617-523-1231

**Party Represented:**
  New Balance Athletics, Inc.

# EXHIBIT 8

## INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION

**IN THE MATTER OF ARBITRATION BETWEEN:**

NEW BALANCE ATHLETICS, INC.

vs.

PERUVIAN SPORTING GOODS S.A.C. et al.

Civil No. 01-18-0003-1183

### PETITIONER NEW BALANCE ATHLETICS, INC.'S MOTION TO AMEND

Pursuant to Procedural Order No. 2 and Article 22 of the UNCITRAL Arbitration Rules, Petitioner New Balance Athletics, Inc. ("New Balance") hereby submits its Amended Notice of Arbitration, attached hereto as Exhibit A. This is New Balance's first Amended Notice and is amended in light of Judge Cowin's Memorandum and Order on New Balance's Motion to Compel Arbitration, dated March 13, 2019.

Dated: May 3, 2019

Respectfully submitted,

/s/ Mark E. Tully
Mark E. Tully
Kate E. MacLeman
100 Northern Avenue
Boston, MA 02210
mtully@goodwinlaw.com
kmacleman@goodwinlaw.com
p: 617-570-1000
f: 617-801-8955

*Attorneys for Petitioner*

# EXHIBIT A

NOTICE OF ARBITRATION UNDER THE ARBITRATION RULES OF THE UNITED NATIONS
COMMISSION ON INTERNATIONAL TRADE LAW

BETWEEN:

NEW BALANCE ATHLETICS, INC.

(CLAIMANT)

-AND-

PERUVIAN SPORTING GOODS S.A.C., RODRIGO RIBADENEIRA, AND SUPERDEPORTE S.A.C.

(RESPONDENT)

# AMENDED NOTICE OF ARBITRATION

## GOODWIN PROCTER LLP

Goodwin Procter LLP
100 Northern Ave
Boston, MA 02210
Tel:  (617) 570-1000
Fax:  (617)523-1231
Legal representative for Claimant                                   May 3, 2019

## I.     INTRODUCTION

1.     This Notice of Arbitration, together with its Exhibits numbered 1 to 10, is submitted on behalf of New Balance Athletics, Inc. ("New Balance") pursuant to Article 3 of the Arbitration Rules of the United Nations Commission on International Trade Law in force as from August 15, 2010 (the "UNCITRAL Arbitration Rules") against Peruvian Sporting Goods S.A.C. ("PSG") and Rodrigo Ribadeneira ("Ribadeneira") (collectively "Respondents").

2.     This Notice of Arbitration contains information concerning the following:

   i.      The name, description and address of each of the Parties (**II**);

   ii.     The Parties' relationship and the nature and circumstances of the Parties' dispute giving rise to Claimant's claims (**III**);

   iii.    The dispute resolution clause, the proposed governing law, the seat and language of the arbitration (**IV**);

   iv.     Claimant's position as regard to the composition of the arbitral tribunal (**V**);

   v.      Claimant's damages (**V**);

   vi.     A statement of the relief sought (**VI**);

3.     This dispute principally concerns Respondent's failure to render payment under the Parties' agreement covering Respondent's distribution of New Balance products (the "Distribution Agreement").

## II.    THE PARTIES

## A.     Claimant

4.     Claimant is New Balance, a company registered under the laws of Massachusetts, with its registered office located at Boston Landing, 100 Guest Street, Boston, Massachusetts 02135.  New Balance is in the business of designing, manufacturing, marketing, and distributing athletic footwear, apparel and accessories.  Its footwear, apparel and accessories are distributed all over the world.

5.      Claimant's address is:

> New Balance Athletics, Inc.
> Boston Landing
> 100 Guest Street
> Boston, MA 02135
> Attention:  Paul Gauron, EVP and General Counsel
> Tel.:  (617) 746-2554
> Fax:  (617) 787-9355
> paul.gauron@newbalance.com

6.      Claimant's representative, to whom all correspondence should be sent in this arbitration, are:

> Goodwin Procter LLP
> Mark Tully (BBO # 550403)
> 100 Northern Avenue
> Boston, MA 02210
> Tel.:  (617) 570-1000
> Fax:  (617)523-1231
> MTully@goodwinlaw.com

## B.    Respondents

7.      Respondents are Peruvian Sporting Goods S.A.C., a company registered under the laws of Peru, with its registered office located at Carretera Panamericana KM, 1303 mz. B lote 4 Zofratacna, Tacna, Peru, Rodrigo Ribadeneira, an individual, who during the relevant time period was the majority shareholder in PSG, and Superdeporte S.A.C., a company registered under the laws of Peru, with its registered office located at Av. Larco Nro. 1301 Int. 301, Miraflores, Peru.

8.      Respondents' contact information is:

> Peruvian Sporting Goods S.A.C.
> Carretera Panamericana KM
> 1303 mz. B lote 4 Zofratacna
> Tacna, Peru
> Attention:  Rodrigo Ribadeneira
> TELEFAX:  (5932) 484-195

> Superdeporte S.A.C.
> Av. Larco Nro.
> 1301 Int. 301
> Miraflores, Peru
> Attention: Rodrigo Ribadeneira

3

Rodrigo Ribadeneira
Hidalgo de Pinto
City of Quito, Ecuador

## III. THE PARTIES' RELATIONSHIP AND THE NATURE AND CIRCUMSTANCES OF THE PARTIES' DISPUTE GIVING RISE TO THE CLAIMS

9. On January 1, 2013, New Balance and PSG entered into a three-year distribution agreement for the sale and distribution of New Balance's products in Peru (the "Agreement"). Ex. 1 (Agreement). The three-year term of the Agreement was subject to a one-year extension if the Agreement was not terminated by either party sixty days in advance of its scheduled termination on December 31, 2015. Ex. 1, ¶ 5(b). By all accounts, the relationship between New Balance and PSG was successful for two and a half years. But in mid-2015, the relationship took a turn for the worse when PSG fell behind on its contractual obligations and became less and less responsive to New Balance's inquiries.

10. By July 2015, New Balance had notified PSG of its past due payments and that unless it made substantial progress toward bringing them up-to-date, PSG would be unable to order more product under the Agreement. Ex. 3, p. 57. Over two months later, PSG had still not become current on its past due payments, promising instead to make its payments to New Balance over time. Ex. 2, p. 23; Ex. 3, pp. 60, 66. To the contrary, however, PSG continuously failed to adhere to each and every payment schedule it proposed. Ex. 3, pp. 64, 74, 110-11.

11. Between July 2015 and January 1, 2016, New Balance and PSG tried to negotiate a new distribution agreement, while New Balance also tried to recover PSG's past-due balances. The Parties could not come to terms on a new distribution agreement, in large part due to PSG's eleventh hour demand for changes to the new agreement's terms. Ex. 3, pp. 80-81. As New Balance pointed out to PSG at the time, many of its demands were "huge change[s] in the conditions that ha[d] been negotiated extensively over the [previous] year." Ex. 3, pp. 82-83.

12. On January 1, 2016, the Agreement's one-year extension went into effect and the parties remained subject to the terms of that Agreement. Ex. 3, pp. 88-102; Ex. 1, ¶ 5(b).

13.    At about that same time, New Balance notified PSG that continued delinquency of amounts owed under the Agreement would jeopardize the parties' relationship. Ex. 3, pp. 110-11.  On May 4, 2016, New Balance wrote to PSG:  "We need to have an honest conversation about what the future holds for our relationship.  We have been partners for many years but the last 12 months ha[ve] tested [New Balance's] patience and, if there is no future with PSG/Super Deportes, we will need to look at other ways to keep the brand relevant in Peru and Ecuador."  Ex. 3, p. 119.  Later that month, New Balance informed PSG that New Balance would discontinue shipping its product to PSG until past due amounts that it owed under the Agreement had been paid.  Ex. 2, p. 13.

14.    On June 23, 2016, New Balance notified PSG that it would not agree to PSG's demanded changes to the Agreement and that the parties' relationship would end on December 31, 2016, at the termination of the one-year extension under the original Agreement.  Ex. 4.

15.    As a result of PSG's failure to pay money due and owing under the Agreement, as of June 30, 2018, PSG owed New Balance over $2.9 million for product sold, contractual interest, and past-due distribution fees.  Interest on these amounts continues to accrue according to the terms of the Agreement.  The precise amounts that PSG owes New Balance are set forth in the below table:

| Description | Amount | Interest | Combined |
|-------------|--------|----------|----------|
| Distribution Fees | $1,692,080.00 | $727,377.41 | $2,419,457.41 |
| Sample Expense | $43,801.00 | $39,955.05 | $83,756.05 |
| Withholding Tax Debits | $207,823.72 | $191,438.70 | $399,262.42 |
| **TOTAL** | **$1,943,704.70** | **$958,771.16** | **$2,902,475.86** |

16.    On November 25, 2016, through an Assignment of Rights, PSG and Superdeportes purport to have transferred "all of the rights entitled to [them]" in relation to the dispute between these entities and New Balance to Ribadeneira.  Ex. 5.  Thus, to the extent of any such purported assignment, Ribadeneira has "take[n] [PSG's] place" under the Agreement, and is subject to the Agreement's arbitration clause.  *Id.*

17.     On January 22, 2017, purporting to rely on this Assignment of Rights, Mr. Ribadeneira filed claims in Peru (the "Peru Action") alleging that the negotiations taking place between PSG and New Balance either resulted in a valid and enforceable contract between New Balance and PSG, or in the alternative, that New Balance acted in bad faith in negotiating an agreement with PSG and/or Superdeportes, and was thus subject to "pre-contractual liability" for causing PSG and/or Superdeportes damages. *See* Ex. 6, pp. 9, 18 (English translation of lawsuit filed in Peru). In the Peru Action, Respondents claim, in part, that the document titled Amended and Restated Distribution Agreement By and Between New Balance Athletic Shoe, Inc. and Peruvian Sporting Goods S.A.C. ("Amended and Restated Agreement") constitutes a valid and enforceable contract between the parties.

18.     On February 1, 2017, Mr. Ribadeneira filed a request for interim measures (the "Peru Interim Relief Request") asking the Peruvian court to order New Balance to "refrain from enforcing the direct distribution within the territory of Peru of its products . . . or with a different party different to [PSG]" based on Respondents' claims that the negotiations taking place between the parties between July 2015 and January 2016 resulted in a new distribution agreement between the parties. Ex. 7, p. 1 (English translation of request for interim measures). On December 8, 2017, the Peruvian court granted the request for interim measures, enjoining New Balance from distributing any of its products in Peru with any distributor other than PSG. *See* Ex. 8. Upon learning of the grant of interim measures, New Balance was unable to distribute any products in Peru until the interim relief was reversed on July 26, 2018. *See* Ex. 9.

19.     At the time Respondents initiated the Peru Action and the Peru Interim Relief Request, Respondents were fully aware of the fact that there was no enforceable distribution agreement in existence between New Balance and PSG. *See* Ex. 4. Respondents were also aware that New Balance had entered into a new business partnership for distribution of its Products in Peru for 2017. In fact, New Balance informed them as such in an email dated July 8, 2016. *See* Ex. 10 (informing Respondent Ribadeneira that New Balance "decided to work with a new partner for Peru."). Furthermore, in both the Peru Action and the Peru Interim Relief Request, Respondents admit that they knew New Balance had

agreed to work with a different distributor in Peru for 2017.  *See* Ex. 6, p. 8 (English translation); Ex. 7, p. 6 (English translation).

20.     Respondents—knowing that there was no agreement between PSG and New Balance, and knowing that New Balance had a new distribution contract for distributing its products in Peru—nonetheless filed the Peru Interim Relief Request *ex parte*, which the Peruvian court erroneously granted, putting to a halt New Balance's ability to distribute products in the region until New Balance was given notice and an opportunity to respond.  *See* Ex. 8. New Balance was thus unable to distribute its products in Peru for months, causing New Balance significant harm, as a result of Respondents' baseless and punitive claims.

## IV.     DISPUTE RESOLUTION CLAUSE, GOVERNING LAW, SEAT AND LANGUAGE OF THE ARBITRATION

### (a)     The Arbitration Clause

21.     This arbitration is initiated pursuant to the arbitration clause found at paragraph 21 of the Agreement, which provides as follows:

> The parties agree that any and all disputes (whether in contract or any other theories of recovery) related to or arising out of this Agreement or the relationship, its application and/or termination (including post-termination obligations) shall be settled by final and binding arbitration in accordance with the UNCITRAL Arbitration Rules. . . . The arbitration shall be heard and determined by a single arbitrator.  The place of arbitration shall be Boston, Massachusetts, USA.

### (b)     The Place of Arbitration

22.     Pursuant to paragraph 21 set out above, the place of the arbitration is Boston, Massachusetts, USA.

### (c)     Governing Law

23.     The Agreement is governed by the substantive laws of the Commonwealth of Massachusetts pursuant to paragraph 20, which provides as follows:

> This Agreement shall be deemed to have been entered into in the Commonwealth of Massachusetts, U.S.A and shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts, U.S.A without giving effect to principles of conflicts of law and excluding the United Nations Convention on Contracts For the International Sale of Goods.

(d)     **The Language of Arbitration**

24.     Pursuant to paragraph 21 of the Agreement, the language of the arbitration shall be English.

## V.     THE ARBITRAL TRIBUNAL

25.     Paragraph 21 of the Agreement provides for a single arbitrator.  Pursuant to paragraph 21, the appointing authority shall be the American Arbitration Association.

## VI.     CLAIMANT'S DAMAGES

26.     New Balance's damages consist of monies owed for product sold, contractual interest, and past-due distribution fees and are currently estimated at $2,902,475.86, plus interest that continues to accrue under the Agreement.

27.     New Balance has also suffered harm as a result of Respondents' baseless legal claims pursued in Peru, which wrongfully interfered with New Balance's distribution contract in Peru.

## VII.     RELIEF SOUGHT

28.     As a result, New Balance respectfully requests the arbitral tribunal to issue an award:

    i.     declaring that the arbitral tribunal has jurisdiction to consider the dispute described herein between the Parties;

    ii.     declaring that Respondents violated their obligations by failing to render payment to New Balance according to the terms of the Agreement;

    iii.     declaring that Respondents unlawfully interfered with New Balance's distribution agreement with its new distributor, which it entered into subsequent to the expiration of the Agreement;

    iv.     ordering Respondents to compensate New Balance for the damages and losses suffered as a result of PSG's breaches of the Agreement, currently estimated to be in the amount of $2,902,475.86, plus interest that continues to accrue under the Agreement;

    v.     ordering Respondents to compensate New Balance for damages it suffered as a result of New Balance's and its new Peruvian distributor's inability to distribute

its products in Peru stemming from Respondents' interference with New Balance's agreement and relationship with its new Peruvian distributor;

vi.    ordering Respondents to compensate New Balance for attorneys' fees and expenses incurred in defending the baseless and vexatious Peru Action and the Peru Interim Relief Request;

vii.    ordering Respondents to pay all arbitration costs, including Claimant's representative's costs and expenses; and

29.    New Balance further requests a judgment declaring that:

i.    the Amended Restated Agreement that was the basis of Respondents' breach of contract and pre-contractual liability claims pending in Peru, but ordered by this Tribunal to be brought here, is not valid or enforceable, and was never finalized, perfected, formalized, or in any way entered into by the parties;

ii.    New Balance acted in good faith in terminating the Agreement under that agreement's express terms and in negotiating the Amended and Restated Agreement; and

iii.    New Balance acted within its rights and in good faith in not entering into the Amended and Restated Agreement or any agreement with Respondents; and

iv.    this arbitration resolves any and all claims between the Parties and New Balance does not owe Respondent any further obligation of any kind.

30.    For the avoidance of doubt, Claimant reserves its right to:

i.    raise any and all further claims arising out of or in connection with the disputed matters described in this Notice of Arbitration or otherwise arising between the Parties; and

ii.    amend and/or supplement the relief sought herein;

iii.    produce such factual or legal arguments or evidence (including witness testimony, expert testimony and documents) as may be necessary to present its case or rebut any case which may be put forward by Respondent; and

iv.    seek interim and provisional measures before this arbitral tribunal or any

competent court or tribunal.

Respectfully submitted,

/s/ Mark Tully

Mark Tully
Goodwin Procter LLP
Legal representative for Claimant
100 Northern Avenue
Boston, MA 02210
Tel.:  (617) 570-1000
Fax:  (617)523-1231
MTully@goodwinlaw.com
May 3, 2019

**Exhibits submitted with the Notice of Arbitration**

| Exhibit number | Description |
|---|---|
| 1. | Distribution Agreement by and between New Balance Athletic Shoe, Inc. and Peruvian Sporting Goods S.A.C. |
| 2. | Traduccion Oficial N.° 845-17 (translated emails) |
| 3. | Traduccion Oficial N.° 971-17 (translated emails) |
| 4. | Termination Notification dated June 23, 2016 |
| 5. | Assignment of Rights between Peruvian Sporting Goods S.A.C. and Rodrigo Ribadeneira |
| 6. | Text of the Lawsuit Filed in Peru (Spanish and English translation) |
| 7. | Text of the Interim Measure Request (Spanish and English translation) |
| 8. | Grant of Interim Measures (Spanish and English Translation) |
| 9. | Reversal of Interim Measures (Spanish and English Translation) |
| 10. | Email Communication between Claimant and Respondents dated July 8, 2016 |

# EXHIBIT 9

IN THE MATTER OF AN ARBITRATION UNDER THE ARBITRATION RULES OF THE

UNITED NATIONS COMMISSION ON INTERNATIONAL TRADE LAW

BETWEEN:

**NEW BALANCE ATHLETICS, INC.**

*Claimant*

-and-

**PERUVIAN SPORTING GOODS S.A.C., SUPERDEPORTE S.A.C., and RODRIGO RIBADENEIRA**

*Respondents*

———————————————————

**RESPONDENTS' MOTION FOR SUMMARY DISPOSITION**

———————————————————

**31 May 2019**

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
1300 I Street NW, Suite 900
Washington, DC 20005
Tel: (202)538-8000
Fax: (202)538-8100
Counsel for Respondents

## I.     INTRODUCTION

1.     Peruvian Sporting Goods S.A.C. ("**PSG**"), Superdeporte S.A.C. ("**Superdeporte**"), and Rodrigo Ribadeneira ("**Mr. Ribadeneira**") (collectively, "**Respondents**") submit this Motion for Summary Disposition ("**Motion for Summary Disposition**") pursuant to Procedural Order No. 2, Article 24 of the Arbitration Rules of the United Nations Commission on International Trade Law as adopted in 2013 (the "**UNCITRAL Arbitration Rules**"), and Rule 18 of the JAMS Comprehensive Arbitration Rules.

2.     Respondents respectfully request that the Tribunal (1) declare that it does not have jurisdiction over Mr. Ribadeneira and as such, dismiss Mr. Ribadeneira as a Respondent from this arbitration, (2) declare that it does not have jurisdiction over Claimant's claim relating to the request for interim measures in Peru, and as such, dismiss Claimant's claim for damages arising from Mr. Ribadeneira's interim measures request, and in the unlikely case that the Tribunal finds it has jurisdiction over Claimant's claim relating to the request for interim measures in Peru, (3) summarily dismiss this claim on the merits.

## II.     STATEMENT OF FACTS

3.     On 1 January 2013, New Balance and PSG (together with New Balance, the "**Parties**") entered into a Distribution Agreement.[1] The Distribution Agreement governed the sale and distribution of New Balance's products in Peru.[2] The Distribution Agreement was valid until 31 December 2015.[3] According to the Distribution Agreement, if neither party expressed an intention to let the Distribution Agreement expire, the Distribution Agreement would automatically be renewed for an additional year, that is, until 31 December 2016.[4] By the end of the Distribution Agreement's original term, neither party expressed an intention to let the Distribution Agreement expire.[5] As such, the Parties allowed the Distribution Agreement to automatically renew until 31 December 2016.[6]

4.     During 2015 New Balance made an offer to PSG to enter into a new and reformed Distribution Agreement for their business in Peru (the "**New Distribution Agreement**").[7] Per New Balance's requirements for the New Distribution Agreement, PSG would be required to enter into the New Distribution Agreement through a different corporate entity,

---

[1]   Claimant's Exhibit 1 at p. 2 ("Effective Date" shall mean January 1, 2013.).

[2]   *Id.* at p. 2 ("Territory" shall mean Peru.).

[3]   *Id.* at p. 2 ("Initial Term" shall commence on the Effective Date and end on the day prior to the third anniversary of the Effective Date.).

[4]   *Id.* at p. 4 ("If neither party sends notice of its intention to let the Agreement expire, then the Agreement shall be automatically renewed at the end of the Initial Term for one one-year period…").

[5]   Claimant's Exhibit 3, p. 88; New Balance's Amended Notice of Arbitration, ¶ 12.

[6]   Claimant's Exhibit 3, p. 88.

[7]   Claimant's Exhibit 6 to Motion to Compel.

which was ultimately called Superdeporte S.A.C. ("**Superdeporte**").[8]   The New Distribution Agreement also entailed a new business structure requested by New Balance.[9] For this new business structure, New Balance required "shop-in-shop locations" and its distributor, Superdeporte, to be at the "retail" level.[10]  New Balance maintained that this structure was essential for any future distribution relationship between the Parties, and it called it an "unfair advantage."[11]

5.    In mid-2015, PSG and New Balance began negotiating the New Distribution Agreement. The Parties exchanged an initial draft of the New Distribution Agreement in September 2015.[12]  By the end of January 2016, all of the terms of the New Distribution Agreement were finalized and agreed to between the Parties.  New Balance and PSG agreed that the New Distribution Agreement would be entered into between New Balance and PSG, as Superdeporte was still a company being repurposed.[13]  Once Superdeporte was repurposed, Superdeporte would be substituted for PSG as New Balance's distributor in Peru.[14] Entering into the new agreement with PSG and then later substituting in Superdeporte would allow the Parties to execute the New Distribution Agreement as soon as possible.[15]

6.    In early May 2016, PSG informed New Balance that Superdeporte was ready to nominally replace PSG and take on the New Distribution Agreement for New Balance's products in Peru.[16]  With Superdeporte repurposed, New Balance was obligated to promptly modify the New Distribution Agreement and add Superdeporte as their Peruvian distributor, as the Parties had agreed to do.[17]  In order to finalize agreements with retailers, PSG asked New Balance for a confirmation that it had complied with the Parties' agreement and modified

---

[8]   Exhibit R-12.

[9]   Claimant's Exhibit 3, p. 120.

[10]   Exhibit R-8, p. 3; Claimant's Exhibit 2 at p. 24; Claimant's Exhibit 3 at p. 69, 120, Claimant's Exhibit 6 to Motion to Compel., p. 11, Exhibit C (In addition to the above 6%, Distributor shall expend on fit out, fixtures and advertising at least $150,000 in each of 2015 and 2016 for shop in shop areas exclusively selling Products and located in Marathon Sports retail outlets in the Territory.").

[11]   Claimant's Exhibit 3, p. 59; Claimant's Exhibit 3, p. 120 ("With the integrated retail and with NB now part of Marathon the advantage you requested is a reality. Also and most importantly in the next months we will be able to make payments to offset what we owe.").

[12]   Claimant's Exhibit 6 to Motion to Compel.

[13]   Exhibit R-12 ("The paper work to to [sic] formalize the new company is not ready yet, should be ready by the end of Q1 or Q2 at the latest. We can sign the contract with PSG and made the change when is ready SD.OK..fine.").

[14]   Claimant's Exhibit 3, p. 80, 91-92.

[15]   Exhibit R-12.

[16]   Claimant's Exhibit 3, p. 120.

[17]   Exhibit R-12 ("Do you have the address and proof of existence of Super Deportes yet? Regardless, I suggest we sign the agreement now as PSG and do an amendment once that info is ready.").

the New Distribution Agreement placing Superdeporte as New Balance's distributor in Peru.[18]

7.      However, on 30 May 2016, New Balance informed PSG and Superdeporte that no distribution agreement existed between New Balance and Superdeporte.[19]  Shortly thereafter, on 23 June 2016, New Balance notified PSG and Superdeporte in writing that it was formally terminating the Distribution Agreement with PSG effective 31 December 2016.[20]  On 8 July 2016, New Balance informed PSG and Superdeporte, that New Balance had decided to work with another distributor in Peru beginning in 2017.[21]  New Balance then unilaterally concluded its contractual relationship with PSG on 31 December 2016 and has done business in Peru through a new distributor, Deportes Sparta, effective 1 January 2017.[22]

8.      Following an assignment of certain rights to pursue claims against New Balance from PSG and Superdeporte to Mr. Ribadeneira, in January 2017,[23] Mr. Ribadeneira initiated civil legal proceedings against New Balance before Peruvian civil courts.[24]  Mr. Ribadeneira claimed that New Balance failed to honor its obligations under the New Distribution Agreement with PSG, and then to be substituted with Superdeporte, and alleged extra-contractual claims that arose from New Balance's failure to conduct itself in good faith under Peruvian law with respect to the negotiation and execution of the New Distribution Agreement.[25]

9.      On 1 February 2017, Mr. Ribadeneira filed a request with the Peruvian civil courts for interim measures.[26]  Mr. Ribadeneira asked the court to order New Balance to abstain from the distribution of its products in Peru with any distributor other than PSG.[27]  In December 2017, the Peruvian civil court overseeing Mr. Ribadeneira's claims granted the request for interim measures.[28]  The court ordered a halt on the distribution of New Balance products in Peru during the pendency of the proceeding.[29]  On 31 July 2018, the Peruvian Court

---

[18]  Claimant's Exhibit 2, pp. 17-19, 27.

[19]  Claimant's Exhibit 2, pp. 12-13.

[20]  Claimant's Exhibit 4.

[21]  Exhibit R-7.

[22]  Claimant's Exhibit 4.

[23]  Claimant's Exhibit 5.

[24]  Exhibit R-1.

[25]  Exhibit R-1 at p. 36.

[26]  Exhibit R-2.

[27]  *See* Exhibit R-2, R-3.

[28]  Exhibit R-3.

[29]  Exhibit R-3 at p. 15.

lifted its interim measures order, formally permitting the distribution of New Balance products in Peru.[30]

## III.  THE LEGAL STANDARD

10.  Summary judgment is required where "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law."[31]  In turn, "[a] party moving for summary judgment in a case in which the opposing party will have the burden of proof at trial is entitled to summary judgment if he demonstrates […] that the party opposing the motion has no reasonable expectation of proving an essential element of that party's case."[32]  The record is examined in the light most favorable to the non-moving party, but "[c]onclusory statements, general denials, and factual allegations not based on personal knowledge [are] insufficient to avoid summary judgment."[33]

## IV.  ARGUMENT

### A.  THE TRIBUNAL DOES NOT HAVE JURISDICTION OVER MR. RIBADENEIRA AND IT SHOULD DISMISS MR. RIBADENEIRA AS A RESPONDENT IN THIS CASE

11.  The Tribunal has no jurisdiction over Mr. Ribadeneira as a Respondent in this case, because Mr. Ribadeneira was not a party to any of the contractual agreements between the Parties and has not agreed to arbitrate any claims with New Balance.  Mr. Ribadeneira was never a party to the Distribution Agreement or to the New Distribution Agreement.  Furthermore, Mr. Ribadeneira was not a signatory to the Distribution Agreement on behalf of PSG or to the New Distribution Agreement on behalf of PSG/Superdeporte, nor was Mr. Ribadeneira a signatory to either agreement's arbitration clause.

12.  Arbitration is fundamentally based upon consent between the parties.[34]  If a party has not consented to arbitrate, then a party may not be compelled to arbitrate.[35]  Mr. Ribadeneira has not consented to arbitrate *any* disputes with New Balance and, as such, should be dismissed as a party to this arbitration.

---

[30]  *See* Exhibit R-4.

[31]  Mass. R. Civ. P. 56(c).

[32]  *Lambert v. Fleet National Bank*, 449 Mass. 119, 123 (2007).

[33]  *Cullen Enters. v. Mass. Prop. Ins. Underwriting Ass'n*, 399 Mass. 886, 890 (1987).

[34]  *Stolt-Nielsen*, 559 U.S. at 682, 130 S.Ct. 1758 (Consent is essential under the FAA because arbitrators wield only the authority they are given. That is, they derive their "powers from the parties' agreement to forgo the legal process and submit their disputes to private dispute resolution"); William Park, *Non-Signatories & International Contracts: An Arbitrator's Dilemma,* in Multiple Party Actions in International Arbitration, OUP (2009), pp. 1-2.

[35]  *Stolt-Nielsen*, 559 U.S. at 683-684, 130 S.Ct. 1758 (Parties may generally shape such agreements to their liking by specifying with whom they will arbitrate, the issues subject to arbitration, the rules by which they will arbitrate, and the arbitrators who will resolve their disputes); M. Reisman, L. Craig, W. Park, J. Paulsson, *International Commercial Arbitration,* 2015 (2nd ed.), p. 409.

13. Furthermore, Mr. Ribadeneira does not meet any of the limited carve outs through which an arbitration agreement may be enforced against a non-signatory third-party.

14. Arbitration agreements may be enforced against non-signatories under the following theories: (1) incorporation by reference; (2) assumption; (3) agency; (4) alter ego; (5) equitable estoppel; and (6) third party beneficiary.[36]

15. First, under the "incorporation by reference" theory, a non-signatory may compel arbitration against a party to an arbitration agreement when that party has entered into a separate contractual relationship with the non-signatory which incorporates the existing arbitration clause.[37] There is no such separate relationship here.

16. Second, under an "assumption" theory, a party may be bound by an arbitration clause if its subsequent conduct indicates that it is assuming the obligation to arbitrate, despite being a non-signatory.[38] Mr. Ribadeneira has never assumed the obligation to arbitrate, and in fact, has opposed, in the strongest terms, the Tribunal's jurisdiction over him at every juncture in this case.

17. Third, under an "agency" theory, a non-signatory who is an agent of a signatory may compel arbitration for liability arising under the contract in question.[39] Agency is "the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act."[40] Mr. Ribadeneira, is not an agent of PSG or Superdeporte. He did not sign the Distribution Agreement on behalf of PSG and there is no other evidence in this proceeding that Mr. Ribadeneira was empowered to act as an agent on behalf of PSG or Superdeporte as an agent.

18. Fourth, under a "veil-piercing/alter ego" theory, a party may be bound by an agreement entered into by its subsidiary regardless of the agreement's structure or the subsidiary's attempts to bind itself alone to its terms, when their conduct demonstrates a virtual abandonment of separateness.[41] There is no evidence here of a virtual abandonment of

---

[36] § 57:19. Obligations and rights of persons who are not parties to arbitration agreement, 21 Williston on Contracts § 57:19 (4th ed.); *see also* M. Reisman, L. Craig, W. Park, J. Paulsson, *International Commercial Arbitration,* 2015 (2nd ed.), Chapter 4.

[37] *Machado v. System4 LLC*, 471 Mass. 204 (Mass., 2015); s*ee also* M. Reisman, L. Craig, W. Park, J. Paulsson, *International Commercial Arbitration,* 2015 (2nd ed.), p. 420.

[38] *Machado v. System4 LLC*, 471 Mass. 204 (Mass.,2015).

[39] *Bridas S.A.P.I.C. v. Government of Turkmenistan,* 345 F.3d 347, 356–358 (5th Cir.2003), cert denied; *see also* M. Reisman, L. Craig, W. Park, J. Paulsson, *International Commercial Arbitration,* 2015 (2nd ed.), p. 421.

[40] Restatement (Second) of Agency § 1(1) (1958).

[41] *Machado v. System4 LLC*, 471 Mass. 204 (Mass.,2015); s*ee also* M. Reisman, L. Craig, W. Park, J. Paulsson, *International Commercial Arbitration,* 2015 (2nd ed.), p. 421.

separateness, since Mr. Ribadeneira does not have a parent-subsidiary relationship with either PSG or Superdeporte.

19. Fifth, equitable estoppel also does not apply to the instant case either, as it generally allows a non-signatory to compel arbitration in either of two circumstances: (1) when a signatory must rely on the terms of the written agreement in asserting its claims against the non-signatory or (2) when a signatory raises allegations of substantially interdependent and concerted misconduct by both the non-signatory and one or more of the signatories to the contract. In such situations, a reviewing court may consider all of the relationships of persons, wrongs and issues in the case.[42]

20. Finally, under a "third-party beneficiary" theory, in determining whether a non-signatory may be bound by an arbitration clause, a court must look to the intentions of the Parties at the time the contract was executed and examine whether the contract displays a clear intent to make the non-signatory a third-party beneficiary.[43] There is no evidence of any intent of the Parties to bind Mr. Ribadeneira to the arbitration agreement. As such, the circumstances do not allow for applying any of the carve outs which may allow a non-signatory to be bound by an arbitration agreement.

21. Furthermore, Mr. Ribadeneira also may not be compelled to arbitrate the affirmative claims against New Balance based upon the supposed assignment of rights executed with PSG and Superdeporte. On 25 November 2016, PSG and Superdeporte executed two similar assignment of rights contracts with Mr. Rodrigo Ribadeneira, assigning to him all of their claims against New Balance. The assignments allowed Mr. Ribadeneira to submit claims against New Balance in Peru and in the rest of the world. The assignments have been acknowledged by New Balance and form part of the record of this arbitration.[44]

22. On 2 May 2019, PSG, Superdeporte and Mr. Ribadeneira executed two similar assignment of rights contracts in which Mr. Ribadeneira transferred all the claims he possessed against New Balance *back* to PSG and Superdeporte.[45]

23. The Tribunal assessed these assignment of rights in its Memorandum and Order of March 18, 2019. In this ruling, the Tribunal made clear that "[i]t is the claims that are subject to arbitration."[46] Furthermore, "[t]o the extent that Ribadeneira has acquired <u>those claims</u>, he

---

[42]   *Machado v. System4 LLC*, 471 Mass. 204 (Mass.,2015); M. Reisman, L. Craig, W. Park, J. Paulsson, *International Commercial Arbitration,* 2015 (2nd ed.), p. 422.

[43]   *Machado v. System4 LLC*, 471 Mass. 204 (Mass.,2015).

[44]   Claimant's Exhibit 5; New Balance Motion to Compel Arbitration, January 25, 2019, p. 5; Memorandum and Order on Claimant's Motion to Compel Arbitration, March 18, 2019, p. 4.

[45]   Contrato de Cesión de Derechos (*Assignment of rights contract*) entered into between PSG and Mr. Ribadeneira, dated 2 May 2019, Exhibit R-9; Contrato de Cesión de Derechos (*Assignment of rights contract)* entered into between Superdeporte and Mr. Ribadeneira, dated 2 May 2019, Exhibit R-10.

[46]   Memorandum and Order on Motion to Compel Arbitration, March 18, 2019, p. 11.

has acquired as well the accompanying obligation to <u>have them adjudicated</u> in this arbitration."[47]

24.    Thus, the Tribunal recognized that following the assignment of rights it could only have jurisdiction over Mr. Ribadeneira with respect to the claims previously filed before Peruvian Courts and only if Mr. Ribadeneira chose to advance those claims in this arbitration proceeding.  Mr. Ribadeneira instead chose to reassign the claims to PSG and Superdeporte.[48]  As such, Mr. Ribadeneira no longer has any nexus to the claims that would allow this Tribunal to exercise any jurisdiction over him.  The Tribunal implicitly recognized that there is no valid basis for the Tribunal to claim jurisdiction over Mr. Ribadeneira absent his having a right to advance those claims through the assignment of rights, and as such, this Tribunal should formally dismiss Mr. Ribadeneira as a Respondent in this arbitration now that he no longer is the assignee of the claims being advanced in Peru.

25.    New Balance has essentially advanced two claims in this case.  The first is its affirmative claim for royalties allegedly due to it under the Distribution Agreement, and the second is a claim for damages allegedly flowing from its inability to sell its products in Peru due to the granting of an injunction by the Peruvian Court.  The Tribunal's ruling regarding its jurisdiction to hear the Peruvian claims is not applicable to the affirmative claims for royalties that New Balance has raised in this arbitration.  New Balance's claims relate to PSG's contractual obligations under the Distribution Agreement.  New Balance has not argued, let alone proven, that the obligations under the Distribution Agreement were ever assigned to Mr. Ribadeneira.  They were not and this is not in dispute between the Parties.  No reading of the Tribunal's order to compel arbitration can be read to give the Tribunal jurisdiction over Mr. Ribadeneira with respect to New Balance's affirmative claims against Respondents for breach of the Distribution Agreement, and, as such, the Tribunal should declare that it has no jurisdiction over Mr. Ribadeneira regarding those claims.

26.    The Tribunal also has no jurisdiction over Mr. Ribadeneira, or any of the other Respondents, concerning New Balance's claim for damages arising from the interim measures request that Mr. Ribadeneira pursued in Peru, as further developed below.

**B.    THE TRIBUNAL DOES NOT HAVE JURISDICTION TO HEAR AND SHOULD DISMISS NEW BALANCE'S CLAIM FOR DAMAGES ARISING FROM THE INTERIM MEASURES REQUEST**

27.    As explained above, on 1 February 2017, Mr. Ribadeneira filed a request with the Peruvian Court for interim measures.  Mr. Ribadeneira, basing his request on Peruvian law, asked the court to order New Balance to abstain from the distribution of its products in Peru with any distributor other than PSG.[49]  In December 2017, the Peruvian Court found that it had jurisdiction over the request for interim measures and also held that the interim measures

---

[47]    Memorandum and Order on Motion to Compel Arbitration, March 18, 2019, p. 6 (emphasis added).

[48]    *See* Exhibits R-9 and R-10.

[49]    *See* Exhibit R-2.

request had merit and granted the measures.[50]  Specifically, the court ordered a temporary halt on the distribution of New Balance products in Peru during the pendency of the proceeding.[51]

28.    On 31 July 2018, the Peruvian Court held that the interim measure was no longer necessary and lifted it.  In doing so, the Court formally permitted the distribution of New Balance products in Peru once again.[52]  Furthermore, under Peruvian law, a party may only request the payment of costs arising from an interim measure if the measure is deemed to be unfounded, and may only request such costs from the judge who decided the interim measure.[53]

29.    In sum, the Peruvian Court was presented with an interim measures request which it found to be within its jurisdiction, granted the measure and later lifted it.

30.    The Distribution Agreement explicitly provides that the Parties are entitled to seek interim relief in a court of competent jurisdiction.[54]  The UNCITRAL Rules also expressly permit a party to file a request for interim measures with a court or judicial authority.[55]  The Peruvian Court declared that it was a competent forum to hear Mr. Ribadeneira's request for interim relief.[56]  Mr. Ribadeneira's request was, thus, appropriately filed in the Peruvian court and was permitted under the Distribution Agreement.

31.    Furthermore, Claimant's assertion of the damages claim arising out the Peruvian court's grant of interim measures provides no basis for this Tribunal to assert jurisdiction over that claim.  Should Claimant believe that damages should be awarded in relation to the Peruvian

---

[50]    Exhibit R-3.

[51]    Exhibit R-3.

[52]    Exhibit R-4.

[53]    Peruvian Code of Civil Procedure, Article 621, "Sanctions arising out of an unnecessary or malicious interim measure. If a claim which was secured by an interim measure is declared to be unfounded, the claimant shall bear the costs and expenses of the interim request, a fine not larger than Procedural Reference Units and, if so requested, can also be required to compensate for the damages caused. The damages' amount will be set by the Judge overseeing the claim within the same proceeding, before hearing the claimant. The decision that rules on the settlement of costs, expenses and fines is subject to appeal without suspending the main proceeding.  The appeal of the order to pay damages does suspend the main proceeding. (Translation: "Sanciones por medida cautelar innecesaria o maliciosa.- Si se declara infundada una demanda cuya pretensión estuvo asegurada con medida cautelar, el titular de ésta pagará las costas y costos del proceso cautelar, una multa no mayor de diez Unidades de Referencia Procesal y, a pedido de parte, podrá ser condenado también a indemnizar los daños y perjuicios ocasionados. La indemnización será fijada por el Juez de la demanda dentro del mismo proceso, previo traslado por tres días. La resolución que decida la fijación de costas, costos y multa es apelable sin efecto suspensivo; la que establece la reparación indemnizatoria lo es con efecto suspensivo.").

[54]    See Claimant's Exhibit 1, p. 23.

[55]    See 2010 UNCITRAL Rules, Article 26.  ("A request for interim measures addressed by any party to a judicial authority shall not be deemed incompatible with the agreement to arbitrate, or as a waiver of that agreement.").

[56]    Exhibit R-4, p. 21.

Court's granting of interim measures, it must file that request for damages before the judge and court that granted the relief.[57]  This is not the appropriate forum.[58]  The Peruvian Court is the only competent court to rule on any claims related to the interim relief that the Peruvian court itself granted.[59]  The Tribunal should thus decline Claimant's invitation to question or trespass upon the Peruvian Court's jurisdiction and its decision to order interim measures.

32.  The interim measures request has concluded, is not a part of this proceeding, and the Tribunal is not competent to award damages arising from the properly filed and granted interim measures request in the Peru Action.[60]  As such, this Tribunal does not have jurisdiction to hear Claimant's claim for damages arising from the interim measures request.

## C.  THE TRIBUNAL SHOULD DISMISS NEW BALANCE'S CLAIM FOR DAMAGES ARISING FROM THE INTERIM MEASURES REQUEST ON THE MERITS

33.  In the unlikely case that the Tribunal were to find that it has jurisdiction to rule on the merits of whether the pursuit of the interim measures request in Peru somehow breaches the Distribution Agreement's arbitration clause, this claim is still subject to summary disposition on the merits.

34.  Respondents respectfully request the Tribunal to summarily rule on the merits of this claim and conclude that Mr. Ribadeneira was entitled as a matter of law to pursue the interim measures request in Peru and that, as such, no recoverable damages can flow from that action in this proceeding.

35.  The disposition of this claim by New Balance can be made as a matter of law by interpreting the Distribution Agreement.  The Distribution Agreement provides in pertinent part as follows: "Notwithstanding the requirement herein that the Parties arbitrate disputes arising from or related to this Agreement, either party shall have the right to seek interim equitable relief in the form of a temporary restraining order or preliminary injunction from a court of competent jurisdiction…"[61]

36.  This language allows any party to the agreement, or any party claiming derivatively through a party to the agreement, to seek interim relief in any court that has competent jurisdiction to hear claims for interim relief relating to the Distribution Agreement.  As noted below, Peru is unquestionably one such jurisdiction.  The Tribunal can so conclude as a matter of law.  The UNCITRAL Rules also entitle any of the Parties to request interim

---

[57]  Peruvian Code of Civil Procedure, Article 621, Declaration of Javier Lozada, ¶ 4.

[58]  Peruvian Code of Civil Procedure, Article 621, Declaration of Javier Lozada, ¶ 4.

[59]  Peruvian Code of Civil Procedure, Article 621, Declaration of Javier Lozada, ¶ 4.

[60]  Peruvian Code of Civil Procedure, Article 621, Declaration of Javier Lozada, ¶ 4.

[61]  Claimant's Exhibit 1 at p. 23.

relief in *any* competent forum even though the underlying merits claims were subject to arbitration in Massachusetts, as this Tribunal has decided.

37.   The Peruvian Court is uncontestably a court of competent jurisdiction to hear such a request. The Distribution Agreement was partly executed in Peru, the Parties had assets in Peru, the conduct sought to be proscribed—the sale of New Balance's products—was to occur in Peru and, most importantly, New Balance executed a new contract for the sale of its products with a third-party distributor in Peru. Because the conduct that was to be enjoined involved a third party, namely New Balance's new distributor, who is not subject to this tribunal's jurisdiction or that of the Massachusetts courts, the Peruvian Courts are the most ideal forum for seeking the injunctive relief that Mr. Ribadeneira sought in his request for interim measures.

38.   Mr. Ribadeneira correctly filed the interim measures request before a Peruvian Court as expressly permitted by the Distribution Agreement and its applicable arbitration rules. The Peruvian Court declared itself competent to hear the request and eventually granted the interim relief. Thus, this Tribunal should dismiss Claimant's claim for damages arising from the interim measures request, as this claim is not cognizable as a matter of law.

## V.   RELIEF SOUGHT

39.   PSG and Superdeporte respectfully request the arbitral tribunal to:

i.     Declare that it has no jurisdiction over Mr. Ribadeneira and dismiss Mr. Ribadeneira as a Respondent in this arbitration;

ii.    Declare that it has no jurisdiction to hear any and all claims filed by Claimant arising from the Request for Interim Measures in Peru, and consequently dismiss such claims.

iii.   In the unlikely case that the Tribunal finds that it has jurisdiction over Claimant's claim arising from the Request for Interim Measures in Peru, Respondents respectfully request the arbitral tribunal to dismiss this claim on the merits.

40.   PSG and Superdeporte reserve their right to:

i.     Amend or supplement the above arguments as well as to present any other counterclaims it may have or that come to light as the proceedings evolve, if any;

ii.    Amend or supplement the relief sought herein;

iii.   Present factual or legal arguments as may be necessary to present its case or rebut any arguments put forward by Claimant; and,

iv.    Seek interim and/or provisional measures before this tribunal or any competent court.

Respectfully submitted,

David M. Orta
Counsel for Respondents
1300 I Street NW, Suite 900
Washington, DC 20005
Tel: (202)538-8000
Fax: (202)538-8100
31 May 2019

**EXHIBIT 10**

ICDR CASE REFERENCE NO. 01-18-0003-1183

**New Balance Athletics, Inc.,**
      **Claimant,**

        **and**

**Peruvian Sporting Goods S.A.C.,**
      **Respondent.**

_____

## MEMORANDUM AND ORDER ON RESPONDENTS' MOTION FOR SUMMARY DISPOSITION

The respondents, Peruvian Sporting Goods S.A.C. (PSG), Superdeporte S.A.C. (Superdeporte) and Rodrigo Ribadeneira (Mr. Ribadeneira), have moved for summary disposition of certain claims pursued by the claimant, New Balance Athletics, Inc. (New Balance). New Balance has submitted an opposition. I conducted a hearing by telephone on August 6, 2019.

<u>Background.</u>  Following my order of March 18, 2019, allowing the claimant's motion to compel arbitration, the parties amended their respective claims and counterclaims. New Balance continues to seek amounts allegedly owed under a now-expired distribution agreement effective January 1, 2013. New Balance asserts this claim not only against PSG, but also against Superdeporte and Mr. Ribadeneira, neither of whom were parties to that agreement. The respondents deny the allegation that they breached the 2013 distribution agreement; contend that, even if they did breach, New Balance has exaggerated its damages; and  assert a counterclaim that New Balance itself breached that agreement, thereby causing damage to PSG.

1

In January, 2017, Mr. Ribadeneira, pursuant to assignments of claims executed by PSG and Superdeporte, commenced legal proceedings in Peru against New Balance for breach of an alleged new distribution agreement (the amended and restated distribution agreement) and, alternatively, for a failure to bargain in good faith in the course of attempting to negotiate a new distribution arrangement ("the Peru claims"). I have concluded that those claims are subject to the arbitration clause in the expired distribution agreement, and the respondents (while preserving their jurisdictional objection) have reasserted them in the present proceeding.

In connection with the Peru claims, Mr. Ribadeneira sought ex parte and received from the Peru court an order temporarily enjoining New Balance from selling product in Peru by means of any distribution arrangement other than one with PSG. The restriction remained in effect from December, 2017, to July, 2018, at which time the court, determining in part that certain facts appeared to be otherwise than what had been represented, dissolved the temporary injunction. New Balance has now added to its arbitration demand a separate claim against PSG, Superdeporte and Mr. Ribadeneira for tortious interference with their new distribution arrangements in Peru by means of the above temporary injunction, which New Balance asserts Mr. Ribadeneira obtained in bad faith.

The respondents now move for summary disposition in their favor on three aspects of New Balance's claims. Specifically, they assert that jurisdiction with respect to the claim of tortious interference arising from the Peruvian injunction exists only in the Peruvian court itself, and is not subject to the present arbitration. In the alternative, they argue that the tortious interference claim cannot be sustained on the evidence presently in the record, and that a summary disposition in the respondents' favor should therefore be entered on the ground of insufficient evidence. Finally, they seek the dismissal of any New Balance claim against Mr. Ribadeneira on

the ground that he is not a party to the arbitration agreement and, having reassigned the Peru claims to PSG and Superdeporte, has eliminated any basis on which I concluded previously that he was compelled to arbitrate.

Discussion. 1. <u>Jurisdiction with respect to New Balance's tortious interference claim</u>. The respondents PSG and Superdeporte seek a partial summary disposition declaring that this tribunal "has no jurisdiction to hear any and all claims filed by Claimant arising from the Request for Interim Measures in Peru," and request that therefore such claims be dismissed. <u>Respondents' Motion for Summary Disposition</u>, par. 39 (ii). I addressed the scope of the tribunal's jurisdiction in the memorandum and order dated March 18, 2019. I determined at that time that the broad arbitration clause contained in the distribution agreement of January 1, 2013, was not limited to disputes regarding performance of that specific contract, but rather governed disputes related to the parties' "relationship" as well, including the termination of that relationship. Accordingly, I ruled that the Peru claims, arising as they did from the parties' effort to negotiate an extension to the relationship and the success or failure of that effort (depending on which of the parties' conflicting views is credited), were subject to this tribunal's jurisdiction and should be adjudicated in this forum.

Now the question becomes whether the next in this sequential series of claims, i.e., New Balance's claim that the obtaining of a restraint on its business activities in Peru in the course of assertion of the Peru claims constituted tortious interference, is itself governed by the original arbitration clause. The tortious interference claim is a further step removed from claims arising specifically with respect to the 2013 distribution agreement, and the first issue to be resolved  is whether that claim is sufficiently remote from the concerns underlying the arbitration clause that it is not governed thereby.

I conclude that, as is the case with the Peru claims themselves, a tortious interference claim that arises from the respondents' assertions of breach of contract and bad faith negotiation, together with their obtaining of preliminary injunctive relief, implicates the parties' "relationship." The "relationship" includes efforts in which the parties engaged to alter or extend it, as well as any success or failure in that regard. Litigation generated by such efforts and their results do not take place in a vacuum; they are a part and parcel of the business relationship, and would not have occurred had that relationship not existed. The Peru claims and the tortious interference claim that assertion of the Peru claims in another forum provoked are all claims "arising out of and relating to the breakdown of business relationships between (the parties)." Next Step Medical Co., Inc. v. Johnson & Johnson International, 619 F. 3d 67, 72 (1st Cir. 2010).

However, apart from the scope of the arbitration clause at issue, the respondents assert that only the Peruvian court has authority to award costs or damages in connection with the now dissolved preliminary innjunction. They argue in this regard that they are entitled to seek interim judicial relief under both the distribution agreement and UNCITRAL rules. Having done so in the Peruvian court, their argument continues, it is that court alone that has the authority to award damages and costs. I am not persuaded that the first proposition, while correct, gets the respondents anywhere, or that the second proposition is an accurate statement of the law that governs the question.

It is not contested that the respondents had a right to seek interim relief. See, for example, G.L.c. 251, s2, that empowers parties to seek judicial relief to order or to stay the arbitration. Likewise, parties may, as here, seek injunctive relief while an arbitration is pending. They may do so, as here, in circumstances where they assert that their claims should not be subject to arbitration but should be adjudicated in a different forum. But the right to seek interim judicial relief does not insulate such parties from the consequences of doing so. Under

Massachusetts law, which governs this arbitration, judicial proceedings may give rise to actions for tortious interference. See Powers v. Leno, 24 Mass. App. Ct. 381, 385 (1987) (factfinder to determine whether defendant intentionally interfered with the plaintiffs' relationship by maliciously bringing and continuing the litigation). As set forth above, I have determined that such a claim is embraced by the extant arbitration clause.

Nor, contrary to the respondents' contention, do I locate in the Peruvian procedural code any attempt to oust another forum of jurisdiction with respect to any claim over which that forum would otherwise have authority. Article 621 provides in relevant part that "(i)f a claim which was secured by an interim measure is declared to be unfounded, the claimant shall bear the costs and expenses of the interim request, a fine not larger than Procedural Reference Units and, if so requested, can also be required to compensate for the damages caused. The damages' amount will be set by the Judge overseeing the claim within the same proceeding...." I find nothing in this statement beyond a logical recognition that interim relief may be improvidently granted, together with an authorization that a party affected thereby may seek recovery of resulting damages from the judge in charge of the case.

Nothing in the provision suggests that the court is attempting to secure exclusive jurisdiction over claims that arise out of the proceeding where there may be jurisdiction with respect to such claims elsewhere. Indeed, I fail to understand how, if such were the intention, the Peru courts could lawfully exercise their authority in that way. As I indicated in my decision of March 18, 2019, any conflicts that could arise as a result of incompatible rulings by the respective tribunals may be reconciled if and when they occur by set-off or otherwise.

2. The tortious interference claim on the merits. Apart from their jurisdictional argument above, the respondents assert also that they should receive a summary disposition in their favor on the merits of New

5

Balance's tortious interference claim. Their argument in this regard is similar in one respect to their jurisdictional argument, specifically that they were entitled to seek interim relief both under the distribution agreement and under UNCITRAL procedural rules, in a court of competent jurisdiction, and they did so. They assert that Mr. Ribadeneira as assignee "was entitled as a matter of law to pursue the interim measures request in Peru and that, as such, no reasonable damages can flow from that action in this proceeding." Respondents' Motion, par. 34.

As I indicated above, the right of the respondents to seek interim judicial relief is not contested. If, however, the obtaining of such relief generates a valid claim of tortious interference, that claim cannot be dismissed simply because the respondents had standing to seek relief. What must be decided is whether there is evidence sufficient to warrant a finding in the claimant's favor, thereby precluding a summary disposition and leaving the dispute for trial.

While the respondents have not addressed specifically the state of the evidence to date regarding the tortious interference claim, I conclude that the evidence presently before me is sufficient to withstand the motion for summary disposition. Under Massachusetts law, actions for tortious interference with contractual or other advantageous business relationships require that the plaintiff prove the existence of such a relationship; intentional interference by the defendant with that relationship; improper motive or means on the part of the defendant; and resulting damage to the plaintiff. See G.S. Enterprises, Inc. v. Falmouth Marine, Inc., 410 Mass. 262, 272 (1991); United Truck Leasing Corp. v. Geltman, 406 Mass. 811, 812-817 (1990). Valid tortious interference claims may arise from the pursuit of a law suit. See Powers v. Leno, 24 Mass. App. Ct. at 385.

6

Here, the fact of the Peru law suit and the accompanying obtaining of interim relief establish that the respondents knew that New Balance had entered into a new distribution arrangement with a third party. Likewise, they demonstrate the respondents' intention to interfere with New Balance's new relationship. Whether they did so "with improper motive or means," and whether New Balance was damaged thereby (and, if so, to what extent), are contested questions of fact.

The respondents state that "(o)n 31 July 2018, the Peruvian Court held that the interim measure was no longer necessary and lifted it." Respondents' Motion, par. 28. This doesn't appear to tell the whole story. The restraint was obtained ex parte. In its resolution of July 26, 2018, in which it dissolved the interim measure enjoining New Balance's distribution in Peru through any person or entity other than PSG (see the respondents' exhibit R-4), the Peruvian court notes, among other things, that the new distribution agreement with PSG and/or Superdeporte that the respondents seek to enforce was apparently never executed. Id., Section Eight. Likewise, even had that agreement been executed, it expired by its own terms on December 31, 2016, a fact apparently not disclosed to the court. Based on subsequent submissions by New Balance, "the Court considers that it is necessary to reevaluate the legal credibility of the right invoked." Id., section Six. On the strength of that reevaluation, the court dissolved the injunction.

If it were the case that the respondents (or Mr. Ribadeneira as assignee) misrepresented the facts relevant to the parties' efforts to negotiate a new distribution agreement, that would plainly support a finding that the respondents (or at least Mr. Ribadeneira) interfered with New Balance's contractual relationship with a third party with an improper motive and by improper means. If so, an inference that New Balance sustained at least some loss as a result of being kept out of the Peruvian market for eight months would be reasonable. I make no findings on these issues at this time. I rule only that there is sufficient evidence in the record on

7

summary disposition to determine that there is a meaningful dispute of fact on these questions, and that a summary disposition at this time would be error.

3. <u>Jurisdiction with respect to Mr. Ribadeneira</u>. As indicated, I have determined previously that, beside the claim and counterclaim with respect to the 2013 distribution agreement, the Peru claims are subject to arbitration as well. See Memorandum and Order dated March 18, 2019. As set forth above, I conclude also that New Balance's tortious interference claim is governed by the arbitration clause. The new question to be answered is whether Mr. Ribadeneira, who is not a party to the distribution agreement containing the arbitration clause, and who has now apparently re-assigned the Peru claims to PSG and Superdeporte, is himself subject to the jurisdiction of this tribunal.

New Balance's initial demand for arbitration asserted only a contract claim for amounts allegedly owed under the distribution agreement. New Balance included as respondents both PSG, a party to the agreement, and Mr. Ribadeneira, who was not a party. The respondents answered, and PSG submitted a counterclaim alleging that New Balance had itself breached the agreement. On the basis of these pleadings, it appeared that an award in favor of New Balance, if any, could only be against PSG, while PSG could be the only party that could benefit in the event the counterclaim was successful.

However, the simplicity of the initial claim and counterclaim is altered by the prior assertion of the Peru claims by Mr. Ribadeneira in the Peruvian court. Whatever understandings between Mr. Ribadeneira on the one hand, and PSG and Superdeporte on the other, may have existed with respect to the assignments of those companies' claims, it is a matter of record that Mr. Ribadeneira initiated the Peruvian proceedings in his own name, made representations to the court, and obtained the interim relief that enjoined New Balance's sales in

8

Peru for approximately seven months. To the extent that this litigation may have interfered tortiously with New Balance's contract with a third party (which I do not attempt to decide at this stage), it is Mr. Ribadeneira who has inflicted it. Because this tribunal has jurisdiction of that claim, it has jurisdiction over Mr. Ribadeneira with respect thereto, and Mr. Ribadeneira cannot undo any damage his Peru claims and the injunction may have caused by the expedient of re-assigning those claims to PSG and Superdeporte.

There remains the question whether New Balance's joinder of Mr. Ribadeneira as a party respondent in its claim for damages under the 2013 distribution agreement with PSG survives his motion for partial summary disposition on jurisdictional grounds. Mr. Ribadeneira was not a party to that agreement, and ordinarily would not share any potential liability thereunder; nor would he be subject to that agreement's arbitration clause with respect to a claim for breach of the agreement. However, New Balance asserts that there are other considerations that leave the facts regarding Mr. Ribadeneira's role in dispute; that there is sufficient evidence in the present record to warrant findings that result in a piercing of the corporate veil; and that his motion for partial summary disposition should therefore be denied. Alternatively, New Balance requests that a ruling be deferred until the completion of discovery.

"A corporation or other person controlling a corporation and directing, or participating actively in … its operations may become subject to civil or criminal liability on principles of agency or causation …. This may sometimes occur where corporations are formed, or availed of, to carry out the objectives and purposes of the corporations or persons controlling them." My Bread Baking Co. v. Cumberland Farms, Inc., 353 Mass. 614, 618 (1968). Common ownership and common management are not by themselves sufficient to ignore valid uses of the corporate form. Id. at 619. Ordinarily, there must be evidence of "some fraudulent or injurious consequence;" a "confused intermingling of activity … with substantial disregard" of the separateness of the

entities; or "serious ambiguity about the manner and capacity in which the various (entities) and their respective representatives are acting." Ibid.

These generalizations are applied more precisely by employment of "twelve factors which should be considered in deciding whether to penetrate the corporate form." Evans v. Multicon Construction Corporation, 30 Mass. App. Ct. 728, 733 (1991), citing Pepsi-Cola Metropolitan Bottling Co. v. Checkers, Inc., 754 F. 2d 10 14-16 (1st Cir. 1985). These include common ownership; pervasive control; confused intermingling of business activity, assets, or management; thin capitalization; nonobservance of corporate formalities; absence of corporate records; no payment of dividends; insolvency at the time of the litigated transaction; siphoning away of corporate assets by the dominant shareholders; nonfunctioning of officers and directors; use of the corporation for transactions of the dominant shareholders; and use of the corporation in promoting fraud. Ibid.

Considering these subjects of relevant inquiry, evidence to date that PSG is little more than a convenient agent of Mr. Ribadeneira is insufficient to warrant a finding to that effect. That Mr. Ribadeneira is that company's principal stockholder, its general manager, and apparently its principal voice with respect to its business decisions do not by themselves justify a disregarding of the corporate form. New Balance contracted knowingly with a corporation, having already done business with that company or a predecessor for more than a decade. There is no evidence that the corporate form has been used to defraud or to avoid obligations. There is no evidence that PSG has made any questionable transfers of assets. That PSG might hypothetically be unable to satisfy an award in favor of New Balance (should there be one) is not sufficient. "The risk that a defendant, without fraud and in the normal course of business operations, may become unable to answer to a judgment is inherent in any civil litigation." Evans v. Multicon Construction Corp., 30 Mass. App. Ct. at 737-738.

I acknowledge that Mr. Ribadeneira appears to exercise considerable authority with respect to the operations of PSG (and presumably Superdeporte). This is hardly unusual given that he is PSG's majority stockholder. That he represented when asserting the Peru claims that he did so on his own behalf, while referring also to "his" employees, does not by itself constitute an admission that he is PSG's alter ego for liability purposes. Likewise, the assignment without consideration and subsequent re-assignment of the Peru claims, while consistent with the extent of his obvious influence, does not invite a reasonable inference that the corporation is used to defraud or to gain some unfair advantage.

New Balance asks that I defer ruling on this portion of the respondents' motion until the close of discovery because of the possibility that discovery may generate evidence in support of its contention that Mr. Ribadeneira is the legal party in interest. I have been informed that the parties will jointly seek an enlargement of the present discovery deadline of August 23, 2019. Because I believe that reasonable efforts to establish relevant facts are more important than adherence to a discovery schedule that is likely to be altered anyway, I will defer a ruling on this aspect of the motion for a brief period. I do so, however, with the understanding that the present state of the evidentiary record would, in my view, require dismissal of the amended claims for breach of the 2013 distribution agreement against both Mr. Ribadeneira and Superdeporte. Upon the close of discovery, I will allow a short period in which New Balance may submit any new evidence supporting its argument for piercing the corporate veil and the respondents shall have an opportunity to answer.

Conclusion. 1. The respondents' motion for partial summary disposition in their favor with respect to New Balance's claim for tortious interference is denied.

11

2. A ruling on respondents' motion for partial summary disposition in favor of Rodrigo Ribadeneira with respect to the claim under the 2013 distribution agreement is deferred subject to the conditions set forth above.

Dated: August 20, 2019 _____/s/_____

William I. Cowin
Arbitrator

# EXHIBIT 11

IN THE MATTER OF AN ARBITRATION UNDER THE ARBITRATION RULES OF THE
UNITED NATIONS COMMISSION ON INTERNATIONAL TRADE LAW

BETWEEN:

**NEW BALANCE ATHLETICS, INC.**

*Claimant*

-and-

**PERUVIAN SPORTING GOODS S.A.C., SUPERDEPORTE S.A.C., and RODRIGO RIBADENEIRA**

*Respondents*

_____

**RESPONDENTS' RENEWED MOTION FOR SUMMARY DISPOSITION**

_____

**12 February 2020**

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
1300 I Street NW, Suite 900
Washington, DC 20005
Tel: (202)538-8000
Fax: (202)538-8100
Counsel for Respondents

## I.    INTRODUCTION

1.    Peruvian Sporting Goods S.A.C. ("**PSG**"), Superdeporte Plus S.A.C. ("**Superdeporte**"), and Rodrigo Ribadeneira ("**Mr. Ribadeneira**") (collectively "**Respondents**") submit this Renewed Motion for Summary Disposition ("**Renewed Motion**") pursuant to Procedural Order No. 5, Article 24 of the Arbitration Rules of the United Nations Commission on International Trade Law as adopted in 2013, Rule 18 of the JAMS Comprehensive Arbitration Rules, and the Tribunal's Memorandum and Order on Respondents' Motion for Summary Disposition dated 20 August 2019 (the "**20 August 2019 Order**" or the "**Order**").

2.    In its 20 August 2019 Order, the Tribunal deferred a ruling until the close of discovery on the question of whether it has jurisdiction over Mr. Ribadeneira with respect to one of New Balance's claims under the Distribution Agreement based upon a theory of piercing the corporate veil.[1] Now that discovery has closed, there is no evidence in the record to warrant a finding that the corporate veil should be pierced, and thus there remains no basis for New Balance to assert any claim against Mr. Ribadeneira under the Distribution Agreement. Furthermore, Mr. Ribadeneira never signed, nor was a party to the Distribution Agreement, and thus he has no obligations or liability to New Balance thereunder. Therefore, there is no basis for Mr. Ribadeneira to be held to arbitrate any claims against New Balance related to the Distribution Agreement and, even if there was, there is no basis to find him liable under these agreements. As such, Respondents respectfully request that the Tribunal dismiss the claim against Mr. Ribadeneira with regard to the Distribution Agreement.

3.    Similarly, there also is no legal basis for New Balance to assert its claims under the Distribution Agreement against Superdeporte. Superdeporte is a separate, distinct legal entity that was created to act under the New Distribution Agreement. It never agreed to arbitrate any disputes with New Balance under the Distribution Agreement. It also never assumed any of PSG's rights or obligations under the Distribution Agreement. During discovery, New Balance failed to identify any factual basis to assert liability against Superdeporte under the Distribution Agreement or that there is any basis to pierce the corporate veil as to Superdeporte. While New Balance has tried to argue in its Second Amended Notice of Arbitration that Superdeporte "replaced PSG as an operational entity in May of 2016,"[2] this does not show that Superdeporte assumed any obligations under the Distribution Agreement. In fact, the purported "change" to Superdeporte was done purely in order to effectuate the New Distribution Agreement. As such, Respondents respectfully

---

[1]    In the same 20 August 2019 Order, this Tribunal upheld its jurisdiction over Mr. Ribadeneira with respect to New Balance's tortious interference claim based upon the assignments of rights from PSG and Superdeporte to Mr. Ribadeneira. Respondents respectfully continue to object to this Tribunal's ruling regarding its jurisdiction over Mr. Ribadeneira with respect to New Balance's tortious interference claim, as well as any other claim being pursued by New Balance against him, and maintain that Mr. Ribadeneira should not be a part of this proceeding. Mr. Ribadeneira continues to assert that this Tribunal has no basis to assert any jurisdiction over him, and he files this Renewed Motion under that reservation of rights and without in any way waiving his rights or arguments in relation to this Tribunal's lack of jurisdiction over him. But for purposes of the Renewed Motion, Respondents focus only on the issue of whether this Tribunal has jurisdiction over Mr. Ribadeneira and Superdeporte with respect to New Balance's claim arising under the Distribution Agreement.

[2]    New Balance's Second Amended Notice of Arbitration, ¶ 7.

1

request that the Tribunal also dismiss the claim against Superdeporte with regard to the Distribution Agreement, as this Tribunal has no jurisdiction to require Superdeporte to arbitrate any claims with New Balance under that agreement, nor is there any legal basis to attribute any liability to Superdeporte under the same agreement.

## II.   **PROCEDURAL HISTORY**

4.   Following the Tribunal's 18 March 2019 Order granting New Balance Athletics, Inc.'s ("**New Balance**" or "**Claimant**") motion to compel arbitration, New Balance and Respondents (together with New Balance, the "**Parties**") amended their respective claims and counterclaims.  New Balance seeks amounts allegedly owed under the Distribution Agreement between the Parties.  As recognized by the Tribunal in its Order, "New Balance asserts this claim not only against PSG, but also against Superdeporte and  Mr. Ribadeneira, neither of whom were parties to that agreement."[3]  Respondents deny the allegations and counterclaim that New Balance itself has failed to fulfill its contractual obligations, which has caused damage to Respondents.

5.   On 31 May 2019, Respondents moved for summary disposition on the issue of this Tribunal's jurisdiction over Mr. Ribadeneira. Respondents sought dismissal of New Balance's claims against Mr. Ribadeneira on the ground that Mr. Ribadeneira is not a party to the Parties' arbitration agreement and has never consented to arbitrate any disputes with New Balance.  In that same motion, Respondents moved for summary disposition of New Balance's claims against Mr. Ribadeneira under the Distribution Agreement, because Mr. Ribadeneira was not a party to that agreement and never assumed any obligations to New Balance pursuant to that agreement, for the payment of royalties or otherwise.  Also, having reassigned the right to pursue the Peru claims to PSG and Superdeporte,[4] Mr. Ribadeneira has eliminated any basis on which this Tribunal previously concluded that he was compelled to arbitrate any claims against New Balance.  Respondents also moved for summary disposition on New Balance's tortious interference claim and argued that it should be dismissed on jurisdictional grounds, or in the alternative, on the merits.

6.   On 20 August 2019, this Tribunal issued a ruling upholding its jurisdiction over Mr. Ribadeneira with respect to New Balance's tortious interference claim based upon the assignments of rights from PSG and Superdeporte.  With regard to New Balance's claim under the Distribution Agreement, this Tribunal recognized that the evidentiary record before the Tribunal as of 20 August 2019 would "require dismissal of the amended claims for breach of the 2013 distribution agreement against both Mr. Ribadeneira and Superdeporte," but nonetheless deferred a ruling on this issue until the close of discovery.[5] It noted that, "[u]pon the close of discovery, [the Tribunal] will allow a short period in

---

[3]  Memorandum and Order on Respondents' Motion for Summary Disposition, August 20, 2019, p. 1.

[4]  Contrato de Cesión de Derechos (*Assignment of rights contract*) entered into between PSG and Mr. Ribadeneira, dated 2 May 2019, Exhibit R-9; Contrato de Cesión de Derechos (*Assignment of rights contract)* entered into between Superdeporte and Mr. Ribadeneira, dated 2 May 2019, Exhibit R-10.

[5]  Memorandum and Order on Respondents' Motion for Summary Disposition, August 20, 2019, p. 11.

which New Balance may submit any new evidence supporting its argument for piercing the corporate veil and the respondents shall have an opportunity to answer."[6]

7.     Nearly three months have passed since the close of discovery on 15 November 2019, and New Balance has not submitted any new evidence supporting its argument for piercing the corporate veil. Nor could it submit any, because no such evidence exists in the record. New Balance also has not offered any evidence to sustain that either Mr. Ribadeneira or Superdeporte ever assumed any obligations to it under the Distribution Agreement. As such, Respondents submit this Renewed Motion to respectfully request the Tribunal to rule on this issue and dismiss New Balance's claim against Mr. Ribadeneira and Superdeporte with regard to the Distribution Agreement, as there is no basis in law or fact to require either of these Respondents to arbitrate any claims against New Balance under the Distribution Agreement, nor is there any basis in law or fact to hold either of these Respondents liable for New Balance's claims under that agreement.

### III.     THE LEGAL STANDARD

8.     Summary judgment is required where "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law."[7] In turn, "[a] party moving for summary judgment in a case in which the opposing party will have the burden of proof at trial is entitled to summary judgment if he demonstrates […] that the party opposing the motion has no reasonable expectation of proving an essential element of that party's case."[8] The record is examined in the light most favorable to the non-moving party, but "[c]onclusory statements, general denials, and factual allegations not based on personal knowledge [are] insufficient to avoid summary judgment."[9]

### IV.     ARGUMENT

**A.     THE TRIBUNAL DOES NOT HAVE JURISDICTION OVER MR. RIBADENEIRA WITH RESPECT TO NEW BALANCE'S CLAIM UNDER THE DISTRIBUTION AGREEMENT BECAUSE THERE IS NO EVIDENCE TO SUPPORT THE PIERCING OF THE CORPORATE VEIL.**

9.     The Tribunal should summarily dismiss New Balance's claim with respect to the Distribution Agreement against Mr. Ribadeneira because there is no evidence supporting New Balance's argument that Mr. Ribadeneira should be subject to the Tribunal's jurisdiction as PSG's alter ego. As recognized by this Tribunal in its 20 August 2019 Order, "Mr. Ribadeneira was not a party to [the Distribution Agreement], and ordinarily would not share any potential liability thereunder; nor would he be subject to that agreement's arbitration clause with respect to a claim for breach of the agreement."[10] The

---

[6]   Memorandum and Order on Respondents' Motion for Summary Disposition, August 20, 2019, p. 11.

[7]   Mass. R. Civ. P. 56(c).

[8]   *Lambert v. Fleet National Bank*, 449 Mass. 119, 123 (2007).

[9]   *Cullen Enters. v. Mass. Prop. Ins. Underwriting Ass'n*, 399 Mass. 886, 890 (1987).

[10]   Memorandum and Order on Respondents' Motion for Summary Disposition, August 20, 2019, p. 9.

only issue pending before the Tribunal is whether there is sufficient evidence to warrant a finding that results in a piercing of the corporate veil and, as such, subject Mr. Ribadeneira to the jurisdiction of this Tribunal. The Tribunal has ruled that as of 20 August 2019 when it issued the Order, there was not sufficient evidence in the record to support the piercing of the corporate veil.[11]  The discovery subsequent to the Tribunal's Order does not reveal any evidence to the contrary.

10.   Under Massachusetts law, corporations and their shareholders are generally considered separate legal entities, and only under rare circumstances, may a court disregard the separateness of entities ("pierce a corporate veil").[12]  In fact, Massachusetts appears "more strict than other jurisdictions in permitting the nonobservance of corporate formalities;" and "[e]ven more infrequent is the court which allows the disregard of corporate formalities in a contractual dispute rather than a tortious injury."[13]

11.   As recognized by the Tribunal in its Order, to pierce the corporate veil, there must be evidence of "some fraudulent or injurious consequences;" a "confused intermingling of activity … with substantial disregard" of the separateness of the entities;" or "serious ambiguity about the manner and capacity in which the various (entities) and their respective representatives are acting." [14]  Furthermore, under Massachusetts law, twelve factors should be considered in deciding whether to penetrate the corporate form, which include: (1) common ownership; (2) pervasive control; (3) confused intermingling of business activity, assets, or management; (4) thin capitalization; (5) nonobservance of corporate formalities; (6) absence of corporate records; (7) no payment of dividends; (8) insolvency at the time of the litigated transaction; (9) siphoning away of corporate assets by the dominant shareholders; (10) nonfunctioning of officers and directors; (11) use of the corporation for transactions of the dominant shareholders; and (12) use of the corporation in promoting fraud."[15]

12.   In our case, even after significant discovery, New Balance cannot sufficiently establish *any* of these factors. The first two factors are better suited to evaluating whether one entity should be held liable for the action of another entity.[16]  Because the issue here is whether, Mr. Ribadeneira, as an individual, should be liable for PSG's actions, the first and second factors are not particularly relevant here. In any case, those two factors do not support a finding of Mr. Ribadeneira acting as PSG's alter ego. While Mr. Ribadeneira was PSG's principal stockholder until the end of 2017, as the Tribunal has recognized, common

---

[11]  Memorandum and Order on Respondents' Motion for Summary Disposition, August 20, 2019, p. 11.

[12]  *Berger v. H.P. Hood, Inc.*, 416 Mass. 652, 657, 624 N.E.2d 947 (1993).

[13]  *Bradford Carpet One Co. v. Piedmont St., LLC*, No. 1777CV1274, 2019 WL 6681659, at *3 (Mass. Super. Oct. 16, 2019).

[14]  Memorandum and Order on Respondents' Motion for Summary Disposition, pp. 9-10, *citing My Bread Baking Co. v. Cumberland Farms, Inc*., 353 Mass. 614, 618 (1968).

[15]  Memorandum and Order on Respondents' Motion for Summary Disposition, p. 10, *citing Evans v. Multicon Construction Corporation*, 30 Mass. App. Ct. 728, 733 (1991) (citations omitted).

[16]  *George Hyman Const. Co. v. Gateman*, 16 F. Supp. 2d 129, 150 (D. Mass. Sept. 2, 1998).

ownership alone is not sufficient to support piercing the corporate veil.[17]  Furthermore, discovery in this case highlighted that Mr. Ribadeneira did not exercise pervasive control over PSG.  On the contrary, Respondents produced an organizational chart with a clear employment structure for PSG.[18]  Ultimately, key employees reported on key decisions to a corporate board.[19]  This board would then vote on key corporate decisions.

13.     The third factor – the confused intermingling of business – does not support piercing of the corporate veil either.  There were transactions between PSG and Superdeporte, as PSG was winding down its business operations and transferring its operations to Superdeporte.[20]  But no evidence indicates that any assets or liabilities of PSG and Superdeporte were ever intermingled, that Mr. Ribadeneira's personal assets were intermingled, or that New Balance was confused as to which entity it was dealing with.  In fact, as noted by the Tribunal in its Order, New Balance "contracted knowingly with a corporation, having already done business with that company or a predecessor for more than a decade."[21]  There is no evidence indicating that PSG was thinly capitalized either, as required by the fourth factor.

14.     As to the fifth and sixth factors – nonobservance of corporate formalities and absence of corporate records, the evidence in the record all indicates to the contrary.  PSG was duly incorporated under Peruvian law and its corporate records were kept in the ordinary course.  In fact, a number of PSG's corporate records have been produced to New Balance during the discovery process, including documents supporting PSG's ownership/shareholding structure;[22]  PSG's organizational chart;[23]  PSG's statements of financial position and integral income for the period from 2013 throughout 2018;[24]  and PSG's bank records from 2014 throughout 2017.[25]

15.     As to the seventh factor – no payment of dividends – although it is true that PSG has not issued any dividends, Massachusetts courts have recognized that "[w]hen the corporation is closely held, that gain may take a form other than the payment of dividends or distributions to stockholders,"[26] and that "a business can have a legitimate purpose even if

---

[17]   Memorandum and Order on Respondents' Motion for Summary Disposition, August 29, 2019, p. 9, *citing My Bread Baking Co. v. Cumberland Farms, Inc*., 353 Mass. 614, 618 (1968).

[18]   *See* Exhibit R-22, PSG00006835.

[19]   *See* e.g. Exhibit R-23, Deposition Transcript of Margarita Ormaza, 126:17-24; 133:5-16.

[20]   *See* e.g. Exhibit R-19, Deposition Transcript of Rodrigo Ribadeneira, 51:3-9.

[21]   Memorandum and Order on Respondents' Motion for Summary Disposition, p. 10.

[22]   *See* Exhibit R-24, PSG00006495 through PSG00006600.

[23]   *See* Exhibit R-22, PSG00006835.

[24]   *See* Exhibit R-25, PSG00006472.

[25]   *See* Exhibit R-26, PSG00005963 through PSG00006469.

[26]   *Evans v. Multicon Const. Corp.,* 30 Mass. App. Ct. 728, 735, 574 N.E.2d 395, 399 (1991).

it is not designed to make dividend payments or profit distribution."[27]  Here, as Mr. Ribadeneira explained in his deposition testimony, conscious decisions were made to not issue dividends but to reinvest the company's profits.[28]  Therefore, PSG was operated as a legitimate, profit-seeking entity, and not the alter ego of Mr. Ribadeneira.

16.  New Balance makes no arguments concerning factors eight through twelve, and there is no new evidence revealed during discovery that would support the finding of any of those factors.

17.  At best, New Balance can show that Mr. Ribadeneira is PSG's principal stockholder.  But by itself, being the sole stockholder is not a significant factor.[29]  In fact, the Tribunal has ruled in its Order that, "[t]hat Mr. Ribadeneira is that company's principal stockholder, its general manager, and apparently its principal voice with respect to its business decisions do not by themselves justify a disregarding of the corporate form."[30]

18.  Weighing all those factors, New Balance has not provided, nor could it possibly provide, sufficient evidence to reach the "high threshold" required to pierce the corporate veil under Massachusetts law.[31]  Therefore, this Tribunal should dismiss Mr. Ribadeneira as a Respondent with respect to New Balance's claim arising from the Distribution Agreement.

19.  Because arbitration is fundamentally based upon consent, if a party has not consented to arbitrate, then a party may not be compelled to arbitrate.  Mr. Ribadeneira has not consented to arbitrate *any* disputes with New Balance with respect to the Distribution Agreement, and as such, should be dismissed as a party to this arbitration with respect to New Balance's claim under the Distribution Agreement.

**B.   THE TRIBUNAL SHOULD ALSO DISMISS NEW BALANCE'S CLAIM UNDER THE DISTRIBUTION AGREEMENT AS TO MR. RIBADENEIRA BECAUSE HE WAS NOT A PARTY TO THE DISTRIBUTION AGREEMENT AND NEVER ASSUMED ANY OBLIGATIONS UNDER THE DISTRIBUTION AGREEMENT.**

20.  Even if the Tribunal were to find that it had jurisdiction over Mr. Ribadeneira—a finding which as noted above is not supported by the record evidence—the Tribunal should nonetheless summarily dismiss New Balance's claim with respect to the Distribution Agreement against Mr. Ribadeneira because the evidence on the record has shown that Mr. Ribadeneira was not a party to the Distribution Agreement and never assumed any obligations under the Distribution Agreement.  Furthermore, Mr. Ribadeneira was not a signatory to the Distribution Agreement on behalf of PSG nor was Mr. Ribadeneira a

---

[27]  *See George Hyman Const. Co. v. Gateman*, 16 F. Supp. 2d 129, 154 (D. Mass. 1998).

[28]  *See* Exhibit R-18, Deposition Transcript of Rodrigo Ribadeneira, 182:4-22.

[29]  *Gordineer v. Colahan*, 2011 Mass. App. Div. 151 (Dist. Ct. 2011) ("We are particularly unconvinced that the fact, standing alone, that [Defendant] was a sole stockholder was significant.").

[30]  Memorandum and Order on Respondents' Motion for Summary Disposition, August 20, 2019, p. 10.

[31]  *Centurion Networking Serv. Partners, LLC v. Dr. Wade N. Barker, P.A.*, 2018 WL 1972789, at *5 (D. Mass. Apr. 26, 2018).

signatory to the agreement's arbitration clause. As there is no basis contractually or under any veil piercing or other theory to hold Mr. Ribadeneira to any obligation under the Distribution Agreement, this Tribunal should enter summary judgment in favor of Mr. Ribadeneira on New Balance's claims against him under the Distribution Agreement.

**C.  THE TRIBUNAL DOES NOT HAVE JURISDICTION OVER SUPERDEPORTE WITH RESPECT TO NEW BALANCE'S CLAIM UNDER THE DISTRIBUTION AGREEMENT BECAUSE THERE IS NO EVIDENCE TO SUPPORT THE PIERCING OF THE CORPORATE VEIL.**

21.  The Tribunal has no basis to hold Superdeporte as a Respondent in this case with respect to New Balance's claim under the Distribution Agreement, because Superdeporte was not a party to the Distribution Agreement and has not agreed to arbitrate any claims under the Distribution Agreement. As this Tribunal has recognized in its Order, in the Tribunal's view, the evidentiary record as of 20 August 2019 would "require the dismissal of the amended claims for the breach of the 2013 distribution agreement against **both Mr. Ribadeneira and Superdeporte**." The subsequent discovery did not disclose any factual basis to support a claim against Superdeporte under the Distribution Agreement.

22.  Arbitration is fundamentally based upon consent between the parties.[32] If a party has not consented to arbitrate, it may not be compelled to arbitrate. Superdeporte, as a non-party to the Distribution Agreement, has not consented to arbitrate any dispute under the Distribution Agreement. It never signed the Distribution Agreement, nor did it assume any of PSG's rights or obligations under the Distribution Agreement. In fact, Superdeporte is a separate, distinct legal entity that was created only half a year before the Distribution Agreement expired, at New Balance's request, and solely for the purpose of carrying out a new distribution agreement with New Balance.[33]

23.  New Balance's argument in its Second Amended Notice of Arbitration that Superdeporte "replaced" PSG in May 2016 is unavailing, as Superdeporte was only preparing to assume responsibilities under the *New Distribution Agreement* as soon as it was ready to do so in May 2016. The Distribution Agreement was entered into between New Balance and PSG on 1 January 2013, and was automatically renewed until 31 December 2016. In late 2014/early 2015, New Balance made an offer to PSG to enter into a new and reformed distribution agreement for their business in Peru (the "New Distribution Agreement").[34] Per New Balance's requirements for the New Distribution Agreement, PSG would be required to enter into the agreement through an entity that could handle both wholesale

---

[32]  *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 682, 130 S. Ct. 1758, 1774, 176 L. Ed. 2d 605 (2010) (Consent is essential under the FAA because arbitrators wield only the authority they are given. That is, they derive their "powers from the parties' agreement to forgo the legal process and submit their disputes to private dispute resolution.").

[33]  *See* Exhibit R-18, Deposition Transcript of Carlos Miguel Gagliardi, 17:16-24.

[34]  *See* Exhibit R-27, PSG00007483.

distribution and retail sales.[35] Because PSG was not set up legally or otherwise to handle retail sales, PSG's parent companies determined that they had to establish a corporate entity that could legally handle both wholesale distribution and retail sales, and thus they established Superdeporte in May 2016.[36] It is clear from the evidentiary record that Superdeporte assumes no rights or obligations under the Distribution Agreement.

24.     New Balance could not genuinely argue, nor has it argued, that Superdeporte is PSG's alter ego. Any such claim would be baseless and should not be upheld by this Tribunal, because there is no basis or evidence in the record to justify piercing the corporate veil as to Superdeporte. Superdeporte sits alongside PSG in the corporate structure, is not PSG's parent, and was created solely to act under the New Distribution Agreement.

25.     As with Mr. Ribadeneira, there is thus no basis to find that Superdeporte has agreed to arbitrate any claims with New Balance under the Distribution Agreement, and this Tribunal should therefore enter summary judgment in favor of Superdeporte on those claims.

**D.     THE TRIBUNAL SHOULD ENTER SUMMARY JUDGMENT AS TO SUPERDEPORTE WITH RESPECT TO NEW BALANCE'S CLAIM UNDER THE DISTRIBUTION AGREEMENT BECAUSE SUPERDEPORTE IS NOT A PARTY TO THE DISTRIBUTION AGREEMENT NOR DID IT ASSUME ANY OBLIGATIONS UNDER THAT AGREEMENT**

26.     For all of the reasons noted above, even if this Tribunal had jurisdiction to arbitrate claims against Superdeporte under the Distribution Agreement—which it does not—New Balance fails to provide any factual or legal basis to maintain any claims against Superdeporte under the Distribution Agreement. There is no contractual or other basis to hold Superdeporte liable to New Balance under that agreement.

27.     As such, this Tribunal should enter summary judgment against New Balance and in favor of Superdeporte with respect to New Balance's claim arising from the Distribution Agreement.

## V.     RELIEF SOUGHT

28.     For all of the above reasons, Respondents respectfully request that the Tribunal enter summary judgment in favor of Mr. Ribadeneira and Superdeporte and against New Balance with respect to New Balance's claim made under the Distribution Agreement and to:

    i.      Declare that it has no jurisdiction over Mr. Ribadeneira with respect to New Balance's claim under the Distribution Agreement;

    ii.     Declare that even if it has jurisdiction over Mr. Ribadeneira, there is no basis to hold Mr. Ribadeneira liable to New Balance under the Distribution Agreement;

---

[35]  *See* Exhibit R-18, Deposition Transcript of Carlos Miguel Gagliardi, 17:16-24.

[36]  *See* Exhibit R-18, Deposition Transcript of Carlos Miguel Gagliardi, 17:16-24.

iii.   Declare that it has no jurisdiction over Superdeporte with respect to New Balance's claim under the Distribution Agreement;

iv.   Declare that even if it has jurisdiction over Superdeporte, there is no basis to hold Superdeporte liable to New Balance under the Distribution Agreement;

v.   Award Respondents Mr. Ribadeneira and Superdeporte all of their attorneys' fees and costs incurred in defending the baseless claims made by New Balance against them under the Distribution Agreement.

Respectfully submitted,

David M. Orta
Julianne Jaquith
Counsel for Respondents
1300 I Street NW, Suite 900
Washington, DC 20005
Tel: (202)538-8000
Fax: (202)538-8100
12 February 2020

# EXHIBIT 12

Page 1187

Proceedings

1  very important reason for this.  Okay?  And
2  the important reason is that before that
3  transfer took place, everything of value in
4  PSG -- all of its assets, all of its New
5  Balance inventory, whatever was in the
6  company that was of value -- was
7  transferred by PSG to Superdeporte.  And
8  this is, again, in compliance with the new
9  agreement to have Superdeporte become the
10  entity under that new distribution
11  agreement with New Balance.  It was
12  transferred and it was transferred for
13  consideration.  I'll get to the
14  consideration -- there's a slide on it --
15  in a second.
16  But that brings us to -- so as it
17  relates to Mr. Ribadeneira, no evidence to
18  pierce the corporate veil, your Honor.
19  None.  And the fact that a company
20  significantly downstream that he owns
21  transferred PSG, once the assets were taken
22  out of it and transferred for consideration
23  to Superdeporte, that that corporate
24  vehicle was transferred for no
25

Page 1188

Proceedings

1  consideration to Mr. Padilla does not come
2  anywhere close to establishing a case for
3  piercing of the corporate veil.
4  Superdeporte, they have an argument
5  that they came out with at the hearing just
6  before the hearing about successor
7  liability.  No successor liability here.
8  Again, Superdeporte not a signatory.  Never
9  consented to arbitrate, never assumed
10  obligations, their argument on successor
11  liability raised way too late and waived.
12  But even if you don't waive it and deal
13  with it on the merits, even if you don't
14  consider it waived and deal with it on the
15  merits, here's what the case law says they
16  have to establish:  The successor expressly
17  or impliedly assumes liabilities of the
18  predecessor.  Okay?  There's no evidence
19  that Superdeporte assumed liabilities of
20  PSG with the exception of the consideration
21  that they paid.  Okay?  But it didn't
22  expressly assume all liabilities of PSG.
23  It didn't assume liabilities of PSG to New
24  Balance.  Key.  And there's no document
25

Page 1189

Proceedings

1  that says that.
2  Two, no de facto merger or
3  consolidation, no evidence to prove that
4  here.
5  Three, that Superdeporte is a mere
6  continuation of PSG, absolutely not.  PSG
7  continues to exist today.  It has a
8  different purpose.  It has a different
9  owner.  Superdeporte, completely separate
10  company, completely separate purpose.  Does
11  retail, wholesale, and operates in Peru.
12  And there's no fraudulent effort to
13  avoid liability.  In fact, if you think
14  about that one, at the point in time when
15  the transfer of assets were made, which was
16  in June of 2016, there was no claim by New
17  Balance.  There was no lawsuit.  There was
18  no arbitration.  There was no immediate
19  legal fight between these entities.  There
20  was no liabilities to a predecessor that
21  were being avoided.
22  Okay.  So I think I've made the
23  point.  No evidence of successor liability.
24  And this is the slide I wanted to
25

Page 1190

Proceedings

1  focus you in on:  Exhibit 287, which I
2  think now as per this morning may become
3  288.  But this is the new exhibit that we
4  provided last night.  This is -- was
5  testified to by Ms. Ormaza during the
6  hearing.  She said that there was a
7  transfer of assets and liabilities.  There
8  was an assumption of some of Peruvian
9  Sporting Goods' liabilities by Superdeporte
10  in the amount as shown here of 5,781,000 of
11  Peruvian soles, and it assumed that
12  liability and paid it to one of the other
13  companies, Equiperu.
14  Now, what else do we have to say
15  about the claims?  This is just to focus
16  your Honor.  Five minutes left.  This about
17  the actual claim that they have, we say
18  only against PSG.  So now this is the
19  affirmative $4.5 million -- whatever the
20  number is -- claim that New Balance has,
21  again we say only as against PSG.
22  What about those claims?  Well, the
23  numbers -- and this important -- and, you
24  know, it was testified to by
25

# EXHIBIT 13

IN THE MATTER OF AN ARBITRATION UNDER THE ARBITRATION RULES OF THE
UNITED NATIONS COMMISSION ON INTERNATIONAL TRADE LAW

BETWEEN:

**NEW BALANCE ATHLETICS, INC.**

*Claimant*

-and-

**PERUVIAN SPORTING GOODS S.A.C., SUPERDEPORTE S.A.C., and RODRIGO
RIBADENEIRA**

*Respondents*

_____

**RESPONDENTS' POST HEARING BRIEF**

_____

**30 June 2020**

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
1300 I Street NW, Suite 900
Washington, DC 20005
Tel: (202)538-8000
Fax: (202)538-8100
Counsel for Respondents

# Table of Contents

**Page**

I. INTRODUCTION ............................................................................................... 1

II. FACTUAL BACKGROUND AND PROPOSED FINDINGS OF FACT ...................... 9

    A. New Balance's Denial of Letters of Credit and Refusal to Accept Orders from PSG .. 12

    B. Negotiation of the New Distribution Agreement ............................................ 27

    C. Mr. Ribadeneira Initiates the Peru Action ...................................................... 39

III. RESPONDENTS' AFFIRMATIVE CLAIMS PREVAIL .......................................... 41

    A. New Balance Breached the Distribution Agreement and its Implied Covenant of Good Faith and Fair Dealing ...................................................................... 41

        i. New Balance Denied PSG the Contractually Bargained for Ability to Pay for Product by Letters of Credit ................................................................... 42

        ii. New Balance Breached the Distribution Agreement by Ceasing and Refusing to Accept New Orders from PSG ...................................................... 45

        iii. New Balance Breached the Distribution Agreement's Implied Covenant of Good Faith and Fair Dealing .................................................................. 48

        iv. Damages ................................................................................................ 49

    B. New Balance Breached The New, Enforceable Distribution Agreement .................... 52

        i. New Balance Refused to Permit Superdeporte to be Substituted into the New Distribution Agreement After Requiring That Respondents Integrate Wholesale and Retail Capabilities and New Balance Repudiated the Existence of the New Distribution Agreement ............................................................................ 54

        ii. New Balance Failed to Permit Respondents to Purchase Product and Perform Under the New Distribution Agreement ......................................................... 57

        iii. New Balance Acted Duplicitously In Negotiating With Other Distributors While It Had an Active Distribution Agreement In Place With PSG/Superdeporte ............. 59

        iv. Damages ................................................................................................ 60

    C. New Balance Breached Its Precontractual Obligations During The Negotiation Of The New Distribution Agreement ....................................................................... 62

IV. NEW BALANCE'S CLAIMS FAIL ..................................................................... 64

    A. This Tribunal Has No Jurisdiction Over Mr. Ribadeneira or Superdeporte As It Relates to the Contract Claim, and New Balance's Contractual Claim Otherwise Fails ........... 64

        v. New Balance's Contractual Claim Against Mr. Ribadeneira Should Fail ............... 65

        vi. New Balance's Contractual Claim Against Superdeporte Should Fail ................... 72

    B. New Balance's Claim That PSG Breached The Distribution Agreement Should Fail Because New Balance Caused PSG's Inability To Pay New Balance .......................... 77

C.   New Balance's Damages Claims Are Further Flawed, Because It Seeks Usury Interest and Interest Not Permitted Under the Distribution Agreement ...................................... 82

D.   New Balance's Tortious Interference Claim Fails ........................................................ 85

**V.   RESPONDENTS' FEES AND COSTS IN THIS ARBITRATION .............................. 90**

**VI.   REQUEST FOR RELIEF .................................................................................... 90**

## I.      INTRODUCTION

1.      Peruvian Sporting Goods S.A.C. ("**PSG**"), Superdeporte Plus S.A.C. ("**Superdeporte**"), and Rodrigo Ribadeneira ("**Mr. Ribadeneira**") (collectively "**Respondents**") submit their Post-Hearing Brief ("**Post-Hearing Brief**") following the Hearing on the merits ("**Hearing**") held March 9-11, 2020 and May 29, 2020.[1]

2.      The evidence has established that New Balance breached its contract and common law obligations when it unilaterally precluded Respondent PSG from purchasing its products via letters of credit and began requiring that PSG purchase products via cash wires within 15 days of product shipments.  This contravened the right that PSG had bargained for to purchase products via letters of credit and thereby finance those purchases for six months.  With this unilateral change to the parties' relationship, New Balance destroyed the cash cycle of PSG's business, and created a liquidity problem in 2015—leading to certain arrearages in its payment obligations to New Balance—from which PSG tried mightily to recover.  As PSG was almost up to date on its product payments to New Balance in August of 2015, New Balance again breached its contract with PSG by placing a complete freeze on product orders.  This breach destroyed PSG's business, made it impossible for PSG to perform its obligations under its contract with New Balance, including generating sufficient further revenues to continue operating its business with New Balance.

3.      PSG and Superdeporte complained about these breaches by New Balance at various junctures, insisting on their right to buy products by letters of credit under the 2013 agreement and

---

[1]   For purposes of this submission, the Marathon Group ("Marathon Group") will mean the group of companies owned directly and/or indirectly by Respondent Mr. Ribadeneira through various operating and holding companies, including, *inter alia*, the Marathon Sports stores in Peru and Ecuador, Respondent Superdeporte, and until the end of 2016, Respondent PSG.

their right under the contract to continue placing orders and purchasing products.[2] At various junctures, Respondents negotiated with New Balance to continue buying products, including by letters of credit, and New Balance would promise to open buying windows and take other steps to allow Respondents to continue performing, but would then renege on its promises after Respondents would make the promised payments.[3]

4.      Contrary to New Balance's self-serving and false statements throughout this case, the parties' business relationship had been operating very well for 14 years until New Balance breached the parties' contract with the two measures mentioned above.  It had in fact been operating so well that New Balance had praised PSG for its marketing efforts in late 2014, stating that it was doing a much better job of promoting New Balance products in the Latin American region than any other distributor, including the company (Sparta) that New Balance later chose to replace Respondents for the Peru territory.[4]

5.      New Balance attempts to paint Respondents as a serial late payer of its bills.  It is not true.  In fact, the parties conducted their business relationship well for 14 years and that PSG only fell into real financial trouble when New Balance stripped it of its right to finance its

---

[2]  E.g. Mr. Cullen admitted in his testimony at the hearing that PSG and alter Superdeporte in 2015-16 requested multiple times to place orders via letter of credit, and New Balance denied these requests.  Hearing Transcript, 443:6 through 444:4 (Q.  But do you agree and do you remember that during those discussions, what PSG was asking you to do was to continue to let them buy by letter of credit?  A.  Yes. That was what they would have preferred, for sure.  Q.  Not only would they prefer it; it's what they were pleading with you to keep in place?  A.  That's what they would have preferred, yes.  Q.  And what they were pleading with you to keep in place.· Do you disagree with that?  A.  I don't know if pleading, but, yes, they were asking for this -- they were absolutely -- yes, they were asking for us to allow them to pay by letter of credit.  Q.  And they were asking you please not to apply this policy of requiring them to pay up front in cash for products because it would really impact their liquidity and their cash position?  A.  They were asking for that, yes.").

[3]  *Supra* ¶42.

[4]  *See* Exhibit 90, PSG00006485 ("Your team is doing a great job . . . the NB store is a true game changer for the brand . . . The Peru team really deserved the marketing award for all they have done . . . congratulations."); *see also* Exhibit 93, PSG00007483 ("I do recognize that the Peru business continues to grow nicely year on year and agree with you that you have worked hard to set a strong foundation for future growth.  As you know, we feel Peru does the best marketing in the region and the results reflect that.").

purchases by letters of credit and then seized on the liquidity problems it caused to freeze further product orders thereby preventing PSG from further performing and destroying the relationship.

6.   New Balance's own exhibit, which Respondents do not accept as fully accurate, proves that the real problems with PSG's liquidity and arrears to New Balance started after New Balance breached the Distribution Agreement.  Figure 1 below, which is based exclusively on the data contained in New Balance's Exhibit 12, shows the monthly cumulative outstanding amount of distribution fees owed by PSG over the period from March 2013 until 2017.[5]  As the graph shows, PSG was nearly current on payment until after January/February 2015 when New Balance started refusing letters of credit from PSG and insisting on cash wire payments.  PSG's delays in payment to New Balance started accumulating in January/February 2015 and significantly increased in September 2015, one month after New Balance completely shut down PSG's access to New Balance's online ordering system.  This was just over six months after PSG placed its orders for Q3 2015 but was not able to receive the product or generate any revenue due to New Balance's insistence on cash payments for product orders.  With its cash cycle significantly disturbed by New Balance's breaches of the contract, and with no new product to generate revenue, PSG's liquidity issues continued and were exacerbated through the end of the parties' relationship, as it was relegated to selling old products at severe discounts or losses.

---

[5]   Gaps in the chart reflect time periods for which the Statement of Accounts were not provided in Exhibit 12.



(Figure 1 -- PSG's Cumulative Outstanding Distribution Fees to New Balance)

7.      The above graph proves that New Balance is simply wrong when it attempts to argue that PSG was chronically in arrears throughout the entirety of the parties' relationship. Instead it shows that New Balance's breaches, especially the ban on all product orders, made it impossible for PSG to perform its obligations under the 2013 Distribution Agreement.  New Balance's conduct further demonstrates this, as it was seeking to expand the parties' relationship in late 2014 and into 2015 with the adoption of a new structure that would expand Respondent PSG and Superdeporte's role for New Balance in Peru.  If New Balance really thought in late 2014 and into early 2015 that PSG was a distributor who was chronically late in its payments, it would not be seeking to expand its relationship with PSG at that time.

4

8.      Starting in late 2013 and spurned more aggressively by New Balance in late 2014 and 2015, New Balance pushed PSG to adopt a new structure to their business dealings that required Respondents to change its corporate distributor to one that could handle both wholesale and retail sales of New Balance's products in Peru.  Common sense dictates that New Balance would not have done this if it perceived PSG to be a failing business partner.  This was a radical change in the parties' relationship , requiring a change in the corporate entity that would handle New Balance's business as Respondents had to create an entirely new entity that could operate at both the wholesale and retail levels in Peru.  It also changed the way New Balance charged for distribution fees, going from a "sales based" to a "purchase based" royalty.  The parties were embarking on these changes exactly during the time that New Balance's breaches were taking their devastating effect on Respondents.

9.      By September 2015, the parties had reached a deal on a new contract—the Amended and Restated Distribution Agreement—that adopted the new structure requested by New Balance.  Both parties not only had agreed to all of the terms of their new contract by that time, but each had a then present intent to be bound by that agreement and each began immediately performing under the new agreement.  New Balance and PSG worked to and did issue new invoices to correspond with the new "purchased based" royalty required by New Balance under the new contract.  PSG made payments of some of those invoices.  Respondents initiated the process—including substantial investments—to create the new corporate vehicle that could operate at the wholesale and retail level—Superdeporte.  While the parties later agreed to certain amendments to their contract in November 2015 and January 2016, they each continued to perform under and intended to be bound by the new agreement.

10.     In the new agreement, Respondents accepted a modification to their payment terms that would disallow an automatic right to purchase products from New Balance via letters of credit.[6] The new agreement still allowed for purchases by letter of credit, but only if New Balance would authorize this.[7] Otherwise, payment for products had to be by cash, wire transfers.[8] For Respondents, this change was acceptable, because—unlike with the 2013 Distribution Agreement where PSG did not have the ability to finance purchases with lines of credit from banks— Superdeporte had access to lines of credit given the very large volume of business done by the Marathon Group retail stores and their existing banking relationships.[9] Respondents were thus prepared via Superdeporte to continue a healthy business relationship under the Superdeporte entity with New Balance, but New Balance ultimately blocked Superdeporte from doing so, refusing to provide it with the authorization to sell New Balance products and to provide the signed new contract listing Superdeporte as New Balance's distributor in Peru.[10]

11.     What Respondents did not know was that New Balance at the very same time was engaging in duplicitous behavior, seeking to replace PSG and Superdeporte as the distributor in Peru. Within days of agreeing the amendments in January of 2016, New Balance was visiting with

---

[6] *See* Exhibit 5-1, NB_PSG0000002 ("Payment of all amounts due for Products and all payment documentation for the purchase of the Products shall be effected by Distributor through cash in advance due upon placement of any order, unless otherwise agreed to by COMPANY, its Affiliate or its Authorized Supplier, as the case may be . . . If COMPANY, its Affiliate or Authorized Supplier allows Distributor to deliver the letter of credit or cash after the placement of the order and Distributor fails to deliver the same . . .").

[7] *Id.*

[8] *Id.*

[9] Hearing Transcript, 958:15-20 ("I was looking and trying – looking for work to moving to Superdeporte and being able to then get a line of credit to work the way New Balance was suggesting. It was not that it was impossible. It was impossible for PSG to do it.").

[10] Exhibit 170, PSG00006711; Exhibit 92A, PSG00005162; Hearing transcript, 646: 24 through 647:8 ("A. Because after -- and anytime after I do something to keep the business running, he didn't achieve what he promise. After that, doing an effort 100,000, 200,000, 150,000, give me a letter. Give me the contract. He all the time tricked me. I was really upset with this. That is not the way business should be handled. That's -- there's no honor in that. So I was really upset.").

other distributors in the region, telling them they were New Balance's "first choice" to come in as the new distributor in Peru—all in breach of New Balance's new contract with Respondents and its duty to operate in good faith and deal fairly with Respondents.  New Balance continued its bad faith conduct, seeking further payments from Respondents and allowing them to continue investing in the creation and deployment of Superdeporte, while at the same time denying it the ability to buy and receive new products and seeking additional payments from them under the false promises that the relationship would continue.  Respondents, operating in good faith, continued performing until New Balance abruptly and in breach of their new agreement, repudiated that contract, announcing unilaterally in late June of 2016 that it was "reverting back" to the 2013 agreement and not renewing that agreement past the end of that year.

12. This is what the evidence has established.  New Balance nonetheless attempts to rewrite history by stating that the parties never finalized the new agreement, because Respondents never signed it, even though applicable law makes clear this is not a requirement.  It admits it thought the agreement was final and performed under it, but then tries to say there is no valid contract because Respondents did not intend for the agreement to be final.  The evidence shows otherwise, as Respondents conduct demonstrates, including their cooperating in the issuance of new invoices, payment of some of those invoices plus their investment in the creation of Superdeporte and their efforts to sell existing inventory by that entity.

13. As noted, New Balance unilaterally and in breach of the 2013 Distribution Agreement altered the payment terms and thereby destroyed PSG's business model and liquidity and then destroyed its business altogether by freezing product orders.  It nevertheless sues in this case all of the Respondents for royalties under the old agreement with PSG for a period of time in 2015 and 2016 when it did not allow PSG (or Superdeporte) to purchase and sell its products in

Peru and thus did not allow it to generate any revenue, let alone enough to pay royalties. Of importance, it never invoiced Respondents for virtually all of the supposed damages it now seeks, nor did it enter into its accounting system, which should come as no surprise since it apparently understood at the time that it could not charge royalties and other fees while at the same time preventing Respondents from buying and selling its products and violating their exclusivity. Its contention now that this is allowed by the parties' agreement is not only contrary to Massachusetts law and common sense but also provably wrong. If this were true, New Balance could sign an agreement with its distributor in Peru, never allow it to purchase products, and then claim that it owes all of the minimum royalties agreed per the parties' contract. That cannot be what the law or parties' contract allows, but that is precisely what New Balance asks this Tribunal to accept.

14.    New Balance cannot recover for these breach of contract damages, because it caused these alleged breaches by PSG, especially by preventing it from making further product purchases. Massachusetts law provides that when one party breaches a contract and this causes the counterparty to the agreement to breach, the second party's breach is excused. Moreover, New Balance has admitted that an implied condition to PSG's duty to pay royalties is that New Balance must allow it to buy and sell its products. Having prevented PSG from doing so, New Balance has failed to satisfy this condition and cannot now seek payment for royalties and other charges based on products that it prevented PSG and later Superdeporte from purchasing.

15.    Then why seek them now in this case when New Balance never invoiced any of the Respondents for these charges in the ordinary course of business and never even entered these charges into its accounting system? New Balance's counsel provided the Tribunal with the answer during his closing argument. Mr. Tully told us in his closing argument that New Balance filed this case *in retaliation for Respondents filing the Peru Action*. In Mr. Tully's words when referring to

Mr. Ribadeneira having filed the Peru Action: "He launched this litigation, the Peru litigation -- **which, by the way, without the Peru litigation, I'm not sure any of us meet**."[11] That candid admission speaks volumes and explains why New Balance is seeking damages in this case that it never invoiced to PSG, never entered in its own accounting system and that it cannot collect under the contract or Massachusetts law.

16.     New Balance also improperly attempts to hold Respondents liable for interfering with its relationship with its new distributor in Peru, even though New Balance initiated this relationship in breach of the parties' new contract for the territory.  It also does so in contravention of Massachusetts law, which provides that a party's lawful attempt to enforce its legal rights in court cannot form the basis for an interference claim.  While New Balance argues that Respondents did not in good faith believe that the Amended and Restated Distribution Agreement was in effect and that Respondents acted with malice and improper intent in filing the Peru Action, the evidence points to the exact opposite conclusion.[12]  Its interference claim must be rejected.

17.     When all the evidence is considered, this Tribunal respectfully should grant Respondents' affirmative claims, deny New Balance's claims and award Respondents the rightful damages they seek for New Balance's wrongful conduct that put an end to a successful 15-year plus business relationship, plus all of its attorneys' fees and costs and applicable interest.

## II.     FACTUAL BACKGROUND AND PROPOSED FINDINGS OF FACT

18.     Mr. Ribadeneira initiated a relationship with New Balance in 1992, whereby an entity within the Marathon Group called Distribuidora Deportiva Dide ("**Dide**") began distributing

---

[11]   Hearing Transcript, 1235:9-12 (emphasis added).

[12]   Exhibit 105-1, NB_PSG0001302, NB_PSG0001306; Exhibit 209, PSG00002774; Exhibit 211, PSG00006754; Exhibit 216, PSG00006831; Exhibit 205, PSG00006772.

sportswear for New Balance in Ecuador.[13]  In 2000, after the relationship between the parties had

gone well in Ecuador, the parties extended their relationship  to cover Peru.[14]  The relationship

progressed nicely in Peru for the first 10 years.  At the end of 2009, PSG was created to become

New Balance's distributor in Peru.[15]  At the beginning of 2010, PSG and New Balance entered

into a distribution agreement for the distribution of New Balance's products in Peru.

19.    On January 1, 2013, New Balance and PSG (together with New Balance, the

"**Parties**") entered into a further Distribution Agreement (the "**Distribution Agreement**").[16]  The

Distribution Agreement governed the sale and distribution of New Balance's products in Peru.[17]

The Distribution Agreement was valid until December 31, 2015.[18]  According to the Distribution

Agreement, if neither party expressed an intention to let the Distribution Agreement expire, the

Distribution Agreement would automatically be renewed for an additional year, that is, until

December 31, 2016.[19]  By the end of the Distribution Agreement's original term, neither party

---

[13]    Hearing Transcript, 938: 16-22 ("A.  I started the relationship with New Balance, and that's why this is somewhat emotional for me because this is the one relationship that I started personally in 1992 while I was in college. I graduated in '92, and I wrote to New Balance and we started a relationship for Ecuador."); 939: 18-19 ("A.  Dide, which was the original distributor for New Balance in Ecuador, and PSG were designed and incorporated to do New Balance exclusively."); 412:11 through 413:3 ("Q.  Are you also aware that PSG -- well, not PSG itself, but the broader group of companies have been working with New Balance in Ecuador since 1992?  A.  I knew it was a long time. Many of our distributors have been working from the mid-'90s. Q.  Do you have any reason to dispute that that relationship was relatively successful from early 1992 until the time you took over in 2013?  A.  No.  Q.  Okay. Now, when you did take over in 2013, the first year was a relatively successful year in terms of your assessment of how they were doing in the territory?  A.  It was successful.").

[14]    Hearing Transcript, 938: 22-25 ("Then later in 2000, I also wrote again and talked to the people who I was working with at the time, and we were given also distribution for Peru in 2000.").

[15]    Hearing Transcript, 939: 18-19 ("A.  Dide, which was the original distributor for New Balance in Ecuador, and PSG were designed and incorporated to do New Balance exclusively."); *see also* Exhibit 44, PSG00006520. Exhibits will be referred to by their Joint Exhibit numbers, as presented during the Hearing.

[16]    Exhibit 1, PSG00005497.

[17]    *Id.*

[18]    *Id.*

[19]    *Id.*

10

expressed an intention to let the Distribution Agreement expire.[20]  As such, the Parties allowed the Distribution Agreement to automatically renew until December 31, 2016.[21]

20.     The Distribution Agreement between PSG and New Balance was successful through the end of 2014.[22]  In 2014, during the term of the Distribution Agreement, New Balance even presented the team at PSG with a marketing award for their work promoting the New Balance brand in Peru.[23]  It also was seeking to expand the parties' relationship by asking Respondents to handle not only wholesale but also retail distribution.[24]

21.     John Cullen ("Mr. Cullen") became New Balance's General Manager for Latin America in 2013.[25]  Mr. Cullen has continued as General Manager for Latin America since that time and remains in the position to date.[26]

---

[20]  Hearing Transcript, 363: 23 through 364:8 ("And then under "Contract Update" -- A.  Yes. Q.  -- your first sentence says, "Peru/Ecuador's contract expired at the end of 2015." Do you see that?  A.  Yes. Q.  Was that accurate at the time you wrote it? A.  No. It auto-renewed for one year."); Exhibit 175-1, PSG00000953.

[21]  *Id.*

[22]  Hearing Transcript, 412:8 through 413:3 ("A.  Yeah, no specifics. I know PSG has been a long-term partner of ours, but aside from that, I didn't know the specifics.  Q.  Are you also aware that PSG -- well, not PSG itself, but the broader group of companies have been working with New Balance in Ecuador since 1992?  A.  I knew it was a long time. Many of our distributors have been working from the mid-'90s.  Q.  Do you have any reason to dispute that that relationship was relatively successful from early 1992 until the time you took over in 2013?  A.  No. Q.  Okay. Now, when you did take over in 2013, the first year was a relatively successful year in terms of your assessment of how they were doing in the territory?  A.  It was successful.").

[23]  *See* Exhibit 90, PSG00006485 ("Your team is doing a great job . . . the NB store is a true game changer for the brand . . . The Peru team really deserved the marketing award for all they have done . . . congratulations."); *see also* Exhibit 93, PSG00007483 ("I do recognize that the Peru business continues to grow nicely year on year and agree with you that you have worked hard to set a strong foundation for future growth.  As you know, we feel Peru does the best marketing in the region and the results reflect that.").

[24]  *See* Exhibit 90, PSG00006485 ("Thank you John for your support.  We are moving to give NB that 'unfair advantage' you describe as your goal with Marathon first in Ecuador and then in Peru.").

[25]  Hearing Transcript, 158: 16-25 ("So I started in 2009. I joined the company to run the international licensing business for New Balance.  And after about three and a half years in that role in early 2013, roughly the beginning of 2013, I changed positions and was the general manager for Latin America starting at that time.  Q.  And have you continued in that role since 2013?  A.  Yes.").

[26]  *Id.*

22.     The only way that PSG made any money from this relationship with New Balance was to buy its products at the wholesale level and sell them to its customers in Peru.[27]  If New Balance prevented PSG from purchasing its products, PSG could not generate revenues and thus could not pay New Balance any distribution fees.[28]

**A.      *New Balance's Denial of Letters of Credit and Refusal to Accept Orders from PSG***

23.     Under the terms of the Distribution Agreement, PSG would place orders for New Balance products during predetermined order windows which were about six months in advance of the shipment of the goods from the factory.[29]  PSG paid for its product orders by letters of credit at sight, as it was entitled to do pursuant to Section 6(b) of the Distribution Agreement, and it paid distribution fees to New Balance via direct cash transfers.[30]  Letters of credit are very common in the sportswear distribution industry and had been an important part of PSG's relationship with New Balance for many years.[31]  Letters of credit were also very important in order to maintain the cash cycle of PSG's distribution business so that the PSG could use revenue from product sales in order to finance future purchases, pay other costs of operation, and make distribution fee payments to New Balance.[32]

---

[27]   Hearing Transcript, 623:25 through 624: 9 ("A.  Because with a lack of product into the market, so how you can make money without product that you convert into money?  And again, if you cease daily sales, if you are not taking to a discount or a clearance place, you need to have new product to sell, which is coming your -- 80 percent of your sales are going to come for a fresh product, not old product.").

[28]   *Id.*

[29]   Respondents' Opening Presentation, slide 83.

[30]   Hearing transcript, 913:21-23 ("Q.  And distribution fees were never paid by letter of credit. Correct?  A. Correct."); 222:18-23 ("THE WITNESS: So my understanding, again, letters of credit are just being used for factory payments, not for distribution fee payments. THE ARBITRATOR: Let's stay with that.  Right.").

[31]   Hearing Transcript, 873:6-12 ("A. It is very common. In the industry of importing, the use of LCs are a very common way to -- of international commerce. Q. And Superdeporte in Ecuador uses letters of credit to purchase product from various other brands?  A.  Yes.").

[32]   Exhibit 1, PSG00005497; Hearing Transcript 605:11 through 25 ("And also it affects the whole cycle of the -- of them, the cash flow of the business, which is quite long, if you think about it. You start selling something

24.     Payment for product by letter of credit was explicitly permitted under Section 6(b) of the Distribution Agreement.[33]  From 2013 through the end of 2014, New Balance complied with its contractual obligation to permit PSG to use letters of credit to pay for products.[34]  This allowed PSG to manage a healthy cash flow cycle in which PSG would place orders, receive product from New Balance, sell the product to Marathon stores and to other end retailers, and begin collecting from retailers before the payment on the letter of credit became due.[35]  The parties' relationship functioned well during this timeframe.

---

now, and you will start collecting money if you sell to third parties. The normal way to work is to give them 90 to 120 days to clear the accounts.  So whatever you are selling today, you will start collecting that in 120 days, because that's the usual way to work.  Q.  So I'm going to ask you about the cash cycle of PSG's business with respect to New Balance in just a second in a little more detail. A.  Yes."  Hearing transcript 628: 3 through 630:21 ("What does "cash conversion cycle" mean?  A.  It's the time when you start – when you recover the money that you have put into the market in products over time. So it's how long takes you to recover the product that you are putting into the marketplace.  Q.  So could you describe -- and does this relate to PSG's business with New Balance, this cash conversion?  A.  No. This is a regular cash conversion cycle.  Q.  When you say "regular," does it apply to PSG's business with New Balance? A.  Yes. It's part of how the business works. You ship goods. I will give you an LC on on-site. Okay? The factory delivers the products to the forwarder. They receive the documents of receiving the goods. You present the goods -- the documents to the bank. They collect the money. With this, I need two month to reach stores for the first time. So you have a transit time, water transit time, roughly to origin is 35 days. Plus, you need to consolidate the goods in origin, and then you need to clear customs in the -- in whatever, in Peru or Ecuador. After that, you are able to start putting product into the market. Right? If you are -- if I'm selling you goods, my normal payment term with account, big accounts, like Falabella or Ripley is between 90 and 120 days. That's basically. That's a part of -- I don't know -- the royal – the gross profit structure that I have, discount, whatever I can have. Payment terms with that one, they can play without this 120 days because that's the cash conversion cycle. They all put the goods into their stores. They will start selling. And when they finish to sell the goods, roughly, they will pay you. So that is how it work.  Q.  So from the moment you have an order confirmed until -- an order confirmed, and that means an order confirmed to start shipment -- A.  Yes.  Q.  -- or I should say -- I'm sorry -- to have the order placed to manufacture the goods to eventually be shipped.  From the moment the order is confirmed until PSG starts seeing monies back from customers for the sale of those products, approximately how much time transpires?  A.  At least nine.  Q.  Nine what?  A.  Month.  Q.  Does the letter of credit help you in any way in facilitating this cash conversion cycle?  A.  Absolutely. The payment term that you have with the LC, me with the bank, is regularly 180 days. So it's going to match the cycle since they -- I receive the products on the port, import them, sell them, and record the money. So that's matching the cash cycle conversion.").

[33]     Exhibit 1, PSG00005497; Hearing Transcript 430: 2-13 ("Q.  All right. So you recognize, don't you, that in the -- what we've been calling the "old agreement" here, the 2013 agreement with PSG, between PSG and New Balance, that PSG had an obligation and a right to purchase product via letter of credit?  A.  That's correct, yes.  Q.  And you also recognized that agreement was never -- at least that provision in the agreement was never amended while that agreement was effective?  A.  That's correct.").

[34]     Exhibit 220, PSG00007238.

[35]     Respondents' Opening Presentation, slides 83-84.

25. When PSG was able to pay for product via letter of credit, it was able to stay current on product payments as well as to make regular royalty payments to New Balance.[36] Any payment delays in 2013 or 2014 were minimal, ordinary for this type of business and did not in any way disrupt the parties' relationship. PSG only seriously fell behind on its payment obligations in 2015 once New Balance improperly stopped accepting letters of credit from PSG for product purchases.[37]

26. In most instances throughout 2014, for example, PSG only owed the prior month's distribution fees, which had just been invoiced the week prior to the account statement, and at most, owed two months' worth of fees.[38] It also owed nominal amounts in sample expenses.[39] The account statements reflect that PSG was making regular payments on its distribution fees and was not significantly behind on payments in 2014.[40] The monthly distribution fees under the Distribution Agreement were based upon PSG's sales.[41] PSG would report its sales to New

---

[36] *See* Exhibit 12, NB_PSG0002843.

[37] *See* Exhibit 12, NB_PSG0002843.

[38] *See* Exhibit 12, NB_PSG0002843. For example, in January 2014, PSG owed October and November 2013 fees. In February 2014, PSG only owed December 2013 fees. In March 2014, PSG owed the 2013 Minimum Fee as well as the January 2014 fee. As of the beginning of April 2014, PSG owed the 2013 Minimum Fee as well as fees for January and February 2014. As of May 2014, PSG owed the 2013 Minimum Fee as well as fees for March 2014. As of June 2014, PSG owed the 2013 Minimum Fee as well as fees for May 2014. As of July 2014, PSG owed the 2013 Minimum Fee as well as fees for May 2014. New Balance's records do not include a statement for fees in August 2014. As of September 2014, PSG owed the 2013 Minimum Fee as well as fees for July 2014. New Balance's records do not include a statement for fees in October 2014. As of November 2014, PSG owed the 2013 Minimum Fee as well as fees for August and September 2014. As of December 2, 2014, PSG owed the 2013 Minimum Fee as well as fees for September and October 2014. As of December 29, 2014, PSG owed the 2013 Minimum Fee as well as fees for October and November 2014.

[39] *See* Exhibit 12, NB_PSG0002843.

[40] *Id*.

[41] Hearing Transcript, 765:22 through 766: 8 ("How are the invoices generated? A. So the -- that comes back to one of the earlier questions on the process for distribution fees. So the markets would submit their sales and distribution fee amount in a template, on a monthly basis. Our finance team will review that and then hand it over to our credit department. Our credit department would issue the invoice for the distribution fees. And then it gets posted to our ERP system, and that's where – that's where it comes from.").

Balance in the month after it made the sales, and New Balance would invoice PSG for the distribution fees.[42] Specifically, as of December 29, 2014 for example, PSG owed $11,446.86 in samples and $166,651.83 in fees. The $166,651.83 in fees was made up of three components: a minimum fee catch-up payment from 2013, which had been billed to PSG on February 28, 2014 ($43,525.00), the October 2014 fee (due at the end of November in the amount of $40,410.13), which had been billed to PSG on November 21, 2014, and the November 2014 fee (due at the end of December 2014 in the amount of $82,716.70), which had been billed to PSG on December 15, 2014.[43] As PSG's account statements reflect, PSG paid the October 2014 fee in January 2015, and the November 2014 fee during March 2015.[44] PSG also paid the 2013 Minimum Fee in April 2015.[45] On these facts, is not true, as New Balance contends, that PSG was chronically late in paying its bills to New Balance since the inception of the parties' relationship or in calendar year 2014. Instead, the payment issues began in earnest in 2015 as a result of New Balance's breaches of the parties' contract.

27. The following figure shows the monthly cumulative outstanding amount of distribution fees owed by PSG over the period from March 2013 forward based on the Statements of Account New Balance has kept.[46] As the figure indicates, there were no real payment issues until January/February 2015 when New Balance breached the Distribution Agreement by not allowing PSG to pay by letter of credit. Over the next several months, PSG was not able to receive any orders and thus had no new product to general revenue from because New Balance wrongfully

---

[42] *Id.*

[43] Exhibit 12, NB_PSG0002843 at 2865-2866.

[44] *Id.* at 2866-2867.

[45] *Id.* at 2869.

[46] *See* Exhibit 12, NB_PSG0002843; gaps in the chart reflect time periods for which the Statement of Accounts were not provided in Exhibit 12.

insisted on cash payment. In August 2015, New Balance completely shut down PSG's access to its online ordering system. One month after that, in September 2015, PSG's delays in payment increased significantly. New Balance's breaches of contract significantly disturbed PSG's cash cycle throughout the entirety of 2015, and PSG understandably was not able to recover from this, having no new products to sell into the Peruvian market.



(Figure 1 -- PSG's Cumulative Outstanding Distribution Fees to New Balance)

28.    In 2014 and 2015, Peru and Ecuador's markets also suffered from significant contractions, including currency devaluations in Peru and a 25% import duty in Ecuador.[47]  As a

---

[47]    Exhibit 242, NB_PSG0000522; Hearing Transcript, 438: 24 through 439:18 ("Q.  And those factors included the introduction of a new, very hefty import duty tax in Ecuador?  A.  Yes.  Q.  25 percent tax?  A.  Correct. Q.  And what that meant is that in order to import product into Ecuador, New Balance product, each pair of shoes would be more -- the importer or the entity receiving the product would have to pay an extra 25 percent to get that product in the market?  A.  That's correct.  Q.  And you recognized that affected PSG.  Right?  A.  Yes.  Q.  And it

consequence, PSG suffered short term cash flow liquidity issues.[48]  The Parties discussed and

assessed PSG's cash flow issues and were aware of the specific cash flow challenges, which were

<hr>

severely affected its cash flow?  A.  It affected them for sure."); Hearing Transcript, 950:15 through 951:25 ("A. So contrary to what John said that there are devaluations all the time, Peru had actually the most stable currency or one of the most stable currencies in the region. Ecuador not only has a very stable currency, Ecuador is dollarized. So the dollar circulates in Ecuador, so there's no such a thing as a devaluation.  But in the case of Peru, the devaluation was huge, it was shocking, and it had to do with the lower -- with a drop in 2 commodity prices, and it was a shock everywhere. Charlie described it yesterday better than me of what the shock was regarding the drop in sales in Peru. It was dramatic. Dramatic, and also the reactions were dramatic. The banks were more careful. Everything was done in -- commercially in -- in terms of less optimism. We just lived a -- we just lived the first crisis that we had lived in 10 years, you know.  Q.  How did that affect --  A.  The 2008 crisis did not have an effect on Peru or Ecuador. This one did. This one did.  Q.  How did it affect PSG's business, if you can give just a brief summation?  A.  I don't have an exact number, but the leftover inventory -- about half of the inventory that we had was difficult to sell, so we got stuck with 50 percent of the inventory. Company-wide -- and this is with all our companies -- we had $36 million worth of inventory, excess inventory, company-wide, one of which was New Balance in this mall."); Hearing Transcript, 602:12 through 604: 22 ("You said the market was contracted due to devaluations in Peru?  A.  Yes. Huge one.  Q.  What does that mean? What devaluations are you referring to?  A.  The currency changed from, I think it was, 2.8 soles per dollar to 3.45 in a month. Actually, the whole market was going -- Peru had really good years between 2011 until 2014. The whole market was going up, growing. And suddenly in -- I think it's May/June 2015, everything stopped. The contraction starts over there and we have this huge devaluation the beginning of 2015 in Peru and the whole market collapse.  Q.  Did that have any effect on PSG's ability to sell products for New Balance?  A.  To sell -- the whole market was struggling. All our clients were having problems to sell. We were having problems to sell because the market was contracted. The people were not buying. So it's a part of recession. It's difficult to sell. So all your movement change -- or your cash flow change.  Q.  You also mentioned, I think you said, import restrictions or import duties. What does that mean?  A.  With Ecuador. Ecuador put an extra duty in, supposedly for a year, in April 2015. And with the heavy duty structure they had, they put a 25 percent over it for a part on shoes, and then they put 45 percent for accessories, which is incredibly nuts. I cannot still understand that part. For example, if you were importing a million dollars, you need to pay in advance to clear the goods besides all the duty that you have paid already. 25 percent, that's 250 million. A quarter million more just to clear the goods. Then after that, all the market was afraid that the prices were up. So you didn't have the chance to increase prices against that 25 percent. So everyone raise that price because the government was controlling that one, too, 10 percent.  But we didn't have any sales. So we start putting discounts into it. So you don't recover 250,000 for a million, but you are getting in worse situation even, because people is not buying and you need to put the product in discount that is with a higher cost than the usual. And at the beginning they put a different year, and you start buying for the end of that period that should be ending in 2016, and they extend it for another year.  So was really difficult, that.").

[48]  Hearing Transcript, 603: 13 through 605:30 ("Q.  You also mentioned, I think you said, import restrictions or import duties. What does that mean?  A.  With Ecuador. Ecuador put an extra duty in, supposedly for a year, in April 2015. And with the heavy duty structure they had, they put a 25 percent over it for a part on shoes, and then they put 45 percent for accessories, which is incredibly nuts. I cannot still understand that part. For example, if you were importing a million dollars, you need to pay in advance to clear the goods besides all the duty that you have paid already. 25 percent, that's 250 million. A quarter million more just to clear the goods. Then after that, all the market was afraid that the prices were up. So you didn't have the chance to increase prices against that 25 percent. So everyone raise that price because the government was controlling that one, too, 10 percent. But we didn't have any sales. So we start putting discounts into it. So you don't recover 250,000 for a million, but you are getting in worse situation even, because people is not buying and you need to put the product in discount that is with a higher cost than the usual. And at the beginning they put a different year, and you start buying for the end of that period that should be ending in 2016, and they extend it for another year. So was really difficult, that.  Q.  With respect to that issue, how did that affect your business in Peru? I understand you're describing a tax for importing products into Ecuador. How did that affect PSG's business in Peru with New Balance?  A.  Because we had both territory with that, and then we were receiving the goods to Peru and were shipping part of Ecuador. So Ecuador needs to pay us. So if they have a cash

17

caused by circumstances wholly outside of the Respondents' control, and PSG dealt with it well until at the end of 2014 and start of 2015 New Balance began breaching the parties' contract by refusing PSG's requests to pay for product purchases via letters of credit.[49]

29.     Around the same time, in late 2014, New Balance informed PSG that beginning in 2015 it was no longer going to accept letters of credit as a form of payment for products.[50] This would present a radical and devastating change for PSG in the parties' relationship.  In response, PSG complained about this breach by New Balance and explained to New Balance how important letters of credit were for their business, their cash flow cycle, and for staying current on payments to New Balance.[51]  Despite PSG's pleas to allow it to continue purchasing products via letters of

---

issue which is tied to sales, it's going to affect us, all the way. And also it affects the whole cycle of the -- of them, the cash flow of the business, which is quite long, if you think about it. You start selling something now, and you will start collecting money if you sell to third parties. The normal way to work is to give them 90 to 120 days to clear the accounts. So whatever you are selling today, you will start collecting that in 120 days, because that's the usual way to work."). Exhibit 242, NB_PSG0000522.

[49]    Hearing Transcript, 608:7 through 609:20 ("Okay. And did you have any discussions with Mr. Cullen about -- and I'll take them in order -- the issue that you were having in making sales because of the devaluation in the Peruvian currency?  A.  No. I explain to him many times that we were suffering with that. It was really difficult time for the country.  Q.  And what sorts of response or what response, if any, did you get from Mr. Cullen?  A.  Not having the support that we're expected is to keep working with us that will allow me to be able to float them. Imagine if sales are tight, your cash is tight. If you need to pay duties in advance, it's affecting all your cash. And also to keep the business running, you need to pay duties. Those duties, you pay those in cash. So whatever you are receiving, you are putting those in to clear customs to get the chance to have the product to selling. So it's a loop.  Q.  Did you have any discussions with Mr. Cullen about the cash issues you were having as a result of the Ecuador tax that you just described before?  A.  Yes. That one, yes.  Q.  And, again, what sort of response did you get from Mr. Cullen, if any, about that issue?  A.  No, I didn't get the support again. They keep pushing to send things with cash, which is not the proper way to do it. Especially -- especially if you have seen a contracture in the market, how do you expect to move from payment method that helps you to fulfill the business instead of putting more money into advances? It doesn't make sense at all.").

[50]    Exhibit 220, PSG00007238.

[51]    Exhibit 220, PSG00007238 ("Here is a brief explanation why we do need to keep working with LCs. Please, send this info to NB Financial Team. Let us know their comments. At sight Letters of Credit started to be used frequently in the 1990s and continue to be used by large multinational companies because they serve as a guarantee of the legitimate origin of the funds. In the region there was and there is an issue of fear regarding money laundering, corrupt politicians, and drug trafficking which through the use of At Sight Letters of Credit is appeased and minimized because it is difficult for money of dubious origin to be able to go through these lines via confirming banks abroad and via local banks with international agencies. At Sight LCs are widely used in all lines of business in our region. Criminals and corrupt politicians do not open Letters of Credit when they import. They transfer cash, and cash transfers become dangerous for multinationals.  With Letters of Credit, there is another advantage for the multinational selling company. This advantage is that the selling company gets its money right away, in cash, but these funds go through

credit as allowed by the parties' agreement, New Balance made it clear that it was unilaterally imposing this change and that the orders for Q2 2015 (made in October/November of 2014) were the last time that it would accept letters of credit from PSG for products.[52] Instead of letters of credit, New Balance was requiring that PSG pay by wire cash transfers for products.[53] This decision was a unilateral decision on New Balance's part for its convenience, and this new payment method was imposed upon PSG.[54] The last orders that New Balance permitted PSG to place in the ordinary course of business by letter of credit were the Q2 2015 orders, which PSG placed in the fall and early winter of 2014.[55]

---

the Bank that opened the At Sight Letter of Credit and also through the confirming Bank. New Balance is paid by the Bank cash in advance therefore it is not required that New Balance gives credit to the importer. That is, New Balance does not need to offer credit to PSG. One of the things that complicates At Sight Letters of Credit is that fixing of discrepancies that may cause delays, i.e. the buyer says that something is not in order. In our case we don't apply discrepancies, we can commit ourselves to not applying discrepancies, and can do so in writing. At sight Letters of Credit are also used to ensure correct delivery. We know that there will be no such issues, and we can even commit in writing that we will not bring up or apply discrepancies. For Peruvian Sporting Goods as buyers we receive credit from the Bank without collateral, and pay in periods of 90 to 180 days, which allows us to better use our cash for opening stores, marketing and capex. Paying cash will be is a misuse of capital that could be used instead for opening mono brands in Peru, or use in marketing assets while we use credit from banks for imports. A quick explanation of how simply we work with At Sight Letters of Credit that operate as follows. The importer (buyer) asks its bank to send a message (letter of credit) to the Bank of the exporter (seller), and makes a commitment to pay for the operation once it receives the respective shipping documents. In this way, cash payment to the exporter is fully and irrevocably guaranteed by the bank issuing the letter of credit, and is carried out by the Bank Under Armour designates as confirming bank. I hope that this will help to better understand the advantages of At Sight Letters of Credit. In the end you will receive the money cash from a very accredited source, New Balance is paid by a bank. For us it is a seal of approval that well-known banks give us these lines which should leave you, New Balance, at ease. It is also very important that this way we receive credit and we can use our cash for investment in the brand.").

[52] Exhibit 225, NB_PSG0001555.

[53] *Id.*

[54] Hearing Transcript, 431: 12-16 ("Q. So when that occurred, that was a New Balance decision. Right? That was not some decision that New Balance took jointly with its distributors? A. That's correct."); Hearing Transcript, 433:4-11 ("Q. You didn't -- or New Balance didn't, I should say -- engage in negotiations with each of its distributors to ensure that each of its distributors accepted that change. Correct? A. No. Q. And you didn't do that with PSG? A. No."); Hearing Transcript, 830:12-18 ("THE ARBITRATOR: Allowing for the fact that New Balance gave them something at least in terms of the 15-day terms. On the letter of credit issue, you basically imposed it on them? THE WITNESS: That's fair. We made that decision, yes.").

[55] Exhibit 224, NB_PSG0001553; Respondents' Closing Presentation, Slide 26.

30.    In January/February 2015, PSG placed an order for Q3 2015 product, but New Balance by that time required payment by wire transfer.[56] Due to its inability to finance the purchases via letters of credit given New Balance's improper rejection of payments via this medium, PSG struggled for months to comply with New Balance's requirement that PSG pay for this order with cash.[57] New Balance refused to ship the Q3 2015 orders until PSG paid for them in cash.[58]

31.    In late July 2015, Mr. Ribadeneira and the CEO of the group, Mr. Renan Meneses, met with Mr. Cullen in New York and negotiated with New Balance to be able to pay for these Q3 2015 orders by letter of credit, which New Balance finally allowed.[59] Within a very short period of time of receiving this approval, PSG made $550,000 in payments for these Q3 2015 orders via letter of credit on August 5, 2015.[60]

32.    Having paid for them on August 5th, this triggered the release of the products, which meant they arrived to market about *6 months later than they should have*. Sportswear is an industry that is driven by what is current, seasonal, and in style.[61] By the time PSG received the Q3 2015

---

[56] *Id.*

[57] Hearing Transcript, 494:22 through 495:5 ("Q. Yes. And so my question is, consistent with what you were being told here by the finance people, did New Balance, at least initially, ask for PSG to pay for Q3 orders by lines of credit as opposed to letters of credit? A. Yes, it appears that way."); Exhibit. 101, NB_PSG0001963; Exhibit 105, NB_PSG0001306.

[58] *Id.*

[59] Exhibit 101, NB_PSG0001963.

[60] Exhibit 105-1, NB_PSG0001306.

[61] Hearing Transcript, 624:10 through 625:5 ("Q. Why is that?· Why is it more difficult to sell older product? A. Because people don't want it. People already saw it into the marketplace. You don't want the old one. You want the new one. You want the fresh goods. And that's part of the business. It's how it works. I'm giving you figures of sellout, not that I'm inventing something. I see the sellout and the aging of the product. And whatever is making your 80 percent of sales is revenue, this new and a mix of old product. But it's 50 days old, so it can't be that old. And if you moving then to 60, 70 days for the balance of whatever you are selling, it's two months.· So it's still new product come by.· And whatever you are not selling is 150, 180 days old, so you need to get rid of that one by putting discount, discount, discount, discount.").

orders, they were stale and no longer in season or current. As a result, PSG had to sell many of the Q3 2015 products at a discount.[62]

33. That PSG was able to pay for these products with letters of credit within two weeks of receiving approval from New Balance, proves that had New Balance not breached the parties' agreement by removing this payment option, PSG would have continued to run the business smoothly and without significant payment delays as it had done for the first 14 years of the parties' relationship in Peru.

34. In Q4 2015, PSG was forced to pay New Balance by cash in accordance with New Balance's new policy.[63] As a consequence, PSG was only able to place limited Q4 orders in April 2015—before New Balance stopped accepting orders from PSG—and it was only able to make a minimal cash payment ( $93,000 worth of product) on the Q4 2015 orders on October 29, 2015, at which point the Q4 2015 orders shipped.[64] Because PSG could not pay for these orders by letters of credit and had to wait until it had the requisite cash to make payments for at least some of these orders, PSG also received the Q4 2015 orders *about 6 months late*—the products were supposed to be delivered to the market in October of 2015, but PSG was only able to pay for them at the end

---

[62]  Exhibit 285, SD-26.

[63]  Hearing Transcript, 471:2-18 ("Q. So you are telling PSG in this email, which is sent in early April, that for the upcoming Q4 window the new NBIL rules will be implemented? A. Correct. Q. And that means that for Q4 purchases, no letters of credit. You have to pay by wire transfer? A. This explains why they paid in cash. Q. Okay. All right. That's what I was driving at. Because you said yesterday they could pay by letter of credit for Q4 orders, but it turns out that you told them something different, which is why they paid by direct transfer. Right? A. Correct.").

[64]  Exhibit 94, NB_PSG0001670; Exhibit 205, PSG00006772; Hearing Transcript, 207:18 through 208:7 (A. Yeah. So this is the first window of Q4 2015. So, again, we're six months before entry into the marketplace. So this is a window in April of 2015 for product that **will be delivered to the market in October of 2015**. Q4 is a very important market. Q4 is a very important Q in the footwear business. It's when we sell a lot of shoes. It's pre-Christmas. It's a very important time for us. Q. And were you able to persuade New Balance to allow PSG to buy in the -- in that window? A. Yes.") (emphasis added).

of October 2015 so that they arrived to market roughly six months after October—requiring that much of this product also be sold at a discount or a loss.[65]

35.     The decision to refuse to accept letters of credit, in violation of the terms of the Distribution Agreement, was a unilateral change on New Balance's part, rooted in New Balance's desire to avoid "additional costs and complexities" associated with letters of credit.[66] New Balance imposed this new payment term on PSG, despite PSG's contractual right under the Distribution Agreement to pay for product by letter of credit.[67] The decision to refuse to accept letters of credit was also motivated by New Balance's desire to earn a higher margin off of product purchases, as eliminating letters of credit lowered its costs by easing the administrative duties of its employees in complying with the requirements of these letters.[68]

---

[65]   See *supra* note 50 (John Cullen admitting the Q4 2015 products were supposed to be delivered to market in October 2015); Exhibit 224, NB PSG0001553; Exhibit 101, NB_PSG0001963; Exhibit 105, NB_PSG0001306.

[66]   Exhibit 227, NB_PSG0001572.

[67]   Hearing Transcript: 829:21 through 830:18 ("THE ARBITRATOR: Was there a point where -- parsing the term "agreement" here -- was there a point at which New Balance basically imposed on PSG the reality that it was not going to be able to pay by letter of credit anymore? THE WITNESS: Yes. THE ARBITRATOR: And PSG agreed in the sense that they had no choice. Does that fairly describe the dynamic of the negotiation? THE WITNESS: Yes. But I would say that we compromised along the way. So, ultimately, you're correct: we would have made the decision. THE ARBITRATOR: Allowing for the fact that New Balance gave them something at least in terms of the 15-day terms. On the letter of credit issue, you basically imposed it on them? THE WITNESS: That's fair. We made that decision, yes.").

[68]   Hearing Transcript: 430:14 through 431:16 ("Q.  Now, you have referenced the fact that New Balance began at some point in 2015 to step in between the factories and the distributors and, in essence, be the entity that distributors would be paying for product when they purchased it? A.  That's correct. Q.  And part of the reason that New Balance did that is it wanted itself to make some margin off product purchases? A.  Maybe. Q.  Well, I mean – A.  I assume. But there was also a lot of additional costs associated with that and significantly more risk for New Balance. But I assume that was also part of the decision. Q.  I mean, New Balance must have some business decision that it made sense for them to step in between. Otherwise it wouldn't have done it? A.  I really can't speak to that, to be honest. Q.  So when that occurred, that was a New Balance decision. Right? That was not some decision that New Balance took jointly with its distributors? A.  That's correct."); Hearing Transcript, 812:11 through 813:3 ("But the -- when NBIL put itself sort of in the middle of the relationship between the factory and the distributor, was New Balance making a margin then on the product that was being -- that the distributor was buying? A.  There was a markup, not a pure profit markup. There was costs associated with this entity. There's costs associated with our sourcing organization. So the margin that was built into the cost was not a pure profit markup, but it was intended to offset NBIL and sourcing expenses. Q.  Okay. So NBIL was making a profit or a markup on shoes that were sold, that distributors were selling? A.  Yes. There was a markup there, yes."); Hearing Transcript, 422:2-20 ("Q.  You did start taking a piece of that business, then? A.  That's correct. Q.  That's when you switched to the NBIL new regime -- A.  That's correct. Q.  -- where you had factories in Hong Kong? You talked about that in your direct. You talked

36. Aside from letters of credit, other forms of financing, like lines of credit, were not available to PSG given the small size of the company and its operations.[69] At the time, letters of credit were PSG's only financing option.[70]

37. PSG explained to New Balance the importance of letters of credit to their business and complained to it about this unilateral change in its payment policy that violated the terms of the Distribution Agreement, but New Balance insisted that PSG pay New Balance cash within 15 days of the shipment of the goods.[71] New Balance itself receives 60 day credit terms from the factories, four times the amount of time that it was providing PSG for its purchases.[72] This shows that New Balance also was making money with this new policy by requiring earlier payments from its distributors and then holding onto that cash for a significant period of time before having to pay its factories for the products.

38. Once PSG fell into arrears in August of 2015 due directly to New Balance's unilateral requirement that PSG purchase products by wire transfers, New Balance seized on

---

about it? A. Yes. Q. At that point you did take a piece? A. We did mark up the product a bit. Q. And New Balance did get some money then? A. That's correct. Q. Okay. From the purchase of the product? A. Yes.").

[69] Hearing transcript, 957:14 through 958: 20 ("Q. Couldn't you just go to your banker and say, 'We've got this line of credit, this trade line for a line of credit that we've been using with you. Can't you just convert this thing into a regular, a line of credit so we can draw on that to buy product?' A. No. Q. Why not? A. It's two areas of the bank. The trade finance side is one area of the bank where we had the relationship. That works mostly on corresponding banks lines that are outside. Those are actually quite easy to get. Getting regular loans, you require collateral. You require a history and presenting balance sheets that are very strong. How are we going to present a balance sheet that is strong if we cannot even order product? Because we have been denied the possibility of ordering product and we don't have a contract. I mean, the first two things they are going to ask me is what's the contract? And I'm not going to have a contract. Because at that time we were also in the middle of the fight of -- for the contract. So that was not - - that was not feasible. I was looking and trying – looking for work to moving to Superdeporte and being able to then get a line of credit to work the way New Balance was suggesting. It was not that it was impossible. It was impossible for PSG to do it.").

[70] *Id.*

[71] Hearing Transcript, 816:10-12 ("And that the ultimate offer to PSG was 15-day terms? A. That's correct.").

[72] Hearing Transcript, 822:15-17 ("Okay. So New Balance has credit for 60 days on paying the factories? A. That's correct.").

PSG's payment delays arising from the inability to pay by letter of credit and shockingly imposed a total ban on all of PSG's orders. In August of 2015, New Balance shut down PSG's access to New Balance's online ordering system, forbidding PSG from placing any further product orders.[73] This was another breach of the parties' agreement and literally prevented PSG from continuing to perform under its contract with New Balance.[74]

39. After August 2015, New Balance, in January 2016, required PSG to make a significant payment of approximately US $200,000 in order to open the Q3 2016 payment window for PSG.[75] PSG made the requested payment and then placed one order in Q3 2016.[76] PSG made various requests to pay for that order by letter of credit, which New Balance *continually refused*.[77] Because PSG did not have the cash available to pay for the Q3 2016 order, New Balance refused to ship the products to PSG, and PSG never received them.[78]

40. Aside from the Q3 2016 order, PSG was unable to place <u>any</u> orders after the Q4 2015 orders, meaning it did not receive any new product from New Balance for the latter part of

---

[73] Exhibit 126-1, PSG00006819.

[74] Hearing Transcript, 623:25 through 624: 9 ("A. Because with a lack of product into the market, so how you can make money without product that you convert into money? And again, if you cease daily sales, if you are not taking to a discount or a clearance place, you need to have new product to sell, which is coming your -- 80 percent of your sales are going to come for a fresh product, not old product.").

[75] Exhibit 209, PSG00002774.

[76] Exhibit 211, PSG00006754.

[77] Hearing Transcript, 474:22 through 475:22 ("Q. They did place orders for Q3 2016, but ultimately they asked for those orders to be paid by letter of credit. New Balance said no. So they never got those orders? A. All I know is they didn't pay for those. I don't know -- they didn't pay for those. We can get those if you want, but they didn't pay for those orders, in any event. Q. Well, I mean, you also know that they -- do you not remember that you testified this morning that they asked to pay by letter of credit and that you said no? A. I think I said no, yes. Sorry. You're right. Q. Okay. So just so we're clear, the last order that PSG was able to pay for by letter of credit -- you've said this already -- were orders that -- of product that they ordered in January/February of 2015? A. Yeah. Q. Everything subsequent to that, for all the rest of 2015, all the rest of 2016, they had to pay by direct wire transfer or else they wouldn't get product? A. Yes.").

[78] *Id.*

2015 and all of 2016.[79]  PSG was purely a sportswear distribution company and it only made money by purchasing and selling product.[80]  Unable to purchase new product, PSG was unable to sell product and thereby did not earn any money on sales of New Balance products requiring it to pay a distribution fee to New Balance.[81]  This placed a financial stranglehold on PSG's business and prevented it from enjoying the fruits of its exclusive distributorship with New Balance.  It simply became unable to operate its business without any further fresh New Balance products.

41.     Desperate to purchase additional products and salvage the business, PSG also made various payments requested by New Balance in good faith based upon New Balance's promises that if PSG made the additional payments, then PSG would be permitted to purchase products again and continue with the New Balance business.  However, at each juncture, New Balance reneged on these promises.  For example, on August 5, 2015, PSG made over $500,000 in factory payments for the Q3 2015 orders with the promise by New Balance that it would permit PSG to place orders for Q1 2016.[82]  After it received PSG's payment, New Balance reneged on this promise, denying PSG permission  to place Q1 2016 orders,  claiming that it was still in arrears on other payments.[83]

---

[79]  Hearing Transcript, 848:3-11 ("Q.  And did PSG receive any – aside from the Q3 order that PSG was allowed to place, did PSG receive any Q1, Q2, Q3, Q4 2016 orders?  A.  No, I don't believe they did. No.  Q.  So PSG received and was not able to sell any 2016 product?  A.  That's true.").

[80]  Hearing Transcript, 623:25 through 624: 9 ("A.  Because with a lack of product into the market, so how you can make money without product that you convert into money?  And again, if you cease daily sales, if you are not taking to a discount or a clearance place, you need to have new product to sell, which is coming your -- 80 percent of your sales are going to come for a fresh product, not old product.").

[81]  Hearing Transcript, 849:3-6 ("Q.  And when a distributor can't buy product and can't sell product, it can't make money.  A.  I agree.").

[82]  Exhibit 105-1, NB_PSG0001302; Exhibit 101, NB_PSG0001963; Exhibit 106, NB_PSG0002036.

[83]  Exhibit 106, NB_PSG0002036.

42.    On August 12, 2015, PSG made additional $30,000 in factory payments, and on October 29, 2015, PSG made six factory payments totaling over $96,000 with the understanding based on promises by New Balance that these payments would allow PSG to place Q2 2016 orders.[84]  Once it received the payments, however, New Balance refused to accept the Q2 2016 orders.[85]  Similarly, in January 2016, PSG made over $34,000 in factory payments and over $162,000 in distribution fee payments covering the period from January through July 2015 with the understanding that New Balance would permit PSG to place Q3 2016 orders.[86]  As explained, after this payment, New Balance allowed PSG to place Q3 2016 orders, but then refused to allows PSG to pay for these orders by letters of credit, instead demanding payment in full by cash.[87]  When PSG was unable to pay upfront by cash, New Balance would not ship the Q3 orders to PSG.[88]  Ultimately, New Balance sold the Q3 orders that PSG had made to one of its other distributors.[89]

---

[84]  Exhibit 205, PSG00006772; Exhibit 201, NB_PSG0001989.

[85]  Exhibit 205, PSG00006772.

[86]  Exhibit. 209, PSG00002774, Exhibit 211, PSG00006754.

[87]  Hearing Transcript, 474:22 through 475:22 ("Q.  They did place orders for Q3 2016, but ultimately they asked for those orders to be paid by letter of credit. New Balance said no. So they never got those orders?  A.  All I know is they didn't pay for those. I don't know -- they didn't pay for those. We can get those if you want, but they didn't pay for those orders, in any event.  Q.  Well, I mean, you also know that they -- do you not remember that you testified this morning that they asked to pay by letter of credit and that you said no?  A.  I think I said no, yes. Sorry. You're right.  Q.  Okay. So just so we're clear, the last order that PSG was able to pay for by letter of credit -- you've said this already -- were orders that -- of product that they ordered in January/February of 2015?  A.  Yeah.  Q. Everything subsequent to that, for all the rest of 2015, all the rest of 2016, they had to pay by direct wire transfer or else they wouldn't get product?  A.  Yes.").

[88]  Exhibit 156, NB_PSG0000515.

[89]  Exhibit 155, NB_PSG0000186.

### B. Negotiation of the New Distribution Agreement

43.     Beginning in 2013, Mr. Cullen approached Mr. Ribadeneira about a new structure

for New Balance distribution in Peru and Ecuador.[90]  Through this structure, New Balance wanted

its distributor in Peru to integrate wholesale and retail through one Marathon Group entity so as to

allow New Balance to obtain better product placement in the Marathon Group retail stores and

other advantages over other sports shoe and apparel manufacturers—what New Balance's John

Cullen called an "unfair advantage."[91]  New Balance was seeking to grow its relationship with

Respondents through this change, expanding it to retain distribution, not just wholesale distribution.

44.     In November 2014, New Balance first made an offer to PSG to enter into a new and

reformed Distribution Agreement for their business in Peru (and Ecuador) that would incorporate

this new wholesale/retail structure (the "**New Distribution Agreement**").[92]  Per New Balance's

requirements for the New Distribution Agreement, Respondents would be required to enter into

the New Distribution Agreement  through an entity that could handle both wholesale distribution

and retail sales.[93]  New Balance was seeking an investment into the growth of the parties'

---

[90]     Exhibit 93, PSG00007483 ("NB will extend our current contract through 2016 with a 10% increase in sales for Ecuador and a 20% increase in sales for Peru. . . .  NB will require PSG/Dide to invest $300k into SIS space at marathon with at least 50% being invested in 2015 and 50% in 2016."); Exhibit 87, PSG00006490 ("It was good to hear of your plans to restructure things in Peru/Ecuador . . . I think it makes a lot of sense for the business.  Over the next few weeks, I will take a look at your contract and see what we need to do to address your new structure in our contract.  As discussed, that will likely mean moving back to having one contract for both countries and converting it to a "FOB" based contract.").

[91]     *See* Exhibit 90, PSG00006485 ("Thank you John for your support.  We are moving to give NB that 'unfair advantage' you describe as your goal with Marathon first in Ecuador and then in Peru."); Ex. 113, NB_PSG0003365 ("As I told you on Thursday Carlos Miguel Galardi will be managing NB out of Lima for Peru and Ecuador, he will do so integrated to the two retail organizations in Peru and Ecuador.  The two retail organizations will handle retail and wholesale, this will continue to serve third party retail accounts and give NB the unfair advantage that you want in both countries.").

[92]     *See* Exhibit 93, PSG00007483.

[93]     *See* Hearing Transcript, 643: 5-11 ("I was talking with him about this since December.  We agreed to reduce the minimums.  That way we're more aligned to what is happening in the marketplace.  And to change it to Superdeporte, which was the integrated entity with wholesale and retail, which was something that he request."). *See also* Exhibit 113, NB_PSG0003365 (". . . he will do so integrated to the two retail organizations in Peru and Ecuador.

relationship, asking for Respondents to expand not only into retail distribution but to build out mini shop-in-shop New Balance stores in the Marathon retail stores.[94]

45.     Because PSG was not set up legally or commercially to handle retail sales,[95] the managers of PSG and its parent companies determined that they had to establish a new, separate corporate entity that could handle both wholesale distribution and retail sales to meet New Balance's requirements for the New Distribution Agreement.[96] They then embarked on the tasks and very substantial investments related to establishing Superdeporte Plus S.A.C., a Peruvian entity, to meet New Balance's requirements for the New Distribution Agreement.[97]

---

The two retail organizations will handle retail and wholesale, this will continue to serve third party retail accounts and give NB the unfair advantage that you want in both countries.").

[94]   Exhibit 93, PSG00007483; Hearing Transcript, 685:3-7 ("A. To have unfair advantage, to have New Balance integrated with a wholesaler/retailer because that will benefit the brand, having better space, better location, better brand image. Yes.").

[95]   Hearing Transcript, 521:14 through 522:4 ("THE ARBITRATOR: I'm trying to understand your perception as to what the deal was under the 2013 agreement. PSG was an importer. It was a distributor. THE WITNESS: Yes. THE ARBITRATOR: It was a customer of the manufacturer. THE WITNESS: Yes. THE ARBITRATOR: Now, could it open its own retail stores and sell directly to customers?· Or was it limited, in your experience, to simply selling to the retail store? THE WITNESS:· I think it was limited to selling to the retail store."); Hearing Transcript, 868: 12-25; 869: 2-16 ("Q. So there's been a lot of discussion about PSG as a wholesale company in Peru and how it was purely a wholesale company and couldn't function at the retail level. Can you explain a little bit about why PSG couldn't function at the retail level? A. PSG does not have the expertise, the knowledge, the stores, the locations, the handling the business of retail. Q. PSG was purely a -- A. Purely a wholesale -- Q. -- distribution company? A. -- wholesale company. An importer and wholesale company. Q. And you talked about the infrastructure, stores and all that. Can you describe a little bit more about the infrastructure required for a retail company? A. First, you have to be key locations, and you have to have more than four locations. In that case, Marathon has at that point 20 locations, very good locations. You have to have the employees, the working force, to handle those big stores. Because our -- those are not small stores. Those are stores are about 700, 600 meters, square meters. So it needs the operation know-how of how to handle these chain of stores. So they do have in place all of that.").

[96]   Hearing Transcript, 917:17 through 918:5 ("A. Mr. Cullen proposed a way, a model of doing business, and for doing that -- for sweeten [phonetic] that model, it was needed to create Superdeporte . . . We follow his request and we implement it. That's why we created Superdeporte.").

[97]   Hearing Transcript, 643: 5-11 ("A. I was talking with him about this since December. We agreed to reduce the minimums. That way we're more aligned to what is happening in the marketplace. And to change it to Superdeporte, which was the integrated entity with wholesale and retail, which was something that he request."); *see also* Exhibit 52-1, PSG00006577.

46.     For this integrated new business structure, New Balance required "shop-in-shop locations" and its distributor, Superdeporte, to sell New Balance products at the "retail" level.[98] This business structure would allow New Balance to receive greater floor space for its products within Marathon Sports stores in Peru (and Ecuador), more shop-in-shop locations at Marathon Sports stores in Peru (and Ecuador), and better product placement where its products within those stores.[99] New Balance explained to PSG that its distributor in Chile, Sparta, utilized this integrated structure, and showcased Sparta's integrated structure as a model.[100] New Balance maintained that this structure was essential for any future distribution relationship between the Parties, and it called it an "unfair advantage".[101]

---

[98]   *See* Exhibit 93, PSG00007483 ("NB will extend our current contract through 2016 with a 10% increase in sales for Ecuador and a 20% increase in sales for Peru. . . . NB will require PSG/Dide to invest $300k into SIS space at marathon with at least 50% being invested in 2015 and 50% in 2016."); Exhibit 113, NB_PSG0003365 ("This is a follow up to our conversation regarding your new contact. As I told you on Thursday Carlos Miguel Gaglardi will be managing NB out of Lima for Peru and Ecuador, he will do so integrated to the two retail organizations In Peru and Ecuador. The two retail organizations will handle retail and wholesale, this will continue to serve third party retail accounts and give NB the unfair advantage that you want in both countries. Carlos Miguel is leaving on vacation for the next weeks please write to him and copy me and Renan regarding all pending issues I will follow up during his absence. The pending issues are to return signed contract and payments plan for pending royalties and fees.").

[99]   Exhibit 93, PSG00007483; Hearing Transcript, 685:3-7 ("A.  To have unfair advantage, to have New Balance integrated with a wholesaler/retailer because that will benefit the brand, having better space, better location, better brand image. Yes.").

[100]   Exhibit 88, NB_PSG0003103.

[101]   Hearing Transcript, 685:3-7 ("A.  To have unfair advantage, to have New Balance integrated with a wholesaler/retailer because that will benefit the brand, having better space, better location, better brand image. Yes."); Hearing Transcript, 966:4-24 ('But could you in your own words describe why Superdeporte Plus was created in Peru to handle New Balance's account, and how it was created?  A.  Okay. Early on, from the beginning when John took over after Ed Haddad -- no, it was actually after Abe Cunningham -- he expressed his desire to have the Peruvian market run similar to the Chilean market where Sparta, who is the largest sporting goods retailer, as Marathon is the largest sporting goods retailer in Peru, was the importer and distributor and had dual margin. He said that from the beginning.  Q.  What do you mean by "dual margin"?  A.  Dual margin, it means that they import at distributor price. They have the chance to sell at wholesale and then make the retail margin. So it's dual -- it's double margin that the retailer makes. That's that unfair advantage that he mentioned many times."); Deposition Transcript of Carlos Miguel Gagliardi, 17:20-24 ("The company was created by suggestion of John Cullen and New Balance to have an unfair advantage being included in a company that operates retail and wholesale. So that's why we create Superdeporte Plus Peru."); Hearing Transcript, 428:6 through 429:24 ("Q.  Okay. So you raised that concept or that idea of basically having more benefit at the retail level, Marathon retail level, as early as 2014 and perhaps earlier?  A.  Yes.  Q.  All right. And that's something that at some point you described as an unfair advantage, you testified on direct wasn't really unfair, but those were your words that you communicated to our client?  A.  I'm not sure where that originated, but yes, we used the term "unfair advantage" incorrectly. . . .  Q.  Yeah.· Mr. Ribadeneira and the folks associated

47.    In late 2014, PSG and New Balance began negotiating the New Distribution Agreement.[102]  By September of 2015, the Parties had finalized and agreed to all of the terms of the New Distribution Agreement, and New Balance sent PSG the "final draft of our contract restructure".[103]  New Balance admits and its contemporaneous conduct so confirms that by this time the Parties had agreed on all of the material terms of the New Distribution Agreement.[104]  By September 2015, New Balance also admits that it had a present intent to be bound by the New Distribution Agreement and that it had begun performing under that agreement when it issued purchase based invoices, which was a key change to the structure of the relationship under the New Distribution Agreement.[105]

---

with Marathon and PSG told you that they would accommodate that request that you were making?  A.  I think we were both trying to drive business in the region. So, yes."); Hearing Transcript, 684:16 through 685:16 ("Q.  Okay. And so when New Balance -- it's your understanding that New Balance required Mr. Ribadeneira to create Superdeporte Plus Peru?  A.  That's what I heard, yes.  Q.  Okay. So they required Mr. Ribadeneira to create a very profitable company. To have a -- to have --  Q.  Is that correct?  A.  To have unfair advantage, to have New Balance integrated with a wholesaler/retailer because that will benefit the brand, having better space, better location, better brand image. Yes. But it was doing business with all of New Balance's competitors, too, wasn't it?  A.  Yes, but it's completely different when the brand is integrated with a retailer. Because if I buy from the other brands, I will have 40 percent profit, initial gross profit. Instead, if I'm working with a brand that is integrated in my entity, I will have initial profit of 65 percent. So you will give more space, more time, more advertising to a brand that is giving you an initial profit of 40 percent or one who is giving you 65 percent.").

[102]  *See* Exhibit 93, PSG0007483.

[103]  *See* Exhibit 5, NB_PSG000001 ("Here is the final draft of our contract restructure."); Hearing Transcript, 524: 11 through 525:2 ("You sent this agreement, right, on the 15th of September 2015 to Mr. Daniel Michaels: 'Here is the final draft of our contract restructure. Exhibit B has been revised to reflect the full amount of inventory.' You testified about that yesterday.  A.  Yes.  Q.  "Please sign two originals and return both to me for countersignature." When you did that, you understood that the parties had agreed to all of the terms of the agreement, which is why you were requesting that PSG sign the agreement and return it to you?  A.  Yes.").

[104]  *See e.g.* Hearing Transcript, 524:11 through 525: 2 ("You sent this agreement, right, on the 15th of September 2015 to Mr. Daniel Michaels: 'Here is the final draft of our contract restructure. Exhibit B has been revised to reflect the full amount of inventory.' You testified about that yesterday.  A.  Yes.  Q.  'Please sign two originals and return both to me for countersignature.' When you did that, you understood that the parties had agreed to all of the terms of the agreement, which is why you were requesting that PSG sign the agreement and return it to you?  A.  Yes."); *see also* Hearing Transcript, 1173:19-23 ("In September of 2015, after months of negotiations, months and months, which started in 2014, you have a final draft sent by Mr. Cullen saying, 'Here it is. It's the final one. Sign it.'").

[105]  *See e.g.* Hearing Transcript, 1215:22 through 1216:3 ("**Yes, there was a present intention on the part of New Balance.  Mr. Cullen testified to that. Mr. Cullen said when he sent it, he did think – he was being honest -- he thought the terms were all agreed upon.**") (emphasis added); Hearing Transcript, 564:13 through 565:2 ("A. We were billing under the terms of a purchase-based agreement. In other words, we were issuing invoices under that

48.     PSG also indicated its intent to be bound by the terms of the New Distribution Agreement through its efforts to create the new integrated wholesale and retail structure that New Balance required, and to establish a new company, Superdeporte, in order to accomplish this structure.[106]

49.     In October 2015, Mr. Carlos Miguel Gagliardi ("Mr. Gagliardi") took over as the relationship manager for PSG and Superdeporte with New Balance.[107] When Mr. Gagliardi reviewed the New Distribution Agreement to sign it, he determined that some of the terms that had already been agreed to by the Parties needed to be amended.[108] The Parties negotiated a few amendments to their agreed New Distribution Agreement over the coming months.[109] One of the key amendments that the Parties negotiated was that the New Distribution Agreement would be entered into between New Balance and PSG, as Superdeporte was still a company being created

---

assumption, that that contract that we sent out in September would be signed. At this point it's clear it's not going to get signed. Q. Because New Balance isn't willing to do it? A. No, because PSG is not paying their bills. Q. And, therefore, New Balance is not willing to sign the contract? A. We're not willing to sign the contract until accounts are current."); *see also* Hearing Transcript, 1216:10-14 ("After they did all of the accounting to change from a sale-based and purchase-based contract, they had to figure out what was in the pipeline and how to charge for that."); Exhibit 26, NB_PSG0003066; Deposition Transcript of Peter Cragan, 80:12 through 83:14.

[106]   Exhibit 142, PSG0001399, Exhibit 90, PSG00006485; Exhibit 118, PSG00001672; Exhibit 132, PSG00005332 ("the contract hasn't been signed due to the changes we are making to make the company more strong and we want to do it with properly [sic] with the new company."); Hearing Transcript, 1176:13-20 (Also, what Superdeporte – what Respondents did also shows their present intent to be bound. They formed a company. They changed everything. They got – they had the assets sold from PSG to Superdeporte. They did everything they're supposed to do to perform under the new agreement.").

[107]   See Exhibit 113, NB_PSG0003365 ("This is a follow up to our conversation regarding your new contact. As I told you on Thursday Carlos Miguel Gaglardi will be managing NB out of Lima for Peru and Ecuador, he will do so integrated to the two retail organizations In Peru and Ecuador. The two retail organizations will handle retail and wholesale, this will continue to serve third party retail accounts and give NB the unfair advantage that you want in both countries. Carlos Miguel is leaving on vacation for the next weeks please write to him and copy me and Renan regarding all pending issues I will follow up during his absence. The pending issues are to return signed contract and payments plan for pending royalties and fees.").

[108]   Exhibit 142, PSG0001399.

[109]   Exhibit 142, PSG0001399, Ex. 177, NB_PSG0000177.

to meet New Balance's requirements for the New Distribution Agreement.[110]  Once Superdeporte was ready, the parties agreed that Superdeporte would be substituted for PSG as New Balance's distributor in Peru and the counterparty to New Balance under the New Distribution Agreement.[111]

50.     Because the Parties had already agreed upon the terms of their New Distribution Agreement and New Balance was already performing under the New Distribution Agreement, the owners of PSG and Superdeporte allowed PSG to perform under the New Distribution Agreement pending the final creation of Superdeporte.  For example, New Balance's purchase based invoices, issued under the terms of the New Distribution Agreement, were addressed to PSG, because Superdeporte was still in the process of being formalized and ready to function at the wholesale and retail level in Peru.[112]

51.     As a further amendment to what the parties agreed in September of 2015, the Parties also negotiated and agreed to reduce the minimum sales requirements under the New Distribution Agreement for the 2016 calendar year.[113]  In exchange for agreeing to reduce the minimums, New Balance and PSG agreed that PSG/Superdeporte would create 10 additional shop-in-shop locations.[114]  The Parties concluded their amendments to the New Distribution Agreement in

---

[110]  Exhibit 142, PSG0001399 ("Will need to be changed to Super Deporte [sic] Peru later.  Does this mean that you do not want this changed now?? When does "later" mean?  The paper work [sic] to formalize the new company is not ready yet, should be ready by the end of Q1 or Q2 at the latest.  We can sign the contract with PSG and make the change when is ready SD. Ok. fine.").

[111]  Exhibit 142, PSG0001399; Hearing Transcript 537:2-16 ("Q.  And then he says, 'We can sign the contract with PSG and made the change' – I think he meant 'make the change.'  A.  Yeah.  Q.  – 'when is ready Superdeporte.' And you say, "Okay. Fine."  A. Yes.  Q.  Right? So you were in agreement that the contract would be signed with Peruvian Sporting Goods, but that Superdeporte Plus, as soon as it was ready, would be substituted in as the party -- as the distributor in the agreement. Right?  A.  Yes.").

[112]  Exhibit 26, NB_PSG0003066.

[113]  Exhibit 147, NB_PSG0000177.

[114]  *Id.*

January of 2016.[115] Again, New Balance was seeking to expand the parties' relationship and was asking Respondents to make further investments into growing that relationship into the future.

52.     In the new agreement, Respondents accepted a modification to their payment terms that required wire/cash payments and disallowed an automatic right to purchase products from New Balance via letters of credit; payment by letters of credit were only allowed if New Balance authorized it.[116] Respondents were fine with this change, because—unlike PSG who did not have the ability to finance purchases with lines of credit from banks—Superdeporte had access to lines of credit through the existing banking relationships and large volume of business done by the Marathon Group retail stores.[117] Respondents were thus prepared via Superdeporte to pay for products via wire transfers that it could obtain with its lines of credit.[118] New Balance ultimately blocked Superdeporte from doing so, refusing to provide it with the authorization to sell New Balance products and to provide the signed new contract listing Superdeporte as New Balance's distributor in Peru.[119]

53.     In early May 2016, PSG informed New Balance that the Marathon Group had finalized all of the legal, logistical and other investments needed to create Superdeporte, that

---

[115] *Id.*

[116] *See* Exhibit 5-1, NB_PSG0000002 ("Payment of all amounts due for Products and all payment documentation for the purchase of the Products shall be effected by Distributor through cash in advance due upon placement of any order, unless otherwise agreed to by COMPANY, its Affiliate or its Authorized Supplier, as the case may be . . . If COMPANY, its Affiliate or Authorized Supplier allows Distributor to deliver the letter of credit or cash after the placement of the order and Distributor fails to deliver the same . . .").

[117] Hearing Transcript, 958:15-20 ("I was looking and trying – looking for work to moving to Superdeporte and being able to then get a line of credit to work the way New Balance was suggesting. It was not that it was impossible. It was impossible for PSG to do it.").

[118] *Id.*

[119] Exhibit 170, PSG00006711; Exhibit 92A, PSG00005162; Hearing transcript, 646: 24 through 647:8 ("A.  Because after -- and anytime after I do something to keep the business running, he didn't achieve what he promise. After that, doing an effort 100,000, 200,000, 150,000, give me a letter. Give me the contract.  He all the time tricked me. I was really upset with this. That is not the way business should be handled. That's -- there's no honor in that. So I was really upset.").

Superdeporte was ready to replace PSG and take on the New Distribution Agreement for New Balance's products in Peru and Ecuador and that the parties could now sign the New Distribution Agreement with Superdeporte as the counterparty to New Balance.[120] With Superdeporte ready, New Balance was obligated to promptly modify the New Distribution Agreement to add Superdeporte as their Peruvian distributor, as the Parties had agreed, and to execute the agreement and send the same for countersignature.[121] PSG also needed this written agreement to conduct business with its retailers in Peru (and Ecuador), some of whom were asking for proof that Superdeporte had a contract with New Balance.[122]

54.     New Balance initially agreed to do what it had previously contractually promised by modifying the New Distribution Agreement to include Superdeporte.[123] New Balance also agreed that it would issue a letter permitting Superdeporte to sell existing New Balance inventory that it had acquired from PSG to Ripley, a Peruvian retailer (and allow Respondents to purchase new products for Q1 2017), if Superdeporte/PSG paid $150,000 in outstanding royalty payments that had been invoiced under the New Distribution Agreement.[124]

---

[120]   Exhibit 155, NB_PSG0000186; Exhibit 154, PSG00006820.

[121]   Ex. 142, PSG0001399; Hearing Transcript 537:10-16 ("Q. And then he says, 'We can sign the contract with PSG and made the change' – I think he meant "make the change. A. Yeah. Q. – 'when is ready Superdeporte.' And you say, 'Okay. Fine.' A. Yes. Q. Right? So you were in agreement that the contract would be signed with Peruvian Sporting Goods, but that Superdeporte Plus, as soon as it was ready, would be substituted in as the party -- as the distributor in the agreement. Right? A. Yes.").

[122]   Ex. 160, PSG00006744.

[123]   Ex. 169, PSG00006838 ("I have written to the legal team to ask them to change the name from the revised contract we negotiated last year and am waiting for a response."); Exhibit 92A, PSG00005162 ("I haven't received the revised contract with Superdeporte Plus Perú, you told me that should be fast.").

[124]   Hearing transcript, 638: 3-7 ("He [Cullen] said, 'Okay. You will receive the letter' -- a letter that I need to sell products to Ripley – 'and the contract.' And I never received that. Instead of that, I receive the [non-renewal] letter."); Hearing Transcript, 639: 3-11 ("A. To John Cullen. He said, 'Okay. Pay 150,000, and we will be moving forward. We will send you the letter.' I need a letter. Since we were operating already with Superdeporte, the new structure of Marathon integrating wholesale and retail, we need a letter to Ripley, which is a client, to show them that we are the ones who can sell the product."); Hearing Transcript, 645: 14-22 ("And we agreed with that one to pay 150,000 to move forward with this and to receive the contract and the letter to sell product that we have in stock. Q.

55.     On June 9, 2016 Respondents made the $150,000 payment under the New Distribution Agreement.[125]  Again this conduct demonstrates not only that the parties had a present intent to be bound by the terms of the New Distribution Agreement, but they in fact were performing under that agreement.

56.     On June 14, 2016, after receiving the payment it requested from Respondents, New Balance reneged on its promise, saying that it would not issue the Ripley letter or allow Respondents to make new orders.[126]  New Balance also reiterated that they would not permit Respondents to pay for the Q3 2016 orders by letter of credit.[127]  Respondents were understandably frustrated and upset with New Balance because it reneged on its promise to provide the letter allowing Superdeporte to sell goods to Ripley and to substitute Superdeporte into the New Distribution Agreement.[128]

57.     On June 23, 2016, ignoring that it had already agreed to all of the terms of the New Distribution Agreement and that the New Distribution Agreement was already an operative contract under which the parties had been performing for months, New Balance informed Respondents that the contract would "revert back" to the terms of the Distribution Agreement.[129] Shortly thereafter, on the same day, New Balance notified PSG and Superdeporte in writing that

---

And did you get the contract or the letter?  A. No, I didn't get anything.  Q.  Did you make the $150,000 payment?  A. Yes, we did.").

[125]  Exhibit 169, PSG00006838.  Exhibit 170, PSG00006711.

[126]  Exhibit 170, PSG00006711.

[127]  Exhibit 170, PSG00006711.

[128]  Hearing transcript, 646: 24 through 647:8 ("A.  Because after -- and anytime after I do something to keep the business running, he didn't achieve what he promise.  After that, doing an effort 100,000, 200,000, 150,000, give me a letter. Give me the contract.  He all the time tricked me. I was really upset with this. That is not the way business should be handled. That's -- there's no honor in that. So I was really upset.").

[129]  Exhibit 92A, PSG00005162 ("Our legal team will not issue a new contract until all payments are current. As such, the new 'purchase based' contract is not valid and we are 'reverting back' to the original contract terms."); Exhibit 160, PSG00006744; Exhibit 166, NB_PSG0000207.

it was formally not renewing the 2013 Distribution Agreement with PSG effective December 31, 2016.[130] New Balance, however, never sent a notice of termination or non-renewal for the New Distribution Agreement, and that agreement remained in effect.[131]

58.     Respondents were frustrated and angry with New Balance because it reneged on its various promises to Respondents.[132] This radical "about face" by New Balance is what led Mr. Gagliardi to send the internal email in which he referred to New Balance as the "gringos."[133]  It was not, as New Balance now argues, evidence of Respondents' unwillingness to pay New Balance amounts that it was claiming were owed.   To the contrary, the contemporaneous evidence demonstrates that Respondents had just made a significant payment of US $150,000 to New Balance and that Mr. Gagliardi was upset about New Balance reneging on yet another promise, this time taking the step to announce that it would "revert back" to the already discontinued earlier distribution agreement.[134]

59.     Respondents understood that the New Distribution Agreement was an enforceable agreement with New Balance and in furtherance of that agreement, Respondents had worked hard to try and comply with New Balance's requirements.   Among other things they made various

---

[130]   Exhibit 173, PSG00001946, Exhibit 92A, PSG00005162.

[131]   Hearing Transcript, 565:9-15 ("Q.  And we agree you never sent a separate notice of nonrenewal or termination letter for the new agreement?  A.  For the amended and restated agreement?  Is that what you mean?  Q. Yes, sir.  A.  No, we did not.").  In the May 29, 2020 hearing, Claimant questioned Respondents' damages expert regarding Exhibit 173, PSG00001947, the June 23, 2016 non-renewal letter from New Balance to PSG.  Claimant asked Mr. Dellepiane whether the June 23, 2016 non-renewal letter could have applied to the New Distribution Agreement as well as the 2013 Distribution Agreement because both agreements had an effective date of January 1, 2013.  These questions were not only improperly addressed to Mr. Dellepiane, as he is not a lawyer and these questions were beyond the scope of his report, but more importantly,  this assertion is contrary to New Balance's witness' testimony, including the testimony of Mr. Cullen.

[132]   Exhibit 171-1, PSG00006482.

[133]   *Id.* ("I think it's time to turn the table and for the gringo to stop having us grabbed by the balls, and do the opposite.").

[134]   *Id.*

payments to New Balance for invoices issued under the new agreement and established Superdeporte to carry on with the responsibilities under that agreement.[135] New Balance, immediately after receiving the promised payment from Respondents, repudiated the agreement and announced that the prior agreement would be the one in effect simultaneously stating that it would not renew that prior agreement beyond the end of 2016.[136]

60. On July 8, 2016, New Balance informed PSG and Superdeporte, without any further explanation, that New Balance had decided to work with another distributor in Peru beginning in 2017.[137] New Balance began doing business in Peru through a new distributor, Deportes Sparta ("**Sparta**"), in the latter half of 2016 with an agreement that has an effective date of January 1, 2017 and in violation of its obligations to PSG and Superdeporte under the New Distribution Agreement, which remained in effect.[138]

61. Unbeknownst to Respondents, New Balance had been negotiating with Sparta, as well as other distributors in Peru, for months.[139] Specifically, in January of 2016, the same month

---

[135] Hearing Transcript, 564:13 through 565:2 ("A. We were billing under the terms of a purchase-based agreement. In other words, we were issuing invoices under that assumption, that that contract that we sent out in September would be signed. At this point it's clear it's not going to get signed. Q. Because New Balance isn't willing to do it? A. No, because PSG is not paying their bills. Q. And, therefore, New Balance is not willing to sign the contract? A. We're not willing to sign the contract until accounts are current."); *see also* Hearing Transcript, 1216:10-14 ("After they did all of the accounting to change from a sale-based and purchase-based contract, they had to figure out what was in the pipeline and how to charge for that."); Exhibit 26, NB_PSG0003066; Deposition Transcript of Peter Cragan, 80:12 through 83:14.

[136] Exhibit 173, PSG00001946; Exhibit 173-1, PSG00001947.

[137] Exhibit 176, NB_PSG0000217; Exhibit 256, NB_PSG0000751.

[138] Exhibit 3, NB_PSG0003575; Hearing Transcript, 1179:12 through 1180:3 ("But then, once they basically had everything in place, with Sparta, there you see on June 15th, about eight days before they notified PSG that the agreement is not going to be renewed and before they notified PSG and Superdeporte that they're going to revert back to the old agreement, you have New Balance through Mr. Cullen telling Sparta, 'Hey, the Peru territory is available.' That's bad faith, your Honor. That's not only a breach of the exclusive rights given to our client -- our clients under the new distribution agreement, it's also a breach of the duty of good faith and fair dealing under Massachusetts law."); Hearing Transcript, 594:9-12 ("Q. Do you know whether they were talking to customers in 2016/ A. They were probably talking to some customers.").

[139] Exhibit 237, NB_PSG0000327.

that New Balance negotiated the amendments to the New Distribution Agreement with Respondents, and once Superdeporte had already been created for purposes of acting as New Balance's distributor under the New Distribution Agreement, Mr. Cullen told Sparta that New Balance would "very likely make a change" of distributors for Peru in 2017 and that Sparta was its "first choice" to take on the Peru distribution.[140] New Balance continued these negotiations with Sparta throughout 2016 and on June 2, 2016, Sparta received internal approval to "move forward with distribution in Peru" with New Balance.[141] In June 2016, Sparta also asked New Balance to indemnify it from lawsuits from PSG/Superdeporte.[142]

62.     While New Balance refused to formally indemnify Sparta, on June 15, 2016, New Balance sent Sparta a letter informing them that the Peru territory was "available."[143] The territory was not then "available", as the New Distribution Agreement remained in effect.

63.     On June 21, 2016, New Balance tried to formalize a new distribution agreement with Sparta for Peru.[144] It also encouraged Sparta to interfere with Respondents' exclusivity in Peru, which was expressly provided in the New Distribution Agreement.[145] New Balance told Sparta the territory was "available", tried to formalize the terms of its agreement with Sparta and told it to go meet with potential customers in Peru before it notified Respondents, on June 23, 2016,

---

[140]   *Id.* (Mr. Cullen goes on to say "I know this is a big decision, but I think it would be the right one for NB and Sparta.").

[141]   Exhibit 244, NB_PSG0000543.

[142]   Exhibit 244, NB_PSG0000543 ("We are particularly interested in understanding, and eventually preparing un [sic] for, any contingencies that may arise with the incumbents.").

[143]   Exhibit 245-1, NB_PSG0000676.

[144]   Exhibit 246, NB_PSG0000677.

[145]   Exhibit 246, NB_PSG0000677.

that it was "reverting back" to the earlier distribution agreement and that it would not renew that legacy agreement beyond 2016.[146]

64.    New Balance also incentivized Sparta to agree to the contract with extremely favorable contractual terms including no Peru-specific sales numbers and no minimum guarantees.[147]  It also permitted Sparta to buy via letters of credit in Peru.[148]

### C.    *Mr. Ribadeneira Initiates the Peru Action*

65.    In January 2017, believing that PSG and/or Superdeporte still had an effective contract with New Balance under the terms of the New Distribution Agreement, Mr. Ribadeneira, on behalf of PSG and Superdeporte, initiated a lawsuit in Peru against New Balance.[149]  In it he alleged that New Balance failed to honor its obligations under the New Distribution Agreement and that it failed to fulfill its pre-contractual obligations with respect to the negotiation and execution of the New Distribution Agreement.[150]

66.    On February 1, 2017, Mr. Ribadeneira, on behalf of PSG and Superdeporte, filed a request with the Peruvian Court for interim measures, asking that the court order New Balance to abstain from the distribution of its products in Peru with any distributor other than PSG.[151]  He did so genuinely believing that the New Distribution Agreement remained a valid, effective agreement

---

[146]    Exhibit 245-1, NB_PSG0000676; Exhibit 173, PSG00001946; Ex. 173-1, PSG00001947.

[147]    Exhibit 253, NB_PSG0000740.

[148]    Exhibit 2, NB_PSG0003584.

[149]    Exhibit 192, Peru Demand; Hearing Transcript 975:7-18 (Q. Okay. Again, without telling us what you discussed with your lawyers, why did you ask the court to do that?  A.  Because I felt wronged. It was the way that it was -- that I guess I cannot -- that came from the conversations that we could best achieve that. That's -- that we could achieve our objective by doing that.  Q. Okay. And the objective was what?  A.  The objective was to have our contract respected and to try to establish a conversation about recuperating the contract.").

[150]    Exhibit 192, Peru Demand.

[151]    Exhibit 191, Request for Interim Measures.

and that New Balance was breaching it by conducting business with Sparta in the Peruvian territory.[152]

67.     In December 2017, the Peruvian court overseeing the Peru Action granted the request for interim measures.[153]  The court ordered a halt on the distribution of New Balance products in Peru during the pendency of the proceeding.[154]  On July 31, 2018, the Peruvian Court dissolved its interim measures order, formally permitting the distribution of New Balance products in Peru.[155]

68.     In March 2019, this Tribunal granted New Balance's motion to compel arbitration of the claims pending in the Peru Action.[156]  In May 2019, the parties amended their claims and Respondents incorporated the claims pending in the Peru Action into this proceeding.[157]  In May 2019, Mr. Ribadeneira assigned the rights in the Peru Action back to PSG and Superdeporte.[158]  In March 2020, PSG and Superdeporte voluntarily dismissed the Peru Action.[159]

69.     The managers of PSG and Superdeporte chose to initiate the Peru Action because they believed that New Balance breached the Distribution Agreement and the New Distribution

---

[152]  Exhibit 192, Peru Demand; Hearing Transcript 975:7-18 (Q.  Okay. Again, without telling us what you discussed with your lawyers, why did you ask the court to do that?  A.  Because I felt wronged. It was the way that it was -- that I guess I cannot -- that came from the conversations that we could best achieve that. That's -- that we could achieve our objective by doing that.  Q.  Okay. And the objective was what?  A.  The objective was to have our contract respected and to try to establish a conversation about recuperating the contract.").

[153]  Exhibit 193, Grant of Interim Measures.

[154]  *Id.*

[155]  Exhibit 194, Peru Court Order Reversal of Interim Measures.

[156]  *See* March 18, 2019 Memorandum and Order on Motion to Compel Arbitration.

[157]  Amendment to Respondents' Counterclaims, May 3, 2019.  Note Respondents subsequently amended their counterclaims on December 19, 2019.

[158]  Exhibit 85, assignment of rights from Mr. Ribadeneira to PSG and Superdeporte.

[159]  Exhibit 192A, Documents seeking dismissal of the Peru Action.

Agreement.[160]  The companies sought legal advice and chose to pursue legal action against New Balance in Peru for breach of the New Distribution Agreement.[161]  Based upon the terms of the Distribution Agreement as well as the New Distribution Agreement, the companies were legally entitled to seek interim relief in the form of an injunction in Peru.[162]

### III.   RESPONDENTS' AFFIRMATIVE CLAIMS PREVAIL

70.     Respondents advance three affirmative claims in this proceeding: (1) New Balance breached the Distribution Agreement and its implied covenant of good faith and fair dealing; (2) New Balance breached the New Distribution Agreement; and (3) alternatively, New Balance breached its precontractual obligations to PSG and Superdeporte during the negotiation of the New Distribution Agreement.

### A.   *New Balance Breached the Distribution Agreement and its Implied Covenant of Good Faith and Fair Dealing*

71.     New Balance violated the terms of the Distribution Agreement and its implied covenant of good faith and fair dealing in various ways, including by: (1) not allowing PSG to place orders via letter of credit when the contract allowed for payments by that method;[163] (2) beginning in January/February of 2015 with Q3 2015 orders, not allowing PSG to place orders if not all product payments were up to date;[164] (3) beginning in August 2015, completely shutting

---

[160]     Hearing Transcript, 974:2-24 ("THE ARBITRATOR: Without telling me what your conversation with one or more lawyers was, before commencing the action in Peru, did you seek legal counsel as to whether you actually had an enforceable contract?  THE WITNESS: Yes.  THE ARBITRATOR: All right.  THE WITNESS: We looked, yeah.  THE ARBITRATOR: Okay.  Q.  When you filed the action in Peru, again, without giving advice -- without giving any advice you got from your lawyers, if you can answer this question without doing that, why did you file the action in Peru?  A. Let me think about this before I -- I felt wronged. I felt, and I told the managers and the managers concurred, that we had an active contract that we needed to establish that it was in our -- in my view, and in their view, active. According to what we feel, it was -- we had a contract, and we needed to have that respected.").

[161]     *Id.*

[162]     Exhibit 1, PSG00005497 at 5521, Exhibit 5-1, NB_PSG0000002 at NB_PSG0000027.

[163]     *See* Exhibit 220, PSG00007238.

[164]     Exhibit 225, NB_PSG0001555.

down PSG's access to NB's online ordering system and preventing PSG from making product purchases on the basis that PSG was in arrears mainly on distribution fee payments;[165] and (4) making false promises, including of reopening product purchases, to seek payment of certain amounts owed to it under the agreement.[166]

72.    To state a claim for breach of contract under Massachusetts law, a party must allege, at a minimum, that there was a valid contract, that the other party breached its duties under its contractual agreement, and that the breach caused the plaintiff damage.[167]  The implied covenant provides "that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract...."[168]  As the documents as well as the Hearing testimony highlight, New Balance breached both the Distribution Agreement and its implied covenant of good faith and fair dealing.

i.    *New Balance Denied PSG the Contractually Bargained for Ability to Pay for Product by Letters of Credit*

73.    Letters of credit have been widely used in international transactions, in the sportswear distribution business, as well as in the parties' many year relationship.[169]  Payment for New Balance products by letter of credit was explicitly permitted under the 2013 Distribution Agreement.[170]  However, New Balance decided to stop accepting payment by letter of credit

---

[165]    Exhibit 126-1, PSG00006819.

[166]    Exhibit 245-1, NB_PSG0000676.

[167]    *Davis v. Dawson*, 15 F.Supp.2d 64, 128 (D.Mass.1998).

[168]    *Anthony's Pier Four, Inc. v. HBC Assocs.,* 411 Mass. 451, 471–472, 583 N.E.2d 806 (1991), quoting from *Druker v. Roland Wm. Jutras Assocs.,* 370 Mass. 383, 385, 348 N.E.2d 763 (1976). *See Uproar Co. v. National Bdcst. Co.,* 81 F.2d 373, 377 (1st Cir.), cert. denied, 298 U.S. 670, 56 S.Ct. 835, 80 L.Ed. 1393 (1936).

[169]    Letters of credit have been recognized as "of particular importance in international transactions, in which sophisticated investors knowingly undertake such risks . . . in return for the benefits to be reaped from international trade," *Enterprise Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 474 (5th Cir.1985).

[170]    Exhibit 1, PSG00005497.

following Q2 2015 orders so that they could further their own economic ends by stepping in the place of the factories in order to avoid the "additional costs and complexities" associated with letters of credit, even though to New Balance, a letter of credit is the equivalent of actually receiving cash.[171]

74. The last orders that New Balance initially allowed PSG to pay by letter of credit in the ordinary course of business were for Q2 2015 in January/February of 2015.[172] In August 2015, many months after the orders had been placed and following PSG's pleas to pay for Q3 2015 orders via letter of credit, New Balance allowed PSG to pay for the stale Q3 orders by letter of credit.[173] That was the last set of orders that PSG was allowed to pay for by letter of credit.[174]

75. As various witnesses explained during the Hearing, New Balance's improper denial of letters of credit in violation of the Distribution Agreement, coupled with external market factors beyond PSG's control, put PSG behind on its payments to New Balance in 2015.[175] Furthermore, as Respondents' witnesses explained and the documents in the record highlight, PSG's business

---

[171] Exhibit 227, NB_PSG0001572; Hearing Transcript, 735:15-20 ("Q. Because the factories could – until the end of 2015, the factories had the capability of accepting letters of credit? A. That's correct. Q. And it's just as good as cash? A. Yes. Yes.").

[172] Exhibit 225, NB_PSG0001555.

[173] Exhibit 101, NB_PSG0001963.

[174] Hearing Transcript, 474:22 through 475:22 ("Q. They did place orders for Q3 2016, but ultimately they asked for those orders to be paid by letter of credit. New Balance said no. So they never got those orders? A. All I know is they didn't pay for those. I don't know -- they didn't pay for those. We can get those if you want, but they didn't pay for those orders, in any event. Q. Well, I mean, you also know that they -- do you not remember that you testified this morning that they asked to pay by letter of credit and that you said no? A. I think I said no, yes. Sorry. You're right. Q. Okay. So just so we're clear, the last order that PSG was able to pay for by letter of credit -- you've said this already -- were orders that -- of product that they ordered in January/February of 2015? A. Yeah. Q. Everything subsequent to that, for all the rest of 2015, all the rest of 2016, they had to pay by direct wire transfer or else they wouldn't get product? A. Yes.").

[175] See e.g. Hearing Transcript, 606:2 through 606:13 ("Q. So thank you for explaining both of those things. Did you have an understanding, when you started working at PSG in October 2015, as to whether New Balance would accept product purchase orders by letter of credit? A. When I get into the business, I understand that, no, we will not be allowed to do it, which it has no sense for me. This is a regular way of doing business, because the letter of credit is much -- helps you to match the cycle of the business.").

model and its cash flow cycle relied upon letters of credit.[176]  Letters of credit allowed PSG to finance the purchase of product for 180 days (the time it took to ship the product, get it into stores, and begin receiving revenue back from customers for the product).[177]  PSG explained to New Balance the importance of letters of credit to their cash flow cycle on various occasions, and New Balance witnesses confirmed that they understood that the move away from letters of credit would have a significant, negative impact on PSG.[178]

76.    New Balance has incorrectly argued that its new payment policy and decision to reject letters of credit should supersede the rights granted to PSG under the Distribution Agreement.

---

[176]    Hearing Transcript 605:11-25 ("And also it affects the whole cycle of the -- of them, the cash flow of the business, which is quite long, if you think about it. You start selling something now, and you will start collecting money if you sell to third parties. The normal way to work is to give them 90 or 120 days to clear the accounts. So whatever you are selling today, you will start collecting that in 120 days, because that's the usual way to work. Q. So I'm going to ask you about the cash cycle of PSG's business with respect to New Balance in just a second in a little more detail. A. Yes."; Hearing transcript 628: 3 through 630:21 ("What does 'cash conversion cycle' mean? A. It's the time when you start – when you recover the money that you have put into the market in products over time. So it's how long takes you to recover the product that you are putting into the marketplace. Q. So could you describe -- and does this relate to PSG's business with New Balance, this cash conversion? A. No. This is a regular cash conversion cycle. Q. When you say 'regular,' does it apply to PSG's business with New Balance? A. Yes. It's part of how the business works. You ship goods. I will give you an LC on-site. Okay? The factory delivers the products to the forwarder. They receive the documents of receiving the goods. You present the goods -- the documents to the bank. They collect the money. With this, I need two month to reach stores for the first time. So you have a transit time, water transit time, roughly to origin is 35 days. Plus, you need to consolidate the goods in origin, and then you need to clear customs in the -- in whatever, in Peru or Ecuador. After that, you are able to start putting product into the market. Right? If you are -- if I'm selling you goods, my normal payment term with account, big accounts, like Falabella or Ripley is between 90 and 120 days. That's basically. That's a part of -- I don't know -- the royal – the gross profit structure that I have, discount, whatever I can have. Payment terms with that one, they can play without this 120 days because that's the cash conversion cycle. They all put the goods into their stores. They will start selling. And when they finish to sell the goods, roughly, they will pay you. So that is how it work. Q. So from the moment you have an order confirmed until -- an order confirmed, and that means an order confirmed to start shipment -- A. Yes. Q. -- or I should say -- I'm sorry -- to have the order placed to manufacture the goods to eventually be shipped. From the moment the order is confirmed until PSG starts seeing monies back from customers for the sale of those products, approximately how much time transpires? A. At least nine. Q. Nine what? A. Month. Q. Does the letter of credit help you in any way in facilitating this cash conversion cycle? A. Absolutely. The payment term that you have with the LC, me with the bank, is regularly 180 days. So it's going to match the cycle since they -- I receive the products on the port, import them, sell them, and record the money. So that's matching the cash cycle conversion.").

[177]    *Id.*

[178]    Exhibit 220, PSG00007238; Hearing Transcript, 447:9-20 ("So Ms. Blanco is telling you basically, 'Look, if you require us to pay up front by cash, you're really going to be disturbing our cash flow cycle because, instead of being able to finance the purchase from a bank via a letter of credit and pay the bank 180 days later, six months later, you're making us pay for the product up front'? A. That's right. Q. 'And that's a big disadvantage to us'? A. Yes.").

This is untrue.  While New Balance required that PSG sign and agree to a manual laying out the terms of New Balance's unilaterally imposed new payment policy, the manual contained an express provision which stated that the rights granted to PSG under its existing contract with New Balance would supersede over anything to the contrary in the manual: "*Notwithstanding anything in here to the contrary, if a written contract signed by both parties is in existence covering the sale of the products covered hereby, the terms and conditions of said contract shall prevail to the extent they are inconsistent with these terms and conditions*."[179]  As such, the terms of the Distribution Agreement, which expressly permitted payment via letter of credit, controlled and should not have been altered by any change in New Balance policy.

77.    New Balance nonetheless made this unilateral change to PSG's payment terms, which was in violation of the Distribution Agreement.[180]  This change was precisely what destroyed PSG's liquidity and cash conversion cycle, placing PSG in a financial stranglehold, and causing PSG to fall behind on both product and distribution fee payments to NB.[181]

> ii.    *New Balance Breached the Distribution Agreement by Ceasing and Refusing to Accept New Orders from PSG*

78.    Seizing upon PSG's payment delays that it itself caused through the failure to accept product purchases by letter of credit, New Balance then used these payment delays to freeze all PSG orders—placing it on a "credit hold" and *banning all future product purchases until all arrears were settled*—again breaching the Distribution Agreement, as the contract does not allow

---

[179]    Exhibit 9-1, NB_PSG0001151.

[180]    Exhibit 1, PSG00005497.

[181]    Exhibit. 9-1, NB_PSG0001151.

NB to freeze orders for payment delays.[182]  This breach was not only very serious, it spelled the death of Respondent's relationship with New Balance.

79.     In August of 2015, New Balance shut down PSG's access to the online ordering system, forbidding PSG from placing any further orders.[183]  The last set of orders that New Balance allowed PSG to purchase were the few Q4 2015 orders that PSG could pay by wire (cash), which it *placed in April 2015* and largely *paid for by wire transfer on October 29, 2015*.[184]

80.     Freezing all orders was not a contractually-permitted remedy – the only contractually bargained-for remedy was termination of the Distribution Agreement for late payments.[185]

81.     Specifically, the Distribution Agreement only allows New Balance to cease accepting orders in one circumstance – if New Balance terminates the Distribution Agreement and the termination has become effective.[186]  Section 10(a) of the Distribution Agreement provides that NB "*shall from and after the date of notice of such termination having been given . . . be entitled to cease accepting orders for any Products…*"[187]  New Balance admits that it never

---

[182]  Exhibit 229, NB_PSG00001625.

[183]  Exhibit 126-1, PSG00006819.

[184]  Hearing Transcript, 207:18 through 208:7 (A.  Yeah. So this is the first window of Q4 2015. So, again, we're six months before entry into the marketplace. So this is a window in April of 2015 for product that will be delivered to the market in October of 2015. Q4 is a very important market. Q4 is a very important Q in the footwear business. It's when we sell a lot of shoes. It's pre-Christmas. It's a very important time for us.  Q.  And were you able to persuade New Balance to allow PSG to buy in the -- in that window?  A.  Yes."); Exhibit 95, NB_PSG0001679; Exhibit 205, PSG00006772; Exhibit 205-1; PSG00006774, PSG00006778, PSG00006780, PSG00006783, PSG00006785, PSG00006788, PSG00006790, PSG00006793, PSG00006795, PSG00006799, PSG00006801, PSG00006805.

[185]  *See* Exhibit 1, Section 16, PSG00005497.

[186]  *See* Exhibit 1, Section 10(a), PSG00005497.

[187]  *Id.*

terminated the Distribution Agreement; it only chose not to renew the Distribution Agreement in June 2016.[188]

82.     Pursuant to the Distribution Agreement's terms, New Balance may also cancel a particular order under Article 6(b) if PSG requests to deliver the letter of credit after placing an order and fails to deliver the same, or if PSG otherwise delays or cancels a particular shipment.[189] New Balance wrongly suggests that based upon the language of 6(c) of the Distribution Agreement, that it may refuse to accept orders for any reason.  However, provisions like 6(c) are common in distribution contracts in the sportswear distribution industry and are only utilized to allow brands to cancel orders that don't meet required style/production requirements.[190]  It is not used, nor may it be, to withhold all orders from a distributor for any reason at all.  As such, New Balance breached the Distribution Agreement when it improperly withheld orders from PSG beginning in August 2015.

83.     It also is bedrock law that that "specific provisions in a contract trump the general provisions."[191]  Section 10(a) is very specific and refers to the one circumstance under the Distribution Agreement where New Balance is permitted to cease all orders—upon termination of the contract only.[192]  Section 16(a) also is very specific that New Balance has a right to terminate the contract if PSG falls behind on payments due to it.[193]  Importantly, while New Balance may have had the right to terminate the contract with PSG, it did not invoke that right.[194]

---

[188]   *See* DeMartini Deposition Transcript, 54:8-10.

[189]   *See* Exhibit 1, Section 6(b), PSG00005497 .

[190]   Margarita Ormaza Deposition Transcript, 52:3 through 53:13.

[191]   *E.g.*, *Puerto Rico Telephone Co. v. SprintCom, Inc.*, 662 F.3d 74, 96 (1st Cir. 2011).

[192]   *See* Exhibit 1, Section 10(a), PSG00005497.

[193]   *See* Exhibit 1, Section 10(a), PSG00005497.

[194]   *See* DeMartini Deposition Transcript, 54:8-10.

84.     These specific contractual provisions control over the more general proposition set forth in 6(c) of the Distribution Agreement regarding the acceptance of orders and prove that New Balance breached the 2013 Distribution Agreement by unilaterally freezing PSG's ability to place orders.  In freezing all PSG's orders, New Balance completely halted PSG's business, making it practically impossible for PSG to earn revenue to pay New Balance.  New Balance then seized on the payment defaults that New Balance itself caused to improperly end its more than 20-year relationship with PSG.

85.     Here, New Balance also argues that its manual provided that it could withhold all orders if PSG was behind on payment.[195]  However, as previously explained, the manual itself specified that the terms of an existing contract controlled over the manual, and the Distribution Agreement did not permit New Balance to unilaterally withhold orders from PSG.[196]

86.     As noted earlier, the inability to purchase and sell New Balance products created a situation where PSG (and later Superdeporte) simply was prevented from performing by New Balance.  Without the ability to purchase products, PSG (and Superdeporte) were unable to conduct its business, generate revenues or perform as required by the parties' contract.

iii.     _New Balance Breached the Distribution Agreement's Implied Covenant of Good Faith and Fair Dealing_

87.     As the prior sections highlight, New Balance breached the Distribution Agreement as well as its duty to act in good faith and to exercise fair dealing in its commercial interactions with PSG.  In doing so, New Balance also destroyed the cash cycle and liquidity of PSG, depriving PSG of the fruits of the Distribution Agreement.

---

[195]  Exhibit 9-1, NB_PSG0001151.

[196]  Exhibit 9-1, NB_PSG0001151.

88.     Under Massachusetts law, a covenant of good faith and fair dealing is implied in every contract.[197]  The covenant provides that "neither party shall do anything that will have the effect of destroying or injuring the rights of the other party to receive the fruits of the contract."[198] A party need not breach an explicit term of the underlying contract in order to breach the covenant of good faith.[199]  Rather, the relevant question under Massachusetts law is whether the party's conduct complied with the parties' reasonable understanding of their performance obligations, as reflected in the overall spirit of the bargain, not whether the party abided by the letter of the contract in the course of performance.[200]  In *T.W. Nickerson, Inc. vs. Fleet Nat. Bank*, Mass. Super., No. 0200427 (Apr. 21, 2006), the court held that Defendant deprived Plaintiff of the fruits of the lease agreements between them through its unreasonable delay in effectuating the leases' renewal option after Plaintiffs timely notified Defendant of their intent to exercise the option, and thus breached the implied covenant of good faith and fair dealing.

89.     As in *T.W.* Nickerson, by not allowing PSG to place orders via letter of credit and later completely shutting down PSG's access to New Balance's online ordering system, New Balance deprived PSG of the fruits of the Distribution Agreement, created a financial stranglehold that prevented PSG from remedying the payment defaults and further performing under the Agreement, and therefore violated the implied covenant of good faith and fair dealing.

       *iv.*     *Damages*

---

[197]  *UNO Restaurants, Inc. v. Boston Kenmore Realty Corp.*, 441 Mass. 376, 385 (2004).

[198]  *Anthony's Pier Four, Inc. v. HBC Associates*, 411 Mass. 451, 471–72 (1991).

[199]  Howard J. Alperin, 14 Mass. Prac., Summary of Basic Law § 5:69 (5th ed. 2014).

[200]  *Id.*

90.     Damages for a breach of contract, like a breach of the implied covenant, allow the aggrieved party to be placed in the same position as it would have been had the other party not breached its performance obligation under the contract (the "but-for" scenario).[201]

91.     In the but-for scenario, New Balance would have performed under the Distribution Agreement, and PSG would have been able to purchase product by letter of credit through September of 2015 when the New Distribution Agreement went into effect, or through December 31, 2016 if this Tribunal finds that the New Distribution Agreement become an effective contract. The **lost profits** as of June 30, 2020, net of all costs and *all* payments due to New Balance under the Distribution Agreement, including all distribution fees, from the merchandise that PSG was not permitted to purchase from New Balance and distribute in Peru between August 1, 2015 and December 31, 2016 are **$1.01 million**.[202]

92.     In addition, as explained above, Respondents, through various distribution entities, had been successfully engaged by New Balance as its exclusive distributor in Peru for over twenty years, and the commercial relationship between New Balance and PSG began in January 2010 which involved one renewal agreement over the course of their six year relationship.[203]  In August 2013, PSG, through Hiper Deporte S.A.C., entered into an 8-year lease agreement for the New

---

[201]     *DCPB, Inc. v. City of Lebanon*, 957 F. 2d 913, 916 (1st Cir. 1992); Hearing Transcript, 1042: 6-22 ("The damages assessment consists of the lost profits consist of the difference between the profits that one can estimate would have taken place but for the termination that is in the scenario that is called sometimes counterfactual or but-for scenario, the scenario in which we model what would have happened in all likelihood in the continuity of that relationship. That's one scenario.  In that scenario, we -- I assume that those problems cease to exist, that those are not present anymore.  Lost profits are derived from comparing that and those profits in the scenario of continuity with the actual profits or losses that the company observed.").

[202]     These figures have been updated as of the date of this filing, June 30, 2020.  Interest on these amounts continues to accrue at 12% annually; Dellepiane Report, at ¶15; Hearing Transcript, 1082:4-5 ("I was instructed to apply 12 percent interest on the counterclaims.").

[203]     Hearing Transcript, 938: 22-25 ("Then later in 2000, I also wrote again and talked to the people who I was working with at the time, and we were given also distribution for Peru in 2000."); *see also* Exhibit 44, PSG00006520.

Balance Jockey Plaza store.[204]  In 2014, New Balance praised PSG for its marketing efforts and progress in both Peru and Ecuador.[205]  In November 2014, New Balance first made an offer to PSG to enter into a new and reformed Distribution Agreement through an entity that could handle both wholesale distribution and retail sales.[206]  Based upon New Balance's request, in the fall of 2015, PSG initiated the process and investments to create Superdeporte in Peru so as to handle both retail and wholesale.  In addition, as Mr. Cullen acknowledged, it was the parties' expectation that their relationship would continue and it was never their objective "to constantly change distributors if [they] run into a little bit of trouble."[207]

93.    Therefore, as Respondents' fact witnesses and their expert witness testified, in the but-for world where New Balance allowed PSG to continue buying by letter of credit, it would not have fallen into material arrears in 2015 and it would have continued performing well as it had been since 2010.  In those circumstances, it is reasonable to assume that a well-established distribution company like PSG, along with the strength of the new wholesale and retail distributor Superdeporte, would have been able to successfully maintain its contractual relationship with New Balance beyond December 31, 2016.  In a but-for world, the commercial relationship between the Parties would be extended with at least a three-year contract, from January 1, 2017 through December 31, 2019, with the same conditions set forth in the New Distribution Agreement and

---

[204]   Exhibit 285, SD-035.

[205]   *See* Exhibit 90, PSG00006485

[206]   *See* Exhibit 93, PSG00007483.

[207]   Cullen Deposition Transcript, 34:22 through 35:8 ("We worked with Peruvian Sporting Goods for many years. We were looking for ways to continue a relationship really. We were trying to find a way forward. It's certainly a lot easier for us to work with -- not to change things up in a marketplace, and have consistency with the customers, have consistency with the consumers. So it's certainly not our MO or objective to constantly change distributors if we run into a little bit of trouble.").

with Superdeporte functioning as the distributor party.[208] Additional lost profits during the extended 3-year period, net of all costs and *all* payments due to New Balance under the Distribution Agreement, including all distribution fees, would be equal to **$3.80 million** as of June 30, 2020.[209]

94.     PSG's total damages as of June 30, 2020 resulting from New Balance's breach of the Distribution Agreement and breach of the implied covenant of good faith and fair dealing are, net of all costs and *all* payments due to New Balance under the Distribution Agreement, including all distribution fees, **$4.80 million**.[210]

### B.     *New Balance Breached The New, Enforceable Distribution Agreement*

95.     The documents and testimony in the case highlight that the New Distribution Agreement was a binding contract under Massachusetts Law.  New Balance breached the New Distribution Agreement in various ways: (1) by not permitting Superdeporte to be substituted as the counterparty to the agreement; (2) by not permitting Respondents to purchase product and perform under the New Distribution Agreement; and (3) by repudiating the existence of the agreement in June of 2016 and insisting, wrongfully and contrary to applicable law, that the parties were "reverting" back to the 2013 Distribution Agreement.

---

[208]    Dellepiane Report, at ¶99; Hearing Transcript, 1045:25 through 1046: 15 ("In counterclaim III I have modeled the 2013 distribution agreement as the document that guides and dictates this relationship up until the end of that term at the end of 2016.  ·But from -- in the modeling an additional 3-year period of continuity, at that point I have assumed that the new distribution agreement dictates that relationship. So the year in counterclaim III, there's -- it's a hybrid in the sense that it assumes continuity of the 2013 up until 2016, and then in the event the arbitrator were to consider a renewal appropriate, that renewal is being modeled on the basis of the new terms of the new distribution agreement.").

[209]    Dellepiane Report, at ¶15; Hearing Transcript, 1046:16:23 ("And the result is summarized on page 19 for each of these three -- well, two ·scenarios, one in which there is just the base period up until the end of 2016. There is, including interest, 0.94, $940,000 in damages. And in the alternative, if the renewal is considered an appropriate assumption, the total ·would be $4.56 million.").

[210]    *Id.*

96.     Importantly, the New Distribution Agreement was a binding contract under Massachusetts law.  Under Massachusetts law, the formation of a valid contract requires an offer, the acceptance of that offer, consideration, and the agreement on sufficient terms laying out the rights and obligations of the parties.[211]  An enforceable agreement requires, <u>first</u>, terms sufficiently complete and definite, and <u>second</u>, a present intent of the parties at the time of formation to be bound by those terms.[212]  Massachusetts law only requires that the terms of the writing be sufficiently complete and definite and the writing reflect a present intent of the parties at the time of formation to be bound.[213]  Here the evidence undeniably establishes both elements. Massachusetts courts also have recognized that because the use of electronic communications has advanced immensely and become commonplace in the negotiation of contracts, emails are writings that satisfy Massachusetts' Statute of Frauds and, as such, create a binding and legally enforceable contract.[214]  The parties had agreed upon all of the terms of the contract in September 2015 when New Balance sent PSG the "final draft" and asked it to execute and return the same.[215]

97.     There also is no question that each of the parties demonstrated a present intent to be bound by this contract *and, in fact, were each performing under it*.  New Balance reissued various invoices using the new "purchased-'based" distribution fee scheme under the new

---

[211]  *Situation Mgmt. Sys., Inc. v. Malouf, Inc*., 430 Mass. 875, 878 (2000).

[212]  *McCarthy v. Tobin*, 429 Mass. 84, 87 (1999).

[213]  *Targus Group Int'l, Inc. v. Sherman*, 76 Mass. App. Ct. 421, 429 (2010).

[214]  St. *John's Holdings, LLC v. Two Electronics, LLC*, No. 16 MISC 000090 RBF, 2016 WL 1460477, at *1 (Mass. Land Ct. Apr. 14, 2016); *Feldberg v. Coxall*, No. MICV201201649A, 2012 WL 3854947, at * 6 (Mass.Super. May 22, 2012); *Fecteau Benefits Group, Inc. v. Knox*, 72 Mass.App.Ct. 204, 212–213, 890 N.E.2d 138 (2008).

[215]  Hearing Transcript 524:11-525:2 ("You [Mr. Cullen] sent this agreement, right, on the 15th of September 2015 to Mr. Daniel Michaels: 'Here is the final draft of our contract restructure.  Exhibit B has been revised to reflect the full amount of inventory.' You testified about that yesterday.  A.  Yes.  Q.  'Please sign two originals and return both to me for countersignature.'  When you did that, you understood that the parties had agreed to all of the terms of the agreement, which is why you were requesting that PSG sign the agreement and return it to you?  A.  Yes.").

53

agreement and sought payment from PSG.[216]  PSG worked with New Balance to provide the

information to have the new invoices issued, made substantial payments to New Balance after the

contract was in effect and based on New Balance's promises that the relationship would continue,

and also sought immediately to create Superdeporte, the entity required to operate wholesale and

retail distribution in Peru under the new agreement.[217]  All of this establishes that the parties were

not only intending to be bound by the terms of the New Distribution Agreement, they were in fact

performing under it.  It is thus a binding contract under Massachusetts law.

      i.    *New Balance Refused to Permit Superdeporte to be Substituted into the New Distribution Agreement After Requiring That Respondents Integrate Wholesale and Retail Capabilities and New Balance Repudiated the Existence of the New Distribution Agreement*

98.    In November 2014, New Balance approached PSG with an offer to execute a New

Distribution Agreement.[218]  For the New Distribution Agreement, New Balance required its

distributor be integrated in order to handle both: (1) wholesale distribution of New Balance

products (as PSG historically had been doing), and (2) retail distribution of New Balance products

(a new function that was not part of the historical relationship with PSG).[219]  To meet New

---

[216]  *See e.g.* Hearing Transcript, 564:13 through 565:2 ("A.  We were billing under the terms of a purchase-based agreement. In other words, we were issuing invoices under that assumption, that that contract that we sent out in September would be signed. At this point it's clear it's not going to get signed. Q.  Because New Balance isn't willing to do it?  A.  No, because PSG is not paying their bills.  Q.  And, therefore, New Balance is not willing to sign the contract?  A.  We're not willing to sign the contract until accounts are current."); *see also* Hearing Transcript, 1216:10-14 ("After they did all of the accounting to change from a sale-based and purchase-based contract, they had to figure out what was in the pipeline and how to charge for that."); Exhibit 26, NB_PSG0003066; Deposition Transcript of Peter Cragan, 80:12 through 83:14.

[217]  Exhibit 142, PSG0001399, Exhibit 90, PSG00006485; Exhibit 118, PSG00001672; Exhibit 132, PSG00005332; Hearing Transcript. 1176:13-20 (Also, what Superdeporte – what Respondents did also shows their present intent to be bound. They formed a company. They changed everything. They got – they had the assets sold from PSG to Superdeporte. They did everything they're supposed to do to perform under the new agreement.").

[218]  *See* Exhibit 93, PSG00007483.

[219]  *See* Exhibit 93, PSG00007483; Ex. 113, NB_PSG0003365.

Balance's requirements, the owners of PSG and the managers of the Marathon group created a new commercial entity – Superdeporte Plus Peru S.A.C., which could handle both wholesale and retail functions and who would act as the new distributor and retailer for New Balance's products in Peru.[220]

99.    In the fall of 2015, once the parties had agreed the contract terms, PSG initiated the process to create Superdeporte in Peru.[221]  Superdeporte was created because of New Balance's request to have a distributor who could function at both the wholesale and retail levels.[222]  PSG was purely a distribution company and did not have the infrastructure (stores, employees, know-how, etc.) or ability to function at both the wholesale and retail levels.[223]

100.    The parties negotiated the New Distribution Agreement during 2015.    On September 15, 2015, New Balance sent PSG the final draft of the New Distribution Agreement.[224] As discussed above, as of September 2015, the parties had agreed to all of the terms of the New Distribution Agreement and thus formed a legally binding and fully enforceable contract under

---

[220]    Exhibit 87, PSG00006490; Exhibit 88, NB_PSG0003103; Exhibit 90, PSG00006485.

[221]    Exhibit 113, NB_PSG0003365.

[222]    Hearing Transcript, 917:17 through 918:5 ("A.  Mr. Cullen proposed a way, a model of doing business, and for doing that -- for sweeten [phonetic] that model, it was needed to create Superdeporte . . . We follow his request and we implement it. That's why we created Superdeporte.").

[223]     Hearing Transcript, 868: 12-25; 869: 2-25 ("Q. So there's been a lot of discussion about PSG as a wholesale company in Peru and how it was purely a wholesale company and couldn't function at the retail level.  Can you explain a little bit about why PSG couldn't function at the retail level? A. PSG does not have the expertise, the knowledge, the stores, the locations, the handling the business of retail. Q. PSG was purely a -- A. Purely a wholesale -- Q. -- distribution company? A. -- wholesale company. An importer and wholesale company. Q. And you talked about the infrastructure, stores and all that. Can you describe a little bit more about the infrastructure required for a retail company?  A.  First, you have to be key locations, and you have to have more than four locations. In that case, Marathon has at that point 20 locations, very good locations. You have to have the employees, the working force, to handle those big stores. Because our -- those are not small stores. Those are stores are about 700, 600 meters, square meters. So it needs the operation know-how of how to handle these chain of stores. So they do have in place all of that.").

[224]    Exhibit 5, NB_PSG000001.

Massachusetts law.[225]  The parties negotiated subsequent amendments to the New Distribution Agreement.[226]  In reliance on the new agreement being final, Respondent made significant investments in creating Superdeporte.[227]  New Balance also performed under the New Agreement, issuing purchase based invoices to PSG under the New Distribution Agreement beginning in August 2015.[228]

101.     PSG and Superdeporte acted in furtherance of the parties' understanding that they had a final agreement in place.  Specifically, Respondents made substantial investments to create Superdeporte; took steps to identify and create the New Balance shop-in-shop locations as required by the New Distribution Agreement; took all legal, tax and accounting steps to transfer PSG's inventory to Superdeporte;[229] worked to find customers to purchase existing New Balance inventory; and made substantial payments to New Balance based upon New Balance's promises of continuing the parties' many year relationship.[230]

102.     However, after the parties had agreed to substitute Superdeporte into the New Distribution Agreement, New Balance, in violation of the New Distribution Agreement, refused to substitute in Superdeporte.  In June 2016, Mr. Gagliardi and Mr. Cullen agreed that if Respondents paid New Balance $150,000 in outstanding distribution fees, that New Balance would

---

[225]  Exhibit 5, NB_PSG000001.

[226]  Exhibit 142, PSG0001399, Exhibit 177, NB_PSG0000177.

[227]  Exhibit 52-1, PSG00006577.

[228]  Exhibit 242-1, NB_PSG0000523; Hearing Transcript, 795:10-21 (" Q.  Okay. So I'd just like to also take you through the chart on the bottom left that you have titled 'History of Billing Error and Correction Purchase-Based Details,' and just confirm that this reflects the purchase-based invoices that were issued to PSG between August 2015 and April 2016. Correct?  A.  That's correct.  Q.  Okay. So that was nine months of purchase-based invoices that were issued to PSG?  A.  Yes. Yes.").

[229]  Exhibit 288.

[230]  Exhibit 105-1, NB_PSG0001302, NB_PSG0001306; Exhibit 209, PSG00002774; Exhibit 211, PSG00006754; Exhibit 216, PSG00006831; Exhibit 205, PSG00006772.

send Respondents the executed contract with Superdeporte substituted in and that it would provide Respondents with the letter that they needed to sell inventory to Ripley.[231]  On June 23, 2016, Mr. Gagliardi asked Mr. Cullen for the contract with Superdeporte.[232]  New Balance refused to replace PSG with Superdeporte in the New Distribution Agreement, and refused to give PSG a letter confirming that Superdeporte was New Balance's distributor in Peru so that Superdeporte could sell product to Ripley.[233]

103.  After the parties had each been performing under the New Distribution Agreement for 9 months, on June 23, 2016, Mr. Cullen responded to Mr. Gagliardi and said that the purchase based contract (the New Distribution Agreement) was not valid and that New Balance would "revert back" to the original contract terms (the 2013) Distribution Agreement.[234]  On the same date, New Balance notified Respondents that the 2013 Distribution Agreement would not be renewed and would terminate by its terms on December 31, 2016.[235]  New Balance's actions were in violation of the New Distribution Agreement, which had been agreed to and became a binding contract between the parties in September of 2015.

ii.  *New Balance Failed to Permit Respondents to Purchase Product and Perform Under the New Distribution Agreement*

---

[231]  Hearing transcript, 638: 3-7 ("He [Cullen] said, 'Okay. You will receive the letter' -- a letter that I need to sell products to Ripley – 'and the contract.'  And I never received that.  Instead of that, I receive the [non-renewal] letter."); Hearing Transcript, 639: 3-11 ("A.  To John Cullen.  He said, 'Okay. Pay 150,000, and we will be moving forward. We will send you the letter.' I need a letter. Since we were operating already with Superdeporte, the new structure of Marathon integrating wholesale and retail, we need a letter to Ripley, which is a client, to show them that we are the ones who can sell the product."); Hearing Transcript, 645: 14-22 ("And we agreed with that one to pay 150,000 to move forward with this and to receive the contract and the letter to sell product that we have in stock.  Q. And did you get the contract or the letter?  A.  No, I didn't get anything.  Q.  Did you make the $150,000 payment? A.  Yes, we did.").

[232]  Exhibit 171-1, PSG00006482.

[233]  *Id.*

[234]  *Id.*

[235]  Exhibit. 160, PSG00006744; Exhibit 166, NB_PSG0000207; Exhibit 171-1, PSG00006482.

104.   As explained above, beginning in May 2015 after allowing PSG to place and pay for some limited Q4 2015 orders, New Balance did not permit PSG to place any new orders (aside from the Q3 2016 order which it never delivered to PSG).[236] The New Distribution Agreement contained the same language as the 2013 Distribution Agreement regarding acceptance and placement of orders.[237] If New Balance wished to cease accepting orders, then it should have terminated the New Distribution Agreement. However, New Balance never terminated or sent a notice of renewal for the New Distribution Agreement.[238] Instead, in violation of the terms of the New Distribution Agreement, New Balance refused to accept new orders from PSG, financially strangling PSG, and making it impossible for PSG to operate its business, generate revenues or

---

[236]   Hearing Transcript, 207:18 through 208:7 (A. Yeah. So this is the first window of Q4 2015. So, again, we're six months before entry into the marketplace. So this is a window in April of 2015 for product that will be delivered to the market in October of 2015. Q4 is a very important market. Q4 is a very important Q in the footwear business. It's when we sell a lot of shoes. It's pre-Christmas. It's a very important time for us. Q. And were you able to persuade New Balance to allow PSG to buy in the -- in that window? A. Yes."); Hearing Transcript, 474:22 through 475:22 ("Q. They did place orders for Q3 2016, but ultimately they asked for those orders to be paid by letter of credit. New Balance said no. So they never got those orders? A. All I know is they didn't pay for those. I don't know -- they didn't pay for those. We can get those if you want, but they didn't pay for those orders, in any event. Q. Well, I mean, you also know that they -- do you not remember that you testified this morning that they asked to pay by letter of credit and that you said no? A. I think I said no, yes. Sorry. You're right. Q. Okay. So just so we're clear, the last order that PSG was able to pay for by letter of credit -- you've said this already -- were orders that -- of product that they ordered in January/February of 2015? A. Yeah. Q. Everything subsequent to that, for all the rest of 2015, all the rest of 2016, they had to pay by direct wire transfer or else they wouldn't get product? A. Yes.").

[237]   Like the Distribution Agreement, the New Distribution Agreement only allows New Balance to cease accepting orders in one circumstance – if new Balance terminates the agreement and the termination has become effective. Section 10(a) of the New Distribution Agreement provides that NB "shall from and after the date of notice of such termination having been given … be entitled to cease accepting orders for any Products . . ." Pursuant to the Distribution Agreement's terms, New Balance may also cancel a particular order under Article 6(b) if PSG requests to deliver the letter of credit after placing an order and fails to deliver the same, or if PSG otherwise delays or cancels a particular shipment. New Balance wrongly suggests that it may refuse to accept orders for any reason based upon Section 6(c) of the New Distribution Agreement.

[238]   Exhibit 92A; PSG00005162; Exhibit 106, NB_PSG0002036; Exhibit 156, NB_PSG0000515; Exhibit 205, PSG00006772; Exhibit 173-1, PSG00001947.

become current on its payments to New Balance.  This was the death of the business, as without

products, PSG or Superdeporte could not generate any revenues.[239]

   iii. *New Balance Acted Duplicitously In Negotiating With Other Distributors While It Had an Active Distribution Agreement In Place With PSG/Superdeporte*

105. Despite having a fully binding agreement in place, New Balance engaged in bad

faith, duplicitous behavior and negotiated with a new distributor to take over in Peru

notwithstanding that it had a contract in place with Respondents.  In January of 2016, the same

month that New Balance negotiated the amendments to the New Distribution Agreement, and once

Superdeporte had been created, Mr. Cullen told Sparta that New Balance would "very likely make

a change" of distributors for Peru in 2017 and that Sparta was its "first choice" to take on the Peru

distribution.[240]  New Balance continued these negotiations with Sparta throughout 2016 and in

June 2016, Sparta received internal approval to move forward with New Balance as its distributor

in Peru.[241]  Recognizing New Balance's duplicitous behavior, in June 2016, Sparta asked New

Balance to indemnify it from lawsuits from PSG/Superdeporte.[242]  While New Balance refused to

formally indemnify Sparta, it sent Sparta a letter on June 15, 2016 informing Sparta that the Peru

territory was "available."[243]  New Balance told Sparta the territory was "available" <u>before</u> it

---

[239] Hearing Transcript, 623:25 through 624: 9 ("A.  Because with a lack of product into the market, so how you can make money without product that you convert into money?  And again, if you cease daily sales, if you are not taking to a discount or a clearance place, you need to have new product to sell, which is coming your -- 80 percent of your sales are going to come for a fresh product, not old product."); Hearing Transcript, 854:23 through 855: 2 (Q.  A negotiated minimum fee assumes the right to buy product undisturbed and the right to sell product. Right?  A.  Yes, it would. It would.").

[240] Exhibit 237, NB_PSG0000327 (Mr. Cullen goes on to say "I know this is a big decision, but I think it would be the right one for NB and Sparta.")

[241] Exhibit 244, NB_PSG0000543.

[242] Exhibit 244, NB_PSG0000543.

[243] Exhibit 245-1, NB_PSG0000676.

notified Respondents, on June 23, 2016, that it was "reverting back" to and not planning to renew the Distribution Agreement .[244]

106.    On June 21, 2016, also before delivering this notification to Respondents, New Balance tried to formalize a new agreement with Sparta.[245]  It also encouraged Sparta to interfere with Respondents' exclusivity.[246]  New Balance also incentivized Sparta to agree to the contract with extremely favorable contractual terms including no Peru-specific sales numbers and no minimum guarantees.[247]  It also allowed Sparta to buy via letters of credit in Peru.[248]

107.    New Balance acted duplicitously and with bad-faith seeking a new distributor for Peru starting in 2017 while concealing this from Respondents, inducing them to continue to perform under the New Distribution Agreement, including making further payments to New Balance, and investments to continue with the distribution.[249]  That conduct violates the principle of good faith and fair dealing under Massachusetts law.[250]

       iv.    *Damages*

---

[244]  Exhibit 92A, PSG00005162 ("Our legal team will not issue a new contract until all payments are current.  As such, the new 'purchase based' contract is not valid and we are 'reverting back' to the original contract terms."); Exhibit 160, PSG00006744; Exhibit 166, NB_PSG0000207.

[245]  Exhibit 246, NB_PSG0000677.

[246]  Exhibit 246, NB_PSG0000677.

[247]  Exhibit 253, NB_PSG0000740.

[248]  Exhibit 2, NB_PSG0003584.

[249]  Hearing Transcript. 1176:13-1177:8 (Also, what Superdeporte – what Respondents did also shows their present intent to be bound. They formed a company. They changed everything. They got – they had the assets sold from PSG to Superdeporte. They did everything they're supposed to do to perform under the new agreement . . . what did New Balance do? . . .  and it later repudiated the agreement when it brought Sparta in."); Exhibit 105-1, NB_PSG0001302, NB_PSG0001306; Exhibit 209, PSG00002774; Exhibit 211, PSG00006754; Exhibit 216, PSG00006831; Exhibit 205, PSG00006772.

[250]  *UNO Restaurants, Inc. v. Boston Kenmore Realty Corp*., 441 Mass. 376, 385 (2004) ("The covenant of good faith and fair dealing is implied in every contract."); *Young v. Wells Fargo Bank*, N.A., 717 F. 3d 224, 238 (1st Cir. 2013) (applying Massachusetts law) ("Lack of good faith carries an implication of a dishonest purpose, conscious doing of wrong, or breach of duty through motive of self-interest or ill will . . . but the core question remains whether the alleged conduct was motivated by a desire to gain an unfair advantage, or otherwise had the effect of injuring the other party's rights to the fruits of the contract.") (internal quotations and citations omitted).

108.     PSG and Superdeporte's damages under this counterclaim consist of the lost profits from New Balance's failure to perform under the New Distribution Agreement, from 1 August 2015 through 31 December 2017 and for the same reasons stated above, thereafter for one other term through the end of 2020.  The damages as of June 30, 2020 for the initial term of the New Distribution Agreement (from August 1, 2015 through December 31, 2016) are, net of all costs and *all* payments due to New Balance under the New Distribution Agreement, including all distribution fees, **$2.56 million**.[251]  Again, in the "but-for" world without New Balance's breaches, it is more than reasonable to conclude based on the evidence that the parties' relationship would have continued and extended beyond the one-year automatic renewal for at least one additional 3 year term.[252]  The damages as of June 30, 2020 for the term of January 1, 2018 through December 31, 2020 are, net of all costs and *all* payments due to New Balance under the New Distribution Agreement, including all distribution fees, **$4.32 million**.[253]

109.     For these breaches, PSG and Superdeporte have suffered damages, net of all costs and *all* payments due to New Balance under the New Distribution Agreement, including all distribution fees, of **$6.87 million as of June 30, 2020 plus pre- and post-award statutory interest.**

---

[251]   Dellepiane Report, at ¶14; Hearing Transcript. 1037:10-18 (The result of this analysis is that under counterclaims I and II, or the period contained in the new distribution agreement from August 2015 through December 2017, I assess damages in the amount of $1.52 million in nominal terms, with interest on those amounts, resulting in a total claim of 2.4 -- or a damage assessment of 2.41 million, as of the date of my report.").

[252]   Dellepiane Report, at ¶14; Hearing Transcript. 1037:19-23 (For the new distribution agreement under counterclaim I and II, I modeled one 3-year renewal term, and the damages associated with that one 3-year renewal term is an additional $4.04 million.");

[253]   Dellepiane Report, at ¶14; Hearing Transcript. 1037:19-23 (For the new distribution agreement under counterclaim I and II, I modeled one 3-year renewal term, and the damages associated with that one 3-year renewal term is an additional $4.04 million.").

### C.  New Balance Breached Its Precontractual Obligations During The Negotiation Of The New Distribution Agreement

110.    Even if the Tribunal were to find that the New Distribution Agreement was not a binding and legally enforceable contract under Massachusetts law, it should still find New Balance liable to Respondents for failing to comply with its precontractual obligations in negotiating the New Distribution Agreement.

111.    Under Massachusetts law, when the parties to a negotiation have agreed on certain terms but left other terms open, they have made a preliminary agreement.[254] To allow parties to invest money in the negotiation of the final contract, courts have recognized a right to recovery based on a failure to negotiate in good faith even if the parties had not yet reached agreement on all the terms of a contract.[255] Through this line of cases, courts have recognized that while a contract draft or a letter of intent may not itself indicate that a party intended to be bound, it constituted a preliminary agreement to negotiate further in good faith.[256] This interim agreement "precludes, however, renouncing the deal, abandoning the negotiations, or insisting on conditions that do not conform to it.[257] The failure by one party to negotiate further in good faith deprives the other party of the fruits of their preliminary agreement and constitutes a breach of the covenant of good faith and fair dealing, which allows the other party to recover.[258] Parties who formed interim agreements are subject to an ongoing duty to negotiate the remainder of the agreement in

---

[254] A. Schwartz and R. Scott, *Precontractual Liability and Preliminary Agreements*, 120 Harv. L. Rev. (2007), p. 664.

[255] *Id.*

[256] *Id.*

[257] *Fickes v. Sun Expert, Inc.*, 762 F. Supp. 998, 1001 (D. Mass. 1991).

[258] *Fickes v. Sun Expert, Inc.*, 762 F. Supp. 998, 1001 (D. Mass. 1991); *Air Technology Corp. v. General Elec. Co.*, 347 Mass. 613, 630 (1964); *Stoneridge Control Devices, Inc. v. Teleflex, Inc.*, No. 021554BLS, 2004 WL 389105, at *1 (Mass. Super. Feb. 17, 2004).

good faith. When one of the parties fails to do that, liability for the full benefit of the expected bargain attaches.[259]

112. As explained above, New Balance failed to honor the terms of the New Distribution Agreement in various ways, including by (i) failing to substitute in Superdeporte to the New Distribution Agreement when it was ready to perform under the New Distribution Agreement, (ii) refusing to accept new orders from PSG after August 2015, (iii) engaging in duplicitous negotiations with third parties while it had an enforceable (and at the minimum, an interim) agreement in place with Respondents and authorizing and encouraging them to violate PSG and Superdeporte's contractual exclusivity rights; and (iv) altogether repudiating the New Distribution Agreement. As such, as a result of New Balance's breach of its precontractual obligations, PSG suffered lost profits from New Balance's failure to perform under the New Distribution Agreement, from 1 August 2015 through 31 December 2017 and thereafter for one other term through the end of 2020.

113. The damages as of June 30, 2020 for the initial term of the New Distribution Agreement (from August 1, 2015 through December 31, 2016) are, net of all costs and *all* payments due to New Balance under the New Distribution Agreement, including all distribution fees, **$2.56 million**. The damages as of June 30, 2020 for the term of January 1, 2018 through December 31, 2020 are, net of all costs and *all* payments due to New Balance under the New Distribution Agreement, including all distribution fees, **$4.32 million**.[260]

---

[259] *DCPB, Inc v. City of Lebanon*, 957 F. 2d 913, 916 (1st Cir. 1992).

[260] Dellepiane Report, at ¶14; Hearing Transcript. 1037:19-23 (For the new distribution agreement under counterclaim I and II, I modeled one 3-year renewal term, and the damages associated with that one 3-year renewal term is an additional $4.04 million.").

114.     For these breaches, PSG and Superdeporte have suffered damages, net of all costs and *all* payments due to New Balance under the New Distribution Agreement, including all distribution fees, of **$6.87 million as of June 30, 2020 plus pre- and post-award statutory interest.**

## IV.     NEW BALANCE'S CLAIMS FAIL

### A.     *This Tribunal Has No Jurisdiction Over Mr. Ribadeneira or Superdeporte As It Relates to the Contract Claim, and New Balance's Contractual Claim Otherwise Fails*

115.     New Balance's contractual claim against Respondents should fail.  Specifically, New Balance's contractual claim against Mr. Ribadeneira and Superdeporte should fail, as there is no basis to hold either Mr. Ribadeneira or Superdeporte as Respondents in this arbitration for New Balance's breach of contract claim arising under the Distribution Agreement.  The only party to the Distribution Agreement was PSG, it is the only party who signed the arbitral agreement and is subject to this Tribunal's jurisdiction for claims brought under the Distribution Agreement, and therefore, PSG is the only party who may be held liable for claims arising under the Distribution Agreement.

116.     Even if this Tribunal finds that it has jurisdiction over Mr. Ribadeneira and Superdeporte as it relates to New Balance's contract claim, that claim fails on the merits as against *all* Respondents.  There is no contractual or other basis to impute liability against Mr. Ribadeneira or Superdeporte for PSG's obligations under the Distribution Agreement.  Moreover, it was New Balance's breaches of the Distribution Agreement, by failing to allow letter of credit purchases and cutting off PSG's ability to purchase product altogether, that caused PSG's payment breaches.  Also, the claim primarily is for distribution fees sought for periods when PSG was not able to buy and sell New Balance products—the agreement and applicable law do not allow for the collection of these fees in those circumstances.

*v.* *New Balance's Contractual Claim Against Mr. Ribadeneira Should Fail*

117. New Balance has attempted to sustain a contractual claim against Mr. Ribadeneira without any legal basis for doing so. Respondents have now filed two motions for summary disposition on this issue. The Tribunal has already recognized that "Mr. Ribadeneira was not a party to [the Distribution Agreement], and ordinarily would not share any potential liability thereunder; nor would he be subject to that agreement's arbitration clause with respect to a claim for breach of the agreement."[261] Furthermore, Mr. Ribadeneira never consented to arbitrate claims under the Distribution Agreement, and he never assumed any obligations to New Balance under the Distribution Agreement. The assignment of rights in the Peru Action only temporarily granted Mr. Ribadeneira the right to pursue legal claims against New Balance, but Mr. Ribadeneira never assumed any obligations to New Balance or liabilities under the Distribution Agreement. Simply put, Mr. Ribadeneira was an indirect owner of PSG through various holding companies that he owns.[262] He was not an employee of PSG, nor was he an officer of PSG.[263] There is no evidence supporting New Balance's argument that Mr. Ribadeneira should be subject to the Tribunal's jurisdiction as PSG's alter ego.

118. Under Massachusetts law, corporations and their shareholders are generally considered separate legal entities, and only under very limited and rare circumstances, may a court

---

[261] Memorandum and Order on Respondents' Motion for Summary Disposition, August 20, 2019, p. 9.

[262] Hearing Transcript, 867:20 through 868:11 ("Q. And Mr. Ribadeneira does not have a management role in -- did not have a role in Peruvian Sporting Goods as a manager or in the employment structure. A. No. Q. Nor did he have a role in the 2 employment structure, did he or does he, in Superdeporte Plus Peru. Correct? A. No. Q. Does he have any employee -- is he employed by any of the companies in the group? A. No. Q. And what is his role, if any? A. He is -- he is the, like, strategic person that is part of this committee and giving his point of view. He's the owner.").

[263] *Id.*

disregard the separateness of entities ("pierce a corporate veil").[264] In fact, Massachusetts appears "more strict than other jurisdictions in permitting the nonobservance of corporate formalities;" and "[e]ven more infrequent is the court which allows the disregard of corporate formalities in a contractual dispute rather than a tortious injury."[265]

119. To pierce the corporate veil, there must be evidence of "some fraudulent or injurious consequences;" a "confused intermingling of activity … with substantial disregard" of the separateness of the entities;" or "serious ambiguity about the manner and capacity in which the various [entities] and their respective representatives are acting."[266] Furthermore, under Massachusetts law, courts consider twelve factors in deciding whether to penetrate the corporate form, which include: (1) common ownership; (2) pervasive control; (3) confused intermingling of business activity, assets, or management; (4) thin capitalization; (5) nonobservance of corporate formalities; (6) absence of corporate records; (7) no payment of dividends; (8) insolvency at the time of the litigated transaction; (9) siphoning away of corporate assets by the dominant shareholders; (10) nonfunctioning of officers and directors; (11) use of the corporation for transactions of the dominant shareholders; and (12) use of the corporation in promoting fraud."[267]

120. Even after significant discovery and Hearing testimony, New Balance has been unable to establish *any* of these factors. The first two factors do not support a finding of Mr. Ribadeneira acting as PSG's alter ego, although these factors are better suited to evaluating

---

[264] *Berger v. H.P. Hood, Inc.*, 416 Mass. 652, 657, 624 N.E.2d 947 (1993).

[265] *Bradford Carpet One Co. v. Piedmont St., LLC*, No. 1777CV1274, 2019 WL 6681659, at *3 (Mass. Super. Oct. 16, 2019).

[266] Memorandum and Order on Respondents' Motion for Summary Disposition, pp. 9-10, *citing My Bread Baking Co. v. Cumberland Farms, Inc*., 353 Mass. 614, 618 (1968).

[267] Memorandum and Order on Respondents' Motion for Summary Disposition, p. 10, *citing Evans v. Multicon Construction Corporation*, 30 Mass. App. Ct. 728, 733 (1991) (citations omitted).

whether one entity should be held liable for the action of another entity.[268]  While Mr. Ribadeneira was, through various intermediate holding companies, PSG's principal stockholder until the end of 2016,[269] as the Tribunal has recognized, common ownership alone is not sufficient to support piercing the corporate veil.[270]

121.    Discovery and testimony in this case prove that Mr. Ribadeneira did not exercise pervasive control over PSG.[271]  On the contrary, Respondents produced an organizational chart with a clear employment structure for PSG.[272]  Ultimately, key employees reported on key decisions to a corporate board, made up of managers from the business, as well as the group's CEO, CFO, and external consultants.[273]  This board would then vote on key corporate decisions

---

[268]  *George Hyman Const. Co. v. Gateman*, 16 F. Supp. 2d 129, 150 (D. Mass. Sept. 2, 1998).

[269]  Hearing Transcript 980: 14-17 ("Q.  Okay. So as of December 2016, you no longer had a direct or indirect ownership interest in PSG. Correct?  A.  As of that date I did not."); Hearing Transcript, 874: 9 -15 (:Q.  Just briefly, at the end of 2016, PSG was sold to -- can you tell me a little bit about what you know about that?  A.  It was sold to Julio Padilla.  Q.  So as of the end of 2016, PSG is no longer a part of the group?  A.  Yes, it wasn't a part of the group.").

[270]  Memorandum and Order on Respondents' Motion for Summary Disposition, August 29, 2019, p. 9, *citing My Bread Baking Co. v. Cumberland Farms, Inc*., 353 Mass. 614, 618 (1968).

[271]   Hearing Transcript 980: 18-24 ("Q.  Okay. And I think you already testified you've never had a management role in PSG, have you?  A.  (Shaking head.)  Q.  So as of December 2016, you had no management role?  A. No.").

[272]  *See* Exhibit 38, PSG00006835.

[273]  *See* e.g. Deposition Transcript of Margarita Ormaza, 126:17-24; 133:5-16.

and management for PSG would execute on those decisions.[274]  Mr. Ribadeneira held but one vote in the board decisions, and he exercised no control over operational decisions.[275]

122.    The third factor – the confused intermingling of business assets, activities and management – does not support piercing of the corporate veil either.  There were transactions between PSG and Superdeporte, as PSG was winding down its sportswear distribution operations in order to transfer its operations to Superdeporte, but this was not handled or directed by Mr. Ribadeneira.[276]  Specifically, as was explained in detail at the Hearing, inventory was transferred

---

[274]    Hearing Transcript 865: 25 through 868:11 ("A.  Yes.  We are split, our main companies. We have a corporate committee that is formed by the CEO of -- a corporate CEO, a CFO, Mr. Ribadeneira, consultants, the corporate supply chain manager, the IT corporate manager, and the human resources manager, corporate manager. Each of the companies will go with the manager and the principal to -- depending on what we are going to discuss in the meetings, go to the committee that usually takes place monthly and the most bimonthly. You go and you present your performance during the last month, and if you have the proposal, your investments, and your strategies for the next period of time.  Q.  So the managers of each company present performance and they present key strategic decisions to a board comprised of various people who ultimately -- the board and the managers -- all vote on key decisions?  A.  Exactly.  Q.  And you said Mr. Ribadeneira is a member of that board. Correct?  A.  Yes. One of them. Q.  And he has one vote on that board?  A.  Yes.  Q.  But he does not, he himself, make unilateral decisions for the companies within the group?  A.  No. There are discussion and consensus.  THE ARBITRATOR: How were the members of the board selected?  THE WITNESS: Those are -- those are employees from the corporate. They are not external. They are the CEO, the CFO. The external part are the consultants, and the consultants are consultants in finance and in retail that has very -- that have proof, international and local expertise in the area. But the operation, like CFO, CEO, they are members -- they are employees of the corporation.  Q. And Mr. Ribadeneira does not have a management role in -- did not have a role in Peruvian Sporting Goods as a manager or in the employment structure. Correct?  A.  No.  Q.  Nor did he have a role in the employment structure, did he or does he, in Superdeporte Plus Peru. Correct?  A.  No.  Q. Does he have any employee -- is he employed by any of the companies in the group?  A. No.  Q.  And what is his role, if any?  A.  He is -- he is the, like, the strategic person that is part of this committee and giving his point of view. He's the owner."); Hearing Transcript, 963: 11-22 ("Q.  Do those management committees make management decisions that then are communicated to the operations team so that they could run the business? A.  Yes. Yes.  Q.  All right. Do you dictate those decisions in those management committees by fiat? In other words, do you step in and say, 'This is what we're going to do,' and they just do it?  A.  No. By no means. It would be impossible.").

[275]    Hearing Transcript, 866:22-24 (Q.  And you said Mr. Ribadeneira is a member of that board. Correct? A.  Yes. One of them.").

[276]    See e.g. Exhibit 288; see also Hearing Transcript, 878:4 through 879:22 ("Q.  There's also been testimony that in May of 2016, Superdeporte in Peru became – was registered as an active company. Right?  A.  Yes.  Q.  It was ready to distribute?  A.  Mm-hmm.  Q.  There were certain sales between PSG and Superdeporte of assets. Right?  A. Yes.  Q.  And what did PSG sell to Superdeporte?  A.  PSG sold all the inventory that he has. It was around, about 650,000, something like that, all the inventory that he had on hand at that point, and sold to Superdeporte.  Q.  And how did Superdeporte pay PSG for the inventory?  A.  When he saw -- when he bought the inventory, he acquire PSG debt. And afterwards, that date was -- how you say -- what's the word? Was paid with intercompany debt.  THE ARBITRATOR:  Are you saying that Superdeporte paid PSG's debt?  THE WITNESS:  Debt, yeah.  THE ARBITRATOR:  So that was essentially the -- in return for the 650,000 in inventory?  THE WITNESS:  Exactly. Exactly.  THE ARBITRATOR:  Thank you.  BY MS. JAQUITH:  Q.  And was that the -- the debt -- Superdeporte

68

from PSG to Superdeporte.[277]  But there is <u>no evidence</u> that any assets or liabilities of PSG and Superdeporte were ever intermingled with those of Mr. Ribadeneira, or that New Balance was reasonably or legitimately confused as to the entity with which it was dealing.[278]  In fact, as noted by the Tribunal in its Order, New Balance "contracted knowingly with a corporation, having already done business with that company or a predecessor for more than a decade."[279]  There also is no evidence indicating that PSG was thinly capitalized either, as required by the fourth factor.

123.    As to the fifth and sixth factors – nonobservance of corporate formalities and absence of corporate records, the evidence in the record all indicates to the contrary.  PSG was duly incorporated under Peruvian law, its corporate formalities were studiously observed and its corporate records were kept in the ordinary course.[280]  In addition to the corporate board decision-making and execution of those decisions by the PSG management team, PSG's corporate records demonstrate that the company was run professionally by its management and without the involvement of Mr. Ribadeneira—see for example documents supporting PSG's

---

paying PSG's debt, was that everything? Was that -- or was there anything else?  A.  Most of the -- a few, like, 40, 45, 50,000 was cash, was trans -- paid in cash.  Q.  And were any other assets sold from PSG to Superdeporte?  A.  From PSG to Superdeporte?  Q.  Aside from the inventory that we just talked about.  A.  I don't -- it's just the inventory.").

[277]  *Id.  See also* Exhibit 288.

[278]  Hearing Transcript, 960:13 through 961:15 ("Q.  First of all, do you have -- again, some of these questions are going to sound absurdly basic. But do you have bank accounts in your own name?  A. Yes.  Q.  Do you use your personal funds from those bank accounts for either Superdeporte or PSG? Have you ever?  A.  Never.  Q.  Have you ever intermingled – so when PSG gets paid for sales or Superdeporte gets paid for sales -- I'm talking now about the Peruvian entity -- do you ever take those funds and put them in your bank account and used them for personal purposes?  A.  Funds from the company into my bank account -- Q.  Yes, sir.  A.  -- to use? No.  Q.  Okay. Do you yourself make all of the operational decisions for PSG?  A. I don't make any of the operational decisions.  Q.  Who makes operational decisions for PSG?  A. Each company has a manager, and in this case, PSG had a manager.").

[279]  Memorandum and Order on Respondents' Motion for Summary Disposition, p. 10.

[280]  Exhibit 44-1, PSG00006520.

69

ownership/shareholding structure;[281] PSG's organizational chart;[282] PSG's statements of financial

position and integral income for the period from 2013 throughout 2018;[283] and PSG's bank records

from 2014 throughout 2017.[284]

124.     As to the seventh factor – non-payment of dividends – although PSG has not issued

any dividends, Massachusetts courts have recognized that "[w]hen the corporation is closely held,

that gain may take a form other than the payment of dividends or distributions to stockholders,"[285]

and that "a business can have a legitimate purpose even if it is not designed to make dividend

payments or profit distribution."[286]  Here, as Mr. Ribadeneira explained in his deposition testimony,

PSG's management made conscious decisions not to issue dividends and instead, to reinvest the

company's profits.[287]  The evidence all points to the inescapable conclusion that PSG was operated

as a legitimate, profit-seeking entity, and not the alter ego of Mr. Ribadeneira.

125.     New Balance has made no arguments concerning factors eight through twelve, and

there is no new evidence revealed during discovery and/or the Hearing that would support the

finding of any of those factors.

---

[281]     *See e.g.* Exhibit 38, PSG00006835, Exhibit 40-1, PSG00006596, Exhibit 41-1, PSG00006509, Exhibit 42-1, PSG00006510, Exhibit 43-1, PSG00006533, Exhibit 44-1, PSG00006520, Exhibit 45-1, PSG00006511, Exhibit 46-1, PSG00006495, Exhibit 47-1, PSG00006512, Exhibit 48-1, PSG00006496, Exhibit 49-1,, PSG00006508, Exhibit 50-1, PSG00006552.

[282]     *See* Exhibit 39, PSG00006836.

[283]     *See* Exhibit 86-1, PSG00006472.

[284]     *See* Exhibits 53 through 73, PSG00006085 through PSG00006311.

[285]     *Evans v. Multicon Const. Corp.,* 30 Mass. App. Ct. 728, 735, 574 N.E.2d 395, 399 (1991).

[286]     *See George Hyman Const. Co. v. Gateman*, 16 F. Supp. 2d 129, 154 (D. Mass. 1998).

[287]     *See* Deposition Transcript of Rodrigo Ribadeneira, 51:3-9 ("Q.  In years where there were profits, were the profits distributed out in any fashion?  A.  We seldomely take dividends out, especially from the small companies. They just get reinvested.  Q.  Do you recall ever -- do you recall PSG ever issuing any dividends or paying out any profits?  A.  No.").

126.    The evidence from the Hearing buttresses these conclusions.  Mr. Ribadeneira testified that PSG's managers made operational decisions for PSG, and the group's central corporate committee made management decisions.[288]  As Mr. Ribadeneira and Ms. Ormaza testified, Mr. Ribadeneira only had one vote at the committee and had never dictated any decisions by fiat.[289]  Mr. Ribadeneira further testified that he had never intermingled PSG's assets with his personal assets.[290]

127.    New Balance is left to argue that Mr. Ribadeneira's ownership of PSG through various holding companies until December 2016 should be sufficient to hold him liable to New Balance for New Balance's contractual claims against PSG.  That argument is, of course, unavailing.  Ownership alone is not sufficient to pierce the corporate veil.  Being the sole stockholder is not a significant factor in piercing the corporate veil, and for good reason.[291]  If that were sufficient the corporate veil doctrine would lose all meaning.  As this Tribunal already has ruled, "[t]hat Mr. Ribadeneira is that company's principal stockholder, its general manager, and apparently its principal voice with respect to its business decisions do not by themselves justify a disregarding of the corporate form."[292]  And the evidence now has aptly demonstrated that Mr.

---

[288]    Hearing Transcript 865: 25 through 868:11; Hearing Transcript, 963: 11-22; Hearing Transcript, 946: 5-18 ("A.  That I don't have a position in any of the companies. I am the owner and I am the owner.  Q.  How involved -- now from the period of 2013 through 2016, 2013 through 2016, how involved were you in day-to-day operational decisions of PSG while it was acting as the distributor and then Superdeporte?  A.  We at that time had 36 and today we have 25. But at that time we have 36 different companies. There's no way in the world that I can be hands-on in 36 companies, even less a company that is so small as this one is. PSG is probably the smallest company that we have.").

[289]    *Id.*

[290]    Hearing Transcript 960: 13 through 961: 7.

[291]    *Gordineer v. Colahan*, 2011 Mass. App. Div. 151 (Dist. Ct. 2011) ("We are particularly unconvinced that the fact, standing alone, that [Defendant] was a sole stockholder was significant.").

[292]    Memorandum and Order on Respondents' Motion for Summary Disposition, August 20, 2019, p. 10.

Ribadeneira was, in fact, not PSG's "general manager",  nor its "principal voice with respect to its business decisions."

128.     Considering all the aforementioned factors and evidence, New Balance has not provided, nor could it possibly provide, sufficient evidence to reach the "high threshold" required to pierce the corporate veil under Massachusetts law to hold Mr. Ribadeneira liable for PSG's obligations to New Balance.[293]  As there is no contractual or other basis to impute liability to Mr. Ribadeneira under the Distribution Agreement, this Tribunal should dismiss Mr. Ribadeneira as a Respondent with respect to New Balance's claim arising from the Distribution Agreement.

*vi.*     *New Balance's Contractual Claim Against Superdeporte Should Fail*

129.     As with Mr. Ribadeneira, this Tribunal has no jurisdiction over Superdeporte regarding New Balance's contract claims under the Distribution Agreement.  Superdeporte is not a party to that agreement and did not agree to its arbitral clause.  As this Tribunal has recognized in its Order issued in response to Respondents' first Motion for Summary Disposition, in the Tribunal's view, the evidentiary record as of August 20, 2019 would "require the dismissal of the amended claims for the breach of the 2013 distribution agreement against ***both Mr. Ribadeneira and Superdeporte***."  The subsequent record has not yielded any factual basis to support a claim that Superdeporte should be held to arbitrate claims under the Distribution Agreement, or that, assuming this Tribunal finds it has jurisdiction over the company, it should be liable to New Balance for PSG's obligations under the agreement.

---

[293]   *Centurion Networking Serv. Partners, LLC v. Dr. Wade N. Barker, P.A.*, 2018 WL 1972789, at *5 (D. Mass. Apr. 26, 2018).

130.    The evidence proves that Superdeporte is a separate, distinct legal entity that was created long *after* the Distribution Agreement became effective.[294]   It was created at New Balance's request solely for the purpose of carrying out the New Distribution Agreement with New Balance.[295]

131.    New Balance's argument that Superdeporte should be liable to New Balance under a theory of "successor liability" is also unavailing.   This argument should be waived as New Balance first belatedly raised it in response to Respondents' Renewed Motion for Summary disposition.  New Balance failed to plead this successor liability theory in its affirmative pleadings, despite having three opportunities to do so in its Notice of Arbitration and subsequent amendments in May and December of 2019.  Raising this argument for the first time in response to Respondents' Renewed Motion for Summary Disposition is untimely and prejudices Respondents.[296]

---

[294]    Exhibit 155, NB_PSG0000187.

[295]    *See* Exhibit 39, PSG00006836, Exhibit 52-1, PGS00006577, Hearing Transcript 428: 6 through 429:16 ("Okay.·So you raised that concept or that idea of basically having more benefit at the retail level, Marathon retail level, as early as 2014 and perhaps earlier?  A.  Yes.  Q.·  All right.·And that's something that at some point you described as an unfair advantage, you testified on direct wasn't really unfair, but those were your words that you communicated to our client?  A. I'm not sure where that originated, but yes, we used the term "unfair advantage" incorrectly.  Q.  And Mr. Ribadeneira and the folks associated with Marathon Sports and with PSG told you that they would try to accommodate that request that you were making?  A.  I think we were both trying to drive business in the region. So, yes. In the market. Sorry.  Q.  But they told you that they would accommodate that request?  A.  We were looking for solutions in order to -- we were looking for solutions to the idea of selling more shoes in Peru.  THE ARBITRATOR:·I think he's entitled to a yes-or-no answer to his question.   THE WITNESS:·  Okay.   THE ARBITRATOR:·Want to repeat the question?  Q.  Yeah.·  Mr. Ribadeneira and others associated with Marathon and PSG told you that they would accommodate your request?  A.·  Yes."); Hearing Transcript, 642: 22 through 643: 11 ("Q.·  What are you referring to that he told you?·What did he tell you would be fast?  A.  He told me many times that he will send me the new contract, the contract with amendment of Superdeporte and the reduction of the minimum fees.  Q.  Do you know whether -- A.  I was talking with him about this since December. We agreed to reduce the minimums. That way we're more aligned to what is happening in the marketplace.·And to change it to Superdeporte, which was the integrated entity with wholesale and retail, which was something that he request.").  Deposition Transcript of Carlos Miguel Gagliardi, 17:16-24.

[296]    *See e.g.*, *McLaughlin v. Harbor Cruises LLC*, 2009 WL 890099, at *2 (D. Mass. Mar. 31, 2009) (finding that defendant waived implied preemption argument where the defendant's answer did not assert preemption as an affirmative defense); c.f. *Albrite Carpets, Inc. v. Travelers Property Cas. Co. of Am.*, 2010 WL 3749457, at *2 (D. Mass. Sept. 22, 2010) (finding waiver where plaintiff did not raise argument in opposition to defendant's first motion for summary judgment).

132.    On the merits, New Balance's successor liability claim fails, as none of the factors for successor liability are met in this case.  To make a claim for successor liability, New Balance must prove "(1) the successor expressly or impliedly assumes liability of the predecessor, (2) the transaction is a de facto merger or consolidation, (3)the successor is a mere continuation of the predecessor, or (4) the transaction is a fraudulent effort to avoid liabilities of the predecessor."[297] New Balance has not been able to prove any of these elements.

133.    PSG did not transfer all or substantially all of its assets to Superdeporte.[298]  PSG transferred its remaining New Balance inventory to Superdeporte, as Superdeporte was being formed, at New Balance's request, and planned to take over as New Balance's distributor role in Peru under the New Distribution Agreement.[299]  Exhibit 288, introduced by Respondents in advance of the May 29, 2020 Hearing date, establishes that Superdeporte paid for PSG's New Balance and other inventory through an intercompany loan.[300]  Once Superdeporte was established, it paid for and then acquired inventory/assets from PSG.  PSG transferred inventory worth 5.7

---

[297]  *Cargill, Inc. v. Beaver Coal & Oil Co.*, 424 Mass. 356, 359 (1997) (Courts "adhere to traditional corporate law principles that the liabilities of a selling predecessor corporation are not imposed on the successor corporation which purchases its assets unless (1) the successor expressly or impliedly assumes liability of the predecessor, (2) the transaction is a de facto merger or consolidation, (3) the successor is a mere continuation of the predecessor, or (4) the transaction is a fraudulent effort to avoid liabilities of the predecessor.").

[298]  *Premier Capital, LLC v. KMZ, Inc.*, 464 Mass. 467, 475 (2013).

[299]  *See* e.g. Hearing Transcript 878:4 through 879:22 ("Q. There's also been testimony that in May of 2016, Superdeporte in Peru became – was registered as an active company. Right?  A.  Yes.  Q.  It was ready to distribute?  A. Mm-hmm.  Q.  There were certain sales between PSG and Superdeporte of assets. Right?  A.  Yes.  Q.  And what did PSG sell to Superdeporte?  A.  PSG sold all the inventory that he has. It was around, about 650,000, something like that, all the inventory that he had on hand at that point, and sold to Superdeporte.  Q.  And how did Superdeporte pay PSG for the inventory?  A.  When he saw -- when he bought the inventory, he acquire PSG debt. And afterwards, that date was -- how you say -- what's the word? Was paid with intercompany debt.  THE ARBITRATOR: Are you saying that Superdeporte paid PSG's debt?  THE WITNESS: Debt, yeah.  THE ARBITRATOR: So that was essentially the -- in return for the 650,000 in inventory?  THE WITNESS: Exactly. Exactly.  THE ARBITRATOR: Thank you.  BY MS. JAQUITH: Q.  And was that the -- the debt -- Superdeporte paying PSG's debt, was that everything? Was that -- or was there anything else?  A.  Most of the -- a few, like, 40, 45, 50,000 was cash, was trans -- paid in cash.  Q.  And were any other assets sold from PSG to Superdeporte?  A.  From PSG to Superdeporte?  Q. Aside from the inventory that we just talked about.  A.  I don't -- it's just the inventory.").

[300]  Exhibit 288.

million soles to PSG.[301]  Of the 5.7 million soles, 1.789 million soles (approximately $517,000 at the June 2020 average's exchange rate) was made up of New Balance inventory.

134.    As a result of this inventory transfer, Superdeporte owed PSG a debt in the amount of 5.7 million soles.[302]  Equiperu S.A.C., another company in the group, had previously loaned PSG money through an intercompany loan.  The companies agreed that Superdeporte would instead repay Equiperu S.A.C.'s loan to PSG as consideration for acquiring PSG's assets.[303]  Since 2016 when the agreement was entered into, Superdeporte has repaid the debt to Equiperu S.A.C.[304]

135.    Superdeporte is not a "mere continuation" of PSG.[305]  Instead, while PSG's clients became a part of Superdeporte, Superdeporte had distinct retail and wholesale capabilities and clients that PSG did not have.[306]  Superdeporte was a significantly larger company than PSG with different business lines, a different corporate purpose, and different clients.[307]

136.    While PSG ceased distribution operations during 2016, it is still a viable entity. There is also no evidence PSG ceased operations in order to eliminate its corporate debt.  It was

---

[301]  *Id.*

[302]  *Id.*

[303]  *Id.*

[304]  *Id.*; Hearing Transcript, 879:2-8 ("THE ARBITRATOR:  Are you saying that Superdeporte paid PSG's debt?  THE WITNESS: Debt, yeah.  THE ARBITRATOR: So that was essentially the – in return for the 650,000 in inventor?  THE WITNESS: Exactly. Exactly.").

[305]  *Milliken & Co. v. Duro Textiles, LLC*, 887 N.E.2d 244, 255, 451 Mass. 547, 557 (Mass. 2008).

[306]  Hearing Transcript, 868: 12-25; 869: 2-16 ("Q.  So there's been a lot of discussion about PSG as a wholesale company in Peru and how it was purely a wholesale company and couldn't function at the retail level. Can you explain a little bit about why PSG couldn't function at the retail level?  A.  PSG does not have the expertise, the knowledge, the stores, the locations, the handling the business of retail.  Q.  PSG was purely a -- A.  Purely a wholesale -- Q.  -- distribution company?  A.  -- wholesale company. An importer and wholesale company.  Q.  And you talked about the  infrastructure, stores and all that. Can you describe a little bit more about the infrastructure required for a retail company?  A.  First, you have to be key locations, and you have to have more than four locations. In that case, Marathon has at that point 20 locations, very good locations. You have to have the employees, the working force, to handle those big stores. Because our -- those are not small stores. Those are stores are about 700, 600 meters, square meters. So it needs the operation know-how of how to handle these chain of stores. So they do have in place all of that.").

[307]  Exhibit 39, PSG00006836, Exhibit 52-1, PSG00006577.

sold to a new owner, Mr. Padilla and is now used for a different purpose.[308]  Under Massachusetts law, "dissolution of the predecessor corporation is required"[309] for successor liability.  This did not occur here with PSG.

137.    Furthermore, there is no evidence here of "continuity of directors, officers, and stockholders; and the continued existence of only one corporation after the sale of assets."[310]  PSG and Superdeporte's organizational charts show that the companies had distinct employees and officers with distinct roles and did not share the same personnel.[311]  PSG ceased operating as a distributor in Peru because of New Balance's request that it have a distributor that could function at both the wholesale and retail levels.[312]  As such, Superdeporte was created to handle both wholesale and retail distribution of New Balance products (as well as that of other brands), to take

---

[308]   Hearing transcript, 874: 9-19; 875: 3-15 ("Q.  Just briefly, at the end of 2016, PSG was sold to -- can you tell me a little bit about what you know about that?  A.  It was sold to Julio Padilla.  Q.  So as of the end of 2016, PSG is no longer a part of the group?  A.  Yes, it wasn't a part of the group.  Q.  Okay. And the company was sold to Mr. Padilla. Correct?  A.  Yes, it was sold to Mr. Julio Padilla.  THE ARBITRATOR: Did anyone, any company in the Marathon family receive anything in return for selling PSG?  THE WITNESS: From what I know, yes.  THE ARBITRATOR: I'm sorry?  THE WITNESS: From what I know, yes.  THE ARBITRATOR: All right. What did they receive?  THE WITNESS: I think it was worth a little bit -- something more than $10,000.  THE ARBITRATOR: $10,000 plus?  THE WITNESS: Something -- yeah, something like that."); 933: 14 through 934:6 ("What's the basis for your understanding that the shares of Mirando were transferred to Mr. Padilla for valuable consideration?  A.  Was discussed in the meeting.  Q.  What meeting?  A.  A committee meeting. This meetings of the corporate committee meeting.  Q.  So Mr. Padilla paid valuable consideration for the shares of Mirando Investments?  A.  Yes. Yes.  Q.  Okay. And how much did he pay?  A.  I'm not sure. I can't tell you that, but I remember it was over 10,000. 10,000. Because the capital was that. The capital paid for that company was that.").

[309]   *McCarthy v. Litton Indus., Inc.*, 410 Mass. 15, 23 (1991).

[310]   *Id.*

[311]   Exhibit 38, PSG00006835, Exhibit 39 PSG00006836.

[312]   Hearing Transcript, 966: 4-24 ("But could you in your own words describe why Superdeporte Plus was created in Peru to handle New Balance's account, and how it was created?  A.  Okay. Early on, from the beginning when John took over after Ed Haddad -- no, it was actually after Abe Cunningham – he expressed his desire to have the Peruvian market run similar to the Chilean market where Sparta, who is the largest sporting goods retailer, as Marathon is the largest sporting goods retailer in Peru, was the importer and distributor and had dual margin. He said that from the beginning.  Q.  What do you mean by 'dual margin'?  A.  Dual margin, it means that they import at distributor price. They have the chance to sell at wholesale and then make the retail margin. So it's dual -- it's double margin that the retailer makes. That's that unfair advantage that he mentioned many times."); Hearing Transcript, 969: 12-15 ("Later, we actually sold out PSG, sold Hiperdeporte, moved the assets to a new entity called Superdeporte to fulfill John's idea of having the Sparta model.").

over PSG's role as New Balance's distributor.  PSG, as noted, continues to exist and was sold to Mr. Padilla at the end of 2016.

138.    Superdeporte assumed no rights or obligations under the Distribution Agreement. New Balance could not genuinely argue, nor has it argued, that Superdeporte is PSG's alter ego. There is no basis or evidence in the record to justify piercing the corporate veil as to Superdeporte. Superdeporte sits alongside PSG in the group's corporate structure – is not PSG's parent, and was created solely to act under the New Distribution Agreement.

139.    As with Mr. Ribadeneira, there is thus no basis to find that Superdeporte has agreed to arbitrate any claims with New Balance under the Distribution Agreement or to hold it liable to New Balance for any of PSG's obligations under that agreement.  This Tribunal should therefore dismiss Superdeporte as a Respondent on New Balance's contractual claim.

### B.    New Balance's Claim That PSG Breached The Distribution Agreement Should Fail Because New Balance Caused PSG's Inability To Pay New Balance

140.    New Balance's primary argument in this case is that PSG breached the Distribution Agreement by failing to pay New Balance amounts owed under the Agreement, primarily supposed "minimum distribution fees" owed for periods when New Balance prevented PSG from purchasing products.  As a result, New Balance claims over $4.5 million in damages.

141.    PSG's alleged breach of the Distribution Agreement should be excused as a matter of law because PSG's breach was caused by New Balance's breach of the Distribution Agreement. Specifically, by denying letter of credit purchases and, importantly, by not allowing PSG to make any purchases after Q4 2015, New Balance prevented PSG from performing under the Distribution Agreement, thereby causing to fall behind in payments to New Balance.

142. Under Massachusetts law, "[A] breach caused solely by the other party's behavior is generally excused[.]"[313] In other words, if one party materially breaches the contract first, then the other party is excused from performance.[314] Here, as explained, New Balance breached the Distribution Agreement first in various ways.

143. Although the Distribution Agreement explicitly permitted payment via letter of credit, and PSG relied on this right in how it conducted its business with New Balance, New Balance, in violation of Section 6(b) of the agreement, did not allow PSG to place orders via letter of credit starting with Q3 2015 orders in January/February of 2015.[315] While it later in August of 2015 made one more exception to its unilateral imposition of a no letters of credit policy for Q3 2015 orders, PSG already had fallen many months behind in distribution fee and other payments to New Balance due to New Balance's breach.[316]

144. Then, strikingly, just after PSG made a substantial payment to New Balance of over US $500 thousand, New Balance shut down PSG's ability to place new orders altogether in August 2015.[317] It did not allow PSG to place any new orders after Q4 2015, in violation of the

---

[313] *Peabody N.E., Inc. v. Marshfield*, 426 Mass. 436, 689 N.E.2d 774, 779 (Mass.1998).

[314] *AM Project Norwood, LLC v. Endicott S. Dev. Corp.,* No. SUCV201702765BLS2, 2018 WL 4937768, at *1 (Mass. Super. Aug. 24, 2018) (finding that a party's failure to turn over records as required by the contract could constitute a material breach excusing the other party from performance of the contract; "Massachusetts law is clear: a party that prevents the other from satisfying a condition precedent cannot rely on the failure of the condition to avoid its own obligations under a contract."). *In re Access Cardiosystems, Inc.,* 361 B.R. 626, 646 (Bankr. D. Mass. 2007) ("if the Debtor made it impossible for the Distributors to obtain, or if the Debtor in bad faith withheld, the necessary approval of reasonable costs associated with the recall, the Debtor cannot now rely on that failure to avoid its obligation to reimburse those expenses"). *King Features Syndicate, Inc. v. Cape Cod Broadcasting Co.*, 317 Mass. 652, 654 (1945) (A condition precedent may be implied if the intent of both parties to create one is clearly manifested in the contract as a whole.).

[315] Hearing Transcript, 494:23 through 495:5 ("And so my question is, consistent with what you were being told here by the finance people, did New Balance, at least initially, ask for PSG to pay for Q3 orders by lines of credit as opposed to letters of credit?  A.  Yes, it appears that way."); Exhibit 225, NB_PSG0001555.

[316] Exhibit 101, NB_PSG0001963; Exhibit 105-1, NB_PSG0001306.

[317] Exhibit 101, NB_PSG0001963; Exhibit 105-1, NB_PSG0001302, NB_PSG0001306; Exhibit 106, NB_PSG0002036; Exhibit 126-1, PSG00006819.

Distribution Agreement—and later of the New Distribution Agreement after that agreement has been concluded.[318]

145.    PSG's business was exclusively purchasing sportswear at the wholesale level from brands, principally New Balance, and then selling it to end retailers.[319]  As such, these breaches financially strangled PSG, making it impossible for PSG to perform under the Distribution Agreement or later the New Distribution Agreement, generate revenues, or enjoy the benefits of the Distribution Agreement or the New Distribution Agreement.

146.    New Balance's claims for damages mostly consist of distribution fees, which are all for the October 2015 to December 2016 period – a period of time for which New Balance did not allow PSG to place any additional orders from New Balance.[320]  Because PSG could not place orders due to New Balance's breach of the Distribution Agreement, it could not generate revenues from its customers, pay New Balance, or make profits as a result.  If PSG was unable to place orders, sell new product, and generate revenues, it should not as a matter of law be responsible for minimum fees for 2015 and 2016.[321]

---

[318]    Hearing Transcript, 474:22 through 475:22 ("Q.  They did place orders for Q3 2016, but ultimately they asked for those orders to be paid by letter of credit. New Balance said no. So they never got those orders?  A. All I know is they didn't pay for those. I don't know -- they didn't pay for those. We can get those if you want, but they didn't pay for those orders, in any event.  Q.  Well, I mean, you also know that they -- do you not remember that you testified this morning that they asked to pay by letter of credit and that you said no?  A.  I think I said no, yes. Sorry. You're right.  Q.  Okay. So just so we're clear, the last order that PSG was able to pay for by letter of credit -- you've said this already -- were orders that -- of product that they ordered in January/February of 2015?  A.  Yeah. Q.  Everything subsequent to that, for all the rest of 2015, all the rest of 2016, they had to pay by direct wire transfer or else they wouldn't get product?  A.  Yes.").

[319]    Exhibit 44-1, PSG00006520.

[320]    Hearing Transcript 848: 3-10 ("Q And did PSG receive any – aside from the Q3 order that PSG was allowed to place, did PSG receive any Q1, Q2, Q3, Q4 2016 orders?  A. No, I don't believe they did. No.  Q So PSG received and was not able to sell any 2016 product?  A. That's true.").

[321]    *Peabody N.E., Inc. v. Marshfield*, 426 Mass. 436, 689 N.E.2d 774, 779 (Mass.1998) ("a breach caused solely by the other party's behavior is generally excused[.]").

147.     PSG's product orders and purchases in 2015 were very limited due to New Balance's unilateral imposition of the new cash payment term, with Q4 orders being placed in April 2015 and being largely paid for via cash transfer on October 29, 2015.  New Balance then did not allow PSG to place any orders for Q1 and Q2 2016, and while it allowed it place limited Q3 2016 orders, it did not allow PSG to pay for these orders via letter of credit and did not deliver the products ordered to PSG.[322]  So PSG [and Superdeporte] were not allowed to purchase any New Balance products from October 2015 on, including all of 2016.

148.     Purchasing and selling New Balance products was an implied condition precedent to making payments of minimum distribution fees to New Balance under the Distribution Agreement.  As Mr. Cragan confirmed in his testimony, a "negotiated minimum fee assumes the right to buy product undisturbed and the right to sell product undisturbed."[323]  Massachusetts courts recognize that where one party does not fulfill a condition that triggers another party's obligations, then that obligation is excused.[324]

149.     New Balance disrupted PSG's ability to buy and sell products starting in January/February of 2015 with Q3 2015 orders and did not allow it to place and receive products

---

[322]     Hearing Transcript, 474:22 through 475:22 ("Q.  They did place orders for Q3 2016, but ultimately they asked for those orders to be paid by letter of credit. New Balance said no. So they never got those orders?  A. All I know is they didn't pay for those. I don't know -- they didn't pay for those. We can get those if you want, but they didn't pay for those orders, in any event.  Q.  Well, I mean, you also know that they -- do you not remember that you testified this morning that they asked to pay by letter of credit and that you said no?  A.  I think I said no, yes. Sorry. You're right.  Q.  Okay. So just so we're clear, the last order that PSG was able to pay for by letter of credit -- you've said this already -- were orders that -- of product that they ordered in January/February of 2015?  A.  Yeah. Q.  Everything subsequent to that, for all the rest of 2015, all the rest of 2016, they had to pay by direct wire transfer or else they wouldn't get product?  A.  Yes.").

[323]     Hearing transcript 854:23-855:2 ("Q.  A negotiated minimum fee assumes the right to buy product undisturbed and the right to sell product. Right? Yes, it would. It would.").

[324]     *In re Access Cardiosystems, Inc.*, 361 B.R. 626, 646 (Bankr. D. Mass. 2007) ("if the Debtor made it impossible for the Distributors to obtain, or if the Debtor in bad faith withheld, the necessary approval of reasonable costs associated with the recall, the Debtor cannot now rely on that failure to avoid its obligation to reimburse those expenses"); *Douglas Properties, LLC vs. Guaranteed Builders & Developers, Inc.*, Mass. Land Ct., No. 13 MISC 478710 GHP (Oct. 5, 2015) ("A condition precedent may be implied if the intent of both parties to create one is clearly manifested in the contract as a whole.").

orders for the entire period for which it now seeks distribution minimum fees—October of 2015 through December 2016. It thus is cannot as a matter of law collect these fees from PSG (or any of the other Respondents).

150. One needs look no further than the contemporaneous facts to further confirm this. New Balance **never invoiced PSG** (or any of the other Respondents) for the Minimum Fees for 2015, 2016, and the Distribution Fees for December 2016, in the amounts of $405,552.19, $881,732.00 and $25,666.00, respectively, which total over $1.3 million. Mr. Cragan also admitted this in his testimony.[325] These amounts were never even entered into New Balance's accounting system.[326]

151. Why would this be the case? Because New Balance understood at the time that these amounts were not owed under the contract. Then why seek them now in this case? New Balance's counsel provided the Tribunal with the answer during his closing argument. Mr. Tully told us in his closing argument that this case was filed *in retaliation for Respondents filing the Peru Action*: "He launched this litigation, the Peru litigation -- which, by the way, <u>without the Peru litigation, I'm not sure any of us meet</u>."[327] That was a remarkably candid admission, and one that explains why New Balance is seeking as damages in this case, including distribution fees and

---

[325] Hearing transcript, 791:20 through 792:10 ("Now, was the December 2016 distribution fee ever invoiced to PSG? A. I don't believe it was, and I think that's why we've pulled it out separately. That's an oversight. That's honestly -- that's a mistake. It should have been -- there was a distribution fee associated with December 2016. It should be included. Q. Okay. And was the minimum guarantee for 2015 in an amount of $405,552.19 ever invoiced to PSG? A. No, it wasn't. Q. And how about the minimum fee for 2016? Was that invoiced to PSG? A. No, it wasn't.").

[326] Hearing transcript 792: 12-24 ("…there was previously testimony that the amounts that were sent to Atradius were what had been invoiced in the system. Correct? A. That's right. Q. So these amounts highlighted in yellow had not been invoiced in the system? A. Yes, that's correct. Q. Okay. So the total of the three rows there that were not invoiced in the system and that New Balance is claiming as damages in this arbitration are over 1.3 million. Correct? A. That's correct.").

[327] Hearing Transcript, 1235:9-12 (emphasis added).

other charges that it never invoiced to PSG, never entered in its own accounting system and that it cannot collect under the contract or applicable law.

152.    New Balance also claims damages for samples of its products for Q3/Q4 2016 through 2017.  PSG does not owe the expenses for the same reasons it does not owe the distribution fees for the period it was not permitted to buy and sell New Balance products.  PSG never received product after Q4 2015 through end of 2016 or beyond.  The purpose of samples is for the distributor to show its customers the new product that will be coming in the next quarters so that customers can place orders.  PSG was never able to place additional orders or receive new product after Q4 2015 so it should not owe New Balance for samples on products that New Balance prevented it from purchasing and selling.

153.    Applying Massachusetts law to these facts, New Balance is precluded as a matter of law from claiming monies from PSG that PSG could not pay due to New Balance's breaches.[328]

### C.    New Balance's Damages Claims Are Further Flawed, Because It Seeks Usury Interest and Interest Not Permitted Under the Distribution Agreement

154.    A large component of New Balance's damages claim is made up of interest, including $2,663,338.00 in fee interest and $105,710.78 in sample interest.[329]  New Balance may not claim this interest.

155.    For the sample interest, the Distribution Agreement as well as the New Distribution Agreement provide that New Balance is entitled to "charge Distributor interest at the rate of two percent (2%) per month <u>(or, if the applicable usury rate does not permit two (2%) percent per month, then at the maximum interest rate permitted by law)</u> for any amounts not received when

---

[328]    *Peabody N.E., Inc. v. Marshfield*, 426 Mass. 436, 689 N.E.2d 774, 779 (Mass.1998) ("a breach caused solely by the other party's behavior is generally excused[.]").

[329]    Exhibit 259A.

due[.]"[330]  The underlined passage here is important—if the applicable usury rate does not permit the 2% interest, which it does not in Massachusetts, then New Balance per the contract may only charge "the maximum interest rate permitted by law", which in Massachusetts for contract claims is 6%.[331]

156.    For the distribution fee interest, both Distribution Agreements provide that, "[a]ll late payments shall bear interest at a rate of two (2%) percent per month or, _if such rate should exceed any applicable permissible legal interest rate, then at the highest legally permissible rate_."[332]  Again , the underlined passage makes evident that where, as here, the 2% exceeds the "applicable permissible legal interest rate" then New Balance may only charge the "highest legally permissible rate, which again is 6%.[333]

157.    The 2% per month interest rate is not permissible under Massachusetts law or the Distribution Agreement, as it is usurious.  The usury statute provides as follows:

> Whoever in exchange for either a loan of money _or other property knowingly contracts for, charges, takes or receives, directly or indirectly, interest and expenses the aggregate of which exceeds an amount greater than twenty per centum per annum_ upon the sum loaned or the equivalent rate for a longer or shorter period, shall be guilty of criminal usury and shall be punished by imprisonment in the state prison for not more than ten years or by a fine of not more than ten thousand dollars, or by both such fine and imprisonment . . . Any loan at a rate of interest proscribed under the provisions of paragraph (a) may be declared void by the supreme judicial or superior court in equity upon petition by the person to whom the loan was made.[334]

---

[330]   Exhibit 1, PSG00005497; Exhibit 5-1, PSG00000002 (emphasis added).

[331]   Mass. Gen. Laws Ann. ch. 107, § 3.

[332]   Exhibit 1, PSG00005497; Exhibit 5-1, PSG00000002 (emphasis added).

[333]   Mass. Gen. Laws Ann. ch. 107, § 3.

[334]   Mass. Gen. Laws Ann. ch. 271, § 49 (emphasis added).

158.    Contrary to what Claimant contends, the usury statute is not limited to criminal cases and is regularly applied in civil suits.[335]  Claimant also tried to argue that the statute applies only in the loan context; however, the text and application of the statute are significantly broader than that.  The wording of the statute provides that it applies beyond the context of a loan, when it specifies that "**Whoever in exchange for either** a loan of money **or other property knowingly contracts for, charges, takes or receives, directly or indirectly, interest and expenses the aggregate of which exceeds an amount greater than twenty per centum per annum**…"[336]  The statute's prohibition on usury rates applies thus whenever anyone "in exchange for other property" "knowingly contracts for, charges, takes or receives .. interest .. the aggregate of which exceeds an amount greater than twenty percent per annum."

159.    That is precisely what New Balance has done here in its contract with PSG.  It contracted with PSG "in exchange for" New Balance's property rights—the right for PSG to exclusively sell its products in the Peruvian territory" and has via that contract charged PSG "interest and expenses the aggregate of which exceeds an amount greater than twenty per centum per annum…".

160.    The legal statutory interest rate under Massachusetts law (in the absence of a legal contractual rate) is 6%.[337]  That is the highest rate that New Balance could charge under the express terms of its contract with PSG, both because that is what the text of the contract provides and because the rate that New Balance is seeking to charge is usury and thus illegal under

---

[335]    *In re Rolfe*, 25 B.R. 89, 94 (Bankr. D. Mass. 1982), aff'd, 710 F.2d 1 (1st Cir. 1983) (loan contract could be rescinded for violating the Statute despite contention that no civil remedies existed); *In re Tavares*, 298 B.R. 195, 203 (Bankr.D.Mass.2003) (holding that a violation of the criminal usury statute constitutes a per se violation of Chapter 93A because the usury statute is a public policy statute covered by 940 Mass.Code Regs. 3.16).

[336]    Mass. Gen. Laws Ann. ch. 271, § 49 (emphasis added).

[337]    Mass. Gen. Laws Ann. ch. 107, § 3.

Massachusetts law.  New Balance claims that it is charging interest at 2% per month, but its interest rate calculations materially exceed that amount.  As Mr. Dellepiane explained in his testimony, New Balance calculates compound interest of 2.42% (32.6% per annum) on alleged outstanding distribution fee amounts, and calculates interest of 2.33% (31.1 % annum) on sample expenses.[338] These interest claims are not only usurious, but are also beyond the contractually-specified 2% rate.

161.    Because the interest rate that New Balance is seeking to charge in this case is usurious and not permitted by the terms of the Distribution Agreement, should this Tribunal award any amounts to New Balance, it should apply the legally permitted statutory interest rate of 6% to any principal amounts awarded.  This is precisely what the Distribution Agreement requires when it provides that New Balance may only charge the "highest legally permissible rate" for distribution fees and the "the maximum interest rate permitted by law" for samples.[339]

### D.    New Balance's Tortious Interference Claim Fails

162.    New Balance has not established the required elements for tortious interference.  In order to prove tortious interference, New Balance has the burden of demonstrating: "(1) the existence of a contract or business relationship which contemplated economic benefit; (2) the defendant['s] knowledge of the contract or business relationship; (3) the defendant['s] **intentional**

---

[338]    Hearing Transcript 1059:4 through 1060:21.

[339]    For the sample interest, the Distribution Agreements provide that, a "rate of two percent (2%) per month (or, if the applicable usury rate does not permit two (2%) percent per month, then at the maximum interest rate permitted by law) would apply to any unpaid Product payment; for the distribution fee interest, the Distribution Agreements provide that "[a]ll late payments shall bear interest at a rate of two (2%) percent per month or, if such rate should exceed any applicable permissible legal interest rate, then at the highest legally permissible rate." Exhibit 1, PSG00005497; Exhibit 5-1, PSG00000002.

**interference** with the contract or business relationship for an **improper purpose or by improper means**; and (4) damages."[340]

163.    Courts evaluate the propriety of a defendant's purpose and means on a case by case basis.[341]  A showing of improper purpose requires "proof of the defendant's *actual malice*, i.e. a spiteful, malignant purpose, unrelated to the legitimate corporate interest."[342]  Furthermore, "[a] legitimate advancement of defendant's own economic interest does not constitute an improper motive."[343]  "Nor is business competition an improper motive."[344]

164.    Improper means may consist of a violation of a statute or a common law precept, threats, misrepresentation of facts or defamation.[345]  The assertion by a party of its legal rights is not "improper means" for purposes of a tortious interference claim.[346]

165.    As the Supreme Judicial Court of Massachusetts held in G.S. *Enterprises, Inc. v. Falmouth Marine*, *Inc*., 410 Mass. 262 (1991), the one case Claimant cited in support of its arguments at the hearing,[347] "It is clear, for example, that a party is justified in interfering with a third-party's contract with another by filing a lawsuit in a good faith effort to assert legally protected rights . . . At the same time, however, a civil action is wrongful if its initiator does not

---

[340]    *United Truck Leasing Corp. v. Geltman*, 406 Mass. 811, 812, 815–817, 551 N.E.2d 20 (1990); Swanset Dev. Corp. v. City of Taunton, 668 N.E.2d 333, 338 (Mass. 1996).

[341]    *Skyhook Wireless, Inc. v. Google Inc*., No. CIV.A. 2010-3652BLS1, 2012 WL 5309755, at *14 (Mass. Super. Sept. 28, 2012), aff'd, 86 Mass. App. Ct. 611, 19 N.E.3d 440 (2014) (internal quotations and citations omitted).

[342]    *Id*. (internal quotations and citations omitted) (emphasis added).

[343]    *Ventiv Health Consulting, Inc. v. Equitas Life Scis*., 289 F. Supp. 3d 272 (D. Mass. 2017).

[344]    *Skyhook Wireless*, 2012 WL 5309755, at *15.

[345]    *See Ventiv Health Consulting, Inc. v. Equitas Life Sciences*, 289 F.Supp.3d 272; Kurker v. Hill, 44 Mass. App. Ct. 184, 689 N.E.2d 833 (1998); *United Truck Leasing Corp. v. Geltman*, 406 Mass. 811, 812, 551 N.E.2d 20, 21 (1990).

[346]    *See Pembroke Country Club Inc. v. Regency Savings Bank*, F.S.B. 62 Mass.App.Ct. 34, 40, 815 N.E.2d 241, 247.

[347]    Hearing Transcript, 1203:16 through 1208:9.

have probable cause to believe the suit will succeed, and is acting primarily for a purpose other than that of properly adjudicating his claims[.]"[348]  The inducement of litigation is wrongful "if the actor has no belief in the merit of the litigation or if, through having some belief in its merit, he nevertheless institutes or threatens to institute the litigation in bad faith, intending only to harass the third parties and not to bring his claims to definitive adjudication."[349]

166.    It is clear from the Supreme Judicial Court's holding in *Falmouth Marine*, that the test is a subjective one, not an objective one.  The question is not what a third party observer would say about the intent of the person who files a lawsuit that is being claimed by another as interference; rather, the question is what the evidence says about what the <u>actual intent and belief was of the person who instituted the suit</u>.  This is why the Supreme Judicial Court in its holding provided that what a court must focus on in determining whether the filing of a suit is tantamount to an unjustified intentional interference is whether the person filing the suit had "a <u>good faith effort</u> to assert legally protected rights . . ." or  "<u>does not have probable cause to believe the suit will succeed</u>, and is <u>acting primarily for a purpose other than that of properly adjudicating his claims</u>[.]"[350]  The question is whether the person who files the suit " <u>has no belief in the merit of the litigation</u> or if, through having some belief in its merit, he nevertheless <u>institutes or threatens to institute the litigation in bad faith</u>, <u>intending</u> only <u>to harass</u> the third parties and not to bring his claims to definitive adjudication."[351]  These are all subjective tests that require one to assess the evidence relating to the actual intent and belief of the person who initiates the suit in question.

---

[348] *Falmouth Marine*, *Inc*., 410 Mass. at 273 (internal citations omitted).

[349]  Restatement (Second) of Torts § 767 (1979).

[350] *Falmouth Marine*, *Inc*., 410 Mass. at 273 (internal citations omitted).

[351]  Restatement (Second) of Torts § 767 (1979).

167.    Here, the evidence proves that, Mr. Ribadeneira, on behalf of PSG and Superdeporte, had neither improper purpose nor improper means, as he <u>genuinely believed and did have probable cause to believe the suit in Peru could succeed</u>.  He initiated the litigation in Peru, after consultation with counsel and the managers of PSG and Superdeporte, purely to defend the companies' legal rights and to "have our contract respected."[352]  He filed a request for interim measures to further his genuine belief that New Balance was violating its contract with PSG and Superdeporte, and the Court granted that request.[353]  He asserted claims for breach of contract and breach of precontractual liability based upon the understanding that the parties "had an active contract."[354]  These claims have since been joined with this action.

168.    In the Hearing, New Balance made much in its closing argument of the fact that Mr. Ribadeneira launched the Peru litigation because he was "emotional and angry" and "looking to get back at New Balance," and as such, "misled the court."[355]  New Balance's counsel focused on a mistake that Mr. Ribadeneira made in the filing of the lawsuit in which he affirmed that he was the ultimate owner of PSG even though a few days earlier the transaction had closed through which downstream companies owned by Ribadeneira had sold PSG to Mr. Juan Padilla.[356]  But this proves nothing more than an honest and understandable mistake by Ribadeneira and a lack of

---

[352] Hearing Transcript, 974: 18-24  ("I felt and I told the managers and the managers concurred that we had an active contract that we needed to establish that it was in our – in my view and in their view, active. According to what we feel, it was -- we had a contract and we needed to have that respected."); Hearing Transcript 975:16-18 ("A The objective was to have our contract respected and to try to establish a conversation about recuperating the contract.").

[353] Exhibit 191, Request for Interim Measures; Exhibit 193, Peru court order grant of Interim Measures.

[354] Hearing Transcript, 234: 24 through 235: 4.

[355] Hearing Transcript, 1235: 7-16.

[356] Hearing Transcript, 984: 21-985:10.

coordination between the management team that handled the transfer to Mr. Padilla and Mr. Ribadeneira and the lawyers who represented him in the Peru Action.

169.     Mr. Ribadeneira testified in the hearing and in deposition that document filed in the Peru Action stating that he was still the ultimate owner of PSG when he had ceased his ownership days before was a "mistake" on his part.[357]  He also testified that the transfer of PSG to Mr. Padilla was handled by the management team, not by him, and that he was not directly involved in the transfer.[358]  This explains how that honest mistake occurred.   This was not some deliberate misrepresentation, as New Balance would have this Tribunal believe, and it certainly does demonstrate the sort of malice and improper intention that the Supreme Judicial Court found was needed to make out a claim for intentional interference in *Falmouth Marine*.

170.     New Balance cannot point to one document or one email showing that Mr. Ribadeneira was "emotional and angry" or that he was "looking to get back at New Balance" or that Mr. Ribadeneira in any way intentionally "misled the court."  Mr. Ribadeneira, in conjunction with the managers of PSG and Superdeporte, believed that they had a viable claim against New Balance for breach of the New Distribution Agreement under Peruvian law, and Mr. Ribadeneira, on behalf of PSG and Superdeporte, and with the approval of the managers, chose to pursue the claim in the Peruvian courts.[359]  At the time, Mr. Ribadeneira was the assignee of the claims.  The

---

[357]   Hearing Transcript, 984: 3-5 ("Q.  And as of January 2017, you were not a majority shareholder of PSG?  A.  No. That's a mistake.").

[358]   Deposition Transcript of Rodrigo Ribadeneira, 27:6-13 (Q.  And do you recall the shares of Myrando Investments being transferred to Julio Padilla?  A.  Yes, they were transferred to Julio Padilla at one point, but I wasn't involved – that wasn't ran -- that was done by the managers. I was made aware of it. I mean, it wasn't even something I had to authorize. It had to happen. It had to be out.").

[359]   Hearing Transcript, 234: 24 through 235: 4 ("I felt and I told the managers and the managers concurred that we had an active contract that we needed to establish that it was in our – in my view and in their view, active. According to what we feel, it was -- we had a contract and we needed to have that respected; Hearing transcript 235:19-21 ("A The objective was to have our contract respected and to try to establish a conversation about recuperating the contract.").

court agreed that Mr. Ribadeneira had a viable claim and granted an injunction in his favor.[360] New Balance creates this narrative because it fits conveniently with their claims, but it is <u>not</u> supported by any credible evidence.

171.    Because New Balance had not proven that Mr. Ribadeneira, or any of the corporate Respondents, filed the Peru Action "for an **improper purpose** or **by improper means**", its claim for intentional interference must be dismissed as a matter of law.[361]

## V.    RESPONDENTS' FEES AND COSTS IN THIS ARBITRATION

172.    In accordance with Article 42 of the 2013 UNCITRAL Rules, a party may make a submission to the Tribunal on the allocation of legal fees and costs and the Tribunal may apportion those costs as between the parties.[362]    Respondents thus request that New Balance should be ordered to pay for all of Respondents' attorneys' fees and costs in this arbitration.    Respondents incurred legal fees and costs in this arbitration in connection with Quinn Emanuel Urquhart & Sullivan's ("**Quinn Emanuel**") representation of the Respondents in these proceedings.    The total attorneys' fees and costs incurred as of the date of this submission in this arbitration are $3,823,278.83.    Respondents expressly reserve the right to update these figures.

## VI.    REQUEST FOR RELIEF

173.    PSG and Superdeporte respectfully requests the arbitral tribunal to:

---

[360]    Exhibit 193, Peru court order Grant of Interim Measures.

[361]    *United Truck Leasing Corp. v. Geltman*, 406 Mass. 811, 812, 815–817, 551 N.E.2d 20 (1990); Swanset Dev. Corp. v. City of Taunton, 668 N.E.2d 333, 338 (Mass. 1996).

[362]    2013 UNCITRAL Rules, Article 42 ("The costs of the arbitration shall in principle be borne by the unsuccessful party or parties. However, the arbitral tribunal may apportion each of such costs between the parties if it determines that apportionment is reasonable, taking into account the circumstances of the case. The arbitral tribunal shall in the final award or, if it deems appropriate, in any other award, determine any amount that a party may have to pay to another party as a result of the decision on allocation of costs.").

- Declare that Claimant breached its obligations under the Distribution Agreement, and that it breached the implied covenant of good faith and fair dealing;

- Declare that Claimant's breach of the Distribution Agreement caused PSG to be in breach of its payment obligations to New Balance under the Distribution Agreement and that, as such, PSG's payment defaults are excused;

- Declare that notwithstanding New Balance's breaches, Claimant cannot recover for the fees and other charges it seeks for the period from October 2015 through December 2016 under applicable law and under the terms of the Distribution Agreement;

- Declare that Claimant's claims against Mr. Ribadeneira and Supderdeporte under the Distribution Agreement must be dismissed for lack of this tribunal's jurisdiction over these Respondents in relation to New Balance's claims under the Distribution Agreement;

- Declare that, in the alternative, Claimant cannot recover against Respondents Ribadeneira or Superdeporte because neither assumed any obligations to New Balance under the Distribution Agreement and New Balance has not proven any alternate legal theory under which either of these Respondents should assume any of PSG's liabilities to Claimant under that agreement;

- Declare that the Parties agreed to the terms of the New Distribution Agreement, and that this created a legally binding and enforceable contract;

- Declare that Claimant violated its contractual obligations to Respondents PSG and Superdeporte under the New Distribution Agreement;

- Declare that Claimant violated its covenant of good faith and fair dealing to Respondents PSG and Superdeporte under the New Distribution Agreement; and,

- Order Claimant to compensate PSG and Superdeporte for the damages and losses suffered as a result of Claimant's breaches of the New Distribution Agreement in the amount of **$6.87 million plus statutory pre and post-award interest of 12%.**

174.     In the unlikely event that the Tribunal were to find that the New Distribution Agreement was not a binding and enforceable contract, PSG and Superdeporte respectfully request the arbitral tribunal to:

- Declare that Claimant violated its pre-contractual good faith obligations during the negotiations of the New Distribution Agreement; and,

- Order Claimant to compensate PSG and Superdeporte for the damages and losses suffered as a result of Claimant's violation of its precontractual duty to negotiate in good faith estimated to be in the amount of **$6.87 million plus statutory pre and post-award interest of 12%**;

175.     In the alternative to and if the Tribunal finds that affirmative substantive and damages claims under the New Distribution Agreement have not been proven, PSG and Superdeporte respectfully request the arbitral tribunal to:

- Order Claimant to compensate PSG for the damages and losses suffered as a result of Claimant's conduct in violation of the Distribution Agreement and its implied covenant of good faith and fair dealing, currently estimated to be in the amount of **$1.01 million plus statutory pre and post-award interest of 12%**;

- Assuming that New Balance's relationship with PSG and Superdeporte would extend through an additional three-year renewal with economic terms similar to those of the New Distribution Agreement, total damages are currently to be in the amount of **$4.80 million plus statutory pre and post-award interest of 12%**;

176.    Each of the Respondents also respectfully request the arbitral tribunal to:

- Order that Claimant pay all applicable pre and post-award interest at 12% per annum or the highest rate allowable under applicable law on all amounts awarded to any of the Respondents;[363]

- Order Claimant to pay all arbitration fees and costs, including PSG and Superdeporte's attorneys' fees and costs and expenses; and

- Order any further and/or additional relief as the Tribunal may deem appropriate.

Respectfully submitted,

David M. Orta
Julianne Jaquith
Tracy Gao
Counsel for Respondents
1300 I Street NW, Suite 900
Washington, DC 20005

---

[363]    *See* G. L. c. 231, § 6C; *Baxter Health Care, Corp. v. Harvard Apparatus, Inc*., 35 Mass. App. Ct. 204, 207 (1993) ("The judgment was correct in confirming the arbitrators' award of interest on the payment due Bard <u>at the rate of twelve percent per annum from the original closing date</u>. Cf. G.L. c. 231, § 6C<u>. The arbitration agreement is silent on the point, but the award was within the inherent power of the arbitrators.</u>"); *Paola v. Commercial Union Assur. Companies*, 461 A.2d 935, 937 (R.I. 1983) ("Under Massachusetts law, the 12% interest rate set forth in Massachusetts General Laws chapter 231, section 6C (discussed above) automatically attaches to arbitration awards - - even when the award is silent on the issue.").

Tel: (202)538-8000
Fax: (202)538-8100
30 June 2020

# EXHIBIT 14

## INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION
### International Arbitral Tribunal

---

New Balance Athletics, Inc.,

        Claimant,

v.                                 ICDR Case No. 01-18-0003-1183

Peruvian Sporting Goods S.A.C.,
Superdeporte Plus Peru, S.A.C.,
Rodrigo Ribadeneira

        Respondents.

---

### MEMORANDUM OF DECISION AND PARTIAL FINAL AWARD

I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement entered into between New Balance Athletics, Inc. ("New Balance") and Peruvian Sporting Goods S.A.C. ("PSG") effective January 1, 2013, and having been duly sworn, and having duly heard the proofs and allegations of the parties, do hereby determine and AWARD, as follows:

Following amendments to the original pleadings, the claimant, New Balance seeks a recovery for amounts allegedly owed by the respondent PSG under a distribution agreement effective January 1, 2013 ("the distribution agreement"). New Balance asserts this contractual claim not only against PSG, but also against the respondents, Superdeporte Plus Peru, S.A.C. ("Superdeporte") and Rodrigo Ribadeneira ("Ribadeneira"), on theories of successor liability and piercing of the corporate veil. In addition, New Balance asserts a claim for tortious interference arising from legal proceedings commenced by or on behalf of the above three respondents in the Peruvian judiciary, and particularly as resulting from a temporary injunction against sales by New Balance in Peru that was obtained by the respondents in that case.

The respondents deny liability in connection with the distribution agreement, contending alternatively that, should any one or more be found liable thereon, the damages sought by New

1

Balance are excessive. They deny as well that they are liable for tortious interference with respect to the legal proceedings in Peru.

By amended counterclaims, the respondents assert three claims of their own. With respect to the distribution agreement, the respondents not only deny that they were in breach, but contend instead that New Balance itself breached the agreement causing the respondents loss. In addition, the respondents reassert in this arbitration the two alternative claims that they commenced in the Peruvian court ("the Peru claims"): specifically, that New Balance entered into a new agreement with certain of the respondents, which New Balance then refused to perform; or alternatively, that a new agreement was not finalized because New Balance negotiated in bad faith, in either event causing loss to the respondents. New Balance denies that it breached the distribution agreement or that a new agreement was ever finalized and executed, denying further that there was any bad faith on its part in connection with the negotiation.

I have concluded previously that each of these claims is subject to arbitration pursuant to section 21 of the distribution agreement ("...any and all disputes (whether in contract or any other theories of recovery) related to or arising out of this Agreement or the relationship, its application and/or termination (including post-termination obligations) shall be settled by final and binding arbitration in accordance with the UNCITRAL Arbitration Rules"). See Memorandum and Order on Claimant's Motion to Compel Arbitration dated March 18, 2019; Memorandum and Order on Respondent's Motion for Summary Disposition dated August 20, 2019.

I conducted evidentiary hearings on March 9, 10 and 11, 2020. With a single witness remaining to be heard, public health considerations arising from the coronavirus pandemic compelled a stay in the proceedings. I heard the last witness and final arguments by both sides by videoconferencing on May 29, 2020. I appreciate the understanding and cooperation that all parties and their counsel have contributed given the conditions.

In the course of the arbitration, the parties filed motions in limine seeking exclusion of evidence anticipated from the opposition. I deferred ruling on those motions pending the hearing,

and I now deny each of them. The procedural rules that govern this arbitration provide that "(the) arbitral tribunal shall determine the admissibility, relevance, materiality and weight of the evidence offered." UNCITRAL Arbitration Rules, article 28, par. 4. Given this authority, it is my preference to receive more evidence rather than less, leaving it to my findings of fact to indicate what evidence I have relied on as well as the weight I have given it.

The respondents filed a renewed motion for summary disposition seeking a determination that the evidence is insufficient to grant relief against either Ribadeneira or Superdeporte, and therefore that I reconsider my earlier ruling that I have jurisdiction with respect to the claims against them. Having heard the evidence, that motion is denied. In so ruling, I address only the question of the sufficiency of the evidence (and the related jurisdictional question), and leave the merits to my findings and discussion.

## SUBSIDIARY FINDINGS OF FACT

1. A predecessor of PSG began distributing New Balance products in Peru in 2000. Effective January 1, 2013, New Balance and PSG entered into the distribution agreement to govern the business relationship until December 31, 2015, or -- absent timely notice otherwise by either party -- until December 31, 2016. Neither Ribadeneira nor Superdeporte (which had yet to be created) was a party to the distribution agreement. The agreement provided in relevant part that PSG shall purchase products from New Balance or other designated entities; resell such products in Peru (subject to minimum sales requirements); and pay defined distribution fees to New Balance. See sections 8 and 14; exhibits B, D and E.

2. The distribution agreement provided for a procedure whereby PSG would order product at quarterly intervals with lead time sufficient to allow for the manufacture and shipping of those products in time for them to be available in the Peruvian stores by a particular season, usually in the vicinity of six months after the ordering "window." It was anticipated that payment for such orders would be made at the time of the order. Payment, unless otherwise agreed to, "shall be effected by distributor through irrevocable letter of credit at sight or cash in advance due upon placement of any order." Section 6(b). Any late payment was made subject to a 2% monthly

3

interest charge (to the extent permitted by any applicable restriction on the legal interest rate). Ibid. It was provided further that "(a)ll orders or modifications placed by Distributor under this Agreement shall be subject to acceptance by Company ... and no such order shall be binding until accepted by Company." Section 6 (c).

3. In 2013, PSG began to experience reverses in its Peruvian operations at least in part to regulatory changes affecting its business in Peru and in Ecuador. During 2013, PSG fell behind in paying factories for product and in paying distribution fees on guaranteed minimum sales (the latter being the subject of virtually all of New Balance's present principal claim under the distribution agreement). The parties then entered into a payment agreement whereby PSG committed to pay a substantial portion of the overdue amounts during the first half of 2014. This introduced a period lasting until the end of the term of the distribution agreement (including the extension year of 2016) in which PSG remained permanently in arrears with respect to its obligations. Representatives of the parties spoke and met regularly on the subject. It is not necessary to describe these communications in detail. New Balance, and particularly John Cullen, its General Manager for the Latin America market, agreed to payment plans and other relief in an effort to preserve the relationship. PSG struggled to make payments, some of which were substantial, but was often in significant arrears for extended periods.

4. At the commencement of the term of the distribution agreement on January 1, 2013, the parties had for some time followed a practice whereby PSG paid factories directly for product orders, while paying distribution fees and other amounts to New Balance. Payments to factories were effectuated by letters of credit provided by lenders with whom PSG had business relationships, while payment of distribution fees to New Balance were made in cash. In September, 2014, New Balance, through an email message from John Cullen, informed PSG that the company had adopted new ordering and payment policies that would take effect during 2015. Under the new policies, which would apply to all of New Balance's distributors, payments for product would be made directly to New Balance rather than to the factories, with a subsequently created new ordering process located in Hong Kong. Of greater moment to PSG, it was announced that distributors would no longer be able to post letters of credit at the time of ordering, but rather would be subject to "20 days pre-pay by wire."

4

5. PSG objected immediately and continuously to the proposed elimination of letters of credit. While New Balance plainly desired to rid itself generally of the administrative difficulties associated with managing letters of credit, it did make reasonable attempts to understand and take into account PSG's position on the subject. While not clear from the evidence, it appears that PSG did have available other credit lines that could have been used to support New Balance's demand for cash at the time of ordering, but that such lines did not provide PSG the same period before having to pay the lender, and PSG preferred as well to use such loan proceeds for other purposes. In addition, while there was evidence of inter-company lending within the companies controlled ultimately by Ribadeneira, the record is silent whether PSG ever sought financing from another Ribadeneira entity in order to maintain its levels of purchase from New Balance.

6. New Balance International Limited, the affiliate of New Balance created to handle orders for product, on April 14, 2015, forwarded to all distributors a manual setting forth the terms of the new ordering protocol. In May, 2015, PSG negotiated new more favorable credit terms of net fifteen days. The new arrangement became effective on June 15, 2015. After several reminders, Sebastian Ordonez, an authorized agent of PSG, executed and delivered on July 16, 2015, an acknowledgement of the new terms set forth in the April manual.

7. In the ordering windows in October and November, 2014 (anticipating receipt of product for placement in Peru stores by the second quarter of 2015), New Balance permitted PSG to order by letter of credit. New Balance indicated that this would be the final occasion on which factory orders could be paid by letters of credit. When the next set of ordering windows arrived in January and February, 2015 (for product to reach the market in the third quarter of 2015), New Balance refused to ship the order when PSG again sought to pay by letter of credit. However, having received a mid-year payment by PSG of approximately $550,000 against its even higher accumulated debt to the factories, New Balance relented, accepted the letter of credit on that occasion, and filled the order. The delay caused the goods ordered at the beginning of 2015 to arrive in the stores about six months late, a marketing problem for PSG in an industry in which styles become obsolete quickly. In connection with the April-May 2015 window, New Balance

filled a small cash order for the fourth quarter of 2015 which was also delivered late. This was the final shipment of product by New Balance to PSG, no orders being filled in 2016.

8. PSG's arrearages increased in 2015, reaching a level in August of that year of more than $420,000 in unpaid distribution fees. Notwithstanding the continuing payment difficulties, in 2015 New Balance and PSG began serious discussions regarding prolongation and alteration of the contractual relationship. This was inspired in part by the interest of New Balance in having its Peru distributor undertake retail activities with respect to New Balance products, given that the Ribadeneira group of companies controlled retail outlets in which New Balance items could be featured. PSG's management agreed to the objective. For reasons that are not clear from the record, but that appear to be undisputed, PSG's management concluded that the company was not organized in a way that could effectively implement the proposed new arrangement, and that a new entity (which subsequently became Superdeporte) should be created to become the new distributor. New Balance did not dictate that a new entity be established, but did not object to the strategy.

9. On September 15, 2015, Cullen forwarded to PSG "the final draft (of) our contract restructure." The draft was entitled "Amended and Restated Distribution Agreement;" the parties thereto were New Balance and PSG; and the draft was essentially the existing distribution agreement with amendments (including retention of the effective date of January 1, 2013, but stating that the amendments would take effect on August 1, 2015). Provisions significant to this arbitration included expiration of the initial term on December 31, 2016, or one year later if no notice to let the agreement expire were sent; payment for orders by cash in advance (deleting earlier language authorizing payment by letters of credit, although New Balance could authorize such payments if it desired to do so); inclusion of Ecuador in the sales territory; and retention of New Balance's right to approve orders. The draft agreement reduced guaranteed minimum sales, a benefit to PSG. At the same time, the parties altered the method of calculating distribution fees in a way that also benefited PSG, and New Balance put that new system into effect prior to execution of a new agreement. With PSG still in arrears in significant amounts, the draft agreement called for an early payment toward that debt of $567, 222.60.

6

10. The draft agreement forwarded by New Balance in the fall of 2015 was never executed on behalf of PSG or any other respondent. Some early confusion arose from the fact that Superdeporte, which was destined to replace PSG as the distributor under the new arrangement, was not incorporated until December, 2015, and was not prepared to operate until May, 2016. New Balance agreed that PSG could enter into the agreement as distributor with Superdeporte substituted subsequently, but the respondents declined. New Balance asked continuously when the replacement agreement would be signed, such requests being forwarded well into 2016. Instead, PSG periodically demanded changes in the draft, most (though not all ) of which New Balance declined to make. In the spring of 2016, PSG personnel sought on repeated occasions to obtain from New Balance a letter authorizing Superdeporte to conduct sales on its behalf, but New Balance declined to provide the requested authorization without a signed agreement with Superdeporte.

11. While the proposed new agreement remained in abeyance, the relationship among the parties deteriorated. The respondents continued to demand changes in the draft while resisting requests that the document be signed subject to later revision. Meanwhile, PSG continued to accumulate substantial arrearages, entered into payment agreements, and failed to fulfill a number of them. The respondents did not make the early payment called for in the draft agreement. In 2016, New Balance continued to foreclose new orders for product because of the size of the PSG debt as well as the inability of the distributor to comply with the cash terms.

12. In 2016, New Balance began to explore alternative arrangements with other potential distributors for the Peru market. In mid-June, 2016, it reached an understanding with Desportes Sparta, then its distributor in Chile, to become its distributor in Peru, at which point New Balance gave PSG timely written notice that the distribution agreement would not be extended beyond its then expiration date of December 31, 2016. On or about August 5, 2016, New Balance set aside the purchase-based model for calculating distribution fees on which the parties had been operating in anticipation of a new agreement, and recalculated fees on the basis of the previously employed sales-based model, thereby increasing the PSG fee arrearage. At some point in 2016, PSG transferred its remaining assets, including New Balance inventory, to Superdeporte and effectively went out of business.

7

13. In January, 2017, Ribadeneira, ultimately the controlling owner of both PSG and Superdeporte, acting pursuant to assignments of rights from those entities, commenced legal proceedings in a Peruvian court against New Balance ("the Peru claims"). The principal claim alleged a breach of a new distribution agreement based on the contention that the parties had agreed, by emails and otherwise, on all of the terms of a successor agreement; that the agreement was enforceable; and that New Balance was in breach thereof by refusing to perform. Alternatively, Ribadeneira claimed that, should it be determined that a new contract had not been created, then New Balance had breached its legal obligation to negotiate in good faith, thereby damaging the respondents. In February, 2017, Ribadeneira moved <u>ex parte</u> for a restraint against sales by New Balance in Peru by means of any distributor other than Superdeporte. The injunction was granted by the Peruvian court on December 18, 2017, without New Balance having been heard. This resulted in suspending the then extant New Balance-Desportes Sparta distribution relationship in Peru for approximately seven months, although the evidence indicates that New Balance incurred resulting losses during only four of those months. When New Balance had an opportunity to contest the restraint, the court dissolved the injunction on July 26, 2018.

## ULTIMATE FINDINGS, RULINGS AND DISCUSSION

1. <u>New Balance's claim under the distribution agreement.</u> Apart from their dispute regarding the interest rate and the calculation of interest, the respondents have not challenged the amount of the arrearages asserted by New Balance for unpaid distribution fees billed with respect to products sold; unpaid fees attributable to failure to satisfy minimum sales requirements; or expenses associated with samples. These amounts constitute New Balance's claim of the amount due under the distribution agreement before the attribution of interest: specifically, $376,749.41 (receivable for fees billed and unpaid); $405,552.19 (difference between amounts billed and minimum fee requirement for 2015); $881,732.00 (minimum fee requirement for 11 months of 2016 after reimposition of the sales-based model of calculation); $25, 666.00 (minimum fees for December, 2016); and $43, 801.00 (sample expense). Accordingly, I treat the New Balance

claim under the distribution agreement as totaling $1,733,500.60 before the addition of interest charges.

The respondents defend essentially on a theory of prior breaches by New Balance that rendered performance by the distributor impossible. See Petrangelo v. Pollard, 356 Mass. 696, 701-702 (1970) (material breach by one contracting party excuses performance by other party). The alleged breaches that the respondents identify are the claimant's unilateral decision in mid-2015 to end the practice of payment for product by letters of credit and, when PSG could not provide the required up-front cash and its arrearages mounted, to reject orders for product altogether. The asserted breaches, according to respondents, are not only defenses to New Balance's claims, but also injured PSG as a result of lost profits from sales that PSG would otherwise have made.

A. Letters of credit. Addressing the elimination of letters of credit first, the respondents rely on a payment clause in the distribution agreement that provides that "(p)ayment of all amounts due for Products and all payment documentation for the purchase of the Products shall be effected by Distributor through irrevocable letter of credit at sight or cash in advance due upon placement of any order." Section 6(b). The provision does permit PSG to pay by letter of credit. The unilateral withdrawal of this authorization was offset to a certain extent by PSG's accompanying negotiation of more favorable cash terms as well as by its subsequent acknowledgement that it would comply with the new system. It is clear, however, that the change in payment procedures was imposed by New Balance and its acceptance was not voluntary on the part of PSG.

The questions that follow are whether this constitutes a breach by New Balance at all and, if so, whether it is a material breach. The letter-of-credit language was plainly included in the distribution agreement for the protection of New Balance. The posting of an irrevocable letter of credit is akin to paying cash. It, like the alternative cash requirement, assured New Balance that it would be paid before it assumed the risk of incurring the expenses of manufacture and shipping of product. If, for reasons of its own convenience, the claimant preferred to eliminate the administrative difficulties associated with letters of credit, it surrendered an option that was

beneficial to itself, not a covenant included for the benefit of the distributor. There is no evidence that New Balance surrendered the option in order to prejudice or manipulate PSG in some way. While PSG may, for reasons of its own, have preferred to use letters of credit, the provision was not included to protect that preference. Consequently, notwithstanding the language of section 6(b), but given the purpose of the letter-of-credit provision, I conclude that there has been no breach of the distribution agreement by New Balance in this regard.

Alternatively, I conclude that, to whatever extent there may have been a breach, the breach was not material. Virtually the entirety of New Balance's claim is for non-payment of distribution fees. Those fees were never paid by letters of credit. In addition, the debt for product purchases could have been paid by letter of credit, the restriction not applying to amounts already payable to the factories, at least to the end of 2015. The respondents have not provided a satisfactory explanation why, if a lender were willing to assume the exposure of providing a letter of credit, that lender would not be just as likely to provide conventional financing for product orders with a repayment cycle that accommodated the distributor's cash flow requirements. Indeed, it appears that PSG did have access to one or more conventional credit lines, but preferred to use those proceeds for business purposes other than the ordering of product. Additionally, it appears from other evidence that the companies in the Ribadeneira group did, at least on some occasions, lend to each other, and the record lacks any indication that PSG ever sought relief from that quarter.

It also is worthy of note that the respondents' emphasis upon the difficulties allegedly created by the elimination of letters of credit appears to have intensified as New Balance pressed harder for payment. When the proposed change was introduced for discussion in 2014, Lorena Blanco, a PSG manager, forwarded to John Cullen on December 11, 2014, an email setting forth reasons why letters of credit should be retained. She identifies letters of credit as a practice familiar in the region as a device for avoiding "money laundering, corrupt politicians, and drug trafficking." She argues the benefits that are realized by the selling company, and minimizes the administrative difficulties. While she states clearly the company's preference for the existing system, she ignores the possibility of alternative financing, and acknowledges that the company prefers to use available cash for opening stores, introducing new brands and marketing. The idea that the

absence of letters of credit could cause the distributor's business venture to fail never materializes in the statement.

The respondents then proceeded to negotiate favorable terms applicable to the new ordering system whereby New Balance agreed to extend by thirty-five days the date on which purchase money had to be paid. Meanwhile, they engaged in negotiations with New Balance in anticipation of a new agreement with an expanded retail role for the respondents in which they appeared satisfied to commit to the continued elimination of letters of credit. Nor did they ever avail themselves of the right under section 16(a)(ii) of the distribution agreement to advise New Balance "of a failure to fulfill any of its obligations under this Agreement," with the accompanying right to terminate the agreement should there not be a timely cure. While PSG argued consistently for restoration of permission to use letters of credit to order product, the contention that withholding that permission constituted a material breach of the distribution agreement emerged much later and largely in connection with this arbitration.

I conclude therefore that payment by letter of credit was provided for in the distribution agreement as protection for New Balance, and could be altered by New Balance without breaching that agreement or providing a defense to PSG's own failures to perform contractual obligations. It was not by itself an inducement necessary to persuade PSG to enter into the distribution arrangement. It has taken on a life of its own in this arbitration that, in my view, greatly exceeds its actual significance to PSG's operations at the time. For the reasons stated, it did not materially affect PSG's reasonable expectations with respect to performance of the agreement, and I deny relief to PSG on any basis regarding the use of letters of credit.

B. Rejection of orders. "All orders and/or modifications placed by Distributor under this Agreement shall be subject to acceptance by COMPANY ..., and no such order shall be binding until accepted by COMPANY." Section 6(c). New Balance availed itself of this authority as PSG's arrearages increased in 2015. After filling orders scheduled for the third and fourth quarters of 2015, New Balance effectively closed down the ordering process and shipped no new product to PSG throughout the entirety of 2016 (apart from any late deliveries of product that would otherwise have been received in 2015). New Balance was entitled to protect itself against

further defaults by its customer. To be sure, New Balance also employed the power to reject orders in part to leverage greater efforts on the distributor's part to reduce the amounts owed. The strategy worked to some extent when PSG made payments totaling approximately $550,000 in mid-2015, in return for which New Balance accepted a letter of credit and shipped a third quarter order.

The respondents challenge the claimant's use of the provision requiring approval of orders, asserting that the clause authorizes rejection of an order only if the manufacturer is unable to accommodate it because of style changes or otherwise. The language of the provision does not contain such a limitation. Witnesses called by PSG offered conclusory opinions that the clause was intended to be restricted in this way, but presented no evidence that their opinions actually reflected the custom of the trade in Peru or elsewhere in Latin America.

Alternatively, the respondents posit that their consistent failures to pay for product and related distribution fees could only be remedied by resort to the notice, opportunity to cure, and termination provisions of section 16(a)(ii) of the distribution agreement. PSG was in fact given multiple notices of its delinquencies with respect to payments and had multiple opportunities to cure. Instead, by August 15, 2015, it remained in arrears by more than $800,000 in product payments and by more than $420,000 in distribution fees. New Balance was not required to terminate the agreement, thereby sacrificing any future return on its investment in the enterprise, in order to encourage PSG to pay for what it had purchased. It was entitled by necessary implication to protect itself against further loss until satisfied that it would receive payment for what it sold. If the concept of prior material breach as relieving a party of an obligation to perform is to have any meaning with respect to a sales contract, failure to pay amounts due under the contract plainly justifies a refusal by the vendor to continue to sell.

C. Minimum sales requirements. As indicated, I have concluded that the claimant's rejections of orders did not breach the distribution agreement and do not support PSG's amended counterclaim for breach of that instrument. However, the exercise by New Balance of its right not to continue to sell to PSG until relieved of its reasonable concern that PSG would default on

its payment obligations is not without consequence with respect to enforcement of a portion of New Balance's claim.

The distribution agreement committed PSG to a level of minimum sales by calendar year with an accompanying obligation to pay distribution fees as a percentage thereof regardless of whether such sales were in fact made. See section 8 and exhibits B, D and E. The requirement that PSG generate a given level of income is a logical corollary to its appointment as exclusive distributor of the claimant's products in Peru because the claimant was otherwise precluded from selling to anyone else. This is reflected in section 8(d) in which PSG acknowledges that New Balance would not have entered into the agreement absent the minimum sales requirement.

Nevertheless, enforcement of the minimum fee provisions must be considered in the light of New Balance's refusal to sell new product to PSG for an extended period. While, as set forth above, New Balance was entitled to reject orders on the basis of a reasonable concern that it would not be paid, a simultaneous insistence on performance of a minimum sales obligation is inconsistent with a basic assumption of the contract: i.e., that the distributor can purchase product to resell. In the circumstances, the assertion by New Balance of both its right to reject orders <u>and</u> its right to enforce the minimum fee provisions violated the good faith and fair dealing covenant implicit in all Massachusetts contracts.

The implied covenant of good faith and fair dealing provides "that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." <u>Anthony's Pier Four, Inc. v. HBC Associates,</u> 411 Mass. 451, 471-472 (1991). <u>Anthony's</u>, still perhaps the leading case in Massachusetts on the scope and application of the covenant, addressed a simpler fact situation: specifically, where it was found that the plaintiff had pretextually exercised a power to withhold approval of a development plan in order to extract further concessions from the defendant. <u>Id.</u> at 473. Here, no pretext is present; New Balance seeks only to enforce existing provisions of the contract, not to compel an improvement of its terms to its benefit.

However, the covenant is not restricted to such acts. Indeed, it presupposes that, as in Anthony's, a party has a contractual basis for certain action, but that such action effects an unfair elimination or dilution of benefits that the other party reasonably expects. To that extent, the covenant merely articulates what is already inherent in the contract, i.e., that all of its provisions shall be effectuated in ways that bring about fulfillment of the reasonable expectations of the parties.

While New Balance reasonably expected to be paid in accordance with the contract's terms, and was entitled to protect itself against further loss, PSG concomitantly expected to have product to sell which would generate the proceeds necessary to pay distribution fees. The promise to pay fees was related directly to its ability to re-sell New Balance's products. An expectation that distribution fees would reflect purchases of product from New Balance that PSG would then resell was an "essential and inducing feature of the contract." Id. at 470. Whether implicit in the terms of the contract itself, or the result of the application of the covenant of good faith and fair dealing, New Balance cannot have both the right to suspend sales and the right to assess minimum fees. I conclude accordingly that New Balance has the right to recover unpaid minimum distribution fees during those periods in which it sold product to PSG, but is not entitled to do so with respect to those periods in which it refused to accept orders and ship product.

D. Interest. "All late payments (of distribution fees) shall bear interest at a rate of two (2%) percent per month or, if such rate should exceed any applicable permissible legal interest rate, then at the highest legally permissible rate." Section 14(j). See also section 6(b) to the same effect with respect to purchases of product. I conclude that the interest provision of section 6(b) applies as well to samples as a form of "Products" as defined in section 2(j).

Because amounts claimed by New Balance for breach of the distribution agreement, and the portion thereof awarded, have been outstanding since 2016 and before, accumulated simple interest at 2% per month constitutes a significant portion of the claim. Simple interest at 2% per month on a debt outstanding for one year equates to an annual interest rate of 24%. The respondents challenge the interest charges on three grounds: that the interest rate is unlawful as

usurious under G.L.c. 271, s.49; unless set aside altogether, the rate cannot exceed 6% annually pursuant to G.L.c. 107, s.3; and New Balance has in any event miscalculated the 2% monthly simple interest charges.

Absent advance notice to the Attorney General, a lender violates c.271, s.49, if in "exchange for either a loan of money or other property (it) knowingly contracts for ... interest and expenses the aggregate of which exceeds ... twenty per centum per annum." The question is whether this statutory limitation applies only to conventional lending or also regulates the interest at issue here: specifically, interest to compensate a seller for the loss of use of funds (and associated expenses) during the period in which the buyer fails to make timely payment. While that circumstance has a characteristic similar to that of a conventional loan in that the buyer effectively pays for the use of funds belonging to the seller, I conclude that section 49 is not intended to apply.

Referring to c.271, s.49, the Supreme Judicial Court stated: "The law is designed to protect the necessitous debtor from outrageous demands by lenders." Begelfer v. Najarian, 381 Mass. 177, 182 (1980). When the bill that led to passage of the statute was filed in 1970, the Governor's message that accompanied it referred to the measure as a tool against organized crime and loansharking. The statute refers to a "loan," a term with a common understanding that does not ordinarily embrace purchase and sale relationships between manufacturers and distributors.

When the legislature has felt the need to regulate interest charged in connection with certain commercial transactions, it has done so expressly. See, for example, G.L. c. 255B, ss.11 and 20 (motor vehicle installment sales). Were it the legislative purpose  to apply section 49 more broadly so that it encompassed negotiated commercial transactions such as this one, it presumably would have said so at some point between 1970 and the present. My attention has not been directed to judicial decisions that have applied the statute as requested by the respondents, and I decline to do so here.

The short answer to the respondents' contention that New Balance cannot charge a rate higher than the 6% annual rate set forth in G.L.c.107, s.3, is that that statute applies only where there is

no written agreement or provision of law that establishes an interest rate. Here the rate is set forth in the distribution agreement. Their argument that the contractual rate is invalid under section 49, thus creating a void that can only be filled by the 6% rate of c.107, s.3, is not only moot in light of my ruling on the scope of section 49, but has also been rejected by the Massachusetts Appeals Court. See Beach Associates v. Fauser, 9 Mass. App. Ct. 386, 389 (1980)(court has equitable authority to reduce rate determined unlawful under section 49 to statutory maximum of 20% per year).

The respondents contend finally that, even if the 2% per month figure applies, New Balance has calculated it erroneously. Mr. Dellepiane, the respondents' expert witness, testified that the attribution of interest on unpaid amounts determined by New Balance is excessive and contains elements consistent with compound, as opposed to simple, interest. See my treatment of the dispute in my conclusion and preliminary award below.

2. The Peru Claims. The respondents seek damages for what they assert is a binding agreement entered into by New Balance on the one hand, and PSG and Superdeporte on the other, to alter and enlarge the parties' distribution arrangements and to replace the existing distribution agreement scheduled to expire on December 31, 2016. New Balance denied then, and denies now, that the parties ever settled on a replacement agreement. Alternatively, the respondents contend that, should it be found that in fact no new agreement was arrived at, then the same damages should be awarded based on a finding that New Balance breached an obligation to negotiate in good faith.

A. Respondents' claim of a new agreement. For an extended period, the parties sought to come together on a new agreement that would extend, with some material changes, the existing distribution relationship. On or about September 15, 2015, John Cullen forwarded a draft of an "Amended and Restated Distribution Agreement" to PSG. The draft was essentially a reiteration and renewal of the earlier distribution agreement, with certain changes, such as enlargement of the market to include Ecuador. The draft retained the effective date of the earlier agreement (January 1, 2013); extended the term of the agreement an additional year (to December 31, 2016, unless further extended); and provided that the amendments would take effect on August 1,

2015. The draft required a significant early payment by the respondents of approximately $567,000 against then existing arrearages.

No new or revised written contract was ever executed, nor did the parties ever orally commit to all material terms. Following submission of the New Balance draft, the parties continued to negotiate. Each side had an incentive to arrive at a binding agreement. New Balance wanted to achieve a greater presence in the retail market, and the respondents were willing to provide that. New Balance offered reduced minimum sales requirements. In addition, effective August 15, 2105, without a signed agreement but anticipating that one was forthcoming, New Balance instituted a new method of calculating distribution fees that benefited PSG.

New Balance pressed on numerous occasions for PSG to sign a written agreement. See, for example, communications dated September 18, October 3, November 4 and November 10, 2015, as well as frequent subsequent efforts. Meanwhile, New Balance continued to carry substantial accounts receivable with respect to its business in Peru. Requests and responses were exchanged, largely by email but occasionally by personal contact. It is the accumulation of these communications on which the respondents rely in asserting that the parties entered into an enforceable new contract.

"An enforceable agreement requires (1) terms sufficiently complete and definite, and (2) a present intent of the parties at the time of formation to be bound by those terms." Targus Group, Intl., Inc. v. Sherman, 76 Mass. App. Ct. 421, 428 (2010). The controlling factor is whether the parties share an intention to be bound to a set of mutual covenants. See McCarthy v. Tobin, 429 Mass. 84, 87 (1999). A formal document is not required, and the necessary specifics and intention to be bound can be located in communications such as email transmissions. I find, however, that that did not take place here, because the respondents never intended to agree, and did not agree, to terms that were satisfactory to New Balance.

Carlos Gagliardi, who assumed responsibility for the New Balance account on behalf of PSG shortly after PSG received the draft of a new agreement, made it clear from the outset that he disliked the terms proposed and did not view the draft as in the respondents' interest. He

communicated this regularly to John Cullen, continuing to press for lower minimum sales requirements and for re-establishment of the option to purchase by letter of credit. Thus, there was neither a meeting of the minds on substance nor a willingness on the part of PSG to be bound. Even where email exchanges reflected agreement on certain items (although never an agreement on all material items), neither Cullen nor Gagliardi was authorized to commit his company to anything insofar as a new agreement was concerned, and there is no evidence that agents of the parties who were so authorized ever intended to be bound by these communications.

I observe as well that the proposition that the respondent relied on a collection of emails and random meetings to create a binding agreement is not credible. These were sophisticated companies engaged in complex commercial transactions involving a lot of money and ordinarily operating on the basis of a written document that memorialized the relevant undertakings. New Balance attempted to bring this about, but the respondents never agreed to sign the draft or any other document. Nor did the respondents ever reduce what they wanted in an agreement to a comprehensive writing of their own, despite the fact that business of this nature is invariably conducted pursuant to written contracts. Furthermore, New Balance was plainly going to demand a substantial reduction in PSG's arrearages as a condition of any new agreement (the draft calls for an immediate payment of more than half a million dollars), and it is a reasonable inference that the respondents were not prepared to make such a payment at that time. I conclude that a new agreement was never in place, and that there was no contract after December 31, 2016, by which New Balance was bound.

B. Respondent's claim of bad faith negotiation. Anticipating the possibility of an adverse finding on the question whether a new distribution agreement existed, the respondents contend that the failure to arrive at such an agreement was a product of bad faith negotiations on the part of New Balance, and is actionable under Massachusetts law.

There is no evidence that New Balance negotiated in bad faith. On the contrary, I find that New Balance had a considered objective to continue the relationship if it could be modified to enlarge its retail position in Peru, an objective that the respondents were prepared to

18

accommodate, and made genuine efforts to reach an agreement that would bring that about. This included flexibility on minimum sales requirements, as well as a change in distribution fee calculations that benefited PSG while a new agreement was still in the negotiation stage. The parties never reached agreement. But protecting one's own commercial interests and rejecting provisions viewed as contrary to those interests do not constitute negotiating in bad faith. Nor does the fact that the respondents may have incurred expense to create Superdeporte or otherwise in anticipation of an agreement mean that New Balance negotiated in bad faith when ultimately no agreement was reached. Likewise, it is not evidence of bad faith that at the end of 2015 New Balance began exploring other arrangements while PSG was demanding contractual provisions that the claimant was unwilling to accept. PSG still had a substantial indebtedness to New Balance with no showing that it was prepared to pay in the near future, and the existing agreement was scheduled to expire at the end of 2016.

Furthermore, relief on the ground of a bad-faith negotiation is available in Massachusetts in circumstances that are extremely narrow. The most frequent example is where a party incurs costs or otherwise changes its position in reasonable reliance on the opposing party's representation that it will subsequently enter into a contract with the relying party. See, for example, Air Tech Corporation v. General Electric Company, 347 Mass. 613, 624-627 (1964), wherein the parties engaged in a joint effort to obtain a contract for the defendant with an understanding that the plaintiff would receive work as a subcontractor if the contract was obtained. The plaintiff made significant contributions to the process of obtaining the contract, and the court held that in those circumstances the plaintiff was entitled to have the defendant negotiate in good faith with respect to the particulars of the promised subcontract. Similar circumstances are not present here. New Balance was entitled to agree or disagree to a new arrangement on the basis of its own business interests.

3. Tortious interference claim. New Balance seeks damages for lost profit as a result of a "precautionary measure" (the equivalent of a preliminary injunction) rendered by a Peruvian court on application of Ribadeneira acting pursuant to assignments of rights granted by PSG and Superdeporte. The measure was granted in connection with a law suit commenced by Ribadeneira in January, 2017, seeking relief with respect to the alleged new distribution

agreement with the claimant. He followed this in February, 2017, with an application for interim relief, which he submitted and prosecuted without notice to New Balance. On December 18, 2017, the court allowed the request and enjoined New Balance from distributing product in Peru through any party other than PSG. The claimant had previously finalized a new distribution arrangement with Desportes Sparta and was prevented from implementing it until, after giving the claimant an opportunity to contest the preliminary relief, the court rescinded the measure on July 26, 2018. Ribadeneira subsequently withdrew the case in Peru and re-assigned the claims to PSG and Superdeporte, which have pursued them in this arbitration.

The respondents were empowered to seek interim judicial relief by statute, see G.L.c.251, s.2; by UNCITRAL rule, article 26, par.9; and by the arbitration clause of the distribution agreement itself (article 21). However, the right to seek such relief does not protect them from consequences attributable to such proceedings, and an enforceable tortious interference claim may arise as a result of a law suit if the grounds required therefor are otherwise established. See Powers v. Leno, 24 Mass. App. Ct. 381, 385 (1987). Such an action requires that the plaintiff prove the existence of a contractual or other advantageous business relationship; intentional interference with that relationship by the defendant; an improper motive or the employment of improper means on the part of the defendant; and resulting damage incurred by the plaintiff. See G.S. Enterprises, Inc. v. Falmouth Marine, Inc., 410 Mass. 262, 272 (1991); United Truck Leasing Corp. v. Geltman, 406 Mass. 811, 812-817 (1990).

Here, a contractual relationship between New Balance and Desportes Sparta was in place. Ribadeneira and his assignors knew that New Balance had located another distributor and sought to interfere with that business by means of a judicial measure. That does not mean by itself that commencement of the law suit was tortious. If PSG or another respondent had in fact contracted with New Balance to extend the business relationship, they were entitled to enforce their rights. But they were not entitled to litigate for an improper purpose or by improper means.

It is unnecessary to determine whether improper motives were in play. The respondents could genuinely have believed that the essentials of a new agreement with New Balance were in place, and that New Balance reneged when a preferable arrangement with Desportes Sparta became

20

available. In addition, I credit Ribadeneira's testimony that the New Balance relationship was important to him emotionally because it represented an early success that he had accomplished on his own. Nor do I give any weight to the statement of a PSG manager that the time had come to "screw the gringo," frustration not directed at the law suit and hardly sufficient on which to base a finding of improper motive on the part of the respondents.

What is considerably clearer is that Ribadeneira's presentation to the Peruvian tribunal omitted significant facts and improperly induced that tribunal to grant relief in his favor with significant cost to New Balance. It follows that the claimant has shown that Ribadeneira and the other respondents that authorized and enabled the law suit in fact did employ improper means in obtaining the precautionary measure. I rely in support of this finding upon the considerations of the Peru tribunal itself when it dissolved its own injunction.

Ribadeneira sought preliminary relief without notice to New Balance, and an uncontested presentation on his behalf was made to the court. On the strength of his representations that the parties through email communications had reached an agreement, the court granted the precautionary measure. Notified of the relief that Ribadeneira had obtained, New Balance presented its contrary evidence and the court withdrew its order.

The court ultimately found, as do I, that there had been no agreement on meaningful contractual provisions, and that the contract claimed by Ribadeneira never existed. The court stated expressly that "none of the emails ... consists of a final offer (binding) or an acceptance, but only a negotiation, which did not come to fruition." It commented that "the commercial operation was even more complex than it seems." The court had determined earlier that an offer had been rendered, the offer had been accepted, and a new agreement had emerged. Referring to this finding when it subsequently dissolved the restraint, the court stated: "... it must be taken into account that this (the finding that a new agreement was in place) was done in accordance with the arguments submitted to grant it, however, and in view of the grounds set out in the brief opposing the precautionary measure <u>as well as the attached evidence,</u> the Court considers that it is necessary to reevaluate the legal credibility of the right invoked." (Emphasis supplied.)

The court speaks in the measured tones of the judiciary. But its phrasing does not conceal its conclusion that the respondents misled the tribunal with regard to facts, withholding information that showed that the existing distribution agreement had expired without an agreed-upon replacement. The respondents' defense that they relied on the advice of counsel is unavailing where they declined to reveal what that advice may have been. Accordingly, I find that the respondents employed improper means in order to obtain their desired result, an outcome that restrained sales by New Balance for approximately seven months, and caused the claimant lost earnings for at least four of those months. This finding applies to the three respondents. While the material misrepresentations were submitted to the court on behalf of Ribadeneira, I find that the assignments from PSG and Superdeporte created principal-agent relationships rendering the principals as well as the agent responsible for the losses caused.

4. New Balance's corporate veil and business successor claims.

A.  Piercing the corporate veil. New Balance seeks to impose PSG's liability on Ribadeneira on a theory that PSG is merely a "corporate veil" for Ribadeneira who is the real party in interest. The corporate veil theory of liability is not favored under Massachusetts law. It is based in part on an agency principle where corporations are formed or used to carry out the purposes of the persons or other entities that control them. See My Bread Baking Co. v. Cumberland Farms, Inc., 353 Mass. 614, 618 (1968). Obviously, those relationships by themselves are insufficient. All corporations are formed to advance the objectives of their shareholders, and the principal reason for their existence is to limit the liability of their owners.

Reaching a corporate owner requires evidence of "some fraudulent or injurious consequence" of use of the corporate form; a "confused intermingling of activity ... with substantial disregard" of the differences between the entities or individuals; or "serious ambiguity about the manner and capacity in which the various (entities) and their respective representatives are acting." Id. at 619. In deciding whether these conditions are present, Massachusetts law requires consideration of twelve factors that are relevant. See Evans v. Multicon Construction Corporation, 30 Mass. App. Ct. 728, 733 (1991), citing Pepsi-Cola Metropolitan Bottling Co. v. Checkers, Inc., 754 F.2d 19, 14-16 (1st Cir. 1985). Not all of the criteria are relevant in every case. For example,

common ownership and no payment of dividends are legally permissible corporate features and do not by themselves suggest that the corporate shield is being employed improperly.

I consider relevant in the present circumstances other criteria enumerated in Evans: specifically, whether there has been a confused intermingling of business activity, assets or management; nonobservance of corporate formalities; absence of corporate records; insolvency on the part of PSG at the time the distribution agreement was executed; siphoning of corporate assets by the dominant shareholders; or other uses of the corporation to facilitate fraud.

New Balance has the burden on the issue, and I am not persuaded that the evidence presented justifies treating PSG as anything other than a legitimately organized entity employed by its owners as a valid corporate enterprise, and not merely an agent of Ribadeneira or anyone else. That PSG became unable to pay what it owes to New Balance is a risk of the market place, and is not by itself evidence of fraud or other impropriety. See Evans v. Multicon Construction Corp., 30 Mass. App. Ct. at 737-738. There is no evidence of an intermingling of corporate assets or affairs that could have confused New Balance, which had been doing business with Ribadeneira and his companies since 2000, and that was prepared to continue to do so. Corporate formalities were observed, and there has been no evidence of fraudulent transfers or other use of PSG to avoid obligations to the claimant. There is, in my view, no basis on which to disregard the corporate form in these circumstances.

B. Business succession. New Balance's claim that Superdeporte is liable on a business successor theory for PSG's debt under the distribution agreement presents a closer question. Initially, I reject Superdeporte's contention that the business succession claim has surfaced too late in the arbitration and that it should be dismissed on the ground of waiver. A claim of successor liability is not an independent cause of action. It is instead a theory of recovery based on underlying facts that show that there is liability and an assumption thereof by another party. See Long Oil Heat, Inc.v. Spencer, 375 F. Supp. 3d 175, 200 (D. NDNY 2019). Furthermore, New Balance joined Superdeporte as a party-respondent, and Superdeporte cannot reasonably claim surprise that the claimant seeks to hold it responsible for the debt.

Successor liability can emerge only where there has been a sale, merger (including a de facto merger) or consolidation. Put differently, there must be some sort of transactional privity between predecessor and successor. See Carmack v. Massachusetts Bay Transportation Authority, 465 F. Supp. 2d 18, 33 (D. MA 2006). The successor entity must succeed to all or substantially all of the assets of the predecessor. See Premier Capital, LLC v. KMZ, Inc., 464 Mass. 467, 475 (2013). However, an arms-length sale of assets is not sufficient by itself. Such a sale must be accompanied by one or more of the following: an actual assumption (express or implied) of the liability in question; a de facto merger or consolidation; a mere continuation of the business of the predecessor; or a fraudulent effort to evade the liability altogether. See Cargill, Incorporated v. Beaver Coal & Oil Co., 424 Mass. 356, 359 (1997). The predecessor entity need not formally dissolve, but it must discontinue operations. Id. at 361.

On the relevant evidence, I find that Superdeporte was, at the time in question, a successor to the business of PSG under applicable Massachusetts law. Superdeporte was created for the purpose of carrying on the business of PSG when the parties attempted to negotiate a continuation of their relationship. New Balance actually dealt with Superdeporte as its distributor in Peru from May, 2016, until it became clear that a new agreement with the respondents could not be negotiated.

In connection with the expiration of the distribution agreement, PSG transferred its remaining assets to Superdeporte. This included New Balance product that remained on hand, on-going business operations with customers, and the right to use office premises previously occupied by PSG. Former PSG employees worked for Superdeporte. Superdeporte paid a substantial loan obligation of PSG to another company within the Ribadeneira group (choosing to reimburse that company rather than reduce the debt to the claimant). Ribadeneira exercised effective control of Superdeporte as he had done with PSG. Upon transfer of all of its remaining assets, PSG ceased operations altogether. Superdeporte then asked the Peruvian judiciary to bless its status as PSG's successor as distributor alleging the existence of a contract to that effect. I am satisfied that on these facts the Superdeporte enterprise is a continuation of the business of PSG, and that

24

Superdeporte (but not Ribadeneira individually) is liable jointly for the obligations of PSG under the distribution agreement.

5. <u>Damages; interest; attorney's fees and expenses.</u> New Balance has presented credible evidence of the specific amounts owed by PSG under the distribution agreement. While the respondents have addressed the claimant's right to recover under that agreement at all, they have not challenged persuasively the accounting itself except for the interest calculation. As set forth above, I award principal amounts representing accounts receivable for distribution fees ($376,749.41); minimum distribution fees for 2015 ($405,552.19); and amounts due with respect to samples ($43, 801.00), a total of $826,102.60. I deny recovery for minimum distribution fees for 2016.

Contractual interest on this amount is awarded at the rate of 2% simple interest per month from the date on which each delinquent amount should have been paid. The parties disagree on the calculation as it was offered in evidence by New Balance. The amount will obviously be significant, and I need further attention by the parties to the calculation. New Balance shall, on or before September 11, 2020, file, and serve on the respondents, an interest calculation to October 1, 2020, together with the dates on which each relevant item became due and, to the extent necessary, an explanation of the calculation. If the respondents agree, they shall so notify the claimant and myself, and I will incorporate the figure in my final award. Should the respondents not agree, they shall file and serve their own interest calculation and supporting information on or before September 25, 2020, and I will make my own determination after such further proceedings as I deem useful.

New Balance has also presented credible evidence of the damages it sustained as a result of what I have concluded was tortious interference with its business relationship with Desportes Sparta. The respondents defended on the merits of the claim, but again did not present meaningful evidence regarding the claimed damages. I credit New Balance's claim that the injunction reduced expected distribution fees, brought about a reasonable sharing of the resulting costs to Desportes Sparta, and imposed legal fees and marketing expenses, and I award the requested damages of $215,736.71. Interest shall be added to this component of the award at an

annual rate of 12% from the date that the amendment setting forth the tortious interference claim was served on the respondents. See G.L.c. 231, ss. 6B and 6H.

The arbitration clause in section 21 of the distribution agreement does not provide for an award of attorney's fees or expenses. That authority does appear in the UNCITRAL rules which the parties agreed would govern the proceeding. "The costs of the arbitration shall in principle be borne by the unsuccessful party or parties." Article 42, par. 1. The term "costs" includes "(t)he legal and other costs incurred by the parties in relation to the arbitration to the extent that the arbitral tribunal determines that the amount of such costs is reasonable." Article 40, par. 2(e). I will be guided by Massachusetts law in making the determination. New Balance may file an application for an award of reasonable attorney's fees and expenses on or before September 11, 2020. The respondents may file a opposition on or before September 25, 2020. I will incorporate the fee award in the final award.

## PARTIAL FINAL AWARD

For the reasons stated above, I award as follows:

1.  Peruvian Sporting Goods and Superdeporte shall pay to New Balance the sum of US$826,102.60 on its claim under the distribution agreement of January 1, 2013 together with simple interest at a rate of 2% per month to be determined as set forth above. The award under this paragraph is assessed jointly against Peruvian Sporting Goods and Superdeporte.

2.  Peruvian Sporting Goods, Superdeporte and Rodrigo Ribadeneira shall pay to New Balance the sum of US$215,736.71 on its claim for tortious interference together with interest pursuant to G.L.c. 231, ss. 6B and 6H as set forth above. The award under this paragraph is assessed jointly against Peruvian Sporting Goods, Superdeporte and Rodrigo Ribadeneira.

3. The counterclaims asserted by Peruvian Sporting Goods, Superdeporte and Rodrigo Ribadeneira are denied.

4. With the issuance of this Partial Final Award, I retain jurisdiction and re-open the hearings for written submissions as ordered in section 5. above. Specific awards of interest, attorney's fees and expenses, the administrative fees and expenses of the AAA-ICDR and the fees and expenses of the Arbitrator shall be made in the Final Award.

I hereby certify that, for the purposes of Article I of the New York Convention of 1958, on the Recognition and Enforcement of Foreign Arbitral Awards, this Memorandum of Decision and Partial Final Award was made in Boston, Massachusetts, United States of America.

*/s/ William I. Cowin*
William I. Cowin
Arbitrator

Dated: August  20, 2020

State of Massachusetts      )
                                    )   SS:
County of Middlesex        )

I, William I. Cowin, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is my Memorandum of Decision and Partial Final Award.


8/20/2020 _____             */s/ William I. Cowin* _____
Date                                    William I. Cowin, Arbitrator




State of STATE                )
                                      )   SS:
County of COUNTY       )

On this _____ day of _____, 2020, before me personally came and appeared William I. Cowin, to me known and known to me to be the individual described in and who executed the foregoing instrument and he acknowledged to me that he executed the same.


_____
Notary Public

# EXHIBIT 15

IN THE MATTER OF AN ARBITRATION UNDER THE ARBITRATION RULES OF THE
UNITED NATIONS COMMISSION ON INTERNATIONAL TRADE LAW

BETWEEN:

**NEW BALANCE ATHLETICS, INC.**

*Claimant*

-and-

**PERUVIAN SPORTING GOODS S.A.C., SUPERDEPORTE S.A.C., and RODRIGO
RIBADENEIRA**

*Respondents*

_____

**RESPONDENTS' REQUEST FOR CORRECTION AND INTERPRETATION OF THE
PARTIAL FINAL AWARD AND/OR FOR THE ISSUANCE OF AN ADDITIONAL
AWARD**

_____

**17 September 2020**

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
1300 I Street NW, Suite 900
Washington, DC 20005
Tel: (202)538-8000
Fax: (202)538-8100
Counsel for Respondents

Peruvian Sporting Goods S.A.C. ("PSG"), Superdeporte Plus S.A.C. ("Superdeporte"), and Rodrigo Ribadeneira (hereafter "Respondents") hereby request and apply, pursuant to Article 38(1) of the 2013 UNCITRAL Arbitration Rules, for a correction of the Partial Final Award issued on August 20, 2020 (the "Award"); and/or alternatively, for the making of an additional award pursuant to Article 39(1).  In addition, Respondents hereby request and apply, pursuant to Article 37(1) of the UNCITRAL Arbitration Rules, for an interpretation of the Award; or alternatively, for the issuance of an additional award pursuant to Article 39(1).

## I.  Request For Correction Of Clerical/Computational Error Or For The Issuance Of An Additional Award

Article 38, titled "Correction of the award", allows for the Tribunal to correct errors or omissions in an award.  Article 38(1) provides:

1. Within 30 days after the receipt of the award, a party, with notice to the other parties, may request the arbitral tribunal to correct in the award any error in computation, any clerical or typographical error, or any error or omission of a similar nature. If the arbitral tribunal considers that the request is justified, it shall make the correction within 45 days of receipt of the request.

Article 39, titled "Additional award", allows the Tribunal to make an additional award as to claims presented but not decided by the Tribunal.  Articles 39(1) and (2) provide:

1. Within 30 days after the receipt of the termination order or the award, a party, with notice to the other parties, may request the arbitral tribunal to make an award or an additional award as to claims presented in the arbitral proceedings but not decided by the arbitral tribunal.

2. If the arbitral tribunal considers the request for an award or additional award to be justified, it shall render or complete its award within 60 days after the receipt of the request. The arbitral tribunal may extend, if necessary, the period of time within which it shall make the award.

Pursuant to Articles 38 and/or 39, Respondents respectfully request the Tribunal to correct the clerical/computational error awarding Claimant New Balance Athletics, Inc. ("New Balance") the full amount of the unpaid minimum distribution fees for 2015 ($405,552.19), Award at 25, or

1

alternatively, to make an additional award resolving Respondents' contention and claim that New

Balance should not be allowed to collect the contractual "Minimum Fee" for the period in 2015

when it did not allow Respondents to purchase and sell New Balance products.

> The Tribunal, in page 13 and 14 of the Award, reasoned and ruled that:

> Nevertheless, enforcement of the minimum fee provisions must be considered in the light of New Balance's refusal to sell new product to PSG for an extended period. While, as set forth above, New Balance was entitled to reject orders on the basis of a reasonable concern that it would not be paid, a simultaneous insistence on performance of a minimum sales obligation is inconsistent with a basic assumption of the contract: i.e., that the distributor can purchase product to resell. In the circumstances, the assertion by New Balance of both its right to reject orders <u>and</u> its right to enforce the minimum fee provisions violated the good faith and fair dealing covenant implicit in all Massachusetts contracts.

> . . . Whether implicit in the terms of the contract itself, or the result of the application of the covenant of good faith and fair dealing, New Balance cannot have <u>both</u> the right to suspend sales <u>and</u> the right to assess minimum fees. I conclude accordingly that *New Balance has the right to recover unpaid minimum distribution fees during those periods in which it sold product to PSG, but is not entitled to do so with respect to those periods in which it refused to accept orders and ship product*.

Award at 13-14 (emphasis added).

It is clear from this ruling that the Tribunal resolved that New Balance can only recover

unpaid minimum distribution fees for "those periods in which it sold product to PSG" and that it

"is not entitled to do so with respect to those periods in which it refused to accept orders and ship

products [to PSG]" *Id*.  The evidence of record proves, and the Tribunal found, that on August 19,

2015, New Balance permanently suspended sales of New Balance products to PSG, and it "refused

to accept orders and ship product" to PSG for the period from August 19, 2015 until December 31,

2015, just as it did for all of 2016.  *See* Ex. 126-1 (Account Suspension Notification); *see also*

Award at 11 ("After filling orders scheduled for the third and fourth quarters of 2015, New Balance

effectively closed down the ordering process and shipped no new product to PSG throughout the

entirety of 2016 (apart from any late deliveries of product that would otherwise have been received in 2015).").

The period from August 19, 2015 to December 31, 2015, just as for the entire period of 2016, was one "in which [New Balance] refused to accept orders and ship products" to PSG. As such, in keeping with the Tribunal's holding at pages 13-14, New Balance "*is not entitled to*" recover unpaid minimum distribution fees for this period. Consistent with the Tribunal's order denying recovery for the minimum distribution fees for 2016, the Tribunal should also deny recovery of the minimum distribution fees apportioned for the period in 2015 when New Balance refused to accept orders and ship products to PSG—that is the period from August 19, 2015 through December 31, 2015. *See* Award at 25 ("I deny recovery for minimum distribution fees for 2016.").

Respondents have apportioned the 2015 calendar year to take into account the period of time when PSG was and was not allowed to purchase and receive products from New Balance and the amount of minimum fees that New Balance received for its products sold in that year. *See* Ex. 1 (Calculation of Apportioned 2015 Minimum Fees and Shortfall). For the period of time during 2015 when PSG was allowed to purchase products from New Balance, the apportioned minimum fee for that period totals $577,439 of the $916,370 for the entire year. *Id.* Of that $577,439, PSG already has paid (or has been ordered to pay) $510,818, leaving an unpaid minimum distribution fee for 2015 $66,621 for the period when New Balance was permitting PSG to place orders and was shipping it products, as calculated in Figure 1 below. *Id.* To make its Award internally consistent, and to prevent an internal flaw and inconsistency in the Tribunal's rulings, the Tribunal should award only that amount to New Balance for minimum fees for 2015, as that is the only

amount that corresponds to the period of time when New Balance was selling products to PSG and allowing PSG to purchase and receive New Balance products.[1]

| (USD) | |
| --- | --- |
| 2015 Minimum Fees | 916,370 |
| Start Date of 2015 Minimum Fees | 1/1/2015 |
| End Date of 2015 Minimum Fees [1] | 8/19/2015 |
| Apportionment Factor for 2015 Minimum Fees | 0.63 |
| Apportioned 2015 Minimum Fees | 577,439 |
| 2015 Fees Paid or Invoiced | 510,818 |
| **2015 Minimum Fee Shortfall** | **66,621** |

Notes:
[1] Last date in which PSG could place purchase orders

(Figure 1)

This is the right result because it is the only way to reconcile the error and inconsistency in the Award that incorrectly awarded New Balance minimum distribution fees for a period of time in 2015 when the Tribunal found that it was "not entitled" to "recover unpaid minimum distribution fees"—that is the period in 2015 when New Balance refused to sell or deliver any new products to

---

[1] It matters not that New Balance allowed PSG to pay for the small Q4 2015 order in October of 2015, as PSG had placed that order *in April of 2015 during the period of time when New Balance was still allowing PSG to place orders and receive products*. Joint Exhibit 94, NB_PSG0001670 (New Balance internal email dated April 22, 2015 establishing that PSG placed Q4 2015 orders in April 2015); Joint Exhibit 205, PSG00006772 (Email chain between PSG and New Balance establishing that on October 27, 2015, PSG paid for a limited number of the Q4 2015 orders that it had placed back in April of 2015 – "today we paid 13 Q415 Pls"); Hearing Transcript, 207:18 through 208:7 (A. Yeah. So this is the first window of Q4 2015. So, again, we're six months before entry into the marketplace. So this is a window in April of 2015 for product that will be delivered to the market in October of 2015. Q4 is a very important market. Q4 is a very important Q in the footwear business. It's when we sell a lot of shoes. It's pre-Christmas. It's a very important time for us. Q. And were you able to persuade New Balance to allow PSG to buy in the -- in that window? A. Yes."). Specifically, PSG placed orders for Q4 2015 in April 2015, and it paid for $93,000 worth of product on October 27, 2015. *Id.* This does not change that New Balance did not allow PSG to place any new orders, receive additional products or pay for those products from August 19, 2015 through December 31, 2015.

PSG.  It also is the required result because the Tribunal awarded the entirety of the distribution fees to New Balance *for 2015 product sold in 2016* while not applying that distribution fee amount received by New Balance for 2015 products to reduce the 2015 minimum distribution fee.  Award at 11 ("After filling orders scheduled for the third and fourth quarters of 2015, New Balance effectively closed down the ordering process and shipped no new product to PSG throughout the entirety of 2016 (apart from any late deliveries of product that would otherwise have been received in 2015)."); *id* at 25 ("I award principal amounts representing accounts receivable for distribution fees ($376,749.41)"); Joint Exhibit 259A (the $376,749.41 comprises the distribution fees for products ordered by PSG before August 19, 2015 when New Balance shut down PSG's ordering and which it sold later in October through December 2015 and February through November 2016.).

Respondents move under Article 38, because this appears to have been an inadvertent error by the Tribunal, as the Tribunal's holding regarding when New Balance cannot recover distribution fees cannot be reconciled with its apparently inadvertent award of minimum distribution fees for the period in 2015 when New Balance refused to sell and deliver new products to PSG.  Alternatively, should the Tribunal not find that this was the type of error that it can correct pursuant to the terms of Article 38, Respondents move the Tribunal to make an additional award under Article 39.  Pursuant to that article, the Tribunal has the power to make an additional award for claims presented and not decided by the Tribunal.  As with the 2016 minimum distribution fees, Respondents claimed and requested the Tribunal to rule that New Balance could not/should not recover minimum distribution fees for the period of time in 2015 when New Balance prevented it

from buying and selling its products, but it appears that the Tribunal did not issue an affirmative ruling with respect to that request.[2]

For the forgoing reasons, Respondents respectfully request that the Tribunal, applying either Article 38 or 39 of the UNCITRAL Arbitration Rules, correct the clerical/computational error awarding the full amount of the unpaid minimum distribution fees for 2015 ($405,552.19), and instead award only the unpaid 2015 minimum distribution fees due and owing through August 19, 2015 ($66,621), or issue an additional award to that effect.

## II.  Request For Interpretation Of The Award Or Issuance Of An Additional Award Concerning The Tribunal's Exercise Of Jurisdiction Over Respondents Ribadeneira and Superdeporte

Article 37, titled "Interpretation of the award", allows for the Tribunal to provide an interpretation of its Award.  Article 37(1) and (2) provide:

1.  Within 30 days after the receipt of the award, a party, with notice to the other parties, may request that the arbitral tribunal give an interpretation of the award.

2.  The interpretation shall be given in writing within 45 days after the receipt of the request. The interpretation shall form part of the award and the provisions of article 34, paragraphs 2 to 6, shall apply.

Pursuant to Articles 37 and/or 39, Respondents respectfully request the Tribunal to provide an interpretation the Award, or to issue an additional award, explaining the evidence and legal doctrines and reasoning that the Tribunal relied on to uphold its jurisdiction over Mr. Ribadeneira and Superdeporte.

---

[2]  Respondents' Post-Hearing Brief, ¶¶ 146-149 ("Because PSG could not place orders due to New Balance's breach of the Distribution Agreement, it could not generate revenues from its customers, pay New Balance, or make profits as a result. If PSG was unable to place orders, sell new product, and generate revenues, it should not as a matter of law be responsible for minimum fees for 2015 and 2016."); Respondents' Closing Presentation, at Slides 120, 125-28 ("PSG does not owe the distribution fees and minimum fees for 2015 and 2016 because New Balance did not allow PSG to make purchases of any new products during this entire period."); Hearing Transcript, 149:17-150: 16.

Since the start of this Arbitration, Respondents Ribadeneira and Superdeporte consistently have maintained that this Tribunal does not have jurisdiction to arbitrate any claims with respect to these Respondents, because neither has ever consented to arbitrate any claims with New Balance, and because there is no legal doctrine or set of facts that can require them to arbitrate claims against New Balance over their objection.

On May 31, 2019, Respondents submitted its Motion for Summary Disposition, requesting the Tribunal to declare that it does not have jurisdiction over Mr. Ribadeneira, and that it does not have jurisdiction over New Balance's tortious interference claim.  In its August 20, 2019 Order, the Tribunal upheld its jurisdiction over the tortious interference claim and over Mr. Ribadeneira with respect to New Balance's tortious interference claim, stating that because it has jurisdiction over the tortious interference claim, it also had jurisdiction over Mr. Ribadeneira.[3]  It also deferred a ruling until the close of discovery on the question of whether it has jurisdiction over Mr. Ribadeneira with respect to New Balance's claims under the Distribution Agreement based upon a theory of piercing the corporate veil.[4]  On February 12, 2020, Respondents filed a Renewed Motion for Summary Disposition, requesting the Tribunal to find that it has no jurisdiction over Mr. Ribadeneira and Superdeporte with respect to New Balance's claim arising under the 2013 Distribution Agreement, and objecting to the Tribunal's decision in its August 20, 2019 Order

---

[3]  August 20, 2019 Order at 8-9 ("However, the simplicity of the initial claim and counterclaim is altered by the prior assertion of the Peru claims by Mr. Ribadeneira in the Peruvian court. Whatever understandings between Mr. Ribadeneira on the one hand, and PSG and Superdeporte on the other, may have existed with respect to the assignments of those companies' claims, it is a matter of record that Mr. Ribadeneira initiated the Peruvian proceedings in his own name, made representations to the court, and obtained the interim relief that enjoined New Balance's sales in Peru for approximately seven months. To the extent that this litigation may have interfered tortiously with New Balance's contract with a third party (which I do not attempt to decide at this stage), it is Mr. Ribadeneira who has inflicted it. Because this tribunal has jurisdiction of that claim, it has jurisdiction over Mr. Ribadeneira with respect thereto, and Mr. Ribadeneira cannot undo any damage his Peru claims and the injunction may have caused by the expedient of re-assigning those claims to PSG and Superdeporte.").

[4]  *Id.*

upholding jurisdiction over Mr. Ribadeneira with respect to New Balance's tortious interference claim. Respondents Ribadeneira and Superdeporte maintained these objections during the hearing in this matter and in their post-hearing submission.[5]

As the Tribunal has correctly found, neither Mr. Ribadeneira nor Superdeporte was a party to the 2013 Distribution Agreement. Award at 3. Therefore, neither Mr. Ribadeneira nor Superdeporte has ever agreed to the arbitration clause contained therein or to arbitrate any claim with New Balance. Arbitration is fundamentally based upon consent between the parties. *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 682 (2010). Since Mr. Ribadeneira and Superdeporte have never agreed to arbitrate any claim with New Balance, the Tribunal should not have exercised jurisdiction over either of these Respondents. Whether or not the Tribunal had jurisdiction over the tortious interference claim, does not resolve the question of whether the Tribunal has jurisdiction to arbitrate that claim with respect to Mr. Ribadeneira. Having jurisdiction over a claim does not, standing alone, confer jurisdiction over a person who has the right to advance that claim. *Walker v. Collyer*, 85 Mass. App. Ct. 311 (2014) (finding that a physician, as a non-signatory to an arbitration agreement between patient and facility, should not

---

[5]  *See e.g.* Hearing Transcript, 141:6-143:9; 1184:8-1189:24 ("As to Mr. Ribadeneira, he didn't sign the distribution agreement. He isn't a party to it. He never consented to arbitrate under it. He never assumed any obligations or liabilities under it. The assignments that he received did not – did not carry with it an assumption of liability or obligations. Okay? All it did was give him the right to bring suit against New Balance. And there is no doctrine of law, no -- that says that an assignment like that by itself carries with it these other things in the agreement. Okay? And nor have they made that argument . . . Superdeporte, they have an argument that they came out with at the hearing just before the hearing about successor liability. No successor liability here. Again, Superdeporte not a signatory. Never consented to arbitrate, never assumed obligations, their argument on successor liability raised way too late and waived. But even if you don't waive it and deal with it on the merits, even if you don't consider it waived and deal with it on the merits, here's what the case law says they have to establish: The successor expressly or impliedly assumes liabilities of the predecessor. Okay? There's no evidence that Superdeporte assumed liabilities of PSG with the exception of the consideration that they paid. Okay?· But it didn't expressly assume all liabilities of PSG. It didn't assume liabilities of PSG to New Balance. Key. And there's no document that says that . . ."; Respondents' Posting-Hearing Brief, ¶¶ 115-139 (". . . The only party to the Distribution Agreement was PSG, it is the only party who signed the arbitral agreement and is subject to this Tribunal's jurisdiction for claims brought under the Distribution Agreement, and therefore, PSG is the only party who may be held liable for claims arising under the Distribution Agreement . . .").

be compelled to arbitrate even though the underlying medical malpractice claim is subject to arbitration.).

The Tribunal dedicated only one paragraph in the 28-page Award to deny Respondents' jurisdictional defenses:

> The respondents filed a renewed motion for summary disposition seeking a determination that the evidence is insufficient to grant relief against either Ribadeneira or Superdeporte, and therefore that I reconsider my earlier ruling that I have jurisdiction with respect to the claims against them. Having heard the evidence, that motion is denied. In so ruling, I address only the question of the sufficiency of the evidence (and the related jurisdictional question), and leave the merits to my findings and discussion.

Award at 3.

In its Award, the Tribunal did not explain the reasons as to why it was asserting jurisdiction over Respondents Ribadeneira and Superdeporte, nor what evidence, if any, it relied upon to deny Respondents' jurisdiction objections and to assert jurisdiction over them. It also did not explain what legal doctrine or doctrines it is relying upon to deny Respondents' jurisdictional objections and to assert jurisdiction over Respondents Mr. Ribadeneira and Superdeporte or its legal reasoning for doing so. Article 34(3) of the UNCITRAL Arbitration Rules requires that the Tribunal do so when it provides that "The arbitral tribunal shall state the reasons upon which the award is based, unless the parties have agreed that no reasons are to be given." Here, the parties have not agreed that the Tribunal need not provide the reasoning behind its rulings in the Award. Respondents, therefore, respectfully request that the Tribunal, applying either Article 37 or 39 of the UNCITRAL Arbitration Rules, provide an interpretation of the Award or issue a new award to shed light on the evidence and legal doctrines that the Tribunal relied on to deny Respondents' jurisdictional defense and to assert jurisdiction over these Respondents. As this is an arbitration at law, not at equity, Respondents are entitled to specific rulings on these important questions.

Respectfully submitted,

David M. Orta
Julianne Jaquith
Tracy Gao
Counsel for Respondents
1300 I Street NW, Suite 900
Washington, DC 20005
Tel: (202)538-8000
Fax: (202)538-8100
17 September 2020

# EXHIBIT 16

INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION
International Arbitral Tribunal

---

New Balance Athletics, Inc.,

        Claimant,

v.                            ICDR Case No. 01-18-0003-1183

Peruvian Sporting Goods S.A.C.,
Superdeporte Plus Peru, S.A.C.,
Rodrigo Ribadeneira

        Respondents.

---

## MEMORANDUM AND ORDER ON RESPONDENTS' REQUEST FOR CORRECTION AND INTERPRETATION OF THE PARTIAL FINAL AWARD AND/OR FOR THE ISSUANCE OF AN ADDITIONAL AWARD

Purporting to act pursuant to UNCITRAL Arbitration Rules, Articles 37(1), 38(1) and 39(1), the respondents seek relief with respect to the preliminary award in two respects: a) my determination that the claimant, New Balance Athletics, Inc. ("New Balance"), shall recover, inter alia, the principal amount of $405,552.19 in connection with minimum sales requirements applicable to calendar year 2015; and b) my determination that the respondents Rodrigo Ribadeneira ("Ribadeneira") and Superdeporte Plus Peru, S.A.C. ("Superdeporte") are subject regarding certain claims to the arbitration clause of the distribution agreement of 2013 entered into by New Balance and Peruvian Sporting Goods S.A.C. ("PSG") notwithstanding the fact that neither was a party to that agreement. New Balance has submitted an opposition.

1. I agree with New Balance that UNCITRAL Articles 38 and 39 are inapplicable. With respect to the first issue, my decision that New Balance shall recover the principal amount of $405,552.19 with respect to minimum sales requirements in 2015 does not come about because of an "error in computation, any clerical or typographical error, or any error or omission of a

1

similar nature." It is a purposeful award based on my view of the evidence. See below. Nor does the finding derive from "claims presented in the arbitral proceedings but not decided by the arbitral tribunal." Indeed, the award is the antithesis of such an omission. I have decided the claim, albeit adversely to the respondents.

Nevertheless, I choose not to rely on the language of the rules to deny the respondents an answer. I will treat the respondents' request as one for "interpretation of the award" under Article 37 with respect to the first issue, and/or for reconsideration with respect to both issues.

2. <u>The minimum sales award</u>. It was not contested, and I so found, that New Balance refused to accept new orders from PSG between August 19, 2015, and December 31, 2015, the period relevant to the present request. Notwithstanding that fact, I allowed recovery of distribution fees applicable to required minimum sales for all of 2015, denying such recovery only with respect to fees that would otherwise have been due on minimum sales in 2016. This was intentional on my part.

If it is unclear from the preliminary award, the distinction derives from the fact that ordering "windows" generally opened approximately six months before product ordered in such windows was available for re-sale by PSG. This was understood by all parties and was the accepted ordering, manufacturing and shipment system employed throughout performance of the 2013 distribution agreement.

It follows that product ordered in January, 2015, would generally be available to PSG in July of that year. Likewise, product ordered in April, 2015, would be available for re-sale in October, 2015. But orders submitted in July and October, 2015, would not reach the Peruvian market until January and April, 2016, respectively. Meanwhile, that market did receive during the second half of 2015 those products that had been ordered in the first half of that calendar year.

The point is that New Balance's refusal to accept orders during the second half of 2015 could not have had a material impact until 2016. There is no evidence in the record that is persuasive to me that suggests otherwise. During that portion of 2015 in which PSG was not permitted to

order, PSG was still receiving product ordered in the first half of that year. It was not until 2016 that the impact of New Balance's decision not to accept further orders in 2015 would have been experienced in a meaningful way.

   My denial of recovery to New Balance with respect to distribution fees in 2016 is based on my conclusion that the 2013 distribution agreement cannot be interpreted in a way that would require PSG to pay fees on sales that, by virtue of New Balance's otherwise justified refusal to risk greater losses by processing orders while substantial arrearages were accumulating, could not materialize because of the absence of product. That denial does not turn on the time at which product would have been ordered. It reflects the time at which product would otherwise have been available for re-sale by PSG.

   On the evidence presented, I found that the impact of the New Balance refusal to accept new orders was experienced by PSG not in 2015 but instead in 2016, and I awarded damages for unpaid distribution fees accordingly. I hereby reconfirm those determinations.

   3. <u>Jurisdiction</u>. Alleging that I have failed to articulate adequately my reasons for asserting arbitral jurisdiction over Ribadeneira and Superdeporte with respect to certain claims, and that I have failed to identify the evidence that supports those determinations, the respondents seek either interpretation of the preliminary award or a new award on the subject matter. In the preliminary award, I have exercised jurisdiction with respect to Superdeporte by imposing joint liability on that company (together with PSG) for amounts owed under the 2013 distribution agreement based on my finding that it is the business successor to PSG. I have exercised jurisdiction over Ribadeneira and Superdeporte, and have concluded that each is liable (together with PSG) with respect to New Balance's tortious interference claim, because the Peru claims, so-called, from which that interference arose were pursued by Ribadeneira pursuant to assignments of those claims by PSG and Superdeporte.

   I have exercised the authority conferred on the arbitral tribunal by Article 23 of the UNCITRAL Arbitration Rules to make the underlying determination that I have jurisdiction under the arbitration clause of the 2013 distribution agreement whereby the parties agreed to

arbitrate "all disputes ... related to or arising out of this Agreement or the relationship, its application and/or termination." I have explained my interpretation and application of this broad clause and relevant authorities at considerable length. See <u>Memorandum and Order on Claimant's Motion to Compel Arbitration</u> dated March 18, 2019; <u>Memorandum and Order on Respondents' Motion for Summary Determination</u> dated August 20, 2019. After further consideration, I decline to modify or expand the conclusions or discussion.

<u>ORDER</u>

1. The respondents' request for correction and interpretation of the preliminary award and/or for an additional award is denied.

2. Within fourteen days of receipt of this decision, the claimant may amend its application for attorney's fees to account for time expended on the instant matter, or it may notify the case manager and the respondents that its presently pending application will suffice.

3. Within fourteen days of receipt of an amended fee application or notice that no amendment will be submitted, the respondents may file oppositions to the claimant's interest calculation and attorney's fee application.

*/s/ William I. Cowin*

William I. Cowin

Arbitrator

Dated: November 4, 2020

4

JS 44 (Rev. 10/20) **CIVIL COVER SHEET**

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Ribadeneira, Rodrigo; Superdeporte Plus Peru S.A.C. | New Balance Athletics, Inc. |

| **(b)** County of Residence of First Listed Plaintiff    Peru | County of Residence of First Listed Defendant    Suffolk County |
|---|---|
| *(EXCEPT IN U.S. PLAINTIFF CASES)* | *(IN U.S. PLAINTIFF CASES ONLY)* |
| | NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED. |

| **(c)** Attorneys *(Firm Name, Address, and Telephone Number)* | Attorneys *(If Known)* |
|---|---|
| Gregg Badichek; Quinn Emanuel Urquhart & Sullivan, LLP; 111 Huntington Ave, Suite 520 Boston, MA 02199, | Mark E. Tully, Kate MacLeman, Dylan Schweers; Goodwin Procter LLP 100 Northern Avenue Boston, MA 02210, |

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1 U.S. Government Plaintiff
- ☐ 3 Federal Question *(U.S. Government Not a Party)*
- ☐ 2 U.S. Government Defendant
- ☒ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*    *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☒ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal | ☐ 376 Qui Tam (31 USC |
| ☐ 130 Miller Act | ☐ 315 Airplane Product |    Product Liability | |    28 USC 157 |    3729(a)) |
| ☐ 140 Negotiable Instrument |    Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & |    Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
|    & Enforcement of Judgment |    Slander |    Personal Injury | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' |    Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted |    Liability | ☐ 368 Asbestos Personal | | ☐ 835 Patent - Abbreviated | ☐ 460 Deportation |
|    Student Loans | ☐ 340 Marine |    Injury Product | |    New Drug Application | ☐ 470 Racketeer Influenced and |
|    (Excludes Veterans) | ☐ 345 Marine Product |    Liability | | ☐ 840 Trademark |    Corrupt Organizations |
| ☐ 153 Recovery of Overpayment |    Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 880 Defend Trade Secrets | ☐ 480 Consumer Credit |
|    of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards |    Act of 2016 |    (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | ☐ 371 Truth in Lending |    Act | | ☐ 485 Telephone Consumer |
| ☒ 190 Other Contract |    Product Liability | ☐ 380 Other Personal | ☐ 720 Labor/Management | **SOCIAL SECURITY** |    Protection Act |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal |    Property Damage |    Relations | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 196 Franchise |    Injury | ☐ 385 Property Damage | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ |
| | ☐ 362 Personal Injury - |    Product Liability | ☐ 751 Family and Medical | ☐ 863 DIWC/DIWW (405(g)) |    Exchange |
| |    Medical Malpractice | |    Leave Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement | | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee |    Income Security Act | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate | | ☐ 870 Taxes (U.S. Plaintiff |    Act |
| ☐ 240 Torts to Land | ☐ 443 Housing/ |    Sentence | |    or Defendant) | ☐ 896 Arbitration |
| ☐ 245 Tort Product Liability |    Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party | ☐ 899 Administrative Procedure |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 535 Death Penalty | **IMMIGRATION** |    26 USC 7609 |    Act/Review or Appeal of |
| |    Employment | **Other:** | ☐ 462 Naturalization Application | |    Agency Decision |
| | ☐ 446 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | ☐ 950 Constitutionality of |
| |    Other | ☐ 550 Civil Rights |    Actions | |    State Statutes |
| | ☐ 448 Education | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - | | | |
| | |    Conditions of | | | |
| | |    Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. Sec.1332(a); 9 U.S.C. Secs. 10, 12

Brief description of cause:
Action to vacate an arbitration award

## VII. REQUESTED IN COMPLAINT:

- ☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.
- DEMAND $
- CHECK YES only if demanded in complaint:
- JURY DEMAND:   ☐ Yes   ☒ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions:)*    JUDGE _____ DOCKET NUMBER _____

| DATE | SIGNATURE OF ATTORNEY OF RECORD |
|---|---|
| 2/1/2021 | /s/ Gregg Badichek |

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

1. Title of case (name of first party on each side only)  Rodrigo Ribadeneira, et al. v. New Balance Athletics, Inc.

2. Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet.   (See local rule 40.1(a)(1)).

   ☐    **I.**    160, 400, 410, 441, 535, 830*, 835*, 850, 880, 891, 893, R.23, REGARDLESS OF NATURE OF SUIT.

   ☑    **II.**    110, 130, 190, 196, 370, 375, 376, 440, 442, 443, 445, 446, 448, 470, 751, 820*, 840*, 895, 896, 899.

   ☐    **III.**    120, 140, 150, 151, 152, 153, 195, 210, 220, 230, 240, 245, 290, 310, 315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 367, 368, 371, 380, 385, 422, 423, 430, 450, 460, 462, 463, 465, 480, 485, 490, 510, 530, 540, 550, 555, 560, 625, 690, 710, 720, 740, 790, 791, 861-865, 870, 871, 890, 950.

        *Also complete AO 120 or AO 121. for patent, trademark or copyright cases.

3. Title and number, if any, of related cases.  (See local rule 40.1(g)).  If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.

4. Has a prior action between the same parties and based on the same claim ever been filed in this court?

                     YES ☐    NO ☑

5. Does the complaint in this case question the constitutionality of an act of congress affecting the public interest?   (See 28 USC §2403)

                     YES ☐    NO ☑

   If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?

                     YES ☐    NO ☐

6. Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?

                     YES ☐    NO ☑

7. Do all of the parties  in this action, excluding governmental agencies of the United States and the Commonwealth of Massachusetts ("governmental agencies"),  residing in Massachusetts reside in the same division? -  (See Local Rule 40.1(d)).

                     YES ☑    NO ☐

    **A.**    If yes, in which division do all of the non-governmental parties reside?

       Eastern Division ☑    Central Division ☐    Western Division ☐

    **B.**    If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?

       Eastern Division ☐    Central Division ☐    Western Division ☐

8. If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court?  (If yes, submit a separate sheet identifying the motions)

                     YES ☐    NO ☐

**(PLEASE TYPE OR PRINT)**
**ATTORNEY'S NAME**  Gregg Badichek
**ADDRESS**  Quinn Emanuel Urquhart & Sullivan, LLP; 111 Huntington Ave, Suite 520 Boston, MA 02199
**TELEPHONE NO.**  617-712-7100

**(CategoryForm11-2020.wpd )**

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

Rodrigo Ribadeneira and )
Superdeporte Plus Peru S.A.C., )
                       )
       Petitioners, )
                       )
    v. )    Civ. No. _____
                       )
New Balance Athletics, Inc., )
                       )
       Respondent. )
                       )
                       )

## PETITIONERS' MOTION TO VACATE ARBITRATION AWARD

Pursuant to Sections 10 and 12 of the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 10, 12, Petitioners Rodrigo Ribadeneira and Superdeporte Plus Peru S.A.C. ("Superdeporte") (collectively "Petitioners") hereby move the United States District Court for the District of Massachusetts for an order vacating the Partial Final Arbitration Award (the "Award") entered on August 20, 2020, as clarified by the Order on Respondents' Request for Correction and Interpretation of the Partial Final Award, dated November 4, 2020 ("Order"), in the matter of *New Balance Athletics, Inc. v. PSG et al.* (ICDR Case No. 01-18-0003-1183), as to Petitioners Ribadeneira and Superdeporte.

Petitioners never signed an arbitration agreement with New Balance Athletics, Inc. ("New Balance"), and therefore did not agree with New Balance to arbitrate any claims. The only arbitration agreement at issue here was between New Balance and Peruvian Sporting Goods S.A.C. Neither Ribadeneira nor Superdeporte are signatories to the agreement. The Supreme Court has long recognized that it is for courts, not arbitrators, to decide whether a party has agreed to arbitration. Here, there is no arbitration agreement, and no legal basis to bind the nonsignatory

1

Petitioners to an agreement that they did not sign. The Arbitrator exceeded his authority by determining in the first instance the gateway arbitrability question of whether Ribadeneira and Superdeporte were bound by the arbitration agreement. The Arbitrator also exceeded his authority by resolving that question in the affirmative, in conflict with well-established law providing six exceptions to the rule that nonsignatories to an arbitration agreement may not be bound thereto. None of those exceptions applies here based on the law and the undisputed facts.

For the reason stated above, and as set forth fully in the accompanying Memorandum of Law in support of this motion, the Award should be vacated as to Petitioners Ribadeneira and Superdeporte.

Date: February 1, 2021

Respectfully submitted,

Rodrigo Ribadeneira and
Superdeporte Plus Peru S.A.C.

By their attorneys,

*/s/ Gregg Badichek*
Gregg Badichek (BBO #706270)
greggbadichek@quinnemanuel.com
111 Huntington Ave, Suite 520
Boston, MA 02199
Tel: 617-712-7100
Fax: 617-712-7200

David M. Orta, *pro hac vice application forthcoming*
davidorta@quinnemanuel.com
Julianne Jaquith, *pro hac vice application forthcoming*
juliannejaquith@quinnemanuel.com
1300 I Street NW, Suite 900
Washington, D.C. 20005
Tel: +1 202 538 8000
Fax: +1 202 538 8100

David Cooper, *pro hac vice application forthcoming*

2

davidcooper@quinnemanuel.com
51 Madison Ave, 22nd floor
New York, NY 10010
Tel: +1 212 849 7000
Fax: +1 212 849 7100

*Attorneys for Petitioners*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 1, 2021, I caused a true and correct copy of the foregoing Motion to be served on the following counsel by email:

Mark E. Tully
Kate MacLeman
Dylan Schweers
Goodwin Procter LLP
100 Northern Avenue
Boston, MA 02210
MTully@goodwinlaw.com
KMacLeman@goodwinlaw.com
DSchweers@goodwinlaw.com

*/s/ Julianne Jaquith*
Julianne Jaquith

4

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| Rodrigo Ribadeneira and | ) |
| Superdeporte Plus Peru S.A.C., | ) |
| | ) |
| Petitioners, | ) |
| | ) |
| v. | ) Civ. No. _____ |
| | ) |
| New Balance Athletics, Inc., | ) |
| | ) |
| Respondent. | ) |
| | ) |
| | ) |
| | ) |
| | ) |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO VACATE**
**ARBITRATION AWARD**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................... 1

FACTUAL BACKGROUND ................................................................................... 3

    A.    The Parties And Their Relationship ........................................................ 3

    B.    The Claims In Peruvian Court ................................................................. 4

    C.    The Arbitration........................................................................................ 5

ARGUMENT ........................................................................................................... 8

I.      THIS COURT DECIDES ARBITRABILITY *DE NOVO* ............................ 9

II.    PETITIONERS ARE NOT BOUND BY THE ARBITRATION CLAUSE, AND NEW BALANCE'S CLAIMS AGAINST THEM ARE NOT ARBITRABLE ............... 11

    A.    Petitioners Did Not Agree To Arbitrate, And Therefore Cannot Be Bound By The Arbitration Clause ......................................................... 11

    B.    None Of The Six Exceptions To The Nonsignatory Rule Applies Here .............. 13

III.   THE ARBITRATOR'S DETERMINATION OF SUCCESSOR LIABILITY FOR SUPERDEPORTE DOES NOT SUPPORT ARBITRABILITY....................................... 17

    A.    Successor Liability Is Irrelevant To Arbitrability....................................... 17

    B.    The Arbitrator's Successor Liability Determination Was Erroneous.................... 18

CONCLUSION....................................................................................................... 20

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Arthur Andersen LLP v. Carlisle*,
    556 U.S. 624 (2009) .................................................................................................. 13

*Awuah v. Coverall N. Am., Inc.*,
    703 F.3d 36 (1st Cir. 2012) ....................................................................................... 10

*Bridas S.A.P.I.C. v. Gov't of Turkmenistan*,
    345 F.3d 347 (5th Cir. 2003) ............................................................................... 16, 17

*Cargill, Inc. v. Beaver Coal & Oil Co.*,
    424 Mass. 356 (1997) ............................................................................................... 18

*Carreiro v. Rhodes Gill & Co.*,
    68 F.3d 1443 (1st Cir. 1995) ..................................................................................... 19

*DK Joint Venture 1 v. Weyand*,
    649 F.3d 310 (5th Cir. 2011) ..................................................................................... 11

*First Options of Chicago, Inc. v. Kaplan*,
    514 U.S. 938 (1995) .............................................................................................. 9, 11

*GNH Grp., Inc. v. Guggenheim Holdings, L.L.C.*,
    No. CV 19-1932-CFC, 2020 WL 4287358 (D. Del. July 27, 2020) ........................... 10

*Grand Wireless, Inc. v. Verizon Wireless, Inc.*,
    748 F.3d 1 (1st Cir. 2014) .................................................................................... 13, 14

*Granite Rock Co. v. Teamsters*,
    561 U.S. 287 (2010) .................................................................................................. 12

*Grigson v. Creative Artists Agency, L.L.C.*,
    210 F.3d 524 (5th Cir. 2000) ..................................................................................... 16

*Howsam v. Dean Witter Reynolds, Inc.*,
    537 U.S. 79 (2002) ...................................................................................................... 9

*In re: Auto. Parts Antitrust Litig.*,
    951 F.3d 377 (6th Cir. 2020) ..................................................................................... 10

*Intergen N.V. v. Grina*,
    344 F.3d 134 (1st Cir. 2003) ............................................................... 12, 16, 17, 18

*Khath v. Midland Funding, LLC*,
  334 F. Supp. 3d 499 (D. Mass. 2018) ................................................................. 10

*Machado v. System4 LLC*,
  471 Mass. 204, 209 (2015) ............................................................ 13, 15, 16, 17

*Mag Portfolio Consult. Gmbh v. Merlin Biomed Grp. LLC*,
  268 F.3d 58 (2d Cir. 2001) ................................................................................ 18

*Matter of Arbitration Between Keystone Shipping Co. & Texport Oil Co.*,
  782 F. Supp. 28 (S.D.N.Y. 1992) ...................................................................... 14

*McCarthy v. Litton Indus., Inc.*,
  410 Mass. 15 (1991) .......................................................................................... 19

*Ouadani v. TF Final Mile LLC*,
  876 F.3d 31 (1st Cir. 2017) ............................................................ 12, 15, 16, 17

*Oxford Health Plans LLC v. Sutter*,
  569 U.S. 564 (2013) ........................................................................................ 8, 11

*Premier Capital, LLC v. KMZ, Inc.*,
  464 Mass. 46 (2013) ..................................................................................... 19, 20

*Sarhank Group v. Oracle Corp.*,
  404 F.3d 657 (2d Cir. 2005) ........................................................................ 10, 11

*Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*,
  559 U.S. 662 (2010) .......................................................................................... 12

*Telenor Mobile Commc'ns AS v. Storm LLC*,
  524 F. Supp. 2d 332 (S.D.N.Y. 2007) .............................................................. 11

*Thomson-CSF, S.A. v. American Arbitration Ass'n*,
  64 F.3d 773 (2d Cir. 1995) ............................................................................... 14

*Walker v. Collyer*,
  85 Mass. App. Ct. 311 (2014) ....................................................... 12, 13, 15, 16

**Statutory Authorities**

9 U.S.C. § 10(a)(4) ............................................................................................... 8

## INTRODUCTION

Petitioners Rodrigo Ribadeneira ("Ribadeneira") and Superdeporte Plus Peru S.A.C. ("Superdeporte") (collectively "Petitioners") respectfully submit this memorandum of law in support of their accompanying Motion to vacate the Partial Final Arbitration Award (the "Award"), dated August 20, 2020, as clarified by the Order on Respondents' Request for Correction and Interpretation of the Partial Final Award, dated November 4, 2020 ("Order"). The Award was issued in favor of New Balance Athletics, Inc. ("New Balance"), against Petitioners and Peruvian Sporting Goods S.A.C. ("PSG"), based on claims of breach of contract and tortious interference. Petitioners here do not contest the Award against PSG, which signed an agreement with New Balance containing an arbitration clause. However, Petitioners did not sign any agreement with New Balance, and therefore did not agree with New Balance to arbitrate any claims. The Supreme Court has long recognized that it is for courts, not arbitrators, to decide whether a party has agreed to arbitration. Here, there is no such agreement, and no legal basis to bind the nonsignatory Petitioners to an agreement that they did not sign. Accordingly, this Court should vacate the Award against Petitioners.

Under well-established law, this Court should decide *de novo* whether the Arbitrator erroneously exercised jurisdiction over Petitioners, because they did not agree to arbitration. The Arbitrator claimed that he had jurisdiction to decide arbitrability based on an implicit delegation in the agreement, but that delegation is irrelevant because the question here is whether that agreement is binding on Petitioners in the first place. That is why courts, including the First Circuit, consistently hold in materially identical cases that the court must perform an independent inquiry into whether a party has agreed to arbitration and vacate arbitration awards against parties who, like Petitioners, have not agreed to arbitrate disputes with the counterparty wishing to arbitrate the claims.

Applying *de novo* review here, this Court should follow the general rule that a party has not agreed to arbitrate—and thus cannot be forced to arbitrate—if it has not signed an agreement with an arbitration provision. There are six limited exceptions to this rule, and notably, the Arbitrator did not even consider them. Rather, the Arbitrator asserted that jurisdiction over the *claims* for tortious interference sufficed for jurisdiction over Petitioners. But this is erroneous as a matter of law: jurisdiction over claims *does not* constitute jurisdiction over parties, and certainly cannot evade the cornerstone rule that arbitration is a matter of consent. Moreover, none of the exceptions to the rule against forcing nonsignatories into arbitration applies here: (1) there was no separate agreement with Petitioners that incorporated by reference the arbitration provision; (2) Petitioners did not assume the obligation to arbitrate and in fact consistently disputed it; (3) there is no evidence that PSG signed the agreement as an agent of Petitioners; (4) the Award correctly rejected the idea that PSG was an alter ego of Petitioners; (5) there is no evidence that Petitioners embraced or directly benefited from the agreement, as required for estoppel; and (6) there is no evidence that Petitioners were intended third-party beneficiaries of the agreement containing the arbitration agreement.

Finally, the Arbitrator's reasoning for finding jurisdiction over Superdeporte for the contract claims likewise ignored the applicable law, and instead rested on his finding of successor liability for Superdeporte. Successor liability is not an exception to the rule that nonsignatories are not bound by an arbitration agreement, and there is no legal basis to treat it as such. Indeed, the First Circuit has held that unless one of the recognized exceptions applies, a nonsignatory cannot be forced to arbitrate simply because it is a successor corporation. In any event, the finding of successor liability is legally and factually erroneous, and therefore cannot support the Arbitrator's jurisdiction over Superdeporte.

## FACTUAL BACKGROUND

### A. The Parties And Their Relationship

At the end of 2009, PSG was created with Ribadeneira as PSG's ultimate majority shareholder through various intervening corporate entities. *See* Petition, ¶ 7. At the beginning of 2010, PSG and New Balance entered into an agreement for the distribution of New Balance's products in Peru. *See* Petition, ¶ 8.

On January 1, 2013, New Balance and PSG entered into a further Distribution Agreement (the "Distribution Agreement"), which is at issue in this proceeding. *See* Petition, ¶ 9, Ex. 1. The Distribution Agreement governed the sale and distribution of New Balance's products in Peru. Article 21 of the Distribution Agreement states, in relevant part: "The parties agree that any and all disputes (whether in contract or any other theories of recovery) related to or arising out of this Agreement or the relationship, its application and/or termination (including post-termination obligations) shall be settled by final and binding arbitration in accordance with the UNCITRAL Arbitration Rules" (the "Arbitration Clause"). *Id.* at 23.

The Distribution Agreement was valid under its original terms until December 31, 2015. However, if neither party expressed an intention to let the Distribution Agreement expire, then (by its terms) the Distribution Agreement would automatically renew for an additional year, *i.e.*, until December 31, 2016. By the end of the Distribution Agreement's original term, neither party expressed an intention to let the Distribution Agreement expire, and thus it automatically renewed until December 31, 2016. *See* Petition, ¶ 11.

Starting in late 2014 and culminating in 2015, New Balance made an offer to PSG to enter into a new and reformed distribution agreement for its business in Peru. Per New Balance's requirements for the new distribution agreement, PSG would enter into the agreement through a different corporate entity, which had distinct capabilities from PSG, which ultimately, after the

formation of Superdeporte in early 2016, became Superdeporte. *See* Petition, ¶ 12. In mid-2015, PSG and New Balance began negotiating the new agreement. PSG believed that, by late 2015 and with minor amendments in January 2016, an agreement had been reached between PSG and New Balance, with Superdeporte ultimately to replace PSG in the new agreement. However, on May 30, 2016, New Balance informed PSG and Superdeporte that it believed no distribution agreement existed between New Balance and Superdeporte and that it was "reverting back" to the original 2013 distribution agreement that New Balance had in place with PSG. *See* Petition, ¶ 13.[1]

Shortly thereafter, on June 23, 2016, New Balance notified PSG and Superdeporte in writing that it was formally terminating the Distribution Agreement with PSG effective December 31, 2016. On July 8, 2016, New Balance informed PSG and Superdeporte that New Balance had decided to work with another distributor in Peru beginning in 2017. *See* Petition, ¶ 14.

## B. The Claims In Peruvian Court

On November 25, 2016, PSG and Superdeporte executed two similar assignments of rights contracts with Ribadeneira, assigning to him all of their rights to the claims initiated against New Balance with respect to the new, unsigned agreement that New Balance claimed to be ineffective. *See* Petition, ¶ 15. Subsequently, in January 2017, Ribadeneira initiated civil legal proceedings against New Balance before Peruvian civil courts. Ribadeneira claimed that New Balance failed to honor its obligations under the new agreement and alleged extracontractual claims arising from New Balance's failure to conduct itself in good faith under Peruvian law with respect to the negotiation and execution of the new agreement (the "Peru Claims"). *See* Petition, ¶ 16.

---

[1] *See also* Exhibit A at 1 ("Our legal team will not issue a new contract until all payments are current. As such, the new 'purchase based' contract is not valid and we are 'reverting back' to the original contract terms.").

On February 1, 2017, Ribadeneira filed a request with the Peruvian civil courts for interim relief. Ribadeneira asked the court to order New Balance to abstain from the distribution of its products in Peru with any distributor other than PSG, claiming that the new agreement was in effect and that, as such, New Balance should not be distributing products through the new distributor. *See* Petition, ¶ 17. In December 2017, the Peruvian civil court ordered a halt on the distribution of New Balance products in Peru during the pendency of the proceeding. *See* Petition, ¶ 18. On July 31, 2018, the Peruvian court lifted its interim order, formally permitting the distribution of New Balance products in Peru. *See* Petition, ¶ 19. On May 2, 2019, PSG, Superdeporte, and Ribadeneira executed two similar assignment of rights contracts in which Ribadeneira transferred all the claims he possessed against New Balance back to PSG and Superdeporte. *See* Petition, ¶ 20.

### C.    The Arbitration

New Balance initiated this arbitration against PSG and Ribadeneira on July 31, 2018. New Balance argued that PSG and Ribadeneira had breached the Distribution Agreement for failure to pay money due thereunder. *See* Petition, ¶ 21, Ex. 2. PSG and Ribadeneira responded on September 4, 2018, arguing (*inter alia*) that the Arbitrator did not have jurisdiction over Ribadeneira because he was not a party to the Distribution Agreement. *See* Petition, ¶ 22, Ex. 3. PSG and Ribadeneira amended their response on October 29, 2018, and, while reiterating their jurisdictional objection as to Ribadeneira, asserted a counterclaim against New Balance for breaching the Distribution Agreement. *See* Petition, ¶ 23, Ex. 4.

On January 25, 2019, New Balance moved to compel PSG and Ribadeneira to arbitrate the claims then pending against New Balance in Peru. *See* Petition, ¶ 24, Ex. 5. In their response of February 4, 2019, PSG and Ribadeneira reiterated their objection that the Arbitrator did not have jurisdiction over Ribadeneira, as he was never a party to the Distribution Agreement. *See* Petition,

¶ 25, Ex. 6.  On March 18, 2019, the Arbitrator granted New Balance's motion to compel arbitration, holding, in relevant part, that "[it] is the claims that are subject to arbitration."  *See* Petition, ¶ 26, Ex. 7.

On May 3, 2019, New Balance amended its notice of arbitration to add Superdeporte as a respondent and to add a claim against PSG, Superdeporte, and Ribadeneira for tortious interference with New Balance's new distribution arrangement with its new distributor in Peru as a result of the Peru Claims.  *See* Petition, ¶ 27, Ex. 8.

PSG, Ribadeneira, and Superdeporte moved for summary disposition on May 31, 2019, asserting, in relevant part, that the Arbitrator did not have jurisdiction over Ribadeneira, explaining the general rule under Massachusetts law that a nonsignatory could not be bound to an arbitration agreement, and that none of the six exceptions applied.  *See* Petition, ¶ 28, Ex. 9.  On August 20, 2019, the Arbitrator denied the motion for summary disposition.  The Arbitrator noted his prior holding that he had jurisdiction over the Peru Claims filed by Ribadeneira, and further held that because New Balance's tortious interference claim arose from the Peru Claims, he had jurisdiction over Ribadeneira with regard to the tortious interference claim as well.  The Arbitrator deferred ruling until the close of discovery on the question whether he had jurisdiction over Ribadeneira with respect to New Balance's original claim for breach of the Distribution Agreement based upon a theory of piercing the corporate veil.  *See* Petition, ¶ 29, Ex. 10.

Following discovery, PSG, Superdeporte, and Ribadeneira renewed their motion for summary disposition on February 12, 2020, and again asserted that the Arbitrator did not have jurisdiction over Ribadeneira or Superdeporte with respect to any of New Balance's claims.  *See* Petition, ¶ 30, Ex. 11.  The parties held a hearing in the case on March 9-11 and May 30 and PSG, Superdeporte and Ribadeneira again argued that the Arbitrator had no jurisdiction over

Ribadeneira and Superdeporte under New Balance's claim for breach of the Distribution Agreement. *See* Petition, ¶ 31, Ex. 12. PSG, Superdeporte and Ribadeneira reiterated this argument in their June 30, 2020 post-hearing brief. *See* Petition, ¶ 32, Ex. 13.

On August 20, 2020, the Arbitrator issued the Award. *See* Petition, ¶ 33, Ex. 14. As relevant here, the Arbitrator determined that PSG was liable for breaching the Distribution Agreement and that Superdeporte was also liable for the breach as PSG's "business successor." As to the tortious interference claim, the Arbitrator stated:

> . . . I find that the respondents employed improper means in order to obtain their desired result, an outcome that restrained sales by New Balance for approximately seven months, and caused the claimant lost earnings for at least four of those months. This finding applies to the three respondents. While the material misrepresentations were submitted to the [Peruvian] court on behalf of Ribadeneira, I find that the assignments from PSG and Superdeporte created principal-agent relationships rendering the principals as well as the agent responsible for the losses caused.

*Id.* at 22. On September 17, 2020, PSG, Superdeporte, and Ribadeneira requested correction of the Award, interpretation of the Award, and/or the issuance of an additional award. *See* Petition, ¶ 35, Ex. 15. As relevant here, they again objected to the Arbitrator's exercise of jurisdiction over Ribadeneira and Superdeporte, noting: "Since the start of this Arbitration, Respondents Ribadeneira and Superdeporte consistently have maintained that this Tribunal does not have jurisdiction to arbitrate any claims with respect to these Respondents, because neither has ever consented to arbitrate any claims with New Balance, and because there is no legal doctrine or set of facts that can require them to arbitrate claims against New Balance over their objection." *Id.* at 7.[2]

---

[2] Respondents also referenced the Arbitrator's finding that neither Ribadeneira nor Superdeporte was a party to the Distribution Agreement, and further explained that arbitral jurisdiction over a claim does not, standing alone, confer arbitral jurisdiction over a person who has the right to advance that claim. Respondents added that in the Award, "the Tribunal did not explain the reasons as to why it was asserting jurisdiction over Respondents Ribadeneira

The Arbitrator denied that request in the Order issued on November 4, 2020. *See* Petition, ¶ 38, Ex. 16. He stated that he had "exercised jurisdiction with respect to Superdeporte by imposing joint liability on that company (together with PSG) for amounts owed under the 2013 distribution agreement based on my finding that it is the business successor to PSG." *Id.* at 3. He further stated that he had "exercised jurisdiction over Ribadeneira and Superdeporte, and ha[d] concluded that each is liable (together with PSG) with respect to New Balance's tortious interference claim, because the Peru claims, so-called, from which that interference arose were pursued by Ribadeneira pursuant to assignments of those claims by PSG and Superdeporte." *Id.*

## ARGUMENT

The Award should be vacated under the Federal Arbitration Act because "the arbitrator[] exceeded [his] powers, or so imperfectly executed them that a mutual, final, and indefinite award upon the subject matter submitted was not made." 9 U.S.C. § 10(a)(4). This Court may vacate an award pursuant to § 10(a)(4) where "the arbitrator act[s] outside the scope of his contractually delegated authority." *Oxford Health Plans LLC v. Sutter*, 569 U.S. 564, 569 (2013) (quotation marks and citation omitted).

The Arbitrator here exceeded his authority by determining in the first instance the gateway arbitrability question of whether Ribadeneira and Superdeporte were bound by the Arbitration Clause. They were not. As explained below, under controlling precedent, gateway questions of arbitrability are for courts to decide. The Arbitrator also exceeded his authority by resolving that question in the affirmative, in conflict with well-established law providing six exceptions to the

---

and Superdeporte, nor what evidence, if any, it relied upon to deny Respondents' jurisdiction objections and to assert jurisdiction over them" and that "[i]t also did not explain what legal doctrine or doctrines it is relying upon to deny Respondents' jurisdictional objections and to assert jurisdiction over Respondents Mr. Ribadeneira and Superdeporte or its legal reasoning for doing so." *See* Petition, ¶ 35, Ex. 15 at 9.

rule that nonsignatories to an arbitration agreement may not be bound thereto.  None of those exceptions applies here based on law and the undisputed facts.

## I.     THIS COURT DECIDES ARBITRABILITY *DE NOVO*

The question whether Petitioners should be subject to arbitration, even though they did not sign the agreement with the Arbitration Clause at issue, is subject to this Court's *de novo* review. As the Supreme Court has explained, "a party can be forced to arbitrate only those issues it specifically has agreed to submit to arbitration," and "[c]ourts should not assume that the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they did so." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944-45 (1995) (quotation marks and brackets omitted).  Thus, "a court should decide whether the arbitration contract bound parties who did not sign the agreement."  *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002).

Here, there is no "clear and unmistakable" evidence of Petitioners' intent to arbitrate these claims, because they did not sign the Distribution Agreement containing the Arbitration Clause, *see* Petition, ¶¶ 9-10, Ex. 1, and they repeatedly objected to the Arbitrator's jurisdiction over them, *see supra* at 5-8.[3]  The Arbitrator recognized these objections, but he asserted that he had jurisdiction to decide arbitrability because the Distribution Agreement incorporates the UNCITRAL rules, which in turn give jurisdiction over arbitrability to the arbitrator.

However, even assuming incorporation of the UNCITRAL rules suffices to constitute a delegation to the arbitrator to initially decide questions of jurisdiction, courts uniformly revisit an arbitrator's ruling on jurisdiction *de novo* and reject the application of such a delegation to decide questions of jurisdiction to *nonsignatories*.  As the First Circuit has explained, while parties to the

---

[3]  *See also First Options*, 514 U.S. at 939 (noting that a nonsignatory party's "objections to the arbitrators' jurisdiction indicate that they did not want the arbitrators to have binding authority over them").

agreements containing the arbitration provision may delegate the question of arbitrability to the arbitrator, "[t]h[e] case is different" for nonsignatories.[4]  Similarly, this Court has recognized that "Supreme Court and First Circuit precedent requir[es] the court to decide this 'narrow' gateway arbitrability issue before ordering arbitration."  *Khath v. Midland Funding, LLC*, 334 F. Supp. 3d 499, 512 (D. Mass. 2018).  In *Khath*, this Court held that it "cannot enforce any provision in the … [a]greements until it decides the predecessor question of whether there was an agreement at all between the parties."  *Id.* at 513 (quotation marks omitted).[5]

Simply put, the Distribution Agreement cannot provide "clear and unmistakable" evidence of Petitioners' intent to allow the Arbitrator to decide jurisdiction when Petitioners did not sign the Distribution Agreement in the first place and there is *no other evidence* that they agreed to arbitrate *any* claims with New Balance.[6]

Furthermore, not only is arbitrability a matter for the court, but even where the arbitrator has purported to decide arbitrability, such a decision is reviewed *de novo*.  The Supreme Court has

---

[4]  *Awuah v. Coverall N. Am., Inc.*, 703 F.3d 36, 42 (1st Cir. 2012).  ("[T]he district court was correct, as to this different group of plaintiffs, to address the predecessor question of whether there was an agreement at all to arbitrate. … The question of whether the [nonsignatories] assumed obligations under the arbitration clause of the Franchise Agreements is for the court.")

[5]  Many other courts are in accord.  *See, e.g.*, *In re: Auto. Parts Antitrust Litig.*, 951 F.3d 377, 382, 385-86 (6th Cir. 2020) (holding that where agreement incorporated AAA rules delegating arbitrability to the arbitrator, it was irrelevant to the question whether the parties had agreed in the first place:  "Because plaintiffs did not consent to any type of arbitration, we will not coerce them otherwise."); *Sarhank Group v. Oracle Corp.*, 404 F.3d 657, 661-62 (2d Cir. 2005) ("Oracle is not a named party to the Agreement. The Agreement is specifically entitled 'Agency Agreement between Oracle Systems Limited and Sarhank Group (Moustapha I. Sarhank).'  An Agreement between Sarhank and Systems which does not mention Oracle does not evidence a 'clear and unmistakable' intent by Oracle to arbitrate or to permit the arbitrator to decide the issue of arbitrability.") (internal citation omitted).

[6]  A district court recently explained the point in clear and succinct terms:  "The Court … cannot conclude that there is clear and unmistakable evidence that these parties (Plaintiff on the one hand, and the Nonsignatory Defendants on the other hand) agreed that an arbitrator should decide arbitrability with respect to Plaintiff's claims against them. How could there be such evidence when Plaintiff and the Nonsignatory Defendants have not signed an agreement with each other containing an arbitration provision with respect to any such claims?"  *GNH Grp., Inc. v. Guggenheim Holdings, L.L.C.*, 2020 WL 4287358, at *5 (D. Del. July 27, 2020) (footnote omitted).

explained: "[G]ateway matters, such as whether parties have a valid arbitration agreement at all … are presumptively for courts to decide. A court may therefore review an arbitrator's determination of such a matter *de novo* absent clear and unmistakable evidence that the parties wanted an arbitrator to resolve the dispute." *Sutter*, 569 U.S. at 569 n.2.[7] Thus, courts afford no deference to an arbitrator's findings on arbitrability.[8]

## II. PETITIONERS ARE NOT BOUND BY THE ARBITRATION CLAUSE, AND NEW BALANCE'S CLAIMS AGAINST THEM ARE NOT ARBITRABLE

Petitioners Ribadeneira and Superdeporte, as nonsignatories to the Distribution Agreement, did not consent to and thus are not bound by the Arbitration Clause. A nonsignatory may be bound to an arbitration clause *only* under six limited exceptions. The Arbitrator did not purport to find that this case falls within any of these exceptions, and indeed, none applies here.

### A. Petitioners Did Not Agree To Arbitrate, And Therefore Cannot Be Bound By The Arbitration Clause

Because arbitration is fundamentally based upon consent of the parties, the general rule is that if a party has not consented to arbitrate, then a party may not be compelled to arbitrate. As the Supreme Court has held, "the first principle that underscores all of our arbitration decisions"

---

[7] *See also First Options*, 514 U.S. at 943 ("If … the parties did *not* agree to submit the arbitrability question itself to arbitration, then the court should decide that question just as it would decide any other question that the parties did not submit to arbitration, namely, independently.").

[8] *See, e.g.*, *DK Joint Venture 1 v. Weyand*, 649 F.3d 310, 317 (5th Cir. 2011) ("[W]here a party attacks the very existence of an agreement, as opposed to its continued validity or enforcement, the courts must first resolve that dispute. Because that is the type of dispute we are addressing here, we do not owe deference to the arbitration panel's determination of its own jurisdiction.") (footnote, quotation marks, and citation omitted); *Sarhank Grp. v. Oracle Corp.*, 404 F.3d 657 (2d Cir. 2005) (vacating district court that had deferred to arbitrator's conclusion on arbitrability, and "remand[ing] to the district court to find as a fact whether Oracle agreed to arbitrate, by its actions or inaction, or by reason of any action of Systems as to which Oracle clothed Systems with apparent or actual authority to consent on its behalf to arbitration"); *Telenor Mobile Commc'ns AS v. Storm LLC*, 524 F. Supp. 2d 332, 352 (S.D.N.Y. 2007) ("If the arbitrators' findings are challenged, as here, we cannot merely defer to these findings. Instead, such a challenge to the arbitrators' jurisdiction militates against deference to the arbitrators' judgment, and in favor of an independent inquiry into the arbitrability of the dispute, as the Court has an independent obligation to determine the threshold issue of arbitrability.") (quotation marks and citations omitted), *aff'd*, 584 F.3d 396 (2d Cir. 2009).

is that "[a]rbitration is strictly a matter of consent, and thus is a way to resolve those disputes—*but only those disputes*—that the parties have agreed to submit to arbitration." *Granite Rock Co. v. Teamsters*, 561 U.S. 287, 299 (2010) (quotation marks and citations omitted); *see also Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 683-84 (2010) ("[I]t is also clear from our precedents and the contractual nature of arbitration that parties may specify *with whom* they choose to arbitrate their disputes.") (emphasis in original).  Thus, "a party cannot be forced to arbitrate if it has not agreed to do so."  *Intergen N.V. v. Grina*, 344 F.3d 134, 137 (1st Cir. 2003).

Ribadeneira and Superdeporte did not sign the Distribution Agreement, which contained the arbitration agreement, and were never parties thereto.  *See Ouadani v. TF Final Mile LLC*, 876 F.3d 31, 36-37 (1st Cir. 2017) (emphasizing that lack of signature to an agreement containing an arbitration clause indicates lack of consent thereto).  Because they did not consent to arbitrate any disputes under the Arbitration Clause, they cannot be bound by the Arbitration Clause.

The Arbitrator erred as a matter of law in determining that he had jurisdiction over Petitioners simply because he had jurisdiction over the Peru Claims.  The arbitrability of a claim does not give an arbitrator jurisdiction over a nonsignatory because whether a *claim* and whether a *party* are subject to arbitration are two completely separate questions.  *See id.* at 36 ("A party that seeks to compel arbitration 'must show . . . that the other party is bound by that clause, *and* [] that the claim asserted comes within the clause's scope.'" (quoting *InterGen N.V. v. Grina*, 344 F.3d 134, 142 (1st Cir. 2003) (emphasis added)).[9]  The question whether the subject matter of the claims falls within the Arbitration Clause plainly does not answer whether Petitioners consented to arbitration, as required to force them into arbitration.  Thus, the Arbitrator's determination that

---

[9]  *See also Walker v. Collyer*, 85 Mass. App. Ct. 311 (2014) (finding that a physician, as a nonsignatory to an arbitration agreement between patient and facility, should not be compelled to arbitrate even though the underlying medical malpractice claim is subject to arbitration).

it had jurisdiction over the Peru Claims is not a legally sufficient basis to exercise arbitral jurisdiction over Petitioners, non-parties and nonsignatories to the Distribution Agreement.

## B.    None Of The Six Exceptions To The Nonsignatory Rule Applies Here

Courts addressing whether a nonsignatory can enforce an arbitration agreement are guided by "traditional principles of state law, which allow a contract to be enforced by or against nonparties to the contract through assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver and estoppel." *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631 (2009) (quotation marks omitted).  The First Circuit has interpreted *Arthur Andersen* "as simply following the general proposition that in deciding whether an agreement to arbitrate is to be enforced, we normally apply ordinary state-law principles that govern the formation of contracts." *Grand Wireless, Inc. v. Verizon Wireless, Inc.*, 748 F.3d 1, 12 (1st Cir. 2014) (quotation marks omitted).  Under Massachusetts law, "[t]raditionally, courts have recognized six theories for binding nonsignatories to arbitration agreements: (1) incorporation by reference; (2) assumption; (3) agency; (4) veil-piercing/alter ego; (5) equitable estoppel, and (6) third-party beneficiary." *Machado v. System4 LLC*, 471 Mass. 204, 209 (2015).[10]  At times, rather than looking to state law, the First Circuit has looked to "federal common law, which incorporates general principles of contract and agency law," but regardless, the same exceptions apply under federal law as under Massachusetts law.  *See id.* (noting the exceptions are based on "incorporation by reference, assumption, agency, alter ego, estoppel, and third-party beneficiary").

---

[10]  "While a nonsignatory attempting to bind a signatory to an arbitration agreement is distinct from a signatory attempting to bind a nonsignatory, courts often consider both scenarios under a similar legal framework." *Machado*, 471 Mass. at 209.  However, as discussed below, signatories and nonsignatories are *not* treated interchangeably under all six exceptions, and courts generally do not apply several of these theories to bind nonsignatories to arbitration agreements.  *See, e.g.*, *Walker*, 85 Mass. App. Ct. at 319 ("[T]hese theories do not apply equally in a situation where a signatory is attempting to force a nonsignatory to arbitrate as opposed to the reverse situation.").

The party seeking arbitration has the burden to show the applicability of one of these exceptions.  *See Grand Wireless*, 748 F.3d at 6 (holding that the party seeking arbitration "must demonstrate that a valid agreement to arbitrate exists, that it is entitled to invoke the arbitration clause, [and] that the other party is bound by that clause") (quotation marks and brackets omitted).  As discussed below, New Balance cannot meet this burden, and none of these exceptions applies to Petitioners.

*First*, under the "incorporation by reference" exception, "a nonsignatory may compel arbitration against a party to an arbitration agreement when that party has entered into a separate contractual relationship with the nonsignatory which incorporates the existing arbitration clause."  *Machado*, 471 Mass. at 210 n.9 (quoting *Thomson-CSF, S.A. v. American Arbitration Ass'n*, 64 F.3d 773, 777 (2d Cir. 1995)).  The Arbitrator's own Award states that there is no separate contractual relationship between Petitioners and New Balance (let alone one that incorporates the Arbitration Clause), and so this exception does not apply.  *See* Petition, Ex. 14 at 3.

*Second*, under the "assumption" exception, "'a party may be bound by an arbitration clause if its subsequent conduct indicates that it is assuming the obligation to arbitrate,' despite being a nonsignatory."  *Machado*, 471 Mass. at 210 n.10 (quoting *Thomson-CSF*, 64 F.3d at 777).  If a nonsignatory "disavow[s] any obligations arising out of the" agreement, then there is no assumption.  *Thomson-CSF, S.A.*, 64 F.3d at 777; *see also Matter of Arbitration Between Keystone Shipping Co. & Texport Oil Co.*, 782 F. Supp. 28, 31 (S.D.N.Y. 1992) (finding no assumption where nonsignatory defendant "never indicated an intention to arbitrate" and "consistently refused to arbitrate its dispute with" signatory plaintiff).  Petitioners never assumed the obligation to arbitrate or any other obligations of the Distribution Agreement.  In fact, Petitioners have consistently opposed, in the clearest possible terms, the Arbitrator's jurisdiction over them.  *See*

*supra* at 5-8.  The assignments of the Peru Claims from PSG and Superdeporte to Ribadeneira *do not* constitute an assumption to arbitrate because the companies assigned their rights to the Peru Claims with respect to the *new* agreement.  There was no assignment of rights under the Distribution Agreement at issue here, which contains the relevant Arbitration Clause.[11]

*Third*, under an "agency" exception, "a nonsignatory who is an agent of a signatory may compel arbitration for liability arising under the contract in question."  *Machado*, 471 Mass. at 210 n.11.  As an initial matter, "the [agency] exception only allows agents to bind principals by their actions, rather than vice versa."  *Walker*, 85 Mass. App. Ct. at 323.  PSG did not sign the Distribution Agreement on behalf of Ribadeneira or Superdeporte, and there is no evidence that PSG was empowered to act as an agent on behalf of Ribadeneira or Superdeporte.  Indeed, the Arbitrator correctly found that PSG was "not merely an agent of Ribadeneira or anyone else."  Petition, Ex. 14 at 23.[12]  Regardless, the agency exception applies only to *allow* a nonsignatory agent to compel the counterparty signatory to arbitrate; it does not *require* a nonsignatory agent to arbitrate.  *See Ouadani*, 876 F.3d at 37 ("The[] rationales [for applying the agency exception] are inapposite here because Ouadani is a nonsignatory plaintiff who is trying to avoid arbitration, not a nonsignatory defendant seeking to compel it.").

---

[11]   Indeed, it would be nonsensical for the assignment to concern the Distribution Agreement because the assignment came from both PSG and Superdeporte, and Superdeporte had no rights under the Distribution Agreement that it could assign to anyone.

[12]   In considering liability (but not jurisdiction), the Arbitrator stated that the assignments of the Peru Claims "from PSG and Superdeporte created principal-agent relationships rendering the principals as well as the agent responsible for the losses caused" for purposes of New Balance's tortious interference claim.  Petition, Ex. 14 at 22. But as noted, this assignment concerned only claims under the new agreement, not the Distribution Agreement with the Arbitration Clause at issue here.  There was no suggestion, let alone evidence, of a principal-agent relationship between PSG and Petitioners for purposes of the Distribution Agreement.  Thus, the alleged agency relationship that the Arbitrator found for joint liability purposes is irrelevant to the question of arbitrability.  *See Ouadani*, 876 F.3d at 37 (refusing to bind nonsignatory agent to arbitration agreement where "[t]he alleged agency relationship between [the nonsignatory agent] and the [signatory principal] is irrelevant to the legal obligation in dispute") (quotation marks and citation omitted).  In any event, there is no evidence that Ribadeneira acted as PSG's agent in bringing the Peru Claims, as he brought them in his own name and at the direction of no other entity.

*Fourth*, under the "veil-piercing/alter ego" exception, a party "may be bound by an agreement entered into by its subsidiary regardless of the agreement's structure or the subsidiary's attempts to bind itself alone to its terms, 'when their conduct demonstrates a virtual abandonment of separateness.'"  *Machado*, 471 Mass. at 210 n.12 (quoting *Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 345 F.3d 347, 358 (5th Cir. 2003)).  The record of the Arbitration contains no evidence of a virtual abandonment of separateness, and Petitioners do not have a parent-subsidiary relationship with PSG.  Thus, the Arbitrator correctly found that PSG was not an alter ego of Petitioners, but rather was "a legitimately organized entity employed by its owners as a valid corporate enterprise."  Petition, Ex. 14 at 3.

*Fifth*, under the "equitable estoppel" exception, "a nonsignatory [may] compel arbitration in either of two circumstances: (1) when a signatory 'must rely on the terms of the written agreement in asserting its claims against the nonsignatory' or (2) when a signatory 'raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract.'"  *Machado*, 471 Mass. at 211 (quoting *Grigson v. Creative Artists Agency, L.L.C.*, 210 F.3d 524, 527 (5th Cir. 2000)).  While courts "have been willing to estop a signatory from avoiding arbitration," they have been "hesitant to estop a nonsignatory seeking to avoid arbitration."  *Id.* (quoting *InterGen*, 344 F.3d at 145-146); *see Ouadani*, 876 F.3d at 38 (same).[13]  There is no evidence that Petitioners ever "embraced" the Distribution Agreement during its life or received any direct benefits from it, and thus they may

---

[13]   Under the latter situation (as here), "estoppel has been limited to cases [that] involve nonsignatories who, during the life of the contract, have embraced the contract despite their nonsignatory status but then, during litigation, attempt to repudiate the arbitration clause in the contract."  *Ouadani*, 876 F.3d at 38 (alteration in original) (quotation marks and citation omitted); *see also Walker*, 85 Mass. App. Ct. at 320-21 (holding that estoppel requires nonsignatory to arbitrate only where it receives "direct" rather than "indirect" benefits from the agreement with the arbitration clause).

not be bound to the Arbitration Clause by equitable estoppel. The evidence is, in fact, to the contrary.

*Finally*, under the "third-party beneficiary" exception, "'a court must look to the intentions of the Parties at the time the contract was executed' and examine whether the contract displays a clear intent to make the nonsignatory a third-party beneficiary." *Machado*, 471 Mass. at 210 n.13 (quoting *Bridas S.A.P.I.C.*, 345 F.3d at 362). Further, the "'critical fact' that determines whether a nonsignatory is a third-party beneficiary is whether the underlying agreement 'manifest[s] an intent to confer specific legal rights upon [the nonsignatory].'" *Ouadani*, 876 F.3d at 39 (quoting *InterGen*, 344 F.3d at 147). Nothing in the Distribution Agreement manifests an intent of the parties at the time of execution to confer specific legal rights upon Ribadeneira or Superdeporte, or otherwise bind them to the Distribution Agreement. Indeed, the Distribution Agreement could not intend to make Superdeporte a beneficiary, as the company was created years after the Distribution Agreement was executed.

In sum, Petitioners are not subject to any of the six exceptions to the rule that a nonsignatory may not be bound to arbitration agreement under Massachusetts and federal common law.

## III. THE ARBITRATOR'S DETERMINATION OF SUCCESSOR LIABILITY FOR SUPERDEPORTE DOES NOT SUPPORT ARBITRABILITY

### A. Successor Liability Is Irrelevant To Arbitrability

Successor liability is not one of the six recognized exceptions, discussed above, that could allow a nonsignatory to be forced into arbitration. Nonetheless, the Arbitrator held that it had jurisdiction over Superdeporte, because it was supposedly the business successor to PSG. *See* Petition, Ex. 16 at 3. However, the Arbitrator cited no authority or reasoning to support the idea that a business successor is bound to arbitrate under an agreement it did not sign.

Moreover, courts consistently recognize that being a business successor does not suffice to force a nonsignatory into arbitration.  For instance, in a case where the nonsignatory itself stated that it was a successor to the signatory, the First Circuit held that it did not matter where the requirements for estoppel were not satisfied.  *See InterGen*, 344 F.3d at 145-46.  The Second Circuit has held the same.  *See Mag Portfolio Consult. Gmbh v. Merlin Biomed Grp. LLC*, 268 F.3d 58, 63 (2d Cir. 2001) (holding that the district court erred in relying on the fact that the nonsignatory was a successor where the estoppel exception did not apply).  In short, successor liability is not an additional exception to the rule that a party cannot be forced to arbitrate where it did not agree to do so.

## B.   The Arbitrator's Successor Liability Determination Was Erroneous

Even if successor liability were relevant to arbitrability over a nonsignatory (and it is not), the law and the facts do not support a finding of successor liability.  As explained *supra* at Section I, this Court should review the Arbitrator's successor liability finding *de novo* to the extent it was used as the basis for a determination of arbitrability.

Successor liability applies only if: "(1) the successor expressly or impliedly assumes liability of the predecessor, (2) the transaction is a de facto merger or consolidation, (3) the successor is a mere continuation of the predecessor, or (4) the transaction is a fraudulent effort to avoid liabilities of the predecessor."  *Cargill, Inc. v. Beaver Coal & Oil Co.*, 424 Mass. 356, 359 (1997).  As to the first, second, and fourth elements, the Arbitrator made no finding that Superdeporte assumed the liabilities of PSG, that the transaction was a de facto merger or consolidation, or that it was a fraudulent transaction.  Indeed, there is no evidence that would support such a finding.

As to the third element, Superdeporte is not a mere continuation of PSG.  Superdeporte was a significantly larger company than PSG, with distinct retail and wholesale capabilities and

clients that PSG did not have.[14] Indeed, PSG ceased operating as a distributor in Peru because of New Balance's request for a distributor that could function at both the wholesale and retail levels, and PSG was sold to a different owner who owns it as of the end of 2016 and has used it for an entirely different purpose.[15] There is also no evidence in the record of "continuity of directors, officers, and stockholders; and the continued existence of only one corporation after the sale of assets." *McCarthy v. Litton Indus., Inc.*, 410 Mass. 15, 23 (1991).

The Arbitrator's reasoning to the contrary is erroneous. *First*, the Arbitrator erred in relying on the idea that "PSG ceased operations altogether," Petition, Ex. 14 at 24, as sufficient to show a successor relationship. Under Massachusetts law, "dissolution of the predecessor corporation is required" for successor liability. *McCarthy*, 410 Mass. at 23. While PSG ceased distribution operations in 2016, it is still a viable entity, having been sold to a new owner and used for a different purpose. *See* Petition, Ex. 13 at ¶ 136. *Second*, the Arbitrator also erred in finding that "PSG transferred its remaining asserts to Superdeporte," Petition, Ex. 14 at 24, when in reality PSG did *not* transfer all or substantially all of its assets to Superdeporte. PSG transferred remaining New Balance *inventory* to Superdeporte, because Superdeporte was the distributor party to the New Distribution Agreement. *See* Petition, Ex. 13 at ¶ 133.[16] In particular, PSG did not transfer all of its rights under the Distribution Agreement, or any contract, to Superdeporte.[17]

---

[14] Exhibit B, PSG, Superdeporte, and Ribadeneira Closing Argument at 117.

[15] Exhibit B, PSG, Superdeporte, and Ribadeneira Closing Argument at 114.

[16] *See also Premier Capital, LLC v. KMZ, Inc.*, 464 Mass. 467, 475 (2013) (holding that such transfer is "an essential prerequisite to successor liability" (quoting *Carreiro v. Rhodes Gill & Co.*, 68 F.3d 1443, 1448 (1st Cir. 1995)).

[17] *See Premier Capital*, 464 Mass. at 476 (finding no successor liability where "[t]he record contains no undisputed facts establishing that [the seller corporation] ever assigned any of its leases or contracts to [the buyer corporation]").

*Third*, while the Arbitrator stated that "Superdeporte was created for the purpose of carrying on the business of PSG when the parties attempted to negotiate a continuation of their relationship," Petition, Ex. 14 at 24, the Arbitrator found that the negotiations did *not* lead to a new agreement with Superdeporte. Similarly, it is irrelevant that "New Balance actually dealt with Superdeporte as its distributor in Peru from May, 2016," id., because Superdeporte had no contractual obligations to New Balance, and New Balance disavowed the new agreement with Superdeporte in May 2016. Regardless, Superdeporte's dealings with New Balance do not remotely suggest that Superdeporte was a mere continuation of PSG, and the record evidence in the arbitration supports that New Balance disavowed that it had any contractual relationship with Superdeporte and that it owed any contractual obligation to it under the Distribution Agreement containing the Arbitration Clause.

Accordingly, there is no legal or factual basis for the Arbitrator's finding of successor liability.

## CONCLUSION

For the foregoing reasons, this Court should vacate the arbitration award as to Petitioners Ribadeneira and Superdeporte.

Date: February 1, 2021

Respectfully submitted,

Rodrigo Ribadeneira and
Superdeporte Plus Peru S.A.C.

By their attorneys,

*/s/ Gregg Badichek*
Gregg Badichek (BBO #706270)
greggbadichek@quinnemanuel.com
111 Huntington Ave, Suite 520
Boston, MA 02199
Tel: 617-712-7100
Fax: 617-712-7200

David M. Orta, *pro hac vice application
forthcoming*
davidorta@quinnemanuel.com
Julianne Jaquith, *pro hac vice application
forthcoming*
juliannejaquith@quinnemanuel.com
1300 I Street NW, Suite 900
Washington, D.C. 20005
Tel: +1 202 538 8000
Fax: +1 202 538 8100

David Cooper, *pro hac vice application
forthcoming*
davidcooper@quinnemanuel.com
51 Madison Ave, 22nd floor
New York, NY 10010
Tel: +1 212 849 7000
Fax: +1 212 849 7100

*Attorneys for Petitioners*

## **CERTIFICATE OF SERVICE**

I hereby certify that on February 1, 2021, I caused a true and correct copy of the foregoing Memorandum of Law and related Exhibits to be served on the following counsel by email:

Mark E. Tully
Kate MacLeman
Dylan Schweers
Goodwin Procter LLP
100 Northern Avenue
Boston, MA 02210
MTully@goodwinlaw.com
KMacLeman@goodwinlaw.com
DSchweers@goodwinlaw.com

*/s/ Julianne Jaquith*
Julianne Jaquith

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| Rodrigo Ribadeneira and | ) |
| Superdeporte Plus Peru S.A.C., | ) |
| | ) |
| Petitioners, | ) |
| | ) |
| v. | ) Civ. No. 1:21-cv-10173-ADB |
| | ) |
| New Balance Athletics, Inc., | ) |
| | ) |
| Respondent. | ) |
| | ) |
| | ) |
| | ) |
| | ) |

## FIRST AMENDED PETITION TO VACATE ARBITRATION AWARDS

Pursuant to Sections 10 and 12 of the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 10, 12, Petitioners Rodrigo Ribadeneira and Superdeporte Plus Peru S.A.C. ("Superdeporte") (collectively "Petitioners") file this First Amended Petition to vacate the Partial Final Arbitration Award dated August 20, 2020 (the " Partial Award"), as clarified by the Order on Respondents' Request for Correction and Interpretation of the Partial Final Award, dated November 4, 2020 ("Order"), and the Final Arbitration Award dated February 11, 2021 (the "Final Award") (collectively, the "Awards"), that were made in this District by a single Arbitrator appointed by the International Centre for Dispute Resolution ("ICDR") in the matter of *New Balance Athletics, Inc. v. PSG et al.* (ICDR Case No. 01-18-0003-1183), as to Petitioners Ribadeneira and Superdeporte.

Petitioners never signed an arbitration agreement with New Balance Athletics, Inc. ("New Balance"), and therefore did not agree with New Balance to arbitrate any claims. The Awards should be vacated under the Federal Arbitration Act because "the arbitrator[] exceeded [his]

1

powers, or so imperfectly executed them that a mutual, final, and indefinite award upon the subject matter submitted was not made." 9 U.S.C. § 10(a)(4). The Arbitrator here exceeded his authority by determining in the first instance the gateway arbitrability question of whether Ribadeneira and Superdeporte were bound by the arbitration agreement. The Arbitrator also exceeded his authority by resolving that question in the affirmative, in conflict with well-established law providing six exceptions to the rule that nonsignatories to an arbitration agreement may not be bound thereto. None of those exceptions applies here based on the law and the undisputed facts.[1]

## PARTIES

1.     Petitioner Rodrigo Ribadeneira is an Ecuadorian entrepreneur who wholly or partially owns corporate entities, including an indirect ownership of Superdeporte through other holding companies, that have made investments in Peru, as well as in other countries in Latin America. Mr. Ribadeneira's address is at Hidalgo de Pinto, Quito, Ecuador.

2.     Petitioner Superdeporte is a limited liability company registered under the laws of Peru, with its registered office located at Av. Larco Nro. 1301 Int. 301, Miraflores, Peru. Superdeporte is in the business of distributing athletic footwear, apparel, and accessories.

3.     Respondent New Balance is a company registered under the laws of Massachusetts, with its registered office located at Boston Landing, 100 Guest Street, Boston, Massachusetts 02135. New Balance is in the business of designing, manufacturing, marketing, and distributing athletic footwear, apparel, and accessories.

## JURISDICTION AND VENUE

---

[1]   While Petitioners are not challenging certain of the other factual and legal findings or conclusions reached by the Arbitrator, they by no means accept them as correct interpretations of the underlying facts or law, and they do not challenge them here given the very limited circumstances under which a party may challenge an arbitral award pursuant to the requirements of the Federal Arbitration Act.

4.    Pursuant to 28 U.S.C. § 1332(a), this Court has jurisdiction over this matter because there is diversity of citizenship, and the amount "in controversy exceeds the sum or value of $75,000, exclusive of interest and costs[.]"

5.    Venue is proper under 9 U.S.C. § 10 because the Awards and the related findings and rulings, that are the subject of this Petition were all made in this District by an ICDR-designated Arbitrator sitting in Boston, Massachusetts.

## FACTS

6.    Mr. Ribadeneira initiated a relationship with New Balance in 1992, whereby one of the entities he owned began distributing sportswear for New Balance in Ecuador.  In 2000, after the relationship between the parties had developed well in Ecuador, the parties extended their relationship to cover Peru.  The relationship progressed well in Peru for the following 10 years.

7.    At the end of 2009, Peruvian Sporting Goods S.A.C. ("PSG") was created, with Ribadeneira as PSG's ultimate majority shareholder through various intervening corporate entities.

8.    At the beginning of 2010, PSG and New Balance entered into a distribution agreement for the distribution of New Balance's products in Peru.

9.    On January 1, 2013, New Balance and PSG entered into a further Distribution Agreement (the "Distribution Agreement"), which is at issue in this proceeding.  The Distribution Agreement governed the sale and distribution of New Balance's products in Peru.  Article 21 of the Distribution Agreement states, in relevant part:  "The parties agree that any and all disputes (whether in contract or any other theories of recovery) related to or arising out of this Agreement or the relationship, its application and/or termination (including post-termination obligations) shall be settled by final and binding arbitration in accordance with the UNCITRAL Arbitration Rules"

3

(the "Arbitration Clause").  A true and accurate copy of the Distribution Agreement is attached hereto as Exhibit 1.

10.     Neither Ribadeneira nor Superdeporte are signatories to the Distribution Agreement between New Balance and PSG, or the Arbitration Clause contained therein.

11.     The Distribution Agreement was valid under its original terms until December 31, 2015.  However, if neither party expressed an intention to let the Distribution Agreement expire, then (by its terms) the Distribution Agreement would automatically renew for an additional year, *i.e.*, until December 31, 2016.  By the end of the Distribution Agreement's original term, neither party expressed an intention to let the Distribution Agreement expire, and thus it automatically renewed until December 31, 2016.

12.     Starting in late 2014 and culminating in 2015, New Balance made an offer to PSG to enter into a new and reformed distribution agreement for its business in Peru.  Per New Balance's requirements for the new distribution agreement, PSG would enter into the agreement through a different corporate entity, which had distinct capabilities from PSG, which ultimately, after the formation of Superdeporte in early 2016, became Superdeporte.

13.     In mid-2015, PSG and New Balance began negotiating the new agreement.  PSG believed that, by late 2015 and with minor amendments in January 2016, an agreement had been reached between PSG and New Balance, with Superdeporte ultimately to replace PSG in the new agreement.  However, on May 30, 2016, New Balance informed PSG and Superdeporte that it believed no distribution agreement existed between New Balance and Superdeporte and that it was "reverting back" to the original 2013 distribution agreement that New Balance had in place with PSG.

4

14.     Shortly thereafter, on June 23, 2016, New Balance notified PSG and Superdeporte in writing that it was formally terminating the Distribution Agreement with PSG effective December 31, 2016.  On July 8, 2016, New Balance informed PSG and Superdeporte that New Balance had decided to work with another distributor in Peru beginning in 2017.

15.     On November 25, 2016, PSG and Superdeporte executed two similar assignments of rights contracts with Ribadeneira, assigning to him all of their rights to the claims initiated against New Balance with respect to the new, unsigned agreement that New Balance claimed to be ineffective.

16.     Subsequently, in January 2017, Ribadeneira initiated civil legal proceedings against New Balance before Peruvian civil courts.  Ribadeneira claimed that New Balance failed to honor its obligations under the new agreement and alleged extracontractual claims arising from New Balance's failure to conduct itself in good faith under Peruvian law with respect to the negotiation and execution of the new agreement (the "Peru Claims").

17.     On February 1, 2017, Ribadeneira filed a request with the Peruvian civil courts for interim relief.  Ribadeneira asked the court to order New Balance to abstain from the distribution of its products in Peru with any distributor other than PSG, claiming that the new agreement was in effect and that, as such, New Balance should not be distributing products through the new distributor.

18.     In December 2017, the Peruvian civil court ordered a halt on the distribution of New Balance products in Peru during the pendency of the proceeding.

19.     On July 31, 2018, the Peruvian court lifted its interim order, formally permitting the distribution of New Balance products in Peru.

20.     On May 2, 2019, PSG, Superdeporte, and Ribadeneira executed two similar assignment of rights contracts in which Ribadeneira transferred all the right to proceed with the claims he possessed against New Balance back to PSG and Superdeporte.

21.     New Balance initiated an arbitration proceeding against PSG and Ribadeneira on July 31, 2018.  New Balance argued that PSG and Ribadeneira had breached the Distribution Agreement for failure to pay money due thereunder.  A true and accurate copy of the Notice of Arbitration is attached hereto as Exhibit 2.

22.     PSG and Ribadeneira responded on September 4, 2018, arguing (*inter alia*) that the Arbitrator did not have jurisdiction over Ribadeneira because he was not a party to the Distribution Agreement.  A true and accurate copy of the Response is attached hereto as Exhibit 3.

23.     PSG and Ribadeneira amended their response on October 29, 2018, and, while reiterating their jurisdictional objection as to Ribadeneira, asserted a counterclaim against New Balance for breaching the Distribution Agreement.  A true and accurate copy of the Amended Response to the Notice of Arbitration and Counterclaim is attached hereto as Exhibit 4.

24.     On January 25, 2019, New Balance moved to compel PSG and Ribadeneira to arbitrate the claims then pending against New Balance in Peru.  A true and accurate copy of the Motion to Compel Arbitration is attached hereto as Exhibit 5.

25.     In their response of February 4, 2019, PSG and Ribadeneira reiterated their objection that the Arbitrator did not have jurisdiction over Ribadeneira, as he was never a party to the Distribution Agreement.  A true and accurate copy of the Response to Claimant's Jurisdictional Objections is attached hereto as Exhibit 6.

26.     On March 18, 2019, the Arbitrator granted New Balance's motion to compel arbitration, holding, in relevant part, that "[it] is the claims that are subject to arbitration."  A true

and accurate copy of the Memorandum and Order on Claimant's Motion to Compel Arbitration is attached hereto as Exhibit 7.

27.     On May 3, 2019, New Balance amended its notice of arbitration to add Superdeporte as a respondent and to add a claim against PSG, Superdeporte, and Ribadeneira for tortious interference with New Balance's new distribution arrangement with its new distributor in Peru as a result of the Peru Claims.  A true and accurate copy of the Motion to Amend is attached hereto as Exhibit 8.

28.     PSG, Ribadeneira, and Superdeporte moved for summary disposition on May 31, 2019, asserting, in relevant part, that the Arbitrator did not have jurisdiction over Ribadeneira, explaining the general rule under Massachusetts law that a nonsignatory could not be bound to an arbitration agreement, and that none of the six exceptions applied.  A true and accurate copy of the Motion for Summary Disposition is attached hereto as Exhibit 9.

29.     On August 20, 2019, the Arbitrator denied the motion for summary disposition. The Arbitrator noted his prior holding that he had jurisdiction over the Peru Claims filed by Ribadeneira, and further held that because New Balance's tortious interference claim arose from the Peru Claims, he had jurisdiction over Ribadeneira with regard to the tortious interference claim as well.  The Arbitrator deferred ruling until the close of discovery on the question whether he had jurisdiction over Ribadeneira with respect to New Balance's original claim for breach of the Distribution Agreement based upon a theory of piercing the corporate veil.  A true and accurate copy of the Memorandum and Order on Respondents' Motion for Summary Disposition is attached hereto as Exhibit 10.

30.     Following discovery, PSG, Superdeporte, and Ribadeneira renewed their motion for summary disposition on February 12, 2020, and again asserted that the Arbitrator did not have

jurisdiction over Ribadeneira or Superdeporte with respect to any of New Balance's claims. A true and accurate copy of the Renewed Motion for Summary Disposition is attached hereto as Exhibit 11.

31.   The parties held a hearing in the case on March 9-11 and May 30, 2020 and PSG, Superdeporte and Ribadeneira again argued that the Arbitrator had no jurisdiction over Ribadeneira and Superdeporte under New Balance's claim for breach of the Distribution Agreement. A true and accurate copy of excerpted portions of the Hearing Transcript is attached hereto as Exhibit 12.

32.    PSG, Superdeporte and Ribadeneira reiterated this argument in their June 30, 2020 post-hearing brief. A true and accurate copy of the Post-Hearing Brief is attached hereto as Exhibit 13.

33.   On August 20, 2020, the Arbitrator issued the Partial Award. A true and accurate copy of the Memorandum of Decision and Partial Final Award is attached hereto as Exhibit 14.

34.   As relevant here, the Arbitrator determined that PSG was liable for breaching the Distribution Agreement and that Superdeporte was also liable for the breach as PSG's "business successor." As to the tortious interference claim, the Arbitrator stated:

> . . . I find that the respondents employed improper means in order to obtain their desired result, an outcome that restrained sales by New Balance for approximately seven months, and caused the claimant lost earnings for at least four of those months. This finding applies to the three respondents. While the material misrepresentations were submitted to the [Peruvian] court on behalf of Ribadeneira, I find that the assignments from PSG and Superdeporte created principal-agent relationships rendering the principals as well as the agent responsible for the losses caused.

Ex. 14 at 22.

35.   On September 17, 2020, PSG, Superdeporte, and Ribadeneira requested correction of the Partial Award, interpretation of the Partial Award, and/or the issuance of an additional

award. A true and accurate copy of the Request for Correction and Interpretation of the Partial

Final Award and/or for the Issuance of an Additional Award is attached hereto as Exhibit 15.

36. As relevant here, they again objected to the Arbitrator's exercise of jurisdiction

over Ribadeneira and Superdeporte, noting: "Since the start of this Arbitration, Respondents

Ribadeneira and Superdeporte consistently have maintained that this Tribunal does not have

jurisdiction to arbitrate any claims with respect to these Respondents, because neither has ever

consented to arbitrate any claims with New Balance, and because there is no legal doctrine or set

of facts that can require them to arbitrate claims against New Balance over their objection." Ex.

15 at 7.

37. They also explained that arbitral jurisdiction over a claim does not, standing alone,

confer arbitral jurisdiction over a person who has the right to advance that claim. Respondents

pointed out that in the Partial Award, "the Tribunal did not explain the reasons as to why it was

asserting jurisdiction over Respondents Ribadeneira and Superdeporte, nor what evidence, if any,

it relied upon to deny Respondents' jurisdiction objections and to assert jurisdiction over them"

and that "[i]t also did not explain what legal doctrine or doctrines it is relying upon to deny

Respondents' jurisdictional objections and to assert jurisdiction over Respondents Mr. Ribadeneira

and Superdeporte or its legal reasoning for doing so." *Id*. at 9.

38. The Arbitrator denied that request in the Order issued on November 4, 2020. He

stated that he had "exercised jurisdiction with respect to Superdeporte by imposing joint liability

on that company (together with PSG) for amounts owed under the 2013 distribution agreement

based on [his] finding that it is the business successor to PSG." He further stated that he had

"exercised jurisdiction over Ribadeneira and Superdeporte, and ha[d] concluded that each is liable

(together with PSG) with respect to New Balance's tortious interference claim, because the Peru

9

claims, so-called, from which that interference arose were pursued by Ribadeneira pursuant to assignments of those claims by PSG and Superdeporte."  A true and accurate copy of the Memorandum and Order on Respondents' Request for Correction and Interpretation of the Partial Final Award and/or for the Issuance of an Additional Award is attached hereto as <u>Exhibit 16</u>.

39.    On February 11, 2021, the Arbitrator issued the Final Award.  A true and accurate copy of the Final Award is attached hereto as <u>Exhibit 17</u>.

40.    As relevant here, in the Final Award, the Arbitrator determined that New Balance was entitled to contractual and statutory interest on amounts owed under the Partial Award and that New Balance was also entitled to attorney's fees from PSG, Superdeporte, and Ribadeneira. In the Final Award, with respect to Superdeporte and Ribadeneira's continued jurisdictional objections, the Arbitrator stated that he had "ruled on their jurisdictional defenses and hereby reiterate those rulings." Ex. 17 at 7.

## <u>COUNT I</u>

41.    Petitioners incorporate all previous paragraphs as if fully set forth here.

42.    Pursuant to Section 10(4) of the FAA, 9 U.S.C. § 10(a)(4), "the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration – (4)where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made."

43.    The Arbitrator here exceeded his authority by determining in the first instance the gateway arbitrability question of whether Ribadeneira and Superdeporte were bound by the Arbitration Clause.

44.     Accordingly, the Awards as to Petitioners Ribadeneira and Superdeporte should be vacated.

## COUNT II

45.     Petitioners incorporate all previous paragraphs as if fully set forth here.

46.     The Arbitrator exceeded his authority by resolving the arbitrability question of whether Ribadeneira and Superdeporte were bound by the Arbitration Clause in the affirmative, in conflict with well-established law providing six exceptions to the rule that nonsignatories to an arbitration agreement may not be bound thereto.

47.     Accordingly, the Awards as to Petitioners Ribadeneira and Superdeporte should be vacated.

## PRAYER FOR RELIEF

Wherefore, Petitioners pray that this Honorable Court enter an Order that:

A.     Vacates the Awards as to Petitioner Ribadeneira;

B.     Vacates the Awards as to Petitioner Superdeporte; and

C.     Provides further relief as this Honorable Court deems just and equitable.

Date: February 22, 2021

Respectfully submitted,

Rodrigo Ribadeneira and
Superdeporte Plus Peru S.A.C.

By their attorneys,

/s/ Gregg Badichek
Gregg Badichek (BBO #706270)
greggbadichek@quinnemanuel.com
111 Huntington Ave, Suite 520
Boston, MA 02199
Tel: 617-712-7100
Fax: 617-712-7200

David M. Orta (admitted *pro hac vice*)
davidorta@quinnemanuel.com
Julianne Jaquith (admitted *pro hac vice*)
juliannejaquith@quinnemanuel.com
1300 I Street NW, Suite 900
Washington, D.C. 20005
Tel: +1 202 538 8000
Fax: +1 202 538 8100

David Cooper (admitted *pro hac vice*)
davidcooper@quinnemanuel.com
51 Madison Ave, 22nd floor
New York, NY 10010
Tel: +1 212 849 7000
Fax: +1 212 849 7100

*Attorneys for Petitioners*

## CERTIFICATE OF SERVICE

I hereby certify that on February 22, 2021, I caused a true and correct copy of the foregoing to be filed in this Court's CM/ECF system, which will send notification of such filing to all parties who have appeared in this matter.

/s/ Gregg Badichek
Gregg Badichek (BBO #706270)

13

# EXHIBIT 1

# DISTRIBUTION AGREEMENT

## BY AND BETWEEN

### NEW BALANCE ATHLETIC SHOE, INC

### AND

### PERUVIAN SPORTING GOODS S.A.C.

LIBC/4349355.3

Arbitration
Exhibit

**1**

PSG00005497

## TABLE OF CONTENTS

1. BASIC TERMS AND DEFINITIONS.................................................................1
2. ADDITIONAL DEFINITIONS ......................................................................2
3. APPOINTMENT OF DISTRIBUTOR ...........................................................3
4. TERRITORY ................................................................................................4
5. TERM............................................................................................................4
6. TERMS AND CONDITIONS OF SALE TO DISTRIBUTOR ......................5
7. CERTAIN COVENANTS OF DISTRIBUTOR ...........................................8
8. MINIMUM SALES REQUIREMENTS.......................................................12
9. DISTRIBUTION OF OTHER PRODUCTS.................................................13
10. RETURN AND PURCHASE OF INVENTORY ..........................................13
11. TRADEMARKS AND AUTHORIZED DOMAIN NAME ..........................14
12. AUTHORITY OF DISTRIBUTOR; REPRESENTATION...........................16
13. RETURNED PRODUCTS ...........................................................................17
14. DISTRIBUTION FEE ................................................................................17
15. CONFIDENTIALITY ................................................................................19
16. TERMINATION.........................................................................................20
17. OBLIGATION ON TERMINATION..........................................................21
18. FORCE MAJEURE ....................................................................................22
19. INSPECTION.............................................................................................23
20. GOVERNING LAW ...................................................................................23
21. ARBITRATION..........................................................................................23
22. NOTICES....................................................................................................24
23. FAILURE TO ENFORCE ..........................................................................24
24. ENTIRE AGREEMENT - MODIFICATIONS ...........................................24
25. ASSIGNABILITY......................................................................................25
26. INVALID PROVISIONS ............................................................................25

LIBC/4349355.3

i

PSG00005498

## DISTRIBUTION AGREEMENT

THIS AGREEMENT, made and entered into as of the Effective Date by and between:

NEW BALANCE ATHLETIC SHOE, INC., having its principal offices at Brighton Landing, 20 Guest Street, Boston, Massachusetts, USA (hereinafter "**COMPANY**"),

ON THE ONE HAND,

AND

PERUVIAN SPORTING GOODS S.A.C., having its principal office at Carretera Panamericana KM, 1303 mz, B lote 4  Zofratacna, Tacna, Peru (hereinafter "**Distributor**"),

ON THE OTHER HAND.

WHEREAS Distributor desires to obtain from COMPANY and COMPANY desires to grant to Distributor, on the terms and conditions set forth below, the right to import, sell and distribute the Products (as hereinafter defined) in the Territory (as hereinafter defined); and

WHEREAS COMPANY is entering into this Agreement based on assurances that Distributor will devote its best efforts to market and sell said Products in the Territory and otherwise adhere to all the terms and conditions of this Agreement.

NOW THEREFORE, in consideration of the mutual covenants herein set forth, the parties hereby agree as follows:

1.    BASIC TERMS AND DEFINITIONS

    (a)    "**Approved Channels**" shall have the meaning set forth in Exhibit A.

    (b)    "**Authorized Domain Name**" shall mean www.newbalance.com.ec



    (c)    "**COMPANY Bank Account**" shall mean:

> New Balance Athletic Shoe, Inc.
> Account Number: 0501232733
> Bank Name: Bank of America
> New York, New York
> ABA #: 026009593

    (d)    "**Distributor's Notice Address**" shall mean:

> Carretera Panamericana KM
> 1303 mz. B lote 4 Zofratacna
> Tacna, Peru
> TELEFAX:  (5932) 484-195

LIBC/4349355.3

PSG00005499

(e)   **"Ecuador Distribution Agreement"** means the Distribution Agreement between COMPANY and Distribuidora Deportiva DIDE SA. dated January 1, 2013.

(f)   **"Effective Date"** shall mean January 1, 2013.

(g)   **"Fee"** shall have the meaning set forth in <u>Exhibit B</u>.

(h)   **"Initial Term"** shall commence on the Effective Date and end on the day prior to the third anniversary of the Effective Date.

(i)   **"Minimum Advertising Expenditure"** shall have the meaning set forth in <u>Exhibit C</u>.

(j)   **"Minimum Fee"** shall have the meaning set forth in <u>Exhibit D</u>.

(k)   **"Minimum Sales Requirement"** shall have the meaning set forth in <u>Exhibit E</u>.

(l)   **"Territory"** shall mean Peru.

(m)   **"Trademark"** shall mean collectively: "New Balance", "NB" and "N".

2.   ADDITIONAL DEFINITIONS

For purposes of this Agreement, the following definitions shall apply:

(a)   **"Accessory"** or **"Accessories"** shall mean hats, socks and bags.

(b)   **"Affiliate"** shall mean any legal entity controlled directly or indirectly to the extent of a holding of at least fifty (50%) percent of the share capital of such entity by either of the parties or so controlled by or under such common control with one of them.

(c)   **"Annual Period"** shall mean the twelve (12) month period commencing on the Effective Date or an anniversary of the Effective Date.



(d)   **"Authorized Suppliers"** shall mean entities which COMPANY advises Distributor in writing from time to time that it has authorized to manufacture Products for sale to distributors and other third parties.

(e)   **"Competing Products"** shall mean any products similar to the Products or which can be put to identical or similar uses or which might compete with or hinder the sale of the Products.

(f)   **"Domain Names"** shall have the meaning set forth in Section 11(d).

(g)   **"Exchange Rate"** shall mean the exchange rate converting the local currency(ies) in the Territory to U.S. dollars as published in *The Wall Street Journal* two business days prior to the date a payment or report, as the case may be, is due.

LIBC/4349355.3

2

PSG00005500

(h)    "**Internet**" shall mean the world wide web or any similar public computer network or electronic media.

(i)    "**Net Selling Price**" shall mean the gross selling price as invoiced by Distributor or Distributor's Affiliate, as the case may be, (after deduction of bona fide trade discounts to the extent customary in the trade, freight charges, and value added type taxes included in the gross selling price) less only accepted returns from purchasers of the Products and defective Products for which credit is given to Distributor's customers. No deduction is allowed for costs incurred in the sale, distribution or advertising of Products (including co-op and promotional allowances) nor shall any deduction be allowed for uncollectable accounts or cash discounts. If Distributor sells Products to an Affiliate or other party controlled by or related to Distributor, or to a series of Affiliates or controlled or related parties, Net Selling Price shall be calculated on the basis of the Net Selling Price for such Product charged by such Affiliate(s) or controlled or related party(ies) on resale of such Product to a third party which is not an Affiliate or other controlled or related party.

(j)    "**Products**" shall mean COMPANY's footwear, apparel and Accessory products bearing one or more of the Trademarks as set forth in COMPANY'S current approved country assortment plan, as modified from time to time, a copy of the original version of which has been delivered to Distributor prior to the Effective Date. Products expressly exclude any products using any other trademarks, tradenames, or logos which COMPANY or its Affiliates may own or have the right to use, other than the Trademarks.

(k)    "**Promotional Products**" shall have the meaning set forth in Section 11(e).

3.    APPOINTMENT OF DISTRIBUTOR



(a)    COMPANY hereby appoints Distributor, which accepts, for the term of this Agreement and subject to the terms and conditions hereof, its exclusive distributor to distribute at the wholesale level of trade and sell the Products to retail dealers and others selling in Approved Channels and who sell to ultimate users in the Territory; provided, however, that Distributor may not distribute and sell Products to retail dealers, and others, whose primary business is the sale to ultimate users over the Internet. COMPANY, in its sole discretion, may waive the foregoing provision in writing upon written request by Distributor. To the extent such designation is exclusive means that COMPANY shall not appoint any third party located within the Territory for the sale or distribution of the Products in the Territory to retail dealers and others selling in Approved Channels and who sell to ultimate users. It is further understood that Distributor shall not appoint any assistant or subsidiary distributors for the purpose of selling and distributing the Products without the prior written consent of COMPANY; provided that this shall not (nor shall anything else in this Agreement) be construed as to restrict the ability of the Distributor to supply the Approved Channels. Distributor hereby undertakes at all times during the term of this Agreement to use its best efforts to vigorously and continuously promote and sell the Products throughout the entire Territory and to all Approved Channels. Distributor may use, display, transmit, market or otherwise reproduce the Trademarks to promote the Products over the Internet on a COMPANY approved web site.    The appointment of Distributor by COMPANY is on an "*intuitu personae*" basis. Notwithstanding the foregoing, Distributor shall be entitled to sell Products to Distribuidora Deportiva DIDE SA for resale by it pursuant to the

3

LIBC/4349355.3

PSG00005501

Ecuador Distribution Agreement. Any such sales shall not be taken into account in determining sales for purposes of Distributor's complying with Minimum Sales Requirement, complying with the Minimum Advertising Expenditure or payment of the Fee.

(b)      Notwithstanding the appointment of Distributor as exclusive distributor for Products as provided above, it is expressly understood and agreed that COMPANY shall be entitled to (i) grant exclusive and/or non-exclusive manufacture, distribution and/or trademark licenses covering the Products outside of the Territory, (ii) grant manufacture licenses or agreements within the Territory, (iii) grant retailers the right to sell Products in the Territory, (iv) grant exclusive or non-exclusive rights to sell Products in the Territory to retail dealers and others selling in channels of distribution other than Approved Channels, including without limitation military and civil service channels, (v) operate or authorize third parties to operate New Balance only retail stores, (vi) grant exclusive and/or non-exclusive distribution or license rights to distribute and sell products which are not Products in the Territory, (vii) grant exclusive and/or non-exclusive rights to distribute and sell Products over the Internet, and (viii) advertise and otherwise offer Products for sale in the Territory (and authorize third parties to do so) at any time within six (6) months prior to the termination of this Agreement under Section 5(a) or Section 5(b). COMPANY shall have no liability for breach of this Agreement for acts in connection with such appointments. COMPANY expressly disclaims any representation, covenant or warranty that Products shall not be sold in the Territory by any such licensee, distributor or other third party.

(c)      It is expressly agreed that Distributor shall have no right under this Agreement to sell Products to ultimate users (i) through a Distributor owned and/or operated New Balance only retail store, (ii) over the Internet or (iii) by any other means other than as specified in Section 3).

4.      TERRITORY

Distributor is appointed distributor only for Approved Channels in the Territory and shall not distribute or sell, or assist in the distribution or sale of, any Products to any parties located outside the Territory or in any channel of distribution other than the Approved Channels. Distributor shall not distribute or sell Products to any person or entity which Distributor knows or should know will distribute or sell Products outside the Territory or other than in the Approved Channels.

5.      TERM

(a)      The original term of this Agreement shall be the Initial Term at the end of which, if either party notifies the other in writing at least sixty (60) days before the end of such Initial Term of its intention to let the Agreement expire, it shall so automatically expire.

(b)      If neither party sends notice of its intention to let the Agreement expire, then the Agreement shall be automatically renewed at the end of the Initial Term for one one-year period, provided, however, that in the event of such renewal either party can, in its sole discretion, with or without cause, and without payment of any termination indemnities or similar payments, terminate this Agreement upon sixty (60) days' prior written notice at any time during any such one year renewal period and this Agreement will terminate at the end of said sixty (60) days.

4

LIBC/4349355.3

PSG00005502

6.   TERMS AND CONDITIONS OF SALE TO DISTRIBUTOR

Distributor undertakes and agrees to purchase the Products from COMPANY and its Affiliates or its Authorized Suppliers under the following terms and conditions:

(a)   Price:

The prices to be paid by Distributor to COMPANY, its Affiliates or Authorized Suppliers, as the case may be, for the Products shall be the prices set forth in COMPANY's, its Affiliates' or Authorized Suppliers' then current published price list specified for the Territory, the current version of which has been delivered to Distributor prior to the Effective Date. Such price list may be changed from time to time by the selling entity in its sole discretion. Such prices are exclusive of handling, shipping and insurance charges, inspection fees, consular fees, import or export duties, taxes, and levies (including without limitation value added, property, sales, use or government entity charges, fees, duties, taxes or levies), all of which shall be the sole responsibility of Distributor. If COMPANY, its Affiliate or Authorized Supplier is required to collect or pay any such charges, fees, duties, taxes or levies, the amounts so paid or collected shall be invoiced to Distributor.

(b)   Payment:

Payment of all amounts due for Products and all payment documentation for the purchase of the Products shall be effected by Distributor through irrevocable letter of credit at sight or cash in advance due upon placement of any order, unless otherwise agreed to by COMPANY, its Affiliate or its Authorized Supplier, as the case may be. All payments shall be made in the currency used in the price list referred to in Section 6(a) above, which will be US dollars unless otherwise specified. If COMPANY, its Affiliate or Authorized Supplier allows Distributor to deliver the letter of credit or cash after the placement of the order and Distributor fails to deliver the same, or if Distributor otherwise delays or cancels the shipment of Products, in addition to the other rights hereunder of COMPANY, its Affiliate or its Authorized Supplier, as the case may be, and without in any manner excusing such violation, COMPANY, its Affiliate or Authorized Supplier shall be entitled (i) to charge Distributor interest at the rate of two percent (2%) per month (or, if the applicable usury rate does not permit two (2%) percent per month, then at the maximum interest rate permitted by law) for any amounts not received when due, (ii) to withhold, or cause its Authorized Supplier to withhold, all shipments of Products and to sell such withheld Products to third parties in which case Distributor shall be responsible *inter alia* for COMPANY's, its Affiliate's or its Authorized Supplier's loss incurred on such sales and/or (iii) to terminate this Agreement as provided in Section 16(a). Distributor shall pay all customs duties, value added taxes and other taxes and charges arising in connection with the transportation, importation, sales and use of the Products it purchases notwithstanding that title to such Products remains with COMPANY or its Affiliate or Authorized Supplier until fully paid.

LIBC/4349355.3

PSG00005503

(c)    Acceptance of Orders:

All purchase orders for the Products shall be sent in writing, by telefax, by electronic mail or by electronic data interchange, as directed by COMPANY. All orders placed via electronic mail (including but not limited to orders placed on COMPANY's NBCustomers.com web site), shall be placed directly with COMPANY or its Affiliate, as directed by COMPANY, or through a third party service provider and shall be identified as Distributor's order by the use of an electronic signature which shall consist of symbols or codes and shall be affixed to or contained in each order. Such signature shall be sufficient to verify the identity of Distributor. Acceptance of any such order may be made electronically and shall contain COMPANY'S or its Affiliate's, as the case may be, identifying signature. All orders and/or modifications placed by Distributor under this Agreement shall be subject to acceptance by COMPANY or its Affiliate or Authorized Supplier, as the case may be, and no such order shall be binding until accepted by COMPANY or its Affiliate or Authorized Supplier, as the case may be. Orders which are not accepted within forty-five (45) days shall be deemed canceled. Distributor may not cancel an accepted order without COMPANY's or the Affiliate's or Authorized Supplier's (as the case may be) written consent. COMPANY and each Affiliate and each Authorized Supplier shall be entitled (without incurring any liability toward Distributor or any customer) to cancel accepted orders prior to delivery to Distributor in the event that, prior to delivery, notice of termination of this Agreement has been given or in the event that this Agreement shall have been otherwise terminated for any reason. All order forms used for the placing by Distributor of orders for the Products shall be subject to the prior approval of COMPANY or the Affiliate or Authorized Supplier, as the case may be, to which the order is sent and, in any event, the terms of this Agreement shall supersede any terms and conditions on such order forms used by Distributor.

(d)    Title and Delivery Schedules:

(i)    It is expressly understood and agreed between the parties that Products delivered to Distributor shall remain the property of COMPANY or its Affiliate or Authorized Supplier, as the case may be, until the entire value of the invoices issued in relation thereto has been collected. Therefore, partial or conditional payment shall not be considered as valid payment for the transfer of title to the property to Distributor. Distributor shall use its best efforts in assisting COMPANY or its Affiliate or Authorized Supplier, as the case may be, and in taking all measures required or useful in order to protect such right and title to the property consisting of the Products until full payment therefor has been received by COMPANY or its Affiliate or Authorized Supplier, as the case may be. Notwithstanding the retention of title in the Products, risk of loss therefor shall pass to Distributor at the factory loading point and COMPANY or its Affiliate or Authorized Supplier shall have no responsibility for any damages or losses attributable to the carrier. Distributor shall procure insurance from a reliable insurance company covering the Products and the interest of COMPANY or its Affiliate or Authorized Supplier therein.

It is further expressly understood and agreed that all free samples, advertising material, technical, sales, marketing and other documents or material delivered to Distributor on a complimentary basis shall remain the property of COMPANY or its Affiliate and shall be immediately returned upon request and in all cases upon termination of this Agreement.

6

LIBC/4349355.3

PSG00005504

(ii)   Delivery schedules stated to Distributor upon acceptance of an order or otherwise are given as an indication only and shall not be binding. However, a specific delivery schedule may be required by Distributor for a particular order and, once explicitly accepted as such by COMPANY or its Affiliate or Authorized Supplier, as the case may be, it shall be binding as so accepted and if it fails to comply therewith, Distributor shall as its exclusive remedy have the right to cancel the order in question if said scheduled date is more than thirty (30) days overdue.

(e)   Product Availability:

COMPANY and its Affiliates will endeavor to make the Products ordered from inventory available in the quantities and at the times specified by Distributor in its purchase orders, but in case of a shortage in the Products, COMPANY and its Affiliates reserve the right to allocate available supplies to its various distributors and customers in such a way as it may reasonably determine.

(f)   Product Identification:

Distributor shall not remove or otherwise modify COMPANY's or its Affiliates' tradenames or trademarks as they appear on the Products sold to Distributor. Distributor shall not, without COMPANY's written consent, place any other tradenames or trademarks on such Products.

(g)   Product Changes:

COMPANY and its Affiliates reserve the right without thereby incurring any liability to Distributor or to Distributor's customers, from time to time, to terminate, limit or significantly modify or change the basic specifications of any Product and to effect any other changes and/or improvements in any Product without prior notice to Distributor.

(h)   Government Authorization:

Distributor, at its own expense, shall obtain all necessary permits and licenses for the importation of the Products into the Territory and shall secure all necessary regulatory approval for, and shall be responsible for compliance with local law with respect to, the distribution, sale or use of the Products within the Territory. COMPANY and its Affiliates shall cooperate with Distributor in obtaining such approvals.

(i)   Sourcing:

Distributor shall not purchase or otherwise procure Products bearing the Trademarks from any source other than COMPANY and its Affiliates and Authorized Suppliers.

(j)   Required Insurance Coverage:

Distributor will carry continuously during the term insurance of the types specified by COMPANY from time to time (including workers' compensation and liability coverage). Initial insurance coverage requirements are:

7

LIBC/4349355.3

PSG00005505

Commercial General Liability or equivalent
    US $1,000,000 each occurrence
    US $2,000,000 general aggregate
    US $1,000,000 products/completed operations

Automobile Liability
    US $1,000,000 combined single limit

Umbrella              (Coverage over general liability and
    US $1,000,000     automobile liability policies)

Each policy must (i) be obtained from an insurance carrier that has and maintains a Best's Insurance Reports rating of A-, Class VIII, or better and (ii) provide for not less than thirty (30) days' prior notice to COMPANY of cancellation or non-renewal of the policy. New Balance Athletic Shoe, Inc. and its Affiliates shall be named additional insureds in all policies. Distributor shall provide COMPANY with a current certificate of insurance at all times during the term.

7.    CERTAIN COVENANTS OF DISTRIBUTOR

    (a)    Sales Structure:

Distributor shall at its sole expense set up and maintain at all times during the term of this Agreement adequate facilities for stocking the Products, showrooms to display the Products and a sales organization adequate to cover the potential market for the Products in the Territory. Such sales organization shall be subject to COMPANY's approval. Distributor shall, under its sole responsibility and at its own expense, employ a trained and qualified staff to promote and sell the Products throughout the entire Territory and in accordance with Distributor's undertaking herein to at all times vigorously and continuously use its best efforts to promote and sell the Products to Approved Channels throughout the entire Territory and to achieve agreed upon sales goals.

    (b)    Assistance to Customers:

Distributor shall furnish all appropriate information regarding the Products to existing and potential customers in the Territory. Distributor shall reply promptly to all requests for information as well as to all correspondence or purchase orders from said customers. COMPANY and its Affiliates may send their own representatives to visit and advise customers in the Territory.

    (c)    Inventory:

Distributor agrees that during the term of this Agreement it will have in inventory such quantity of Products as shall be sufficient to promptly and efficiently permit Distributor to supply customers in the Territory.

8

LIBC/4349355.3

PSG00005506

      (d)    Safety Health and Other Regulations:

Distributor shall keep COMPANY and its Affiliates informed in writing of all administrative and/or technical regulations applicable to the Products in the Territory; however, COMPANY and its Affiliates shall be the sole judge of whether they will modify or cause to be modified any of the Products in order to conform to any such regulations and COMPANY and its Affiliates shall be under no obligation to so modify or cause to be modified any of the Products.

      (e)    Resale Prices:

Distributor is free to set its resale prices. Such resale prices shall at all times be set forth in a current price list for the Products maintained by Distributor.

      (f)    Reports of Operation/Accurate Records:

(i)    Distributor shall promptly make available to COMPANY or its Affiliate, if directed by COMPANY, during the term of this Agreement, at least quarterly, and shall cooperate in and cause third parties to cooperate in making available to COMPANY or such Affiliate, such information as COMPANY shall reasonably request from time to time and the information set forth below as the same may be modified from time to time:



        (A)    Actual and forecast sales of each of the Products in the Territory as well as Distributor's marketing plan for each Product for the upcoming twelve (12) months on a rolling basis;

        (B)    Distributor's marketing plan, advertising and promotion campaigns (including actual copy and any photographs, audio, video or point of sale materials and displays used in such advertising) and actual expenditures referred to in Section 7(g) in such quarter (such plan shall include, without limitation, on a Product by Product basis, marketing timetable, methods of distribution, nature, timing and amounts of advertising and actual and targeted customers). Such expenditures shall be stated in the local currency of the Territory and the totals shall be converted to U.S. dollars using the Exchange Rate;

        (C)    The potential and existing market, the outlook and trends for the sale of the Products in the Territory, as well as all publically available information on competition (including prices, terms of sales, etc.), on marketing techniques and on significant changes in laws, regulations and practices in the Territory with regard to the importing and sales of the Products;

        (D)    Product line-ups; and

        (E)    List of all Distributor's then current customers of any Product.

9

LIBC/4349355.3

PSG00005507

(ii)   Within ninety (90) days after the close of each fiscal year of the Distributor, Distributor shall forward to COMPANY original signed financial statements relating to Distributor including a balance sheet as of the close of such year and statements of income and retained earnings and cash flows for the year then ended, accompanied by a report thereon, prepared and audited in conformity with generally accepted accounting principles in the Territory by a firm of independent certified public accountants acceptable to COMPANY.

(iii)   It is understood and agreed that the prompt rendering of the aforesaid reports and statements are material obligations of Distributor without which COMPANY would not have been prepared to sign this Agreement. All information and reports provided to COMPANY or its Affiliate pursuant to Section 7(f)(i) shall be treated as confidential material.

(iv)   During the term of this Agreement and for three (3) years thereafter, COMPANY or its Affiliate and Distributor each agree to maintain accurate and complete books, records and accounts of transactions under this Agreement.

(v)   All reports and written materials submitted under this Section or elsewhere pursuant to this Agreement shall be in English with accurate translations.

(g)   Product Advertising and Marketing Expenditures:

Distributor shall:

(i)   at its own cost be responsible for adequate advertising of the Products in the Territory (which shall at all times be properly and exclusively, unless COMPANY otherwise agrees in writing, identified with Trademarks) and the active promotion of sales of the Products throughout the entire Territory.

Distributor further undertakes to expend to unrelated third parties on promotional activities during each Annual Period for advertising and co-op advertising, printed and point-of-sale promotional material, fixtures supplied to third party customers (to the extent not reimbursed), sales promotion and similar marketing activities, consistent with Distributor's marketing plan, as submitted to COMPANY or its Affiliate pursuant to Section 7(f) hereof, the Minimum Advertising Expenditure. At least fifteen (15%) percent of the Minimum Advertising Expenditure shall be expended in each calendar quarter. This amount shall not include any co-op or other allowances made by COMPANY or its Affiliate to Distributor for promotional activities nor shall it include funds spent on samples, tradeshows, trade discounts, sales incentives, attendance at meetings referred to in subsection (iii) below and travel expenses.

(ii)   if requested by COMPANY, Distributor shall pay up to fifteen (15%) percent of its Minimum Advertising Expenditure in any Annual Period to COMPANY or its Affiliate to be utilized in connection with a global or regional marketing fund for purposes of advertising Products or otherwise enhancing brand image. Amounts so paid by Distributor shall be taken into account in determining Distributor's compliance with its Minimum Advertising Expenditure obligations.

10

LIBC/4349355.3

PSG00005508

(iii) participate at its own cost in all appropriate expositions within the Territory for the showing of the Products and attend at least two COMPANY annual worldwide and regional sales meetings.

(iv) express and identify properly in its communications with each customer the "Authorized Distributor" relationship with COMPANY and its Affiliates for the Products.

(v) not engage in, publish, cause to be published, encourage or approve any advertisement or practice which might mislead or deceive the public, which might be detrimental to the good name, trademarks, tradenames, goodwill or reputation of COMPANY and its Affiliates or the Products, or which infringes upon another's copyright, trade dress, slogan advertising idea, publication rights, privacy rights or other intellectual property rights.

All advertising and promotional materials must be approved by COMPANY or its Affiliate prior to use by Distributor, including without limitation printed advertising, catalogs, brochures, billboards, electronic material, Internet sites, television or radio ads, press releases and wireless networks and any and all other mediums now known or hereafter devised. Distributor further agrees, upon request, to promptly discontinue any advertising or practice reasonably deemed by COMPANY or its Affiliate to have a detrimental effect as aforesaid. In any such case, Distributor agrees that it will ensure that any such discontinuance is complied with by all retail sellers or others to which Distributor has distributed the Products. Distributor shall not advertise the Products outside the Territory, provided, however, that Distributor may use, display, transmit, market or otherwise reproduce the Trademarks to promote the Products over the Internet on a COMPANY approved web site, as set forth in Section 3(a). Except for the use of the Trademarks as approved by COMPANY or its Affiliate, Distributor shall indemnify and hold COMPANY and its Affiliates harmless from and against all losses, costs, liabilities and expenses arising out of any claim such advertising or promotional materials violate or infringe any copyright, trademark, service mark, patent or other intellectual property right.



(h)     Commercial Practices

Distributor shall at all times respect normal commercial practices and the rules of fair competition in each country of the Territory. It shall engage in no practices which could be detrimental or embarrassing to COMPANY or its Affiliates.

(i)     Appointment of Brand and Sales Managers

Distributor shall within thirty (30) days of the Effective Date appoint a brand manager and a sales manager to act as liaisons between COMPANY and its Affiliates and Distributor and to have overall responsibility with regard to the Products, sales performance, marketing and sales planning. Such brand manager and sales manager shall be exclusively dedicated to the Products. If COMPANY is not satisfied with the performance of either manager, such manager shall be assigned to other duties.

11

LIBC/4349355.3

PSG00005509

(j)     Samples

During each relevant period, Distributor shall purchase and take delivery of one or more sample bands of Products as specified in COMPANY's or its Affiliate's merchandise plan for the particular selling season.

(k)     Standards of Business Conduct

Distributor acknowledges that COMPANY has, and is determined to maintain, a high reputation for ethical conduct in the world-wide business community and acknowledges further that Distributor's conduct as a distributor shall reflect on COMPANY's and its Affiliates' reputation. Distributor further acknowledges that COMPANY and its Affiliates have obligations under laws of various countries, including, but not limited to the laws of the United States, and that its public image in the business community is critical to it. Distributor shall not do any act or omission which may harm COMPANY's and its Affiliates' reputation or good name or which may trigger the application against COMPANY or its Affiliates of any such laws.

Distributor agrees and undertakes to conform its activities under this Agreement to the highest standards of business ethics and in furtherance thereof assumes full responsibility for compliance with all laws and regulations (whether local or any other applicable laws or rules) and common ethical standards of the Territory; and, even though local laws or business practice may not prohibit such action or omission, Distributor shall not be involved in any unethical activity. Without limitation to the generality of the foregoing, Distributor shall abide strictly by all environmental laws and regulations and individual and labor laws in force in the Territory and shall not, even though local laws or business practices may not prohibit such action, seek unethically to influence any government official.

In conducting all aspects of its operations under this Agreement, Distributor shall abide by any codes of ethics or codes of conduct adopted by the COMPANY from time to time and provided to Distributor. Company shall be entitled to monitor compliance with such codes of ethics and/or codes of conduct at COMPANY's own cost. It is understood and agreed that any such verification or monitoring by COMPANY shall be without liability to COMPANY and shall not relieve Distributor from strictly complying with the codes of ethics and/or codes of conduct.

8.     MINIMUM SALES REQUIREMENTS

(a)     During the Initial Term, Distributor undertakes to sell during each Annual Period such minimum amount in U.S. dollars of Products in Approved Channels in the Territory equal to and as specified in the Minimum Sales Requirement. Such Minimum Sales Requirement shall be based on the Net Selling Price of the Products and initially be calculated in the local currency(ies) of the Territory and converted to U.S. dollars using the Exchange Rate when the monthly reports pursuant to Section 8(c) are delivered by Distributor.

(b)     If this Agreement is extended as provided in Section 5 above, the Minimum Sales Requirements for the one year renewal period will automatically be twenty percent (20%) greater than the Minimum Sales Requirement for the immediately preceding Annual Period with respect to each category.

12

LIBC/4349355.3

PSG00005510

(c)     Within fifteen (15) days after the end of each calendar month, Distributor shall deliver to COMPANY or its Affiliate, if directed by COMPANY, an authenticated written statement in English certified by Distributor's chief financial officer showing the aggregate of the Net Selling Prices and number of units of the Products sold by Distributor or its Affiliates during the prior calendar month broken down by style of each Product, the Approved Channel it was sold in and the geographic area within the Territory where it was sold, all as specified by COMPANY. In addition, such report will include a statement of the inventory as of the end of the month of each style of Products. Such statements shall be stated in the local currency of the Territory and the totals shall be converted into U.S. dollars using the Exchange Rate.

(d)     It is understood and agreed that Distributor's undertaking to fulfill such Minimum Sales Requirement is a material obligation of Distributor without which COMPANY would not have been prepared to enter into this Agreement and failure to satisfy such Minimum Sales Requirement with respect to any Product category in any Annual Period shall entitle COMPANY to (i) terminate this Agreement or (ii) to designate Distributor's appointment for such Product category as non-exclusive for the remainder of the term, by written notice to Distributor at any time after COMPANY shall learn that such Minimum Sales Requirement has not been satisfied.

## 9.     DISTRIBUTION OF OTHER PRODUCTS

(a)     Distributor agrees during the term of this Agreement that Distributor and its Affiliates will not manufacture, sell, distribute or otherwise handle in the Territory any Competing Products unless otherwise agreed to in writing by COMPANY.



(b)     Distributor expressly agrees for itself and its Affiliates during the term of this Agreement not to directly or indirectly facilitate the distribution and/or sale of any Competing Products or to hold or acquire, directly or indirectly, any participation in any organization or entity selling, distributing or otherwise handling Competing Products. Non-compliance by Distributor or its Affiliates with the provisions of this paragraph during the term hereof shall be cause for COMPANY to terminate this Agreement pursuant to Section 16 below.

(c)     In the event that this Section 9 or any portion thereof shall be held by a court or arbitration panel, administrative body or governmental agency of competent jurisdiction to be invalid, illegal or unenforceable for any reason whatsoever, it is expressly understood and agreed that as to such jurisdiction the foregoing restrictions set forth in Section 9 shall be automatically considered modified to embrace the greatest possible time and area of restriction then permitted under applicable law, and such invalidity, illegality or unenforceability of this Section 9 or any portion thereof shall not impair the enforceability of these restrictions as so modified nor in any manner otherwise affect the remaining provisions of this Agreement.

## 10.    RETURN AND PURCHASE OF INVENTORY

(a)     In the event of termination, expiration or non-renewal of this Agreement for any reason whatsoever, COMPANY and its Affiliate shall from and after the date of notice of such termination having been given by either party be entitled to cease accepting orders for any Products and shall be entitled to direct Authorized Suppliers to cease accepting orders. On the effective date of termination, all Products and other materials and documents which are in the

13

PSG00005511

possession or under the control of Distributor which remain the property of COMPANY or any Affiliate shall be immediately returned to COMPANY or the Affiliate by Distributor. Within thirty (30) days of the effective date of such termination, expiration or non-renewal of this Agreement, Distributor shall submit to COMPANY an inventory list of all unsold Products and Promotional Products and all unfinished Promotional Products which are the property of Distributor as of the date of the said termination, expiration or non-renewal. COMPANY may in its sole discretion in all cases (but shall in no case have any obligation to) purchase or cause any Affiliate to purchase all or any part of such inventory by notifying Distributor in writing. Under no circumstances regardless of the cause of termination of this Agreement (including COMPANY's default) shall COMPANY be required to purchase such inventory. The price for any such inventory so purchased shall be COMPANY's, the Affiliate's or the Authorized Supplier's, as the case may be, actual selling price therefor to Distributor or Distributor's manufacturing cost in the case of Promotional Products (excluding shipping, insurance and customs costs). The transportation and packing costs for the Products owned by COMPANY or any Affiliate or repurchased as provided above shall be paid by Distributor. Distributor shall in any event return to COMPANY and its Affiliates free of charge all Products, materials and equipment which they may have made available to Distributor free of charge.

(b) In the event that COMPANY and its Affiliates should not purchase or should purchase only part of the inventory mentioned in the preceding paragraph, Distributor shall have the right, under the terms and conditions of this Agreement, to sell the said inventory or that part of the inventory not purchased for a period of ninety (90) days after the effective date of the termination to customers in Approved Channels in the Territory, it being understood and agreed by Distributor that all such sales shall be made pursuant to normal conditions and terms of sale (including prices) theretofore practiced by Distributor. Distributor shall pay to COMPANY the Fee required under Section 14 hereof with respect to such sales. After such date, all sales by Distributor of any Products held in inventory on the date of termination shall end. Distributor shall thereafter destroy all remaining inventory upon prior written notice to COMPANY of the proposed place and time of such destruction. COMPANY may, at its sole discretion (i) elect to have a representative present at the time and place of such destruction or (ii) request a certificate of the president or other officer of Distributor and the brand manager certifying as to the destruction of the inventory and accompanied by verifying photographs or video.



11. TRADEMARKS AND AUTHORIZED DOMAIN NAME

(a) During the term of this Agreement and solely in connection with the distribution and sale of Products in accordance with the terms and conditions of this Agreement, COMPANY grants Distributor the non-exclusive, non-assignable right to use the Trademarks and Authorized Domain Name.

(b) Distributor shall not (i) acquire any right or interest whatsoever, as a result of this Agreement, in any patents, trademarks including the Trademarks, domain name including the Authorized Domain Name or other intellectual property rights of COMPANY or its Affiliates, (ii) represent in any way that it has any right to or interest in any of the patents, trademarks including the Trademarks, domain name including the Authorized Domain Name or other intellectual property rights of COMPANY or its Affiliates or (iii) use the Trademarks in any manner except as explicitly authorized by COMPANY. Distributor acknowledges and agrees

14

PSG00005512

that any use of Trademarks shall inure to the sole benefit of COMPANY and its Affiliates. If Distributor acquires any rights to the Trademarks or Authorized Domain Name by operation of law or otherwise, it will immediately at no expense to COMPANY, assign such rights to COMPANY along with any associated goodwill, applications and/or registrations.

(c)     If any case of unfair competition or infringement by third parties of the Trademarks or other intellectual property rights of COMPANY or its Affiliates comes to the knowledge of Distributor, the latter will inform COMPANY immediately. COMPANY will, at its own discretion, decide whether it will prosecute any such case of which it is so notified and in what manner it will prosecute. At the request of COMPANY, Distributor will assist COMPANY to the best of its ability. Without limiting the foregoing, it is expressly understood that Distributor shall not be entitled to take or institute any action thereon, either by way of informal protest or legal, equitable or criminal proceedings, without express written approval of COMPANY, nor shall Distributor be entitled to call upon COMPANY to take action thereon, all such matters shall be entirely within the discretion of COMPANY.

(d)     Distributor agrees that it will not, in any country, at any time, (i) challenge COMPANY's or its Affiliate's ownership or use of the Trademarks or Authorized Domain Name, (ii) apply for or seek registration of any words, trademarks, tradenames, domain names, or logos which are the same as or confusingly similar to any of the Trademarks or Authorized Domain Name or which may in any manner be used in unfair competition therewith or (iii) infringe any Trademarks, nor will Distributor incorporate any Trademarks or Authorized Domain Name into Distributor's trademarks, service marks, company name, Internet address, domain names, or any other similar designations. Distributor further undertakes and agrees that it will not at any time do, or so far as it is able, allow to be done, any act or thing which may in any way diminish, dilute or adversely affect the reputation of any of the Trademarks. Further, Distributor acknowledges and agrees that, as between COMPANY and its Affiliates, on the one hand, and Distributor, COMPANY and its Affiliates own all right, title and interest in and to any Internet domain names (and any registrations thereof) containing any of the Trademarks (collectively, the "Domain Names"), including without limitation the Authorized Domain Name and to the extent Distributor retains or obtains any right, title or interest in or to any Domain Name for any reason, Distributor hereby transfers, conveys and assigns, and will transfer, convey and assign, to COMPANY and its successors and assigns any such right, title and interest in and to such Domain Name and any other rights appurtenant thereto. Distributor shall execute any documents requested by COMPANY relating to the Domain Names in order to effectuate COMPANY's rights to the Domain Names hereunder.

(e)     COMPANY may from time to time, pursuant to written approval, and subject to such further terms and conditions as may be provided in such written approval, grant to Distributor a non-exclusive license to use the Trademarks in the Territory to manufacture and package or to arrange for the manufacture and packaging of products to be used solely for promotional purposes and not for re-sale ("Promotional Products"). If such Promotional Products are to be manufactured by a third party manufacturer, such manufacturer shall be subject to COMPANY's written approval at least sixty (60) days prior to the commencement of any manufacturing of such Promotional Products. Distributor or such approved manufacturer shall manufacture and package the Promotional Products from such materials and using such production methods, techniques and standards as COMPANY may specify. COMPANY

15

LIBC/4349355.3

PSG00005513

reserves the right to inspect all machinery, facilities, equipment, raw materials, ingredients, packaging, work in progress and finished Promotional Products. Prior to distribution of any Promotional Product, Distributor shall submit to COMPANY or its Affiliate, if directed by COMPANY, production samples of finished units of the Promotional Product, including packaging. Distributor shall not commence distribution of any such Promotional Product until it has received written approval of the Promotional Product. Distributor shall withdraw from the course of manufacture and from the market any Promotional Product which does not conform with the methods, techniques and standards of COMPANY or which has not otherwise been approved by COMPANY or its Affiliate. Distributor shall indemnify and hold COMPANY and its Affiliates harmless from and against all losses, costs, liabilities and expenses arising out of or related to the Promotional Products or any approved manufacturer whether related to intellectual property infringement, product liability or any other claim or cause of action.

(f)     With respect to the Authorized Domain Name, Distributor shall (i) identify itself to Network Solutions, LLC, or any other applicable registrar for the Authorized Domain Name (the "Registrar") as the new "Account Contact", (ii) submit any information required by the Registrar to change the Authorized Domain Name server information necessary for Distributor's exercise of the rights granted hereunder, and (iii) submit documentation required by the Registrar to effect such changes. Distributor shall assume all duties and responsibilities required by the Registrar as the "Account Contact".

(g)     Distributor shall assist COMPANY and its Affiliates, at COMPANY's request, in the procurement and maintenance of COMPANY's intellectual property rights, including the Trademark and Authorized Domain Name. In connection therewith, Distributor shall, without limitation, execute and deliver to COMPANY in such form as it may reasonably request, all instruments necessary to (i) effectuate copyright and trademark protection, (ii) record Distributor as a registered user of any Trademarks or (iii) cancel any such registration. With respect to any registrations or applications for registration of Trademarks in the Territory, Distributor agrees to take all proper actions requested by COMPANY to facilitate and expedite the registrations.

(h)     COMPANY and Distributor agree that upon termination or expiration of this Agreement, COMPANY or any of its Affiliates (as directed by COMPANY) shall have all right, title and interest in the website content related to the Authorized Domain Name, including copyright rights. COMPANY or its Affiliates shall exclusively own the website content and all economic and other exploitation rights therein and related thereto, including all textual, audio and/or visual rights, digital layers, software engines and digital files. Distributor shall obtain the necessary assignments from the respective authors of any copyrighted works.

12.     AUTHORITY OF DISTRIBUTOR; REPRESENTATION

(a)     The relationship between COMPANY and Distributor is and will remain that of seller and buyer and independent contractor. Distributor, its agents and employees are in no way the sales representatives or agents of COMPANY and its Affiliates for any purpose whatsoever and have no right or authority to represent themselves or act as such or in any way to bind COMPANY and its Affiliates to any obligation to a third party, and they shall not assume or create in writing or otherwise any obligation of any kind, express or implied, in the name of or on behalf of COMPANY and its Affiliates, unless specifically authorized to do so in writing by

16

PSG00005514

COMPANY or its Affiliate and in accordance with the conditions specified by COMPANY or its Affiliate.

(b) Distributor warrants and agrees that it shall be at all times an independent contractor and that it shall do business at its own risk and for its own profit and not as an agent or employee of COMPANY or of any of its Affiliates.

(c) Distributor represents to COMPANY that prior to its negotiation of this Agreement it possessed all of the facilities, equipment, personnel, expertise and experience necessary to perform its obligations under this Agreement and such facilities, equipment, personnel, expertise and experience fully exists on the Effective Date. Distributor acknowledges it has not incurred additional capital or labor costs at the request of COMPANY or its Affiliates or in connection with this Agreement. Distributor further acknowledges that to the extent it incurs additional capital or labor costs during the term of this Agreement, it incurs such cost at its own risk and for its own profit.

13. RETURNED PRODUCTS

(a) COMPANY and its Affiliates and Authorized Suppliers will accept no returns for credit either from Distributor or from any customer unless the company which sold the Product to Distributor gives written permission, in each case, in advance. In no case will such company consider accepting the return of any Products which are not (i) in good merchantable condition comparable to such company's prevailing standards, (ii) in its standard product line and (iii) in active demand. In cases where such company gives its written permission for a specific return for credit, the credit given will be based upon the originally invoiced price of the returned Product.



(b) In the event COMPANY determines it is necessary or appropriate to undertake a product recall, Distributor, at its own expense, shall assist COMPANY, its Affiliates and Authorized Suppliers in such manner and to such extent as COMPANY may reasonably request.

14. DISTRIBUTION FEE

(a) In consideration of the rights granted under this Agreement, Distributor agrees to pay COMPANY the Fee in U.S. dollars based on the sale of all Products by Distributor or its Affiliates, as the case may be. The Fee payable under this Section 14 shall be calculated and paid in accordance with the provisions hereinafter contained and shall be payable within fifteen (15) days after the end of each calendar month with respect to the immediately prior calendar month.

(b) During the Initial Term, Distributor shall pay COMPANY the Minimum Fee. If this Agreement is extended as provided in Section 5, the Minimum Fee for the one year renewal period will automatically be twenty percent (20%) greater than the greater of (i) the Minimum Fee for the immediately preceding Annual Period and (ii) the aggregate Fees payable with respect to the immediately proceeding Annual Period. If the Minimum Fee is not paid in full during any required period of this Agreement, then the balance shall be paid by Distributor to COMPANY in accordance with the provisions hereinafter contained within fifteen (15) days after the end of such period.

17

LIBC/4349355.3

PSG00005515

(c)    Within fifteen (15) days after the end of each calendar month, Distributor shall deliver to COMPANY the statement required under Section 8(c) and the amount of the Fee and, if applicable, the Minimum Fee due to COMPANY in respect thereof.

(d)    For the purpose of this Section 14, the Products shall be deemed to have been sold upon the earlier of the dispatch of the invoice to the purchaser or the delivery of the Products to the purchaser.

(e)    Distributor shall during the continuance of this Agreement keep at its usual place of business true and particular accounts and records of the Products sold by Distributor or its Affiliates and of the amount of all Fees paid or payable hereunder.

(f)    The duly authorized representatives of COMPANY shall have the right at any reasonable time during business hours to inspect and audit the accounts and records of Distributor or its Affiliates relating to the sale and/or disposal of the Products and of the invoice price and all other matters directly or indirectly relevant to the calculation of the amount of Fee due and such representatives shall be entitled to take copies of or extracts from any such records.



(g)    Fee payments made hereunder shall be made in U.S. dollars at the Exchange Rate by wire transfer to the COMPANY Bank Account or to such other account or in such other manner as COMPANY may direct in writing to Distributor, provided that, if payment is overdue and if the Exchange Rate on the date when payment is actually made to COMPANY exceeds the rate prevailing on the date when such payment is due, then such payment shall be made at such higher rate. In the event of Distributor's being unable to effect any payment due hereunder in accordance with this Agreement by reason of any refusal of any government to permit such payment applicable exchange control regulations or by reason of any other government order or control, Distributor shall not be relieved of its obligation to make such payment but COMPANY shall not be entitled to exercise any right of termination hereunder by reason of delay or failure to make the payment provided that:

(i)    Distributor uses every reasonable endeavor to obtain permission to make said payment, and

(ii)    Distributor shall effect payment in any permitted manner required by COMPANY.

Distributor shall make all such declarations and provide all such information and assistance as COMPANY may reasonably require to enable COMPANY to obtain all applicable double taxation convention relief or exemptions from relevant withholding obligation and/or to enable COMPANY to reclaim or claim a credit for such taxes as may have been withheld in accordance with this Section.

(h)    The parties recognize that if any government imposes a withholding tax on the Fee and Minimum Fee, Distributor shall be entitled to deduct therefrom the applicable withholding tax provided that (i) such tax is in fact remitted to such government and (ii) Distributor submits to COMPANY a certificate of such payment.

18

PSG00005516

(i)    In addition, Distributor shall promptly pay for all materials, samples and merchandise which COMPANY, its Affiliates or Authorized Suppliers sells to Distributor pursuant to this Agreement or in connection with the distribution relationship created hereby.

(j)    All late payments shall bear interest at a rate of two (2%) percent per month or, if such rate should exceed any applicable permissible legal interest rate, then at the highest legally permissible rate. The operation of this Section 14 is without prejudice to any other right or remedy COMPANY may have under law or pursuant to the terms of this Agreement, including the right to terminate this Agreement pursuant to Section 16.

## 15.    CONFIDENTIALITY

(a)    Distributor acknowledges that all technical and commercial information and know-how furnished by COMPANY and its Affiliates to Distributor during the term of this Agreement is proprietary and is of a highly confidential and secret nature.

(b)    All of such technical and commercial information and know-how is given and received in strict confidence and is to be used by Distributor solely for the purpose of carrying out this Agreement. Distributor shall keep in strict confidence the aforesaid technical and commercial information and know-how and shall not, for any reason whatsoever, reveal, disclose, sell or transfer any part of such technical or commercial information or know-how, directly or indirectly, to its own employees or agents or to any third party except as permitted by the terms of this Agreement.



(c)    In the performance of its obligations under this Section 15, Distributor shall at its own cost take all precautions and steps which may be reasonably requested in order to protect such know-how and confidential information (including the bringing of legal action in order to ensure that others respect this undertaking of confidentiality). Nothing herein shall be interpreted as prohibiting COMPANY or its Affiliate at its own expense from bringing such legal actions within or outside the Territory as it shall deem to be in its best interest.

(d)    Distributor shall have the right to disclose such technical information and know-how received only to those of Distributor's employees who need to know such information and Distributor agrees to exercise a high degree of care in the selection of its employees and assistant and subsidiary distributors to whom such technical information and know-how, or any part thereof, will be disclosed.

(e)    Distributor's obligations set forth in this Section 15 shall survive and remain in effect even after the expiration or the termination of this Agreement.

(f)    It is expressly agreed that the obligations of Distributor to keep confidential information under this Section 15 shall not apply to any such information which:

(i)    was in the public domain at the time of disclosure to Distributor; or

(ii)    was in the possession of Distributor without binder of secrecy prior to disclosure to it; or

19

LIBC/4349355.3

PSG00005517

(iii) though confidential at the time of disclosure, subsequently becomes part of the public domain through no fault of Distributor.

(g) Distributor shall inform COMPANY without delay of any and all violations which come to Distributor's attention of COMPANY's and its Affiliates' rights in the technical and commercial information and know-how covered by this Agreement. If COMPANY or its Affiliate, after consultation with Distributor but in its entire discretion, should decide to institute a legal action in its own name, it may do so at its own expense, provided however, that Distributor may, at its option, participate in such legal action, in which case each party shall pay its own expenses in connection with such an action, including fees of legal counsel. COMPANY or its Affiliate, as the case may be, shall have the final decision with regard to the conduct of all such legal actions and shall retain all settlements, recoveries and judgments arising therefrom, after reimbursement to Distributor for out of pocket expenses, if any, incurred by Distributor in connection with such legal action at COMPANY's or its Affiliate's specific request. If Distributor decides not to participate in such legal action, it shall at Distributor's expense cooperate with COMPANY or its Affiliate, as the case may be, and assign to it without compensation any claims it may have.

16. TERMINATION

(a) Notwithstanding any other provisions of this Agreement, this Agreement may be terminated before the expiration of its term, without payment by COMPANY of any indemnity or other sums on account of such termination, under the following circumstances:



(i) by COMPANY if any amounts due under this Agreement are not paid within five (5) days of the date such amounts are due;

(ii) except with respect to obligations and terms otherwise provided for in this Section 16, by either party if within fifteen (15) days after notification to the other party, advising said other party of a failure to fulfill any of its obligations under this Agreement or of a violation of or a default under the terms of this Agreement, said other party has not cured such failure, violation or default;

(iii) by COMPANY (A) if a change occurs in the ownership of Distributor as defined in Section 25 (whether such change is in direct or indirect ownership), or (B) if a change or disruption occurs in Distributor's management, commercial or financial situation which change has or might, in COMPANY's reasonable judgment, substantially adversely affect the performance by Distributor of its obligations under this Agreement or (C) if Distributor (v) files a voluntary petition in bankruptcy or is adjudicated a bankrupt or insolvent, (w) files (or there is filed and not dismissed within thirty (30) days) a petition (or an answer to a petition) seeking any reorganization, arrangement, composition, liquidation, dissolution or similar proceeding under any present or future statute, law, or regulation, inside or outside the Territory, relating to bankruptcy, insolvency or other relief for debtors, (x) seeks or consents to or acquiesces in the appointment of any trustee, receiver, or liquidator of all or any substantial part of its properties, (y) makes any general assignment for the benefit of creditors, or (z) admits in writing its inability to pay its debts generally as they become due;

20

PSG00005518

(iv)     upon termination of any other agreement of any nature between COMPANY or its Affiliates, and Distributor, including the Ecuador Distribution Agreement, for any reason whatsoever;

(v)     by mutual consent of the parties hereto;

(vi)     by COMPANY at any time after COMPANY shall learn that the Minimum Sales Requirement has not been satisfied; or

(vii)     by COMPANY upon written notice to Distributor if Distributor violates the terms of Sections 4, 6(f), 6(i) or 15 hereof.

(b)     Termination of this Agreement as provided in paragraphs (i), (ii), (iii)(A), (iii)(B), (vi) and (vii) of Section 16(a) shall be by written notice and shall be effective upon delivery. In the case of paragraphs (iii)(C), (iv) and (v) of Section 16(a), termination is automatic (without notice) upon the occurrence of the event. The time of delivery of any such notice shall be determined as set forth in Section 22 hereof.

(c)     Without limiting COMPANY's right to terminate this Agreement in the event of a breach by Distributor, Distributor agrees that it would be difficult for COMPANY to determine actual damages in the event Distributor breaches any of the below-mentioned obligations. Distributor also agrees that any such action by Distributor would irreparably harm COMPANY's business. Therefore, in good faith estimate of actual damages and not as a penalty, in such circumstances Distributor agrees to pay to COMPANY U.S. $100,000 as liquidated damages in each instance for any of the below-mentioned obligations within seven (7) days after receiving written notice from COMPANY. The breach conditions set forth below shall not be construed to limit COMPANY's other rights and remedies with respect to any such breach of this Agreement. Breach obligations for which Distributor will be liable for liquidated damages are: (i) in the event that Distributor distributes or sells the Products at wholesale outside the Approved Channels or the Territory.



17.     OBLIGATION ON TERMINATION

(a)     COMPANY AND ITS AFFILIATES SHALL HAVE NO LIABILITY TO DISTRIBUTOR OR DISTRIBUTOR'S CUSTOMERS OR OTHER THIRD PARTIES, FOR CLAIMS OR DAMAGES OF ANY KIND, INCLUDING INCIDENTAL OR CONSEQUENTIAL DAMAGES, ARISING OR RESULTING SOLELY FROM TERMINATION OF THIS AGREEMENT IN ACCORDANCE WITH ITS TERMS. Notwithstanding any laws or regulations in the Territory to the contrary, COMPANY and its Affiliates shall not be liable to Distributor on account of the termination or expiration of this Agreement for reimbursement or damages for loss of goodwill, prospective profits or anticipated orders, or on account of any expenditures, investments, leases or commitments made by Distributor or for any other reason whatsoever based upon or growing out of such termination or expiration. Distributor waives any right it may have to receive any compensation or reparations on termination or expiration of this Agreement. Notwithstanding any laws or regulations in the Territory to the contrary, Distributor acknowledges and agrees that (a) Distributor has no expectation and has received no assurances that its business relationship with COMPANY will

21

PSG00005519

continue beyond the stated term of this Agreement or its earlier termination in accordance with Section 16 hereof, or that any investment by Distributor in the promotion of Products will be recovered or recouped by virtue of this Agreement; and **(b)** Distributor shall not have or acquire by virtue of this Agreement or otherwise any vested, proprietary or other right in the promotion of Products or in any goodwill created by its efforts hereunder. The parties acknowledge that this Section 17(a) has been included as a material inducement for COMPANY to enter into this Agreement and that COMPANY would not have entered into this Agreement but for the limitations of liability as set forth herein.

(b)     The termination, expiration or non-renewal of this Agreement shall not relieve Distributor of any liability for any monies due to COMPANY or any Affiliate at the time of such termination, expiration or non-renewal nor shall it relieve Distributor of the post-termination obligations imposed by this Agreement. At no time during the term of this Agreement or at or after its termination shall Distributor have the right for any reason whatsoever to withhold any payments due hereunder to COMPANY or to set off against any such payments any amounts which Distributor claims are owed to it by COMPANY or any Affiliate.

(c)     Upon such termination, expiration or non-renewal, Distributor shall immediately remove from its premise, website and elsewhere all signs and advertising relating to COMPANY and the Products and shall thereafter cease all use of the Trademarks and Authorized Domain Name and all other trademarks and tradenames identified with the Products and Distributor shall ensure that all such use by any assistant and subsidiary distributors or others claiming rights from Distributor shall also immediately cease. Upon such termination, expiration or non-renewal, Distributor agrees promptly to return to COMPANY all technical, sales, marketing and other confidential documents which COMPANY or any Affiliate may have supplied to it, as well as, to the best of Distributor's ability, all copies thereof.



(d)     Upon termination, expiration or non-renewal, Distributor shall permit representatives of COMPANY to inspect the Products and the premises of Distributor to insure compliance with this Section 17.

(e)     Notwithstanding the expiration or non-renewal or earlier termination of this Agreement Sections 1, 2, 6(a), 6(b), 7(f), 10, 11, 12, 14, 15 and 17 through 26 shall remain in full force and effect.

## 18.     FORCE MAJEURE

COMPANY and its Affiliates shall not under any circumstances be liable for any claim whatsoever or however arising of Distributor or any of its customers or any other third party due to COMPANY's, its Affiliates' or Authorized Suppliers' failure of or any delay in performance of any of its obligations arising in connection with this Agreement if the performance of such obligation is prevented, restricted or materially interfered with as a result of any acts, causes or circumstances beyond the reasonable control of COMPANY, its Affiliates and Authorized Suppliers including without limitation acts of God, acts or omissions of any other entity or person (including suppliers of the Products or parts or components thereof), fire, flood, strike or labor dispute of any kind, embargo, war, riot, insurrection or civil or military authority.

22

PSG00005520

19.    INSPECTION

Upon request, COMPANY and its representatives shall have reasonable access, during normal working hours, to Distributor's place(s) of business and inventory stock to ascertain Distributor's compliance with this Agreement.

20.    GOVERNING LAW

This Agreement shall be deemed to have been entered into in the Commonwealth of Massachusetts, U.S.A. and shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts, U.S.A. without giving effect to principles of conflicts of law and excluding the United Nations Convention on Contracts For the International Sale of Goods. This Agreement has been executed in the English language and any interpretation or construction of this Agreement shall be based solely on the English language official text, notwithstanding the fact the parties for convenience or for local requirements may have also executed a version of this Agreement in a non-English language.

21.    ARBITRATION

The parties agree that any and all disputes (whether in contract or any other theories of recovery) related to or arising out of this Agreement or the relationship, its application and/or termination (including post-termination obligations) shall be settled by final and binding arbitration in accordance with the UNCITRAL Arbitration Rules.

 COMPANY may designate the appointing authority, which may be either the International Chamber of Commerce or the American Arbitration Association. The arbitration may be administered by the designated appointing authority, in accordance with its procedures for cases under the UNCITRAL Arbitration Rules.

The arbitration shall be heard and determined by a single arbitrator. The place of arbitration shall be Boston, Massachusetts, USA. The language of the arbitration shall be English and the arbitrator shall speak English fluently. All documents which are not in English shall be submitted with an English translation thereof. The decision of the arbitrator shall be final and binding and any court with proper jurisdiction shall be entitled to issue a decree enforcing the arbitral award.

The arbitrator shall determine the matters in dispute in accordance with the laws of the Commonwealth of Massachusetts, USA. The award shall be made and shall be payable in U.S. dollars.

Notwithstanding the requirement herein that the parties arbitrate disputes arising from or related to this Agreement, either party shall have the right to seek interim equitable relief in the form of a temporary restraining order or preliminary injunction from a court of competent jurisdiction pending the resolution of any such arbitration proceedings. In the event that either party seeks such relief, the other party agrees that the U.S. District Court District of Massachusetts shall have jurisdiction over such matters and the parties hereby agree to submit to such jurisdiction and that any such equitable relief may be enforced against it without any

23

PSG00005521

defense anywhere in the world. Service of process for purposes of the foregoing will be valid if made by hand, in person or via telefax.

22.   NOTICES

All notices, requests, demands and other communications shall be validly given if sent by registered or certified mail, recognized overnight courier such as Federal Express or by telefax to the recipient party's address or telefax number appearing hereinbelow, unless such party has notified the other party of a substitute address or telefax number in writing, and shall be deemed validly delivered upon the date of sending.

| | |
|---|---|
| To COMPANY at: | Brighton Landing |
| | 20 Guest Street |
| | Boston, Massachusetts 02135-2088 USA |
| | Attn: Vice President - International |
| | TELEFAX: (617) 787-9355 |
| | |
| With a copy to: | Brighton Landing |
| | 20 Guest Street |
| | Boston, Massachusetts 02135-2088 USA |
| | Attn: President |
| | TELEFAX: (617) 787-9355 |
| | |
| To Distributor at: | Distributor's Notice Address |



23.   FAILURE TO ENFORCE

The failure of COMPANY to enforce at any time or for any period of time the provisions hereof in accordance with their terms will not be construed to be a waiver of such provisions or of the right of COMPANY thereafter to enforce each and every such provision.

24.   ENTIRE AGREEMENT - MODIFICATIONS

This Agreement supersedes all prior agreements, oral or written, between the parties hereto with respect to the subject matter hereof, including the Distribution Agreement dated January 1, 2010, as amended, and contains the entire and only agreement between the parties respecting the sale and the purchase, the distribution and servicing by Distributor of any Products, and any representation, terms or conditions relating thereto or in connection therewith, oral or in writing, not incorporated herein will not be binding upon either party. No modification, termination, notice of termination or discharge of this Agreement or any of the provisions hereof nor any representation, promise or condition relating to this Agreement will be binding unless made in writing.

24

PSG00005522

## 25. ASSIGNABILITY

This Agreement is binding upon the parties hereto and their respective successors in interest, but with respect to Distributor, this Agreement and the rights granted hereunder is nondivisible, nontransferable and nonassignable, and without the right to grant subdistribution agreements or subcontracts. Without limiting the foregoing, any direct or indirect change in ownership of Distributor shall be deemed a prohibited assignment (for purposes hereof, "change in ownership" shall occur in the event the holders of the stock, membership interests or other voting equity of Distributor own less than sixty seven percent (67%) of such stock, membership interests or other voting equity immediately after one or a series of related transactions). COMPANY shall have the right by written notice to Distributor to assign its rights and/or obligations hereunder to an Affiliate, to a purchaser of its business, or to any entity which succeeds to the interest of COMPANY in the Territory and shall have the right to nominate any other person or entity to receive payments or to undertake the obligations of COMPANY under the terms of this Agreement whether or not this Agreement is so assigned.

## 26. INVALID PROVISIONS

Except as otherwise provided elsewhere in this Agreement, should any provision of this Agreement now or later conflict with any applicable law or administrative regulation with the force of law, whether national or supranational, said provision(s) shall be considered as not written and of no effect and all other provisions of this Agreement shall remain in full force and effect.

IN WITNESS WHEREOF the parties have accepted, agreed and executed this Agreement in one or more counterparts, each of which will be deemed an original, as of the Effective Date.

NEW BALANCE ATHLETIC SHOE, INC.

By: _____

Name: _____Alan R. Hed_____

Title: _____EVP International_____

PERUVIAN SPORTING GOODS S.A.C.

By: _____

Name: _____Lorena Blanco Z_____

Title: _____General Manager_____

25

LIBC/4349355.3

PSG00005523

## Exhibit A

### Approved Channels

- Sporting Goods/Outdoor Stores
- New Balance Only Stores
- Family Shoe Stores
- Specialty Running Stores
- Department Stores



LIBC/4349355.3

PSG00005524

Exhibit B

Fee

(A)   For Products which are footwear, thirteen percent (13%) of the Net Selling Price.

(B)   For Products which are apparel and Accessories:

    (i)     Eleven percent (11%) of the Net Selling Price of such Products which are sold in 2013.

    (ii)     Twelve percent (12%) of the Net Selling Price of such Products which are sold in 2014.

    (iii)     Thirteen percent (13%) of the Net Selling Price of such Products which are sold in 2015 and thereafter.

LIBC/4349355.3

PSG00005525

## Exhibit C

### Minimum Advertising Expenditure

Six (6%) percent of the greater of (i) the aggregate Net Selling Price from the sale of Products by Distributor during the Annual Period or (ii) the aggregate monetary Minimum Sales Requirement for the Annual Period.

PSG00005526

Exhibit D

Minimum Fee

| Annual Period | Amount in US $ | | |
|---|---|---|---|
| | Footwear | Apparel | Accessories |
| January 1, 2013 – December 31, 2013 | $479,570 | $35,536 | $6,600 |
| January 1, 2014 – December 31, 2014 | $624,000 | $64,800 | $10,080 |
| January 1, 2015 – December 31, 2015 | $790,400 | $108,225 | $17,745 |



LIBC/4349355.3

PSG00005527

## Exhibit E

### Minimum Sales Requirement

| Annual Period | Amount in US $ | | |
|---|---|---|---|
| | Footwear | Apparel | Accessories |
| January 1, 2013 – December 31, 2013 | $3,689,000 | $323,060 | $60,000 |
| January 1, 2014 – December 31, 2014 | $4,800,000 | $540,000 | $84,000 |
| January 1, 2015 – December 31, 2015 | $6,080,000 | $832,500 | $136,500 |



LIBC/4349355.3

PSG00005528

## Exhibit E

### Minimum Sales Requirement

| Annual Period | Amount in US $ | | |
|---|---|---|---|
| | Footwear | Apparel | Accessories |
| January 1, 2013 – December 31, 2013 | $3,689,000 | $323,060 | $60,000 |
| January 1, 2014 – December 31, 2014 | $4,800,000 | $540,000 | $84,000 |
| January 1, 2015 – December 31, 2015 | $6,080,000 | $832,500 | $136,500 |

LIBC/4349355.3

PSG00005529

# EXHIBIT 2

NOTICE OF ARBITRATION UNDER THE ARBITRATION RULES OF THE UNITED NATIONS
COMMISSION ON INTERNATIONAL TRADE LAW

BETWEEN:

NEW BALANCE ATHLETICS, INC.

(CLAIMANT)

-AND-

PERUVIAN SPORTING GOODS S.A.C. AND RODRIGO RIBADENEIRA

(RESPONDENT)

# NOTICE OF ARBITRATION

**GOODWIN PROCTER LLP**

Goodwin Procter LLP
100 Northern Ave
Boston, MA 02210
Tel: (617) 570-1000
Fax: (617) 523-1231
Legal representative for Claimant                                                    July 31, 2018

## I.  INTRODUCTION

1. This Notice of Arbitration, together with its Exhibits numbered 1 to 5, is submitted on behalf of New Balance Athletics, Inc. ("New Balance") pursuant to Article 3 of the Arbitration Rules of the United Nations Commission on International Trade Law in force as from August 15, 2010 (the "UNCITRAL Arbitration Rules") against Peruvian Sporting Goods S.A.C. ("PSG") and Rodrigo Ribadeneira ("Ribadeneira") (collectively "Respondents").

2. This Notice of Arbitration contains information concerning the following:

   i.     The name, description and address of each of the Parties (**II**);

   ii.    The Parties' contractual relationship and the nature and circumstances of the Parties' dispute giving rise to Claimant's claims (**III**);

   iii.   The dispute resolution clause, the proposed governing law, the seat and language of the arbitration (**IV**);

   iv.    Claimant's position as regard to the composition of the arbitral tribunal (**V**);

   v.     Claimant's damages (**V**);

   vi.    A statement of the relief sought (**VI**);

3. This dispute principally concerns Respondent's failure to render payment under the Parties' agreement covering Respondent's distribution of New Balance products (the "Distribution Agreement").

## II.  THE PARTIES

## A.  Claimant

4. Claimant is New Balance, a company registered under the laws of Massachusetts, with its registered office located at Boston Landing, 100 Guest Street, Boston, Massachusetts 02135. New Balance is in the business of designing, manufacturing, marketing, and

2

distributing athletic footwear, apparel and accessories. Its footwear, apparel and accessories are distributed all over the world.

5.    Claimant's address is:

> New Balance Athletics, Inc.
> Boston Landing
> 100 Guest Street
> Boston, MA 02135
> Attention: Paul Gauron, EVP and General Counsel
> Tel.:    (617) 746-2554
> Fax:    (617) 787-9355
> paul.gauron@newbalance.com

6.    Claimant's representative, to whom all correspondence should be sent in this arbitration, are:

> Goodwin Procter LLP
> Mark Tully (BBO # 550403)
> 100 Northern Avenue
> Boston, MA 02210
> Tel.:    (617) 570-1000
> Fax:    (617) 523-1231
> MTully@goodwinlaw.com

**B.    Respondents**

7.    Respondents are Peruvian Sporting Goods S.A.C., a company registered under the laws of Peru, with its registered office located at Carretera Panamericana KM, 1303 mz. B lote 4 Zofratacna, Tacna, Peru, and Rodrigo Ribadeneira, an individual, who during the relevant time period was the majority shareholder in PSG.

8.    Respondents' contact information is:

> Peruvian Sporting Goods S.A.C.
> Carretera Panamericana KM
> 1303 mz. B lote 4 Zofratacna
> Tacna, Peru
> Attention: Rodrigo Ribadeneira
> TELEFAX: (5932) 484-195
>
> Rodrigo Ribadeneira

3

Hidalgo de Pinto
City of Quito, Ecuador

## III.   THE PARTIES' CONTRACT AND THE NATURE AND CIRCUMSTANCES OF THE PARTIES' DISPUTE GIVING RISE TO THE CLAIMS

9.       On January 1, 2013, New Balance and PSG entered into a three-year distribution agreement for the sale and distribution of New Balance's products in Peru (the "Agreement"). Ex. 1 (Agreement). The three-year term of the Agreement was subject to a one-year extension if the Agreement was not terminated by either party sixty days in advance of its scheduled termination on December 31, 2015. Ex. 1, ¶ 5(b). By all accounts, the relationship between New Balance and PSG was successful for two and a half years. But in mid-2015, the relationship took a turn for the worse when PSG fell behind on its contractual obligations and became less and less responsive to New Balance's inquiries.

10.     By July 2015, New Balance had notified PSG of its past due payments and that unless it made substantial progress toward bringing them up-to-date, PSG would be unable to order more product under the Agreement. Ex. 3, p. 57. Over two months later, PSG had still not become current on its past due payments, promising instead to make its payments to New Balance over time. Ex. 2, p. 23; Ex. 3, pp. 60, 66. To the contrary, however, PSG continuously failed to adhere to each and every payment schedule it proposed. Ex. 3, pp. 64, 74, 110–11.

11.     Between July 2015 and January 1, 2016, New Balance and PSG tried to negotiate a new distribution agreement, while New Balance also tried to recover PSG's past-due balances. The Parties could not come to terms on a new distribution agreement, in large part due to PSG's eleventh hour demand for changes to the new agreement's terms. Ex. 3, pp. 80–81. As New Balance pointed out to PSG at the time, many of its demands were "huge change[s] in the conditions that ha[d] been negotiated extensively over the [previous] year." Ex. 3, pp. 82–83.

12.     On January 1, 2016, the Agreement's one-year extension went into effect and the parties remained subject to the terms of that Agreement. Ex. 3, pp. 88–102; Ex. 1, ¶ 5(b).

4

13.  At about that same time, New Balance notified PSG that continued delinquency of amounts owed under the Agreement would jeopardize the parties' relationship. Ex. 3, pp. 110–11.  On May 4, 2016, New Balance wrote to PSG: "We need to have an honest conversation about what the future holds for our relationship.  We have been partners for many years but the last 12 months ha[ve] tested [New Balance's] patience and, if there is no future with PSG/Super Deportes, we will need to look at other ways to keep the brand relevant in Peru and Ecuador." Ex. 3, p. 119.  Later that month, New Balance informed PSG that New Balance would discontinue shipping its product to PSG until past due amounts that it owed under the Agreement had been paid. Ex. 2, p. 13.

14.  On June 23, 2016, New Balance notified PSG that it would not agree to PSG's demanded changes to the Agreement and that the parties' relationship would end on December 31, 2016, at the termination of the one-year extension under the original Agreement.  Ex. 4.

15.  As a result of PSG's failure to pay money due and owing under the Agreement, as of June 30, 2018, PSG owed New Balance over $2.9 million for product sold, contractual interest, and past-due distribution fees.  Interest on these amounts continues to accrue according to the terms of the Agreement.  The precise amounts that PSG owes New Balance are set forth in the below table:

| Description | Amount | Interest | Combined |
|---|---|---|---|
| Distribution Fees | $1,692,080.00 | $727,377.41 | $2,419,457.41 |
| Sample Expense | $43,801.00 | $39,955.05 | $83,756.05 |
| Withholding Tax Debits | $207,823.72 | $191,438.70 | $399,262.42 |
| **TOTAL** | **$1,943,704.70** | **$958,771.16** | **$2,902,475.86** |

16.  On November 25, 2016, through an Assignment of Rights, PSG purports to have transferred "all of the rights entitled to [it]" in relation to the dispute between it and New Balance to Ribadeneira.  Ex. 5.  Thus, to the extent of any such purported assignment, Ribadeneira has "take[n] [PSG's] place" under the Agreement, and is subject to the Agreement's arbitration clause. *Id.*

## IV. DISPUTE RESOLUTION CLAUSE, GOVERNING LAW, SEAT AND LANGUAGE OF THE ARBITRATION

### (a)    The Arbitration Clause

17.    This arbitration is initiated pursuant to the arbitration clause found at paragraph 21 of the Agreement, which provides as follows:

> The parties agree that any and all disputes (whether in contract or any other theories of recovery) related to or arising out of this Agreement or the relationship, its application and/or termination (including post-termination obligations) shall be settled by final and binding arbitration in accordance with the UNCITRAL Arbitration Rules. . . .  The arbitration shall be heard and determined by a single arbitrator.  The place of arbitration shall be Boston, Massachusetts, USA.

### (b)    The Place of Arbitration

18.    Pursuant to paragraph 21 set out above, the place of the arbitration is Boston, Massachusetts, USA.

### (c)    Governing Law

19.    The Agreement is governed by the substantive laws of the Commonwealth of Massachusetts pursuant to paragraph 20, which provides as follows:

> This Agreement shall be deemed to have been entered into in the Commonwealth of Massachusetts, U.S.A and shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts, U.S.A without giving effect to principles of conflicts of law and excluding the United Nations Convention on Contracts For the International Sale of Goods.

### (d)    The Language of Arbitration

20.    Pursuant to paragraph 21 of the Agreement, the language of the arbitration shall be English.

## V.    THE ARBITRAL TRIBUNAL

21.    Paragraph 21 of the Agreement provides for a single arbitrator. Pursuant to paragraph 21, the appointing authority shall be the American Arbitration Association.

## VI.    CLAIMANT'S DAMAGES

ACTIVE/95834196.5

22. New Balance's damages consist of monies owed for product sold, contractual interest, and past-due distribution fees and are currently estimated at $2,902,475.86, plus interest that continues to accrue under the Agreement.

## VII. RELIEF SOUGHT

23. As a result, New Balance respectfully requests the arbitral tribunal to issue an award:

    i.    declaring that the arbitral tribunal has jurisdiction to consider the dispute described herein between the Parties;

    ii.   declaring that Respondents violated their obligations by failing to render payment to New Balance according to the terms of the Agreement;

    iii.  ordering Respondents to compensate New Balance for the damages and losses suffered as a result of PSG's breaches of the Agreement, currently estimated to be in the amount of $2,902,475.86, plus interest that continues to accrue under the Agreement;

    iv.   ordering Respondents to pay all arbitration costs, including Claimant's representative's costs and expenses; and

24. For the avoidance of doubt, Claimant reserves its right to:

    i.    raise any and all further claims arising out of or in connection with the disputed matters described in this Notice of Arbitration or otherwise arising between the Parties; and

    ii.   amend and/or supplement the relief sought herein;

    iii.  produce such factual or legal arguments or evidence (including witness testimony, expert testimony and documents) as may be necessary to present its case or rebut any case which may be put forward by Respondent; and

    iv.   seek interim and provisional measures before this arbitral tribunal or any competent national court.

ACTIVE/95834196.5

Respectfully submitted,

/s/ Mark Tully

Mark Tully
Goodwin Procter LLP
Legal representative for Claimant
100 Northern Avenue
Boston, MA 02210
Tel.: (617) 570-1000
Fax: (617) 523-1231
MTully@goodwinlaw.com
July 31, 2018

8

# EXHIBIT 3

IN THE MATTER OF AN ARBITRATION UNDER THE ARBITRATION RULES OF THE
UNITED NATIONS COMMISSION ON INTERNATIONAL TRADE LAW

BETWEEN:

NEW BALANCE ATHLETICS, INC.

(CLAIMANT)

-AND-

PERUVIAN SPORTING GOODS S.A.C. and RODRIGO RIBADENEIRA

(RESPONDENTS)

# RESPONSE TO THE NOTICE OF ARBITRATION

## QUINN EMANUEL URQUHART & SULLIVAN LLP

Quinn Emanuel Urquhart & Sullivan
1300 I Street NW, Suite 900
Washington, DC 20005
Tel: (202)538-8000
Fax: (202)538-8100
Legal representative for Respondents

September 4, 2018

## I.     INTRODUCTION

1.     Peruvian Sporting Goods S.A.C. ("PSG") and Rodrigo Ribadeneira ("Mr. Ribadeneira") (collectively, "Respondents") submit this response to Claimant's Notice of Arbitration (hereinafter the "Response"), together with its Exhibits numbered R-1 to R-6 pursuant to Article 4 of the Arbitration Rules of The United Nations Commission on International Trade Law as adopted in 2013 (the "UNCITRAL Arbitration Rules").

2.     Respondents reserve their right to submit a Statement of Defense/Counter-Memorial/Counterclaim pursuant to Articles 21 and 22 of the UNCITRAL Arbitration Rules, including objecting to the jurisdiction of the Arbitral Tribunal, in accordance with the schedule and due process determined by the parties and/or the Tribunal.

3.     Unless expressly admitted, each paragraph of the Notice is denied by Respondents.

4.     Pursuant to Article 4 of the UNCITRAL Arbitration Rules, this Response contains information concerning the following:

    i.       The name, description and address of each of the Parties (**II**);

    ii.      Respondents' comments as to the arbitral tribunal's jurisdiction (**III**);

    iii.     Respondents' position as regards the nature and circumstances of the dispute (**IV**);

    iv.      Respondents' comments concerning the composition of the arbitral tribunal (**V**);

    v.       Respondents' comments as to the place of arbitration, the applicable rules of law and the language of the arbitration (**VI**);

    vi.      Relief sought (**VII**)

## II.    THE PARTIES

## A.    Respondents

5.    Respondent Peruvian Sporting Goods S.A.C. is a sportswear distribution company registered under the laws of Peru, with its registered office located at Carretera Panamericana KM, 1303 Mz. B lote 4 Zofratacna, Tacna, Peru.

6.    Respondent Rodrigo Ribadeneira is a successful Ecuadorian entrepreneur who wholly or partially owns corporate entities, including PSG, that have made investments in Peru, as well as in other countries in Latin America.

7.    Respondents' addresses are:

> Peruvian Sporting Goods S.A.C
> Carretera Panamericana KM
> 1303 mz. B lote 4 Zofratacna
> Tacna, Peru
> Tel: (5932)484-195
>
> Rodrigo Ribadeneira
> Hidalgo de Pinto
> Quito, Ecuador

8.    Respondents' representatives, to whom all correspondence should be sent in this arbitration, are:

> Quinn Emanuel Urquhart & Sullivan LLP
> David M. Orta
> Julianne Jaquith
> Manuel Valderrama
> 1300 I Street NW, Suite 900
> Washington, DC 20005
> Tel:(202)538-8000
> Fax: (202)538-8100
> davidorta@quinnemanuel.com
> juliannejaquith@quinnemanuel.com
> manuelvalderrama@quinnemanuel.com

**B.    Claimant**

9.    Claimant is New Balance, a company registered under the laws of Massachusetts, with its registered office located at Boston Landing, 100 Guest Street, Boston, Massachusetts 02135.  New Balance is in the business of designing, manufacturing, marketing, and distributing athletic footwear, apparel, and accessories.

## III.    RESPONDENTS' COMMENTS AS TO THE ARBITRAL TRIBUNAL'S JURISDICTION

10.    This Tribunal does not have jurisdiction over Mr. Rodrigo Ribadeneira.  Mr. Ribadeneira was not and never has been a party to the 2013 Distribution Agreement between PSG and New Balance (the "Distribution Agreement").  PSG also never assigned the Distribution Agreement to Mr. Ribadeneira, nor has he in any way assumed the obligations to New Balance under that agreement.  It is a fundamental principle of arbitration that it is based upon the consent of the parties to the arbitration agreement.  Without its consent, a party may not be compelled to arbitrate a dispute.

11.    Pursuant to Clause 21 of the Distribution Agreement, the parties to the Distribution Agreement agree to arbitrate "all disputes arising out of the Distribution Agreement."  *See* Claimant's Exhibit 1.  Only the parties to the Distribution Agreement, namely PSG and New Balance, can be bound by the Distribution Agreement's arbitration clause.  The Distribution Agreement itself, with respect to the Distributor is, by its own terms, "nondivisible, nontransferable, and nonassignable".  *See* Claimant's Exhibit 1.  As noted, PSG never assigned or transferred this agreement to Mr. Ribadeneira.  Accordingly, Mr. Ribadeneira, as a non-party to the Distribution Agreement and its arbitration agreement, cannot be bound by its arbitration clause.

4

12.   Claimant wrongly contends that through an Assignment of Rights PSG has transferred its rights in relation to the dispute between it and New Balance to Mr. Ribadeneira. *See* Notice of Arbitration, ¶ 16; *see also* Claimant's Exhibit 5.  PSG executed the Assignment of Rights in connection with very different proceedings initiated against New Balance in Peru.  The Peruvian proceedings, as will be described in more detail below, relate to New Balance's failure to move forward with a New Distribution Agreement in Peru with Superdeporte S.A.C., an entity that Respondents had created for purposes of distributing New Balance's products in Peru.  It does not relate to PSG's rights and obligations under the Distribution Agreement that is the subject of this proceeding.

13.   Furthermore, the Assignment of Rights contemplates only that PSG will assign its rights to Mr. Ribadeneira "with respect to legal actions to be initiated against New Balance Athletic Shoe Inc. in Peru and anywhere else in the world." *See* Claimant's Exhibit 5.  This arbitration proceeding is not a proceeding initiated against New Balance, as New Balance is the Claimant in this arbitration.  Moreover, and importantly, the Assignment of Rights does not assign and does not effectuate any assignment of PSG's obligation to pay invoices billed by New Balance under the Distribution Agreement.  That obligation, should it exist, remains with PSG.  As such, Mr. Ribadeneira has not "take[n] PSG's place" under the Agreement as New Balance contends.  *Id.*  The Assignment of Rights is not only inapplicable to this proceeding, an assignment of the type that Claimants says occurred— which it did not—is forbidden by the Distribution Agreement which, as noted, precludes any assignment of PSG's rights and obligations under the agreement.

14.   As a result, an arbitral tribunal lacks jurisdiction to hear any dispute between Claimant and Mr. Ribadeneira or any claims which Claimant purports to have in relation to Mr.

Ribadeneira. It must decline to exercise jurisdiction over any dispute relating to Mr. Ribadeneira, who does not consent to arbitrate these disputes with New Balance.

## IV. THE NATURE AND CIRCUMSTANCES OF THE DISPUTE

### (a) Factual Background

15. On January 1, 2013, New Balance and PSG entered into a Distribution Agreement, as they had done a number of times previously, which governed the sale and distribution of New Balance's products in Peru. The Distribution Agreement was valid for a term of three years. If neither party expressed an intention to let the Distribution Agreement expire, then, by its terms, the Distribution Agreement would automatically be renewed for an additional year, until December 31, 2016. At the end of 2015, neither party expressed an intention to let the Distribution Agreement expire. As such, the parties allowed the Distribution Agreement to automatically renew until December 31, 2016.

16. The Distribution Agreement between PSG and New Balance was successful. PSG invested significant sums of money in marketing New Balance's products in Peru, and those efforts significantly increased New Balance's brand visibility and sales in Peru.

17. During 2015, New Balance proposed that PSG, through a new corporate entity to be created, and New Balance enter into a new Distribution Agreement (the "New Distribution Agreement") for Peru that would take effect after the December 31, 2016 expiration of the Distribution Agreement with PSG and presumably would contain more favorable terms for both parties. The new structure proposed by New Balance required that the corporate entity with whom it contracted for distribution in Peru be at the "retail" level so that New Balance would receive dual margins and better product placement where its products were being sold. New Balance maintained that this was essential for any future distribution

6

relationship with New Balance. New Balance stated that it required the new structure under the New Distribution Agreement so as to gain an "unfair advantage" over its competitors in the Peruvian market. Claimant's Exhibit 3, p. 59.

18. The parties exchanged an initial draft of the New Distribution Agreement in September 2015 and negotiated the terms of the New Distribution Agreement over the coming months. As a part of the New Distribution Agreement, New Balance requested that PSG alter their distribution structure for New Balance products in Peru, in part by utilizing a new Peruvian entity that PSG or its owners would create—the entity created for this purpose ultimately was called Superdeporte S.A.C. ("Superdeporte")—to serve as New Balance's exclusive distributor under the New Distribution Agreement. By the end of January 2016, all of the terms of the New Distribution Agreement were finalized and agreed to between New Balance and PSG, as Superdeporte had not yet been created. New Balance and PSG agreed that the New Distribution Agreement would be finalized as between New Balance and PSG, and that once Superdeporte was established, Superdeporte would be substituted for PSG in the New Distribution Agreement. Claimant's Exhibit 3, p. 80, 91-92. This approach would allow the parties to finalize the New Distribution Agreement as soon as possible.

19. In early May of 2016, PSG and Superdeporte informed New Balance that despite some delays, Superdeporte was ready to distribute New Balance products in Peru. With Superdeporte up and running, New Balance was supposed to promptly modify the New Distribution Agreement in order to add Superdeporte as their Peruvian distributor. As such, in order to finalize agreements with retailers, one of PSG's employees asked New Balance

for a letter confirming that Superdeporte was New Balance's distributor in Peru. Claimant's Exhibit 2, pp. 17-19, 27.

20.　　On May 30, 2016, much to PSG and Superdeporte's surprise, New Balance informed PSG and Superdeporte that no distribution agreement existed between New Balance and Superdeporte. Claimant's Exhibit 2, pp. 12-13. Shortly thereafter, on June 23, 2016, New Balance notified PSG and Superdeporte in writing that it was formally terminating the Distribution Agreement with PSG effective December 31, 2016. *See* Claimant's Exhibit 4. On July 8, 2016, ignoring that it had already concluded the New Distribution Agreement between New Balance and Superdeporte that would take effect on January 1, 2017, New Balance informed PSG and Superdeporte, without any explanation, that New Balance had decided to work with another distributor in Peru beginning in 2017. New Balance then concluded its contractual relationship with PSG on December 31, 2017 and has done business in Peru through another distributor, Deportes Sparta, effective January 1, 2017.

21.　　At or around that time, Superdeporte S.A., New Balance's partner in Ecuador, was also negotiating licensing agreements with New Balance in Ecuador. After the termination of the relationship in Peru, negotiations for the Ecuador agreements also stalled and ultimately failed.

22.　　In January 2017, Mr. Ribadeneira initiated civil legal proceedings against New Balance in the Peruvian civil courts with respect to New Balance's failure to honor its obligations under the New Distribution Agreement and alleging extra-contractual claims that arose from New Balance's failure to conduct itself in good faith under Peruvian law with respect to the negotiation and execution of the New Distribution Agreement ("the Peruvian Demand"). *See* Respondents' Exhibit 1. In the Peruvian Demand, Mr. Ribadeneira argues

8

first that the terms of the New Distribution Agreement were agreed to, the New Distribution Agreement is a valid contract, and that the parties' respective rights had been validly perfected. *Id.* at 18 (English version) and at 21 (Spanish version). If the court were to find that there was not a valid contract, Mr. Ribadeneira also argues that New Balance had a pre-contractual obligation under Peruvian law to negotiate with PSG and Superdeporte in good faith, particularly after requiring that the owners of the Peruvian distribution business create a new entity at the "retail" level for purposes of effectuating the New Distribution Agreement, and that it breached its pre-contractual obligation to Mr. Ribadeneira, PSG, and Superdeporte. *Id.* at 9 (English version) and at 10 (Spanish version).

23.    On February 1, 2017, Mr. Ribadeneira filed a request with the Peruvian Court for interim measures, asking that the court order New Balance to abstain from the distribution of its products in Peru with any distributor other than PSG. *See* Respondents' Exhibit 2. In December 2017, the Peruvian court overseeing the Peruvian Demand granted the request for interim measures. *See* Respondents' Exhibit 3. The court ordered a halt on the distribution of New Balance products in Peru during the pendency of the proceeding. On July 31, 2018, the Peruvian Court dissolved its interim measures order, formally permitting the distribution of New Balance products in Peru. *See* Respondents' Exhibit 4.

24.    On May 29, 2018, Respondents and Superdeporte filed a petition for discovery in aid of the Peruvian proceeding pursuant to 28 U.S.C. §1782 in the District of Massachusetts against Claimant, as well as a number of current and former employees who were involved in the decision not to move forward with the New Distribution Agreement. Claimant, as well as John, Cullen, a current New Balance employee, and William Tung, a former New Balance employee, have moved to quash the subpoenas and Respondents and Superdeporte

9

have opposed the motions to quash. On August 17, 2018, Respondents and Superdeporte filed a separate petition for discovery in aid of the Peruvian proceeding pursuant to 28 U.S.C. §1782 in the District of Oregon from a former New Balance employee, Alan Hed, who signed the Distribution Agreement on behalf of Claimant, and who was also involved in New Balance's decision not to move forward with the new Distribution Agreement and to work with another distributor in Peru. On August 22, 2018, the Oregon Court granted the 1782 petition. These proceedings remain ongoing.

**(b)     Responses to Claimant's Claims**

25.     Respondents deny Claimant's entitlement to the damages it seeks. Claimant estimates its damages to be over $2.9 million, but it provides no documentary support for the alleged damages sought. Claimant has failed to submit invoices, statements of account, or other contemporaneous documentation to support its claim for damages. Pursuant to Section 14 of the Distribution Agreement, the right of Claimant to obtain the Distribution Fee as well as the calculation of the Distribution Fee, is based upon the sale of products by the distributor or its affiliates. *See* Claimant's Exhibit 1. Claimant provides no proof that products were in fact sold within the meaning of Section 14 of the Distribution Agreement. To the extent that products were not sold, no Distribution Fees would be owed under the Distribution Agreement. Respondents reserve the right to rebut any and all of Claimant's damages claims once Claimant has submitted any support for their damages claim.

26.     While Respondents did fall behind on their payments of Distribution Fees to Claimant in late 2015, given the parties' longstanding relationship, which dates back to 1992, both parties sought and expected to work through the payment delays. Such payment delays are common in the sportswear distribution industry, and parties expect continuity in their

contracts. The situation here was no different. Claimant had been flexible in the past with payment delays, and Respondent PSG expected the same treatment here, which has become a customary part of the parties' relationship. Respondent PSG explained its temporary cash flow issues to Claimant who expressed a desire to continue to work together notwithstanding this temporary delay in payment. Respondent PSG continued to make payments to Claimant in good faith throughout 2015 and 2016. *See* Claimant's Exhibit 3, p. 118. Respondent PSG thanked Claimant for its patience on its payment defaults and reinforced its superior ability as a distributor.

27. Furthermore, in addition to failing to cite to a shred of evidentiary support, Claimant's damages claim is larger than the amounts that Claimant's own collections agency sought to collect from Respondent PSG in 2017. *See* Respondents' Exhibit 5. In 2017, Claimant hired a collections agency, Atradius Collections, who attempted to collect supposed amounts owed under the Distribution Agreement. Claimant's own collections agency's statement of account states that Respondent PSG's outstanding amount owed to Claimant, excluding interest, was $918,207.51, and including interest, was $1,025,657.04. *Id*. Contemporaneous statements of account which Claimant provided to Respondent PSG also reflect similar totals. *See* Respondents' Exhibit 6.

28. For all of these reasons, and others to be elaborated during this proceeding, Respondents contest Claimant's unsubstantiated damages claim.

## V.    THE ARBITRAL TRIBUNAL

29. Paragraph 21 of the Distribution Agreement provides for a single arbitrator. In its Notice of Arbitration and in accordance with paragraph 21 of the Distribution Agreement, Claimant designated the American Arbitration Association as the appointing authority.

30. To date, neither Claimant nor Respondents have submitted a proposal for the appointment of an arbitrator. In accordance with Article 8 of the UNCITRAL Rules, if within 30 days after receipt by all other parties of a proposal for the appointment of a sole arbitrator the parties have not reached agreement thereon, a sole arbitrator shall, at the request of a party, be appointed by the appointing authority.

## VI. RESPONDENTS' COMMENTS AS TO THE PLACE OF ARBITRATION, THE APPLICABLE RULES OF LAW AND THE LANGUAGE OF THE ARBITRATION

### (a) The Place of Arbitration

31. Respondents confirm Boston, Massachusetts as the place of arbitration.

### (b) Governing Law

32. Respondents confirm that in accordance with paragraph 20 of the Distribution Agreement, the Agreement is covered by the substantive laws of the Commonwealth of Massachusetts but note further that the applicable conflict of laws provisions of the Commonwealth of Massachusetts also will apply.

### (c) The Language of Arbitration

33. Respondents confirm that in accordance with paragraph 21 of the Distribution Agreement, the language of the arbitration is English.

## VII. RELIEF SOUGHT

34. Respondents reject Claimant's claims as set out in its Notice and reject the relief sought.

35. Respondents respectfully request the arbitral tribunal to:

   i.   Dismiss all Claimant's claims with respect to Mr. Ribadeneira on the ground that the arbitral tribunal lacks jurisdiction with respect to a dispute between Claimant and Mr. Ribadeneira.

      ii.     Dismiss Claimant's claim in their entirety;

      iii.    Order Claimant to pay all arbitration costs, including Respondents' representative's costs and expenses; and

      iv.    Order any further and/or additional relief as the Tribunal may deem appropriate.

36.    Respondents reserve their right to:

      i.      Amend or supplement the above arguments as well as to present any counterclaims it may have or that come to light as the proceedings evolve, if any;

      ii.     Amend or supplement the relief sought herein;

      iii.    Present factual or legal arguments as may be necessary to present its case or rebut any case put forward by Claimant; and,

      iv.    Seek interim and or provisional measures before this tribunal or any competent national court.

Respectfully submitted,

David M. Orta
Legal representative for Respondents
1300 I Street NW, Suite 900
Washington, DC 20005
Tel: (202)538-8000
Fax: (202)538-8100
September 4, 2018

# EXHIBIT 4

IN THE MATTER OF AN ARBITRATION UNDER THE ARBITRATION RULES OF THE
UNITED NATIONS COMMISSION ON INTERNATIONAL TRADE LAW

BETWEEN:

NEW BALANCE ATHLETICS, INC.

(CLAIMANT)

-AND-

PERUVIAN SPORTING GOODS S.A.C. and RODRIGO RIBADENEIRA

(RESPONDENTS)

# AMENDED RESPONSE TO THE NOTICE OF ARBITRATION AND COUNTERCLAIM

**QUINN EMANUEL URQUHART & SULLIVAN LLP**

Quinn Emanuel Urquhart & Sullivan
1300 I Street NW, Suite 900
Washington, DC 20005
Tel: (202)538-8000
Fax: (202)538-8100
Legal representative for Respondents
October 29, 2018

# I.   INTRODUCTION

1.   Peruvian Sporting Goods S.A.C. ("PSG") and Rodrigo Ribadeneira ("Mr. Ribadeneira") (collectively, "Respondents") submit this amended response to Claimant's Notice of Arbitration (hereinafter the "Amended Response and Counterclaim"), together with its Exhibits numbered R-1 to R-6 pursuant to Article 4 of the Arbitration Rules of The United Nations Commission on International Trade Law as adopted in 2013 (the "UNCITRAL Arbitration Rules").

2.   Respondents reserve their right to submit a Statement of Defense/Counter-Memorial/Counterclaim pursuant to Articles 21 and 22 of the UNCITRAL Arbitration Rules, including objecting to the jurisdiction of the Arbitral Tribunal, in accordance with the schedule and due process determined by the parties and/or the Tribunal.

3.   Unless expressly admitted, each paragraph of the Notice is denied by Respondents.

4.   Pursuant to Article 4 of the UNCITRAL Arbitration Rules, this Response contains information concerning the following:

    i.      The name, description and address of each of the Parties (**II**);

    ii.     Respondents' comments as to the arbitral tribunal's jurisdiction (**III**);

    iii.    Respondents' position as regards the nature and circumstances of the dispute (**IV**);

    iv.    Respondents' comments concerning the composition of the arbitral tribunal (**V**);

    v.     Respondents' comments as to the place of arbitration, the applicable rules of law and the language of the arbitration (**VI**);

    vi.    Respondents' counterclaim (**VII**);

    vii.   Relief sought (**VIII**)

2

## II.    THE PARTIES

### A.    Respondents

5.    Respondent Peruvian Sporting Goods S.A.C. is a sportswear distribution company registered under the laws of Peru, with its registered office located at Carretera Panamericana KM, 1303 Mz. B lote 4 Zofratacna, Tacna, Peru.

6.    Respondent Rodrigo Ribadeneira is a successful Ecuadorian entrepreneur who wholly or partially owns, or owned, corporate entities that have made investments in Peru, as well as in other countries in Latin America.

7.    Respondents' addresses are:

> Peruvian Sporting Goods S.A.C
> Carretera Panamericana KM
> 1303 mz. B lote 4 Zofratacna
> Tacna, Peru
> Tel: (5932)484-195
>
> Rodrigo Ribadeneira
> Hidalgo de Pinto
> Quito, Ecuador

8.    Respondents' representatives, to whom all correspondence should be sent in this arbitration, are:

> Quinn Emanuel Urquhart & Sullivan LLP
> David M. Orta
> Julianne Jaquith
> Manuel Valderrama
> 1300 I Street NW, Suite 900
> Washington, DC 20005
> Tel:(202)538-8000
> Fax: (202)538-8100
> davidorta@quinnemanuel.com
> juliannejaquith@quinnemanuel.com
> manuelvalderrama@quinnemanuel.com

**B.      Claimant**

9.      Claimant is New Balance, a company registered under the laws of Massachusetts, with its registered office located at Boston Landing, 100 Guest Street, Boston, Massachusetts 02135.  New Balance is in the business of designing, manufacturing, marketing, and distributing athletic footwear, apparel, and accessories.

## III.     RESPONDENTS' COMMENTS AS TO THE ARBITRAL TRIBUNAL'S JURISDICTION

10.     This Tribunal does not have jurisdiction over Mr. Rodrigo Ribadeneira.  Mr. Ribadeneira was not and never has been a party to the 2013 Distribution Agreement between PSG and New Balance (the "Distribution Agreement").  PSG also never assigned the Distribution Agreement to Mr. Ribadeneira, nor has he in any way assumed the obligations to New Balance under that agreement.  It is a fundamental principle of arbitration that it is based upon the consent of the parties to the arbitration agreement.  Without its consent, a party may not be compelled to arbitrate a dispute.

11.     Pursuant to Clause 21 of the Distribution Agreement, the parties to the Distribution Agreement agree to arbitrate "all disputes arising out of the Distribution Agreement."  *See* Claimant's Exhibit 1.  Only the parties to the Distribution Agreement, namely PSG and New Balance, can be bound by the Distribution Agreement's arbitration clause.  The Distribution Agreement itself, with respect to the Distributor is, by its own terms, "nondivisible, nontransferable, and nonassignable".  *See* Claimant's Exhibit 1.  As noted, PSG never assigned or transferred this agreement to Mr. Ribadeneira.  Accordingly, Mr. Ribadeneira, as a non-party to the Distribution Agreement and its arbitration agreement, cannot be bound by its arbitration clause.

4

12.     Claimant wrongly contends that through an Assignment of Rights PSG has transferred its rights in relation to the dispute between it and New Balance to Mr. Ribadeneira. *See* Notice of Arbitration, ¶ 16; *see also* Claimant's Exhibit 5. PSG executed the Assignment of Rights in connection with very different proceedings initiated against New Balance in Peru. The Peruvian proceedings, as will be described in more detail below, relate to New Balance's failure to move forward with a New Distribution Agreement in Peru with Superdeporte S.A.C., an entity that Respondents reconstituted and repurposed for purposes of distributing New Balance's products in Peru. It does not relate to PSG's rights and obligations under the Distribution Agreement that is the subject of this proceeding.

13.     Furthermore, the Assignment of Rights contemplates only that PSG will assign its rights related to the Peruvian Demand (defined and discussed in more detail below) to Mr. Ribadeneira "with respect to legal actions to be initiated against New Balance Athletic Shoe Inc. in Peru and anywhere else in the world." *See* Claimant's Exhibit 5. This arbitration proceeding is distinct from the Peruvian Demand and it is not a proceeding initiated against New Balance, as New Balance is the Claimant in this arbitration. Moreover, and importantly, the Assignment of Rights does not assign and does not effectuate any assignment of PSG's obligation to pay invoices billed by New Balance under the Distribution Agreement. That obligation, should it exist, remains with PSG. Nor has PSG assigned its rights and obligations under the arbitration agreement contained in the Distribution Agreement to Mr. Ribadeneira. As such, Mr. Ribadeneira has not "take[n] PSG's place" under the Agreement as New Balance contends. *Id.* The Assignment of Rights is not only inapplicable to this proceeding, an assignment of the type that Claimant

says occurred—which it did not—is forbidden by the Distribution Agreement which, as noted, precludes any assignment of PSG's rights and obligations under the agreement.

14. As a result, an arbitral tribunal lacks jurisdiction to hear any dispute between Claimant and Mr. Ribadeneira or any claims which Claimant purports to have in relation to Mr. Ribadeneira. It must decline to exercise jurisdiction over any dispute relating to Mr. Ribadeneira, who does not consent to arbitrate these disputes with New Balance.

## IV.   THE NATURE AND CIRCUMSTANCES OF THE DISPUTE

### (a)   Factual Background

15. On January 1, 2013, New Balance and PSG entered into a Distribution Agreement, as they had done a number of times previously, which governed the sale and distribution of New Balance's products in Peru. The Distribution Agreement was valid for a term of three years. If neither party expressed an intention to let the Distribution Agreement expire, then, by its terms, the Distribution Agreement would automatically be renewed for an additional year, until December 31, 2016. At the end of 2015, neither party expressed an intention to let the Distribution Agreement expire. As such, the parties allowed the Distribution Agreement to automatically renew until December 31, 2016.

16. The Distribution Agreement between PSG and New Balance was successful. PSG invested significant sums of money in marketing New Balance's products in Peru, and those efforts significantly increased New Balance's brand visibility and sales in Peru.

17. During 2015, New Balance proposed that PSG, through a new corporate entity, and New Balance enter into a new Distribution Agreement (the "New Distribution Agreement") for Peru that would take effect after the December 31, 2016 expiration of the Distribution Agreement with PSG and that presumably would contain more favorable terms for both

parties. The new structure proposed by New Balance required that the corporate entity with whom it contracted for distribution in Peru be at the "retail" level so that New Balance would receive dual margins and better product placement where its products were being sold. New Balance maintained that this was essential for any future distribution relationship with New Balance. New Balance stated that it required the new structure under the New Distribution Agreement so as to gain an "unfair advantage" over its competitors in the Peruvian market. Claimant's Exhibit 3, p. 59.

18. PSG and New Balance exchanged an initial draft of the New Distribution Agreement in September 2015 and negotiated the terms of the New Distribution Agreement over the coming months. As a part of the New Distribution Agreement, New Balance requested that PSG alter their distribution structure for New Balance products in Peru, in part by utilizing a new Peruvian entity—the entity reconstituted and repurposed for this objective ultimately was called Superdeporte S.A.C. ("Superdeporte")—to serve as New Balance's exclusive distributor under the New Distribution Agreement. By the end of January 2016, all of the terms of the New Distribution Agreement were finalized and agreed to between New Balance and PSG, as Superdeporte had not yet been created. New Balance and PSG agreed that the New Distribution Agreement would be finalized as between New Balance and PSG, and that once Superdeporte was ready, Superdeporte would be substituted for PSG in the New Distribution Agreement. Claimant's Exhibit 3, p. 80, 91-92. This approach would allow the parties to finalize the New Distribution Agreement as soon as possible.

19. In early May of 2016, PSG and Superdeporte informed New Balance that despite some delays, Superdeporte was ready to distribute New Balance products in Peru. With

Superdeporte up and running, New Balance was supposed to promptly modify the New Distribution Agreement in order to add Superdeporte as their Peruvian distributor. As such, in order to finalize agreements with retailers, one of PSG's employees asked New Balance for a letter confirming that Superdeporte was New Balance's distributor in Peru. Claimant's Exhibit 2, pp. 17-19, 27.

20. On May 30, 2016, much to PSG and Superdeporte's surprise, New Balance informed PSG and Superdeporte that no distribution agreement existed between New Balance and Superdeporte. Claimant's Exhibit 2, pp. 12-13. Shortly thereafter, on June 23, 2016, New Balance notified PSG and Superdeporte in writing that it was formally terminating the Distribution Agreement with PSG effective December 31, 2016. *See* Claimant's Exhibit 4. On July 8, 2016, ignoring that it had already concluded the New Distribution Agreement between New Balance and Superdeporte that would take effect on January 1, 2017, New Balance informed PSG and Superdeporte, without any explanation, that New Balance had decided to work with another distributor in Peru beginning in 2017. New Balance then concluded its contractual relationship with PSG on December 31, 2016 and has done business in Peru through another distributor, Deportes Sparta, effective January 1, 2017.

21. At or around that time, Superdeporte S.A., New Balance's partner in Ecuador, was also negotiating licensing agreements with New Balance in Ecuador. After the termination of the relationship in Peru, negotiations for the Ecuador agreements also stalled and ultimately failed.

22. In January 2017, Mr. Ribadeneira initiated civil legal proceedings against New Balance in the Peruvian civil courts with respect to New Balance's failure to honor its obligations under the New Distribution Agreement with PSG, and then to be substituted with

Superdeporte, and alleging extra-contractual claims that arose from New Balance's failure to conduct itself in good faith under Peruvian law with respect to the negotiation and execution of the New Distribution Agreement ("the Peruvian Demand"). *See* Respondents' Exhibit 1. In the Peruvian Demand, Mr. Ribadeneira argues first that the terms of the New Distribution Agreement were agreed to, the New Distribution Agreement is a valid contract, and that the parties' respective rights had been validly perfected. *Id.* at 18 (English version) and at 21 (Spanish version). If the court were to find that there was not a valid contract, Mr. Ribadeneira also argues that New Balance had a pre-contractual obligation under Peruvian law to negotiate with PSG and Superdeporte in good faith, particularly after requiring that the owners of the Peruvian distribution business create a new entity at the "retail" level for purposes of effectuating the New Distribution Agreement, and that it breached its pre-contractual obligation to PSG and Superdeporte. *Id.* at 9 (English version) and at 10 (Spanish version).

23.    On February 1, 2017, Mr. Ribadeneira filed a request with the Peruvian Court for interim measures, asking that the court order New Balance to abstain from the distribution of its products in Peru with any distributor other than PSG. *See* Respondents' Exhibit 2. In December 2017, the Peruvian court overseeing the Peruvian Demand granted the request for interim measures. *See* Respondents' Exhibit 3. The court ordered a halt on the distribution of New Balance products in Peru during the pendency of the proceeding. On July 31, 2018, the Peruvian Court dissolved its interim measures order, formally permitting the distribution of New Balance products in Peru. *See* Respondents' Exhibit 4.

24.    On May 29, 2018, Respondents and Superdeporte filed a petition for discovery in aid of the Peruvian proceeding pursuant to 28 U.S.C. §1782 in the District of Massachusetts

against Claimant, as well as a number of current and former employees who were involved in the decision not to move forward with the New Distribution Agreement. Claimant, as well as John, Cullen, a current New Balance employee, and William Tung, a former New Balance employee, have moved to quash the subpoenas and Respondents and Superdeporte have opposed the motions to quash. On August 17, 2018, Respondents and Superdeporte filed a separate petition for discovery in aid of the Peruvian proceeding pursuant to 28 U.S.C. §1782 in the District of Oregon from a former New Balance employee, Alan Hed, who signed the Distribution Agreement on behalf of Claimant, and who was also involved in New Balance's decision not to move forward with the New Distribution Agreement and to work with another distributor in Peru. On August 22, 2018, the Oregon Court granted the 1782 petition. These proceedings remain ongoing.

**(b)      Responses to Claimant's Claims**

25.      Respondents deny Claimant's entitlement to the damages it seeks and further deny that Claimant can seek any damages against Mr. Ribadeneira, a non-party to the Distribution Agreement. Claimant estimates its damages to be over $2.9 million, but it provides no documentary support for the alleged damages sought. Claimant has failed to submit invoices, statements of account, or other contemporaneous documentation to support its claim for damages. Pursuant to Section 14 of the Distribution Agreement, the right of Claimant to obtain the Distribution Fee as well as the calculation of the Distribution Fee, is based upon the sale of products by the distributor or its affiliates. *See* Claimant's Exhibit 1. Claimant provides no proof that products were in fact sold within the meaning of Section 14 of the Distribution Agreement. To the extent that products were not sold, no Distribution Fees would be owed under the Distribution Agreement. Respondents reserve

the right to rebut any and all of Claimant's damages claims once Claimant has submitted any support for their damages claim.

26. While Respondent PSG did fall behind on its payments of Distribution Fees to Claimant in late 2015, given the parties' longstanding relationship, which dates back to 1992, both parties sought and expected to work through the payment delays. Such payment delays are common in the sportswear distribution industry, and parties expect continuity in their contracts. The situation here was no different. Claimant had been flexible in the past with payment delays, and Respondent PSG expected the same treatment here, which has become a customary part of the parties' relationship. Respondent PSG explained its temporary cash flow issues to Claimant who expressed a desire to continue to work together notwithstanding this temporary delay in payment. Respondent PSG continued to make payments to Claimant in good faith throughout 2015 and 2016. *See* Claimant's Exhibit 3, p. 118. Respondent PSG thanked Claimant for its patience on its payment defaults and reinforced its superior ability as a distributor.

27. Furthermore, in addition to failing to cite to a shred of evidentiary support, Claimant's damages claim is larger than the amounts that Claimant's own collections agency sought to collect from Respondent PSG in 2017. *See* Respondents' Exhibit 5. In 2017, Claimant hired a collections agency, Atradius Collections, who attempted to collect supposed amounts owed under the Distribution Agreement. Claimant's own collections agency's statement of account states that Respondent PSG's outstanding amount owed to Claimant, excluding interest, was $918,207.51, and including interest, was $1,025,657.04. *Id*. Contemporaneous statements of account which Claimant provided to Respondent PSG also reflect similar totals. *See* Respondents' Exhibit 6.

28.     For all of these reasons, and others to be elaborated during this proceeding, Respondents
        contest Claimant's unsubstantiated damages claim.

## V.      THE ARBITRAL TRIBUNAL

29.     Paragraph 21 of the Distribution Agreement provides for a single arbitrator.  In its Notice
        of Arbitration and in accordance with paragraph 21 of the Distribution Agreement,
        Claimant designated the American Arbitration Association as the appointing authority.

30.     The parties have agreed to the appointment of William Cowin as the arbitrator for this
        matter.

## VI.     RESPONDENTS' COMMENTS AS TO THE PLACE OF ARBITRATION, THE APPLICABLE RULES OF LAW AND THE LANGUAGE OF THE ARBITRATION

### (a)     The Place of Arbitration

31.     Respondents confirm Boston, Massachusetts as the place of arbitration.

### (b)     Governing Law

32.     Respondents confirm that in accordance with paragraph 20 of the Distribution Agreement,
        the Agreement is covered by the substantive laws of the Commonwealth of Massachusetts
        but note further that the applicable conflict of laws provisions of the Commonwealth of
        Massachusetts also will apply.

### (c)     The Language of Arbitration

33.     Respondents confirm that in accordance with paragraph 21 of the Distribution Agreement,
        the language of the arbitration is English.

## VII.    RESPONDENTS' COUNTERCLAIM

### (a)     Factual Background to the Counterclaim

34.     New Balance accepted orders from its distributors, like Respondent PSG, on a quarterly
        basis.  As such, Respondent PSG was able to place orders from New Balance four times a

12

year.  Respondent PSG would place an order for products about six months in advance of the shipments of the goods, and generally PSG had to pre-pay for its orders.

35.    In 2014, there was a significant market contraction in Peru and Ecuador that caused Respondent PSG to suffer cash flow issues.  The cash flow issues made it difficult for Respondent PSG to timely pay its Distribution Fees and to pre-pay for its orders with New Balance.

36.    Respondent PSG discussed these cash flow issues with New Balance.  Although New Balance was initially receptive to granting Respondent PSG more time to make its payments to New Balance, in mid-2015, New Balance refused to accept any additional orders from Respondent PSG until Respondent PSG paid outstanding amounts owed to New Balance.  In fact, in mid-2015, New Balance closed Respondent PSG's access to New Balance's online ordering system, preventing PSG from placing any additional orders under the Distribution Agreement.

37.    Under this scenario, Respondent PSG asked New Balance to pay for its future orders through letters of credit, as provided for in the Distribution Agreement.  The only way Respondent PSG could pay the amounts owed to New Balance was through amounts Respondent PSG would earn from the sale of New Balance inventory, and New Balance knew this.  Although the Distribution Agreement permits payment by letter of credit, New Balance refused—in breach of its obligations under the Distribution Agreement—to accept PSG's payment by letter of credit.

38.    As a result, Respondent PSG was unable to place any orders from mid 2015 through the end of 2016, when the Distribution Agreement terminated and lost the right it had to

purchase products from New Balance, make sales in the Peruvian market and earn the corresponding revenues and profits from those sales.

**(b)    Claimant's Violations of Its Legal Obligations**

39.    Pursuant to Clause 6(b) of the Distribution Agreement, Respondent PSG may make payment for products through irrevocable letter of credit or cash.[1]  Beginning in mid-2015, Petitioner PSG sought to place orders for New Balance products (footwear, apparel, and accessories) through a letter of credit.  New Balance refused to accept any orders from Respondent PSG by letter of credit, in violation of Clause 6(b) of the Distribution Agreement.  As a result of New Balance's breach of the Distribution Agreement, Respondent PSG has been damaged in the amount of approximately $1.8 million.  Although Claimant may argue that these damages suffered by PSG should be precluded based upon the language in Clause 17 of the Distribution Agreement, this reading of the Distribution Agreement would be erroneous.  This counterclaim does not  arise or result from termination of the Distribution Agreement.  Instead, this counterclaim relates to Claimant's violation of its legal obligations during the pendency of the Distribution Agreement.  Thus, Respondent PSG's counterclaim is permissible under the language in Clause 17 of the Distribution Agreement.

---

[1]  Clause 6(b) states: "Payment of all amounts due for Products and all payment documentation for the purchase of the Products shall be effected by Distributor through irrevocable letter of credit at sight or cash in advance due upon placement of any order, unless otherwise agreed to by Company, its Affiliate, or it Authorized Supplier, as the case may be."  "Products" are defined in Clause 2(j) as follows: "Company's footwear, apparel and Accessory products bearing one of more of the trademarks as set forth in Company's current approved country assortment plan, as modified from time to time, a copy of the original version of which has been delivered to Distributor prior to the Effective Date."

> **(c)** **Respondents Have Suffered Losses of $1.8 Million for Which Claimant Is Liable**

40.    Respondent PSG's damages consist of the lost profits from the merchandise that PSG was unable to purchase from New Balance between mid 2015 and the end of 2016, currently estimated at $1.8 million.

## VIII.    RELIEF SOUGHT

41.    Respondents reject Claimant's claims as set out in its Notice and reject the relief sought therein.

42.    Respondents respectfully request the arbitral tribunal to:

    i.    Dismiss all Claimant's claims with respect to Mr. Ribadeneira on the ground that the arbitral tribunal lacks jurisdiction with respect to a dispute between Claimant and Mr. Ribadeneira;

    ii.    Dismiss Claimant's claims in their entirety;

    iii.    Declare that Claimant has violated its obligations under the Distribution Agreement;

    iv.    Order Claimant to compensate Respondents for the damages and losses suffered as a result of Claimant's conduct, currently estimated to be in the amount of $1.8 million;

    v.    Order Claimant to pay all arbitration costs, including Respondents' representative's costs and expenses; and

    vi.    Order any further and/or additional relief as the Tribunal may deem appropriate.

43.    Respondents reserve their right to:

    i.    Amend or supplement the above arguments as well as to present any other counterclaims it may have or that come to light as the proceedings evolve, if any;

ii.      Amend or supplement the relief sought herein;

iii.     Present factual or legal arguments as may be necessary to present its case or rebut

any case put forward by Claimant; and,

iv.      Seek interim and or provisional measures before this tribunal or any competent

national court.

Respectfully submitted,

David M. Orta
Legal representative for Respondents
1300 I Street NW, Suite 900
Washington, DC 20005
Tel: (202)538-8000
Fax: (202)538-8100
October 29, 2018

16

# EXHIBIT 5

## INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION

IN THE MATTER OF ARBITRATION
BETWEEN:

NEW BALANCE ATHLETICS, INC.

vs.

PERUVIAN SPORTING GOODS S.A.C. et al.

Civil No. 01-18-0003-1183

**Hearing Requested**

### PETITIONER NEW BALANCE ATHLETICS, INC.'S MOTION TO COMPEL ARBITRATION AND MEMORANDUM IN SUPPORT THEREOF

Petitioner New Balance Athletics, Inc. ("New Balance") moves to compel Peruvian Sporting Goods ("PSG") and its business manager and majority shareholder Rodrigo Ribadeneira (together, "Respondents") to arbitrate the claims pending against New Balance in Peru. In short, Respondents breached the mandatory arbitration provision in PSG's distribution contract with New Balance (the "Distribution Agreement") that requires "any and all disputes . . . related to or arising out of [the Distribution Agreement] or the relationship, its application and/or termination (including post-termination obligations)" be "settled by final and binding arbitration." Instead, Respondents filed suit against New Balance in Peru claiming that New Balance either breached a binding distribution contract with PSG or, in the alternative, acted in bad faith in terminating its distribution relationship with PSG (the "Peru Claims"). As described more fully below, the Peru Claims directly relate to the parties' renegotiation of the original Distribution Agreement and, as result, they clearly fall under the parties' broad arbitration agreement.

Respondents argue that they are not bound by New Balance and PSG's arbitration agreement because (1) the Peru Claims pertain to a "new" agreement and not the Distribution

Agreement where the arbitration agreement is found, and (2) the Peru Claims have been assigned to Ribadeneira who is a non-signatory to the Distribution Agreement.  It cannot be clearer, however, that the Peru Claims arise out of New Balance's original distribution relationship with PSG, and the termination thereof, and fall under the parties' broad agreement to arbitrate "any and all disputes" "related to or arising out of" not only the Distribution Agreement, but its application or termination, and the parties' relationship generally.  Moreover, the parties' arbitration agreement encompasses the parties' entire relationship and not just the express terms of the Distribution Agreement, and therefore, is equally applicable to the negotiations of the alleged "new" agreement with PSG—which itself contains an identical arbitration provision.

Finally, Respondents cannot use a purported assignment to obviate their contractual arbitration obligations.  Ribadeneira, although technically a non-signatory to the Distribution Agreement, is bound by the arbitration provisions for a number of reasons, including that 1) as an assignee he must stand in the shoes of the assignor, 2) he assumed the agreement in bringing the Peru Claims, and 3) the Peru Claims are so "inextricably intertwined with and relate directly to" the Distribution Agreement containing the arbitration provision that he is equitably estopped from denying its application.  *See Machado v. System4 LLC*, 471 Mass. 204, 211-13 (2015).  In short, Respondents' arguments are meritless, and they cannot meet their burden of proof that the Peru Claims are not arbitrable.

As a result, and for the reasons more fully set forth below, New Balance requests that this tribunal compel arbitration of the Peru Claims.

## I.      BACKGROUND FACTS

### A.      The Parties' Distribution Contract

On January 1, 2013, New Balance PSG entered into the Distribution Agreement, a three-year agreement for the sale and distribution of New Balance's products in Peru.  Ex. 1.[1]  The three-year term of the Distribution Agreement was subject to a one-year extension if it was not terminated by either party sixty days in advance of its scheduled termination on December 31, 2015.  Ex. 1, ¶¶ 1(h), 5(b).  At all relevant times, Ribadeneira was the business manager and majority shareholder of PSG, as well as New Balance's primary contact at PSG.

The Distribution Agreement was entered into, in part, based on the parties' agreement to arbitrate any and all disputes arising out of the Distribution Agreement, or the parties' relationship generally, in accordance with the UNCITRAL Arbitration Rules and the laws of the Commonwealth of Massachusetts.  More specifically, the Distribution Agreement reads:

> The parties agree that any and all disputes (whether in contract or any other theories of recovery) related to or arising out of this [Distribution Agreement] or the relationship, its application and/or termination (including post-termination obligations) shall be settled by final and binding arbitration in accordance with the UNCITRAL Arbitration Rules. . . . The arbitration shall be heard and determined by a single arbitrator.  The place of arbitration shall be Boston, Massachusetts, USA . . . .  The arbitrator shall determine the matters in dispute in accordance with the law of the Commonwealth of Massachusetts, USA.
>
> Ex. 1, ¶ 21.[2]

As the end of three-year term of the Distribution Agreement neared, in mid-2015, PSG stopped paying New Balance money due and owing on products distributed in Peru and repeatedly breached the Distribution Agreement.  Ex. 3, at 57, 74.  On July 17, 2015, New Balance notified PSG of its past due payments and made clear that unless PSG made substantial

---

[1] True and correct copies of Exhibits 1-6 are submitted herewith.

progress toward bringing them up-to-date, PSG would be unable to order more product under the Distribution Agreement. Ex. 3, at 57. At this same time, New Balance put PSG on "credit hold" foreclosing it from placing new orders on New Balance products. Ex. 3, at 57. Over two months later, PSG still had not paid New Balance, and instead promised to pay New Balance over time. Ex. 2, at 23; Ex. 3, at 60, 66. However, PSG failed to adhere to each and every payment schedule it proposed. Ex. 3, at 64, 74, 110-11.

While maintaining efforts to collect PSG's outstanding debts, New Balance and PSG attempted to negotiate an amended and restated distribution agreement (the "Amended and Restated Agreement") at PSG's request. *See* Ex. 6. That agreement, if entered into, would have run until December 31, 2016. *See* Ex. 6, ¶ 1(h). New Balance reached out to PSG on multiple occasions to sign the Amended and Restated Agreement—including through emails on September 18, 2015, October 3, 2015, October 4, 2015, November 4, 2015, November 10, 2015, November 17, 2015, December 2, 2015, and April 11, 2016—but PSG failed to do so at each and every opportunity. Ex. 3, at 58, 60, 62, 72, 74, 82, 116. Instead, PSG made ever-changing demands, including attempting to remove the minimum fee provision. Ex. 3, at 71.

As a result, on January 1, 2016, the Distribution Agreement's one-year extension went into effect and the parties remained subject to the terms of that Distribution Agreement, which expired by its terms at the end of December 2016. Ex. 3, at 88–102; Ex. 1, ¶ 5(b). Respondents appear to claim that the Amended and Restated Agreement was in effect between New Balance and PSG beginning on January 25, 2016, and that the Amended and Restated Agreement should be enforced as written. Respondents' Ex. 1, at 54. If so, the Amended and Restated Agreement

---

[2] The arbitration provision in the Distribution Agreement survives the Distribution Agreement's termination. *See* Ex. 1, ¶ 17(e) ("Notwithstanding the expiration or non-renewal or earlier termination of this [Distribution Agreement] Sections . . . 17 through 26 shall remain in full force and effect."); *Id.* ¶ 21 (arbitration clause).

contains the same arbitration provision as the 2013 Distribution Agreement.  Ex. 6, ¶ 21.  The

Amended and Restated Agreement was by and between New Balance and PSG, and New

Balance was notified that PSG would be "changed to Super Deporte[s] Peru later."  Ex. 3, at 71,

85.  New Balance understood this change in the Amended and Restated Agreement to be in name

only.  *See, e.g.*, Ex. 3, at 91 ("Do you have the address and proof of existence of Super Deportes

yet?  Regardless, I suggest we sign the agreement now as PSG and do an amendment once that

info is ready."); *see also* Ex. 2, at 13 (New Balance writing to PSG noting, "PSG . . . soon to be

Super Deportes . . .").  New Balance's contacts, operations, and relationship with PSG (or "Super

Deportes") were otherwise not to change.

     **B.**     **PSG's Claims Against New Balance**

     On January 22, 2017, ignoring the arbitration agreement, Respondent Ribadeneira filed

suit against New Balance in Peru claiming both breach of contract of the Amended and Restated

Agreement—which he calls the "new agreement"—and, alternatively, "pre-contractual liability."

Respondents' Ex. 1, at 44, 53.  Respondents have represented that Ribadeneira has brought the

Peru Claims based on two virtually identical documents titled "Cesion de Derechos" (translated,

Assignment of Rights), dated November 25, 2016, whereby PSG and Super Deportes

purportedly, without any agreement or notice to New Balance, transferred their rights to

Ribadeneira.  Ex. 5.  The Assignment of Rights, as translated, states that PSG:

> [H]eld negotiations with [New Balance] in order to celebrate a Distribution
> Contract to import, sell and distribute sports products in the territory of Peru.
> However, once the contractual  terms were agreed and the contract ready to be
> executed, [New Balance] informed [PSG] that it will work with another partner in
> Peru, arising a dispute between the parties. . . .  By this contract [PSG] . . .
> transfers without valuable considerations to [Ribadeneira] all its rights in attention
> to the dispute.

Ex. 5.

In short, the Peru Claims contend that New Balance either entered into the Amended and Restated Agreement and breached it, or alternatively, committed a tort by failing to negotiate the Amended and Restated Agreement in good faith, allegedly causing Ridadeneira to suffer approximately $3,000,000 in damages. Respondents' Ex. 1, at 44, 53.[3]

C.    **New Balance's Claims Against PSG**

On July 31, 2018, New Balance initiated arbitration proceedings against PSG and Mr. Ribadeneira, the purported assignee of PSG's rights, to recoup the more than $2.5 million owed to New Balance as a result of the parties' Distribution Agreement. On September 4, 2018, Respondents filed a response to New Balance's Notice of Arbitration, which was subsequently amended on October 29, 2018, to add a counterclaim. PSG concedes liability on New Balance's claim, stating that it "fell behind on its payments of Distribution Fees." Amended Response to the Notice of Arbitration and Counterclaim, at 11, ¶ 26. However, Respondents object to this tribunal's jurisdiction over Ribadeneira, arguing that as a non-party to the Distribution Agreement, he may not be compelled into arbitration. *Id*. at 4-6.

During the parties' initial status conference, New Balance informed the tribunal of the Peru Claims and its intention to move to compel the Peru Claims into arbitration. At that time, Respondents' counsel stated that the Peru Claims are not subject to arbitration because Ribadeneira is not a signatory to the Distribution Agreement. Similarly, in the Amended Response and Counterclaim, Respondents state that the "assignment of rights" from PSG did not assign the Distribution Agreement or any rights thereunder, but rather only assigned to Ribadeneira claims to litigate "legal actions to be initiated *against* New Balance" related to New

---

[3] On December 18, 2017, the Peruvian court granted Respondents' request for interim measure of relief, but on July 30, 2018, reversed its decision and denied the request for interim relief. New Balance has since filed a motion to dismiss the Peruvian proceedings based on the court's lack of jurisdiction. That motion is pending before the Peruvian court.

Balance's "failure to move forward with" a distribution agreement. *Id.* at 5-6, ¶ 13 (emphasis added).

New Balance files this motion seeking the tribunal to issue an order that Respondents' claims currently pending in Peru are subject to the arbitration provision in the Distribution Agreement and must be submitted to arbitration.

## II.    LEGAL STANDARD

"[A]ny and all disputes (whether in contract or any other theories of recovery) related to or arising out of this [Distribution Agreement] or the relationship, its application and/or termination (including post-termination obligations) shall be settled by final and binding arbitration in accordance with UNCITRAL Arbitration Rules" and the laws of Massachusetts. Ex. 1, ¶ 21.[4]   Under Massachusetts law, there is a "strong public policy" in favor of arbitrating commercial disputes. *See Plymouth-Carver Regional Sch. Dist. v. J. Farmer & Co., Inc.*, 407 Mass. 1006, 1007 (1990).[5]   More specifically, "where a contract contains an arbitration clause, there is a presumption of arbitrability," and arbitration should not be denied unless it can be said with "positive assurance" that the particular clause cannot be construed to cover the dispute in issue. *Drywall Sys., Inc. v. ZVI Constr. Co.*, 435 Mass. 664, 666-67 (2002).

"[W]hen considering a broadly worded arbitration clause, there is a presumption that a contract dispute is encompassed by the clause unless it is clear that the dispute is excluded." *Commonwealth v. Philip Morris Inc.*, 448 Mass. 836, 843 (2007).   The party opposing arbitration

---

[4]  Under the UNCITRAL Arbitration Rules, the arbitral tribunal has "the power to rule on its own jurisdiction, including any objections with respect to the existence or validity of the arbitration agreement." UNCITRAL Arbitration Rules § 3, art. 23; *see also Apollo Computer, Inc. v. Berg*, 886 F.2d 469, 473-74 (1st Cir. 1989) (concluding that parties agreed to submit issue of validity to the arbitrator where contract dictated arbitration would be decided in accordance with particular arbitration rules, and those rules allowed arbitrator to determine jurisdiction).
[5]  Peruvian courts routinely enforce arbitration agreements. *See* Legislative Decree N° 1071 (Peruvian Arbitration Law); *see also* Cecilia O'Neill de la Fuente & José Luis Repetto Deville, *Main Features of Arbitration in Peru*, 23 ILSA J. Int'l & Comp. L. 425, 426 (2017) (recognizing Peruvian courts' respect for arbitration law).

bears the burden of proving that the claim at issue is not referable to arbitration. *Grand Wireless, Inc. v. Verizon Wireless, Inc.*, 748 F.3d 1, 7 (1st Cir. 2014) (noting "presumption in favor of arbitration applies unless the party opposing arbitration rebuts it").[6] Only "the most forceful evidence" of a desire to exclude a claim from arbitration can exclude it. *Id.* at 8.

## III. ARGUMENT

### A. The Peru Claims Are Subject To The Arbitration Provision Contained In The Distribution Agreement

The Peru Claims, which clearly arise from the parties' failed renegotiation of the Distribution Agreement, plainly fall under the broad language of the Distribution Agreement's arbitration clause. *See Carpenter v. Pomerantz*, 36 Mass. App. Ct. 627, 630 (1994) (noting broad arbitration clauses given "strong presumption of arbitrability"). The arbitration provision in the Distribution Agreement is broad, covering "any and all disputes" "related to or arising out of" not only the Distribution Agreement, but its application or termination, and the parties' relationship generally. The Peru Claims directly relate to the Distribution Agreement, its termination, and the discontinuation of the parties' relationship generally. As a result, the dispute must be arbitrated because it is "susceptible of an interpretation that covers the asserted dispute." *See Drywall Sys. Inc.*, 435 Mass. at 666. Indeed any interpretation of the arbitration provision encompasses the Peru claims, as any alternative interpretation flies in the face of fact and logic. *See, e.g.*, *Grand Wireless, Inc.*, 748 F.3d at 7–8 (compelling arbitration of extra-contractual claims, in part, because the arbitration provision in the contract compelled arbitration of claims arising out of the parties' relationship).

---

[6] Because the Massachusetts Arbitration Act is the Massachusetts enactment of the Uniform Arbitration Act, Massachusetts courts give the decisions of other jurisdictions and federal courts "strong weight." *O'Brien v. Hanover Ins. Co.*, 427 Mass 194, 201 (1998).

The Peru Claims are grounded in the fact that New Balance terminated its Distribution Agreement with PSG to distribute products in Peru.  The assignment of rights itself, moreover, states that the Peru Claims arose out of the Distribution Agreement and its termination.  *See* Ex. 5 (stating as translated: "During 2015 and 2016, [PSG] held negotiations with the [New Balance] in order to celebrate a Distribution Contract to import, sell and distribute sports products in the territory of Peru.  However, once the contractual terms were agreed and the contract ready to be executed, [New Balance] informed [PSG] that it will work with another partner in Peru, arising a dispute between the parties").

Respondents try to sidestep the arbitration provision by claiming that the Peru Claims pertain to a new and different agreement—namely the Amended and Restated Agreement that contains yet another agreement to arbitrate—but that argument fails.  *First*, if Respondents are correct that a new distribution agreement was entered into on January 25, 2016, then that "new" distribution agreement has the same arbitration and choice of law provisions, requiring the parties to arbitrate the Peru Claims in Boston under Massachusetts law.  Ex. 6, ¶ 21. *Second*, the arbitration provision in the Distribution Agreement applies not only to the implementation of the Distribution Agreement itself, but also to its termination and the parties' relationship generally, such that it applies here.  *See, e.g.*, *Grand Wireless, Inc.*, 748 F.3d at 7–8 (holding claims were covered by broad arbitration agreement where the allegations related to the parties' relationship that arose out of an agreement with an arbitration clause); *Acevedo Maldonado v. PPG Indus., Inc.*, 514 F.2d 614, 616 (1st Cir. 1975) (recognizing broad arbitration clauses cover "contract-generated or contract-related disputes between the parties however labeled"); *see also Next Step Med. Co. v. Johnson & Johnson Int'l*, 619 F.3d 67, 69 (1st Cir. 2010) (upholding magistrate's ruling requiring parties to arbitrate dispute based upon arbitration clause in previously terminated

agreement).[7]  And, in any event, the "new" distribution agreement is merely a draft extension of

the prior Distribution Agreement.  Indeed, the "Effective Date" of the "new" agreement is

defined as: "January 1, 2013 with this Amended and Restated Agreement effective August 1,

2015," such that the "new" agreement incorporates the Distribution Agreement by explicit

reference.  *See* Ex. 6, at ¶ 1(f).  There is no doubt that the Peru Claims—whether they pertain to

the Distribution Agreement or the "new" agreement—fall under the ambit of the parties' broad

arbitration agreement.

**B.**      **Respondents Cannot Avoid Arbitration Of The Peru Claims By Arguing That Ribadeneira Is Not A Signatory To The Distribution Agreement**

Respondents further argue that they cannot be compelled to arbitrate Ribadeneira's Peru

Claims because he is not a signatory to the Distribution Agreement or the Amended and Restated

Agreement, but that argument also fails.  Respondents cannot avoid their arbitration obligations

by assignment.  Whether a non-signatory can be compelled to arbitrate is determined by

traditional principles of Massachusetts contract law.  *See Arthur Andersen LLP v. Carlisle*, 556

U.S. 624, 630-31, 632 (2009).  Traditional principles of Massachusetts contract law require the

assignee to take the place of the assignor and litigate his claims as if he were the assignor.  *See,*

*e.g.*, *Yung v. Reymonde*, 1999 Mass. App. Div. 194 (Dist. Ct. 1999) ("When a claim is assigned,

the assignee stands in the shoes of the assignor and is in the same position as the assignor

without the assignment."); *Graves Equip., Inc. v. M. DeMatteo Const. Co.*, 397 Mass. 110, 112

(1986) (recognizing the "common law rule that an assignee of contract rights stands in the shoes

of the assignor and has no greater rights against the debtor than the assignor had"); *Quincy Tr.*

*Co. v. Town of Pembroke*, 346 Mass. 730, 732 (1964) ("[T]he assignee stands in no better

position than the assignor, and any defence which the defendant could raise against the latter

---

[7]  *See* Ex.1, ¶ 17(e) ("Notwithstanding the expiration or non-renewal or earlier termination of this [Distribution

may also be raised against the former."). In other words, PSG cannot assign away the arbitration agreement that it entered into. *Id.* Indeed, the Distribution Agreement itself specifically states that it is "binding upon the parties hereto and their respective successors in interest" (Ex.1, ¶ 25) and, as a result, is binding on Ribadeneira. It would be unsound to allow parties to avoid arbitration simply by assigning rights to third parties who then sue the other contracting party. *Cf. Grand Wireless, Inc.*, 748 F. 3d at 11 (stating: "Any other rule . . . would permit the party bringing the complaint to avoid the practical consequences of having signed an agreement to arbitrate; naming the other party's officers, directors or employees as defendants along with the corporation would absolve the party of all obligations to arbitrate").[8] Especially where, as in this instance, the third party is closely related to the signing party. Notably, if PSG were to assert the Peru Claims itself, then it would be subject to the arbitration clause in the Distribution Agreement, as claims arising out of the parties' relationship. Basic contract principles dictate that PSG should not be able to avoid this result by assigning its rights to its largest shareholder and business manager.

Moreover, Ribadeneira should be compelled to arbitrate his Peru Claims for the many other reasons courts bind non-signatories to arbitration agreements, including that Ribadeneira: assumed the arbitration agreement upon assignment, is an agent of the signatory that derived benefits from the arbitration agreement, and brings claims that are so "directly intertwined" with the arbitration agreement that compelling arbitration is appropriate. *See, e.g.*, *Machado*, 471 Mass. at 209-10; *see also Ambeliotis v. Brown*, No. CV1400855BLS1, 2015 WL 9591312, at *5 (Mass. Super. Sept. 30, 2015) (concluding non-signatory-plaintiff required to submit dispute to

---

Agreement] Sections . . . 17 through 26 shall remain in full force and effect); *Id.* ¶ 21 (arbitration clause).
[8] Of course, this principle also applies here because Ribadeneira is an agent of PSG.

arbitration because plaintiff's trustee signed agreement and because plaintiff "derived the benefits of" the agreement).

Moreover, Ribadeneira, as majority shareholder of PSG, acted pursuant to the Distribution Agreement and received direct benefits therefrom. For that reason alone, he should be bound by the arbitration agreement. *See Deloitte Noraudit A/S v. Deloitte Haskins & Sells, U.S.*, 9 F.3d 1060, 1064 (2d Cir. 1993) (determining that a non-signatory party that knowingly benefited from an agreement containing an arbitration clause by continuing to use the company name provided for in that agreement could be compelled to arbitrate). "If arbitration defenses could be foreclosed simply by adding as a defendant a person not a party to an arbitration agreement, the utility of such agreements would be seriously compromised." *Hilti, Inc. v. Oldach*, 392 F. 2d 368, 369, n.2 (1st Cir. 1968). In addition, Ribadeneira's claims "are so intimately founded in and closely related to an agreement which also mandates arbitration" that he, as "the party opposing arbitration, is equitably estopped from denying the arbitrability of [his] claims." *Machado*, 471 Mass. at 211.

## IV. CONCLUSION

For the foregoing reasons, this Court should grant New Balance's motion and compel the Peru Claims into arbitration.

Dated: January 25, 2019

Respectfully submitted,

/s/ Mark E. Tully
Mark E. Tully
Kate E. MacLeman
100 Northern Avenue
Boston, MA 02210
mtully@goodwinlaw.com
kmacleman@goodwinlaw.com
p: 617-570-1000
f: 617-801-8955

*Attorneys for Respondents*

# EXHIBIT 6

IN THE MATTER OF AN ARBITRATION UNDER THE ARBITRATION RULES OF THE
UNITED NATIONS COMMISSION ON INTERNATIONAL TRADE LAW

BETWEEN:

NEW BALANCE ATHLETICS, INC.

(CLAIMANT)

-AND-

PERUVIAN SPORTING GOODS S.A.C. and RODRIGO RIBADENEIRA

(RESPONDENTS)

# RESPONSE TO CLAIMANT'S JURISDICTIONAL OBJECTIONS

**QUINN EMANUEL URQUHART & SULLIVAN LLP**

Quinn Emanuel Urquhart & Sullivan
1300 I Street NW, Suite 900
Washington, DC 20005
Tel: (202)538-8000
Fax: (202)538-8100
Legal representative for Respondents                              February 4, 2019

## I.     INTRODUCTION

1.     In accordance with Procedural Order No. 1, Respondents Peruvian Sporting Goods ("PSG") and Rodrigo Ribadeneira ("Mr. Ribadeneira") (together, "Respondents") assert that this Tribunal does not have jurisdiction over Mr. Ribadeneira and further object to Claimant's attempt to join the pending claims in the Peru action (the "Peru Action") with this arbitration.  Mr. Ribadeneira was not a party to the 2013 Distribution Agreement (the "Distribution Agreement"), nor was he a party to a new distribution agreement (the "New Distribution Agreement"), negotiated at New Balance's request in 2015.  The New Distribution Agreement also is distinct from the earlier distribution agreement on which New Balance bases its claims in this arbitration proceeding.  It involves different parties and a very different distribution structure than was at issue in the Distribution Agreement. Furthermore, the claims in the Peru Action are entirely distinct from this arbitration, because they involve New Balance's failure to move forward with the New Distribution Agreement, which as noted had a different distributor party and a different distribution structure.  Moreover, the claims in the Peru Action were filed by Mr. Rodrigo Ribadeneira in his individual capacity, and he was not a party to either of the distribution agreements with New Balance.  Finally, the determination as to the jurisdiction of the Peru claims is pending before the Peruvian court and it is solely within the jurisdiction of the Peruvian court to determine its own jurisdiction.  As such, Respondents respectfully request that this Tribunal decline to exercise jurisdiction over Mr. Ribadeneira and that this Tribunal deny Claimant's request to join the Peru claims with this arbitration.

## II.    FACTUAL BACKGROUND

2.     On January 1, 2013, New Balance and PSG entered into a Distribution Agreement which governed the sale and distribution of New Balance's products in Peru.  New Balance and

PSG had worked together for a number of years in Peru and through this relationship, had negotiated distribution agreements in the past. This Distribution Agreement was valid for a term of three years. If neither party expressed an intention to let the Distribution Agreement expire, then, by its terms, the Distribution Agreement would automatically be renewed for an additional year, until December 31, 2016. At the end of 2015, neither party expressed an intention to let the Distribution Agreement expire. As such, the parties allowed the Distribution Agreement to automatically renew until December 31, 2016.

3.      The Distribution Agreement between PSG and New Balance was successful. PSG invested significant sums of money in marketing New Balance's products in Peru, and those efforts significantly increased New Balance's brand visibility and sales in Peru. Through the Distribution Agreement, PSG would distribute New Balance's products to third party retailers and to Marathon Sports Stores in Peru. Marathon Sports is an Ecuador-based athletic company with sportswear stores across Latin America. Mr. Ribadeneira is the CEO of Marathon Sports.

4.      During 2015, New Balance proposed that a new corporate entity, Superdeporte S.A.C. ("Superdeporte"), and New Balance enter into a new and different type of distribution agreement for Peru – the New Distribution Agreement – that would contain a new structure and more favorable terms for these parties. The new structure proposed by New Balance required that the corporate entity with whom it contracted for distribution in Peru be at the "retail" level – it had to be an entity other than PSG as PSG did not sell at the retail level – so that New Balance would receive dual margins (at the distribution and the retail levels) and better product placement where its products were being sold. For example, under the New Distribution Agreement, New Balance required that its new Peru distributor "expend

2

US $150,000 in each of 2015 and 2016 for furniture, fixtures, point of purchase materials and other improvements to create shop in shop displays for Products in Marathon Sports stores located in the Territory." Claimant's Exhibit 6, p. 11. Through the shop in shop locations, Superdeporte would provide New Balance an exclusive space within Marathon Sports stores dedicated to the sale of New Balance products. New Balance maintained that this new structure was essential for any future distribution relationship with New Balance in Peru. Additionally, the New Distribution Agreement significantly increased the distribution fees that the distributor was required to pay to New Balance, as well as the minimum purchase requirement that the distributor needed to make to New Balance. *See* Claimant's Exhibit 6, at Exhibits D and E. New Balance stated that it required the new structure under the New Distribution Agreement so as to gain an "unfair advantage" over its competitors in the Peruvian market. Claimant's Exhibit 3, p. 59.

5.      The principals and management of Superdeporte and New Balance exchanged an initial draft of the New Distribution Agreement in September 2015 and negotiated the terms of the New Distribution Agreement over the coming months. *See* Claimant's Exhibit 6 at p. 1. By the end of January 2016, all of the terms of the New Distribution Agreement were finalized and agreed to between New Balance and Superdeporte. The only outstanding item was for Superdeporte's principals and management to take the necessary steps for Superdeporte to serve as the distributor for New Balance in Peru. In December 2015, the parties agreed, that in the interest of finalizing the New Distribution Agreement as soon as possible, the New Distribution Agreement would be executed between New Balance and PSG as a temporary fix to get the agreement finalized and executed, and that once Superdeporte was established, Superdeporte would be substituted for PSG as the

counterparty to New Balance, and the new distributor for New Balance products in Peru pursuant to the New Distribution Agreement. Claimant's Exhibit 3, p. 80, 91–92. This approach would allow the parties to finalize the New Distribution Agreement as soon as possible.

6. In early May of 2016, Mr. Ribadeneira, one of the principals of Superderporte, informed New Balance that despite some delays, Superdeporte was ready to distribute New Balance products in Peru. With Superdeporte up and running, New Balance was supposed to promptly modify the New Distribution Agreement in order to substitute in Superdeporte as their Peruvian distributor. As such, in order to finalize agreements with retailers, one of Mr. Ribadeneira's employees asked New Balance for a letter confirming that Superdeporte was New Balance's distributor in Peru. Claimant's Exhibit 2, pp. 17–19, 27.

7. On May 30, 2016, New Balance informed Mr. Ribadeneira and his employees that no distribution agreement existed between New Balance and Superdeporte and that New Balance would not be proceeding with the New Distribution Agreement with that entity. Claimant's Exhibit 2, pp. 12–13. Shortly thereafter, on June 23, 2016, New Balance formally terminated the Distribution Agreement with PSG through a termination letter. *See* Claimant's Exhibit 4. On July 8, 2016, ignoring that it had already concluded negotiations for the New Distribution Agreement between New Balance and Superdeporte, New Balance informed PSG and Superdeporte, without any explanation, that New Balance had decided to work with another distributor in Peru beginning in 2017. After concluding its contractual relationship with PSG, New Balance has done business in Peru through another distributor, Deportes Sparta, effective January 1, 2017.

8.  In January 2017, Mr. Ribadeneira (who is a principal for Superdeporte), in his individual capacity, initiated civil legal proceedings against New Balance in the Peruvian civil courts with respect to New Balance's failure to honor its obligations to proceed with the New Distribution Agreement between New Balance and Superdeporte, and alleging extra-contractual claims that arose from New Balance's failure to conduct itself in good faith under Peruvian law with respect to the negotiation and execution of the New Distribution Agreement. *See* Respondents' Exhibit 1. In the Peru Action, Mr. Ribadeneira argues first that Superdeporte, PSG, and New Balance agreed to the terms of the New Distribution Agreement, and that the parties' respective rights had been validly perfected. *Id.* at 18 (English version) and at 21 (Spanish version). If the court were to find that the contract had not been concluded, Mr. Ribadeneira also argues that New Balance had a pre-contractual obligation under Peruvian law to negotiate with PSG and Superdeporte in good faith, particularly after requiring that the owners of the Peruvian distribution business spend months creating a new entity at the "retail" level for purposes of effectuating the New Distribution Agreement, and that it breached its pre-contractual obligation to PSG and Superdeporte. *Id.* at 9 (English version) and at 10 (Spanish version).

9.  On February 1, 2017, Mr. Ribadeneira filed a request with the Peruvian Court for interim measures, asking that the court order New Balance to abstain from the distribution of its products in Peru with any distributor other than PSG. *See* Respondents' Exhibit 2. In December 2017, the Peruvian court overseeing the Peru Action granted the request for interim measures. *See* Respondents' Exhibit 3. The court ordered a halt on the distribution of New Balance products in Peru during the pendency of the proceeding. On July 31, 2018,

the Peruvian Court dissolved its interim measures order, formally permitting the distribution of New Balance products in Peru.

10. The Peru Action remains ongoing. On April 19, 2018, New Balance moved for dismissal of the Peru Action because it argued the case should instead be heard before the Peruvian commercial court. On May 14, 2018, the Peruvian civil courts rejected New Balance's request to transfer the action, and New Balance appealed. On June 11, 2018, New Balance then argued, for the first time, that the Peru Action is subject to mandatory arbitration under the 2013 Distribution Agreement.

11. On May 29, 2018, Respondents and Superdeporte filed a petition for discovery in aid of the Peru Action pursuant to 28 U.S.C. §1782 in the District of Massachusetts against Claimant, as well as a number of current and former employees who were involved in the decision not to move forward with the New Distribution Agreement. Claimant, as well as John, Cullen, a current New Balance employee, and William Tung, a former New Balance employee, moved to quash the subpoenas. On December 7, 2018, the Magistrate Judge issued a Report and Recommendation recommending that that the Court issue an order granting the subpoenas. New Balance submitted its opposition to the Report and Recommendation on January 18, 2019, and Mr. Ribadeneira, PSG, and Superdeporte submitted their Response to New Balance's Opposition on February 1, 2019. On August 17, 2018, Respondents and Superdeporte filed a separate petition for discovery in aid of the Peruvian proceeding pursuant to 28 U.S.C. §1782 in the District of Oregon from a former New Balance employee, Alan Hed, who signed the Distribution Agreement on behalf of Claimant, and who was also involved in New Balance's decision not to move forward with the New Distribution Agreement and to work with another distributor in Peru.

On August 22, 2018, the Oregon Court granted the 1782 petition. These proceedings remain ongoing.

## III. THIS TRIBUNAL DOES NOT HAVE JURISDICTION OVER MR. RIBADENEIRA

12. Simply put, this Tribunal does not have jurisdiction over Mr. Ribadeneira. Mr. Ribadeneira was not and never has been a party to the Distribution Agreement between PSG and New Balance. He also has never been a party to the New Distribution Agreement. PSG also never assigned the Distribution Agreement to Mr. Ribadeneira, nor has he in any way assumed the obligations under the Distribution Agreement. Arbitration is fundamentally based upon the consent of the parties to the arbitration agreement. Without its consent, a party may not be compelled to arbitrate a dispute.

### A. Mr. Ribadeneira Was Not a Party to the Distribution Agreement Or its Arbitration Clause

13. Pursuant to Clause 21 of the Distribution Agreement, the *parties* to the Distribution Agreement agree to arbitrate any and all disputes arising out of the Distribution Agreement. *See* Claimant's Exhibit 1. As such, only the *parties* to the Distribution Agreement, namely PSG and New Balance, can be bound by the Distribution Agreement's arbitration clause. Accordingly, Mr. Ribadeneira, as a non-party to the Distribution Agreement as well as its arbitration agreement, cannot be bound by its arbitration clause.

### B. PSG Has Not Assigned Its Rights Under the Agreement to Mr. Ribadeneira

14. Furthermore, PSG has not transferred or assigned its rights in relation to the dispute between it and New Balance to Mr. Ribadeneira. *See* Notice of Arbitration, ¶ 16; *see also* Claimant's Exhibit 5. The Distribution Agreement itself, with respect to the Distributor is, by its own terms, "nondivisible, nontransferable, and nonassignable". *See* Claimant's

7

Exhibit 1. As such, PSG never assigned or transferred this agreement to Mr. Ribadeneira and Claimant's discussion of assignment is plainly irrelevant.

15. PSG and Superdeporte executed Assignments of Rights in connection with the Peru Action. The Peru Action relates to New Balance's failure to move forward with a New Distribution Agreement in Peru with Superdeporte, an entity that Respondents reconstituted and repurposed for purposes of distributing New Balance's products in Peru. It does not relate to PSG's rights and obligations under the Distribution Agreement that are the subject of this proceeding.

16. What is more, the Assignment of Rights contemplates only that PSG will assign its rights related to the Peruvian Demand to Mr. Ribadeneira "with respect to legal actions to be *initiated against* New Balance Athletic Shoe Inc. in Peru and anywhere else in the world." *See* Claimant's Exhibit 5 (emphasis added). This arbitration proceeding is distinct from the Peruvian Demand and it is not a proceeding *initiated against* New Balance, as New Balance is the Claimant in this arbitration.

17. PSG did not assign its rights and obligations under the arbitration agreement contained in the Distribution Agreement to Mr. Ribadeneira. The Assignment of Rights is not only inapplicable to this proceeding, but also, an assignment of the type that Claimant says occurred—which it did not—is forbidden by the Distribution Agreement and the New Distribution Agreement.

18. As a result, this tribunal lacks jurisdiction to hear any dispute between Claimant and Mr. Ribadeneira or any claims which Claimant purports to have in relation to Mr. Ribadeneira. It must decline to exercise jurisdiction over any dispute relating to Mr. Ribadeneira, who does not consent to arbitrate these disputes with New Balance. It also lacks jurisdiction to

hear the separate and distinct claims that Mr. Ribadeneira has filed against New Balance in the Peru Action.

## IV. THIS TRIBUNAL SHOULD NOT JOIN THE CLAIMS IN THE PERU ACTION WITH THIS ARBITRATION

19.     There is a strong public policy in favor of enforcing arbitration agreements both in Massachusetts and in Peru.  This is generally true unless, as is true here, the party opposing arbitration rebuts the presumption in favor or arbitration.  *Grand Wireless, Inc. v. Verizon Wireless, Inc.*, 748 F.3d 1, 7 (1st Cir. 2014).  Rebutting the presumption begins with highlighting an ambiguity.  Under Massachusetts law, an ambiguity arises only if "a reasonable person could read the provision more than one way."  *Shen v. CMFG Life Ins. Co.*, No. CV 15-11593-MLW, 2016 WL 1129308, at *8 (D. Mass. Mar. 4, 2016), *report and recommendation adopted*, No. CV 15-11593-MLW, 2016 WL 1189125 (D. Mass. Mar. 22, 2016).  Rebutting an ambiguity in order to limit arbitration requires a showing of an intent to exclude the type of dispute at issue from the scope of the arbitration clause.  *See Grand*, 748 F.3d at 8–9.  By this standard, the arbitration clause contained in the Distribution Agreement does not apply to the claims in the Peru Action.  The parties did not intend to arbitrate the claims that Mr. Ribadeneira filed against New Balance in Peru in relation to New Balance's failure to move forward with the New Distribution Agreement.

### A. The Peru Action Does Not Relate to or Arise From the Distribution Agreement At Issue in This Arbitration, it Relates to New Balance's Failure to Move Forward With the New Distribution Agreement

20.     The Distribution Agreement's arbitration clause provides: "The parties agree that any and all disputes (whether in contract or any other theories of recovery) related to or arising out of this Agreement or the relationship, its application and/or termination (including post-

termination obligations) shall be settled by final and binding arbitration in accordance with the UNCITRAL Arbitration Rules." *See* Claimant's Exhibit 1.

21. The parties to the arbitration clause of the Distribution Agreement are *only* PSG and New Balance. The "relationship" at issue in the arbitration clause is the distribution arrangement between PSG and New Balance as set forth in the Distribution Agreement. It does not involve any other relationship including the new and different structure and relationship that the parties were negotiating under the New Distribution Agreement. PSG and New Balance have, in accordance with this arbitration agreement, agreed to arbitrate their contractual claims arising under the Distribution Agreement in this forum.

22. The claims pending in the Peru Action do not arise out of or relate to the Distribution Agreement. Instead, they arise out of and relate to the New Distribution Agreement and New Balance's bad faith in failing to move forward with the New Distribution Agreement. The claims in the Peru Action also do not pertain to post-termination obligations under this Distribution Agreement. Instead, they pertain to the negotiation of a New Distribution Agreement, which ultimately did not come to fruition because New Balance acted in bad faith in negotiating the New Distribution Agreement. As such, the Peru Claims do not fall within the scope of the Distribution Agreement should not be joined with this arbitration.

23. Furthermore, the claims at issue in the Peru Action are not, as Claimant contends, inextricably intertwined with the arbitration claims. The New Distribution Agreement, at New Balance's request, had a different structure and different parties than the Distribution Agreement. Under the New Distribution Agreement, Superdeporte was going to serve as New Balance's exclusive distributor in Peru. New Balance has not made any claims in this

arbitration related to the New Distribution Agreement between New Balance and Superdeporte.

**B. The New Distribution Agreement Was Not Simply a Contract Renewal, it Was a Complete Restructure of the Distribution Relationship**

24. Claimant also inaccurately refers to the New Distribution Agreement as merely a renewal of the Distribution Agreement. This characterization is plainly incorrect. The facts reflect that the New Distribution Agreement, while it may not have involved significant changes on New Balance's part, involved a *complete* reorganization of the distribution relationship from the perspective of the distributor. First, as explained above, the New Distribution Agreement, at New Balance's request, was to have a different distributor party, Superdeporte. Under the New Distribution Agreement, Superdeporte was going to serve as New Balance's exclusive distributor in Peru. It took Mr. Ribadeneira months to properly reconstitute Superdeporte so that it was prepared to serve as New Balance's exclusive distributor in Peru.

25. The New Distribution Agreement also had a distinct structure as compared to the Distribution Agreement. Under the New Distribution Agreement, the parties planned to significantly increase the distribution of New Balance products in Peru. In addition to expanding the distribution of New Balance products in Peru, the structure of the relationship changed, at New Balance's request. The change in structure was designed to increase New Balance's margins and improve product placement where its products were sold. New Balance sought to increase its margins through the "shop in shop" locations at Marathon Sports Stores, giving New Balance increased floor space as well as an "unfair advantage" over its competitors.

11

26. New Balance's attempts to characterize the New Distribution Agreement as merely a renewal are also contrary to New Balance's contemporaneous representations to Respondents. For example, when New Balance shared the terms of the New Distribution Agreement with PSG's representatives, New Balance itself refers to the draft New Distribution Agreement as a "contract restructure." Claimant's Exhibit 6, p. 1. To restructure something is to change its makeup or organization, which is exactly what the parties contemplated through the New Distribution Agreement.

**C.** **Superdeporte Has Not Consented to Arbitration with Claimant**

27. While the terms of the New Distribution Agreement had been agreed to between the parties and the New Distribution Agreement was set for execution, the parties never formally executed the New Distribution Agreement. New Balance acted in bad faith in negotiating and finalizing the New Distribution Agreement, and misled Respondents and Superdeporte into thinking that they had concluded negotiations and ultimately decided not to move forward with the New Distribution Agreement. While the New Distribution Agreement also contained an identical arbitration clause, New Balance, Superdeporte, and PSG never signed the New Distribution Agreement. Superdeporte's name does not even appear in the draft of the New Distribution Agreement. As such, Superdeporte was never a party to the New Distribution Agreement, nor was it a party to its arbitration clause.

**D.** **It is Exclusively Up to the Peruvian Court, Not This Tribunal, to Determine its Jurisdiction to Hear the Claims in the Peru Action**

28. The Peruvian Court is currently considering its jurisdiction over the claims in the Peru Action. First, New Balance's jurisdictional objections to the Peru Action are unlikely to be granted. When the Peruvian civil courts rejected New Balance's request to transfer the action to the Peruvian commercial court in May 2018, the Peruvian civil court in fact

confirmed its own competence over the Peru Action. *See* declaration of Javier Lozada, ¶¶ 4, 10. In fact, the Peruvian court affirmed its jurisdiction to hear the matter when it admitted the Demand, considered the request for interim measures, and when it denied New Balance's request to transfer the Peru Action to the Peruvian commercial court. *Id.* at ¶ 10. New Balance's jurisdictional objections, arguing first that the matter should be heard by the commercial court and then that the matter is subject to arbitration, are inconsistent, unsupported by the evidence on the record, and are unlikely to be granted. *Id.* at ¶ 11.

29.   To date, New Balance has made arguments regarding the Peruvian court's jurisdiction both in the Peru Action as well as in this arbitration. New Balance's strategy is faulty because it risks inconsistent outcomes. Furthermore, under the doctrine of *lis pendens*, this tribunal should defer to the Peruvian court regarding the determination of the Peruvian court's own jurisdiction. New Balance first raised the issue of the Peruvian court's jurisdiction to hear this matter before the Peruvian court. The Peruvian court will, in turn, rule on its jurisdiction. This tribunal should thus refrain from ruling on the question while it remains pending before the Peruvian court.

30.   Finally, it is exclusively within the prevue of the Peruvian court to determine its own jurisdiction to hear this dispute. The Peru Action will continue until a judgement is issued in Peru that resolves the merits of the controversy. *See* Informe Legal, CASAHIERRO Abogados, p. 3 (English version). Under Peruvian law, arbitration consolidation may only take place between arbitration proceedings, not between an arbitration proceeding and an ongoing litigation. *Id*. at pp. 4–5. Furthermore, consolidation may only be made effective by express agreement between the parties. *Id*. Here, there has been no express agreement

between the parties. Furthermore, the constitution of Peru states that "no authority may appeal to pending cases before the jurisdictional body or interfere in the exercise of its functions." *Id.* at pp. 5. For the tribunal to intervene in this case would be an interference with the exercise of the court's functions, and would also subject the judge in the Peru Action to criminal prosecution for the crime of undue avoidance under Peruvian law. *Id.* at p. 6.

31.     Therefore, even if this tribunal were to find that the Peru Claims should be joined with this arbitration, under Peruvian law, the judge in the Peru Action would not be compelled to follow, and almost certainly would not follow, this tribunal's determination regarding the claims at issue in the Peru Action. *Id.*

## V.     RELIEF SOUGHT

32.     Respondents reject Claimant's claims as set out in its Motion and reject the relief sought therein.

33.     Respondents respectfully request the arbitral tribunal to:

       i.      Dismiss all Claimant's claims with respect to Mr. Ribadeneira on the ground that the arbitral tribunal lacks jurisdiction with respect to a dispute between Claimant and Mr. Ribadeneira;

      ii.      Reject Claimant's Motion to compel arbitration of the claims pending in the Peru Action;

     iii.      Order Claimant to pay all arbitration costs associated with this jurisdictional briefing, including Respondents' representative's costs and expenses; and

     iv.      Order any further and/or additional relief as the Tribunal may deem appropriate.

34.     Respondents reserve their right to:

     i.        Amend or supplement the above arguments as well as the relief sought herein;

     ii.       Present additional factual or legal arguments as may be necessary to present its case or rebut any case put forward by Claimant; and,

     iii.      Seek interim and or provisional measures before this tribunal or any competent national court.

Respectfully submitted,

David M. Orta
Legal representative for Respondents
1300 I Street NW, Suite 900
Washington, DC 20005
Tel: (202)538-8000
Fax: (202)538-8100
February 4, 2019

# EXHIBIT 7

**INTERNATIONAL INSTITUTE FOR CONFLICT PREVENTION & RESOLUTION**

IN THE MATTER OF ARBITRATION
BETWEEN:

NEW BALANCE ATHLETICS, INC.,
    Claimant

v.

PERUVIAN SPORTING GOODS S.A.C., et
al.
    Respondents

CASE NO. 01-18-0003-1183

## MEMORANDUM AND ORDER ON CLAIMANT'S MOTION
## TO COMPEL ARBITRATION

The claimant, New Balance Athletics, Inc. ("New Balance"), seeks an award against the

respondents, Peruvian Sporting Goods S.A.C. ("PSG") and Rodrigo Ribadeneira, PSG's majority

stockholder and general manager ("Ribadeneira"), for amounts allegedly owed under a

distribution agreement dated January 1, 2013, pursuant to which PSG purchased New Balance

products for distribution in Peru ("the distribution agreement"). PSG has submitted an

amended response, including a counterclaim alleging breach of the distribution agreement by

New Balance. Ribadeneira has objected to the jurisdiction of the tribunal. New Balance has

moved for an order declaring that Ribadeneira is subject to the tribunal's jurisdiction with

respect to certain claims asserted by Ribadeneira in the courts of Peru, and that such claims

must be adjudicated in this arbitration. I am empowered to make the jurisdictional

determination pursuant to Article 23 of the UNCITRAL Arbitration Rules. I conducted a hearing

on the subject by telephone on February 26, 2019.

1

1. **Findings of Fact.** Based on the relevant evidence submitted to me to date, I make the following findings with respect to the jurisdictional defense asserted by Ribadeneira and the motion to compel arbitration of the Peru claims. These findings relate to the motion to compel arbitration only and are made without prejudice to the right of the parties to present evidence on the merits of the arbitration claims.

PSG has distributed New Balance products in Peru since 2000. New Balance and PSG entered into the distribution agreement effective January 1, 2013, to December 31, 2015. In the event that neither party gave timely notice otherwise, which they did not, the agreement self-extended to December 31, 2016. Ribadeneira was not a party to the distribution agreement. That agreement contained in section 21 an arbitration clause as follows: "The parties agree that any and all disputes (whether in contract or any other theories of recovery) related to or arising out of this Agreement or the relationship, its application and/or termination (including post-termination obligations) shall be settled by final and binding arbitration in accordance with the UNCITRAL Arbitration Rules." Under section 25, the distribution agreement is "nondivisible, nontransferable, and nonassignable." Under section 17(e), the obligation to arbitrate survives termination of the agreement.

In mid-2015, alleging that PSG was in significant arrears with respect to amounts owed, New Balance placed PSG on "credit hold," and refused to fill new orders, even when backed by a letter of credit. At the same time, the parties embarked on a negotiation to bring about a new distribution agreement that would make certain changes in wholesale/retail arrangements.

2

On September 15, 2015, New Balance forwarded to PSG a draft of an Amended and
Restated Agreement between the parties. The draft contained the same arbitration clause that
appears in the distribution agreement; recites an effective date of January 1, 2013 (the
effective date of the distribution agreement); adds an effective date of August 15, 2015, with
respect to the amendment; and appears to be an extension of the then extant distribution
agreement with certain changes. Further negotiation by the parties of various terms continued
from there. It was anticipated that a yet-to-be created entity, Superdeporte S.A.C.
("Superdeporte"), of which Ribadeneira would also be a principal, would be substituted for PSG
as distributor once Superdeporte was established and capable of performing the distributor's
functions. Throughout this period, New Balance regularly demanded that PSG make significant
payments with respect to its arrearages, but no mutually satisfactory arrangements were
implemented and the debt remained outstanding. There was also discussion at this time of
proceeding with PSG as signatory, with Superdeporte to be substituted for PSG at a later time.
In the end, no version of an amended agreement was signed by any party.

On or about May 16, 2016, with no new agreement signed and a substantial arrearage
continuing to exist, PSG notified New Balance that Superdeporte had been established and was
prepared to assume responsibilities as distributor. PSG requested a letter confirming
Superdeporte as its new distributor in Peru. After   agreeing initially to provide the requested
letter, New Balance subsequently refused to do so, citing the absence of a contract with
Superdeporte and the size of the debt owed by PSG.

3

On or about May 30, 2016, New Balance notified PSG that it would not proceed with a new arrangement until a satisfactory payment was made and a new agreement with Superdeporte was executed. On or about June 23, 2016, New Balance forwarded to PSG a subsequent notice that it would not renew the distribution agreement, and on or about July 8, 2016, notified PSG that it would work with a different distributor in Peru.

On or about November 25, 2016, PSG and Superdeporte executed similar written assignments of claims to Ribadeneira. The assignments recite allegations regarding the earlier negotiations between PSG and New Balance. Each assignor then assigns to Ribadeneira, without consideration, "... all its rights in attention to the dispute mentioned before against NEW BALANCE ATHLETIC SHOE INC. before judicial and administrative authorities, which enables THE ASSIGNEE to hold its position and execute all THE ASSIGNOR'S rights in respect with the legal actions to be initiated against NEW BALANCE ATHLETIC SHOE INC. in Peru and anywhere else in the world."

In January, 2017, Ribadeneira commenced legal proceedings in the Peru civil courts on two alternative claims ("the Peru claims"). First, Ribadeneira alleged that New Balance, PSG and Superdeporte had in fact agreed on a new distribution arrangement; that such agreement was fully perfected as of January 25, 2016; and that the new agreement had been breached by New Balance causing damages to the other contracting parties. Alternatively, Ribadeneira alleged

that New Balance had failed to fulfill its obligation under Peruvian law to conduct the negotiation regarding a new distribution agreement in good faith, likewise causing damages.

The proceeding in Peru remains pending. In December, 2017, the Peruvian court temporarily enjoined New Balance from distributing products in Peru through any distributor other than PSG. In July, 2018, the court dissolved the injunction, based apparently on its finding that no distribution contract between New Balance and PSG remained in effect. New Balance has moved to dismiss the Peru claims in the Peru courts. Meanwhile, discovery with respect to those claims has been authorized by the United States District Court in Oregon, and a similar request is pending in the United States District Court in Massachusetts.

2. **Discussion.** With certain exceptions, "a party cannot be required to arbitrate any dispute that it has not by contract submitted to arbitration." *Commonwealth v. Philip Morris Incorporated*, 448 Mass. 836, 843 (2007). Ribadeneira was not a party to the distribution agreement effective January 1, 2013, and in ordinary circumstances would not be bound personally by its provisions, including its arbitration clause. Likewise, if -- as Ribadeneira contends -- the Amended and Restated Agreement or other extension of the distribution relationship became effective, such new agreement, and any arbitration clause contained therein, would ordinarily bind PSG and/or Superdeporte, but not Ribadeneira in his individual capacity. The question is whether Ribadeneira, while not a party to either agreement, may have become subject to the arbitration clause with respect to the Peru claims by virtue of the PSG and/or Superdeporte assignments or for other reasons.

5

The related question, the answer to which will in my view be dispositive, is what disputes the arbitration clause is intended to encompass, and specifically whether it applies to the Peru claims at all. The answer appears clear with respect to the first of such claims. If Ribadeneira is correct that a new distribution agreement between New Balance and either PSG or Superdeporte became effective (notwithstanding the absence of formal execution by any affected party), the arbitration clause contained therein would bind either PSG or Superdeporte with respect to the assertion of claims thereunder. Those claimants cannot evade the arbitration clause by means of assignments of the claims to a nonparty. To the extent that Ribadeneira has acquired those claims, he has acquired as well the accompanying obligation to have them adjudicated in this arbitration.

In this regard, Ribadeneira's assertion of at least the first of the Peru claims turns on the validity of the respective assignments, given that it is the claims of PSG and/or Superdeporte that he is pursuing. I assume the validity of those assignments notwithstanding the nonassignment provision set forth in section 25 of the distribution agreement as well as in the purported new agreement. *Apollo Computer, Inc. v. Berg*, 886 F.2d 469, 472 (1st Cir. 1989) ("... under Massachusetts law, a general nonassignment clause will be construed as barring only the delegation of duties, not the assignment of rights"). The assignments do not convey to Ribadeneira any of the obligations incurred by PSG or Superdeporte, nor do they transfer to Ribadeneira personally any on-going right to act as distributor. They assign only claims, if any,

6

already possessed by the assignors for breach of the purported agreement and, as set forth above, do so subject to the requirement that such claims be arbitrated.

Whether the second Peru claim is embraced by the arbitration clause of the original distribution agreement is a closer question. That claim is an alternative claim that assumes that New Balance on the one hand, and PSG and/or Superdeporte on the other, did not conclude a new distribution agreement. In that event, Ribadeneira, as assignee of PSG and Superdeporte, asserts under Peru law that New Balance bargained in bad faith; induced the principals of PSG and Superdeporte to incur considerable expense in reliance on New Balance's representations; and ultimately damaged those companies by terminating the negotiation and engaging with a new distributor. Given that the claim turns on the allegation that no new agreement exists, a duty to arbitrate can be located, if at all, only in the arbitration clause of the original agreement.

The arbitration clause of the distribution agreement provides in relevant part "that any and all disputes ... related to or arising out of the Agreement or the relationship, its application and/or termination (including post-termination obligations) shall be settled by final and binding arbitration." This is a so-called "broad clause" that creates "a presumption that a contract dispute is encompassed by the clause unless it is clear that the dispute is excluded." *Commonwealth v. Philip Morris Incorporated,* 448 Mass. at 843-844; *Carpenter v. Pomerantz,* 36 Mass. App. Ct. 627, 630 (1994) (where broad arbitration clause, "there is a strong presumption of arbitrability"). In construing a broad clause similar to the clause in the distribution

7

agreement, the Court of Appeals observed that "(b) road language of this nature covers contract-generated or contract-related disputes between the parties however labeled: it is immaterial whether claims are in contract or in tort." _Maldonado v. PPG Industries, Inc._, 514 F. 2d 614, 616 (1st Cir. 1975) (emphasis supplied). "The arbitration clause is not limited to disputes over the terms of the contract or to disputes arising during the performance of the contract." Id at 616 n. 6.

The terms of a contract, including presumably its arbitration clause, may be enforced by or against nonparties through "assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver and estoppel." _Arthur Andersen LLP v. Carlisle,_ 129 S. Ct. 1896, 1902 (2009), quoting 21 R. Lord, Williston on Contracts s. 57:19, p. 183 (4th ed. 2001). Where a broad arbitration clause is in place, arbitration is avoided only where there is "positive assurance that the arbitration clause is not susceptible to an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." _Grand Wireless, Inc. v. Verizon Wireless, Inc.,_ 748 F.3d 1, 8 (1st Cir. 2014), quoting _United Steelworkers of Am. v. Warrior & Gulf Navigation Co.,_ 363 U.S. 574, 582-583 (1960).

With these principles in mind, I turn to the language of the arbitration clause and the Peru claim at issue. The provision that "all disputes related to or arising out of this Agreement" speaks for itself. Thus, the parties do not dispute, nor could they, that New Balance's claim for amounts due under the agreement and PSG's counterclaim for breach of that agreement are governed by the clause. The reference in the clause to those disputes that relate to or arise out

8

of the agreement is followed by the phrase "or the relationship." I am not persuaded by the proposition that the reference to "the relationship" reflects only the rights and obligations created by the agreement. Such an interpretation renders the phrase superfluous. Abiding by normal criteria for the interpretation of language of this nature, the phrase presumably means t something, and that "something" must expand the scope of the arbitration clause beyond those disputes that are captured by the preceding language.

I conclude, therefore, that the phrase "or the relationship" was intended to apply to all aspects of the interaction between New Balance and PSG on the subject of the distribution of New Balance products in Peru, whether such interaction reflected existing contractual rights or otherwise. The arbitration clause refers as well to "this Agreement or the relationship, its application and/or termination," suggesting that the clause embraces disputes arising from the cessation of business dealings between the parties apart from disputes arising specifically from the distribution agreement itself.

The Peru claim at issue, i.e., that New Balance negotiated in bad faith before ending the distribution relationship, arises from the parties' efforts while the original agreement was in effect to extend the relationship into the future past the date (December 31, 2016) on which the existing agreement would expire by its own terms. Those efforts generated a draft of a document entitled "Amended and Restated Agreement" that recites an effective date of January 1, 2013, the effective date of the earlier agreement, with a subsequent reference to August 15, 2015, as the date on which amendments would become effective. The inference is

9

clear that what was contemplated by the parties was the continuation of a relationship between manufacturer and distributor which had by then existed for more than fifteen years, but which would otherwise expire if not extended by agreement. That the extended agreement contained somewhat different terms does not alter its purpose. This is true as well with the intention to substitute as distributor Superdeporte, a company in which Ribadeneira would also be a principal, and which apparently could undertake distribution activities that PSG could not perform. It is still the ending of the relationship between New Balance and PSG that invokes the arbitration clause, and I am not persuaded that PSG and Superdeporte are sufficiently independent of each other that any incidental effect on Superdeporte is unfair or unlawful.

I am satisfied that the claim of PSG and/or Superdeporte that PSG acted unlawfully with respect to negotiation of an extended agreement, which claim has been assigned to Ribadeneira, implicates directly the "relationship" between manufacturer and distributor that then existed; accordingly, that claim is governed by the arbitration clause. In this regard, the outcome is similar to that arrived at in *Next Step Medical Co., Inc. v. Johnson & Johnson International,* 619 F.3d 67, 72 (1st Cir. 2010), wherein an arbitration clause governed any dispute "arising out of or relating in any way to the business relationship between (the parties)." Id. at 69. Construing the intended scope of the clause, the court concluded that it "is not limited to contract disputes ... (A) claim arising out of and relating to the breakdown of business relationships ... is covered by this broadly worded arbitration clause." Id. at 72.

10

My conclusion that the arbitration clause applies to the Peru claims disposes as well of Ribadeneira's contention that he cannot be compelled to arbitrate because he is not a party to the agreement that contains the arbitration requirement. It is the claims that are subject to arbitration. Those claims belonged to PSG and/or Superdeporte, but were subsequently transferred to Ribadeneira by assignment. They remain governed by the arbitration clause irrespective of who prosecutes them. I make no attempt to determine whether Ribadeneira has other rights as an individual under Peru law that may be independent of the claims of PSG and/or Superdeporte; it is the claims of those entities that are covered.

By so ruling, it is not my intention to attempt to impose a result on the courts of Peru, nor do I seek to interfere with whatever jurisdiction those courts choose to assert. I decide only what has been presented to me in this arbitration. Resolution of any possible conflicts that could result from on-going litigation in a separate forum is for another time.

**3. Conclusion**. The motion of New Balance to compel arbitration is allowed. The case administrator shall contact the parties to arrange a convenient time for a scheduling conference to be conducted by telephone.

/s/ William I. Cowin
Hon. William I. Cowin (Ret.)
Arbitrator

DATED: March 18, 2019

11

## PROOF OF SERVICE BY EMAIL & U.S. MAIL

Re: New Balance Athletics, Inc. / Peruvian Sporting Goods S.A.C. (ICDR)
Reference No. 1400017459

I, Kristen Flaherty, not a party to the within action, hereby declare that on March 18, 2019, I served the attached Memorandum and Order on Claimant's Motion to Compel Arbitration on the parties in the within action by Email and by depositing true copies thereof enclosed in sealed envelopes with postage thereon fully prepaid, in the United States Mail, at Boston, MASSACHUSETTS, addressed as follows:

Kate E. MacLeman Esq
Mark E. Tully Esq.
Goodwin Procter LLP
100 Northern Ave
Boston, MA  02210
Phone: 617-570-1000
kmacleman@goodwinlaw.com
mtully@goodwinprocter.com
    Parties Represented:
    New Balance Athletics, Inc.

Mr. Michael Pickett
Joseph P. McGurrin Esq.
Goodwin Procter LLP
100 Northern Avenue
Boston, MA  02210
Phone: 617-570-1389
mpickett@goodwinlaw.com
jmcgurrin@goodwinlaw.com
    Parties Represented:
    New Balance Athletics, Inc.

Julianne Jaquith Esq.
David M. Orta Esq.
Quinn Emanuel Urquhart & Sullivan LLP
1300 I Street NW
Suite 900
Washington, DC  20005
Phone: 202-538-8000
juliannejaquith@quinnemanuel.com
davidorta@quinnemanuel.com
    Parties Represented:
    Peruvian Sporting Goods S.A.C.

I declare under penalty of perjury the foregoing to be true and correct. Executed at Boston, MASSACHUSETTS on March 18, 2019.

Kristen Flaherty
KFlaherty@jamsadr.com

# SERVICE LIST

| | | | |
|---|---|---|---|
| **Case Name:** | New Balance Athletics, Inc. vs. Peruvian Sporting Goods S.A.C. (ICl | **Hear Type:** | Arbitration |
| **Reference #:** | 1400017459 | **Case Type:** | Business/Commercial |
| **Panelist:** | Cowin, William I., | | |

---

### Julianne Jaquith

Quinn Emanuel Urquhart & Sullivan LLP

Julianne Jaquith
1300 I Street NW
Suite 900
Washington, DC 20005
juliannejaquith@quinnemanuel.com

Respondent
Phone: 202-538-8000
Fax: 202-538-8100

**Party Represented:**
Peruvian Sporting Goods S.A.C.

### Kate E. MacLeman

Goodwin Procter LLP

Kate E. MacLeman
100 Northern Ave
Boston, MA 02210
kmacleman@goodwinlaw.com

Claimant
Phone: 617-570-1000
Fax: 617-523-1231

**Party Represented:**
New Balance Athletics, Inc.

### Joseph P. McGurrin

Goodwin Procter LLP

Joseph P. McGurrin
100 Northern Avenue
Boston, MA 02210
jmcgurrin@goodwinlaw.com

Claimant
Phone: 617-570-1389
Fax: 617-321-4702

**Party Represented:**
New Balance Athletics, Inc.

### David M. Orta

Quinn Emanuel Urquhart & Sullivan LLP

David M. Orta
1300 I Street NW
Suite 900
Washington, DC 20005
davidorta@quinnemanuel.com

Respondent
Phone: 202-538-8000
Fax: 202-538-8100

**Party Represented:**
Peruvian Sporting Goods S.A.C.

### Michael Pickett

Goodwin Procter LLP

Michael Pickett
100 Northern Avenue
Boston, MA 02210
mpickett@goodwinlaw.com

Claimant
Phone: 617-570-1389
Fax: 617-321-4702

**Party Represented:**
New Balance Athletics, Inc.

### Mark E. Tully

Goodwin Procter LLP

Mark E. Tully
100 Northern Ave
Boston, MA 02210
mtully@goodwinprocter.com

Claimant
Phone: 617-570-1000
Fax: 617-523-1231

**Party Represented:**
New Balance Athletics, Inc.

# EXHIBIT 8

## INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION

**IN THE MATTER OF ARBITRATION BETWEEN:**

NEW BALANCE ATHLETICS, INC.

vs.

PERUVIAN SPORTING GOODS S.A.C. et al.

Civil No. 01-18-0003-1183

## PETITIONER NEW BALANCE ATHLETICS, INC.'S MOTION TO AMEND

Pursuant to Procedural Order No. 2 and Article 22 of the UNCITRAL Arbitration Rules, Petitioner New Balance Athletics, Inc. ("New Balance") hereby submits its Amended Notice of Arbitration, attached hereto as Exhibit A. This is New Balance's first Amended Notice and is amended in light of Judge Cowin's Memorandum and Order on New Balance's Motion to Compel Arbitration, dated March 13, 2019.

Dated: May 3, 2019

Respectfully submitted,

/s/ Mark E. Tully
Mark E. Tully
Kate E. MacLeman
100 Northern Avenue
Boston, MA 02210
mtully@goodwinlaw.com
kmacleman@goodwinlaw.com
p: 617-570-1000
f: 617-801-8955

*Attorneys for Petitioner*

# EXHIBIT A

NOTICE OF ARBITRATION UNDER THE ARBITRATION RULES OF THE UNITED NATIONS
COMMISSION ON INTERNATIONAL TRADE LAW

BETWEEN:

NEW BALANCE ATHLETICS, INC.

(CLAIMANT)

-AND-

PERUVIAN SPORTING GOODS S.A.C., RODRIGO RIBADENEIRA, AND SUPERDEPORTE S.A.C.

(RESPONDENT)

# AMENDED NOTICE OF ARBITRATION

## GOODWIN PROCTER LLP

Goodwin Procter LLP
100 Northern Ave
Boston, MA 02210
Tel:  (617) 570-1000
Fax:  (617)523-1231
Legal representative for Claimant                               May 3, 2019

## I.    INTRODUCTION

1.    This Notice of Arbitration, together with its Exhibits numbered 1 to 10, is submitted on behalf of New Balance Athletics, Inc. ("New Balance") pursuant to Article 3 of the Arbitration Rules of the United Nations Commission on International Trade Law in force as from August 15, 2010 (the "UNCITRAL Arbitration Rules") against Peruvian Sporting Goods S.A.C. ("PSG") and Rodrigo Ribadeneira ("Ribadeneira") (collectively "Respondents").

2.    This Notice of Arbitration contains information concerning the following:

    i.    The name, description and address of each of the Parties (**II**);

    ii.    The Parties' relationship and the nature and circumstances of the Parties' dispute giving rise to Claimant's claims (**III**);

    iii.    The dispute resolution clause, the proposed governing law, the seat and language of the arbitration (**IV**);

    iv.    Claimant's position as regard to the composition of the arbitral tribunal (**V**);

    v.    Claimant's damages (**V**);

    vi.    A statement of the relief sought (**VI**);

3.    This dispute principally concerns Respondent's failure to render payment under the Parties' agreement covering Respondent's distribution of New Balance products (the "Distribution Agreement").

## II.    THE PARTIES

### A.    Claimant

4.    Claimant is New Balance, a company registered under the laws of Massachusetts, with its registered office located at Boston Landing, 100 Guest Street, Boston, Massachusetts 02135.  New Balance is in the business of designing, manufacturing, marketing, and distributing athletic footwear, apparel and accessories.  Its footwear, apparel and accessories are distributed all over the world.

5.    Claimant's address is:

       New Balance Athletics, Inc.
       Boston Landing
       100 Guest Street
       Boston, MA 02135
       Attention:  Paul Gauron, EVP and General Counsel
       Tel.:  (617) 746-2554
       Fax:  (617) 787-9355
       paul.gauron@newbalance.com

6.    Claimant's representative, to whom all correspondence should be sent in this arbitration, are:

       Goodwin Procter LLP
       Mark Tully (BBO # 550403)
       100 Northern Avenue
       Boston, MA 02210
       Tel.:  (617) 570-1000
       Fax:  (617)523-1231
       MTully@goodwinlaw.com

**B.    Respondents**

7.    Respondents are Peruvian Sporting Goods S.A.C., a company registered under the laws of Peru, with its registered office located at Carretera Panamericana KM, 1303 mz. B lote 4 Zofratacna, Tacna, Peru, Rodrigo Ribadeneira, an individual, who during the relevant time period was the majority shareholder in PSG, and Superdeporte S.A.C., a company registered under the laws of Peru, with its registered office located at Av. Larco Nro. 1301 Int. 301, Miraflores, Peru.

8.    Respondents' contact information is:

       Peruvian Sporting Goods S.A.C.
       Carretera Panamericana KM
       1303 mz. B lote 4 Zofratacna
       Tacna, Peru
       Attention:  Rodrigo Ribadeneira
       TELEFAX:  (5932) 484-195

       Superdeporte S.A.C.
       Av. Larco Nro.
       1301 Int. 301
       Miraflores, Peru
       Attention: Rodrigo Ribadeneira

Rodrigo Ribadeneira
Hidalgo de Pinto
City of Quito, Ecuador

## III. THE PARTIES' RELATIONSHIP AND THE NATURE AND CIRCUMSTANCES OF THE PARTIES' DISPUTE GIVING RISE TO THE CLAIMS

9.    On January 1, 2013, New Balance and PSG entered into a three-year distribution agreement for the sale and distribution of New Balance's products in Peru (the "Agreement"). Ex. 1 (Agreement). The three-year term of the Agreement was subject to a one-year extension if the Agreement was not terminated by either party sixty days in advance of its scheduled termination on December 31, 2015. Ex. 1, ¶ 5(b). By all accounts, the relationship between New Balance and PSG was successful for two and a half years. But in mid-2015, the relationship took a turn for the worse when PSG fell behind on its contractual obligations and became less and less responsive to New Balance's inquiries.

10.   By July 2015, New Balance had notified PSG of its past due payments and that unless it made substantial progress toward bringing them up-to-date, PSG would be unable to order more product under the Agreement. Ex. 3, p. 57. Over two months later, PSG had still not become current on its past due payments, promising instead to make its payments to New Balance over time. Ex. 2, p. 23; Ex. 3, pp. 60, 66. To the contrary, however, PSG continuously failed to adhere to each and every payment schedule it proposed. Ex. 3, pp. 64, 74, 110-11.

11.   Between July 2015 and January 1, 2016, New Balance and PSG tried to negotiate a new distribution agreement, while New Balance also tried to recover PSG's past-due balances. The Parties could not come to terms on a new distribution agreement, in large part due to PSG's eleventh hour demand for changes to the new agreement's terms. Ex. 3, pp. 80-81. As New Balance pointed out to PSG at the time, many of its demands were "huge change[s] in the conditions that ha[d] been negotiated extensively over the [previous] year." Ex. 3, pp. 82-83.

12.   On January 1, 2016, the Agreement's one-year extension went into effect and the parties remained subject to the terms of that Agreement. Ex. 3, pp. 88-102; Ex. 1, ¶ 5(b).

13. At about that same time, New Balance notified PSG that continued delinquency of amounts owed under the Agreement would jeopardize the parties' relationship. Ex. 3, pp. 110-11.  On May 4, 2016, New Balance wrote to PSG:  "We need to have an honest conversation about what the future holds for our relationship.  We have been partners for many years but the last 12 months ha[ve] tested [New Balance's] patience and, if there is no future with PSG/Super Deportes, we will need to look at other ways to keep the brand relevant in Peru and Ecuador."  Ex. 3, p. 119.  Later that month, New Balance informed PSG that New Balance would discontinue shipping its product to PSG until past due amounts that it owed under the Agreement had been paid.  Ex. 2, p. 13.

14. On June 23, 2016, New Balance notified PSG that it would not agree to PSG's demanded changes to the Agreement and that the parties' relationship would end on December 31, 2016, at the termination of the one-year extension under the original Agreement.  Ex. 4.

15. As a result of PSG's failure to pay money due and owing under the Agreement, as of June 30, 2018, PSG owed New Balance over $2.9 million for product sold, contractual interest, and past-due distribution fees.  Interest on these amounts continues to accrue according to the terms of the Agreement.  The precise amounts that PSG owes New Balance are set forth in the below table:

| Description | Amount | Interest | Combined |
|---|---|---|---|
| Distribution Fees | $1,692,080.00 | $727,377.41 | $2,419,457.41 |
| Sample Expense | $43,801.00 | $39,955.05 | $83,756.05 |
| Withholding Tax Debits | $207,823.72 | $191,438.70 | $399,262.42 |
| **TOTAL** | **$1,943,704.70** | **$958,771.16** | **$2,902,475.86** |

16. On November 25, 2016, through an Assignment of Rights, PSG and Superdeportes purport to have transferred "all of the rights entitled to [them]" in relation to the dispute between these entities and New Balance to Ribadeneira.  Ex. 5.  Thus, to the extent of any such purported assignment, Ribadeneira has "take[n] [PSG's] place" under the Agreement, and is subject to the Agreement's arbitration clause.  *Id.*

17. On January 22, 2017, purporting to rely on this Assignment of Rights, Mr. Ribadeneira filed claims in Peru (the "Peru Action") alleging that the negotiations taking place between PSG and New Balance either resulted in a valid and enforceable contract between New Balance and PSG, or in the alternative, that New Balance acted in bad faith in negotiating an agreement with PSG and/or Superdeportes, and was thus subject to "pre-contractual liability" for causing PSG and/or Superdeportes damages. *See* Ex. 6, pp. 9, 18 (English translation of lawsuit filed in Peru). In the Peru Action, Respondents claim, in part, that the document titled Amended and Restated Distribution Agreement By and Between New Balance Athletic Shoe, Inc. and Peruvian Sporting Goods S.A.C. ("Amended and Restated Agreement") constitutes a valid and enforceable contract between the parties.

18. On February 1, 2017, Mr. Ribadeneira filed a request for interim measures (the "Peru Interim Relief Request") asking the Peruvian court to order New Balance to "refrain from enforcing the direct distribution within the territory of Peru of its products . . . or with a different party different to [PSG]" based on Respondents' claims that the negotiations taking place between the parties between July 2015 and January 2016 resulted in a new distribution agreement between the parties. Ex. 7, p. 1 (English translation of request for interim measures). On December 8, 2017, the Peruvian court granted the request for interim measures, enjoining New Balance from distributing any of its products in Peru with any distributor other than PSG. *See* Ex. 8. Upon learning of the grant of interim measures, New Balance was unable to distribute any products in Peru until the interim relief was reversed on July 26, 2018. *See* Ex. 9.

19. At the time Respondents initiated the Peru Action and the Peru Interim Relief Request, Respondents were fully aware of the fact that there was no enforceable distribution agreement in existence between New Balance and PSG. *See* Ex. 4. Respondents were also aware that New Balance had entered into a new business partnership for distribution of its Products in Peru for 2017. In fact, New Balance informed them as such in an email dated July 8, 2016. *See* Ex. 10 (informing Respondent Ribadeneira that New Balance "decided to work with a new partner for Peru."). Furthermore, in both the Peru Action and the Peru Interim Relief Request, Respondents admit that they knew New Balance had

agreed to work with a different distributor in Peru for 2017.  *See* Ex. 6, p. 8 (English translation); Ex. 7, p. 6 (English translation).

20.     Respondents—knowing that there was no agreement between PSG and New Balance, and knowing that New Balance had a new distribution contract for distributing its products in Peru—nonetheless filed the Peru Interim Relief Request *ex parte*, which the Peruvian court erroneously granted, putting to a halt New Balance's ability to distribute products in the region until New Balance was given notice and an opportunity to respond.  *See* Ex. 8.  New Balance was thus unable to distribute its products in Peru for months, causing New Balance significant harm, as a result of Respondents' baseless and punitive claims.

## IV.     DISPUTE RESOLUTION CLAUSE, GOVERNING LAW, SEAT AND LANGUAGE OF THE ARBITRATION

### (a)     The Arbitration Clause

21.     This arbitration is initiated pursuant to the arbitration clause found at paragraph 21 of the Agreement, which provides as follows:

> The parties agree that any and all disputes (whether in contract or any other theories of recovery) related to or arising out of this Agreement or the relationship, its application and/or termination (including post-termination obligations) shall be settled by final and binding arbitration in accordance with the UNCITRAL Arbitration Rules. . . . The arbitration shall be heard and determined by a single arbitrator.  The place of arbitration shall be Boston, Massachusetts, USA.

### (b)     The Place of Arbitration

22.     Pursuant to paragraph 21 set out above, the place of the arbitration is Boston, Massachusetts, USA.

### (c)     Governing Law

23.     The Agreement is governed by the substantive laws of the Commonwealth of Massachusetts pursuant to paragraph 20, which provides as follows:

> This Agreement shall be deemed to have been entered into in the Commonwealth of Massachusetts, U.S.A and shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts, U.S.A without giving effect to principles of conflicts of law and excluding the United Nations Convention on Contracts For the International Sale of Goods.

7

### (d)    The Language of Arbitration

24.    Pursuant to paragraph 21 of the Agreement, the language of the arbitration shall be English.

## V.    THE ARBITRAL TRIBUNAL

25.    Paragraph 21 of the Agreement provides for a single arbitrator.  Pursuant to paragraph 21, the appointing authority shall be the American Arbitration Association.

## VI.    CLAIMANT'S DAMAGES

26.    New Balance's damages consist of monies owed for product sold, contractual interest, and past-due distribution fees and are currently estimated at $2,902,475.86, plus interest that continues to accrue under the Agreement.

27.    New Balance has also suffered harm as a result of Respondents' baseless legal claims pursued in Peru, which wrongfully interfered with New Balance's distribution contract in Peru.

## VII.    RELIEF SOUGHT

28.    As a result, New Balance respectfully requests the arbitral tribunal to issue an award:

   i.    declaring that the arbitral tribunal has jurisdiction to consider the dispute described herein between the Parties;

   ii.    declaring that Respondents violated their obligations by failing to render payment to New Balance according to the terms of the Agreement;

   iii.    declaring that Respondents unlawfully interfered with New Balance's distribution agreement with its new distributor, which it entered into subsequent to the expiration of the Agreement;

   iv.    ordering Respondents to compensate New Balance for the damages and losses suffered as a result of PSG's breaches of the Agreement, currently estimated to be in the amount of $2,902,475.86, plus interest that continues to accrue under the Agreement;

   v.    ordering Respondents to compensate New Balance for damages it suffered as a result of New Balance's and its new Peruvian distributor's inability to distribute

its products in Peru stemming from Respondents' interference with New Balance's agreement and relationship with its new Peruvian distributor;

vi.     ordering Respondents to compensate New Balance for attorneys' fees and expenses incurred in defending the baseless and vexatious Peru Action and the Peru Interim Relief Request;

vii.    ordering Respondents to pay all arbitration costs, including Claimant's representative's costs and expenses; and

29.    New Balance further requests a judgment declaring that:

i.      the Amended Restated Agreement that was the basis of Respondents' breach of contract and pre-contractual liability claims pending in Peru, but ordered by this Tribunal to be brought here, is not valid or enforceable, and was never finalized, perfected, formalized, or in any way entered into by the parties;

ii.     New Balance acted in good faith in terminating the Agreement under that agreement's express terms and in negotiating the Amended and Restated Agreement; and

iii.    New Balance acted within its rights and in good faith in not entering into the Amended and Restated Agreement or any agreement with Respondents; and

iv.     this arbitration resolves any and all claims between the Parties and New Balance does not owe Respondent any further obligation of any kind.

30.    For the avoidance of doubt, Claimant reserves its right to:

i.      raise any and all further claims arising out of or in connection with the disputed matters described in this Notice of Arbitration or otherwise arising between the Parties; and

ii.     amend and/or supplement the relief sought herein;

iii.    produce such factual or legal arguments or evidence (including witness testimony, expert testimony and documents) as may be necessary to present its case or rebut any case which may be put forward by Respondent; and

iv.     seek interim and provisional measures before this arbitral tribunal or any

competent court or tribunal.

Respectfully submitted,

/s/ Mark Tully

Mark Tully
Goodwin Procter LLP
Legal representative for Claimant
100 Northern Avenue
Boston, MA 02210
Tel.: (617) 570-1000
Fax: (617)523-1231
MTully@goodwinlaw.com
May 3, 2019

**Exhibits submitted with the Notice of Arbitration**

| Exhibit number | Description |
|---|---|
| 1. | Distribution Agreement by and between New Balance Athletic Shoe, Inc. and Peruvian Sporting Goods S.A.C. |
| 2. | Traduccion Oficial N.° 845-17 (translated emails) |
| 3. | Traduccion Oficial N.° 971-17 (translated emails) |
| 4. | Termination Notification dated June 23, 2016 |
| 5. | Assignment of Rights between Peruvian Sporting Goods S.A.C. and Rodrigo Ribadeneira |
| 6. | Text of the Lawsuit Filed in Peru (Spanish and English translation) |
| 7. | Text of the Interim Measure Request (Spanish and English translation) |
| 8. | Grant of Interim Measures (Spanish and English Translation) |
| 9. | Reversal of Interim Measures (Spanish and English Translation) |
| 10. | Email Communication between Claimant and Respondents dated July 8, 2016 |

# EXHIBIT 9

IN THE MATTER OF AN ARBITRATION UNDER THE ARBITRATION RULES OF THE
UNITED NATIONS COMMISSION ON INTERNATIONAL TRADE LAW

BETWEEN:

**NEW BALANCE ATHLETICS, INC.**

*Claimant*

-and-

**PERUVIAN SPORTING GOODS S.A.C., SUPERDEPORTE S.A.C., and RODRIGO
RIBADENEIRA**

*Respondents*

_____

**RESPONDENTS' MOTION FOR SUMMARY DISPOSITION**

_____

**31 May 2019**

QUINN EMANUEL URQUHART & SULLIVAN, LLP
1300 I Street NW, Suite 900
Washington, DC 20005
Tel: (202)538-8000
Fax: (202)538-8100
Counsel for Respondents

## I.   INTRODUCTION

1.    Peruvian Sporting Goods S.A.C. ("**PSG**"), Superdeporte S.A.C. ("**Superdeporte**"), and Rodrigo Ribadeneira ("**Mr. Ribadeneira**") (collectively, "**Respondents**") submit this Motion for Summary Disposition ("**Motion for Summary Disposition**") pursuant to Procedural Order No. 2, Article 24 of the Arbitration Rules of the United Nations Commission on International Trade Law as adopted in 2013 (the "**UNCITRAL Arbitration Rules**"), and Rule 18 of the JAMS Comprehensive Arbitration Rules.

2.    Respondents respectfully request that the Tribunal (1) declare that it does not have jurisdiction over Mr. Ribadeneira and as such, dismiss Mr. Ribadeneira as a Respondent from this arbitration, (2) declare that it does not have jurisdiction over Claimant's claim relating to the request for interim measures in Peru, and as such, dismiss Claimant's claim for damages arising from Mr. Ribadeneira's interim measures request, and in the unlikely case that the Tribunal finds it has jurisdiction over Claimant's claim relating to the request for interim measures in Peru, (3) summarily dismiss this claim on the merits.

## II.   STATEMENT OF FACTS

3.    On 1 January 2013, New Balance and PSG (together with New Balance, the "**Parties**") entered into a Distribution Agreement.[1]  The Distribution Agreement governed the sale and distribution of New Balance's products in Peru.[2]  The Distribution Agreement was valid until 31 December 2015.[3]  According to the Distribution Agreement, if neither party expressed an intention to let the Distribution Agreement expire, the Distribution Agreement would automatically be renewed for an additional year, that is, until 31 December 2016.[4]  By the end of the Distribution Agreement's original term, neither party expressed an intention to let the Distribution Agreement expire.[5]  As such, the Parties allowed the Distribution Agreement to automatically renew until 31 December 2016.[6]

4.    During 2015 New Balance made an offer to PSG to enter into a new and reformed Distribution Agreement for their business in Peru (the "**New Distribution Agreement**").[7]  Per New Balance's requirements for the New Distribution Agreement, PSG would be required to enter into the New Distribution Agreement through a different corporate entity,

---

[1]   Claimant's Exhibit 1 at p. 2 ("Effective Date" shall mean January 1, 2013.).

[2]   *Id.* at p. 2 ("Territory" shall mean Peru.).

[3]   *Id.* at p. 2 ("Initial Term" shall commence on the Effective Date and end on the day prior to the third anniversary of the Effective Date.).

[4]   *Id.* at p. 4 ("If neither party sends notice of its intention to let the Agreement expire, then the Agreement shall be automatically renewed at the end of the Initial Term for one one-year period…").

[5]   Claimant's Exhibit 3, p. 88; New Balance's Amended Notice of Arbitration, ¶ 12.

[6]   Claimant's Exhibit 3, p. 88.

[7]   Claimant's Exhibit 6 to Motion to Compel.

which was ultimately called Superdeporte S.A.C. ("**Superdeporte**").[8]   The New Distribution Agreement also entailed a new business structure requested by New Balance.[9] For this new business structure, New Balance required "shop-in-shop locations" and its distributor, Superdeporte, to be at the "retail" level.[10]  New Balance maintained that this structure was essential for any future distribution relationship between the Parties, and it called it an "unfair advantage."[11]

5.     In mid-2015, PSG and New Balance began negotiating the New Distribution Agreement. The Parties exchanged an initial draft of the New Distribution Agreement in September 2015.[12]  By the end of January 2016, all of the terms of the New Distribution Agreement were finalized and agreed to between the Parties.  New Balance and PSG agreed that the New Distribution Agreement would be entered into between New Balance and PSG, as Superdeporte was still a company being repurposed.[13]  Once Superdeporte was repurposed, Superdeporte would be substituted for PSG as New Balance's distributor in Peru.[14] Entering into the new agreement with PSG and then later substituting in Superdeporte would allow the Parties to execute the New Distribution Agreement as soon as possible.[15]

6.     In early May 2016, PSG informed New Balance that Superdeporte was ready to nominally replace PSG and take on the New Distribution Agreement for New Balance's products in Peru.[16]  With Superdeporte repurposed, New Balance was obligated to promptly modify the New Distribution Agreement and add Superdeporte as their Peruvian distributor, as the Parties had agreed to do.[17]  In order to finalize agreements with retailers, PSG asked New Balance for a confirmation that it had complied with the Parties' agreement and modified

---

[8]   Exhibit R-12.

[9]   Claimant's Exhibit 3, p. 120.

[10]   Exhibit R-8, p. 3; Claimant's Exhibit 2 at p. 24; Claimant's Exhibit 3 at p. 69, 120, Claimant's Exhibit 6 to Motion to Compel., p. 11, Exhibit C (In addition to the above 6%, Distributor shall expend on fit out, fixtures and advertising at least $150,000 in each of 2015 and 2016 for shop in shop areas exclusively selling Products and located in Marathon Sports retail outlets in the Territory.").

[11]   Claimant's Exhibit 3, p. 59; Claimant's Exhibit 3, p. 120 ("With the integrated retail and with NB now part of Marathon the advantage you requested is a reality. Also and most importantly in the next months we will be able to make payments to offset what we owe.").

[12]   Claimant's Exhibit 6 to Motion to Compel.

[13]   Exhibit R-12 ("The paper work to to [sic] formalize the new company is not ready yet, should be ready by the end of Q1 or Q2 at the latest. We can sign the contract with PSG and made the change when is ready SD.OK..fine.").

[14]   Claimant's Exhibit 3, p. 80, 91-92.

[15]   Exhibit R-12.

[16]   Claimant's Exhibit 3, p. 120.

[17]   Exhibit R-12 ("Do you have the address and proof of existence of Super Deportes yet? Regardless, I suggest we sign the agreement now as PSG and do an amendment once that info is ready.").

the New Distribution Agreement placing Superdeporte as New Balance's distributor in Peru.[18]

7.    However, on 30 May 2016, New Balance informed PSG and Superdeporte that no distribution agreement existed between New Balance and Superdeporte.[19]   Shortly thereafter, on 23 June 2016, New Balance notified PSG and Superdeporte in writing that it was formally terminating the Distribution Agreement with PSG effective 31 December 2016.[20]  On 8 July 2016, New Balance informed PSG and Superdeporte, that New Balance had decided to work with another distributor in Peru beginning in 2017.[21]  New Balance then unilaterally concluded its contractual relationship with PSG on 31 December 2016 and has done business in Peru through a new distributor, Deportes Sparta, effective 1 January 2017.[22]

8.    Following an assignment of certain rights to pursue claims against New Balance from PSG and Superdeporte to Mr. Ribadeneira, in January 2017,[23] Mr. Ribadeneira initiated civil legal proceedings against New Balance before Peruvian civil courts.[24]  Mr. Ribadeneira claimed that New Balance failed to honor its obligations under the New Distribution Agreement with PSG, and then to be substituted with Superdeporte, and alleged extra-contractual claims that arose from New Balance's failure to conduct itself in good faith under Peruvian law with respect to the negotiation and execution of the New Distribution Agreement.[25]

9.    On 1 February 2017, Mr. Ribadeneira filed a request with the Peruvian civil courts for interim measures.[26]  Mr. Ribadeneira asked the court to order New Balance to abstain from the distribution of its products in Peru with any distributor other than PSG.[27]  In December 2017, the Peruvian civil court overseeing Mr. Ribadeneira's claims granted the request for interim measures.[28]  The court ordered a halt on the distribution of New Balance products in Peru during the pendency of the proceeding.[29]  On 31 July 2018, the Peruvian Court

---

[18]  Claimant's Exhibit 2, pp. 17-19, 27.

[19]  Claimant's Exhibit 2, pp. 12-13.

[20]  Claimant's Exhibit 4.

[21]  Exhibit R-7.

[22]  Claimant's Exhibit 4.

[23]  Claimant's Exhibit 5.

[24]  Exhibit R-1.

[25]  Exhibit R-1 at p. 36.

[26]  Exhibit R-2.

[27]  *See* Exhibit R-2, R-3.

[28]  Exhibit R-3.

[29]  Exhibit R-3 at p. 15.

lifted its interim measures order, formally permitting the distribution of New Balance products in Peru.[30]

## III.    THE LEGAL STANDARD

10.    Summary judgment is required where "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law."[31]  In turn, "[a] party moving for summary judgment in a case in which the opposing party will have the burden of proof at trial is entitled to summary judgment if he demonstrates […] that the party opposing the motion has no reasonable expectation of proving an essential element of that party's case."[32]  The record is examined in the light most favorable to the non-moving party, but "[c]onclusory statements, general denials, and factual allegations not based on personal knowledge [are] insufficient to avoid summary judgment."[33]

## IV.    ARGUMENT

### A.    THE TRIBUNAL DOES NOT HAVE JURISDICTION OVER MR. RIBADENEIRA AND IT SHOULD DISMISS MR. RIBADENEIRA AS A RESPONDENT IN THIS CASE

11.    The Tribunal has no jurisdiction over Mr. Ribadeneira as a Respondent in this case, because Mr. Ribadeneira was not a party to any of the contractual agreements between the Parties and has not agreed to arbitrate any claims with New Balance.  Mr. Ribadeneira was never a party to the Distribution Agreement or to the New Distribution Agreement.  Furthermore, Mr. Ribadeneira was not a signatory to the Distribution Agreement on behalf of PSG or to the New Distribution Agreement on behalf of PSG/Superdeporte, nor was Mr. Ribadeneira a signatory to either agreement's arbitration clause.

12.    Arbitration is fundamentally based upon consent between the parties.[34]  If a party has not consented to arbitrate, then a party may not be compelled to arbitrate.[35]  Mr. Ribadeneira has not consented to arbitrate *any* disputes with New Balance and, as such, should be dismissed as a party to this arbitration.

---

[30]  *See* Exhibit R-4.

[31]  Mass. R. Civ. P. 56(c).

[32]  *Lambert v. Fleet National Bank*, 449 Mass. 119, 123 (2007).

[33]  *Cullen Enters. v. Mass. Prop. Ins. Underwriting Ass'n*, 399 Mass. 886, 890 (1987).

[34]  *Stolt-Nielsen*, 559 U.S. at 682, 130 S.Ct. 1758 (Consent is essential under the FAA because arbitrators wield only the authority they are given. That is, they derive their "powers from the parties' agreement to forgo the legal process and submit their disputes to private dispute resolution"); William Park, *Non-Signatories & International Contracts: An Arbitrator's Dilemma,* in Multiple Party Actions in International Arbitration, OUP (2009), pp. 1-2.

[35]  *Stolt-Nielsen*, 559 U.S. at 683-684, 130 S.Ct. 1758 (Parties may generally shape such agreements to their liking by specifying with whom they will arbitrate, the issues subject to arbitration, the rules by which they will arbitrate, and the arbitrators who will resolve their disputes); M. Reisman, L. Craig, W. Park, J. Paulsson, *International Commercial Arbitration,* 2015 (2nd ed.), p. 409.

13. Furthermore, Mr. Ribadeneira does not meet any of the limited carve outs through which an arbitration agreement may be enforced against a non-signatory third-party.

14. Arbitration agreements may be enforced against non-signatories under the following theories: (1) incorporation by reference; (2) assumption; (3) agency; (4) alter ego; (5) equitable estoppel; and (6) third party beneficiary.[36]

15. First, under the "incorporation by reference" theory, a non-signatory may compel arbitration against a party to an arbitration agreement when that party has entered into a separate contractual relationship with the non-signatory which incorporates the existing arbitration clause.[37] There is no such separate relationship here.

16. Second, under an "assumption" theory, a party may be bound by an arbitration clause if its subsequent conduct indicates that it is assuming the obligation to arbitrate, despite being a non-signatory.[38] Mr. Ribadeneira has never assumed the obligation to arbitrate, and in fact, has opposed, in the strongest terms, the Tribunal's jurisdiction over him at every juncture in this case.

17. Third, under an "agency" theory, a non-signatory who is an agent of a signatory may compel arbitration for liability arising under the contract in question.[39] Agency is "the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act."[40] Mr. Ribadeneira, is not an agent of PSG or Superdeporte. He did not sign the Distribution Agreement on behalf of PSG and there is no other evidence in this proceeding that Mr. Ribadeneira was empowered to act as an agent on behalf of PSG or Superdeporte as an agent.

18. Fourth, under a "veil-piercing/alter ego" theory, a party may be bound by an agreement entered into by its subsidiary regardless of the agreement's structure or the subsidiary's attempts to bind itself alone to its terms, when their conduct demonstrates a virtual abandonment of separateness.[41] There is no evidence here of a virtual abandonment of

---

[36] § 57:19. Obligations and rights of persons who are not parties to arbitration agreement, 21 Williston on Contracts § 57:19 (4th ed.); *see also* M. Reisman, L. Craig, W. Park, J. Paulsson, *International Commercial Arbitration,* 2015 (2nd ed.), Chapter 4.

[37] *Machado v. System4 LLC*, 471 Mass. 204 (Mass., 2015); s*ee also* M. Reisman, L. Craig, W. Park, J. Paulsson, *International Commercial Arbitration,* 2015 (2nd ed.), p. 420.

[38] *Machado v. System4 LLC*, 471 Mass. 204 (Mass.,2015).

[39] *Bridas S.A.P.I.C. v. Government of Turkmenistan,* 345 F.3d 347, 356–358 (5th Cir.2003), cert denied; *see also* M. Reisman, L. Craig, W. Park, J. Paulsson, *International Commercial Arbitration,* 2015 (2nd ed.), p. 421.

[40] Restatement (Second) of Agency § 1(1) (1958).

[41] *Machado v. System4 LLC*, 471 Mass. 204 (Mass.,2015); s*ee also* M. Reisman, L. Craig, W. Park, J. Paulsson, *International Commercial Arbitration,* 2015 (2nd ed.), p. 421.

separateness, since Mr. Ribadeneira does not have a parent-subsidiary relationship with either PSG or Superdeporte.

19.    Fifth, equitable estoppel also does not apply to the instant case either, as it generally allows a non-signatory to compel arbitration in either of two circumstances: (1) when a signatory must rely on the terms of the written agreement in asserting its claims against the non-signatory or (2) when a signatory raises allegations of substantially interdependent and concerted misconduct by both the non-signatory and one or more of the signatories to the contract.  In such situations, a reviewing court may consider all of the relationships of persons, wrongs and issues in the case.[42]

20.    Finally, under a "third-party beneficiary" theory, in determining whether a non-signatory may be bound by an arbitration clause, a court must look to the intentions of the Parties at the time the contract was executed and examine whether the contract displays a clear intent to make the non-signatory a third-party beneficiary.[43]  There is no evidence of any intent of the Parties to bind Mr. Ribadeneira to the arbitration agreement.  As such, the circumstances do not allow for applying any of the carve outs which may allow a non-signatory to be bound by an arbitration agreement.

21.    Furthermore, Mr. Ribadeneira also may not be compelled to arbitrate the affirmative claims against New Balance based upon the supposed assignment of rights executed with PSG and Superdeporte.  On 25 November 2016, PSG and Superdeporte executed two similar assignment of rights contracts with Mr. Rodrigo Ribadeneira, assigning to him all of their claims against New Balance.  The assignments allowed Mr. Ribadeneira to submit claims against New Balance in Peru and in the rest of the world.  The assignments have been acknowledged by New Balance and form part of the record of this arbitration.[44]

22.    On 2 May 2019, PSG, Superdeporte and Mr. Ribadeneira executed two similar assignment of rights contracts in which Mr. Ribadeneira transferred all the claims he possessed against New Balance *back* to PSG and Superdeporte.[45]

23.    The Tribunal assessed these assignment of rights in its Memorandum and Order of March 18, 2019.  In this ruling, the Tribunal made clear that "[i]t is the claims that are subject to arbitration."[46]  Furthermore, "[t]o the extent that Ribadeneira has acquired those claims, he

---

[42]    *Machado v. System4 LLC*, 471 Mass. 204 (Mass.,2015); M. Reisman, L. Craig, W. Park, J. Paulsson, *International Commercial Arbitration,* 2015 (2nd ed.),  p. 422.

[43]    *Machado v. System4 LLC*, 471 Mass. 204 (Mass.,2015).

[44]    Claimant's Exhibit 5; New Balance Motion to Compel Arbitration, January 25, 2019, p. 5; Memorandum and Order on Claimant's Motion to Compel Arbitration, March 18, 2019, p. 4.

[45]    Contrato de Cesión de Derechos (*Assignment of rights contract*) entered into between PSG and Mr. Ribadeneira, dated 2 May 2019, Exhibit R-9; Contrato de Cesión de Derechos (*Assignment of rights contract)* entered into between Superdeporte and Mr. Ribadeneira, dated 2 May 2019, Exhibit R-10.

[46]    Memorandum and Order on Motion to Compel Arbitration, March 18, 2019, p. 11.

has acquired as well the accompanying obligation to <u>have them adjudicated</u> in this arbitration."[47]

24. Thus, the Tribunal recognized that following the assignment of rights it could only have jurisdiction over Mr. Ribadeneira with respect to the claims previously filed before Peruvian Courts and only if Mr. Ribadeneira chose to advance those claims in this arbitration proceeding. Mr. Ribadeneira instead chose to reassign the claims to PSG and Superdeporte.[48] As such, Mr. Ribadeneira no longer has any nexus to the claims that would allow this Tribunal to exercise any jurisdiction over him. The Tribunal implicitly recognized that there is no valid basis for the Tribunal to claim jurisdiction over Mr. Ribadeneira absent his having a right to advance those claims through the assignment of rights, and as such, this Tribunal should formally dismiss Mr. Ribadeneira as a Respondent in this arbitration now that he no longer is the assignee of the claims being advanced in Peru.

25. New Balance has essentially advanced two claims in this case. The first is its affirmative claim for royalties allegedly due to it under the Distribution Agreement, and the second is a claim for damages allegedly flowing from its inability to sell its products in Peru due to the granting of an injunction by the Peruvian Court. The Tribunal's ruling regarding its jurisdiction to hear the Peruvian claims is not applicable to the affirmative claims for royalties that New Balance has raised in this arbitration. New Balance's claims relate to PSG's contractual obligations under the Distribution Agreement. New Balance has not argued, let alone proven, that the obligations under the Distribution Agreement were ever assigned to Mr. Ribadeneira. They were not and this is not in dispute between the Parties. No reading of the Tribunal's order to compel arbitration can be read to give the Tribunal jurisdiction over Mr. Ribadeneira with respect to New Balance's affirmative claims against Respondents for breach of the Distribution Agreement, and, as such, the Tribunal should declare that it has no jurisdiction over Mr. Ribadeneira regarding those claims.

26. The Tribunal also has no jurisdiction over Mr. Ribadeneira, or any of the other Respondents, concerning New Balance's claim for damages arising from the interim measures request that Mr. Ribadeneira pursued in Peru, as further developed below.

**B.** **THE TRIBUNAL DOES NOT HAVE JURISDICTION TO HEAR AND SHOULD DISMISS NEW BALANCE'S CLAIM FOR DAMAGES ARISING FROM THE INTERIM MEASURES REQUEST**

27. As explained above, on 1 February 2017, Mr. Ribadeneira filed a request with the Peruvian Court for interim measures. Mr. Ribadeneira, basing his request on Peruvian law, asked the court to order New Balance to abstain from the distribution of its products in Peru with any distributor other than PSG.[49] In December 2017, the Peruvian Court found that it had jurisdiction over the request for interim measures and also held that the interim measures

---

[47] Memorandum and Order on Motion to Compel Arbitration, March 18, 2019, p. 6 (emphasis added).

[48] *See* Exhibits R-9 and R-10.

[49] *See* Exhibit R-2.

request had merit and granted the measures.[50]  Specifically, the court ordered a temporary halt on the distribution of New Balance products in Peru during the pendency of the proceeding.[51]

28.     On 31 July 2018, the Peruvian Court held that the interim measure was no longer necessary and lifted it.  In doing so, the Court formally permitted the distribution of New Balance products in Peru once again.[52]  Furthermore, under Peruvian law, a party may only request the payment of costs arising from an interim measure if the measure is deemed to be unfounded, and may only request such costs from the judge who decided the interim measure.[53]

29.     In sum, the Peruvian Court was presented with an interim measures request which it found to be within its jurisdiction, granted the measure and later lifted it.

30.     The Distribution Agreement explicitly provides that the Parties are entitled to seek interim relief in a court of competent jurisdiction.[54]  The UNCITRAL Rules also expressly permit a party to file a request for interim measures with a court or judicial authority.[55]  The Peruvian Court declared that it was a competent forum to hear Mr. Ribadeneira's request for interim relief.[56]  Mr. Ribadeneira's request was, thus, appropriately filed in the Peruvian court and was permitted under the Distribution Agreement.

31.     Furthermore, Claimant's assertion of the damages claim arising out the Peruvian court's grant of interim measures provides no basis for this Tribunal to assert jurisdiction over that claim.  Should Claimant believe that damages should be awarded in relation to the Peruvian

---

[50]   Exhibit R-3.

[51]   Exhibit R-3.

[52]   Exhibit R-4.

[53]   Peruvian Code of Civil Procedure, Article 621, "Sanctions arising out of an unnecessary or malicious interim measure. If a claim which was secured by an interim measure is declared to be unfounded, the claimant shall bear the costs and expenses of the interim request, a fine not larger than Procedural Reference Units and, if so requested, can also be required to compensate for the damages caused. The damages' amount will be set by the Judge overseeing the claim within the same proceeding, before hearing the claimant. The decision that rules on the settlement of costs, expenses and fines is subject to appeal without suspending the main proceeding.  The appeal of the order to pay damages does suspend the main proceeding. (Translation: "Sanciones por medida cautelar innecesaria o maliciosa.- Si se declara infundada una demanda cuya pretensión estuvo asegurada con medida cautelar, el titular de ésta pagará las costas y costos del proceso cautelar, una multa no mayor de diez Unidades de Referencia Procesal y, a pedido de parte, podrá ser condenado también a indemnizar los daños y perjuicios ocasionados. La indemnización será fijada por el Juez de la demanda dentro del mismo proceso, previo traslado por tres días. La resolución que decida la fijación de costas, costos y multa es apelable sin efecto suspensivo; la que establece la reparación indemnizatoria lo es con efecto suspensivo.").

[54]   See Claimant's Exhibit 1, p. 23.

[55]   See 2010 UNCITRAL Rules, Article 26.  ("A request for interim measures addressed by any party to a judicial authority shall not be deemed incompatible with the agreement to arbitrate, or as a waiver of that agreement.").

[56]   Exhibit R-4, p. 21.

Court's granting of interim measures, it must file that request for damages before the judge and court that granted the relief.[57] This is not the appropriate forum.[58] The Peruvian Court is the only competent court to rule on any claims related to the interim relief that the Peruvian court itself granted.[59] The Tribunal should thus decline Claimant's invitation to question or trespass upon the Peruvian Court's jurisdiction and its decision to order interim measures.

32. The interim measures request has concluded, is not a part of this proceeding, and the Tribunal is not competent to award damages arising from the properly filed and granted interim measures request in the Peru Action.[60] As such, this Tribunal does not have jurisdiction to hear Claimant's claim for damages arising from the interim measures request.

## C. THE TRIBUNAL SHOULD DISMISS NEW BALANCE'S CLAIM FOR DAMAGES ARISING FROM THE INTERIM MEASURES REQUEST ON THE MERITS

33. In the unlikely case that the Tribunal were to find that it has jurisdiction to rule on the merits of whether the pursuit of the interim measures request in Peru somehow breaches the Distribution Agreement's arbitration clause, this claim is still subject to summary disposition on the merits.

34. Respondents respectfully request the Tribunal to summarily rule on the merits of this claim and conclude that Mr. Ribadeneira was entitled as a matter of law to pursue the interim measures request in Peru and that, as such, no recoverable damages can flow from that action in this proceeding.

35. The disposition of this claim by New Balance can be made as a matter of law by interpreting the Distribution Agreement. The Distribution Agreement provides in pertinent part as follows: "Notwithstanding the requirement herein that the Parties arbitrate disputes arising from or related to this Agreement, either party shall have the right to seek interim equitable relief in the form of a temporary restraining order or preliminary injunction from a court of competent jurisdiction…"[61]

36. This language allows any party to the agreement, or any party claiming derivatively through a party to the agreement, to seek interim relief in any court that has competent jurisdiction to hear claims for interim relief relating to the Distribution Agreement. As noted below, Peru is unquestionably one such jurisdiction. The Tribunal can so conclude as a matter of law. The UNCITRAL Rules also entitle any of the Parties to request interim

---

[57] Peruvian Code of Civil Procedure, Article 621, Declaration of Javier Lozada, ¶ 4.

[58] Peruvian Code of Civil Procedure, Article 621, Declaration of Javier Lozada, ¶ 4.

[59] Peruvian Code of Civil Procedure, Article 621, Declaration of Javier Lozada, ¶ 4.

[60] Peruvian Code of Civil Procedure, Article 621, Declaration of Javier Lozada, ¶ 4.

[61] Claimant's Exhibit 1 at p. 23.

relief in *any* competent forum even though the underlying merits claims were subject to arbitration in Massachusetts, as this Tribunal has decided.

37.     The Peruvian Court is uncontestably a court of competent jurisdiction to hear such a request. The Distribution Agreement was partly executed in Peru, the Parties had assets in Peru, the conduct sought to be proscribed—the sale of New Balance's products—was to occur in Peru and, most importantly, New Balance executed a new contract for the sale of its products with a third-party distributor in Peru. Because the conduct that was to be enjoined involved a third party, namely New Balance's new distributor, who is not subject to this tribunal's jurisdiction or that of the Massachusetts courts, the Peruvian Courts are the most ideal forum for seeking the injunctive relief that Mr. Ribadeneira sought in his request for interim measures.

38.     Mr. Ribadeneira correctly filed the interim measures request before a Peruvian Court as expressly permitted by the Distribution Agreement and its applicable arbitration rules. The Peruvian Court declared itself competent to hear the request and eventually granted the interim relief. Thus, this Tribunal should dismiss Claimant's claim for damages arising from the interim measures request, as this claim is not cognizable as a matter of law.

## V.     RELIEF SOUGHT

39.     PSG and Superdeporte respectfully request the arbitral tribunal to:

i.      Declare that it has no jurisdiction over Mr. Ribadeneira and dismiss Mr. Ribadeneira as a Respondent in this arbitration;

ii.     Declare that it has no jurisdiction to hear any and all claims filed by Claimant arising from the Request for Interim Measures in Peru, and consequently dismiss such claims.

iii.    In the unlikely case that the Tribunal finds that it has jurisdiction over Claimant's claim arising from the Request for Interim Measures in Peru, Respondents respectfully request the arbitral tribunal to dismiss this claim on the merits.

40.     PSG and Superdeporte reserve their right to:

i.      Amend or supplement the above arguments as well as to present any other counterclaims it may have or that come to light as the proceedings evolve, if any;

ii.     Amend or supplement the relief sought herein;

iii.    Present factual or legal arguments as may be necessary to present its case or rebut any arguments put forward by Claimant; and,

iv.     Seek interim and/or provisional measures before this tribunal or any competent court.

Respectfully submitted,

David M. Orta
Counsel for Respondents
1300 I Street NW, Suite 900
Washington, DC 20005
Tel: (202)538-8000
Fax: (202)538-8100
31 May 2019

# EXHIBIT 10

**ICDR CASE REFERENCE NO. 01-18-0003-1183**

**New Balance Athletics, Inc.,**
  **Claimant,**

   **and**

**Peruvian Sporting Goods S.A.C.,**
  **Respondent.**

_____

**MEMORANDUM AND ORDER ON RESPONDENTS' MOTION FOR SUMMARY DISPOSITION**

The respondents, Peruvian Sporting Goods S.A.C. (PSG), Superdeporte S.A.C. (Superdeporte) and Rodrigo Ribadeneira (Mr. Ribadeneira), have moved for summary disposition of certain claims pursued by the claimant, New Balance Athletics, Inc. (New Balance). New Balance has submitted an opposition. I conducted a hearing by telephone on August 6, 2019.

Background.  Following my order of March 18, 2019, allowing the claimant's motion to compel arbitration, the parties amended their respective claims and counterclaims. New Balance continues to seek amounts allegedly owed under a now-expired distribution agreement effective January 1, 2013. New Balance asserts this claim not only against PSG, but also against Superdeporte and Mr. Ribadeneira, neither of whom were parties to that agreement. The respondents deny the allegation that they breached the 2013 distribution agreement; contend that, even if they did breach, New Balance has exaggerated its damages; and  assert a counterclaim that New Balance itself breached that agreement, thereby causing damage to PSG.

1

In January, 2017, Mr. Ribadeneira, pursuant to assignments of claims executed by PSG and Superdeporte, commenced legal proceedings in Peru against New Balance for breach of an alleged new distribution agreement (the amended and restated distribution agreement) and, alternatively, for a failure to bargain in good faith in the course of attempting to negotiate a new distribution arrangement ("the Peru claims"). I have concluded that those claims are subject to the arbitration clause in the expired distribution agreement, and the respondents (while preserving their jurisdictional objection) have reasserted them in the present proceeding.

In connection with the Peru claims, Mr. Ribadeneira sought ex parte and received from the Peru court an order temporarily enjoining New Balance from selling product in Peru by means of any distribution arrangement other than one with PSG. The restriction remained in effect from December, 2017, to July, 2018, at which time the court, determining in part that certain facts appeared to be otherwise than what had been represented, dissolved the temporary injunction. New Balance has now added to its arbitration demand a separate claim against PSG, Superdeporte and Mr. Ribadeneira for tortious interference with their new distribution arrangements in Peru by means of the above temporary injunction, which New Balance asserts Mr. Ribadeneira obtained in bad faith.

The respondents now move for summary disposition in their favor on three aspects of New Balance's claims. Specifically, they assert that jurisdiction with respect to the claim of tortious interference arising from the Peruvian injunction exists only in the Peruvian court itself, and is not subject to the present arbitration. In the alternative, they argue that the tortious interference claim cannot be sustained on the evidence presently in the record, and that a summary disposition in the respondents' favor should therefore be entered on the ground of insufficient evidence. Finally, they seek the dismissal of any New Balance claim against Mr. Ribadeneira on

the ground that he is not a party to the arbitration agreement and, having reassigned the Peru claims to PSG and Superdeporte, has eliminated any basis on which I concluded previously that he was compelled to arbitrate.

<u>Discussion</u>. 1. <u>Jurisdiction with respect to New Balance's tortious interference claim</u>. The respondents PSG and Superdeporte seek a partial summary disposition declaring that this tribunal "has no jurisdiction to hear any and all claims filed by Claimant arising from the Request for Interim Measures in Peru," and request that therefore such claims be dismissed. <u>Respondents' Motion for Summary Disposition</u>, par. 39 (ii). I addressed the scope of the tribunal's jurisdiction in the memorandum and order dated March 18, 2019. I determined at that time that the broad arbitration clause contained in the distribution agreement of January 1, 2013, was not limited to disputes regarding performance of that specific contract, but rather governed disputes related to the parties' "relationship" as well, including the termination of that relationship. Accordingly, I ruled that the Peru claims, arising as they did from the parties' effort to negotiate an extension to the relationship and the success or failure of that effort (depending on which of the parties' conflicting views is credited), were subject to this tribunal's jurisdiction and should be adjudicated in this forum.

Now the question becomes whether the next in this sequential series of claims, i.e., New Balance's claim that the obtaining of a restraint on its business activities in Peru in the course of assertion of the Peru claims constituted tortious interference, is itself governed by the original arbitration clause. The tortious interference claim is a further step removed from claims arising specifically with respect to the 2013 distribution agreement, and the first issue to be resolved  is whether that claim is sufficiently remote from the concerns underlying the arbitration clause that it is not governed thereby.

I conclude that, as is the case with the Peru claims themselves, a tortious interference claim that arises from the respondents' assertions of breach of contract and bad faith negotiation, together with their obtaining of preliminary injunctive relief, implicates the parties' "relationship." The "relationship" includes efforts in which the parties engaged to alter or extend it, as well as any success or failure in that regard. Litigation generated by such efforts and their results do not take place in a vacuum; they are a part and parcel of the business relationship, and would not have occurred had that relationship not existed. The Peru claims and the tortious interference claim that assertion of the Peru claims in another forum provoked are all claims "arising out of and relating to the breakdown of business relationships between (the parties)." Next Step Medical Co., Inc. v. Johnson & Johnson International, 619 F. 3d 67, 72 (1st Cir. 2010).

However, apart from the scope of the arbitration clause at issue, the respondents assert that only the Peruvian court has authority to award costs or damages in connection with the now dissolved preliminary innjunction. They argue in this regard that they are entitled to seek interim judicial relief under both the distribution agreement and UNCITRAL rules. Having done so in the Peruvian court, their argument continues, it is that court alone that has the authority to award damages and costs. I am not persuaded that the first proposition, while correct, gets the respondents anywhere, or that the second proposition is an accurate statement of the law that governs the question.

It is not contested that the respondents had a right to seek interim relief. See, for example, G.L.c. 251, s2, that empowers parties to seek judicial relief to order or to stay the arbitration. Likewise, parties may, as here, seek injunctive relief while an arbitration is pending. They may do so, as here, in circumstances where they assert that their claims should not be subject to arbitration but should be adjudicated in a different forum. But the right to seek interim judicial relief does not insulate such parties from the consequences of doing so. Under

Massachusetts law, which governs this arbitration, judicial proceedings may give rise to actions for tortious

interference. See Powers v. Leno, 24 Mass. App. Ct. 381, 385 (1987) (factfinder to determine whether

defendant intentionally interfered with the plaintiffs' relationship by maliciously bringing and continuing the

litigation). As set forth above, I have determined that such a claim is embraced by the extant arbitration clause.

Nor, contrary to the respondents' contention, do I locate in the Peruvian procedural code any attempt to

oust another forum of jurisdiction with respect to any claim over which that forum would otherwise have

authority. Article 621 provides in relevant part that "(i)f a claim which was secured by an interim measure is

declared to be unfounded, the claimant shall bear the costs and expenses of the interim request, a fine not larger

than Procedural Reference Units and, if so requested, can also be required to compensate for the damages

caused. The damages' amount will be set by the Judge overseeing the claim within the same proceeding...." I

find nothing in this statement beyond a logical recognition that interim relief may be improvidently granted,

together with an authorization that a party affected thereby may seek recovery of resulting damages from the

judge in charge of the case.

Nothing in the provision suggests that the court is attempting to secure exclusive jurisdiction over claims

that arise out of the proceeding where there may be jurisdiction with respect to such claims elsewhere. Indeed, I

fail to understand how, if such were the intention, the Peru courts could lawfully exercise their authority in that

way. As I indicated in my decision of March 18, 2019, any conflicts that could arise as a result of incompatible

rulings by the respective tribunals may be reconciled if and when they occur by set-off or otherwise.

2. The tortious interference claim on the merits. Apart from their jurisdictional argument above, the

respondents assert also that they should receive a summary disposition in their favor on the merits of New

5

Balance's tortious interference claim. Their argument in this regard is similar in one respect to their jurisdictional argument, specifically that they were entitled to seek interim relief both under the distribution agreement and under UNCITRAL procedural rules, in a court of competent jurisdiction, and they did so. They assert that Mr. Ribadeneira as assignee "was entitled as a matter of law to pursue the interim measures request in Peru and that, as such, no reasonable damages can flow from that action in this proceeding." Respondents' Motion, par. 34.

As I indicated above, the right of the respondents to seek interim judicial relief is not contested. If, however, the obtaining of such relief generates a valid claim of tortious interference, that claim cannot be dismissed simply because the respondents had standing to seek relief. What must be decided is whether there is evidence sufficient to warrant a finding in the claimant's favor, thereby precluding a summary disposition and leaving the dispute for trial.

While the respondents have not addressed specifically the state of the evidence to date regarding the tortious interference claim, I conclude that the evidence presently before me is sufficient to withstand the motion for summary disposition. Under Massachusetts law, actions for tortious interference with contractual or other advantageous business relationships require that the plaintiff prove the existence of such a relationship; intentional interference by the defendant with that relationship; improper motive or means on the part of the defendant; and resulting damage to the plaintiff. See G.S. Enterprises, Inc. v. Falmouth Marine, Inc., 410 Mass. 262, 272 (1991); United Truck Leasing Corp. v. Geltman, 406 Mass. 811, 812-817 (1990). Valid tortious interference claims may arise from the pursuit of a law suit. See Powers v. Leno, 24 Mass. App. Ct. at 385.

Here, the fact of the Peru law suit and the accompanying obtaining of interim relief establish that the respondents knew that New Balance had entered into a new distribution arrangement with a third party. Likewise, they demonstrate the respondents' intention to interfere with New Balance's new relationship. Whether they did so "with improper motive or means," and whether New Balance was damaged thereby (and, if so, to what extent), are contested questions of fact.

The respondents state that "(o)n 31 July 2018, the Peruvian Court held that the interim measure was no longer necessary and lifted it." Respondents' Motion, par. 28. This doesn't appear to tell the whole story. The restraint was obtained ex parte. In its resolution of July 26, 2018, in which it dissolved the interim measure enjoining New Balance's distribution in Peru through any person or entity other than PSG (see the respondents' exhibit R-4), the Peruvian court notes, among other things, that the new distribution agreement with PSG and/or Superdeporte that the respondents seek to enforce was apparently never executed. Id., Section Eight. Likewise, even had that agreement been executed, it expired by its own terms on December 31, 2016, a fact apparently not disclosed to the court. Based on subsequent submissions by New Balance, "the Court considers that it is necessary to reevaluate the legal credibility of the right invoked." Id., section Six. On the strength of that reevaluation, the court dissolved the injunction.

If it were the case that the respondents (or Mr. Ribadeneira as assignee) misrepresented the facts relevant to the parties' efforts to negotiate a new distribution agreement, that would plainly support a finding that the respondents (or at least Mr. Ribadeneira) interfered with New Balance's contractual relationship with a third party with an improper motive and by improper means. If so, an inference that New Balance sustained at least some loss as a result of being kept out of the Peruvian market for eight months would be reasonable. I make no findings on these issues at this time. I rule only that there is sufficient evidence in the record on

summary disposition to determine that there is a meaningful dispute of fact on these questions, and that a summary disposition at this time would be error.

3. <u>Jurisdiction with respect to Mr. Ribadeneira</u>. As indicated, I have determined previously that, beside the claim and counterclaim with respect to the 2013 distribution agreement, the Peru claims are subject to arbitration as well. See Memorandum and Order dated March 18, 2019. As set forth above, I conclude also that New Balance's tortious interference claim is governed by the arbitration clause. The new question to be answered is whether Mr. Ribadeneira, who is not a party to the distribution agreement containing the arbitration clause, and who has now apparently re-assigned the Peru claims to PSG and Superdeporte, is himself subject to the jurisdiction of this tribunal.

New Balance's initial demand for arbitration asserted only a contract claim for amounts allegedly owed under the distribution agreement. New Balance included as respondents both PSG, a party to the agreement, and Mr. Ribadeneira, who was not a party. The respondents answered, and PSG submitted a counterclaim alleging that New Balance had itself breached the agreement. On the basis of these pleadings, it appeared that an award in favor of New Balance, if any, could only be against PSG, while PSG could be the only party that could benefit in the event the counterclaim was successful.

However, the simplicity of the initial claim and counterclaim is altered by the prior assertion of the Peru claims by Mr. Ribadeneira in the Peruvian court. Whatever understandings between Mr. Ribadeneira on the one hand, and PSG and Superdeporte on the other, may have existed with respect to the assignments of those companies' claims, it is a matter of record that Mr. Ribadeneira initiated the Peruvian proceedings in his own name, made representations to the court, and obtained the interim relief that enjoined New Balance's sales in

Peru for approximately seven months. To the extent that this litigation may have interfered tortiously with New Balance's contract with a third party (which I do not attempt to decide at this stage), it is Mr. Ribadeneira who has inflicted it. Because this tribunal has jurisdiction of that claim, it has jurisdiction over Mr. Ribadeneira with respect thereto, and Mr. Ribadeneira cannot undo any damage his Peru claims and the injunction may have caused by the expedient of re-assigning those claims to PSG and Superdeporte.

There remains the question whether New Balance's joinder of Mr. Ribadeneira as a party respondent in its claim for damages under the 2013 distribution agreement with PSG survives his motion for partial summary disposition on jurisdictional grounds. Mr. Ribadeneira was not a party to that agreement, and ordinarily would not share any potential liability thereunder; nor would he be subject to that agreement's arbitration clause with respect to a claim for breach of the agreement. However, New Balance asserts that there are other considerations that leave the facts regarding Mr. Ribadeneira's role in dispute; that there is sufficient evidence in the present record to warrant findings that result in a piercing of the corporate veil; and that his motion for partial summary disposition should therefore be denied. Alternatively, New Balance requests that a ruling be deferred until the completion of discovery.

"A corporation or other person controlling a corporation and directing, or participating actively in … its operations may become subject to civil or criminal liability on principles of agency or causation …. This may sometimes occur where corporations are formed, or availed of, to carry out the objectives and purposes of the corporations or persons controlling them." My Bread Baking Co. v. Cumberland Farms, Inc., 353 Mass. 614, 618 (1968). Common ownership and common management are not by themselves sufficient to ignore valid uses of the corporate form. Id. at 619. Ordinarily, there must be evidence of "some fraudulent or injurious consequence;" a "confused intermingling of activity … with substantial disregard" of the separateness of the

9

entities; or "serious ambiguity about the manner and capacity in which the various (entities) and their respective representatives are acting." Ibid.

These generalizations are applied more precisely by employment of "twelve factors which should be considered in deciding whether to penetrate the corporate form." Evans v. Multicon Construction Corporation, 30 Mass. App. Ct. 728, 733 (1991), citing Pepsi-Cola Metropolitan Bottling Co. v. Checkers, Inc., 754 F. 2d 10 14-16 (1st Cir. 1985). These include common ownership; pervasive control; confused intermingling of business activity, assets, or management; thin capitalization; nonobservance of corporate formalities; absence of corporate records; no payment of dividends; insolvency at the time of the litigated transaction; siphoning away of corporate assets by the dominant shareholders; nonfunctioning of officers and directors; use of the corporation for transactions of the dominant shareholders; and use of the corporation in promoting fraud. Ibid.

Considering these subjects of relevant inquiry, evidence to date that PSG is little more than a convenient agent of Mr. Ribadeneira is insufficient to warrant a finding to that effect. That Mr. Ribadeneira is that company's principal stockholder, its general manager, and apparently its principal voice with respect to its business decisions do not by themselves justify a disregarding of the corporate form. New Balance contracted knowingly with a corporation, having already done business with that company or a predecessor for more than a decade. There is no evidence that the corporate form has been used to defraud or to avoid obligations. There is no evidence that PSG has made any questionable transfers of assets. That PSG might hypothetically be unable to satisfy an award in favor of New Balance (should there be one) is not sufficient. "The risk that a defendant, without fraud and in the normal course of business operations, may become unable to answer to a judgment is inherent in any civil litigation." Evans v. Multicon Construction Corp., 30 Mass. App. Ct. at 737-738.

10

I acknowledge that Mr. Ribadeneira appears to exercise considerable authority with respect to the operations of PSG (and presumably Superdeporte). This is hardly unusual given that he is PSG's majority stockholder. That he represented when asserting the Peru claims that he did so on his own behalf, while referring also to "his" employees, does not by itself constitute an admission that he is PSG's alter ego for liability purposes. Likewise, the assignment without consideration and subsequent re-assignment of the Peru claims, while consistent with the extent of his obvious influence, does not invite a reasonable inference that the corporation is used to defraud or to gain some unfair advantage.

New Balance asks that I defer ruling on this portion of the respondents' motion until the close of discovery because of the possibility that discovery may generate evidence in support of its contention that Mr. Ribadeneira is the legal party in interest. I have been informed that the parties will jointly seek an enlargement of the present discovery deadline of August 23, 2019. Because I believe that reasonable efforts to establish relevant facts are more important than adherence to a discovery schedule that is likely to be altered anyway, I will defer a ruling on this aspect of the motion for a brief period. I do so, however, with the understanding that the present state of the evidentiary record would, in my view, require dismissal of the amended claims for breach of the 2013 distribution agreement against both Mr. Ribadeneira and Superdeporte. Upon the close of discovery, I will allow a short period in which New Balance may submit any new evidence supporting its argument for piercing the corporate veil and the respondents shall have an opportunity to answer.

Conclusion. 1. The respondents' motion for partial summary disposition in their favor with respect to New Balance's claim for tortious interference is denied.

11

2. A ruling on respondents' motion for partial summary disposition in favor of Rodrigo Ribadeneira with respect to the claim under the 2013 distribution agreement is deferred subject to the conditions set forth above.


Dated: August 20, 2019           _____/s/_____

                           William I. Cowin
                           Arbitrator

# EXHIBIT 11

IN THE MATTER OF AN ARBITRATION UNDER THE ARBITRATION RULES OF THE
UNITED NATIONS COMMISSION ON INTERNATIONAL TRADE LAW

BETWEEN:

### NEW BALANCE ATHLETICS, INC.

*Claimant*

-and-

### PERUVIAN SPORTING GOODS S.A.C., SUPERDEPORTE S.A.C., and RODRIGO RIBADENEIRA

*Respondents*

_____

### RESPONDENTS' RENEWED MOTION FOR SUMMARY DISPOSITION

_____

**12 February 2020**

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
1300 I Street NW, Suite 900
Washington, DC 20005
Tel: (202)538-8000
Fax: (202)538-8100
Counsel for Respondents

## I.     **INTRODUCTION**

1.    Peruvian Sporting Goods S.A.C. ("**PSG**"), Superdeporte Plus S.A.C. ("**Superdeporte**"), and Rodrigo Ribadeneira ("**Mr. Ribadeneira**") (collectively "**Respondents**") submit this Renewed Motion for Summary Disposition ("**Renewed Motion**") pursuant to Procedural Order No. 5, Article 24 of the Arbitration Rules of the United Nations Commission on International Trade Law as adopted in 2013, Rule 18 of the JAMS Comprehensive Arbitration Rules, and the Tribunal's Memorandum and Order on Respondents' Motion for Summary Disposition dated 20 August 2019 (the "**20 August 2019 Order**" or the "**Order**").

2.    In its 20 August 2019 Order, the Tribunal deferred a ruling until the close of discovery on the question of whether it has jurisdiction over Mr. Ribadeneira with respect to one of New Balance's claims under the Distribution Agreement based upon a theory of piercing the corporate veil.[1] Now that discovery has closed, there is no evidence in the record to warrant a finding that the corporate veil should be pierced, and thus there remains no basis for New Balance to assert any claim against Mr. Ribadeneira under the Distribution Agreement. Furthermore, Mr. Ribadeneira never signed, nor was a party to the Distribution Agreement, and thus he has no obligations or liability to New Balance thereunder. Therefore, there is no basis for Mr. Ribadeneira to be held to arbitrate any claims against New Balance related to the Distribution Agreement and, even if there was, there is no basis to find him liable under these agreements. As such, Respondents respectfully request that the Tribunal dismiss the claim against Mr. Ribadeneira with regard to the Distribution Agreement.

3.    Similarly, there also is no legal basis for New Balance to assert its claims under the Distribution Agreement against Superdeporte. Superdeporte is a separate, distinct legal entity that was created to act under the New Distribution Agreement. It never agreed to arbitrate any disputes with New Balance under the Distribution Agreement. It also never assumed any of PSG's rights or obligations under the Distribution Agreement. During discovery, New Balance failed to identify any factual basis to assert liability against Superdeporte under the Distribution Agreement or that there is any basis to pierce the corporate veil as to Superdeporte. While New Balance has tried to argue in its Second Amended Notice of Arbitration that Superdeporte "replaced PSG as an operational entity in May of 2016,"[2] this does not show that Superdeporte assumed any obligations under the Distribution Agreement. In fact, the purported "change" to Superdeporte was done purely in order to effectuate the New Distribution Agreement. As such, Respondents respectfully

---

[1]   In the same 20 August 2019 Order, this Tribunal upheld its jurisdiction over Mr. Ribadeneira with respect to New Balance's tortious interference claim based upon the assignments of rights from PSG and Superdeporte to Mr. Ribadeneira. Respondents respectfully continue to object to this Tribunal's ruling regarding its jurisdiction over Mr. Ribadeneira with respect to New Balance's tortious interference claim, as well as any other claim being pursued by New Balance against him, and maintain that Mr. Ribadeneira should not be a part of this proceeding. Mr. Ribadeneira continues to assert that this Tribunal has no basis to assert any jurisdiction over him, and he files this Renewed Motion under that reservation of rights and without in any way waiving his rights or arguments in relation to this Tribunal's lack of jurisdiction over him. But for purposes of the Renewed Motion, Respondents focus only on the issue of whether this Tribunal has jurisdiction over Mr. Ribadeneira and Superdeporte with respect to New Balance's claim arising under the Distribution Agreement.

[2]   New Balance's Second Amended Notice of Arbitration, ¶ 7.

request that the Tribunal also dismiss the claim against Superdeporte with regard to the Distribution Agreement, as this Tribunal has no jurisdiction to require Superdeporte to arbitrate any claims with New Balance under that agreement, nor is there any legal basis to attribute any liability to Superdeporte under the same agreement.

## II.   PROCEDURAL HISTORY

4.     Following the Tribunal's 18 March 2019 Order granting New Balance Athletics, Inc.'s ("**New Balance**" or "**Claimant**") motion to compel arbitration, New Balance and Respondents (together with New Balance, the "**Parties**") amended their respective claims and counterclaims.  New Balance seeks amounts allegedly owed under the Distribution Agreement between the Parties.  As recognized by the Tribunal in its Order, "New Balance asserts this claim not only against PSG, but also against Superdeporte and Mr. Ribadeneira, neither of whom were parties to that agreement."[3]  Respondents deny the allegations and counterclaim that New Balance itself has failed to fulfill its contractual obligations, which has caused damage to Respondents.

5.     On 31 May 2019, Respondents moved for summary disposition on the issue of this Tribunal's jurisdiction over Mr. Ribadeneira. Respondents sought dismissal of New Balance's claims against Mr. Ribadeneira on the ground that Mr. Ribadeneira is not a party to the Parties' arbitration agreement and has never consented to arbitrate any disputes with New Balance.  In that same motion, Respondents moved for summary disposition of New Balance's claims against Mr. Ribadeneira under the Distribution Agreement, because Mr. Ribadeneira was not a party to that agreement and never assumed any obligations to New Balance pursuant to that agreement, for the payment of royalties or otherwise.  Also, having reassigned the right to pursue the Peru claims to PSG and Superdeporte,[4] Mr. Ribadeneira has eliminated any basis on which this Tribunal previously concluded that he was compelled to arbitrate any claims against New Balance.  Respondents also moved for summary disposition on New Balance's tortious interference claim and argued that it should be dismissed on jurisdictional grounds, or in the alternative, on the merits.

6.     On 20 August 2019, this Tribunal issued a ruling upholding its jurisdiction over Mr. Ribadeneira with respect to New Balance's tortious interference claim based upon the assignments of rights from PSG and Superdeporte.  With regard to New Balance's claim under the Distribution Agreement, this Tribunal recognized that the evidentiary record before the Tribunal as of 20 August 2019 would "require dismissal of the amended claims for breach of the 2013 distribution agreement against both Mr. Ribadeneira and Superdeporte," but nonetheless deferred a ruling on this issue until the close of discovery.[5] It noted that, "[u]pon the close of discovery, [the Tribunal] will allow a short period in

---

[3]  Memorandum and Order on Respondents' Motion for Summary Disposition, August 20, 2019, p. 1.

[4]  Contrato de Cesión de Derechos (*Assignment of rights contract*) entered into between PSG and Mr. Ribadeneira, dated 2 May 2019, Exhibit R-9; Contrato de Cesión de Derechos (*Assignment of rights contract*) entered into between Superdeporte and Mr. Ribadeneira, dated 2 May 2019, Exhibit R-10.

[5]  Memorandum and Order on Respondents' Motion for Summary Disposition, August 20, 2019, p. 11.

which New Balance may submit any new evidence supporting its argument for piercing the corporate veil and the respondents shall have an opportunity to answer."[6]

7.      Nearly three months have passed since the close of discovery on 15 November 2019, and New Balance has not submitted any new evidence supporting its argument for piercing the corporate veil. Nor could it submit any, because no such evidence exists in the record.  New Balance also has not offered any evidence to sustain that either Mr. Ribadeneira or Superdeporte ever assumed any obligations to it under the Distribution Agreement.  As such, Respondents submit this Renewed Motion to respectfully request the Tribunal to rule on this issue and dismiss New Balance's claim against Mr. Ribadeneira and Superdeporte with regard to the Distribution Agreement, as there is no basis in law or fact to require either of these Respondents to arbitrate any claims against New Balance under the Distribution Agreement, nor is there any basis in law or fact to hold either of these Respondents liable for New Balance's claims under that agreement.

## III.      THE LEGAL STANDARD

8.      Summary judgment is required where "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law."[7]  In turn, "[a] party moving for summary judgment in a case in which the opposing party will have the burden of proof at trial is entitled to summary judgment if he demonstrates […] that the party opposing the motion has no reasonable expectation of proving an essential element of that party's case."[8]  The record is examined in the light most favorable to the non-moving party, but "[c]onclusory statements, general denials, and factual allegations not based on personal knowledge [are] insufficient to avoid summary judgment."[9]

## IV.      ARGUMENT

### A.      THE TRIBUNAL DOES NOT HAVE JURISDICTION OVER MR. RIBADENEIRA WITH RESPECT TO NEW BALANCE'S CLAIM UNDER THE DISTRIBUTION AGREEMENT BECAUSE THERE IS NO EVIDENCE TO SUPPORT THE PIERCING OF THE CORPORATE VEIL.

9.      The Tribunal should summarily dismiss New Balance's claim with respect to the Distribution Agreement against Mr. Ribadeneira because there is no evidence supporting New Balance's argument that Mr. Ribadeneira should be subject to the Tribunal's jurisdiction as PSG's alter ego.  As recognized by this Tribunal in its 20 August 2019 Order, "Mr. Ribadeneira was not a party to [the Distribution Agreement], and ordinarily would not share any potential liability thereunder; nor would he be subject to that agreement's arbitration clause with respect to a claim for breach of the agreement."[10]  The

---

[6]   Memorandum and Order on Respondents' Motion for Summary Disposition, August 20, 2019, p. 11.

[7]   Mass. R. Civ. P. 56(c).

[8]   *Lambert v. Fleet National Bank*, 449 Mass. 119, 123 (2007).

[9]   *Cullen Enters. v. Mass. Prop. Ins. Underwriting Ass'n*, 399 Mass. 886, 890 (1987).

[10]   Memorandum and Order on Respondents' Motion for Summary Disposition, August 20, 2019, p. 9.

only issue pending before the Tribunal is whether there is sufficient evidence to warrant a finding that results in a piercing of the corporate veil and, as such, subject Mr. Ribadeneira to the jurisdiction of this Tribunal. The Tribunal has ruled that as of 20 August 2019 when it issued the Order, there was not sufficient evidence in the record to support the piercing of the corporate veil.[11] The discovery subsequent to the Tribunal's Order does not reveal any evidence to the contrary.

10. Under Massachusetts law, corporations and their shareholders are generally considered separate legal entities, and only under rare circumstances, may a court disregard the separateness of entities ("pierce a corporate veil").[12] In fact, Massachusetts appears "more strict than other jurisdictions in permitting the nonobservance of corporate formalities;" and "[e]ven more infrequent is the court which allows the disregard of corporate formalities in a contractual dispute rather than a tortious injury."[13]

11. As recognized by the Tribunal in its Order, to pierce the corporate veil, there must be evidence of "some fraudulent or injurious consequences;" a "confused intermingling of activity … with substantial disregard" of the separateness of the entities;" or "serious ambiguity about the manner and capacity in which the various (entities) and their respective representatives are acting."[14] Furthermore, under Massachusetts law, twelve factors should be considered in deciding whether to penetrate the corporate form, which include: (1) common ownership; (2) pervasive control; (3) confused intermingling of business activity, assets, or management; (4) thin capitalization; (5) nonobservance of corporate formalities; (6) absence of corporate records; (7) no payment of dividends; (8) insolvency at the time of the litigated transaction; (9) siphoning away of corporate assets by the dominant shareholders; (10) nonfunctioning of officers and directors; (11) use of the corporation for transactions of the dominant shareholders; and (12) use of the corporation in promoting fraud."[15]

12. In our case, even after significant discovery, New Balance cannot sufficiently establish *any* of these factors. The first two factors are better suited to evaluating whether one entity should be held liable for the action of another entity.[16] Because the issue here is whether, Mr. Ribadeneira, as an individual, should be liable for PSG's actions, the first and second factors are not particularly relevant here. In any case, those two factors do not support a finding of Mr. Ribadeneira acting as PSG's alter ego. While Mr. Ribadeneira was PSG's principal stockholder until the end of 2017, as the Tribunal has recognized, common

---

[11] Memorandum and Order on Respondents' Motion for Summary Disposition, August 20, 2019, p. 11.

[12] *Berger v. H.P. Hood, Inc.*, 416 Mass. 652, 657, 624 N.E.2d 947 (1993).

[13] *Bradford Carpet One Co. v. Piedmont St., LLC*, No. 1777CV1274, 2019 WL 6681659, at *3 (Mass. Super. Oct. 16, 2019).

[14] Memorandum and Order on Respondents' Motion for Summary Disposition, pp. 9-10, *citing My Bread Baking Co. v. Cumberland Farms, Inc*., 353 Mass. 614, 618 (1968).

[15] Memorandum and Order on Respondents' Motion for Summary Disposition, p. 10, *citing Evans v. Multicon Construction Corporation*, 30 Mass. App. Ct. 728, 733 (1991) (citations omitted).

[16] *George Hyman Const. Co. v. Gateman*, 16 F. Supp. 2d 129, 150 (D. Mass. Sept. 2, 1998).

ownership alone is not sufficient to support piercing the corporate veil.[17] Furthermore, discovery in this case highlighted that Mr. Ribadeneira did not exercise pervasive control over PSG. On the contrary, Respondents produced an organizational chart with a clear employment structure for PSG.[18] Ultimately, key employees reported on key decisions to a corporate board.[19] This board would then vote on key corporate decisions.

13.     The third factor – the confused intermingling of business – does not support piercing of the corporate veil either. There were transactions between PSG and Superdeporte, as PSG was winding down its business operations and transferring its operations to Superdeporte.[20] But no evidence indicates that any assets or liabilities of PSG and Superdeporte were ever intermingled, that Mr. Ribadeneira's personal assets were intermingled, or that New Balance was confused as to which entity it was dealing with. In fact, as noted by the Tribunal in its Order, New Balance "contracted knowingly with a corporation, having already done business with that company or a predecessor for more than a decade."[21] There is no evidence indicating that PSG was thinly capitalized either, as required by the fourth factor.

14.     As to the fifth and sixth factors – nonobservance of corporate formalities and absence of corporate records, the evidence in the record all indicates to the contrary. PSG was duly incorporated under Peruvian law and its corporate records were kept in the ordinary course. In fact, a number of PSG's corporate records have been produced to New Balance during the discovery process, including documents supporting PSG's ownership/shareholding structure;[22] PSG's organizational chart;[23] PSG's statements of financial position and integral income for the period from 2013 throughout 2018;[24] and PSG's bank records from 2014 throughout 2017.[25]

15.     As to the seventh factor – no payment of dividends – although it is true that PSG has not issued any dividends, Massachusetts courts have recognized that "[w]hen the corporation is closely held, that gain may take a form other than the payment of dividends or distributions to stockholders,"[26] and that "a business can have a legitimate purpose even if

---

[17]     Memorandum and Order on Respondents' Motion for Summary Disposition, August 29, 2019, p. 9, *citing My Bread Baking Co. v. Cumberland Farms, Inc*., 353 Mass. 614, 618 (1968).

[18]     *See* Exhibit R-22, PSG00006835.

[19]     *See* e.g. Exhibit R-23, Deposition Transcript of Margarita Ormaza, 126:17-24; 133:5-16.

[20]     *See* e.g. Exhibit R-19, Deposition Transcript of Rodrigo Ribadeneira, 51:3-9.

[21]     Memorandum and Order on Respondents' Motion for Summary Disposition, p. 10.

[22]     *See* Exhibit R-24, PSG00006495 through PSG00006600.

[23]     *See* Exhibit R-22, PSG00006835.

[24]     *See* Exhibit R-25, PSG00006472.

[25]     *See* Exhibit R-26, PSG00005963 through PSG00006469.

[26]     *Evans v. Multicon Const. Corp.,* 30 Mass. App. Ct. 728, 735, 574 N.E.2d 395, 399 (1991).

it is not designed to make dividend payments or profit distribution."[27]  Here, as Mr. Ribadeneira explained in his deposition testimony, conscious decisions were made to not issue dividends but to reinvest the company's profits.[28]  Therefore, PSG was operated as a legitimate, profit-seeking entity, and not the alter ego of Mr. Ribadeneira.

16.     New Balance makes no arguments concerning factors eight through twelve, and there is no new evidence revealed during discovery that would support the finding of any of those factors.

17.     At best, New Balance can show that Mr. Ribadeneira is PSG's principal stockholder.  But by itself, being the sole stockholder is not a significant factor.[29]  In fact, the Tribunal has ruled in its Order that, "[t]hat Mr. Ribadeneira is that company's principal stockholder, its general manager, and apparently its principal voice with respect to its business decisions do not by themselves justify a disregarding of the corporate form."[30]

18.     Weighing all those factors, New Balance has not provided, nor could it possibly provide, sufficient evidence to reach the "high threshold" required to pierce the corporate veil under Massachusetts law.[31]  Therefore, this Tribunal should dismiss Mr. Ribadeneira as a Respondent with respect to New Balance's claim arising from the Distribution Agreement.

19.     Because arbitration is fundamentally based upon consent, if a party has not consented to arbitrate, then a party may not be compelled to arbitrate.  Mr. Ribadeneira has not consented to arbitrate *any* disputes with New Balance with respect to the Distribution Agreement, and as such, should be dismissed as a party to this arbitration with respect to New Balance's claim under the Distribution Agreement.

**B.      THE TRIBUNAL SHOULD ALSO DISMISS NEW BALANCE'S CLAIM UNDER THE DISTRIBUTION AGREEMENT AS TO MR. RIBADENEIRA BECAUSE HE WAS NOT A PARTY TO THE DISTRIBUTION AGREEMENT AND NEVER ASSUMED ANY OBLIGATIONS UNDER THE DISTRIBUTION AGREEMENT.**

20.     Even if the Tribunal were to find that it had jurisdiction over Mr. Ribadeneira—a finding which as noted above is not supported by the record evidence—the Tribunal should nonetheless summarily dismiss New Balance's claim with respect to the Distribution Agreement against Mr. Ribadeneira because the evidence on the record has shown that Mr. Ribadeneira was not a party to the Distribution Agreement and never assumed any obligations under the Distribution Agreement.  Furthermore, Mr. Ribadeneira was not a signatory to the Distribution Agreement on behalf of PSG nor was Mr. Ribadeneira a

---

[27]  *See George Hyman Const. Co. v. Gateman*, 16 F. Supp. 2d 129, 154 (D. Mass. 1998).

[28]  *See* Exhibit R-18, Deposition Transcript of Rodrigo Ribadeneira, 182:4-22.

[29]  *Gordineer v. Colahan*, 2011 Mass. App. Div. 151 (Dist. Ct. 2011) ("We are particularly unconvinced that the fact, standing alone, that [Defendant] was a sole stockholder was significant.").

[30]  Memorandum and Order on Respondents' Motion for Summary Disposition, August 20, 2019, p. 10.

[31]  *Centurion Networking Serv. Partners, LLC v. Dr. Wade N. Barker, P.A.*, 2018 WL 1972789, at *5 (D. Mass. Apr. 26, 2018).

signatory to the agreement's arbitration clause. As there is no basis contractually or under any veil piercing or other theory to hold Mr. Ribadeneira to any obligation under the Distribution Agreement, this Tribunal should enter summary judgment in favor of Mr. Ribadeneira on New Balance's claims against him under the Distribution Agreement.

## C. THE TRIBUNAL DOES NOT HAVE JURISDICTION OVER SUPERDEPORTE WITH RESPECT TO NEW BALANCE'S CLAIM UNDER THE DISTRIBUTION AGREEMENT BECAUSE THERE IS NO EVIDENCE TO SUPPORT THE PIERCING OF THE CORPORATE VEIL.

21. The Tribunal has no basis to hold Superdeporte as a Respondent in this case with respect to New Balance's claim under the Distribution Agreement, because Superdeporte was not a party to the Distribution Agreement and has not agreed to arbitrate any claims under the Distribution Agreement. As this Tribunal has recognized in its Order, in the Tribunal's view, the evidentiary record as of 20 August 2019 would "require the dismissal of the amended claims for the breach of the 2013 distribution agreement against **both Mr. Ribadeneira and Superdeporte**." The subsequent discovery did not disclose any factual basis to support a claim against Superdeporte under the Distribution Agreement.

22. Arbitration is fundamentally based upon consent between the parties.[32] If a party has not consented to arbitrate, it may not be compelled to arbitrate. Superdeporte, as a non-party to the Distribution Agreement, has not consented to arbitrate any dispute under the Distribution Agreement. It never signed the Distribution Agreement, nor did it assume any of PSG's rights or obligations under the Distribution Agreement. In fact, Superdeporte is a separate, distinct legal entity that was created only half a year before the Distribution Agreement expired, at New Balance's request, and solely for the purpose of carrying out a new distribution agreement with New Balance.[33]

23. New Balance's argument in its Second Amended Notice of Arbitration that Superdeporte "replaced" PSG in May 2016 is unavailing, as Superdeporte was only preparing to assume responsibilities under the *New Distribution Agreement* as soon as it was ready to do so in May 2016. The Distribution Agreement was entered into between New Balance and PSG on 1 January 2013, and was automatically renewed until 31 December 2016. In late 2014/early 2015, New Balance made an offer to PSG to enter into a new and reformed distribution agreement for their business in Peru (the "New Distribution Agreement").[34] Per New Balance's requirements for the New Distribution Agreement, PSG would be required to enter into the agreement through an entity that could handle both wholesale

---

[32] *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 682, 130 S. Ct. 1758, 1774, 176 L. Ed. 2d 605 (2010) (Consent is essential under the FAA because arbitrators wield only the authority they are given. That is, they derive their "powers from the parties' agreement to forgo the legal process and submit their disputes to private dispute resolution.").

[33] *See* Exhibit R-18, Deposition Transcript of Carlos Miguel Gagliardi, 17:16-24.

[34] *See* Exhibit R-27, PSG00007483.

distribution and retail sales.[35] Because PSG was not set up legally or otherwise to handle retail sales, PSG's parent companies determined that they had to establish a corporate entity that could legally handle both wholesale distribution and retail sales, and thus they established Superdeporte in May 2016.[36] It is clear from the evidentiary record that Superdeporte assumes no rights or obligations under the Distribution Agreement.

24. New Balance could not genuinely argue, nor has it argued, that Superdeporte is PSG's alter ego. Any such claim would be baseless and should not be upheld by this Tribunal, because there is no basis or evidence in the record to justify piercing the corporate veil as to Superdeporte. Superdeporte sits alongside PSG in the corporate structure, is not PSG's parent, and was created solely to act under the New Distribution Agreement.

25. As with Mr. Ribadeneira, there is thus no basis to find that Superdeporte has agreed to arbitrate any claims with New Balance under the Distribution Agreement, and this Tribunal should therefore enter summary judgment in favor of Superdeporte on those claims.

**D. THE TRIBUNAL SHOULD ENTER SUMMARY JUDGMENT AS TO SUPERDEPORTE WITH RESPECT TO NEW BALANCE'S CLAIM UNDER THE DISTRIBUTION AGREEMENT BECAUSE SUPERDEPORTE IS NOT A PARTY TO THE DISTRIBUTION AGREEMENT NOR DID IT ASSUME ANY OBLIGATIONS UNDER THAT AGREEMENT**

26. For all of the reasons noted above, even if this Tribunal had jurisdiction to arbitrate claims against Superdeporte under the Distribution Agreement—which it does not—New Balance fails to provide any factual or legal basis to maintain any claims against Superdeporte under the Distribution Agreement. There is no contractual or other basis to hold Superdeporte liable to New Balance under that agreement.

27. As such, this Tribunal should enter summary judgment against New Balance and in favor of Superdeporte with respect to New Balance's claim arising from the Distribution Agreement.

## V. RELIEF SOUGHT

28. For all of the above reasons, Respondents respectfully request that the Tribunal enter summary judgment in favor of Mr. Ribadeneira and Superdeporte and against New Balance with respect to New Balance's claim made under the Distribution Agreement and to:

   i.    Declare that it has no jurisdiction over Mr. Ribadeneira with respect to New Balance's claim under the Distribution Agreement;

   ii.   Declare that even if it has jurisdiction over Mr. Ribadeneira, there is no basis to hold Mr. Ribadeneira liable to New Balance under the Distribution Agreement;

---

[35] *See* Exhibit R-18, Deposition Transcript of Carlos Miguel Gagliardi, 17:16-24.

[36] *See* Exhibit R-18, Deposition Transcript of Carlos Miguel Gagliardi, 17:16-24.

iii.    Declare that it has no jurisdiction over Superdeporte with respect to New Balance's claim under the Distribution Agreement;

iv.    Declare that even if it has jurisdiction over Superdeporte, there is no basis to hold Superdeporte liable to New Balance under the Distribution Agreement;

v.    Award Respondents Mr. Ribadeneira and Superdeporte all of their attorneys' fees and costs incurred in defending the baseless claims made by New Balance against them under the Distribution Agreement.


Respectfully submitted,


David M. Orta
Julianne Jaquith
Counsel for Respondents
1300 I Street NW, Suite 900
Washington, DC 20005
Tel: (202)538-8000
Fax: (202)538-8100
12 February 2020

# EXHIBIT 12

Page 1187

Proceedings

1    Proceedings
2    very important reason for this. Okay? And
3    the important reason is that before that
4    transfer took place, everything of value in
5    PSG -- all of its assets, all of its New
6    Balance inventory, whatever was in the
7    company that was of value -- was
8    transferred by PSG to Superdeporte. And
9    this is, again, in compliance with the new
10   agreement to have Superdeporte become the
11   entity under that new distribution
12   agreement with New Balance. It was
13   transferred and it was transferred for
14   consideration. I'll get to the
15   consideration -- there's a slide on it --
16   in a second.
17        But that brings us to -- so as it
18   relates to Mr. Ribadeneira, no evidence to
19   pierce the corporate veil, your Honor.
20   None. And the fact that a company
21   significantly downstream that he owns
22   transferred PSG, once the assets were taken
23   out of it and transferred for consideration
24   to Superdeporte, that that corporate
25   vehicle was transferred for no

Page 1188

Proceedings

1    Proceedings
2    consideration to Mr. Padilla does not come
3    anywhere close to establishing a case for
4    piercing of the corporate veil.
5        Superdeporte, they have an argument
6    that they came out with at the hearing just
7    before the hearing about successor
8    liability. No successor liability here.
9    Again, Superdeporte not a signatory. Never
10   consented to arbitrate, never assumed
11   obligations, their argument on successor
12   liability raised way too late and waived.
13   But even if you don't waive it and deal
14   with it on the merits, even if you don't
15   consider it waived and deal with it on the
16   merits, here's what the case law says they
17   have to establish: The successor expressly
18   or impliedly assumes liabilities of the
19   predecessor. Okay? There's no evidence
20   that Superdeporte assumed liabilities of
21   PSG with the exception of the consideration
22   that they paid. Okay? But it didn't
23   expressly assume all liabilities of PSG.
24   It didn't assume liabilities of PSG to New
25   Balance. Key. And there's no document

Page 1189

Proceedings

1    Proceedings
2    that says that.
3        Two, no de facto merger or
4    consolidation, no evidence to prove that
5    here.
6        Three, that Superdeporte is a mere
7    continuation of PSG, absolutely not. PSG
8    continues to exist today. It has a
9    different purpose. It has a different
10   owner. Superdeporte, completely separate
11   company, completely separate purpose. Does
12   retail, wholesale, and operates in Peru.
13        And there's no fraudulent effort to
14   avoid liability. In fact, if you think
15   about that one, at the point in time when
16   the transfer of assets were made, which was
17   in June of 2016, there was no claim by New
18   Balance. There was no lawsuit. There was
19   no arbitration. There was no immediate
20   legal fight between these entities. There
21   was no liabilities to a predecessor that
22   were being avoided.
23        Okay. So I think I've made the
24   point. No evidence of successor liability.
25        And this is the slide I wanted to

Page 1190

Proceedings

1    Proceedings
2    focus you in on: Exhibit 287, which I
3    think now as per this morning may become
4    288. But this is the new exhibit that we
5    provided last night. This is -- was
6    testified to by Ms. Ormaza during the
7    hearing. She said that there was a
8    transfer of assets and liabilities. There
9    was an assumption of some of Peruvian
10   Sporting Goods' liabilities by Superdeporte
11   in the amount as shown here of 5,781,000 of
12   Peruvian soles, and it assumed that
13   liability and paid it to one of the other
14   companies, Equiperu.
15        Now, what else do we have to say
16   about the claims? This is just to focus
17   your Honor. Five minutes left. This about
18   the actual claim that they have, we say
19   only against PSG. So now this is the
20   affirmative $4.5 million -- whatever the
21   number is -- claim that New Balance has,
22   again we say only as against PSG.
23        What about those claims? Well, the
24   numbers -- and this important -- and, you
25   know, it was testified to by

# EXHIBIT 13

IN THE MATTER OF AN ARBITRATION UNDER THE ARBITRATION RULES OF THE
UNITED NATIONS COMMISSION ON INTERNATIONAL TRADE LAW

BETWEEN:

## NEW BALANCE ATHLETICS, INC.

*Claimant*

-and-

## PERUVIAN SPORTING GOODS S.A.C., SUPERDEPORTE S.A.C., and RODRIGO RIBADENEIRA

*Respondents*

———————————————

## RESPONDENTS' POST HEARING BRIEF

———————————————

**30 June 2020**

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
1300 I Street NW, Suite 900
Washington, DC 20005
Tel: (202)538-8000
Fax: (202)538-8100
Counsel for Respondents

# Table of Contents

**Page**

I.   **INTRODUCTION** .................................................................................. 1

II.  **FACTUAL BACKGROUND AND PROPOSED FINDINGS OF FACT** ...................... 9

  A.  New Balance's Denial of Letters of Credit and Refusal to Accept Orders from PSG .. 12

  B.  Negotiation of the New Distribution Agreement .......................................... 27

  C.  Mr. Ribadeneira Initiates the Peru Action ................................................. 39

III. **RESPONDENTS' AFFIRMATIVE CLAIMS PREVAIL** ........................................ 41

  A.  New Balance Breached the Distribution Agreement and its Implied Covenant of Good Faith and Fair Dealing ......................................................................... 41

    i.  New Balance Denied PSG the Contractually Bargained for Ability to Pay for Product by Letters of Credit ............................................................... 42

    ii.  New Balance Breached the Distribution Agreement by Ceasing and Refusing to Accept New Orders from PSG .......................................................... 45

    iii. New Balance Breached the Distribution Agreement's Implied Covenant of Good Faith and Fair Dealing ................................................................... 48

    iv. Damages .................................................................................. 49

  B.  New Balance Breached The New, Enforceable Distribution Agreement ................... 52

    i.  New Balance Refused to Permit Superdeporte to be Substituted into the New Distribution Agreement After Requiring That Respondents Integrate Wholesale and Retail Capabilities and New Balance Repudiated the Existence of the New Distribution Agreement ...................................................................... 54

    ii.  New Balance Failed to Permit Respondents to Purchase Product and Perform Under the New Distribution Agreement ......................................................... 57

    iii. New Balance Acted Duplicitously In Negotiating With Other Distributors While It Had an Active Distribution Agreement In Place With PSG/Superdeporte .............. 59

    iv. Damages .................................................................................. 60

  C.  New Balance Breached Its Precontractual Obligations During The Negotiation Of The New Distribution Agreement ................................................................... 62

IV. **NEW BALANCE'S CLAIMS FAIL** ............................................................... 64

  A.  This Tribunal Has No Jurisdiction Over Mr. Ribadeneira or Superdeporte As It Relates to the Contract Claim, and New Balance's Contractual Claim Otherwise Fails ........... 64

    v.  New Balance's Contractual Claim Against Mr. Ribadeneira Should Fail ............... 65

    vi. New Balance's Contractual Claim Against Superdeporte Should Fail ................... 72

  B.  New Balance's Claim That PSG Breached The Distribution Agreement Should Fail Because New Balance Caused PSG's Inability To Pay New Balance .......................... 77

C.   New Balance's Damages Claims Are Further Flawed, Because It Seeks Usury Interest and Interest Not Permitted Under the Distribution Agreement ............................ 82

D.   New Balance's Tortious Interference Claim Fails ............................................ 85

**V.  RESPONDENTS' FEES AND COSTS IN THIS ARBITRATION ............................. 90**

**VI. REQUEST FOR RELIEF .................................................................. 90**

## I.     INTRODUCTION

1.     Peruvian Sporting Goods S.A.C. ("**PSG**"), Superdeporte Plus S.A.C. ("**Superdeporte**"), and Rodrigo Ribadeneira ("**Mr. Ribadeneira**") (collectively "**Respondents**") submit their Post-Hearing Brief ("**Post-Hearing Brief**") following the Hearing on the merits ("**Hearing**") held March 9-11, 2020 and May 29, 2020.[1]

2.     The evidence has established that New Balance breached its contract and common law obligations when it unilaterally precluded Respondent PSG from purchasing its products via letters of credit and began requiring that PSG purchase products via cash wires within 15 days of product shipments.  This contravened the right that PSG had bargained for to purchase products via letters of credit and thereby finance those purchases for six months.  With this unilateral change to the parties' relationship, New Balance destroyed the cash cycle of PSG's business, and created a liquidity problem in 2015—leading to certain arrearages in its payment obligations to New Balance—from which PSG tried mightily to recover.  As PSG was almost up to date on its product payments to New Balance in August of 2015, New Balance again breached its contract with PSG by placing a complete freeze on product orders.  This breach destroyed PSG's business, made it impossible for PSG to perform its obligations under its contract with New Balance, including generating sufficient further revenues to continue operating its business with New Balance.

3.     PSG and Superdeporte complained about these breaches by New Balance at various junctures, insisting on their right to buy products by letters of credit under the 2013 agreement and

---

[1]  For purposes of this submission, the Marathon Group ("Marathon Group") will mean the group of companies owned directly and/or indirectly by Respondent Mr. Ribadeneira through various operating and holding companies, including, *inter alia*, the Marathon Sports stores in Peru and Ecuador, Respondent Superdeporte, and until the end of 2016, Respondent PSG.

their right under the contract to continue placing orders and purchasing products.[2]  At various

junctures, Respondents negotiated with New Balance to continue buying products, including by

letters of credit, and New Balance would promise to open buying windows and take other steps to

allow Respondents to continue performing, but would then renege on its promises after

Respondents would make the promised payments.[3]

4.      Contrary to New Balance's self-serving and false statements throughout this case,

the parties' business relationship had been operating very well for 14 years until New Balance

breached the parties' contract with the two measures mentioned above.  It had in fact been

operating so well that New Balance had praised PSG for its marketing efforts in late 2014, stating

that it was doing a much better job of promoting New Balance products in the Latin American

region than any other distributor, including the company (Sparta) that New Balance later chose to

replace Respondents for the Peru territory.[4]

5.      New Balance attempts to paint Respondents as a serial late payer of its bills.  It is

not true.  In fact, the parties conducted their business relationship well for 14 years and that PSG

only fell into real financial trouble when New Balance stripped it of its right to finance its

---

[2]  E.g. Mr. Cullen admitted in his testimony at the hearing that PSG and alter Superdeporte in 2015-16 requested multiple times to place orders via letter of credit, and New Balance denied these requests.  Hearing Transcript, 443:6 through 444:4 (Q.  But do you agree and do you remember that during those discussions, what PSG was asking you to do was to continue to let them buy by letter of credit?  A.  Yes. That was what they would have preferred, for sure.  Q.  Not only would they prefer it; it's what they were pleading with you to keep in place?  A.  That's what they would have preferred, yes.  Q.  And what they were pleading with you to keep in place.· Do you disagree with that?  A.  I don't know if pleading, but, yes, they were asking for this -- they were absolutely -- yes, they were asking for us to allow them to pay by letter of credit.  Q.  And they were asking you please not to apply this policy of requiring them to pay up front in cash for products because it would really impact their liquidity and their cash position?  A.  They were asking for that, yes.").

[3]  *Supra* ¶42.

[4]  *See* Exhibit 90, PSG00006485 ("Your team is doing a great job . . . the NB store is a true game changer for the brand . . . The Peru team really deserved the marketing award for all they have done . . . congratulations."); *see also* Exhibit 93, PSG00007483 ("I do recognize that the Peru business continues to grow nicely year on year and agree with you that you have worked hard to set a strong foundation for future growth.  As you know, we feel Peru does the best marketing in the region and the results reflect that.").

purchases by letters of credit and then seized on the liquidity problems it caused to freeze further product orders thereby preventing PSG from further performing and destroying the relationship.

6. New Balance's own exhibit, which Respondents do not accept as fully accurate, proves that the real problems with PSG's liquidity and arrears to New Balance started after New Balance breached the Distribution Agreement. Figure 1 below, which is based exclusively on the data contained in New Balance's Exhibit 12, shows the monthly cumulative outstanding amount of distribution fees owed by PSG over the period from March 2013 until 2017.[5] As the graph shows, PSG was nearly current on payment until after January/February 2015 when New Balance started refusing letters of credit from PSG and insisting on cash wire payments. PSG's delays in payment to New Balance started accumulating in January/February 2015 and significantly increased in September 2015, one month after New Balance completely shut down PSG's access to New Balance's online ordering system. This was just over six months after PSG placed its orders for Q3 2015 but was not able to receive the product or generate any revenue due to New Balance's insistence on cash payments for product orders. With its cash cycle significantly disturbed by New Balance's breaches of the contract, and with no new product to generate revenue, PSG's liquidity issues continued and were exacerbated through the end of the parties' relationship, as it was relegated to selling old products at severe discounts or losses.

---

[5] Gaps in the chart reflect time periods for which the Statement of Accounts were not provided in Exhibit 12.



(Figure 1 -- PSG's Cumulative Outstanding Distribution Fees to New Balance)

7.      The above graph proves that New Balance is simply wrong when it attempts to argue that PSG was chronically in arrears throughout the entirety of the parties' relationship. Instead it shows that New Balance's breaches, especially the ban on all product orders, made it impossible for PSG to perform its obligations under the 2013 Distribution Agreement.  New Balance's conduct further demonstrates this, as it was seeking to expand the parties' relationship in late 2014 and into 2015 with the adoption of a new structure that would expand Respondent PSG and Superdeporte's role for New Balance in Peru.  If New Balance really thought in late 2014 and into early 2015 that PSG was a distributor who was chronically late in its payments, it would not be seeking to expand its relationship with PSG at that time.

8.       Starting in late 2013 and spurned more aggressively by New Balance in late 2014 and 2015, New Balance pushed PSG to adopt a new structure to their business dealings that required Respondents to change its corporate distributor to one that could handle both wholesale and retail sales of New Balance's products in Peru.  Common sense dictates that New Balance would not have done this if it perceived PSG to be a failing business partner.  This was a radical change in the parties' relationship , requiring a change in the corporate entity that would handle New Balance's business as Respondents had to create an entirely new entity that could operate at both the wholesale and retail levels in Peru.  It also changed the way New Balance charged for distribution fees, going from a "sales based" to a "purchase based" royalty.  The parties were embarking on these changes exactly during the time that New Balance's breaches were taking their devastating effect on Respondents.

9.       By September 2015, the parties had reached a deal on a new contract—the Amended and Restated Distribution Agreement—that adopted the new structure requested by New Balance.  Both parties not only had agreed to all of the terms of their new contract by that time, but each had a then present intent to be bound by that agreement and each began immediately performing under the new agreement.  New Balance and PSG worked to and did issue new invoices to correspond with the new "purchased based" royalty required by New Balance under the new contract.  PSG made payments of some of those invoices.  Respondents initiated the process—including substantial investments—to create the new corporate vehicle that could operate at the wholesale and retail level—Superdeporte.  While the parties later agreed to certain amendments to their contract in November 2015 and January 2016, they each continued to perform under and intended to be bound by the new agreement.

10.     In the new agreement, Respondents accepted a modification to their payment terms that would disallow an automatic right to purchase products from New Balance via letters of credit.[6] The new agreement still allowed for purchases by letter of credit, but only if New Balance would authorize this.[7] Otherwise, payment for products had to be by cash, wire transfers.[8] For Respondents, this change was acceptable, because—unlike with the 2013 Distribution Agreement where PSG did not have the ability to finance purchases with lines of credit from banks— Superdeporte had access to lines of credit given the very large volume of business done by the Marathon Group retail stores and their existing banking relationships.[9] Respondents were thus prepared via Superdeporte to continue a healthy business relationship under the Superdeporte entity with New Balance, but New Balance ultimately blocked Superdeporte from doing so, refusing to provide it with the authorization to sell New Balance products and to provide the signed new contract listing Superdeporte as New Balance's distributor in Peru.[10]

11.     What Respondents did not know was that New Balance at the very same time was engaging in duplicitous behavior, seeking to replace PSG and Superdeporte as the distributor in Peru.  Within days of agreeing the amendments in January of 2016, New Balance was visiting with

---

[6]  *See* Exhibit 5-1, NB_PSG0000002 ("Payment of all amounts due for Products and all payment documentation for the purchase of the Products shall be effected by Distributor through cash in advance due upon placement of any order, unless otherwise agreed to by COMPANY, its Affiliate or its Authorized Supplier, as the case may be . . . If COMPANY, its Affiliate or Authorized Supplier allows Distributor to deliver the letter of credit or cash after the placement of the order and Distributor fails to deliver the same . . .").

[7]  *Id.*

[8]  *Id.*

[9]  Hearing Transcript, 958:15-20 ("I was looking and trying – looking for work to moving to Superdeporte and being able to then get a line of credit to work the way New Balance was suggesting. It was not that it was impossible. It was impossible for PSG to do it.").

[10]  Exhibit 170, PSG00006711; Exhibit 92A, PSG00005162; Hearing transcript, 646: 24 through 647:8 ("A.  Because after -- and anytime after I do something to keep the business running, he didn't achieve what he promise. After that, doing an effort 100,000, 200,000, 150,000, give me a letter. Give me the contract.  He all the time tricked me. I was really upset with this. That is not the way business should be handled. That's -- there's no honor in that. So I was really upset.").

other distributors in the region, telling them they were New Balance's "first choice" to come in as the new distributor in Peru—all in breach of New Balance's new contract with Respondents and its duty to operate in good faith and deal fairly with Respondents. New Balance continued its bad faith conduct, seeking further payments from Respondents and allowing them to continue investing in the creation and deployment of Superdeporte, while at the same time denying it the ability to buy and receive new products and seeking additional payments from them under the false promises that the relationship would continue. Respondents, operating in good faith, continued performing until New Balance abruptly and in breach of their new agreement, repudiated that contract, announcing unilaterally in late June of 2016 that it was "reverting back" to the 2013 agreement and not renewing that agreement past the end of that year.

12.     This is what the evidence has established. New Balance nonetheless attempts to rewrite history by stating that the parties never finalized the new agreement, because Respondents never signed it, even though applicable law makes clear this is not a requirement. It admits it thought the agreement was final and performed under it, but then tries to say there is no valid contract because Respondents did not intend for the agreement to be final. The evidence shows otherwise, as Respondents conduct demonstrates, including their cooperating in the issuance of new invoices, payment of some of those invoices plus their investment in the creation of Superdeporte and their efforts to sell existing inventory by that entity.

13.     As noted, New Balance unilaterally and in breach of the 2013 Distribution Agreement altered the payment terms and thereby destroyed PSG's business model and liquidity and then destroyed its business altogether by freezing product orders. It nevertheless sues in this case all of the Respondents for royalties under the old agreement with PSG for a period of time in 2015 and 2016 when it did not allow PSG (or Superdeporte) to purchase and sell its products in

Peru and thus did not allow it to generate any revenue, let alone enough to pay royalties. Of importance, it never invoiced Respondents for virtually all of the supposed damages it now seeks, nor did it enter into its accounting system, which should come as no surprise since it apparently understood at the time that it could not charge royalties and other fees while at the same time preventing Respondents from buying and selling its products and violating their exclusivity. Its contention now that this is allowed by the parties' agreement is not only contrary to Massachusetts law and common sense but also provably wrong. If this were true, New Balance could sign an agreement with its distributor in Peru, never allow it to purchase products, and then claim that it owes all of the minimum royalties agreed per the parties' contract. That cannot be what the law or parties' contract allows, but that is precisely what New Balance asks this Tribunal to accept.

14.     New Balance cannot recover for these breach of contract damages, because it caused these alleged breaches by PSG, especially by preventing it from making further product purchases. Massachusetts law provides that when one party breaches a contract and this causes the counterparty to the agreement to breach, the second party's breach is excused. Moreover, New Balance has admitted that an implied condition to PSG's duty to pay royalties is that New Balance must allow it to buy and sell its products. Having prevented PSG from doing so, New Balance has failed to satisfy this condition and cannot now seek payment for royalties and other charges based on products that it prevented PSG and later Superdeporte from purchasing.

15.     Then why seek them now in this case when New Balance never invoiced any of the Respondents for these charges in the ordinary course of business and never even entered these charges into its accounting system? New Balance's counsel provided the Tribunal with the answer during his closing argument. Mr. Tully told us in his closing argument that New Balance filed this case *in retaliation for Respondents filing the Peru Action*. In Mr. Tully's words when referring to

Mr. Ribadeneira having filed the Peru Action: "He launched this litigation, the Peru litigation -- **which, by the way, without the Peru litigation, I'm not sure any of us meet**."[11] That candid admission speaks volumes and explains why New Balance is seeking damages in this case that it never invoiced to PSG, never entered in its own accounting system and that it cannot collect under the contract or Massachusetts law.

16. New Balance also improperly attempts to hold Respondents liable for interfering with its relationship with its new distributor in Peru, even though New Balance initiated this relationship in breach of the parties' new contract for the territory. It also does so in contravention of Massachusetts law, which provides that a party's lawful attempt to enforce its legal rights in court cannot form the basis for an interference claim. While New Balance argues that Respondents did not in good faith believe that the Amended and Restated Distribution Agreement was in effect and that Respondents acted with malice and improper intent in filing the Peru Action, the evidence points to the exact opposite conclusion.[12] Its interference claim must be rejected.

17. When all the evidence is considered, this Tribunal respectfully should grant Respondents' affirmative claims, deny New Balance's claims and award Respondents the rightful damages they seek for New Balance's wrongful conduct that put an end to a successful 15-year plus business relationship, plus all of its attorneys' fees and costs and applicable interest.

## II. FACTUAL BACKGROUND AND PROPOSED FINDINGS OF FACT

18. Mr. Ribadeneira initiated a relationship with New Balance in 1992, whereby an entity within the Marathon Group called Distribuidora Deportiva Dide ("**Dide**") began distributing

---

[11] Hearing Transcript, 1235:9-12 (emphasis added).

[12] Exhibit 105-1, NB_PSG0001302, NB_PSG0001306; Exhibit 209, PSG00002774; Exhibit 211, PSG00006754; Exhibit 216, PSG00006831; Exhibit 205, PSG00006772.

sportswear for New Balance in Ecuador.[13]  In 2000, after the relationship between the parties had

gone well in Ecuador, the parties extended their relationship  to cover Peru.[14]  The relationship

progressed nicely in Peru for the first 10 years.  At the end of 2009, PSG was created to become

New Balance's distributor in Peru.[15]  At the beginning of 2010, PSG and New Balance entered

into a distribution agreement for the distribution of New Balance's products in Peru.

19.     On January 1, 2013, New Balance and PSG (together with New Balance, the

"**Parties**") entered into a further Distribution Agreement (the "**Distribution Agreement**").[16]  The

Distribution Agreement governed the sale and distribution of New Balance's products in Peru.[17]

The Distribution Agreement was valid until December 31, 2015.[18]  According to the Distribution

Agreement, if neither party expressed an intention to let the Distribution Agreement expire, the

Distribution Agreement would automatically be renewed for an additional year, that is, until

December 31, 2016.[19]  By the end of the Distribution Agreement's original term, neither party

---

[13]   Hearing Transcript, 938: 16-22 ("A.  I started the relationship with New Balance, and that's why this is somewhat emotional for me because this is the one relationship that I started personally in 1992 while I was in college. I graduated in '92, and I wrote to New Balance and we started a relationship for Ecuador."); 939: 18-19 ("A.  Dide, which was the original distributor for New Balance in Ecuador, and PSG were designed and incorporated to do New Balance exclusively."); 412:11 through 413:3 ("Q.  Are you also aware that PSG -- well, not PSG itself, but the broader group of companies have been working with New Balance in Ecuador since 1992?  A.  I knew it was a long time. Many of our distributors have been working from the mid-'90s. Q.  Do you have any reason to dispute that that relationship was relatively successful from early 1992 until the time you took over in 2013?  A.  No.  Q.  Okay. Now, when you did take over in 2013, the first year was a relatively successful year in terms of your assessment of how they were doing in the territory?  A.  It was successful.").

[14]   Hearing Transcript, 938: 22-25 ("Then later in 2000, I also wrote again and talked to the people who I was working with at the time, and we were given also distribution for Peru in 2000.").

[15]   Hearing Transcript, 939: 18-19 ("A.  Dide, which was the original distributor for New Balance in Ecuador, and PSG were designed and incorporated to do New Balance exclusively."); *see also* Exhibit 44, PSG00006520. Exhibits will be referred to by their Joint Exhibit numbers, as presented during the Hearing.

[16]   Exhibit 1, PSG00005497.

[17]   *Id.*

[18]   *Id.*

[19]   *Id.*

expressed an intention to let the Distribution Agreement expire.[20]  As such, the Parties allowed the Distribution Agreement to automatically renew until December 31, 2016.[21]

20.      The Distribution Agreement between PSG and New Balance was successful through the end of 2014.[22]  In 2014, during the term of the Distribution Agreement, New Balance even presented the team at PSG with a marketing award for their work promoting the New Balance brand in Peru.[23]  It also was seeking to expand the parties' relationship by asking Respondents to handle not only wholesale but also retail distribution.[24]

21.      John Cullen ("Mr. Cullen") became New Balance's General Manager for Latin America in 2013.[25]  Mr. Cullen has continued as General Manager for Latin America since that time and remains in the position to date.[26]

---

[20]   Hearing Transcript, 363: 23 through 364:8 ("And then under "Contract Update" -- A.  Yes. Q.  -- your first sentence says, "Peru/Ecuador's contract expired at the end of 2015." Do you see that?  A.  Yes. Q.  Was that accurate at the time you wrote it? A.  No. It auto-renewed for one year."); Exhibit 175-1, PSG00000953.

[21]   *Id.*

[22]   Hearing Transcript, 412:8 through 413:3 ("A.  Yeah, no specifics. I know PSG has been a long-term partner of ours, but aside from that, I didn't know the specifics.  Q.  Are you also aware that PSG -- well, not PSG itself, but the broader group of companies have been working with New Balance in Ecuador since 1992?  A.  I knew it was a long time. Many of our distributors have been working from the mid-'90s.  Q.  Do you have any reason to dispute that that relationship was relatively successful from early 1992 until the time you took over in 2013?  A.  No. Q.  Okay. Now, when you did take over in 2013, the first year was a relatively successful year in terms of your assessment of how they were doing in the territory?  A. It was successful.").

[23]   *See* Exhibit 90, PSG00006485 ("Your team is doing a great job . . . the NB store is a true game changer for the brand . . . The Peru team really deserved the marketing award for all they have done . . . congratulations."); *see also* Exhibit 93, PSG00007483 ("I do recognize that the Peru business continues to grow nicely year on year and agree with you that you have worked hard to set a strong foundation for future growth.  As you know, we feel Peru does the best marketing in the region and the results reflect that.").

[24]   *See* Exhibit 90, PSG00006485 ("Thank you John for your support.  We are moving to give NB that 'unfair advantage' you describe as your goal with Marathon first in Ecuador and then in Peru.").

[25]   Hearing Transcript, 158: 16-25 ("So I started in 2009. I joined the company to run the international licensing business for New Balance.  And after about three and a half years in that role in early 2013, roughly the beginning of 2013, I changed positions and was the general manager for Latin America starting at that time.  Q.  And have you continued in that role since 2013?  A.  Yes.").

[26]   *Id.*

22.     The only way that PSG made any money from this relationship with New Balance was to buy its products at the wholesale level and sell them to its customers in Peru.[27]  If New Balance prevented PSG from purchasing its products, PSG could not generate revenues and thus could not pay New Balance any distribution fees.[28]

### A.     New Balance's Denial of Letters of Credit and Refusal to Accept Orders from PSG

23.     Under the terms of the Distribution Agreement, PSG would place orders for New Balance products during predetermined order windows which were about six months in advance of the shipment of the goods from the factory.[29]  PSG paid for its product orders by letters of credit at sight, as it was entitled to do pursuant to Section 6(b) of the Distribution Agreement, and it paid distribution fees to New Balance via direct cash transfers.[30]  Letters of credit are very common in the sportswear distribution industry and had been an important part of PSG's relationship with New Balance for many years.[31]  Letters of credit were also very important in order to maintain the cash cycle of PSG's distribution business so that the PSG could use revenue from product sales in order to finance future purchases, pay other costs of operation, and make distribution fee payments to New Balance.[32]

---

[27]  Hearing Transcript, 623:25 through 624: 9 ("A.  Because with a lack of product into the market, so how you can make money without product that you convert into money?  And again, if you cease daily sales, if you are not taking to a discount or a clearance place, you need to have new product to sell, which is coming your -- 80 percent of your sales are going to come for a fresh product, not old product.").

[28]  *Id.*

[29]  Respondents' Opening Presentation, slide 83.

[30]  Hearing transcript, 913:21-23 ("Q.  And distribution fees were never paid by letter of credit. Correct?  A. Correct."); 222:18-23 ("THE WITNESS: So my understanding, again, letters of credit are just being used for factory payments, not for distribution fee payments. THE ARBITRATOR: Let's stay with that.  Right.").

[31]  Hearing Transcript, 873:6-12 ("A. It is very common. In the industry of importing, the use of LCs are a very common way to -- of international commerce.  Q.  And Superdeporte in Ecuador uses letters of credit to purchase product from various other brands?  A.  Yes.").

[32]  Exhibit 1, PSG00005497; Hearing Transcript 605:11 through 25 ("And also it affects the whole cycle of the -- of them, the cash flow of the business, which is quite long, if you think about it. You start selling something

24.     Payment for product by letter of credit was explicitly permitted under Section 6(b) of the Distribution Agreement.[33]  From 2013 through the end of 2014, New Balance complied with its contractual obligation to permit PSG to use letters of credit to pay for products.[34]  This allowed PSG to manage a healthy cash flow cycle in which PSG would place orders, receive product from New Balance, sell the product to Marathon stores and to other end retailers, and begin collecting from retailers before the payment on the letter of credit became due.[35]  The parties' relationship functioned well during this timeframe.

---

now, and you will start collecting money if you sell to third parties. The normal way to work is to give them 90 to 120 days to clear the accounts.  So whatever you are selling today, you will start collecting that in 120 days, because that's the usual way to work.  Q.  So I'm going to ask you about the cash cycle of PSG's business with respect to New Balance in just a second in a little more detail.  A.  Yes."  Hearing transcript 628: 3 through 630:21 ("What does "cash conversion cycle" mean?  A.  It's the time when you start – when you recover the money that you have put into the market in products over time. So it's how long takes you to recover the product that you are putting into the marketplace.  Q.  So could you describe -- and does this relate to PSG's business with New Balance, this cash conversion?  A.  No. This is a regular cash conversion cycle.  Q.  When you say "regular," does it apply to PSG's business with New Balance?  A.  Yes. It's part of how the business works. You ship goods. I will give you an LC on on-site. Okay? The factory delivers the products to the forwarder. They receive the documents of receiving the goods. You present the goods -- the documents to the bank. They collect the money. With this, I need two month to reach stores for the first time. So you have a transit time, water transit time, roughly to origin is 35 days. Plus, you need to consolidate the goods in origin, and then you need to clear customs in the -- in whatever, in Peru or Ecuador. After that, you are able to start putting product into the market. Right? If you are -- if I'm selling you goods, my normal payment term with account, big accounts, like Falabella or Ripley is between 90 and 120 days. That's basically. That's a part of -- I don't know -- the royal – the gross profit structure that I have, discount, whatever I can have. Payment terms with that one, they can play without this 120 days because that's the cash conversion cycle. They all put the goods into their stores. They will start selling. And when they finish to sell the goods, roughly, they will pay you. So that is how it work.  Q.  So from the moment you have an order confirmed until -- an order confirmed, and that means an order confirmed to start shipment -- A.  Yes.  Q.  -- or I should say -- I'm sorry -- to have the order placed to manufacture the goods to eventually be shipped.  From the moment the order is confirmed until PSG starts seeing monies back from customers for the sale of those products, approximately how much time transpires?  A.  At least nine.  Q.  Nine what?  A.  Month.  Q.  Does the letter of credit help you in any way in facilitating this cash conversion cycle?  A.  Absolutely. The payment term that you have with the LC, me with the bank, is regularly 180 days. So it's going to match the cycle since they -- I receive the products on the port, import them, sell them, and record the money. So that's matching the cash cycle conversion.").

[33]   Exhibit 1, PSG00005497; Hearing Transcript 430: 2-13 ("Q.  All right. So you recognize, don't you, that in the -- what we've been calling the "old agreement" here, the 2013 agreement with PSG, between PSG and New Balance, that PSG had an obligation and a right to purchase product via letter of credit?  A.  That's correct, yes.  Q. And you also recognized that that agreement was never -- at least that provision in the agreement was never amended while that agreement was effective?  A.  That's correct.").

[34]   Exhibit 220, PSG00007238.

[35]   Respondents' Opening Presentation, slides 83-84.

25.     When PSG was able to pay for product via letter of credit, it was able to stay current on product payments as well as to make regular royalty payments to New Balance.[36]  Any payment delays in 2013 or 2014 were minimal, ordinary for this type of business and did not in any way disrupt the parties' relationship.  PSG only seriously fell behind on its payment obligations in 2015 once New Balance improperly stopped accepting letters of credit from PSG for product purchases.[37]

26.     In most instances throughout 2014, for example, PSG only owed the prior month's distribution fees, which had just been invoiced the week prior to the account statement, and at most, owed two months' worth of fees.[38]  It also owed nominal amounts in sample expenses.[39]  The account statements reflect that PSG was making regular payments on its distribution fees and was not significantly behind on payments in 2014.[40]  The monthly distribution fees under the Distribution Agreement were based upon PSG's sales.[41]  PSG would report its sales to New

---

[36]     *See* Exhibit 12, NB_PSG0002843.

[37]     *See* Exhibit 12, NB_PSG0002843.

[38]     *See* Exhibit 12, NB_PSG0002843.  For example, in January 2014, PSG owed October and November 2013 fees.  In February 2014, PSG only owed December 2013 fees.  In March 2014, PSG owed the 2013 Minimum Fee as well as the January 2014 fee.  As of the beginning of April 2014, PSG owed the 2013 Minimum Fee as well as fees for January and February 2014.  As of May 2014, PSG owed the 2013 Minimum Fee as well as fees for March 2014.  As of June 2014, PSG owed the 2013 Minimum Fee as well as fees for May 2014.  As of July 2014, PSG owed the 2013 Minimum Fee as well as fees for May 2014.  New Balance's records do not include a statement for fees in August 2014.  As of September 2014, PSG owed the 2013 Minimum Fee as well as fees for July 2014.  New Balance's records do not include a statement for fees in October 2014.  As of November 2014, PSG owed the 2013 Minimum Fee as well as fees for August and September 2014. As of December 2, 2014, PSG owed the 2013 Minimum Fee as well as fees for September and October 2014.  As of December 29, 2014, PSG owed the 2013 Minimum Fee as well as fees for October and November 2014.

[39]     *See* Exhibit 12, NB_PSG0002843.

[40]     *Id.*

[41]     Hearing Transcript, 765:22 through 766: 8 ("How are the invoices generated? A. So the -- that comes back to one of the earlier questions on the process for distribution fees. So the markets would submit their sales and distribution fee amount in a template, on a monthly basis. Our finance team will review that and then hand it over to our credit department. Our credit department would issue the invoice for the distribution fees. And then it gets posted to our ERP system, and that's where – that's where it comes from.").

Balance in the month after it made the sales, and New Balance would invoice PSG for the distribution fees.[42]  Specifically, as of December 29, 2014 for example, PSG owed $11,446.86 in samples and $166,651.83 in fees.  The $166,651.83 in fees was made up of three components: a minimum fee catch-up payment from 2013, which had been billed to PSG on February 28, 2014 ($43,525.00), the October 2014 fee (due at the end of November in the amount of $40,410.13), which had been billed to PSG on November 21, 2014, and the November 2014 fee (due at the end of December 2014 in the amount of $82,716.70), which had been billed to PSG on December 15, 2014.[43]  As PSG's account statements reflect, PSG paid the October 2014 fee in January 2015, and the November 2014 fee during March 2015.[44]  PSG also paid the 2013 Minimum Fee in April 2015.[45]  On these facts, is not true, as New Balance contends, that PSG was chronically late in paying its bills to New Balance since the inception of the parties' relationship or in calendar year 2014.  Instead, the payment issues began in earnest in 2015 as a result of New Balance's breaches of the parties' contract.

27.     The following figure shows the monthly cumulative outstanding amount of distribution fees owed by PSG over the period from March 2013 forward based on the Statements of Account New Balance has kept.[46]  As the figure indicates, there were no real payment issues until January/February 2015 when New Balance breached the Distribution Agreement by not allowing PSG to pay by letter of credit.  Over the next several months, PSG was not able to receive any orders and thus had no new product to general revenue from because New Balance wrongfully

---

[42]  *Id.*

[43]  Exhibit 12, NB_PSG0002843 at 2865-2866.

[44]  *Id.* at 2866-2867.

[45]  *Id.* at 2869.

[46]  *See* Exhibit 12, NB_PSG0002843; gaps in the chart reflect time periods for which the Statement of Accounts were not provided in Exhibit 12.

insisted on cash payment.  In August 2015, New Balance completely shut down PSG's access to

its online ordering system.  One month after that, in September 2015, PSG's delays in payment

increased significantly.  New Balance's breaches of contract significantly disturbed PSG's cash

cycle throughout the entirety of 2015, and PSG understandably was not able to recover from this,

having no new products to sell into the Peruvian market.



(Figure 1 -- PSG's Cumulative Outstanding Distribution Fees to New Balance)

28.     In 2014 and 2015, Peru and Ecuador's markets also suffered from significant

contractions, including currency devaluations in Peru and a 25% import duty in Ecuador.[47]  As a

---

[47]     Exhibit 242, NB_PSG0000522; Hearing Transcript, 438: 24 through 439:18 ("Q.  And those factors
included the introduction of a new, very hefty import duty tax in Ecuador?  A.  Yes.  Q.  25 percent tax?  A.  Correct.
Q.  And what that meant is that in order to import product into Ecuador, New Balance product, each pair of shoes
would be more -- the importer or the entity receiving the product would have to pay an extra 25 percent to get that
product in the market?  A.  That's correct.  Q.  And you recognized that affected PSG.  Right?  A.  Yes.  Q.  And it

consequence, PSG suffered short term cash flow liquidity issues.[48]  The Parties discussed and

assessed PSG's cash flow issues and were aware of the specific cash flow challenges, which were

---

severely affected its cash flow?  A.  It affected them for sure."); Hearing Transcript, 950:15 through 951:25 ("A. So contrary to what John said that there are devaluations all the time, Peru had actually the most stable currency or one of the most stable currencies in the region. Ecuador not only has a very stable currency, Ecuador is dollarized. So the dollar circulates in Ecuador, so there's no such a thing as a devaluation.  But in the case of Peru, the devaluation was huge, it was shocking, and it had to do with the lower -- with a drop in 2 commodity prices, and it was a shock everywhere. Charlie described it yesterday better than me of what the shock was regarding the drop in sales in Peru. It was dramatic. Dramatic, and also the reactions were dramatic. The banks were more careful. Everything was done in -- commercially in -- in terms of less optimism. We just lived a -- we just lived the first crisis that we had lived in 10 years, you know.  Q.  How did that affect --  A.  The 2008 crisis did not have an effect on Peru or Ecuador. This one did. This one did.  Q.  How did it affect PSG's business, if you can give just a brief summation?  A.  I don't have an exact number, but the leftover inventory -- about half of the inventory that we had was difficult to sell, so we got stuck with 50 percent of the inventory. Company-wide -- and this is with all our companies -- we had $36 million worth of inventory, excess inventory, company-wide, one of which was New Balance in this mall."); Hearing Transcript, 602:12 through 604: 22 ("You said the market was contracted due to devaluations in Peru?  A.  Yes. Huge one.  Q.  What does that mean? What devaluations are you referring to?  A.  The currency changed from, I think it was, 2.8 soles per dollar to 3.45 in a month. Actually, the whole market was going -- Peru had really good years between 2011 until 2014. The whole market was going up, growing. And suddenly in -- I think it's May/June 2015, everything stopped. The contraction starts over there and we have this huge devaluation the beginning of 2015 in Peru and the whole market collapse.  Q.  Did that have any effect on PSG's ability to sell products for New Balance?  A. To sell -- the whole market was struggling. All our clients were having problems to sell. We were having problems to sell because the market was contracted. The people were not buying. So it's a part of recession. It's difficult to sell. So all your movement change -- or your cash flow change.  Q.  You also mentioned, I think you said, import restrictions or import duties. What does that mean?  A.  With Ecuador. Ecuador put an extra duty in, supposedly for a year, in April 2015. And with the heavy duty structure they had, they put a 25 percent over it for a part on shoes, and then they put 45 percent for accessories, which is incredibly nuts. I cannot still understand that part. For example, if you were importing a million dollars, you need to pay in advance to clear the goods besides all the duty that you have paid already. 25 percent, that's 250 million. A quarter million more just to clear the goods. Then after that, all the market was afraid that the prices were up. So you didn't have the chance to increase prices against that 25 percent. So everyone raise that price because the government was controlling that one, too, 10 percent.  But we didn't have any sales. So we start putting discounts into it. So you don't recover 250,000 for a million, but you are getting in worse situation even, because people is not buying and you need to put the product in discount that is with a higher cost than the usual. And at the beginning they put a different year, and you start buying for the end of that period that should be ending in 2016, and they extend it for another year.  So was really difficult, that.").

[48]  Hearing Transcript, 603: 13 through 605:30 ("Q.  You also mentioned, I think you said, import restrictions or import duties. What does that mean?  A.  With Ecuador. Ecuador put an extra duty in, supposedly for a year, in April 2015. And with the heavy duty structure they had, they put a 25 percent over it for a part on shoes, and then they put 45 percent for accessories, which is incredibly nuts. I cannot still understand that part. For example, if you were importing a million dollars, you need to pay in advance to clear the goods besides all the duty that you have paid already. 25 percent, that's 250 million. A quarter million more just to clear the goods. Then after that, all the market was afraid that the prices were up. So you didn't have the chance to increase prices against that 25 percent. So everyone raise that price because the government was controlling that one, too, 10 percent. But we didn't have any sales. So we start putting discounts into it. So you don't recover 250,000 for a million, but you are getting in worse situation even, because people is not buying and you need to put the product in discount that is with a higher cost than the usual. And at the beginning they put a different year, and you start buying for the end of that period that should be ending in 2016, and they extend it for another year. So was really difficult, that.  Q.  With respect to that issue, how did that affect your business in Peru? I understand you're describing a tax for importing products into Ecuador. How did that affect PSG's business in Peru with New Balance?  A.  Because we had both territory with that, and then we were receiving the goods to Peru and were shipping part of Ecuador. So Ecuador needs to pay us. So if they have a cash

17

caused by circumstances wholly outside of the Respondents' control, and PSG dealt with it well until at the end of 2014 and start of 2015 New Balance began breaching the parties' contract by refusing PSG's requests to pay for product purchases via letters of credit.[49]

29.     Around the same time, in late 2014, New Balance informed PSG that beginning in 2015 it was no longer going to accept letters of credit as a form of payment for products.[50]  This would present a radical and devastating change for PSG in the parties' relationship.  In response, PSG complained about this breach by New Balance and explained to New Balance how important letters of credit were for their business, their cash flow cycle, and for staying current on payments to New Balance.[51]  Despite PSG's pleas to allow it to continue purchasing products via letters of

---

issue which is tied to sales, it's going to affect us, all the way. And also it affects the whole cycle of the -- of them, the cash flow of the business, which is quite long, if you think about it. You start selling something now, and you will start collecting money if you sell to third parties. The normal way to work is to give them 90 to 120 days to clear the accounts. So whatever you are selling today, you will start collecting that in 120 days, because that's the usual way to work."). Exhibit 242, NB_PSG0000522.

[49]    Hearing Transcript, 608:7 through 609:20 ("Okay. And did you have any discussions with Mr. Cullen about -- and I'll take them in order -- the issue that you were having in making sales because of the devaluation in the Peruvian currency?  A.  No. I explain to him many times that we were suffering with that. It was really difficult time for the country.  Q.  And what sorts of response or what response, if any, did you get from Mr. Cullen?  A.  Not having the support that we're expected is to keep working with us that will allow me to be able to float them. Imagine if sales are tight, your cash is tight. If you need to pay duties in advance, it's affecting all your cash. And also to keep the business running, you need to pay duties. Those duties, you pay those in cash. So whatever you are receiving, you are putting those in to clear customs to get the chance to have the product to selling. So it's a loop.  Q.  Did you have any discussions with Mr. Cullen about the cash issues you were having as a result of the Ecuador tax that you just described before?  A.  Yes. That one, yes.  Q.  And, again, what sort of response did you get from Mr. Cullen, if any, about that issue?  A.  No, I didn't get the support again. They keep pushing to send things with cash, which is not the proper way to do it. Especially -- especially if you have seen a contracture in the market, how do you expect to move from payment method that helps you to fulfill the business instead of putting more money into advances? It doesn't make sense at all.").

[50]    Exhibit 220, PSG00007238.

[51]    Exhibit 220, PSG00007238 ("Here is a brief explanation why we do need to keep working with LCs. Please, send this info to NB Financial Team. Let us know their comments. At sight Letters of Credit started to be used frequently in the 1990s and continue to be used by large multinational companies because they serve as a guarantee of the legitimate origin of the funds. In the region there was and there is an issue of fear regarding money laundering, corrupt politicians, and drug trafficking which through the use of At Sight Letters of Credit is appeased and minimized because it is difficult for money of dubious origin to be able to go through these lines via confirming banks abroad and via local banks with international agencies. At Sight LCs are widely used in all lines of business in our region. Criminals and corrupt politicians do not open Letters of Credit when they import. They transfer cash, and cash transfers become dangerous for multinationals.  With Letters of Credit, there is another advantage for the multinational selling company. This advantage is that the selling company gets its money right away, in cash, but these funds go through

credit as allowed by the parties' agreement, New Balance made it clear that it was unilaterally imposing this change and that the orders for Q2 2015 (made in October/November of 2014) were the last time that it would accept letters of credit from PSG for products.[52] Instead of letters of credit, New Balance was requiring that PSG pay by wire cash transfers for products.[53] This decision was a unilateral decision on New Balance's part for its convenience, and this new payment method was imposed upon PSG.[54] The last orders that New Balance permitted PSG to place in the ordinary course of business by letter of credit were the Q2 2015 orders, which PSG placed in the fall and early winter of 2014.[55]

---

the Bank that opened the At Sight Letter of Credit and also through the confirming Bank. New Balance is paid by the Bank cash in advance therefore it is not required that New Balance gives credit to the importer. That is, New Balance does not need to offer credit to PSG. One of the things that complicates At Sight Letters of Credit is that fixing of discrepancies that may cause delays, i.e. the buyer says that something is not in order. In our case we don't apply discrepancies, we can commit ourselves to not applying discrepancies, and can do so in writing. At sight Letters of Credit are also used to ensure correct delivery. We know that there will be no such issues, and we can even commit in writing that we will not bring up or apply discrepancies. For Peruvian Sporting Goods as buyers we receive credit from the Bank without collateral, and pay in periods of 90 to 180 days, which allows us to better use our cash for opening stores, marketing and capex. Paying cash will be is a misuse of capital that could be used instead for opening mono brands in Peru, or use in marketing assets while we use credit from banks for imports. A quick explanation of how simply we work with At Sight Letters of Credit that operate as follows. The importer (buyer) asks its bank to send a message (letter of credit) to the Bank of the exporter (seller), and makes a commitment to pay for the operation once it receives the respective shipping documents. In this way, cash payment to the exporter is fully and irrevocably guaranteed by the bank issuing the letter of credit, and is carried out by the Bank Under Armour designates as confirming bank. I hope that this will help to better understand the advantages of At Sight Letters of Credit. In the end you will receive the money cash from a very accredited source, New Balance is paid by a bank. For us it is a seal of approval that well-known banks give us these lines which should leave you, New Balance, at ease. It is also very important that this way we receive credit and we can use our cash for investment in the brand.").

[52] Exhibit 225, NB_PSG0001555.

[53] *Id.*

[54] Hearing Transcript, 431: 12-16 ("Q. So when that occurred, that was a New Balance decision. Right? That was not some decision that New Balance took jointly with its distributors? A. That's correct."); Hearing Transcript, 433:4-11 ("Q. You didn't -- or New Balance didn't, I should say -- engage in negotiations with each of its distributors to ensure that each of its distributors accepted that change. Correct? A. No. Q. And you didn't do that with PSG? A. No."); Hearing Transcript, 830:12-18 ("THE ARBITRATOR: Allowing for the fact that New Balance gave them something at least in terms of the 15-day terms. On the letter of credit issue, you basically imposed it on them? THE WITNESS: That's fair. We made that decision, yes.").

[55] Exhibit 224, NB_PSG0001553; Respondents' Closing Presentation, Slide 26.

30.    In January/February 2015, PSG placed an order for Q3 2015 product, but New Balance by that time required payment by wire transfer.[56]  Due to its inability to finance the purchases via letters of credit given New Balance's improper rejection of payments via this medium, PSG struggled for months to comply with New Balance's requirement that PSG pay for this order with cash.[57]  New Balance refused to ship the Q3 2015 orders until PSG paid for them in cash.[58]

31.    In late July 2015, Mr. Ribadeneira and the CEO of the group, Mr. Renan Meneses, met with Mr. Cullen in New York and negotiated with New Balance to be able to pay for these Q3 2015 orders by letter of credit, which New Balance finally allowed.[59]  Within a very short period of time of receiving this approval, PSG made $550,000 in payments for these Q3 2015 orders via letter of credit on August 5, 2015.[60]

32.    Having paid for them on August 5th, this triggered the release of the products, which meant they arrived to market about *6 months later than they should have*.  Sportswear is an industry that is driven by what is current, seasonal, and in style.[61]  By the time PSG received the Q3 2015

---

[56]  *Id.*

[57]  Hearing Transcript, 494:22 through 495:5 ("Q.  Yes. And so my question is, consistent with what you were being told here by the finance people, did New Balance, at least initially, ask for PSG to pay for Q3 orders by lines of credit as opposed to letters of credit?  A.  Yes, it appears that way."); Exhibit. 101, NB_PSG0001963; Exhibit 105, NB_PSG0001306.

[58]  *Id.*

[59]  Exhibit 101, NB_PSG0001963.

[60]  Exhibit 105-1, NB_PSG0001306.

[61]  Hearing Transcript, 624:10 through 625:5 ("Q.  Why is that?· Why is it more difficult to sell older product?  A.  Because people don't want it.  People already saw it into the marketplace.  You don't want the old one.  You want the new one.  You want the fresh goods.  And that's part of the business. It's how it works.  I'm giving you figures of sellout, not that I'm inventing something. I see the sellout and the aging of the product.  And whatever is making your 80 percent of sales is revenue, this new and a mix of old product.  But it's 50 days old, so it can't be that old.  And if you moving then to 60, 70 days for the balance of whatever you are selling, it's two months.· So it's still new product come by.· And whatever you are not selling is 150, 180 days old, so you need to get rid of that one by putting discount, discount, discount, discount.").

orders, they were stale and no longer in season or current. As a result, PSG had to sell many of the Q3 2015 products at a discount.[62]

33. That PSG was able to pay for these products with letters of credit within two weeks of receiving approval from New Balance, proves that had New Balance not breached the parties' agreement by removing this payment option, PSG would have continued to run the business smoothly and without significant payment delays as it had done for the first 14 years of the parties' relationship in Peru.

34. In Q4 2015, PSG was forced to pay New Balance by cash in accordance with New Balance's new policy.[63] As a consequence, PSG was only able to place limited Q4 orders in April 2015—before New Balance stopped accepting orders from PSG—and it was only able to make a minimal cash payment ( $93,000 worth of product) on the Q4 2015 orders on October 29, 2015, at which point the Q4 2015 orders shipped.[64] Because PSG could not pay for these orders by letters of credit and had to wait until it had the requisite cash to make payments for at least some of these orders, PSG also received the Q4 2015 orders *about 6 months late*—the products were supposed to be delivered to the market in October of 2015, but PSG was only able to pay for them at the end

---

[62] Exhibit 285, SD-26.

[63] Hearing Transcript, 471:2-18 ("Q. So you are telling PSG in this email, which is sent in early April, that for the upcoming Q4 window the new NBIL rules will be implemented? A. Correct. Q. And that means that for Q4 purchases, no letters of credit. You have to pay by wire transfer? A. This explains why they paid in cash. Q. Okay. All right. That's what I was driving at. Because you said yesterday they could pay by letter of credit for Q4 orders, but it turns out that you told them something different, which is why they paid by direct transfer. Right? A. Correct.").

[64] Exhibit 94, NB_PSG0001670; Exhibit 205, PSG00006772; Hearing Transcript, 207:18 through 208:7 (A. Yeah. So this is the first window of Q4 2015. So, again, we're six months before entry into the marketplace. So this is a window in April of 2015 for product that **will be delivered to the market in October of 2015**. Q4 is a very important market. Q4 is a very important Q in the footwear business. It's when we sell a lot of shoes. It's pre-Christmas. It's a very important time for us. Q. And were you able to persuade New Balance to allow PSG to buy in the -- in that window? A. Yes.") (emphasis added).

of October 2015 so that they arrived to market roughly six months after October—requiring that much of this product also be sold at a discount or a loss.[65]

35. The decision to refuse to accept letters of credit, in violation of the terms of the Distribution Agreement, was a unilateral change on New Balance's part, rooted in New Balance's desire to avoid "additional costs and complexities" associated with letters of credit.[66] New Balance imposed this new payment term on PSG, despite PSG's contractual right under the Distribution Agreement to pay for product by letter of credit.[67] The decision to refuse to accept letters of credit was also motivated by New Balance's desire to earn a higher margin off of product purchases, as eliminating letters of credit lowered its costs by easing the administrative duties of its employees in complying with the requirements of these letters.[68]

---

[65] See *supra* note 50 (John Cullen admitting the Q4 2015 products were supposed to be delivered to market in October 2015); Exhibit 224, NB PSG0001553; Exhibit 101, NB_PSG0001963; Exhibit 105, NB_PSG0001306.

[66] Exhibit 227, NB_PSG0001572.

[67] Hearing Transcript: 829:21 through 830:18 ("THE ARBITRATOR: Was there a point where -- parsing the term "agreement" here -- was there a point at which New Balance basically imposed on PSG the reality that it was not going to be able to pay by letter of credit anymore? THE WITNESS: Yes. THE ARBITRATOR: And PSG agreed in the sense that they had no choice. Does that fairly describe the dynamic of the negotiation? THE WITNESS: Yes. But I would say that we compromised along the way. So, ultimately, you're correct: we would have made the decision. THE ARBITRATOR: Allowing for the fact that New Balance gave them something at least in terms of the 15-day terms. On the letter of credit issue, you basically imposed it on them? THE WITNESS: That's fair. We made that decision, yes.").

[68] Hearing Transcript: 430:14 through 431:16 ("Q. Now, you have referenced the fact that New Balance began at some point in 2015 to step in between the factories and the distributors and, in essence, be the entity that distributors would be paying for product when they purchased it? A. That's correct. Q. And part of the reason that New Balance did that is it wanted itself to make some margin off product purchases? A. Maybe. Q. Well, I mean – A. I assume. But there was also a lot of additional costs associated with that and significantly more risk for New Balance. But I assume that was also part of the decision. Q. I mean, New Balance must have some business decision that it made sense for them to step in between. Otherwise it wouldn't have done it? A. I really can't speak to that, to be honest. Q. So when that occurred, that was a New Balance decision. Right? That was not some decision that New Balance took jointly with its distributors? A. That's correct."); Hearing Transcript, 812:11 through 813:3 ("But the -- when NBIL put itself sort of in the middle of the relationship between the factory and the distributor, was New Balance making a margin then on the product that was being -- that the distributor was buying? A. There was a markup, not a pure profit markup. There was costs associated with this entity. There's costs associated with our sourcing organization. So the margin that was built into the cost was not a pure profit markup, but it was intended to offset NBIL and sourcing expenses. Q. Okay. So NBIL was making a profit or a markup on shoes that were sold, that distributors were selling? A. Yes. There was a markup there, yes."); Hearing Transcript, 422:2-20 ("Q. You did start taking a piece of that business, then? A. That's correct. Q. That's when you switched to the NBIL new regime -- A. That's correct. Q. -- where you had factories in Hong Kong? You talked about that in your direct. You talked

36. Aside from letters of credit, other forms of financing, like lines of credit, were not available to PSG given the small size of the company and its operations.[69] At the time, letters of credit were PSG's only financing option.[70]

37. PSG explained to New Balance the importance of letters of credit to their business and complained to it about this unilateral change in its payment policy that violated the terms of the Distribution Agreement, but New Balance insisted that PSG pay New Balance cash within 15 days of the shipment of the goods.[71] New Balance itself receives 60 day credit terms from the factories, four times the amount of time that it was providing PSG for its purchases.[72] This shows that New Balance also was making money with this new policy by requiring earlier payments from its distributors and then holding onto that cash for a significant period of time before having to pay its factories for the products.

38. Once PSG fell into arrears in August of 2015 due directly to New Balance's unilateral requirement that PSG purchase products by wire transfers, New Balance seized on

---

about it? A. Yes. Q. At that point you did take a piece? A. We did mark up the product a bit. Q. And New Balance did get some money then? A. That's correct. Q. Okay. From the purchase of the product? A. Yes.").

[69] Hearing transcript, 957:14 through 958: 20 ("Q. Couldn't you just go to your banker and say, 'We've got this line of credit, this trade line for a line of credit that we've been using with you. Can't you just convert this thing into a regular, a line of credit so we can draw on that to buy product?' A. No. Q. Why not? A. It's two areas of the bank. The trade finance side is one area of the bank where we had the relationship. That works mostly on corresponding banks lines that are outside. Those are actually quite easy to get. Getting regular loans, you require collateral. You require a history and presenting balance sheets that are very strong. How are we going to present a balance sheet that is strong if we cannot even order product? Because we have been denied the possibility of ordering product and we don't have a contract. I mean, the first two things they are going to ask me is what's the contract? And I'm not going to have a contract. Because at that time we were also in the middle of the fight of -- for the contract. So that was not - - that was not feasible. I was looking and trying – looking for work to moving to Superdeporte and being able to then get a line of credit to work the way New Balance was suggesting. It was not that it was impossible. It was impossible for PSG to do it.").

[70] *Id.*

[71] Hearing Transcript, 816:10-12 ("And that the ultimate offer to PSG was 15-day terms? A. That's correct.").

[72] Hearing Transcript, 822:15-17 ("Okay. So New Balance has credit for 60 days on paying the factories? A. That's correct.").

PSG's payment delays arising from the inability to pay by letter of credit and shockingly imposed a total ban on all of PSG's orders.  In August of 2015, New Balance shut down PSG's access to New Balance's online ordering system, forbidding PSG from placing any further product orders.[73] This was another breach of the parties' agreement and literally prevented PSG from continuing to perform under its contract with New Balance.[74]

39.     After August 2015, New Balance, in January 2016, required PSG to make a significant payment of approximately US $200,000 in order to open the Q3 2016 payment window for PSG.[75]  PSG made the requested payment and then placed one order in Q3 2016.[76]  PSG made various requests to pay for that order by letter of credit, which New Balance *continually refused*.[77] Because PSG did not have the cash available to pay for the Q3 2016 order, New Balance refused to ship the products to PSG, and PSG never received them.[78]

40.     Aside from the Q3 2016 order, PSG was unable to place any orders after the Q4 2015 orders, meaning it did not receive any new product from New Balance for the latter part of

---

[73]  Exhibit 126-1, PSG00006819.

[74]  Hearing Transcript, 623:25 through 624: 9 ("A.  Because with a lack of product into the market, so how you can make money without product that you convert into money?  And again, if you cease daily sales, if you are not taking to a discount or a clearance place, you need to have new product to sell, which is coming your -- 80 percent of your sales are going to come for a fresh product, not old product.").

[75]  Exhibit 209, PSG00002774.

[76]  Exhibit 211, PSG00006754.

[77]  Hearing Transcript, 474:22 through 475:22 ("Q.  They did place orders for Q3 2016, but ultimately they asked for those orders to be paid by letter of credit. New Balance said no. So they never got those orders?  A.  All I know is they didn't pay for those. I don't know -- they didn't pay for those. We can get those if you want, but they didn't pay for those orders, in any event.  Q.  Well, I mean, you also know that they -- do you not remember that you testified this morning that they asked to pay by letter of credit and that you said no?  A.  I think I said no, yes. Sorry. You're right.  Q.  Okay. So just so we're clear, the last order that PSG was able to pay for by letter of credit -- you've said this already -- were orders that -- of product that they ordered in January/February of 2015?  A.  Yeah.  Q. Everything subsequent to that, for all the rest of 2015, all the rest of 2016, they had to pay by direct wire transfer or else they wouldn't get product?  A.  Yes.").

[78]  *Id.*

2015 and all of 2016.[79]  PSG was purely a sportswear distribution company and it only made

money by purchasing and selling product.[80]  Unable to purchase new product, PSG was unable to

sell product and thereby did not earn any money on sales of New Balance products requiring it to

pay a distribution fee to New Balance.[81]  This placed a financial stranglehold on PSG's business

and prevented it from enjoying the fruits of its exclusive distributorship with New Balance.  It

simply became unable to operate its business without any further fresh New Balance products.

     41.     Desperate to purchase additional products and salvage the business, PSG also made

various payments requested by New Balance in good faith based upon New Balance's promises

that if PSG made the additional payments, then PSG would be permitted to purchase products

again and continue with the New Balance business.  However, at each juncture, New Balance

reneged on these promises.  For example, on August 5, 2015, PSG made over $500,000 in factory

payments for the Q3 2015 orders with the promise by New Balance that it would permit PSG to

place orders for Q1 2016.[82]  After it received PSG's payment, New Balance reneged on this

promise, denying PSG permission  to place Q1 2016 orders,  claiming that it was still in arrears on

other payments.[83]

---

    [79]  Hearing Transcript, 848:3-11 ("Q.  And did PSG receive any – aside from the Q3 order that PSG was allowed to place, did PSG receive any Q1, Q2, Q3, Q4 2016 orders?  A.  No, I don't believe they did. No.  Q.  So PSG received and was not able to sell any 2016 product?  A.  That's true.").

    [80]  Hearing Transcript, 623:25 through 624: 9 ("A.  Because with a lack of product into the market, so how you can make money without product that you convert into money?  And again, if you cease daily sales, if you are not taking to a discount or a clearance place, you need to have new product to sell, which is coming your -- 80 percent of your sales are going to come for a fresh product, not old product.").

    [81]  Hearing Transcript, 849:3-6 ("Q.  And when a distributor can't buy product and can't sell product, it can't make money.  A.  I agree.").

    [82]  Exhibit 105-1, NB_PSG0001302; Exhibit 101, NB_PSG0001963; Exhibit 106, NB_PSG0002036.

    [83]  Exhibit 106, NB_PSG0002036.

42.     On August 12, 2015, PSG made additional $30,000 in factory payments, and on October 29, 2015, PSG made six factory payments totaling over $96,000 with the understanding based on promises by New Balance that these payments would allow PSG to place Q2 2016 orders.[84]  Once it received the payments, however, New Balance refused to accept the Q2 2016 orders.[85]  Similarly, in January 2016, PSG made over $34,000 in factory payments and over $162,000 in distribution fee payments covering the period from January through July 2015 with the understanding that New Balance would permit PSG to place Q3 2016 orders.[86]  As explained, after this payment, New Balance allowed PSG to place Q3 2016 orders, but then refused to allows PSG to pay for these orders by letters of credit, instead demanding payment in full by cash.[87]  When PSG was unable to pay upfront by cash, New Balance would not ship the Q3 orders to PSG.[88]  Ultimately, New Balance sold the Q3 orders that PSG had made to one of its other distributors.[89]

---

[84]  Exhibit 205, PSG00006772; Exhibit 201, NB_PSG0001989.

[85]  Exhibit 205, PSG00006772.

[86]  Exhibit. 209, PSG00002774, Exhibit 211, PSG00006754.

[87]  Hearing Transcript, 474:22 through 475:22 ("Q.  They did place orders for Q3 2016, but ultimately they asked for those orders to be paid by letter of credit. New Balance said no. So they never got those orders?  A.  All I know is they didn't pay for those. I don't know -- they didn't pay for those. We can get those if you want, but they didn't pay for those orders, in any event.  Q.  Well, I mean, you also know that they -- do you not remember that you testified this morning that they asked to pay by letter of credit and that you said no?  A.  I think I said no, yes. Sorry. You're right.  Q.  Okay. So just so we're clear, the last order that PSG was able to pay for by letter of credit -- you've said this already -- were orders that -- of product that they ordered in January/February of 2015?  A.  Yeah.  Q. Everything subsequent to that, for all the rest of 2015, all the rest of 2016, they had to pay by direct wire transfer or else they wouldn't get product?  A.  Yes.").

[88]  Exhibit 156, NB_PSG0000515.

[89]  Exhibit 155, NB_PSG0000186.

## B. *Negotiation of the New Distribution Agreement*

43.    Beginning in 2013, Mr. Cullen approached Mr. Ribadeneira about a new structure for New Balance distribution in Peru and Ecuador.[90]  Through this structure, New Balance wanted its distributor in Peru to integrate wholesale and retail through one Marathon Group entity so as to allow New Balance to obtain better product placement in the Marathon Group retail stores and other advantages over other sports shoe and apparel manufacturers—what New Balance's John Cullen called an "unfair advantage."[91]  New Balance was seeking to grow its relationship with Respondents through this change, expanding it to retain distribution, not just wholesale distribution.

44.    In November 2014, New Balance first made an offer to PSG to enter into a new and reformed Distribution Agreement for their business in Peru (and Ecuador) that would incorporate this new wholesale/retail structure (the "**New Distribution Agreement**").[92]  Per New Balance's requirements for the New Distribution Agreement, Respondents would be required to enter into the New Distribution Agreement  through an entity that could handle both wholesale distribution and retail sales.[93]  New Balance was seeking an investment into the growth of the parties'

---

[90]    Exhibit 93, PSG00007483 ("NB will extend our current contract through 2016 with a 10% increase in sales for Ecuador and a 20% increase in sales for Peru. . . .  NB will require PSG/Dide to invest $300k into SIS space at marathon with at least 50% being invested in 2015 and 50% in 2016."); Exhibit 87, PSG00006490 ("It was good to hear of your plans to restructure things in Peru/Ecuador . . . I think it makes a lot of sense for the business.  Over the next few weeks, I will take a look at your contract and see what we need to do to address your new structure in our contract.  As discussed, that will likely mean moving back to having one contract for both countries and converting it to a "FOB" based contract.").

[91]    *See* Exhibit 90, PSG00006485 ("Thank you John for your support.  We are moving to give NB that 'unfair advantage' you describe as your goal with Marathon first in Ecuador and then in Peru."); Ex. 113, NB_PSG0003365 ("As I told you on Thursday Carlos Miguel Galardi will be managing NB out of Lima for Peru and Ecuador, he will do so integrated to the two retail organizations in Peru and Ecuador.  The two retail organizations will handle retail and wholesale, this will continue to serve third party retail accounts and give NB the unfair advantage that you want in both countries.").

[92]    *See* Exhibit 93, PSG00007483.

[93]    *See* Hearing Transcript, 643: 5-11 ("I was talking with him about this since December.  We agreed to reduce the minimums.  That way we're more aligned to what is happening in the marketplace.  And to change it to Superdeporte, which was the integrated entity with wholesale and retail, which was something that he request.").  *See also* Exhibit 113, NB_PSG0003365 (". . . he will do so integrated to the two retail organizations in Peru and Ecuador.

27

relationship, asking for Respondents to expand not only into retail distribution but to build out mini shop-in-shop New Balance stores in the Marathon retail stores.[94]

45.     Because PSG was not set up legally or commercially to handle retail sales,[95] the managers of PSG and its parent companies determined that they had to establish a new, separate corporate entity that could handle both wholesale distribution and retail sales to meet New Balance's requirements for the New Distribution Agreement.[96]  They then embarked on the tasks and very substantial investments related to establishing Superdeporte Plus S.A.C., a Peruvian entity, to meet New Balance's requirements for the New Distribution Agreement.[97]

---

The two retail organizations will handle retail and wholesale, this will continue to serve third party retail accounts and give NB the unfair advantage that you want in both countries.").

[94]  Exhibit 93, PSG00007483; Hearing Transcript, 685:3-7 ("A.  To have unfair advantage, to have New Balance integrated with a wholesaler/retailer because that will benefit the brand, having better space, better location, better brand image. Yes.").

[95]    Hearing Transcript, 521:14 through 522:4 ("THE ARBITRATOR: I'm trying to understand your perception as to what the deal was under the 2013 agreement. PSG was an importer. It was a distributor.  THE WITNESS: Yes.  THE ARBITRATOR: It was a customer of the manufacturer.  THE WITNESS: Yes.  THE ARBITRATOR: Now, could it open its own retail stores and sell directly to customers?· Or was it limited, in your experience, to simply selling to the retail store? THE WITNESS:· I think it was limited to selling to the retail store."); Hearing Transcript, 868: 12-25; 869: 2-16 ("Q. So there's been a lot of discussion about PSG as a wholesale company in Peru and how it was purely a wholesale company and couldn't function at the retail level. Can you explain a little bit about why PSG couldn't function at the retail level?  A.  PSG does not have the expertise, the knowledge, the stores, the locations, the handling the business of retail.  Q.  PSG was purely a --  A.  Purely a wholesale --  Q.  -- distribution company?  A. -- wholesale company. An importer and wholesale company.  Q.  And you talked about the infrastructure, stores and all that. Can you describe a little bit more about the infrastructure required for a retail company?  A. First, you have to be key locations, and you have to have more than four locations. In that case, Marathon has at that point 20 locations, very good locations. You have to have the employees, the working force, to handle those big stores. Because our -- those are not small stores. Those are stores are about 700, 600 meters, square meters. So it needs the operation know-how of how to handle these chain of stores. So they do have in place all of that.").

[96]  Hearing Transcript, 917:17 through 918:5 ("A.  Mr. Cullen proposed a way, a model of doing business, and for doing that -- for sweeten [phonetic] that model, it was needed to create Superdeporte . . . We follow his request and we implement it. That's why we created Superdeporte.").

[97]  Hearing Transcript, 643: 5-11 ("A.  I was talking with him about this since December. We agreed to reduce the minimums. That way we're more aligned to what is happening in the marketplace. And to change it to Superdeporte, which was the integrated entity with wholesale and retail, which was something that he request."); *see also* Exhibit 52-1, PSG00006577.

46. For this integrated new business structure, New Balance required "shop-in-shop locations" and its distributor, Superdeporte, to sell New Balance products at the "retail" level.[98] This business structure would allow New Balance to receive greater floor space for its products within Marathon Sports stores in Peru (and Ecuador), more shop-in-shop locations at Marathon Sports stores in Peru (and Ecuador), and better product placement where its products within those stores.[99] New Balance explained to PSG that its distributor in Chile, Sparta, utilized this integrated structure, and showcased Sparta's integrated structure as a model.[100] New Balance maintained that this structure was essential for any future distribution relationship between the Parties, and it called it an "unfair advantage".[101]

---

[98] *See* Exhibit 93, PSG00007483 ("NB will extend our current contract through 2016 with a 10% increase in sales for Ecuador and a 20% increase in sales for Peru. . . . NB will require PSG/Dide to invest $300k into SIS space at marathon with at least 50% being invested in 2015 and 50% in 2016."); Exhibit 113, NB_PSG0003365 ("This is a follow up to our conversation regarding your new contact. As I told you on Thursday Carlos Miguel Gaglardi will be managing NB out of Lima for Peru and Ecuador, he will do so integrated to the two retail organizations In Peru and Ecuador. The two retail organizations will handle retail and wholesale, this will continue to serve third party retail accounts and give NB the unfair advantage that you want in both countries. Carlos Miguel is leaving on vacation for the next weeks please write to him and copy me and Renan regarding all pending issues I will follow up during his absence. The pending issues are to return signed contract and payments plan for pending royalties and fees.").

[99] Exhibit 93, PSG00007483; Hearing Transcript, 685:3-7 ("A. To have unfair advantage, to have New Balance integrated with a wholesaler/retailer because that will benefit the brand, having better space, better location, better brand image. Yes.").

[100] Exhibit 88, NB_PSG0003103.

[101] Hearing Transcript, 685:3-7 ("A. To have unfair advantage, to have New Balance integrated with a wholesaler/retailer because that will benefit the brand, having better space, better location, better brand image. Yes."); Hearing Transcript, 966:4-24 ('But could you in your own words describe why Superdeporte Plus was created in Peru to handle New Balance's account, and how it was created? A. Okay. Early on, from the beginning when John took over after Ed Haddad -- no, it was actually after Abe Cunningham -- he expressed his desire to have the Peruvian market run similar to the Chilean market where Sparta, who is the largest sporting goods retailer, as Marathon is the largest sporting goods retailer in Peru, was the importer and distributor and had dual margin. He said that from the beginning. Q. What do you mean by "dual margin"? A. Dual margin, it means that they import at distributor price. They have the chance to sell at wholesale and then make the retail margin. So it's dual -- it's double margin that the retailer makes. That's that unfair advantage that he mentioned many times."); Deposition Transcript of Carlos Miguel Gagliardi, 17:20-24 ("The company was created by suggestion of John Cullen and New Balance to have an unfair advantage being included in a company that operates retail and wholesale. So that's why we create Superdeporte Plus Peru."); Hearing Transcript, 428:6 through 429:24 ("Q. Okay. So you raised that concept or that idea of basically having more benefit at the retail level, Marathon retail level, as early as 2014 and perhaps earlier? A. Yes. Q. All right. And that's something that at some point you described as an unfair advantage, you testified on direct wasn't really unfair, but those were your words that you communicated to our client? A. I'm not sure where that originated, but yes, we used the term "unfair advantage" incorrectly. . . . Q. Yeah.· Mr. Ribadeneira and the folks associated

47.     In late 2014, PSG and New Balance began negotiating the New Distribution Agreement.[102]  By September of 2015, the Parties had finalized and agreed to all of the terms of the New Distribution Agreement, and New Balance sent PSG the "final draft of our contract restructure".[103]  New Balance admits and its contemporaneous conduct so confirms that by this time the Parties had agreed on all of the material terms of the New Distribution Agreement.[104]  By September 2015, New Balance also admits that it had a present intent to be bound by the New Distribution Agreement and that it had begun performing under that agreement when it issued purchase based invoices, which was a key change to the structure of the relationship under the New Distribution Agreement.[105]

---

with Marathon and PSG told you that they would accommodate that request that you were making? A. I think we were both trying to drive business in the region. So, yes."); Hearing Transcript, 684:16 through 685:16 ("Q. Okay. And so when New Balance -- it's your understanding that New Balance required Mr. Ribadeneira to create Superdeporte Plus Peru? A. That's what I heard, yes. Q. Okay. So they required Mr. Ribadeneira to create a very profitable company. To have a -- to have -- Q. Is that correct? A. To have unfair advantage, to have New Balance integrated with a wholesaler/retailer because that will benefit the brand, having better space, better location, better brand image. Yes. But it was doing business with all of New Balance's competitors, too, wasn't it? A. Yes, but it's completely different when the brand is integrated with a retailer. Because if I buy from the other brands, I will have 40 percent profit, initial gross profit. Instead, if I'm working with a brand that is integrated in my entity, I will have initial profit of 65 percent. So you will give more space, more time, more advertising to a brand that is giving you an initial profit of 40 percent or one who is giving you 65 percent.").

[102]     See Exhibit 93, PSG00007483.

[103]     See Exhibit 5, NB_PSG000001 ("Here is the final draft of our contract restructure."); Hearing Transcript, 524: 11 through 525:2 ("You sent this agreement, right, on the 15th of September 2015 to Mr. Daniel Michaels: 'Here is the final draft of our contract restructure. Exhibit B has been revised to reflect the full amount of inventory.' You testified about that yesterday. A. Yes. Q. "Please sign two originals and return both to me for countersignature." When you did that, you understood that the parties had agreed to all of the terms of the agreement, which is why you were requesting that PSG sign the agreement and return it to you? A. Yes.").

[104]     See e.g. Hearing Transcript, 524:11 through 525: 2 ("You sent this agreement, right, on the 15th of September 2015 to Mr. Daniel Michaels: 'Here is the final draft of our contract restructure. Exhibit B has been revised to reflect the full amount of inventory.' You testified about that yesterday. A. Yes. Q. 'Please sign two originals and return both to me for countersignature.' When you did that, you understood that the parties had agreed to all of the terms of the agreement, which is why you were requesting that PSG sign the agreement and return it to you? A. Yes."); see also Hearing Transcript, 1173:19-23 ("In September of 2015, after months of negotiations, months and months, which started in 2014, you have a final draft sent by Mr. Cullen saying, 'Here it is. It's the final one. Sign it.'").

[105]     See e.g. Hearing Transcript, 1215:22 through 1216:3 (**"Yes, there was a present intention on the part of New Balance.  Mr. Cullen testified to that. Mr. Cullen said when he sent it, he did think – he was being honest -- he thought the terms were all agreed upon."**) (emphasis added); Hearing Transcript, 564:13 through 565:2 ("A. We were billing under the terms of a purchase-based agreement. In other words, we were issuing invoices under that

48.     PSG also indicated its intent to be bound by the terms of the New Distribution Agreement through its efforts to create the new integrated wholesale and retail structure that New Balance required, and to establish a new company, Superdeporte, in order to accomplish this structure.[106]

49.     In October 2015, Mr. Carlos Miguel Gagliardi ("Mr. Gagliardi") took over as the relationship manager for PSG and Superdeporte with New Balance.[107] When Mr. Gagliardi reviewed the New Distribution Agreement to sign it, he determined that some of the terms that had already been agreed to by the Parties needed to be amended.[108] The Parties negotiated a few amendments to their agreed New Distribution Agreement over the coming months.[109] One of the key amendments that the Parties negotiated was that the New Distribution Agreement would be entered into between New Balance and PSG, as Superdeporte was still a company being created

---

assumption, that that contract that we sent out in September would be signed. At this point it's clear it's not going to get signed. Q. Because New Balance isn't willing to do it? A. No, because PSG is not paying their bills. Q. And, therefore, New Balance is not willing to sign the contract? A. We're not willing to sign the contract until accounts are current."); *see also* Hearing Transcript, 1216:10-14 ("After they did all of the accounting to change from a sale-based and purchase-based contract, they had to figure out what was in the pipeline and how to charge for that."); Exhibit 26, NB_PSG0003066; Deposition Transcript of Peter Cragan, 80:12 through 83:14.

[106] Exhibit 142, PSG0001399, Exhibit 90, PSG00006485; Exhibit 118, PSG00001672; Exhibit 132, PSG00005332 ("the contract hasn't been signed due to the changes we are making to make the company more strong and we want to do it with properly [sic] with the new company."); Hearing Transcript, 1176:13-20 (Also, what Superdeporte – what Respondents did also shows their present intent to be bound. They formed a company. They changed everything. They got – they had the assets sold from PSG to Superdeporte. They did everything they're supposed to do to perform under the new agreement.").

[107] See Exhibit 113, NB_PSG0003365 ("This is a follow up to our conversation regarding your new contact. As I told you on Thursday Carlos Miguel Gaglardi will be managing NB out of Lima for Peru and Ecuador, he will do so integrated to the two retail organizations In Peru and Ecuador. The two retail organizations will handle retail and wholesale, this will continue to serve third party retail accounts and give NB the unfair advantage that you want in both countries. Carlos Miguel is leaving on vacation for the next weeks please write to him and copy me and Renan regarding all pending issues I will follow up during his absence. The pending issues are to return signed contract and payments plan for pending royalties and fees.").

[108] Exhibit 142, PSG0001399.

[109] Exhibit 142, PSG0001399, Ex. 177, NB_PSG0000177.

to meet New Balance's requirements for the New Distribution Agreement.[110]  Once Superdeporte was ready, the parties agreed that Superdeporte would be substituted for PSG as New Balance's distributor in Peru and the counterparty to New Balance under the New Distribution Agreement.[111]

50.     Because the Parties had already agreed upon the terms of their New Distribution Agreement and New Balance was already performing under the New Distribution Agreement, the owners of PSG and Superdeporte allowed PSG to perform under the New Distribution Agreement pending the final creation of Superdeporte.  For example, New Balance's purchase based invoices, issued under the terms of the New Distribution Agreement, were addressed to PSG, because Superdeporte was still in the process of being formalized and ready to function at the wholesale and retail level in Peru.[112]

51.     As a further amendment to what the parties agreed in September of 2015, the Parties also negotiated and agreed to reduce the minimum sales requirements under the New Distribution Agreement for the 2016 calendar year.[113]  In exchange for agreeing to reduce the minimums, New Balance and PSG agreed that PSG/Superdeporte would create 10 additional shop-in-shop locations.[114]  The Parties concluded their amendments to the New Distribution Agreement in

---

[110]  Exhibit 142, PSG0001399 ("Will need to be changed to Super Deporte [sic] Peru later.  Does this mean that you do not want this changed now??  When does "later" mean?  The paper work [sic] to formalize the new company is not ready yet, should be ready by the end of Q1 or Q2 at the latest.  We can sign the contract with PSG and make the change when is ready SD. Ok. fine.").

[111]  Exhibit 142, PSG0001399; Hearing Transcript 537:2-16 ("Q.  And then he says, 'We can sign the contract with PSG and made the change' – I think he meant 'make the change.'  A.  Yeah.  Q.  – 'when is ready Superdeporte.'  And you say, "Okay. Fine."  A. Yes.  Q.  Right?  So you were in agreement that the contract would be signed with Peruvian Sporting Goods, but that Superdeporte Plus, as soon as it was ready, would be substituted in as the party -- as the distributor in the agreement. Right?  A.  Yes.").

[112]  Exhibit 26, NB_PSG0003066.

[113]  Exhibit 147, NB_PSG0000177.

[114]  *Id.*

January of 2016.[115]  Again, New Balance was seeking to expand the parties' relationship and was

asking Respondents to make further investments into growing that relationship into the future.

52.     In the new agreement, Respondents accepted a modification to their payment terms

that required wire/cash payments and disallowed an automatic right to purchase products from

New Balance via letters of credit; payment by letters of credit were only allowed if New Balance

authorized it.[116] Respondents were fine with this change, because—unlike PSG who did not have

the ability to finance purchases with lines of credit from banks—Superdeporte had access to lines

of credit through the existing banking relationships and large volume of business done by the

Marathon Group retail stores.[117]  Respondents were thus prepared via Superdeporte to pay for

products via wire transfers that it could obtain with its lines of credit.[118]  New Balance ultimately

blocked Superdeporte from doing so, refusing to provide it with the authorization to sell New

Balance products and to provide the signed new contract listing Superdeporte as New Balance's

distributor in Peru.[119]

53.     In early May 2016, PSG informed New Balance that the Marathon Group had

finalized all of the legal, logistical and other investments needed to create Superdeporte, that

---

[115] *Id.*

[116] *See* Exhibit 5-1, NB_PSG0000002 ("Payment of all amounts due for Products and all payment documentation for the purchase of the Products shall be effected by Distributor through cash in advance due upon placement of any order, unless otherwise agreed to by COMPANY, its Affiliate or its Authorized Supplier, as the case may be . . . If COMPANY, its Affiliate or Authorized Supplier allows Distributor to deliver the letter of credit or cash after the placement of the order and Distributor fails to deliver the same . . .").

[117] Hearing Transcript, 958:15-20 ("I was looking and trying – looking for work to moving to Superdeporte and being able to then get a line of credit to work the way New Balance was suggesting. It was not that it was impossible. It was impossible for PSG to do it.").

[118] *Id.*

[119] Exhibit 170, PSG00006711; Exhibit 92A, PSG00005162; Hearing transcript, 646: 24 through 647:8 ("A.  Because after -- and anytime after I do something to keep the business running, he didn't achieve what he promise. After that, doing an effort 100,000, 200,000, 150,000, give me a letter. Give me the contract.  He all the time tricked me. I was really upset with this. That is not the way business should be handled. That's -- there's no honor in that. So I was really upset.").

Superdeporte was ready to replace PSG and take on the New Distribution Agreement for New Balance's products in Peru and Ecuador and that the parties could now sign the New Distribution Agreement with Superdeporte as the counterparty to New Balance.[120] With Superdeporte ready, New Balance was obligated to promptly modify the New Distribution Agreement to add Superdeporte as their Peruvian distributor, as the Parties had agreed, and to execute the agreement and send the same for countersignature.[121] PSG also needed this written agreement to conduct business with its retailers in Peru (and Ecuador), some of whom were asking for proof that Superdeporte had a contract with New Balance.[122]

54. New Balance initially agreed to do what it had previously contractually promised by modifying the New Distribution Agreement to include Superdeporte.[123] New Balance also agreed that it would issue a letter permitting Superdeporte to sell existing New Balance inventory that it had acquired from PSG to Ripley, a Peruvian retailer (and allow Respondents to purchase new products for Q1 2017), if Superdeporte/PSG paid $150,000 in outstanding royalty payments that had been invoiced under the New Distribution Agreement.[124]

---

[120] Exhibit 155, NB_PSG0000186; Exhibit 154, PSG00006820.

[121] Ex. 142, PSG0001399; Hearing Transcript 537:10-16 ("Q. And then he says, 'We can sign the contract with PSG and made the change' – I think he meant "make the change. A. Yeah. Q. – 'when is ready Superdeporte.' And you say, 'Okay. Fine.' A. Yes. Q. Right? So you were in agreement that the contract would be signed with Peruvian Sporting Goods, but that Superdeporte Plus, as soon as it was ready, would be substituted in as the party -- as the distributor in the agreement. Right? A. Yes.").

[122] Ex. 160, PSG00006744.

[123] Ex. 169, PSG00006838 ("I have written to the legal team to ask them to change the name from the revised contract we negotiated last year and am waiting for a response."); Exhibit 92A, PSG00005162 ("I haven't received the revised contract with Superdeporte Plus Perú, you told me that should be fast.").

[124] Hearing transcript, 638: 3-7 ("He [Cullen] said, 'Okay. You will receive the letter' -- a letter that I need to sell products to Ripley – 'and the contract.' And I never received that. Instead of that, I receive the [non-renewal] letter."); Hearing Transcript, 639: 3-11 ("A. To John Cullen. He said, 'Okay. Pay 150,000, and we will be moving forward. We will send you the letter.' I need a letter.· Since we were operating already with Superdeporte, the new structure of Marathon integrating wholesale and retail, we need a letter to Ripley, which is a client, to show them that we are the ones who can sell the product."); Hearing Transcript, 645: 14-22 ("And we agreed with that one to pay 150,000 to move forward with this and to receive the contract and the letter to sell product that we have in stock. Q.

55.     On June 9, 2016 Respondents made the $150,000 payment under the New Distribution Agreement.[125]  Again this conduct demonstrates not only that the parties had a present intent to be bound by the terms of the New Distribution Agreement, but they in fact were performing under that agreement.

56.     On June 14, 2016, after receiving the payment it requested from Respondents, New Balance reneged on its promise, saying that it would not issue the Ripley letter or allow Respondents to make new orders.[126]  New Balance also reiterated that they would not permit Respondents to pay for the Q3 2016 orders by letter of credit.[127]  Respondents were understandably frustrated and upset with New Balance because it reneged on its promise to provide the letter allowing Superdeporte to sell goods to Ripley and to substitute Superdeporte into the New Distribution Agreement.[128]

57.     On June 23, 2016, ignoring that it had already agreed to all of the terms of the New Distribution Agreement and that the New Distribution Agreement was already an operative contract under which the parties had been performing for months, New Balance informed Respondents that the contract would "revert back" to the terms of the Distribution Agreement.[129] Shortly thereafter, on the same day, New Balance notified PSG and Superdeporte in writing that

---

And did you get the contract or the letter?  A. No, I didn't get anything.  Q.  Did you make the $150,000 payment?  A. Yes, we did.").

[125]   Exhibit 169, PSG00006838.  Exhibit 170, PSG00006711.

[126]   Exhibit 170, PSG00006711.

[127]   Exhibit 170, PSG00006711.

[128]   Hearing transcript, 646: 24 through 647:8 ("A.  Because after -- and anytime after I do something to keep the business running, he didn't achieve what he promise.  After that, doing an effort 100,000, 200,000, 150,000, give me a letter. Give me the contract.  He all the time tricked me. I was really upset with this. That is not the way business should be handled. That's -- there's no honor in that. So I was really upset.").

[129]   Exhibit 92A, PSG00005162 ("Our legal team will not issue a new contract until all payments are current. As such, the new 'purchase based' contract is not valid and we are 'reverting back' to the original contract terms."); Exhibit 160, PSG00006744; Exhibit 166, NB_PSG0000207.

it was formally not renewing the 2013 Distribution Agreement with PSG effective December 31, 2016.[130]  New Balance, however, never sent a notice of termination or non-renewal for the New Distribution Agreement, and that agreement remained in effect.[131]

58.     Respondents were frustrated and angry with New Balance because it reneged on its various promises to Respondents.[132] This radical "about face" by New Balance is what led Mr. Gagliardi to send the internal email in which he referred to New Balance as the "gringos."[133]  It was not, as New Balance now argues, evidence of Respondents' unwillingness to pay New Balance amounts that it was claiming were owed.   To the contrary, the contemporaneous evidence demonstrates that Respondents had just made a significant payment of US $150,000 to New Balance and that Mr. Gagliardi was upset about New Balance reneging on yet another promise, this time taking the step to announce that it would "revert back" to the already discontinued earlier distribution agreement.[134]

59.     Respondents understood that the New Distribution Agreement was an enforceable agreement with New Balance and in furtherance of that agreement, Respondents had worked hard to try and comply with New Balance's requirements.   Among other things they made various

---

[130]    Exhibit 173, PSG00001946, Exhibit 92A, PSG00005162.

[131]    Hearing Transcript, 565:9-15 ("Q.  And we agree you never sent a separate notice of nonrenewal or termination letter for the new agreement?  A.  For the amended and restated agreement?  Is that what you mean?  Q. Yes, sir.  A.  No, we did not.").  In the May 29, 2020 hearing, Claimant questioned Respondents' damages expert regarding Exhibit 173, PSG00001947, the June 23, 2016 non-renewal letter from New Balance to PSG.  Claimant asked Mr. Dellepiane whether the June 23, 2016 non-renewal letter could have applied to the New Distribution Agreement as well as the 2013 Distribution Agreement because both agreements had an effective date of January 1, 2013.  These questions were not only improperly addressed to Mr. Dellepiane, as he is not a lawyer and these questions were beyond the scope of his report, but more importantly,  this assertion is contrary to New Balance's witness' testimony, including the testimony of Mr. Cullen.

[132]    Exhibit 171-1, PSG00006482.

[133]    Id. ("I think it's time to turn the table and for the gringo to stop having us grabbed by the balls, and do the opposite.").

[134]    Id.

payments to New Balance for invoices issued under the new agreement and established Superdeporte to carry on with the responsibilities under that agreement.[135] New Balance, immediately after receiving the promised payment from Respondents, repudiated the agreement and announced that the prior agreement would be the one in effect simultaneously stating that it would not renew that prior agreement beyond the end of 2016.[136]

60.    On July 8, 2016, New Balance informed PSG and Superdeporte, without any further explanation, that New Balance had decided to work with another distributor in Peru beginning in 2017.[137] New Balance began doing business in Peru through a new distributor, Deportes Sparta ("**Sparta**"), in the latter half of 2016 with an agreement that has an effective date of January 1, 2017 and in violation of its obligations to PSG and Superdeporte under the New Distribution Agreement, which remained in effect.[138]

61.    Unbeknownst to Respondents, New Balance had been negotiating with Sparta, as well as other distributors in Peru, for months.[139] Specifically, in January of 2016, the same month

---

[135]    Hearing Transcript, 564:13 through 565:2 ("A. We were billing under the terms of a purchase-based agreement. In other words, we were issuing invoices under that assumption, that that contract that we sent out in September would be signed. At this point it's clear it's not going to get signed. Q. Because New Balance isn't willing to do it? A. No, because PSG is not paying their bills. Q. And, therefore, New Balance is not willing to sign the contract? A. We're not willing to sign the contract until accounts are current."); *see also* Hearing Transcript, 1216:10-14 ("After they did all of the accounting to change from a sale-based and purchase-based contract, they had to figure out what was in the pipeline and how to charge for that."); Exhibit 26, NB_PSG0003066; Deposition Transcript of Peter Cragan, 80:12 through 83:14.

[136]    Exhibit 173, PSG00001946; Exhibit 173-1, PSG00001947.

[137]    Exhibit 176, NB_PSG0000217; Exhibit 256, NB_PSG0000751.

[138]    Exhibit 3, NB_PSG0003575; Hearing Transcript, 1179:12 through 1180:3 ("But then, once they basically had everything in place, with Sparta, there you see on June 15th, about eight days before they notified PSG that the agreement is not going to be renewed and before they notified PSG and Superdeporte that they're going to revert back to the old agreement, you have New Balance through Mr. Cullen telling Sparta, 'Hey, the Peru territory is available.' That's bad faith, your Honor. That's not only a breach of the exclusive rights given to our client -- our clients under the new distribution agreement, it's also a breach of the duty of good faith and fair dealing under Massachusetts law."); Hearing Transcript, 594:9-12 ("Q. Do you know whether they were talking to customers in 2016/ A. They were probably talking to some customers.").

[139]    Exhibit 237, NB_PSG0000327.

that New Balance negotiated the amendments to the New Distribution Agreement with Respondents, and once Superdeporte had already been created for purposes of acting as New Balance's distributor under the New Distribution Agreement, Mr. Cullen told Sparta that New Balance would "very likely make a change" of distributors for Peru in 2017 and that Sparta was its "first choice" to take on the Peru distribution.[140] New Balance continued these negotiations with Sparta throughout 2016 and on June 2, 2016, Sparta received internal approval to "move forward with distribution in Peru" with New Balance.[141] In June 2016, Sparta also asked New Balance to indemnify it from lawsuits from PSG/Superdeporte.[142]

62.     While New Balance refused to formally indemnify Sparta, on June 15, 2016, New Balance sent Sparta a letter informing them that the Peru territory was "available."[143] The territory was not then "available", as the New Distribution Agreement remained in effect.

63.     On June 21, 2016, New Balance tried to formalize a new distribution agreement with Sparta for Peru.[144] It also encouraged Sparta to interfere with Respondents' exclusivity in Peru, which was expressly provided in the New Distribution Agreement.[145] New Balance told Sparta the territory was "available", tried to formalize the terms of its agreement with Sparta and told it to go meet with potential customers in Peru before it notified Respondents, on June 23, 2016,

---

[140]   *Id.* (Mr. Cullen goes on to say "I know this is a big decision, but I think it would be the right one for NB and Sparta.").

[141]   Exhibit 244, NB_PSG0000543.

[142]   Exhibit 244, NB_PSG0000543 ("We are particularly interested in understanding, and eventually preparing un [sic] for, any contingencies that may arise with the incumbents.").

[143]   Exhibit 245-1, NB_PSG0000676.

[144]   Exhibit 246, NB_PSG0000677.

[145]   Exhibit 246, NB_PSG0000677.

that it was "reverting back" to the earlier distribution agreement and that it would not renew that legacy agreement beyond 2016.[146]

64.    New Balance also incentivized Sparta to agree to the contract with extremely favorable contractual terms including no Peru-specific sales numbers and no minimum guarantees.[147]  It also permitted Sparta to buy via letters of credit in Peru.[148]

### C.    Mr. Ribadeneira Initiates the Peru Action

65.    In January 2017, believing that PSG and/or Superdeporte still had an effective contract with New Balance under the terms of the New Distribution Agreement, Mr. Ribadeneira, on behalf of PSG and Superdeporte, initiated a lawsuit in Peru against New Balance.[149]  In it he alleged that New Balance failed to honor its obligations under the New Distribution Agreement and that it failed to fulfill its pre-contractual obligations with respect to the negotiation and execution of the New Distribution Agreement.[150]

66.    On February 1, 2017, Mr. Ribadeneira, on behalf of PSG and Superdeporte, filed a request with the Peruvian Court for interim measures, asking that the court order New Balance to abstain from the distribution of its products in Peru with any distributor other than PSG.[151]  He did so genuinely believing that the New Distribution Agreement remained a valid, effective agreement

---

[146]  Exhibit 245-1, NB_PSG0000676; Exhibit 173, PSG00001946; Ex. 173-1, PSG00001947.

[147]  Exhibit 253, NB_PSG0000740.

[148]  Exhibit 2, NB_PSG0003584.

[149]  Exhibit 192, Peru Demand; Hearing Transcript 975:7-18 (Q.  Okay. Again, without telling us what you discussed with your lawyers, why did you ask the court to do that?  A.  Because I felt wronged. It was the way that it was -- that I guess I cannot -- that came from the conversations that we could best achieve that. That's -- that we could achieve our objective by doing that.  Q.  Okay. And the objective was what?  A.  The objective was to have our contract respected and to try to establish a conversation about recuperating the contract.").

[150]  Exhibit 192, Peru Demand.

[151]  Exhibit 191, Request for Interim Measures.

and that New Balance was breaching it by conducting business with Sparta in the Peruvian territory.[152]

67.     In December 2017, the Peruvian court overseeing the Peru Action granted the request for interim measures.[153]  The court ordered a halt on the distribution of New Balance products in Peru during the pendency of the proceeding.[154]  On July 31, 2018, the Peruvian Court dissolved its interim measures order, formally permitting the distribution of New Balance products in Peru.[155]

68.     In March 2019, this Tribunal granted New Balance's motion to compel arbitration of the claims pending in the Peru Action.[156]  In May 2019, the parties amended their claims and Respondents incorporated the claims pending in the Peru Action into this proceeding.[157]  In May 2019, Mr. Ribadeneira assigned the rights in the Peru Action back to PSG and Superdeporte.[158]  In March 2020, PSG and Superdeporte voluntarily dismissed the Peru Action.[159]

69.     The managers of PSG and Superdeporte chose to initiate the Peru Action because they believed that New Balance breached the Distribution Agreement and the New Distribution

---

[152]   Exhibit 192, Peru Demand; Hearing Transcript 975:7-18 (Q.  Okay.  Again, without telling us what you discussed with your lawyers, why did you ask the court to do that?  A.  Because I felt wronged.  It was the way that it was -- that I guess I cannot -- that came from the conversations that we could best achieve that.  That's -- that we could achieve our objective by doing that.  Q.  Okay.  And the objective was what?  A.  The objective was to have our contract respected and to try to establish a conversation about recuperating the contract.").

[153]   Exhibit 193, Grant of Interim Measures.

[154]   *Id.*

[155]   Exhibit 194, Peru Court Order Reversal of Interim Measures.

[156]   *See* March 18, 2019 Memorandum and Order on Motion to Compel Arbitration.

[157]   Amendment to Respondents' Counterclaims, May 3, 2019.  Note Respondents subsequently amended their counterclaims on December 19, 2019.

[158]   Exhibit 85, assignment of rights from Mr. Ribadeneira to PSG and Superdeporte.

[159]   Exhibit 192A, Documents seeking dismissal of the Peru Action.

Agreement.[160] The companies sought legal advice and chose to pursue legal action against New Balance in Peru for breach of the New Distribution Agreement.[161] Based upon the terms of the Distribution Agreement as well as the New Distribution Agreement, the companies were legally entitled to seek interim relief in the form of an injunction in Peru.[162]

## III. RESPONDENTS' AFFIRMATIVE CLAIMS PREVAIL

70. Respondents advance three affirmative claims in this proceeding: (1) New Balance breached the Distribution Agreement and its implied covenant of good faith and fair dealing; (2) New Balance breached the New Distribution Agreement; and (3) alternatively, New Balance breached its precontractual obligations to PSG and Superdeporte during the negotiation of the New Distribution Agreement.

### A. New Balance Breached the Distribution Agreement and its Implied Covenant of Good Faith and Fair Dealing

71. New Balance violated the terms of the Distribution Agreement and its implied covenant of good faith and fair dealing in various ways, including by: (1) not allowing PSG to place orders via letter of credit when the contract allowed for payments by that method;[163] (2) beginning in January/February of 2015 with Q3 2015 orders, not allowing PSG to place orders if not all product payments were up to date;[164] (3) beginning in August 2015, completely shutting

---

[160] Hearing Transcript, 974:2-24 ("THE ARBITRATOR: Without telling me what your conversation with one or more lawyers was, before commencing the action in Peru, did you seek legal counsel as to whether you actually had an enforceable contract? THE WITNESS: Yes. THE ARBITRATOR: All right. THE WITNESS: We looked, yeah. THE ARBITRATOR: Okay. Q. When you filed the action in Peru, again, without giving advice -- without giving any advice you got from your lawyers, if you can answer this question without doing that, why did you file the action in Peru? A. Let me think about this before I -- I felt wronged. I felt, and I told the managers and the managers concurred, that we had an active contract that we needed to establish that it was in our -- in my view, and in their view, active. According to what we feel, it was -- we had a contract, and we needed to have that respected.").

[161] *Id.*

[162] Exhibit 1, PSG00005497 at 5521, Exhibit 5-1, NB_PSG0000002 at NB_PSG0000027.

[163] *See* Exhibit 220, PSG00007238.

[164] Exhibit 225, NB_PSG0001555.

down PSG's access to NB's online ordering system and preventing PSG from making product purchases on the basis that PSG was in arrears mainly on distribution fee payments;[165] and (4) making false promises, including of reopening product purchases, to seek payment of certain amounts owed to it under the agreement.[166]

72.     To state a claim for breach of contract under Massachusetts law, a party must allege, at a minimum, that there was a valid contract, that the other party breached its duties under its contractual agreement, and that the breach caused the plaintiff damage.[167]  The implied covenant provides "that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract...."[168]  As the documents as well as the Hearing testimony highlight, New Balance breached both the Distribution Agreement and its implied covenant of good faith and fair dealing.

       i.     *New Balance Denied PSG the Contractually Bargained for Ability to Pay for Product by Letters of Credit*

73.     Letters of credit have been widely used in international transactions, in the sportswear distribution business, as well as in the parties' many year relationship.[169]  Payment for New Balance products by letter of credit was explicitly permitted under the 2013 Distribution Agreement.[170]  However, New Balance decided to stop accepting payment by letter of credit

---

[165]  Exhibit 126-1, PSG00006819.

[166]  Exhibit 245-1, NB_PSG0000676.

[167]  *Davis v. Dawson*, 15 F.Supp.2d 64, 128 (D.Mass.1998).

[168]  *Anthony's Pier Four, Inc. v. HBC Assocs.,* 411 Mass. 451, 471–472, 583 N.E.2d 806 (1991), quoting from *Druker v. Roland Wm. Jutras Assocs.,* 370 Mass. 383, 385, 348 N.E.2d 763 (1976). *See Uproar Co. v. National Bdcst. Co.,* 81 F.2d 373, 377 (1st Cir.), cert. denied, 298 U.S. 670, 56 S.Ct. 835, 80 L.Ed. 1393 (1936).

[169]  Letters of credit have been recognized as "of particular importance in international transactions, in which sophisticated investors knowingly undertake such risks . . . in return for the benefits to be reaped from international trade," *Enterprise Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 474 (5th Cir.1985).

[170]  Exhibit 1, PSG00005497.

following Q2 2015 orders so that they could further their own economic ends by stepping in the place of the factories in order to avoid the "additional costs and complexities" associated with letters of credit, even though to New Balance, a letter of credit is the equivalent of actually receiving cash.[171]

74.    The last orders that New Balance initially allowed PSG to pay by letter of credit in the ordinary course of business were for Q2 2015 in January/February of 2015.[172]  In August 2015, many months after the orders had been placed and following PSG's pleas to pay for Q3 2015 orders via letter of credit, New Balance allowed PSG to pay for the stale Q3 orders by letter of credit.[173]  That was the last set of orders that PSG was allowed to pay for by letter of credit.[174]

75.    As various witnesses explained during the Hearing, New Balance's improper denial of letters of credit in violation of the Distribution Agreement, coupled with external market factors beyond PSG's control, put PSG behind on its payments to New Balance in 2015.[175]  Furthermore, as Respondents' witnesses explained and the documents in the record highlight, PSG's business

---

[171] Exhibit 227, NB_PSG0001572; Hearing Transcript, 735:15-20 ("Q. Because the factories could – until the end of 2015, the factories had the capability of accepting letters of credit? A. That's correct. Q. And it's just as good as cash? A. Yes. Yes.").

[172] Exhibit 225, NB_PSG0001555.

[173] Exhibit 101, NB_PSG0001963.

[174]  Hearing Transcript, 474:22 through 475:22 ("Q.  They did place orders for Q3 2016, but ultimately they asked for those orders to be paid by letter of credit. New Balance said no. So they never got those orders?  A. All I know is they didn't pay for those. I don't know -- they didn't pay for those. We can get those if you want, but they didn't pay for those orders, in any event.  Q.  Well, I mean, you also know that they -- do you not remember that you testified this morning that they asked to pay by letter of credit and that you said no?  A.  I think I said no, yes. Sorry. You're right.   Q.  Okay. So just so we're clear, the last order that PSG was able to pay for by letter of credit -- you've said this already -- were orders that -- of product that they ordered in January/February of 2015?  A.  Yeah. Q.  Everything subsequent to that, for all the rest of 2015, all the rest of 2016, they had to pay by direct wire transfer or else they wouldn't get product?  A.  Yes.").

[175]  See e.g. Hearing Transcript, 606:2 through 606:13 ("Q.  So thank you for explaining both of those things. Did you have an understanding, when you started working at PSG in October 2015, as to whether New Balance would accept product purchase orders by letter of credit?  A.  When I get into the business, I understand that, no, we will not be allowed to do it, which it has no sense for me. This is a regular way of doing business, because the letter of credit is much -- helps you to match the cycle of the business.").

model and its cash flow cycle relied upon letters of credit.[176] Letters of credit allowed PSG to finance the purchase of product for 180 days (the time it took to ship the product, get it into stores, and begin receiving revenue back from customers for the product).[177] PSG explained to New Balance the importance of letters of credit to their cash flow cycle on various occasions, and New Balance witnesses confirmed that they understood that the move away from letters of credit would have a significant, negative impact on PSG.[178]

76.     New Balance has incorrectly argued that its new payment policy and decision to reject letters of credit should supersede the rights granted to PSG under the Distribution Agreement.

---

[176]   Hearing Transcript 605:11-25 ("And also it affects the whole cycle of the -- of them, the cash flow of the business, which is quite long, if you think about it. You start selling something now, and you will start collecting money if you sell to third parties. The normal way to work is to give them 90 or 120 days to clear the accounts. So whatever you are selling today, you will start collecting that in 120 days, because that's the usual way to work. Q. So I'm going to ask you about the cash cycle of PSG's business with respect to New Balance in just a second in a little more detail. A. Yes."; Hearing transcript 628: 3 through 630:21 ("What does 'cash conversion cycle' mean? A. It's the time when you start – when you recover the money that you have put into the market in products over time. So it's how long takes you to recover the product that you are putting into the marketplace. Q. So could you describe -- and does this relate to PSG's business with New Balance, this cash conversion? A. No. This is a regular cash conversion cycle. Q. When you say 'regular,' does it apply to PSG's business with New Balance? A. Yes. It's part of how the business works. You ship goods. I will give you an LC on-site. Okay? The factory delivers the products to the forwarder. They receive the documents of receiving the goods. You present the goods -- the documents to the bank. They collect the money. With this, I need two month to reach stores for the first time. So you have a transit time, water transit time, roughly to origin is 35 days. Plus, you need to consolidate the goods in origin, and then you need to clear customs in the -- in whatever, in Peru or Ecuador. After that, you are able to start putting product into the market. Right? If you are -- if I'm selling you goods, my normal payment term with account, big accounts, like Falabella or Ripley is between 90 and 120 days. That's basically. That's a part of -- I don't know -- the royal – the gross profit structure that I have, discount, whatever I can have. Payment terms with that one, they can play without this 120 days because that's the cash conversion cycle. They all put the goods into their stores. They will start selling. And when they finish to sell the goods, roughly, they will pay you. So that is how it work. Q. So from the moment you have an order confirmed until -- an order confirmed, and that means an order confirmed to start shipment -- A. Yes. Q. -- or I should say -- I'm sorry -- to have the order placed to manufacture the goods to eventually be shipped. From the moment the order is confirmed until PSG starts seeing monies back from customers for the sale of those products, approximately how much time transpires? A. At least nine. Q. Nine what? A. Month. Q. Does the letter of credit help you in any way in facilitating this cash conversion cycle? A. Absolutely. The payment term that you have with the LC, me with the bank, is regularly 180 days. So it's going to match the cycle since they -- I receive the products on the port, import them, sell them, and record the money. So that's matching the cash cycle conversion.").

[177]   Id.

[178]   Exhibit 220, PSG00007238; Hearing Transcript, 447:9-20 ("So Ms. Blanco is telling you basically, 'Look, if you require us to pay up front by cash, you're really to be disturbing our cash flow cycle because, instead of being able to finance the purchase from a bank via a letter of credit and pay the bank 180 days later, six months later, you're making us pay for the product up front'? A. That's right. Q. 'And that's a big disadvantage to us'? A. Yes.").

This is untrue. While New Balance required that PSG sign and agree to a manual laying out the terms of New Balance's unilaterally imposed new payment policy, the manual contained an express provision which stated that the rights granted to PSG under its existing contract with New Balance would supersede over anything to the contrary in the manual: "*Notwithstanding anything in here to the contrary, if a written contract signed by both parties is in existence covering the sale of the products covered hereby, the terms and conditions of said contract shall prevail to the extent they are inconsistent with these terms and conditions.*"[179] As such, the terms of the Distribution Agreement, which expressly permitted payment via letter of credit, controlled and should not have been altered by any change in New Balance policy.

77. New Balance nonetheless made this unilateral change to PSG's payment terms, which was in violation of the Distribution Agreement.[180] This change was precisely what destroyed PSG's liquidity and cash conversion cycle, placing PSG in a financial stranglehold, and causing PSG to fall behind on both product and distribution fee payments to NB.[181]

ii. *New Balance Breached the Distribution Agreement by Ceasing and Refusing to Accept New Orders from PSG*

78. Seizing upon PSG's payment delays that it itself caused through the failure to accept product purchases by letter of credit, New Balance then used these payment delays to freeze all PSG orders—placing it on a "credit hold" and *banning all future product purchases until all arrears were settled*—again breaching the Distribution Agreement, as the contract does not allow

---

[179] Exhibit 9-1, NB_PSG0001151.

[180] Exhibit 1, PSG00005497.

[181] Exhibit. 9-1, NB_PSG0001151.

NB to freeze orders for payment delays.[182]  This breach was not only very serious, it spelled the death of Respondent's relationship with New Balance.

79.     In August of 2015, New Balance shut down PSG's access to the online ordering system, forbidding PSG from placing any further orders.[183]  The last set of orders that New Balance allowed PSG to purchase were the few Q4 2015 orders that PSG could pay by wire (cash), which it *placed in April 2015* and largely *paid for by wire transfer on October 29, 2015*.[184]

80.     Freezing all orders was not a contractually-permitted remedy – the only contractually bargained-for remedy was termination of the Distribution Agreement for late payments.[185]

81.     Specifically, the Distribution Agreement only allows New Balance to cease accepting orders in one circumstance – if New Balance terminates the Distribution Agreement and the termination has become effective.[186]  Section 10(a) of the Distribution Agreement provides that NB "*shall from and after the date of notice of such termination having been given . . . be entitled to cease accepting orders for any Products…*"[187]  New Balance admits that it never

---

[182]    Exhibit 229, NB_PSG00001625.

[183]    Exhibit 126-1, PSG00006819.

[184]    Hearing Transcript, 207:18 through 208:7 (A.  Yeah. So this is the first window of Q4 2015. So, again, we're six months before entry into the marketplace. So this is a window in April of 2015 for product that will be delivered to the market in October of 2015. Q4 is a very important market. Q4 is a very important Q in the footwear business. It's when we sell a lot of shoes. It's pre-Christmas. It's a very important time for us.  Q.  And were you able to persuade New Balance to allow PSG to buy in the -- in that window?  A.  Yes."); Exhibit 95, NB_PSG0001679; Exhibit 205, PSG00006772; Exhibit 205-1; PSG00006774, PSG00006778, PSG00006780, PSG00006783, PSG00006785, PSG00006788, PSG00006790, PSG00006793, PSG00006795, PSG00006799, PSG00006801, PSG00006805.

[185]    *See* Exhibit 1, Section 16, PSG00005497.

[186]    *See* Exhibit 1, Section 10(a), PSG00005497.

[187]    *Id.*

terminated the Distribution Agreement; it only chose not to renew the Distribution Agreement in June 2016.[188]

82.　　Pursuant to the Distribution Agreement's terms, New Balance may also cancel a particular order under Article 6(b) if PSG requests to deliver the letter of credit after placing an order and fails to deliver the same, or if PSG otherwise delays or cancels a particular shipment.[189] New Balance wrongly suggests that based upon the language of 6(c) of the Distribution Agreement, that it may refuse to accept orders for any reason. However, provisions like 6(c) are common in distribution contracts in the sportswear distribution industry and are only utilized to allow brands to cancel orders that don't meet required style/production requirements.[190] It is not used, nor may it be, to withhold all orders from a distributor for any reason at all. As such, New Balance breached the Distribution Agreement when it improperly withheld orders from PSG beginning in August 2015.

83.　　It also is bedrock law that that "specific provisions in a contract trump the general provisions."[191] Section 10(a) is very specific and refers to the one circumstance under the Distribution Agreement where New Balance is permitted to cease all orders—upon termination of the contract only.[192] Section 16(a) also is very specific that New Balance has a right to terminate the contract if PSG falls behind on payments due to it.[193] Importantly, while New Balance may have had the right to terminate the contract with PSG, it did not invoke that right.[194]

---

[188]　*See* DeMartini Deposition Transcript, 54:8-10.

[189]　*See* Exhibit 1, Section 6(b), PSG00005497 .

[190]　Margarita Ormaza Deposition Transcript, 52:3 through 53:13.

[191]　*E.g.*, *Puerto Rico Telephone Co. v. SprintCom, Inc.*, 662 F.3d 74, 96 (1st Cir. 2011).

[192]　*See* Exhibit 1, Section 10(a), PSG00005497.

[193]　*See* Exhibit 1, Section 10(a), PSG00005497.

[194]　*See* DeMartini Deposition Transcript, 54:8-10.

84.     These specific contractual provisions control over the more general proposition set forth in 6(c) of the Distribution Agreement regarding the acceptance of orders and prove that New Balance breached the 2013 Distribution Agreement by unilaterally freezing PSG's ability to place orders.  In freezing all PSG's orders, New Balance completely halted PSG's business, making it practically impossible for PSG to earn revenue to pay New Balance.  New Balance then seized on the payment defaults that New Balance itself caused to improperly end its more than 20-year relationship with PSG.

85.     Here, New Balance also argues that its manual provided that it could withhold all orders if PSG was behind on payment.[195]  However, as previously explained, the manual itself specified that the terms of an existing contract controlled over the manual, and the Distribution Agreement did not permit New Balance to unilaterally withhold orders from PSG.[196]

86.     As noted earlier, the inability to purchase and sell New Balance products created a situation where PSG (and later Superdeporte) simply was prevented from performing by New Balance.  Without the ability to purchase products, PSG (and Superdeporte) were unable to conduct its business, generate revenues or perform as required by the parties' contract.

iii.     _New Balance Breached the Distribution Agreement's Implied Covenant of Good Faith and Fair Dealing_

87.     As the prior sections highlight, New Balance breached the Distribution Agreement as well as its duty to act in good faith and to exercise fair dealing in its commercial interactions with PSG.  In doing so, New Balance also destroyed the cash cycle and liquidity of PSG, depriving PSG of the fruits of the Distribution Agreement.

---

[195]  Exhibit 9-1, NB_PSG0001151.

[196]  Exhibit 9-1, NB_PSG0001151.

88.     Under Massachusetts law, a covenant of good faith and fair dealing is implied in every contract.[197]  The covenant provides that "neither party shall do anything that will have the effect of destroying or injuring the rights of the other party to receive the fruits of the contract."[198] A party need not breach an explicit term of the underlying contract in order to breach the covenant of good faith.[199]  Rather, the relevant question under Massachusetts law is whether the party's conduct complied with the parties' reasonable understanding of their performance obligations, as reflected in the overall spirit of the bargain, not whether the party abided by the letter of the contract in the course of performance.[200]  In *T.W. Nickerson, Inc. vs. Fleet Nat. Bank*, Mass. Super., No. 0200427 (Apr. 21, 2006), the court held that Defendant deprived Plaintiff of the fruits of the lease agreements between them through its unreasonable delay in effectuating the leases' renewal option after Plaintiffs timely notified Defendant of their intent to exercise the option, and thus breached the implied covenant of good faith and fair dealing.

89.     As in *T.W.* Nickerson, by not allowing PSG to place orders via letter of credit and later completely shutting down PSG's access to New Balance's online ordering system, New Balance deprived PSG of the fruits of the Distribution Agreement, created a financial stranglehold that prevented PSG from remedying the payment defaults and further performing under the Agreement, and therefore violated the implied covenant of good faith and fair dealing.

        iv.     *Damages*

---

[197]  *UNO Restaurants, Inc. v. Boston Kenmore Realty Corp.*, 441 Mass. 376, 385 (2004).

[198]  *Anthony's Pier Four, Inc. v. HBC Associates*, 411 Mass. 451, 471–72 (1991).

[199]  Howard J. Alperin, 14 Mass. Prac., Summary of Basic Law § 5:69 (5th ed. 2014).

[200]  *Id.*

90.     Damages for a breach of contract, like a breach of the implied covenant, allow the aggrieved party to be placed in the same position as it would have been had the other party not breached its performance obligation under the contract (the "but-for" scenario").[201]

91.     In the but-for scenario, New Balance would have performed under the Distribution Agreement, and PSG would have been able to purchase product by letter of credit through September of 2015 when the New Distribution Agreement went into effect, or through December 31, 2016 if this Tribunal finds that the New Distribution Agreement become an effective contract. The **lost profits** as of June 30, 2020, net of all costs and *all* payments due to New Balance under the Distribution Agreement, including all distribution fees, from the merchandise that PSG was not permitted to purchase from New Balance and distribute in Peru between August 1, 2015 and December 31, 2016 are **<u>$1.01 million</u>**.[202]

92.     In addition, as explained above, Respondents, through various distribution entities, had been successfully engaged by New Balance as its exclusive distributor in Peru for over twenty years, and the commercial relationship between New Balance and PSG began in January 2010 which involved one renewal agreement over the course of their six year relationship.[203]  In August 2013, PSG, through Hiper Deporte S.A.C., entered into an 8-year lease agreement for the New

---

[201]     *DCPB, Inc. v. City of Lebanon*, 957 F. 2d 913, 916 (1st Cir. 1992); Hearing Transcript, 1042: 6-22 ("The damages assessment consists of the lost profits consist of the difference between the profits that one can estimate would have taken place but for the termination that is in the scenario that is called sometimes counterfactual or but-for scenario, the scenario in which we model what would have happened in all likelihood in the continuity of that relationship. That's one scenario.  In that scenario, we -- I assume that those problems cease to exist, that those are not present anymore.  Lost profits are derived from comparing that and those profits in the scenario of continuity with the actual profits or losses that the company observed.").

[202]     These figures have been updated as of the date of this filing, June 30, 2020.  Interest on these amounts continues to accrue at 12% annually; Dellepiane Report, at ¶15; Hearing Transcript, 1082:4-5 ("I was instructed to apply 12 percent interest on the counterclaims.").

[203]     Hearing Transcript, 938: 22-25 ("Then later in 2000, I also wrote again and talked to the people who I was working with at the time, and we were given also distribution for Peru in 2000."); *see also* Exhibit 44, PSG00006520.

Balance Jockey Plaza store.[204]  In 2014, New Balance praised PSG for its marketing efforts and

progress in both Peru and Ecuador.[205]  In November 2014, New Balance first made an offer to

PSG to enter into a new and reformed Distribution Agreement through an entity that could handle

both wholesale distribution and retail sales.[206]  Based upon New Balance's request, in the fall of

2015, PSG initiated the process and investments to create Superdeporte in Peru so as to handle

both retail and wholesale.  In addition, as Mr. Cullen acknowledged, it was the parties' expectation

that their relationship would continue and it was never their objective "to constantly change

distributors if [they] run into a little bit of trouble."[207]

93.     Therefore, as Respondents' fact witnesses and their expert witness testified, in the

but-for world where New Balance allowed PSG to continue buying by letter of credit, it would not

have fallen into material arrears in 2015 and it would have continued performing well as it had

been since 2010.  In those circumstances, it is reasonable to assume that a well-established

distribution company like PSG, along with the strength of the new wholesale and retail distributor

Superdeporte, would have been able to successfully maintain its contractual relationship with New

Balance beyond December 31, 2016.  In a but-for world, the commercial relationship between the

Parties would be extended with at least a three-year contract, from January 1, 2017 through

December 31, 2019, with the same conditions set forth in the New Distribution Agreement and

---

[204]   Exhibit 285, SD-035.

[205]   *See* Exhibit 90, PSG00006485

[206]   *See* Exhibit 93, PSG00007483.

[207]   Cullen Deposition Transcript, 34:22 through 35:8 ("We worked with Peruvian Sporting Goods for many years. We were looking for ways to continue a relationship really. We were trying to find a way forward. It's certainly a lot easier for us to work with -- not to change things up in a marketplace, and have consistency with the customers, have consistency with the consumers. So it's certainly not our MO or objective to constantly change distributors if we run into a little bit of trouble.").

with Superdeporte functioning as the distributor party.[208] Additional lost profits during the extended 3-year period, net of all costs and *all* payments due to New Balance under the Distribution Agreement, including all distribution fees, would be equal to **$3.80 million** as of June 30, 2020.[209]

94.    PSG's total damages as of June 30, 2020 resulting from New Balance's breach of the Distribution Agreement and breach of the implied covenant of good faith and fair dealing are, net of all costs and *all* payments due to New Balance under the Distribution Agreement, including all distribution fees, **$4.80 million**.[210]

### B.    New Balance Breached The New, Enforceable Distribution Agreement

95.    The documents and testimony in the case highlight that the New Distribution Agreement was a binding contract under Massachusetts Law.  New Balance breached the New Distribution Agreement in various ways: (1) by not permitting Superdeporte to be substituted as the counterparty to the agreement; (2) by not permitting Respondents to purchase product and perform under the New Distribution Agreement; and (3) by repudiating the existence of the agreement in June of 2016 and insisting, wrongfully and contrary to applicable law, that the parties were "reverting" back to the 2013 Distribution Agreement.

---

[208]    Dellepiane Report, at ¶99; Hearing Transcript, 1045:25 through 1046: 15 ("In counterclaim III I have modeled the 2013 distribution agreement as the document that guides and dictates this relationship up until the end of that term at the end of 2016.  ·But from -- in the modeling an additional 3-year period of continuity, at that point I have assumed that the new distribution agreement dictates that relationship. So the year in counterclaim III, there's -- it's a hybrid in the sense that it assumes continuity of the 2013 up until 2016, and then in the event the arbitrator were to consider a renewal appropriate, that renewal is being modeled on the basis of the new terms of the new distribution agreement.").

[209]    Dellepiane Report, at ¶15; Hearing Transcript, 1046:16:23 ("And the result is summarized on page 19 for each of these three -- well, two ·scenarios, one in which there is just the base period up until the end of 2016. There is, including interest, 0.94, $940,000 in damages. And in the alternative, if the renewal is considered an appropriate assumption, the total ·would be $4.56 million.").

[210]    *Id.*

96.     Importantly, the New Distribution Agreement was a binding contract under Massachusetts law.  Under Massachusetts law, the formation of a valid contract requires an offer, the acceptance of that offer, consideration, and the agreement on sufficient terms laying out the rights and obligations of the parties.[211]  An enforceable agreement requires, first, terms sufficiently complete and definite, and second, a present intent of the parties at the time of formation to be bound by those terms.[212]  Massachusetts law only requires that the terms of the writing be sufficiently complete and definite and the writing reflect a present intent of the parties at the time of formation to be bound.[213]  Here the evidence undeniably establishes both elements. Massachusetts courts also have recognized that because the use of electronic communications has advanced immensely and become commonplace in the negotiation of contracts, emails are writings that satisfy Massachusetts' Statute of Frauds and, as such, create a binding and legally enforceable contract.[214]  The parties had agreed upon all of the terms of the contract in September 2015 when New Balance sent PSG the "final draft" and asked it to execute and return the same.[215]

97.     There also is no question that each of the parties demonstrated a present intent to be bound by this contract *and, in fact, were each performing under it*.  New Balance reissued various invoices using the new "purchased-'based'" distribution fee scheme under the new

---

[211]  *Situation Mgmt. Sys., Inc. v. Malouf, Inc*., 430 Mass. 875, 878 (2000).

[212]  *McCarthy v. Tobin*, 429 Mass. 84, 87 (1999).

[213]  *Targus Group Int'l, Inc. v. Sherman*, 76 Mass. App. Ct. 421, 429 (2010).

[214]  St. *John's Holdings, LLC v. Two Electronics, LLC*, No. 16 MISC 000090 RBF, 2016 WL 1460477, at *1 (Mass. Land Ct. Apr. 14, 2016); *Feldberg v. Coxall*, No. MICV201201649A, 2012 WL 3854947, at * 6 (Mass.Super. May 22, 2012); *Fecteau Benefits Group, Inc. v. Knox*, 72 Mass.App.Ct. 204, 212–213, 890 N.E.2d 138 (2008).

[215]  Hearing Transcript 524:11-525:2 ("You [Mr. Cullen] sent this agreement, right, on the 15th of September 2015 to Mr. Daniel Michaels: 'Here is the final draft of our contract restructure.  Exhibit B has been revised to reflect the full amount of inventory.' You testified about that yesterday.  A.  Yes.  Q.  'Please sign two originals and return both to me for countersignature.' When you did that, you understood that the parties had agreed to all of the terms of the agreement, which is why you were requesting that PSG sign the agreement and return it to you?  A.  Yes.").

agreement and sought payment from PSG.[216] PSG worked with New Balance to provide the information to have the new invoices issued, made substantial payments to New Balance after the contract was in effect and based on New Balance's promises that the relationship would continue, and also sought immediately to create Superdeporte, the entity required to operate wholesale and retail distribution in Peru under the new agreement.[217] All of this establishes that the parties were not only intending to be bound by the terms of the New Distribution Agreement, they were in fact performing under it. It is thus a binding contract under Massachusetts law.

> i. *New Balance Refused to Permit Superdeporte to be Substituted into the New Distribution Agreement After Requiring That Respondents Integrate Wholesale and Retail Capabilities and New Balance Repudiated the Existence of the New Distribution Agreement*

98. In November 2014, New Balance approached PSG with an offer to execute a New Distribution Agreement.[218] For the New Distribution Agreement, New Balance required its distributor be integrated in order to handle both: (1) wholesale distribution of New Balance products (as PSG historically had been doing), and (2) retail distribution of New Balance products (a new function that was not part of the historical relationship with PSG).[219] To meet New

---

[216] *See e.g.* Hearing Transcript, 564:13 through 565:2 ("A. We were billing under the terms of a purchase-based agreement. In other words, we were issuing invoices under that assumption, that that contract that we sent out in September would be signed. At this point it's clear it's not going to get signed. Q. Because New Balance isn't willing to do it? A. No, because PSG is not paying their bills. Q. And, therefore, New Balance is not willing to sign the contract? A. We're not willing to sign the contract until accounts are current."); *see also* Hearing Transcript, 1216:10-14 ("After they did all of the accounting to change from a sale-based and purchase-based contract, they had to figure out what was in the pipeline and how to charge for that."); Exhibit 26, NB_PSG0003066; Deposition Transcript of Peter Cragan, 80:12 through 83:14.

[217] Exhibit 142, PSG0001399, Exhibit 90, PSG00006485; Exhibit 118, PSG00001672; Exhibit 132, PSG00005332; Hearing Transcript. 1176:13-20 (Also, what Superdeporte – what Respondents did also shows their present intent to be bound. They formed a company. They changed everything. They got – they had the assets sold from PSG to Superdeporte. They did everything they're supposed to do to perform under the new agreement.").

[218] *See* Exhibit 93, PSG00007483.

[219] *See* Exhibit 93, PSG00007483; Ex. 113, NB_PSG0003365.

Balance's requirements, the owners of PSG and the managers of the Marathon group created a new commercial entity – Superdeporte Plus Peru S.A.C., which could handle both wholesale and retail functions and who would act as the new distributor and retailer for New Balance's products in Peru.[220]

99.    In the fall of 2015, once the parties had agreed the contract terms, PSG initiated the process to create Superdeporte in Peru.[221]  Superdeporte was created because of New Balance's request to have a distributor who could function at both the wholesale and retail levels.[222]  PSG was purely a distribution company and did not have the infrastructure (stores, employees, know-how, etc.) or ability to function at both the wholesale and retail levels.[223]

100.    The parties negotiated the New Distribution Agreement during 2015.   On September 15, 2015, New Balance sent PSG the final draft of the New Distribution Agreement.[224] As discussed above, as of September 2015, the parties had agreed to all of the terms of the New Distribution Agreement and thus formed a legally binding and fully enforceable contract under

---

[220]    Exhibit 87, PSG00006490; Exhibit 88, NB_PSG0003103; Exhibit 90, PSG00006485.

[221]    Exhibit 113, NB_PSG0003365.

[222]    Hearing Transcript, 917:17 through 918:5 ("A.  Mr. Cullen proposed a way, a model of doing business, and for doing that -- for sweeten [phonetic] that model, it was needed to create Superdeporte . . . We follow his request and we implement it. That's why we created Superdeporte.").

[223]    Hearing Transcript, 868: 12-25; 869: 2-25 ("Q. So there's been a lot of discussion about PSG as a wholesale company in Peru and how it was purely a wholesale company and couldn't function at the retail level.  Can you explain a little bit about why PSG couldn't function at the retail level? A. PSG does not have the expertise, the knowledge, the stores, the locations, the handling the business of retail. Q. PSG was purely a -- A.  Purely a wholesale -- Q. -- distribution company? A. -- wholesale company. An importer and wholesale company. Q. And you talked about the infrastructure, stores and all that. Can you describe a little bit more about the infrastructure required for a retail company?  A. First, you have to be key locations, and you have to have more than four locations. In that case, Marathon has at that point 20 locations, very good locations. You have to have the employees, the working force, to handle those big stores. Because our -- those are not small stores. Those are stores are about 700, 600 meters, square meters. So it needs the operation know-how of how to handle these chain of stores. So they do have in place all of that.").

[224]    Exhibit 5, NB_PSG000001.

Massachusetts law.[225]  The parties negotiated subsequent amendments to the New Distribution Agreement.[226]  In reliance on the new agreement being final, Respondent made significant investments in creating Superdeporte.[227]  New Balance also performed under the New Agreement, issuing purchase based invoices to PSG under the New Distribution Agreement beginning in August 2015.[228]

101.  PSG and Superdeporte acted in furtherance of the parties' understanding that they had a final agreement in place.  Specifically, Respondents made substantial investments to create Superdeporte; took steps to identify and create the New Balance shop-in-shop locations as required by the New Distribution Agreement; took all legal, tax and accounting steps to transfer PSG's inventory to Superdeporte;[229] worked to find customers to purchase existing New Balance inventory; and made substantial payments to New Balance based upon New Balance's promises of continuing the parties' many year relationship.[230]

102.  However, after the parties had agreed to substitute Superdeporte into the New Distribution Agreement, New Balance, in violation of the New Distribution Agreement, refused to substitute in Superdeporte.  In June 2016, Mr. Gagliardi and Mr. Cullen agreed that if Respondents paid New Balance $150,000 in outstanding distribution fees, that New Balance would

---

[225]  Exhibit 5, NB_PSG000001.

[226]  Exhibit 142, PSG0001399, Exhibit 177, NB_PSG0000177.

[227]  Exhibit 52-1, PSG00006577.

[228]  Exhibit 242-1, NB_PSG0000523; Hearing Transcript, 795:10-21 (" Q.  Okay.  So I'd just like to also take you through the chart on the bottom left that you have titled 'History of Billing Error and Correction Purchase-Based Details,' and just confirm that this reflects the purchase-based invoices that were issued to PSG between August 2015 and April 2016.  Correct?  A.  That's correct.  Q.  Okay.  So that was nine months of purchase-based invoices that were issued to PSG?  A.  Yes.  Yes.").

[229]  Exhibit 288.

[230]  Exhibit 105-1, NB_PSG0001302, NB_PSG0001306; Exhibit 209, PSG00002774; Exhibit 211, PSG00006754; Exhibit 216, PSG00006831; Exhibit 205, PSG00006772.

send Respondents the executed contract with Superdeporte substituted in and that it would provide Respondents with the letter that they needed to sell inventory to Ripley.[231]  On June 23, 2016, Mr. Gagliardi asked Mr. Cullen for the contract with Superdeporte.[232]  New Balance refused to replace PSG with Superdeporte in the New Distribution Agreement, and refused to give PSG a letter confirming that Superdeporte was New Balance's distributor in Peru so that Superdeporte could sell product to Ripley.[233]

103.    After the parties had each been performing under the New Distribution Agreement for 9 months, on June 23, 2016, Mr. Cullen responded to Mr. Gagliardi and said that the purchase based contract (the New Distribution Agreement) was not valid and that New Balance would "revert back" to the original contract terms (the 2013) Distribution Agreement.[234]  On the same date, New Balance notified Respondents that the 2013 Distribution Agreement would not be renewed and would terminate by its terms on December 31, 2016.[235]  New Balance's actions were in violation of the New Distribution Agreement, which had been agreed to and became a binding contract between the parties in September of 2015.

ii.    _New Balance Failed to Permit Respondents to Purchase Product and Perform Under the New Distribution Agreement_

---

[231]    Hearing transcript, 638: 3-7 ("He [Cullen] said, 'Okay. You will receive the letter' -- a letter that I need to sell products to Ripley – 'and the contract.'  And I never received that.  Instead of that, I receive the [non-renewal] letter."); Hearing Transcript, 639: 3-11 ("A.  To John Cullen.  He said, 'Okay. Pay 150,000, and we will be moving forward. We will send you the letter.' I need a letter. Since we were operating already with Superdeporte, the new structure of Marathon integrating wholesale and retail, we need a letter to Ripley, which is a client, to show them that we are the ones who can sell the product."); Hearing Transcript, 645: 14-22 ("And we agreed with that one to pay 150,000 to move forward with this and to receive the contract and the letter to sell product that we have in stock.  Q. And did you get the contract or the letter?  A.  No, I didn't get anything.  Q.  Did you make the $150,000 payment?  A.  Yes, we did.").

[232]    Exhibit 171-1, PSG00006482.

[233]    _Id._

[234]    _Id._

[235]    Exhibit. 160, PSG00006744; Exhibit 166, NB_PSG0000207; Exhibit 171-1, PSG00006482.

104.     As explained above, beginning in May 2015 after allowing PSG to place and pay for some limited Q4 2015 orders, New Balance did not permit PSG to place any new orders (aside from the Q3 2016 order which it never delivered to PSG).[236]  The New Distribution Agreement contained the same language as the 2013 Distribution Agreement regarding acceptance and placement of orders.[237]  If New Balance wished to cease accepting orders, then it should have terminated the New Distribution Agreement.  However, New Balance never terminated or sent a notice of renewal for the New Distribution Agreement.[238]  Instead, in violation of the terms of the New Distribution Agreement, New Balance refused to accept new orders from PSG, financially strangling PSG, and making it impossible for PSG to operate its business, generate revenues or

---

[236]  Hearing Transcript, 207:18 through 208:7 (A. Yeah. So this is the first window of Q4 2015. So, again, we're six months before entry into the marketplace. So this is a window in April of 2015 for product that will be delivered to the market in October of 2015. Q4 is a very important market. Q4 is a very important Q in the footwear business. It's when we sell a lot of shoes. It's pre-Christmas. It's a very important time for us.  Q.  And were you able to persuade New Balance to allow PSG to buy in the -- in that window?  A.  Yes.");  Hearing Transcript, 474:22 through 475:22 ("Q.  They did place orders for Q3 2016, but ultimately they asked for those orders to be paid by letter of credit.  New Balance said no. So they never got those orders?  A.  All I know is they didn't pay for those. I don't know -- they didn't pay for those. We can get those if you want, but they didn't pay for those orders, in any event.  Q.  Well, I mean, you also know that they -- do you not remember that you testified this morning that they asked to pay by letter of credit and that you said no?  A.  I think I said no, yes. Sorry. You're right.  Q.  Okay. So just so we're clear, the last order that PSG was able to pay for by letter of credit -- you've said this already -- were orders that -- of product that they ordered in January/February of 2015?  A.  Yeah.  Q.  Everything subsequent to that, for all the rest of 2015, all the rest of 2016, they had to pay by direct wire transfer or else they wouldn't get product?  A.  Yes.").

[237]  Like the Distribution Agreement, the New Distribution Agreement only allows New Balance to cease accepting orders in one circumstance – if new Balance terminates the agreement and the termination has become effective.  Section 10(a) of the New Distribution Agreement provides that NB "shall from and after the date of notice of such termination having been given … be entitled to cease accepting orders for any Products . . ."  Pursuant to the Distribution Agreement's terms, New Balance may also cancel a particular order under Article 6(b) if PSG requests to deliver the letter of credit after placing an order and fails to deliver the same, or if PSG otherwise delays or cancels a particular shipment.  New Balance wrongly suggests that it may refuse to accept orders for any reason based upon Section 6(c) of the New Distribution Agreement.

[238]  Exhibit 92A; PSG00005162; Exhibit 106, NB_PSG0002036; Exhibit 156, NB_PSG0000515; Exhibit 205, PSG00006772; Exhibit 173-1, PSG00001947.

become current on its payments to New Balance.  This was the death of the business, as without

products, PSG or Superdeporte could not generate any revenues.[239]

### iii. New Balance Acted Duplicitously In Negotiating With Other Distributors While It Had an Active Distribution Agreement In Place With PSG/Superdeporte

105.    Despite having a fully binding agreement in place, New Balance engaged in bad

faith, duplicitous behavior and negotiated with a new distributor to take over in Peru

notwithstanding that it had a contract in place with Respondents.  In January of 2016, the same

month that New Balance negotiated the amendments to the New Distribution Agreement, and once

Superdeporte had been created, Mr. Cullen told Sparta that New Balance would "very likely make

a change" of distributors for Peru in 2017 and that Sparta was its "first choice" to take on the Peru

distribution.[240]  New Balance continued these negotiations with Sparta throughout 2016 and in

June 2016, Sparta received internal approval to move forward with New Balance as its distributor

in Peru.[241]  Recognizing New Balance's duplicitous behavior, in June 2016, Sparta asked New

Balance to indemnify it from lawsuits from PSG/Superdeporte.[242]  While New Balance refused to

formally indemnify Sparta, it sent Sparta a letter on June 15, 2016 informing Sparta that the Peru

territory was "available."[243]  New Balance told Sparta the territory was "available" before it

---

[239]  Hearing Transcript, 623:25 through 624: 9 ("A.  Because with a lack of product into the market, so how you can make money without product that you convert into money?  And again, if you cease daily sales, if you are not taking to a discount or a clearance place, you need to have new product to sell, which is coming your -- 80 percent of your sales are going to come for a fresh product, not old product."); Hearing Transcript, 854:23 through 855: 2 (Q.  A negotiated minimum fee assumes the right to buy product undisturbed and the right to sell product. Right?  A.  Yes, it would. It would.").

[240]  Exhibit 237, NB_PSG0000327 (Mr. Cullen goes on to say "I know this is a big decision, but I think it would be the right one for NB and Sparta.")

[241]  Exhibit 244, NB_PSG0000543.

[242]  Exhibit 244, NB_PSG0000543.

[243]  Exhibit 245-1, NB_PSG0000676.

notified Respondents, on June 23, 2016, that it was "reverting back" to and not planning to renew the Distribution Agreement .[244]

106.    On June 21, 2016, also before delivering this notification to Respondents, New Balance tried to formalize a new agreement with Sparta.[245]  It also encouraged Sparta to interfere with Respondents' exclusivity.[246]  New Balance also incentivized Sparta to agree to the contract with extremely favorable contractual terms including no Peru-specific sales numbers and no minimum guarantees.[247]  It also allowed Sparta to buy via letters of credit in Peru.[248]

107.    New Balance acted duplicitously and with bad-faith seeking a new distributor for Peru starting in 2017 while concealing this from Respondents, inducing them to continue to perform under the New Distribution Agreement, including making further payments to New Balance, and investments to continue with the distribution.[249]  That conduct violates the principle of good faith and fair dealing under Massachusetts law.[250]

       iv.    *Damages*

---

[244]  Exhibit 92A, PSG00005162 ("Our legal team will not issue a new contract until all payments are current.  As such, the new 'purchase based' contract is not valid and we are 'reverting back' to the original contract terms."); Exhibit 160, PSG00006744; Exhibit 166, NB_PSG0000207.

[245]  Exhibit 246, NB_PSG0000677.

[246]  Exhibit 246, NB_PSG0000677.

[247]  Exhibit 253, NB_PSG0000740.

[248]  Exhibit 2, NB_PSG0003584.

[249]  Hearing Transcript. 1176:13-1177:8 (Also, what Superdeporte – what Respondents did also shows their present intent to be bound. They formed a company. They changed everything. They got – they had the assets sold from PSG to Superdeporte. They did everything they're supposed to do to perform under the new agreement . . . what did New Balance do? . . .  and it later repudiated the agreement when it brought Sparta in."); Exhibit 105-1, NB_PSG0001302, NB_PSG0001306; Exhibit 209, PSG00002774; Exhibit 211, PSG00006754; Exhibit 216, PSG00006831; Exhibit 205, PSG00006772.

[250]  *UNO Restaurants, Inc. v. Boston Kenmore Realty Corp*., 441 Mass. 376, 385 (2004) ("The covenant of good faith and fair dealing is implied in every contract."); *Young v. Wells Fargo Bank*, N.A., 717 F. 3d 224, 238 (1st Cir. 2013) (applying Massachusetts law) ("Lack of good faith carries an implication of a dishonest purpose, conscious doing of wrong, or breach of duty through motive of self-interest or ill will . . . but the core question remains whether the alleged conduct was motivated by a desire to gain an unfair advantage, or otherwise had the effect of injuring the other party's rights to the fruits of the contract.") (internal quotations and citations omitted).

108. PSG and Superdeporte's damages under this counterclaim consist of the lost profits from New Balance's failure to perform under the New Distribution Agreement, from 1 August 2015 through 31 December 2017 and for the same reasons stated above, thereafter for one other term through the end of 2020. The damages as of June 30, 2020 for the initial term of the New Distribution Agreement (from August 1, 2015 through December 31, 2016) are, net of all costs and *all* payments due to New Balance under the New Distribution Agreement, including all distribution fees, **$2.56 million**.[251] Again, in the "but-for" world without New Balance's breaches, it is more than reasonable to conclude based on the evidence that the parties' relationship would have continued and extended beyond the one-year automatic renewal for at least one additional 3 year term.[252] The damages as of June 30, 2020 for the term of January 1, 2018 through December 31, 2020 are, net of all costs and *all* payments due to New Balance under the New Distribution Agreement, including all distribution fees, **$4.32 million**.[253]

109. For these breaches, PSG and Superdeporte have suffered damages, net of all costs and *all* payments due to New Balance under the New Distribution Agreement, including all distribution fees, of **$6.87 million as of June 30, 2020 plus pre- and post-award statutory interest.**

---

[251] Dellepiane Report, at ¶14; Hearing Transcript. 1037:10-18 (The result of this analysis is that under counterclaims I and II, or the period contained in the new distribution agreement from August 2015 through December 2017, I assess damages in the amount of $1.52 million in nominal terms, with interest on those amounts, resulting in a total claim of 2.4 -- or a damage assessment of 2.41 million, as of the date of my report.").

[252] Dellepiane Report, at ¶14; Hearing Transcript. 1037:19-23 (For the new distribution agreement under counterclaim I and II, I modeled one 3-year renewal term, and the damages associated with that one 3-year renewal term is an additional $4.04 million.");

[253] Dellepiane Report, at ¶14; Hearing Transcript. 1037:19-23 (For the new distribution agreement under counterclaim I and II, I modeled one 3-year renewal term, and the damages associated with that one 3-year renewal term is an additional $4.04 million.").

### C.   New Balance Breached Its Precontractual Obligations During The Negotiation Of The New Distribution Agreement

110.    Even if the Tribunal were to find that the New Distribution Agreement was not a binding and legally enforceable contract under Massachusetts law, it should still find New Balance liable to Respondents for failing to comply with its precontractual obligations in negotiating the New Distribution Agreement.

111.    Under Massachusetts law, when the parties to a negotiation have agreed on certain terms but left other terms open, they have made a preliminary agreement.[254]  To allow parties to invest money in the negotiation of the final contract, courts have recognized a right to recovery based on a failure to negotiate in good faith even if the parties had not yet reached agreement on all the terms of a contract.[255]  Through this line of cases, courts have recognized that while a contract draft or a letter of intent may not itself indicate that a party intended to be bound, it constituted a preliminary agreement to negotiate further in good faith.[256]  This interim agreement "precludes, however, renouncing the deal, abandoning the negotiations, or insisting on conditions that do not conform to it.[257]  The failure by one party to negotiate further in good faith deprives the other party of the fruits of their preliminary agreement and constitutes a breach of the covenant of good faith and fair dealing, which allows the other party to recover.[258]  Parties who formed interim agreements are subject to an ongoing duty to negotiate the remainder of the agreement in

---

[254]   A. Schwartz and R. Scott, *Precontractual Liability and Preliminary Agreements*, 120 Harv. L. Rev. (2007), p. 664.

[255]   *Id.*

[256]   *Id.*

[257]   *Fickes v. Sun Expert, Inc*., 762 F. Supp. 998, 1001 (D. Mass. 1991).

[258]   *Fickes v. Sun Expert, Inc*., 762 F. Supp. 998, 1001 (D. Mass. 1991); *Air Technology Corp. v. General Elec. Co*., 347 Mass. 613, 630 (1964); *Stoneridge Control Devices, Inc. v. Teleflex, Inc*., No. 021554BLS, 2004 WL 389105, at *1 (Mass. Super. Feb. 17, 2004).

good faith.  When one of the parties fails to do that, liability for the full benefit of the expected bargain attaches.[259]

112.    As explained above, New Balance failed to honor the terms of the New Distribution Agreement in various ways, including by (i) failing to substitute in Superdeporte to the New Distribution Agreement when it was ready to perform under the New Distribution Agreement, (ii) refusing to accept new orders from PSG after August 2015, (iii) engaging in duplicitous negotiations with third parties while it had an enforceable (and at the minimum, an interim) agreement in place with Respondents and authorizing and encouraging them to violate PSG and Superdeporte's contractual exclusivity rights; and (iv) altogether repudiating the New Distribution Agreement.  As such, as a result of New Balance's breach of its precontractual obligations, PSG suffered lost profits from New Balance's failure to perform under the New Distribution Agreement, from 1 August 2015 through 31 December 2017 and thereafter for one other term through the end of 2020.

113.    The damages as of June 30, 2020 for the initial term of the New Distribution Agreement (from August 1, 2015 through December 31, 2016) are, net of all costs and *all* payments due to New Balance under the New Distribution Agreement, including all distribution fees, **$2.56 million**.  The damages as of June 30, 2020 for the term of January 1, 2018 through December 31, 2020 are, net of all costs and *all* payments due to New Balance under the New Distribution Agreement, including all distribution fees, **$4.32 million**.[260]

---

[259]    *DCPB, Inc v. City of Lebanon*, 957 F. 2d 913, 916 (1st Cir. 1992).

[260]    Dellepiane Report, at ¶14; Hearing Transcript. 1037:19-23 (For the new distribution agreement under counterclaim I and II, I modeled one 3-year renewal term, and the damages associated with that one 3-year renewal term is an additional $4.04 million.").

114.     For these breaches, PSG and Superdeporte have suffered damages, net of all costs and *all* payments due to New Balance under the New Distribution Agreement, including all distribution fees, of **$6.87 million as of June 30, 2020 plus pre- and post-award statutory interest.**

## IV.    NEW BALANCE'S CLAIMS FAIL

### A.    *This Tribunal Has No Jurisdiction Over Mr. Ribadeneira or Superdeporte As It Relates to the Contract Claim, and New Balance's Contractual Claim Otherwise Fails*

115.     New Balance's contractual claim against Respondents should fail.  Specifically, New Balance's contractual claim against Mr. Ribadeneira and Superdeporte should fail, as there is no basis to hold either Mr. Ribadeneira or Superdeporte as Respondents in this arbitration for New Balance's breach of contract claim arising under the Distribution Agreement.  The only party to the Distribution Agreement was PSG, it is the only party who signed the arbitral agreement and is subject to this Tribunal's jurisdiction for claims brought under the Distribution Agreement, and therefore, PSG is the only party who may be held liable for claims arising under the Distribution Agreement.

116.     Even if this Tribunal finds that it has jurisdiction over Mr. Ribadeneira and Superdeporte as it relates to New Balance's contract claim, that claim fails on the merits as against *all* Respondents.  There is no contractual or other basis to impute liability against Mr. Ribadeneira or Superdeporte for PSG's obligations under the Distribution Agreement.  Moreover, it was New Balance's breaches of the Distribution Agreement, by failing to allow letter of credit purchases and cutting off PSG's ability to purchase product altogether, that caused PSG's payment breaches.  Also, the claim primarily is for distribution fees sought for periods when PSG was not able to buy and sell New Balance products—the agreement and applicable law do not allow for the collection of these fees in those circumstances.

v.    *New Balance's Contractual Claim Against Mr. Ribadeneira Should Fail*

117.    New Balance has attempted to sustain a contractual claim against Mr. Ribadeneira without any legal basis for doing so.  Respondents have now filed two motions for summary disposition on this issue.  The Tribunal has already recognized that "Mr. Ribadeneira was not a party to [the Distribution Agreement], and ordinarily would not share any potential liability thereunder; nor would he be subject to that agreement's arbitration clause with respect to a claim for breach of the agreement."[261]  Furthermore, Mr. Ribadeneira never consented to arbitrate claims under the Distribution Agreement, and he never assumed any obligations to New Balance under the Distribution Agreement.  The assignment of rights in the Peru Action only temporarily granted Mr. Ribadeneira the right to pursue legal claims against New Balance, but Mr. Ribadeneira never assumed any obligations to New Balance or liabilities under the Distribution Agreement.  Simply put, Mr. Ribadeneira was an indirect owner of PSG through various holding companies that he owns.[262]  He was not an employee of PSG, nor was he an officer of PSG.[263]  There is no evidence supporting New Balance's argument that Mr. Ribadeneira should be subject to the Tribunal's jurisdiction as PSG's alter ego.

118.    Under Massachusetts law, corporations and their shareholders are generally considered separate legal entities, and only under very limited and rare circumstances, may a court

---

[261]    Memorandum and Order on Respondents' Motion for Summary Disposition, August 20, 2019, p. 9.

[262]    Hearing Transcript, 867:20 through 868:11 ("Q.  And Mr. Ribadeneira does not have a management role in -- did not have a role in Peruvian Sporting Goods as a manager or in the employment structure.  A.  No.  Q.  Nor did he have a role in the 2 employment structure, did he or does he, in Superdeporte Plus Peru. Correct?  A.  No.  Q. Does he have any employee -- is he employed by any of the companies in the group?  A.  No.  Q.  And what is his role, if any?  A.  He is -- he is the, like, strategic person that is part of this committee and giving his point of view. He's the owner.").

[263]    *Id.*

disregard the separateness of entities ("pierce a corporate veil").[264]  In fact, Massachusetts appears "more strict than other jurisdictions in permitting the nonobservance of corporate formalities;" and "[e]ven more infrequent is the court which allows the disregard of corporate formalities in a contractual dispute rather than a tortious injury."[265]

119.    To pierce the corporate veil, there must be evidence of "some fraudulent or injurious consequences;" a "confused intermingling of activity … with substantial disregard" of the separateness of the entities;" or "serious ambiguity about the manner and capacity in which the various [entities] and their respective representatives are acting." [266]   Furthermore, under Massachusetts law, courts consider twelve factors in deciding whether to penetrate the corporate form, which include: (1) common ownership; (2) pervasive control; (3) confused intermingling of business activity, assets, or management; (4) thin capitalization; (5) nonobservance of corporate formalities; (6) absence of corporate records; (7) no payment of dividends; (8) insolvency at the time of the litigated transaction; (9) siphoning away of corporate assets by the dominant shareholders; (10) nonfunctioning of officers and directors; (11) use of the corporation for transactions of the dominant shareholders; and (12) use of the corporation in promoting fraud."[267]

120.    Even after significant discovery and Hearing testimony, New Balance has been unable to establish *any* of these factors.  The first two factors do not support a finding of Mr. Ribadeneira acting as PSG's alter ego, although these factors are better suited to evaluating

---

[264]  *Berger v. H.P. Hood, Inc.*, 416 Mass. 652, 657, 624 N.E.2d 947 (1993).

[265]  *Bradford Carpet One Co. v. Piedmont St., LLC*, No. 1777CV1274, 2019 WL 6681659, at *3 (Mass. Super. Oct. 16, 2019).

[266]  Memorandum and Order on Respondents' Motion for Summary Disposition, pp. 9-10, *citing My Bread Baking Co. v. Cumberland Farms, Inc*., 353 Mass. 614, 618 (1968).

[267]  Memorandum and Order on Respondents' Motion for Summary Disposition, p. 10, *citing Evans v. Multicon Construction Corporation*, 30 Mass. App. Ct. 728, 733 (1991) (citations omitted).

whether one entity should be held liable for the action of another entity.[268] While Mr. Ribadeneira was, through various intermediate holding companies, PSG's principal stockholder until the end of 2016,[269] as the Tribunal has recognized, common ownership alone is not sufficient to support piercing the corporate veil.[270]

121. Discovery and testimony in this case prove that Mr. Ribadeneira did not exercise pervasive control over PSG.[271] On the contrary, Respondents produced an organizational chart with a clear employment structure for PSG.[272] Ultimately, key employees reported on key decisions to a corporate board, made up of managers from the business, as well as the group's CEO, CFO, and external consultants.[273] This board would then vote on key corporate decisions

---

[268] *George Hyman Const. Co. v. Gateman*, 16 F. Supp. 2d 129, 150 (D. Mass. Sept. 2, 1998).

[269] Hearing Transcript 980: 14-17 ("Q. Okay. So as of December 2016, you no longer had a direct or indirect ownership interest in PSG. Correct? A. As of that date I did not."); Hearing Transcript, 874: 9 -15 (:Q. Just briefly, at the end of 2016, PSG was sold to -- can you tell me a little bit about what you know about that? A. It was sold to Julio Padilla. Q. So as of the end of 2016, PSG is no longer a part of the group? A. Yes, it wasn't a part of the group.").

[270] Memorandum and Order on Respondents' Motion for Summary Disposition, August 29, 2019, p. 9, *citing My Bread Baking Co. v. Cumberland Farms, Inc*., 353 Mass. 614, 618 (1968).

[271] Hearing Transcript 980: 18-24 ("Q. Okay. And I think you already testified you've never had a management role in PSG, have you? A. (Shaking head.) Q. So as of December 2016, you had no management role? A. No.").

[272] *See* Exhibit 38, PSG00006835.

[273] *See* e.g. Deposition Transcript of Margarita Ormaza, 126:17-24; 133:5-16.

and management for PSG would execute on those decisions.[274]  Mr. Ribadeneira held but one vote in the board decisions, and he exercised no control over operational decisions.[275]

122.    The third factor – the confused intermingling of business assets, activities and management – does not support piercing of the corporate veil either.  There were transactions between PSG and Superdeporte, as PSG was winding down its sportswear distribution operations in order to transfer its operations to Superdeporte, but this was not handled or directed by Mr. Ribadeneira.[276]  Specifically, as was explained in detail at the Hearing, inventory was transferred

---

[274]    Hearing Transcript 865: 25 through 868:11 ("A.  Yes.  We are split, our main companies.  We have a corporate committee that is formed by the CEO of -- a corporate CEO, a CFO, Mr. Ribadeneira, consultants, the corporate supply chain manager, the IT corporate manager, and the human resources manager, corporate manager.  Each of the companies will go with the manager and the principal to -- depending on what we are going to discuss in the meetings, go to the committee that usually takes place monthly and the most bimonthly.  You go and you present your performance during the last month, and if you have the proposal, your investments, and your strategies for the next period of time.  Q.  So the managers of each company present performance and they present key strategic decisions to a board comprised of various people who ultimately -- the board and the managers -- all vote on key decisions?  A.  Exactly.  Q.  And you said Mr. Ribadeneira is a member of that board.  Correct?  A.  Yes.  One of them.  Q.  And he has one vote on that board?  A.  Yes.  Q.  But he does not, he himself, make unilateral decisions for the companies within the group?  A.  No.  There are discussion and consensus.  THE ARBITRATOR:  How were the members of the board selected?  THE WITNESS:  Those are -- those are employees from the corporate.  They are not external.  They are the CEO, the CFO.  The external part are the consultants, and the consultants are consultants in finance and in retail that has very -- that have proof, international and local expertise in the area.  But the operation, like CFO, CEO, they are members -- they are employees of the corporation.  Q.  And Mr. Ribadeneira does not have a management role in -- did not have a role in Peruvian Sporting Goods as a manager or in the employment structure.  Correct?  A.  No.  Q.  Nor did he have a role in the employment structure, did he or does he, in Superdeporte Plus Peru.  Correct?  A.  No.  Q.  Does he have any employee -- is he employed by any of the companies in the group?  A.  No.  Q.  And what is his role, if any?  A.  He is -- he is the, like, strategic person that is part of this committee and giving his point of view.  He's the owner."); Hearing Transcript, 963: 11-22 ("Q.  Do those management committees make management decisions that then are communicated to the operations team so that they could run the business?  A.  Yes.  Yes.  Q.  All right.  Do you dictate those decisions in those management committees by fiat?  In other words, do you step in and say, 'This is what we're going to do,' and they just do it?  A.  No.  By no means.  It would be impossible.").

[275]    Hearing Transcript, 866:22-24 (Q.  And you said Mr. Ribadeneira is a member of that board.  Correct?  A.  Yes.  One of them.").

[276]    *See* e.g. Exhibit 288; *see also* Hearing Transcript, 878:4 through 879:22 ("Q.  There's also been testimony that in May of 2016, Superdeporte in Peru became – was registered as an active company.  Right?  A.  Yes.  Q.  It was ready to distribute?  A.  Mm-hmm.  Q.  There were certain sales between PSG and Superdeporte of assets.  Right?  A.  Yes.  Q.  And what did PSG sell to Superdeporte?  A.  PSG sold all the inventory that he has.  It was around, about 650,000, something like that, all the inventory that he had on hand at that point, and sold to Superdeporte.  Q.  And how did Superdeporte pay PSG for the inventory?  A.  When he saw -- when he bought the inventory, he acquire PSG debt.  And afterwards, that date was -- how you say -- what's the word?  Was paid with intercompany debt.  THE ARBITRATOR:  Are you saying that Superdeporte paid PSG's debt?  THE WITNESS:  Debt, yeah.  THE ARBITRATOR:  So that was essentially the -- in return for the 650,000 in inventory?  THE WITNESS:  Exactly.  Exactly.  THE ARBITRATOR:  Thank you.  BY MS. JAQUITH:  Q.  And was that the -- the debt -- Superdeporte

from PSG to Superdeporte.[277]  But there is <u>no evidence</u> that any assets or liabilities of PSG and Superdeporte were ever intermingled with those of Mr. Ribadeneira, or that New Balance was reasonably or legitimately confused as to the entity with which it was dealing.[278]  In fact, as noted by the Tribunal in its Order, New Balance "contracted knowingly with a corporation, having already done business with that company or a predecessor for more than a decade."[279]  There also is no evidence indicating that PSG was thinly capitalized either, as required by the fourth factor.

123.  As to the fifth and sixth factors – nonobservance of corporate formalities and absence of corporate records, the evidence in the record all indicates to the contrary.  PSG was duly incorporated under Peruvian law, its corporate formalities were studiously observed and its corporate records were kept in the ordinary course.[280]  In addition to the corporate board decision-making and execution of those decisions by the PSG management team, PSG's corporate records demonstrate that the company was run professionally by its management and without the involvement of Mr. Ribadeneira—see for example documents supporting PSG's

---

paying PSG's debt, was that everything? Was that -- or was there anything else?  A.  Most of the -- a few, like, 40, 45, 50,000 was cash, was trans -- paid in cash.  Q.  And were any other assets sold from PSG to Superdeporte?  A.  From PSG to Superdeporte?  Q.  Aside from the inventory that we just talked about.  A.  I don't -- it's just the inventory.").

[277]  *Id.  See also* Exhibit 288.

[278]  Hearing Transcript, 960:13 through 961:15 ("Q.  First of all, do you have -- again, some of these questions are going to sound absurdly basic.  But do you have bank accounts in your own name?  A.  Yes.  Q.  Do you use your personal funds from those bank accounts for either Superdeporte or PSG?  Have you ever?  A.  Never.  Q.  Have you ever intermingled – so when PSG gets paid for sales or Superdeporte gets paid for sales -- I'm talking now about the Peruvian entity -- do you ever take those funds and put them in your bank account and used them for personal purposes?  A.  Funds from the company into my bank account --  Q.  Yes, sir.  A.  -- to use?  No.  Q.  Okay.  Do you yourself make all of the operational decisions for PSG?  A. I don't make any of the operational decisions.  Q.  Who makes operational decisions for PSG?  A.  Each company has a manager, and in this case, PSG had a manager.").

[279]  Memorandum and Order on Respondents' Motion for Summary Disposition, p. 10.

[280]  Exhibit 44-1, PSG00006520.

ownership/shareholding structure;[281] PSG's organizational chart;[282] PSG's statements of financial position and integral income for the period from 2013 throughout 2018;[283] and PSG's bank records from 2014 throughout 2017.[284]

124.     As to the seventh factor – non-payment of dividends – although PSG has not issued any dividends, Massachusetts courts have recognized that "[w]hen the corporation is closely held, that gain may take a form other than the payment of dividends or distributions to stockholders,"[285] and that "a business can have a legitimate purpose even if it is not designed to make dividend payments or profit distribution."[286]  Here, as Mr. Ribadeneira explained in his deposition testimony, PSG's management made conscious decisions not to issue dividends and instead, to reinvest the company's profits.[287]  The evidence all points to the inescapable conclusion that PSG was operated as a legitimate, profit-seeking entity, and not the alter ego of Mr. Ribadeneira.

125.     New Balance has made no arguments concerning factors eight through twelve, and there is no new evidence revealed during discovery and/or the Hearing that would support the finding of any of those factors.

---

[281]     *See e.g.* Exhibit 38, PSG00006835, Exhibit 40-1, PSG00006596, Exhibit 41-1, PSG00006509, Exhibit 42-1, PSG00006510, Exhibit 43-1, PSG00006533, Exhibit 44-1, PSG00006520, Exhibit 45-1, PSG00006511, Exhibit 46-1, PSG00006495, Exhibit 47-1, PSG00006512, Exhibit 48-1, PSG00006496, Exhibit 49-1,, PSG00006508, Exhibit 50-1, PSG00006552.

[282]     *See* Exhibit 39, PSG00006836.

[283]     *See* Exhibit 86-1, PSG00006472.

[284]     *See* Exhibits 53 through 73, PSG00006085 through PSG00006311.

[285]     *Evans v. Multicon Const. Corp.,* 30 Mass. App. Ct. 728, 735, 574 N.E.2d 395, 399 (1991).

[286]     *See George Hyman Const. Co. v. Gateman*, 16 F. Supp. 2d 129, 154 (D. Mass. 1998).

[287]     *See* Deposition Transcript of Rodrigo Ribadeneira, 51:3-9 ("Q.  In years where there were profits, were the profits distributed out in any fashion?  A.  We seldomely take dividends out, especially from the small companies. They just get reinvested.  Q.  Do you recall ever -- do you recall PSG ever issuing any dividends or paying out any profits?  A.  No.").

126.    The evidence from the Hearing buttresses these conclusions.  Mr. Ribadeneira testified that PSG's managers made operational decisions for PSG, and the group's central corporate committee made management decisions.[288]  As Mr. Ribadeneira and Ms. Ormaza testified, Mr. Ribadeneira only had one vote at the committee and had never dictated any decisions by fiat.[289]  Mr. Ribadeneira further testified that he had never intermingled PSG's assets with his personal assets.[290]

127.    New Balance is left to argue that Mr. Ribadeneira's ownership of PSG through various holding companies until December 2016 should be sufficient to hold him liable to New Balance for New Balance's contractual claims against PSG.  That argument is, of course, unavailing.  Ownership alone is not sufficient to pierce the corporate veil.  Being the sole stockholder is not a significant factor in piercing the corporate veil, and for good reason.[291]  If that were sufficient the corporate veil doctrine would lose all meaning.  As this Tribunal already has ruled, "[t]hat Mr. Ribadeneira is that company's principal stockholder, its general manager, and apparently its principal voice with respect to its business decisions do not by themselves justify a disregarding of the corporate form."[292]  And the evidence now has aptly demonstrated that Mr.

---

[288]    Hearing Transcript 865: 25 through 868:11; Hearing Transcript, 963: 11-22; Hearing Transcript, 946: 5-18 ("A.  That I don't have a position in any of the companies. I am the owner and I am the owner.  Q.  How involved -- now from the period of 2013 through 2016, 2013 through 2016, how involved were you in day-to-day operational decisions of PSG while it was acting as the distributor and then Superdeporte?  A.  We at that time had 36 and today we have 25. But at that time we have 36 different companies. There's no way in the world that I can be hands-on in 36 companies, even less a company that is so small as this one is. PSG is probably the smallest company that we have.").

[289]    *Id.*

[290]    Hearing Transcript 960: 13 through 961: 7.

[291]    *Gordineer v. Colahan*, 2011 Mass. App. Div. 151 (Dist. Ct. 2011) ("We are particularly unconvinced that the fact, standing alone, that [Defendant] was a sole stockholder was significant.").

[292]    Memorandum and Order on Respondents' Motion for Summary Disposition, August 20, 2019, p. 10.

Ribadeneira was, in fact, not PSG's "general manager", nor its "principal voice with respect to its business decisions."

128. Considering all the aforementioned factors and evidence, New Balance has not provided, nor could it possibly provide, sufficient evidence to reach the "high threshold" required to pierce the corporate veil under Massachusetts law to hold Mr. Ribadeneira liable for PSG's obligations to New Balance.[293] As there is no contractual or other basis to impute liability to Mr. Ribadeneira under the Distribution Agreement, this Tribunal should dismiss Mr. Ribadeneira as a Respondent with respect to New Balance's claim arising from the Distribution Agreement.

*vi.* <u>*New Balance's Contractual Claim Against Superdeporte Should Fail*</u>

129. As with Mr. Ribadeneira, this Tribunal has no jurisdiction over Superdeporte regarding New Balance's contract claims under the Distribution Agreement. Superdeporte is not a party to that agreement and did not agree to its arbitral clause. As this Tribunal has recognized in its Order issued in response to Respondents' first Motion for Summary Disposition, in the Tribunal's view, the evidentiary record as of August 20, 2019 would "require the dismissal of the amended claims for the breach of the 2013 distribution agreement against **both Mr. Ribadeneira and Superdeporte**." The subsequent record has not yielded any factual basis to support a claim that Superdeporte should be held to arbitrate claims under the Distribution Agreement, or that, assuming this Tribunal finds it has jurisdiction over the company, it should be liable to New Balance for PSG's obligations under the agreement.

---

[293] *Centurion Networking Serv. Partners, LLC v. Dr. Wade N. Barker, P.A.*, 2018 WL 1972789, at *5 (D. Mass. Apr. 26, 2018).

130.    The evidence proves that Superdeporte is a separate, distinct legal entity that was created long *after* the Distribution Agreement became effective.[294]   It was created at New Balance's request solely for the purpose of carrying out the New Distribution Agreement with New Balance.[295]

131.    New Balance's argument that Superdeporte should be liable to New Balance under a theory of "successor liability" is also unavailing.   This argument should be waived as New Balance first belatedly raised it in response to Respondents' Renewed Motion for Summary disposition.  New Balance failed to plead this successor liability theory in its affirmative pleadings, despite having three opportunities to do so in its Notice of Arbitration and subsequent amendments in May and December of 2019.  Raising this argument for the first time in response to Respondents' Renewed Motion for Summary Disposition is untimely and prejudices Respondents.[296]

---

[294]  Exhibit 155, NB_PSG0000187.

[295]  *See* Exhibit 39, PSG00006836, Exhibit 52-1, PGS00006577, Hearing Transcript 428: 6 through 429:16 ("Okay.·So you raised that concept or that idea of basically having more benefit at the retail level, Marathon retail level, as early as 2014 and perhaps earlier?  A.  Yes.  Q.·  All right.·And that's something that at some point you described as an unfair advantage, you testified on direct wasn't really unfair, but those were your words that you communicated to our client?  A. I'm not sure where that originated, but yes, we used the term "unfair advantage" incorrectly.  Q.  And Mr. Ribadeneira and the folks associated with Marathon Sports and with PSG told you that they would try to accommodate that request that you were making?  A.  I think we were both trying to drive business in the region. So, yes. In the market. Sorry.  Q.  But they told you that they would accommodate that request?  A.  We were looking for solutions in order to -- we were looking for solutions to the idea of selling more shoes in Peru.  THE ARBITRATOR:·I think he's entitled to a yes-or-no answer to his question.  THE WITNESS:·  Okay.  THE ARBITRATOR:·Want to repeat the question?  Q.  Yeah.·  Mr. Ribadeneira and others associated with Marathon and PSG told you that they would accommodate your request?  A.·  Yes."); Hearing Transcript, 642: 22 through 643: 11 ("Q.·  What are you referring to that he told you?·What did he tell you would be fast?  A.  He told me many times that he will send me the new contract, the contract with amendment of Superdeporte and the reduction of the minimum fees.  Q.  Do you know whether -- A.  I was talking with him about this since December. We agreed to reduce the minimums. That way we're more aligned to what is happening in the marketplace.·And to change it to Superdeporte, which was the integrated entity with wholesale and retail, which was something that he request.").  Deposition Transcript of Carlos Miguel Gagliardi, 17:16-24.

[296]  *See e.g.*, *McLaughlin v. Harbor Cruises LLC*, 2009 WL 890099, at *2 (D. Mass. Mar. 31, 2009) (finding that defendant waived implied preemption argument where the defendant's answer did not assert preemption as an affirmative defense); c.f. *Albrite Carpets, Inc. v. Travelers Property Cas. Co. of Am.*, 2010 WL 3749457, at *2 (D. Mass. Sept. 22, 2010) (finding waiver where plaintiff did not raise argument in opposition to defendant's first motion for summary judgment).

132.    On the merits, New Balance's successor liability claim fails, as none of the factors for successor liability are met in this case.  To make a claim for successor liability, New Balance must prove "(1) the successor expressly or impliedly assumes liability of the predecessor, (2) the transaction is a de facto merger or consolidation, (3)the successor is a mere continuation of the predecessor, or (4) the transaction is a fraudulent effort to avoid liabilities of the predecessor."[297] New Balance has not been able to prove any of these elements.

133.    PSG did not transfer all or substantially all of its assets to Superdeporte.[298]  PSG transferred its remaining New Balance inventory to Superdeporte, as Superdeporte was being formed, at New Balance's request, and planned to take over as New Balance's distributor role in Peru under the New Distribution Agreement.[299]  Exhibit 288, introduced by Respondents in advance of the May 29, 2020 Hearing date, establishes that Superdeporte paid for PSG's New Balance and other inventory through an intercompany loan.[300]  Once Superdeporte was established, it paid for and then acquired inventory/assets from PSG.  PSG transferred inventory worth 5.7

---

[297]    *Cargill, Inc. v. Beaver Coal & Oil Co.*, 424 Mass. 356, 359 (1997) (Courts "adhere to traditional corporate law principles that the liabilities of a selling predecessor corporation are not imposed on the successor corporation which purchases its assets unless (1) the successor expressly or impliedly assumes liability of the predecessor, (2) the transaction is a de facto merger or consolidation, (3) the successor is a mere continuation of the predecessor, or (4) the transaction is a fraudulent effort to avoid liabilities of the predecessor.").

[298]    *Premier Capital, LLC v. KMZ, Inc.*, 464 Mass. 467, 475 (2013).

[299]    *See* e.g. Hearing Transcript 878:4 through 879:22 ("Q. There's also been testimony that in May of 2016, Superdeporte in Peru became – was registered as an active company. Right?  A.  Yes.  Q.  It was ready to distribute?  A.  Mm-hmm.  Q.  There were certain sales between PSG and Superdeporte of assets. Right?  A.  Yes.  Q.  And what did PSG sell to Superdeporte?  A.  PSG sold all the inventory that he has. It was around, about 650,000, something like that, all the inventory that he had on hand at that point, and sold to Superdeporte.  Q.  And how did Superdeporte pay PSG for the inventory?  A.  When he saw -- when he bought the inventory, he acquire PSG debt. And afterwards, that date was -- how you say -- what's the word? Was paid with intercompany debt.  THE ARBITRATOR: Are you saying that Superdeporte paid PSG's debt?  THE WITNESS: Debt, yeah.  THE ARBITRATOR: So that was essentially the -- in return for the 650,000 in inventory?  THE WITNESS: Exactly. Exactly.  THE ARBITRATOR: Thank you.  BY MS. JAQUITH: Q.  And was that the -- the debt -- Superdeporte paying PSG's debt, was that everything? Was that -- or was there anything else?  A.  Most of the -- a few, like, 40, 45, 50,000 was cash, was trans -- paid in cash.  Q.  And were any other assets sold from PSG to Superdeporte?  A.  From PSG to Superdeporte? Q. Aside from the inventory that we just talked about.  A.  I don't -- it's just the inventory.").

[300]    Exhibit 288.

million soles to PSG.[301]  Of the 5.7 million soles, 1.789 million soles (approximately $517,000 at the June 2020 average's exchange rate) was made up of New Balance inventory.

134.    As a result of this inventory transfer, Superdeporte owed PSG a debt in the amount of 5.7 million soles.[302]  Equiperu S.A.C., another company in the group, had previously loaned PSG money through an intercompany loan.  The companies agreed that Superdeporte would instead repay Equiperu S.A.C.'s loan to PSG as consideration for acquiring PSG's assets.[303]  Since 2016 when the agreement was entered into, Superdeporte has repaid the debt to Equiperu S.A.C.[304]

135.    Superdeporte is not a "mere continuation" of PSG.[305]  Instead, while PSG's clients became a part of Superdeporte, Superdeporte had distinct retail and wholesale capabilities and clients that PSG did not have.[306]  Superdeporte was a significantly larger company than PSG with different business lines, a different corporate purpose, and different clients.[307]

136.    While PSG ceased distribution operations during 2016, it is still a viable entity.  There is also no evidence PSG ceased operations in order to eliminate its corporate debt.  It was

---

[301]  *Id.*

[302]  *Id.*

[303]  *Id.*

[304]  *Id.*; Hearing Transcript, 879:2-8 ("THE ARBITRATOR:  Are you saying that Superdeporte paid PSG's debt?  THE WITNESS: Debt, yeah.  THE ARBITRATOR: So that was essentially the – in return for the 650,000 in inventor?  THE WITNESS: Exactly. Exactly.").

[305]  *Milliken & Co. v. Duro Textiles, LLC*, 887 N.E.2d 244, 255, 451 Mass. 547, 557 (Mass. 2008).

[306]  Hearing Transcript, 868: 12-25; 869: 2-16 ("Q.  So there's been a lot of discussion about PSG as a wholesale company in Peru and how it was purely a wholesale company and couldn't function at the retail level. Can you explain a little bit about why PSG couldn't function at the retail level?  A.  PSG does not have the expertise, the knowledge, the stores, the locations, the handling the business of retail.  Q.  PSG was purely a -- A.  Purely a wholesale -- Q.  -- distribution company?  A.  -- wholesale company. An importer and wholesale company.  Q.  And you talked about the  infrastructure, stores and all that. Can you describe a little bit more about the infrastructure required for a retail company?  A.  First, you have to be key locations, and you have to have more than four locations. In that case, Marathon has at that point 20 locations, very good locations. You have to have the employees, the working force, to handle those big stores. Because our -- those are not small stores. Those are stores are about 700, 600 meters, square meters. So it needs the operation know-how of how to handle these chain of stores. So they do have in place all of that.").

[307]  Exhibit 39, PSG00006836, Exhibit 52-1, PSG00006577.

sold to a new owner, Mr. Padilla and is now used for a different purpose.[308]  Under Massachusetts law, "dissolution of the predecessor corporation is required"[309] for successor liability.  This did not occur here with PSG.

137.    Furthermore, there is no evidence here of "continuity of directors, officers, and stockholders; and the continued existence of only one corporation after the sale of assets."[310]  PSG and Superdeporte's organizational charts show that the companies had distinct employees and officers with distinct roles and did not share the same personnel.[311]  PSG ceased operating as a distributor in Peru because of New Balance's request that it have a distributor that could function at both the wholesale and retail levels.[312]  As such, Superdeporte was created to handle both wholesale and retail distribution of New Balance products (as well as that of other brands), to take

---

[308]    Hearing transcript, 874: 9-19; 875; 3-15 ("Q.  Just briefly, at the end of 2016, PSG was sold to -- can you tell me a little bit about what you know about that?  A.  It was sold to Julio Padilla.  Q.  So as of the end of 2016, PSG is no longer a part of the group?  A.  Yes, it wasn't a part of the group.  Q.  Okay.  And the company was sold to Mr. Padilla.  Correct?  A.  Yes, it was sold to Mr. Julio Padilla.  THE ARBITRATOR: Did anyone, any company in the Marathon family receive anything in return for selling PSG?  THE WITNESS: From what I know, yes.  THE ARBITRATOR: I'm sorry?  THE WITNESS: From what I know, yes.  THE ARBITRATOR: All right. What did they receive?  THE WITNESS: I think it was worth a little bit -- something more than $10,000.  THE ARBITRATOR: $10,000 plus?  THE WITNESS: Something -- yeah, something like that."); 933: 14 through 934:6 ("What's the basis for your understanding that the shares of Mirando were transferred to Mr. Padilla for valuable consideration?  A.  Was discussed in the meeting.  Q.  What meeting?  A.  A committee meeting.  This meetings of the corporate committee meeting.  Q.  So Mr. Padilla paid valuable consideration for the shares of Mirando Investments?  A.  Yes. Yes.  Q. Okay.  And how much did he pay?  A.  I'm not sure. I can't tell you that, but I remember it was over 10,000. 10,000. Because the capital was that. The capital paid for that company was that.").

[309]    *McCarthy v. Litton Indus., Inc.*, 410 Mass. 15, 23 (1991).

[310]    *Id.*

[311]    Exhibit 38, PSG00006835, Exhibit 39 PSG00006836.

[312]    Hearing Transcript, 966: 4-24 ("But could you in your own words describe why Superdeporte Plus was created in Peru to handle New Balance's account, and how it was created?  A.  Okay. Early on, from the beginning when John took over after Ed Haddad -- no, it was actually after Abe Cunningham – he expressed his desire to have the Peruvian market run similar to the Chilean market where Sparta, who is the largest sporting goods retailer, as Marathon is the largest sporting goods retailer in Peru, was the importer and distributor and had dual margin. He said that from the beginning.  Q.  What do you mean by 'dual margin'?  A.  Dual margin, it means that they import at distributor price. They have the chance to sell at wholesale and then make the retail margin. So it's dual -- it's double margin that the retailer makes. That's that unfair advantage that he mentioned many times.");  Hearing Transcript, 969: 12-15 ("Later, we actually sold out PSG, sold Hiperdeporte, moved the assets to a new entity called Superdeporte to fulfill John's idea of having the Sparta model.").

over PSG's role as New Balance's distributor. PSG, as noted, continues to exist and was sold to Mr. Padilla at the end of 2016.

138. Superdeporte assumed no rights or obligations under the Distribution Agreement. New Balance could not genuinely argue, nor has it argued, that Superdeporte is PSG's alter ego. There is no basis or evidence in the record to justify piercing the corporate veil as to Superdeporte. Superdeporte sits alongside PSG in the group's corporate structure – is not PSG's parent, and was created solely to act under the New Distribution Agreement.

139. As with Mr. Ribadeneira, there is thus no basis to find that Superdeporte has agreed to arbitrate any claims with New Balance under the Distribution Agreement or to hold it liable to New Balance for any of PSG's obligations under that agreement. This Tribunal should therefore dismiss Superdeporte as a Respondent on New Balance's contractual claim.

**B.      New Balance's Claim That PSG Breached The Distribution Agreement Should Fail Because New Balance Caused PSG's Inability To Pay New Balance**

140. New Balance's primary argument in this case is that PSG breached the Distribution Agreement by failing to pay New Balance amounts owed under the Agreement, primarily supposed "minimum distribution fees" owed for periods when New Balance prevented PSG from purchasing products. As a result, New Balance claims over $4.5 million in damages.

141. PSG's alleged breach of the Distribution Agreement should be excused as a matter of law because PSG's breach was caused by New Balance's breach of the Distribution Agreement. Specifically, by denying letter of credit purchases and, importantly, by not allowing PSG to make any purchases after Q4 2015, New Balance prevented PSG from performing under the Distribution Agreement, thereby causing to fall behind in payments to New Balance.

142.     Under Massachusetts law, "[A] breach caused solely by the other party's behavior is generally excused[.]"[313]  In other words, if one party materially breaches the contract first, then the other party is excused from performance.[314]  Here, as explained, New Balance breached the Distribution Agreement first in various ways.

143.     Although the Distribution Agreement explicitly permitted payment via letter of credit, and PSG relied on this right in how it conducted its business with New Balance, New Balance, in violation of Section 6(b) of the agreement, did not allow PSG to place orders via letter of credit starting with Q3 2015 orders in January/February of 2015.[315]  While it later in August of 2015 made one more exception to its unilateral imposition of a no letters of credit policy for Q3 2015 orders, PSG already had fallen many months behind in distribution fee and other payments to New Balance due to New Balance's breach.[316]

144.     Then, strikingly, just after PSG made a substantial payment to New Balance of over US $500 thousand, New Balance shut down PSG's ability to place new orders altogether in August 2015.[317]  It did not allow PSG to place any new orders after Q4 2015, in violation of the

---

[313]  *Peabody N.E., Inc. v. Marshfield*, 426 Mass. 436, 689 N.E.2d 774, 779 (Mass.1998).

[314]  *AM Project Norwood, LLC v. Endicott S. Dev. Corp.,* No. SUCV201702765BLS2, 2018 WL 4937768, at *1 (Mass. Super. Aug. 24, 2018) (finding that a party's failure to turn over records as required by the contract could constitute a material breach excusing the other party from performance of the contract; "Massachusetts law is clear: a party that prevents the other from satisfying a condition precedent cannot rely on the failure of the condition to avoid its own obligations under a contract.").  *In re Access Cardiosystems, Inc.,* 361 B.R. 626, 646 (Bankr. D. Mass. 2007) ("if the Debtor made it impossible for the Distributors to obtain, or if the Debtor in bad faith withheld, the necessary approval of reasonable costs associated with the recall, the Debtor cannot now rely on that failure to avoid its obligation to reimburse those expenses"). *King Features Syndicate, Inc. v. Cape Cod Broadcasting Co.*, 317 Mass. 652, 654 (1945) (A condition precedent may be implied if the intent of both parties to create one is clearly manifested in the contract as a whole.).

[315]  Hearing Transcript, 494:23 through 495:5 ("And so my question is, consistent with what you were being told here by the finance people, did New Balance, at least initially, ask for PSG to pay for Q3 orders by lines of credit as opposed to letters of credit?  A.  Yes, it appears that way."); Exhibit 225, NB_PSG0001555.

[316]  Exhibit 101, NB_PSG0001963; Exhibit 105-1, NB_PSG0001306.

[317]  Exhibit 101, NB_PSG0001963; Exhibit 105-1, NB_PSG0001302, NB_PSG0001306; Exhibit 106, NB_PSG0002036; Exhibit 126-1, PSG00006819.

Distribution Agreement—and later of the New Distribution Agreement after that agreement has been concluded.[318]

145.    PSG's business was exclusively purchasing sportswear at the wholesale level from brands, principally New Balance, and then selling it to end retailers.[319]  As such, these breaches financially strangled PSG, making it impossible for PSG to perform under the Distribution Agreement or later the New Distribution Agreement, generate revenues, or enjoy the benefits of the Distribution Agreement or the New Distribution Agreement.

146.    New Balance's claims for damages mostly consist of distribution fees, which are all for the October 2015 to December 2016 period – a period of time for which New Balance did not allow PSG to place any additional orders from New Balance.[320]  Because PSG could not place orders due to New Balance's breach of the Distribution Agreement, it could not generate revenues from its customers, pay New Balance, or make profits as a result.  If PSG was unable to place orders, sell new product, and generate revenues, it should not as a matter of law be responsible for minimum fees for 2015 and 2016.[321]

---

[318]    Hearing Transcript, 474:22 through 475:22 ("Q.  They did place orders for Q3 2016, but ultimately they asked for those orders to be paid by letter of credit. New Balance said no. So they never got those orders?  A. All I know is they didn't pay for those. I don't know -- they didn't pay for those. We can get those if you want, but they didn't pay for those orders, in any event.  Q.  Well, I mean, you also know that they -- do you not remember that you testified this morning that they asked to pay by letter of credit and that you said no?  A.  I think I said no, yes. Sorry. You're right.  Q.  Okay. So just so we're clear, the last order that PSG was able to pay for by letter of credit -- you've said this already -- were orders that -- of product that they ordered in January/February of 2015?  A.  Yeah. Q.  Everything subsequent to that, for all the rest of 2015, all the rest of 2016, they had to pay by direct wire transfer or else they wouldn't get product?  A.  Yes.").

[319]    Exhibit 44-1, PSG00006520.

[320]    Hearing Transcript 848: 3-10 ("Q And did PSG receive any – aside from the Q3 order that PSG was allowed to place, did PSG receive any Q1, Q2, Q3, Q4 2016 orders?  A. No, I don't believe they did. No.  Q So PSG received and was not able to sell any 2016 product?  A. That's true.").

[321]    *Peabody N.E., Inc. v. Marshfield*, 426 Mass. 436, 689 N.E.2d 774, 779 (Mass.1998) ("a breach caused solely by the other party's behavior is generally excused[.]").

147. PSG's product orders and purchases in 2015 were very limited due to New Balance's unilateral imposition of the new cash payment term, with Q4 orders being placed in April 2015 and being largely paid for via cash transfer on October 29, 2015. New Balance then did not allow PSG to place any orders for Q1 and Q2 2016, and while it allowed it place limited Q3 2016 orders, it did not allow PSG to pay for these orders via letter of credit and did not deliver the products ordered to PSG.[322] So PSG [and Superdeporte] were not allowed to purchase any New Balance products from October 2015 on, including all of 2016.

148. Purchasing and selling New Balance products was an implied condition precedent to making payments of minimum distribution fees to New Balance under the Distribution Agreement. As Mr. Cragan confirmed in his testimony, a "negotiated minimum fee assumes the right to buy product undisturbed and the right to sell product undisturbed."[323] Massachusetts courts recognize that where one party does not fulfill a condition that triggers another party's obligations, then that obligation is excused.[324]

149. New Balance disrupted PSG's ability to buy and sell products starting in January/February of 2015 with Q3 2015 orders and did not allow it to place and receive products

---

[322] Hearing Transcript, 474:22 through 475:22 ("Q. They did place orders for Q3 2016, but ultimately they asked for those orders to be paid by letter of credit. New Balance said no. So they never got those orders? A. All I know is they didn't pay for those. I don't know -- they didn't pay for those. We can get those if you want, but they didn't pay for those orders, in any event. Q. Well, I mean, you also know that they -- do you not remember that you testified this morning that they asked to pay by letter of credit and that you said no? A. I think I said no, yes. Sorry. You're right. Q. Okay. So just so we're clear, the last order that PSG was able to pay for by letter of credit -- you've said this already -- were orders that -- of product that they ordered in January/February of 2015? A. Yeah. Q. Everything subsequent to that, for all the rest of 2015, all the rest of 2016, they had to pay by direct wire transfer or else they wouldn't get product? A. Yes.").

[323] Hearing transcript 854:23-855:2 ("Q. A negotiated minimum fee assumes the right to buy product undisturbed and the right to sell product. Right? Yes, it would. It would.").

[324] *In re Access Cardiosystems, Inc.*, 361 B.R. 626, 646 (Bankr. D. Mass. 2007) ("if the Debtor made it impossible for the Distributors to obtain, or if the Debtor in bad faith withheld, the necessary approval of reasonable costs associated with the recall, the Debtor cannot now rely on that failure to avoid its obligation to reimburse those expenses"); *Douglas Properties, LLC vs. Guaranteed Builders & Developers, Inc.*, Mass. Land Ct., No. 13 MISC 478710 GHP (Oct. 5, 2015) ("A condition precedent may be implied if the intent of both parties to create one is clearly manifested in the contract as a whole.").

orders for the entire period for which it now seeks distribution minimum fees—October of 2015 through December 2016. It thus is cannot as a matter of law collect these fees from PSG (or any of the other Respondents).

150. One needs look no further than the contemporaneous facts to further confirm this. New Balance **never invoiced PSG** (or any of the other Respondents) for the Minimum Fees for 2015, 2016, and the Distribution Fees for December 2016, in the amounts of $405,552.19, $881,732.00 and $25,666.00, respectively, which total over $1.3 million. Mr. Cragan also admitted this in his testimony.[325] These amounts were never even entered into New Balance's accounting system.[326]

151. Why would this be the case? Because New Balance understood at the time that these amounts were not owed under the contract. Then why seek them now in this case? New Balance's counsel provided the Tribunal with the answer during his closing argument. Mr. Tully told us in his closing argument that this case was filed *in retaliation for Respondents filing the Peru Action*: "He launched this litigation, the Peru litigation -- which, by the way, <u>without the Peru litigation, I'm not sure any of us meet</u>."[327] That was a remarkably candid admission, and one that explains why New Balance is seeking as damages in this case, including distribution fees and

---

[325] Hearing transcript, 791:20 through 792:10 ("Now, was the December 2016 distribution fee ever invoiced to PSG? A. I don't believe it was, and I think that's why we've pulled it out separately. That's an oversight. That's honestly -- that's a mistake. It should have been -- there was a distribution fee associated with December 2016. It should be included. Q. Okay. And was the minimum guarantee for 2015 in an amount of $405,552.19 ever invoiced to PSG? A. No, it wasn't. Q. And how about the minimum fee for 2016? Was that invoiced to PSG? A. No, it wasn't.").

[326] Hearing transcript 792: 12-24 ("…there was previously testimony that the amounts that were sent to Atradius were what had been invoiced in the system. Correct? A. That's right. Q. So these amounts highlighted in yellow had not been invoiced in the system? A. Yes, that's correct. Q. Okay. So the total of the three rows there that were not invoiced in the system and that New Balance is claiming as damages in this arbitration are over 1.3 million. Correct? A. That's correct.").

[327] Hearing Transcript, 1235:9-12 (emphasis added).

other charges that it never invoiced to PSG, never entered in its own accounting system and that it cannot collect under the contract or applicable law.

152.    New Balance also claims damages for samples of its products for Q3/Q4 2016 through 2017.  PSG does not owe the expenses for the same reasons it does not owe the distribution fees for the period it was not permitted to buy and sell New Balance products.  PSG never received product after Q4 2015 through end of 2016 or beyond.  The purpose of samples is for the distributor to show its customers the new product that will be coming in the next quarters so that customers can place orders.  PSG was never able to place additional orders or receive new product after Q4 2015 so it should not owe New Balance for samples on products that New Balance prevented it from purchasing and selling.

153.    Applying Massachusetts law to these facts, New Balance is precluded as a matter of law from claiming monies from PSG that PSG could not pay due to New Balance's breaches.[328]

### C.    New Balance's Damages Claims Are Further Flawed, Because It Seeks Usury Interest and Interest Not Permitted Under the Distribution Agreement

154.    A large component of New Balance's damages claim is made up of interest, including $2,663,338.00 in fee interest and $105,710.78 in sample interest.[329]  New Balance may not claim this interest.

155.    For the sample interest, the Distribution Agreement as well as the New Distribution Agreement provide that New Balance is entitled to "charge Distributor interest at the rate of two percent (2%) per month (or, if the applicable usury rate does not permit two (2%) percent per month, then at the maximum interest rate permitted by law) for any amounts not received when

---

[328]    *Peabody N.E., Inc. v. Marshfield*, 426 Mass. 436, 689 N.E.2d 774, 779 (Mass.1998) ("a breach caused solely by the other party's behavior is generally excused[.]").

[329]    Exhibit 259A.

due[.]"[330]  The underlined passage here is important—if the applicable usury rate does not permit the 2% interest, which it does not in Massachusetts, then New Balance per the contract may only charge "the maximum interest rate permitted by law", which in Massachusetts for contract claims is 6%.[331]

156.    For the distribution fee interest, both Distribution Agreements provide that, "[a]ll late payments shall bear interest at a rate of two (2%) percent per month or, <u>if such rate should exceed any applicable permissible legal interest rate, then at the highest legally permissible rate.</u>"[332]  Again , the underlined passage makes evident that where, as here, the 2% exceeds the "applicable permissible legal interest rate" then New Balance may only charge the "highest legally permissible rate, which again is 6%.[333]

157.    The 2% per month interest rate is not permissible under Massachusetts law or the Distribution Agreement, as it is usurious.  The usury statute provides as follows:

> Whoever in exchange for either a loan of money *or other property knowingly contracts for, charges, takes or receives, directly or indirectly, interest and expenses the aggregate of which exceeds an amount greater than twenty per centum per annum* upon the sum loaned or the equivalent rate for a longer or shorter period, shall be guilty of criminal usury and shall be punished by imprisonment in the state prison for not more than ten years or by a fine of not more than ten thousand dollars, or by both such fine and imprisonment . . . Any loan at a rate of interest proscribed under the provisions of paragraph (a) may be declared void by the supreme judicial or superior court in equity upon petition by the person to whom the loan was made.[334]

---

[330]  Exhibit 1, PSG00005497; Exhibit 5-1, PSG00000002 (emphasis added).

[331]  Mass. Gen. Laws Ann. ch. 107, § 3.

[332]  Exhibit 1, PSG00005497; Exhibit 5-1, PSG00000002 (emphasis added).

[333]  Mass. Gen. Laws Ann. ch. 107, § 3.

[334]  Mass. Gen. Laws Ann. ch. 271, § 49 (emphasis added).

158.     Contrary to what Claimant contends, the usury statute is not limited to criminal cases and is regularly applied in civil suits.[335]  Claimant also tried to argue that the statute applies only in the loan context; however, the text and application of the statute are significantly broader than that.  The wording of the statute provides that it applies beyond the context of a loan, when it specifies that "**Whoever in exchange for either** a loan of money **or other property knowingly contracts for, charges, takes or receives, directly or indirectly, interest and expenses the aggregate of which exceeds an amount greater than twenty per centum per annum**…"[336]  The statute's prohibition on usury rates applies thus whenever anyone "in exchange for other property" "knowingly contracts for, charges, takes or receives .. interest .. the aggregate of which exceeds an amount greater than twenty percent per annum."

159.     That is precisely what New Balance has done here in its contract with PSG.  It contracted with PSG "in exchange for" New Balance's property rights—the right for PSG to exclusively sell its products in the Peruvian territory" and has via that contract charged PSG "interest and expenses the aggregate of which exceeds an amount greater than twenty per centum per annum…".

160.     The legal statutory interest rate under Massachusetts law (in the absence of a legal contractual rate) is 6%.[337]  That is the highest rate that New Balance could charge under the express terms of its contract with PSG, both because that is what the text of the contract provides and because the rate that New Balance is seeking to charge is usury and thus illegal under

---

[335]     *In re Rolfe*, 25 B.R. 89, 94 (Bankr. D. Mass. 1982), aff'd, 710 F.2d 1 (1st Cir. 1983) (loan contract could be rescinded for violating the Statute despite contention that no civil remedies existed); *In re Tavares*, 298 B.R. 195, 203 (Bankr.D.Mass.2003) (holding that a violation of the criminal usury statute constitutes a per se violation of Chapter 93A because the usury statute is a public policy statute covered by 940 Mass.Code Regs. 3.16).

[336]     Mass. Gen. Laws Ann. ch. 271, § 49 (emphasis added).

[337]     Mass. Gen. Laws Ann. ch. 107, § 3.

Massachusetts law.  New Balance claims that it is charging interest at 2% per month, but its interest rate calculations materially exceed that amount.  As Mr. Dellepiane explained in his testimony, New Balance calculates compound interest of 2.42% (32.6% per annum) on alleged outstanding distribution fee amounts, and calculates interest of 2.33% (31.1 % annum) on sample expenses.[338] These interest claims are not only usurious, but are also beyond the contractually-specified 2% rate.

161.    Because the interest rate that New Balance is seeking to charge in this case is usurious and not permitted by the terms of the Distribution Agreement, should this Tribunal award any amounts to New Balance, it should apply the legally permitted statutory interest rate of 6% to any principal amounts awarded.  This is precisely what the Distribution Agreement requires when it provides that New Balance may only charge the "highest legally permissible rate" for distribution fees and the "the maximum interest rate permitted by law" for samples.[339]

### D.    New Balance's Tortious Interference Claim Fails

162.    New Balance has not established the required elements for tortious interference.  In order to prove tortious interference, New Balance has the burden of demonstrating: "(1) the existence of a contract or business relationship which contemplated economic benefit; (2) the defendant['s] knowledge of the contract or business relationship; (3) the defendant['s] **intentional**

---

[338]    Hearing Transcript 1059:4 through 1060:21.

[339]    For the sample interest, the Distribution Agreements provide that, a "rate of two percent (2%) per month (or, if the applicable usury rate does not permit two (2%) percent per month, then at the maximum interest rate permitted by law) would apply to any unpaid Product payment; for the distribution fee interest, the Distribution Agreements provide that "[a]ll late payments shall bear interest at a rate of two (2%) percent per month or, if such rate should exceed any applicable permissible legal interest rate, then at the highest legally permissible rate." Exhibit 1, PSG00005497; Exhibit 5-1, PSG00000002.

**interference** with the contract or business relationship for an **improper purpose or by improper means**; and (4) damages."[340]

163.  Courts evaluate the propriety of a defendant's purpose and means on a case by case basis.[341]  A showing of improper purpose requires "proof of the defendant's *actual malice*, i.e. a spiteful, malignant purpose, unrelated to the legitimate corporate interest."[342]  Furthermore, "[a] legitimate advancement of defendant's own economic interest does not constitute an improper motive."[343]  "Nor is business competition an improper motive."[344]

164.  Improper means may consist of a violation of a statute or a common law precept, threats, misrepresentation of facts or defamation.[345]  The assertion by a party of its legal rights is not "improper means" for purposes of a tortious interference claim.[346]

165.  As the Supreme Judicial Court of Massachusetts held in G.S. *Enterprises, Inc. v. Falmouth Marine*, *Inc*., 410 Mass. 262 (1991), the one case Claimant cited in support of its arguments at the hearing,[347] "It is clear, for example, that a party is justified in interfering with a third-party's contract with another by filing a lawsuit in a good faith effort to assert legally protected rights . . . At the same time, however, a civil action is wrongful if its initiator does not

---

[340]  *United Truck Leasing Corp. v. Geltman*, 406 Mass. 811, 812, 815–817, 551 N.E.2d 20 (1990); Swanset Dev. Corp. v. City of Taunton, 668 N.E.2d 333, 338 (Mass. 1996).

[341]  *Skyhook Wireless, Inc. v. Google Inc*., No. CIV.A. 2010-3652BLS1, 2012 WL 5309755, at *14 (Mass. Super. Sept. 28, 2012), aff'd, 86 Mass. App. Ct. 611, 19 N.E.3d 440 (2014) (internal quotations and citations omitted).

[342]  *Id*. (internal quotations and citations omitted) (emphasis added).

[343]  *Ventiv Health Consulting, Inc. v. Equitas Life Scis*., 289 F. Supp. 3d 272 (D. Mass. 2017).

[344]  *Skyhook Wireless*, 2012 WL 5309755, at *15.

[345]  *See Ventiv Health Consulting, Inc. v. Equitas Life Sciences*, 289 F.Supp.3d 272; Kurker v. Hill, 44 Mass. App. Ct. 184, 689 N.E.2d 833 (1998); *United Truck Leasing Corp. v. Geltman*, 406 Mass. 811, 812, 551 N.E.2d 20, 21 (1990).

[346]  *See Pembroke Country Club Inc. v. Regency Savings Bank*, F.S.B. 62 Mass.App.Ct. 34, 40, 815 N.E.2d 241, 247.

[347]  Hearing Transcript, 1203:16 through 1208:9.

have probable cause to believe the suit will succeed, and is acting primarily for a purpose other than that of properly adjudicating his claims[.]"[348]  The inducement of litigation is wrongful "if the actor has no belief in the merit of the litigation or if, through having some belief in its merit, he nevertheless institutes or threatens to institute the litigation in bad faith, intending only to harass the third parties and not to bring his claims to definitive adjudication."[349]

166.    It is clear from the Supreme Judicial Court's holding in *Falmouth Marine*, that the test is a subjective one, not an objective one.  The question is not what a third party observer would say about the intent of the person who files a lawsuit that is being claimed by another as interference; rather, the question is what the evidence says about what the <u>actual intent and belief was of the person who instituted the suit</u>.  This is why the Supreme Judicial Court in its holding provided that what a court must focus on in determining whether the filing of a suit is tantamount to an unjustified intentional interference is whether the person filing the suit had "a <u>good faith effort</u> to assert legally protected rights . . ." or  "<u>does not have probable cause to believe the suit will succeed</u>, and is <u>acting primarily for a purpose other than that of properly adjudicating his claims</u>[.]"[350]  The question is whether the person who files the suit " <u>has no belief in the merit of the litigation</u> or if, through having some belief in its merit, he nevertheless <u>institutes or threatens to institute the litigation in bad faith</u>, <u>intending</u> only <u>to harass</u> the third parties and not to bring his claims to definitive adjudication."[351]  These are all subjective tests that require one to assess the evidence relating to the actual intent and belief of the person who initiates the suit in question.

---

[348] *Falmouth Marine*, *Inc*., 410 Mass. at 273 (internal citations omitted).

[349]  Restatement (Second) of Torts § 767 (1979).

[350] *Falmouth Marine*, *Inc*., 410 Mass. at 273 (internal citations omitted).

[351]  Restatement (Second) of Torts § 767 (1979).

167.    Here, the evidence proves that, Mr. Ribadeneira, on behalf of PSG and Superdeporte, had neither improper purpose nor improper means, as he <u>genuinely believed and did have probable cause to believe the suit in Peru could succeed</u>.  He initiated the litigation in Peru, after consultation with counsel and the managers of PSG and Superdeporte, purely to defend the companies' legal rights and to "have our contract respected."[352]  He filed a request for interim measures to further his genuine belief that New Balance was violating its contract with PSG and Superdeporte, and the Court granted that request.[353]  He asserted claims for breach of contract and breach of precontractual liability based upon the understanding that the parties "had an active contract."[354]  These claims have since been joined with this action.

168.    In the Hearing, New Balance made much in its closing argument of the fact that Mr. Ribadeneira launched the Peru litigation because he was "emotional and angry" and "looking to get back at New Balance," and as such, "misled the court."[355]  New Balance's counsel focused on a mistake that Mr. Ribadeneira made in the filing of the lawsuit in which he affirmed that he was the ultimate owner of PSG even though a few days earlier the transaction had closed through which downstream companies owned by Ribadeneira had sold PSG to Mr. Juan Padilla.[356]  But this proves nothing more than an honest and understandable mistake by Ribadeneira and a lack of

---

[352]    Hearing Transcript, 974: 18-24  ("I felt and I told the managers and the managers concurred that we had an active contract that we needed to establish that it was in our – in my view and in their view, active. According to what we feel, it was -- we had a contract and we needed to have that respected."); Hearing Transcript 975:16-18 ("A The objective was to have our contract respected and to try to establish a conversation about recuperating the contract.").

[353]    Exhibit 191, Request for Interim Measures; Exhibit 193, Peru court order grant of Interim Measures.

[354]    Hearing Transcript, 234: 24 through 235: 4.

[355]    Hearing Transcript, 1235: 7-16.

[356]    Hearing Transcript, 984: 21-985:10.

coordination between the management team that handled the transfer to Mr. Padilla and Mr. Ribadeneira and the lawyers who represented him in the Peru Action.

169.     Mr. Ribadeneira testified in the hearing and in deposition that document filed in the Peru Action stating that he was still the ultimate owner of PSG when he had ceased his ownership days before was a "mistake" on his part.[357]  He also testified that the transfer of PSG to Mr. Padilla was handled by the management team, not by him, and that he was not directly involved in the transfer.[358]  This explains how that honest mistake occurred.  This was not some deliberate misrepresentation, as New Balance would have this Tribunal believe, and it certainly does demonstrate the sort of malice and improper intention that the Supreme Judicial Court found was needed to make out a claim for intentional interference in *Falmouth Marine*.

170.     New Balance cannot point to one document or one email showing that Mr. Ribadeneira was "emotional and angry" or that he was "looking to get back at New Balance" or that Mr. Ribadeneira in any way intentionally "misled the court."  Mr. Ribadeneira, in conjunction with the managers of PSG and Superdeporte, believed that they had a viable claim against New Balance for breach of the New Distribution Agreement under Peruvian law, and Mr. Ribadeneira, on behalf of PSG and Superdeporte, and with the approval of the managers, chose to pursue the claim in the Peruvian courts.[359]  At the time, Mr. Ribadeneira was the assignee of the claims.  The

---

[357]   Hearing Transcript, 984: 3-5 ("Q.  And as of January 2017, you were not a majority shareholder of PSG?  A.  No. That's a mistake.").

[358]   Deposition Transcript of Rodrigo Ribadeneira, 27:6-13 (Q.  And do you recall the shares of Myrando Investments being transferred to Julio Padilla?  A.  Yes, they were transferred to Julio Padilla at one point, but I wasn't involved – that wasn't ran -- that was done by the managers. I was made aware of it. I mean, it wasn't even something I had to authorize. It had to happen. It had to be out.").

[359]   Hearing Transcript, 234: 24 through 235: 4 ("I felt and I told the managers and the managers concurred that we had an active contract that we needed to establish that it was in our – in my view and in their view, active. According to what we feel, it was -- we had a contract and we needed to have that respected; Hearing transcript 235:19-21 ("A The objective was to have our contract respected and to try to establish a conversation about recuperating the contract.").

court agreed that Mr. Ribadeneira had a viable claim and granted an injunction in his favor.[360]
New Balance creates this narrative because it fits conveniently with their claims, but it is <u>not</u>
supported by any credible evidence.

171.    Because New Balance had not proven that Mr. Ribadeneira, or any of the corporate
Respondents, filed the Peru Action "for an **improper purpose** or **by improper means**", its claim
for intentional interference must be dismissed as a matter of law.[361]

## V.    RESPONDENTS' FEES AND COSTS IN THIS ARBITRATION

172.    In accordance with Article 42 of the 2013 UNCITRAL Rules, a party may make a
submission to the Tribunal on the allocation of legal fees and costs and the Tribunal may apportion
those costs as between the parties.[362]   Respondents thus request that New Balance should be
ordered to pay for all of Respondents' attorneys' fees and costs in this arbitration.   Respondents
incurred legal fees and costs in this arbitration in connection with Quinn Emanuel Urquhart &
Sullivan's ("**Quinn Emanuel**") representation of the Respondents in these proceedings.   The total
attorneys' fees and costs incurred as of the date of this submission in this arbitration are
$3,823,278.83.  Respondents expressly reserve the right to update these figures.

## VI.    REQUEST FOR RELIEF

173.    PSG and Superdeporte respectfully requests the arbitral tribunal to:

---

[360]    Exhibit 193, Peru court order Grant of Interim Measures.

[361]    *United Truck Leasing Corp. v. Geltman*, 406 Mass. 811, 812, 815–817, 551 N.E.2d 20 (1990); Swanset
Dev. Corp. v. City of Taunton, 668 N.E.2d 333, 338 (Mass. 1996).

[362]    2013 UNCITRAL Rules, Article 42 ("The costs of the arbitration shall in principle be borne by the
unsuccessful party or parties. However, the arbitral tribunal may apportion each of such costs between the parties if it
determines that apportionment is reasonable, taking into account the circumstances of the case. The arbitral tribunal
shall in the final award or, if it deems appropriate, in any other award, determine any amount that a party may have to
pay to another party as a result of the decision on allocation of costs.").

- Declare that Claimant breached its obligations under the Distribution Agreement, and that it breached the implied covenant of good faith and fair dealing;

- Declare that Claimant's breach of the Distribution Agreement caused PSG to be in breach of its payment obligations to New Balance under the Distribution Agreement and that, as such, PSG's payment defaults are excused;

- Declare that notwithstanding New Balance's breaches, Claimant cannot recover for the fees and other charges it seeks for the period from October 2015 through December 2016 under applicable law and under the terms of the Distribution Agreement;

- Declare that Claimant's claims against Mr. Ribadeneira and Supderdeporte under the Distribution Agreement must be dismissed for lack of this tribunal's jurisdiction over these Respondents in relation to New Balance's claims under the Distribution Agreement;

- Declare that, in the alternative, Claimant cannot recover against Respondents Ribadeneira or Superdeporte because neither assumed any obligations to New Balance under the Distribution Agreement and New Balance has not proven any alternate legal theory under which either of these Respondents should assume any of PSG's liabilities to Claimant under that agreement;

- Declare that the Parties agreed to the terms of the New Distribution Agreement, and that this created a legally binding and enforceable contract;

- Declare that Claimant violated its contractual obligations to Respondents PSG and Superdeporte under the New Distribution Agreement;

- Declare that Claimant violated its covenant of good faith and fair dealing to Respondents PSG and Superdeporte under the New Distribution Agreement; and,

- Order Claimant to compensate PSG and Superdeporte for the damages and losses suffered as a result of Claimant's breaches of the New Distribution Agreement in the amount of **$6.87 million plus statutory pre and post-award interest of 12%.**

174. In the unlikely event that the Tribunal were to find that the New Distribution Agreement was not a binding and enforceable contract, PSG and Superdeporte respectfully request the arbitral tribunal to:

- Declare that Claimant violated its pre-contractual good faith obligations during the negotiations of the New Distribution Agreement; and,

- Order Claimant to compensate PSG and Superdeporte for the damages and losses suffered as a result of Claimant's violation of its precontractual duty to negotiate in good faith estimated to be in the amount of **$6.87 million plus statutory pre and post-award interest of 12%**;

175. In the alternative to and if the Tribunal finds that affirmative substantive and damages claims under the New Distribution Agreement have not been proven, PSG and Superdeporte respectfully request the arbitral tribunal to:

- Order Claimant to compensate PSG for the damages and losses suffered as a result of Claimant's conduct in violation of the Distribution Agreement and its implied covenant of good faith and fair dealing, currently estimated to be in the amount of **$1.01 million plus statutory pre and post-award interest of 12%**;

- Assuming that New Balance's relationship with PSG and Superdeporte would extend through an additional three-year renewal with economic terms similar to those of the New Distribution Agreement, total damages are currently to be in the amount of **$4.80 million plus statutory pre and post-award interest of 12%**;

176. Each of the Respondents also respectfully request the arbitral tribunal to:

- Order that Claimant pay all applicable pre and post-award interest at 12% per annum or the highest rate allowable under applicable law on all amounts awarded to any of the Respondents;[363]

- Order Claimant to pay all arbitration fees and costs, including PSG and Superdeporte's attorneys' fees and costs and expenses; and

- Order any further and/or additional relief as the Tribunal may deem appropriate.

Respectfully submitted,

David M. Orta
Julianne Jaquith
Tracy Gao
Counsel for Respondents
1300 I Street NW, Suite 900
Washington, DC 20005

---

[363] *See* G. L. c. 231, § 6C; *Baxter Health Care, Corp. v. Harvard Apparatus, Inc*., 35 Mass. App. Ct. 204, 207 (1993) ("The judgment was correct in confirming the arbitrators' award of interest on the payment due Bard <u>at the rate of twelve percent per annum from the original closing date. Cf. G.L. c. 231, § 6C. The arbitration agreement is silent on the point, but the award was within the inherent power of the arbitrators.</u>"); *Paola v. Commercial Union Assur. Companies*, 461 A.2d 935, 937 (R.I. 1983) ("Under Massachusetts law, the 12% interest rate set forth in Massachusetts General Laws chapter 231, section 6C (discussed above) automatically attaches to arbitration awards -- even when the award is silent on the issue.").

Tel: (202)538-8000
Fax: (202)538-8100
30 June 2020

**EXHIBIT 14**

# INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION
### International Arbitral Tribunal

---

New Balance Athletics, Inc.,

            Claimant,

v.                                 ICDR Case No. 01-18-0003-1183

Peruvian Sporting Goods S.A.C.,
Superdeporte Plus Peru, S.A.C.,
Rodrigo Ribadeneira

            Respondents.

---

### MEMORANDUM OF DECISION AND PARTIAL FINAL AWARD

I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement entered into between New Balance Athletics, Inc. ("New Balance") and Peruvian Sporting Goods S.A.C. ("PSG") effective January 1, 2013, and having been duly sworn, and having duly heard the proofs and allegations of the parties, do hereby determine and AWARD, as follows:

Following amendments to the original pleadings, the claimant, New Balance seeks a recovery for amounts allegedly owed by the respondent PSG under a distribution agreement effective January 1, 2013 ("the distribution agreement"). New Balance asserts this contractual claim not only against PSG, but also against the respondents, Superdeporte Plus Peru, S.A.C. ("Superdeporte") and Rodrigo Ribadeneira ("Ribadeneira"), on theories of successor liability and piercing of the corporate veil. In addition, New Balance asserts a claim for tortious interference arising from legal proceedings commenced by or on behalf of the above three respondents in the Peruvian judiciary, and particularly as resulting from a temporary injunction against sales by New Balance in Peru that was obtained by the respondents in that case.

The respondents deny liability in connection with the distribution agreement, contending alternatively that, should any one or more be found liable thereon, the damages sought by New

1

Balance are excessive. They deny as well that they are liable for tortious interference with respect to the legal proceedings in Peru.

By amended counterclaims, the respondents assert three claims of their own. With respect to the distribution agreement, the respondents not only deny that they were in breach, but contend instead that New Balance itself breached the agreement causing the respondents loss. In addition, the respondents reassert in this arbitration the two alternative claims that they commenced in the Peruvian court ("the Peru claims"): specifically, that New Balance entered into a new agreement with certain of the respondents, which New Balance then refused to perform; or alternatively, that a new agreement was not finalized because New Balance negotiated in bad faith, in either event causing loss to the respondents. New Balance denies that it breached the distribution agreement or that a new agreement was ever finalized and executed, denying further that there was any bad faith on its part in connection with the negotiation.

I have concluded previously that each of these claims is subject to arbitration pursuant to section 21 of the distribution agreement ("...any and all disputes (whether in contract or any other theories of recovery) related to or arising out of this Agreement or the relationship, its application and/or termination (including post-termination obligations) shall be settled by final and binding arbitration in accordance with the UNCITRAL Arbitration Rules"). See Memorandum and Order on Claimant's Motion to Compel Arbitration dated March 18, 2019; Memorandum and Order on Respondent's Motion for Summary Disposition dated August 20, 2019.

I conducted evidentiary hearings on March 9, 10 and 11, 2020. With a single witness remaining to be heard, public health considerations arising from the coronavirus pandemic compelled a stay in the proceedings. I heard the last witness and final arguments by both sides by videoconferencing on May 29, 2020. I appreciate the understanding and cooperation that all parties and their counsel have contributed given the conditions.

In the course of the arbitration, the parties filed motions in limine seeking exclusion of evidence anticipated from the opposition. I deferred ruling on those motions pending the hearing,

and I now deny each of them. The procedural rules that govern this arbitration provide that "(the) arbitral tribunal shall determine the admissibility, relevance, materiality and weight of the evidence offered." UNCITRAL Arbitration Rules, article 28, par. 4. Given this authority, it is my preference to receive more evidence rather than less, leaving it to my findings of fact to indicate what evidence I have relied on as well as the weight I have given it.

The respondents filed a renewed motion for summary disposition seeking a determination that the evidence is insufficient to grant relief against either Ribadeneira or Superdeporte, and therefore that I reconsider my earlier ruling that I have jurisdiction with respect to the claims against them. Having heard the evidence, that motion is denied. In so ruling, I address only the question of the sufficiency of the evidence (and the related jurisdictional question), and leave the merits to my findings and discussion.

SUBSIDIARY FINDINGS OF FACT

1. A predecessor of PSG began distributing New Balance products in Peru in 2000. Effective January 1, 2013, New Balance and PSG entered into the distribution agreement to govern the business relationship until December 31, 2015, or -- absent timely notice otherwise by either party -- until December 31, 2016. Neither Ribadeneira nor Superdeporte (which had yet to be created) was a party to the distribution agreement. The agreement provided in relevant part that PSG shall purchase products from New Balance or other designated entities; resell such products in Peru (subject to minimum sales requirements); and pay defined distribution fees to New Balance. See sections 8 and 14; exhibits B, D and E.

2. The distribution agreement provided for a procedure whereby PSG would order product at quarterly intervals with lead time sufficient to allow for the manufacture and shipping of those products in time for them to be available in the Peruvian stores by a particular season, usually in the vicinity of six months after the ordering "window." It was anticipated that payment for such orders would be made at the time of the order. Payment, unless otherwise agreed to, "shall be effected by distributor through irrevocable letter of credit at sight or cash in advance due upon placement of any order." Section 6(b). Any late payment was made subject to a 2% monthly

interest charge (to the extent permitted by any applicable restriction on the legal interest rate). Ibid. It was provided further that "(a)ll orders or modifications placed by Distributor under this Agreement shall be subject to acceptance by Company ... and no such order shall be binding until accepted by Company." Section 6 (c).

3. In 2013, PSG began to experience reverses in its Peruvian operations at least in part to regulatory changes affecting its business in Peru and in Ecuador. During 2013, PSG fell behind in paying factories for product and in paying distribution fees on guaranteed minimum sales (the latter being the subject of virtually all of New Balance's present principal claim under the distribution agreement). The parties then entered into a payment agreement whereby PSG committed to pay a substantial portion of the overdue amounts during the first half of 2014. This introduced a period lasting until the end of the term of the distribution agreement (including the extension year of 2016) in which PSG remained permanently in arrears with respect to its obligations. Representatives of the parties spoke and met regularly on the subject. It is not necessary to describe these communications in detail. New Balance, and particularly John Cullen, its General Manager for the Latin America market, agreed to payment plans and other relief in an effort to preserve the relationship. PSG struggled to make payments, some of which were substantial, but was often in significant arrears for extended periods.

4. At the commencement of the term of the distribution agreement on January 1, 2013, the parties had for some time followed a practice whereby PSG paid factories directly for product orders, while paying distribution fees and other amounts to New Balance. Payments to factories were effectuated by letters of credit provided by lenders with whom PSG had business relationships, while payment of distribution fees to New Balance were made in cash. In September, 2014, New Balance, through an email message from John Cullen, informed PSG that the company had adopted new ordering and payment policies that would take effect during 2015. Under the new policies, which would apply to all of New Balance's distributors, payments for product would be made directly to New Balance rather than to the factories, with a subsequently created new ordering process located in Hong Kong. Of greater moment to PSG, it was announced that distributors would no longer be able to post letters of credit at the time of ordering, but rather would be subject to "20 days pre-pay by wire."

4

5. PSG objected immediately and continuously to the proposed elimination of letters of credit. While New Balance plainly desired to rid itself generally of the administrative difficulties associated with managing letters of credit, it did make reasonable attempts to understand and take into account PSG's position on the subject. While not clear from the evidence, it appears that PSG did have available other credit lines that could have been used to support New Balance's demand for cash at the time of ordering, but that such lines did not provide PSG the same period before having to pay the lender, and PSG preferred as well to use such loan proceeds for other purposes. In addition, while there was evidence of inter-company lending within the companies controlled ultimately by Ribadeneira, the record is silent whether PSG ever sought financing from another Ribadeneira entity in order to maintain its levels of purchase from New Balance.

6. New Balance International Limited, the affiliate of New Balance created to handle orders for product, on April 14, 2015, forwarded to all distributors a manual setting forth the terms of the new ordering protocol. In May, 2015, PSG negotiated new more favorable credit terms of net fifteen days. The new arrangement became effective on June 15, 2015. After several reminders, Sebastian Ordonez, an authorized agent of PSG, executed and delivered on July 16, 2015, an acknowledgement of the new terms set forth in the April manual.

7. In the ordering windows in October and November, 2014 (anticipating receipt of product for placement in Peru stores by the second quarter of 2015), New Balance permitted PSG to order by letter of credit. New Balance indicated that this would be the final occasion on which factory orders could be paid by letters of credit. When the next set of ordering windows arrived in January and February, 2015 (for product to reach the market in the third quarter of 2015), New Balance refused to ship the order when PSG again sought to pay by letter of credit. However, having received a mid-year payment by PSG of approximately $550,000 against its even higher accumulated debt to the factories, New Balance relented, accepted the letter of credit on that occasion, and filled the order. The delay caused the goods ordered at the beginning of 2015 to arrive in the stores about six months late, a marketing problem for PSG in an industry in which styles become obsolete quickly. In connection with the April-May 2015 window, New Balance

filled a small cash order for the fourth quarter of 2015 which was also delivered late. This was the final shipment of product by New Balance to PSG, no orders being filled in 2016.

8. PSG's arrearages increased in 2015, reaching a level in August of that year of more than $420,000 in unpaid distribution fees. Notwithstanding the continuing payment difficulties, in 2015 New Balance and PSG began serious discussions regarding prolongation and alteration of the contractual relationship. This was inspired in part by the interest of New Balance in having its Peru distributor undertake retail activities with respect to New Balance products, given that the Ribadeneira group of companies controlled retail outlets in which New Balance items could be featured. PSG's management agreed to the objective. For reasons that are not clear from the record, but that appear to be undisputed, PSG's management concluded that the company was not organized in a way that could effectively implement the proposed new arrangement, and that a new entity (which subsequently became Superdeporte) should be created to become the new distributor. New Balance did not dictate that a new entity be established, but did not object to the strategy.

9. On September 15, 2015, Cullen forwarded to PSG "the final draft (of) our contract restructure." The draft was entitled "Amended and Restated Distribution Agreement;" the parties thereto were New Balance and PSG; and the draft was essentially the existing distribution agreement with amendments (including retention of the effective date of January 1, 2013, but stating that the amendments would take effect on August 1, 2015). Provisions significant to this arbitration included expiration of the initial term on December 31, 2016, or one year later if no notice to let the agreement expire were sent; payment for orders by cash in advance (deleting earlier language authorizing payment by letters of credit, although New Balance could authorize such payments if it desired to do so); inclusion of Ecuador in the sales territory; and retention of New Balance's right to approve orders. The draft agreement reduced guaranteed minimum sales, a benefit to PSG. At the same time, the parties altered the method of calculating distribution fees in a way that also benefited PSG, and New Balance put that new system into effect prior to execution of a new agreement. With PSG still in arrears in significant amounts, the draft agreement called for an early payment toward that debt of $567, 222.60.

6

10. The draft agreement forwarded by New Balance in the fall of 2015 was never executed on behalf of PSG or any other respondent. Some early confusion arose from the fact that Superdeporte, which was destined to replace PSG as the distributor under the new arrangement, was not incorporated until December, 2015, and was not prepared to operate until May, 2016. New Balance agreed that PSG could enter into the agreement as distributor with Superdeporte substituted subsequently, but the respondents declined. New Balance asked continuously when the replacement agreement would be signed, such requests being forwarded well into 2016. Instead, PSG periodically demanded changes in the draft, most (though not all ) of which New Balance declined to make. In the spring of 2016, PSG personnel sought on repeated occasions to obtain from New Balance a letter authorizing Superdeporte to conduct sales on its behalf, but New Balance declined to provide the requested authorization without a signed agreement with Superdeporte.

11. While the proposed new agreement remained in abeyance, the relationship among the parties deteriorated. The respondents continued to demand changes in the draft while resisting requests that the document be signed subject to later revision. Meanwhile, PSG continued to accumulate substantial arrearages, entered into payment agreements, and failed to fulfill a number of them. The respondents did not make the early payment called for in the draft agreement. In 2016, New Balance continued to foreclose new orders for product because of the size of the PSG debt as well as the inability of the distributor to comply with the cash terms.

12. In 2016, New Balance began to explore alternative arrangements with other potential distributors for the Peru market. In mid-June, 2016, it reached an understanding with Desportes Sparta, then its distributor in Chile, to become its distributor in Peru, at which point New Balance gave PSG timely written notice that the distribution agreement would not be extended beyond its then expiration date of December 31, 2016. On or about August 5, 2016, New Balance set aside the purchase-based model for calculating distribution fees on which the parties had been operating in anticipation of a new agreement, and recalculated fees on the basis of the previously employed sales-based model, thereby increasing the PSG fee arrearage. At some point in 2016, PSG transferred its remaining assets, including New Balance inventory, to Superdeporte and effectively went out of business.

7

13. In January, 2017, Ribadeneira, ultimately the controlling owner of both PSG and Superdeporte, acting pursuant to assignments of rights from those entities, commenced legal proceedings in a Peruvian court against New Balance ("the Peru claims"). The principal claim alleged a breach of a new distribution agreement based on the contention that the parties had agreed, by emails and otherwise, on all of the terms of a successor agreement; that the agreement was enforceable; and that New Balance was in breach thereof by refusing to perform. Alternatively, Ribadeneira claimed that, should it be determined that a new contract had not been created, then New Balance had breached its legal obligation to negotiate in good faith, thereby damaging the respondents. In February, 2017, Ribadeneira moved ex parte for a restraint against sales by New Balance in Peru by means of any distributor other than Superdeporte. The injunction was granted by the Peruvian court on December 18, 2017, without New Balance having been heard. This resulted in suspending the then extant New Balance-Desportes Sparta distribution relationship in Peru for approximately seven months, although the evidence indicates that New Balance incurred resulting losses during only four of those months. When New Balance had an opportunity to contest the restraint, the court dissolved the injunction on July 26, 2018.

## ULTIMATE FINDINGS, RULINGS AND DISCUSSION

1. New Balance's claim under the distribution agreement. Apart from their dispute regarding the interest rate and the calculation of interest, the respondents have not challenged the amount of the arrearages asserted by New Balance for unpaid distribution fees billed with respect to products sold; unpaid fees attributable to failure to satisfy minimum sales requirements; or expenses associated with samples. These amounts constitute New Balance's claim of the amount due under the distribution agreement before the attribution of interest: specifically, $376,749.41 (receivable for fees billed and unpaid); $405,552.19 (difference between amounts billed and minimum fee requirement for 2015); $881,732.00 (minimum fee requirement for 11 months of 2016 after reimposition of the sales-based model of calculation); $25, 666.00 (minimum fees for December, 2016); and $43, 801.00 (sample expense). Accordingly, I treat the New Balance

claim under the distribution agreement as totaling $1,733,500.60 before the addition of interest charges.

The respondents defend essentially on a theory of prior breaches by New Balance that rendered performance by the distributor impossible. See Petrangelo v. Pollard, 356 Mass. 696, 701-702 (1970) (material breach by one contracting party excuses performance by other party). The alleged breaches that the respondents identify are the claimant's unilateral decision in mid-2015 to end the practice of payment for product by letters of credit and, when PSG could not provide the required up-front cash and its arrearages mounted, to reject orders for product altogether. The asserted breaches, according to respondents, are not only defenses to New Balance's claims, but also injured PSG as a result of lost profits from sales that PSG would otherwise have made.

A. Letters of credit. Addressing the elimination of letters of credit first, the respondents rely on a payment clause in the distribution agreement that provides that "(p)ayment of all amounts due for Products and all payment documentation for the purchase of the Products shall be effected by Distributor through irrevocable letter of credit at sight or cash in advance due upon placement of any order." Section 6(b). The provision does permit PSG to pay by letter of credit. The unilateral withdrawal of this authorization was offset to a certain extent by PSG's accompanying negotiation of more favorable cash terms as well as by its subsequent acknowledgement that it would comply with the new system. It is clear, however, that the change in payment procedures was imposed by New Balance and its acceptance was not voluntary on the part of PSG.

The questions that follow are whether this constitutes a breach by New Balance at all and, if so, whether it is a material breach. The letter-of-credit language was plainly included in the distribution agreement for the protection of New Balance. The posting of an irrevocable letter of credit is akin to paying cash. It, like the alternative cash requirement, assured New Balance that it would be paid before it assumed the risk of incurring the expenses of manufacture and shipping of product. If, for reasons of its own convenience, the claimant preferred to eliminate the administrative difficulties associated with letters of credit, it surrendered an option that was

beneficial to itself, not a covenant included for the benefit of the distributor. There is no evidence that New Balance surrendered the option in order to prejudice or manipulate PSG in some way. While PSG may, for reasons of its own, have preferred to use letters of credit, the provision was not included to protect that preference. Consequently, notwithstanding the language of section 6(b), but given the purpose of the letter-of-credit provision, I conclude that there has been no breach of the distribution agreement by New Balance in this regard.

Alternatively, I conclude that, to whatever extent there may have been a breach, the breach was not material. Virtually the entirety of New Balance's claim is for non-payment of distribution fees. Those fees were never paid by letters of credit. In addition, the debt for product purchases could have been paid by letter of credit, the restriction not applying to amounts already payable to the factories, at least to the end of 2015. The respondents have not provided a satisfactory explanation why, if a lender were willing to assume the exposure of providing a letter of credit, that lender would not be just as likely to provide conventional financing for product orders with a repayment cycle that accommodated the distributor's cash flow requirements. Indeed, it appears that PSG did have access to one or more conventional credit lines, but preferred to use those proceeds for business purposes other than the ordering of product. Additionally, it appears from other evidence that the companies in the Ribadeneira group did, at least on some occasions, lend to each other, and the record lacks any indication that PSG ever sought relief from that quarter.

It also is worthy of note that the respondents' emphasis upon the difficulties allegedly created by the elimination of letters of credit appears to have intensified as New Balance pressed harder for payment. When the proposed change was introduced for discussion in 2014, Lorena Blanco, a PSG manager, forwarded to John Cullen on December 11, 2014, an email setting forth reasons why letters of credit should be retained. She identifies letters of credit as a practice familiar in the region as a device for avoiding "money laundering, corrupt politicians, and drug trafficking." She argues the benefits that are realized by the selling company, and minimizes the administrative difficulties. While she states clearly the company's preference for the existing system, she ignores the possibility of alternative financing, and acknowledges that the company prefers to use available cash for opening stores, introducing new brands and marketing. The idea that the

absence of letters of credit could cause the distributor's business venture to fail never materializes in the statement.

The respondents then proceeded to negotiate favorable terms applicable to the new ordering system whereby New Balance agreed to extend by thirty-five days the date on which purchase money had to be paid. Meanwhile, they engaged in negotiations with New Balance in anticipation of a new agreement with an expanded retail role for the respondents in which they appeared satisfied to commit to the continued elimination of letters of credit. Nor did they ever avail themselves of the right under section 16(a)(ii) of the distribution agreement to advise New Balance "of a failure to fulfill any of its obligations under this Agreement," with the accompanying right to terminate the agreement should there not be a timely cure. While PSG argued consistently for restoration of permission to use letters of credit to order product, the contention that withholding that permission constituted a material breach of the distribution agreement emerged much later and largely in connection with this arbitration.

I conclude therefore that payment by letter of credit was provided for in the distribution agreement as protection for New Balance, and could be altered by New Balance without breaching that agreement or providing a defense to PSG's own failures to perform contractual obligations. It was not by itself an inducement necessary to persuade PSG to enter into the distribution arrangement. It has taken on a life of its own in this arbitration that, in my view, greatly exceeds its actual significance to PSG's operations at the time. For the reasons stated, it did not materially affect PSG's reasonable expectations with respect to performance of the agreement, and I deny relief to PSG on any basis regarding the use of letters of credit.

B. Rejection of orders. "All orders and/or modifications placed by Distributor under this Agreement shall be subject to acceptance by COMPANY ..., and no such order shall be binding until accepted by COMPANY." Section 6(c). New Balance availed itself of this authority as PSG's arrearages increased in 2015. After filling orders scheduled for the third and fourth quarters of 2015, New Balance effectively closed down the ordering process and shipped no new product to PSG throughout the entirety of 2016 (apart from any late deliveries of product that would otherwise have been received in 2015). New Balance was entitled to protect itself against

further defaults by its customer. To be sure, New Balance also employed the power to reject orders in part to leverage greater efforts on the distributor's part to reduce the amounts owed. The strategy worked to some extent when PSG made payments totaling approximately $550,000 in mid-2015, in return for which New Balance accepted a letter of credit and shipped a third quarter order.

The respondents challenge the claimant's use of the provision requiring approval of orders, asserting that the clause authorizes rejection of an order only if the manufacturer is unable to accommodate it because of style changes or otherwise. The language of the provision does not contain such a limitation. Witnesses called by PSG offered conclusory opinions that the clause was intended to be restricted in this way, but presented no evidence that their opinions actually reflected the custom of the trade in Peru or elsewhere in Latin America.

Alternatively, the respondents posit that their consistent failures to pay for product and related distribution fees could only be remedied by resort to the notice, opportunity to cure, and termination provisions of section 16(a)(ii) of the distribution agreement. PSG was in fact given multiple notices of its delinquencies with respect to payments and had multiple opportunities to cure. Instead, by August 15, 2015, it remained in arrears by more than $800,000 in product payments and by more than $420,000 in distribution fees. New Balance was not required to terminate the agreement, thereby sacrificing any future return on its investment in the enterprise, in order to encourage PSG to pay for what it had purchased. It was entitled by necessary implication to protect itself against further loss until satisfied that it would receive payment for what it sold. If the concept of prior material breach as relieving a party of an obligation to perform is to have any meaning with respect to a sales contract, failure to pay amounts due under the contract plainly justifies a refusal by the vendor to continue to sell.

C. Minimum sales requirements. As indicated, I have concluded that the claimant's rejections of orders did not breach the distribution agreement and do not support PSG's amended counterclaim for breach of that instrument. However, the exercise by New Balance of its right not to continue to sell to PSG until relieved of its reasonable concern that PSG would default on

its payment obligations is not without consequence with respect to enforcement of a portion of New Balance's claim.

The distribution agreement committed PSG to a level of minimum sales by calendar year with an accompanying obligation to pay distribution fees as a percentage thereof regardless of whether such sales were in fact made. See section 8 and exhibits B, D and E. The requirement that PSG generate a given level of income is a logical corollary to its appointment as exclusive distributor of the claimant's products in Peru because the claimant was otherwise precluded from selling to anyone else. This is reflected in section 8(d) in which PSG acknowledges that New Balance would not have entered into the agreement absent the minimum sales requirement.

Nevertheless, enforcement of the minimum fee provisions must be considered in the light of New Balance's refusal to sell new product to PSG for an extended period. While, as set forth above, New Balance was entitled to reject orders on the basis of a reasonable concern that it would not be paid, a simultaneous insistence on performance of a minimum sales obligation is inconsistent with a basic assumption of the contract: i.e., that the distributor can purchase product to resell. In the circumstances, the assertion by New Balance of both its right to reject orders and its right to enforce the minimum fee provisions violated the good faith and fair dealing covenant implicit in all Massachusetts contracts.

The implied covenant of good faith and fair dealing provides "that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." Anthony's Pier Four, Inc. v. HBC Associates, 411 Mass. 451, 471-472 (1991). Anthony's, still perhaps the leading case in Massachusetts on the scope and application of the covenant, addressed a simpler fact situation: specifically, where it was found that the plaintiff had pretextually exercised a power to withhold approval of a development plan in order to extract further concessions from the defendant. Id. at 473. Here, no pretext is present; New Balance seeks only to enforce existing provisions of the contract, not to compel an improvement of its terms to its benefit.

However, the covenant is not restricted to such acts. Indeed, it presupposes that, as in Anthony's, a party has a contractual basis for certain action, but that such action effects an unfair elimination or dilution of benefits that the other party reasonably expects. To that extent, the covenant merely articulates what is already inherent in the contract, i.e., that all of its provisions shall be effectuated in ways that bring about fulfillment of the reasonable expectations of the parties.

While New Balance reasonably expected to be paid in accordance with the contract's terms, and was entitled to protect itself against further loss, PSG concomitantly expected to have product to sell which would generate the proceeds necessary to pay distribution fees. The promise to pay fees was related directly to its ability to re-sell New Balance's products. An expectation that distribution fees would reflect purchases of product from New Balance that PSG would then resell was an "essential and inducing feature of the contract." Id. at 470. Whether implicit in the terms of the contract itself, or the result of the application of the covenant of good faith and fair dealing, New Balance cannot have both the right to suspend sales and the right to assess minimum fees. I conclude accordingly that New Balance has the right to recover unpaid minimum distribution fees during those periods in which it sold product to PSG, but is not entitled to do so with respect to those periods in which it refused to accept orders and ship product.

D. Interest. "All late payments (of distribution fees) shall bear interest at a rate of two (2%) percent per month or, if such rate should exceed any applicable permissible legal interest rate, then at the highest legally permissible rate." Section 14(j). See also section 6(b) to the same effect with respect to purchases of product. I conclude that the interest provision of section 6(b) applies as well to samples as a form of "Products" as defined in section 2(j).

Because amounts claimed by New Balance for breach of the distribution agreement, and the portion thereof awarded, have been outstanding since 2016 and before, accumulated simple interest at 2% per month constitutes a significant portion of the claim. Simple interest at 2% per month on a debt outstanding for one year equates to an annual interest rate of 24%. The respondents challenge the interest charges on three grounds: that the interest rate is unlawful as

usurious under G.L.c. 271, s.49; unless set aside altogether, the rate cannot exceed 6% annually pursuant to G.L.c. 107, s.3; and New Balance has in any event miscalculated the 2% monthly simple interest charges.

Absent advance notice to the Attorney General, a lender violates c.271, s.49, if in "exchange for either a loan of money or other property (it) knowingly contracts for ... interest and expenses the aggregate of which exceeds ... twenty per centum per annum." The question is whether this statutory limitation applies only to conventional lending or also regulates the interest at issue here: specifically, interest to compensate a seller for the loss of use of funds (and associated expenses) during the period in which the buyer fails to make timely payment. While that circumstance has a characteristic similar to that of a conventional loan in that the buyer effectively pays for the use of funds belonging to the seller, I conclude that section 49 is not intended to apply.

Referring to c.271, s.49, the Supreme Judicial Court stated: "The law is designed to protect the necessitous debtor from outrageous demands by lenders." Begelfer v. Najarian, 381 Mass. 177, 182 (1980). When the bill that led to passage of the statute was filed in 1970, the Governor's message that accompanied it referred to the measure as a tool against organized crime and loansharking. The statute refers to a "loan," a term with a common understanding that does not ordinarily embrace purchase and sale relationships between manufacturers and distributors.

When the legislature has felt the need to regulate interest charged in connection with certain commercial transactions, it has done so expressly. See, for example, G.L. c. 255B, ss.11 and 20 (motor vehicle installment sales). Were it the legislative purpose to apply section 49 more broadly so that it encompassed negotiated commercial transactions such as this one, it presumably would have said so at some point between 1970 and the present. My attention has not been directed to judicial decisions that have applied the statute as requested by the respondents, and I decline to do so here.

The short answer to the respondents' contention that New Balance cannot charge a rate higher than the 6% annual rate set forth in G.L.c.107, s.3, is that that statute applies only where there is

no written agreement or provision of law that establishes an interest rate. Here the rate is set forth in the distribution agreement. Their argument that the contractual rate is invalid under section 49, thus creating a void that can only be filled by the 6% rate of c.107, s.3, is not only moot in light of my ruling on the scope of section 49, but has also been rejected by the Massachusetts Appeals Court. See Beach Associates v. Fauser, 9 Mass. App. Ct. 386, 389 (1980)(court has equitable authority to reduce rate determined unlawful under section 49 to statutory maximum of 20% per year).

The respondents contend finally that, even if the 2% per month figure applies, New Balance has calculated it erroneously. Mr. Dellepiane, the respondents' expert witness, testified that the attribution of interest on unpaid amounts determined by New Balance is excessive and contains elements consistent with compound, as opposed to simple, interest. See my treatment of the dispute in my conclusion and preliminary award below.

2. The Peru Claims. The respondents seek damages for what they assert is a binding agreement entered into by New Balance on the one hand, and PSG and Superdeporte on the other, to alter and enlarge the parties' distribution arrangements and to replace the existing distribution agreement scheduled to expire on December 31, 2016. New Balance denied then, and denies now, that the parties ever settled on a replacement agreement. Alternatively, the respondents contend that, should it be found that in fact no new agreement was arrived at, then the same damages should be awarded based on a finding that New Balance breached an obligation to negotiate in good faith.

A. Respondents' claim of a new agreement. For an extended period, the parties sought to come together on a new agreement that would extend, with some material changes, the existing distribution relationship. On or about September 15, 2015, John Cullen forwarded a draft of an "Amended and Restated Distribution Agreement" to PSG. The draft was essentially a reiteration and renewal of the earlier distribution agreement, with certain changes, such as enlargement of the market to include Ecuador. The draft retained the effective date of the earlier agreement (January 1, 2013); extended the term of the agreement an additional year (to December 31, 2016, unless further extended); and provided that the amendments would take effect on August 1,

2015. The draft required a significant early payment by the respondents of approximately $567,000 against then existing arrearages.

No new or revised written contract was ever executed, nor did the parties ever orally commit to all material terms. Following submission of the New Balance draft, the parties continued to negotiate. Each side had an incentive to arrive at a binding agreement. New Balance wanted to achieve a greater presence in the retail market, and the respondents were willing to provide that. New Balance offered reduced minimum sales requirements. In addition, effective August 15, 2105, without a signed agreement but anticipating that one was forthcoming, New Balance instituted a new method of calculating distribution fees that benefited PSG.

New Balance pressed on numerous occasions for PSG to sign a written agreement. See, for example, communications dated September 18, October 3, November 4 and November 10, 2015, as well as frequent subsequent efforts. Meanwhile, New Balance continued to carry substantial accounts receivable with respect to its business in Peru. Requests and responses were exchanged, largely by email but occasionally by personal contact. It is the accumulation of these communications on which the respondents rely in asserting that the parties entered into an enforceable new contract.

"An enforceable agreement requires (1) terms sufficiently complete and definite, and (2) a present intent of the parties at the time of formation to be bound by those terms." Targus Group, Intl., Inc. v. Sherman, 76 Mass. App. Ct. 421, 428 (2010). The controlling factor is whether the parties share an intention to be bound to a set of mutual covenants. See McCarthy v. Tobin, 429 Mass. 84, 87 (1999). A formal document is not required, and the necessary specifics and intention to be bound can be located in communications such as email transmissions. I find, however, that that did not take place here, because the respondents never intended to agree, and did not agree, to terms that were satisfactory to New Balance.

Carlos Gagliardi, who assumed responsibility for the New Balance account on behalf of PSG shortly after PSG received the draft of a new agreement, made it clear from the outset that he disliked the terms proposed and did not view the draft as in the respondents' interest. He

communicated this regularly to John Cullen, continuing to press for lower minimum sales requirements and for re-establishment of the option to purchase by letter of credit. Thus, there was neither a meeting of the minds on substance nor a willingness on the part of PSG to be bound. Even where email exchanges reflected agreement on certain items (although never an agreement on all material items), neither Cullen nor Gagliardi was authorized to commit his company to anything insofar as a new agreement was concerned, and there is no evidence that agents of the parties who were so authorized ever intended to be bound by these communications.

I observe as well that the proposition that the respondent relied on a collection of emails and random meetings to create a binding agreement is not credible. These were sophisticated companies engaged in complex commercial transactions involving a lot of money and ordinarily operating on the basis of a written document that memorialized the relevant undertakings. New Balance attempted to bring this about, but the respondents never agreed to sign the draft or any other document. Nor did the respondents ever reduce what they wanted in an agreement to a comprehensive writing of their own, despite the fact that business of this nature is invariably conducted pursuant to written contracts. Furthermore, New Balance was plainly going to demand a substantial reduction in PSG's arrearages as a condition of any new agreement (the draft calls for an immediate payment of more than half a million dollars), and it is a reasonable inference that the respondents were not prepared to make such a payment at that time. I conclude that a new agreement was never in place, and that there was no contract after December 31, 2016, by which New Balance was bound.

B. Respondent's claim of bad faith negotiation. Anticipating the possibility of an adverse finding on the question whether a new distribution agreement existed, the respondents contend that the failure to arrive at such an agreement was a product of bad faith negotiations on the part of New Balance, and is actionable under Massachusetts law.

There is no evidence that New Balance negotiated in bad faith. On the contrary, I find that New Balance had a considered objective to continue the relationship if it could be modified to enlarge its retail position in Peru, an objective that the respondents were prepared to

18

accommodate, and made genuine efforts to reach an agreement that would bring that about. This included flexibility on minimum sales requirements, as well as a change in distribution fee calculations that benefited PSG while a new agreement was still in the negotiation stage. The parties never reached agreement. But protecting one's own commercial interests and rejecting provisions viewed as contrary to those interests do not constitute negotiating in bad faith. Nor does the fact that the respondents may have incurred expense to create Superdeporte or otherwise in anticipation of an agreement mean that New Balance negotiated in bad faith when ultimately no agreement was reached. Likewise, it is not evidence of bad faith that at the end of 2015 New Balance began exploring other arrangements while PSG was demanding contractual provisions that the claimant was unwilling to accept. PSG still had a substantial indebtedness to New Balance with no showing that it was prepared to pay in the near future, and the existing agreement was scheduled to expire at the end of 2016.

Furthermore, relief on the ground of a bad-faith negotiation is available in Massachusetts in circumstances that are extremely narrow. The most frequent example is where a party incurs costs or otherwise changes its position in reasonable reliance on the opposing party's representation that it will subsequently enter into a contract with the relying party. See, for example, Air Tech Corporation v. General Electric Company, 347 Mass. 613, 624-627 (1964), wherein the parties engaged in a joint effort to obtain a contract for the defendant with an understanding that the plaintiff would receive work as a subcontractor if the contract was obtained. The plaintiff made significant contributions to the process of obtaining the contract, and the court held that in those circumstances the plaintiff was entitled to have the defendant negotiate in good faith with respect to the particulars of the promised subcontract. Similar circumstances are not present here. New Balance was entitled to agree or disagree to a new arrangement on the basis of its own business interests.

3. Tortious interference claim. New Balance seeks damages for lost profit as a result of a "precautionary measure" (the equivalent of a preliminary injunction) rendered by a Peruvian court on application of Ribadeneira acting pursuant to assignments of rights granted by PSG and Superdeporte. The measure was granted in connection with a law suit commenced by Ribadeneira in January, 2017, seeking relief with respect to the alleged new distribution

agreement with the claimant. He followed this in February, 2017, with an application for interim relief, which he submitted and prosecuted without notice to New Balance. On December 18, 2017, the court allowed the request and enjoined New Balance from distributing product in Peru through any party other than PSG. The claimant had previously finalized a new distribution arrangement with Desportes Sparta and was prevented from implementing it until, after giving the claimant an opportunity to contest the preliminary relief, the court rescinded the measure on July 26, 2018. Ribadeneira subsequently withdrew the case in Peru and re-assigned the claims to PSG and Superdeporte, which have pursued them in this arbitration.

The respondents were empowered to seek interim judicial relief by statute, see G.L.c.251, s.2; by UNCITRAL rule, article 26, par.9; and by the arbitration clause of the distribution agreement itself (article 21). However, the right to seek such relief does not protect them from consequences attributable to such proceedings, and an enforceable tortious interference claim may arise as a result of a law suit if the grounds required therefor are otherwise established. See Powers v. Leno, 24 Mass. App. Ct. 381, 385 (1987). Such an action requires that the plaintiff prove the existence of a contractual or other advantageous business relationship; intentional interference with that relationship by the defendant; an improper motive or the employment of improper means on the part of the defendant; and resulting damage incurred by the plaintiff. See G.S. Enterprises, Inc. v. Falmouth Marine, Inc., 410 Mass. 262, 272 (1991); United Truck Leasing Corp. v. Geltman, 406 Mass. 811, 812-817 (1990).

Here, a contractual relationship between New Balance and Desportes Sparta was in place. Ribadeneira and his assignors knew that New Balance had located another distributor and sought to interfere with that business by means of a judicial measure. That does not mean by itself that commencement of the law suit was tortious. If PSG or another respondent had in fact contracted with New Balance to extend the business relationship, they were entitled to enforce their rights. But they were not entitled to litigate for an improper purpose or by improper means.

It is unnecessary to determine whether improper motives were in play. The respondents could genuinely have believed that the essentials of a new agreement with New Balance were in place, and that New Balance reneged when a preferable arrangement with Desportes Sparta became

available. In addition, I credit Ribadeneira's testimony that the New Balance relationship was important to him emotionally because it represented an early success that he had accomplished on his own. Nor do I give any weight to the statement of a PSG manager that the time had come to "screw the gringo," frustration not directed at the law suit and hardly sufficient on which to base a finding of improper motive on the part of the respondents.

What is considerably clearer is that Ribadeneira's presentation to the Peruvian tribunal omitted significant facts and improperly induced that tribunal to grant relief in his favor with significant cost to New Balance. It follows that the claimant has shown that Ribadeneira and the other respondents that authorized and enabled the law suit in fact did employ improper means in obtaining the precautionary measure. I rely in support of this finding upon the considerations of the Peru tribunal itself when it dissolved its own injunction.

Ribadeneira sought preliminary relief without notice to New Balance, and an uncontested presentation on his behalf was made to the court. On the strength of his representations that the parties through email communications had reached an agreement, the court granted the precautionary measure. Notified of the relief that Ribadeneira had obtained, New Balance presented its contrary evidence and the court withdrew its order.

The court ultimately found, as do I, that there had been no agreement on meaningful contractual provisions, and that the contract claimed by Ribadeneira never existed. The court stated expressly that "none of the emails ... consists of a final offer (binding) or an acceptance, but only a negotiation, which did not come to fruition." It commented that "the commercial operation was even more complex than it seems." The court had determined earlier that an offer had been rendered, the offer had been accepted, and a new agreement had emerged. Referring to this finding when it subsequently dissolved the restraint, the court stated: "... it must be taken into account that this (the finding that a new agreement was in place) was done in accordance with the arguments submitted to grant it, however, and in view of the grounds set out in the brief opposing the precautionary measure as well as the attached evidence, the Court considers that it is necessary to reevaluate the legal credibility of the right invoked." (Emphasis supplied.)

The court speaks in the measured tones of the judiciary. But its phrasing does not conceal its conclusion that the respondents misled the tribunal with regard to facts, withholding information that showed that the existing distribution agreement had expired without an agreed-upon replacement. The respondents' defense that they relied on the advice of counsel is unavailing where they declined to reveal what that advice may have been. Accordingly, I find that the respondents employed improper means in order to obtain their desired result, an outcome that restrained sales by New Balance for approximately seven months, and caused the claimant lost earnings for at least four of those months. This finding applies to the three respondents. While the material misrepresentations were submitted to the court on behalf of Ribadeneira, I find that the assignments from PSG and Superdeporte created principal-agent relationships rendering the principals as well as the agent responsible for the losses caused.

4. New Balance's corporate veil and business successor claims.

A.  Piercing the corporate veil. New Balance seeks to impose PSG's liability on Ribadeneira on a theory that PSG is merely a "corporate veil" for Ribadeneira who is the real party in interest. The corporate veil theory of liability is not favored under Massachusetts law. It is based in part on an agency principle where corporations are formed or used to carry out the purposes of the persons or other entities that control them. See My Bread Baking Co. v. Cumberland Farms, Inc., 353 Mass. 614, 618 (1968). Obviously, those relationships by themselves are insufficient. All corporations are formed to advance the objectives of their shareholders, and the principal reason for their existence is to limit the liability of their owners.

Reaching a corporate owner requires evidence of "some fraudulent or injurious consequence" of use of the corporate form; a "confused intermingling of activity ... with substantial disregard" of the differences between the entities or individuals; or "serious ambiguity about the manner and capacity in which the various (entities) and their respective representatives are acting." Id. at 619. In deciding whether these conditions are present, Massachusetts law requires consideration of twelve factors that are relevant. See Evans v. Multicon Construction Corporation, 30 Mass. App. Ct. 728, 733 (1991), citing Pepsi-Cola Metropolitan Bottling Co. v. Checkers, Inc., 754 F.2d 19, 14-16 (1st Cir. 1985). Not all of the criteria are relevant in every case. For example,

22

common ownership and no payment of dividends are legally permissible corporate features and do not by themselves suggest that the corporate shield is being employed improperly.

I consider relevant in the present circumstances other criteria enumerated in Evans: specifically, whether there has been a confused intermingling of business activity, assets or management; nonobservance of corporate formalities; absence of corporate records; insolvency on the part of PSG at the time the distribution agreement was executed; siphoning of corporate assets by the dominant shareholders; or other uses of the corporation to facilitate fraud.

New Balance has the burden on the issue, and I am not persuaded that the evidence presented justifies treating PSG as anything other than a legitimately organized entity employed by its owners as a valid corporate enterprise, and not merely an agent of Ribadeneira or anyone else. That PSG became unable to pay what it owes to New Balance is a risk of the market place, and is not by itself evidence of fraud or other impropriety. See Evans v. Multicon Construction Corp., 30 Mass. App. Ct. at 737-738. There is no evidence of an intermingling of corporate assets or affairs that could have confused New Balance, which had been doing business with Ribadeneira and his companies since 2000, and that was prepared to continue to do so. Corporate formalities were observed, and there has been no evidence of fraudulent transfers or other use of PSG to avoid obligations to the claimant. There is, in my view, no basis on which to disregard the corporate form in these circumstances.

B. Business succession. New Balance's claim that Superdeporte is liable on a business successor theory for PSG's debt under the distribution agreement presents a closer question. Initially, I reject Superdeporte's contention that the business succession claim has surfaced too late in the arbitration and that it should be dismissed on the ground of waiver. A claim of successor liability is not an independent cause of action. It is instead a theory of recovery based on underlying facts that show that there is liability and an assumption thereof by another party. See Long Oil Heat, Inc.v. Spencer, 375 F. Supp. 3d 175, 200 (D. NDNY 2019). Furthermore, New Balance joined Superdeporte as a party-respondent, and Superdeporte cannot reasonably claim surprise that the claimant seeks to hold it responsible for the debt.

Successor liability can emerge only where there has been a sale, merger (including a de facto merger) or consolidation. Put differently, there must be some sort of transactional privity between predecessor and successor. See Carmack v. Massachusetts Bay Transportation Authority, 465 F. Supp. 2d 18, 33 (D. MA 2006). The successor entity must succeed to all or substantially all of the assets of the predecessor. See Premier Capital, LLC v. KMZ, Inc., 464 Mass. 467, 475 (2013). However, an arms-length sale of assets is not sufficient by itself. Such a sale must be accompanied by one or more of the following: an actual assumption (express or implied) of the liability in question; a de facto merger or consolidation; a mere continuation of the business of the predecessor; or a fraudulent effort to evade the liability altogether. See Cargill, Incorporated v. Beaver Coal & Oil Co., 424 Mass. 356, 359 (1997). The predecessor entity need not formally dissolve, but it must discontinue operations. Id. at 361.

On the relevant evidence, I find that Superdeporte was, at the time in question, a successor to the business of PSG under applicable Massachusetts law. Superdeporte was created for the purpose of carrying on the business of PSG when the parties attempted to negotiate a continuation of their relationship. New Balance actually dealt with Superdeporte as its distributor in Peru from May, 2016, until it became clear that a new agreement with the respondents could not be negotiated.

In connection with the expiration of the distribution agreement, PSG transferred its remaining assets to Superdeporte. This included New Balance product that remained on hand, on-going business operations with customers, and the right to use office premises previously occupied by PSG. Former PSG employees worked for Superdeporte. Superdeporte paid a substantial loan obligation of PSG to another company within the Ribadeneira group (choosing to reimburse that company rather than reduce the debt to the claimant). Ribadeneira exercised effective control of Superdeporte as he had done with PSG. Upon transfer of all of its remaining assets, PSG ceased operations altogether. Superdeporte then asked the Peruvian judiciary to bless its status as PSG's successor as distributor alleging the existence of a contract to that effect. I am satisfied that on these facts the Superdeporte enterprise is a continuation of the business of PSG, and that

Superdeporte (but not Ribadeneira individually) is liable jointly for the obligations of PSG under the distribution agreement.

5. <u>Damages; interest; attorney's fees and expenses.</u> New Balance has presented credible evidence of the specific amounts owed by PSG under the distribution agreement. While the respondents have addressed the claimant's right to recover under that agreement at all, they have not challenged persuasively the accounting itself except for the interest calculation. As set forth above, I award principal amounts representing accounts receivable for distribution fees ($376,749.41); minimum distribution fees for 2015 ($405,552.19); and amounts due with respect to samples ($43, 801.00), a total of $826,102.60. I deny recovery for minimum distribution fees for 2016.

Contractual interest on this amount is awarded at the rate of 2% simple interest per month from the date on which each delinquent amount should have been paid. The parties disagree on the calculation as it was offered in evidence by New Balance. The amount will obviously be significant, and I need further attention by the parties to the calculation. New Balance shall, on or before September 11, 2020, file, and serve on the respondents, an interest calculation to October 1, 2020, together with the dates on which each relevant item became due and, to the extent necessary, an explanation of the calculation. If the respondents agree, they shall so notify the claimant and myself, and I will incorporate the figure in my final award. Should the respondents not agree, they shall file and serve their own interest calculation and supporting information on or before September 25, 2020, and I will make my own determination after such further proceedings as I deem useful.

New Balance has also presented credible evidence of the damages it sustained as a result of what I have concluded was tortious interference with its business relationship with Desportes Sparta. The respondents defended on the merits of the claim, but again did not present meaningful evidence regarding the claimed damages. I credit New Balance's claim that the injunction reduced expected distribution fees, brought about a reasonable sharing of the resulting costs to Desportes Sparta, and imposed legal fees and marketing expenses, and I award the requested damages of $215,736.71. Interest shall be added to this component of the award at an

annual rate of 12% from the date that the amendment setting forth the tortious interference claim was served on the respondents. See G.L.c. 231, ss. 6B and 6H.

The arbitration clause in section 21 of the distribution agreement does not provide for an award of attorney's fees or expenses. That authority does appear in the UNCITRAL rules which the parties agreed would govern the proceeding. "The costs of the arbitration shall in principle be borne by the unsuccessful party or parties." Article 42, par. 1. The term "costs" includes "(t)he legal and other costs incurred by the parties in relation to the arbitration to the extent that the arbitral tribunal determines that the amount of such costs is reasonable." Article 40, par. 2(e). I will be guided by Massachusetts law in making the determination. New Balance may file an application for an award of reasonable attorney's fees and expenses on or before September 11, 2020. The respondents may file a opposition on or before September 25, 2020. I will incorporate the fee award in the final award.

PARTIAL FINAL AWARD

For the reasons stated above, I award as follows:

1. Peruvian Sporting Goods and Superdeporte shall pay to New Balance the sum of US$826,102.60 on its claim under the distribution agreement of January 1, 2013 together with simple interest at a rate of 2% per month to be determined as set forth above. The award under this paragraph is assessed jointly against Peruvian Sporting Goods and Superdeporte.

2. Peruvian Sporting Goods, Superdeporte and Rodrigo Ribadeneira shall pay to New Balance the sum of US$215,736.71 on its claim for tortious interference together with interest pursuant to G.L.c. 231, ss. 6B and 6H as set forth above. The award under this paragraph is assessed jointly against Peruvian Sporting Goods, Superdeporte and Rodrigo Ribadeneira.

3.  The counterclaims asserted by Peruvian Sporting Goods, Superdeporte and Rodrigo
    Ribadeneira are denied.

4.  With the issuance of this Partial Final Award, I retain jurisdiction and re-open the
    hearings for written submissions as ordered in section 5. above. Specific awards of
    interest, attorney's fees and expenses, the administrative fees and expenses of the AAA-
    ICDR and the fees and expenses of the Arbitrator shall be made in the Final Award.

I hereby certify that, for the purposes of Article I of the New York Convention of 1958, on the
Recognition and Enforcement of Foreign Arbitral Awards, this Memorandum of Decision and
Partial Final Award was made in Boston, Massachusetts, United States of America.


                                        /s/ William I. Cowin
                                          William I. Cowin
                                          Arbitrator

Dated: August  20, 2020

State of Massachusetts     )
                                )   SS:
County of Middlesex       )

I, William I. Cowin, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is my Memorandum of Decision and Partial Final Award.

_____8/20/2020_____          */s/ William I. Cowin*_____
Date                                  William I. Cowin, Arbitrator

State of STATE            )
                                )   SS:
County of COUNTY      )

On this _____ day of _____, 2020, before me personally came and appeared William I. Cowin, to me known and known to me to be the individual described in and who executed the foregoing instrument and he acknowledged to me that he executed the same.

_____
Notary Public

# EXHIBIT 15

IN THE MATTER OF AN ARBITRATION UNDER THE ARBITRATION RULES OF THE
UNITED NATIONS COMMISSION ON INTERNATIONAL TRADE LAW

BETWEEN:

**NEW BALANCE ATHLETICS, INC.**

*Claimant*

-and-

**PERUVIAN SPORTING GOODS S.A.C., SUPERDEPORTE S.A.C., and RODRIGO
RIBADENEIRA**

*Respondents*

_____

**RESPONDENTS' REQUEST FOR CORRECTION AND INTERPRETATION OF THE
PARTIAL FINAL AWARD AND/OR FOR THE ISSUANCE OF AN ADDITIONAL
AWARD**

_____

**17 September 2020**

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
1300 I Street NW, Suite 900
Washington, DC 20005
Tel: (202)538-8000
Fax: (202)538-8100
Counsel for Respondents

Peruvian Sporting Goods S.A.C. ("PSG"), Superdeporte Plus S.A.C. ("Superdeporte"), and Rodrigo Ribadeneira (hereafter "Respondents") hereby request and apply, pursuant to Article 38(1) of the 2013 UNCITRAL Arbitration Rules, for a correction of the Partial Final Award issued on August 20, 2020 (the "Award"); and/or alternatively, for the making of an additional award pursuant to Article 39(1).  In addition, Respondents hereby request and apply, pursuant to Article 37(1) of the UNCITRAL Arbitration Rules, for an interpretation of the Award; or alternatively, for the issuance of an additional award pursuant to Article 39(1).

## I.     Request For Correction Of Clerical/Computational Error Or For The Issuance Of An Additional Award

Article 38, titled "Correction of the award", allows for the Tribunal to correct errors or omissions in an award.  Article 38(1) provides:

1.  Within 30 days after the receipt of the award, a party, with notice to the other parties, may request the arbitral tribunal to correct in the award any error in computation, any clerical or typographical error, or any error or omission of a similar nature. If the arbitral tribunal considers that the request is justified, it shall make the correction within 45 days of receipt of the request.

Article 39, titled "Additional award", allows the Tribunal to make an additional award as to claims presented but not decided by the Tribunal.  Articles 39(1) and (2) provide:

1.  Within 30 days after the receipt of the termination order or the award, a party, with notice to the other parties, may request the arbitral tribunal to make an award or an additional award as to claims presented in the arbitral proceedings but not decided by the arbitral tribunal.

2.  If the arbitral tribunal considers the request for an award or additional award to be justified, it shall render or complete its award within 60 days after the receipt of the request. The arbitral tribunal may extend, if necessary, the period of time within which it shall make the award.

Pursuant to Articles 38 and/or 39, Respondents respectfully request the Tribunal to correct the clerical/computational error awarding Claimant New Balance Athletics, Inc. ("New Balance") the full amount of the unpaid minimum distribution fees for 2015 ($405,552.19), Award at 25, or

1

alternatively, to make an additional award resolving Respondents' contention and claim that New

Balance should not be allowed to collect the contractual "Minimum Fee" for the period in 2015

when it did not allow Respondents to purchase and sell New Balance products.

> The Tribunal, in page 13 and 14 of the Award, reasoned and ruled that:
>
> Nevertheless, enforcement of the minimum fee provisions must be considered in the light of New Balance's refusal to sell new product to PSG for an extended period. While, as set forth above, New Balance was entitled to reject orders on the basis of a reasonable concern that it would not be paid, a simultaneous insistence on performance of a minimum sales obligation is inconsistent with a basic assumption of the contract: i.e., that the distributor can purchase product to resell. In the circumstances, the assertion by New Balance of both its right to reject orders and its right to enforce the minimum fee provisions violated the good faith and fair dealing covenant implicit in all Massachusetts contracts.
>
> . . . Whether implicit in the terms of the contract itself, or the result of the application of the covenant of good faith and fair dealing, New Balance cannot have both the right to suspend sales and the right to assess minimum fees. I conclude accordingly that *New Balance has the right to recover unpaid minimum distribution fees during those periods in which it sold product to PSG, but is not entitled to do so with respect to those periods in which it refused to accept orders and ship product.*

Award at 13-14 (emphasis added).

It is clear from this ruling that the Tribunal resolved that New Balance can only recover

unpaid minimum distribution fees for "those periods in which it sold product to PSG" and that it

"is not entitled to do so with respect to those periods in which it refused to accept orders and ship

products [to PSG]" *Id.* The evidence of record proves, and the Tribunal found, that on August 19,

2015, New Balance permanently suspended sales of New Balance products to PSG, and it "refused

to accept orders and ship product" to PSG for the period from August 19, 2015 until December 31,

2015, just as it did for all of 2016. *See* Ex. 126-1 (Account Suspension Notification); *see also*

Award at 11 ("After filling orders scheduled for the third and fourth quarters of 2015, New Balance

effectively closed down the ordering process and shipped no new product to PSG throughout the

entirety of 2016 (apart from any late deliveries of product that would otherwise have been received in 2015).").

The period from August 19, 2015 to December 31, 2015, just as for the entire period of 2016, was one "in which [New Balance] refused to accept orders and ship products" to PSG. As such, in keeping with the Tribunal's holding at pages 13-14, New Balance "*is not entitled to*" recover unpaid minimum distribution fees for this period. Consistent with the Tribunal's order denying recovery for the minimum distribution fees for 2016, the Tribunal should also deny recovery of the minimum distribution fees apportioned for the period in 2015 when New Balance refused to accept orders and ship products to PSG—that is the period from August 19, 2015 through December 31, 2015. *See* Award at 25 ("I deny recovery for minimum distribution fees for 2016.").

Respondents have apportioned the 2015 calendar year to take into account the period of time when PSG was and was not allowed to purchase and receive products from New Balance and the amount of minimum fees that New Balance received for its products sold in that year. *See* Ex. 1 (Calculation of Apportioned 2015 Minimum Fees and Shortfall). For the period of time during 2015 when PSG was allowed to purchase products from New Balance, the apportioned minimum fee for that period totals $577,439 of the $916,370 for the entire year. *Id.* Of that $577,439, PSG already has paid (or has been ordered to pay) $510,818, leaving an unpaid minimum distribution fee for 2015 $66,621 for the period when New Balance was permitting PSG to place orders and was shipping it products, as calculated in Figure 1 below. *Id.* To make its Award internally consistent, and to prevent an internal flaw and inconsistency in the Tribunal's rulings, the Tribunal should award only that amount to New Balance for minimum fees for 2015, as that is the only

amount that corresponds to the period of time when New Balance was selling products to PSG and

allowing PSG to purchase and receive New Balance products.[1]

| (USD) | |
| --- | --- |
| 2015 Minimum Fees | 916,370 |
| Start Date of 2015 Minimum Fees | 1/1/2015 |
| End Date of 2015 Minimum Fees [1] | 8/19/2015 |
| Apportionment Factor for 2015 Minimum Fees | 0.63 |
| Apportioned 2015 Minimum Fees | 577,439 |
| 2015 Fees Paid or Invoiced | 510,818 |
| **2015 Minimum Fee Shortfall** | **66,621** |

Notes:
[1] Last date in which PSG could place purchase orders

(Figure 1)

This is the right result because it is the only way to reconcile the error and inconsistency in

the Award that incorrectly awarded New Balance minimum distribution fees for a period of time

in 2015 when the Tribunal found that it was "not entitled" to "recover unpaid minimum distribution

fees"—that is the period in 2015 when New Balance refused to sell or deliver any new products to

---

[1] It matters not that New Balance allowed PSG to pay for the small Q4 2015 order in October of 2015, as PSG had placed that order *in April of 2015 during the period of time when New Balance was still allowing PSG to place orders and receive products*. Joint Exhibit 94, NB_PSG0001670 (New Balance internal email dated April 22, 2015 establishing that PSG placed Q4 2015 orders in April 2015); Joint Exhibit 205, PSG00006772 (Email chain between PSG and New Balance establishing that on October 27, 2015, PSG paid for a limited number of the Q4 2015 orders that it had placed back in April of 2015 – "today we paid 13 Q415 Pls"); Hearing Transcript, 207:18 through 208:7 (A. Yeah. So this is the first window of Q4 2015. So, again, we're six months before entry into the marketplace. So this is a window in April of 2015 for product that will be delivered to the market in October of 2015. Q4 is a very important market. Q4 is a very important Q in the footwear business. It's when we sell a lot of shoes. It's pre-Christmas. It's a very important time for us. Q. And were you able to persuade New Balance to allow PSG to buy in the -- in that window? A. Yes."). Specifically, PSG placed orders for Q4 2015 in April 2015, and it paid for $93,000 worth of product on October 27, 2015. *Id*. This does not change that New Balance did not allow PSG to place any new orders, receive additional products or pay for those products from August 19, 2015 through December 31, 2015.

PSG. It also is the required result because the Tribunal awarded the entirety of the distribution fees to New Balance *for 2015 product sold in 2016* while not applying that distribution fee amount received by New Balance for 2015 products to reduce the 2015 minimum distribution fee. Award at 11 ("After filling orders scheduled for the third and fourth quarters of 2015, New Balance effectively closed down the ordering process and shipped no new product to PSG throughout the entirety of 2016 (apart from any late deliveries of product that would otherwise have been received in 2015)."); *id* at 25 ("I award principal amounts representing accounts receivable for distribution fees ($376,749.41)"); Joint Exhibit 259A (the $376,749.41 comprises the distribution fees for products ordered by PSG before August 19, 2015 when New Balance shut down PSG's ordering and which it sold later in October through December 2015 and February through November 2016.).

Respondents move under Article 38, because this appears to have been an inadvertent error by the Tribunal, as the Tribunal's holding regarding when New Balance cannot recover distribution fees cannot be reconciled with its apparently inadvertent award of minimum distribution fees for the period in 2015 when New Balance refused to sell and deliver new products to PSG. Alternatively, should the Tribunal not find that this was the type of error that it can correct pursuant to the terms of Article 38, Respondents move the Tribunal to make an additional award under Article 39. Pursuant to that article, the Tribunal has the power to make an additional award for claims presented and not decided by the Tribunal. As with the 2016 minimum distribution fees, Respondents claimed and requested the Tribunal to rule that New Balance could not/should not recover minimum distribution fees for the period of time in 2015 when New Balance prevented it

from buying and selling its products, but it appears that the Tribunal did not issue an affirmative ruling with respect to that request.[2]

For the forgoing reasons, Respondents respectfully request that the Tribunal, applying either Article 38 or 39 of the UNCITRAL Arbitration Rules, correct the clerical/computational error awarding the full amount of the unpaid minimum distribution fees for 2015 ($405,552.19), and instead award only the unpaid 2015 minimum distribution fees due and owing through August 19, 2015 ($66,621), or issue an additional award to that effect.

## II. Request For Interpretation Of The Award Or Issuance Of An Additional Award Concerning The Tribunal's Exercise Of Jurisdiction Over Respondents Ribadeneira and Superdeporte

Article 37, titled "Interpretation of the award", allows for the Tribunal to provide an interpretation of its Award. Article 37(1) and (2) provide:

1. Within 30 days after the receipt of the award, a party, with notice to the other parties, may request that the arbitral tribunal give an interpretation of the award.

2. The interpretation shall be given in writing within 45 days after the receipt of the request. The interpretation shall form part of the award and the provisions of article 34, paragraphs 2 to 6, shall apply.

Pursuant to Articles 37 and/or 39, Respondents respectfully request the Tribunal to provide an interpretation the Award, or to issue an additional award, explaining the evidence and legal doctrines and reasoning that the Tribunal relied on to uphold its jurisdiction over Mr. Ribadeneira and Superdeporte.

---

[2] Respondents' Post-Hearing Brief, ¶¶ 146-149 ("Because PSG could not place orders due to New Balance's breach of the Distribution Agreement, it could not generate revenues from its customers, pay New Balance, or make profits as a result. If PSG was unable to place orders, sell new product, and generate revenues, it should not as a matter of law be responsible for minimum fees for 2015 and 2016."); Respondents' Closing Presentation, at Slides 120, 125-28 ("PSG does not owe the distribution fees and minimum fees for 2015 and 2016 because New Balance did not allow PSG to make purchases of any new products during this entire period."); Hearing Transcript, 149:17-150: 16.

Since the start of this Arbitration, Respondents Ribadeneira and Superdeporte consistently have maintained that this Tribunal does not have jurisdiction to arbitrate any claims with respect to these Respondents, because neither has ever consented to arbitrate any claims with New Balance, and because there is no legal doctrine or set of facts that can require them to arbitrate claims against New Balance over their objection.

On May 31, 2019, Respondents submitted its Motion for Summary Disposition, requesting the Tribunal to declare that it does not have jurisdiction over Mr. Ribadeneira, and that it does not have jurisdiction over New Balance's tortious interference claim. In its August 20, 2019 Order, the Tribunal upheld its jurisdiction over the tortious interference claim and over Mr. Ribadeneira with respect to New Balance's tortious interference claim, stating that because it has jurisdiction over the tortious interference claim, it also had jurisdiction over Mr. Ribadeneira.[3] It also deferred a ruling until the close of discovery on the question of whether it has jurisdiction over Mr. Ribadeneira with respect to New Balance's claims under the Distribution Agreement based upon a theory of piercing the corporate veil.[4] On February 12, 2020, Respondents filed a Renewed Motion for Summary Disposition, requesting the Tribunal to find that it has no jurisdiction over Mr. Ribadeneira and Superdeporte with respect to New Balance's claim arising under the 2013 Distribution Agreement, and objecting to the Tribunal's decision in its August 20, 2019 Order

---

[3] August 20, 2019 Order at 8-9 ("However, the simplicity of the initial claim and counterclaim is altered by the prior assertion of the Peru claims by Mr. Ribadeneira in the Peruvian court. Whatever understandings between Mr. Ribadeneira on the one hand, and PSG and Superdeporte on the other, may have existed with respect to the assignments of those companies' claims, it is a matter of record that Mr. Ribadeneira initiated the Peruvian proceedings in his own name, made representations to the court, and obtained the interim relief that enjoined New Balance's sales in Peru for approximately seven months. To the extent that this litigation may have interfered tortiously with New Balance's contract with a third party (which I do not attempt to decide at this stage), it is Mr. Ribadeneira who has inflicted it. Because this tribunal has jurisdiction of that claim, it has jurisdiction over Mr. Ribadeneira with respect thereto, and Mr. Ribadeneira cannot undo any damage his Peru claims and the injunction may have caused by the expedient of re-assigning those claims to PSG and Superdeporte.").

[4] *Id.*

upholding jurisdiction over Mr. Ribadeneira with respect to New Balance's tortious interference claim. Respondents Ribadeneira and Superdeporte maintained these objections during the hearing in this matter and in their post-hearing submission.[5]

As the Tribunal has correctly found, neither Mr. Ribadeneira nor Superdeporte was a party to the 2013 Distribution Agreement. Award at 3. Therefore, neither Mr. Ribadeneira nor Superdeporte has ever agreed to the arbitration clause contained therein or to arbitrate any claim with New Balance. Arbitration is fundamentally based upon consent between the parties. *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 682 (2010). Since Mr. Ribadeneira and Superdeporte have never agreed to arbitrate any claim with New Balance, the Tribunal should not have exercised jurisdiction over either of these Respondents. Whether or not the Tribunal had jurisdiction over the tortious interference claim, does not resolve the question of whether the Tribunal has jurisdiction to arbitrate that claim with respect to Mr. Ribadeneira. Having jurisdiction over a claim does not, standing alone, confer jurisdiction over a person who has the right to advance that claim. *Walker v. Collyer*, 85 Mass. App. Ct. 311 (2014) (finding that a physician, as a non-signatory to an arbitration agreement between patient and facility, should not

---

[5]  *See e.g.* Hearing Transcript, 141:6-143:9; 1184:8-1189:24 ("As to Mr. Ribadeneira, he didn't sign the distribution agreement. He isn't a party to it. He never consented to arbitrate under it. He never assumed any obligations or liabilities under it. The assignments that he received did not – did not carry with it an assumption of liability or obligations. Okay? All it did was give him the right to bring suit against New Balance. And there is no doctrine of law, no -- that says that an assignment like that by itself carries with it these other things in the agreement. Okay? And nor have they made that argument . . . Superdeporte, they have an argument that they came out with at the hearing just before the hearing about successor liability. No successor liability here. Again, Superdeporte not a signatory. Never consented to arbitrate, never assumed obligations, their argument on successor liability raised way too late and waived. But even if you don't waive it and deal with it on the merits, even if you don't consider it waived and deal with it on the merits, here's what the case law says they have to establish: The successor expressly or impliedly assumes liabilities of the predecessor. Okay? There's no evidence that Superdeporte assumed liabilities of PSG with the exception of the consideration that they paid. Okay?· But it didn't expressly assume all liabilities of PSG. It didn't assume liabilities of PSG to New Balance. Key. And there's no document that says that . . ."; Respondents' Posting-Hearing Brief, ¶¶ 115-139 (". . . The only party to the Distribution Agreement was PSG, it is the only party who signed the arbitral agreement and is subject to this Tribunal's jurisdiction for claims brought under the Distribution Agreement, and therefore, PSG is the only party who may be held liable for claims arising under the Distribution Agreement . . .").

be compelled to arbitrate even though the underlying medical malpractice claim is subject to arbitration.).

The Tribunal dedicated only one paragraph in the 28-page Award to deny Respondents' jurisdictional defenses:

> The respondents filed a renewed motion for summary disposition seeking a determination that the evidence is insufficient to grant relief against either Ribadeneira or Superdeporte, and therefore that I reconsider my earlier ruling that I have jurisdiction with respect to the claims against them. Having heard the evidence, that motion is denied. In so ruling, I address only the question of the sufficiency of the evidence (and the related jurisdictional question), and leave the merits to my findings and discussion.

Award at 3.

In its Award, the Tribunal did not explain the reasons as to why it was asserting jurisdiction over Respondents Ribadeneira and Superdeporte, nor what evidence, if any, it relied upon to deny Respondents' jurisdiction objections and to assert jurisdiction over them. It also did not explain what legal doctrine or doctrines it is relying upon to deny Respondents' jurisdictional objections and to assert jurisdiction over Respondents Mr. Ribadeneira and Superdeporte or its legal reasoning for doing so. Article 34(3) of the UNCITRAL Arbitration Rules requires that the Tribunal do so when it provides that "The arbitral tribunal shall state the reasons upon which the award is based, unless the parties have agreed that no reasons are to be given." Here, the parties have not agreed that the Tribunal need not provide the reasoning behind its rulings in the Award. Respondents, therefore, respectfully request that the Tribunal, applying either Article 37 or 39 of the UNCITRAL Arbitration Rules, provide an interpretation of the Award or issue a new award to shed light on the evidence and legal doctrines that the Tribunal relied on to deny Respondents' jurisdictional defense and to assert jurisdiction over these Respondents. As this is an arbitration at law, not at equity, Respondents are entitled to specific rulings on these important questions.

Respectfully submitted,

David M. Orta
Julianne Jaquith
Tracy Gao
Counsel for Respondents
1300 I Street NW, Suite 900
Washington, DC 20005
Tel: (202)538-8000
Fax: (202)538-8100
17 September 2020

# EXHIBIT 16

INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION
International Arbitral Tribunal

---

New Balance Athletics, Inc.,

        Claimant,

v.                              ICDR Case No. 01-18-0003-1183

Peruvian Sporting Goods S.A.C.,
Superdeporte Plus Peru, S.A.C.,
Rodrigo Ribadeneira

        Respondents.

---

## MEMORANDUM AND ORDER ON RESPONDENTS' REQUEST FOR CORRECTION AND INTERPRETATION OF THE PARTIAL FINAL AWARD AND/OR FOR THE ISSUANCE OF AN ADDITIONAL AWARD

Purporting to act pursuant to UNCITRAL Arbitration Rules, Articles 37(1), 38(1) and 39(1), the respondents seek relief with respect to the preliminary award in two respects: a) my determination that the claimant, New Balance Athletics, Inc. ("New Balance"), shall recover, inter alia, the principal amount of $405,552.19 in connection with minimum sales requirements applicable to calendar year 2015; and b) my determination that the respondents Rodrigo Ribadeneira ("Ribadeneira") and Superdeporte Plus Peru, S.A.C. ("Superdeporte") are subject regarding certain claims to the arbitration clause of the distribution agreement of 2013 entered into by New Balance and Peruvian Sporting Goods S.A.C. ("PSG") notwithstanding the fact that neither was a party to that agreement. New Balance has submitted an opposition.

1. I agree with New Balance that UNCITRAL Articles 38 and 39 are inapplicable. With respect to the first issue, my decision that New Balance shall recover the principal amount of $405,552.19 with respect to minimum sales requirements in 2015 does not come about because of an "error in computation, any clerical or typographical error, or any error or omission of a

1

similar nature." It is a purposeful award based on my view of the evidence. See below. Nor does the finding derive from "claims presented in the arbitral proceedings but not decided by the arbitral tribunal." Indeed, the award is the antithesis of such an omission. I have decided the claim, albeit adversely to the respondents.

Nevertheless, I choose not to rely on the language of the rules to deny the respondents an answer. I will treat the respondents' request as one for "interpretation of the award" under Article 37 with respect to the first issue, and/or for reconsideration with respect to both issues.

2. <u>The minimum sales award</u>. It was not contested, and I so found, that New Balance refused to accept new orders from PSG between August 19, 2015, and December 31, 2015, the period relevant to the present request. Notwithstanding that fact, I allowed recovery of distribution fees applicable to required minimum sales for all of 2015, denying such recovery only with respect to fees that would otherwise have been due on minimum sales in 2016. This was intentional on my part.

If it is unclear from the preliminary award, the distinction derives from the fact that ordering "windows" generally opened approximately six months before product ordered in such windows was available for re-sale by PSG. This was understood by all parties and was the accepted ordering, manufacturing and shipment system employed throughout performance of the 2013 distribution agreement.

It follows that product ordered in January, 2015, would generally be available to PSG in July of that year. Likewise, product ordered in April, 2015, would be available for re-sale in October, 2015. But orders submitted in July and October, 2015, would not reach the Peruvian market until January and April, 2016, respectively. Meanwhile, that market did receive during the second half of 2015 those products that had been ordered in the first half of that calendar year.

The point is that New Balance's refusal to accept orders during the second half of 2015 could not have had a material impact until 2016. There is no evidence in the record that is persuasive to me that suggests otherwise. During that portion of 2015 in which PSG was not permitted to

2

order, PSG was still receiving product ordered in the first half of that year. It was not until 2016 that the impact of New Balance's decision not to accept further orders in 2015 would have been experienced in a meaningful way.

My denial of recovery to New Balance with respect to distribution fees in 2016 is based on my conclusion that the 2013 distribution agreement cannot be interpreted in a way that would require PSG to pay fees on sales that, by virtue of New Balance's otherwise justified refusal to risk greater losses by processing orders while substantial arrearages were accumulating, could not materialize because of the absence of product. That denial does not turn on the time at which product would have been ordered. It reflects the time at which product would otherwise have been available for re-sale by PSG.

On the evidence presented, I found that the impact of the New Balance refusal to accept new orders was experienced by PSG not in 2015 but instead in 2016, and I awarded damages for unpaid distribution fees accordingly. I hereby reconfirm those determinations.

3. <u>Jurisdiction</u>. Alleging that I have failed to articulate adequately my reasons for asserting arbitral jurisdiction over Ribadeneira and Superdeporte with respect to certain claims, and that I have failed to identify the evidence that supports those determinations, the respondents seek either interpretation of the preliminary award or a new award on the subject matter. In the preliminary award, I have exercised jurisdiction with respect to Superdeporte by imposing joint liability on that company (together with PSG) for amounts owed under the 2013 distribution agreement based on my finding that it is the business successor to PSG. I have exercised jurisdiction over Ribadeneira and Superdeporte, and have concluded that each is liable (together with PSG) with respect to New Balance's tortious interference claim, because the Peru claims, so-called, from which that interference arose were pursued by Ribadeneira pursuant to assignments of those claims by PSG and Superdeporte.

I have exercised the authority conferred on the arbitral tribunal by Article 23 of the UNCITRAL Arbitration Rules to make the underlying determination that I have jurisdiction under the arbitration clause of the 2013 distribution agreement whereby the parties agreed to

arbitrate "all disputes ... related to or arising out of this Agreement or the relationship, its application and/or termination." I have explained my interpretation and application of this broad clause and relevant authorities at considerable length. See <u>Memorandum and Order on Claimant's Motion to Compel Arbitration</u> dated March 18, 2019; <u>Memorandum and Order on Respondents' Motion for Summary Determination</u> dated August 20, 2019. After further consideration, I decline to modify or expand the conclusions or discussion.

<u>ORDER</u>

1. The respondents' request for correction and interpretation of the preliminary award and/or for an additional award is denied.

2. Within fourteen days of receipt of this decision, the claimant may amend its application for attorney's fees to account for time expended on the instant matter, or it may notify the case manager and the respondents that its presently pending application will suffice.

3. Within fourteen days of receipt of an amended fee application or notice that no amendment will be submitted, the respondents may file oppositions to the claimant's interest calculation and attorney's fee application.

*/s/ William I. Cowin*
William I. Cowin
Arbitrator

Dated: November 4, 2020

# EXHIBIT 17

INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION
International Arbitral Tribunal

New Balance Athletics, Inc.,

Claimant,

v.                                                                ICDR Case No. 01-18-0003-1183

Peruvian Sporting Goods S.A.C.,
Superdeporte Plus Peru, S.A.C.,
Rodrigo Ribadeneira

Respondents.

## MEMORANDUM OF DECISION AND
## FINAL AWARD

I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the
arbitration agreement entered into between New Balance Athletics, Inc. ("New Balance") and
Peruvian Sporting Goods S.A.C. ("PSG") effective January 1, 2013, and having been duly
sworn, and having duly heard the proofs and allegations of the parties, do hereby determine and
AWARD, as follows:

In my Memorandum of Decision and Partial Final Award dated August 20, 2020, I made
preliminary awards in favor of the claimant, New Balance Athletics, Inc. ("New Balance") on
two claims:  a) principal of $826,102.60 on its claim for non-payment on a distribution
agreement dated January 1, 2013; and b) $215,736.71 under its claim for tortious
interference.  With respect to the second claim, I ordered that interest be added pursuant to G.L.
c. 231, ss. 6B and 6H.  Because interest is a subject of New Balance's contractual claim and is
disputed, I reserved action on the issue pending further proceedings.  I provided as well for the
filing by New Balance as the prevailing party of an application for an award of attorney's fees
and expenses.  These further proceedings have now been completed.

1. <u>Contract claim for interest</u>.  Interest on late payments of distribution fees by the respondent
Peruvian Sporting Goods, S.A.C. ("PSG") is governed by section 14 of the 2013 distribution

1

agreement, which provides that such fees "shall be payable within fifteen (15) days after the end of each calendar month with respect to the immediately prior calendar month."  Section 14(a).  "All late payments shall bear interest at a rate of two (2%) percent per month."  Section 14(j).  I have concluded earlier that the 2% monthly interest charge does not violate applicable usury law.

As indicated, New Balance is entitled to contractual interest on the late payments in question.  It has identified an error in the award of the principal amount thereof, which error I acknowledge.  In reducing New Balance's claim on the ground that it refused to accept PSG orders for product to be delivered in 2016, I failed to credit New Balance with the amount of a distribution fee applicable to product that was in fact sold during December, 2016.  Consequently, the amount involved ($25,666.00) should be added to the principal amount of the contract claim (heretofore $826,102.60), thus increasing that portion of the award to $851,768.60.  New Balance calculates that interest on this amount, determined from the date on which each unpaid distribution fee was due, equals $929,284.43 as of October 1, 2020.

Apart from a minor adjustment in that calculation (see below), the respondents oppose the calculation in question on the basis of the dates on which New Balance commences the assessment of interest with respect to certain of the overdue distribution fees.  In some instances, New Balance issued invoices subsequent to the dates upon which fees were due to be paid pursuant to the applicable contractual provision.  The respondents contend that when that occurred interest should be calculated from the date of the invoice only.  The differential accounts for approximately $100,000 in interest.

I agree with the claimant that the respondents' proposition is inconsistent with the relevant terms of the contract.  As indicated, section 14(a) of the 2013 distribution agreement provides that the fee "shall be payable within fifteen (15) days after the end of each calendar month with respect to the immediately prior calendar month."  Nothing refers to the issuance of invoices or suggests that New Balance's practice of issuing invoices in some way altered the applicable provision of the written contract.  Nor is there any evidence otherwise.  Accordingly, I conclude that the claimant's use of due dates as defined in section 14(a) is accurate.  Nor is this affected by

2

the claimant's temporary change in how distribution fees were calculated in anticipation of execution of a new agreement, followed by a reversion to the prior agreed-upon method when no new agreement materialized.

As a final interest detail, the respondents identify an additional dollar that apparently found its way into the claimant's interest calculation with respect to each overdue payment. Without pretending that I understand fully why these calculations should or should not commence with a factor of one dollar, I credit the respondents' view that starting each calculation with a dollar seems to be gratuitous, and I adjust the interest award by $59.00 to account therefor. Accordingly, based on the above, I award interest to October 1, 2020, on the distribution fee award in the amount of $929,225.43. I leave any accumulation of interest thereafter to whatever confirmation process may take place with respect to the award. See also my determination above regarding interest on the tortious interference award.

2. <u>Attorney's fees</u>. Pursuant to Article 42, paragraph 1 of the UNCITRAL Arbitration Rules, New Balance has applied for an award of attorney's fees and expenses associated with the arbitration. That paragraph provides that "(t)he costs of the arbitration shall in principle be borne by the unsuccessful party or parties," although the arbitrator may apportion such costs if the circumstances of the case make apportionment reasonable. New Balance seeks attorney's fees totaling $1,674,520, which includes a supplemental application ($24,525) following my denial of the respondents' request for correction and interpretation of the partial final award. New Balance seeks in addition a total of $176,987.95 in case-related expenses.

The respondents oppose the application for fees and expenses on multiple grounds. They challenge whether they are in fact the "unsuccessful" parties given that New Balance recovered only a portion of its claims measured in dollar terms, and contend on that basis that I should deny fees and expenses altogether, or reduce materially an award therefor. They dispute the scope of the attorney's work for which fees and expenses were sought, asserting that compensation is sought for work unrelated to the arbitration. They submit that the hourly rates and time expended by the claimant's counsel are excessive, and that New Balance has not provided adequate records to support the professional time for which reimbursement is claimed. Finally, they reiterate their

contention that I have no jurisdiction in this arbitration with respect to the respondents Rodrigo Ribadeneira and Superdeporte Plus Peru, S.A.C. ("Superdeporte") and therefore any award of fees and expenses against them cannot be sustained. I address each of these issues.

The respondents are correct that New Balance did not obtain all that it sought with respect to unpaid distribution fees, and I take that into account below. However, to characterize New Balance as not being the "successful" party in this arbitration is to ignore the outcome of the claims and defenses. I equate the term "successful" with "prevailing" as that word is used in relevant Massachusetts decisions. The prevailing party is generally one who obtains a judgment. See Hannon v. Original Gunite Aquatech Pools, Inc., 385 Mass. 813,828 (1982). While only a court may enter a "judgment," an award is the equivalent for purposes of a fee application in an arbitration. Here, New Balance has obtained an award on its contract claim of $1,780,994.03 (principal of $851,768.60; contractual interest of $929,225.43). This constitutes a substantial degree of success, considering that the respondents' position throughout has been that New Balance was entitled to nothing and in fact should pay PSG because of its own breaches.

Furthermore, success in this proceeding is measured by more than simply the percentage obtained on the claim under the 2013 distribution agreement. New Balance prevailed on other elements of the case as well. It has obtained a tortious interference award of $215,736.71 plus statutory interest. It has defeated multiple counterclaims. It has prevailed in all jurisdictional disputes. While it has not been successful in asserting liability against Mr. Ribadeneira personally except on the tort claim, it did prevail on its claim against Superdeporte on a business successor theory. I conclude that New Balance is without doubt the prevailing or "successful" party in this arbitration.

The respondents challenge the subject matters embraced within the claimant's fee application. They argue in this regard that fees should not be awarded for work conducted in connection with matters that took place in United States or Peruvian courts (in other words, work performed in forums other than specifically before the arbitration tribunal). While this does not

4

constitute a significant portion of the amount sought, it is a reasonable concern and I address it.  I conclude that fees with respect to these matters should be allowed.

As I have determined previously, the claims and counterclaims in this proceeding are arbitrable pursuant to the broad arbitration clause in section 21 of the 2013 distribution agreement.  See Memorandum and Order on Claimant's Motion to Compel Arbitration; Memorandum and Order on Respondents' Motion for Summary Disposition.  Notwithstanding that New Balance was contractually entitled to have "all disputes ... related to or arising out of this Agreement or the relationship" with PSG decided by binding arbitration, the respondents embroiled the claimant in litigation in the courts of Peru with related discovery proceedings in United States Courts.  In my view, New Balance was entitled to defend itself in those proceedings in part to enforce its right to arbitrate and concomitantly not to be burdened by having to litigate the arbitrable claims in other forums.  I conclude that reasonable fees associated with such efforts are compensable costs under the applicable UNCITRAL rule.  The respondents were of course free to attempt to avoid arbitration if they believed it was in their interest to do so; but that choice generated expense that had to be defrayed by the claimant and it is equitable that the claimant be permitted to recover it.

The respondents assert that the hourly rates and time expended on which the claimant bases its application for reimbursement are excessive, and that the claimant has not adequately supported its time expenditures by specific time records.  In assessing these contentions, I am governed by Massachusetts law on the subject. That law places the decision largely within my discretion.  See Linthicum v. Archambault, 379 Mass. 381, 388 (1979).  In exercising that discretion, I consider the nature, size and difficulty of the case, the experience and skills of the attorneys, the usual charges in this market for legal services in similar cases, and the results achieved.  Id. at 388-389.  I take into account as well the kind of exposure to an award of fees and expenses that the respondents could anticipate when they engaged in this arbitration with the attendant risks of adverse results.

I agree that the hourly rates charged by claimant's counsel are high, and the time expended litigating the case is substantial.  But neither is out of line with the hourly rates or time that

would be expended by a major law firm on a case of this size and complexity in the Boston market.  The respondents are a highly sophisticated, successful businessman and entities that he effectively controlled.  When, as I have concluded, the respondents agreed to engage in arbitration pursuant to arbitral rules containing a fee-shifting provision, they were on notice that an unfavorable result would generate an additional substantial recovery for the claimant.  Indeed, the respondents have provided their own evidence that they were conscious of this possibility by submitting, at an earlier stage of the arbitration, a preliminary fee application that even at that time exceeded what the claimant presently seeks.  Accordingly, I decline to reduce either the hourly rates or the time expended as submitted by the claimant.

My conclusion in this respect is not affected by the absence of a submission of individual daily time entries by each attorney or other law firm employee who worked on the case.  My authority to assess reasonable attorney's fees and expenses is not dependent on the production of contemporaneous time records.  See Arlington Trust Co. v. Caimi, 414 Mass. 839, 848 (1993).  I credit the information as presented by the claimant and, as indicated, find that it is consistent with the time that would reasonably be expended on a case of this nature in this market.

Notwithstanding the above, I consider the result ultimately achieved by the claimant as a factor that requires a reduction in the amount of attorney's fees that are awarded.  New Balance achieved only approximately one-half of the principal recovery it sought under the 2013 distribution agreement for unpaid distribution fees.  This in turn reduced the amount of accumulated interest that it was able to obtain.  However, as set forth above, New Balance prevailed on its remaining claims (including those regarding jurisdiction) and on its defenses, and is clearly the "successful" party in the arbitration.  Weighing the successes against the failures, I judge that the fee portion of the claimant's application (apart from expenses) should be reduced by twenty (20%) percent, thus reducing the fee component of the claimant's application from $1,674,520 to $1,339,616.

In imposing this reduction, I wish to make clear that I have no reservations regarding the quality of the claimant's legal representation. Indeed, the lawyering on both sides has been of the highest caliber throughout.  Rather, it is a reflection of the fact that an attorney's fee award

reimburses the client for its obligation to its counsel. Where, as here, it was the claimant whose refusal to accept orders to be delivered in 2016 resulted in denial of a significant portion of its distribution fee claim, I exercise my discretion to reduce the level of reimbursement to take that into account.

Finally, the respondents reiterate their contention that neither Mr. Ribadeneira nor Superdeporte are subject to this tribunal's jurisdiction, and that accordingly I have no authority to award fees adversely to them. I have ruled on their jurisdictional defenses and hereby reiterate those rulings. I do acknowledge that a smaller proportion of the final award and interest thereon is entered against Mr. Ribadeneira than that entered against PSG and Superdeporte. Accordingly, I will allocate the award of attorney's fees and expenses against the respective respondents proportionally to their liability on the principal and interest claims.

## FINAL AWARD

For the reasons state above, I determine and award as follows:

1. Memorandum of Decision and Partial Final Award dated August 20, 2020 is hereby modified as follows:

   a. On page 26, paragraph 1, $25,666.00 should be added to the principal amount of the contract claim (heretofore $826,102.60), thus increasing the awarded sum to the principal amount of $851,768.60.

2. In all other respects, said Memorandum of Decision and Partial Final Award dated August 20, 2020 is hereby reaffirmed and incorporated herein by reference.

3. New Balance is awarded contractual interest of $929,225.43 to October 1, 2020, for a total award under the distribution agreement of January 1, 2013, of $1,780,994.03. The award under this paragraph is assessed jointly against Peruvian Sporting Goods S.A.C. and Superdeporte Plus Peru, S.A.C.

4. New Balance shall recover attorney's fees of $1,339,616, together with $176,987.95 in case-related expenses for a total fee and expense award of $1,516,603.95. The award

under this paragraph shall be allocated among the three Respondents in accordance with the liabilities assessed against them under the preceding paragraphs.

5.  The administrative fees and expenses of the ICDR, a division of the American Arbitration Association, totaling $40,230.37, and the compensation and expenses of the Arbitrator totaling $55,076.26 shall be borne by the three Respondents. These amounts are included in the total fee and expense award in paragraph 4 above.

6.  This award is in full settlement of all claims and counterclaims submitted to this Arbitration.

I hereby certify that, for the purposes of Article I of the New York Convention of 1958, on the Recognition and Enforcement of Foreign Arbitral Awards, this Memorandum of Decision and Final Award was made in Boston, Massachusetts, United States of America.

*/s/ William I. Cowin*
William I. Cowin
Arbitrator

Dated: February 11, 2021

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Rodrigo Ribadeneira and<br>Superdeporte Plus Peru S.A.C., | ) |
| | ) |
| Petitioners, | ) |
| | ) |
| v. | )    Civ. No. 1:21-cv-10173-ADB |
| | ) |
| New Balance Athletics, Inc., | ) |
| | ) |
| Respondent. | ) |
| | ) |
| | ) |

## PETITIONERS' AMENDED MOTION TO VACATE ARBITRATION AWARDS

Pursuant to Sections 10 and 12 of the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 10, 12, Petitioners Rodrigo Ribadeneira and Superdeporte Plus Peru S.A.C. ("Superdeporte") (collectively "Petitioners") hereby move the United States District Court for the District of Massachusetts for an order vacating the Partial Final Arbitration Award (the "Partial Award") entered on August 20, 2020, as clarified by the Order on Respondents' Request for Correction and Interpretation of the Partial Final Award, dated November 4, 2020 ("Order"), and the Final Arbitration Award dated February 11, 2021 (the "Final Award") (collectively, the "Awards"), in the matter of *New Balance Athletics, Inc. v. PSG et al.* (ICDR Case No. 01-18-0003-1183), as to Petitioners Ribadeneira and Superdeporte.

Petitioners filed a Petition to Vacate the Arbitration Award on February 1, 2021 with accompanying motion and memorandum of law (Dkt Nos. 1-3). On February 11, 2021, the Arbitrator issued a Final Award. Here, Petitioners submit this amended motion, along with the First Amended Petition and the memorandum of law in support of the motion, which are substantively the same as the original Petition, motion and memorandum of law filed on February

1

1, 2021, because they now also seek to vacate the Final Award, on the same grounds that they moved to vacate the Partial Award.

Petitioners never signed an arbitration agreement with New Balance Athletics, Inc. ("New Balance"), and therefore did not agree with New Balance to arbitrate any claims. The only arbitration agreement at issue here was between New Balance and Peruvian Sporting Goods S.A.C. Neither Ribadeneira nor Superdeporte are signatories to the agreement. The Supreme Court has long recognized that it is for courts, not arbitrators, to decide whether a party has agreed to arbitration. Here, there is no arbitration agreement, and no legal basis to bind the nonsignatory Petitioners to an agreement that they did not sign. The Arbitrator exceeded his authority by determining in the first instance the gateway arbitrability question of whether Ribadeneira and Superdeporte were bound by the arbitration agreement. The Arbitrator also exceeded his authority by resolving that question in the affirmative, in conflict with well-established law providing six exceptions to the rule that nonsignatories to an arbitration agreement may not be bound thereto. None of those exceptions applies here based on the law and the undisputed facts.

## REQUEST FOR ORAL ARGUMENT

In accordance with Local Rule 7.1, Petitioners respectfully request that the Court set this matter for oral argument before ruling upon this motion.

For the reason stated above, and as set forth fully in the accompanying memorandum of law in support of this motion, the Awards should be vacated as to Petitioners Ribadeneira and Superdeporte.

Date: February 22, 2021                    Respectfully submitted,

                                           Rodrigo Ribadeneira and
                                           Superdeporte Plus Peru S.A.C.

                                           By their attorneys,

2

*/s/ Gregg Badichek*
Gregg Badichek (BBO #706270)
greggbadichek@quinnemanuel.com
111 Huntington Ave, Suite 520
Boston, MA 02199
Tel: 617-712-7100
Fax: 617-712-7200

David M. Orta (admitted *pro hac vice*)
davidorta@quinnemanuel.com
Julianne Jaquith (admitted *pro hac vice*)
juliannejaquith@quinnemanuel.com
1300 I Street NW, Suite 900
Washington, D.C. 20005
Tel: +1 202 538 8000
Fax: +1 202 538 8100

David Cooper (admitted *pro hac vice*)
davidcooper@quinnemanuel.com
51 Madison Ave, 22nd floor
New York, NY 10010
Tel: +1 212 849 7000
Fax: +1 212 849 7100

*Attorneys for Petitioners*

## CERTIFICATE OF SERVICE

I hereby certify that on February 22, 2021, I caused a true and correct copy of the foregoing to be filed in this Court's CM/ECF system, which will send notification of such filing to all parties who have appeared in this matter.

*/s/ Gregg Badichek*
Gregg Badichek (BBO #706270)

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| Rodrigo Ribadeneira and | ) |
| Superdeporte Plus Peru S.A.C., | ) |
| | ) |
| Petitioners, | ) |
| | ) |
| v. | ) Civ. No. 1:21-cv-10173-ADB |
| | ) |
| New Balance Athletics, Inc., | ) |
| | ) |
| Respondent. | ) |
| | ) |
| | ) |
| | ) |
| | ) |

**MEMORANDUM OF LAW IN SUPPORT OF AMENDED MOTION TO VACATE**
**<u>ARBITRATION AWARD</u>**

# TABLE OF CONTENTS

Page

INTRODUCTION .................................................................................................................. 1

FACTUAL BACKGROUND ................................................................................................ 3

    A.    The Parties And Their Relationship ............................................................ 3

    B.    The Claims In Peruvian Court ..................................................................... 4

    C.    The Arbitration ............................................................................................ 5

ARGUMENT ........................................................................................................................ 8

I.      THIS COURT DECIDES ARBITRABILITY *DE NOVO* ................................... 9

II.    PETITIONERS ARE NOT BOUND BY THE ARBITRATION CLAUSE, AND
       NEW BALANCE'S CLAIMS AGAINST THEM ARE NOT ARBITRABLE ..... 11

    A.    Petitioners Did Not Agree To Arbitrate, And Therefore Cannot Be Bound
         By The Arbitration Clause ......................................................................... 12

    B.    None Of The Six Exceptions To The Nonsignatory Rule Applies Here ..... 13

III.   THE ARBITRATOR'S DETERMINATION OF SUCCESSOR LIABILITY FOR
       SUPERDEPORTE DOES NOT SUPPORT ARBITRABILITY ....................... 17

    A.    Successor Liability Is Irrelevant To Arbitrability ..................................... 17

    B.    The Arbitrator's Successor Liability Determination Was Erroneous ....... 18

CONCLUSION .................................................................................................................. 20

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Arthur Andersen LLP v. Carlisle*,
   556 U.S. 624 (2009)...................................................................................................13

*Awuah v. Coverall N. Am., Inc.*,
   703 F.3d 36 (1st Cir. 2012) ....................................................................................10

*Bridas S.A.P.I.C. v. Gov't of Turkmenistan*,
   345 F.3d 347 (5th Cir. 2003)...........................................................................16, 17

*Cargill, Inc. v. Beaver Coal & Oil Co.*,
   424 Mass. 356 (1997) ..............................................................................................18

*Carreiro v. Rhodes Gill & Co.*,
   68 F.3d 1443 (1st Cir. 1995) ...................................................................................19

*DK Joint Venture 1 v. Weyand*,
   649 F.3d 310 (5th Cir. 2011) ...................................................................................11

*First Options of Chicago, Inc. v. Kaplan*,
   514 U.S. 938 (1995)...............................................................................................9, 11

*GNH Grp., Inc. v. Guggenheim Holdings, L.L.C.*,
   No. CV 19-1932-CFC, 2020 WL 4287358 (D. Del. July 27, 2020)..........................10

*Grand Wireless, Inc. v. Verizon Wireless, Inc.*,
   748 F.3d 1 (1st Cir. 2014) ...............................................................................13, 14

*Granite Rock Co. v. Teamsters*,
   561 U.S. 287 (2010).................................................................................................12

*Grigson v. Creative Artists Agency, L.L.C.*,
   210 F.3d 524 (5th Cir. 2000)..................................................................................16

*Howsam v. Dean Witter Reynolds, Inc.*,
   537 U.S. 79 (2002)....................................................................................................9

*In re: Auto. Parts Antitrust Litig.*,
   951 F.3d 377 (6th Cir. 2020)..................................................................................10

*Intergen N.V. v. Grina*,
   344 F.3d 134 (1st Cir. 2003) ...............................................................12, 16, 17, 18

*Khath v. Midland Funding, LLC*,
    334 F. Supp. 499 (D. Mass. 2018) .......................................................... 10

*Machado v. System4 LLC*,
    471 Mass. 204, 209 (2015) ............................................... 13, 15, 16, 17

*Mag Portfolio Consult. Gmbh v. Merlin Biomed Grp. LLC*,
    268 F.3d 58 (2d Cir. 2001) ................................................................ 18

*Matter of Arbitration Between Keystone Shipping Co. & Texport Oil Co.*,
    782 F. Supp. 28 (S.D.N.Y. 1992) ........................................................ 14

*McCarthy v. Litton Indus., Inc.*,
    410 Mass. 15 (1991) ......................................................................... 19

*Ouadani v. TF Final Mile LLC*,
    876 F.3d 31 (1st Cir. 2017) ............................................... 12, 15, 16, 17

*Oxford Health Plans LLC v. Sutter*,
    569 U.S. 564 (2013) ........................................................................ 8, 11

*Premier Capital, LLC v. KMZ, Inc.*,
    464 Mass. 46 (2013) ....................................................................... 19, 20

*Sarhank Group v. Oracle Corp.*,
    404 F.3d 657 (2d Cir. 2005) ............................................................ 10, 11

*Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*,
    559 U.S. 662 (2010) ........................................................................... 12

*Telenor Mobile Commc'ns AS v. Storm LLC*,
    524 F. Supp. 2d 332 (S.D.N.Y. 2007) ................................................ 11

*Thomson-CSF, S.A. v. American Arbitration Ass'n*,
    64 F.3d 773 (2d Cir. 1995) ................................................................ 14

*Walker v. Collyer*,
    85 Mass. App. Ct. 311 (2014) .......................................... 12, 13, 15, 16

**Statutory Authorities**

9 U.S.C. § 10(a)(4) ................................................................................. 8

## INTRODUCTION

Petitioners Rodrigo Ribadeneira ("Ribadeneira") and Superdeporte Plus Peru S.A.C. ("Superdeporte") (collectively "Petitioners") respectfully submit this memorandum of law in support of their accompanying Amended Motion to vacate the Partial Final Arbitration Award dated August 20, 2020 (the "Partial Award"), as clarified by the Order on Respondents' Request for Correction and Interpretation of the Partial Final Award, dated November 4, 2020 ("Order"), and the Final Arbitration Award dated February 11, 2021 (the "Final Award") (collectively, the "Awards"). The Awards were issued in favor of New Balance Athletics, Inc. ("New Balance"), against Petitioners and Peruvian Sporting Goods S.A.C. ("PSG"), based on claims of breach of contract and tortious interference. Petitioners here do not contest the Awards against PSG, which signed an agreement with New Balance containing an arbitration clause. However, Petitioners did not sign any agreement with New Balance, and therefore did not agree with New Balance to arbitrate any claims. The Supreme Court has long recognized that it is for courts, not arbitrators, to decide whether a party has agreed to arbitration. Here, there is no such agreement, and no legal basis to bind the nonsignatory Petitioners to an agreement that they did not sign. Accordingly, this Court should vacate the Awards against Petitioners.

Under well-established law, this Court should decide *de novo* whether the Arbitrator erroneously exercised jurisdiction over Petitioners, because they did not agree to arbitration. The Arbitrator claimed that he had jurisdiction to decide arbitrability based on an implicit delegation in the agreement, but that delegation is irrelevant because the question here is whether that agreement is binding on Petitioners in the first place. That is why courts, including the First Circuit, consistently hold in materially identical cases that the court must perform an independent inquiry into whether a party has agreed to arbitration and vacate arbitration awards against parties

who, like Petitioners, have not agreed to arbitrate disputes with the counterparty wishing to arbitrate the claims.

Applying *de novo* review here, this Court should follow the general rule that a party has not agreed to arbitrate—and thus cannot be forced to arbitrate—if it has not signed an agreement with an arbitration provision.  There are six limited exceptions to this rule, and notably, the Arbitrator did not even consider them.  Rather, the Arbitrator asserted that jurisdiction over the *claims* for tortious interference sufficed for jurisdiction over Petitioners.  But this is erroneous as a matter of law:  jurisdiction over claims *does not* constitute jurisdiction over parties, and certainly cannot evade the cornerstone rule that arbitration is a matter of consent.  Moreover, none of the exceptions to the rule against forcing nonsignatories into arbitration applies here:  (1) there was no separate agreement with Petitioners that incorporated by reference the arbitration provision; (2) Petitioners did not assume the obligation to arbitrate and in fact consistently disputed it; (3) there is no evidence that PSG signed the agreement as an agent of Petitioners; (4) the Partial Award correctly rejected the idea that PSG was an alter ego of Petitioners; (5) there is no evidence that Petitioners embraced or directly benefited from the agreement, as required for estoppel; and (6) there is no evidence that Petitioners were intended third-party beneficiaries of the agreement containing the arbitration agreement.

Finally, the Arbitrator's reasoning for finding jurisdiction over Superdeporte for the contract claims likewise ignored the applicable law, and instead rested on his finding of successor liability for Superdeporte.  Successor liability is not an exception to the rule that nonsignatories are not bound by an arbitration agreement.  Indeed, the First Circuit has held that unless one of the recognized exceptions applies, a nonsignatory cannot be forced to arbitrate simply because it is a

successor corporation. In any event, the finding of successor liability is legally and factually erroneous, and therefore cannot support the Arbitrator's jurisdiction over Superdeporte.

## FACTUAL BACKGROUND

### A. The Parties And Their Relationship

At the end of 2009, PSG was created with Ribadeneira as PSG's ultimate majority shareholder through various intervening corporate entities. *See* First Amended Petition to Vacate Arbitration Awards, ¶ 7 ("Petition"). At the beginning of 2010, PSG and New Balance entered into an agreement for the distribution of New Balance's products in Peru. *See* Petition, ¶ 8.

On January 1, 2013, New Balance and PSG entered into a further Distribution Agreement (the "Distribution Agreement"), which is at issue in this proceeding. *See* Petition, ¶ 9, Ex. 1. The Distribution Agreement governed the sale and distribution of New Balance's products in Peru. Article 21 of the Distribution Agreement states, in relevant part: "The parties agree that any and all disputes (whether in contract or any other theories of recovery) related to or arising out of this Agreement or the relationship, its application and/or termination (including post-termination obligations) shall be settled by final and binding arbitration in accordance with the UNCITRAL Arbitration Rules" (the "Arbitration Clause"). *Id.* at 23.

The Distribution Agreement was valid under its original terms until December 31, 2015. However, if neither party expressed an intention to let the Distribution Agreement expire, then (by its terms) the Distribution Agreement would automatically renew for an additional year, *i.e.*, until December 31, 2016. By the end of the Distribution Agreement's original term, neither party expressed an intention to let the Distribution Agreement expire, and thus it automatically renewed until December 31, 2016. *See* Petition, ¶ 11.

Starting in late 2014 and culminating in 2015, New Balance made an offer to PSG to enter into a new and reformed distribution agreement for its business in Peru. Per New Balance's

requirements for the new distribution agreement, PSG would enter into the agreement through a different corporate entity, which had distinct capabilities from PSG, which ultimately, after the formation of Superdeporte in early 2016, became Superdeporte. *See* Petition, ¶ 12. In mid-2015, PSG and New Balance began negotiating the new agreement. PSG believed that, by late 2015 and with minor amendments in January 2016, an agreement had been reached between PSG and New Balance, with Superdeporte ultimately to replace PSG in the new agreement. However, on May 30, 2016, New Balance informed PSG and Superdeporte that it believed no distribution agreement existed between New Balance and Superdeporte and that it was "reverting back" to the original 2013 distribution agreement that New Balance had in place with PSG. *See* Petition, ¶ 13.[1]

Shortly thereafter, on June 23, 2016, New Balance notified PSG and Superdeporte in writing that it was formally terminating the Distribution Agreement with PSG effective December 31, 2016. On July 8, 2016, New Balance informed PSG and Superdeporte that New Balance had decided to work with another distributor in Peru beginning in 2017. *See* Petition, ¶ 14.

## B.     The Claims In Peruvian Court

On November 25, 2016, PSG and Superdeporte executed two similar assignments of rights contracts with Ribadeneira, assigning to him all of their rights to the claims initiated against New Balance with respect to the new, unsigned agreement that New Balance claimed to be ineffective. *See* Petition, ¶ 15. Subsequently, in January 2017, Ribadeneira initiated civil legal proceedings against New Balance before Peruvian civil courts. Ribadeneira claimed that New Balance failed to honor its obligations under the new agreement and alleged extracontractual claims arising from

---

[1]   *See also* Exhibit A at 1 ("Our legal team will not issue a new contract until all payments are current. As such, the new 'purchase based' contract is not valid and we are 'reverting back' to the original contract terms.").

New Balance's failure to conduct itself in good faith under Peruvian law with respect to the negotiation and execution of the new agreement (the "Peru Claims"). *See* Petition, ¶ 16.

On February 1, 2017, Ribadeneira filed a request with the Peruvian civil courts for interim relief. Ribadeneira asked the court to order New Balance to abstain from the distribution of its products in Peru with any distributor other than PSG, claiming that the new agreement was in effect and that, as such, New Balance should not be distributing products through the new distributor. *See* Petition, ¶ 17. In December 2017, the Peruvian civil court ordered a halt on the distribution of New Balance products in Peru during the pendency of the proceeding. *See* Petition, ¶ 18. On July 31, 2018, the Peruvian court lifted its interim order, formally permitting the distribution of New Balance products in Peru. *See* Petition, ¶ 19. On May 2, 2019, PSG, Superdeporte, and Ribadeneira executed two similar assignment of rights contracts in which Ribadeneira transferred all the claims he possessed against New Balance back to PSG and Superdeporte. *See* Petition, ¶ 20.

### C. The Arbitration

New Balance initiated this arbitration against PSG and Ribadeneira on July 31, 2018. New Balance argued that PSG and Ribadeneira had breached the Distribution Agreement for failure to pay money due thereunder. *See* Petition, ¶ 21, Ex. 2. PSG and Ribadeneira responded on September 4, 2018, arguing (*inter alia*) that the Arbitrator did not have jurisdiction over Ribadeneira because he was not a party to the Distribution Agreement. *See* Petition, ¶ 22, Ex. 3. PSG and Ribadeneira amended their response on October 29, 2018, and, while reiterating their jurisdictional objection as to Ribadeneira, asserted a counterclaim against New Balance for breaching the Distribution Agreement. *See* Petition, ¶ 23, Ex. 4.

On January 25, 2019, New Balance moved to compel PSG and Ribadeneira to arbitrate the claims then pending against New Balance in Peru. *See* Petition, ¶ 24, Ex. 5. In their response of

February 4, 2019, PSG and Ribadeneira reiterated their objection that the Arbitrator did not have jurisdiction over Ribadeneira, as he was never a party to the Distribution Agreement.  *See* Petition, ¶ 25, Ex. 6.  On March 18, 2019, the Arbitrator granted New Balance's motion to compel arbitration, holding, in relevant part, that "[it] is the claims that are subject to arbitration."  *See* Petition, ¶ 26, Ex. 7.

On May 3, 2019, New Balance amended its notice of arbitration to add Superdeporte as a respondent and to add a claim against PSG, Superdeporte, and Ribadeneira for tortious interference with New Balance's new distribution arrangement with its new distributor in Peru as a result of the Peru Claims.  *See* Petition, ¶ 27, Ex. 8.

PSG, Ribadeneira, and Superdeporte moved for summary disposition on May 31, 2019, asserting, in relevant part, that the Arbitrator did not have jurisdiction over Ribadeneira, explaining the general rule under Massachusetts law that a nonsignatory could not be bound to an arbitration agreement, and that none of the six exceptions applied.  *See* Petition, ¶ 28, Ex. 9.  On August 20, 2019, the Arbitrator denied the motion for summary disposition.  The Arbitrator noted his prior holding that he had jurisdiction over the Peru Claims filed by Ribadeneira, and further held that because New Balance's tortious interference claim arose from the Peru Claims, he had jurisdiction over Ribadeneira with regard to the tortious interference claim as well.  The Arbitrator deferred ruling until the close of discovery on the question whether he had jurisdiction over Ribadeneira with respect to New Balance's original claim for breach of the Distribution Agreement based upon a theory of piercing the corporate veil.  *See* Petition, ¶ 29, Ex. 10.

Following discovery, PSG, Superdeporte, and Ribadeneira renewed their motion for summary disposition on February 12, 2020, and again asserted that the Arbitrator did not have jurisdiction over Ribadeneira or Superdeporte with respect to any of New Balance's claims.  *See*

Petition, ¶ 30, Ex. 11.  The parties held a hearing in the case on March 9-11 and May 30 and PSG, Superdeporte and Ribadeneira again argued that the Arbitrator had no jurisdiction over Ribadeneira and Superdeporte under New Balance's claim for breach of the Distribution Agreement.  *See* Petition, ¶ 31, Ex. 12.  PSG, Superdeporte and Ribadeneira reiterated this argument in their June 30, 2020 post-hearing brief.  *See* Petition, ¶ 32, Ex. 13.

On August 20, 2020, the Arbitrator issued the Partial Award.  *See* Petition, ¶ 33, Ex. 14. As relevant here, the Arbitrator determined that PSG was liable for breaching the Distribution Agreement and that Superdeporte was also liable for the breach as PSG's "business successor." As to the tortious interference claim, the Arbitrator stated:

> . . . I find that the respondents employed improper means in order to obtain their desired result, an outcome that restrained sales by New Balance for approximately seven months, and caused the claimant lost earnings for at least four of those months.  This finding applies to the three respondents.  While the material misrepresentations were submitted to the [Peruvian] court on behalf of Ribadeneira, I find that the assignments from PSG and Superdeporte created principal-agent relationships rendering the principals as well as the agent responsible for the losses caused.

*Id.* at 22. On September 17, 2020, PSG, Superdeporte, and Ribadeneira requested correction of the Partial Award, interpretation of the Partial Award, and/or the issuance of an additional award.  *See* Petition, ¶ 35, Ex. 15.  As relevant here, they again objected to the Arbitrator's exercise of jurisdiction over Ribadeneira and Superdeporte, noting: "Since the start of this Arbitration, Respondents Ribadeneira and Superdeporte consistently have maintained that this Tribunal does not have jurisdiction to arbitrate any claims with respect to these Respondents, because neither has ever consented to arbitrate any claims with New Balance, and because there is no legal doctrine or

set of facts that can require them to arbitrate claims against New Balance over their objection." *Id.* at 7.[2]

The Arbitrator denied that request in the Order issued on November 4, 2020. *See* Petition, ¶ 38, Ex. 16. He stated that he had "exercised jurisdiction with respect to Superdeporte by imposing joint liability on that company (together with PSG) for amounts owed under the 2013 distribution agreement based on my finding that it is the business successor to PSG." *Id.* at 3. He further stated that he had "exercised jurisdiction over Ribadeneira and Superdeporte, and ha[d] concluded that each is liable (together with PSG) with respect to New Balance's tortious interference claim, because the Peru claims, so-called, from which that interference arose were pursued by Ribadeneira pursuant to assignments of those claims by PSG and Superdeporte." *Id.*

On February 11, 2021, the Arbitrator issued the Final Award. *See* Petition ¶¶ 39-40, Ex. 17. As relevant here, the Arbitrator determined that New Balance was entitled to contractual and statutory interest on amounts owed under the Partial Award, and to attorney's fees from PSG, Superdeporte, and Ribadeneira. With respect to Superdeporte and Ribadeneira's continued jurisdictional objections, the Arbitrator stated that he had "ruled on their jurisdictional defenses and hereby reiterate those rulings." *Id.* at 7.

## ARGUMENT

The Awards should be vacated under the Federal Arbitration Act because "the arbitrator[] exceeded [his] powers, or so imperfectly executed them that a mutual, final, and indefinite award

---

[2] Respondents also referenced the Arbitrator's finding that neither Ribadeneira nor Superdeporte was a party to the Distribution Agreement, and further explained that arbitral jurisdiction over a claim does not, standing alone, confer arbitral jurisdiction over a person who has the right to advance that claim. Respondents added that in the Award, "the Tribunal did not explain the reasons as to why it was asserting jurisdiction over Respondents Ribadeneira and Superdeporte, nor what evidence, if any, it relied upon to deny Respondents' jurisdiction objections and to assert jurisdiction over them" and that "[i]t also did not explain what legal doctrine or doctrines it is relying upon to deny Respondents' jurisdictional objections and to assert jurisdiction over Respondents Mr. Ribadeneira and Superdeporte or its legal reasoning for doing so." *See* Petition, ¶ 35, Ex. 15 at 9.

upon the subject matter submitted was not made." 9 U.S.C. § 10(a)(4). This Court may vacate an award pursuant to § 10(a)(4) where "the arbitrator act[s] outside the scope of his contractually delegated authority." *Oxford Health Plans LLC v. Sutter*, 569 U.S. 564, 569 (2013) (quotation marks and citation omitted).

The Arbitrator here exceeded his authority by determining in the first instance the gateway arbitrability question of whether Ribadeneira and Superdeporte were bound by the Arbitration Clause. They were not. As explained below, under controlling precedent, gateway questions of arbitrability are for courts to decide. The Arbitrator also exceeded his authority by resolving that question in the affirmative, in conflict with well-established law providing six exceptions to the rule that nonsignatories to an arbitration agreement may not be bound thereto. None of those exceptions applies here based on law and the undisputed facts.

## I.      THIS COURT DECIDES ARBITRABILITY *DE NOVO*

The question whether Petitioners should be subject to arbitration, even though they did not sign the agreement with the Arbitration Clause at issue, is subject to this Court's *de novo* review. As the Supreme Court has explained, "a party can be forced to arbitrate only those issues it specifically has agreed to submit to arbitration," and "[c]ourts should not assume that the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they did so." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944-45 (1995) (quotation marks and brackets omitted). Thus, "a court should decide whether the arbitration contract bound parties who did not sign the agreement." *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002).

Here, there is no "clear and unmistakable" evidence of Petitioners' intent to arbitrate these claims, because they did not sign the Distribution Agreement containing the Arbitration Clause, *see* Petition, ¶¶ 9-10, Ex. 1, and they repeatedly objected to the Arbitrator's jurisdiction over them,

*see supra* at 5-8.[3]  The Arbitrator recognized these objections, but he asserted that he had jurisdiction to decide arbitrability because the Distribution Agreement incorporates the UNCITRAL rules, which in turn give jurisdiction over arbitrability to the arbitrator.

However, even assuming incorporation of the UNCITRAL rules suffices to constitute a delegation to the arbitrator to initially decide questions of jurisdiction, courts uniformly revisit an arbitrator's ruling on jurisdiction *de novo* and reject the application of such a delegation to decide questions of jurisdiction to *nonsignatories*.  As the First Circuit has explained, while parties to the agreements containing the arbitration provision may delegate the question of arbitrability to the arbitrator, "[t]h[e] case is different" for nonsignatories.[4]  Similarly, this Court has recognized that "Supreme Court and First Circuit precedent requir[es] the court to decide this 'narrow' gateway arbitrability issue before ordering arbitration."  *Khath v. Midland Funding, LLC*, 334 F. Supp. 3d 499, 512 (D. Mass. 2018).  In *Khath*, this Court held that it "cannot enforce any provision in the … [a]greements until it decides the predecessor question of whether there was an agreement at all between the parties."  *Id.* at 513 (quotation marks omitted).[5]

Simply put, the Distribution Agreement cannot provide "clear and unmistakable" evidence of Petitioners' intent to allow the Arbitrator to decide jurisdiction when Petitioners did not sign

---

[3]  *See also First Options*, 514 U.S. at 939 (noting that a nonsignatory party's "objections to the arbitrators' jurisdiction indicate that they did not want the arbitrators to have binding authority over them").

[4]  *Awuah v. Coverall N. Am., Inc.*, 703 F.3d 36, 42 (1st Cir. 2012).  ("[T]he district court was correct, as to this different group of plaintiffs, to address the predecessor question of whether there was an agreement at all to arbitrate. … The question of whether the [nonsignatories] assumed obligations under the arbitration clause of the Franchise Agreements is for the court.")

[5]  Many other courts are in accord.  *See, e.g.*, *In re: Auto. Parts Antitrust Litig.*, 951 F.3d 377, 382, 385-86 (6th Cir. 2020) (holding that where agreement incorporated AAA rules delegating arbitrability to the arbitrator, it was irrelevant to the question whether the parties had agreed in the first place:  "Because plaintiffs did not consent to any type of arbitration, we will not coerce them otherwise."); *Sarhank Group v. Oracle Corp.*, 404 F.3d 657, 661-62 (2d Cir. 2005) ("Oracle is not a named party to the Agreement. The Agreement is specifically entitled 'Agency Agreement between Oracle Systems Limited and Sarhank Group (Moustapha I. Sarhank).'  An Agreement between Sarhank and Systems which does not mention Oracle does not evidence a 'clear and unmistakable' intent by Oracle to arbitrate or to permit the arbitrator to decide the issue of arbitrability.") (internal citation omitted).

the Distribution Agreement in the first place and there is *no other evidence* that they agreed to arbitrate *any* claims with New Balance.[6]

Furthermore, not only is arbitrability a matter for the court, but even where the arbitrator has purported to decide arbitrability, such a decision is reviewed *de novo*.  The Supreme Court has explained:  "[G]ateway matters, such as whether parties have a valid arbitration agreement at all … are presumptively for courts to decide.  A court may therefore review an arbitrator's determination of such a matter *de novo* absent clear and unmistakable evidence that the parties wanted an arbitrator to resolve the dispute."  *Sutter*, 569 U.S. at 569 n.2.[7]  Thus, courts afford no deference to an arbitrator's findings on arbitrability.[8]

## II. PETITIONERS ARE NOT BOUND BY THE ARBITRATION CLAUSE, AND NEW BALANCE'S CLAIMS AGAINST THEM ARE NOT ARBITRABLE

Petitioners Ribadeneira and Superdeporte, as nonsignatories to the Distribution Agreement, did not consent to and thus are not bound by the Arbitration Clause.  A nonsignatory

---

[6] A district court recently explained the point in clear and succinct terms:  "The Court … cannot conclude that there is clear and unmistakable evidence that these parties (Plaintiff on the one hand, and the Nonsignatory Defendants on the other hand) agreed that an arbitrator should decide arbitrability with respect to Plaintiff's claims against them. How could there be such evidence when Plaintiff and the Nonsignatory Defendants have not signed an agreement with each other containing an arbitration provision with respect to any such claims?"  *GNH Grp., Inc. v. Guggenheim Holdings, L.L.C.*, 2020 WL 4287358, at *5 (D. Del. July 27, 2020) (footnote omitted).

[7] *See also First Options*, 514 U.S. at 943 ("If … the parties did *not* agree to submit the arbitrability question itself to arbitration, then the court should decide that question just as it would decide any other question that the parties did not submit to arbitration, namely, independently.").

[8] *See, e.g.*, *DK Joint Venture 1 v. Weyand*, 649 F.3d 310, 317 (5th Cir. 2011) ("[W]here a party attacks the very existence of an agreement, as opposed to its continued validity or enforcement, the courts must first resolve that dispute.  Because that is the type of dispute we are addressing here, we do not owe deference to the arbitration panel's determination of its own jurisdiction.") (footnote, quotation marks, and citation omitted); *Sarhank Grp. v. Oracle Corp.*, 404 F.3d 657 (2d Cir. 2005) (vacating district court that had deferred to arbitrator's conclusion on arbitrability, and "remand[ing] to the district court to find as a fact whether Oracle agreed to arbitrate, by its actions or inaction, or by reason of any action of Systems as to which Oracle clothed Systems with apparent or actual authority to consent on its behalf to arbitration"); *Telenor Mobile Commc'ns AS v. Storm LLC*, 524 F. Supp. 2d 332, 352 (S.D.N.Y. 2007) ("If the arbitrators' findings are challenged, as here, we cannot merely defer to these findings.  Instead, such a challenge to the arbitrators' jurisdiction militates against deference to the arbitrators' judgment, and in favor of an independent inquiry into the arbitrability of the dispute, as the Court has an independent obligation to determine the threshold issue of arbitrability.") (quotation marks and citations omitted), *aff'd*, 584 F.3d 396 (2d Cir. 2009).

may be bound to an arbitration clause *only* under six limited exceptions. The Arbitrator did not

purport to find that this case falls within any of these exceptions, and indeed, none applies here.

### A. Petitioners Did Not Agree To Arbitrate, And Therefore Cannot Be Bound By The Arbitration Clause

Because arbitration is fundamentally based upon consent of the parties, the general rule is

that if a party has not consented to arbitrate, then a party may not be compelled to arbitrate. As

the Supreme Court has held, "the first principle that underscores all of our arbitration decisions"

is that "[a]rbitration is strictly a matter of consent, and thus is a way to resolve those disputes—

*but only those disputes*—that the parties have agreed to submit to arbitration." *Granite Rock Co.*

*v. Teamsters*, 561 U.S. 287, 299 (2010) (quotation marks and citations omitted); *see also Stolt-*

*Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 683-84 (2010) ("[I]t is also clear from our

precedents and the contractual nature of arbitration that parties may specify *with whom* they choose

to arbitrate their disputes.") (emphasis in original). Thus, "a party cannot be forced to arbitrate if

it has not agreed to do so." *Intergen N.V. v. Grina*, 344 F.3d 134, 137 (1st Cir. 2003).

Ribadeneira and Superdeporte did not sign the Distribution Agreement, which contained

the arbitration agreement, and were never parties thereto. *See Ouadani v. TF Final Mile LLC*, 876

F.3d 31, 36-37 (1st Cir. 2017) (emphasizing that lack of signature to an agreement containing an

arbitration clause indicates lack of consent thereto). Because they did not consent to arbitrate any

disputes under the Arbitration Clause, they cannot be bound by the Arbitration Clause.

The Arbitrator erred as a matter of law in determining that he had jurisdiction over

Petitioners simply because he had jurisdiction over the Peru Claims. The arbitrability of a claim

does not give an arbitrator jurisdiction over a nonsignatory because whether a *claim* and whether

a *party* are subject to arbitration are two completely separate questions. *See id.* at 36 ("A party

that seeks to compel arbitration 'must show . . . that the other party is bound by that clause, *and* []

that the claim asserted comes within the clause's scope.'" (quoting *InterGen N.V. v. Grina*, 344 F.3d 134, 142 (1st Cir. 2003) (emphasis added)).[9]  The question whether the subject matter of the claims falls within the Arbitration Clause plainly does not answer whether Petitioners consented to arbitration, as required to force them into arbitration.  Thus, the Arbitrator's determination that it had jurisdiction over the Peru Claims is not a legally sufficient basis to exercise arbitral jurisdiction over Petitioners, non-parties and nonsignatories to the Distribution Agreement.

### B.  None Of The Six Exceptions To The Nonsignatory Rule Applies Here

Courts addressing whether a nonsignatory can enforce an arbitration agreement are guided by "traditional principles of state law, which allow a contract to be enforced by or against nonparties to the contract through assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver and estoppel." *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631 (2009) (quotation marks omitted).  The First Circuit has interpreted *Arthur Andersen* "as simply following the general proposition that in deciding whether an agreement to arbitrate is to be enforced, we normally apply ordinary state-law principles that govern the formation of contracts." *Grand Wireless, Inc. v. Verizon Wireless, Inc.*, 748 F.3d 1, 12 (1st Cir. 2014) (quotation marks omitted).  Under Massachusetts law, "[t]raditionally, courts have recognized six theories for binding nonsignatories to arbitration agreements: (1) incorporation by reference; (2) assumption; (3) agency; (4) veil-piercing/alter ego; (5) equitable estoppel, and (6) third-party beneficiary." *Machado v. System4 LLC*, 471 Mass. 204, 209 (2015).[10]  At times, rather

---

[9]  *See also Walker v. Collyer*, 85 Mass. App. Ct. 311 (2014) (finding that a physician, as a nonsignatory to an arbitration agreement between patient and facility, should not be compelled to arbitrate even though the underlying medical malpractice claim is subject to arbitration).

[10]  "While a nonsignatory attempting to bind a signatory to an arbitration agreement is distinct from a signatory attempting to bind a nonsignatory, courts often consider both scenarios under a similar legal framework." *Machado*, 471 Mass. at 209.  However, as discussed below, signatories and nonsignatories are *not* treated interchangeably under all six exceptions, and courts generally do not apply several of these theories to bind nonsignatories to arbitration agreements. *See, e.g.*, *Walker*, 85 Mass. App. Ct. at 319 ("[T]hese theories do not apply equally in a situation where a signatory is attempting to force a nonsignatory to arbitrate as opposed to the reverse situation.").

than looking to state law, the First Circuit has looked to "federal common law, which incorporates general principles of contract and agency law," but regardless, the same exceptions apply under federal law as under Massachusetts law. *See id.* (noting the exceptions are based on "incorporation by reference, assumption, agency, alter ego, estoppel, and third-party beneficiary").

The party seeking arbitration has the burden to show the applicability of one of these exceptions. *See Grand Wireless*, 748 F.3d at 6 (holding that the party seeking arbitration "must demonstrate that a valid agreement to arbitrate exists, that it is entitled to invoke the arbitration clause, [and] that the other party is bound by that clause") (quotation marks and brackets omitted). As discussed below, New Balance cannot meet this burden, and none of these exceptions applies to Petitioners.

*First*, under the "incorporation by reference" exception, "a nonsignatory may compel arbitration against a party to an arbitration agreement when that party has entered into a separate contractual relationship with the nonsignatory which incorporates the existing arbitration clause." *Machado*, 471 Mass. at 210 n.9 (quoting *Thomson-CSF, S.A. v. American Arbitration Ass'n*, 64 F.3d 773, 777 (2d Cir. 1995)). The Arbitrator's own Partial Award states that there is no separate contractual relationship between Petitioners and New Balance (let alone one that incorporates the Arbitration Clause), and so this exception does not apply. *See* Petition, Ex. 14 at 3.

*Second*, under the "assumption" exception, "'a party may be bound by an arbitration clause if its subsequent conduct indicates that it is assuming the obligation to arbitrate,' despite being a nonsignatory." *Machado*, 471 Mass. at 210 n.10 (quoting *Thomson-CSF*, 64 F.3d at 777). If a nonsignatory "disavow[s] any obligations arising out of the" agreement, then there is no assumption. *Thomson-CSF, S.A.*, 64 F.3d at 777; *see also Matter of Arbitration Between Keystone Shipping Co. & Texport Oil Co.*, 782 F. Supp. 28, 31 (S.D.N.Y. 1992) (finding no assumption

where nonsignatory defendant "never indicated an intention to arbitrate" and "consistently refused to arbitrate its dispute with" signatory plaintiff). Petitioners never assumed the obligation to arbitrate or any other obligations of the Distribution Agreement. In fact, Petitioners have consistently opposed, in the clearest possible terms, the Arbitrator's jurisdiction over them. *See supra* at 5-8. The assignments of the Peru Claims from PSG and Superdeporte to Ribadeneira *do not* constitute an assumption to arbitrate because the companies assigned their rights to the Peru Claims with respect to the *new* agreement. There was no assignment of rights under the Distribution Agreement at issue here, which contains the relevant Arbitration Clause.[11]

*Third*, under an "agency" exception, "a nonsignatory who is an agent of a signatory may compel arbitration for liability arising under the contract in question." *Machado*, 471 Mass. at 210 n.11. As an initial matter, "the [agency] exception only allows agents to bind principals by their actions, rather than vice versa." *Walker*, 85 Mass. App. Ct. at 323. PSG did not sign the Distribution Agreement on behalf of Ribadeneira or Superdeporte, and there is no evidence that PSG was empowered to act as an agent on behalf of Ribadeneira or Superdeporte. Indeed, the Arbitrator correctly found that PSG was "not merely an agent of Ribadeneira or anyone else." Petition, Ex. 14 at 23.[12] Regardless, the agency exception applies only to *allow* a nonsignatory agent to compel the counterparty signatory to arbitrate; it does not *require* a nonsignatory agent to

---

[11] Indeed, it would be nonsensical for the assignment to concern the Distribution Agreement because the assignment came from both PSG and Superdeporte, and Superdeporte had no rights under the Distribution Agreement that it could assign to anyone.

[12] In considering liability (but not jurisdiction), the Arbitrator stated that the assignments of the Peru Claims "from PSG and Superdeporte created principal-agent relationships rendering the principals as well as the agent responsible for the losses caused" for purposes of New Balance's tortious interference claim. Petition, Ex. 14 at 22. But as noted, this assignment concerned only claims under the new agreement, not the Distribution Agreement with the Arbitration Clause at issue here. There was no suggestion, let alone evidence, of a principal-agent relationship between PSG and Petitioners for purposes of the Distribution Agreement. Thus, the alleged agency relationship that the Arbitrator found for joint liability purposes is irrelevant to the question of arbitrability. *See Ouadani*, 876 F.3d at 37 (refusing to bind nonsignatory agent to arbitration agreement where "[t]he alleged agency relationship between [the nonsignatory agent] and the [signatory principal] is irrelevant to the legal obligation in dispute") (quotation marks and citation omitted). In any event, there is no evidence that Ribadeneira acted as PSG's agent in bringing the Peru Claims, as he brought them in his own name and at the direction of no other entity.

arbitrate. *See Ouadani*, 876 F.3d at 37 ("The[] rationales [for applying the agency exception] are inapposite here because Ouadani is a nonsignatory plaintiff who is trying to avoid arbitration, not a nonsignatory defendant seeking to compel it.").

*Fourth*, under the "veil-piercing/alter ego" exception, a party "may be bound by an agreement entered into by its subsidiary regardless of the agreement's structure or the subsidiary's attempts to bind itself alone to its terms, 'when their conduct demonstrates a virtual abandonment of separateness.'" *Machado*, 471 Mass. at 210 n.12 (quoting *Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 345 F.3d 347, 358 (5th Cir. 2003)). The record of the Arbitration contains no evidence of a virtual abandonment of separateness, and Petitioners do not have a parent-subsidiary relationship with PSG. Thus, the Arbitrator correctly found that PSG was not an alter ego of Petitioners, but rather was "a legitimately organized entity employed by its owners as a valid corporate enterprise." Petition, Ex. 14 at 3.

*Fifth*, under the "equitable estoppel" exception, "a nonsignatory [may] compel arbitration in either of two circumstances: (1) when a signatory 'must rely on the terms of the written agreement in asserting its claims against the nonsignatory' or (2) when a signatory 'raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract.'" *Machado*, 471 Mass. at 211 (quoting *Grigson v. Creative Artists Agency, L.L.C.*, 210 F.3d 524, 527 (5th Cir. 2000)). While courts "have been willing to estop a signatory from avoiding arbitration," they have been "hesitant to estop a nonsignatory seeking to avoid arbitration." *Id.* (quoting *InterGen*, 344 F.3d at 145-146); *see Ouadani*, 876 F.3d at 38 (same).[13] There is no evidence that Petitioners ever "embraced" the

---

[13] Under the latter situation (as here), "estoppel has been limited to cases [that] involve nonsignatories who, during the life of the contract, have embraced the contract despite their nonsignatory status but then, during litigation, attempt to repudiate the arbitration clause in the contract." *Ouadani*, 876 F.3d at 38 (alteration in original) (quotation

Distribution Agreement during its life or received any direct benefits from it, and thus they may not be bound to the Arbitration Clause by equitable estoppel. The evidence is, in fact, to the contrary.

*Finally*, under the "third-party beneficiary" exception, "'a court must look to the intentions of the Parties at the time the contract was executed' and examine whether the contract displays a clear intent to make the nonsignatory a third-party beneficiary." *Machado*, 471 Mass. at 210 n.13 (quoting *Bridas S.A.P.I.C.*, 345 F.3d at 362). Further, the "'critical fact' that determines whether a nonsignatory is a third-party beneficiary is whether the underlying agreement 'manifest[s] an intent to confer specific legal rights upon [the nonsignatory].'" *Ouadani*, 876 F.3d at 39 (quoting *InterGen*, 344 F.3d at 147). Nothing in the Distribution Agreement manifests an intent of the parties at the time of execution to confer specific legal rights upon Ribadeneira or Superdeporte, or otherwise bind them to the Distribution Agreement. Indeed, the Distribution Agreement could not intend to make Superdeporte a beneficiary, as the company was created years after the Distribution Agreement was executed.

In sum, Petitioners are not subject to any of the six exceptions to the rule that a nonsignatory may not be bound to arbitration agreement under Massachusetts and federal common law.

## III.  THE ARBITRATOR'S DETERMINATION OF SUCCESSOR LIABILITY FOR SUPERDEPORTE DOES NOT SUPPORT ARBITRABILITY

### A.  Successor Liability Is Irrelevant To Arbitrability

Successor liability is not one of the six recognized exceptions, discussed above, that could allow a nonsignatory to be forced into arbitration. Nonetheless, the Arbitrator held that it had jurisdiction over Superdeporte, because it was supposedly the business successor to PSG. *See*

---

marks and citation omitted); *see also Walker*, 85 Mass. App. Ct. at 320-21 (holding that estoppel requires nonsignatory to arbitrate only where it receives "direct" rather than "indirect" benefits from the agreement with the arbitration clause).

Petition, Ex. 16 at 3. However, the Arbitrator cited no authority or reasoning to support the idea that a business successor is bound to arbitrate under an agreement it did not sign.

Moreover, courts consistently recognize that being a business successor does not suffice to force a nonsignatory into arbitration. For instance, in a case where the nonsignatory itself stated that it was a successor to the signatory, the First Circuit held that it did not matter where the requirements for estoppel were not satisfied. *See InterGen*, 344 F.3d at 145-46. The Second Circuit has held the same. *See Mag Portfolio Consult. Gmbh v. Merlin Biomed Grp. LLC*, 268 F.3d 58, 63 (2d Cir. 2001) (holding that the district court erred in relying on the fact that the nonsignatory was a successor where the estoppel exception did not apply). In short, successor liability is not an additional exception to the rule that a party cannot be forced to arbitrate where it did not agree to do so.

## B. The Arbitrator's Successor Liability Determination Was Erroneous

Even if successor liability were relevant to arbitrability over a nonsignatory (and it is not), the law and the facts do not support a finding of successor liability. As explained *supra* at Section I, this Court should review the Arbitrator's successor liability finding *de novo* to the extent it was used as the basis for a determination of arbitrability.

Successor liability applies only if: "(1) the successor expressly or impliedly assumes liability of the predecessor, (2) the transaction is a de facto merger or consolidation, (3) the successor is a mere continuation of the predecessor, or (4) the transaction is a fraudulent effort to avoid liabilities of the predecessor." *Cargill, Inc. v. Beaver Coal & Oil Co.*, 424 Mass. 356, 359 (1997). As to the first, second, and fourth elements, the Arbitrator made no finding that Superdeporte assumed the liabilities of PSG, that the transaction was a de facto merger or consolidation, or that it was a fraudulent transaction. Indeed, there is no evidence that would support such a finding.

As to the third element, Superdeporte is not a mere continuation of PSG. Superdeporte was a significantly larger company than PSG, with distinct retail and wholesale capabilities and clients that PSG did not have.[14] Indeed, PSG ceased operating as a distributor in Peru because of New Balance's request for a distributor that could function at both the wholesale and retail levels, and PSG was sold to a different owner who owns it as of the end of 2016 and has used it for an entirely different purpose.[15] There is also no evidence in the record of "continuity of directors, officers, and stockholders; and the continued existence of only one corporation after the sale of assets." *McCarthy v. Litton Indus., Inc.*, 410 Mass. 15, 23 (1991).

The Arbitrator's reasoning to the contrary is erroneous. *First*, the Arbitrator erred in relying on the idea that "PSG ceased operations altogether," Petition, Ex. 14 at 24, as sufficient to show a successor relationship. Under Massachusetts law, "dissolution of the predecessor corporation is required" for successor liability. *McCarthy*, 410 Mass. at 23. While PSG ceased distribution operations in 2016, it is still a viable entity, having been sold to a new owner and used for a different purpose. *See* Petition, Ex. 13 at ¶ 136. *Second*, the Arbitrator also erred in finding that "PSG transferred its remaining asserts to Superdeporte," Petition, Ex. 14 at 24, when in reality PSG did *not* transfer all or substantially all of its assets to Superdeporte. PSG transferred remaining New Balance *inventory* to Superdeporte, because Superdeporte was the distributor party to the New Distribution Agreement. *See* Petition, Ex. 13 at ¶ 133.[16] In particular, PSG did not transfer all of its rights under the Distribution Agreement, or any contract, to Superdeporte.[17]

---

[14]  Exhibit B, PSG, Superdeporte, and Ribadeneira Closing Argument at 117.

[15]  Exhibit B, PSG, Superdeporte, and Ribadeneira Closing Argument at 114.

[16]  *See also Premier Capital, LLC v. KMZ, Inc.*, 464 Mass. 467, 475 (2013) (holding such transfer is "an essential prerequisite to successor liability" (quoting *Carreiro v. Rhodes Gill & Co.*, 68 F.3d 1443, 1448 (1st Cir. 1995)).

[17]  *See Premier Capital*, 464 Mass. at 476 (finding no successor liability where "[t]he record contains no undisputed facts establishing that [the seller corporation] ever assigned any of its leases or contracts to [the buyer corporation]").

*Third*, while the Arbitrator stated that "Superdeporte was created for the purpose of carrying on the business of PSG when the parties attempted to negotiate a continuation of their relationship," Petition, Ex. 14 at 24, the Arbitrator found that the negotiations did *not* lead to a new agreement with Superdeporte. Similarly, it is irrelevant that "New Balance actually dealt with Superdeporte as its distributor in Peru from May, 2016," *id.*, because Superdeporte had no contractual obligations to New Balance, and New Balance disavowed the new agreement with Superdeporte in May 2016. Regardless, Superdeporte's dealings with New Balance do not remotely suggest that Superdeporte was a mere continuation of PSG, and the record evidence in the arbitration supports that New Balance disavowed that it had any contractual relationship with Superdeporte and that it owed any contractual obligation to it under the Distribution Agreement containing the Arbitration Clause.

Accordingly, there is no legal or factual basis for the Arbitrator's finding of successor liability.

## CONCLUSION

For the foregoing reasons, this Court should vacate the Awards as to Petitioners Ribadeneira and Superdeporte.

20

Date: February 22, 2021

Respectfully submitted,

Rodrigo Ribadeneira and
Superdeporte Plus Peru S.A.C.

By their attorneys,

*/s/ Gregg Badichek*
Gregg Badichek (BBO #706270)
greggbadichek@quinnemanuel.com
111 Huntington Ave, Suite 520
Boston, MA 02199
Tel: 617-712-7100
Fax: 617-712-7200

David M. Orta, (admitted *pro hac vice*)
davidorta@quinnemanuel.com
Julianne Jaquith, (admitted *pro hac vice*)
juliannejaquith@quinnemanuel.com
1300 I Street NW, Suite 900
Washington, D.C. 20005
Tel: +1 202 538 8000
Fax: +1 202 538 8100

David Cooper, (admitted *pro hac vice*)
davidcooper@quinnemanuel.com
51 Madison Ave, 22nd floor
New York, NY 10010
Tel: +1 212 849 7000
Fax: +1 212 849 7100

*Attorneys for Petitioners*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 22, 2021, I caused a true and correct copy of the foregoing to be filed in this Court's CM/ECF system, which will send notification of such filing to all parties who have appeared in this matter.

*/s/ Gregg Badichek*
Gregg Badichek (BBO #706270)

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| RODRIGO RIBADENEIRA AND SUPERDEPORTE PLUS PERU S.A.C., <br><br> Petitioners, <br><br> v. <br><br> NEW BALANCE ATHLETICS, INC., <br><br> Respondent. | ) <br> ) <br> ) <br> ) <br> ) <br> )    Civ. No. 1:21-cv-10173-ADB <br> ) <br> ) <br> ) <br> ) <br> ) |

**RESPONDENT NEW BALANCE ATHLETICS, INC.'S**
**MOTION TO DISMISS THE FIRST AMENDED PETITION**
**TO VACATE ARBITRATION AWARDS**

Pursuant to M.G.L. c. 251, § 12(b) or, in the alternative, 9 U.S.C. § 12, Respondent New Balance Athletics, Inc., by its attorneys, hereby moves to dismiss Petitioners' First Amended Petition to Vacate the Arbitration Awards (the "Amended Petition"). As grounds for this Motion, Respondent states as follows:

The Amended Petition should be dismissed for the reasons stated in the Memorandum of Law in Support of New Balance's Motion to Dismiss the First Amended Petition to Vacate and Cross-Motion for Confirmation of the Arbitration Awards (the "Memorandum in Support").

WHEREFORE, Respondent respectfully requests that this Court enter the Proposed Order, attached to the Memorandum in Support, dismissing the Amended Petition in its entirety and granting such other and further relief as the Court deems just and proper.

Date:  March 8, 2021

Respectfully submitted,

NEW BALANCE ATHLETICS, INC.

By its counsel,

*/s/ Mark E. Tully*
Mark E. Tully (BBO# 550403)
Kate E. MacLeman (BBO# 684962)
Dylan Schweers (BBO# 698461)
Goodwin Procter LLP
100 Northern Avenue
Boston, Massachusetts 02210
Tel.: 617.570.1000
Fax.: 617.523.1231
MTully@goodwinlaw.com
KMacLeman@goodwinlaw.com
DSchweers@goodwinlaw.com

## LOCAL RULE 7.1(A)(2) CERTIFICATION
## AND CERTIFICATE OF SERVICE

I, Mark. E. Tully, hereby certify that counsel for Respondent conferred with Counsel for Petitioners in an effort to resolve or narrow the issues presented in this motion prior to filing.

I further certify that a copy of the foregoing document, filed through the CM/ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on March 8, 2021.

Dated: March 8, 2021                    */s/ Mark E. Tully*
                                        Mark E. Tully

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| RODRIGO RIBADENEIRA AND SUPERDEPORTE PLUS PERU S.A.C., ) ) ) Petitioners, ) ) v. ) ) NEW BALANCE ATHLETICS, INC., ) ) Respondent. ) | Civ. No. 1:21-cv-10173-ADB |

## RESPONDENT NEW BALANCE ATHLETICS, INC.'S CROSS-MOTION FOR CONFIRMATION OF THE ARBITRATION AWARDS

Pursuant to M.G.L. c. 251, § 11 or, in the alternative, 9 U.S.C. § 9, Respondent New Balance Athletics, Inc., by its attorneys, cross-moves this Court for an order confirming the Partial Final Award entered on August 20, 2020 and the Final Arbitration Award dated February 11, 2021 (together, the "Arbitration Awards") in the matter of *New Balance Athletics, Inc. v. PSG et al*. (ICDR Case No. 01-18-0003-1183). As grounds for this Motion, Respondent states as follows:

The Arbitration Awards should be confirmed for the reasons stated in the Memorandum of Law in Support of New Balance's Motion to Dismiss the First Amended Petition to Vacate and Cross-Motion for Confirmation of the Arbitration Awards (the "Memorandum in Support").

WHEREFORE, Respondent respectfully requests that this Court enter the Proposed Order, attached to the Memorandum in Support, confirming the Arbitration Awards and granting such other and further relief as the Court deems just and proper.

Date:  March 8, 2021

Respectfully submitted,

NEW BALANCE ATHLETICS, INC.

By its counsel,

/s/ Mark E. Tully
Mark E. Tully (BBO# 550403)
Kate E. MacLeman (BBO# 684962)
Dylan Schweers (BBO# 698461)
Goodwin Procter LLP
100 Northern Avenue
Boston, Massachusetts 02210
Tel.: 617.570.1000
Fax.: 617.523.1231
MTully@goodwinlaw.com
KMacLeman@goodwinlaw.com
DSchweers@goodwinlaw.com

## LOCAL RULE 7.1(A)(2) CERTIFICATION
## AND CERTIFICATE OF SERVICE

I, Mark. E. Tully, hereby certify that counsel for Respondent conferred with Counsel for Petitioners in an effort to resolve or narrow the issues presented in this motion prior to filing.

I further certify that a copy of the foregoing document, filed through the CM/ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on March 8, 2021.


Dated: March 8, 2021                    */s/ Mark E. Tully*
                                        Mark E. Tully

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| RODRIGO RIBADENEIRA AND | ) |
| SUPERDEPORTE PLUS PERU S.A.C., | ) |
| | ) |
| Petitioners, | ) |
| | )    Civ. No. 1:21-cv-10173-ADB |
| v. | ) |
| | ) |
| NEW BALANCE ATHLETICS, INC., | ) |
| | ) |
| Respondent. | ) |

**RESPONDENT NEW BALANCE ATHLETICS, INC.'S
MEMORANDUM OF LAW IN SUPPORT OF ITS
MOTION TO DISMISS THE FIRST AMENDED PETITION TO VACATE AND
CROSS-MOTION FOR CONFIRMATION OF THE ARBITRATION AWARDS**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................... 1

FACTUAL BACKGROUND ........................................................................................... 2

    I.    THE PARTIES AND THE PERU CLAIMS ....................................................... 2

    II.   NEW BALANCE'S MOTION TO COMPEL ..................................................... 3

    III.  THE ARBITRATION PROCEEDINGS AND THE AWARD ............................ 4

    IV.  PETITIONERS' POST-AWARD FILINGS ....................................................... 5

ARGUMENT .................................................................................................................... 6

    I.    THE AMENDED PETITION SHOULD BE DISMISSED AS UNTIMELY ......................................................................................................... 6

        A.   Petitioners' Challenge To The Partial Final Award Is Untimely Under The MUAA And The FAA ............................................................. 6

        B.   The Clock To Challenge The Arbitration Award Started From The Date Of The Partial Final Award And Not The Date Petitioners' Motion For Clarification Was Denied ....................................................... 8

        C.   The Arbitrator's Issuance Of The Final Award Did Not Extend The Time Petitioners Had To Vacate The Arbitration Award ......................... 9

    II.   THE PARTIAL FINAL AWARD AND THE FINAL AWARD SHOULD BE CONFIRMED ................................................................................................ 11

CONCLUSION ................................................................................................................. 12

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Derwin v. Gen. Dynamics Corp.*,
   719 F.2d 484 (1st Cir. 1983)...........................................................................7

*Dialysis Access Ctr., LLC v. RMS Lifeline, Inc.*,
   932 F.3d 1 (1st Cir. 2019)...............................................................................7

*Ekstrom v. Value Health, Inc.*,
   68 F.3d 1391 (D.C. Cir. 1995).......................................................................7

*Fradella v. Petricca*,
   183 F.3d 17 (1st Cir. 1999).....................................................................1, 8, 9

*Hart Surgical, Inc. v. Ultracision, Inc.*,
   244 F.3d 231 (1st Cir. 2001).................................................................2, 9, 10

*Lumbersmans Mut. Cas. Co. v. Malacaria*,
   40 Mass. App. Ct. 184 (1996).......................................................................6

*Maltz v. Smith Barney, Inc.*,
   427 Mass. 560 (1998) ....................................................................................7

*Miller v. Cotter*,
   448 Mass. 671 (2007) ....................................................................................7

*Nationwide Mut. Ins. Co. v. First State Ins. Co.*,
   213 F. Supp. 2d 10 (D. Mass. 2002) ..........................................................10

*Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Jr. Univ.*,
   489 U.S. 468 (1989)......................................................................................7

**Statutes**

9 U.S.C. §§ 9, 12................................................................................... *passim*

M.G.L. c. 251, §§ 11, 12.........................................................................6, 9, 11

**Other Authorities**

UNCITRAL Arbitration Rules arts. 37, 38, 39...............................................5

## INTRODUCTION

New Balance Athletics, Inc. ("New Balance") respectfully submits this memorandum of law in support of its accompanying Motion to Dismiss the First Amended Petition to Vacate the Arbitration Awards and its Cross-Motion for Confirmation of the Arbitration Awards.[1]  The Petition to Vacate the Arbitration Award (the "Petition"), as recently amended (the "Amended Petition"), should be dismissed as time-barred.  The Arbitrator entered the Partial Final Award, which fully and finally resolved liability and jurisdictional issues on August 20, 2020, more than five months ago.[2]  As a result, the Amended Petition is time-barred under the strict time limits imposed by **either** the Massachusetts Uniform Arbitration Act ("MUAA"), which applies here under the terms of the applicable contract and requires vacatur motions to be filed 30 days following an award, or the Federal Arbitration Act ("FAA") with its 90-day requirement for vacatur motions.

The Arbitrator's actions and orders after the August 20, 2020 Partial Final Award do not change this result.  In sum, the Arbitrator's entry of a second award on February 11, 2021 (the "Final Award"), which incorporated the Partial Final Award and addressed only the final calculation of damages, including interest and fees, did not restart the clock for seeking to vacate the Partial Final Award.  Similarly, neither the Petitioners' Motion for Clarification of the Partial Final Award ("Clarification Motion") nor the Arbitrator's order denying the Clarification Motion ("Clarification Denial") extended the period for moving to vacate the Partial Final Award. *Fradella v. Petricca*, 183 F.3d 17, 19–20 (1st Cir. 1999).

---

[1] The Arbitration refers to the matter captioned *New Balance Athletics, Inc. v. PSG et al.* (ICDR Case No. 01-18-003-1183).

[2] The Arbitrator awarded New Balance $826,102.60 in principal damages on its breach of contract claim, to be paid jointly by Peruvian Sporting Goods S.A.C. ("PSG"), Superdeporte Plus Peru S.A.C. ("Superdeporte") and awarded New Balance $215,736.71 in principal damages on its tortious interference claim to be paid jointly by PSG, Superdeporte, and Rodrigo Ribadeneira ("Ribadeneira," and together with Superdeporte, the "Petitioners").

More specifically, the Arbitrator's second award, the Final Award, addressing only the calculation of total damages, including interest and attorney's fees, did not restart the clock for challenging the Arbitration Award because both parties understood that the Partial Final Award was exactly that—final—at least as to the liability and jurisdictional issues complained of by Petitioners here. Indeed, recognizing that the Partial Final Award was (just as it is called) a final award, Petitioners filed their original Petition on February 2, 2021, *before the issuance of the Final Award*, and suggested nowhere that the Partial Final Award was not "final." That the Arbitrator subsequently issued the Final Award, which again incorporated the Partial Final Award and addressed only total damages with interest and attorney's fees, did not extend Petitioner's deadline. *Hart Surgical, Inc. v. Ultracision, Inc.*, 244 F.3d 231, 235 (1st Cir. 2001).

The Court should dismiss the Amended Petition, and instead, confirm both the Partial Final Award and the Final Award.

## FACTUAL BACKGROUND

### I. THE PARTIES AND THE PERU CLAIMS

Petitioner Ribadeneira is the head of a family conglomerate of international sporting goods companies, two of which are PSG and Superdeporte.[3] Until the end of 2016, New Balance contracted with Ribadeneira's companies to distribute New Balance's products in Peru and Ecuador.

The Arbitration sprang from litigation originally brought by Ribadeneira against New Balance in Peru regarding these contracts. Specifically, on November 25, 2016, Ribadeneira executed two identical assignments of rights—one with PSG and one with Superdeporte—granting Ribadeneira the right to pursue litigation against New Balance (the "First Assignments

---

[3] The Amended Petition is brought by only two of the three defendants/counterclaim-plaintiffs to the Arbitration. The third party who does not join in the Petition is PSG, the original contracting party, which was succeeded by Superdeporte.

of Rights") regarding the distribution of New Balance products in Peru. Amended Petition ("Am. Pet.") ¶ 15; *see also* New Balance's Opposition to Petitioners' Amended Motion to Vacate Arbitration Awards ("Opp.") Ex. C (First Assignments of Rights). Pursuant to the First Assignments of Rights, Ribadeneira—ignoring the parties' arbitration agreement[4]—filed claims in Peru against New Balance seeking millions of dollars in damages and an injunction prohibiting New Balance from distributing products in Peru with a new distributor (the "Peru Claims"). Am. Pet. ¶¶ 16, 17.

## II. NEW BALANCE'S MOTION TO COMPEL

Upon learning of the Peru Claims, on July 31, 2018, New Balance initiated the Arbitration proceedings against PSG and Ribadeneira, as the assignee of PSG's rights, to: 1) compel arbitration of the Peru Claims, and 2) recoup the more than $2.5 million in unpaid product and past-due distribution fees that were owed to New Balance pursuant to the parties' January 1, 2013 Distribution Agreement (the "Distribution Agreement"). Am. Pet. ¶¶ 21, 24; Am. Pet. Ex. 2 (Notice of Arbitration). In response, Ribadeneira opposed New Balance's motion to compel and lodged an objection to the Arbitrator's jurisdiction over him. The parties proceeded to fully brief and argue New Balance's motion to compel and Ribadeneira's jurisdictional challenges before the Arbitrator. On March 18, 2019, the Arbitrator agreed with New Balance, granted its motion to compel, and denied Ribadeneira's jurisdictional challenges. Am. Pet. Ex. 7 (Motion to Compel Order). At no point did Petitioners challenge the Arbitrator's determination of arbitrability or his exercise of jurisdiction in state or federal court.

---

[4] The arbitration agreement reads: "The parties agree that any and all disputes (whether in contract or any other theories of recovery) related to or arising out of this [Distribution Agreement] or the relationship, its application and/or termination (including post-termination obligations) shall be settled by final and binding arbitration in accordance with the UNCITRAL Arbitration Rules. . . . The arbitration shall be heard and determined by a single arbitrator. The place of arbitration shall be Boston, Massachusetts, USA . . . . The arbitrator shall determine the matters in dispute in accordance with the law of the Commonwealth of Massachusetts, USA." Am. Pet. Ex. 1 (Distribution Agreement) ¶ 21.

## III.    THE ARBITRATION PROCEEDINGS AND THE AWARD

Following the Arbitrator's motion to compel order, on May 2, 2019, Ribadeneira executed a second assignment of rights (the "Second Assignment of Rights") wherein he purportedly reversed the First Assignment of Rights.  *See* Opp. Ex. D (Second Assignment of Rights).  In other words, the Second Assignment of Rights assigned back to PSG and Superdeporte the litigation against New Balance.  *Id.*  On May 3, 2019, in light of the Arbitrator's order granting New Balance's motion to compel the Peru Claims into the Arbitration and the Second Assignment of Rights that assigned the Peru Claims ***back*** to PSG and Superdeporte, New Balance filed its amended notice of arbitration adding Superdeporte as a defendant.

After months of discovery, including three depositions per side, the Arbitration took place over the course of four days on March 9–11 and May 30, 2020.  Am. Pet. ¶ 31.  Petitioners appeared at the Arbitration, participating fully and seeking millions of dollars in damages from New Balance.  In fact, Ribadeneira himself attended the Arbitration hearing every day in-person on March 9–11 and via Zoom videoconference on May 30.

On August 20, 2020, the Arbitrator issued the Partial Final Award resolving all issues of liability.  *See* Am. Pet. Ex. 14 (Partial Final Award).  The Arbitrator found Petitioners liable on New Balance's claims and denied Petitioners' counterclaims.  The Arbitrator also reiterated his determination that he had jurisdiction over Petitioners under applicable Massachusetts law.  *Id.* at 3, 27.  The Arbitrator carved out two collateral issues from the Partial Final Award: the pre- and post-judgment interest calculation and an award of attorney's fees.  *Id.* at 25-27.  In response, Petitioners did not object to the Arbitrator's decision to bifurcate the interest and attorney's fee issues and treated the Partial Final Award as final on the issues of liability and jurisdiction.

## IV.    PETITIONERS' POST-AWARD FILINGS

On September 17, 2020, Petitioners moved for a correction of the Partial Final Award,
clarification of the Partial Final Award, and/or the issuance of an "additional award" (the
"Clarification Motion").  Am. Pet. Ex. 15 (Clarification Motion).  Illustrating their understanding
that the Partial Final Award was indeed final, Petitioners made the Clarification Motion under
Articles 37, 38, and 39 of the UNCITRAL Arbitration Rules, which apply to final awards.  *Id.* at
6; *see also* Opp. Ex. G (UNCITRAL Arbitration Rules).[5]  On November 4, 2020, the Arbitrator
issued the Clarification Denial, which denied Petitioners' motions to clarify the award, to amend
the award, or to issue an additional award.  Am. Pet. Ex. 16 (Clarification Denial) at 2, 4 (calling
the Partial Final Award "a purposeful award based on [the Arbitrator's] view of the evidence").

Petitioners then delayed for several months before filing their Petition and Motion to
Vacate Arbitration Award (the "Motion") challenging the Partial Final Award.  Neither the
Petition nor the Motion suggested that the Partial Final Award was not the final award.  To the
contrary, the Petition and Motion are admissions that the Partial Final Award is a final award as
it relates to the jurisdictional issues being challenged.

On February 11, 2021, the Arbitrator addressed the two remaining issues (total damages
with interest and attorney's fees) in the Final Award, which incorporated the Partial Final Award.
Petitioners then filed the Amended Petition and Amended Motion to Vacate the Arbitration
Award (the "Amended Motion") on February 22, 2021.  New Balance's Motion to Dismiss and
Cross-Motion to Confirm the Partial Final Award and the Final Award followed.

---

[5] Article 37 provides for clarifications of awards, while Articles 38 and 39 apply to corrections based on calculation errors and requests for additional awards "after the receipt . . . of the award," respectively.  UNCITRAL Arbitration Rules arts. 37, 38, 39.  Notably, "awards" are explicitly defined as being **final** and binding on the parties."  *Id.* at art. 34(2) (emphasis added).

## ARGUMENT

Petitioners' filings in this Court are too little, too late. The deadline for challenging the Partial Final Award lapsed several months ago, on September 19, 2020. M.G.L. c. 251, § 12(b) (applying the MUAA's 30-day rule). Contrary to Petitioners' representation, the MUAA, and not the FAA applies here. However, even if the FAA were to apply here, the FAA's 90-day window to challenge the Partial Final Award also lapsed several months ago on November 20, 2020. 9 U.S.C. § 12. Neither Petitioners' Clarification Motion nor the Arbitrator's Final Award impact the timing by which Petitioners were required to bring their original Petition. The clock started running when the Partial Final Award was entered on August 20, 2020, and under the MUAA and the FAA, Petitioners' time has run out. Because Petitioners' time to object to the Partial Final Award has lapsed, and because they do not object to the interest and attorney's fee calculations in the Final Award, the Court should confirm the Partial Final Award and the Final Award. *See* M.G.L. c. 251, § 11; *see also* 9 U.S.C. § 9.

## I.    THE AMENDED PETITION SHOULD BE DISMISSED AS UNTIMELY

### A.    Petitioners' Challenge To The Partial Final Award Is Untimely Under The MUAA And The FAA

Under the MUAA, a party to an arbitration has thirty days to make a judicial challenge to the arbitrator's award. M.G.L. c. 251, § 12(b) ("An application under this section shall be made within thirty days after delivery of a copy of the award to the applicant . . . ."). Section 12(b)'s time limits are strictly construed. *Lumbersmans Mut. Cas. Co. v. Malacaria*, 40 Mass. App. Ct. 184, 192 (1996). The Partial Final Award was entered on August 20, 2020—well more than 30 days before Petitioners' filing. As a result, the Amended Petition should be dismissed as untimely.

The MUAA applies here because the parties chose Massachusetts law as the law governing the resolution of all disputes. *See* Am. Pet. Ex. 1 (Distribution Agreement) ¶ 20 (Governing Law); ¶ 21 (Arbitration Agreement Choice of Law).[6]  In other words, the parties specifically displaced the applicability of the FAA by explicit agreement. *See Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Jr. Univ.*, 489 U.S. 468, 479 (1989) ("Where, as here, the parties have agreed to abide by state rules of arbitration, enforcing those rules according to the terms of the agreement is fully consistent with the goals of the FAA . . . "; *see also Dialysis Access Ctr., LLC v. RMS Lifeline, Inc.*, 932 F.3d 1, 7 (1st Cir. 2019); *Ekstrom v. Value Health, Inc.*, 68 F.3d 1391 (D.C. Cir. 1995) (applying Connecticut law's limitations period to an arbitration challenge given an agreement's Connecticut choice-of-law provision).[7]

However, even if the Court were to apply the FAA, the Amended Petition is still untimely.  Under the FAA, parties have three months to serve notices of motions to vacate, modify, or correct.  9 U.S.C. § 12.  The Partial Final Award was entered on August 20, 2020— well more than three months before Petitioners' filing.  As a result, the Amended Petition should be dismissed with prejudice under the FAA, as well.

---

[6]  The arbitration agreement states: "The arbitration shall be heard and determined by a single arbitrator.  The place of arbitration shall be Boston, Massachusetts, USA . . . .  *The arbitrator shall determine the matters in dispute in accordance with the law of the Commonwealth of Massachusetts, USA.*"  Am. Pet. Ex. 1, ¶ 21 (emphasis added).

[7]  Relatedly, courts have consistently held that where a state's law otherwise applies, enforcing a shorter time limitation on challenges is proper and furthers the FAA's purpose of expediting dispute resolution.  *See, e.g.*, *Miller v. Cotter*, 448 Mass. 671, 678–79 (2007) ("Only those State acts that seek to limit the enforceability of arbitration contracts are preempted by the Federal Act."); *Maltz v. Smith Barney, Inc*., 427 Mass. 560, 562 (1998) (holding that a previously dismissed federal action filed 89 days after an award was untimely under the MUAA); *Derwin v. Gen. Dynamics Corp*., 719 F.2d 484, 489 (1st Cir. 1983) (refusing to apply the FAA's one-year time limit to an action to confirm, and noting that a "party who fails to initiate an action to vacate or modify an award within the 30-day time limit specified in [M.G.L. c. 150C] sections 11 and 12 [the Massachusetts labor dispute arbitration law] is barred from asserting those claims as defenses to a later action to confirm").

B.    The Clock To Challenge The Arbitration Award Started From The Date Of The
Partial Final Award And Not The Date Petitioners' Motion For Clarification Was
Denied

Petitioners will likely argue that the FAA applies and that their Amended Petition is

timely because they filed it within three months of the Arbitrator's Clarification Denial.  But the

Clarification Denial did not restart the three-month clock found in Section 12 of the FAA.  *See,*

*e.g.*, *Fradella*, 183 F.3d at 18–20 (denying petition as untimely after finding that the tribunal's

minor correction to the original award did not restart the FAA's three-month clock).

In *Fradella*, an arbitration panel issued an award against the petitioner on December 18,

1997.  *Id.* at 18.  The following month, Fradella's attorney wrote to the arbitration panel stating

that the award improperly stated that the decision was made in accordance with New York rather

than Massachusetts law.  *Id.*  On February 23, 1998, the arbitration panel sent Fradella a revised

award, correcting the earlier references to New York law.  *Id.*  On March 25, 1998, Fradella

moved to vacate the award under the FAA.  *Id.*  The First Circuit held that the motion was

untimely, finding that not even a substantive error in the arbitral award would have rendered the

original award non-final.  *Id.* at 20 ("the contention that mere error—whether ministerial,

procedural or substantive—renders an arbitral award non-'final' is fatally flawed.").

Here, the Partial Final Award was issued on August 20, 2020, and although Petitioners

submitted a Clarification Motion with a laundry list of criticisms, Am. Pet. Ex. 15, the

Clarification Denial flatly denied the substance of the Clarification Motion, Am. Pet. Ex. 16 at 4,

and as in *Fradella*, cast no "doubt upon the arbitrator['s] intention" that the Partial Final Award

resolved the claims therein.  That is to say, there was not even a ministerial correction to the

Partial Final Award.  The three-month deadline under Section 12 thus expired on November 20,

2020, three months after the issuance of the Partial Final Award, and well before Petitioners filed

anything in this Court.

Just as the law is clear that the Clarification Denial did not restart the three-month clock, so too is it clear that even if Petitioners' claim that the Clarification Motion somehow tolled the three-month period, their Amended Petition would still be untimely.  First, *Fradella* rejected the notion that a motion to modify or clarify within an arbitration proceeding pauses the § 12 limitations period while the arbitrator considers the motion.  *Fradella*, 183 F.3d at 20 n.4 ("Congress never intended that FAA § 12 be tolled by an application for reconsideration filed with the arbitrators").  Second, even if the pendency of Petitioners' Clarification Motion had tolled the § 12 limitation period, Petitioners did not file their Clarification Motion until September 17, 2020, twenty-eight days after the August 20, 2020 Partial Final Award.  Accordingly, even if the period during which the Arbitrator considered Petitioners' Clarification Motion should be excluded from the three-month limitations period, the limitations period still would have ended on January 7, 2021, *i.e.*, four weeks before Petitioners filed their original Petition.

Accordingly, this Court should bar the challenge to the Partial Final Award.

C.    The Arbitrator's Issuance Of The Final Award Did Not Extend The Time Petitioners Had To Vacate The Arbitration Award

Petitioners will also likely argue that the Final Award restarted the clock for them to challenge the Arbitrator's decision.  Not so.  The Arbitrator retained jurisdiction after the issuance of the Partial Final Award to determine interest and fees only.  Such a subsequent damages determination does not prevent the Partial Final Award from being exactly that—final. *Fradella*, 183 F.3d at 19 (an award does not lack finality "even though the arbitrators purport to retain jurisdiction in the event the need arises to resolve some subsidiary matter, such as damages or backpay calculations").  And once an award—partial or otherwise—has been delivered, the

clock begins running on the parties' time to challenge or confirm the award in court.  M.G.L. c. 251, § 12; 9 U.S.C. § 12.

Furthermore, the parties understood that the Partial Final Award was final as to the issues of liability and jurisdiction.  *See Hart Surgical*, 244 F.3d at 235 (holding that a district court may confirm or vacate a partial award when "[b]oth the parties and the [arbitrator] . . . understood the determination of liability to be a final award");[8] *see also Nationwide Mut. Ins. Co. v. First State Ins. Co.*, 213 F. Supp. 2d 10, 16 (D. Mass. 2002) (citing *Providence Journal Co. v. Providence Newspaper Guild*, 271 F.3d 10, 15 (1st Cir. 2001)) ("the parties' intent to bifurcate could be implied from the parties' actions, even though the parties never formally bifurcated the arbitration").[9]

For example, in *Nationwide*, the court found that the "Interim Award" in the case was final because 1) the parties agreed that the decision should be called an award; 2); the arbitrators did not reopen discovery into matters having been resolved in the Interim Award, and 3) the subsequent "Final Award" did not "restate the findings and conclusions of the Interim Award, but merely cited [the relevant] portion of the Interim Award."  *Id.* at 16.  Similar facts to those in *Nationwide* are true in this case, and those facts render the Partial Final Award final, at least with respect to its determination of jurisdiction and liability Petitioners challenge here.  *First*, the parties accepted that the Partial Final Award was an award, with Petitioners moving to modify the award under UNCITRAL Arbitration Rules governing "awards," which, as mentioned, are

---

[8] The reasons *Hart Surgical* gave for ordinarily avoiding interlocutory appeals during the pendency of an arbitration (waste of time, interruption of the arbitration proceeding, delaying tactics, *Hart Surgical*, 244 F.3d at 233) do not apply here and would not have applied had Petitioners timely brought their claim for judicial review.  The Partial Final Award resolved the principal issues in the case (as illustrated by the fact that the original Petition and the Amended Petition concern only matters that had been substantively resolved in the Partial Final Award).  Accordingly, it would not have caused any interruption or delay for Petitioners to have challenged the Partial Final Award without waiting for the Arbitrator's decisions regarding interest and fees in the Final Award.

[9] In *Nationwide*, the court ultimately reached the merits of the claim because *Providence Journal* had not yet been decided when the arbitration took place.  However, such an exception would not apply here as the arbitration at issue took place in 2020.

explicitly defined as "final." *Supra* at n.5 and accompanying text. *Second*, the Partial Final Award and the Clarification Denial did not open the door to revisiting any issue decided in the Partial Final Award but rather merely set a schedule for addressing the collateral issues of interest and fees. *See* Am. Pet. Ex. 15 at 27; Am. Pet. Ex. 16 at 4. *Third*, the Final Award contains essentially no substantive discussion of jurisdiction or liability, instead merely referencing the reasoning and conclusions of the Partial Final Award as to those matters. Am. Pet. Ex. 16 at 7. The fact that Petitioners filed their Petition on February 2, 2021, *i.e.*, before the Arbitrator issued the Final Award, also exposes Petitioners' actual belief that the Partial Final Award was indeed final.

In brief, this Court should find that the Partial Final Award was final for the purpose of Petitioners' Amended Petition.

## II. THE PARTIAL FINAL AWARD AND THE FINAL AWARD SHOULD BE CONFIRMED

Even absent the defects in the timeliness of the Amended Petition, the Amended Motion does not state any basis for overturning the Partial Final Award and/or Final Award. Petitioners do not (and cannot) dispute that the Arbitrator issued a lengthy decision that cited to the Distribution Agreement, the arbitration provision, and relevant Massachusetts law; applied the law to the evidence presented by the parties; and found in favor of New Balance. Given the absence of any legitimate grounds for vacation of the Partial Final Award and/or Final Award, New Balance requests that the Court confirm the Partial Final Award and the Final Award pursuant to M.G.L. c. 251, § 11 ("the court shall confirm an award, unless within the time limits hereinafter imposed grounds are urged for vacating or modifying or correcting the award") or 9 U.S.C. § 9 ("the court must grant such an order [confirming the award] unless the award is vacated, modified, or corrected").

## CONCLUSION

For the reasons stated above and in its accompanying Opposition, this Court should grant New Balance's Motion to Dismiss the Amended Petition, deny Petitioners' Amended Motion, and grant New Balance's Cross-Motion to Confirm.

Date: March 8, 2021

Respectfully submitted,

NEW BALANCE ATHLETICS, INC.

By its counsel,

*/s/ Mark E. Tully*
Mark E. Tully (BBO# 550403)
Kate E. MacLeman (BBO# 684962)
Dylan Schweers (BBO# 698461)
Goodwin Procter LLP
100 Northern Avenue
Boston, Massachusetts 02210
Tel.: 617.570.1000
Fax.: 617.523.1231
MTully@goodwinlaw.com
KMacLeman@goodwinlaw.com
DSchweers@goodwinlaw.com

## <u>CERTIFICATE OF SERVICE</u>

I, Mark E. Tully, certify that a copy of the foregoing document, filed through the CM/ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on March 8, 2021.

Dated: March 8, 2021                    <u>*/s/ Mark E. Tully*</u>
                                         Mark E. Tully

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

RODRIGO RIBADENEIRA AND       )
SUPERDEPORTE PLUS PERU S.A.C.,   )
                                       )
          Petitioners,          )
                                       )   Civ. No. 1:21-cv-10173-ADB
      v.                         )
                                       )
NEW BALANCE ATHLETICS, INC.,     )
                                       )
          Respondent.        )

## [PROPOSED] ORDER GRANTING THE MOTION TO DISMISS THE FIRST AMENDED PETITION TO VACATE ARBITRATION AWARDS AND THE CROSS-MOTION FOR CONFIRMATION OF THE ARBITRATION AWARDS

Upon consideration of Respondent's Motion To Dismiss the First Amended Petition to Vacate Arbitration Awards and the Cross-Motion for Confirmation of the Arbitration Awards, it is hereby ORDERED that said motion to dismiss and cross-motion for confirmation are GRANTED and that Petitioners' First Amended Petition to Vacate Arbitration Awards is DISMISSED with prejudice. Judgment will be entered accordingly.

Dated: _____

_____
U.S. District Judge Allison D. Burroughs

# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

RODRIGO RIBADENEIRA AND ) 
SUPERDEPORTE PLUS PERU S.A.C., ) 
            ) 
            Petitioners, ) 
            )    Civ. No. 1:21-cv-10173-ADB
         v. ) 
            ) 
NEW BALANCE ATHLETICS, INC., ) 
            ) 
            Respondent. ) 

## RESPONDENT NEW BALANCE ATHLETICS, INC.'S OPPOSITION
## TO PETITIONERS' AMENDED MOTION TO VACATE ARBITRATION AWARDS

## <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION .................................................................................................................. 1

FACTUAL BACKGROUND ................................................................................................. 3

I. THE PARTIES' RELATIONSHIP ........................................................................ 3

    A. The Distribution Agreement ...................................................................... 3

    B. PSG and Superdeporte's Assignments of Rights to Ribadeneira and Ribadeneira's Claims Against New Balance in Peru ................................. 6

II. THE ARBITRATION ............................................................................................ 7

    A. The Parties' Pleadings ................................................................................ 7

    B. New Balance's Motion to Compel ............................................................. 8

    C. PSG, Superdeporte, and Ribadeneira's Second Assignment of Rights and the Parties' Amended Pleadings ............................................ 10

    D. PSG and Petitioners' Motions for Summary Disposition ....................... 11

    E. The Hearing and Post-Hearing Briefing ................................................. 13

III. THE ARBITIRATION AWARDS AND POST-AWARD FILINGS ................. 13

    A. The Partial Final Award ........................................................................... 13

    B. The Petition and Motion to Vacate the Partial Final Award ................... 15

    C. The Final Award and Amended Petition and Amended Motion to Vacate ....................................................................................................... 15

ARGUMENT ....................................................................................................................... 16

I. THE COURT MUST GIVE EXTREME DEFERENCE TO THE ARBITRATOR'S AWARD .................................................................................. 16

II. PETITIONERS HAVE NOT MET THEIR BURDEN OF PROOF .................... 23

III. SUPERDEPORTE HAS WAIVED ANY CHALLENGE TO ARBITRABILITY .............................................................................................. 24

IV. PETITIONERS ARE BOUND BY THE ARBITRATION CLAUSE EVEN UNDER THE *DE NOVO* STANDARD OF REVIEW ........................... 25

    A. The Arbitration Agreement Applies Broadly to the Relationship Among the Parties ................................................................................... 25

    B. Enforcing the Arbitration Agreement Against Non-Signatories, Such as Petitioners, is Appropriate Here ................................................ 26

CONCLUSION .................................................................................................................... 31

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Apollo Computer, Inc. v. Berg*,
886 F.2d 469 (1st Cir. 1989) .................................................................................18

*Arthur Andersen LLP v. Carlisle*,
556 U.S. 624 (2009) ..............................................................................................27

*Awuah v. Coverall N. Am., Inc.*,
703 F.3d 36 (1st Cir. 2012) ...........................................................................17, 18

*Carpenter v. Pomerantz*,
36 Mass. App. Ct. 627 (1994) ...............................................................................26

*Cleveland Elec. Illuminating Co. v. Utility Wkrs. Union of Am., Local 270*,
440 F.3d 809 (6th Cir. 2006) ...........................................................................22, 24

*Commonwealth v. Philip Morris Inc.*,
448 Mass. 836 (2007) ............................................................................................26

*First Options of Chi., Inc. v. Kaplan*,
514 U.S. 938 (1995) ....................................................................................... *passim*

*Fortune, Alsweet & Eldridge, Inc. v. Daniel*,
724 F.2d 1355 (9th Cir. 1983) ........................................................................24, 25

*Grand Wireless, Inc. v. Verizon Wireless, Inc.*,
748 F.3d 1 (1st Cir. 2014) .....................................................................................29

*Graves Equip., Inc. v. M. DeMatteo Const. Co.*,
397 Mass. 110 (1986) ............................................................................................27

*Hoolahan v. IBC Advanced Alloys Corp.*,
947 F.3d 101 (1st Cir. 2020) ........................................................................ *passim*

*Khath v. Midland Funding, LLC*,
334 F. Supp. 3d 499 (D. Mass. 2018) ...................................................................18

*Machado v. System4 LLC*,
471 Mass. 204 (2015) .................................................................................... *passim*

*Milliken & Co. v. Duro Textiles, LLC*,
451 Mass. 547 (2008) ............................................................................................30

*Next Step Medical Co., Inc. v. Johnson & Johnson International,*
    619 F.3d 67 (1st Cir. 2010)........................................................................26

*Oxford Health Plans LLC v. Sutter,*
    569 U.S. 564 (2013)................................................................................17

*Patton v. Johnson,*
    915 F.3d 827 (1st Cir. 2019)...............................................17, 18, 22, 21

*Photographic Illustrators Corp. v. Osram Sylvania, Inc.,*
    366 F. Supp. 3d 160 (D. Mass. 2019) ....................................................16, 23

*Quincy Tr. Co. v. Town of Pembroke,*
    346 Mass. 730 (1964) ............................................................................26

*Salem Hosp. v. Massachusetts Nurses Ass'n,*
    449 F.3d 234 (1st Cir. 2006)..........................................................3, 16, 23

*Teamsters Local Union No. 764 v. J.H. Merritt & Co.,*
    770 F.2d 40 (3d Cir. 1985)......................................................................24

*Time Warner Cable of New York City LLC v. Int'l Bhd. of Elec. Workers,*
    170 F. Supp. 3d 392 (E.D.N.Y. 2016) .....................................................25

*Turner Fisheries, Inc. v. Seafood Workers Union I.L.A. 1572–2,*
    19 Mass. App. Ct. 925 (1984).............................................................24, 25

*Walker v. Collyer,*
    85 Mass. App. Ct. 311 (2014)..............................................................29, 31

*Weiss v. Atholl,*
    1998 WL 1184150 (Mass. Super. Ct. Dec. 28, 1998)..........................................26

*Yung v. Reymonde,*
    1999 WL 788445, 1999 Mass. App. Div. 194 (1999) ................................27, 28, 29

# INTRODUCTION

This case arises out of a dispute between New Balance Athletics, Inc. ("New Balance") and Peruvian Sporting Goods S.A.C. ("PSG"), a sportswear distribution company that was, at the time, one of several sportswear companies owned by Petitioner Rodrigo Ribadeneira ("Ribadeneira").  PSG, under the ownership of Ribadeneira, sold New Balance's product in Peru as its exclusive distributor but failed to pay New Balance the money due from those sales in breach of their January 1, 2013 Distribution Agreement (the "Distribution Agreement").  PSG ultimately shut down without New Balance's knowledge and transferred its entire business to Petitioner Superdeporte Plus Peru S.A.C. ("Superdeporte"), having never paid New Balance the distribution fees owed under the Distribution Agreement.  After years of arbitrating their disputes, on August 20, 2020, more than five months ago, the Hon. William I. Cowin (Ret.), a former Massachusetts Appeals Court judge (the "Arbitrator"), entered an arbitration award denying Petitioners' claims against New Balance and awarding New Balance $826,102.60 in unpaid distribution fees, exclusive of interest and attorney's fees, and $215,736.71 in tort damages for intentional interference with contract.

On February 2, 2021, Ribadeneira and Superdeporte (together, the "Petitioners") filed a Petition and Motion to Vacate the Arbitration Award, as recently amended, thereby "embark[ing] on [their] Mt. Everest climb" to challenge the results of the Arbitration.  *Hoolahan v. IBC Advanced Alloys Corp.,* 947 F.3d 101, 105 (1st Cir. 2020).  Petitioners seek to challenge the Arbitration Award[1] on the basis that the Arbitrator "exceeded his authority by determining in the

---

[1] As explained in New Balance's Motion to Dismiss the Petition to Vacate ("Motion to Dismiss") filed concurrently herewith, the Arbitrator issued the Partial Final Award on August 20, 2020, in which he denied Petitioners' renewed motion for summary disposition, reiterated his previous order finding jurisdiction over Petitioners, and resolved all issues of liability in the Arbitration in favor of New Balance.  *See* New Balance's Memorandum of Law in Support of Motion to Dismiss at 4.  PSG and Petitioners then moved to clarify the Partial Final Award, and the Arbitrator denied that motion on November 4, 2020.  *Id.* at 5.  On February 11, 2021, the Arbitrator issued his Final Award, which included the final calculation of all damages, interest, fees, and expenses.  *Id.*  Petitioners appear to be

first instance the gateway arbitrability question of whether Ribadeneira and Superdeporte were bound by the arbitration agreement"—a decision that Petitioners first asked the Arbitrator to make three years ago.  Now, after years of discovery and a four-day arbitration hearing involving transcontinental witnesses, Petitioners ask this Court to go back to the beginning of the Arbitration—to nearly three years ago when New Balance, PSG, and Petitioners jointly submitted the arbitrability question to the Arbitrator for the ***first time*** during the parties' initial scheduling conference and subsequent briefing—to review the Arbitrator's arbitrability decision and vacate the order as it pertains to Petitioners.  Petitioners' Motion, unsupported by both fact and law, should be denied. [2]

First, Petitioners have not met the high burden of proving that the Arbitrator "exceeded his authority."  Despite Petitioners' contentions to the contrary,[3] New Balance and Petitioners jointly submitted the question of arbitrability to the Arbitrator (by way of motion to compel briefing) prior to proceeding with the Arbitration, as reflected in the Arbitrator's first order in the Arbitration ("Order No. 1").[4]  In Order No. 1, the Arbitrator explained that "[Ribadeneira] seeks a preliminary determination regarding the tribunal's jurisdiction" and that the "parties agreed" to

---

[2] As a threshold matter, for the reasons stated in the Motion to Dismiss, Petitioners' Motion is untimely.  As a result, the Petition should be dismissed and the Motion denied as moot.  However, should the Court choose to hear Petitioners on their climb to avoid paying New Balance for money it is owed, then the Court should deny Petitioners' Motion for the following additional reasons stated herein.

challenging all of these awards, beginning with the August 20, 2020 Partial Final Award, though Petitioners make no particular objection to the interest and fees determinations in the Final Award.  For purposes of this opposition, New Balance's reference to the "Award" encompasses all of the Arbitrator's decisions in the Arbitration.

[3] Somewhat surprisingly, despite their numerous submissions to the Arbitrator as explained herein, Petitioners now assert that the Court should not apply the "extraordinarily" deferential standard in its review of the Arbitrator's award because they claim that there is "no evidence" that the parties submitted the jurisdiction question to the Arbitrator at any point in the Arbitration.  This is blatantly untrue, as reflected by the very exhibits attached to the Amended Petition, including the parties' lengthy briefing on the arbitrability question (Amended Petition ("Am. Pet.") Exs. 5-6) (New Balance's Motion to Compel; PSG and Petitioner Ribadeneira's Response) (*see also infra* pp. 8-9; 18-21).

[4] *See* Arbitrator's Order No. 1 dated December 27, 2018, attached hereto as Ex. A.  Petitioners did not include Order No. 1 as an exhibit to their Amended Petition, and instead appear to cherry-pick their exhibits from the Arbitration's record.

submit briefing on the issue.  What's more, Petitioners collectively submitted the question of arbitrability to the Arbitrator on **nine** separate occasions.  Each time, Petitioners specifically asked the Arbitrator to issue an order declaring that the Tribunal lacked jurisdiction over Petitioners; the Arbitrator specifically ruled on the issue; and Petitioners did not seek any relief from this Court or any other.  As a result, those decisions, which were logical and sound, are entitled to an "extremely narrow and extraordinarily deferential" standard of review.  *Salem Hosp. v. Massachusetts Nurses Ass'n*, 449 F.3d 234, 237–38 (1st Cir. 2006); *see also First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 943–44 (1995).  Petitioners' Motion cannot survive that standard of review.

Second, even if the Court were to review Petitioners' Motion under a *de novo* standard of review—it should not—the Motion should still be denied.  Under well-settled Massachusetts law, Petitioners were bound by the parties' broad arbitration agreement, requiring the parties to arbitrate any dispute arising out of their relationship.  Though the Distribution Agreement was signed by PSG, PSG was disbanded and succeeded by Superdeporte while the contract was still in effect.  Ribadeneira and Superdeporte then sued New Balance for multi-million-dollar claims arising out of the parties' Distribution Agreement, assumed the arbitration clause contained therein, and for these reasons, and the others explained more fully below, cannot now attempt to avoid being bound by it.  *Machado v. System4 LLC*, 471 Mass. 204, 209 (2015).

## FACTUAL BACKGROUND

### I.     THE PARTIES' RELATIONSHIP

#### A.    The Distribution Agreement

On January 1, 2013, New Balance and PSG entered into the Distribution Agreement, a three-year agreement for the sale and distribution of New Balance's products in Peru.  Am. Pet. ¶ 9.  The three-year term of the Distribution Agreement was subject to a one-year extension if it

was not terminated by either party sixty days in advance of its scheduled termination on

December 31, 2015. Am. Pet. Ex. 1 (Distribution Agreement) ¶¶ 1(h), 5(b). At all relevant

times, Ribadeneira was the business manager and majority shareholder of PSG, as well as New

Balance's primary contact at PSG. Am. Pet. ¶ 7.

The Distribution Agreement was entered into, in part, based on the parties' agreement to

arbitrate any and all disputes arising out of the Distribution Agreement, or the parties'

relationship generally, in accordance with the UNCITRAL Arbitration Rules and the laws of the

Commonwealth of Massachusetts. More specifically, the Distribution Agreement reads:

> The parties agree that any and all disputes (whether in contract or any other
> theories of recovery) ***related to or arising out of this [Distribution Agreement] or
> the relationship***, its application and/or termination (including post-termination
> obligations) shall be settled by final and binding arbitration in accordance with the
> UNCITRAL Arbitration Rules. . . . The arbitration shall be heard and determined
> by a single arbitrator. The place of arbitration shall be Boston, Massachusetts,
> USA . . . . The arbitrator shall determine the matters in dispute in accordance
> with the law of the Commonwealth of Massachusetts, USA.

Am. Pet. Ex. 1, ¶ 21 (Arbitration Agreement).[5]

As the end of three-year term of the Distribution Agreement neared, in mid-2015, PSG

stopped paying New Balance money due and owing on products distributed in Peru and

repeatedly breached the Distribution Agreement. *See generally* Am. Pet. Ex. 14 (Partial Final

Award) ¶ 8. In fact, as of August 2015, PSG owed New Balance-affiliated factories roughly

$800,000 in past due product payments and owed New Balance in excess of $420,000 in past due

distribution fees. *Id*. Despite these past due amounts, between mid-2015 and January 1, 2016,

New Balance and PSG tried to negotiate an amended and restated distribution agreement, while

New Balance simultaneously tried to recover PSG's past-due balances. *Id*. at ¶ 9. The parties

---

[5] The Distribution Agreement also had a separate choice-of-law provision mandating that the Distribution
Agreement "be governed by and construed with the laws of the Commonwealth of Massachusetts, U.S.A." *Id*. at ¶
20 (Governing Law).

came close to reaching an agreement—indeed, New Balance sent the final draft to PSG and Ribadeneira for their signature on multiple occasions—but, ultimately, the parties could not finalize the amended and restated distribution agreement, in large part due to PSG's eleventh-hour demands for material changes to the terms.  *Id*. ¶¶ 9-10.[6]  As a result, on January 1, 2016, the Distribution Agreement's one-year extension went into effect and the parties remained subject to the terms of that Distribution Agreement, which expired by its terms at the end of December 2016.  Am. Pet. Ex. 1, ¶ 5(b).

In or about May 2016, Petitioner Superdeporte replaced PSG as an operational entity with Petitioner Ribadeneira as its controlling owner and majority shareholder.  Am. Pet. Ex. 14 ¶¶ 8, 13.  Superdeporte was specifically formed by PSG's shareholders, including Ribadeneira, to take over PSG's business.  Ultimately, Superdeporte took over all of PSG's clients, wholesale operations, and remaining New Balance product, and PSG then ceased all operations.  *Id*. ¶ 12.  Ribadeneira admitted that Superdeporte paid PSG's outstanding intercompany debt at the time of the transition.  *See* Arbitration Transcript ("Arb. Tr.") at 878:21-879:5, attached hereto as Ex. B.  In terms of the relationship between PSG, Superdeporte, and Ribadeneira, Ribadeneira admitted at the Arbitration—"it's me at the end"—when discussing his corporate structure, stating: "I'm the ultimate owner of all the companies.  So, yes, I know that at the end, it [money] will end up in one of my companies."  Ex. B (Arb. Tr.) hereto at 992:21-993:9.

---

[6] This so-called "new distribution agreement" (Am. Pet. ¶ 12) was a mere continuation of the Distribution Agreement, titled the "Amended and Restated Distribution Agreement," which would have incorporated the terms of the Distribution Agreement had it been executed by the parties.  It contained an identical arbitration clause to the one in the Distribution Agreement.  *See* Am. Pet. Ex. 7 (Motion to Compel Order) at 3.  In fact, one of Superdeporte's counterclaims in the Arbitration, as well as its defense for filing the *ex parte* injunction request in Peru, was that the parties actually entered into the "new distribution agreement" and New Balance failed to perform under it.  *See* Am. Pet. Exs. 4 (PSG and Petitioners' Amended Response to Notice of Arbitration and Counterclaim), 13 (PSG and Petitioners' Post-Hearing Brief).

Throughout 2016, despite PSG's transition to Superdeporte, the company continued to accumulate substantial arrearages, entered into payment agreements, and failed to fulfill all of them. Am. Pet. Ex. 14 ¶ 11. As a result, on June 23, 2016, New Balance provided timely written notice to PSG, Superdeporte, and Ribadeneira that the Distribution Agreement would not be extended beyond its then expiration date of December 31, 2016. *Id.* at ¶ 12. Thereafter, the parties' contractual relationship ended by its terms on December 31, 2016, with PSG still owing New Balance nearly $2 million (without interest) in past due fees.

B.  PSG and Superdeporte's Assignments of Rights to Ribadeneira and Ribadeneira's Claims Against New Balance in Peru

On November 25, 2016, Ribadeneira executed two identical assignments of rights— one with PSG and one with Superdeporte—granting Ribadeneira the right to pursue litigation against New Balance (the "First Assignments of Rights"). Am. Pet. ¶ 15; *see also* First Assignments of Rights, attached hereto as Ex. C. The First Assignments of Rights, as translated, states that PSG:

> [H]eld negotiations with [New Balance] in order to celebrate a Distribution Contract to import, sell and distribute sports products in the territory of Peru. However, once the contractual terms were agreed and the contract ready to be executed, [New Balance] informed [PSG] that it will work with another partner in Peru, arising a dispute between the parties. . . . By this contract [PSG] . . . transfers without valuable considerations to [Ribadeneira] all its rights in attention to the dispute.

Ex. C. In addition, Ribadeneira paid no money for the assignments, which state on their face that they are for no consideration. Ex. C at ¶ 2.

On January 22, 2017, ignoring the Distribution Agreement's arbitration provision and purporting to rely on the First Assignments of Rights, Ribadeneira filed claims in Peru (the "Peru Action") alleging that the negotiations taking place between PSG and New Balance either resulted in a valid and enforceable contract between New Balance and PSG, or in the alternative,

that New Balance acted in bad faith in negotiating an agreement with PSG and/or Superdeporte, and was thus subject to "pre-contractual liability" for causing PSG and/or Superdeporte damages.  Am. Pet. ¶ 16.  Then, on February 2, 2017, as PSG's assignee, Ribadeneira filed an *ex parte* request for interim measures (the "Peru Interim Relief Request," together with the Peru Action, the "Peru Claims") asking the Peruvian court to order New Balance to abstain from distribution of its products in Peru with any distributor other than PSG and/or Superdeporte based on Ribadeneira's claims that the parties' negotiations between July 2015 and January 2016 resulted in a "new distribution agreement" between the parties.  *Id*. ¶ 17.  Ribadeneira's Interim Relief Request contained material factual misrepresentations and omitted the (unexecuted) draft "new agreement" (which also contained the same arbitration agreement as in the Distribution Agreement) that formed the very basis of his request.[7]  On December 8, 2017, the Peruvian court granted Ribadeneira's *ex parte* Interim Relief Request, without New Balance having been heard, enjoining New Balance from distributing any of its products in Peru with any distributor other than PSG and/or Superdeporte.  *Id*. ¶ 18; *see also* Am. Pet. Ex. 14 ¶ 13.  After New Balance learned of the injunction, it immediately contested the restraint in Peru, and, with the benefit of the full record before it, the Peruvian court subsequently lifted the injunction on July 28, 2018.  Am. Pet. Ex. 14 ¶ 13.

## II.   THE ARBITRATION

### A.   The Parties' Pleadings

On July 31, 2018, New Balance initiated arbitration proceedings against PSG and Ribadeneira, as the assignee of PSG's rights, to recoup the more than $2.5 million owed to New

---

[7] Indeed, the Arbitrator found that Ribadeneira's "presentation to the Peruvian tribunal omitted significant facts and improperly induced that tribunal to grant relief in his favor with significant cost to New Balance."  Am. Pet. Ex. 14 at p. 21.

Balance as a result of the parties' Distribution Agreement.  Am. Pet. ¶ 21; Am. Pet. Ex. 2 (Notice

of Arbitration).  On September 4, 2018, PSG and Ribadeneira filed a response to New Balance's

Notice of Arbitration, which was subsequently amended on October 29, 2018, to add a breach of

contract counterclaim against New Balance.  Am. Pet. ¶¶ 22-23.  In both responses, Ribadeneira

argued that the Arbitrator did not have jurisdiction over him because he was not a party to the

Distribution Agreement and specifically "request[ed] ***the arbitral tribunal to***: dismiss all

Claimant's claims with respect to ***Mr. Ribadeneira on the ground that the arbitral tribunal***

***lacks jurisdiction with respect to a dispute between Claimant and Mr. Ribadeneira***."  *See* Am.

Pet. Ex. 3 (Response to Notice of Arbitration) at ¶ 35(i) (emphasis added); Am. Pet. Ex. 4 ¶ 42(i)

(emphasis added).

On December 6, 2018, the Arbitrator conducted an initial teleconference among the

parties.  *See* Ex. A (Order No. 1) hereto.  During the initial teleconference, "[d]iscussion was

held regarding an objection to the tribunal's jurisdiction asserted by Rodrigo Ribadeneira . . ."

*Id*. at 1.  More specifically, Ribadeneira asked the Arbitrator for "a preliminary determination

regarding the tribunal's jurisdiction."  *Id.*  On the call, the "parties agreed" that New Balance

would file a motion seeking "relief that would dispose of the jurisdictional dispute" and

Ribadeneira would be entitled to file a response.  *Id*. ¶¶ 2-3.

  B.   New Balance's Motion to Compel

On January 25, 2019, New Balance moved to compel PSG and Ribadeneira to arbitrate

the Peru Claims in the Arbitration pursuant to the parties' arbitration clause in the Distribution

Agreement.  Am. Pet. ¶ 24.  Specifically, New Balance asserted, *inter alia,* that Ribadeneira was

"bound by the arbitration provisions for a number of reasons," including that 1) as an assignee he

must stand in the shoes of the assignor, 2) he assumed the agreement in bringing the Peru

Claims, and 3) the Peru Claims are so inextricably intertwined with and relate directly to the

Distribution Agreement containing the arbitration provision that he is equitably estopped from denying its application. Am. Pet. Ex. 5 (Motion to Compel) at 2, 10-12. In response, PSG and Ribadeneira filed their response to New Balance's motion to compel. Am. Pet. ¶ 25. The majority of their filing was dedicated to Ribadeneira's objection to the Arbitrator's jurisdiction over him, *see* Am. Pet. Ex. 6 (Response to Motion to Compel) ¶¶ 1, 8, 9, 12-18, wherein Ribadeneira unambiguously "***ask[ed] the arbitral tribunal to:*** dismiss all Claimant's claims with respect to ***Mr. Ribadeneira on the ground that the arbitral tribunal lacks jurisdiction with respect to a dispute between Claimant and Mr. Ribadeneira.***" *Id.* at ¶ 33(i) (emphasis added). Following the parties' submissions, the Arbitrator "conducted a hearing on the subject [arbitrability] by telephone" on February 26, 2019. *See* Am. Pet. Ex. 7 at 1.

On March 18, 2019, the Arbitrator agreed with New Balance and granted its motion to compel in a lengthy opinion. Am. Pet. Ex. 7. In granting the motion to compel, the Arbitrator applied the parties' "broad" arbitration provision to the facts before him, and held that the arbitration clause's phrase "the relationship" was intended to apply to all aspects of the interaction between New Balance and PSG on the subject of distribution of New Balance products in Peru. *Id.* at 7-10. Therefore, the Arbitrator found that the Peru Claims, which were clearly based on the parties' relationship, were governed by the parties' arbitration clause, regardless of which entity brought the claims. *Id.* at 10. Additionally, the Arbitrator addressed "whether Ribadeneira, while not a party to [the Distribution Agreement], may have become subject to the arbitration clause with respect to the Peru claims by virtue of the PSG and/or Superdeporte assignments or for other reasons." *Id.* at 5. The Arbitrator reasoned that his "conclusion that the arbitration clause applies to the Peru [C]laims disposes as well of

Ribadeneira's contention that he cannot be compelled to arbitrate because he is not a party to the agreement that contains the arbitration requirement." *Id.* at 11.

C.   PSG, Superdeporte, and Ribadeneira's Second Assignment of Rights and the Parties' Amended Pleadings

Following the Arbitrator's motion to compel order, on May 2, 2019, Ribadeneira executed a second assignment of rights (the "Second Assignment of Rights") wherein he purportedly reversed the First Assignment of Rights. *See* Second Assignment of Rights, attached hereto as Ex. D. In other words, the Second Assignment of Rights assigned back to PSG the litigation against New Balance. *Id.*

Thus, on May 3, 2019, in light of the Arbitrator's order granting New Balance's motion to compel and the Second Assignment of Rights that assigned the Peru Claims ***back*** to ***PSG and Superdeporte***, New Balance filed its Amended Notice of Arbitration to add Superdeporte as a defendant (as both holder of the Peru Claims and as PSG's business successor) and to add a claim against PSG, Superdeporte, and Ribadeneira for tortious interference with New Balance's new distribution arrangement with its new distributor in Peru as a result of the Peru Claims. Am. Pet. ¶ 27. Among other things, New Balance asked the Arbitrator to issue an award "declaring that the arbitral tribunal has jurisdiction to consider the dispute." Am. Pet. Ex. 8 (Amended Notice of Arbitration) ¶ 28(i).

On May 17, 2019, PSG, Superdeporte, and Ribadeneira filed their response to New Balance's amended notice and "request[ed] the arbitral tribunal to: [d]eclare that the arbitral tribunal lacks jurisdiction to hear all of [New Balance's claims ***with respect to Mr. Ribadeneira***." Respondents' Opposition to Claimant's Amended Notice of Arbitration ¶ 27(i), attached hereto as Ex. E (emphasis added). Superdeporte did not join in this request or otherwise challenge the Tribunal's jurisdiction over it. *See id.*

D.   <u>PSG and Petitioners' Motions for Summary Disposition</u>

On May 31, 2019, relying in part on the Second Assignment of Rights, PSG, Superdeporte, and Ribadeneira moved for summary disposition in the Arbitration and, among other things, "requested[ed] that the Tribunal (1) declare that it does not have jurisdiction over Mr. Ribadeneira and as such, dismiss Mr. Ribadeneira as a Respondent from this arbitration." Am. Pet. Ex. 9 (Motion for Summary Disposition) ¶ 2.  Ribadeneira, again, submitted a lengthy brief in support of his assertion that the Arbitrator lacked jurisdiction over him and specifically asked the Arbitrator to render a decision stating as such.  *See id.* ¶¶ 11-26, 39(i).  Again, Superdeporte did not join in this request or otherwise challenge the Tribunal's jurisdiction over it.  *See id.*

On August 20, 2019, the Arbitrator denied the motion for summary disposition.  Pet. ¶ 29.  In doing so, the Arbitrator explained he "addressed the scope of the tribunal's jurisdiction in the memorandum and order dated March 18, 2019" and "determined at that time that the broad arbitration clause contained in the distribution agreement of January 1, 2013, was not limited to disputes regarding the performance of that specific contract, but rather governed despite related to the parties' 'relationship' as well," including the Peru Claims.  Am. Pet. Ex. 10 (Summary Disposition Order) at 3.  Related to the Second Assignment of Rights, the Arbitrator stated that "[t]he new question to be answered is whether Mr. Ribadeneira, who is not a party to the distribution agreement containing the arbitration clause, and who has now apparently re-assigned the Peru [C]laims to PSG and Superdeporte, ***is himself subject to the jurisdiction of this tribunal***."  *Id.* at 8 (emphasis added).  In answering this question in the affirmative, the Arbitrator held that "[b]ecause this tribunal has jurisdiction of [New Balance's tortious interference] claim, ***it has jurisdiction over Mr. Ribadeneira with respect thereto***, and Mr.

Ribadeneira cannot undo any damage his Peru claims and the injunction may have caused by the expedient of re-assigning those claims to PSG and Superdeporte." *Id*. at 9 (emphasis added).

On December 19, 2019, PSG and Petitioners filed their Second Amendment to their Counterclaims. *See* Second Amendment to Counterclaims, attached hereto as Ex. F. PSG and Petitioners took the position that "having *reassigned* the right to pursue the Peru [C]laims to PSG and Superdeporte, Mr. Ribadeneira has eliminated any basis on which the Tribunal previously concluded that he was compelled to arbitrate any claims against New Balance." *Id.* ¶ 3. Additionally, among other counterclaims, PSG and Superdeporte alleged that New Balance's breaches caused "PSG and Superdeporte [to] have suffered damages worth up to $6.45 million." *Id.* at 24. As part of their relief sought from the Arbitrator, "PSG and Superdeporte respectfully request[ed] the arbitral tribunal to: . . . [d]eclare that Claimant [New Balance] violated its *obligations under the Distribution Agreement*, and that it breached the implied covenant of good faith and fair dealing." *Id.* ¶ 69(vii) (emphasis added). In sum, PSG and Superdeporte sought over $10 million in damages against New Balance for its alleged breaches of the Distribution Agreement and "bad faith" negotiations of the "new distribution agreement." *Id.* ¶ 69.

On February 12, 2020, following the close of discovery, PSG, Superdeporte, and Ribadeneira renewed their motion for summary disposition. Am. Pet. ¶ 30. Their renewed motion only pertained to New Balance's breach of contract claim, however, they repeated their assertions that the Arbitrator did not have jurisdiction over Ribadeneira, and, for the first time, alleged that the Arbitrator also did not have jurisdiction over Superdeporte. Am. Pet. Ex. 11 (Renewed Motion for Summary Disposition) ¶¶ 2, 3. They also repeated their request for the

Arbitrator to declare that the Tribunal lacks jurisdiction over Ribadeneira and also requested the same for Superdeporte.  *Id.* ¶¶ 28(i), 28(iii).

### E.      The Hearing and Post-Hearing Briefing

The parties held a hearing in the Arbitration on March 9-11 and May 30, 2020 and PSG, Superdeporte and Ribadeneira again argued that the Arbitrator had no jurisdiction over Ribadeneira and Superdeporte.  Pet. ¶ 31.  Ribadeneira flew from Peru to Boston to participate in the hearing, and he attended each day of the hearing as a party to the proceeding.  Likewise, PSG and Superdeporte also had their corporative representative (the same individual) travel to the hearing from Peru and another witness flew in from Chile to testify on Petitioners' behalf.  PSG and Petitioners also submitted an expert report and called the expert as a witness during the hearing.

Following the Arbitration's hearing on the merits, Petitioners filed their Post-Hearing Brief, seeking a final order from the Arbitrator declaring that the claims against Ribadeneira and Superdeporte "must be dismissed for lack of this tribunal's jurisdiction over" them.  Am. Pet. Ex. 13 ¶ 173.

## III.      THE ARBITRATION AWARDS AND POST-AWARD FILINGS

### A.      The Partial Final Award

On August 20, 2020, the Arbitrator issued the Partial Final Award.  Am. Pet. ¶ 33.  The Arbitrator found PSG and Superdeporte jointly liable for New Balance's breach of contract claim under the Distribution Agreement.  Am. Pet. Ex. 14 at 26.  With regard to Superdeporte, the Arbitrator provided a detailed analysis of the successor liability issue, ultimately finding that Superdeporte is liable to New Balance under this theory.  *Id.* at 23-25.  The Arbitrator also found that PSG, Superdeporte, and Ribadeneira were jointly liable for New Balance's tortious interference claim.  *Id.*  In addition, the Arbitrator denied all of PSG and Petitioners'

counterclaims that they alleged against New Balance. *Id.* at 27. Therefore, the Arbitrator addressed and decided all issues of liability in his Partial Final Award. *Id.* at 26-27. The Arbitrator, however, ordered that the "specific awards" relating to interest, attorney's fees and expenses, and AAA's administrative fees shall be made in his Final Award. *Id.* at 27.

On September 17, 2020, PSG and Petitioners requested correction of the Partial Final Award, interpretation of the Partial Final Award, and/or the issuance of an additional award. Am. Pet. ¶ 35. In their submission, PSG and Petitioners admitted that that they already "request[d] [] the Tribunal [] declare that it does not have jurisdiction over Mr. Ribadeneira" in their motion for summary disposition on May 31, 2019, however, they yet again requested that the Arbitrator issue "an additional award concerning the Tribunal's exercise of jurisdiction over [] Ribadeneira and Superdeporte." Am. Pet. Ex. 15 (Clarification Motion) at 6-7.

On November 4, 2020, the Arbitrator denied PSG and Petitioners' request for correction and/or interpretation of the Partial Final Award. Am. Pet. ¶ 38. In response to their request related to the jurisdictional question, the Arbitrator explained that he had "exercised jurisdiction with respect to Superdeporte by imposing joint liability on that company (together with PSG) for amounts owed under the 2013 [D]istribution [A]greement based on [his] finding that it is the business successor to PSG." Am. Pet. Ex. 16 (Clarification Denial) at 3. He further stated that he had "exercised jurisdiction over Ribadeneira and Superdeporte, and ha[d] concluded that each is liable (together with PSG) with respect to New Balance's tortious interference claim, because the Peru [C]laims, so-called, from which that interference arose were pursued by Ribadeneira pursuant to assignments of those claims by PSG and Superdeporte." *Id.* What's more, citing to his motion to compel order dated March 18, 2019, the Arbitrator noted that he already

"explained [his] ***interpretation and application of this broad [arbitration] clause and relevant authorities at considerable length***." *Id.* at 4 (emphasis added).

### B.    The Petition and Motion to Vacate the Partial Final Award

On February 2, 2021, 90 days after the Arbitrator's Clarification Denial and 165 days after the Arbitrator issued the Partial Final Award, Petitioners filed their Petition and Motion to Vacate the Arbitration Award in this Court. Despite the ***9 times*** that Petitioners collectively requested that the Arbitrator issue an order declaring that he doesn't have jurisdiction over Petitioners, Petitioners ask the Court to find that the Arbitrator exceeded his authority in determining the arbitrability question. Pet. at 2. Moreover, Petitioners ask this Court to review the Arbitrator's decision *de novo* on the grounds that Petitioners never agreed to submit this question to the Arbitrator. Mot. to Vacate at 9-11.

### C.    The Final Award and Amended Petition and Amended Motion to Vacate

After the parties submitted briefing related to interest and attorney's fees, the Arbitrator issued his Final Award on February 11, 2021. Am. Pet. ¶ 39. In his Final Award, the Arbitrator "reaffirmed and incorporated herein by reference" the Partial Final Award. Am. Pet. Ex. 17 (Final Award) at 7. With regard to Petitioners' jurisdictional challenge (which they raised again in their opposition to New Balance's request for attorney's fees), the Arbitrator reiterated that he already "ruled on their jurisdictional defenses and hereby reiterate those rulings." *Id.*

In response, nearly two weeks later, on February 22, 2021, Petitioners filed their Amended Petition and Amended Motion to Vacate the Arbitration Award (the "Amended Motion") on the same grounds as their original petition and motion.

For the reasons stated more fully below, this Court should defer to the Arbitrator's well-reasoned Award, as well as the Arbitrator's other various orders in the Arbitration regarding arbitrability, and deny Petitioners' Amended Motion.

# ARGUMENT

The parties submitted the arbitrability question to the Arbitrator on several occasions, and the Arbitrator found jurisdiction over Petitioners each and every time. At no point did Petitioners challenge, move to stay the Arbitration, and/or move to vacate the Arbitrator's findings regarding his jurisdiction over Petitioners in state or federal court. Therefore, this Court should defer to the Arbitrator's Award and deny the Amended Motion. Moreover, even if the Court were to review Petitioners' jurisdictional question under the *de novo* standard of review, the Arbitrator still properly exercised jurisdiction over Petitioners, as laid out in his well-reasoned opinions.

## I. THE COURT MUST GIVE EXTREME DEFERENCE TO THE ARBITRATOR'S AWARD

"The hallmark of federal court review of an arbitrator's decision is extreme deference to the opinion of the arbitrator . . . *[j]udicial review of an arbitration decision is extremely narrow and extraordinarily deferential and is among the narrowest known in the law*." *Salem Hosp.*, 449 F.3d at 237 (emphasis added). Indeed, pursuant to this extremely narrow standard, the party challenging the arbitration award "bears a heavy burden"[8] because a reviewing court will not "hear claims of factual or legal error by an arbitrator as an appellate court does in reviewing decisions of lower courts, even where such error is painfully clear, nor do they revisit the arbitrators' ultimate determination of whether or not to impose liability." *Photographic Illustrators Corp. v. Osram Sylvania, Inc.,* 366 F. Supp. 3d 160, 166 (D. Mass. 2019) (internal quotations omitted); *Hoolahan,* 947 F.3d at 120 ("[A]s long as the Award draws its essence from the Agreement that underlies the arbitration proceeding and the arbitrator arguably construed or

---

[8] *See Hoolahan*, 947 F.3d at 105 (comparing challenging an arbitration award to a "Mt. Everest climb," especially where the petitioner "decried the arbitrator's calculations and first requested that the arbitrator modify the award. Denied there, it kept trekking, and asked the district court to vacate the award.")

applied the Agreement within the scope of his authority, we will not disturb the Award.") (internal punctuation and citations omitted).

The "gateway dispute about whether the ***parties are bound by a given arbitration clause*** raises a 'question of arbitrability' for a court to decide," unless the parties "clearly and unmistakably" "delegate questions of arbitrability to the arbitrator." *Awuah v. Coverall N. Am., Inc.*, 703 F.3d 36, 41 (1st Cir. 2012) (quoting *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002)). Most relevant to Petitioners' Amended Motion, when there is such "clear and unmistakable" evidence that the parties submitted the question of arbitrability to the arbitrator, the highly deferential standard applies to an arbitrator's arbitrability decision. *First Options*, 514 U.S. 938 at 943 ("Did the parties agree to submit the arbitrability question itself to arbitration? ***If so, then the court's standard for reviewing the arbitrator's decision about that matter should not differ from the standard courts apply when they review any other matter that parties have agreed to arbitrate***.") (emphasis added); *see also* Am. Mot. at 11 (quoting *Oxford Health Plans LLC v. Sutter*, 569 U.S. 564, 569 (2013) and recognizing that "[a] court ***may*** therefore review an arbitrator's determination of such a matter [arbitrability] *de novo* ***absent clear and unmistakable evidence that the parties wanted an arbitrator to resolve the dispute***.") (emphasis added). What is more, "[a] court ***must defer*** to an arbitrator's arbitrability decision when the parties submitted that matter [arbitrability] to arbitration." *First Options*, 514 U.S. at 943; *see also Patton v. Johnson*, 915 F.3d 827, 835 (1st Cir. 2019). In other words, if Petitioners and New Balance submitted the arbitrability question to the Arbitrator, then the Court ***must*** defer to the Arbitrator's decision. *Id.*

Given this "extremely narrow and extraordinarily deferential" standard of review, it is not surprising that Petitioners have asked this Court to apply the more lenient *de novo* standard in its

review of the Arbitrator's Award.  *See* Am. Mot. at 9-11.  Petitioners attempt to circumvent the

"hallmark" deferential review standard by asserting that there is "no clear and unmistakable

evidence" of Petitioners' intent to submit the question of arbitrability to the Arbitrator because

"they did not sign the Distribution Agreement."  *Id.* at 9.  Petitioners' argument, however,

ignores their very own submissions to the Arbitrator that clearly show their intent to have the

Arbitrator decide this issue.[9]  *See Patton*, 915 F.3d at 835–36 (finding "clear and unmistakable"

evidence that the parties submitted the question of arbitrability to the arbitrator where "[a]ll of

the parties to the first JAMS arbitration *submitted briefs to the arbitrator on the issue of*

*whether the claims asserted were arbitrable at all, and no one questioned the arbitrator's*

*authority to decide that issue. Nor did any party seek to vacate the arbitrator's decision on*

*such a ground*") (emphasis added).[10]

Indeed, the Arbitration's record is replete with clear evidence that Petitioners and New

Balance submitted the arbitrability question to the Arbitrator.  In fact, with regard to Petitioner

Ribadeneira (who at the time was acting as the assignee of PSG and Superdeporte's litigation

---

[9] Furthermore, as explained in Section IV.B, pp. 26-31, *infra*, Petitioners are bound by the arbitration clause, and the arbitration clause explicitly incorporates the UNCITRAL Arbitration Rules.  Am. Pet. Ex. 1 ¶ 21.  Under the UNCITRAL Arbitration Rules, the arbitral tribunal has "the power to rule on its own jurisdiction, including any objections with respect to the existence or validity of the arbitration agreement."  UNCITRAL Arbitration Rules § 3, art. 23, attached hereto as Ex. G; *see also Apollo Computer, Inc. v. Berg*, 886 F.2d 469, 473-74 (1st Cir. 1989) (concluding that parties agreed to submit issue of validity to the arbitrator where contract dictated arbitration would be decided in accordance with particular arbitration rules, and those rules allowed arbitrator to determine jurisdiction).  As a result, the parties clearly agreed and intended for the Arbitrator to have the authority to rule on his own jurisdiction.  Therefore, even if the Court does not find "clear and unmistakable" evidence that the parties agreed to submit the arbitrability question to the Arbitrator *during the Arbitration*, the extremely deferential standard still applies to the Arbitrator's decision finding jurisdiction over Petitioners.

[10] For these reasons, Petitioners' reliance on cases such as *Awuah*, 703 F.3d at 42 and *Khath v. Midland Funding, LLC*, 334 F. Supp. 3d 499, 512 (D. Mass. 2018) is misplaced.  *See* Am. Mot. at 10, n.4 and n.5.  Petitioners cite to these cases, and others, for the proposition that arbitrability should be for the courts to decide; however, that is only if the parties did not submit this issue to the arbitrator.  *See Awuah*, 703 F.3d 3 at 41 (1st Cir. 2012) ("*Parties may delegate questions of arbitrability to the arbitrator*, *but unless the parties clearly and unmistakably provide otherwise*, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator.") (emphasis added); *see also Khath*, 334 F.Supp. 3d. at 515 (same, and furthermore noting that the contract explicitly provided that arbitrability of class actions—which was the issue at hand—"shall be decided by a court").  Here, New Balance and Petitioners clearly and unmistakably submitted the arbitrability question to the Arbitrator, and thus, these cases do not apply.

rights), the Court need not look further than his first submission in the Arbitration. On September 4, 2018, in response to New Balance's Notice of Arbitration, Ribadeneira "request[ed] *the arbitral tribunal to*: dismiss all Claimant's claims with respect to *Mr. Ribadeneira on the ground that the arbitral tribunal lacks jurisdiction with respect to a dispute between Claimant and Mr. Ribadeneira*." *See* Am. Pet. Ex. 3 at ¶ 35(i) (emphasis added). Then, in his amended response, wherein he also alleged counterclaims against New Balance *in the Arbitration*, Ribadeneira repeated his request for the *Arbitrator to find* that "the arbitral tribunal lacks jurisdiction with respect" to him. *See* Am. Pet. Ex. 4 at ¶ 42(i).

The Arbitrator's Order No. 1 provides further "clear and unmistakable" evidence that the parties submitted the question of arbitrability to the Arbitrator. *See* Ex. A hereto. In Order No. 1, the Arbitrator explained that he "conducted an initial teleconference . . . with all parties participating by counsel. Discussion was held regarding an objection to the tribunal's jurisdiction asserted by Respondent Rodrigo Ribadeneira . . ." *Id.* at 1. More specifically, the Arbitrator explained that "[Ribadeneira] *seeks a preliminary determination regarding the tribunal's jurisdiction* so that, if his objection to the jurisdiction prevails, he may be relieved of the obligation to participate in the defense." *Id.* (emphasis added). As Order No. 1 makes even more clear, Ribadeneira explicitly asked the Arbitrator to make a "preliminary determination" regarding the "tribunal's jurisdiction." *Id.* Order No. 1 also held that the "parties agreed" that New Balance shall "file a motion seeking . . . relief that would dispose of the jurisdictional dispute" and Ribadeneira "may file a response." *Id.* at ¶¶ 2-3.

Per the Arbitrator's Order No. 1, New Balance proceeded to move to compel PSG and Ribadeneira to arbitrate the Peru Claims in the Arbitration. *See* Am. Pet. ¶ 24. In doing so, New Balance acknowledged that although Ribadeneira was "technically a non-signatory to the

Distribution Agreement," he "is bound by the arbitration provision for a number of reasons."
*See* Am. Pet. Ex. 5 at 2, 10-12. As a result, pursuant to the parties' arbitration agreement and the
UNCITRAL Arbitration Rules (incorporated therein) that grant arbitrators "the power to rule on
its own jurisdiction," New Balance requested that the Arbitrator find jurisdiction over Petitioner
Ribadeneira in the Arbitration. *See id.* at 7, n.4; *see also* Ex. G (UNCITRAL Arbitration Rules)
hereto. Thereafter, Petitioner Ribadeneira, "[i]n accordance with Order No. 1," filed a response
to New Balance's motion to compel. *See* Am. Pet. ¶ 25; Am. Pet. Ex. 6 at ¶ 1. In his response,
Petitioner Ribadeneira submitted a lengthy brief defending his jurisdictional objection (*see* Am.
Pet. Ex. 6 ¶¶ 12-31) and, again, unambiguously "***ask[ed] the arbitral tribunal to:*** dismiss all
Claimant's claims with respect to ***Mr. Ribadeneira on the ground that the arbitral tribunal***
***lacks jurisdiction with respect to a dispute between Claimant and Mr. Ribadeneira.***" *Id.* at ¶
33(i) (emphasis added). On March 18, 2019, pursuant to the parties' joint request for the
Arbitrator to decide the arbitrability question, the Arbitrator granted New Balance's motion to
compel arbitration and found jurisdiction over the Peru Claims, which "dispose[d]" of
"Ribadeneira's contention that he cannot be compelled to arbitrate because he is not a party to
the agreement that contains the arbitration requirement." Am. Pet. Ex. 7 at 11.

While Order No. 1, the parties' specific submissions regarding arbitrability, and the
Arbitrator's subsequent decision, are "clear and unmistakable" evidence that the parties intended
for the Arbitrator to decide the arbitrability issue, Petitioners ***repeated*** similar requests to the
Arbitrator throughout the entire course of the Arbitration. Am. Pet. Ex. 9 ¶ 39(i) ("PSG and
Superdeporte ***respectfully request that the arbitral tribunal to: declare that it has no***
***jurisdiction over Mr. Ribadeneira* . . .**") (emphasis added). The Arbitrator denied Ribadeneira's
motion for summary judgment and found that "[b]ecause this tribunal has jurisdiction of [New

Balance's tortious interference claim], *it has jurisdiction over Mr. Ribadeneira with respect thereto*." Am. Pet. Ex. 10 at 9.

There is also clear and unmistakable evidence that Superdeporte, too, intended for the Arbitrator to decide the arbitrability question. On February 12, 2020, at the close of the Arbitration's discovery, Petitioners requested that the Arbitrator find that it lacked jurisdiction over both Petitioners. *See* Am. Pet. Ex. 11 ¶ 28(i) (Ribadeneira), ¶ 28(iii) (Superdeporte). Then, following the Arbitration's hearing on the merits, Petitioners filed their post-hearing brief and requested that the Arbitrator: "[d]eclare that Claimant's claims against *Mr. Ribadeneira and Superdeporte under the Distribution Agreement must be dismissed for lack of this tribunal's jurisdiction over these Respondents in relation to New Balance's claims under the Distribution Agreemen*t." *See* Am. Pet. Ex. 13 ¶ 173 (emphasis added). In addition, as explained in Section III, pp. 24-25, *infra*, Superdeporte *never* objected to the Arbitrator's jurisdiction at any point in the Arbitration. Instead, upon receiving the assignment back from Ribadeneira to pursue claims against New Balance, Superdeporte affirmatively brought its multi-million-dollar counterclaims in the Arbitration. Superdeporte only joined Ribadeneira's "renewed" request for dismissal on jurisdictional grounds at the close of discovery and several months after being named as a defendant in the Arbitration. *Cf. First Options*, 514 U.S. at 946 (party's written objections to arbitration panel's jurisdiction is evidence of unwillingness to be bound where parties did not previously agree to submit arbitrability question to arbitration panel).

Finally, in their request for correction and interpretation of the Partial Final Award, Petitioners asked the Arbitrator to issue a jurisdictional finding for the *ninth* time in the Arbitration, and they also admit that they "submitted its Motion for Summary Disposition*,*

***requesting the Tribunal to declare that it does not have jurisdiction over Mr. Ribadeneira***."
Am. Pet. Ex. 15 at 7 (emphasis added).

In sum, the history of this case is akin to that in *Patton*, where the parties affirmatively sought the arbitrator's decision on arbitrability, the arbitrator made a clear arbitrability decision, and the arbitration proceeded without any of the parties challenging the arbitrability decision, or the arbitrator's authority to do so, in state or federal court. *See Patton,* 915 F.3d at 835–36; *cf. First Options*, 514 U.S. at 946 (court should apply "independent review" when objecting party moved to dismiss on jurisdictional grounds and never independently sought the arbitrator's opinion on jurisdiction.); *see also Cleveland Elec. Illuminating Co. v. Util. Workers Union of Am*., 440 F.3d 809, 813 (6th Cir. 2006) (deferring to arbitrator's arbitrability decision and distinguishing the facts from *First Options* because the parties "submitted the question of arbitrability to the arbitrator for his determination."). Here, the Arbitration's record is clear and unmistakable: New Balance and Petitioners intended for the Arbitrator to decide the issue of arbitrability, and the Arbitrator did just that on multiple occasions. Critically, and perhaps most detrimental to Petitioners' Amended Motion, none of the parties, including Petitioners, ever challenged the Arbitrator's multiple orders finding jurisdiction over Petitioners, or his ***authority*** to reach this jurisdictional determination, in any state or federal court. Petitioners had every right, and multiple opportunities, to move to vacate and/or challenge the Arbitrator's authority in a court of law, but they failed to do so. Instead, Petitioners participated fully in the Arbitration, including asserting multi-million-dollar counterclaims against New Balance and appearing as fact witnesses at the hearing, and repeatedly asked the Arbitrator to decide the arbitrability issue.

Therefore, given the voluminous "clear and unmistakable" evidence of the parties' intent to submit the arbitrability question to the Arbitrator, the Court should apply the "extremely

narrow and extremely deferential" review standard to the Arbitrator's Award, not a *de novo* review.

## II.     PETITIONERS HAVE NOT MET THEIR BURDEN OF PROOF

Petitioners wrongly assume *de novo* review applies here, and, as a result, make no attempt to overcome their "heavy burden" of rebutting one of "the narrowest [standards of review] known in the law." *Salem Hosp.*, 449 F.3d at 237–38; *see also Photographic Illustrators*, 366 F. Supp. 3d at 166. Indeed, the Amended Motion is wholly absent of ***any*** allegations to suggest that this case is one of the "very unusual circumstances" such that the Arbitrator's Award should be vacated by the Court. *Sutter*, 569 U.S. at 568 (quoting *First Options*, 514 U.S. at 942). More specifically, Petitioners neither dispute that that the Arbitrator's Award "draws its essence" from the Distribution Agreement nor that the Arbitrator failed to "arguably construe[] or appl[y]" the Distribution Agreement. *See Hoolahan,* 947 F.3d at 120. Nor could they.

As explained above, *supra* 8-13, the Arbitrator, on several occasions at the request of Petitioners, applied the parties' "broad" arbitration provision to the facts before him and "exercised jurisdiction over Ribadeneira and Superdeporte" to conclude that "each is liable (together with PSG) with respect to New Balance's tortious interference claim." Am. Pet. Ex. 16 at 3; Am. Pet. Ex. 7. In fact, in response to Petitioners' last-ditch effort to clarify and/or correct the Partial Final Award, the Arbitrator informed the parties that he already "explained [his jurisdictional] interpretation and application of this broad [arbitration] clause and relevant authorities at considerable length." Am. Pet. Ex. 16 at 4. Indeed, Petitioners do not (and cannot) dispute that the Arbitrator issued a lengthy decision that cited to the Distribution Agreement, the arbitration provision, and relevant Massachusetts law, ultimately finding that he had jurisdiction over Petitioners. *See* Am. Pet. Ex. 7.

In sum, New Balance and Petitioners clearly and unmistakably submitted the arbitrability question the Arbitrator to decide, which he did, and therefore, the Court "***must*** defer to [the] arbitrator's arbitrability decision," *First Options*, 514 U.S. at 943–44 (emphasis added), and ought not "disturb the Award," *Hoolahan*, 947 F.3d at 120.

## III.     SUPERDEPORTE HAS WAIVED ANY CHALLENGE TO ARBITRABILITY

Alternatively, to the extent Petitioners argue that their submissions do not constitute "clear and unmistakable" evidence that Superdeporte submitted the issue of arbitrability to the Arbitrator, then it must follow that Superdeporte has waived any argument that the Arbitrator lacked jurisdiction over Superdeporte by failing to timely raise the issue. *See Turner Fisheries, Inc. v. Seafood Workers Union*, 19 Mass. App. Ct. 925, 927 (1984) (party who participated in arbitration but failed to raise the issue that no agreement to arbitrate existed was barred from subsequently raising that issue in a judicial action to vacate the arbitration award).[11]  As indicated in Section II.C-E, pp. 10-13, *infra*, Superdeporte did not object to the Arbitrator's jurisdiction when New Balance initially added it to the Arbitration in May 2019, and, instead, proceeded to file multi-million-dollar counterclaims against New Balance pursuant to the Distribution Agreement with the very arbitration clause that it is now refusing to be bound by. *See infra* at pp. 10-11.  In other words, Superdeporte chose to participate in the Arbitration (and indeed bring its own claims) without objection.  *See* Ex. F hereto (Petitioners' second amended, and final, pleading filed before the hearing, alleging multi-million-dollar counterclaims and ***only*** asserting Ribadeneira's objection to jurisdiction).

---

[11] Likewise, federal courts applying the FAA consistently hold that a party to an arbitration must raise challenges to arbitrability, including jurisdictional challenges, during the arbitration itself in order to preserve the issue for judicial review.  *Cleveland Elec.*, 440 F.3d at 813*; Teamsters Local Union No. 764 v. J.H. Merritt & Co.*, 770 F.2d 40, 42 (3d Cir. 1985); *Fortune, Alsweet & Eldridge, Inc. v. Daniel*, 724 F.2d 1355, 1356-57 (9th Cir. 1983).

Moreover, Superdeporte did not raise the issue of jurisdiction until Petitioners filed their "renewed" motion for summary disposition in February 2020, which was: i) *after* the close of discovery; ii) more than eight months after New Balance named Superdeporte as a defendant in the Arbitration; and iii) mere weeks before the Arbitration hearing. *See id*.  In sum, Superdeporte either presented the arbitrability issue to the Arbitrator and is now bound by his decision (*see* Section I, pp. 21-24, *infra*) or, alternatively, failed to timely object to jurisdiction at the outset and waived its ability to do so at this stage.  *See Turner Fisheries, Inc.*, 19 Mass. App. Ct. at 927; *see also Time Warner Cable of New York City LLC v. Int'l Bhd. of Elec. Workers*, 170 F. Supp. 3d 392, 417 (E.D.N.Y. 2016), *aff'd* 684 F. App'x 68 (2d Cir. 2017). ("[party] only challenged the arbitrator's authority after the arbitration record was closed . . . [b]y agreeing to the arbitration and then actively participating in the proceedings, [party] waived its right to contest the arbitrator's jurisdiction."); *Fortune*, 724 F.2d at 1357 (party waived objections to "legitimacy of the arbitration process, in which he had voluntarily participated over a period of several months").

## IV.   PETITIONERS ARE BOUND BY THE ARBITRATION CLAUSE EVEN UNDER THE *DE NOVO* STANDARD OF REVIEW

Even if the Court determines that *de novo* review applies to the question of arbitrability, the Amended Motion should still be denied because, under well-established Massachusetts law, Petitioners are bound by the Distribution Agreement's broad arbitration provision.

### A.   The Arbitration Agreement Applies Broadly to the Relationship Among the Parties

First, the arbitration clause of the Distribution Agreement provides, in relevant part, that "any and all disputes . . . related to or arising out of the Agreement or the relationship, its application and/or termination (including post-termination obligations) shall be settled by final and binding arbitration."  Am. Pet. Ex. 1 ¶ 21.  This is a so-called "broad clause" that creates "a

presumption that a contract dispute is encompassed by the clause unless it is clear that the

dispute is excluded." *Commonwealth v. Philip Morris Inc.*, 448 Mass. 836, 843–44 (2007);

*Carpenter v. Pomerantz*, 36 Mass. App. Ct. 627, 630 (1994).

In construing a broad clause similar to the clause in the Distribution Agreement, the First

Circuit observed that "[b]road language of this nature covers contract-generated or ***contract-***

***related disputes*** between the parties however labeled: it is immaterial whether claims are in

contract or in tort." *Maldonado v. PPG Industries, Inc.*, 514 F.2d 614, 616 (1st Cir. 1975)

(emphasis added). "The arbitration clause is not limited to disputes over the terms of the

contract or to disputes arising during the performance of the contract." *Id.* at 616 n.6. In other

words, the parties' arbitration agreement encompasses the parties' entire relationship and not just

the express terms of the Distribution Agreement. *See, e.g.*, *Weiss v. Atholl*, 1998 WL 1184150,

at *4 (Mass. Super. Ct. Dec. 28, 1998) (finding abuse of process claim was arbitrable); *Next Step*

*Medical Co., Inc.*, 619 F. 3d 67, 72 (1st Cir. 2010) (holding a tort "claim arising out of and

relating to the breakdown of business relationships" was covered by an arbitration clause similar

to the one at issue here).

B.  Enforcing the Arbitration Agreement Against Non-Signatories, Such as
    Petitioners, is Appropriate Here

Petitioners argue that while the arbitration provision applies to PSG, the party under

Ribadeneira's ownership that actually signed the Distribution Agreement, the agreement should

not apply to Ribadeneira himself or PSG's successor, Superdeporte. As the Arbitrator already

held on numerous occasions, Petitioners' argument is wrong as a matter of law. Whether a non-

signatory can be compelled to arbitrate is determined by traditional principles of Massachusetts

contract law. *See Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 630-32 (2009). As is relevant

here, traditional principles of Massachusetts contract law require the assignee to take the place of

the assignor and litigate his claims as if he were the assignor. *See, e.g.*, *Yung v. Reymonde*, 1999 WL 788445, at *1, 1999 Mass. App. Div. 194 (1999), *aff'd*, 433 Mass. 1001 (2000) ("When a claim is assigned, the assignee stands in the shoes of the assignor and is in the same position as the assignor without the assignment."); *Graves Equip., Inc. v. M. DeMatteo Const. Co.*, 397 Mass. 110, 112 (1986) (recognizing the "common law rule that an assignee of contract rights stands in the shoes of the assignor . . ."); *Quincy Tr. Co. v. Town of Pembroke*, 346 Mass. 730, 732 (1964) ("[T]he assignee stands in no better position than the assignor, and any defen[s]e which the defendant could raise against the latter may also be raised against the former.").

Furthermore, under Massachusetts law, courts traditionally recognize "six theories for binding nonsignatories to arbitration agreements: (1) incorporation by reference; (2) assumption; (3) agency; (4) veil-piercing/alter ego; (5) equitable estoppel, and (6) third-party beneficiary." *Machado*, 471 Mass. at 209 (footnotes omitted). Petitioners are bound to the parties' arbitration agreement under both the assumption and equitable estoppel theories. Under the "assumption" exception, "'a party may be bound by an arbitration clause if its subsequent conduct indicates that it is assuming the obligation to arbitrate,' despite being a nonsignatory." *Id.* at 210, n.10. And under the "equitable estoppel" exception, "a nonsignatory [may] compel arbitration in either of two circumstances: (1) when a signatory 'must rely on the terms of the written agreement in asserting its claims against the nonsignatory' or (2) when a signatory 'raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract.'" *Id.* at 211.

As applied here, Ribadeneira and Superdeporte assumed the obligation to arbitrate when they brought claims against New Balance for breach of the very Distribution Agreement that requires disputes to be resolved through binding arbitration, and at the very least, given their

conduct, should be equitably estopped from attempting to circumvent the parties' arbitration agreement.

1. *Petitioner Ribadeneira*

Ribadeneira is bound by the parties' arbitration agreement because, although a non-signatory, he pursued the signatory's (PSG's) rights under the Distribution Agreement and the draft amended and restated distribution agreement, both of which required arbitration, and brought claims that were so "inextricably intertwined with and relate directly to" the Distribution Agreement and amended and restated distribution agreement that he is equitably estopped from denying its application. *See Machado*, 471 Mass. at 211-13. Thus the Arbitrator had jurisdiction over him as an assignee, *see Yung*, 1999 WL 788445, at *2, and under the principles articulated in *Machado*.

As laid out *supra*, pp. 6-7, Ribadeneira entered in the First Assignment of Rights with PSG and Superdeporte giving himself the authority to litigate their claims against New Balance arising out of the Distribution Agreement and the parties' relationship generally. With that authority, Ribadeneira shut down New Balance's operations in Peru with an *ex parte* motion that told the Peru court that PSG and Superdeporte had the exclusive right to distribute New Balance's products in Peru and that New Balance was violating that exclusive agreement by using a new distributor. Ribadeneira made this *ex parte* motion despite New Balance having terminated its relationship with PSG and Petitioners more than a year prior.

Following New Balance's motion to compel arbitration, Ribadeneira tried to avoid the jurisdiction of the Arbitrator by entering into the Second Assignment of Rights, assigning the litigation rights **back** to PSG and Superdeporte. But the damage had already been done. Ribadeneira, sitting in the shoes of PSG and Superdeporte as their assignee, sought to claim benefits from the Distribution Agreement and amended and restated distribution agreement, each

28

of which contained arbitration agreements, and tortiously interfered with New Balance's business.  As a result of his conduct, Ribadeneira is bound by the parties arbitration agreement.  *See Machado*, 471 Mass. at 211-13 and n.10 (recognizing that "a party may be bound by an arbitration clause if its subsequent conduct indicates that it is assuming the obligation to arbitrate"); *see also Yung*, 1999 WL 788445, at *2 (recognizing that assignee stands in shoes of assignor).[12]  In other words, Ribadeneira cannot commit a tort or file frivolous litigation when "acting as PSG" and then execute an assignment to avoid liability and the jurisdiction of the Tribunal.  *See, e.g.*, *Grand Wireless, Inc. v. Verizon Wireless, Inc.*, 748 F.3d 1, 11 (1st Cir. 2014) ("Any other rule . . . would permit the party bringing the complaint to avoid the practical consequences of having signed an agreement to arbitrate; naming the other party's officers, directors or employees as defendants along with the corporation would absolve the party of all obligations to arbitrate").  The law at least requires, as a matter of equity, that Ribadeneira answer to New Balance's tort claim in the Arbitration.  *Walker v. Collyer*, 85 Mass. App. Ct. 311, 320 (2014) (recognizing that "an entity 'knowingly exploiting an agreement with an arbitration clause can be estopped from avoiding arbitration despite having never signed the agreement'").

### 2. *Petitioner Superdeporte*

Superdeporte is likewise bound by the parties' arbitration agreement as both the business successor of PSG and as a party who brought litigation against New Balance on the basis of the Distribution Agreement and the amended and restated distribution agreement, again each of which contained identical mandatory arbitration provisions.  As a result of both acts,

---

[12] Notably, if PSG were to assert the Peru Claims itself against New Balance, then it would be subject to the arbitration clause in the Distribution Agreement.  Basic contract principles dictate that PSG should not be able to avoid this result by assigning its rights to its largest shareholder and business manager.  *See, e.g.*, *Yung*, 1999 WL 788445, at *2.

Superdeporte not only assumed the parties' arbitration agreement, but "raise[d] allegations of substantially interdependent and concerted misconduct by both the nonsignatory [Superdeporte] and one or more of the signatories [PSG] to the contract" such that Superdeporte is now estopped from asserting a lack of jurisdiction. *Machado,* 471 Mass. at 211-13.

During the Arbitration, it was overwhelmingly established that PSG's parent companies, at the ultimate direction of Ribadeneira, "liquidated PSG and created Superdeporte" to take over PSG's operations. Am. Pet. Ex. 11 at ¶ 23. Superdeporte took over PSG's entire company— from inventory, assets, and clients to employees and physical space. *See* Deposition Transcript of Carlos Miguel Gagliardi, attached hereto as Ex. I, at 38:13-17 (PSG "disappeared" in May of 2016 after "[a]ll brands were moved from PSG to Superdeporte Plus Peru"); *id.* at 93:23-94:5 (all PSG product was "moved" from PSG to Superdeporte"). In effect, Superdeporte was "merely a 'new hat'" for PSG, and as a result, was found liable to New Balance as PSG's successor under Massachusetts law. *Milliken & Co. v. Duro Textiles, LLC*, 451 Mass. 547, 555 (2008) (holding a successor company liable when there is a "reorganization transforming a single company from one corporate entity into another").

Following PSG's transition to Superdeporte, there is no question that Superdeporte's "subsequent conduct" indicated that it was assuming the obligations of PSG under the Distribution Agreement. For example, contemporaneous documentary evidence reflects PSG's continuation into Superdeporte. Namely, on March 2, 2016, PSG's and Superdeporte's representative told New Balance that he wanted New Balance to change the name of its Peru distributor from PSG to Superdeporte because Superdeporte would begin importing New Balance's product. *See* Arbitration Ex. 157 at NB_PSG0000513 (requesting to change the "address and the name of the companies"), attached hereto as Ex. H; *see also id.* at

30

NB_PSG0000512 (stating, "the company's name is changing in a couple of months and when Q3 arrive it will be another company the one which will be importing the goods").  To that end, PSG asked New Balance for a letter stating that its distributor in Peru was Superdeporte "[b]ecause [they] were changing from PSG to Superdeporte" and wanted to introduce the new corporate identity to buyers.  *See* Ex. I (Gagaliardi Dep. Tr.) at 93:16-22.  As a result, Superdeporte assumed PSG's obligations under the Distribution Agreement, including the arbitration clause.  *Machado,* 471 Mass. at 210 n.10.

For the same reasons, Petitioner Superdeporte is estopped from arguing that it is not bound by the parties' arbitration agreement.  Indeed, as Petitioners' Amended Motion points out: "'estoppel has been limited to cases [that] involve nonsignatories [Superdeporte] who, during the life of the contract, have embraced the contract despite their nonsignatory status but then, during litigation, attempt to repudiate the arbitration clause in the contract.' *Ouadani*, 876 F.3d at 38 (alteration in original) (quotation marks and citation omitted); *see also Walker*, 85 Mass. App. Ct. at 320–21 (holding that estoppel requires nonsignatory to arbitrate only where it receives 'direct' rather than 'indirect' benefits from the agreement with the arbitration clause)."  This is precisely the situation here.  Superdeporte "embraced" the Distribution Agreement and the amended and restated distribution agreement and even sued New Balance over both in an attempt to recover **over $10 million in damages** against New Balance for its alleged breaches, yet now it is attempting to dissociate itself from that very agreement.  Massachusetts law precludes Superdeporte from such conduct, and thus, Superdeporte is bound by the Distribution Agreement's arbitration clause.  *Machado,* 471 Mass. at 211.

## CONCLUSION

For the reasons stated above, this Court should deny Petitioners' Amended Motion to Vacate the Arbitration Award and grant New Balance's Cross-Motion to Confirm the Awards.

Date:  March 8, 2021

Respectfully submitted,

NEW BALANCE ATHLETICS, INC.

By its counsel,

*/s/ Mark E. Tully*
Mark E. Tully (BBO# 550403)
Kate E. MacLeman (BBO# 684962)
Dylan Schweers (BBO# 698461)
Goodwin Procter LLP
100 Northern Avenue
Boston, Massachusetts 02210
Tel.: 617.570.1000
Fax.: 617.523.1231
MTully@goodwinlaw.com
KMacLeman@goodwinlaw.com
DSchweers@goodwinlaw.com

**CERTIFICATE OF SERVICE**

I, Mark E. Tully, certify that a copy of the foregoing document, filed through the CM/ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on March 8, 2021.


Dated: March 8, 2021                                   */s/ Mark E. Tully*
                                                                    Mark E. Tully

# EXHIBIT A

## INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION

| | |
|---|---|
| **IN THE MATTER OF ARBITRATION BETWEEN:** | |
| NEW BALANCE ATHLETICS, INC. | |
| vs. | CASE NO. 01-18-0003-1183 |
| PERUVIAN SPORTING GOODS S.A.C. | |

## <u>ORDER NO. 1</u>

I conducted an initial conference by telephone on December 6, 2018, with all parties participating by counsel. Discussion was held regarding an objection to the tribunal's jurisdiction asserted by the respondent Rodrigo Ribadeneira on the ground that he is not a party to the 2013 agreement between New Balance Athletics, Inc. ("New Balance") and Peruvian Sporting Goods S.A.C. ("PSG"); that agreement has not been assigned to him; and consequently he is not subject to that agreement's arbitration clause. See Amended Response to the Notice of Arbitration and Counterclaim, paragraph 10. He seeks a preliminary determination regarding the tribunal's jurisdiction so that, if his objection to the jurisdiction prevails, he may be relieved of the obligation to participate in the defense of the case.

Reference is made also to legal proceedings pending in the civil courts of Peru in which Mr. Ribadeneira alleges that New Balance has breached contractual and other obligations, causing him damage thereby. See Amended Response, paragraph 22. New Balance has proposed that the present arbitration be expanded to encompass Mr. Ribadeneira's pending Peruvian claims, thereby resolving the jurisdictional dispute.

Consequently, the parties agreed as follows:

1.      The parties shall attempt to negotiate a satisfactory agreement regarding

expansion of the pending arbitration to include the claims presently pending in the Peruvian courts.

2.    Absent a resolution pursuant to paragraph #1 above, New Balance shall, on or before January 11, 2019, file a motion seeking incorporation of the pending Peruvian proceedings into this arbitration, or alternative relief that would dispose of the jurisdictional dispute.

3.    PSG and Rodrigo Ribadeneira may file a response on or before January 21, 2019.

4.    Following the filings referred to, a telephone conference with counsel will be scheduled to discuss proceedings on the motion and in the arbitration in general.

*/s/ William I. Cowin*

Dated: December 27, 2018                    William I. Cowin, Arbitrator

# EXHIBIT B

1                AMERICAN ARBITRATION ASSOCIATION

2                     Case No. 11800031183

3    - - - - - - - - - - - - - - - - - - - - - -x

4     In the Matter of Arbitration between:    :

5    NEW BALANCE ATHLETICS, INC.,              :

6                          Claimant,           :

7       - and -                                :

8    PERVIAN SPORTING GOODS SAC, et al.,       :

9                          Respondent.         :

10   - - - - - - - - - - - - - - - - - - - - - -x

11

12   ARBITRATOR:  Hon. William I. Cowin (Ret.)

13

14                       Held at:

15             AMERICAN ARBITRATION ASSOCIATION

16                   200 State Street

17               Boston, Massachusetts 02109

18

19               Monday, March 9, 2020

20                     9:11 a.m.

21

22

23

24   REPORTED BY:  Deanna J. Dean, RDR, CRR

25   Job Number:  177002

Page 877

```
 1              Proceedings
 2    whether -- what the nature of -- I mean,
 3    let's get to what we're really at here:
 4    What was the nature of this transfer of
 5    PSG?  If she knows.
 6    BY MS. JAQUITH:
 7         Q.   Let's take a look, then, at Exhibit
 8    78.  Should be in Volume No. 2.
 9              79.  I'm sorry.
10         A.   Okay.  I understand what you ask.
11         Q.   Was it a sale of stock?  Did
12    Mr. Padilla --
13         A.   Bought the company, not the assets.
14         Q.   How?  Did he purchase shares?
15         A.   Yes.  The company, the shares of the
16    company.
17         Q.   Okay.  Thank you.
18              THE WITNESS:  You are right.  Sorry
19    for that.
20              THE ARBITRATOR:  No, you're doing
21    fine.
22              THE WITNESS:  I'm sorry.
23              THE ARBITRATOR:  You're doing fine.
24              THE WITNESS:  You know what happened
25    that -- sorry.  This is a very -- a stock
```

Page 878

```
 1              Proceedings
 2    for us is also the inventory, so that's why
 3    I get confused.
 4         Q.   There's also been testimony that in
 5    May of 2016, Superdeporte in Peru became -- was
 6    registered as an active company.  Right?
 7         A.   Yes.
 8         Q.   It was ready to distribute?
 9         A.   Mm-hmm.
10         Q.   There were certain sales between PSG
11    and Superdeporte of assets.  Right?
12         A.   Yes.
13         Q.   And what did PSG sell to
14    Superdeporte?
15         A.   PSG sold all the inventory that he
16    has.  It was around, about 650,000, something
17    like that, all the inventory that he had on
18    hand at that point, and sold to Superdeporte.
19         Q.   And how did Superdeporte pay PSG for
20    the inventory?
21         A.   When he saw -- when he bought the
22    inventory, he acquire PSG debt.  And
23    afterwards, that date was -- how you say --
24    what's the word?  Was paid with intercompany
25    debt.
```

Page 879

```
 1              Proceedings
 2              THE ARBITRATOR:  Are you saying that
 3    Superdeporte paid PSG's debt?
 4              THE WITNESS:  Debt, yeah.
 5              THE ARBITRATOR:  So that was
 6    essentially the -- in return for the
 7    650,000 in inventory?
 8              THE WITNESS:  Exactly.  Exactly.
 9              THE ARBITRATOR:  Thank you.
10    BY MS. JAQUITH:
11         Q.   And was that the -- the debt --
12    Superdeporte paying PSG's debt, was that
13    everything?  Was that -- or was there anything
14    else?
15         A.   Most of the -- a few, like, 40, 45,
16    50,000 was cash, was trans -- paid in cash.
17         Q.   And were any other assets sold from
18    PSG to Superdeporte?
19         A.   From PSG to Superdeporte?
20         Q.   Aside from the inventory that we
21    just talked about.
22         A.   I don't -- it's just the inventory.
23         Q.   What about the store?
24         A.   The store, okay.  PSG was not -- was
25    not the owner of the store.  It was
```

Page 880

```
 1              Proceedings
 2    Hiperdeporte.
 3         Q.   Ah.
 4         A.   So Hiperdeporte sold the store.
 5    That's from perception.
 6         Q.   And Hiperdeporte is another --
 7         A.   Another company of the --
 8         Q.   -- Peruvian wholesale company.
 9    Right?
10         A.   Yes.  It's a retailer.
11         Q.   A retail company that's part of the
12    group?
13         A.   Yes.  Yes.  That's why it has the --
14    it has the store.
15         Q.   Okay.  And Hiperdeporte sold the
16    store to Superdeporte?
17         A.   Yes.  Around the same time.
18         Q.   And do you know how it --
19    Superdeporte paid for -- what was -- how the
20    store was paid for?
21         A.   The store was paid for in at the end
22    of the year, also by part of this -- this --
23    the stuff that Superdeporte acquire from PSG
24    and Hiperdeporte.
25         Q.   Okay.
```

47 (Pages 877 to 880)

```
 1                Proceedings
 2  about 35 to 40 percent of PSG's sales during
 3  the 2013 to 2016 time period were sales to
 4  Dide?
 5      A.   Yes.  35, I would say.
 6      Q.   She said 35 to 40 percent.  Does
 7  that sound about --
 8      A.   I would say 35.
 9      Q.   Okay.  And I think you told me when
10  we last met that, factually, in the 2015-2016
11  time period, the sales that PSG was making to
12  Dide, Dide was making to Marathon Sports?
13      A.   Say that again.
14      Q.   The sales that PSG -- the sales of
15  New Balance product that PSG was making to
16  Dide, Dide was turning around and selling to
17  Marathon Sports?
18      A.   Most of those would have gone to
19  Marathon.  There were other accounts as well
20  that Dide had.
21      Q.   And I think you described part of
22  the problem with PSG's cash flow and payments
23  was that Marathon wasn't paying Dide and Dide
24  wasn't paying PSG?
25      A.   That was one part, and also that
```

```
 1                Proceedings
 2  Peru was also very slow because of the
 3  devaluation.
 4      Q.   That was certainly part of the
 5  impact?
 6      A.   Yes.
 7      Q.   Okay.  And during the period of time
 8  that PSG was having difficulty making its
 9  payments to New Balance, I think you said
10  more than 10 times PSG promised New Balance
11  that it would make the payments and then didn't
12  make those payments?
13      A.   New Balance said that we would make
14  the payments and we didn't make the payments,
15  10 times?
16      Q.   No.  That PSG promised in one form
17  or another, through a payment plan or
18  otherwise --
19      A.   I don't know if it was 10 times or
20  five times or three times.  I really don't
21  recall.
22      Q.   Well, you testified at your
23  deposition that it was more than 10 times.
24           Do you recall that?
25      A.   I imagine, yeah.
```

```
 1                Proceedings
 2      Q.   Okay.  I mean, I can show you --
 3      A.   I -- I remember having more than 10
 4  conversations about -- about the issue.  So I
 5  imagine it was probably 10 times that that came
 6  to me, but I did not count them exactly.
 7      Q.   No, no.  And as you testified in
 8  your deposition, you being precise, but
 9  you did say it was -- you couldn't come up with
10  a number, but it was more than 10 times?
11      A.   Around.
12      Q.   Would you be more comfortable if I
13  directed you to page 125 of your deposition
14  testimony?
15           MR. TULLY:  That's the judge's.
16  This is mine.  Here's an extra.
17           MR. ORTA:  What page?
18           MR. TULLY:  125, please.  Does the
19  witness have one?
20           MR. ORTA:  I'm trying to get it in
21  front of him.
22           MR. TULLY:  Okay.
23           MR. ORTA:  (Handing.)
24      Q.   So just calling your attention to
25  the very end of page 125 where I begin my
```

```
 1                Proceedings
 2  question.
 3           "Question:  Can you approximate how
 4  many times PSG promised New Balance that
 5  payments would be forthcoming and then they
 6  didn't pay?"
 7           And you said, "I don't know exactly
 8  an exact amount, but a few times."
 9           And I asked, "More than 10?"
10           You said, "More than 10?  Yes, more
11  than 10."
12      A.   Probably, yeah.
13           MR. ORTA:  No.  Actually, he said,
14  "Yes, maybe more than 10."
15           MR. TULLY:  Oh, I'm sorry.  I read
16  it too quickly.  Thank you.
17           MR. ORTA:  "Yes, maybe more than
18  10."
19           MR. TULLY:  "Yes, maybe more than
20  10."
21      Q.   Now, just a moment ago when I was
22  asking you about this undocumented intention to
23  give back to PSG and Superdeporte any benefit
24  you got from the Peru litigation, at the end of
25  your answer, you said, "It's me at the end,"
```

Page 993

```
 1              Proceedings
 2   didn't you?
 3       A.   As I said throughout the -- and I
 4   even have a patrimonial declaration where it
 5   says that I'm the ultimate owner of all the
 6   companies.  So, yes, I know that at the end, it
 7   will end up in one of my companies.  So --
 8       Q.   It's all you?
 9       A.   It's all me.  But each company
10   operates separately and each company has --
11   files taxes separately.  I cannot move money
12   from the other without doing it in an
13   arm's-length way.  There are many procedures
14   and many formalities that we have to fulfill,
15   especially having one public company.
16       Q.   But one formality that you didn't
17   bother with was to document in any way that you
18   would be giving back any benefit from the Peru
19   litigation to PSG and Superdeporte?
20       A.   I was not advised to do that.  I --
21       Q.   Don't -- don't go into advice.
22   Legal advice, at least.  If you were advised
23   otherwise, that's fine.
24         If you'll bear with me just for one
25   minute.
```

Page 994

```
 1              Proceedings
 2        I suspect I know the answer to the
 3   question.  At the time of your filing and your
 4   request for an injunction, were you aware of
 5   what documents were being submitted to the Peru
 6   court?
 7       A.   I reviewed some things.  I did much
 8   of it at a distance.  I was not there present
 9   when much of it happened.
10       Q.   Okay.  And without disclosing any
11   communication with your lawyers, were you aware
12   that the contract you were seeking to enforce
13   was not submitted to the court?
14       A.   I don't remember that.  I don't
15   know.
16       Q.   And were you aware that the notice
17   of nonrenewal, call it termination, whatever
18   you -- however you want to refer to it, the
19   June 23rd letter from New Balance saying that
20   the relationship would not continue, that that
21   was not provided to the court?
22       A.   I have no -- I don't remember.  I
23   don't know.
24         MR. TULLY:  Those are in evidence,
25   your Honor.
```

Page 995

```
 1              Proceedings
 2   Thank you very much.
 3         THE ARBITRATOR:  Redirect?
 4         MR. ORTA:  We're done.
 5         (Witness excused.)
 6         MS. MacLEMAN:  Judge Cowin, how did
 7   you want to deal with our designations?  Do
 8   you want to submit them as Exhibit 288?
 9         THE ARBITRATOR:  Well, let me ask
10   you first -- I think it came from Ms.
11   Jaquith.  There was a very useful
12   compilation of proposed deposition
13   testimony --
14         MS. MacLEMAN:  We have a binder of
15   it.
16         THE ARBITRATOR:  That looks like it
17   might be it.
18         -- with indications of what was
19   objected to and what was agreed to go in.
20   Is that what it is?
21         MR. TULLY:  Yes.  This has
22   objections.
23         MS. MacLEMAN:  This is the
24   designation chart that we submitted with
25   the highlighted decisions and tabs.  And
```

Page 996

```
 1              Proceedings
 2   the yellow means that it was designated by
 3   New Balance and the pink means it was
 4   designated by respondents.
 5         THE ARBITRATOR:  Yeah.  And the
 6   chart indicates --
 7         MR. ORTA:  Hold on.  Hold on.
 8   Before you give it to the judge, I think we
 9   have an entitlement to know what you're
10   giving to the judge.
11         MS. MacLEMAN:  It's already been
12   submitted.  This is a printed copy.  You're
13   welcome to review it.
14         MR. ORTA:  My team is telling me
15   they are not comfortable with this.  So can
16   we just have an opportunity to take a look
17   at it to make sure --
18         MS. MacLEMAN:  Sure.
19         MR. TULLY:  When we submitted it, we
20   gave it to them.
21         THE ARBITRATOR:  I'm happy to have
22   the respondents look at it.  I'm just
23   trying to ascertain what it is.
24         MS. MacLEMAN:  Sure.
25         THE ARBITRATOR:  So those are the
```

76 (Pages 993 to 996)

Page 1263

```
 1              C E R T I F I C A T E
 2
 3       I, Deanna J. Dean, a Registered Diplomate
 4  Reporter, Certified Realtime Reporter, and
 5  Massachusetts Notary Public, do hereby certify that
 6  the foregoing, to the best of my knowledge, skill
 7  and ability, is a true and accurate transcript of
 8  the arbitration between New Balance Athletics, Inc.
 9  and Peruvian Sporting Goods SAC, et al., as
10  reported by me via videoconference on the date
11  hereinbefore set forth.
12       I further certify that I am neither attorney
13  or counsel for, nor related to or employed by any
14  of the parties to the action in which this
15  deposition was taken, and further that I am not a
16  relative or employee of any attorney or counsel
17  employed in this case, nor am I financially
18  interested in this action.
19
20
21
22  _____
23          Deanna J. Dean, RDR, CRR
24       Signed this 10th day of June, 2020
25       My MA commission expires December 26, 2025
```

# EXHIBIT C



## CESIÓN DE DERECHOS

Conste por el presente documento, un contrato de cesión de derechos que celebran, de una parte, PERUVIAN SPORTING GOODS S.A.C. identificada con RUC Nro. 20532477418 debidamente representada por Julio César Padilla Murillo identificado con C.de Extranjería Nro. 000306676 con domicilio en Av. Paseo de la República Nro. 5895 interior 1014 Urbanización San Antonio, Miraflores, en adelante **LA CEDENTE**; y, de otra parte, RODRIGO XAVIER RIBADENEIRA PARDUCCI identificado con Pasaporte Nro. 1703848950 con domicilio en Hidalgo de Pinto de la ciudad de Quito, Ecuador, en adelante **EL CESIONARIO;** en los términos siguientes:

**PRIMERO:** Durante los años 2015 y 2016, **LA CEDENTE** mantuvo negociaciones con la empresa NEW BALANCE ATHLETIC SHOE INC a fin de celebrar un Contrato de Distribución para importar, vender y distribuir en el territorio peruano productos deportivos. Sin embargo, una vez que los términos contractuales estuvieron acordados y el contrato listo para ser ejecutado, NEW BALANCE ATHLETIC SHOE INC informó a **LA CEDENTE** que trabajaría con otro socio en el Perú, originándose una controversia entre ambas partes.

En dicha negociación participó también **EL CESIONARIO** de manera conjunta con **EL CEDENTE**, quien también forma parte de la controversia antes descrita.

**SEGUNDO:** Por el presente contrato, **LA CEDENTE** de conformidad con el artículo 1206º y ss. del Código Civil, transfiere a título gratuito a **EL CESIONARIO** todos los derechos que le corresponden en atención a la controversia antes descrita contra NEW BALANCE ATHLETIC SHOE INC, tanto ante autoridades judiciales como administrativas; pudiendo **EL CESIONARIO** ocupar su lugar y ejercer los derechos que le corresponden a **LA CEDENTE** respecto de las





DEPOSITION EXHIBIT
13
PSC

Arbitration Exhibit
**80**

acciones legales a iniciarse en contra de NEW BALANCE ATHLETIC SHOE INC, tanto en el Perú como en cualquier lugar del mundo.

**TERCERO:** LA CEDENTE no garantiza a **EL CESIONARIO** la existencia o exigibilidad del derecho cedido, ni responde por el resultado de los procesos judiciales y/o administrativos que pudieran iniciarse en contra de NEW BALANCE ATHLETIC SHOE INC.

**CUARTO:** El presente contrato de cesión de derechos tiene carácter civil y se regirá por sus propias cláusulas y, en su defecto, por el Código Civil Peruano. Asimismo, se precisa que la jurisdicción aplicable para cualquier aspecto relacionado con el mismo será la peruana.

En señal de conformidad, las partes suscriben el presente documento en dos ejemplares del mismo tenor, en la ciudad de Lima, el día 25 de noviembre del año 2016.

**LA CEDENTE**

**EL CESIONARIO**

# ANEXO

# 1-D

## CESIÓN DE DERECHOS

Conste por el presente documento, un contrato de cesión de derechos que celebran, de una parte, SUPERDEPORTE PLUS PERU SAC. identificada con RUC Nro. 20600892470 debidamente representada por su Gerente General Lorena Blanco Zuloaga identificada con DNI Nro. 10543705, con domicilio en Av. Larco Nro. 1301, interior 301, distrito de Miraflores, en adelante **LA CEDENTE**; y, de otra parte, RODRIGO XAVIER RIBADENEIRA PARDUCCI identificado con Pasaporte Nro. 1703848950 con domicilio en la Hidalgo de Pinto, Quito Tenis, de la ciudad de Quito, Ecuador, en adelante **EL CESIONARIO**; en los términos siguientes:

**PRIMERO:** Durante el año 2016, **LA CEDENTE** fue creada a raíz de las negociaciones que sus fundadores sostuvieron con la empresa NEW BALANCE ATHLETIC SHOE INC a fin de celebrar un Contrato de Distribución para importar, vender y distribuir en el territorio peruano productos deportivos. Sin embargo, una vez que los términos contractuales estuvieron acordados y el contrato listo para ser ejecutado, NEW BALANCE ATHLETIC SHOE INC informó a **LA CEDENTE** que trabajaría con otro socio en el Perú, originándose una controversia entre ambas partes.

En dicha negociación participó también **EL CESIONARIO** de manera conjunta con **EL CEDENTE**, quien también forma parte de la controversia antes descrita.

**SEGUNDO:** Por el presente contrato, **LA CEDENTE** de conformidad con el artículo 1206º de Código Civil, transfiere a título gratuito a **EL CESIONARIO** todos los derechos que le corresponden en atención a la controversia antes descrita contra NEW BALANCE ATHLETIC SHOE INC, tanto ante autoridades judiciales como administrativas; pudiendo **EL CESIONARIO** ocupar su lugar y ejercer los

derechos que le corresponden a **LA CEDENTE** respecto de las acciones legales a iniciarse en contra de NEW BALANCE ATHLETIC SHOE INC, tanto en el Perú como en cualquier lugar del mundo.

**TERCERO: LA CEDENTE** no garantiza a **EL CESIONARIO** la existencia o exigibilidad del derecho cedido, ni responde por el resultado de los procesos judiciales y/o administrativos que pudieran iniciarse en contra de NEW BALANCE ATHLETIC SHOE INC.

**CUARTO:** El presente contrato de cesión de derechos tiene carácter civil y se regirá por sus propias cláusulas y, en su defecto, por el Código Civil Peruano. Asimismo, se precisa que la jurisdicción aplicable para cualquier aspecto relacionado con el mismo será la peruana.

En señal de conformidad, las partes suscriben el presente documento en dos ejemplares del mismo tenor, en la ciudad de Lima, el día 25 de noviembre del año 2016.


**LA CEDENTE**                    **EL CESIONARIO**

## ASSIGNMENT OF RIGHTS

Witnesseth hereby THE CONTRACT of Assignment of Rights entered into by and between on one hand, PERUVIAN SPORTING GOODS S.A.C., holder of Tax ID Number (RUC) 20532477418, duly represented by Julio César Padilla Murillo, holder of Alien Card (C.E.) 000306676 with residence at Av. Paseo de la Republica N.° 5895, Interior 1014, Urbanización San Antonio, Miraflores, hereinafter referred to as **THE ASSIGNOR**; and, on the other hand, RODRIGO XAVIER RIBADENEIRA PARDUCCI, holder of Passport N.° 1703848950 with residence at Hidalgo de Pinto, City of Quito, Equator, hereinafter referred to as **THE ASSIGNEE**, under the following terms:

**FIRST**: During 2015 and 2016, THE ASSIGNOR held negotiations with the company NEW BALANCE ATHLETIC SHOE INC. in order to celebrate a Distribution Contract to import, sell and distribute sports products in the territory of Peru. However, once the contractual terms were agreed and the contract ready to be executed, NEW BALANCE ATHLETIC SHOE INC. informed THE ASSIGNOR that it will work with another partner in Peru, arising a dispute between the parties.

THE ASSIGNEE participated in this negotiation along with THE ASSIGNOR, who is also part of the aforementioned dispute.

**SECOND:** By this contract, THE ASSIGNOR in compliance with Section 1206 and subsection of the Civil Code, transfers without valuable considerations to THE ASSIGNEE all its rights in attention to the dispute mentioned before against NEW BALANCE ATHLETIC SHOE INC., before judicial and administrative authorities, which enables THE ASSIGNEE to hold its position and execute all THE ASSIGNOR´s rights in respect with the legal actions to be initiated against NEW BALANCE ATHLETIC SHOE INC. in Peru and anywhere else in the world.

**THIRD**: THE ASSIGNOR does not guarantee to THE ASSIGNEE the existence or the enforceability of the assigned rights, nor respond for the results of the judicial and administrative proceedings that may arise against NEW BALANCE ATHLETIC SHOE INC.

**FOURTH**: This contract of assignment of rights is of civil nature and shall be governed by its own clauses; otherwise, it shall be governed by the Peruvian Civil Code. Likewise, it is hereby stated that the applicable jurisdiction for any of the aspects related to it shall be the Peruvian jurisdiction.

IN WITNESS WHEREOF, the Parties hereunto set their hands in two (2) counterparts, each of which shall be deemed as original, in the city of Lima, this 25th day of November 2016.


(illegible signature)                              (illegible signature)
THE ASSIGNOR                                   THE ASSIGNEE

## ASSIGNMENT OF RIGHTS

Witnesseth hereby THE CONTRACT of Assignment of Rights entered into by and between on one hand, SUPERDEPORTE PLUS PERU SAC, holder of Tax ID Number (RUC) 20600892470, duly represented by General Manager Lorena Blanco Zuloaga, holder of National Identity Card (DNI) 10543705 with residence at Av. Larco N.° 1301, Interior 301, District of Miraflores, hereinafter referred to as **THE ASSIGNOR**; and, on the other hand, RODRIGO XAVIER RIBADENEIRA PARDUCCI, holder of Passport N.° 1703848950 with residence at Hidalgo de Pinto, Quito Tenis, City of Quito, Equator, hereinafter referred to as **THE ASSIGNEE**, under the following terms:

**FIRST**: During 2016, THE ASSIGNOR was organized due to the negotiations that the founders held with the company NEW BALANCE ATHLETIC SHOE INC. in order to celebrate a Distribution Contract to import sell and distribute sports products in the territory of Peru. However, once the contractual terms were agreed and the contract ready to be executed. NEW BALANCE ATHLETIC SHOE INC. informed THE ASSIGNOR that it will work with another partner in Peru, arising a dispute between the parties.

THE ASSIGNEE also participated in this negotiation along with THE ASSIGNOR, who is also part of the aforementioned dispute.

**SECOND:** By this contract, THE ASSIGNOR in compliance with Section 1206 of the Civil Code, transfers without valuable considerations to THE ASSIGNEE all their rights in attention to the dispute mentioned before against NEW BALANCE ATHLETIC SHOE INC., before judicial and administrative authorities, being able THE ASSIGNEE to hold its position and execute all THE ASSIGNOR´s rights in respect with the legal actions to be initiated against NEW BALANCE ATHLETIC SHOE INC, in Peru and anywhere else in the world.

**THIRD**: THE ASSIGNOR does not guarantee to THE ASSIGNEE the existence or the enforceability of the assigned rights, nor respond for the results of the judicial and administrative proceedings that may arise against NEW BALANCE ATHLETIC SHOE INC.

**FOURTH**: This contract of assignment of rights is of civil nature and shall be governed by its own clauses, or otherwise, by the Peruvian Civil Code. Likewise, it is hereby stated that the applicable jurisdiction for any of the aspects related to it shall be the Peruvian jurisdiction.

IN WITNESS WHEREOF, the Parties hereunto set their hands in two (2) counterparts, each of which shall be deemed as original, in the city of Lima, this 25th day of November 2016.


(illegible signature)                                              (illegible signature)
THE ASSIGNOR                                                  THE ASSIGNEE

# EXHIBIT D

## CESIÓN DE DERECHOS

Conste por el presente documento, un contrato de cesión de derechos que celebran de una parte, **RODRIGO XAVIER RIBADENEIRA PARDUCCI**, identificado con Pasaporte Nro. 1703848950; con domicilio para estos efectos en Hidalgo de Pinto de la Ciudad de Quito, Ecuador (en adelante, "**EL CEDENTE**"); y de otra parte, **PERUVIAN SPORTING GOODS S.A.C.**, identificada con RUC Nro. 20532477418; con domicilio para estos efectos en Av. Paseo de la República Nro. 5895 interior 1014 Urbanización San Antonio, Miraflores, distrito y provincia de Lima, Perú; debidamente representada por Julio César Padilla Murillo, identificado con carné de extranjería Nro. 000306676, (en adelante, "**LA CESIONARIA**"); en los términos siguientes:

**PRIMERO:** Durante los años 2015 y 2016, **LA CESIONARIA** mantuvo negociaciones con la empresa NEW BALANCE ATHLETIC SHOE INC a fin de celebrar un Contrato de Distribución para importar, vender y distribuir en el territorio peruano productos deportivos. Sin embargo, una vez que los términos contractuales estuvieron acordados y el contrato listo para ser ejecutado, NEW BALANCE ATHLETIC SHOE INC informó a **LA CESIONARIA** que trabajaría con otro socio en el Perú, originándose una controversia entre ambas partes.

Por otro lado, en virtud al contrato de Cesión de Derechos de fecha 25 de noviembre de 2016, **LA CESIONARIA** le transfirió – a título gratuito – a **EL CEDENTE** todos los derechos que le correspondían en atención a la controversia antes descrita contra NEW BALANCE ATHLETIC SHOE INC, esto a fin que **EL CEDENTE** ocupara el lugar de **LA CESIONARIA** y ejerciera los derechos que le correspondían a esta última respecto de las acciones legales a iniciarse en contra de NEW BALANCE ATHLETIC SHOE INC, tanto en el Perú como en cualquier lugar del mundo (en adelante, los "**Derechos Cedidos**").

**SEGUNDO:** Por el presente contrato, y de conformidad a los dispuesto en el artículo 1206° del Código Civil, **EL CEDENTE** restituye – vía cesión de derechos – la integridad de los **Derechos Cedidos** a favor de **LA CESIONARIA**, todo esto a título gratuito.

**TERCERO: EL CEDENTE** no garantiza a **LA CESIONARIA** la existencia o exigibilidad de los **Derechos Cedidos**, ni responde por el resultado de los procesos judiciales y/o administrativos que pudieran iniciarse o se hubieran iniciado en contra de NEW BALANCE ATHLETIC SHOE INC.



R-9_002

**CUARTO :** El presente contrato de cesión de derechos tiene carácter civil y se regirá por sus propias cláusulas y, en su defecto, por el Código Civil Peruano. Asimismo, se precisa que la jurisdicción aplicable para cualquier aspecto relacionado con el mismo será la peruana.

En señal de conformidad, las partes suscriben el presente documento en dos ejemplares del mismo tenor, en la ciudad de Lima, el día 02 de mayo de 2019.

EL CEDENTE                     LA CESIONARIA

R-9_003

## ASSIGNMENT OF RIGHTS

Hereby this contract of assignment of rights celebrated by one part, **RODRIGO XAVIER RIBADENEIRA PARDUCCI**, identified by Passport No. 1703848950; with domicile for these purposes in Hidalgo de Pinto de la Ciudad in Quito, Ecuador (hereinafter, **"THE GRANTOR"**); and by the other part, **PERUVIAN SPORTING GOODS S.A.C.**, identified with TIN No. 20532477418; with domicile for these purposes in Av. Paseo de la Republica No. 5895 interior 1014 Urbanización San Antonio, Miraflores, district and province of Lima, Peru; duly represented by Julio Cesar Padilla Murillo, identified by alien ID No. 000306676, (hereinafter, **"THE ASSIGNEE"**); in the following terms:

**FIRST**: During the years 2015 and 2016, **THE ASSIGNEE** maintained negotiations with the company NEW BALANCE ATHLETIC SHOE INC in order to celebrate a Distribution Contract to import, sell and distribute sports products in Peru. However, once the contractual terms were agreed on and the contract was ready to be executed, NEW BALANCE ATHLETIC SHOE INC informed **THE ASSIGNEE** that they were going to work with another partner in Peru, causing a dispute between both parties.

On the other hand, by virtue of the Assignment of Rights Agreement dated November 25, 2016, **THE ASSIGNEE** transferred - free of charge - to **THE GRANTOR** all the rights that corresponded to them in attention to the dispute described above against NEW BALANCE ATHLETIC SHOE INC so that **THE GRANTOR** could take the place of **THE ASSIGNEE** and exercise the rights that corresponded to the latter with respect to the legal actions to be initiated against NEW BALANCE ATHLETIC SHOE INC in Peru as anywhere in the world (hereinafter, the **"Assigned Rights"**).

**SECOND**: By this contract, and in accordance with the provisions of the Article 1206° of the Civil Code, **THE GRANTOR** assigns back - by transfer of rights - the integrity of the **Assigned Rights** in favor of **THE ASSIGNEE**, all this for free.

**THIRD**: **THE GRANTOR** does not guarantee **THE ASSIGNEE** the existence or enforceability of the **Assigned Rights**, nor is it liable for the outcome of judicial and/or administrative proceedings that could be initiated or have been initiated against NEW BALANCE ATHLETIC SHOE INC.

**FOURTH**: This contract of assignment of rights has a civil character and shall be governed by its own clauses and, failing that, by the Peruvian Civil Code. Likewise, it is specified that the applicable jurisdiction for any aspect related to it will be Peruvian.

For the sake of conformity, the parties sign this document in two copies of the same tenor, in the city of Lima, on May 2, 2019.

(Signature)                                              (Signature)

_____                            _____
**THE GRANTOR**                                     **THE ASSIGNEE**

R-9_004

## CESIÓN DE DERECHOS

Conste por el presente documento, un contrato de cesión de derechos que celebran, de una parte, **RODRIGO XAVIER RIBADENEIRA PARDUCCI** identificado con Pasaporte Nro. 1703848950; con domicilio para estos efectos en Hidalgo de Pinto de la Ciudad de Quito, Ecuador (en adelante, **"EL CEDENTE"**); y de otra parte, **SUPERDEPORTE PLUS S.A.C.**, identificada con RUC Nro. 20600892470; con domicilio en Av. Larco Nro. 1301, interior 301, distrito de Miraflores, provincia y departamento de Lima, Perú; debidamente representada por Jorge Herminio Ortiz Ramírez, identificado con DNI Nro. 09136393, (en adelante, **"LA CESIONARIA"**); en los términos siguientes:

**PRIMERO:** Durante el año 2016, **LA CESIONARIA** fue creada a raíz de las negociaciones que sus fundadores sostuvieron con la empresa NEW BALANCE ATHLETIC SHOE INC a fin de celebrar un Contrato de Distribución para importar, vender y distribuir en el territorio peruano productos deportivos. Sin embargo, una vez que los términos contractuales estuvieron acordados y el contrato listo para ser ejecutado, NEW BALANCE ATHLETIC SHOE INC informó a **LA CESIONARIA** que trabajaría con otro socio en el Perú, originándose una controversia entre ambas partes.

Por otro lado, en virtud al contrato de Cesión de Derechos de fecha 25 de noviembre de 2016, **LA CESIONARIA** le transfirió – a título gratuito – a **EL CEDENTE** todos los derechos que le correspondían en atención a la controversia antes descrita contra NEW BALANCE ATHLETIC SHOE INC, esto a fin que **EL CEDENTE** ocupara el lugar de **LA CESIONARIA** y ejerciera los derechos que le correspondían a esta última respecto de las acciones legales a iniciarse en contra de NEW BALANCE ATHLETIC SHOE INC, tanto en el Perú como en cualquier lugar del mundo (en adelante, los **"Derechos Cedidos"**).

**SEGUNDO:** Por el presente contrato, y de conformidad a los dispuesto en el artículo 1206° del Código Civil, **EL CEDENTE** restituye – vía cesión de derechos – la integridad de los Derechos Cedidos a favor de **LA CESIONARIA**, todo esto a título gratuito.

**TERCERO: EL CEDENTE** no garantiza a **LA CESIONARIA** la existencia o exigibilidad del derecho cedido, ni responde por el resultado de los procesos judiciales y/o administrativos que pudieran iniciarse o se hubieran iniciado en contra de NEW BALANCE ATHLETIC SHOE INC.

**CUARTO:** El presente contrato de cesión de derechos tiene carácter civil y se regirá por sus propias cláusulas y, en su defecto, por el Código Civil Peruano. Asimismo, se precisa que la jurisdicción aplicable para cualquier aspecto relacionado con el mismo será la peruana.

En señal de conformidad, las partes suscriben el presente documento en dos ejemplares del mismo tenor, en la ciudad de Lima, el día 02 de mayo del año 2019.

_____
**EL CEDENTE**

_____
**LA CESIONARIA**

R-10_003

## ASSIGNMENT OF RIGHTS

Hereby this contract of assignment of rights celebrated by one part, **RODRIGO XAVIER RIBADENEIRA PARADUCCI**, identified by Passport No. 1703848950; with domicile for these purposes in Hidalgo de Pinto de la Ciudad in Quito, Ecuador (hereinafter, **"THE GRANTOR"**); and by the other part, **SUPERDEPORTE PLUS S.A.C.**, identified with TIN No. 20600892470; with domicile for these purposes in Av. Larco Nro. 1301, interior 301, Miraflores district, province of Lima, Peru; duly represented by Jorge Herminio Ortiz Ramirez, identified by national ID No. 09136393, (hereinafter, **"THE ASSIGNEE"**); in the following terms:

**FIRST**: During the year 2016, **THE ASSIGNEE** was created as a result of the negotiations that its founders held with the company NEW BALANCE ATHLETIC SHOE INC in order to celebrate a Distribution Contract to import, sell and distribute sports products in Peru. However, once the contractual terms were agreed on and the contract was ready to be executed, NEW BALANCE ATHLETIC SHOE INC informed **THE ASSIGNEE** that they were going to work with another partner in Peru, causing a dispute between both parties.

On the other hand, by virtue of the Assignment of Rights Agreement dated November 25, 2016, **THE ASSIGNEE** transferred - free of charge - to **THE GRANTOR** all the rights that corresponded to them in attention to the dispute described above against NEW BALANCE ATHLETIC SHOE INC so that **THE GRANTOR** could take the place of **THE ASSIGNEE** and exercise the rights that corresponded to the latter with respect to the legal actions to be initiated against NEW BALANCE ATHLETIC SHOE INC in Peru as anywhere in the world (hereinafter, the **"Assigned Rights"**).

**SECOND**: By this contract, and in accordance with the provisions of the Article 1206° of the Civil Code, **THE GRANTOR** assigns back - by transfer of rights - the integrity of the **Assigned Rights** in favor of **THE ASSIGNEE**, all this for free.

**THIRD**: **THE GRANTOR** does not guarantee **THE ASSIGNEE** the existence or enforceability of the **Assigned Rights**, nor is it liable for the outcome of judicial and/or administrative proceedings that could be initiated or have been initiated against NEW BALANCE ATHLETIC SHOE INC.

**FOURTH**: This contract of assignment of rights has a civil character and shall be governed by its own clauses and, failing that, by the Peruvian Civil Code. Likewise, it is specified that the applicable jurisdiction for any aspect related to it will be Peruvian.

For the sake of conformity, the parties sign this document in two copies of the same tenor, in the city of Lima, on May 2, 2019.

(Signature)                                          (Signature)

_____                    _____

**THE GRANTOR**                                **THE ASSIGNEE**

# EXHIBIT E

IN THE MATTER OF AN ARBITRATION UNDER THE ARBITRATION RULES OF THE
UNITED NATIONS COMMISSION ON INTERNATIONAL TRADE LAW

BETWEEN:

**NEW BALANCE ATHLETICS, INC.**

*Claimant*

-and-

**PERUVIAN SPORTING GOODS S.A.C., SUPERDEPORTE S.A.C., and RODRIGO
RIBADENEIRA**

*Respondents*

———————————————

**RESPONDENTS' OPPOSITION TO CLAIMANT'S AMENDED**

**NOTICE OF ARBITRATION**

———————————————

**17 May 2019**

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
1300 I Street NW, Suite 900
Washington, DC 20005
Tel: (202)538-8000
Fax: (202)538-8100
Counsel for Respondents

## I.     INTRODUCTION

1.      Peruvian Sporting Goods S.A.C. ("**Respondent PSG**"), Superdeporte S.A.C. ("**Superdeporte**"), and Rodrigo Ribadeneira ("**Mr. Ribadeneira**") (collectively, "**Respondents**") submit this amended response and objection to Claimant's Amended Notice of Arbitration (the "**Amended Response and Objections**"), pursuant to Procedural Order No. 2 and Article 4 of the Arbitration Rules of The United Nations Commission on International Trade Law as adopted in 2013 (the "**UNCITRAL Arbitration Rules**").

2.      Respondents reserve their right to submit a Statement of Defense/Counter-Memorial/Counterclaim pursuant to Articles 21 and 22 of the UNCITRAL Arbitration Rules, in accordance with the schedule and due process determined by the Parties and/or the Tribunal.  Respondents continue to object in the very strongest terms to the jurisdiction of the Tribunal over Mr. Ribadeneira.[1]  Respondents further object to the jurisdiction of the Tribunal over Claimant's claim relating to Mr. Ribadeneira's request for interim measures in Peru.  Respondents reserve their right to submit a Motion for Summary Disposition pursuant to Rule 18 of the JAMS Comprehensive Arbitration Rules and Procedures in relation to these issues.

3.      Unless expressly admitted, each paragraph of the Amended Notice of Arbitration is denied by Respondents.

4.      Pursuant to Procedural Order No. 2, this Amended Response and Objections contains information concerning Respondents' position as regards to Claimant New Balance's Amended Notice of Arbitration.

---

[1]  Respondents note that Mr. Ribadeneira reversed the assignment of claims that was granted to him by PSG and Superdeporte and assigned his rights to those claims against New Balance back to PSG and Superdeporte on May 2, 2019.  As such, Mr. Ribadeneira no longer holds any rights to assert any claims against New Balance deriving from PSG or Superdeporte.  *See* Contratos de Cesión de Derechos (*Assignment of Rights Contracts*) entered into between Mr. Ribadeneira and PSG, and Mr. Ribadeneira and Superdeporte, dated May 2, 2019, Respondents' Exhibits R-9, R-10.

## II.    RESPONSES TO CLAIMANT'S CLAIMS

### (a)    Claimant is Not Entitled to the Damages it Seeks for Respondents' Supposed Breach of the Distribution Agreement

5.    Respondents deny Claimant's entitlement to the damages it seeks and further deny that Claimant can seek any damages against Mr. Ribadeneira or Superdeporte, both non-parties to the Distribution Agreement and its arbitration clause.

6.    Claimant estimates its damages to be over US$ 2.9 million, but it provides no documentary support for the alleged damages sought.  Claimant has failed to submit invoices, statements of account, or any other contemporaneous documentation to support its claim for damages. Moreover, Claimant does not even specify the term during which it suffered these alleged damages.

7.    Pursuant to Section 14 of the Distribution Agreement, the right of Claimant to obtain the Distribution Fee as well as the calculation of the Distribution Fee, is based upon the sale of products by the distributor or its affiliates.[2]  However, Claimant provides no proof that Respondents sold any products within the meaning of Section 14 of the Distribution Agreement.  To the extent that Respondents sold no products, no Distribution Fees are owed under the Distribution Agreement.

8.    In fact, in mid-2015, New Balance completely shut down Respondent PSG's access to New Balance's online ordering system.  Naturally, this shut down prevented PSG from placing any additional orders.  Because Respondent PSG was unable to place any orders, it was also unable to sell any product.  Therefore, for the period of time that Respondent PSG was unable to sell any product (namely mid-2015 through the end of 2016), Respondent PSG are not responsible for any Distribution Fees under the Distribution Agreement.

9.    As made clear by Respondents' Counterclaims, Claimant through this conduct breached the Distribution Agreement and made it impossible for Respondent PSG to purchase any further products under the Distribution Agreement.  They must therefore be estopped from

---

[2]    *See* Claimant's Exhibit 1, p. 17.

seeking any damages associated with the claimed breach of the agreement by Respondent PSG.

10. Respondents further note that Mr. Ribadeneira and Superdeporte are not parties to the Distribution Agreement, assumed no obligations and thus owe no obligations to Claimant in relation to that agreement. There is no contractual basis, or otherwise, for Claimant to seek damages from Mr. Ribadeneira or Superdeporte in relation to the alleged breach of the Distribution Agreement. Moreover, to assert the Tribunal's jurisdiction over Mr. Ribadeneira and Superdeporte, New Balance confusingly and inexplicably cites the arbitration clause of the Distribution Agreement. Mr. Ribadeneira and Superdeporte were never part of the Distribution Agreement. Hence, the Tribunal does not have jurisdiction over Mr. Ribadeneira and Superdeporte. This is incontestable and, as a threshold issue, should not be overlooked by the Tribunal.

11. Respondents reserve the right to rebut any and all of Claimant's damages claims once Claimant has submitted any support for their damages claim.

12. While Respondent PSG did fall behind on its payments of Distribution Fees to Claimant in late 2015, by that time Claimant had shut down the online ordering and precluded Respondent PSG from making further purchases of its product. This prevented Respondent PSG from earning revenue to pay Distribution Fees, and, as such, Claimant is barred and equitably and legally estopped from seeking damages from Respondent for the nonpayment of the Distribution Fees.

13. Indeed, Claimant had been flexible in the past with payment delays, and Respondent PSG expected the same treatment here, which has become a customary element of the parties' relationship, as well as continued access to purchase and sell Claimant's products.

14. Respondent PSG continued to make payments to Claimant in good faith throughout 2015 and 2016 by selling the inventory of Claimant's product that it did have.[3] Respondent PSG

---

[3] *See* Claimant's Exhibit 3, p. 118.

4

thanked Claimant for its patience on its payment defaults and reinforced its superior ability as a distributor.

15. Furthermore, even if, *arguendo*, Respondent PSG did owe some amount to Claimant under the Distribution Agreement, which Respondent PSG denies, Claimant's damages claim is exponentially larger than the amounts that Claimant's own collections agency sought to collect from Respondent PSG in 2017.[4]

16. In 2017, Claimant hired a collections agency, Atradius Collections, who attempted to collect from Respondent PSG the amounts that it supposedly owed under the Distribution Agreement. Claimant's own collections agency's statement of account states that Respondent PSG's outstanding amount owed to Claimant, excluding interest, was $918,207.51, and including interest, was $1,025,657.04.[5]

17. Contemporaneous statements of account which Claimant provided to Respondent PSG also reflect similar totals.[6] Therefore, even if, *arguendo*, Respondent PSG owed Claimant money under the Distribution Agreement, which Respondent PSG contends that it does not for the reasons cited above, the amounts that Claimant has identified are unsubstantiated and inflated. It is Claimant's burden to validate any damages claim made in this arbitration. Claimants has not even attempted to do as much.

18. For all of these reasons, and others to be elaborated during this proceeding, Respondents contest Claimant's unsubstantiated damages claim.

**(b)** **This Tribunal Does Not Have Jurisdiction to Hear Claimant's Damages Claim Regarding the Peru Interim Relief Request**

19. Respondent's further deny that the Tribunal has jurisdiction to hear Claimant's misguided claim for hypothetical damages arising from the Peruvian Court's grant of interim measures.

---

[4] *See* Respondents' Exhibit 5.

[5] *Id.*

[6] *See* Respondents' Exhibit 6.

20.     On 1 February 2017, Mr. Ribadeneira filed a request with the Peruvian Court for interim measures. Mr. Ribadeneira, basing his request on Peruvian law, asked the court to order New Balance to abstain from the distribution of its products in Peru with any distributor other than PSG.[7] In December 2017, the Peruvian Court found that it had jurisdiction on Mr. Ribadeneira's request for interim measures. The Peruvian Court also held that the interim measures request had merit and granted the measures.[8] Specifically, the court ordered a halt on the distribution of New Balance products in Peru during the pendency of the proceeding.

21.     On 31 July 2018, the Peruvian Court held that the interim measure was no longer necessary and lifted it. Therein, the Court formally permitted the distribution of New Balance products in Peru once again.[9] Thus, the Peruvian Court was presented with an interim measures request which it found to be within its jurisdiction, granted the measure and later lifted it. This is how interim measures work. As such, the interim measures request has concluded, and is no longer pending.

22.     First, the Distribution Agreement explicitly provides that the parties are entitled to seek interim relief in a court of competent jurisdiction.[10] The Peruvian Court declared that it was a competent forum to hear Mr. Ribadeneira's request for interim relief. Mr. Ribadeneira's request was, thus, appropriately filed in the Peruvian court and was permitted under the Distribution Agreement.

23.     Furthermore, Judge Cowin has made a ruling on the arbitrability of the Peru claims, and has found that the Peru claims are arbitrable in this forum, chiefly because of the assignment of rights to Rodrigo Ribadeneira.[11] Judge Cowin's ruling did not implicate, nor did it discuss, the request for interim measures, nor is within Judge Cowin's jurisdiction

---

[7]  *See* Respondents' Exhibit 2.

[8]  *See* Respondents' Exhibit 3.

[9]  *See* Respondents' Exhibit 4.

[10]  *See* Claimant's Exhibit 1, p. 23.

[11]  On 2 May 2019, PSG, Superdeporte and Mr. Ribadeneira executed two similar assignment of rights contracts in which Mr. Ribadeneira transferred all the claims he possessed against New Balance back to PSG and Superdeporte. *See* Exhibits R-9 and R-10.

to grant relief in relation to the interim measures ordered by the Peruvian Court. Should Claimant believe that damages should be awarded in relation to the Peruvian Court's granting of interim measures, it must file that request for damages before the judge and court that granted this relief. The Tribunal should decline Claimant's invitation to question or trespass upon the Peruvian Court's jurisdiction and its decision to order interim measures.

24. The interim measures request has concluded, is not a part of this proceeding, and the Tribunal is not competent to award damages arising from the properly filed and granted interim measures request in the Peru Action.

25. Again, if Claimant feels that the interim measures request filed by Mr. Ribadeneira was frivolous or lacked merit, Claimant should file such claims before the Peruvian Court that granted the measure. This is not the appropriate forum.

26. For all of the aforementioned reasons, Claimant's damages claims should be dismissed and the Tribunal should assess the costs incurred by Respondents in responding to these claims on Claimant.

## III.    RELIEF SOUGHT

27. PSG, Superdeporte, and Mr. Ribadeneira respectfully request the arbitral tribunal to:

   i.    Declare that the arbitral tribunal lacks jurisdiction to hear all Claimant's claims with respect to Mr. Ribadeneira;

   ii.   Declare that there is no contractual or other legal basis for Claimant to seek damages from Mr. Ribadeneira or Superdeporte under the Distribution Agreement;

   iii.  Dismiss Claimant's contractual claims in their entirety;

   iv.   Declare that the arbitral tribunal lacks jurisdiction to hear Claimant's claim regarding alleged damages suffered arising from Mr. Ribadeneira's request for interim measures in Peru;

     v.     Order Claimant to pay all arbitration costs, including Respondents' representatives' costs and expenses and deny Claimant's requested relief regarding attorneys' fees and costs arising from the Peru Action; and

     vi.    Order any further and/or additional relief as the Tribunal may deem appropriate.

28.     PSG, Superdeporte, and Mr. Ribadeneira (without in any way accepting this Tribunal's jurisdiction) reserve their right to:

     i.     Amend or supplement the above arguments as well as to present any other counterclaims it may have or that come to light as the proceedings evolve, if any;

     ii.    Amend or supplement the relief sought herein;

     iii.   Present factual or legal arguments as may be necessary to present its case or rebut any case put forward by Claimant; and,

     iv.    Seek interim and/or provisional measures before this tribunal or any competent court.

Respectfully submitted,

David M. Orta
Legal counsel for Respondents
1300 I Street NW, Suite 900
Washington, DC 20005
Tel: (202)538-8000
Fax: (202)538-8100
May 17, 2019

# EXHIBIT F

# INTERNATIONAL CENTER FOR DISPUTE RESOLUTION

| | |
|---|---|
| **IN THE MATTER OF ARBITRATION BETWEEN:**<br><br>NEW BALANCE ATHLETICS, INC.<br><br>vs.<br><br>PERUVIAN SPORTING GOODS S.A.C. et al. | Civil No. 01-18-0003-1183 |

## RESPONDENTS' MOTION TO AMEND

Pursuant to Article 22 of the UNCITRAL Arbitration Rules, Respondents Peruvian Sporting Goods ("PSG"), Superdeporte Plus Peru S.A.C. ("Superdeporte"), and Rodrigo Ribadeneira ("Mr. Ribadeneira") (collectively, "Respondents"), hereby submit their Second Amended Notice of Arbitration, attached hereto as Exhibit A. The purpose of this Second Amended Notice is to update Respondents' claims and certain information related thereto after the benefit of discovery.  Respondents submitted their first Amended Notice of Arbitration ("First Amended Notice") on May 3, 2019.  Since their First Amended Notice, Respondents have had the benefit of document discovery as well as depositions.  Specifically, Respondents seek to amend their Notice to (i) further clarify their arguments regarding when the parties reached agreement on the terms of the New Distribution Agreement and when a contract was formed; (ii) to provide the tribunal with additional information regarding New Balance's request that the owners of PSG pursue the New Distribution Agreement with a company that could operate with New Balance products at both the wholesale and retail levels in Peru;  (iii) to provide the tribunal with additional information regarding PSG and Superdeporte's cash flow cycle and why the combination by New

Balance to both stop sales of new products to Respondents and deny them the ability to purchase products via letters of credit was the death knell for Respondents' business with New Balance; and, (iv) to further amend their legal claims to comport with the evidence adduced during discovery. Respondents have not delayed in seeking these amendments, and there would be no undue prejudice to Claimant in allowing these amendments, as Claimant is itself currently seeking to amend its claims to update them based on the evidence adduced during discovery. As such, Respondents respectfully move to amend their claims and ask that the Tribunal grant their request.

Dated: December 19, 2019                       Respectfully submitted,

                                        /s/ David M. Orta
                                        David M. Orta
                                        Julianne Jaquith
                                        1300 I Street NW Suite 900
                                        Washington, DC 20005
                                        davidorta@quinnemanuel.com
                                        juliannejaquith@quinnemanuel.com
                                        p: 202 538 8000
                                        f: 202 538 8100

                                        *Attorneys for Respondents*

# EXHIBIT A

IN THE MATTER OF AN ARBITRATION UNDER THE ARBITRATION RULES OF THE
UNITED NATIONS COMMISSION ON INTERNATIONAL TRADE LAW

BETWEEN:

**NEW BALANCE ATHLETICS, INC.**

*Claimant*

-and-

**PERUVIAN SPORTING GOODS S.A.C., SUPERDEPORTE PLUS S.A.C., and
RODRIGO RIBADENEIRA**

*Respondents*

———————————————

**SECOND AMENDMENT TO RESPONDENTS' COUNTERCLAIMS**

———————————————

**December 19, 2019**

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
1300 I Street NW, Suite 900
Washington, DC 20005
Tel: (202)538-8000
Fax: (202)538-8100
Counsel for Respondents

## I.    INTRODUCTION

1.    On 25 November 2016, Peruvian Sporting Goods ("PSG") and Superdeporte Plus S.A.C.
("Superdeporte") executed two similar assignment of rights contracts with Mr. Rodrigo
Ribadeneira ("Mr. Ribadeneira"), assigning to him the right to pursue the claims against
New Balance Athletics, Inc. ("New Balance").  The assignments allowed Mr. Ribadeneira
to submit claims on behalf of the other Respondents and against New Balance in Peru and
in the rest of the world.  The assignments have been acknowledged by New Balance and
form part of the record of this arbitration.[1]

2.    On 2 May 2019, PSG, Superdeporte and Mr. Ribadeneira executed two similar assignment
of rights contracts in which Mr. Ribadeneira transferred back to the companies the right to
pursue the claims that had been assigned to him by PSG and Superdeporte.[2]  Thus, these
second amendments to Respondents' counterclaims are brought by PSG and Superdeporte
against New Balance.

3.    Respondents continue to object to the jurisdiction of this Tribunal over Mr. Ribadeneira.
Respondents previously moved for summary disposition on the issue of this Tribunal's
jurisdiction over Mr. Ribadeneira.  Respondents sought dismissal of New Balance's claims
against Mr. Ribadeneira on the ground that Mr. Ribadeneira is not a party to the Parties'
arbitration agreement and has never consented to arbitrate any disputes with New Balance.
Also, having reassigned the right to pursue the Peru claims to PSG and Superdeporte, Mr.
Ribadeneira has eliminated any basis on which this Tribunal previously concluded that he

---

[1]  Motion to compel arbitration and Memorandum in support thereof, filed by New Balance, on 25 January 2019, p.
5.  Memorandum and Order on Claimant's Motion to compel arbitration, p. 4.
[2]  Exhibit R-10, Contrato de Cesión de Derechos (*Assignment of rights contract*) entered into between PSG and Mr.
Ribadeneira, dated 2 May 2019, Exhibit R-9; Contrato de Cesión de Derechos (*Assignment of rights contract*) entered
into between Superdeporte and Mr. Ribadeneira, dated 2 May 2019.

was compelled to arbitrate any claims against New Balance. On 20 August 2019, this Tribunal issued a ruling upholding its jurisdiction over Mr. Ribadeneira with respect to New Balance's tortious interference claim based upon the assignments of rights from PSG and Superdeporte. Respondents respectfully object to this Tribunal's ruling regarding its jurisdiction over Mr. Ribadeneira with respect to New Balance's tortious interference claim, as well as any other claim being pursued by New Balance against him, and maintain that Mr. Ribadeneira should not be a part of this proceeding.

4. In the same 20 August 2019 ruling, this Tribunal deferred a ruling until the close of discovery on the question of whether Mr. Ribadeneira may be joined as a party in New Balance's claims for damages arising from the Distribution Agreement based upon a theory of piercing the corporate veil. Now that discovery has closed, there is no evidence in the record to warrant a finding that the corporate veil should be pierced, and as such, Respondents maintain that Mr. Ribadeneira should not be a part of this proceeding with respect to this claim or any of New Balance's claims, and respectfully seek a dismissal of the claims against him on jurisdictional grounds.

5. PSG and Superdeporte submit the following amendments to Respondents' Amended Response to the Notice of Arbitration and Counterclaim to further clarify their claims in light of the evidence adduced during discovery in this proceeding.

## II. EXECUTIVE SUMMARY

6. On 1 January 2013, New Balance and PSG (together with New Balance, the "Parties") entered into a Distribution Agreement. The Distribution Agreement governed the sale and distribution of New Balance's products in Peru. The Distribution Agreement was valid until 31 December 2015. According to the Distribution Agreement, if neither party

expressed an intention to let the Distribution Agreement expire, the Distribution Agreement would automatically be renewed for an additional year, that is, until 31 December 2016.  By the end of the Distribution Agreement's original term, neither party expressed an intention to let the Distribution Agreement expire.  As such, the Parties allowed the Distribution Agreement to automatically renew until 31 December 2016.

7.      The Distribution Agreement between PSG and New Balance was successful.  PSG invested significant sums of money in marketing New Balance's products in Peru, and those efforts significantly increased New Balance's brand visibility and sales in Peru.  During the term of the Distribution Agreement, New Balance even presented the team at PSG with a marketing award for their work promoting the New Balance brand in Peru.[3]  The relationship between PSG and New Balance began in 2010, but the relationship between New Balance and Respondents extended back to 1999 when it first began.

8.      During 2015, New Balance made an offer to PSG to enter into a new and reformed Distribution Agreement for their business in Peru (the "New Distribution Agreement"). Per New Balance's requirements for the New Distribution Agreement, PSG, or another entity, would be required to enter into the New Distribution Agreement  through an entity that could handle both wholesale distribution and retail sales.  Because PSG was not set up legally or otherwise to handle retail sales, PSG's parent companies determined that they had to establish a corporate entity that could legally handle both wholesale distribution and retail sales, and they established Superdeporte Plus S.A.C., a Peruvian entity to meet New Balance's requirements for the New Distribution Agreement.  For this new business structure, New Balance required "shop-in-shop locations" and its distributor, Superdeporte,

---

[3]   *See* Exhibit R-12, PSG00006485.

to be at the "retail" level.  This business structure would allow New Balance to receive greater floor space for its products, more shop-in-shop locations at Marathon Sports stores, and better product placement where its products were being sold.  New Balance maintained that this structure was essential for any future distribution relationship between the Parties, and it called it an "unfair advantage".[4]

9. In mid-2015, PSG and New Balance began negotiating the New Distribution Agreement. By September of 2015, the Parties had finalized and agreed to all of the terms of the New Distribution Agreement.[5]  In fact, New Balance acknowledged through its conduct that the Parties had agreed on all of the material terms of the New Distribution Agreement by that time and had begun performing under the New Distribution Agreement when it issued purchase based invoices (which was a key change to the relationship under the New Distribution Agreement) to PSG beginning in August 2015.[6]

10. In October 2015, Mr. Carlos Miguel Gagliardi ("Mr. Gagliardi") took over as the relationship manager for PSG and Superdeporte with New Balance.[7]  When Mr. Gagliardi reviewed the New Distribution Agreement in order to sign it, he determined that some of the terms that had already been agreed by the Parties needed to be amended.  The Parties negotiated a few amendments to their agreed New Distribution Agreement over the coming

---

[4]   Claimant's Exhibit 3, p. 59; Exhibit R-17, Deposition Transcript of Carlos Miguel Gagliardi, 17:20-24 ("The company was created by suggestion of John Cullen and New Balance to have an unfair advantage being included in a company that operates retail and wholesale.  So that's why we create Superdeporte Plus Peru.").

[5]   *See* Exhibit R-13, PSG00002672 ("Here is the final draft of our contract restructure.").

[6]   *See e.g.*, Exhibit R-14, Deposition Transcript of Peter Cragan, 80:12 through 83:14.

[7]   See Exhibit R-15, PSG00005395 ("This is a follow up to our conversation regarding your new contact. As I told you on Thursday Carlos Miguel Gaglardi will be managing NB out of Lima for Peru and Ecuador, he will do so integrated to the two retail organizations In Peru and Ecuador. The two retail organizations will handle retail and wholesale, this will continue to serve third party retail accounts and give NB the unfair advantage that you want in both countries. Carlos Miguel is leaving on vacation for the next weeks please write to him and copy me and Renan regarding all pending issues I will follow up during his absence. The pending issues are to return signed contract and payments plan for pending royalties and fees.").

months. One of the key terms that the Parties negotiated was that the New Distribution Agreement would be entered into between New Balance and PSG, as Superdeporte was still a company being repurposed to meet New Balance's requirements for the New Distribution Agreement. Specifically, the owners of the company were taking the necessary steps legally and otherwise to ensure that Superdeporte could handle both wholesale distribution and retail sales in Peru, as required by New Balance. Once Superdeporte was repurposed, Superdeporte would be substituted for PSG as New Balance's distributor in Peru and the counterparty to New Balance under the New Distribution Agreement.[8]

11. Because the Parties had already agreed upon the terms of their new contract and New Balance was performing under the same and insisting that PSG sign the agreement, the owners of PSG and Superdeporte allowed PSG to perform under the New Distribution Agreement pending the final repurposing of Superdeporte.

12. The Parties also negotiated and agreed to reduce the minimum sales requirements under the New Distribution Agreement.[9] In exchange for agreeing to reduce the minimums, New Balance and PSG agreed that PSG would create 10 additional shop-in-shop locations.[10] The Parties concluded their amendments to the New Distribution Agreement in January of 2016.[11]

13. In early May 2016, PSG informed New Balance that Superdeporte was ready to nominally replace PSG and take on the New Distribution Agreement for New Balance's products in Peru. With Superdeporte repurposed, New Balance was obligated to promptly modify the

---

[8]  Claimant's Exhibit 3, p. 80, 91-92.
[9]  Exhibit R-16, NB PSG0003097.
[10]  *Id.*
[11]  *See* Exhibit R-8.

New Distribution Agreement and add Superdeporte as their Peruvian distributor, as the Parties had agreed to do. As such, in order to finalize agreements with retailers, PSG asked New Balance for a confirmation that it had complied with the Parties' agreement and modified the New Distribution Agreement placing Superdeporte as New Balance's distributor in Peru.[12]

14. However, on 30 May 2016, ignoring that it had already agreed to all of the terms of the New Distribution Agreement, and that the Parties were already performing under their new contract, New Balance informed PSG and Superdeporte that no New Distribution Agreement existed, including between New Balance and Superdeporte.[13] Shortly thereafter, on 23 June 2016, New Balance notified PSG and Superdeporte in writing that it was formally terminating the earlier Distribution Agreement with PSG effective 31 December 2016.[14]

15. On 8 July 2016, New Balance informed PSG and Superdeporte, without any further explanation, that New Balance had decided to work with another distributor in Peru beginning in 2017.[15] New Balance then unilaterally and illegally concluded its contractual relationship with PSG on 31 December 2016 and has done business in Peru through a new distributor, Deportes Sparta ("Sparta"), effective 1 January 2017.

16. PSG and Superdeporte bring these counterclaims to hold New Balance accountable for its bad faith breaches of the New Distribution Agreement, to hold New Balance accountable for its breaches of its precontractual obligations in the negotiations of the New Distribution Agreement, to hold New Balance accountable for its breaches of the Distribution

---

[12] Claimant's Exhibit 2, pp. 17-19, 27.
[13] Claimant's Exhibit 2, pp. 12-13.
[14] Claimant's Exhibit 4.
[15] Exhibit R-7, Email sent from John Cullen to Rodrigo Ribadeneira and Carlos Miguel Gagliardi, dated 8 July 2016.

Agreement, and to compensate PSG and Superdeporte for the losses and damages they suffered due to New Balance's wrongdoings.

## III. RESPONDENTS' COUNTERCLAIMS

### 1. PSG AND SUPERDEPORTE'S COUNTERCLAIM: NEW BALANCE BREACHED ITS OBLIGATIONS UNDER THE NEW DISTRIBUTION AGREEMENT

17. Pursuant to the Memorandum and Order on Claimant's Motion to Compel Arbitration dated 18 March 2019 and Procedural Order No. 2, PSG and Superdeporte submit this counterclaim based on New Balance's breach of the New Distribution Agreement.

18. As stated above, in mid-2015, New Balance approached PSG with an offer to execute a New Distribution Agreement which would entail a renewed business relationship between the Parties.[16] For the New Distribution Agreement, New Balance required the owners of PSG to pursue the relationship with New Balance through a corporate entity that could handle both wholesale distribution of New Balance products (as PSG historically had been doing) as well as retail distribution of its products (a new function that was not part of the historical relationship with PSG). To meet these New Balance requirements, the owners of PSG incorporated and repurposed a new commercial entity – Superdeporte – which could legally handle both the wholesale and retail functions and who would act as the new distributor and retailer for New Balance's products in Peru.

19. Shortly after New Balance's offer, the Parties started negotiating the New Distribution Agreement mostly via email exchanges. The negotiations also entailed meetings at New Balance's headquarters in Boston, Massachusetts. On 18 September 2015, New Balance sent PSG via email the final draft of the New Distribution Agreement.[17] At this time, the

---

[16] Exhibit R-11, Email from John Cullen to Rodrigo Ribadeneira, dated 1 July 2015.
[17] Claimant's Exhibit 6, Email from John Cullen to Daniel Michaels, dated 18 September 2015, p. 1.

Parties had agreed to all of the terms of the New Distribution Agreement. The New Distribution Agreement was a legally binding and fully enforceable contract as of that date.

20. In the fall of 2015, per New Balance's request to restructure the Parties' relationship to require a distributor who could function at both the wholesale and retail levels, PSG initiated the process to incorporate Superdeporte in Peru.[18] PSG itself did not have the capability to function at both the wholesale and retail levels, as PSG had been set up legally as purely a wholesale company. Respondents also did not have another entity in Peru that was capable of functioning at both the retail and wholesale levels. As such, the owners of PSG needed to create a new entity that could fulfill New Balance's wholesale and retail requirements under the New Distribution Agreement.

21. In October 2015, after the Parties had concluded their new contract a month earlier, Mr. Gagliardi began supervising the relationship with New Balance in Ecuador and Peru.[19] Over the coming months, Mr. Gagliardi negotiated certain key amendments to the New Distribution Agreement. One change Mr. Gagliardi negotiated was that New Balance expressly agreed to execute the New Distribution Agreement with PSG and later substitute PSG with Superdeporte when the latter was incorporated and repurposed, ready to act legally in Peru as a wholesale distributor and retailer of New Balance products.[20]

22. The Parties also agreed to amend and reduce the minimum sales requirements for 2016 to $676,000 and in exchange, PSG agreed to invest and create 10 additional shop-in-shop locations for New Balance in the future.[21]

---

[18]   Exhibit R-17, Deposition transcript of Carlos Miguel Gagliardi, 18:24 through 19:25.
[19]   Exhibit R-17, Deposition transcript of Carlos Miguel Gagliardi, 55: 19-21.
[20]   Claimant's Exhibit 3, p. 80, 91-92.
[21]   Exhibit R-8, Email from Carlos Miguel Gagliardi to John Cullen, dated 25 January 2016.

23.     On 4 May 2016, the owners of PSG informed New Balance that Superdeporte had been incorporated and that it was ready to act as New Balance's distributor and retailer in Peru and thus to be substituted into the New Distribution Agreement.[22]  As previously agreed, the Parties had to then allow Superdeporte to replace PSG as New Balance's counterparty in the Peruvian relationship.  However, New Balance failed to comply with its contractual obligations under the New Distribution Agreement.

24.     On 16 May 2016, the owners of PSG asked New Balance for written confirmation that Superdeporte was included as the distributor under the New Distribution Agreement.  They needed this confirmation in order to sell New Balance goods to Peruvian retail stores.  This is because in all public filings and otherwise, they had substituted Superdeporte for PSG as the New Balance distributor and retailer in Peru.  This was in accordance with New Balance's requirements.  However, to their surprise, on 30 May 2016, New Balance simply informed the owners of PSG that they would no longer continue to perform under the New Distribution Agreement and would revert to performing under the already-replaced earlier Distribution Agreement.  This was a material breach of the already concluded agreement between the Parties.

25.     Shortly thereafter, on 23 June 2016, New Balance notified PSG and Superdeporte in writing that it was not renewing the already concluded earlier Distribution Agreement and this earlier and no longer effective agreement would terminate by its terms effective 31 December 2016.[23]

---

[22]  Claimant's Exhibit 2, pp. 17-19, 27.
[23]  Claimant's Exhibit 4.

26.   On 8 July 2016, New Balance wrote to Mr. Rodrigo Ribadeneira informing him that New Balance had a new partner in Peru and repeating that the New Distribution Agreement was not in force.  The Parties' commercial relationship officially ended on 31 December 2016.

### A. THE NEW DISTRIBUTION AGREEMENT WAS A BINDING AND LEGALLY ENFORCEABLE CONTRACT, WHICH NEW BALANCE BREACHED BY REPUDIATING THE CONTRACT AND ACTING IN A MANNER INCONSISTENT WITH ITS GOOD FAITH AND FAIR DEALING OBLIGATIONS

27.   Under Massachusetts law, the New Distribution Agreement was a binding and legally enforceable contract as of September 2015 when the Parties agreed to all of the material terms of the same and began performing under their new contract.  The Parties perfected their New Distribution Agreement through in person and email negotiations, which they concluded by September of 2015.

28.   The formation of a valid contract requires an offer, the acceptance of that offer, consideration, and the agreement on sufficient terms laying out the rights and obligations of the parties.[24]  An enforceable agreement requires, first, terms sufficiently complete and definite, and second, a present intent of the parties at the time of formation to be bound by those terms.[25]  Regarding the writing requirement, Massachusetts law does not require that

---

[24]   *Situation Mgmt. Sys., Inc. v. Malouf, Inc.*, 430 Mass. 875, 878 (2000) (finding in favor of Defendant who advanced counterclaims including a breach of contract claim based upon an oral agreement between the parties.  "[i]t is axiomatic that to create an enforceable contract, there must be agreement between the parties on the material terms of that contract, and the parties must have a present intention to be bound by that agreement. [] It is not required that all terms of the agreement be precisely specified, and the presence of undefined or unspecified terms will not necessarily preclude the formation of a binding contract. [] The parties must, however, have progressed beyond the stage of 'imperfect negotiation.'").

[25]   *McCarthy v. Tobin*, 429 Mass. 84, 87 (1999) ("If, however, the parties have agreed upon all material terms, it may be inferred that the purpose of a final document which the parties agree to execute is to serve as a polished memorandum of an already binding contract); *Lafayette Place Assocs. v. Boston Redev. Auth.*, 427 Mass. 509, 517 (1998) (finding that while not all terms of the agreement must be specified, the parties must have at least progressed beyond imperfect negotiation and a meeting of the minds must be reached); *see also Situation Mgmt. Sys., Inc.*, 430 Mass. at 878; *Targus Group Int'l, Inc. v. Sherman*, 76 Mass. App. Ct. 421, 428 (2010).

the writing necessarily be a formal contract; instead, it only requires that the terms of the writing be sufficiently complete and definite and the writing reflect a present intent of the parties at the time of formation to be bound.[26]  Here, as stated above, the Parties carefully and lengthily negotiated each and every term of the New Distribution Agreement by email and in person, and, by mid-September of 2015, agreed not only to the contract's substantial, material terms, but to all of the contract's terms, which resulted in a binding contract.

29.     Over the coming months, the Parties' negotiated amendments to the contract through several email exchanges and in person meetings.  Mr. Gagliardi specifically negotiated that the Agreement would take effect with PSG and that Superdeporte would replace PSG when it was incorporated and legally ready to act as New Balance's distributor and retailer in Peru.  Mr. Gagliardi also negotiated certain reductions to the minimum sales requirements under the New Distribution Agreement, and agreed that in exchange for the reduction in minimums, Superdeporte would invest in and create 10 additional New Balance shop-in-shop locations in the future.[27]

30.     Massachusetts courts have recognized that the use of electronic communications, particularly in the legal field and in the negotiation of contractual agreements, has advanced immensely and become commonplace.[28]  Moreover, several recent decisions acknowledge that emails are writings that satisfy Massachusetts' Statute of Frauds and, as such, create a binding and legally enforceable contract.[29]

---

[26] *Targus Group Int'l, Inc.*, 76 Mass. App. Ct. at 429 (holding that sufficient completeness depends upon the substance of the terms approved by the parties); *see also Michelson v. Sherman*, 310 Mass. 774, 775 (1942) (finding that the writing must contain directly, or by implication, all of the essential terms of the parties' agreement).
[27]   Exhibit R-16, NB PSG0003097.
[28]   *St. John's Holdings, LLC v. Two Electronics, LLC*, No. 16 MISC 000090 RBF, 2016 WL 1460477, at *1 (Mass. Land Ct. Apr. 14, 2016).
[29]   *Feldberg v. Coxall*, No. MICV201201649A, 2012 WL 3854947 (Mass. Super. May 22, 2012); *Fecteau Benefits Group, Inc. v. Knox*, 72 Mass. App. Ct. (2008) (finding the parties intended to be bound by emails settling a fee dispute where they formed a clear and complete agreement including material terms such as the amount of legal fees, a

31.    For instance, in *Shattuck,* Massachusetts' Superior Court held that email messages exchanged between a prospective buyer and seller satisfied the Statute of Frauds.[30] The plaintiff-buyer and defendant-seller had engaged in negotiations concerning the sale of property through their attorneys that were conducted in person, by telephone, and via email.[31] Several emails were exchanged addressing specific contractual provisions, including the closing date, purchase price, deposit amount, and waivers of contingencies.[32] The Superior Court found that these emails reflected detailed attention to many of the provisions that would govern the purchase and sale, and signified a close involvement of the parties' attorneys in forming the contract.[33]

32.    Furthermore, in *Feldberg*, the parties disputed whether a series of emails between their attorneys regarding the sale of property was sufficient to satisfy the Statute of Frauds.[34] The key email at issue was sent by the plaintiffs' attorney with a revised offer attached with changes reflecting conversations between the parties.[35] The draft attached to the email contained a purchase price, described the property, and provided a closing date.[36] The defendant's attorney responded asking for a written approval from the bank and ending the email by stating "I think we are ready to go ... We are almost there."[37] Plaintiffs' attorney provided a copy of a commitment letter from the bank containing reasonable conditions for plaintiff's mortgage transaction. The defendant claimed the conditions repudiated the

---

deadline for acceptance, and acceptance without equivocation); *Slover*, 24 LCR at* 7 (finding that emails between the parties may create a binding contract that satisfies the Statute of Frauds, provided the emails contain all essential terms).

[30] *Shattuck v. Klotzbach*, No. 011109A, 2001 WL 1839720 (Mass. Super. Dec. 11, 2001)

[31] *Id.* at *3-4.

[32] *Id.* at *1-2.

[33] *Id.* at *3-4.

[34] *Feldberg v. Coxall*, No. MICV201201649A, 2012 WL 3854947 (Mass. Super. May 22, 2012).

[35] *Id.* at *4.

[36] *Id.* at *4-5.

[37] *Id.* at *5.

deal.[38]  Massachusetts Superior Court ultimately concluded that these transactions complied with the Statute of Frauds.[39]

33.     Finally, in *St. John's*, St. John's Holdings, LLC alleged that a text message from a real estate broker for defendant Two Electronics, LLC constituted acceptance of a binding offer from St. John's Holdings to buy Two Electronics' property.[40]  Two Electronics argued that no contract was ever formed between the parties because Two Electronics did not accept the offer to purchase and the communications between the parties about the sale of the subject property did not satisfy the Statute of Frauds.[41]  The dispute in this case was whether the parties merely engaged in negotiations regarding the purchase of the subject property, or whether their dealings, carried out through electronic communications, gave rise to a binding and enforceable contract for the purchase and sale of the real estate.[42]  Massachusetts Land Court found that the text message could constitute a writing under the Statute of Frauds sufficient to bind Two Electronics to an agreement to sell.[43]  The court found that the text message was a writing and that, read in the context of exchanges between the parties, it contained sufficient terms to state a binding contract between St. John's Holdings and Two Electronics.[44]

34.     New Balance and PSG had agreed to complete and definite terms of a New Distribution Agreement.[45]  The Parties expressed their agreement to the terms through the exchange of

---

[38]  *Id.* at *5.
[39]  *Id.* at *6.
[40]  *St. John's Holdings, LLC v. Two Elecs., LLC*, No. 16 MISC 000090 RBF, 2016 WL 1460477, at *1 (Mass. Land Ct. Apr. 14, 2016).
[41]  *Id.*.
[42]  *Id.* at *5.
[43]  *Id.* at *1.
[44]  *Id.* at *1.
[45]  Exhibit R-13, PSG00002672; Exhibit R-8, Email from Carlos Miguel Gagliardi to John Cullen, dated 25 January 2016.

the New Distribution Agreement itself in September 2015.  At that point, the Parties had reached agreement on the terms of a binding agreement.  Over the following months, and concluding in January of 2016, the Parties modified some terms by further email exchanges; these changes legally were amendments to the terms they had concluded by September 2015.

35. Specifically, the Parties later agreed that Superdeporte would substitute PSG as the distributor party under the New Distribution Agreement once Superdeporte was formed and ready to act as the new distributor and retailer in Peru.  The Parties also agreed to decrease certain of the minimum sales requirements under the New Distribution Agreement, and in exchange Superdeporte was to invest in and create 10 additional New Balance shop-in-shop locations.[46]

36. The intent of the Parties was to be bound by those terms.  Specifically, and in furtherance of this intent to be bound, in an email from John Cullen to Carlos Miguel Gagliardi on 25 January 2016, John Cullen stated: "Please do not forget to send the scanned copies off [sic] the contracts…that is also important."[47]

37. On 30 May 2016, ignoring that it had already finalized the terms of the New Distribution Agreement, New Balance informed PSG and Superdeporte that no distribution agreement existed between New Balance and Superdeporte.[48]  Thus, many months after the Parties had concluded their New Distribution Agreement and had been performing under the new contract, New Balance unilaterally, arbitrarily, and in a latent absence of good faith ignored the Parties' agreement and terminated New Balance's relationship with PSG and

---

[46] *Id.*
[47] *Id.*
[48] Claimant's Exhibit 2, pp. 12-13.

Superdeporte in breach of its obligations under the New Distribution Agreement. The New Distribution Agreement was an enforceable contract under Massachusetts law, and New Balance breached its obligations under the New Distribution Agreement, causing damage to Respondents.

38. New Balance also breached the Parties' agreement by breaching its terms and by failing to act in good faith and abide by its good faith and fair dealing obligations, including by:

- Meeting with and trying to obtain agreements with other companies, including Sparta, to be the new distributor in Peru after having concluded a new agreement with PSG/Superdeporte and while knowing that the owners of Superdeporte were making substantial investments to incorporate and repurpose that company so that it could meet New Balance's requirements to be the new distributor and retailer for New Balance in Peru;

- Conducting negotiations with other companies not only in violation of their existing agreement with Respondents but without even informing them of this fact;

- Telling other companies that they would be replacing Respondents as the new New Balance distributor in Peru while withholding that information from Respondents;

- Telling others in the market that Sparta would be the new distributor and allowing Sparta to do the same, thereby undercutting Respondent's ability to make sales in the market;

- Not allowing Respondents to buy new New Balance products to sell in the market;

- Not allowing Respondents to make purchases via letters of credit even though this was allowed under the terms of the New Distribution Agreement and also was necessary to allow Respondents to operate their business with New Balance;

15

- Not providing Respondents with the necessary letters and authorizations to allow them to sell their inventory in Peru; and,

- Inducing Respondents to make payments under the false promise that New Balance would allow the Respondents to buy new products and continue operating when New Balance in fact had no intention to allow the Respondents to do this.

39. All of these breaches of the New Distribution Agreement by New Balance caused very substantial damages in the many millions to Respondents PSG and Superdeporte, which must be compensated under applicable law.

**B. AS A RESULT OF CLAIMANT'S BREACH OF THE NEW DISTRIBUTION AGREEMENT, PSG AND SUPERDEPORTE HAVE SUFFERED DAMAGES WORTH UP TO $6.45 MILLION**

40. PSG and Superdeporte's damages under this counterclaim consist of the lost profits from New Balance's failure to perform under the New Distribution Agreement, from 1 August 2015 through 31 December 2017 and thereafter for at least one other term through the end of 2020. The term of the New Distribution Agreement was from 1 August 2015 through 31 December 2016.[49] If neither party expressed an intention for the agreement to expire at the end of 2016, the New Distribution Agreement would automatically be renewed for an additional year, that is, until 31 December 2017.[50] These damages are currently estimated at $2.41 million.[51] Furthermore, the Parties understood that the relationship would continue at least for one more term following the contract's one-year term extension through December 2017. This is why the New Distribution Agreement included such

---

[49] Claimant's Exhibit 6, p. 2.
[50] *Id.* at p. 4.
[51] Expert Report on Damages by Santiago Dellepiane of BRG, dated October 18, 2019 ("Dellepiane Report"), p. 7, Table 1.

robust future investment obligations for PSG/Superdeporte and for New Balance's benefit (the creation of Superdeporte and the investment in additional shop-in-shop locations). The owners of Superdeporte and PSG would not have made the corporate changes to create Superdeporte, nor would they have agreed to invest in the creation of so many New Balance shop-in-shop locations, if they believed that the relationship with New Balance would only extend for an additional year or two. These changes were made with the understanding that the Parties' relationship would continue into the future, at least through the end of 2020, as this was needed for the owners of PSG and Superdeporte to recapture their investments on New Balance's behalf. If the Parties' relationship was extended for a three-year renewal with economic terms similar to those of the New Distribution Agreement from 1 January 2018 through 31 December 2020, additional damages would be equal to $4.04 million.[52] Consequently, the total damages resulting from the breach of the New Distribution Agreement and the three-year renewal are currently estimated at $6.45 million.[53]

**2. PSG AND SUPERDEPORTE'S ALTERNATIVE COUNTERCLAIM: NEW BALANCE BREACHED ITS PRECONTRACTUAL OBLIGATIONS DURING THE NEGOTIATIONS OF THE NEW DISTRIBUTION AGREEMENT**

41. Pursuant to the Memorandum and Order on Claimant's Motion to Compel Arbitration dated 18 March 2019 and Procedural Order No. 2, PSG and Superdeporte submit this alternative counterclaim in the unlikely case that the Tribunal finds that the New Distribution Agreement was not a binding and legally enforceable contract under Massachusetts law. Under such circumstances, Respondents have a valid claim against

---

[52] Dellepiane Report, p. 7, Table 1.
[53] Dellepiane Report, p. 7, Table 1.

New Balance for failing to comply with their good faith obligations in negotiating the New Distribution Agreement with Respondents.  Such breach caused substantial damages to Respondents, which New Balance must compensate.

42.   According to Professors Schwartz and Scott, when the parties to a negotiation have agreed on certain terms but left other terms open, they have made a preliminary agreement.[54]  In other words, the parties to a negotiation have made a preliminary agreement when the best inference from their negotiations is that they have made a binding preliminary commitment to pursue a profitable transaction.[55]

43.   It has been recognized that "modern business transactions are becoming noticeably more complex and involve contracts containing an extensive set of documents."[56]  To allow parties to invest money in the negotiation of the final contract, courts have recognized a right to recovery based on a failure to negotiate in good faith even if the parties had not yet reached agreement on all the terms of a contract.  Through this  line of cases, courts have recognized that while a contract draft or a letter of intent may not itself indicate that a party intended to be bound, it constituted a preliminary agreement to negotiate further in good faith.  This interim agreement "precludes, however, renouncing the deal, abandoning the negotiations, or insisting on conditions that do not conform to it."[57]  The failure by one party to negotiate further in good faith deprives the other party of the fruits of their preliminary agreement and constitutes a breach of the covenant of good faith and fair dealing, which allows the other party to recover.[58]

---

[54]  A. Schwartz and R. Scott, *Precontractual Liability and Preliminary Agreements*, 120 Harv. L. Rev. (2007), p. 664.
[55]  *Id.*
[56]  Janne G. Siegel, *Contracts--The Trend Toward Legal Realism*, 13 U. Ark. Little Rock L.J. 249, 268 (1991).
[57]  *Fickes v. Sun Expert, Inc*., 762 F. Supp. 998, 1001 (D. Mass. 1991).
[58]   *Fickes v. Sun Expert, Inc*., 762 F. Supp. 998, 1001 (D. Mass. 1991); *Air Technology Corp. v. General Elec. Co*., 347 Mass. 613, 630 (1964); *Stoneridge Control Devices, Inc. v. Teleflex, Inc*., No. 021554BLS, 2004 WL 389105, at *1 (Mass. Super. Feb. 17, 2004).

44.    *Air Technology* is one of the earliest cases that recognized a right to recovery when the parties' negotiations did not result in a final agreement.  The court found a preliminary agreement between the parties to be enforceable and awarded damages by measuring the fair value of the lost opportunity and the probability of successful negotiations of an ultimate commercial contract.[59]  The parties in *Air Technology* worked together to help defendant General Electric obtain a contract with the U.S. Air Force and agreed that plaintiff would be retained as one of defendant's subcontractors if they obtained the contract.[60]  Defendant General Electric was ultimately awarded the contract but failed to hire plaintiff as a subcontractor.[61]  The superior court found that General Electric had failed to act in good faith when it failed to negotiate with the plaintiff for the subcontract after receiving the Air Force contract.[62]  The Supreme Judicial Court of Massachusetts held that "the amount of the recovery cannot be less than the higher of two available alternative measures of damages viz. (a) the value reasonably expected by [plaintiff] in the performance of the joint arrangement, and (b) the fair value of [plaintiff]'s contribution to that arrangement."[63]

45.    In *Stoneridge*, Massachusetts' Superior Court examined a letter of intent that contained none of the essential terms of a commercial contract but simply agreed to execute a contract if certain conditions in the letter of intent were satisfied.[64]  After defendant awarded the contract to a competitor, plaintiff filed a lawsuit alleging that it had satisfied the conditions specified in the letter of intent and was thus entitled to recover the profits that it would have

---

[59]   *Air Technology Corp. v. General Elec. Co*., 347 Mass. 613, 630 (1964).
[60]   *Id*. at *615-617.
[61]   *Id*. at *618.
[62]   *Id*. at *624.
[63]   *Id*. at *628-29.
[64]   *Stoneridge Control Devices, Inc. v. Teleflex, Inc.*, No. 021554BLS, 2004 WL 389105 (Mass. Super. Feb. 17, 2004).

made if the defendant had executed a commercial contract as it promised.[65] The court found that the defendant had acted in bad faith by awarding the contract to the competitor and had deprived plaintiff of the benefit of its bargain—the promise that upon meeting the technical requirements, it would receive the commercial contract.[66] Following the Supreme Judicial Court's holding in *Air Technology*, the superior court determined that Stoneridge was entitled to recover expectation damages based on the value of this lost business opportunity.[67]

46.    Courts in other jurisdictions have similarly recognized precontractual agreements as enforceable where a party has breached its obligation to negotiate in good faith, and have awarded damages measured by the value of lost business opportunities. For instance, in *Pharmathene*, two Delaware biodefense companies memorialized their intent to establish a partnership in a license agreement term sheet.[68] After agreeing to some initial terms in the license agreement, the parties started a merger discussion and agreed that they would enter into a definitive license agreement if the merger failed.[69] After both the merger and a final licensing agreement fell through, plaintiff alleged breach of contract, promissory estoppel, and unjust enrichment.[70] The court found that defendant acted in bad faith in relation to its duty to negotiate the terms "substantially similar" to those in the term sheet.[71]

47.    As evidenced in those cases, parties who formed interim agreements were subject to an ongoing duty to negotiate the remainder of the agreement in good faith. When one of the parties fails to do that, liability for the full benefit of the expected bargain attaches.

---

[65] *Id*. at *24.
[66] *Id*. at *41, 46.
[67] *Id*. at *47.
[68] *Pharmathene, Inc. v. Siga Technologies, Inc*., 2011 WL 4390726, at *5 (Del. Ch. Sept. 22, 2011).
[69] *Id*. at *16.
[70] *Id*. at *9.
[71] *Ibid*.

A. **NEW BALANCE DID NOT COMPLY WITH ITS PRECONTRACTUAL OBLIGATIONS DURING THE NEGOTIATIONS OF THE NEW DISTRIBUTION AGREEMENT**

48. As stated above, New Balance and PSG negotiated the New Distribution Agreement for several months starting in the middle of 2015 and concluded their new contract in September of 2015. The Parties first exchanged several drafts of the new contract before reaching their agreement. PSG's representatives travelled to New Balance's headquarters in Boston to negotiate the New Distribution Agreement. The owners of PSG and Superdeporte incorporated and repurposed a new commercial entity – Superdeporte – to meet New Balance's requirement that the Peruvian distributor also distribute at the retail level. By September of 2015, the Parties agreed not only upon the material terms of the New Distribution Agreement, but to all of them. The Parties intended and understood to have concluded a new contract by then. The Parties also negotiated amendments to their agreement between October of 2015 and January of 2016.

49. Notwithstanding that the Parties had a fully binding agreement in place, in violation of the good faith obligation under Massachusetts law, New Balance's John Cullen was at the same time negotiating amendments to the Parties' agreement, visiting other companies in Peru trying to seek a new distributor to replace PSG and Superdeporte.[72] New Balance, through Mr. Cullen, continued this improper conduct through May of 2016 when it surprisingly informed PSG and Superdeporte that it would not continue the relationship with them beyond the end of 2016 and that it would be pursuing its business in Peru with another distributor.

---

[72] Exhibit R-19, Deposition Transcript of John Cullen, 31:8 through 33:4; 119:4 through 120:6; 132:20 through 138:6; Exhibit R-20, NB_PSG0000327.

50.     In furtherance of the understanding that they had a final, amended agreement with New Balance, and not knowing that New Balance was acting in bad faith seeking another company to replace PSG and Superdeporte, Mr. Ribadeneira and the managers of the corporate entities finalized all necessary steps to create Superdeporte. They also took steps to create the shop-in-shop locations as required by the New Distribution Agreement.[73] In early May of 2016, Mr. Ribadeneira informed New Balance that Superdeporte was ready to distribute New Balance products in Peru. With Superdeporte up and running, New Balance was supposed to promptly modify the New Distribution Agreement in order to substitute in Superdeporte for PSG as their Peruvian distributor. As such, in order to finalize agreements with retailers so that Superdeporte could sell New Balance products in Peru, one of the Marathon group's employees asked New Balance for a letter confirming that Superdeporte was New Balance's distributor in Peru.[74]

51.     In breach of its duty and obligation under Massachusetts law to carry out the negotiations for the New Distribution Agreement in good faith, New Balance also suddenly and unexpectedly rejected the New Distribution Agreement that they had previously agreed, stating that no distribution agreement existed between New Balance and PSG or Superdeporte.[75] Moreover, after expressing its intention not to continue the relationship with PSG and Superdeporte, New Balance also informed them that New Balance had a brand new contract with a new distributor for its business in Peru.[76]

52.     As previously described, New Balance and PSG spent months negotiating the terms of the New Distribution Agreement. In September 2015, the Parties concluded negotiations for

---

[73]  Claimant's Exhibit 6, p. 11.
[74]  Claimant's Exhibit 2, pp. 17–19, 27.
[75]  Claimant's Exhibit 2, pp. 12–13.
[76]  Exhibit R-7, Email sent from John Cullen to Rodrigo Ribadeneira and Carlos Miguel Gagliardi, dated 8 July 2016.

the New Distribution Agreement, having reached agreement on all of the material terms. In order to satisfy New Balance's requirements under the New Distribution Agreement, the owners of PSG had to incorporate and utilize a new commercial entity that was capable of performing for New Balance in Peru both at the wholesale and retail levels. PSG was set up legally as purely a wholesale company in Peru and thus PSG was not capable of performing the necessary retail functions under the New Distribution Agreement. The Parties intended and agreed upon the use of Superdeporte for this purpose. While Superdeporte was being repurposed, the Parties continued negotiating certain amendments to the New Distribution Agreement and ultimately reached agreement on the terms by January of 2016. However, New Balance failed to act in good faith and in commitment of its promises.

53. When Superdeporte was repurposed and after all the contractual terms were agreed upon, New Balance simply walked away and failed to exercise its duty to act in good faith in finalizing this last step. New Balance not only abandoned the New Distribution Agreement with PSG and Superdeporte, but it also terminated the entire business relationship.[77] New Balance then informed PSG, Superdeporte and Mr. Ribadeneira that it had a new business partner in Peru, Deportes Sparta.[78] New Balance made PSG and Superdeporte adapt the entire business structure to its requirements only to gain time to negotiate and contract with a competitor. Through all the acts described herein, New Balance breached its precontractual obligations and its duty to utilize good faith in the negotiations of the New Distribution Agreement with PSG and Superdeporte.

---

[77] Claimant's Exhibit 4.
[78] Exhibit R-7, Email sent from John Cullen to Rodrigo Ribadeneira and Carlos Miguel Gagliardi, dated 8 July 2016.

54. These breaches by New Balance of its precontractual obligations have caused Respondents very substantial damages in the millions that New Balance must compensate under applicable law.

**B.** **PSG AND SUPERDEPORTE HAVE SUFFERED DAMAGES WORTH UP TO $6.45 MILLION**

55. For this alternative claim, PSG and Superdeporte aim to hold New Balance accountable for its breaches of its precontractual obligations to negotiate in good faith during the negotiations of the New Distribution Agreement. The damages under this alternative counterclaim consist of the reasonable expected profits that Superdeporte would have obtained had New Balance acted in good faith and complied with its promise to execute the New Distribution Agreement, from 1 August 2015 to 31 December 2017. These damages are currently estimated at $2.41 million.[79] Furthermore, PSG would not have made the corporate changes to create Superdeporte or agreed to the substantial investment to create New Balance shop-in-shop stores if it believed that the relationship with New Balance would only extend for an additional year or two years. These changes were made with the understanding that the Parties' relationship would continue into the future, at least until December 2020. If New Balance's relationship with PSG and Superdeporte was extended through a three-year renewal with economic terms similar to those of the New Distribution Agreement from 1 January 2018 through 31 December 2020, additional damages would be equal to $4.04 million.[80] Consequently, the total damages resulting from the breach of precontractual obligations during the negotiations of the New

---

[79] Dellepiane Report, p. 7, Table 1.
[80] Dellepiane Report, p. 7, Table 1.

Distribution Agreement and the three-year renewal are currently estimated at $6.45 million.[81]

### 3. PSG's Counterclaim: New Balance Breached Its Obligations Under The Distribution Agreement And The Implied Covenant Of Good Faith And Fair Dealing

56. Pursuant to Procedural Order No. 2, PSG submits this second counterclaim for New Balance's breach of the Distribution Agreement. PSG acknowledges that there may be some set off damages between this counterclaim and the prior two claims submitted herein depending upon the Tribunal's ultimate findings and rulings.

### A. New Balance Breached Its Obligations Under The Distribution Agreement

57. During the Parties' performance under the Distribution Agreement, New Balance accepted orders from PSG on a quarterly basis. PSG would place orders for products about six months in advance of the shipment of the goods. To place each order, PSG used New Balance's online distributor ordering system. Generally, PSG paid for its footwear orders by letters of credit, and it paid distribution fees to New Balance via direct transfer. Letters of credit were an integral part of PSG's business relationship with various brands and had been an important part of the relationship with New Balance.

58. In 2014, Peru and Ecuador's markets suffered from significant contractions. As a consequence, PSG went through certain short term cash flow liquidity issues. Specifically, the cash flow issues made it difficult at times for PSG to timely pay the distribution fees under the Distribution Agreement and to pre-pay for the apparel orders made to New Balance.

---

[81] Dellepiane Report, p. 7, Table 1.

59. The Parties discussed and assessed PSG's cash flow issues and were aware of the specific cash flow challenges. New Balance was initially receptive to granting PSG with extensions of time to make its payments to New Balance. However, in mid-2015, New Balance refused to accept new additional orders from PSG until all amounts due were paid for. In the midst of these cash flow challenges, New Balance also proposed to abandon PSG's ability to pay for product by letter of credit. In fact, New Balance told PSG that it would no longer accept letters of credit from any of its distributors. Letters of credit are key to PSG and Superdeporte's businesses and are common in the sportswear distribution industry. Specifically, PSG and Superdeporte use letters of credit to manage their cash flow cycle which allows them to place orders, receive the product from the brand, and sell the product from the brand before the payment on the letter of credit becomes due.[82] Without the benefit of letters of credit, PSG would need to prepay for its goods, which would require that it have the cash flow to pay for the goods before it received or was able to start selling the goods, which would "strangle the business."[83]

60. In the midst of PSG's financial challenges, in mid-2015, New Balance also completely shut down PSG's access to New Balance's online ordering system and precluded it from receiving any further new products. Naturally, this shut down prevented PSG from placing any additional orders, which placed PSG in a financial stranglehold. New Balance prevented PSG from buying and selling further products, which resulted in a significant reduction in revenue. The sportswear distribution business is based upon fashions, which

---

[82] *See e.g.*, Exhibit R-18, Deposition Transcript of Rodrigo Ribadeneira, 98: 22 through 99:11; 209:4-12; Exhibit R-17, Deposition Transcript of Carlos Miguel Gagliardi, 39:14 through 40:23; 54:17 through 55:9; 164:10 through 165:5.
[83] Exhibit R-18, Deposition Transcript of Rodrigo Ribadeneira, 99:11.

change regularly.[84]  Without the most current items to sell, PSG was not able to sell products in order to pay New Balance.[85]  This in turn exacerbated the payment issues between the Parties.

61.     PSG desperately needed to resume placing orders from New Balance so that it could sell New Balance's products and, in turn, become current on New Balance's distribution fees. Without new product, PSG could not earn money to repay New Balance for amounts owed. Thus, PSG asked New Balance to place new orders using letters of credit through which the payment to New Balance was secured and guaranteed.  Payment for orders by letter of credit was provided for in Clause 6(b) of the Distribution Agreement, and the Parties expressly allowed for this in their contract.[86]  Furthermore, payment by letter of credit was not prohibited under the New Distribution Agreement.  Notwithstanding that the payment by letter of credit was permitted under the Distribution Agreement, New Balance improperly refused to accept PSG's orders, thereby breaching its obligations to PSG under the Distribution Agreement.

62.     In so doing, New Balance essentially locked PSG out of performing under the Distribution Agreement by refusing to allow PSG to place new orders and cutting off its revenue source

---

[84]  Exhibit R-17, Deposition Transcript of Carlos Miguel Gagliardi, 140:23 through 141:7 ("No. I know why. We were struggling with the sales, and that's the difficult part. And we are -- at this time of the year we had already [sic] without product, new product, for six months.  As I told you before, that 80 percent of your sales are going to come from fresh product; 20 percent of the sales are going to come from relative older product, aging; and then you have the product that is not selling that you need to put into discount.").

[85]  Exhibit R-17, Deposition Transcript of Carlos Miguel Gagliardi, 168:23 ("without product, you cannot do anything."); 93:4-6 ("And, again, without product, you cannot recover sales; without sales, you cannot pay anything you are owing…").

[86]  Clause 6(b) of the Distribution Agreement states: "Payment of all amounts due for Products and all payment documentation for the purchase of the Products shall be effected by Distributor through irrevocable letter of credit at sight or cash in advance due upon placement of any order, unless otherwise agreed to by Company, its Affiliate, or it Authorized Supplier, as the case may be." "Products" are defined in Clause 2(j) as follows: "Company's footwear, apparel and Accessory products bearing one of more of the trademarks as set forth in Company's current approved country assortment plan, as modified from time to time, a copy of the original version of which has been delivered to Distributor prior to the Effective Date."

under the contract.  While the payment defaults might have authorized New Balance to initiate steps to terminate the agreement, New Balance did not avail itself of that option.  Instead, it created a *sui generis* remedy, by simply refusing to allow PSG to make additional purchases under the contract, even ones backed by letters of credit.  The Distribution Agreement did not convey this right to New Balance.  New Balance unilaterally exercised this option in breach of the Parties' contract.  As such, New Balance breached the Distribution Agreement with PSG.

**B. NEW BALANCE BREACHED CLAUSE 6(B) OF THE DISTRIBUTION AGREEMENT AS WELL AS THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING UNDER THE DISTRIBUTION AGREEMENT**

63.  Clause 6(b) of the Distribution Agreement allowed PSG to make purchases by way of a letter of credit.  PSG attempted to exercise that right starting in mid-2015 (as it had done for many years previously), and New Balance breached its obligation to allow PSG to make additional purchases of product utilizing letters of credit.

64.  New Balance also breached its obligation to perform under the Distribution Agreement in a way that comports with its duty to act in good faith and to exercise fair dealing in its commercial interactions with PSG.  Under Massachusetts law, a covenant of good faith and fair dealing is implied in every contract.[87]  The covenant provides that "neither party shall do anything that will have the effect of destroying or injuring the rights of the other party to receive the fruits of the contract."[88]  A party need not breach an explicit term of the underlying contract in order to breach the covenant of good faith.  Rather, the relevant question under Massachusetts law is whether the party's conduct complied with the parties'

---

[87] *UNO Restaurants, Inc. v. Boston Kenmore Realty Corp.*, 441 Mass. 376, 385 (2004).
[88] *Anthony's Pier Four, Inc. v. HBC Associates*, 411 Mass. 451, 471–72 (1991).

reasonable understanding of their performance obligations, as reflected in the overall spirit of the bargain, not whether the party abided by the letter of the contract in the course of performance.[89]

65. While a breach of the contract need not be shown in order to prove a breach of the implied covenant of good faith and fair dealing, a party may rely on the same allegations for their breach of the implied covenant claim as for their breach of contract claim.[90] Lack of good faith carries an implication of a dishonest purpose, a conscious wrongdoing, or a breach of duty through motive of self-interest or ill will, but the central inquiry remains whether the alleged conduct was driven by a desire to gain an unfair advantage, or otherwise had the effect of injuring the other party's rights to the fruits of the contract.[91]

66. As stated above, New Balance failed to allow PSG to perform its obligations to buy products using letters of credit (or to buy products at all) under the Distribution Agreement. New Balance's breach of contract was not brief, but lasted the last one and a half years of the Distribution Agreement's term. Preventing PSG from performing under the contract was not a remedy that was provided for in the Distribution Agreement. Through this conduct, New Balance acted in violation of the implied covenant of good faith and fair dealing. New Balance deprived PSG of the opportunity to receive the fruits of the Distribution Agreement and thereby created a financial stranglehold that prevented it from remedying the payment defaults and further performing under the Parties' agreement.

67. Prohibiting a party from performing under the contract inherently denies that party the right to receive the fruits of the contract. New Balance did not terminate the Distribution

---

[89] Howard J. Alperin, 14 Mass. Prac., Summary of Basic Law § 5:69 (5th ed. 2014).
[90] *Speakman v. Allmerica Fin. Life Ins.*, 367 F. Supp. 2d 122, 132 (D. Mass. 2005) (applying Massachusetts law).
[91] *Young v. Wells Fargo Bank, N.A.*, 717 F. 3d 224, 238 (1st Cir. 2013) (applying Massachusetts law).

Agreement, which it may have had the right to do, but did not do. Instead, New Balance held PSG in an untenable stalemate position, financially strangled PSG and left it unable to place orders so that it could sell New Balance products and in turn, rectify the cash flow issues that had impacted PSG. This conduct amounted to a breach of the covenant of good faith and fair dealing.

## C. NEW BALANCE'S BREACH OF THE DISTRIBUTION AGREEMENT AND BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING CAUSED PSG LOSSES OF UP TO $4.56 MILLION

68.  The breach of the duty of good faith and fair dealing, like breach of contract, has generally been addressed by awarding compensatory damages. In other words, damages for a breach of the implied covenant, like breach of contract, allows the aggrieved party to be placed in the same position as it would have been had the other party not breached its performance obligation under the contract.[92] PSG's damages based upon New Balance's breach of its contractual obligations under the Distribution Agreement and the implied covenant of good faith and fair dealing consist of the lost profits from the merchandise that PSG was not permitted to purchase from New Balance and distribute in Peru between 1 August 2015 and 31 December 2016. PSG's damages are currently estimated at $0.94 million.[93] If New Balance's relationship with PSG and Superdeporte was extended through a three-year renewal with economic terms similar to those of the New Distribution Agreement from January 1, 2017 through December 31, 2019, additional damages would be equal to $3.62 million.[94] The total damages resulting from New Balance's breach of the Distribution

---

[92]  *DCPB, Inc v. City of Lebanon*, 957 F. 2d 913, 916 (1st Cir. 1992).
[93]  Dellepiane Report, p. 7, Table 2.
[94]  Dellepiane Report, p. 7, Table 2.

Agreement, breach of the implied covenant of good faith and fair dealing, and the three-year renewal are currently estimated at $4.56 million.[95]

## IV.  RELIEF SOUGHT

69.  PSG and Superdeporte respectfully request the arbitral tribunal to:

i.    Declare that the Parties agreed to the terms of the New Distribution Agreement, and that this created a legally binding and enforceable contract;

ii.   Declare that Claimant violated its contractual obligations under the New Distribution Agreement;

iii.  Declare that Claimant violated its covenant of good faith and fair dealing under the New Distribution Agreement;

iv.   Order Claimant to compensate PSG and Superdeporte for the damages and losses suffered as a result of Claimant's breaches of the New Distribution Agreement currently estimated to be in the amount of $2.41 million; assuming that New Balance's relationship with PSG and Superdeporte would extend through an additional three-year renewal with economic terms similar to those of the New Distribution Agreement, total damages are currently to be in the amount of $6.45 million;

v.    In the alternative to (i), (ii) and (iii), declare that Claimant violated its precontractual obligations during the negotiations of the New Distribution Agreement;

vi.   Order Claimant to compensate PSG and Superdeporte for the damages and losses suffered as a result of Claimant's conduct under (iv) currently estimated to be in

---

[95]  Dellepiane Report, p. 7, Table 2.

the amount of $2.41 million; assuming that New Balance's relationship with PSG and Superdeporte would extend through an additional three-year renewal with economic terms similar to those of the New Distribution Agreement, total damages are currently to be in the amount of $6.45 million;

vii. Declare that Claimant violated its obligations under the Distribution Agreement, and that it breached the implied covenant of good faith and fair dealing;

viii. Order Claimant to compensate PSG for the damages and losses suffered as a result of Claimant's conduct in violation of the Distribution Agreement and its implied covenant of good faith and fair dealing, currently estimated to be in the amount of $0.94 million; assuming that New Balance's relationship with PSG and Superdeporte would extend through an additional three-year renewal with economic terms similar to those of the New Distribution Agreement, total damages are currently to be in the amount of $4.56 million;

ix. Order that Claimant pay all applicable pre and post-award interest at the highest rate allowable under applicable law;

x. Order Claimant to pay all arbitration costs, including PSG and Superdeporte's representative's costs and expenses; and,

xi. Order any further and/or additional relief as the Tribunal may deem appropriate.

70. PSG and Superdeporte reserve their right to:

i. Amend or supplement the above arguments as well as to present any other counterclaims it may have or that come to light as the proceedings evolve, if any;

ii. Amend or supplement the relief sought herein;

iii. Present factual or legal arguments as may be necessary to present its case or rebut any case put forward by Claimant; and,

iv. Seek interim and/or provisional measures before this tribunal or any competent court.

Respectfully submitted,

David M. Orta
Julianne Jaquith
Counsel for Respondents
1300 I Street NW, Suite 900
Washington, DC 20005
Tel: (202)538-8000
Fax: (202)538-8100
19 December  2019

# EXHIBIT G

1:10-cv-01873-DB Document 29-7 Filed 02/03/21 Page

# UNCITRAL
# Arbitration Rules
(with new article 1, paragraph 4, as adopted in 2013)

# UNCITRAL
# Rules on Transparency in Treaty-based Investor-State Arbitration





UNITED NATIONS

*Further information may be obtained from:*
UNCITRAL secretariat, Vienna International Centre
P.O. Box 500, 1400 Vienna, Austria
Telephone: (+43-1) 26060-4060          Telefax: (+43-1) 26060-5813
Internet: www.uncitral.org          E-mail: uncitral@uncitral.org

UNITED NATIONS COMMISSION ON INTERNATIONAL TRADE LAW

# UNCITRAL
# Arbitration Rules

(with new article 1, paragraph 4,
as adopted in 2013)

# UNCITRAL
# Rules on Transparency
# in Treaty-based
# Investor-State Arbitration



UNITED NATIONS
New York, 2014

© United Nations: United Nations Commission on International
Trade Law. February 2014. All rights reserved worldwide.

This publication has not been formally edited.

Publishing production: English, Publishing and Library Section.
United Nations Office at Vienna.

# **Contents**

|  | *Page* |
|---|---|
| **General Assembly resolution 68/109** . . . . . . . . . . . . . . | 1 |
| **UNCITRAL Arbitration Rules (with new article 1, paragraph 4, as adopted in 2013)** . . . . . . . . . . . . . . . . | 5 |
| **Section I.   Introductory rules** . . . . . . . . . . . . . . . . . . . | 5 |
| Scope of application (article 1) . . . . . . . . . . . . . . . . | 5 |
| Notice and calculation of periods of time (article 2) | 5 |
| Notice of arbitration (article 3) . . . . . . . . . . . . . . . . . | 6 |
| Response to the notice of arbitration (article 4) . . . . | 7 |
| Representation and assistance (article 5) . . . . . . . . . | 8 |
| Designating and appointing authorities (article 6) . . . | 8 |
| **Section II.   Composition of the arbitral tribunal** . . . | 10 |
| Number of arbitrators (article 7) . . . . . . . . . . . . . . . . | 10 |
| Appointment of arbitrators (articles 8 to 10) . . . . . . . | 10 |
| Disclosures by and challenge of arbitrators (articles 11 to 13) . . . . . . . . . . . . . . . . . . . . . . . . . | 12 |
| Replacement of an arbitrator (article 14) . . . . . . . . . . | 13 |
| Repetition of hearings in the event of the replacement of an arbitrator (article 15) . . . . . . . . | 14 |
| Exclusion of liability (article 16) . . . . . . . . . . . . . . . | 14 |
| **Section III.   Arbitral proceedings** . . . . . . . . . . . . . . . . | 15 |
| General provisions (article 17) . . . . . . . . . . . . . . . . . | 15 |
| Place of arbitration (article 18) . . . . . . . . . . . . . . . . . | 16 |
| Language (article 19) . . . . . . . . . . . . . . . . . . . . . . . . . | 16 |
| Statement of claim (article 20) . . . . . . . . . . . . . . . . . | 16 |
| Statement of defence (article 21) . . . . . . . . . . . . . . . | 17 |
| Amendments to the claim or defence (article 22) . . . | 18 |
| Pleas as to the jurisdiction of the arbitral tribunal (article 23) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 18 |
| Further written statements (article 24) . . . . . . . . . . . | 19 |
| Periods of time (article 25) . . . . . . . . . . . . . . . . . . . . | 19 |
| Interim measures (article 26) . . . . . . . . . . . . . . . . . . | 19 |
| Evidence (article 27) . . . . . . . . . . . . . . . . . . . . . . . . . | 20 |

*Page*

Hearings (article 28) . . . . . . . . . . . . . . . . . . . . . . . . 21

Experts appointed by the arbitral tribunal (article 29) 21

Default (article 30). . . . . . . . . . . . . . . . . . . . . . . . . . 22

Closure of hearings (article 31) . . . . . . . . . . . . . . . 23

Waiver of right to object (article 32) . . . . . . . . . . . . 23

**Section IV.  The award** . . . . . . . . . . . . . . . . . . . . . . . . 24

Decisions (article 33). . . . . . . . . . . . . . . . . . . . . . . . 24

Form and effect of the award (article 34) . . . . . . . . 24

Applicable law, *amiable compositeur* (article 35) . . . 25

Settlement or other grounds for termination (article 36) 25

Interpretation of the award (article 37) . . . . . . . . . . 26

Correction of the award (article 38). . . . . . . . . . . . . 26

Additional award (article 39) . . . . . . . . . . . . . . . . . . 26

Definition of costs (article 40) . . . . . . . . . . . . . . . . . 27

Fees and expenses of arbitrators (article 41) . . . . . . . 27

Allocation of costs (article 42) . . . . . . . . . . . . . . . . . 29

Deposit of costs (article 43) . . . . . . . . . . . . . . . . . . . 29

*Annex* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Model arbitration clause for contracts . . . . . . . . . . . 31

Possible waiver statement . . . . . . . . . . . . . . . . . . . . 31

Model statements of independence pursuant to
    article 11 of the Rules. . . . . . . . . . . . . . . . . . . . . . 31

**UNCITRAL Rules on Transparency in Treaty-based
Investor-State Arbitration**. . . . . . . . . . . . . . . . . . . . . . . 33

Article 1. Scope of application. . . . . . . . . . . . . . . . . . . 33

Applicability of the Rules. . . . . . . . . . . . . . . . . . . . . 33

Application of the Rules. . . . . . . . . . . . . . . . . . . . . . 33

Discretion and authority of the arbitral tribunal . . . 34

Applicable instrument in case of conflict . . . . . . . . 34

Application in non-UNCITRAL arbitrations . . . . . . 35

Article 2. Publication of information at the
    commencement of arbitral proceedings . . . . . . . . . . . 35

Article 3. Publication of documents . . . . . . . . . . . . . . 35

Article 4. Submission by a third person . . . . . . . . . . . 36

Article 5. Submission by a non-disputing Party to
    the treaty . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Page*

Article 6.  Hearings ............................  38

Article 7.  Exceptions to transparency...............  38

   Confidential or protected information ...........  38

   Integrity of the arbitral process ................  40

Article 8.  Repository of published information.......  40

## Resolution adopted by the
## General Assembly on 16 December 2013

*[on the report of the Sixth Committee (A/68/462)]*

### 68/109. United Nations Commission on International Trade Law Rules on Transparency in Treaty-based Investor-State Arbitration and Arbitration Rules (as revised in 2010, with new article 1, paragraph 4, as adopted in 2013)

*The General Assembly*,

*Recalling* its resolution 2205 (XXI) of 17 December 1966, by which it established the United Nations Commission on International Trade Law with a mandate to further the progressive harmonization and unification of the law of international trade and in that respect to bear in mind the interests of all peoples, in particular those of developing countries, in the extensive development of international trade,

*Recognizing* the value of arbitration as a method of settling disputes that may arise in the context of international relations and the wide use of arbitration for the settlement of treaty-based investor-State disputes,

*Recalling* its resolutions 31/98 of 15 December 1976 and 65/22 of 6 December 2010, in which it recommended the use of the Arbitration Rules of the United Nations Commission on International Trade Law,[1]

*Bearing in mind* that the Arbitration Rules are widely used for the settlement of treaty-based investor-State disputes,

*Recognizing* the need for provisions on transparency in the settlement of such treaty-based investor-State disputes to take account of the public interest involved in such arbitrations,

*Believing* that rules on transparency in treaty-based investor-State arbitration would contribute significantly to the establishment of a harmonized legal framework for a fair and efficient

---

[1]*Official Records of the General Assembly, Thirty-first Session, Supplement No. 17* (A/31/17), chap. V, sect. C; and ibid., *Sixty-fifth Session, Supplement No. 17* (A/65/17), chap. III and annex I.

settlement of international investment disputes, increase transparency and accountability and promote good governance,

*Noting* that the Commission, at its forty-sixth session, adopted the Rules on Transparency in Treaty-based Investor-State Arbitration[2] and amended the Arbitration Rules as revised in 2010 to include, in a new article 1, paragraph 4, a reference to the Rules on Transparency,[3]

*Noting also* that the Rules on Transparency are available for use in investor-State arbitrations initiated under rules other than the Arbitration Rules or in ad hoc proceedings,

*Noting further* that the preparation of the Rules on Transparency was the subject of due deliberation in the Commission and that they benefited from consultations with Governments and interested intergovernmental and international non-governmental organizations,

1. *Expresses its appreciation* to the United Nations Commission on International Trade Law for having prepared and adopted the Rules on Transparency in Treaty-based Investor-State Arbitration[2] and the Arbitration Rules (as revised in 2010, with new article 1, paragraph 4, as adopted in 2013),[3] as annexed to the report of the Commission on the work of its forty-sixth session;[4]

2. *Requests* the Secretary-General to publish, including electronically, and disseminate broadly the text of the Rules on Transparency, both together with the Arbitration Rules (as revised in 2010, with new article 1, paragraph 4, as adopted in 2013) and as a stand-alone text, and to transmit them to Governments and organizations interested in the field of dispute settlement;

3. *Recommends* the use of the Rules on Transparency in relation to the settlement of investment disputes within the scope of their application as defined in article 1 of the Rules, and invites Member States that have chosen to include the Rules in their treaties to inform the Commission accordingly;

4. *Also recommends* that, subject to any provision in relevant treaties that may require a higher degree of transparency

---

[2] Ibid., *Sixty-eighth Session, Supplement No. 17* (A/68/17), chap. III and annex I.

[3] Ibid., chap. III and annex II.

[4] *Official Records of the General Assembly, Sixty-eighth Session, Supplement No. 17* (A/68/17).

than that provided in the Rules on Transparency, the Rules be applied through appropriate mechanisms to investor-State arbitration initiated pursuant to treaties providing for the protection of investors or investments concluded before the date of coming into effect of the Rules, to the extent that such application is consistent with those treaties.

*68th plenary meeting*
*16 December 2013*

# UNCITRAL Arbitration Rules
**(with new article 1, paragraph 4, as revised in 2013)**

## Section I.  Introductory rules

### *Scope of application*\*

### *Article 1*

1.  Where parties have agreed that disputes between them in respect of a defined legal relationship, whether contractual or not, shall be referred to arbitration under the UNCITRAL Arbitration Rules, then such disputes shall be settled in accordance with these Rules subject to such modification as the parties may agree.

2.  The parties to an arbitration agreement concluded after 15 August 2010 shall be presumed to have referred to the Rules in effect on the date of commencement of the arbitration, unless the parties have agreed to apply a particular version of the Rules. That presumption does not apply where the arbitration agreement has been concluded by accepting after 15 August 2010 an offer made before that date.

3.  These Rules shall govern the arbitration except that where any of these Rules is in conflict with a provision of the law applicable to the arbitration from which the parties cannot derogate, that provision shall prevail.

4.  For investor-State arbitration initiated pursuant to a treaty providing for the protection of investments or investors, these Rules include the UNCITRAL Rules on Transparency in Treaty-based Investor-State Arbitration ("Rules on Transparency"), subject to article 1 of the Rules on Transparency.

### *Notice and calculation of periods of time*

### *Article 2*

1.  A notice, including a notification, communication or proposal, may be transmitted by any means of communication that provides or allows for a record of its transmission.

---

\*A model arbitration clause for contracts can be found in the annex to the Rules.

2. If an address has been designated by a party specifically for this purpose or authorized by the arbitral tribunal, any notice shall be delivered to that party at that address, and if so delivered shall be deemed to have been received. Delivery by electronic means such as facsimile or e-mail may only be made to an address so designated or authorized.

3. In the absence of such designation or authorization, a notice is:

   *(a)* Received if it is physically delivered to the addressee; or

   *(b)* Deemed to have been received if it is delivered at the place of business, habitual residence or mailing address of the addressee.

4. If, after reasonable efforts, delivery cannot be effected in accordance with paragraphs 2 or 3, a notice is deemed to have been received if it is sent to the addressee's last-known place of business, habitual residence or mailing address by registered letter or any other means that provides a record of delivery or of attempted delivery.

5. A notice shall be deemed to have been received on the day it is delivered in accordance with paragraphs 2, 3 or 4, or attempted to be delivered in accordance with paragraph 4. A notice transmitted by electronic means is deemed to have been received on the day it is sent, except that a notice of arbitration so transmitted is only deemed to have been received on the day when it reaches the addressee's electronic address.

6. For the purpose of calculating a period of time under these Rules, such period shall begin to run on the day following the day when a notice is received. If the last day of such period is an official holiday or a non-business day at the residence or place of business of the addressee, the period is extended until the first business day which follows. Official holidays or non-business days occurring during the running of the period of time are included in calculating the period.

### *Notice of arbitration*

### *Article 3*

1. The party or parties initiating recourse to arbitration (hereinafter called the "claimant") shall communicate to the other party or parties (hereinafter called the "respondent") a notice of arbitration.

6

2. Arbitral proceedings shall be deemed to commence on the date on which the notice of arbitration is received by the respondent.

3. The notice of arbitration shall include the following:

   *(a)* A demand that the dispute be referred to arbitration;

   *(b)* The names and contact details of the parties;

   *(c)* Identification of the arbitration agreement that is invoked;

   *(d)* Identification of any contract or other legal instrument out of or in relation to which the dispute arises or, in the absence of such contract or instrument, a brief description of the relevant relationship;

   *(e)* A brief description of the claim and an indication of the amount involved, if any;

   *(f)* The relief or remedy sought;

   *(g)* A proposal as to the number of arbitrators, language and place of arbitration, if the parties have not previously agreed thereon.

4. The notice of arbitration may also include:

   *(a)* A proposal for the designation of an appointing authority referred to in article 6, paragraph 1;

   *(b)* A proposal for the appointment of a sole arbitrator referred to in article 8, paragraph 1;

   *(c)* Notification of the appointment of an arbitrator referred to in article 9 or 10.

5. The constitution of the arbitral tribunal shall not be hindered by any controversy with respect to the sufficiency of the notice of arbitration, which shall be finally resolved by the arbitral tribunal.

### *Response to the notice of arbitration*

*Article 4*

1. Within 30 days of the receipt of the notice of arbitration, the respondent shall communicate to the claimant a response to the notice of arbitration, which shall include:

   *(a)* The name and contact details of each respondent;

*(b)* A response to the information set forth in the notice of arbitration, pursuant to article 3, paragraphs 3 *(c)* to *(g)*.

2. The response to the notice of arbitration may also include:

*(a)* Any plea that an arbitral tribunal to be constituted under these Rules lacks jurisdiction;

*(b)* A proposal for the designation of an appointing authority referred to in article 6, paragraph 1;

*(c)* A proposal for the appointment of a sole arbitrator referred to in article 8, paragraph 1;

*(d)* Notification of the appointment of an arbitrator referred to in article 9 or 10;

*(e)* A brief description of counterclaims or claims for the purpose of a set-off, if any, including where relevant, an indication of the amounts involved, and the relief or remedy sought;

*(f)* A notice of arbitration in accordance with article 3 in case the respondent formulates a claim against a party to the arbitration agreement other than the claimant.

3. The constitution of the arbitral tribunal shall not be hindered by any controversy with respect to the respondent's failure to communicate a response to the notice of arbitration, or an incomplete or late response to the notice of arbitration, which shall be finally resolved by the arbitral tribunal.

## *Representation and assistance*

### *Article 5*

Each party may be represented or assisted by persons chosen by it. The names and addresses of such persons must be communicated to all parties and to the arbitral tribunal. Such communication must specify whether the appointment is being made for purposes of representation or assistance. Where a person is to act as a representative of a party, the arbitral tribunal, on its own initiative or at the request of any party, may at any time require proof of authority granted to the representative in such a form as the arbitral tribunal may determine.

## *Designating and appointing authorities*

### *Article 6*

1. Unless the parties have already agreed on the choice of an appointing authority, a party may at any time propose the name

or names of one or more institutions or persons, including the Secretary-General of the Permanent Court of Arbitration at The Hague (hereinafter called the "PCA"), one of whom would serve as appointing authority.

2.   If all parties have not agreed on the choice of an appointing authority within 30 days after a proposal made in accordance with paragraph 1 has been received by all other parties, any party may request the Secretary-General of the PCA to designate the appointing authority.

3.   Where these Rules provide for a period of time within which a party must refer a matter to an appointing authority and no appointing authority has been agreed on or designated, the period is suspended from the date on which a party initiates the procedure for agreeing on or designating an appointing authority until the date of such agreement or designation.

4.   Except as referred to in article 41, paragraph 4, if the appointing authority refuses to act, or if it fails to appoint an arbitrator within 30 days after it receives a party's request to do so, fails to act within any other period provided by these Rules, or fails to decide on a challenge to an arbitrator within a reasonable time after receiving a party's request to do so, any party may request the Secretary-General of the PCA to designate a substitute appointing authority.

5.   In exercising their functions under these Rules, the appointing authority and the Secretary-General of the PCA may require from any party and the arbitrators the information they deem necessary and they shall give the parties and, where appropriate, the arbitrators, an opportunity to present their views in any manner they consider appropriate. All such communications to and from the appointing authority and the Secretary-General of the PCA shall also be provided by the sender to all other parties.

6.   When the appointing authority is requested to appoint an arbitrator pursuant to articles 8, 9, 10 or 14, the party making the request shall send to the appointing authority copies of the notice of arbitration and, if it exists, any response to the notice of arbitration.

7.   The appointing authority shall have regard to such considerations as are likely to secure the appointment of an independent and impartial arbitrator and shall take into account the advisability of appointing an arbitrator of a nationality other than the nationalities of the parties.

9

## Section II.   Composition of the arbitral tribunal

*Number of arbitrators*

*Article 7*

1.   If the parties have not previously agreed on the number of arbitrators, and if within 30 days after the receipt by the respondent of the notice of arbitration the parties have not agreed that there shall be only one arbitrator, three arbitrators shall be appointed.

2.   Notwithstanding paragraph 1, if no other parties have responded to a party's proposal to appoint a sole arbitrator within the time limit provided for in paragraph 1 and the party or parties concerned have failed to appoint a second arbitrator in accordance with article 9 or 10, the appointing authority may, at the request of a party, appoint a sole arbitrator pursuant to the procedure provided for in article 8, paragraph 2, if it determines that, in view of the circumstances of the case, this is more appropriate.

*Appointment of arbitrators (articles 8 to 10)*

*Article 8*

1.   If the parties have agreed that a sole arbitrator is to be appointed and if within 30 days after receipt by all other parties of a proposal for the appointment of a sole arbitrator the parties have not reached agreement thereon, a sole arbitrator shall, at the request of a party, be appointed by the appointing authority.

2.   The appointing authority shall appoint the sole arbitrator as promptly as possible. In making the appointment, the appointing authority shall use the following list-procedure, unless the parties agree that the list-procedure should not be used or unless the appointing authority determines in its discretion that the use of the list-procedure is not appropriate for the case:

   *(a)*   The appointing authority shall communicate to each of the parties an identical list containing at least three names;

*(b)* Within 15 days after the receipt of this list, each party may return the list to the appointing authority after having deleted the name or names to which it objects and numbered the remaining names on the list in the order of its preference;

*(c)* After the expiration of the above period of time the appointing authority shall appoint the sole arbitrator from among the names approved on the lists returned to it and in accordance with the order of preference indicated by the parties;

*(d)* If for any reason the appointment cannot be made according to this procedure, the appointing authority may exercise its discretion in appointing the sole arbitrator.

### *Article 9*

1.   If three arbitrators are to be appointed, each party shall appoint one arbitrator. The two arbitrators thus appointed shall choose the third arbitrator who will act as the presiding arbitrator of the arbitral tribunal.

2.   If within 30 days after the receipt of a party's notification of the appointment of an arbitrator the other party has not notified the first party of the arbitrator it has appointed, the first party may request the appointing authority to appoint the second arbitrator.

3.   If within 30 days after the appointment of the second arbitrator the two arbitrators have not agreed on the choice of the presiding arbitrator, the presiding arbitrator shall be appointed by the appointing authority in the same way as a sole arbitrator would be appointed under article 8.

### *Article 10*

1.   For the purposes of article 9, paragraph 1, where three arbitrators are to be appointed and there are multiple parties as claimant or as respondent, unless the parties have agreed to another method of appointment of arbitrators, the multiple parties jointly, whether as claimant or as respondent, shall appoint an arbitrator.

2.   If the parties have agreed that the arbitral tribunal is to be composed of a number of arbitrators other than one or three, the arbitrators shall be appointed according to the method agreed upon by the parties.

3.    In the event of any failure to constitute the arbitral tribunal under these Rules, the appointing authority shall, at the request of any party, constitute the arbitral tribunal and, in doing so, may revoke any appointment already made and appoint or reappoint each of the arbitrators and designate one of them as the presiding arbitrator.

### *Disclosures by and challenge of arbitrators\*\* (articles 11 to 13)*

### *Article 11*

When a person is approached in connection with his or her possible appointment as an arbitrator, he or she shall disclose any circumstances likely to give rise to justifiable doubts as to his or her impartiality or independence. An arbitrator, from the time of his or her appointment and throughout the arbitral proceedings, shall without delay disclose any such circumstances to the parties and the other arbitrators unless they have already been informed by him or her of these circumstances.

### *Article 12*

1.    Any arbitrator may be challenged if circumstances exist that give rise to justifiable doubts as to the arbitrator's impartiality or independence.

2.    A party may challenge the arbitrator appointed by it only for reasons of which it becomes aware after the appointment has been made.

3.    In the event that an arbitrator fails to act or in the event of the de jure or de facto impossibility of his or her performing his or her functions, the procedure in respect of the challenge of an arbitrator as provided in article 13 shall apply.

### *Article 13*

1.    A party that intends to challenge an arbitrator shall send notice of its challenge within 15 days after it has been notified

---

\*\*Model statements of independence pursuant to article 11 can be found in the annex to the Rules.

12

of the appointment of the challenged arbitrator, or within 15 days after the circumstances mentioned in articles 11 and 12 became known to that party.

2. The notice of challenge shall be communicated to all other parties, to the arbitrator who is challenged and to the other arbitrators. The notice of challenge shall state the reasons for the challenge.

3. When an arbitrator has been challenged by a party, all parties may agree to the challenge. The arbitrator may also, after the challenge, withdraw from his or her office. In neither case does this imply acceptance of the validity of the grounds for the challenge.

4. If, within 15 days from the date of the notice of challenge, all parties do not agree to the challenge or the challenged arbitrator does not withdraw, the party making the challenge may elect to pursue it. In that case, within 30 days from the date of the notice of challenge, it shall seek a decision on the challenge by the appointing authority.

### *Replacement of an arbitrator*

*Article 14*

1. Subject to paragraph 2, in any event where an arbitrator has to be replaced during the course of the arbitral proceedings, a substitute arbitrator shall be appointed or chosen pursuant to the procedure provided for in articles 8 to 11 that was applicable to the appointment or choice of the arbitrator being replaced. This procedure shall apply even if during the process of appointing the arbitrator to be replaced, a party had failed to exercise its right to appoint or to participate in the appointment.

2. If, at the request of a party, the appointing authority determines that, in view of the exceptional circumstances of the case, it would be justified for a party to be deprived of its right to appoint a substitute arbitrator, the appointing authority may, after giving an opportunity to the parties and the remaining arbitrators to express their views: *(a)* appoint the substitute arbitrator; or *(b)* after the closure of the hearings, authorize the other arbitrators to proceed with the arbitration and make any decision or award.

13

*Repetition of hearings in the event of the
replacement of an arbitrator*

*Article 15*

If an arbitrator is replaced, the proceedings shall resume at the
stage where the arbitrator who was replaced ceased to perform
his or her functions, unless the arbitral tribunal decides
otherwise.

*Exclusion of liability*

*Article 16*

Save for intentional wrongdoing, the parties waive, to the fullest
extent permitted under the applicable law, any claim against the
arbitrators, the appointing authority and any person appointed
by the arbitral tribunal based on any act or omission in con-
nection with the arbitration.

## Section III. Arbitral proceedings

### *General provisions*

*Article 17*

1.    Subject to these Rules, the arbitral tribunal may conduct the arbitration in such manner as it considers appropriate, provided that the parties are treated with equality and that at an appropriate stage of the proceedings each party is given a reasonable opportunity of presenting its case. The arbitral tribunal, in exercising its discretion, shall conduct the proceedings so as to avoid unnecessary delay and expense and to provide a fair and efficient process for resolving the parties' dispute.

2.    As soon as practicable after its constitution and after inviting the parties to express their views, the arbitral tribunal shall establish the provisional timetable of the arbitration. The arbitral tribunal may, at any time, after inviting the parties to express their views, extend or abridge any period of time prescribed under these Rules or agreed by the parties.

3.    If at an appropriate stage of the proceedings any party so requests, the arbitral tribunal shall hold hearings for the presentation of evidence by witnesses, including expert witnesses, or for oral argument. In the absence of such a request, the arbitral tribunal shall decide whether to hold such hearings or whether the proceedings shall be conducted on the basis of documents and other materials.

4.    All communications to the arbitral tribunal by one party shall be communicated by that party to all other parties. Such communications shall be made at the same time, except as otherwise permitted by the arbitral tribunal if it may do so under applicable law.

5.    The arbitral tribunal may, at the request of any party, allow one or more third persons to be joined in the arbitration as a party provided such person is a party to the arbitration agreement, unless the arbitral tribunal finds, after giving all parties, including the person or persons to be joined, the opportunity to be heard, that joinder should not be permitted

15

because of prejudice to any of those parties. The arbitral tribunal may make a single award or several awards in respect of all parties so involved in the arbitration.

## *Place of arbitration*

### *Article 18*

1.    If the parties have not previously agreed on the place of arbitration, the place of arbitration shall be determined by the arbitral tribunal having regard to the circumstances of the case. The award shall be deemed to have been made at the place of arbitration.

2.    The arbitral tribunal may meet at any location it considers appropriate for deliberations. Unless otherwise agreed by the parties, the arbitral tribunal may also meet at any location it considers appropriate for any other purpose, including hearings.

## *Language*

### *Article 19*

1.    Subject to an agreement by the parties, the arbitral tribunal shall, promptly after its appointment, determine the language or languages to be used in the proceedings. This determination shall apply to the statement of claim, the statement of defence, and any further written statements and, if oral hearings take place, to the language or languages to be used in such hearings.

2.    The arbitral tribunal may order that any documents annexed to the statement of claim or statement of defence, and any supplementary documents or exhibits submitted in the course of the proceedings, delivered in their original language, shall be accompanied by a translation into the language or languages agreed upon by the parties or determined by the arbitral tribunal.

## *Statement of claim*

### *Article 20*

1.    The claimant shall communicate its statement of claim in writing to the respondent and to each of the arbitrators within

a period of time to be determined by the arbitral tribunal. The claimant may elect to treat its notice of arbitration referred to in article 3 as a statement of claim, provided that the notice of arbitration also complies with the requirements of paragraphs 2 to 4 of this article.

2.    The statement of claim shall include the following particulars:

- *(a)* The names and contact details of the parties;
- *(b)* A statement of the facts supporting the claim;
- *(c)* The points at issue;
- *(d)* The relief or remedy sought;
- *(e)* The legal grounds or arguments supporting the claim.

3.    A copy of any contract or other legal instrument out of or in relation to which the dispute arises and of the arbitration agreement shall be annexed to the statement of claim.

4.    The statement of claim should, as far as possible, be accompanied by all documents and other evidence relied upon by the claimant, or contain references to them.

### *Statement of defence*

### *Article 21*

1.    The respondent shall communicate its statement of defence in writing to the claimant and to each of the arbitrators within a period of time to be determined by the arbitral tribunal. The respondent may elect to treat its response to the notice of arbitration referred to in article 4 as a statement of defence, provided that the response to the notice of arbitration also complies with the requirements of paragraph 2 of this article.

2.    The statement of defence shall reply to the particulars *(b)* to *(e)* of the statement of claim (art. 20, para. 2). The statement of defence should, as far as possible, be accompanied by all documents and other evidence relied upon by the respondent, or contain references to them.

3.    In its statement of defence, or at a later stage in the arbitral proceedings if the arbitral tribunal decides that the delay was justified under the circumstances, the respondent may make a counterclaim or rely on a claim for the purpose of a set-off provided that the arbitral tribunal has jurisdiction over it.

4. The provisions of article 20, paragraphs 2 to 4, shall apply to a counterclaim, a claim under article 4, paragraph 2 *(f)*, and a claim relied on for the purpose of a set-off.

*Amendments to the claim or defence*

*Article 22*

During the course of the arbitral proceedings, a party may amend or supplement its claim or defence, including a counterclaim or a claim for the purpose of a set-off, unless the arbitral tribunal considers it inappropriate to allow such amendment or supplement having regard to the delay in making it or prejudice to other parties or any other circumstances. However, a claim or defence, including a counterclaim or a claim for the purpose of a set-off, may not be amended or supplemented in such a manner that the amended or supplemented claim or defence falls outside the jurisdiction of the arbitral tribunal.

*Pleas as to the jurisdiction of the arbitral tribunal*

*Article 23*

1. The arbitral tribunal shall have the power to rule on its own jurisdiction, including any objections with respect to the existence or validity of the arbitration agreement. For that purpose, an arbitration clause that forms part of a contract shall be treated as an agreement independent of the other terms of the contract. A decision by the arbitral tribunal that the contract is null shall not entail automatically the invalidity of the arbitration clause.

2. A plea that the arbitral tribunal does not have jurisdiction shall be raised no later than in the statement of defence or, with respect to a counterclaim or a claim for the purpose of a set-off, in the reply to the counterclaim or to the claim for the purpose of a set-off. A party is not precluded from raising such a plea by the fact that it has appointed, or participated in the appointment of, an arbitrator. A plea that the arbitral tribunal is exceeding the scope of its authority shall be raised as soon as the matter alleged to be beyond the scope of its authority is raised during the arbitral proceedings. The arbitral tribunal may, in either case, admit a later plea if it considers the delay justified.

3.   The arbitral tribunal may rule on a plea referred to in paragraph 2 either as a preliminary question or in an award on the merits. The arbitral tribunal may continue the arbitral proceedings and make an award, notwithstanding any pending challenge to its jurisdiction before a court.

### *Further written statements*

### *Article 24*

The arbitral tribunal shall decide which further written statements, in addition to the statement of claim and the statement of defence, shall be required from the parties or may be presented by them and shall fix the periods of time for communicating such statements.

### *Periods of time*

### *Article 25*

The periods of time fixed by the arbitral tribunal for the communication of written statements (including the statement of claim and statement of defence) should not exceed 45 days. However, the arbitral tribunal may extend the time limits if it concludes that an extension is justified.

### *Interim measures*

### *Article 26*

1.   The arbitral tribunal may, at the request of a party, grant interim measures.

2.   An interim measure is any temporary measure by which, at any time prior to the issuance of the award by which the dispute is finally decided, the arbitral tribunal orders a party, for example and without limitation, to:

   *(a)* Maintain or restore the status quo pending determination of the dispute;

   *(b)* Take action that would prevent, or refrain from taking action that is likely to cause, (i) current or imminent harm or (ii) prejudice to the arbitral process itself;

   *(c)* Provide a means of preserving assets out of which a subsequent award may be satisfied; or

   *(d)* Preserve evidence that may be relevant and material to the resolution of the dispute.

3.    The party requesting an interim measure under paragraphs 2 *(a)* to *(c)* shall satisfy the arbitral tribunal that:

*(a)*  Harm not adequately reparable by an award of damages is likely to result if the measure is not ordered, and such harm substantially outweighs the harm that is likely to result to the party against whom the measure is directed if the measure is granted; and

*(b)*  There is a reasonable possibility that the requesting party will succeed on the merits of the claim. The determination on this possibility shall not affect the discretion of the arbitral tribunal in making any subsequent determination.

4.    With regard to a request for an interim measure under paragraph 2 *(d),* the requirements in paragraphs 3 *(a)* and *(b)* shall apply only to the extent the arbitral tribunal considers appropriate.

5.    The arbitral tribunal may modify, suspend or terminate an interim measure it has granted, upon application of any party or, in exceptional circumstances and upon prior notice to the parties, on the arbitral tribunal's own initiative.

6.    The arbitral tribunal may require the party requesting an interim measure to provide appropriate security in connection with the measure.

7.    The arbitral tribunal may require any party promptly to disclose any material change in the circumstances on the basis of which the interim measure was requested or granted.

8.    The party requesting an interim measure may be liable for any costs and damages caused by the measure to any party if the arbitral tribunal later determines that, in the circumstances then prevailing, the measure should not have been granted. The arbitral tribunal may award such costs and damages at any point during the proceedings.

9.    A request for interim measures addressed by any party to a judicial authority shall not be deemed incompatible with the agreement to arbitrate, or as a waiver of that agreement.

### *Evidence*

*Article 27*

1.    Each party shall have the burden of proving the facts relied on to support its claim or defence.

2.    Witnesses, including expert witnesses, who are presented by the parties to testify to the arbitral tribunal on any issue of fact or expertise may be any individual, notwithstanding that the individual is a party to the arbitration or in any way related to a party. Unless otherwise directed by the arbitral tribunal, statements by witnesses, including expert witnesses, may be presented in writing and signed by them.

3.    At any time during the arbitral proceedings the arbitral tribunal may require the parties to produce documents, exhibits or other evidence within such a period of time as the arbitral tribunal shall determine.

4.    The arbitral tribunal shall determine the admissibility, relevance, materiality and weight of the evidence offered.

## *Hearings*

*Article 28*

1.    In the event of an oral hearing, the arbitral tribunal shall give the parties adequate advance notice of the date, time and place thereof.

2.    Witnesses, including expert witnesses, may be heard under the conditions and examined in the manner set by the arbitral tribunal.

3.    Hearings shall be held in camera unless the parties agree otherwise. The arbitral tribunal may require the retirement of any witness or witnesses, including expert witnesses, during the testimony of such other witnesses, except that a witness, including an expert witness, who is a party to the arbitration shall not, in principle, be asked to retire.

4.    The arbitral tribunal may direct that witnesses, including expert witnesses, be examined through means of telecommunication that do not require their physical presence at the hearing (such as videoconference).

## *Experts appointed by the arbitral tribunal*

*Article 29*

1.    After consultation with the parties, the arbitral tribunal may appoint one or more independent experts to report to it,

in writing, on specific issues to be determined by the arbitral tribunal. A copy of the expert's terms of reference, established by the arbitral tribunal, shall be communicated to the parties.

2. The expert shall, in principle before accepting appointment, submit to the arbitral tribunal and to the parties a description of his or her qualifications and a statement of his or her impartiality and independence. Within the time ordered by the arbitral tribunal, the parties shall inform the arbitral tribunal whether they have any objections as to the expert's qualifications, impartiality or independence. The arbitral tribunal shall decide promptly whether to accept any such objections. After an expert's appointment, a party may object to the expert's qualifications, impartiality or independence only if the objection is for reasons of which the party becomes aware after the appointment has been made. The arbitral tribunal shall decide promptly what, if any, action to take.

3. The parties shall give the expert any relevant information or produce for his or her inspection any relevant documents or goods that he or she may require of them. Any dispute between a party and such expert as to the relevance of the required information or production shall be referred to the arbitral tribunal for decision.

4. Upon receipt of the expert's report, the arbitral tribunal shall communicate a copy of the report to the parties, which shall be given the opportunity to express, in writing, their opinion on the report. A party shall be entitled to examine any document on which the expert has relied in his or her report.

5. At the request of any party, the expert, after delivery of the report, may be heard at a hearing where the parties shall have the opportunity to be present and to interrogate the expert. At this hearing, any party may present expert witnesses in order to testify on the points at issue. The provisions of article 28 shall be applicable to such proceedings.

## *Default*

### *Article 30*

1. If, within the period of time fixed by these Rules or the arbitral tribunal, without showing sufficient cause:

*(a)* The claimant has failed to communicate its statement of claim, the arbitral tribunal shall issue an order for the termination of the arbitral proceedings, unless there are remaining

matters that may need to be decided and the arbitral tribunal considers it appropriate to do so;

*(b)* The respondent has failed to communicate its response to the notice of arbitration or its statement of defence, the arbitral tribunal shall order that the proceedings continue, without treating such failure in itself as an admission of the claimant's allegations; the provisions of this subparagraph also apply to a claimant's failure to submit a defence to a counterclaim or to a claim for the purpose of a set-off.

2. If a party, duly notified under these Rules, fails to appear at a hearing, without showing sufficient cause for such failure, the arbitral tribunal may proceed with the arbitration.

3. If a party, duly invited by the arbitral tribunal to produce documents, exhibits or other evidence, fails to do so within the established period of time, without showing sufficient cause for such failure, the arbitral tribunal may make the award on the evidence before it.

## *Closure of hearings*

### *Article 31*

1. The arbitral tribunal may inquire of the parties if they have any further proof to offer or witnesses to be heard or submissions to make and, if there are none, it may declare the hearings closed.

2. The arbitral tribunal may, if it considers it necessary owing to exceptional circumstances, decide, on its own initiative or upon application of a party, to reopen the hearings at any time before the award is made.

## *Waiver of right to object*

### *Article 32*

A failure by any party to object promptly to any non-compliance with these Rules or with any requirement of the arbitration agreement shall be deemed to be a waiver of the right of such party to make such an objection, unless such party can show that, under the circumstances, its failure to object was justified.

## Section IV.   The award

### *Decisions*

*Article 33*

1.    When there is more than one arbitrator, any award or other decision of the arbitral tribunal shall be made by a majority of the arbitrators.

2.    In the case of questions of procedure, when there is no majority or when the arbitral tribunal so authorizes, the presiding arbitrator may decide alone, subject to revision, if any, by the arbitral tribunal.

### *Form and effect of the award*

*Article 34*

1.    The arbitral tribunal may make separate awards on different issues at different times.

2.    All awards shall be made in writing and shall be final and binding on the parties. The parties shall carry out all awards without delay.

3.    The arbitral tribunal shall state the reasons upon which the award is based, unless the parties have agreed that no reasons are to be given.

4.    An award shall be signed by the arbitrators and it shall contain the date on which the award was made and indicate the place of arbitration. Where there is more than one arbitrator and any of them fails to sign, the award shall state the reason for the absence of the signature.

5.    An award may be made public with the consent of all parties or where and to the extent disclosure is required of a party by legal duty, to protect or pursue a legal right or in relation to legal proceedings before a court or other competent authority.

6.    Copies of the award signed by the arbitrators shall be communicated to the parties by the arbitral tribunal.

*Applicable law, amiable compositeur*

*Article 35*

1.    The arbitral tribunal shall apply the rules of law designated by the parties as applicable to the substance of the dispute. Failing such designation by the parties, the arbitral tribunal shall apply the law which it determines to be appropriate.

2.    The arbitral tribunal shall decide as amiable compositeur or ex aequo et bono only if the parties have expressly authorized the arbitral tribunal to do so.

3.    In all cases, the arbitral tribunal shall decide in accordance with the terms of the contract, if any, and shall take into account any usage of trade applicable to the transaction.

### *Settlement or other grounds for termination*

*Article 36*

1.    If, before the award is made, the parties agree on a settlement of the dispute, the arbitral tribunal shall either issue an order for the termination of the arbitral proceedings or, if requested by the parties and accepted by the arbitral tribunal, record the settlement in the form of an arbitral award on agreed terms. The arbitral tribunal is not obliged to give reasons for such an award.

2.    If, before the award is made, the continuation of the arbitral proceedings becomes unnecessary or impossible for any reason not mentioned in paragraph 1, the arbitral tribunal shall inform the parties of its intention to issue an order for the termination of the proceedings. The arbitral tribunal shall have the power to issue such an order unless there are remaining matters that may need to be decided and the arbitral tribunal considers it appropriate to do so.

3.    Copies of the order for termination of the arbitral proceedings or of the arbitral award on agreed terms, signed by the arbitrators, shall be communicated by the arbitral tribunal to the parties. Where an arbitral award on agreed terms is made, the provisions of article 34, paragraphs 2, 4 and 5, shall apply.

*Interpretation of the award*

*Article 37*

1.   Within 30 days after the receipt of the award, a party, with notice to the other parties, may request that the arbitral tribunal give an interpretation of the award.

2.   The interpretation shall be given in writing within 45 days after the receipt of the request. The interpretation shall form part of the award and the provisions of article 34, paragraphs 2 to 6, shall apply.


## *Correction of the award*

*Article 38*

1.   Within 30 days after the receipt of the award, a party, with notice to the other parties, may request the arbitral tribunal to correct in the award any error in computation, any clerical or typographical error, or any error or omission of a similar nature. If the arbitral tribunal considers that the request is justified, it shall make the correction within 45 days of receipt of the request.

2.   The arbitral tribunal may within 30 days after the communication of the award make such corrections on its own initiative.

3.   Such corrections shall be in writing and shall form part of the award. The provisions of article 34, paragraphs 2 to 6, shall apply.


## *Additional award*

*Article 39*

1.   Within 30 days after the receipt of the termination order or the award, a party, with notice to the other parties, may request the arbitral tribunal to make an award or an additional award as to claims presented in the arbitral proceedings but not decided by the arbitral tribunal.

2.   If the arbitral tribunal considers the request for an award or additional award to be justified, it shall render or complete its award within 60 days after the receipt of the request. The

arbitral tribunal may extend, if necessary, the period of time within which it shall make the award.

3.   When such an award or additional award is made, the provisions of article 34, paragraphs 2 to 6, shall apply.

### *Definition of costs*

*Article 40*

1.   The arbitral tribunal shall fix the costs of arbitration in the final award and, if it deems appropriate, in another decision.

2.   The term "costs" includes only:

   *(a)*   The fees of the arbitral tribunal to be stated separately as to each arbitrator and to be fixed by the tribunal itself in accordance with article 41;

   *(b)*   The reasonable travel and other expenses incurred by the arbitrators;

   *(c)*   The reasonable costs of expert advice and of other assistance required by the arbitral tribunal;

   *(d)*   The reasonable travel and other expenses of witnesses to the extent such expenses are approved by the arbitral tribunal;

   *(e)*   The legal and other costs incurred by the parties in relation to the arbitration to the extent that the arbitral tribunal determines that the amount of such costs is reasonable;

   *(f)*   Any fees and expenses of the appointing authority as well as the fees and expenses of the Secretary-General of the PCA.

3.   In relation to interpretation, correction or completion of any award under articles 37 to 39, the arbitral tribunal may charge the costs referred to in paragraphs 2 *(b)* to *(f)*, but no additional fees.

### *Fees and expenses of arbitrators*

*Article 41*

1.   The fees and expenses of the arbitrators shall be reasonable in amount, taking into account the amount in dispute, the complexity of the subject matter, the time spent by the arbitrators and any other relevant circumstances of the case.

2. If there is an appointing authority and it applies or has stated that it will apply a schedule or particular method for determining the fees for arbitrators in international cases, the arbitral tribunal in fixing its fees shall take that schedule or method into account to the extent that it considers appropriate in the circumstances of the case.

3. Promptly after its constitution, the arbitral tribunal shall inform the parties as to how it proposes to determine its fees and expenses, including any rates it intends to apply. Within 15 days of receiving that proposal, any party may refer the proposal to the appointing authority for review. If, within 45 days of receipt of such a referral, the appointing authority finds that the proposal of the arbitral tribunal is inconsistent with paragraph 1, it shall make any necessary adjustments thereto, which shall be binding upon the arbitral tribunal.

*4.* *(a)* When informing the parties of the arbitrators' fees and expenses that have been fixed pursuant to article 40, paragraphs 2 *(a)* and *(b)*, the arbitral tribunal shall also explain the manner in which the corresponding amounts have been calculated;

*(b)* Within 15 days of receiving the arbitral tribunal's determination of fees and expenses, any party may refer for review such determination to the appointing authority. If no appointing authority has been agreed upon or designated, or if the appointing authority fails to act within the time specified in these Rules, then the review shall be made by the Secretary-General of the PCA;

*(c)* If the appointing authority or the Secretary-General of the PCA finds that the arbitral tribunal's determination is inconsistent with the arbitral tribunal's proposal (and any adjustment thereto) under paragraph 3 or is otherwise manifestly excessive, it shall, within 45 days of receiving such a referral, make any adjustments to the arbitral tribunal's determination that are necessary to satisfy the criteria in paragraph 1. Any such adjustments shall be binding upon the arbitral tribunal;

*(d)* Any such adjustments shall either be included by the arbitral tribunal in its award or, if the award has already been issued, be implemented in a correction to the award, to which the procedure of article 38, paragraph 3, shall apply.

5. Throughout the procedure under paragraphs 3 and 4, the arbitral tribunal shall proceed with the arbitration, in accordance with article 17, paragraph 1.

6.     A referral under paragraph 4 shall not affect any determination in the award other than the arbitral tribunal's fees and expenses; nor shall it delay the recognition and enforcement of all parts of the award other than those relating to the determination of the arbitral tribunal's fees and expenses.

### *Allocation of costs*

*Article 42*

1.     The costs of the arbitration shall in principle be borne by the unsuccessful party or parties. However, the arbitral tribunal may apportion each of such costs between the parties if it determines that apportionment is reasonable, taking into account the circumstances of the case.

2.     The arbitral tribunal shall in the final award or, if it deems appropriate, in any other award, determine any amount that a party may have to pay to another party as a result of the decision on allocation of costs.

### *Deposit of costs*

*Article 43*

1.     The arbitral tribunal, on its establishment, may request the parties to deposit an equal amount as an advance for the costs referred to in article 40, paragraphs 2 *(a)* to *(c)*.

2.     During the course of the arbitral proceedings the arbitral tribunal may request supplementary deposits from the parties.

3.     If an appointing authority has been agreed upon or designated, and when a party so requests and the appointing authority consents to perform the function, the arbitral tribunal shall fix the amounts of any deposits or supplementary deposits only after consultation with the appointing authority, which may make any comments to the arbitral tribunal that it deems appropriate concerning the amount of such deposits and supplementary deposits.

4.     If the required deposits are not paid in full within 30 days after the receipt of the request, the arbitral tribunal shall so inform the parties in order that one or more of them may make the required payment. If such payment is not made, the arbitral tribunal may order the suspension or termination of the arbitral proceedings.

5. After a termination order or final award has been made, the arbitral tribunal shall render an accounting to the parties of the deposits received and return any unexpended balance to the parties.

*Annex*

**Model arbitration clause for contracts**

Any dispute, controversy or claim arising out of or relating to this contract, or the breach, termination or invalidity thereof, shall be settled by arbitration in accordance with the UNCITRAL Arbitration Rules.

> *Note.    Parties should consider adding:*

> *(a)* The appointing authority shall be . . . [name of institution or person];

> *(b)* The number of arbitrators shall be . . .. [one or three];

> *(c)* The place of arbitration shall be . . . [town and country];

> *(d)* The language to be used in the arbitral proceedings shall be . . . .

**Possible waiver statement**

> *Note.    If the parties wish to exclude recourse against the arbitral award that may be available under the applicable law, they may consider adding a provision to that effect as suggested below, considering, however, that the effectiveness and conditions of such an exclusion depend on the applicable law.*

*Waiver*

> The parties hereby waive their right to any form of recourse against an award to any court or other competent authority, insofar as such waiver can validly be made under the applicable law.

**Model statements of independence pursuant to article 11 of the Rules**

*No circumstances to disclose*

> I am impartial and independent of each of the parties and intend to remain so. To the best of my knowledge, there

31

are no circumstances, past or present, likely to give rise to justifiable doubts as to my impartiality or independence. I shall promptly notify the parties and the other arbitrators of any such circumstances that may subsequently come to my attention during this arbitration.

*Circumstances to disclose*

I am impartial and independent of each of the parties and intend to remain so. Attached is a statement made pursuant to article 11 of the UNCITRAL Arbitration Rules of *(a)* my past and present professional, business and other relationships with the parties and *(b)* any other relevant circumstances. [Include statement.] I confirm that those circumstances do not affect my independence and impartiality. I shall promptly notify the parties and the other arbitrators of any such further relationships or circumstances that may subsequently come to my attention during this arbitration.

*Note. Any party may consider requesting from the arbitrator the following addition to the statement of independence:*

I confirm, on the basis of the information presently available to me, that I can devote the time necessary to conduct this arbitration diligently, efficiently and in accordance with the time limits in the Rules.

## UNCITRAL Rules on Transparency in Treaty-based Investor-State Arbitration

### *Article 1.   Scope of application*

*Applicability of the Rules*

1.    The UNCITRAL Rules on Transparency in Treaty-based Investor-State Arbitration ("Rules on Transparency") shall apply to investor-State arbitration initiated under the UNCITRAL Arbitration Rules pursuant to a treaty providing for the protection of investments or investors ("treaty")\* concluded on or after 1 April 2014 unless the Parties to the treaty\*\* have agreed otherwise.

2.    In investor-State arbitrations initiated under the UNCITRAL Arbitration Rules pursuant to a treaty concluded before 1 April 2014, these Rules shall apply only when:

*(a)*   The parties to an arbitration (the "disputing parties") agree to their application in respect of that arbitration; or

*(b)*   The Parties to the treaty or, in the case of a multilateral treaty, the State of the claimant and the respondent State, have agreed after 1 April 2014 to their application.

*Application of the Rules*

3.    In any arbitration in which the Rules on Transparency apply pursuant to a treaty or to an agreement by the Parties to that treaty:

*(a)*   The disputing parties may not derogate from these Rules, by agreement or otherwise, unless permitted to do so by the treaty;

---

\*For the purposes of the Rules on Transparency, a "treaty" shall be understood broadly as encompassing any bilateral or multilateral treaty that contains provisions on the protection of investments or investors and a right for investors to resort to arbitration against Parties to the treaty, including any treaty commonly referred to as a free trade agreement, economic integration agreement, trade and investment framework or cooperation agreement, or bilateral investment treaty.

\*\*For the purposes of the Rules on Transparency, any reference to a "Party to the treaty" or a "State" includes, for example, a regional economic integration organization where it is a Party to the treaty.

*(b)* The arbitral tribunal shall have the power, besides its discretionary authority under certain provisions of these Rules, to adapt the requirements of any specific provision of these Rules to the particular circumstances of the case, after consultation with the disputing parties, if such adaptation is necessary to conduct the arbitration in a practical manner and is consistent with the transparency objective of these Rules.

*Discretion and authority of the arbitral tribunal*

4.   Where the Rules on Transparency provide for the arbitral tribunal to exercise discretion, the arbitral tribunal in exercising such discretion shall take into account:

*(a)* The public interest in transparency in treaty-based investor-State arbitration and in the particular arbitral proceedings; and

*(b)* The disputing parties' interest in a fair and efficient resolution of their dispute.

5.   These Rules shall not affect any authority that the arbitral tribunal may otherwise have under the UNCITRAL Arbitration Rules to conduct the arbitration in such a manner as to promote transparency, for example by accepting submissions from third persons.

6.   In the presence of any conduct, measure or other action having the effect of wholly undermining the transparency objectives of these Rules, the arbitral tribunal shall ensure that those objectives prevail.

*Applicable instrument in case of conflict*

7.   Where the Rules on Transparency apply, they shall supplement any applicable arbitration rules. Where there is a conflict between the Rules on Transparency and the applicable arbitration rules, the Rules on Transparency shall prevail. Notwithstanding any provision in these Rules, where there is a conflict between the Rules on Transparency and the treaty, the provisions of the treaty shall prevail.

8.   Where any of these Rules is in conflict with a provision of the law applicable to the arbitration from which the disputing parties cannot derogate, that provision shall prevail.

*Application in non-UNCITRAL arbitrations*

9.   These Rules are available for use in investor-State arbitrations initiated under rules other than the UNCITRAL Arbitration Rules or in ad hoc proceedings.

### *Article 2.   Publication of information at the commencement of arbitral proceedings*

Once the notice of arbitration has been received by the respondent, each of the disputing parties shall promptly communicate a copy of the notice of arbitration to the repository referred to under article 8. Upon receipt of the notice of arbitration from the respondent, or upon receipt of the notice of arbitration and a record of its transmission to the respondent, the repository shall promptly make available to the public information regarding the name of the disputing parties, the economic sector involved and the treaty under which the claim is being made.

### *Article 3.   Publication of documents*

1.   Subject to article 7, the following documents shall be made available to the public: the notice of arbitration, the response to the notice of arbitration, the statement of claim, the statement of defence and any further written statements or written submissions by any disputing party; a table listing all exhibits to the aforesaid documents and to expert reports and witness statements, if such table has been prepared for the proceedings, but not the exhibits themselves; any written submissions by the non-disputing Party (or Parties) to the treaty and by third persons, transcripts of hearings, where available; and orders, decisions and awards of the arbitral tribunal.

2.   Subject to article 7, expert reports and witness statements, exclusive of the exhibits thereto, shall be made available to the public, upon request by any person to the arbitral tribunal.

3.   Subject to article 7, the arbitral tribunal may decide, on its own initiative or upon request from any person, and after consultation with the disputing parties, whether and how to make available exhibits and any other documents provided to, or issued by, the arbitral tribunal not falling within paragraphs 1 or 2 above. This may include, for example, making such documents available at a specified site.

4. The documents to be made available to the public pursuant to paragraphs 1 and 2 shall be communicated by the arbitral tribunal to the repository referred to under article 8 as soon as possible, subject to any relevant arrangements or time limits for the protection of confidential or protected information prescribed under article 7. The documents to be made available pursuant to paragraph 3 may be communicated by the arbitral tribunal to the repository referred to under article 8 as they become available and, if applicable, in a redacted form in accordance with article 7. The repository shall make all documents available in a timely manner, in the form and in the language in which it receives them.

5. A person granted access to documents under paragraph 3 shall bear any administrative costs of making those documents available to that person, such as the costs of photocopying or shipping documents to that person, but not the costs of making those documents available to the public through the repository.

### *Article 4.  Submission by a third person*

1. After consultation with the disputing parties, the arbitral tribunal may allow a person that is not a disputing party, and not a non-disputing Party to the treaty ("third person(s)"), to file a written submission with the arbitral tribunal regarding a matter within the scope of the dispute.

2. A third person wishing to make a submission shall apply to the arbitral tribunal, and shall, in a concise written statement, which is in a language of the arbitration and complies with any page limits set by the arbitral tribunal:

*(a)* Describe the third person, including, where relevant, its membership and legal status (e.g., trade association or other non-governmental organization), its general objectives, the nature of its activities and any parent organization (including any organization that directly or indirectly controls the third person);

*(b)* Disclose any connection, direct or indirect, which the third person has with any disputing party;

*(c)* Provide information on any government, person or organization that has provided to the third person (i) any financial or other assistance in preparing the submission; or (ii) substantial assistance in either of the two years preceding the application by the third person under this article (e.g. funding around 20 per cent of its overall operations annually);

36

*(d)* Describe the nature of the interest that the third person has in the arbitration; and

*(e)* Identify the specific issues of fact or law in the arbitration that the third person wishes to address in its written submission.

3.  In determining whether to allow such a submission, the arbitral tribunal shall take into consideration, among other factors it determines to be relevant:

*(a)* Whether the third person has a significant interest in the arbitral proceedings; and

*(b)* The extent to which the submission would assist the arbitral tribunal in the determination of a factual or legal issue related to the arbitral proceedings by bringing a perspective, particular knowledge or insight that is different from that of the disputing parties.

4.  The submission filed by the third person shall:

*(a)* Be dated and signed by the person filing the submission on behalf of the third person;

*(b)* Be concise, and in no case longer than as authorized by the arbitral tribunal;

*(c)* Set out a precise statement of the third person's position on issues; and

*(d)* Address only matters within the scope of the dispute.

5.  The arbitral tribunal shall ensure that any submission does not disrupt or unduly burden the arbitral proceedings, or unfairly prejudice any disputing party.

6.  The arbitral tribunal shall ensure that the disputing parties are given a reasonable opportunity to present their observations on any submission by the third person.

### *Article 5.  Submission by a non-disputing Party to the treaty*

1.  The arbitral tribunal shall, subject to paragraph 4, allow, or, after consultation with the disputing parties, may invite, submissions on issues of treaty interpretation from a non-disputing Party to the treaty.

2.  The arbitral tribunal, after consultation with the disputing parties, may allow submissions on further matters within the

scope of the dispute from a non-disputing Party to the treaty. In determining whether to allow such submissions, the arbitral tribunal shall take into consideration, among other factors it determines to be relevant, the factors referred to in article 4, paragraph 3, and, for greater certainty, the need to avoid submissions which would support the claim of the investor in a manner tantamount to diplomatic protection.

3. The arbitral tribunal shall not draw any inference from the absence of any submission or response to any invitation pursuant to paragraphs 1 or 2.

4. The arbitral tribunal shall ensure that any submission does not disrupt or unduly burden the arbitral proceedings, or unfairly prejudice any disputing party.

5. The arbitral tribunal shall ensure that the disputing parties are given a reasonable opportunity to present their observations on any submission by a non-disputing Party to the treaty.

### *Article 6.   Hearings*

1. Subject to article 6, paragraphs 2 and 3, hearings for the presentation of evidence or for oral argument ("hearings") shall be public.

2. Where there is a need to protect confidential information or the integrity of the arbitral process pursuant to article 7, the arbitral tribunal shall make arrangements to hold in private that part of the hearing requiring such protection.

3. The arbitral tribunal shall make logistical arrangements to facilitate the public access to hearings (including where appropriate by organizing attendance through video links or such other means as it deems appropriate). However, the arbitral tribunal may, after consultation with the disputing parties, decide to hold all or part of the hearings in private where this becomes necessary for logistical reasons, such as when the circumstances render any original arrangement for public access to a hearing infeasible.

### *Article 7.   Exceptions to transparency*

*Confidential or protected information*

1. Confidential or protected information, as defined in paragraph 2 and as identified pursuant to the arrangements referred

to in paragraphs 3 and 4, shall not be made available to the public pursuant to articles 2 to 6.

2.  Confidential or protected information consists of:

*(a)* Confidential business information;

*(b)* Information that is protected against being made available to the public under the treaty;

*(c)* Information that is protected against being made available to the public, in the case of the information of the respondent State, under the law of the respondent State, and in the case of other information, under any law or rules determined by the arbitral tribunal to be applicable to the disclosure of such information; or

*(d)* Information the disclosure of which would impede law enforcement.

3.  The arbitral tribunal, after consultation with the disputing parties, shall make arrangements to prevent any confidential or protected information from being made available to the public, including by putting in place, as appropriate:

*(a)* Time limits in which a disputing party, non-disputing Party to the treaty or third person shall give notice that it seeks protection for such information in documents;

*(b)* Procedures for the prompt designation and redaction of the particular confidential or protected information in such documents; and

*(c)* Procedures for holding hearings in private to the extent required by article 6, paragraph 2.

Any determination as to whether information is confidential or protected shall be made by the arbitral tribunal after consultation with the disputing parties.

4.  Where the arbitral tribunal determines that information should not be redacted from a document, or that a document should not be prevented from being made available to the public, any disputing party, non-disputing Party to the treaty or third person that voluntarily introduced the document into the record shall be permitted to withdraw all or part of the document from the record of the arbitral proceedings.

5.  Nothing in these Rules requires a respondent State to make available to the public information the disclosure of which it considers to be contrary to its essential security interests.

*Integrity of the arbitral process*

6.    Information shall not be made available to the public pursuant to articles 2 to 6 where the information, if made available to the public, would jeopardize the integrity of the arbitral process as determined pursuant to paragraph 7.

7.    The arbitral tribunal may, on its own initiative or upon the application of a disputing party, after consultation with the disputing parties where practicable, take appropriate measures to restrain or delay the publication of information where such publication would jeopardize the integrity of the arbitral process because it could hamper the collection or production of evidence, lead to the intimidation of witnesses, lawyers acting for disputing parties or members of the arbitral tribunal, or in comparably exceptional circumstances.

### *Article 8.    Repository of published information*

The repository of published information under the Rules on Transparency shall be the Secretary-General of the United Nations or an institution named by UNCITRAL.

Printed in Austria



V.14-00024—February 2014—750

# EXHIBIT H

| From: | Eric Tse |
|---|---|
| Sent: | Wednesday, May 11, 2016 7:26 AM |
| To: | =SMTP:sordonez@psg.com.pe; Koey Wong |
| Cc: | Helen But; Ying Wang; Bonnie Chu; John Cullen; Phyllis Cheung |
| Subject: | RE: PROFILE CHANGE - [Peru] |

Hi Sebastian,

We had some discussions on the samples issue of #4.

For the current Peru samples, we can give instructions to CEVA to ship to "SUPERDEPORTE PLUS PERU SAC" and in Shipping Invoice, but can you accept the Bill To of NBUS CI to remain as "Peruvian Sporting Goods SAC"? This could be the best we can do.

Best Regards,

*Eric Tse*



New Balance International Limited
29/F, One Kowloon, 1 Wang Yuen Street, | Kowloon Bay |Hong Kong | Tel : (852) 3170 9342 |

**From:** Sebastian Ordonez [mailto:sordonez@psg.com.pe]
**Sent:** Tuesday, May 10, 2016 1:14 AM
**To:** Eric Tse; Koey Wong
**Cc:** Helen But; Ying Wang; Bonnie Chu; John Cullen; Phyllis Cheung
**Subject:** RE: PROFILE CHANGE - [Peru]

Hi Eric,

1. OK.
2. It is ok. As soon as we got the money, we can ship the orders that are already under PSG in the system to PSG and then we will sell them to Superdeporte on the sea. June's orders can be shipped to Superdeporte to avoid the selling process.
3. Ok.
4. How long would take to change these samples documents to Superdeporte? If it's possible it will make things faster for us. IF it's not, I'm already asking our trade dept. to check which would be the solution to the problem. I'll write you back as soon as I get an answer.

Thanks,
Sebastian

**De:** Eric Tse [mailto:Eric.Tse@newbalance.com.hk]
**Enviado el:** lunes, mayo 09, 2016 2:11 AM
**Para:** Sebastian Ordonez; Koey Wong
**CC:** Helen But; Ying Wang; Bonnie Chu; John Cullen; Phyllis Cheung
**Asunto:** RE: PROFILE CHANGE - [Peru]

Hi Sebastian,

Arbitration
Exhibit

**157**

CONFIDENTIAL

NB_PSG0000511

Case 1:21-cv-00700-RBA Document 629-1 Filed 03/28/21 Page 20 of 1009

We are still waiting for the final approval on this name change since it'll affect the distribution agreement, meanwhile, we would like to clarify a few items as well:

1. Based on your latest communications with Nancy, we will update your DHL a/c as well:

| Customer Compliance International Maintenance | PERU | | |
|---|---|---|---|
| Country | PERU | Attachment Count | |
| Courier Name | DHL | Courier Account | 958053i |
| Courier Special Instructions | "Samples should be send by DHL like courier by Damco like cargo If shippment exceeds  value exceeds $2000 or weight more than 50kg " CONTACT: Nearest Panalpina in each city | | |
| Last Updated By | Koey Wong | Last Update Date | 9/9/2( |

2. **For Bulk orders,** pls. confirm how this will affect your current opened orders delivery?
Attached is the list of all your opened orders, highlighted 68 POs (32,100 PRS) are currently on credit hold due to payment issues.
Our suggestions:
   - Pls. take note that we cannot change your orders partially under the new company, can you advise if you can clear as much as possible for those orders that you can ship in May.
   - Then we will process the changes at the end of May (5/25~5/31), we will need about 1 week to process the PO changes to the new company.
   - All POs shipped in June onward will be under the new company name for Ship To & Bill To.
   Pls. confirm if above is OK? If not, then we may need to come up with another plan.

3. **For VAS:** Pls. take note all your labels have been updated with the new company name.

4. **For samples:**
   - Your Q117 samples are ready for shipment in CEVA, pls. confirm that we can still ship under Peruvian Sporting Goods SAC? If possible, pls. accept since it's too late to change & make all the changes on the sample orders in our system.
   - Your Q217 samples with NBIL will be shipped through the new company name (Pls. refer to my separate email about sample matrix confirmation)

If you have any questions, pls. feel free to let us know.

Best Regards,

*Eric Tse*



New Balance International Limited
29/F, One Kowloon, 1 Wang Yuen Street, | Kowloon Bay |Hong Kong | Tel  : (852) 3170 9342 |

**From:** Sebastian Ordonez [mailto:sordonez@psg.com.pe]
**Sent:** Wednesday, March 02, 2016 11:49 PM
**To:** Koey Wong; Jenny Ho
**Cc:** Helen But; Eric Tse
**Subject:** RE: PROFILE CHANGE - [Peru]

Hi Koey,

1. Yes please. This has been a last minute change, because the company's name is changing in a couple of months and when Q3 arrive it will be another company the one which will be importing the goods.
2. Yes. I have changed everything in the attached profile.

NB_PSG0000512

Please help us communicating this to all the factories.

Thanks,
Sebastian

---

**De:** Koey Wong [mailto:Koey.Wong@newbalance.com.hk]
**Enviado el:** martes, marzo 01, 2016 8:19 PM
**Para:** Sebastian Ordonez; Jenny Ho
**CC:** Helen But; Eric Tse
**Asunto:** RE: PROFILE CHANGE - [Peru]
**Importancia:** Alta


Hi Sebastian,

I keep checking with you for profile update as per attached email. Please check and advise on below:

1. All material label for unshipped orders should contain the updated importer details as below. right? We will further check with factory if any rework cost will be imposed then.

2. Do you need to revise the consignee and notify according to the updated importer details?

3. Attached your footwear and apparel profiles, please advise if any additional update is needed.

Thanks!

Best regards,



new balance

**Koey Wong**
**Analyst, Global Trade Management**

NEW BALANCE INTERNATIONAL LIMITED
29/F, ONE KOWLOON,
1 WANG YUEN STREET,
KOWLOON BAY, KOWLOON.

**T** (852) 3723 6263

---

**From:** Sebastian Ordonez [mailto:sordonez@psg.com.pe]
**Sent:** Wednesday, March 02, 2016 6:19 AM
**To:** Jenny Ho
**Cc:** Trade; Helen But
**Subject:** RE: PROFILE CHANGE

Hi Trade Dept,

I want to change some info in our profile. Basically, the address and the name of the companies.
Can you send me the format please?

 NB_PSG0000513

Regards,
Sebastian

---

**De:** Jenny Ho [mailto:Jenny.Ho@newbalance.com.hk]
**Enviado el:** jueves, febrero 25, 2016 9:40 PM
**Para:** Sebastian Ordonez
**CC:** Trade; Helen But
**Asunto:** RE: PROFILE CHANGE

Dear Sebastian,

I am copying Trade department who is responsible on customer profile.
You may contact them for your further enquiry.

Dear Trade team,

Please help to follow up with Peru, thanks.

Best Regards,



new balance

**Jenny Ho**
**International Account Services Representative**

NEW BALANCE INTERNATIONAL LIMITED
29/F, ONE KOWLOON,
1 WANG YUEN STREET,
KOWLOON BAY, KOWLOON.

**T** 852 3723 6250

newbalance.com

---

**From:** Sebastian Ordonez [mailto:sordonez@psg.com.pe]
**Sent:** Friday, February 26, 2016 2:03 AM
**To:** Jenny Ho
**Cc:** LA IAS
**Subject:** PROFILE CHANGE

Hi Jenny,

Who I have to contact if I want to change our profile info for the labels and documents that will be issued in the following weeks?

Regards,
Sebastian

NB_PSG0000514

# EXHIBIT I

1    IN THE MATTER OF AN ARBITRATION UNDER THE ARBITRATION

2         RULES OF THE UNITED NATIONS COMMISSION ON

3              INTERNATIONAL TRADE LAW

4                    BETWEEN

5

6            NEW BALANCE ATHLETICS, INC.,

7                   Claimant,

8                    -and-

9         PERUVIAN SPORTING GOODS S.A.C.

10            and RODRIGO RIBADENEIRA,

11                 Respondents.

12

13

14

15

16    VIDEOTAPED DEPOSITION OF CARLOS MIGUEL GAGLIARDI

17                 Washington, D.C.

18            Wednesday, November 6, 2019

19

20      * PORTIONS CONFIDENTIAL * ATTORNEYS' EYES ONLY *

21

22

23

24

25    Job No. 170315

Case 3:21-cv-01707-ADBB Document 629-11 Filed 03/08/21 Page 25 of 1009
Contains Confidential - Attorneys' Eyes Only Portions

Page 38

1                    C. GAGLIARDI

2    created, was officially working.

3         Q.   Superdeporte Plus Peru was doing business

4    with both Puma and New Balance in 2016?

5         A.   Superdeporte Plus Peru was buying to all

6    the brands.

7         Q.   Were there any other New Balance

8    competitors that Superdeporte Plus Peru was doing

9    business with in 2016?

10         A.   All the brands.  All the brands that

11    you -- if you are in the retail store, every single

12    brand is your competitor there.

13         Q.   Once Superdeporte Plus Peru got off the

14    ground in May 2016, what happened to PSG?

15         A.   They disappeared.  They didn't hold any

16    other brands.  All the brands were moved from PSG to

17    Superdeporte Plus Peru.  And that's when we have a

18    lot of damage from not receiving the contract with

19    Superdeporte.

20         We moved the store, the store that we have in

21    PSG in the Jockey Plaza, all the assets, we moved

22    that one to Superdeporte Plus, and we couldn't

23    operate it because we don't have product because they

24    didn't allow us to buy product.

25         And then we -- hold on one second, the word --

Contains Confidential - Attorneys' Eyes Only Portions

1                          C. GAGLIARDI

2    product.

3         Q.   In your experience --

4         A.   And, again, without product, you cannot

5    recover sales; without sales, you cannot pay anything

6    you are owing, but we were paying.

7         Q.   And the basis for saying you were paying

8    is the hundred thousand dollars that you say you paid

9    in October of 2015?

10        A.   A hundred, and then 150,000, then after he

11   agreed to send the contract, yes, and the letter to

12   sell the product that we had that was old product,

13   but we managed to have an order to sell it, but for

14   that we need the letter that he committed to send and

15   never sent.

16        Q.   Why did you need the letter?

17        A.   Because we were changing from PSG to

18   Superdeporte, and you need to introduce yourself into

19   the companies that you are selling.  So the company

20   requests you, okay, I need a letter saying that you

21   are the nominated distributor to sell me the product.

22   That's normal.

23        Q.   Did Superdeporte take PSG's product once

24   it was -- once Superdeporte was created?

25        A.   Yeah, we moved all the product, yes.

1              C. GAGLIARDI

2          C E R T I F I C A T E

3

4      I, LINDA S. KINKADE, Registered Diplomate

5  Reporter, Certified Realtime Reporter, Registered

6  Merit Reporter, Certified Shorthand Reporter, and

7  Notary Public, do hereby certify that prior to the

8  commencement of examination the deponent herein was

9  duly sworn by me to testify truthfully under penalty

10  of perjury.

11      I FURTHER CERTIFY that the foregoing is a true

12  and accurate transcript of the proceedings as

13  reported by me stenographically to the best of my

14  ability.

15      I FURTHER CERTIFY that I am neither counsel

16  for nor related to nor employed by any of the parties

17  to this case and have no interest, financial or

18  otherwise, in its outcome.

19      IN WITNESS WHEREOF, I have hereunto set my

20  hand and affixed my notarial seal this 19th day of

21  November, 2019.

22  _____

23  LINDA S. KINKADE
    My commission expires:  July 31, 2022
24  NOTARY PUBLIC IN AND FOR

25  THE DISTRICT OF COLUMBIA

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

Rodrigo Ribadeneira and )
Superdeporte Plus Peru S.A.C., )
                          )
         Petitioners, )
                          )
     v. )   Civ. No. 1:21-cv-10173-ADB
                          )
New Balance Athletics, Inc., )
                          )   **LEAVE TO FILE GRANTED**
         Respondent. )   **ON APRIL 5, 2021**
                          )
                          )
                          )
                          )

## REPLY IN SUPPORT OF AMENDED MOTION TO VACATE ARBITRATION AWARD

# TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................................1

ARGUMENT ..........................................................................................................3

I.     THIS COURT DECIDES ARBITRABILITY AS TO PETITIONERS *DE NOVO*
AND THERE IS NO "CLEAR AND UNMISTAKABLE EVIDENCE" THAT
PETITIONERS AGREED TO ARBITRATE THAT QUESTION....................................3

     A.     There Is No Clear And Unmistakable Evidence The Petitioners Agreed To
Arbitrate Arbitrability Or To Be Bound By The Arbitrator's
Determination On Arbitrability..............................................................................3

     B.     Superdeporte Has Preserved Its Challenge To Arbitrability...................................8

II.     PETITIONERS HAVE MET THEIR BURDEN OF PROOF TO SHOW THAT
NONE OF THE EXCEPTIONS TO THE NONSIGNATORY RULE APPLIES ...........11

     A.     The Arbitration Clause Does Not Bind Petitioners Through Their
"Relationship"......................................................................................................12

     B.     The Assumption and Equitable Estoppel Exceptions To The Nonsignatory
Rule Do Not Apply Here .....................................................................................12

          i.     There Is No Assignment Exception And, Regardless, No Relevant
Assignment Here.................................................................................12

          ii.     The Assumption Exception Does Not Apply............................................14

          iii.     The Equitable Estoppel Exception Does Not Apply.................................16

CONCLUSION....................................................................................................17

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Aircraft Braking Sys. Corp. v. Loc. 856*,
   97 F.3d 155 (6th Cir. 1996) ....................................................................................... 5

*Awuah v. Coverall N. Am., Inc.*,
   703 F.3d 36 (1st Cir. 2012) ........................................................................................ 6

*Cleveland Elec. Illuminating Co. v. Util. Workers Union of Am.*,
   440 F.3d 809 (6th Cir. 2006) ..................................................................................... 6

*ConocoPhillips, Inc. v. Loc. 13-0555 United Steelworkers Int'l Union*,
   741 F.3d 627 (5th Cir. 2014) ..................................................................................... 5

*DK Joint Venture 1 v. Weyand*,
   649 F.3d 310 (5th Cir. 2011) ..................................................................................... 7

*Essex Cty. Sheriff's Dep't v. Essex Cty. Corr. Officers Ass'n*,
   78 Mass. App. Ct. 1122 (2011) ................................................................................ 10

*First Options of Chi, Inc. v. Kaplan*,
   514 U.S. 938 (1995) ...................................................................................... 3, 4, 5, 7

*Fortune, Alsweet & Eldridge, Inc. v. Daniel*,
   724 F.2d 1355 (9th Cir. 1983) ................................................................................. 10

*Grand Wireless, Inc. v. Verizon Wireless, Inc.*,
   748 F.3d 1 (1st Cir. 2014) ........................................................................................ 14

*Howsam v. Dean Witter Reynolds, Inc.*,
   537 U.S. 79 (2002) ..................................................................................................... 3

*In re Intuniv Antitrust Litig.*,
   No. 1:16-CV-12653-ADB, 2021 WL 517386 (D. Mass. Feb. 11, 2021) ................. 12

*Int'l Bhd. of Teamsters v. W. Pa. Motor Carriers Ass'n*,
   574 F.2d 783 (3d Cir. 1978) ...................................................................................... 5

*InterGen N.V. v. Grina*,
   344 F.3d 134 (1st Cir. 2003) ........................................................................ 12, 15, 16

*Kaplan v. First Options of Chi., Inc.*,
   19 F.3d 1503 (3d Cir. 1994)
   *aff'd*, 514 U.S. 938 .................................................................................................. 11

*Machado v. System4 LLC,*
    471 Mass. 204 (2015) ................................................................ 11, 14, 16

*Mag Portfolio Consult. Gmbh v. Merlin Biomed Grp. LLC,*
    268 F.3d 58 (2d Cir. 2001) ................................................................ 15

*Ouadani v. TF Final Mile LLC,*
    876 F.3d 31 (1st Cir. 2017) ........................................................ 12, 16

*Oxford Health Plans LLC v. Sutter,*
    569 U.S. 564 (2013) ........................................................................ 3

*Patton v. Johnson,*
    915 F.3d 827 (1st Cir. 2019) ............................................................ 5, 6

*Sarhank Grp. v. Oracle Corp.,*
    404 F.3d 657 (2d Cir. 2005) ............................................................. 5, 7

*Shank/Balfour Beatty, Balfour Beatty Constr. v. Int'l Bhd. of Elec. Workers Loc. 99,*
    497 F.3d 83 (1st Cir. 2007) ............................................................. 7, 9

*Teamsters Loc. Union No. 764 v. J.H. Merritt & Co.,*
    770 F.2d 40 (3d Cir. 1985) ................................................................ 10

*Telenor Mobile Commc'ns AS v. Storm LLC,*
    524 F. Supp. 2d 332 (S.D.N.Y. 2007)
    *aff'd*, 584 F.3d 396 (2d Cir. 2009) .................................................... 8

*Thomson-CSF, S.A. v. Am. Arb. Ass'n,*
    64 F.3d 773 (2d Cir. 1995) ................................................................ 14

*Time Warner Cable of N.Y.C. LLC v. Int'l Bhd. of Elec. Workers,*
    *AFLCIO, Loc. Union, No. 3,*
    684 F. App'x 68 (2d Cir. 2017) ........................................................ 10

*Time Warner Cable of N.Y.C. LLC v. Int'l Bhd. of Elec. Workers,*
    170 F. Supp. 3d 392 (E.D.N.Y. 2016) ............................................... 10

*Turner Fisheries, Inc. v. Seafood Workers Union,*
    19 Mass. App. Ct. 925 (1984) .......................................................... 9, 10

*Walker v. Collyer,*
    85 Mass. App. Ct. 311 (2014) .................................................... 11, 12, 16

## INTRODUCTION

Petitioners Rodrigo Ribadeneira ("Ribadeneira") and Superdeporte Plus Peru S.A.C. ("Superdeporte") (collectively "Petitioners") respectfully submit this reply in support of their Amended Petition ("Am. Pet."), Amended Motion, and accompanying amended memorandum ("Mem."), to vacate the Partial Final Arbitration Award dated August 20, 2020 (the "Partial Award"), as clarified by the Order on Respondents' Request for Correction and Interpretation of the Partial Final Award and/or for the Issuance of an Additional Award ("Clarification Order"), dated November 4, 2020, and the Final Arbitration Award dated February 11, 2021 (collectively, the "Awards"). The Awards were issued in favor of New Balance Athletics, Inc. ("New Balance"), against Petitioners and Peruvian Sporting Goods S.A.C. ("PSG"), based on claims of breach of contract and tortious interference.

This Court should decide the question of the Arbitrator's jurisdiction *de novo* because Petitioners did not sign the Distribution Agreement between PSG and New Balance (the "Distribution Agreement") that contains the Arbitration Clause (the "Arbitration Clause") at issue in this proceeding, and they did not agree to arbitrate any claims with New Balance. New Balance argues that Petitioners' objections to arbitrability were in fact submissions of that issue to the Arbitrator and constitute "clear and unmistakable evidence" that Petitioners intended to be bound by the Arbitrator's determination on arbitrability. But New Balance fails to confront Supreme Court precedent holding exactly the opposite. Objecting to arbitrability before an arbitrator does *not* constitute "clear and unmistakable evidence" that a party intends to be bound by the arbitrator's determination—just the opposite. Similarly, New Balance's suggestion that Superdeporte has waived any challenge to arbitrability is baseless, as Superdeporte three times objected to

jurisdiction, and the Arbitrator considered the issue on the merits without any suggestion of waiver. Nothing more was required to preserve the issue.[1]

Applying *de novo* (or any standard of) review, this Court should vacate the arbitration award because the Arbitrator had no jurisdiction over Petitioners. New Balance argues that the Arbitration Clause should be enforced against Petitioners because it is broad and because theories of assumption and equitable estoppel bind Petitioners to it. However, the breadth of the Arbitration Clause is irrelevant because Petitioners never assumed the obligation to arbitrate at all, and they consistently disavowed any such obligation in the strongest terms. Moreover, New Balance's arguments regarding assumption and equitable estoppel ignore that there is a much higher standard for signatories to bind nonsignatories, as they seek to do here, than the reverse. In any event, New Balance's arguments rest entirely on the erroneous idea that Petitioners were assigned and brought claims under the Distribution Agreement. But Petitioners do not quote the language of the assignment or the claims, which unequivocally show that claims were assigned and brought solely under the *new* agreement negotiated between the parties, *not* under the Distribution Agreement containing the Arbitration Clause at issue. Thus, the assignment cannot be used to bind Petitioners, nonsignatories, to the Distribution Agreement. Accordingly, this Court should vacate the Awards against Petitioners.

---

[1] New Balance contends in a footnote that Petitioners' Amended Motion is untimely. *See* Respondent New Balance Athletics, Inc.'s Opposition to Petitioners' Amended Motion to Vacate Arbitration Awards ("Opp.") at 1 n.1. This is incorrect. As explained in Petitioners' response in opposition to New Balance's Cross-Motion to confirm the Awards, Petitioners' Amended Motion to vacate the Awards is timely.

**ARGUMENT**

I.     **THIS COURT DECIDES ARBITRABILITY AS TO PETITIONERS *DE NOVO* AND THERE IS NO "CLEAR AND UNMISTAKABLE EVIDENCE" THAT PETITIONERS AGREED TO ARBITRATE THAT QUESTION**

This Court decides arbitrability as to Petitioners *de novo*.  "[A] party can be forced to arbitrate only those issues it specifically has agreed to submit to arbitration," and "[c]ourts should not assume that the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they did so."  *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944-45 (1995) (quotation omitted).

A.     **There Is No Clear And Unmistakable Evidence The Petitioners Agreed To Arbitrate Arbitrability Or To Be Bound By The Arbitrator's Determination On Arbitrability**

This Court decides arbitrability as to Petitioners *de novo*.  "[G]ateway matters, such as whether parties have a valid arbitration agreement at all . . . are presumptively for courts to decide. . . . A court may therefore review an arbitrator's determination of such a matter *de novo* absent clear and unmistakable evidence that the parties wanted an arbitrator to resolve the dispute."  *Oxford Health Plans LLC v. Sutter*, 569 U.S. 564, 569 n.2 (2013) (citations omitted); *see also First Options*, 514 U.S. at 945.  Here, there is no clear and unmistakable evidence that the parties wanted an arbitrator to resolve arbitrability for the very simple reason that Petitioners did not sign the agreement with the arbitration provision and objected to the arbitrator's jurisdiction over Ribadeneira and Superdeporte various times during the underlying arbitration.  That is why the Supreme Court has held that "a court should decide whether the arbitration contract bound parties who did not sign the agreement."  *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002).

New Balance accepts the legal standard, but argues that Petitioners raising objections to the Arbitrator's jurisdiction constitutes clear and unmistakable evidence that Petitioners wanted the Arbitrator to decide arbitrability.  *See* Opp. at 16-23.  As the Supreme Court and numerous

circuit courts have held, New Balance's argument is wrong as a matter of law, and there is no paradoxical rule whereby a party grants jurisdiction by objecting to jurisdiction.

The Supreme Court squarely rejected New Balance's argument in *First Options*. In that case, First Options of Chicago, Inc. ("First Options") initiated arbitration against the Kaplans, who had not personally signed the relevant document containing an arbitration clause. 514 U.S. at 940-41. The Kaplans "denied that their disagreement with First Options was arbitrable and filed written objections to that effect with the arbitration panel." *Id.* at 941. The arbitration panel nevertheless ruled that it had the power to rule on the merits of the dispute, and issued an award in favor of First Options. *Id.* Before the Supreme Court, First Options contended that *de novo* review of the arbitration panel's arbitrability determination was unavailable because "the Kaplans clearly agreed to have the arbitrators decide (*i.e.*, to arbitrate) the question of arbitrability" based on their "filing with the arbitrators a written memorandum objecting to the arbitrators' jurisdiction." *Id.* at 946.

The Supreme Court rejected First Options' argument and held that "*merely arguing the arbitrability issue to an arbitrator does not indicate a clear willingness to arbitrate that issue*, *i.e.*, a willingness to be effectively bound by the arbitrator's decision on that point." 514 U.S. at 946 (emphasis added). The Supreme Court added that, "[t]o the contrary, insofar as the Kaplans were forcefully objecting to the arbitrators deciding their dispute with First Options, one naturally would think that they did *not* want the arbitrators to have binding authority over them." *Id.* The Supreme Court concluded that "the Kaplans did not clearly agree to submit the question of arbitrability to arbitration" and that *de novo* review of the arbitration panel's determination on arbitrability was required. *Id.* at 947.

4

Numerous circuit courts are in accord. *See, e.g.*, *Sarhank Grp. v. Oracle Corp.*, 404 F.3d 657, 662 (2d Cir. 2005) ("Merely arguing non-arbitrability to the arbitrators and then to the [reviewing] courts does not amount to consent by [the nonsignatory] to having the arbitrators decide the issue."); *Aircraft Braking Sys. Corp. v. Loc. 856*, 97 F.3d 155, 161 (6th Cir. 1996) (a nonsignatory "did not submit the issue of arbitrability to the arbitrator" in light of its "forcefully objecting to the arbitrator deciding [its] dispute," which indicates "that [it] did not want the arbitrator to have binding authority over [it]." (quoting *First Options*, 514 U.S. at 946)); *Int'l Bhd. of Teamsters v. W. Pa. Motor Carriers Ass'n*, 574 F.2d 783, 786-87 (3d Cir. 1978) (recognizing that a party does not lose the right to independent court review by arguing arbitrability to arbitrators) (*cited in First Options*, 514 U.S. at 946); *ConocoPhillips, Inc. v. Loc. 13-0555 United Steelworkers Int'l Union*, 741 F.3d 627, 631 (5th Cir. 2014) ("[A] 'willingness to be effectively bound' is not demonstrated by 'merely arguing the arbitrability issue to an arbitrator.'" (quoting *First Options*, 514 U.S. at 946)).

This well-established rule controls here. Every single instance of Petitioners objecting to arbitrability before the Arbitrator cited by New Balance, *see* Opp. at 16-23, was a statement by Petitioners that "they did not want the arbitrator[] to have binding authority over them," *First Options*, 514 U.S. at 946. Accordingly, as a matter of law, Petitioners' objections to the Arbitrator's jurisdiction *cannot* constitute "clear and unmistakable evidence" that Petitioners intended to arbitrate that issue.

In the face of this case law directly on point, New Balance rests its argument almost entirely on one case, *Patton v. Johnson*, 915 F.3d 827, 835 (1st Cir. 2019), which is clearly inapposite. *See* Opp. at 18, 22. In *Patton*, certain "[p]arties to a contract" had disagreed whether certain *claims* were arbitrable, and briefed that issue extensively to the arbitrator. 915 F.3d at 834-35. Finding

"clear and unmistakable evidence" that the parties intended to arbitrate the arbitrability of those *claims*, the First Circuit considered it relevant that the parties "manifested no intent to 'reserve the question of arbitrability for the court'" and did not "seek to vacate the arbitrator's decision on such a ground." *Id.* at 835 (quoting *Cleveland Elec. Illuminating Co. v. Util. Workers Union of Am.*, 440 F.3d 809, 813 (6th Cir. 2006)).

In stark contrast to *Patton*, Petitioners here manifested an intent to reserve the question of arbitrability for the court by repeatedly objecting to the Arbitrator's *jurisdiction*—and that is precisely the ground upon which Petitioners now seek to vacate the Arbitrator's Awards. Simply put, there is a clear distinction in the law between whether certain claims are arbitrable and whether a party agreed to arbitration at all. *See, e.g.*, *Awuah v. Coverall N. Am., Inc.*, 703 F.3d 36, 42 (1st Cir. 2012) (while parties to arbitration agreements may delegate arbitrability issues to an arbitrator, "[t]h[e] case is different" for nonsignatories, as "[t]he question of whether the [nonsignatories] assumed obligations under the arbitration clause . . . is for the court."). For questions about whether a nonsignatory is bound by an arbitration agreement, an objection to the Arbitrator's exercise or jurisdiction does not *grant* the Arbitrator jurisdiction—as *First Options* expressly held. Indeed, *Patton* distinguished *First Options* precisely on this ground and did not purport to create the anomalous situation where a party grants jurisdiction by objecting to it. *See Patton*, 915 F. 3d at 835 ("distinguish[ing] *First Options*" because there the "parties had filed written objections to the arbitration in which they challenged the arbitrators' jurisdiction over questions of arbitrability").

New Balance also errs in asserting that there is "clear and unmistakable" evidence that Petitioners intended to be bound by the arbitrability question because they did not <u>concurrently</u> challenge the Arbitrator's jurisdictional determinations in a court. *See* Opp. at 22. That contention too was considered and rejected by the Supreme Court in *First Options*. There, First Options

6

argued that the Kaplans intended to arbitrate whether they were bound to the arbitration agreement because they "had other ways to get an independent court decision on the question of arbitrability without arguing the issue to the arbitrators[,] *e.g.,* by trying to enjoin the arbitration." *First Options*, 514 U.S. at 946. The Supreme Court disagreed: a party not seeking recourse from a court during an arbitration "simply does not say anything about whether [the nonsignatory party] intended to be bound by the arbitrators' decision." *Id.* Similarly, the First Circuit has held that a party challenging an arbitrator's determination as to arbitrability "had no obligation to seek a stay of arbitration in court" while the arbitration was pending. *Shank/Balfour Beatty, Balfour Beatty Constr. v. Int'l Bhd. of Elec. Workers Loc. 99*, 497 F.3d 83, 90 n.2 (1st Cir. 2007). Despite characterizing Petitioners' decision not to seek recourse from a court during the arbitration as "perhaps most detrimental to Petitioners' Amended Motion," New Balance ignores these holdings directly to the contrary and cites no authority for its position. *See* Opp. at 22.

In sum, there is no "clear and unmistakable evidence" that Petitioners intended to be bound by the Arbitrator's determination on arbitrability. Petitioners' objections to the Arbitrator's assertion of jurisdiction during the arbitration do not and cannot, as a matter of law, provide "clear and unmistakable" evidence of Petitioners' intent to submit that question to the Arbitrator and to be bound by his decision thereon. Nor is there such evidence in the Distribution Agreement itself, as Petitioners did not sign it in the first place, or otherwise agree to be bound by it. Accordingly, this Court determines *de novo* whether Petitioners should be subject to arbitration and affords no deference to an arbitrator's findings on arbitrability. *First Options*, 514 U.S. at 944-45.[2]

---

[2] *See also, e.g.*, *DK Joint Venture 1 v. Weyand*, 649 F.3d 310, 317 (5th Cir. 2011) ("[W]here a party attacks the very existence of an agreement, as opposed to its continued validity or enforcement, the courts must first resolve that dispute. Because that is the type of dispute we are addressing here, we do not owe deference to the arbitration panel's determination of its own jurisdiction.") (footnote, quotation marks, and citation omitted); *Sarhank Grp. v. Oracle Corp.*, 404 F.3d 657, 662-63 (2d Cir. 2005) (vacating district court that had deferred to arbitrator's conclusion

## B.  Superdeporte Has Preserved Its Challenge To Arbitrability

New Balance does not dispute that Ribadeneira preserved its challenge to arbitrability, but argues that Superdeporte waived any challenge to the Arbitrator's arbitrability determination.  *See* Opp. at 24-25.  But New Balance's assertion that Superdeporte participated in the arbitration "without objection," Opp. at 24, and that "Superdeporte ***never*** objected to the Arbitrator's jurisdiction at any point in the Arbitration," Opp. at 21, are simply false.

As New Balance concedes (in direct conflict with its own arguments), Superdeporte objected to the Arbitrator's jurisdiction numerous times throughout the arbitration.  *See* Opp. at 12-22.  On May 31, 2019, less than a month after New Balance first amended its claims to add Superdeporte as a Respondent, *see* Am. Pet. Ex. 8 at ¶¶ 7-8, Respondents moved for summary disposition, objecting to the Arbitrator's jurisdiction over "any of the . . . Respondents," including Superdeporte, as to New Balance's tortious interference claims—the only apparent basis on which New Balance could at that time name Superdeporte as a Respondent.  *See* Am. Pet. Ex. 9 at ¶ 26. On December 9, 2019, New Balance added a claim against Superdeporte for successor liability under the Distribution Agreement.  *See* Ex. 28 at ¶ 7.[3]  On February 12, 2020, Respondents renewed their motion for summary disposition and objected to the tribunal's jurisdiction over Superdeporte, including on the basis of the newly added successor liability claim.  *See* Am. Pet.

_____

on arbitrability, and "remand[ing] to the district court to find as a fact whether Oracle agreed to arbitrate, by its actions or inaction, or by reason of any action of Systems as to which Oracle clothed Systems with apparent or actual authority to consent on its behalf to arbitration"); *Telenor Mobile Commc'ns AS v. Storm LLC*, 524 F. Supp. 2d 332, 352 (S.D.N.Y. 2007) ("If the arbitrators' findings are challenged, as here, we cannot merely defer to these findings. Instead, such a challenge to the arbitrators' jurisdiction militates against deference to the arbitrators' judgment, and in favor of an independent inquiry into the arbitrability of the dispute, as the Court has an independent obligation to determine the threshold issue of arbitrability.") (quotation marks and citations omitted), *aff'd*, 584 F.3d 396 (2d Cir. 2009).

   [3]  New Balance states that it "filed its Amended Notice of Arbitration to add Superdeporte as a defendant (as both holder of the Peru Claims and as PSG's business successor) and to add a claim against PSG, Superdeporte, and Ribadeneira for tortious interference with New Balance's new distribution arrangement with its new distributor in Peru as a result of the Peru Claims."  Opp. at 10.  This is incorrect.  New Balance did not add Superdeporte "as PSG's business successor" in its May 3, 2019 filing.  *See* Am. Pet. Ex. 8.

Ex. 11 at ¶¶ 21-25 ("The Tribunal has no basis to hold Superdeporte as a Respondent in this case with respect to New Balance's claim under the Distribution Agreement, because Superdeporte was not a party to the Distribution Agreement and has not agreed to arbitrate any claims under the Distribution Agreement."). Then, during the merits hearing in the arbitration[4] and again in the post-hearing brief, Petitioners requested that the Arbitrator: "[d]eclare that Claimant's claims against Mr. Ribadeneira and Superdeporte under the Distribution Agreement must be dismissed for lack of this tribunal's jurisdiction over these Respondents in relation to New Balance's claims under the Distribution Agreement." Am. Pet. Ex. 13 at ¶ 173. Thus, at each juncture, Superdeporte promptly challenged the Arbitrator's jurisdiction.

While New Balance complains that Superdeporte could have raised the challenge to jurisdiction sooner or in some different manner, there is no plausible basis to find waiver here, as Superdeporte unequivocally objected to jurisdiction before the Arbitrator decided the claims. Moreover, the Arbitrator did not in any way suggest that Superdeporte had waived its challenge to arbitrability or jurisdiction, but instead reached the merits of the issue, determining (incorrectly) that he had jurisdiction over Superdeporte. New Balance fails to explain why this Court should find that Superdeporte waived its challenge where the Arbitrator plainly did not think so. *See Shank/Balfour Beatty*, 497 F.3d at 90 n.2 (holding that a petitioner "did not waive its right to challenge arbitrability by participating in the hearing on the merits after it raised the arbitrability issues before the arbitrator and the arbitrator ruled against the [petitioner]"). Indeed, the only cases New Balance cites concern the situation where a party did not raise *any* objection to jurisdiction in the arbitration or did so only *after* the arbitrator had decided the merits. *See Turner Fisheries, Inc. v. Seafood Workers Union*, 19 Mass. App. Ct. 925, 927 (1984) ("No objection was raised by

---

[4] *See, e.g.*, Am. Pet. Ex. 12 at 1187-89 ("Again, Superdeporte not a signatory.· Never consented to arbitrate, never assumed obligations . . . .").

9

[petitioner] at the time of the [arbitration] hearing, and it was too late to raise it for the first time before the Superior Court in its application to vacate the award.");[5] *Time Warner Cable of N.Y.C. LLC v. Int'l Bhd. of Elec. Workers*, 170 F. Supp. 3d 392, 417 (E.D.N.Y. 2016) ("[Petitioner] only challenged the arbitrator's authority after the arbitration record was closed and an unfavorable interim award [finding petitioner liable] had been issued against it. . . . [Petitioner] waived its right to contest the arbitrator's jurisdiction.");[6] *Fortune, Alsweet & Eldridge, Inc. v. Daniel*, 724 F.2d 1355, 1357 (9th Cir. 1983) ("We have long recognized a rule that a party may not submit a claim to arbitration and then challenge the authority of the arbitrator to act after receiving an unfavorable result.").[7] Here, given the clear objections before the Arbitrator issued any merits decision, there was no waiver.

Finally, to the extent Petitioners suggest that Superdeporte's raising counter-claims in the arbitration amounts to a waiver, *see* Opp. at 24, that is erroneous. As discussed above, Superdeporte participated in the Arbitration only while preserving its objection to the jurisdiction of the Arbitrator. While making that objection, Superdeporte was not forced to capitulate on the merits, but rather was entitled to litigate fully in the arbitration, including by making its own claims. Simply put, raising claims in the Arbitration cannot constitute clear and unmistakable evidence of an intent to arbitrate when the party *also* states unequivocally that the Arbitrator has no jurisdiction. That is why courts still review jurisdiction of the arbitrator *de novo* even where a

---

[5] *See also Essex Cty. Sheriff's Dep't v. Essex Cty. Corr. Officers Ass'n*, 78 Mass. App. Ct. 1122 (2011) ("Having failed to object to arbitrability before the arbitrator, the sheriff is precluded from challenging arbitrability for the first time on a motion to vacate." (citing *Turner Fisheries*, 19 Mass. Appt. Ct. at 927)).

[6] *Aff'd sub nom. Time Warner Cable of N.Y.C. LLC v. Int'l Bhd. of Elec. Workers, AFLCIO, Loc. Union No. 3*, 684 F. App'x 68 (2d Cir. 2017), and *aff'd sub nom. Time Warner Cable of N.Y.C. LLC v. Int'l Bhd. of Elec. Workers, AFLCIO, Loc. Union No. 3*, 684 F. App'x 68 (2d Cir. 2017).

[7] *See also Teamsters Loc. Union No. 764 v. J.H. Merritt & Co.*, 770 F.2d 40, 42-43 (3d Cir. 1985) ("[Petitioner] waived its right to contest the [arbitrator's] jurisdiction in district court by failing to raise its jurisdictional objection before the [arbitrator]. . . . a party may waive its right to raise on appeal an objection to the decision of an arbitrator when the party failed to address the objection before the arbitrator in the first instance.").

10

party has raised a counter-claim in an arbitration. *See Kaplan v. First Options of Chi., Inc.*, 19 F.3d 1503, 1512 (3d Cir. 1994) ("Mr. Kaplan's filing of a counterclaim against First Options in the arbitration does not waive his objection to the arbitrators' jurisdiction."), *aff'd*, 514 U.S. 938.

## II. PETITIONERS HAVE MET THEIR BURDEN OF PROOF TO SHOW THAT NONE OF THE EXCEPTIONS TO THE NONSIGNATORY RULE APPLIES

Applying *de novo* review (or any other standard of review), the Arbitrator lacked jurisdiction over Petitioners. Petitioners, as nonsignatories to the Distribution Agreement, did not consent to and thus are not bound by the Arbitration Clause. As Petitioners explained and New Balances recognizes, *see* Opp. at 27, Massachusetts law determines when a nonsignatory may be bound to an arbitration clause, and identifies only six limited exceptions: "(1) incorporation by reference; (2) assumption; (3) agency; (4) veil-piercing/alter ego; (5) equitable estoppel, and (6) third-party beneficiary." *Machado v. System4 LLC*, 471 Mass. 204, 209 (2015). New Balance ignores, however, that "these theories do not apply equally in a situation where a signatory is attempting to force a nonsignatory to arbitrate as opposed to the reverse situation." *Walker v. Collyer*, 85 Mass. App. Ct. 311, 319 (2014).

The Arbitrator determined that he had jurisdiction over Petitioners because: 1) he had jurisdiction over the Peru Claims, and 2) Superdeporte was PSG's "business successor." Petitioners have demonstrated that these theories are not among the six exceptions to the Massachusetts nonsignatory rule and do not allow for the exercise of jurisdiction over nonsignatories. *See* Mem. at 11-20.

New Balance nevertheless argues that Petitioners are bound by the Arbitration Clause because it is broad and because the assumption and equitable estoppel exceptions apply. *See* Opp. at 25-31. New Balance is wrong on both counts.

### A.      The Arbitration Clause Does Not Bind Petitioners Through Their "Relationship"

New Balance argues that the Arbitration Clause is a "broad clause" that "encompasses the parties' entire relationship and not just the express terms of the Distribution Agreement."  Opp. at 25.  But however broad the clause might be in terms of which *claims* are arbitrable, that says nothing about whether Petitioners, as nonsignatories, are bound by the Arbitration Clause *at all*. *See Ouadani v. TF Final Mile LLC*, 876 F.3d 31, 36 (1st Cir. 2017) ("A party that seeks to compel arbitration 'must show . . . that the other party is bound by [the arbitration] clause, *and* [] that the claim asserted comes within the clause's scope." (quoting *InterGen N.V. v. Grina*, 344 F.3d 134, 142 (1st Cir. 2003)); *see also Walker*, 85 Mass. App. Ct. 311 (finding that a physician, as a nonsignatory to an arbitration agreement between patient and facility, should not be compelled to arbitrate even though the underlying medical malpractice claim is subject to arbitration).

### B.      The Assumption and Equitable Estoppel Exceptions To The Nonsignatory Rule Do Not Apply Here

#### i.      There Is No Assignment Exception And, Regardless, No Relevant Assignment Here

As an initial matter, New Balance errs in relying on PSG and Superdeporte's assignment of the Peru Claims to Ribadeneira (who subsequently assigned them back).  *See* Opp. at 27-31. This assignment theory does not fall under the six enumerated exceptions to the Massachusetts nonsignatory rule, and New Balance cites no authority to support the proposition that a *nonsignatory* may be bound to an arbitration agreement where it was the assignee of a given claim. Even assuming *arguendo* that assignment of contractual rights could circumvent the nonsignatory rule, only a *nonsignatory* could raise that theory to compel a *signatory* to arbitrate.  *See In re Intuniv Antitrust Litig.*, No. 1:16-CV-12653-ADB, 2021 WL 517386, at *5 (D. Mass. Feb. 11,

2021) ("[A]ssignment and estoppel . . . are each basic common-law principles that permit *non-signatories* to enforce arbitration agreements." (emphasis added)).

Regardless, there was no assignment of rights under the Distribution Agreement. PSG and Superdeporte assigned Ribadeneira the Peru Claims under the *new* agreement (which the Arbitrator found was not consummated), *not* the Distribution Agreement containing the relevant Arbitration Clause. New Balance states that "Ribadeneira entered in the First Assignment of Rights with PSG and Superdeporte giving himself the authority to litigate their claims against New Balance arising out of the Distribution Agreement and the parties' relationship generally." Opp. at 28. But New Balance does not cite the terms of the assignment, which clearly assigned claims under the *new* agreement, with no authorization to litigate claims arising from "the parties' relationship generally."[8] Accordingly, Ribadeneira brought claims only under the new agreement,

---

[8] *See* Opp. Ex. C at 8:

During 2015 and 2016, THE ASSIGNOR [PSG] held negotiations with the company NEW BALANCE ATHLETIC SHOE INC. in order to celebrate a Distribution Contract to import, sell and distribute sports products in the territory of Peru. However, once the contractual terms were agreed and the contract ready to be executed, NEW BALANCE ATHLETIC SHOE INC. informed THE ASSIGNOR that it will work with another partner in Peru, arising a dispute between the parties. . . . THE ASSIGNOR . . . transfers without valuable considerations to THE ASSIGNEE [Mr. Ribadeneira] all its rights in attention to the dispute mentioned before against NEW BALANCE ATHLETIC SHOE INC.

*See id.* at 9:

During 2016, THE ASSIGNOR [Superdeporte] was organized due to the negotiations that the founders held with the company NEW BALANCE ATHLETIC SHOE INC. in order to celebrate a Distribution Contract to import sell and distribute sports products in the territory of Peru. However, once the contractual terms were agreed and the contract ready to be executed, NEW BALANCE ATHLETIC SHOE INC. informed THE ASSIGNOR that it will work with another partner in Peru, arising a dispute between the parties. . . . THE ASSIGNOR . . . transfers without valuable considerations to THE ASSIGNEE [Mr. Ribadeneira] all its rights in attention to the dispute mentioned before against NEW BALANCE ATHLETIC SHOE INC.

not under the Distribution Agreement, which contains the relevant Arbitration Clause.[9]  Indeed,

by its terms, rights under the Distribution Agreement cannot be assigned, as it provides that "with

respect to [PSG], this Agreement and the rights granted hereunder is nondivisible, nontransferable

and nonassignable."  Am. Pet. Ex. 1 at ¶ 25.

Therefore, New Balance's reliance on an assignment theory is baseless.

### ii.    The Assumption Exception Does Not Apply

Assumption likewise does not bind Petitioners to the Arbitration Clause.  Under this theory,

"'a party may be bound by an arbitration clause if its subsequent conduct indicates that it is

assuming the obligation to arbitrate,' despite being a nonsignatory."  *Machado*, 471 Mass. at 210

n.10 (quoting *Thomson-CSF, S.A. v. Am. Arb. Ass'n*, 64 F.3d 773, 777 (2d Cir. 1995)).  However,

if a nonsignatory "disavow[s] any obligations arising out of the" agreement, then there is no

assumption.  *Thomson-CSF, S.A.*, 64 F.3d at 777.  Here, as New Balance concedes, Petitioners

have consistently objected to and disavowed any obligation to arbitrate with New Balance in the

strongest possible terms.  Regardless, New Balance relies entirely on PSG and Superdeporte's

assignment of the Peru Claims to Ribadeneira under the *new agreement* to contend that he assumed

the obligation to arbitrate under the *Distribution Agreement*.  *See* Opp. at 28-29.  But as discussed

above, the Peru Claims *did not arise under the Distribution Agreement but only under the new

agreement*.[10]

---

[9]  *See* Am. Pet. ¶¶ 16-17 ("On November 25, 2016, PSG and Superdeporte executed two similar assignments of rights contracts with Ribadeneira, *assigning to him all of their rights to the claims initiated against New Balance with respect to the new, unsigned agreement that New Balance claimed to be ineffective*.  Subsequently, in January 2017, Ribadeneira initiated civil legal proceedings against New Balance before Peruvian civil courts.  Ribadeneira claimed that New Balance failed to honor its obligations under the new agreement and alleged extracontractual claims arising from New Balance's failure to conduct itself in good faith under Peruvian law with respect to the negotiation and execution of the new agreement." (emphasis added)).

[10]  New Balance quotes *Grand Wireless, Inc. v. Verizon Wireless, Inc.*, 748 F.3d 1, 11 (1st Cir. 2014), to suggest that Ribadeneira was "acting as PSG."  Opp. at 29.  But the quotation presented by New Balance regards an *agency* theory raised by a nonsignatory to an arbitration agreement.  *See id.*  The agency theory does not apply here, and New Balance does not argue otherwise.  *See* Mem. at 15-16; Opp. at 28-29.

New Balance also contends that Superdeporte is bound to arbitrate as PSG's business successor. *See* Opp. at 29-31. However, successor liability is not one of the six exceptions to the nonsignatory rule, and it is irrelevant to arbitrability. *See* Mem. at 17-18; *InterGen*, 344 F.3d at 145-46 (determining that a nonsignatory business successor to a signatory could not be forced to arbitrate in the absence of the equitable estoppel elements); *Mag Portfolio Consult. Gmbh v. Merlin Biomed Grp. LLC*, 268 F.3d 58, 63 (2d Cir. 2001) (holding that the district court erred in relying on the fact that the nonsignatory was a successor where the estoppel exception did not apply). New Balance ignores this case law on point and presents no authority to the contrary. *See* Opp. at 29-30.

In any event, as Petitioners have explained, Superdeporte is *not* PSG's business successor or its continuation, under the Distribution Agreement or otherwise. *See* Mem. at 18-20. PSG has been and remains a separate, viable entity. *See* Am. Pet. Ex. 13 at ¶ 136. Superdeporte is an independent company with different capabilities (including both wholesale and retail) that was formed in early 2016 at New Balance's request to enter into a *new agreement*. New Balance's interpretation of select quotations is misleading. *See* Opp. at 30-31. The March 2, 2016 email exchange that New Balance cites reflects Superdeporte's role as the distributor under the *new agreement*, which PSG believed to have finally concluded in January 2016. *See* Opp. at 30-31, Ex. H; Am. Pet. ¶¶ 12-13. Similarly, Superdeporte requested a letter from New Balance because the *distributor* was "changing from PSG to Superdeporte," and Superdeporte "need[ed] to introduce [it]self into the companies" to whom it would be selling New Balance's products. *See* Opp. Ex. I at 93. That letter was not intended to introduce Superdeporte as a "new corporate identity" of PSG, as New Balance imagines, but as a new *company* and new Peruvian distributor for New Balance under the *new agreement*. Opp. at 31. In any event, there is no evidence that

Superdeporte—a separate company formed with specific capabilities at New Balance's request for a new agreement—assumed PSG's obligation to arbitrate under the Distribution Agreement.

### iii.     The Equitable Estoppel Exception Does Not Apply

Finally, equitable estoppel does not bind Petitioners to the Arbitration Clause.  It should be noted at the outset that New Balance relies entirely on the test for when *nonsignatories* can bind *signatories*.  *See* Opp. at 28-30.  In reality, courts have been "hesitant to estop a nonsignatory seeking to avoid arbitration."  *Machado*, 471 Mass. at 211 (quoting *InterGen*, 344 F.3d at 145-46); *see also Ouadani*, 876 F.3d at 38 (same).    Where signatories raise this theory against nonsignatories, "estoppel has been limited to cases [that] involve nonsignatories who, during the life of the contract, have embraced the contract despite their nonsignatory status but then, during litigation, attempt to repudiate the arbitration clause in the contract."  *Ouadani*, 876 F.3d at 38 (alteration in original) (quotation marks and citation omitted); *see also Walker*, 85 Mass. App. Ct. at 320-21 (holding that estoppel requires nonsignatory to arbitrate only where it receives "direct" rather than "indirect" benefits from the agreement with the arbitration clause).

Petitioners never embraced the Distribution Agreement or received direct benefits from it. To argue that Petitioners are equitably estopped, New Balance again relies on the assignment of the Peru Claims, and further states that Petitioners litigated against New Balance under the Distribution Agreement.  Opp. at 28, 31.  Again, however, this is incorrect: Petitioners *never raised claims against New Balance under the Distribution Agreement*.    As noted above, PSG and Superdeporte's assignment of the Peru Claims to Ribadeneira arose under the *new agreement*, not the Distribution Agreement containing the Arbitration Clause at issue here.  Furthermore, New Balance ignores that Superdeporte was formed to enter into a new agreement with New Balance, and could not have embraced or benefitted from the Distribution Agreement.  *See* Mem. at 3-4.

16

Accordingly, Petitioners cannot be bound to the Arbitration Clause in the Distribution Agreement under the equitable estoppel exception.

## CONCLUSION

For the foregoing reasons, this Court should vacate the Awards as to Petitioners Ribadeneira and Superdeporte.

Date: April 7, 2021

Respectfully submitted,

Rodrigo Ribadeneira and
Superdeporte Plus Peru S.A.C.

By their attorneys,

*/s/ Gregg Badichek*
Gregg Badichek (BBO #706270)
greggbadichek@quinnemanuel.com
111 Huntington Ave, Suite 520
Boston, MA 02199
Tel: 617-712-7100
Fax: 617-712-7200

David M. Orta, (admitted *pro hac vice*)
davidorta@quinnemanuel.com
Julianne Jaquith, (admitted *pro hac vice*)
juliannejaquith@quinnemanuel.com
1300 I Street NW, Suite 900
Washington, D.C. 20005
Tel: +1 202 538 8000
Fax: +1 202 538 8100

David Cooper, (admitted *pro hac vice*)
davidcooper@quinnemanuel.com
51 Madison Ave, 22nd floor
New York, NY 10010
Tel: +1 212 849 7000
Fax: +1 212 849 7100

*Attorneys for Petitioners*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 7, 2021, I caused a true and correct copy of the foregoing to be filed in this Court's CM/ECF system, which will send notification of such filing to all parties who have appeared in this matter.

*/s/ Gregg Badichek*
Gregg Badichek (BBO #706270)

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| Rodrigo Ribadeneira and | ) |
| Superdeporte Plus Peru S.A.C., | ) |
| | ) |
| Petitioners, | ) |
| | ) |
| v. | ) Civ. No. 1:21-cv-10173-ADB |
| | ) |
| New Balance Athletics, Inc., | ) |
| | ) |
| Respondent. | ) |
| | ) |
| | ) |

**PETITIONERS' OPPOSITION TO RESPONDENT'S MOTION TO DISMISS THE
FIRST AMENDED PETITION TO VACATE ARBITRATION AWARDS AND
OPPOSITION TO RESPONDENT'S CROSS-MOTION FOR CONFIRMATION OF THE
ARBITRATION AWARDS**

**<u>TABLE OF CONTENTS</u>**

**Page**

I.    FACTUAL BACKGROUND ................................................................................................... 2

II.    THE AMENDED PETITION IS TIMELY ...................................................................... 7

      A.   The MUAA Is Inapplicable In This Case ................................................................ 7

      B.   The Arbitration Award Did Not Become Final Until The Issuance Of A Final Award On February 11, 2021 ................................................................................... 8

      C.   In The Alternative, The Clock To Challenge The Arbitration Award Did Not Start At Least Until After The Issuance Of The Clarification Order ......................... 13

REQUEST FOR ORAL ARGUMENT ........................................................................................ 16

# TABLE OF AUTHORITIES

**Page**

## Cases

*Alvarado v. Wells Fargo Advisors*,
    2010 WL 3419654 (S.D. Tex. Aug. 27, 2010) ....................................................................... 14

*Cofinco, Inc. v. Bakrie & Bros., N. V.*,
    395 F. Supp. 613 (S.D.N.Y. 1975) ................................................................................................ 12

*Dialysis Access Center, LLC v. RMS Lifeline, Inc.*,
    932 F.3d 1 (1st Cir. 2019) .......................................................................................................... 7, 8

*DiAthegen, LLC v. Phyton Biotech, Inc.*,
    2013 WL 3280270 (W.D. Tex. June 26, 2013) ...................................................................... 9, 13

*First State Ins. Co. v. Nationwide Mut. Ins. Co.*,
    2014 WL 5342609 (D. Mass. Oct. 21, 2014) ........................................................................... 8, 9

*Fradella v. Petricca*,
    183 F.3d 17 (C.A.1 (Mass.),1999) ............................................................................................. 14

*Hart Surgical, Inc. v. Ultracision, Inc.*,
    244 F.3d 231 (1st Cir. 2001) ...................................................................................... 11, 12, 13

*U.S. v. Int'l Fidelity Ins. Co.*,
    2015 WL 4111423 (D. Mass. 2015) ....................................................................................... 9, 13

*Johnson & Johnson Int'l v. Puerto Rico Hospital Supply, Inc.*,
    405 F. Supp. 3d 333 (D. Puerto Rico 2019) ................................................................................ 7

*Mastrobuono v. Shearson Lehman Hutton, Inc.*,
    514 U.S. 52 (1995) ........................................................................................................................ 8

*Phillips v. Merrill Lynch, Pierce, Fenner and Smith, Inc.*,
    2006 WL 3746692 (D. Conn. Dec 15, 2006) ............................................................................. 14

*Providence J. Co. v. Providence Newspaper Guild*,
    271 F.3d 16 (1st Cir. 2001) ....................................................................................................... 11

*Savas v. UBS Financial Serv., Inc.*,
    2007 WL 1768773 (E.D. Mich. 2007) ....................................................................................... 14

*Seneca Nation of Indians v. New York*,
    420 F. Supp. 3d 89 (W.D.N.Y. 2019) .......................................................................................... 9

*UHC Mgmt. Co. v. Comput. Sci. Corp.*,
    148 F.3d 992 (8th Cir. 1998) ....................................................................................................... 8

## Statutory Authorities

9 U.S.C. § 12 ..................................................................................................................................... 8, 14

**Rules and Regulations**

Local Rule 7.1 ........................................................................................................ 16

UNCITRAL Rule Article 39 ..................................................................................... 4

UNCITRAL Rule Article 37 ..................................................................................... 4

Petitioners Rodrigo Ribadeneira ("Ribadeneira") and Superdeporte Plus Peru S.A.C.'s ("Superdeporte") (collectively "Petitioners") Petition to Vacate the Arbitration Award, as recently amended, was timely under the Federal Arbitration Act ("FAA") whether calculated as from the Arbitrator's February 11, 2021 Final Award or alternatively, the November 4, 2020 Order on Respondents' Request for Correction and Interpretation of the Partial Final Award and/or for the Issuance of an Additional Award ("Clarification Order").

*First*, the Massachusetts Uniform Arbitration Act ("MUAA") does not apply here. There was no explicit agreement between the parties to have the MUAA displace the FAA. Under well-established law, in the absence of such an explicit agreement, the FAA applies.

*Second*, under the FAA, Petitioners' motion to vacate is timely. The 90-day clock begins to run when an arbitration award is final, and New Balance Athletics ("New Balance") thus errs in relying on the *Partial* Final Award as the basis for supposed untimeliness here. The First Circuit clearly has held that such a partial award starts the clock *only* when the parties have agreed to bifurcate the arbitration proceedings, and there was no such agreement in this case. Moreover, the matters remaining to be decided after the Partial Final Award were substantial, as they involved the majority of the potential damages. In addition, the Clarification Order provided a new rationale for the arbitrator's jurisdiction, and it is this rationale that Petitioners are challenging in their Motion to Vacate, and thus Petitioners have every right to move to vacate the award as modified by the Clarification Order. In short, there is no legal basis for New Balance's attempt to turn the 90-day period into a trap that parties can avoid only by appealing from every partial award from an arbitrator. Petitioners moved to vacate the award when it provided the rationale for jurisdiction that Petitioners sought to challenge, and moved again when the award became final. Nothing more is required.

For these reasons, this Court should deny Respondent's Motion to Dismiss and Cross Motion for Confirmation of the Arbitration Awards.

## I.  FACTUAL BACKGROUND

On July 31, 2018, New Balance initiated arbitration proceedings against Peruvian Sporting Goods S.A.C. ("PSG") and Ribadeneira based upon fees that it alleged were owed to New Balance under a distribution agreement between PSG and New Balance (the "Distribution Agreement"). Am. Pet. ¶ 21; *id*. at Ex. 2 (Notice of Arbitration). PSG and Ribadeneira immediately objected to the Arbitrator's jurisdiction over Ribadeneira, as he was not a signatory to the Distribution Agreement or its arbitration clause and never consented to arbitrate any dispute with New Balance. Am. Pet. ¶¶ 22-23. The parties briefed the issue and the Arbitrator compelled the arbitration of the claims pending in Peru against New Balance (the "Peru Action") and found that he had jurisdiction over Ribadeneira because he found that he had jurisdiction over the claims asserted in the Peru Action. *Id*. at ¶¶ 24-26. The parties subsequently amended their claims and New Balance added Superdeporte as a party to the case, though Petitioners continued to object to the Arbitrator's assertion of jurisdiction over Ribadeneira and further objected to the Arbitrator's jurisdiction over Superdeporte for any claims arising from the Distribution Agreement between PSG and New Balance. Am. Pet. ¶¶ 27-30; *id*. at Ex. 1.

The hearings in this case took place on March 9-11, 2020 and May 30, 2020. Am. Pet. ¶ 31. The hearings dealt with all of the matters in the case, including jurisdiction, liability, and damages. Petitioners continued to object to the Arbitrator's jurisdiction over Ribadeneira and Superdeporte before, during, and after the hearing. Am. Pet. Ex. 9, 11, 12, 13. At the close of the hearing, the Arbitrator requested that the parties submit post-hearing briefing by June 30, 2020.

Ex. 18,19.[1]  In the Arbitrator's request for post-hearing briefing, he did not indicate that he would bifurcate his review or his award, nor did he request the parties' consent to bifurcate the remainder of the proceedings.  *Id.*

The post-hearing briefs dealt with the various substantive issues in the case, as well as the Arbitrator's jurisdiction over Ribadeneira and Superdeporte.  Am. Pet. Ex. 13.  Notably, reflecting their understanding that the post-hearing submissions were designed to resolve all issues in the case and that there was not any bifurcation, PSG, Superdeporte, and Ribadeneira not only briefed all issues in their post-hearing brief but also submitted a request for attorney's fees along with their post hearing submission on June 30, 2020.  Am. Pet. Ex. 13 at ¶ 172.  New Balance's post-hearing submission did not include a request for attorney's fees.  New Balance then filed a supplemental post-hearing submission, although this was not contemplated by the Arbitrator.  Ex. 20.  The Arbitrator then granted PSG, Superdeporte, and Ribadeneira an opportunity to respond to New Balance's supplemental post-hearing submission.  Ex. 21.

On August 20, 2020, the Arbitrator issued a partial final award in which it found PSG liable for breaching the Distribution Agreement, and found Superdeporte also liable for the breach as PSG's "business successor."  Am. Pet. Ex. 14 ("Partial Final Award").  The Arbitrator also found PSG, Superdeporte, and Ribadeneira liable for tortious interference with New Balance's new distribution arrangement with its new distributor in Peru as a result of civil legal proceedings against New Balance before Peruvian civil courts.  *Id.*

In the Partial Final Award, the Arbitrator expressly stated that he was reserving decision on (1) the calculation of interest on the award amount, which the tribunal acknowledged would be

---

[1]  Petitioners' Amended Petition was accompanied by Exhibits 1-17.  This submission is accompanied by consecutively numbered Exhibits 18-29.

"significant," and (2) which of the Respondents would be liable for the interest. *Id.* at 25.[2] The Arbitrator then provided a schedule by which the parties would provide their respective interest calculations, including the proposed calculation of interest, the dates on which each relevant item became due, and an explanation of the calculation. *Id.* In the Partial Final Award, the Arbitrator also provided a schedule for the parties to provide their respective positions on the application for attorney's fees and costs. *Id.* New Balance filed its proposed interest calculation on September 11, 2020, along with its application for attorney's fees and costs. Ex. 22.

On September 17, 2020, PSG, Superdeporte, and Ribadeneira filed a Request for Correction and Interpretation of the Partial Final Award and/or For the Issuance of an Additional Award ("Request for Correction/Issuance of an Additional Award"). Am. Pet. Ex. 15. One of the key claims in the Request for Correction/Issuance of an Additional Award was that the Arbitrator improperly exercised jurisdiction over Ribadeneira and Superdeporte and, importantly, that the Arbitrator had not disposed of those objections in the Partial Final Award. *Id.* Specifically, Ribadeneira, Superdeporte, and PSG requested that the Arbitrator, pursuant to Articles 37 and/or 39 of the UNCITRAL Rules, "provide an interpretation of the Award, or to issue an additional award, explaining the evidence and legal doctrines and reasoning that the Arbitrator relied on to uphold its jurisdiction over Ribadeneira and Superdeporte." Am. Pet. Ex. 15 at 6. That Petitioners sought not only interpretation of the Partial Final Award, but also the issuance of an *additional* award, is significant, as it shows that Petitioners were unclear as to whether the Arbitrator had disposed of their jurisdictional objections and, if so, on what legal and factual basis. As Petitioners expressly argued in their Request for Correction/Issuance of an Additional Award:

---

[2]    The contract provided for the imposition of interest at a rate of 2% per month. PSG challenged the imposition of the 2% per month interest rate as usury under Massachusetts law. Ultimately, the Arbitrator found that the 2% per month interest rate should apply.

> In its Award, the Tribunal did not explain the reasons as to why it was asserting jurisdiction over Respondents Ribadeneira and Superdeporte, nor what evidence, if any, it relied upon to deny Respondents' jurisdiction objections and to assert jurisdiction over them. It also did not explain what legal doctrine or doctrines it is relying upon to deny Respondents' jurisdictional objections and to assert jurisdiction over Respondents Mr. Ribadeneira and Superdeporte or its legal reasoning for doing so.

Am. Pet. Ex. 15 at 10.

On September 21, 2020, the Arbitrator acknowledged receipt of Respondents' Request for Correction/Issuance of an Additional Award and ordered that in light of the submission, (1) the date by which PSG, Superdeporte, and Ribadeneira had to file oppositions to New Balance's damages calculations and applications for attorney's fees was set aside; (2) New Balance was granted an opportunity to respond to the Request for Correction/Issuance of an Additional Award; and (3) the deadlines for submitting revised attorney's fees calculations and calculations of interest were revised. Ex. 23. Specifically, the Arbitrator found that within fourteen days of receipt of the Arbitrator's decision on Respondents' Request for Correction/Issuance of an Additional Award, New Balance would be permitted to amend its application for attorney's fees, and within fourteen days of New Balance's submission of its amended application for attorney's fees, PSG, Superdeporte, and Ribadeneira could file oppositions to the New Balance's damages calculation and application for attorney's fees. *Id*. As of this point in the proceedings, it is evident that the amount of damages awarded, including interest, was not yet established. It also was not clear against whom the damages would finally be awarded for each of New Balance's claims since Petitioners were continuing to object to the Arbitrator's assertion of jurisdiction over Ribadeneira and Superdeporte, and were seeking clarification or an additional award on the jurisdictional issues.

New Balance opposed Respondents' Request for Correction/Issuance of an Additional Award on various grounds on October 13, 2020. On November 4, 2020, or 76 days after the issuance of the Partial Final Award, the Arbitrator issued his Clarification Order, in which the

Arbitrator reviewed and confirmed his Partial Award, as well as the analysis contained therein, and ultimately explained the purported basis for his jurisdiction over all three Respondents.[3] The Arbitrator also upheld his award for contractual damages. Am. Pet. Ex. 16. It was only at this point in the proceedings that Petitioners understood that the Arbitrator was definitely maintaining his assertion of jurisdiction over Ribadeneira (for the tortious interference claim) and Superdeporte (for the breach of the Distribution Agreement and tortious interference claims). On November 16, 2020, New Balance submitted a revised application for attorney's fees and costs arising from the time spent on its opposition to Ribadeneira, Superdeporte, and PSG's Request for Issuance of an Additional Award. Ex. 24. PSG, Superdeporte, and Ribadeneira filed their opposition to New Balance's application for attorney's fees and a revised interest calculation on November 30, 2020. Ex. 25.

On December 14, 2020, New Balance sent a letter to the Arbitrator commenting on Ribadeneira, Superdeporte, and PSG's opposition to New Balance's application for attorney's fees and revised interest calculation in which New Balance offered to submit additional briefing on the issue. Ex. 26. The Arbitrator declined New Balance's request for additional briefing, but permitted Respondents to respond substantively to New Balance's letter, which they did on December 29, 2020. Ex. 27.

---

[3] Am. Pet. Ex. 16 at 3 (Clarification Order) ("Alleging that I have failed to articulate adequately my reasons for asserting arbitral jurisdiction over Ribadeneira and Superdeporte with respect to certain claims, and that I have failed to identify the evidence that supports those determinations, the respondents seek either interpretation of the preliminary award or a new award on the subject matter. In the preliminary award, I have exercised jurisdiction with respect to Superdeporte by imposing joint liability on that company (together with PSG) for amounts owed under the 2013 distribution agreement based on my finding that it is the business successor to PSG. I have exercised jurisdiction over Ribadeneira and Superdeporte, and have concluded that each is liable (together with PSG) with respect to New Balance's tortious interference claim, because the Peru claims, so-called, from which that interference arose were pursued by Ribadeneira pursuant to assignments of those claims by PSG and Superdeporte.").

On February 1, 2021, Ribadeneira and Superdeporte filed a Petition to Vacate the Partial Final Award. On February 11, 2021, the Arbitrator issued the Final Award, in which he modified the principal amount of the damages awarded on the contract claim, awarded contractual interest in the amount of $929,225.43 (notably, an amount that was greater than the underlying contractual award) against PSG and Superdeporte, and awarded attorney's fees to New Balance. Am. Pet. Ex. 17. It was only at this point that Petitioners understood that the Arbitrator had issued a truly Final Award in which the precise amount that Petitioners were ordered to pay New Balance was established, including which of the Petitioners were ordered to pay which amounts to New Balance. Consequently, on February 22, 2021, Ribadeneira and Superdeporte filed an amended Petition to Vacate the Partial Final Award and the Final Award. On March 8, 2021, New Balance filed a Motion to Dismiss the First Amended Petition, an Opposition to Petitioners' Motion to Vacate the Arbitration Awards, and a Cross Motion for Confirmation of the Arbitration Awards.

## II.   THE AMENDED PETITION IS TIMELY

### A.   The MUAA Is Inapplicable In This Case

Respondent's first argument that the MUAA applies here is easily dispensed with. As a threshold matter, Ribadeneira and Superdeporte have not consented to arbitrate anything in Massachusetts or under Massachusetts law, as neither Ribadeneira nor Superdeporte were parties to the Distribution Agreement and/or to its arbitration provision, and neither otherwise consented to arbitrate any disputes with New Balance. Am. Pet. ¶ 10.

Furthermore, courts have unequivocally held that a general choice of law provision in a contract is not enough to displace the FAA's standard of review. *See Dialysis Access Center, LLC v. RMS Lifeline, Inc.*, 932 F.3d 1, 8 (1st Cir. 2019). In order for the MUAA to apply, Respondent would need to show that the "parties *explicitly agreed*" to have the MUAA displace the FAA, and "such a general, contractual provision is not enough." *Id.*; *see also Johnson & Johnson Int'l v.*

*Puerto Rico Hospital Supply, Inc.*, 405 F. Supp. 3d 333, 342 (D. Puerto Rico 2019) ("J & JI's arguments are identical to those presented by the medical care provider in *Dialysis*, and equally unpersuasive. Absent from the 2005 agreement is an explicit displacement of the FAA."); *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 58-64 (1995) (suggesting that a generic choice of law provision, which did not expressly state that the FAA did not apply, did not displace the FAA); *UHC Mgmt. Co. v. Comput. Sci. Corp.*, 148 F.3d 992, 997 (8th Cir. 1998) ("[We] will not interpret an arbitration agreement as precluding the application of the FAA unless the parties' intent that the agreement be so construed is abundantly clear."). Here, the Distribution Agreement has only a generic choice of law provision stating that Massachusetts law would govern the Distribution Agreement generally, and that in the event of arbitration, the "arbitrator shall determine the matters in dispute in accordance with the laws of the Commonwealth of Massachusetts, USA." Am. Pet. Ex. 1 at 23. The Distribution Agreement does not expressly provide for the displacement of the FAA, or state that the FAA does not apply, and thus it does not displace the FAA under well-established law.

Therefore, the FAA, and not the MUAA, should apply.

**B.    The Arbitration Award Did Not Become Final Until The Issuance Of A Final Award On February 11, 2021**

As a general matter, the 90-day period to file a motion to vacate an arbitral award does not begin until there is a final award. Section 12 of the FAA states: "Notice of a motion to vacate, modify, or correct an award must be served upon the adverse party or his attorney within three months after the award is filed or delivered." 9 U.S.C. § 12. The statute does not state or imply that a partial award starts the 90-day period.

Courts have accordingly held that a motion to vacate is timely where it is filed within 90 days of the final award, even if there was a prior partial award. For instance, this Court in *First*

*State Ins. Co. v. Nationwide Mut. Ins. Co.*, 2014 WL 5342609, at *1 (D. Mass. Oct. 21, 2014), affirmed that the three-month clock would not begin when a payment order had not yet been issued. Specifically, the tribunal in the underlying arbitration in *First State Ins. Co.* first released an award addressing the majority of the merits, and a year later "issued a payment order regarding fees and costs and stated that the matter was closed." *Id.* at *2. The court rejected the argument that "Nationwide has forfeited any motion to vacate by not objecting to the [first] award within ninety days," holding this could not be right because there was not a mutual understanding that the first award was truly final. *Id.* at *4. This was especially true because the initial award itself indicated that there were still issues left for the tribunal to resolve. *Id.* Many other courts are in accord. *See, e.g.*, *U.S. v. Int'l Fidelity Ins. Co.*, 2015 WL 4111423, at *1 (D. Mass. 2015) (rejecting the argument that the clock started at the time of the partial final award); *Seneca Nation of Indians v. New York*, 420 F. Supp. 3d 89, 98-99 (W.D.N.Y. 2019) (holding that motion to vacate was timely even where "the reasoning for the award is contained in the Partial Final Award" because "the Final Award is the final arbitration award for purposes of the FAA"); *DiAthegen, LLC v. Phyton Biotech, Inc.*, 2013 WL 3280270, at *3–4 (W.D. Tex. June 26, 2013) (The court dismissed Plaintiff's theory that "because the [] Partial Final Award contained the arbitrators' findings as to all issues except for attorney's fees, costs, and interest, [Defendant] was required to file its challenge to the panel's contractual damages award within three months of the filing of the partial final award," holding: "[t]here is no basis for penalizing [Defendant] for its decision to wait until the completion of arbitration to file its petition. Accordingly, the court holds [Defendant's] petition to vacate the [] Final Award is timely.").

The same is true here. The Arbitrator issued a Partial Final Award on August 20, 2020. Am. Pet. Ex. 14. In the Partial Final Award, the Arbitrator expressly stated that he was reserving

decision on the calculation of interest on the award amount which the Arbitrator acknowledged would be "significant" (ultimately, even more than the principal contractual amount) as well as who would be liable for the interest. Am. Pet. Ex. 14 at 25. New Balance argued since the inception of the case that it was entitled to interest on the amounts claimed under the Distribution Agreement. Am. Pet. Ex. 2 at ¶¶ 15, 23. This claim for interest was assuredly unresolved as of the issuance of the Partial Final Award and was not simply a clerical or subsidiary matter. The parties engaged in briefing throughout the fall of 2020 with respect to the calculation of interest, including how much interest should be owed, for which claim and by whom it should be owed. Ex. 22, 25, 26, 27. In the Partial Final Award, the Arbitrator also expressly stated that he was reserving judgment on the assignment and calculation of attorneys' fees and costs. Am. Pet. Ex. 14. Furthermore, within 30 days of the issuance of the Partial Award, Respondents also filed a Request for Correction/Issuance of an Additional Award, specifically requesting that the Arbitrator provide additional analysis and/or issue a new award on various substantive issues in the case; importantly on the very substantive issue of whether and why the Arbitrator would be exercising jurisdiction over Ribadeneira and Superdeporte. Am. Pet. Ex. 15. New Balance substantively responded to Respondents' Request for Correction/Issuance of an Additional Award, and the parties continued making substantive submissions to the Arbitrator through December of 2020. Ex. 25-27. It was not until the issuance of the Final Award on February 11, 2021 that the Arbitrator resolved all claims that had been submitted to him. Am. Pet. Ex. 17. It was not until the issuance of this Final Award in February of 2021 that the parties had a clear picture of the complete damages award, including the calculation of interest, and against which parties the damages were awarded—in other words, who had to pay New Balance which amounts and for which claims. Under any reasonable reading of the applicable cases in this district, it was not until then that the Arbitrator

had issued a "final" award under the meaning of the FAA. As such, the 90-day clock under the FAA did not begin to run until after the issuance of the Final Award on February 11, 2021.

There are only two exceptions to the rule that a partial award starts the clock and both are plainly inapplicable here.

*First*, a partial award starts the clock when there is an explicit agreement by the parties to bifurcate the proceedings. For example, the court in *Hart Surgical, Inc. v. Ultracision, Inc*., 244 F.3d 231, 233 (1st Cir. 2001) specified "that the FAA permits a district court to confirm or vacate a partial award," *id*. at 234, but expressly limited this holding to "the situation in which there is a formal, agreed-to bifurcation at the arbitration stage." *Id*. at 235-36; *see also Providence J. Co. v. Providence Newspaper Guild*, 271 F.3d 16, 19 (1st Cir. 2001) (explaining that because the parties agreed to divide the arbitration hearing into two parts and the arbitrator "conclusively decided every point required by and included in the [first] phase" . . . "it is clear that the partial award on liability should be deemed 'final.'" (quotation marks omitted)); *Seneca Nation of Indians*, 420 F. Supp. 3d at 99 (holding that a partial final award is final only "when parties explicitly agree to bifurcate their arbitration proceedings through a limited submission").

Here, there was no formal (or informal), agreed-to bifurcation. The parties did not ask the Arbitrator to bifurcate the proceedings, or to issue a partial award on certain issues. Rather, the Arbitrator unilaterally determined that costs as well as the calculation and imposition of interest, a heavily contested issue in the case, would be considered separately. Partial Final Award at 25-27. As noted, it was not until the Arbitrator issued his Final Award in February of 2021 that Petitioners knew exactly how much each was ordered to pay New Balance and for which claims. As such, under these circumstances, the Partial Final Award cannot be said to be the product of a mutual decision by the parties to bifurcate. This is particularly true because the policy behind the FAA

11

"is to resolve issues in the manner intended by the parties." *Hart*, 244 F.3d at 235 n.3 (citation omitted).

 *Second*, a partial award may start the clock when all that remains to be decided are ancillary and ministerial matters. Here, on the other hand, the entire question of the interest to be awarded and who would be liable for it—an amount which was heavily contested both in briefing and at the hearing and worth more than the underlying award itself—remained. *See, e.g.*, *Cofinco, Inc. v. Bakrie & Bros., N. V.*, 395 F. Supp. 613, 616 (S.D.N.Y. 1975) (award not final that "le[ft] open matters like 'accrued expenses,' interest, and the like, which could entail large sums and disagreements confided to the arbitral jurisdiction"). Until the Arbitrator issued his Final Award in February of 2021, neither New Balance nor any of the Petitioners knew how much each Petitioner had to pay New Balance for the principal amounts (even excluding the question of what amounts would be owed for fees and costs) and for which claim. This, alone, establishes that the prior Partial Award, as modified/clarified by the Arbitrator after his November 2020 decision, was not "final" for purposes of the FAA. Here, the interest calculations are inseparably intertwined with the underlying dispute, as the calculation of interest will determine the true sum to be recouped. As the Arbitrator indicated in his partial final award regarding interest, "[t]he amount will obviously be significant, and I need further attention by the parties to the calculation." Am. Pet. Ex. 14 at 25. *On top* of that, attorney's fees and costs were left to be determined. Thus, the remaining issues left for consideration at the time of the Partial Final Award were not "ministerial" as in *Fradella*, but instead were an integral component of the underlying contractual dispute <u>and ultimately represented a sum greater than the amount the Arbitrator awarded for the underlying contractual liability</u>.

Finally, to the extent there is any ambiguity on the law here, it should be interpreted reasonably to allow this action to proceed. The First Circuit in *Hart* cautioned against extending its decision beyond agreed-upon bifurcation because courts must take account of the important equitable consideration that "the losing side may forfeit an appeal (*e.g.*, as to liability) by waiting until all arbitration proceedings are complete." *Hart*, 244 F.3d at 236. As courts have recognized, the FAA was not designed to set up traps for parties seeking to vacate arbitration awards. Recognizing the lack of clarity in determining when the 90-day clock starts, this Court in *U.S. v. Int'l Fidelity Ins.* declined to adopt the position that the clock started at the time of the partial final award, holding that "against this backdrop [of ambiguity], the Court finds it would unfairly and unnecessarily penalize Williams to arbitrarily adopt the plaintiff's position." 2015 WL 4111423, at *1 (D. Mass. 2015); *see also DiAthegen*, 2013 WL 3280270, at *4. Likewise, here, there is no basis to punish Petitioners for not immediately appealing a partial award that did not resolve key issues in the arbitration. Indeed, such an approach would simply force parties in an arbitration to go to court after virtually every interim decision of the arbitrator for fear that it might later be deemed to start the clock—only to re-file later when the award is actually final. Such an approach provides no benefits, is woefully inefficient, and has no basis in the statute or case law.

## C. In The Alternative, The Clock To Challenge The Arbitration Award Did Not Start At Least Until After The Issuance Of The Clarification Order

Even assuming that the clock began running before the Final Award was issued on February 11, 2021, Petitioners' petition to vacate was timely because the 90-day period did not start running until at least after the Arbitrator issued the Clarification Order on November 4, 2020. It was not until that time that the Arbitrator articulated reasons for asserting jurisdiction over Petitioners as well as confirmed the principal amount (exclusive of interest, which was the largest

component of the damages award) that he was awarding on New Balance's contract breach claim; he did neither in the Partial Final Award he issued in August.

An award cannot be final for purposes of the FAA when a timely challenge to jurisdiction over two of the parties against whom damages are sought remains pending. Courts have held that the clock to challenge an arbitration award should not start when a motion for clarification, particularly relating to substantive issues in the case, is still pending before the arbitral tribunal. In *Phillips v. Merrill Lynch, Pierce, Fenner and Smith, Inc*., 2006 WL 3746692, at *1 (D. Conn. Dec 15, 2006), for example, Philips moved to vacate over a year after the initial award was released, but argued that "the Panel's decision was not 'final' for purposes of the FAA's three-month time limit until the clarification was issued . . ." The court agreed *Id.* at *3. The court indicated that the initial award contained ambiguity on the substantive claims and therefore the clock did not start until a determination was made on the motion to clarify. *Id.*; *see also Savas v. UBS Financial Serv., Inc*., 2007 WL 1768773, at *3 (E.D. Mich. 2007) (indicating that since an award was clarified by an order served on September 5, the "the latest possible date that Plaintiff could have satisfied the three-month statute of limitations period in § 12 of the FAA would have been December 4, 2006"). Nor does it matter that the clarification was denied. *See, e.g.*, *Alvarado v. Wells Fargo Advisors*, 2010 WL 3419654, at *2 (S.D. Tex. Aug. 27, 2010) (where a Motion for Clarification was denied, the initial award did not start the time period under § 12 because plaintiff was "unable to comply with the award" prior to resolution of the clarification motion).

While the court in *Fradella v. Petricca*, 183 F.3d 17 (C.A.1 (Mass.),1999) held that a motion to clarify an error in an arbitration award should not stop the 90 day clock from running under the FAA, *Fradella* is distinguishable in two key ways. First, here, Petitioners challenged the Arbitrator's exercise of jurisdiction and the basis for the same over Ribadeneira and

Superdeporte. Am. Pet. Ex. 9, 11. In their Request for Correction and Interpretation of the Partial Final Award and/or the Issuance of an Additional Award, Petitioners pointed out that the Arbitrator should not exercise jurisdiction over Petitioners as they never agreed to arbitrate any claims with New Balance, and that the Arbitrator did not explain the evidence or legal doctrine it relied on when asserting jurisdiction over Petitioners. Am. Pet. Ex. 15. Accordingly, Petitioners requested that the Arbitrator correct/interpret the Partial Final Award or issue an additional award.

While the Arbitrator had previously found that he had jurisdiction over New Balance's tortious interference claim and over Ribadeneira with respect to the tortious interference claim, the Arbitrator had not previously stated that he otherwise had jurisdiction over Petitioners and expressly reserved decision on Petitioners' jurisdictional objections until after the hearing in the case. Ex. 29. In the Partial Award, the Arbitrator stated, without explanation, that he had jurisdiction over all Petitioners for all claims. Am. Pet. Ex. 14 at 3. In the Clarification Order, the Arbitrator then provided entirely new reasoning for the exercise of jurisdiction over Petitioners. Am. Pet. Ex. 16 at 3. Notably, the Arbitrator's assertion of jurisdiction over Ribadeneira and Superdeporte forms the basis for Petitioner's Vacatur Petition. In addition, in their Request for Correction/Issuance of an Additional Award, Petitioners also argued that the Arbitrator's finding on the contract breach was internally inconsistent, and that he should therefore reduce significantly the amount awarded. Am. Pet. Ex. 15 at 1-6. While the Arbitrator did not accept Petitioners' arguments, he could have done so, and it is thus unquestionable that it was not until after he resolved Petitioners' Request for Clarification/Issuance of an Additional Award that his ruling on jurisdiction and part (i.e., interest still to be determined) of the principal amount of damages was complete. As such, until the Arbitrator resolved Petitioners' request, the Award could not be final. New Balance's position would lead to the unreasonable outcome that Petitioners would forego an

opportunity to set aside the Partial Award and the clock would start to run for purposes of the FAA *before* the Arbitrator ruled on Petitioners' challenges to the Arbitrator's jurisdiction over two of the parties and *before* the Arbitrator resolved the principal amount of damages owed to New Balance. Instead, and in the alternative to the above argument, Petitioners appropriately filed this action within 90 days of the Arbitrator's Clarification Order.

Second, Petitioners filed a Request for Correction/Issuance of an Additional Award, while the issuance of an additional award was not contemplated in *Fradella*. In requesting the issuance of an additional award, Petitioners expressly requested that the Arbitrator resolve fundamental issues in the case. It would have been improper for Petitioners to seek intervention from the court while these matters remained under consideration by the Arbitrator, particularly given that the Arbitrator could have issued a new Partial Award. Therefore, the clock to challenge the Partial Final Award would not have started to run until at least after the Arbitrator issued the Clarification Order on November 4, 2020.

## REQUEST FOR ORAL ARGUMENT

In accordance with Local Rule 7.1, Petitioners respectfully request that the Court set this matter for oral argument before ruling upon this motion.

Date: April 7, 2021

Respectfully submitted,

Rodrigo Ribadeneira and
Superdeporte Plus Peru S.A.C.

By their attorneys,

*/s/ Gregg Badichek*

Gregg Badichek (BBO #706270)
greggbadichek@quinnemanuel.com
111 Huntington Ave, Suite 520
Boston, MA 02199
Tel: 617-712-7100
Fax: 617-712-7200

David M. Orta (admitted *pro hac vice*)
davidorta@quinnemanuel.com
Julianne Jaquith (admitted *pro hac vice*)
juliannejaquith@quinnemanuel.com
1300 I Street NW, Suite 900
Washington, D.C. 20005
Tel: +1 202 538 8000
Fax: +1 202 538 8100

David Cooper (admitted *pro hac vice*)
davidcooper@quinnemanuel.com
51 Madison Ave, 22nd floor
New York, NY 10010
Tel: +1 212 849 7000
Fax: +1 212 849 7100

*Attorneys for Petitioners*

## CERTIFICATE OF SERVICE

I hereby certify that on April 7, 2021, I caused a true and correct copy of the foregoing to be filed in this Court's CM/ECF system, which will send notification of such filing to all parties who have appeared in this matter.

/s/ Gregg Badichek
Gregg Badichek (BBO #706270)

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

RODRIGO RIBADENEIRA AND     )
SUPERDEPORTE PLUS PERU S.A.C.,   )
                            )
        Petitioners,        )
                            )   Civ. No. 1:21-cv-10173-ADB
      v.                 )
                            )
NEW BALANCE ATHLETICS, INC.,    )
                            )
        Respondent.      )

## NEW BALANCE ATHLETICS, INC.'S REPLY BRIEF IN FURTHER SUPPORT OF ITS MOTION TO DISMISS THE FIRST AMENDED PETITION TO VACATE AND CROSS-MOTION FOR CONFIRMATION OF THE ARBITRATION AWARDS

## <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ....................................................................................................... 1

ARGUMENT ............................................................................................................... 2

    I.     PETITIONERS' OPPOSITION MISSES THE MARK ON WHY BOTH THE MUAA AND THE FAA COMPEL DISMISSAL ....................................... 2

         A.   The MUAA Applies to Petitioners' Challenge Of The Arbitration Award ..................................................................................................... 2

         B.   Petitioners' Challenge Is Untimely Even If The FAA Applies ................. 5

    II.    THE PARTIAL FINAL AWARD AND THE FINAL AWARD SHOULD BE CONFIRMED ..................................................................................... 9

CONCLUSION .......................................................................................................... 10

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alvarado v. Wells Fargo Advisors, LLC*,
   2010 WL 3419654 (S.D. Tex. Aug. 27, 2010) ...........................................................6

*American Numismatic Ass'n v. Cipoletti*,
   254 P.3d 1169 (Colo.App.2011) ................................................................................2

*Dialysis Access Center, LLC v. RMS Lifeline, Inc.*,
   932 F.3d (1st Cir. 2019)..............................................................................................4

*First State Ins. Co. v. Nationwide Mut. Ins. Co.*,
   2014 WL 5342609 (D. Mass. Oct. 21, 2014)..............................................................7

*Fradella v. Petricca*,
   183 F.3d 17 (1st Cir. 1999)......................................................................................6, 8

*Hart Surgical, Inc. v. Ultracision, Inc.*,
   244 F.3d 231 (1st Cir. 2001)................................................................................2, 8, 9

*InterGen N.V. v. Grina*,
   344 F.3d 134 (1st Cir. 2003)......................................................................................3

*Johnson & Johnson Int'l v. Puerto Rico Hospital Supply, Inc.*,
   405 F. Supp. 3d 333 (D.P.R. 2019)............................................................................4

*Loc. 589, Amalgamated Transit Union v. Massachusetts Bay Transp. Auth.*,
   397 Mass. 426 (1986) ................................................................................................1

*Machado v. System4 LLC*,
   471 Mass. 204 (2015) ................................................................................................3

*Milliken & Co. v. Duro Textiles, LLC*,
   451 Mass. 547 (2008) ................................................................................................3

*Nationwide Mut. Ins. Co. v. First State Ins. Co.*,
   213 F. Supp. 2d 10 (D. Mass. 2002) ..........................................................................8

*Phillip v. Merrill Lynch*,
   2006 WL 3746692 (D. Conn. Dec 15, 2006) .............................................................5

*Savas v. UBS Financial Services, Inc.*,
   2007 WL 1768773 (E.D. Mich. June 15, 2007)..........................................................5

*Seneca Nation of Indians v. New York*,
   420 F. Supp. 3d 89 (W.D.N.Y. 2019) ............................................................................7

*Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Jr. Univ.*,
   489 U.S. 468 (1989) ........................................................................................................4

**Statutes**

9 U.S.C. §§ 4, 9, 12, 16 ........................................................................................7, 9, 10

M.G.L. c. 251, §§ 2, 11, 12 ..............................................................................2, 4, 9, 10

# INTRODUCTION

Petitioners' Opposition fails to save the Amended Petition in three ways.[1] First, and fatally, the Opposition ignores that the parties' *twice* agreed to apply Massachusetts law, once in the Distribution Agreement's general choice-of-law provision and again in the *arbitration clause itself*. As a result, the MUAA applies, and its strict 30-day window to challenge arbitration awards bars Petitioners' Amended Petition.

Second, even were the Court to apply the FAA's three-month window for challenges, the Amended Petition is untimely because the Partial *Final* Award was just that: final for purposes of the deadline for challenges to jurisdiction and liability. Petitioners' contention to the contrary, *i.e.*, it was only when the Arbitrator issued his Final Award that the challenge clock began to run, is belied by Petitioners own conduct before this Court. Petitioners filed their Motion to Vacate on February 2, 2021 challenging the Partial Final Award *before* the Final Award issued. Obviously Petitioners understood that the Partial Final Award was final and subject to challenge and confirmation.

Third, because the Partial Final Award fully and finally resolved the liability and jurisdictional issues in the Arbitration, neither the Arbitrator's Clarification Denial nor the Final Award extended the time to seek to vacate the Partial Final Award.[2] As a matter of law, the issuance of the Final Award did not extend Petitioners' deadline under either the MUAA or the FAA. *Hart Surgical, Inc. v. Ultracision, Inc.*, 244 F.3d 231, 235 (1st Cir. 2001) (partial award

---

[1] Petitioners' Opposition to Respondent's Motion to Dismiss the First Amended Petition to Vacate Arbitration Awards and Opposition to Respondent's Cross-Motion for Confirmation of the Arbitration Awards is referred to as the "Opposition" or "Opp." Citations to "Mem." and "Exs. _" are to New Balance's Memorandum in Support of its Motion to Dismiss the First Amended Petition to Vacate and Cross-Motion for Confirmation of the Arbitration Awards ("Motion to Dismiss") and accompanying Exhibits. All other capitalized terms have the meanings set forth in the Motion to Dismiss and New Balance's Opposition to Petitioners' Amended Motion to Vacate Arbitration Awards ("Opposition to Motion to Vacate").

[2] *See Loc. 589, Amalgamated Transit Union v. Massachusetts Bay Transp. Auth.*, 397 Mass. 426, 431 (1986) (definitively establishing that jurisdictional challenges fall within the MUAA's 30-day window to vacate arbitration awards).

1

may be vacated or confirmed when parties and arbitrator understand determination of liability is final); *see also American Numismatic Ass'n v. Cipoletti*, 254 P.3d 1169, 1173 (Colo.App.2011) ("[A]n 'award' is subject to confirmation or challenge under the 1975 Act if it entirely disposes of the case on the merits").[3]

     The Amended Petition and Amended Motion to Vacate must be dismissed because:

(1) The Partial Final Award was issued on August 20, 2020. Under the MUAA, the deadline for any challenges expired on September 19, 2020. Under the FAA, the deadline for any challenges expired on November 20, 2020.

(2) Even if the deadline for challenging the Partial Final Award was somehow "tolled" during the pendency of Petitioners' Clarification Motion (*i.e.*, from filing on September 17, 2020 through the Clarification Denial on November 4, 2020), Petitioners' challenge is still time-barred. Under the MUAA, the "tolled" deadline expired on November 6, 2020; indeed, even if the time period to challenge was fully refreshed upon the Clarification Denial, the MUAA deadline expired on December 4, 2020. Under the FAA, the "tolled" deadline expired on January 7, 2021.

(3) In order to find that Petitioners' challenge is timely, the Court would need to conclude that (a) the FAA and its three-month period applies, and (b) the Clarification Motion and Denial did not toll the running of the period, but actually gave rise to an entirely new three-month window, neither of which is supported by this record.

     In sum, Petitioners' time has run out by several months, or at the very least, several days. The Amended Petition should therefore be dismissed with prejudice, and this Court should confirm both the Partial Final Award and Final Award.

## ARGUMENT

**I.   PETITIONERS' OPPOSITION MISSES THE MARK ON WHY BOTH THE MUAA AND THE FAA COMPEL DISMISSAL**

    A.   <u>The MUAA Applies to Petitioners' Challenge Of The Arbitration Award</u>

---

[3] *See* M.G.L. c. 251, § 19 ("This chapter shall be so construed as to effectuate its general purpose to make uniform the law of those states which enact it.")

2

Petitioners contend that the MUAA does not apply because they were not parties to the Distribution Agreement.  Opp. at 7.  As explained more fully in New Balance's Opposition to Motion to Vacate, the Distribution Agreement's arbitration clause binds Petitioners. Ribadeneira assumed the obligation to arbitrate when he accepted an assignment of PSG's rights and obligations under the Distribution Agreement and brought his Peru Claims against New Balance,[4] and Superdeporte assumed the obligations under the Distribution Agreement as PSG's business successor[5] and also by bringing claims against New Balance under the Distribution Agreement.  *Machado v. System4 LLC*, 471 Mass. 204, 211-13 (2015); Opp. to Mot. to Vacate at 28-31.

In another misguided attempt to avoid the MUAA's strict 30-day window to challenge arbitration awards, Petitioners argue that the FAA applies because the Distribution Agreement's "general choice of law provision . . . is not enough to displace the FAA[]."  Opp. at 7.  The critical problem for Petitioners, however, is that the Distribution Agreement contains *more* than a general choice-of-law provision.  *See* Am. Pet. Ex. 1, ¶ 21 (Arbitration Clause).  Petitioners ignore that the Distribution Agreement's arbitration clause provides that "***[t]he arbitrator shall***

---

[4] Petitioners take the position that they did not assume the Distribution Agreement's obligations because their Peru Claims were brought pursuant to a "new" distribution agreement, not the Distribution Agreement.  *See* Petitioners' Reply Brief in Support of Amended Motion to Vacate ("Pets.' Reply Br.") at 13-16.  As explained in New Balance's Opposition to Motion to Vacate, this argument is entirely meritless.  This so-called "new distribution agreement" was a mere continuation of the Distribution Agreement, aptly titled "Amended and Restated Distribution Agreement," which in any case included ***an identical arbitration clause***.  *See* Am. Pet. Ex. 7 (Motion to Compel Order) at 3; Opp. to Mot. to Vacate at 5 n.6.

[5] Petitioners also contend that "business successor" is not a recognized "exception" to the nonsignatory rule under Massachusetts law.  *See* Pets.' Reply Br. at 15.  New Balance, however, never claimed it was an "exception," and likewise the Arbitrator never made such a finding.  Of course business successor isn't an "exception" given that under the "mere continuation" theory, a business successor takes the position of the predecessor company, including its obligations and liabilities.  *See, e.g.*, *Milliken & Co. v. Duro Textiles, LLC*, 451 Mass. 547, 556 (2008).  Thus, business successor is not an "exception" binding nonsignatories because it is axiomatic that a business successor would be bound to its predecessor's arbitration clause.  In addition, Petitioners' reliance on *InterGen N.V. v. Grina*, 344 F.3d 134 (1st Cir. 2003) for its position that "business successor liability is not one of the six exceptions" is entirely misplaced.  Opp. at 15.  First, unlike here, *InterGen* did not involve business successor liability *or even business successors*.  In fact, the court did not use the phrase "business successor" once in its opinion, likely because the case involved *subsidiaries*, not business successors.  *See id.* at 137.  Second, even if *InterGen* stood for the proposition that Petitioners say it does—it doesn't—*InterGen* clearly recognizes the equitable estoppel nonsignatory exception, which also binds Petitioners here.  *See id.* at 145-46; *see also* Opp. to Mot. to Vacate at 27-31.

*determine the matters in dispute in accordance with the law of the Commonwealth of*

*Massachusetts, USA*." *Id.* (emphasis added).  Therefore, contrary to Petitioners' argument that

the Distribution Agreement contains "only" a general choice-of-law provision, it in fact contains

both a *general* choice-of-law provision and a *specific* choice-of-law provision in the arbitration

clause, both of which require the application of Massachusetts law.  *See* Am. Pet. Ex. 1 ¶ 20

("Governing Law"), ¶ 21 ("Arbitration").

      As a result, the cases cited in the Opposition do not lend Petitioners any support, and, in

fact, only buttress New Balance's position.  Opp. at 7-8.  Those cases stand for the proposition

that a contract's "generic choice of law provision" does not displace the FAA, but parties can

nevertheless agree to displace the FAA elsewhere in the contract.  *See, e.g., Dialysis Access*

*Center, LLC v. RMS Lifeline, Inc.,* 932 F.3d 1, 8 (1st Cir. 2019) ; *Johnson & Johnson Int'l v.*

*Puerto Rico Hospital Supply, Inc*., 405 F. Supp. 3d 333, 342 (D.P.R. 2019).  Such is the case

here—the Distribution Agreement contains a generic choice-of-law provision *and* a separate

arbitration clause incorporating Massachusetts law.  In other words, the parties specifically

displaced the FAA by explicit agreement.  *See Volt Info. Scis., Inc. v. Bd. of Trs. of Leland*

*Stanford Jr. Univ.*, 489 U.S. 468, 479 (1989) ("Where, as here, the parties have agreed to abide

by state rules of arbitration, enforcing those rules according to the terms of the agreement is fully

consistent with the goals of the FAA . . .").

      Accordingly, because the MUAA applies, Petitioners' deadline to challenge the Partial

Final Award was several months ago on September 19, 2020.  M.G.L. c. 251, § 12(b).  In fact,

even accepting Petitioners' argument that the clock to challenge did not start until the

Clarification Denial, Opp. at 13-16, Petitioners' deadline under the MUAA was on December 4,

2020.  As a result, the Amended Petition should be dismissed as untimely.

B.    Petitioners' Challenge Is Untimely Even If The FAA Applies

As New Balance anticipated in its Motion to Dismiss, Petitioners argue that their challenge is timely under the FAA because they filed within 90 days of the Clarification Denial and/or the Final Award.  Opp. at 8-16.  Both of these arguments fail for the same reason: Petitioners' time to challenge started from the date of the Partial Final Award.  And because the Partial Final Award was entered on August 20, 2020—well more than three months before Petitioners' original filing, the Amended Petition is untimely under the FAA and should be dismissed with prejudice.

i.    *The Time to Challenge Started From the Date of the Partial Final Award, Not the Clarification Denial.*

Petitioners claim that the clock started only upon the issuance of the Clarification Denial because "[i]t was not until that time that the Arbitrator articulated reasons for asserting jurisdiction over Petitioners" and "confirmed the principal amount."  Opp. at 13-14.  This argument cannot withstand scrutiny.

Under the UNCITRAL Arbitration Rules, a clarifying order is not substantive, but deals only with technicalities or mathematical errors.  Ex. G (UNCITRAL Rules) at 38, 39.[6]  And, as explained in New Balance's Motion to Dismiss, Rules 37, 38, and 39 provide for correction and clarification of *final* awards.  *See* Ex. G.; Mem. at 5 n.5, 10.  Therefore, the mere fact that Petitioners filed their Clarification Motion pursuant to such Rules clearly shows that Petitioners "understood" the Partial Final Award was final.  *Id.*  Additionally, as clearly noted in the Clarification Denial and contrary to Petitioners' claim, the Arbitrator had extensively

_____

[6] As a result, each of Petitioners' cited cases is distinguishable from the instant facts, where Petitioners neither sought nor obtained a substantive revision of the Partial Final Award's jurisdictional decision.  *See* Am. Pet. Ex. 15 (Clarification Motion) at 6-9.  For example, in *Phillip v. Merrill Lynch*, the arbitral tribunal issued a substantive clarification, and furthermore, the "clarification" in that case was not a clarification within the confines of the arbitration procedure, but instead one *ordered by the district court* in response to the objecting party's then-successful protests. 2006 WL 3746692, at *1-2 (D. Conn. Dec 15, 2006); *see also Savas v. UBS Financial Services, Inc.*, 2007 WL 1768773, at *2 (E.D. Mich. June 15, 2007) (involving a substantive clarification).

5

"articulated" his reasons for asserting jurisdiction over the Petitioners in multiple opinions well before his Clarification Denial. *See* Am. Pet. Ex. 16 (Clarification Denial) at 4 (citing to his Motion to Compel Order and Summary Disposition Order and noting "I have explained my interpretation and application of this broad [arbitration] clause and relevant authorities at considerable length."); *see also* Am. Pet. Ex. 7 (Motion to Compel Order) at 5, 11; Am. Pet. Ex. 10 (Summary Disposition Order) at 3, 8, 9. And as for Petitioners' purported confusion regarding the principal damages amount in the Partial Final Award, this is hard to believe given that the Arbitrator had made a detailed finding down to the penny for the principal damages amount. *See* Am. Pet. Ex. 14 (Partial Final Award) at 26-27.

In addition, Petitioners' assertion that they only "understood" that the Arbitrator was "definitely maintaining his assertion of jurisdiction over" Petitioners *after* the Clarification Denial (Opp. at 6) is flatly contradicted by the record. In the Clarification Denial, the Arbitrator noted that he had: (1) made his jurisdiction determination two years *prior* to his Clarification Denial and (2) at that time, denied the entire substance of the Clarification Motion. Therefore, the Clarification Denial cast no "doubt upon the arbitrator['s] intention" that the Partial Final Award resolved the claims therein. *Fradella v. Petricca*, 183 F.3d 17, 19–20 (1st Cir. 1999); *compare with Alvarado v. Wells Fargo Advisors, LLC,* 2010 WL 3419654, at *2 (S.D. Tex. Aug. 27, 2010) (finding that the plaintiff had made allegations that "[i]f proven true . . . would render the arbitration award non-final.").

Even if the Clarification Motion tolled the limitations period, it certainly did not restart the clock all together. *See Fradella*, 183 F.3d at 21 (holding that a correction did not restart the FAA limitations period). Given that Petitioners waited 28 days to file their Clarification Motion, the three-month FAA limitation period that would have started after the issuance of the

Clarification Motion was likewise shortened by 28 days—*i.e.*, Petitioners' motion to vacate was due before January 7, 2021. But Petitioners waited to file their original Petition until February 2, 2021, 90 days after the Clarification Denial, perhaps because they assumed this was within the three-month window under the FAA. *See* Opp. at 16. As a result, even if the time period for a challenge was paused pending the issuance of the Clarification Denial, the Petition is still untimely under the FAA's three-month window.

     ii.    *The Issuance Of The Final Award Did Not Extend The Time Under Either the MUAA or the FAA.*

Petitioners also argue that the Partial Final Award was not "final" for purposes of moving to vacate because there were "still issues left for the tribunal to resolve" and it was "only at this point [the Final Award] that Petitioners understood the Arbitrator had issued a truly Final Award." Opp. at 7, 9-13.[7] Petitioners' argument fails for several reasons.

Most importantly, Petitioners' actions following the Partial Final Award show that they understood the Partial Final Award to be final: Petitioners ***moved this Court to vacate the Partial Final Award.*** This is all the evidence necessary to show that they "understood" the Partial Final Award to be final and subject to challenge by way of a Motion to Vacate. *See* Mem. at 11.[8]

Petitioners challenged the Partial Final Award because it fully resolved all issues of liability and jurisdiction in the Arbitration. Mem. at 8-10; *see also* Am. Pet. Ex. 14 (Partial Final Award). The Arbitrator only carved out two collateral issues from the Partial Final Award, the

---

[7] Petitioners also argue that the text of the FAA "does not state or imply that a partial award starts the 90-day period." Opp. at 8. Neither the text of the FAA nor the MUAA, however, mention "partial" or "final" awards, instead mentioning only "an award," and the Partial Final Award is indisputably "an award." 9 U.S.C. § 12; M.G.L. c. 251, § 12.

[8] This understanding that the Partial Final Award was final distinguishes this case from those cited in the Opposition. For example, in two of Petitioners' cited cases, the court specifically noted that the party objecting to the arbitration award did not understand the at-issue award to be final. *First State Ins. Co. v. Nationwide Mut. Ins. Co.,* 2014 WL 5342609, at *4 (D. Mass. Oct. 21, 2014) ("the evidence shows no such understanding here" that there was a "final award"); *Seneca Nation of Indians v. New York*, 420 F. Supp. 3d 89, 100 (W.D.N.Y. 2019), *aff'd*, 988 F.3d 618 (2d Cir. 2021) ("the parties expressly agreed that the panel's liability determination would be a final award only if the panel found no liability, which it did not" (emphasis in original)).

pre- and post-judgment interest calculation and an award of attorney's fees, neither of which are related in any way to the Petition or Amended Petition. Petitioners' argument that the "interest calculations are inseparably intertwined with the underlying dispute, as the calculation of interest will determine the true sum to be recouped," Opp. at 12, is meritless under the facts and law. As *Fradella* held, even base damages are *not* inseparable from liability. 183 F.3d 17, 19 (1st Cir. 1999) (finding an award does not lack finality "even though the arbitrators purport to retain jurisdiction in the event the need arises to resolve some subsidiary matter, such as damages or backpay calculations"). Accordingly, the time period to challenge began when the Partial Final Award was issued and resolved all issues of liability and jurisdiction. *See* Opp. at 12 (recognizing that "a partial award may start the clock when all that remains to be decided are ancillary and ministerial matters.").

Alternatively, as Petitioners have acknowledged, "a partial award starts the clock when there is an explicit agreement by the parties to bifurcate the proceedings." Opp. at 11. Here, the parties' filings in the Arbitration after the Partial Final Award clearly show that they intended and understood that the proceedings would be bifurcated. *Nationwide Mut. Ins. Co. v. First State Ins. Co.*, 213 F. Supp. 2d 10, 16 (D. Mass. 2002) (citing *Providence Journal Co. v. Providence Newspaper Guild*, 271 F.3d 10, 15 (1st Cir. 2001)) ("the parties' intent to bifurcate could be implied from the parties' actions, even though the parties never formally bifurcated the arbitration"). Rather than object to the Arbitrator's decision to bifurcate, the parties agreed with the Arbitrator's schedule and submitted briefing on the open collateral issues. Opp. Exs. 24-27 (briefing on interest and fees). Therefore, to the extent this Court even considers the matter of interest and attorney's fees to be "substantive" issues, the parties agreed to bifurcate the proceeding such that the clock started with the Partial Final Award. *See Hart Surgical*, 244 F.3d

at 235 (holding that a district court may confirm or vacate a partial award when "[b]oth the parties and the [arbitrator] . . . understood the determination of liability to be a final award").

Finally, in a clear last-ditch attempt to stop the clock from starting with the Partial Final Award, Petitioners suggest that doing so would not only "punish" them, but also would be "woefully inefficient" with no "basis in the statute[s]."  Opp. at 13.  Petitioners suggest that they could not have been expected to seek to vacate the Partial Final Award, *id.*, but Petitioners *did* in fact seek to vacate the Partial Final Award.  If Petitioners had decided "to go to court" following any one of the Arbitrator's orders finding jurisdiction over Petitioners, then that court's decision one way or the other would have been the end of Petitioners' jurisdictional challenge saga.  To be clear, if that court agreed, or disagreed, with the Arbitrator's decision finding jurisdiction, Petitioners would not have needed to file its current challenge in this Court.  Finally, despite Petitioners' argument that there is no "basis in the statute[s]" for parties to go to court following an "interim decision," *both* the FAA and MUAA provide avenues for just that:  allowing parties in *pending* arbitrations to make applications to state or federal courts to stay, enjoin, or compel arbitration proceedings based on jurisdictional issues.  *See* M.G.L. c. 251, § 2(b); 9 U.S.C. §§ 4, 16(a)(2).

Accordingly, the Final Award did not extend the time period for Petitioners to challenge the Award, and this Court should therefore dismiss Petitioners' challenge to the Partial Final Award as untimely.

## II.   THE PARTIAL FINAL AWARD AND THE FINAL AWARD SHOULD BE CONFIRMED

Given that Petitioners' Amended Petition should be dismissed as untimely, and the fact that Petitioners failed to raise any legitimate grounds for vacation of the Partial Final Award and/or Final Award, *see generally* Opp. to Motion to Vacate, New Balance requests that the

Court confirm the Partial Final Award and the Final Award pursuant to M.G.L. c. 251, § 11 ("the court shall confirm an award, unless within the time limits hereinafter imposed grounds are urged for vacating or modifying or correcting the award") or 9 U.S.C. § 9 ("the court must grant such an order [confirming the award] unless the award is vacated, modified, or corrected").

## CONCLUSION

For the reasons stated above and in its Motion to Dismiss and Opposition to Motion to Vacate, this Court should grant New Balance's Motion to Dismiss, deny Petitioners' Amended Motion, and grant New Balance's Cross-Motion to Confirm.

Date: May 6, 2021

Respectfully submitted,

NEW BALANCE ATHLETICS, INC.

By its counsel,

*/s/ Mark E. Tully*
Mark E. Tully (BBO# 550403)
Kate E. MacLeman (BBO# 684962)
Dylan Schweers (BBO# 698461)
Goodwin Procter LLP
100 Northern Avenue
Boston, Massachusetts 02210
Tel.: 617.570.1000
Fax.: 617.523.1231
MTully@goodwinlaw.com
KMacLeman@goodwinlaw.com
DSchweers@goodwinlaw.com

## CERTIFICATE OF SERVICE

I, Mark E. Tully, certify that a copy of the foregoing document, filed through the CM/ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on May 6, 2021.


Dated: May 6, 2021                              */s/ Mark E. Tully*
                                                Mark E. Tully

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| RODRIGO RIBADENEIRA and SUPERDEPORTE PLUS PERU S.A.C., | * * * * | |
| Petitioners, | * * | |
| v. | * * | Civil Action No. 21-cv-10173-ADB |
| NEW BALANCE ATHLETICS, INC., | * * * | |
| Respondent. | * * | |

**MEMORANDUM AND ORDER**

BURROUGHS, D.J.

On August 20, 2020, a single arbitrator appointed by the International Centre for Dispute Resolution issued a "Partial Final Award," resolving several tort and contract claims in favor of respondent New Balance Athletics, Inc. ("New Balance" or "Respondent") and against Petitioners Rodrigo Ribadeneira ("Ribadeneira") and Superdeporte Plus Peru S.A.C. ("Superdeporte," together with Ribadeneira, "Petitioners"). On February 11, 2021, the same arbitrator issued another award in favor of New Balance (the "Final Award," together with the Partial Final Award, the "Awards") that granted New Balance attorney's fees and statutory and contractual interest on amounts owed under the Partial Final Award.

Currently pending before the Court are: (1) Petitioners' amended petition and amended motion to vacate the Awards, [ECF Nos. 20, 21]; (2) Respondent's motion to dismiss the amended petition to vacate the Awards, [ECF No. 26]; and (3) Respondent's cross-motion to confirm the Awards, [ECF No. 27]. For the reasons set forth below, Petitioners' motion is GRANTED and Respondent's motions are DENIED.

# I. BACKGROUND

## A. Factual Background

The following facts, which are largely undisputed, are taken from the parties' submissions and the documents cited therein.

### 1. The Distribution Agreements

Peruvian Sporting Goods S.A.C. ("PSG") was created in late 2009, with Ribadeneira as its majority shareholder.  [ECF No. 20 ¶ 7].  On January 1, 2013, New Balance and PSG entered into a Distribution Agreement (the "Agreement") for the distribution of New Balance's products in Peru.  [Id. ¶ 9; ECF No. 20-1].  Article 21 of the Agreement includes an arbitration clause, which provides that

> [t]he parties agree that any and all disputes (whether in contract or any other theories of recovery) related to or arising out of this Agreement or the relationship, its application and/or termination (including post-termination obligations) shall be settled by final and binding arbitration in accordance with the [United Nations Commission on International Trade Law ("UNCITRAL")] Arbitration Rules.

[ECF No. 20-1 at 26].  The only signatories to the Agreement are New Balance and PSG through their representatives.  [Id. at 28].  Neither Ribadeneira nor Superdeporte signed the Agreement.  See [id.].  The Agreement was set to expire on December 31, 2015, but a provision allowed it to renew automatically for an additional year if no party expressed, in a writing at least sixty days before the expiration date, an intention to let it expire.  [Id. at 7; ECF No. 20 ¶ 11].  Neither party expressed such an intent, and the Agreement automatically renewed until December 31, 2016.  [ECF No. 20 ¶ 11].

Beginning in late 2014 and culminating in 2015, while the Agreement was still in effect, New Balance offered PSG an opportunity to enter into a new and reformed distribution agreement.  [ECF No. 20 ¶ 12].  Around that time, the relationship between PSG and New

Balance was strained because PSG allegedly owed New Balance roughly $800,000 in past due product payments and $420,000 in past due distribution fees.  [ECF No. 20-14 at 13].  New Balance requested that PSG enter into the new agreement through a distinct corporate entity.  [ECF No. 20 ¶ 12].  As a result of that request, PSG planned for Superdeporte, which at that time was a newly formed company, to eventually enter into the new distribution agreement with New Balance.  [Id.].

PSG and New Balance began negotiations for the new contract in mid-2015. [ECF No. 20 ¶ 13].  By January 2016, PSG believed that it had entered into a new agreement with New Balance and that Superdeporte would ultimately replace PSG as the signatory.  [Id.].  New Balance did not share that view, however, and on May 30, 2016, New Balance told PSG and Superdeporte that it did not think any new agreement existed and that it was "reverting back" to the Agreement.  [Id.].  Less than a month later, New Balance provided PSG and Superdeporte with written notice that it was terminating the Agreement on December 31, 2016 and had entered into an agreement with another distributor.  [Id. ¶ 14].

About a month before the Agreement was set to expire, Superdeporte and PSG assigned their rights to any claims against New Balance that arose out of the new, unsigned distribution agreement to Ribadeneira.  [ECF No. 20 ¶ 15; ECF No. 29-3].  In January 2017, Ribadeneira initiated legal proceedings against New Balance in Peru, alleging that New Balance did not fulfill its obligations under the new agreement and was liable for other extracontractual claims relating to its conduct during the negotiations of the new agreement (the "Peru Claims").  [ECF No. 20 ¶ 16].  At Ribadeneira's request, in December 2017, the Peruvian civil court entered an interim order directing New Balance to abstain from using any other company to distribute its products in Peru during the pendency of the proceedings.  [Id. ¶¶ 17–18].  The interim order was

lifted in July 2018, and New Balance was permitted to resume distribution of its products in Peru. [Id. ¶ 19; ECF No. 20-14 at 9].

### 2.    The Underlying Arbitration

On July 31, 2018, New Balance initiated arbitration proceedings against PSG and Ribadeneira (but not Superdeporte), arguing that they had breached the Agreement. [ECF No. 20 ¶ 21; ECF No. 20-2 ¶ 23]. On September 4, 2018, PSG and Ribadeneira responded to the arbitration notice by asserting that the "arbitral tribunal lacks jurisdiction to hear any dispute between [New Balance] and Mr. Ribadeneira or any claims which [New Balance] purports to have in relation to Mr. Ribadeneira" because he was not a party to the Agreement. [ECF No. 20-3 ¶¶ 10–14]. PSG and Ribadeneira also asked the arbitrator to "[d]ismiss all [of New Balance's] claims with respect to Mr. Ribadeneira on the ground that the arbitral tribunal lacks jurisdiction . . . ." [Id. ¶ 35]. About two months later, on October 29, 2018, PSG and Ribadeneira amended their response to the arbitration notice to assert a counterclaim against New Balance, while also maintaining that the arbitrator lacked jurisdiction over Ribadeneira and requesting that all claims against him be dismissed. [ECF No. 20 ¶ 23; ECF No. 20-4].

On December 27, 2018, the arbitrator issued a procedural order recounting the proceedings to date and the next steps. [ECF No. 29-1]. The order explained that a

> [d]iscussion was held [in December 2018] regarding an objection to the tribunal's jurisdiction asserted by [Ribadeneira] on the ground that he is not a party to the 2013 agreement between [New Balance] and [PSG]; that agreement has not been assigned to him; and consequently he is not subject to that agreement's arbitration clause.

[Id. at 2]. The procedural order stated that Ribadeneira sought "a preliminary determination regarding the tribunal's jurisdiction so that, if his objection to the jurisdiction prevails, he may be relieved of the obligation to participate in the defense of the case." [Id.].

On January 25, 2019, New Balance moved to compel the Peru Claims to be brought into the arbitration and argued that those claims were subject to the Agreement's arbitration provision.  [ECF No. 20-5 at 8].  Ribadeneira and PSG opposed the motion on jurisdictional ground and asserted that the arbitrator

> lacks jurisdiction to hear any dispute between [New Balance] and [Ribadeneira] or any claims which [New Balance] purports to have in relation to [Ribadeneira].  It must decline to exercise jurisdiction over any dispute relating to [Ribadeneira], who does not consent to arbitrate these disputes with New Balance.  It also lacks jurisdiction to hear the separate and distinct claims that [Ribadeneira] has filed against New Balance in the Peru [Claims].

[ECF No. 20-6 ¶ 18].  They ultimately asked the arbitrator to "[d]ismiss all [of New Balance's] claims with respect to Mr. Ribadeneira on the ground that the arbitral tribunal lacks jurisdiction with respect to a dispute between [New Balance] and Mr. Ribadeneira."  [Id. ¶ 33].  Despite PSG and Ribadeneira's protest, the arbitrator granted the motion to compel arbitration on March 18, 2019 and added the Peru Claims to the arbitration.  [ECF No. 20-7].  The arbitrator found that he was empowered to make a jurisdictional determination pursuant to Article 23 of the UNCITRAL Rules.[1]  [Id. at 2].

On May 2, 2019, Ribadeneira executed two assignment of rights contracts that transferred his rights to proceed against New Balance back to PSG and Superdeporte.  [ECF No. 20 ¶ 20; ECF No. 29-4].  On May 3, 2019, New Balance amended the notice of arbitration to add (1)

---

[1] Article 23 states that

> [t]he arbitral tribunal shall have the power to rule on its own jurisdiction, including any objections with respect to the existence or validity of the arbitration agreement.  For that purpose, an arbitration clause that forms part of a contract shall be treated as an agreement independent of the other terms of the contract.  A decision by the arbitral tribunal that the contract is null shall not entail automatically the invalidity of the arbitration clause.

[ECF No. 29-7 at 18].

Superdeporte as a respondent; and (2) a claim that Ribadeneira, Superdeporte, and PSG tortiously interfered with New Balance's agreement with its new distributor by seeking the interim order in the Peruvian courts. [ECF No. 20-8 at 6, 9–11]. Ribadeneira, Superdeporte, and PSG opposed this amended notice and asked the arbitrator to declare that he lacked jurisdiction to hear all the claims with respect to Ribadeneira and the "claim regarding alleged damages suffered arising from Mr. Ribadeneira's request for interim measures in Peru." [ECF No. 29-5 at 8].

On May 31, 2019, Ribadeneira, Superdeporte, and PSG moved for summary disposition, requesting, in part, that the arbitrator declare that he did not have jurisdiction over Ribadeneira or the tortious interference claim. [ECF No. 20-9 ¶¶ 24–26]. The arbitrator denied the motion, reiterated that he had jurisdiction over the Peru Claims, and found that he had jurisdiction over the tortious interference claim because it arose from the Peru Claims. [ECF No. 20-10 at 5, 12]. He deferred ruling on his jurisdiction over New Balance's claim for breach of the Agreement against Ribadeneira until further discovery into whether Ribadeneira had pierced the corporate veil. [Id. at 12–13].

After discovery closed, Ribadeneira, Superdeporte, and PSG moved for summary disposition again, contending that the arbitrator did not have jurisdiction over Ribadeneira or Superdeporte with respect to New Balance's claims under the Agreement. [ECF No. 20-11 ¶¶ 2–3]. Petitioners explicitly maintained their objection to the arbitrator's ruling that Ribadeneira was subject to the tribunal's jurisdiction with respect to any claim, stating that they

> respectfully continue to object to this Tribunal's ruling regarding its jurisdiction over Mr. Ribadeneira with respect to New Balance's tortious interference claim, as well as any other claim being pursued by New Balance against him, and maintain that Mr. Ribadeneira should not be a part of this proceeding. Mr. Ribadeneira continues to assert that this Tribunal has no basis to assert any jurisdiction over him, and he files this Renewed Motion under that reservation of rights and without

in any way waiving his rights or arguments in relation to this Tribunal's lack of jurisdiction over him.  But for purposes of the Renewed Motion, [Petitioners] focus only on the issue of whether this Tribunal has jurisdiction over Mr. Ribadeneira and Superdeporte with respect to New Balance's claim arising under the [Agreement].

[Id. ¶ 2 n.1].

At the arbitration hearing, Ribadeneira, Superdeporte and PSG reiterated that the arbitrator had no jurisdiction over Ribadeneira or Superdeporte with respect to the claims arising under the Agreement.  [ECF No. 20-12 at 2 (arguing Ribadeneira did not pierce the corporate veil and Superdeporte was not a successor to PSG)].  In their post-hearing briefs, Ribadeneira, Superdeporte, and PSG again argued that the arbitrator had no jurisdiction over Ribadeneira or Superdeporte with respect to claims arising from the Agreement, [ECF No. 20-13 ¶¶ 115–39], but the brief does not discuss jurisdiction over the tortious interference claim, see [ECF No. 20-13].

On August 20, 2020, the arbitrator issued the Partial Final Award and determined that Superdeporte were liable for breaching the Agreement as PSG's "business successor."  [ECF No. 20-14 at 24–26].  Ribadeneira was found not liable for any breach of the Agreement because there was insufficient evidence to demonstrate that he had pierced the corporate veil.  [Id. at 23–24].  On the tortious interference claim, the arbitrator found that Ribadeneira, Superdeporte, and PSG all employed improper means to restrain New Balance's sales by filing the lawsuit in the Peruvian courts.  [Id. at 23].

On September 17, 2020, Ribadeneira, Superdeporte and PSG moved for a correction and interpretation of the Partial Final Award, and/or the issuance of an additional award, based on their objection to the arbitrator's exercise of jurisdiction over Ribadeneira and Superdeporte.  [ECF No. 20-15 at 8–11].  The arbitrator denied the motion on November 4, 2020 and stated that

he "exercised jurisdiction with respect to Superdeporte by imposing joint liability on that company (together with PSG) for amounts owed under the 2013 distribution agreement based on [his] finding that it is the business successor to PSG," and, with regards to the tortious interference claim, he "exercised jurisdiction over Ribadeneira and Superdeporte" after concluding "that each is liable (together with PSG) . . . because the Peru [C]laims, so-called, from which that interference arose were pursued by Ribadeneira pursuant to assignments of those claims by PSG and Superdeporte."  [ECF No. 20-16 at 4].

The arbitrator issued the Final Award on February 11, 2021, which reiterated his rulings on the jurisdictional arguments and also determined that New Balance was entitled to attorney's fees, as well as statutory and contractual interests on the amount due under the Partial Final Award.  [ECF No. 20-17 at 8–9].

### B.    Procedural Background

Petitioners filed their initial petition to vacate, and corresponding motion to vacate, on February 1, 2021.  [ECF Nos. 1, 2].  After the Final Award was issued, Petitioners filed an amended petition to vacate and motion to vacate on February 22, 2021.  [ECF Nos. 20, 21].  New Balance opposed the amended motion to vacate on March 8, 2021 and filed motions to dismiss the petition and confirm the award.  [ECF Nos. 26, 27, 29].  Petitioners opposed New Balance's motions and filed their reply in support of the amended motion to vacate on April 7, 2021.  [ECF Nos. 34, 35].  On May 6, 2021, New Balance filed its reply in support of its motions to dismiss and confirm.  [ECF No. 36].

## II.    NEW BALANCE'S MOTION TO DISMISS

New Balance moves to dismiss the amended petition to vacate the Awards because the petition is untimely, under either the Federal Arbitration Act ("FAA") or the Massachusetts

Uniform Arbitration Act ("MUAA"), and consequently, Petitioners have waived any opportunity to challenge the Awards.  [ECF No. 28 at 9–14].  Petitioners counter that the FAA applies here and its ninety-day period for challenging the Awards did not begin to run until the Final Award was issued on February 11, 2021, or, at the earliest, when the arbitrator issued his order denying the motion for clarification on November 4, 2020.  [ECF No. 35 at 12–20].

### A. Applicable Law

As a threshold matter, the parties disagree as to whether the FAA or the MUAA governs the enforcement of the award.  [ECF No. 28 at 6–7; ECF No. 35 at 7–8].  Under the MUAA, parties seeking to vacate an arbitral award must file a petition within thirty days of the award, Mass. Gen. Laws ch. 251, § 12(b), and under the FAA, parties must do so within ninety days, 9 U.S.C. § 12.

New Balance argues that the MUAA's thirty-day limit controls here because the parties agreed that the MUAA, not the FAA, would apply to any claim arising out of the Agreement. [ECF No. 28 at 10].  New Balance points to the arbitration provision's choice-of-law clause, which states that "[t]he arbitrator shall determine the matters in dispute in accordance with the law of the Commonwealth of Massachusetts, USA."  [Id.; ECF No. 20-1 at 26].

In Hall Street Associates. v. Mattel, Inc., the Supreme Court explained that parties may contract around the FAA and "they may contemplate enforcement under state statutory or common law . . . ."  552 U.S. 576, 590 (2008).  Although the parties may contract around the FAA, "it may be displaced by state law (if at all) only if the parties have so *agreed explicitly*." Ortiz-Espinosa v. BBVA Sec. of P.R., Inc., 852 F.3d 36, 42 (1st Cir. 2017) (emphasis added). By its plain language, the arbitration provision's choice-of-law clause refers only to the law the arbitrator will apply when deciding matters in dispute and does not demonstrate that the parties

explicitly agreed to displace the FAA on matters of award enforcement and vacatur when challenges are raised in a court rather than in an arbitral tribunal. See id. at 42 (applying the FAA when "[c]laimants have not pointed to any language in their arbitration agreement indicating that the parties intended that state law would govern vacatur of the arbitration award"). Accordingly, in the absence of an explicit agreement to displace it, the FAA and its ninety-day deadline apply here.

### B.    Timeliness

The parties also dispute when the ninety-day clock started to run. New Balance argues that the petition to vacate is still untimely even if the FAA applies because it should have been filed ninety days after the Partial Final Award was issued. [ECF No. 28 at 11–14]. Petitioners argue that the ninety days started on the date that the Final Award was issued or, in the alternative, that the clock did not start until the arbitrator issued his order denying the clarification motion. [ECF No. 35 at 12–20]. The Court agrees that the petition was timely filed because the clock did not begin to run until the Final Award was issued on February 11, 2021.

The First Circuit has explained that

> "[n]ormally, an arbitral award is deemed 'final' provided it evidences the arbitrators' intention to resolve *all* claims submitted in the demand for arbitration." Hart Surgical, Inc. v. Ultracision, Inc., 244 F.3d 231, 233 (1st Cir. 2001) (quoting Fradella v. Patricca, 183 F.3d 17, 19 (1st Cir. 1999)).
>
> . . . Hart Surgical holds that a bifurcated liability judgment may qualify as final when the arbitrating parties have formally agreed to litigate liability and damages in separate, independent stages. Providence Journal Co. v. Providence Newspaper Guild, 271 F.3d 16 (1st Cir. 2001), takes the further step of holding that an informal agreement to that effect will suffice. These cases, in turn, are supported by the Supreme Court's position that the Federal Arbitration Act "lets parties tailor some, even many, features of arbitration by contract, including . . . procedure." Hall Street Assocs., L.L.C. v. Mattel, Inc., 552 U.S. 576, 586 (2008).

Univ. of Notre Dame (USA) in England v. TJAC Waterloo, LLC, 861 F.3d 287, 291 (1st Cir. 2017) (some alterations in original) (some citations omitted).

Here, although the arbitrator issued two awards, there is no evidence of an informal or formal agreement between the parties to bifurcate the proceedings before the arbitrator. The parties do not argue otherwise or point the Court to any such agreement. See [ECF No. 35-1 (procedural order explaining how hearing and briefing will proceed with no mention of a formal agreement to bifurcate proceedings)]. Instead, the record indicates that the arbitrator decided on his own to bifurcate the proceedings by reserving certain issues for a later order and requesting additional briefing after the Partial Final Award was issued. [ECF No. 20-14 at 26–28]. This contrasts with the facts of Providence Journal where the parties informally bifurcated the proceeding by agreeing to divide the hearing into two parts. Providence J. Co., 271 F.3d at 20. Thus, the Court must look to other evidence to determine when the arbitrator resolved all of the claims before him.

The Court finds that the arbitrator did not intend the Partial Final Award to represent the final disposition of all matters before him. In the Final Award, the arbitrator unambiguously held that "[t]his award is in full settlement of all claims and counterclaims submitted to this Arbitration." [ECF No. 20-17 at 9]. The Partial Final Award, in contrast, contains no such language, and specifically states that the arbitrator "retain[s] jurisdiction and re-open[s] the hearings for written submissions as ordered . . . ." [ECF No. 20-14 at 28]. Matters of significant costs remained to be decided after the Partial Final Award was issued, which necessitated additional briefing. Further, in his order on the motion for clarification and the Final Award, the arbitrator refers to the Partial Final Award as a "preliminary award." [ECF No. 20-16 at 2–5; ECF No. 20-17 at 2].

To be sure, New Balance is correct that some facts suggest that Petitioners may have understood the Partial Final Award to be final. [ECF No. 28 at 13–14]. Most notably,

Petitioners filed their initial petition to vacate several weeks before the Final Award was even issued and challenged only the Partial Final Award.  [ECF No. 1].  But these facts, which go to Petitioners' understanding, are not sufficient to demonstrate the arbitrator's "intention to resolve *all* claims submitted in the demand for arbitration" in light of the evidence to the contrary.  Univ. of Notre Dame (USA) in England, 861 F.3d at 291 (quoting Hart Surgical, 244 F.3d at 233).

In sum, the ninety-day deadline began to run on the day that the arbitrator issued the Final Award.  Accordingly, the amended petition to vacate was timely filed under the FAA's ninety-day deadline, and New Balance's motion to dismiss the amended petition is DENIED.

### III.  PETITIONERS' MOTION TO VACATE THE AWARDS

Petitioners move to vacate the Awards pursuant to 9 U.S.C. § 10(a)(4) because the arbitrator exceeded his powers and acted outside the scope of his authority when he determined that he had jurisdiction over them.  [ECF No. 22 at 12–13].

#### A.  Standard of Review

The Court must first decide what standard of review applies to Petitioners' challenge to the arbitrator's authority.  Petitioners argue that the Court must review the arbitrator's rulings on his jurisdiction de novo, [ECF No. 22 at 13–15], while New Balance advocates for the extremely deferential review that arbitral awards are typically afforded, [ECF No. 29 at 20–27].

The Supreme Court addressed the scope of the district court's review in First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938 (1995).  In that case, First Options, a firm that cleared stock trades, and MK Investments, Inc., an investment firm, entered into an agreement that contained an arbitration clause.  Id. at 940.  After MK Investments, Inc. lost $1.5 million, First Options demanded immediate repayment of MK Investments, Inc.'s debts and insisted that Manuel Kaplan, the sole owner of MK Investments, Inc. and his wife, Carol Kaplan, personally

pay for any deficiency.  Id.  When the debt was not repaid, First Options pursued arbitration with

MK Investments, Inc. and the Kaplans, even though the Kaplans had never personally signed the

operative agreement.  Id. at 941.  The Kaplans filed written objections regarding their non-

signatory status with the arbitration panel, but the panel determined it had jurisdiction and ruled

in favor of First Options.  Id.  The Kaplans sought review in the district court and the court

confirmed the award.  Id.  Eventually the case was appealed to the Supreme Court, which held,

*inter alia*, that if

> the parties agree[d] to submit the arbitrability question itself to arbitration[,] . . .
> then the court's standard for reviewing the arbitrator's decision about *that* matter
> should not differ from the standard courts apply when they review any other
> matter that parties have agreed to arbitrate.  That is to say, the court should give
> considerable leeway to the arbitrator, setting aside his or her decision only in
> certain narrow circumstances.  *If, on the other hand, the parties did <u>not</u> agree to
> submit the arbitrability question itself to arbitration, then the court should decide
> that question just as it would decide any other question that the parties did not
> submit to arbitration, namely, independently.*  These two answers flow inexorably
> from the fact that arbitration is simply a matter of contract between the parties; it
> is a way to resolve those disputes—but only those disputes—that the parties have
> agreed to submit to arbitration.

Id. at 943 (second emphasis added) (citations omitted); see also Oxford Health Plans LLC v.

Sutter, 569 U.S. 564, 569 n.2 (2013) ("A court may therefore review an arbitrator's

determination of [arbitrability] *de novo* absent 'clear[ ] and unmistakabl[e]' evidence that the

parties wanted an arbitrator to resolve the dispute." (first alteration added) (quoting AT & T

Techs., Inc. v. Commc'ns Workers of Am., 475 U.S. 643, 649 (1986))).  Therefore, unless there

is "clear and unmistakable" evidence that the parties agreed to submit the issue of arbitrability to

the arbitrator, the Court must review arbitrability independently and without deference to the

arbitrator's findings.  First Options of Chicago, Inc, 514 U.S. at 943; Awuah v. Coverall N. Am.,

Inc., 703 F.3d 36, 41 (1st Cir. 2012).  "The clear and unmistakable evidence standard is

demanding." Patton v. Johnson, 915 F.3d 827, 835 (1st Cir. 2019) (internal quotation marks omitted).

Petitioners' conduct during arbitration can provide proof that they submitted the arbitrability question to the arbitrator. Patton, 915 F.3d at 835 ("[T]he language of the contract is not always the exclusive source of relevant information; the parties' conduct also may herald an agreement to arbitrate the question of arbitrability."). New Balance contends that Petitioners asked the arbitrator to decide the arbitrability question at least nine times, which shows "clear and unmistakable" evidence that the parties submitted the arbitrability question to the arbitrator. [ECF No. 29 at 7, 20–27]. Petitioners frame their conduct as objecting to the arbitrator's jurisdiction at essentially every stage of the arbitration rather than consenting to him deciding the issue. [ECF No. 34 at 7–11]. It is undisputed that Petitioners raised the issue of the arbitrator's jurisdiction in many of their arbitration filings. As examples, they raised it (1) in response to the arbitration notice; (2) in response to the motion to compel arbitration of the Peru Claims; (3) in both motions for summary disposition; (4) in the post-hearing briefing; and (5) in the motion for clarification. The Supreme Court made clear in First Options, however, that "merely arguing the arbitrability issue to an arbitrator does not indicate a clear willingness to arbitrate that issue, *i.e.,* a willingness to be effectively bound by the arbitrator's decision on that point" and that a party "forcefully objecting" to an arbitrator deciding the parties' dispute leads to the conclusion that the party "did *not* want the arbitrator[] to have binding authority over them." 514 U.S. at 946 (emphasis in original).

Like the Kaplans in First Options, Petitioners' continued challenges and objections to the arbitrator's jurisdiction over them shows that they did not want to be bound by the arbitrator's decision on arbitrability. Although Petitioners asked the arbitrator to make rulings on

arbitrability and to dismiss claims against them, this alone is not clear and unmistakable evidence

that they intended or agreed to be bound by the arbitrator's findings on arbitrability.  At most,

Petitioners' actions demonstrate ambiguity regarding their intent to have the arbitrator decide the

arbitrability question, and ambiguity alone cannot meet the demanding standard.  First Options

of Chicago, Inc., 514 U.S. at 944–45 ("[T]he law treats silence or ambiguity about the question

who (primarily) should decide arbitrability differently from the way it treats silence or ambiguity

about the question whether a particular merits-related dispute is arbitrable because it is within the

scope of a valid arbitration agreement—for in respect to this latter question the law reverses the

presumption" (internal quotation marks omitted)); see also ConocoPhillips, Inc. v. Loc. 13-0555

United Steelworkers Int'l Union, 741 F.3d 627, 631–33 (5th Cir. 2014) (interpreting First

Options to stand for the proposition that a party's silence and ambiguity do not demonstrate a

clear willingness to have an arbitrator decide the arbitrability question). [2]

---

[2] The Court also disagrees with New Balance's contention that Superdeporte waived any
challenge to the arbitrator's jurisdiction by not raising the argument below.  [ECF No. 29 at
28–29].  Superdeporte, after it was added to the arbitration in May 2019, first argued that the
arbitrator had no jurisdiction over it with regards to the tortious interference claim and then, after
the close of discovery but before the hearing, argued that the arbitrator had no jurisdiction to
decide claims stemming from the Agreement because it was not a party to the Agreement.  New
Balance fails to cite to any case law to support its proposition that a party waives its right to
challenge jurisdiction when it objects to the arbitrator's jurisdiction prior to the hearing, even if
that objection comes after the close of discovery.  The cases New Balance cites all involve
circumstances where the arbitrability arguments were raised much later in the proceedings.  See
Turner Fisheries, Inc. v. Seafood Workers Union, 471 N.E.2d 770, 772 (Mass. App. Ct. 1984)
("No objection was raised by Turner at the time of the hearing, and it was too late to raise it for
the first time before the Superior Court in its application to vacate the award.");  Time Warner
Cable of New York City LLC v. Int'l Bhd. of Elec. Workers, 170 F. Supp. 3d 392, 417
(E.D.N.Y. 2016) ("[The party] only challenged the arbitrator's authority after the arbitration
record was closed and an unfavorable interim award had been issued against it.");  Fortune,
Alsweet & Eldridge, Inc. v. Daniel, 724 F.2d 1355, 1356–57 (9th Cir. 1983) (party attended first
part of the hearing and raised arguments, but then halfway through the hearing objected to
arbitrator's authority);  Teamsters Loc. Union No. 764 v. J.H. Merritt & Co., 770 F.2d 40, 42 (3d
Cir. 1985) ("[W]e agree with the district court that [defendant] waived its right to contest the

New Balance primarily relies on the First Circuit's opinion in Patton v. Johnson to demonstrate that Petitioners clearly and unmistakably submitted the arbitrability question to the arbitrator.  See [ECF No. 29 at 22, 26].  Patton has a complicated procedural history.  In that case, the appellant, a lawyer, sought to compel his former clients to arbitrate tort claims, including a claim for legal malpractice.  Patton, 915 F.3d at 830.  At the start of their relationship, the clients and the law firm executed an attorney representation agreement (the "ARA") that contained a three-paragraph arbitration provision.  Id. at 831.  Those three paragraphs had separate lines for the clients to initial.  Id.  Although the clients signed the ARA, they did not separately initial or otherwise acknowledge the arbitration paragraphs.  Id.  After the attorney-client relationship deteriorated, the law firm initiated arbitration against one of the clients.  Id.  The appellant-lawyer was not a party to that arbitration.  Id.  In the arbitration, the client challenged the law firm's right to arbitrate and argued that his failure to initial the arbitration paragraphs meant that they had no effect.  Id.  The arbitrator agreed that the ARA did not contain a valid and enforceable agreement to arbitrate.  Id.

After the first arbitration was resolved, the appellant-lawyer, relying on the ARA, sought to compel the same client to arbitrate with him.  Patton, 915 F.3d at 831–32.  The district court held that the lawyer was barred from compelling arbitration due to principles of collateral estoppel, which stemmed from the previous arbitrator's finding that the arbitration provision in the ARA was unenforceable.  Id. at 832.  On appeal, the appellant-lawyer argued that the first arbitrator did not have jurisdiction to decide the arbitrability issue because the parties did not

---

Board's jurisdiction in district court by failing to raise its jurisdictional objection before the Board.").

submit the arbitrability question to the arbitrator. <u>Id.</u> at 834. The First Circuit rejected this argument because the facts showed that all of the parties to the first arbitration had submitted the arbitrability issue to the arbitrator. <u>Id.</u> at 835. The "clear and unmistakable evidence" included that: (1) the law firm took the "unequivocal position" that the arbitrator had the authority to adjudicate the validity and existence of the agreement; (2) all parties had "submitted briefs to the arbitrator on the issue of whether the claims asserted were arbitrable at all"; (3) "no one [had] questioned the arbitrator's authority to decide that issue"; and (4) no party had moved to vacate the arbitrator's decision. <u>Id.</u> at 835.

 <u>Patton</u> does not compel a finding that Petitioners submitted the arbitrability question because many of the factors that the First Circuit found persuasive in that case are absent here. While it is true that Petitioners briefed the issue of the arbitrator's jurisdiction over them, in <u>Patton</u>, the law firm, who employed the appellant-lawyer, unequivocally represented that the arbitrator had the authority to decide the arbitrability issue and there appears to have been no dispute among the parties on that point. There has been no such "unequivocal" concession made in this case. As explained previously, Petitioners' stance in the arbitration was at most ambiguous. Further, unlike here, none of the parties to the <u>Patton</u> arbitration ever moved to vacate the arbitrator's decision.[3]

---

[3] New Balance also asserts in a footnote that the Agreement itself is the requisite clear and unmistakable evidence because the Agreement's arbitration clause states that all proceedings will be governed by the UNCITRAL Rules, which allow the arbitrator to decide his own jurisdiction. [ECF No. 29 at 22 n.9]. Although the Agreement incorporates the UNCITRAL Rules, which designate questions of arbitrability to the arbitrator, Petitioners did not sign the Agreement. The terms of a contract that they never signed cannot provide clear and unmistakable proof that Petitioners agreed to arbitrate arbitrability. <u>See</u> <u>PaineWebber Inc. v. Elahi</u>, 87 F.3d 589, 599 (1st Cir. 1996) ("[C]ertainly a party who did not sign the agreement did not consider who should decide arbitrability."). New Balance cites to the First Circuit's analysis in <u>Apollo Computer, Inc. v. Berg</u>, 886 F.2d 469 (1st Cir. 1989), for support, but that case determined whether a

Finally, New Balance asserts that Petitioners should have sought a stay of the arbitration

or moved to vacate the jurisdictional findings before the arbitration ended.  [ECF No. 29 at 26].

Petitioners' decision to object to arbitrability, rather than to seek a stay of the arbitration, does

not mean they forfeited their challenge and also does not indicate a clear and unmistakable

decision to arbitrate arbitrability.  Shank/Balfour Beatty, a Joint Venture of M.L. Shank, Co.,

Balfour Beatty Constr. v. Int'l Bhd. Of Elec. Workers Loc. 99, 497 F.3d 83, 90 n.2 (1st Cir.

2007) ("[Plaintiff] did not waive its right to challenge arbitrability by participating in the hearing

on the merits after it raised the arbitrability issues before the arbitrator and the arbitrator ruled

against the company. . . .[Plaintiff] had no obligation to seek a stay of arbitration in court . . . ."

(citations omitted)).

Because Petitioners did not clearly and unmistakably agree to arbitrate arbitrability, the

Court must independently decide whether they were bound to arbitrate under the Agreement.

### B.      Were Petitioners Subject to the Agreement's Arbitration Clause?

New Balances argues that, even when reviewed de novo, the evidence shows that

Petitioners are bound by the Agreement's arbitration clause.

First, New Balance asserts that the broadly worded arbitration clause encompasses all

claims arising out of the Agreement, which includes all of the claims raised in the underlying

arbitration.  [ECF No. 29 at 29–30].  As the cases cited by New Balance show, the broad

language of the clause is relevant when all parties are signatories to the contract, but that is not

---

non-signatory could bind a signatory to an arbitration agreement that incorporated the American
Arbitration Association's Rules.

the case here.[4]  The arbitration clause's broad scope is not sufficient to require non-signatories to

participate in an arbitration absent other evidence showing that they are subject to the arbitration

agreement.  Cf. Walker v. Collyer, 9 N.E.3d 854, 860 (Mass. App. Ct. 2014) (finding that a

broad arbitration clause did not indicate a party's intent to be bound to an arbitration agreement

when party did not "personally [sign the agreement]"); Oehme, van Sweden & Assocs., Inc. v.

Maypaul Trading & Servs. Ltd., 902 F. Supp. 2d 87, 97 (D.D.C. 2012) ("A signatory to a

contract has clearly and unmistakably agreed to its terms, but that is not necessarily true of a

nonsignatory.").

Second, New Balance contends that Petitioners are required to abide by the arbitration

clause under the theories of assumption and equitable estoppel.  [ECF No. 29 at 31].  The parties

agree that the question of whether a non-signatory can be bound by the arbitration agreement is

governed by Massachusetts law, and that Massachusetts law provides "six theories for binding

nonsignatories to arbitration agreements: (1) incorporation by reference; (2) assumption;

(3) agency; (4) veil-piercing/alter ego; (5) equitable estoppel, and (6) third-party beneficiary."

Machado v. System4 LLC, 28 N.E.3d 401, 408 (Mass. 2015) (footnotes omitted); [ECF No. 29 at

30–31; ECF No. 34 at 15].[5]

---

[4] Accordingly, the cases New Balance cites are inapposite because they do not involve situations
where a signatory seeks to compel a non-signatory to arbitrate.  Acevedo Maldonado v. PPG
Indus., Inc., 514 F.2d 614, 615 (1st Cir. 1975) (dispute stemming from a contract between two
parties); Weiss v. Atholl, No. 963679, 1998 WL 1184150, at *1 (Mass. Super. Ct. Dec. 28, 1998)
(arbitration clause was in an employment agreement between the two parties); Next Step Med.
Co. v. Johnson & Johnson Int'l, 619 F.3d 67, 69, 72 (1st Cir. 2010) (arbitration clause was part
of a business contract which, by its terms, specifically applied to all parties in the litigation);
Com. v. Philip Morris Inc., 864 N.E.2d 505, 507 (Mass. 2007) (arbitration clause in settlement
agreement between the parties); Carpenter v. Pomerantz, 634 N.E.2d 587, 588 (Mass. App. Ct.
1994) (arbitration clause in employment agreement between the parties).

[5] Although the parties agree that Massachusetts law applies, the parties also cite to federal cases
that interpret and apply federal common law principles of contract and agency.  The theories of

"Under an 'assumption'" theory, 'a party may be bound by an arbitration clause if its subsequent conduct indicates that it is assuming the obligation to arbitrate,' despite being a nonsignatory." Machado, 28 N.E.3d at 408 n.10 (quoting Thomson-CSF, S.A. v. Am. Arb. Ass'n, 64 F.3d 773, 777 (2d Cir. 1995)). In Thomson,[6] the Second Circuit found it significant that the non-signatory "explicitly disavowed any obligations arising out of the [agreement] and filed [an] action seeking a declaration of non-liability under the [a]greement," and ultimately concluded that, under those facts, the non-signatory did not assume "the obligation to arbitrate." 64 F.3d at 777. Similar to the non-signatory in Thomson, both Ribadeneira and Superdeporte have continually objected to and challenged their participation in the arbitration and any obligations under the Agreement. Thus, Petitioners have not assumed an obligation to arbitrate.

Despite evidence of Petitioners' unwillingness to assume the arbitration obligation, New Balance argues that Superdeporte is PSG's successor and therefore assumed its obligations under the Agreement. [ECF No. 29 at 33–35]. Although New Balance has identified evidence that may indicate that Superdeporte is a successor to PSG's distribution obligations in Peru, it has not put forth evidence to counter the fact that Superdeporte has consistently tried to distance itself from the Agreement's arbitration obligations. Whether Superdeporte is PSG's successor may ultimately be relevant to Superdeporte's liability for any tort or contract claims, but, without

---

non-signatory liability under federal common law are substantially similar to those under Massachusetts law, and Massachusetts courts have relied on federal cases interpreting federal law. E.g., Walker, 9 N.E.3d at 859 ("Multiple Federal Circuit Courts of Appeals have addressed the question whether a signatory can compel a nonsignatory to arbitrate. We find these cases persuasive and adopt their approach here."). The Court has considered all of the case law cited by the parties and finds that the outcome here would be the same under either state or federal law.

[6] The Massachusetts Supreme Judicial Court relied on Thomson when outlining the six theories of non-signatory liability. Machado, 28 N.E.3d at 408 n.9–n.10, n.12.

more, it is not a basis for finding that a non-signatory is bound by an arbitration clause. See Machado, 28 N.E.3d at 408 (listing the six theories courts have recognized for binding non-signatories).

New Balance argues that Ribadeneira was assigned PSG and Superdeporte's rights to litigate under the Agreement and therefore assumed the obligation to arbitrate. [ECF No. 29 at 32]. The plain language of the assignments, however, shows that Ribadeneira was assigned claims related to the new and ultimately unexecuted contract, not the Agreement.[7] New Balance has not explained how Ribadeneira can be subject to the Agreement's arbitration provision by virtue of being assigned rights relating to failed negotiations for a different contract.

Under the theory of equitable estoppel, a signatory can compel a non-signatory to abide by an arbitration clause when a "nonsignatory party receiv[es] a direct benefit from an arbitration

---

[7] PSG's assignment clause states:

> During 2015 and 2016, [PSG] held negotiations with [New Balance] in order to celebrate a Distribution Contract to import, sell and distribute sports products in the territory of Peru. However, once the contractual terms were agreed and the contract ready to be executed, [New Balance] informed [PSG] that it will work with another partner in Peru, arising a dispute between the parties. . . . [PSG] . . . transfers without valuable considerations to [Ribadeneira] all its rights in attention to the dispute mentioned before against [New Balance] . . . .

[ECF No. 29-3 at 8]. Superdeporte's assignment clause states:

> During 2016, [Superdeporte] was organized due to the negotiations that the founders held with [New Balance] in order to celebrate a Distribution Contract to import sell and distribute sports products in the territory of Peru. However, once the contractual terms were agreed and the contract ready to be executed[,] [New Balance] informed [Superdeporte] that it will work with another partner in Peru, arising a dispute between the parties. . . . [Superdeporte] . . . transfers without valuable considerations to [Ribadeneira] all their rights in attention to the dispute mentioned before against [New Balance].

[Id. at 9].

agreement." <u>Walker</u>, 9 N.E.3d at 861 (citing <u>Thomson–CSF</u>, 64 F.3d at 778); <u>see also</u> <u>Ouadani v. TF Final Mile LLC</u>, 876 F.3d 31, 38 (1st Cir. 2017) (explaining that when a signatory seeks to bind a non-signatory "estoppel has been limited to cases '[that] involve non-signatories who, during the life of the contract, have embraced the contract despite their nonsignatory status but then, during litigation, attempt to repudiate the arbitration clause in the contract.'" (alteration in original) (quoting <u>InterGen N.V. v. Grina</u>, 344 F.3d 134, 146 (1st Cir. 2003))).[8]

New Balance argues that Ribadeneira is estopped from disavowing the arbitration clause because he brought suit against New Balance in Peruvian court for breach of the Agreement. [ECF No. 29 at 32–33]. Similar to its assumption argument, New Balance relies on the fact that PSG and Superdeporte assigned rights to Ribadeneira, which allowed him to bring the Peru Claims. [<u>Id.</u>]. But, as explained above, those assignments related to the new contract, not the Agreement, and the right to bring the Peru Claims was not a direct benefit from the Agreement.

New Balance contends that Superdeporte is estopped because it asserted a counterclaim against New Balance for breach of the Agreement and sought $10 million in damages. [ECF No. 29 at 35]. Setting aside whether raising a counterclaim in an arbitration even demonstrates that Superdeporte embraced the Agreement, only PSG, not Superdeporte sought damages for breach of the Agreement. [ECF No. 29-6 at 30–36 (explicitly referring to the counterclaim that "New Balance breached its obligations under the [Agreement] and the implied covenant of good faith and fair dealing" as "PSG's counterclaim" and arguing that PSG, not Superdeporte, suffered

---

[8] Another form of estoppel allows a non-signatory to compel a signatory to arbitrate a dispute when "(a) the nonsignatory has a close relationship with a signatory and (b) the underlying issues for arbitration are intertwined with an agreement the estopped party has actually signed." <u>Walker</u>, 9 N.E.3d at 861 (citing <u>Thomson–CSF</u>, 64 F.3d at 779). The cases establishing this form of estoppel limit its use to circumstances where a non-signatory wants to compel a signatory to arbitrate, <u>id.</u> at 863, and thus this theory is not available to New Balance in this case.

damages on account of that breach)]. Because the counterclaims that Superdeporte raised did not arise out of the Agreement, its decision to assert those counterclaims is not evidence of a direct benefit from the Agreement.

Because the Court finds that Petitioners are not subject to the Agreement's arbitration provision, their motion to vacate the Awards is <u>GRANTED</u>, and New Balance's cross-motion to confirm the Awards is <u>DENIED</u>.

## IV. CONCLUSION

Accordingly, (1) Petitioners' amended motion to vacate the Awards, [ECF No. 21], is <u>GRANTED</u>, and (2) Respondent's motion to dismiss the amended petition to vacate the Awards, [ECF No. 26], and cross-motion to confirm the Awards, [ECF No. 27], are <u>DENIED</u>.

**SO ORDERED.**

September 27, 2021                                     /s/ Allison D. Burroughs
                                                       ALLISON D. BURROUGHS
                                                       U.S. DISTRICT JUDGE